# EXHIBIT 34
# [Filed Under Seal]

| From: | Owen, Steve [Steve.Owen@cca.com] |
|---|---|
| Sent: | 4/29/2013 6:14:18 AM |
| To: | Brandon Lausch (blausch@temple.edu) [blausch@temple.edu] |
| CC: | Simon Hakim [shakim@temple.edu]; Erwin A. Blackstone (eblackst@temple.edu) [eblackst@temple.edu] |
| Subject: | Cost Study - Release/Media Distribution |
| Attachments: | Cost Analysis of Public and Contractor-Operated Prisons FINAL.pdf; Lay Audience Executive Summary_FINAL.pdf; QA (2).docx; Cost Study_Media Distribution List_Temple.xlsx |

Good morning, Brandon. Attached are copies of the final study and the lay audience executive summary (both in PDF for external distribution). I've also attached a copy of the targeted media distribution list (broken down by state) to assist you with pitching. You'll note that we did not include Pennsylvania, as we assume that you all would know best whom to share with in your home state. I've also attached a copy of a Q&A document for Simon/Erwin to assist them with anticipated questions they might get from media. We hope this is helpful and are happy to assist further if there are additional questions anticipated or received.

**Simon/Erwin** – I would recommend that you all post the PDF of the cost study online midday today, with Brandon then following through with the media distributions. Can you please send an email to Brandon and me to let us know once the study has been posted online?

Gentlemen – congratulations on getting to this point. We greatly appreciate the professionalism, courtesy and integrity with which you have each approached this very important project, and thank you in advance for the remaining steps ahead to release the study and garner awareness to its useful findings. Please let me know if there is anything else you need from us to assist today.

- Steve

**Steven Owen**
**Senior Director, Public Affairs**
**CCA** America's Leader in Partnership Corrections
10 Burton Hills Blvd
Nashville, TN 37215
615.263.3107 *office*
615.308-0044 *cell*
615.263.3090 *fax*
www.cca.com | www.insidecca.com | www.ccacommunities.com

See how CCA is making a difference

(i) This e-mail and any files transmitted with it are confidential and intended solely for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately and delete this e-mail and any associated files from your system. (ii) Views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of Corrections Corporation of America. (iii) The recipient should check this e-mail and any attachments for the presence of viruses. The company accepts no liability for errors or omissions caused by e-mail transmission or any damage caused by any virus transmitted by or with this e-mail. This email has been scanned for content and viruses by the McAfee Email Security System

BLACKSTONE0019100

Working Paper

# Cost Analysis of Public and Contractor-Operated Prisons

April 29, 2013

**Dr. Simon Hakim and Dr. Erwin A. Blackstone**

**Professors of Economics at Temple University**

**Center For Competitive Government**

**Philadelphia, Pennsylvania**

**E-mail: hakim@temple.edu; Erwin.blackstone@temple.edu**

BLACKSTONE0019101

# Contents

Executive Summary ............................................................................................................. 2

1. Introduction .................................................................................................................. 5
2. Model for Estimating the State's Avoidable Costs ...................................................... 5
3. Direct Avoidable Costs for Public Prisons .................................................................. 7
4. Indirect Avoidable Costs for Public Prisons .............................................................. 8
5. Miscellaneous Costs ................................................................................................... 8
6. Capital and Finance Costs .......................................................................................... 9
7. Capital Flexibility Gained by Use of Contractor Operated Prisons ......................... 10
8. Non-Cost Performance Measures ............................................................................. 11
9. Unaccounted Benefits and Costs of Contract Prisons ............................................. 11
10. Discussion of Individual State Costs and Performance ............................................ 12
    Arizona ..................................................................................................................... 13
    California .................................................................................................................. 13
    Florida ...................................................................................................................... 15
    Kentucky................................................................................................................... 17
    Maine ....................................................................................................................... 18
    Mississippi ............................................................................................................... 18
    Ohio.......................................................................................................................... 19
    Oklahoma ................................................................................................................. 20
    Tennessee ................................................................................................................ 22
    Texas ........................................................................................................................ 23
11. General Discussion of Public Costs and Private Prices ............................................ 25
    Short- Versus Long-Term Costs. ............................................................................. 25
    Unfunded Pensions and Healthcare........................................................................ 26
    Labor Costs. ............................................................................................................. 26
12. Summary and Conclusions ....................................................................................... 28

References ......................................................................................................................... 33

Appendix 1: Data Sources for the Table on State Costs, Contract Prices, and Savings ............................ 36

Table 1: State Costs and Private Prices.............................................................................. 41

BLACKSTONE0019102

# Executive Summary

Considerable controversy exists among state officials, outside experts, and the media whether contract prisons provide sufficient savings and perform adequately in other dimensions to justify their use. This research is designed to examine the evidence using state data as the primary source. The study uses economic models to determine each state's avoidable costs, which are then compared against the per diem charges of the private operator. In cases where the operator manages a state prison, avoidable costs include just short run costs. Where overcrowding exists or when the state correctional institutions require modernization or replacement, long run costs are shown to be appropriate. The research considers all avoidable costs including indirect costs and often-ignored underfunded pension and retiree health care costs. Interviews with state corrections officials and legislative oversight analysts were conducted. Individual states were analyzed to understand the role and issues associated with the use of contract prisons.

Statutory requirements in some states mandate savings of at least five to ten percent in order to contract out to private operators. In particular, there is ambiguity in the categories and the measurements of the state costs that should be considered for the savings required by the private operators. In some cases, avoidable state prison costs imposed on other departments of state government are unavailable.

There are three primary reasons for the use of contract prisons: to generate cost savings and avoid large capital expenditures; to relieve overcrowding, whether ordered by the courts or required because of threat of litigation perceived by departments of correction (DOC); and the sale of a state prison to private operators for budgetary reasons. The savings required of private prison contracts by statute are Florida (seven percent), Kentucky (ten percent), Mississippi (ten percent), Ohio (five percent), and Texas (ten percent). The statutory requirements apply both to where the contractor operates a state-owned prison and to where prisoners are placed in contract prisons. In cases like Florida and Mississippi, the contractor manages state-owned prisons. In Kentucky and Oklahoma, the prisoners are transferred to privately owned prisons. Texas uses both types of contract prisons.

The relief of overcrowding is the second major reason for the use of private prisons and includes both out-of-state transfer of inmates and in-state use of private facilities. In California, for example, the courts required a timely reduction of overcrowding, leading to the use of out-of-state contract prisons. In addition to California, the examined states that have experienced overcrowding were Arizona, Kentucky, Ohio, Oklahoma, Tennessee, and Texas.

Contracting out by selling a state prison to a private operator generates an immediate lump sum amount to narrow a state budgetary deficit. This occurred in Ohio, which sold the Lake Erie Correctional Institution to a private contractor.

The table below specifies the short run direct and indirect costs that are linked to the operation of the state prison. The long run costs include the short run costs in addition to the depreciation and the government principle and interest payments for the bonds that are used to finance a prison. These two items, which are also termed capital costs, become avoidable costs when a DOC avoids building new prisons by sending inmates to contract prisons. Our estimation of the avoidable costs includes a few categories of actual costs that were missing in prior studies. In the short run, costs included data on underfunded pensions and retiree healthcare of current employees. Neglecting these costs lowers the state's apparent avoidable costs and distorts legislative intent. California has by far the highest underfunded costs at $15.18 per inmate per day, followed by Maine's $6.86, while the others range from $0.55 in Florida to $4.44 in Texas.

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 5 of 50 PageID #: 20735

BLACKSTONE0019103

Whenever overcrowding exists, the statutory requirement is less relevant since the overcrowding must be alleviated in a timely fashion. California is a classic example of the cost encountered for not avoiding substantial overcrowding. Overcrowding requires that the long run avoidable costs be compared against the contractor's price. The long run consideration is also relevant when the state owns old prisons that need major renovations, prisons are subject to demolition because of age or condition, or when the state faces difficulties in raising capital.

The table below provides both short and long run savings in the use of contract prisons. The long run savings for Arizona's two prisons are 14.25 and 22.34 percent; California had 32.20 and 58.61 percent savings for two prisons; Kentucky's savings for its four prisons ranged between 12.46 and 23.5 percent; Ohio saved 20.28 and 26.81 percent in 2012 and 2010, respectively; Oklahoma saved on its four prisons 16.77 to 36.77 percent; Tennessee had 17.32 percent; and Texas had 44.95 percent. Maine, which does not utilize contract prisons, could have saved 47.65 percent when below capacity and 49.38 percent if overcrowding exists.

At least equal performance to state prisons is required for contracting out. Indeed, the American Correctional Association established standards for prison performance, which the contract prisons generally met. Further, interviews with state DOCs reported that their contracts mandate performance levels, and DOCs closely monitor adherence to the contract requirements. Penalties can be and are imposed for performance violations. In Florida, contractors performed above the state level in training and educating inmates, which could be attributed to competition among contractors and the desire for contract renewal.

A major finding from the data and the interviews is that competition yields savings and better performance. The economics of Industrial organization demonstrates the important benefits derived from the presence of even a small competitor in an otherwise monopolistic market. Even though private contractors comprise less than seven percent of the industry, they have generated substantial competitive benefits. The benefits emanate from two sources. As more contractors compete, the prices are lower, and the performance is better. Likewise, when private prisons become an available option, efforts are made by public prison managers to lower costs, and demands by employees are constrained, since public employees realize that the legislature might favor private corrections as a more cost effective option. Further, the greater the competition, the more managerial and technological innovations are introduced in both the public and private segments of the industry. Interestingly, we found that in several states where both public and private contract prisons operate, there was cooperation, mutual learning of new technologies, joint training, and adoption of efficient management.

This study leads to a possible moderate change that could encourage further competition and thereby achieve more efficient delivery of existing corrections services. This is the model of managed competition initiated by then Mayor Stephen Goldsmith of Indianapolis, Indiana, which encouraged public workers to participate in the bidding for their services to preserve their municipal jobs along with the existence of private competitors. Mayor Goldsmith initiated the "yellow pages" test where he enabled contracting out of all city services whenever several providers were listed. But, he went one step further and allowed city employees to compete for the service. By so doing, public employees, as well as private contractors, have an incentive to search for managerial and technological innovations and offer the service at competitive prices.

Adopting managed competition also has implications for the current statutory savings requirements. State legislators in the statutory states have established arbitrary levels of required savings of five, seven, and ten percent. High percentage savings may discourage some bidders and be counterproductive. It is not clear why the percentages differ and what is the basis for these numbers.

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 6 of 50 PageID #: 20736

BLACKSTONE0019104

The bidding by contractors often just approaches the statutory requirement. It could be more effective to let open competition determine the price. By instituting managed competition where the public sector competes on a level field with the private sector, we let the market determine the savings. In such a case, the complicated calculations of what cost items should be considered as avoidable costs and how to measure these costs becomes unnecessary. Managed competition has worked for many local public services, and there is no reason why it cannot be successfully implemented in the prison industry. Indeed, public and private competition and cooperation in the provision of prison services has worked and could even be extended.

## State Prison Costs, Contract Prices, and State Savings
### Costs Presented are Costs Per Day

| States | Custody/ Year* | Short Run Costs | Long Run Costs | Contractor Per Diem | Short Run % Savings | | Long Run % Savings | | % Private Inmates |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Prison 1 | Prison 2 | Prison 1 | Prison 2 | |
| AZ | Min 2010 | $50.61 | $59.95 | $46.56 | 8.01 | | 22.34 | | 22.95 |
| AZ | Med 2010 | $52.49 | $61.83 | $53.02 | -1.00 | | 14.25 | | 11.35 |
| CA | 2007-8 | $112.98 | $117.59 | $79.73 | 29.43 | | 32.20 | | 1.31 |
| CA | All 2011/12 | $152.01 | $156.62 | $64.82 | 57.36 | | 58.61 | | 6.72 |
| FL | 2008/9 | $54.39 | $61.43 | $50.58 | 7.00 | | 17.67 | | 11.31 |
| KY | Min/Med11 | $58.13 | $60.03 | $47.21 | 18.79 | | 21.36 | | 10.35 |
| KY | Min/Med12 | $55.59 | $57.49 | $43.98 | 20.88 | | 23.50 | | |
| KY | Med 2011 | $52.98 | $54.88 | $44.14 | 16.68 | | 19.57 | | |
| KY | Med 2012 | $54.80 | $56.70 | $49.63 | 9.43 | | 12.46 | | |
| ME | 2011 | $125.59 | $129.90 | $65.75 | 47.65 | | 49.38 | | 0.0 |
| MS | Min 2011 | $36.26 | $47.52 | | | | | | |
| MS | Med/Max11 | $34.11 | $41.68 | $31.15 | 8.69 | | 25.27 | | 24.88 |
| OH | 2010 | $52.98 | $62.66 | $45.86 | 13.44 | | 26.81 | | 5.87 |
| OH | 2012 | $47.84 | $57.52 | $45.86 | 4.14 | | 20.28 | | |
| OK | Min 2011 | $41.64 | $51.18 | | | | | | |
| OK | Med 2011 | $42.11 | $51.65 | $43.02 | 4.35 | -2.16 | 22.02 | 16.71 | 45.74 |
| OK | Max 2011 | $80.01 | $89.55 | $56.62 | 27.56 | 29.23 | 35.27 | 36.77 | 27.13 |
| TN | Med 2011 | $53.21 | $53.21 | $42.29 | 17.32 | | 17.32 | | 18.7 |
| TX | Proto 2010 | $59.85 | $68.07 | $37.47 | 37.39 | | 44.95 | | 11.03 |
| BOP/GAO | Low 2011 | $67.28 | $71.89 | | | | | | |

\*"Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 7 of 50 PageID #: 20737

BLACKSTONE0019105

## 1. Introduction

Considerable controversy exists among state officials, outside experts, and the media whether contract prisons provide sufficient savings and perform adequately in other dimensions to justify their use. This research is designed to examine the evidence using state data as the primary source. The study uses economic models to determine each state's avoidable cost, which is then compared against the per diem charge of the private operator. In cases where the operator manages a state prison, avoidable cost includes just short run costs. Where overcrowding exists or when the state correctional institutions require modernization or replacement, long run costs are shown to be appropriate. The research considers all avoidable costs including indirect costs and often-ignored underfunded pension and retiree health care costs. These two items are addressed in detail. Interviews with state corrections officials and legislative oversight analysts were conducted. Detailed calculations were provided and savings were determined. Individual states were also analyzed to provide a more complete understanding of the role and issues associated with use of private prisons.

Statutory requirements in some states mandate savings of at least five to ten percent in order to contract out to private operators. In particular, there is ambiguity in the categories and the calculation of the state costs that should be considered for the savings required by the private operators.

Data published by government or provided by government executives were used, and the source for each item is provided in the Appendix to this report. We believe that this academic study on the costs of state prisons could help alleviate some of the ambiguity on this subject. The study concludes with some recommendations that are based on economic theory and empirical findings in industrial organization on methods to improve productivity and cost savings to the prison industry.

Section 2 discusses the concept of avoidable cost and how it varies according to the reason for using contract prisons. Then, we discuss in detail the avoidable direct, indirect, and miscellaneous costs items presented in Table 1. The discussion proceeds with detailing the long-term avoidable cost or the capital and financing for the state prisons. When evaluating whether private prisons are socially beneficial, the analysis continues with non-monetary variables like the flexibility contributed by private prisons and the performance or outcomes of public and private prisons. We incorporated in qualitative terms some tax considerations, and the costs and service considerations of overcrowding. The report concludes with a summary and recommendations that stem from the report and could improve efficient provision of prison services.

## 2. Model for Estimating the State's Avoidable Costs

This study determines whether contracting out prisoners or prisons reduces state costs and is beneficial to the welfare of its citizens. Cost savings are usually required in order for the state to contract out inmates. When the non-monetary performance of the prisons is incorporated into the analysis, it becomes more comprehensive, reflecting overall net benefits to the state's citizens. The cost savings are all expressed in monetary terms. However, the performance will be captured in more general terms since quantifiable data are sometimes not available. This study relies on government sources for most data. We imputed data, again relying on government sources, when direct data were missing. The source Appendix provides information about where the data were obtained for each of the variables (entries) in Table 1.

The basis for a state decision to contract out the management of existing prisons or transfer inmates to private prisons should be based on budgetary savings while at least maintaining the same performance. Budgetary savings should reflect avoidable costs to the state. We distinguish in this study between a state owned and managed prison and a Public-Private-Partnership (PPP) type prison of Build-Transfer-Operate (BTO) (e.g. Florida), where a private company leases either a state prison or a privately built and

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 8 of 50 PageID #: 20738

BLACKSTONE0019106

operated prison, regulated and monitored by the state. Another option is that the private company buys and operates a formerly public prison under state supervision and regulation.

Economists assume efficient use of freed up resources even if the state chooses to under-employ such resources. For example, if inmates are transferred to a private prison and, as a result, a manager becomes idle, his salary is then an avoidable cost. We assume that the manager ceases in his/her obsolete position. It is reasonable to assume that the DOC is efficient in its use of resources. Also, in the calculation of avoidable costs, we distinguish between contracting out a prison and the transfer of inmates to private prisons. In the first case, a private company takes over the management of a prison for a few years and then the prison returns to the DOC. In such a case, the avoidable costs include all the direct costs plus the indirect costs to the DOC and other state agencies. Recovery of capital outlays and interest payments are not avoidable if the public sector bears the renovations and rebuild of the old prison or the construction of a new prison. The issue of indirect costs will be considered below.

Inmates are transferred to PPP prisons, sometimes to relieve overcrowding as a result of court rulings. An appellate court found that California in 2008 was operating at 188 percent of its designed capacity, jeopardizing the health and safety of the inmates. California has been ordered to reduce its capacity utilization to 137.5 percent by December 2013. California also lost control of the healthcare delivery in its prisons to a Federal Receiver after it was determined that the state was not delivering a Constitutional level of inmate medical care because of the severe overcrowding in its prisons. Excessive overcrowding exists elsewhere, as well. Ohio, for example, in 2012 had prisons operating at 128 percent of their capacity.

There is another infeasible alternative. The state could house inmates in overcrowded conditions, which spreads the fixed costs over a larger number of prisoners, lowering costs per inmate. However, overcrowding significantly reduces performance, including creating greater security problems, lowering correctional officer and inmate safety, and contributing to higher wages as the job becomes increasingly dangerous and difficult. Further, this is a non-viable alternative since the courts are likely to intervene.

Another possibility is that the state owns old and outdated facilities that require significant and often unavailable resources for renovations, and where prisoners are likely to sue the states for cruel or unusual punishment. For example, in Texas, a prison built in 1856 is still being used. States can fund the construction of new prisons or modernize existing prisons by issuing general obligation or revenue bonds. However, the state constitution usually limits the extent of borrowing general fund dollars for capital projects. For example, the State of Washington limits the debt service to nine percent of general state revenues for the previous three years (State of Washington, 2012). Further, our examination found that the State of Arizona has a constitutional cap on general fund bonds of $325,000. Other states require voter approval for issuing of bonds. These constraints gear states to create PPPs where the capital outlays of new or renovated prisons and other infrastructure are privately financed.

When the state does not have to bear necessary capital costs, the avoidable costs to the state include both short and long run costs. The short run costs are direct and indirect costs. The long run costs include capital costs, which involve modernization, significant repairs, depreciation, and financing costs. Depreciation incorporates the decline in the value of the facilities, while modernization and repair include renewed and improved conditions. For example, the Legislative Budget Board of Texas recognized that in the case of overcrowding, state avoidable costs must include the long run costs related to new construction when calculating the per diem charge (Gaes et al, 2004:87-88). Clearly, when the state saves resources by contracting out the operation of a facility, more can be spent on other priorities. Because of limited ability to issue bonds, when the facilities are financed by private contractors, the state could borrow more for other public infrastructure and save on interest payments.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 9 of 50 PageID #: 20739

BLACKSTONE0019107

When inmates are transferred to PPP prisons due to overcrowding or governmental capital shortages, the avoidable costs also include the long run costs. In fact, the courts are likely to intervene and require the state to correct overcrowding or the housing of inmates in unsuitable conditions. Thus, these conditions are not feasible and sustainable in the long term. However, it is important to note that including the costs of both the adverse effects of overcrowding and, at the same time, the capital and finance costs to avoid the overcrowding involves double counting and is inappropriate.

Appropriate measurement of avoidable costs will include the following categories of annual spending for each state on minimum- and medium-security male prisons, which are most commonly the alternative to private prisons. We have analyzed the professional literature to construct a comprehensive list of all avoidable costs. We considered in particular the works of Nelson (2005) and Belenko (1999).

### 3. Direct Avoidable Costs for Public Prisons

Personnel Services (Table 1, rows 1a, and 1b) include wages, salaries, and benefits for all prison employees. Benefits include health insurance, funded and unfunded pensions, and paid days off. When we analyzed the personnel services, we recognized that some of the pension and retiree healthcare costs of then current personnel are paid by other state departments or are not paid in full. The Vera Report (2012) provided data gathered from 40 states, which we used to supplement reported personnel costs. The underfunded pensions and healthcare costs of correctional personnel are short run costs that were not included in the financial reports of the DOCs, which were used to calculate the state costs versus private fees (Table 1, rows 15a, and 15b). These underfunded personnel costs amounted to $4.252 billion out of the total unaccounted costs of $5.4 billion or 78 percent. The other unaccounted costs are capital and some inmate medical expenses.

Also unaccounted for are indirect costs, which appear for individual states but were not aggregated by Vera. More important is the fact that the unaccounted costs, even without the avoidable indirect costs, which were not aggregated by Vera, are 12.7 percent of the total correctional budgets. The unaccounted costs are not considered by the states in their comparison of the avoidable state correctional costs and private fees. However, these costs are appropriately included at the time they occur, even though the actual outlays take place at a future date. Much of the critique on contracting out prisoners rests on inadequate savings by the state government. However, the inclusion of these unaccounted costs and the consideration of the more relevant long run costs make the comparison more accurate. Accordingly, Table 1 includes the underfunded pensions and retiree healthcare benefits as real costs of public prisons. Vera provided these data for all the states we analyzed except for Mississippi.

The underfunded information for Mississippi is available in another source (Pew, 2010) however, not specifically for corrections employees. We maintained our conservative approach and excluded the underfunded amounts for Mississippi, since no concrete data are available.

The Pew study stressed the significant amounts of underfunded retiree pensions and healthcare for the states. In 2010, a $1.38 trillion gap existed; $757 billion for pension promises and $627 billion for retiree healthcare, an increase of nine percent from just 2009. In 2008, one-third of total obligations were unfunded. Noteworthy, of the states we analyzed Oklahoma and Kentucky had more than one-third of their liabilities unfunded, and Mississippi had more than 20 percent. On the other hand, Florida was one of only four states that were fully funded.

In terms of medical care, the responsibility for services differs among the states. In general, offsite medical costs often include ceilings to safeguard the contractor from unanticipated medical expenditures. Onsite medical costs are normally the responsibility of the contractor, and the PPP facilities often have physicians, nurses and other medical personnel to provide care, which is included in the per diem. For example, in Mississippi, private contractors cover the first 72 hours of care for inmates

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 10 of 50 PageID #: 20740

BLACKSTONE0019108

receiving treatment in outpatient facilities and, beyond that, medical care is the state's responsibility. In Oklahoma, the contractor is responsible for all medical costs per inmate under $100,000 with a $50,000 limit per episode. When we compare state costs and private fees, they should both reflect the appropriate medical expenses. However, comparisons across states are more difficult because of different practices (Table 1, rows 2a, and 2b).

Maine provided full details on its public prison expenses for food, utilities, fuel, office supplies, technology, rent, clothing of inmates, and minor repairs. However, for the other states we were able to obtain just an aggregate of such expenses. Contracted professional services include teachers, psychologists, and others. Inclusion of Maine in this study provides a benchmark for public managed prisons, as well as an example of a state that currently lacks private competition.

### 4.    Indirect Avoidable Costs for Public Prisons

This category includes central administrative functions like adjudicating inmate grievances, parole hearings, inmate transfers, liability insurance, human resources (background check of potential employees, and hiring, training, administering employee records), legal (shared between the DOC and the Attorney General), and auditing of the private prisons, which are potentially avoided when prisoners are transferred to private institutions. These costs, which other state agencies incur, are often not accounted for when the DOC calculates its own avoidable costs. The avoidable indirect costs accrue to other state agencies or to higher levels within the administration of the DOC. Contracting out inmates allows savings in such costs or resources could be directed to other activities. Gaes et al., 2004, argue that based on existing economic literature, if the state refers a small number of prisoners to private prisons then there is no significant decline in these indirect avoidable costs (Gaes, 2004: 95-96). They add (p. 98) that even when prison services are contracted out, some of the overhead costs continue to burden the public sector. For example, the state normally maintains control over classification, disciplinary, and other central office activities. Tennessee and Oklahoma calculated that when prisoners are transferred to contract prisons then approximately 75 percent of the indirect costs remain as state costs or 25 percent become avoidable costs (MGT of America, 2007; Tennessee General Assembly, 2010). In the discussion on savings below, we shall maintain our conservative approach and treat only 25 percent as avoidable indirect costs.

Moreover, indirect costs are difficult to measure and may not be fully accounted for by some states. The Bureau of Prisons/General Accountability Office (BOP/GAO) figure for indirect costs of $8.09 could serve as a standard. In fact, the reported range for most states was $3.72 to $6.64. Texas' indirect costs of $1.30 seem far too low, and, to a lesser extent, this applies to Mississippi's $2.96. The states that reported most comprehensively approximated the 11 percent of the GAO. Thus, we incorporated for all states eleven percent as indirect costs. Vera provided some data on unaccounted indirect costs, which we also incorporated. Unfortunately, Vera did not report at all for ten states including Mississippi, which may explain its reported low indirect costs.

### 5.    Miscellaneous Costs

These include contract development and procurement and contract compliance monitoring costs of the contractor-operated prisons by the relevant DOC. These should be considered as costs to the private prisons. Clearly, the monitoring of the private prisons should be reimbursed by the contractors or subtracted from the costs of the public prisons. In Ohio, the private contractors must reimburse the ODRC for two monitors and their expenses. In Kentucky for fiscal year 2009, the monitoring costs were $105,362 for 1,234 prisoners or $0.23 per inmate per day; a negligible amount that will not change the results even if added as an estimate for all the states. In Florida in 2009-10 the annual monitoring costs

BLACKSTONE0019109

for each PPP prison ranged from $54,000 to $72,000, or $0.08- $0.10 per inmate per day. In Florida and Ohio, the onsite monitoring costs are very small and are indeed included in the per diem prices.

### 6. Capital and Finance Costs

These costs should be included for all states that house inmates in private prisons to handle overcrowding or to avoid rebuilding or substantial maintenance costs. There are, after all, in excess of 290,000 prison beds in public facilities that are older than 50 years (US BJS, 2005). The necessity to include the capital costs as avoidable costs for the public sector is recognized by the State of California's legislative research agency, which stated: "Many CDCR prisons are more than 30 years old. While still operational, many of these prisons require much greater levels of maintenance and some will require significant renovations. Long-term maintenance and renovations costs should be taken into consideration when identifying prisons to close" (California Legislative Analyst's Office, 2012B: 16). These costs are not to be incorporated when a private company manages an existing public prison. The depreciation should be calculated for the period between major renovations. A prison, like a standard building, is assumed to be fully depreciated over a period of 50 years. In fact, a prison encounters both more wear and tear and requires more modernization, including incorporation of new technology, than a normal building. Even though prisons would be expected to require major renovations and upgrading periodically, we utilize the 50 years depreciation life as does the U.S. BOP. The exception is Arizona where its legislative research unit used 20 years (JLBC 2012). Since capital outlays are funded normally through the issuance of bonds, the annual interest payments should be incorporated in the calculation of public prison costs. The reason for Arizona's 20-year amortization is because contract prisons are transferred after 20 years to state ownership.

GAO, 2012 (p.10) concluded that the capital costs, including modernization and repair projects and depreciation, for the fiscal years 2009 through 2011 ranged from $4.39 to $4.82 per inmate per day. These were the fees the states paid the Federal Bureau of Prisons (BOP) when state prisoners were housed in federal institutions. In our calculations of the costs for state prisons, we used the average of $4.61.

It is important to note that states issue bonds to finance prison construction, and the cost of interest per inmate is a long run variable cost to be imputed to obtain the avoidable inmate cost per day. The correct measure should be the current construction cost of a new prison, which would reflect avoidable costs. Then, the interest on such capital costs must be used to calculate the interest per inmate per day. We chose the average interest rate for 2012 of 3.75 percent for a 20-year maturity bond. This is a conservative rate, which is especially low in 2012 (see http://www.munibondadvisor.com/market.htm). Our research shows that construction cost for a 1,500-bed medium security prison in 2012 is $225 million (see http://juneauempire.com/stories/030611/opi_795369352.shtml). Thus, the annualized interest cost per inmate per day over a 20-year life of the bond is $15.41.

Another calculation of interest costs comes from a 2007 study for the Oklahoma Legislature (MGT, 2007). The study estimated construction costs of $54,500,510 for a 660-bed maximum-security facility expansion. This yielded annual principle and interest costs of $15.37 per inmate per day for a 25-year bond. This figure is essentially identical to our calculated principle and interest cost.

However, even if we use the 2011 sale price of the then 11-year-old 1,798-bed Lake Erie Correctional Institution in Ohio of $72.77 million, the annualized interest per inmate per day would be $4.16. We used the Construction Cost Index for buildings, utilities, and grounds of the U.S. Army Corps of Engineers (2011). The cost of construction increased by 57.9 percent since the year 2000, so that the 2011 cost would be $115 million or the interest cost would be $6.57 per inmate per day.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 12 of 50 PageID #: 20742

BLACKSTONE0019110

A problem arises because in recent years public prison construction was rare in the examined states. Thus, we used interest payments, when available, as reported by the individual states. As discussed above, the measure of $6.57 drawn from Ohio could be used.

Vera reported prison interest costs that should be attributed to correctional facilities rather than be part of other state budgets. The appropriate measure would be the current per inmate interest cost for the construction of a facility. Unfortunately, the Vera data refer to interest payments for prisons that might have been built long ago and do not reflect current costs. Also, the capital costs should correspond to the same number of inmates as in the relevant size prison. Since we divide by the total number of inmates, our measure of interest payment is understated. In maintaining our conservative approach, we chose to use Vera's capital cost when the states do not report their own cost.

Florida built a new public prison in 2009. The annual interest per inmate per day was $7.05. However, in the case of Florida where private vendors operate the existing public prisons, only the short-term costs are relevant. The other states showed lower costs. Except for Florida, imputed costs of interest were lower for all other examined states than the $6.57 updated interest costs. Maintaining our conservative approach, we used Vera or the state data for all examined states except California for which interest data from Vera were missing. Including the $6.57 for California would increase the long run 2007-8 savings from contracting out from 32.20 to 35.79 percent. However, we chose to be even more conservative by not including for California any interest cost.

### 7. Capital Flexibility Gained by Use of Contractor Operated Prisons

Use of private prisons increases the flexibility of government corrections in a variety of ways. Demand for prison cells changes over time. When demand is high, public prisons lack cells, and overcrowding results. The courts usually require timely alleviation in such cases as California in 2013. In the absence of contract prisons, the states need to build expensive new facilities while their borrowing capacity is low. On the other hand, the number of inmates is expected to diminish for such reasons as the declining cohort of young males, reduction in the use of "three strikes" sentencing, easing of drug laws as already occurred in the states of Washington and Colorado, and a possible reduction in recidivism. Prisons could then become under-occupied or even vacant, and it is difficult and expensive to transform them for other uses. Further, much of the expensive surveillance features will have to be abandoned. For example, the Central Unit state prison in Sugar Land, Texas lies vacant. Florida. Texas, New York, and Michigan have seen a decline in the number of prisoners and have already closed prisons. The only three states that have experienced a significant increase in prisoners are Kentucky, Oklahoma, and Tennessee. In fact, 35 adult U.S. correctional facilities have closed between 2011 and 2013 (Stumpf, 2013). Thus, contract prisons play the role of an equilibrating mechanism for equating supply and demand for cells. This flexibility translates into large savings for state governments.

These significant savings for state governments are not accounted for in our calculations of inmate per diem costs, even though they should be considered state avoidable costs. This is again an indication of our conservative approach where avoidable costs are downward biased when savings exist but cannot be comfortably estimated.

Private prison construction yields savings in both time and costs compared to state governments contracting out the construction. Cumbersome procedures in obtaining bids and selecting the winning contractor, possible rules for the use of unionized labor, and the inability to take advantage of buying power make the cost higher and often hinder timely completion. A private contractor built a 3,000-bed medium security prison for California in Arizona and began housing its first inmate just 15 months after beginning construction. Because of the regulatory requirements in California, that process would have taken much longer. These issues are discussed more fully in the individual state sections.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 13 of 50 PageID #: 20743

BLACKSTONE0019111

We do face here the typical peak load problem similar to the case of electricity. When a state faces excess demand for prison cells, then the private prison industry relieves the pressure by saving the public sector the full construction costs. In the electricity industry, excess demand in one region is usually satisfied by purchasing electricity from other utilities, which experience excess capacity. The price reflects long run costs. The same principle should apply to the prison industry.

## 8. Non-Cost Performance Measures

Our discussion so far has concentrated on the comparison of public costs and the fees paid for private prisons. Obviously, dimensions of quality should also be considered. An important indication of quality of operation and management of prisons is accreditation by the American Correctional Association (ACA).

There are some suggestions that the private facilities are performing at least equal to public correctional facilities. Generally, PPP prisons must obtain and maintain accreditation by the ACA. In 2002, there were a total of 5,000 detention facilities in the United States, of which 532 were accredited. Of the 532, 465 were public and 67 were private. At most, 10 percent of government facilities were accredited, while 45 percent of private institutions were accredited (Segal, 2002: 12).

Contracts also ensure quality performance, since monetary penalties are assessed for unsatisfactory performance. The contracts sometime require equal performance, as in the case of Ohio. Renewal of contracts is, of course, aided by good performance. In Florida, the Chamber of Commerce in 2012 provided data showing greater provision of education, training and vocational services in private facilities (see section on Florida below).

The existence of competition by private prisons constrains price increases of labor and improves efficiency in the use of labor. The existence of the private option has changed staffing patterns in Oklahoma public prisons, which has led to consolidation of some case manager roles and improved food services.

In Ohio, private correctional officers are trained with public officers at the same academy. The staff meetings include both private and public wardens. This indicates identical training of officers, and collaboration between the public and private institutions that could suggest similar levels of performance. This is, indeed, a practice that is highly likely to improve mutual learning and performance by both sectors.

In Kentucky, the Legislative Research Commission stated in a 2009 report (p. 19) that: "All three contracted prisons offer more programming than the comparable state prisons. In particular, the state-operated Little Sandy Correctional Complex and the contracted Lee Adjustment Center have little programming in common except for work, GED, Narcotics Anonymous/Alcoholics Anonymous, and prerelease programs. The Lee Adjustment Center provides a number of vocational training opportunities not offered at Little Sandy."

## 9. Unaccounted Benefits and Costs of Contract Prisons

Private prisons provide additional benefits to state governments besides providing savings from their operation. Private prisons pay income and property taxes while state facilities do not. In Arizona, for example, the economic consulting firm of Elliot Pollack and Company (2010: 1) determined that one private contractor paid over $26 million in taxes to the state and local governments in 2009. Such state or local revenues could be used to reduce taxes or to finance other government functions. These taxes could increase the state income and employment by the familiar multiplier effect. We did not quantify such benefits, but their existence should be recognized.

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 14 of 50 PageID #: 20744

BLACKSTONE0019112

Overcrowding diminishes both the short and long run inmate per day monetary costs. When prisons are operated over capacity, additional inmates added to the facility are significantly less expensive to house than in a facility that is operating at or below capacity. This is because in an overcrowded prison the fixed costs associated with the operation have already been accounted for. Therefore, the marginal cost of housing each additional inmate does not include any "overhead" costs. As prisons become more overcrowded, the lower marginal cost of each additional inmate drives down the facility per inmate average cost. Because state run prisons are much more likely to operate under overcrowded conditions (for example, California), the average "per inmate cost" is understated compared to private facilities operated at or even below capacity. While this is a significant factor in comparing costs, we have not accounted for this difference in our analysis.

In spite of achieved cost savings from overcrowding, the quality of service and the level of security are substantially reduced. In the case of California, the courts have concluded that security problems and deficient medical care resulting from overcrowding led to unwarranted deaths and suffering of the inmate population. Often, the remedies mandated by the courts far outstrip the perceived savings achieved from operating overcrowding prisons. See the discussion of judicial decision in the case of California below. Further, cost comparisons would tend to be biased against private facilities if their utilization rates were lower than public facilities.

Evaluation of private versus public prisons requires consideration of legal issues. In private correctional facilities, disciplinary actions require involvement of the state monitors, while in similar public facilities the warden has greater autonomy. Further, private correctional officers lack sovereign immunity, which means they are more vulnerable to litigation. The lack of sovereign immunity could be argued to reduce the willingness of officers to pursue escapees beyond the private facility (Sanders, 2012). In practice, however, both private and public correctional facilities normally request law enforcement involvement during incidents. Further encouraging good performance of private contractors is the fact that the contract usually requires indemnifying the state for any malfeasance. On the other hand, the U.S. Supreme Court held that private correctional officers are less vulnerable for violating the Eighth Amendment to the U.S. Constitution against cruel and unusual punishment. In the case of private prisons, inmates charging violations must first exhaust any state remedies before claiming constitutional protections (see Minneci v. Pollard, 132 S. Ct. 187 (2011)).

### 10. Discussion of Individual State Costs and Performance

Thirty of the 50 states used private prisons in 2010, while the extent of usage varies from New Mexico's 43.6 percent of inmates confined in contract prisons to South Dakota at 0.1 percent. Overall, 6.8 percent of all state inmates were in contractor-operated prisons. The states that generally have a large number of private inmates were all in the south. The leading states in their overall number of private prisoners were Texas and Florida. After those two states, those with the highest number of privately held prisoners in descending order were Oklahoma, Arizona, Mississippi, Georgia, and Tennessee. These seven states accounted for 49 percent of all state held prisoners in private facilities data (U.S. Bureau of Justice Statistics, 2011; Gilroy, 2011).

In this study, we analyzed in detail six of the seven states, as well as California, which experienced a recent significant increase, and Ohio, which sold a large prison to a private contractor. A lack of available data prevented us from including Georgia. We incorporated Maine, which did not contract out for corrections services. However, it had good data for comparison of its state-operated prisons. The GAO/BOP report on the costs of federal prisons was included in order to supplement for missing data. Maine and the federal report also provided necessary benchmarks and standards to appraise the state data.

**Arizona**

Arizona has employed contract prisons since 1986. State law requires that private providers deliver the same level of service at lower cost to the state or a superior level of service at essentially the same cost. Contracts with the Arizona DOC (ADOC) also require that the state take ownership of the prison financed by the private sector after the contract term expires, typically after 20 years, and at no cost to the state (see http://www.azleg.gov/FormatDocument.asp?inDoc=/ars/41/01609-01.htm&Title=41&DocType=ARS).

Until the 2010 cost report, PPP prisons in Arizona were shown to achieve cost savings. The reasons why the 2010 report reached a surprising and, we believe, incorrect conclusion includes inadequately addressing depreciation and correctional officer retirement issues.

The Arizona DOC used depreciation based on the original cost. This approach underestimates the real cost of public prisons, which should be based on what it would cost in 2010 to finance and build a public prison. The Joint Legislative Budget Committee Staff, JLBC (2012) did such an analysis and employed a 20-year life. This yielded a state per diem per inmate cost of $10.71 instead of the $1.41 the ADOC reported. The $10.71 also includes the interest payments for capital costs paid by the ADOC. However, the budget should still have included the $0.04 interest that other state agencies incurred but Vera determined were attributable to corrections. The JLBC also found that the state retirement system was underfunding its pension contributions by overestimating expected investment returns. This correction added $2.67 per day per inmate to state costs.

Finally, medical costs were properly handled. The state provides all the required medical care at selected ADOC prisons, while private contractors have limits on the care they are required to provide as part of their contracts based on ADOC requested RFP stipulations. Accordingly, the JLBC staff simply mimicked what the DOC did and reduced state costs for medical services by $10.08 and private contractors' by $7.64.

ADOC did not report any short run indirect costs. Instead of incorporating from the Vera Report the unaccounted $0.16 hierarchical costs, we included the 11 percent indirect costs calculated in the BOP/GAO report. The range for such costs in our analyzed states is $1.30 to $8.09 with concentration in the $5 - $6 range. Taking into account that 75 percent of the indirect costs are non-avoidable, the long run savings would be 22.34 percent for the minimum-security prison and 14.25 percent for the medium-security prison. In the case of Arizona, which faces overcrowding conditions, the long run savings are relevant.

**California**

California contracts with private providers to assist in housing its inmate population both in-state through contracts with community correction facilities, as well as out-of-state to house approximately 9,000 medium-security inmates in prisons in Arizona, Oklahoma and Mississippi. The utilization of PPP prisons by California is done primarily to reduce severe overcrowding in state prisons but has the added benefit of providing significant operational savings to the state as well. We calculate that privatizing a portion of its inmate management has saved California approximately $164 million a year. This is in addition to the billions of dollars that the state has saved by not financing construction costs to add additional prison capacity. As discussed below, the state has been able to utilize the flexibility that PPP prisons provide to institute other policy measures to reduce overcrowding in its state prisons to help meet court mandates.

California experienced a substantial increase in its prison population during the 1990s and 2000s, going from 76,000 in the late 1980s to 171,000 in 2008-9. This increase was so great that by 2008, the system

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 16 of 50 PageID #: 20746

BLACKSTONE0019114

was operating at 188 percent of its designed capacity. The designed capacity is considered to be one inmate per cell and no inmates housed in gyms or day rooms.

The overcrowding in California prisons led to problems in delivering adequate healthcare. In April 2001, Plata v Brown plaintiffs claimed in a class action suit that California provided such inadequate medical care that it violated the cruel and unusual punishment amendment to the U.S. Constitution (California Legislative Analyst's Office (LAO), 2012A). The court held that the system was "broken beyond repair" and that death and suffering had resulted. California in 2002 agreed to improve the healthcare situation. However, in 2006 the court held that insufficient progress had been made, determining that overcrowding led to security restrictions on inmate movements that prevented inmates from receiving appropriate and timely care. Also in 2006, the courts placed a federal receiver in control of inmate medical care, taking the state out of the management of the prison's healthcare system. That receiver remains in place today.

In August 2009, a three-judge panel upheld the ruling and ordered that overcrowding be reduced to at most 137.5 percent of designed capacity within two years in order to provide adequate healthcare, a decision that was affirmed by the U.S. Supreme Court in May 2011. The Supreme Court ordered that California reduce its prison population to the 137.5 percent figure by June 2013. This meant that the state had to reduce its inmate population by about 39,000 to comply with the ruling.

California responded by instituting a policy commonly referred to as "realignment," which essentially shifted the responsibility of housing inmates convicted of certain non-violent crimes from the state prison system to county jails. Realignment, coupled with the continued utilization of PPP prisons, has enabled the state to reduce its inmate population by approximately 37,000. However, despite these reductions, the state is still operating its prison system at 150 percent of capacity.

In 2010, the state housed 8,021 male inmates in five contracted facilities out-of-state (California LAO, 2010). The California State Auditor (2010) determined that the California Department of Corrections and Rehabilitation (CDCR) spent an average of between $3,200 and $7,800 less per inmate to house 2,226 inmates out-of-state than it would have spent in California prisons during 2007-8. These savings refer just to the short run operating costs, while the correct savings in the case of overcrowding, as discussed earlier, should relate to the long run and would be even higher. In any event, the Auditor noted the usual difficulty of determining comparable inmates.

The issue of monitoring costs for out-of-state facilities is important. For example, the CALAO reported that the out-of-state program required 73 monitoring positions for 5 contract prisons. Given that other states have one or at most three monitors per prison, the figure of 73 is unusually high.

The CALAO reported that in 2011 California paid between $61 and $72 per day per inmate in out-of-state facilities. The relevant average cost for its in state public prisons was $104, or about double the price paid to the PPP prisons.

While the state has been able to enjoy substantial savings by contracting with private providers, they have begun to look at replacing older and expensive facilities through new construction. Last legislative session, California authorized its Public Works Board to sell $810 million of revenue bonds to build 2,400 dorm beds at existing state prisons at a cost of $337,500 per bed. Those beds will replace beds at the California Rehabilitation Center in Norco, California, which was originally built in 1928 as a hotel. Assuming a 20-year amortization, as was the case in the Arizona example above, with an annual interest rate of 3.75 percent, the average annual interest rate for a municipal bond, principle and interest costs to the state equates to $66.70 per inmate per day without any costs for operating the prison. The cost to house an inmate out of state in a PPP facility averages $64.82.

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 17 of 50 PageID #: 20747

BLACKSTONE0019115

Overcrowding was costly to California. Medical care doubled between 2007-8 and 2011-12 reaching $43.95 per inmate per day. This compares to Maine's $16.67, which was the next highest medical per inmate cost of the states we reviewed. All other examined states ranged between $6 and $11. The court order increased California's medical costs over that period by $1.08 billion annually. The other high-cost item for California is personnel services, which are primarily security related. California's per diem for personnel services is $67.01, which was second to Maine's $79.25. Texas was third with $40.92. Florida's was $38.83, while personnel services for all other states examined ranged between $20 and $30. (Oklahoma showed high costs just for its maximum-security prison, which was not a major part of our analysis.) Noteworthy, both California and Maine, which exhibit high medical and personnel services costs, are the only states in our sample that lack competing contract prisons within their borders.

## Florida

Some states require private prisons to achieve specified savings to obtain and maintain their contracts while still satisfying performance standards. For example, under Florida law a contractor must promise and then achieve savings of at least seven percent over comparable public prisons. The Office of Program Policy Analysis and Government Accountability (OPPAGA) of the Florida Legislature conducted an analysis of four privately operated prison contracts and reported on April 20, 2010 that all four contracts achieved the required savings and recommended their consideration for renewal (OPPAGA, 2010A).

The privately operated Bay Correctional Facility had a per diem cost of $52.73 compared to the comparable public prisons of $56.98 for savings of 7.5 percent during the two-year study period. The privately operated Moore Haven Correctional Facility had two-year savings of 12.5 percent, while the contract Graceville Correctional Facility had savings of 22.1 percent for the one year when a comparison could be made. Finally, the contract Gadsden Correctional Facility had two-year savings of 28.3 percent.

OPPAGA concluded that the contractors' performance in dimensions other than costs was acceptable. Performance criteria included such security requirements as key control, perimeter cameras, and filling vacant positions in a timely manner. Health services in particular were found to be well delivered. It is also noteworthy to point out that contractor operated prisons provided more substance abuse and education programs, according to OPPAGA, than the comparable public prisons, so much so that costs had to be added to the public prisons for appropriate comparison.

OPPAGA also noted that a major reason for the cost advantage of private prisons is the higher retirement expenses for public prison employees than those provided by private contractors. Public correction officers have an amount equal to about 21 percent of their salaries contributed to a retirement fund, whereas private correctional officers receive matching contributions to their 401K funds of up to five percent of their salaries. Other reasons for the cost advantage of private prisons include higher costs for providing educational and substance abuse programs at public facilities and a higher allocation of administrative costs.

Florida's evaluation of private prisons has yielded some important evidence about performance. Specifically, OPPAGA's Information Brief Comparing Cost of Public and Private Prisons of March 1997 noted that per diem public prisons costs rose less than 1.5 percent annually between FYs 1992-93 and 1995-96. OPPAGA noted that competition induced by the privatization of some prisons might have produced greater efficiency in the public prison system (p. 6). In a study of private prisons in Florida including a comparison of other state systems prepared for the Florida Department of Management Services (MGT of America, 006: 33), the three lowest per diem inmate costs included Texas, Georgia and Florida – all states with competing private prisons. The authors suggested that use of contract prisons lowered costs of state-operated prisons, as well. This finding is consistent with a later Vanderbilt University study conducted on all 50 states, which concluded that states with private prisons

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 18 of 50 PageID #: 20748

BLACKSTONE0019116

experienced 2.64-3.15 percent lower growth in public prison costs. These savings had a two-year lag. The study concluded that learning or possibly competition cause the public savings (Blumstein et al, 2007).

The Correctional Privatization Commission of Florida responded to OPPAGA's brief by claiming that the private prisons must satisfy higher performance standards than state facilities. The Commission stated that private prisons must indemnify the state against any liability, are subject to greater monitoring, must achieve and maintain accreditation by the American Correctional Association, and must provide a broad range of education and technical programs. The Commission noted that the two private prisons had achieved earlier accreditation than required by their contract and their scores were the highest ever achieved by any Florida prison (pp. 9 and 10 of brief).

The Florida Chamber of Commerce reported in 2012 that the number of inmates per staff to provide rehabilitation services was 1 per 38 in private prisons and 1 per 272 in public prisons in DOC Region IV. In fact, 79.3 percent of inmates in the private correctional facilities participated in such educational, vocational, and life skill training compared to 21.3 percent in public facilities (Florida Chamber of Commerce, 2012). At a minimum, these data show that private facilities can and do provide training to reduce the likelihood of recidivism.

In a 2012 presentation by the Florida Department of Management Services (FLDMS) before the Florida House Appropriations committee, the per diem costs of six contract prisons were compared with the most similar public prisons in Florida. Short run savings over the 2009 to 2013 ranged between 10 and 27 percent (Florida Department of Management Services, 2012: 9). Indicative of Florida's approval of the contract prisons, the presentation stated that in 1993 there was one contract prison of 800 beds, in 2004 there were five with 4,304 beds, and in 2012 there were seven with 10,128 beds (page 3).

An earlier study conducted for the Florida Department of Management Services (MGT, 2006: 26) compared the costs for the public South Bay and Lake City Correctional Facilities against imputed costs for similar public facilities. The study showed that in the period from 2004 to 2006, the percentage savings were 19.4 and 11.2, respectively.

As for the long run, some states like Florida (and Texas) employ a BTO system for private prisons whereby the private firm bids to build a private prison; the state finances it, and pays the private firm for managing the construction process. The private firm then transfers ownership to the state and is given a lease to operate the facility for some years, usually renewable upon satisfactory performance. For Florida, the firm must save seven percent both in operating or short-term costs and also in construction costs compared to a state-operated and built facility.

A 2010 study by Florida's OPPAGA has shown such additional construction benefits besides operating costs. The comparison was between a state prison for 3,288 inmates, Suwannee Correctional Institution (whose main unit was designed for 1,521 inmates) and a private prison, Blackwater River Correctional Facility, designed for 2,000 inmates. Both facilities were designed and built for close custody inmates and those with mental health problems. The state facility could accommodate more severely ill inmates.

Comparing the main unit of Suwannee and the comparable Blackwater River facility, OPPAGA determined that the per bed costs for the private and public facilities were, respectively, $57,682 and $64,277 so that the private facility was shown to have achieved about ten percent savings, in excess of the required seven percent. It is noteworthy that the facilities had about equal costs if the total facilities were compared. However, OPPAGA concluded that this would not be a fair comparison because the public facility (i.e. Suwannee), among other reasons, included a work camp whose construction was far less costly than a regular prison.

BLACKSTONE0019117

Additional site development is a major reason for public facilities having higher costs. Site infrastructure cost $12,070 per bed for the public facility compared to $4,512 for the private prison. Blackwater took advantage of Santa Rosa County's interest in encouraging companies to locate there. The county charged no impact fee other than the $3.6 million land cost. Meanwhile Suwannee required infrastructure to bring water, gas, and sewer to the prison, which was seven miles from the City of Live Oak. The public prison had to reimburse the city $3 million for an impact fee to upgrade water facilities and replace the county sewer plant.

The contract prison was also built quicker than the public prison. The public prison was authorized by the legislature in 2006 but was not completed until October 2009, whereas the private prison was authorized in 2008 and completed in July 2010. In general, OPPAGA reported that private prisons are built in 18 to 24 months compared to 36 months for public prisons. The private firms are not burdened by the cumbersome public sector requirements involved in selection of contractors, subcontractors, and the process of selecting site appraisers. There are also important differences in the construction itself of the prison. Blackwater, the private prison, installed air conditioning, which obviously contributes to more comfortable living and working conditions and may alleviate inmate tensions in hot weather. The Suwanee public prison installed a less costly dehumidification system. In addition, the public prison employs a centrally located guard tower to watch over inmates, whereas the private prison employs cameras, reflecting the private prison's greater reliance on technology. Finally, the private prison does not have a central dining room but provides food in the living quarters of the inmates. The private prison thereby reduces cost of construction, enhances inmate control, and may reduce staffing requirements (OPPAGA, 2010B).

**Kentucky**

Overcrowding in state prisons during the 1970s and 1980s led Kentucky to use private prisons. The first contract for use of private prisons occurred in 1986. The state also used county jails to house inmates. The number of inmates in private facilities increased from an average of 15,164 in fiscal year 2000 to 22,553 in fiscal year 2009 (KLRC, 2009). As we found in our analysis, the long run savings realized by Kentucky through PPP prisons has been significant, ranging from 12.46 and 23.50 percent.

In fiscal year 2009, 54 percent of inmates were in state prisons, 34 percent were confined in local and regional jails, 5.5 percent were in three contract prisons, and the remaining 6 percent were in halfway houses or home custody. A rough indication of relative cost is the fact that state prisons held 54 percent of the inmates and accounted for 64 percent of the DOC's cost while contract prisons with 5.5 percent of inmates cost the state 5.3 percent.

Kentucky statutes and/or contract terms require the private prisons to achieve accreditation by the American Correctional Association. The contracted prisons must achieve savings of at least ten percent compared to comparable state institutions and must provide similar education, training, and substance abuse programs as state facilities. The contracts have required that Kentucky guarantee and pay for minimum numbers of inmates. For example, at the Otter Creek Correctional Center, the fiscal year 2009 contract required that the state pay for a minimum of 90 percent of the contracted beds or 429 beds of the 476 contracted beds. This means that the extra cost is zero for housing an inmate in a contracted prison when the state occupancy is below the guaranteed rate. Moreover, in the contracted Lee Adjustment Center, inmates from Vermont were housed to fill beds not contracted to Kentucky.

In 2013, the Kentucky Department of Corrections provided overall prison per diem costs for contract and state prisons. The public prison cost for FY2012 was $60.14 compared with $46.80 for contract prisons. In any event, the savings from contract prisons were about $13 per inmate per day or 22 percent. This is not a comparison of comparable facilities.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 20 of 50 PageID #: 20750

BLACKSTONE0019118

In an earlier study, the Legislative Research Commission (KLRC) noted that comparing public and contracted prisons was difficult both because of differences in inmate characteristics and differences in the facilities themselves. In any event, the KLRC found for fiscal year 2009 that the average cost per inmate in the privately operated Marion Adjustment Center was $40.02 and the relevant state cost was $56.75. For privately operated Otter Creek, the cost to Kentucky was $53.60 compared to $77.96 for the most comparable state facility. Privately operated Lee Adjustment Center's cost was $58.04 compared to the relevant state cost of $47.53. However, it should be noted that only 50 beds were contracted at the Lee compared to 826 at Marion and 476 at Otter Creek, the other two PPP prisons. The annual savings for Marion was $5,043,928, $4,232,302 for Otter, and losses of $189,983 for Lee. For all three prisons combined, the short-term annual savings for the state were $9,086,251. Further, since Kentucky contracted out for overcrowding reasons, the long-term costs for public prisons should be considered and, thus, the savings for the state were even higher.

If only the per diem rate were compared to the state costs, the private contractors appear more cost effective. This is because the state pays for some prescription drugs and hospital expenses for inmates of PPP prisons, as well as the costs for monitoring contract compliance. Accordingly, the per diems for Marion were $34.54 and $43.62 for minimum and medium security, respectively. The blended rate at Lee was $43.62 and at Otter Creek it was $51.17. In terms of performance, as discussed in section 7, contracted prisons offer more programming than do state prisons (KLRC, 2009: 19). In terms of safety, there is no clear difference (KLRC, 2009: 67-68). More grievances were filed in contracted prisons. However, as the KLRC (p. 70) notes, this could be because inmates feel secure enough to complain. They do not fear retaliation or they are confident that their complaints will be addressed.

## Maine

Maine, which does not utilize private prisons, has only 2,038 inmates. The state, however, maintains detailed data for almost all categories of pubic costs. Interestingly, the short run prison costs are $117.36 per inmate and the long run prison costs per inmate are $127.95, including an imputed depreciation figure of $4.61 from the GAO/BOP. Maine's costs for both short and long run are double most of the other states examined. The reasons could be lack of economies of scale and high costs emanating from lack of competition provided by private prisons. Maine has four adult prisons, housing an average daily census in 2011 of 141, 147, 658, and 1,008 (Maine, Office of Program Evaluation and Government Accountability, 2011: 2). Thus, only one prison is efficient in size, while the others suffer from diseconomies of scale with higher cost for similar services of at least 15 percent. The short run cost per inmate per day in the other examined states is approximately $50. Adding the 15 percent cost penalty yields $57.50, while the additional cost attributed to lack of competitive pressure provided by the private prisons imposes on Maine up to $60 per day.

Maine's neighboring state, Vermont, contracts out prisoners to prisons in Arizona, Kentucky, and Massachusetts for $65.75 compared to $137.00 for housing inmates in its own state prisons. Vermont's in-state costs are similar to those of Maine (Picard, 2011). Although Maine does not contract out inmates, it seems important to show what Maine could save if it contracted out at its neighbor Vermont's prices. In 2011, Maine was almost at capacity. Thus, if Maine chose to contract out existing inmates then the avoidable costs would be merely short run. The savings would be $69.93 per inmate per day or 51.54 percent. However, given the fact that Maine is already operating near capacity (capacity is considered in the range of 95-98 percent), savings resulting from contracting out of additional inmates would be $69.12 per inmate per day or 49.38 percent. These would be long run savings because additional inmates would require public capital expansion.

## Mississippi

Mississippi's contracting with private firms to provide inmate correctional services began in 1994. Legislation allowed county boards to build and contract with the sheriff's department or for a private

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 21 of 50 PageID #: 20751

BLACKSTONE0019119

firm to operate and manage the facility. The first such facility was built in 1996 and was a combined jail and regional facility. An interview with a Mississippi DOC official revealed that in 2012 the DOC paid $29.54 per day to house 300 inmates in the original facility. Under this arrangement, Mississippi state government pays the debt services and, at the end of 20 years, the facility becomes state property. Private firms also built and operated their own prisons.

In 2012, five correctional facilities were managed and operated by private firms. They were built by counties and then leased to private firms. Four were 1,000-bed facilities, and one had 1,500 beds. A typical per diem rate was $29.74 plus medical, since the state paid all hospital expenses beyond the first 72 hours. The first 72 hours were the responsibility of the contractors.

Mississippi is a statutory savings state, which means that it must obtain the required ten percent savings over public prisons in order to have private firm operation. This constraint led to the 2011 voluntary termination of CCA's contract to operate the Delta Correctional Facility because CCA considered the required $31.16 per diem (ten percent less than the state's $34.61 cost) to be unacceptable (Reason, 2011). Mississippi was experiencing a decline in prison population, so the closure of the Delta facility could be easily accommodated by moving inmates to other facilities.

The contract prisons have to meet other non-price requirements as well. They must attain American Correctional Association accreditation within 14 months of beginning operation. Further, each of the five contract facilities has a monitor who is a state employee but is paid as part of the contract per diem.

**Ohio**
Ohio began the process of private participation in correctional institutions in March 1998 when the state legislature passed a law mandating that the Ohio Department of Rehabilitation and Corrections (ODRC) engage private firms to operate and manage the North Coast Correctional Treatment Facility (NCCTF), a 552-inmate, minimum-security substance abuse treatment facility for adult males, and the Lake Erie Correctional Institution (LECI), a 1,380-inmate, minimum/medium-security facility (material supplied by ODRC).

The initial contractor for the NCCTF, Civigenics, held the contract from September 1999 until replaced by MTC in fiscal year 2002. MTC agreed to a per diem of $62.87 for fiscal years 2002 and 2003, and Ohio reported savings compared to state operation of 5.02 and 5.92 percent, respectively, for the two years. Savings for subsequent years were about 17 percent, attributed to cost containment efforts by MTC. State operations would have cost $79.77 per inmate per day, according to Ohio officials.

More recent contracts provided additional savings for inmate populations in excess of 552 up to the maximum of 612 inmates. The 2006 fiscal year rate, for example, was $42 instead of the $65.08 rate for the first 452 inmates. This is likely a result of economies of scale that extend to inmate populations of at least 1,000 in minimum/medium security prisons discussed elsewhere in this report. Moreover, subsequent contracts after 2006 held annual increases below the Consumer Price Index (CPI), and the ODRC reported savings to be about 16 percent.

The contracts required MTC to maintain staffing at or above a certain level and provide a full range of education, health, rehabilitation, and training programs. The facility also had a Community Advisory Board and community volunteers, which help inmates and assured community member integration. The facility scored 100 percent on ACA accreditation standards.

It is important to note how Ohio determined some of its state cost data, which are compared with private prices. The ODRC uses a sophisticated model that includes program specific costs (ODRC, 2007). State costs are estimated based upon local conditions, and the experience of similar ODRC facilities adjusted for inflation. ODRC indirect costs are based on recent departmental reports.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 22 of 50 PageID #: 20752

BLACKSTONE0019120

LECI opened in April 2000 with MTC as the contractor. The ODRC determined that the per diem rate of $39.94 for fiscal year 2002 yielded savings of 12.55 percent compared to state operation. Additional cost savings for fiscal year 2003 were achieved by cutting 1.2 full-time equivalent staff and reducing the annual increase of prices to 0.5 percent instead of the CPI increase. Cost savings for fiscal years 2003 and 2004 were determined by the ODRC to be 12.94 and 16.69 percent, respectively. Contracts for subsequent years included lower rates for inmates between 1,380 and 1,480. Contracts for subsequent years also held per diem rate increases below the increase in the CPI, and savings were determined by the ODRC to be about six percent. Similar to NCCTF, an advisory board, community volunteers, and a 100 percent score on ACA accreditation were achieved.

In September 2011 the ODRC announced the sale of LECI to CCA for $72.7 million. The firm would also operate the facility and expand the capacity by 304 inmates. Annual savings of eight percent in operating costs were expected.

Turning to the findings, Ohio's short run savings from contracting out prisoners were 13.44 percent for 2010 and 4.14 percent for 2012. The respective savings for the long run were 26.81 percent and 20.28 percent. The statutory requirement in Ohio is five percent, and our calculations are in line with the ODRC. The ODRC provided us with its calculated savings, which ranged between six and 23.7 percent for the fiscal years 2002 through 2008 for one facility. For the other privately operated facility, the savings ranged between 8.5 and 18.1 percent for the fiscal years 2000 through 2008. All these savings related just to the short run. In any event, the appropriate comparison should be done on a long run basis, since Ohio avoids construction of new prisons and enjoys flexibility for changing inmate population.

As for indirect costs, the only item available was Vera's administrative cost, which we termed hierarchical costs of $1.4 million or $0.08 per inmate per day for fiscal year 2010. It is likely that other indirect costs are missing, and the same discussion that we had for Arizona applies. We chose to be conservative in our calculations and ignored these costs, since Ohio's savings from contracting out were above the statutory requirements.

The difference between the public long-term costs and the price paid for private prisons in 2012 was $16 per inmate per day. This difference is attributed to capital and interest costs of $9.63 per inmate per day and unaccounted pension and healthcare of $2.64 per inmate per day, totaling $12.27 per inmate per day. Thus, only $3.73 per inmate per day could be attributed to all other elements of cost including labor. In other words, lower pay to correctional officers by the contractor-operated prisons is a small component for the savings. Indeed, our interviews with ODRC personnel revealed that public correctional officers earn only $1 more per hour than their private counterparts. Differences in labor productivity and purchasing power savings of private prisons are additional elements that comprise the 23 percent. Thus, differences in wage costs could not exceed 23 percent of total savings for contracting out.

## Oklahoma

Oklahoma began contracting out inmates to private contractors operating in 1998 as a result of overcrowding in the state's public prisons. The Oklahoma Department of Corrections (OKDOC) considers overcrowding to occur when capacity utilization reaches or exceeds 95 percent. Oklahoma statute 54, section 570, "the Oklahoma Prison Overcrowding Emergency Powers Act" provides the authority for such contracting out to private contractors.

OKDOC in 1995 initially used county jails to house inmates, but capacity at county jails was soon exhausted. The OKDOC then contracted with private providers to house inmates in Texas. In December 1995, OKDOC contracted for 510 male beds and 50 female beds with Texas. As of April 15, 1997, contracts for 2,285 male inmates and 423 female inmates were in effect at eight Texas facilities

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 23 of 50 PageID #: 20753

BLACKSTONE0019121

operated by six companies. Monitoring of the Texas facilities proved difficult, and some problems occurred at one facility. Oklahoma had only two contract monitors and had to rely on volunteers (Oklahoma DOC, History). Accordingly, when space became available in Oklahoma private prisons, the inmates were relocated to Oklahoma. By October 1998, all inmates housed in Texas had been relocated to private prisons in Oklahoma. In December 2000, 5,824 male inmates were in five Oklahoma contract prisons operated by three companies, and 872 female inmates were in one private prison.

As of September 2011, 4,738 offenders were in Oklahoma private prisons. In 2011, the OKDOC determined that the $41.79 per diem rate at the private facilities was comparable to the $42.41 daily cost in medium-security state prisons. The OKDOC cost comparison does not include capital costs and is evidently done on a short-term basis. However, even for the short run, public prison costs should incorporate the unfunded pension and retiree healthcare for current employees. Moreover, the comparison should be done on a long-term basis. Indeed, as the OKDOC stated: "It appears continued housing in private facilities is a viable alternative to the massive capital outlay required for construction." (Document provided by OKDOC.) Thus, a true cost comparison between public and private beds in Oklahoma should consider capital costs to build a new facility, because the OKDOC currently operates close to 100 percent of capacity in its public prisons.

Of note, Oklahoma has not built a public prison since 1976; however, it did buy a 600-bed private prison in 2000 for about $27 million. Its public prisons in 2012 operated at 98 percent of capacity. Oklahoma in 2012 contracted with private prisons in the state to house almost 7,000 inmates, including out-of-state and halfway house inmates, while its state prisons held 18,000 inmates. The state contracted out medium- and maximum-security inmates. Private prisons in Oklahoma also held prisoners from Hawaii, California, Colorado, and Idaho. An OKDOC official claims that inmates who commit crimes while in Oklahoma private prisons impose a cost for adjudication and punishment by the Oklahoma justice system. On the other hand, contract prisons pay state and local taxes, provide employment, and purchase local goods and services. Determining the net financial impact of out-of-state inmates on Oklahoma is beyond the scope of this study.

Oklahoma uses PPP prisons for population management. Instead of building new prisons, Oklahoma contracts with private prisons, providing important flexibility so that new prisons are not needed. If capacity utilization is low, fewer inmates are sent to private prisons. Clearly, when comparing private and public costs, the public costs should incorporate all the long run capital costs.

Contracts with prison operators require certain performance standards. For example, one such contract requires that 80 percent of inmates be involved in education and job training programs. Private prisons must pay for inmate medical costs under $100,000 with a cap of $50,000 for a single episode. The state covers the rest. As in other states, OKDOC classifies all inmates, including those with medical problems, and determines to which prison they are sent. Some contracts specify that the percentage of inmates with particular conditions mirror that in the public prisons.

A 2007 study of Oklahoma public and contractor operated prisons conducted for the state legislature concluded that private prisons in fiscal year 2006 were less expensive than the most comparable public facilities (MGT, 2007: 3-21). Specifically, the per diems were $47.14 compared to $51.94. The report noted the difficulty of determining comparable facilities. It also stated that the cost difference was in part attributable to the older age of the public prisons, which added to their security problems, requiring higher staffing levels than the newer contractor operated prisons. The study also noted that contractor operator prisons could be built quicker because the leading contractors have greater experience and expertise in building prisons than almost all states.

The contracts also were shown to provide substantial flexibility for Oklahoma. The state had the option in some of the contracts to buy the contractor operated facility "at fair market value." Under the contracts, Oklahoma can reserve beds for up to 15 days, after which it has to pay for the beds even if it does not use them (MGT, 2007: 3-30).

The report showed that the contracted prices can be so low (as also in Mississippi above) that the private operator chooses to withdraw from the contract. This occurred in the case of the Cornell contract when Oklahoma raised the per diem by only seven percent in the ten years ending in 2006 (MGT, 2007: 3-20).

We now turn to our results. To begin, the public short-term costs are understated since Oklahoma does not fully fund its employees' retirement pensions. The Vera Report (2011) stated that 2.6 percent of the total OKDOC budget, or $11.6 million, was unfunded, and our interview with an OKDOC official indicated that 20 percent of required pension contributions were underfunded. We applied the 2.6 percent to the total short run cost per inmate per day and obtained the range of $0.99 to $1.99.

Comparing public costs with the private per diem charges for 2011, we find that in the short run, one contractor-operated, medium-security prison was 2.16 percent more expensive while the other saved 4.35 percent. However, this is an inappropriate comparison because Oklahoma's prisons were operating at full capacity even with the use of private prisons. Thus, the only alternative for Oklahoma is to build more prisons and, therefore, the long run state costs should be considered. The savings from the two medium-security prisons would then be 16.1 percent and 22.02 percent. For maximum-security facilities, the short run savings from the two private prisons were 27.56, and 29.23 percent. Again, the more appropriate long run savings were greater and, in fact, were 35.27 and 36.77 percent.

Salaries of correctional officers in public and private prisons are comparable. For example, beginning public correctional officers in 2012 earned $24,605, while private officers earned $24,190, a 1.7 percent difference. The total long run savings by contracting out medium-security prisoners were $8.63 and $11.37 per inmate per day for the two prisons, which results mostly from capital savings. The two maximum-security prisons achieved savings of $31.58, and $32.92 per inmate per day. Additional savings arose from avoided unaccounted pensions and healthcare costs of $1.29. The cost advantage of PPP facilities likely arises from their greater productivity and possibly greater purchasing power. This coincides with the 15 percent greater productivity of private prisons experienced in Ohio. Thus, the long run savings from contracting out to private prisons is marginally attributed to wage differences.

Generally, the quality of private and public prisons is thought to be comparable. The co-existence of public and private prisons has provided important additional benefits. In response to private prisons, public prisons have changed staffing patterns to become more efficient. Public prisons have also consolidated case management and improved service as a result of the experience with PPP prisons.

## Tennessee

Tennessee is a statutory state with a five percent required savings on private prison operations. The state owns the facilities, which are leased to private operators. Thus, like Florida, short run or operational savings are relevant.

Tennessee began the use of contract prisons because of overcrowding during the 1980s. The original 1986 law authorizing contract prisons allowed only one work camp. The legislation was amended in 1991 to allow one minimum- or medium-security contract prison. Tennessee then built three prisons, one of which was leased to a private firm under a three-year contract with a possibility of two-year renewal. This facility has between 1,500 and 1,600 beds. After the five years, the facility must be rebid. The contract prison must achieve five percent savings over a comparable public prison providing the

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 25 of 50 PageID #: 20755

BLACKSTONE0019123

same quality of service or higher quality at the same cost. The evaluation of contractor performance is done in the third contract year.

In 2013 and for some time prior, contractor operation has been evaluated through an annual inspection review of education services provided, the security level, and other indicia. Tennessee is still permitted to have only one contract prison. However, the state can contract with counties to house inmates, and the counties can then contract with private firms. As of 2013, Hardeman County has two contract prisons, one owned by the county and the other by the private contractor CCA. The one state-owned contract facility is South Central Correctional Center, which is leased to CCA. Each contract prison is overseen by two DOC monitors. The contract prison wardens participate in DOC meetings. One warden of a contract facility in 2013 was formerly a state prison warden. The contracts specify training requirements for correctional officers. Some private prison administrative employees receive some training in state facilities. Noteworthy, the state recently considered whether to take over South Central, sell the facility or continue to lease it. Tennessee decided to continue leasing, suggesting state satisfaction with the arrangement.

In terms of contract specifics, Tennessee guarantees payment for 90 percent of the contract capacity even if it uses less than the 90 percent. For utilization in excess of 90 percent, it pays the normal per diem. In county contract facilities, the state must give notice of 270 days before it can pay for fewer beds.

In April 2010, the Fiscal Review Committee of the General Assembly of the State of Tennessee conducted a review of private and public prisons for the fiscal year ending in June 2009. The committee staff reported that the state costs were $53.32 per inmate per day, which meant that the contractor's price including all state associated costs had to be below $50.65 per inmate per day. The state, after all, still incurred such administrative costs for contract prisons as inmate classification and record maintenance. The relevant figure for the private facilities (per diem plus associated state cost) was, in fact, $43.99 per inmate per day, which is $9.33 below the state cost, amounting to savings of 17.5 percent.

The report stated that it was difficult to do a dollar-to-dollar comparison because the relevant facilities have different levels of healthy inmates, although the DOC could not quantify the cost of these differences. Additionally, the report states that private facility had a relatively safer inmate population based on the number of close custody and maximum-security inmates in each facility. Again, the DOC could not quantify the cost difference

Tennessee was the only one of our examined states that reported the maintenance and the central administration overheads to be added to the contract price to determine any savings. We followed Tennessee and calculated the savings considering these costs.

## Texas

Texas began its legislative process of privatization in the late 1980s because of prison overcrowding, and the state's private prisons were built in the mid-1990s. The state also built public prisons in the same period. Initially, privatization took the form of state finance by revenue bonds, later by general obligation bonds. The later privately operated prisons were built by the contractors, who typically received a seven-year lease, renewable at the end of every two years. The Texas Legislature required that private contractors achieve ten percent lower costs without specifying whether the savings needed to be in operations or overall costs. In fact, Texas evaluates the savings on operating costs, which is appropriate in this particular case because the facilities are, in general, owned by the state and simply operated by private contractors. The data in Table 1 do not include medical services since Texas

BLACKSTONE0019124

contracts with local medical schools for all inmate medical care. Further, if medical care requires more than 72 hours, the inmates will be transferred from the private prison to a state prison.

In 2012, Texas contracted with 17 contract prisons comprising one-third of its inmate population. Most private facilities are minimum-security, while some are medium-security. Most private prisons are small, built for 500 inmates, while the one described as a prototype in Table 1 is for 1,000 inmates. Of the 17 private prisons, 13 were owned by the state under the BTO arrangement, and four were built or renovated and owned by the private operators. Most of the publicly operated prisons in Texas are quite old, and the oldest was built in 1856.

In 2012, Texas had approximately 140,000 prisoners housed in public and private facilities with a total capacity of 156,000. County jails are used as a relief valve to house prisoners when excess demand occurs. In addition, some of the private prisons specialize in certain types of offenders and are able to offer special treatment. For example, the private prison in Henderson, Texas specializes in treatment of drunk drivers.

Except for two public prisons in Houston and Dallas the remaining public and private prisons are located in rural areas or smaller cities, enhancing the local economy. Positions in these prisons are typically filled by local residents, providing jobs for the local community. Contractor-operated prisons purchase other local services, all contributing to these areas with the usual multiplier effect.

The direct costs per inmate in Texas public prisons in 2010 were $53.77, indirect were $1.30, and hierarchal were $0.19, reaching what Texas considers average variable costs of $55.26 per inmate per day. This figure is what Texas uses in its calculation for the required ten percent savings. This would yield a price no higher than $49.73 per inmate per day for the private facilities. The appropriate avoidable costs should also include the underfunded pensions and retiree healthcare of $4.44, which means that the appropriate required price to reach is $53.73 per inmate per day for private facilities. The price paid to the contractor for the 1,000-bed prototype was $37.47. The contract varies for each prison, while prices are typically lower for larger prisons due to significant economies of scale. We learned from Florida that the costs per inmate are 15 percent higher for a 750-inmate prison than for a 1,000-inmate prison.

Our interviews have clearly shown the benefits of the competition among the private contractors. The private companies cannot go below the public performance standards detailed in the contracts. However, evidence suggests that competition often yields higher performance quality in order to maintain long-term contracts. In addition to competition in pricing, Texas gains additional concessions through individual negotiations that follow the selection of the contractors. Thus, the states and inmates gain more than merely the statutory lower prices in the contract negotiations.

In addition to the actual savings, we learned from our interviews with officials of the Texas Department of Criminal Justice (TDCJ) that contractor operated prisons -- to a greater extent than state facilities -- have employed electronic tracking systems instead of the manual key board system. Electronic tracking systems provide greater security since access requires personal identification. In addition, some private prisons exceed the required standard eight-times-a-day count of prisoners. In terms of annual refresher training for correction officers, some private prisons train 56 hours annually instead of the standard 40 hours for public prisons. Private and public wardens together attend the same monthly meeting held by the six regional TDCJ directors. This clearly indicates the strong partnership and cooperation between the public and private sectors.

BLACKSTONE0019125

## 11. General Discussion of Public Costs and Private Prices

The critical issue of this study is the finding for the savings state governments derived from contracting out prison services. When the state legislatures enacted the statutory requirements for savings, they usually did not specify the exact nature of the savings. In this study, we distinguished between the direct operating savings that relate to the short run and the overall savings, which relate to the long run. As indicated earlier in this report, long run savings are the correct measure, except when a PPP prison manages an existing public facility. The typical motivation for PPP prisons is to relieve overcrowding where the only viable alternative is for the state to build its own prisons. Further, given the aging of U.S. prisons, even without overcrowding, some substantial rebuilding is often necessary, making long run costs applicable. Another lesser but related motivation is to save state resources.

Our study found that contracting out inmates to private prisons saved state governments money while maintaining performance at least at the same quality as public prisons. A head of corrections of a large state suggested that the compliance with the detailed contracts help ensure comparable performance. The existence of private prisons fosters competition and helps constrain spending on public prisons.

Short-term savings run the gamut from Oklahoma's loss for medium-security prisons of 2.16 percent all the way to California's savings of 57.36 percent. Texas and Oklahoma's maximum-security private prisons had relatively high short run savings of 37.39 and 29.23 percent, respectively.

As discussed earlier in section 3, the indirect costs are incorporated in the short run costs. The reported indirect costs range from $3.72 per inmate per day to $6.64 per inmate per day. We used mostly the estimates of the Vera report when available. Studies for the legislatures of Oklahoma and Tennessee concluded that about 75 percent of indirect costs continued even for the privatized inmates. In the long run, adjustments often occur and the private prisons might assume more of these currently government functions. Thus, in the long run, a greater percentage of the indirect costs may be avoided. In any case, the magnitude of the indirect costs is small and could not affect the results. As discussed in section 4, either the entire or only 25 percent of the indirect costs could be considered avoidable. We calculated in Table 1 both alternatives, however in our conclusions we maintained our conservative approach and considered only the 25 percent as avoidable costs. In any case, available data indicate that indirect costs are quite low, most in the range of $5 to $7.

Long term savings ranged between Kentucky's 12.46 percent and California's 58.61 percent, while Maine was close to California with potential savings of 49.38 percent. Maine, which does not contract out to private prisons, was incorporated in this study because of the availability of its detailed data. The extent of the details for the direct and indirect short run costs vary among the analyzed states. In the case of Maine, it is noteworthy that its lack of both private and public competition and its small prisons that cannot exploit economies of scale explain the state's high costs and great potential for savings. Indeed, additional competition among the states and private companies could be most beneficial. The extent of the savings including satisfying the statutory requirements did not change appreciably when just 25 percent avoidable indirect costs were employed. Only in the short run for medium-security prisons in Oklahoma and Arizona did the savings decline to -2.16 and -1 percent, respectively. However, the long run savings for both these states matter and those savings were maintained.

The following three factors led to lower costs of contract prisons. The issues of short versus long run avoidable costs and unfunded pensions and healthcare were usually ignored and led to greater savings for contracted prisons than typically found.

### Short- Versus Long-Term Costs

The state legislatures enabled contracting out in order to relieve overcrowding. In several states like Ohio, Florida, Mississippi, and Kentucky, a related objective was to achieve savings. The legislatures of

---

**Cost Analysis of Public and Contractor-Operated Prisons** – April 29, 2013                    Page 25

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 28 of 50 PageID #: 20758

BLACKSTONE0019126

these mandatory-savings states have determined that the required savings were obtained, even though they typically focused only on short-term costs.

In fact, the savings should reflect the avoidable costs to the state. Since, in general, overcrowding, along with the aging of the state prison infrastructure, means that the only alternative is state construction or major renovations, modernization, or repair, interest costs should be incorporated as the avoidable costs for government, an issue recognized by the Legislative Analyst's Office in California (2012B: 16). However, the states do not report depreciation since they are not private entities.

Better data are available for the interest payments made on bonds floated to build major infrastructures. Depreciation was estimated at $4.61 by the US BOP/GAO, and we incorporated that figure in all the states that did not report depreciation. The Legislative Staff Report for Arizona determined that depreciation was $9.30, indicating that the use of $4.61 is conservative. This long-run cost added to the savings of contracting out in the range of 2-14 percentage points, with six of the 13 observations at ten or more.

**Unfunded Pensions and Healthcare**
Vera, 2012, collected data from the 40 states that responded to its inquiry about the total cost of corrections. Vera obtained results for all the states that we examined except for Mississippi. The Vera study includes amounts for which the state is liable but did not fully pay. It also includes short-run costs attributable to corrections but which were not in the corrections' budgets. Capital costs, which relate to the long run and are not normally part of the corrections budget, were also enumerated. For our purpose, these are avoidable costs when states contracts out prisoners. These unfunded pensions and retiree healthcare contribute 1-13 percent of total long run costs with a mode of 4-5 percent.

**Labor Costs**
In the long run, labor costs were in the range of 43-71 percent of total costs. In general, contract prisons pay comparable wages but somewhat less in benefits. For example, Ohio private correctional officers are paid $1 less per hour. In Oklahoma in 2012, the beginning base salary for a correctional officer was $2,153 per month at the Northeast Oklahoma Correctional Center. A comparable beginning private correctional officer at the Davis Correctional facility earned $2,068 per month, 3.95 percent less than a public officer. Our interviews with state DOC officials revealed that, on occasion, private correctional officers were paid higher wages but lower pensions. The rationale provided is that the young correctional officers are concerned more about their current wages than distant pensions and retiree healthcare benefits.

Private contractors typically offer workers matching contributions up to five percent of their salaries for their 401k accounts. However, many workers choose not to contribute their share and thus lose the employer's contribution. Private and public correctional officers are drawn from the same labor pool. Generally, the training is substantially the same, providing similar number of hours with a few course differences. See for example, Arizona RFP, at http://www.azcorrections.gov/adc/divisions/adminservices/notice_rfp_1200001388.pdf.

In Ohio, for example, they attend the same training academy and, in another state, public correctional officers work part time in private facilities. It appears that private contractors are able to hire correctional officers of similar attributes to those hired by the state. Also, private contractors are more flexible than state governments to reflect specific market conditions and the specific preferences of employees. Private contractors provide a benchmark for labor costs for state correctional employees.

In California where only community correctional facilities operate within the state, the wages and benefits package in the correctional public sector are exceptionally high. California has 30,000 unionized

Case 3:16-cv-02267    Document 399-9    Filed 01/22/21    Page 29 of 50 PageID #: 20759

BLACKSTONE0019127

correctional officers and, each year, 130,000 candidates apply to become correctional officers. This excess demand for employment in public prisons is not surprising since the starting minimum salary in 2008 was $3,774 per month, and some earn more than $73,000 a year. California State Auditor (2009: 49) reports that during fiscal year 2007-8, beginning correctional officers were paid an average of $50,739 excluding any overtime. The annual pension contribution by California even for new officers was $12,000 for fiscal year 2009-10. This was $4,000 more than other state employees received. The overwhelming excess supply of applicants for correctional employment clearly suggests that the total compensation package was well above these workers' market values (CALAO, 2008). A strong union and lack of competition within the state from private contractors contributed to the exceptionally high wages and benefits. Maine, which again has no competition from private contractors and less efficient, smaller sized facilities, also had relatively high labor costs.

We wish to stress that government sources were primary for this study. Also, when calculations were made, we were conservative (biased downwards) in the state costs. The long run savings of contracting out prisoners are attributed, in declining importance, to the long-term consideration of costs, the inclusion of unfunded pensions and retiree healthcare, and the lower private costs of labor. We found no evidence that the lower costs are associated with possible lower performance of private prisons. Actually, we encountered government evidence that the performance of PPP prisons was, on occasion, higher than public prisons in Florida and Kentucky and comparable in the other examined states. An explanation for the at least comparable performance is the detailed contracts and the monitoring, including onsite that touches upon all the performance measures.

Other possible explanations for the savings are the purchasing power and flexibility in purchasing of the private firms. The contracting firms buy in large quantities for various prisons and can take advantage of opportunities that arise rather than be constrained by cumbersome state purchasing regulations. Also, in operation, private firms have greater flexibility in employment, perhaps taking greater advantage than government in using part-time workers (Interview with a Texas Department of Criminal Justice official, October 26, 2012). Private firms, in some cases, enjoy greater flexibility in hiring, which saves time and resources. Also, private firms can tailor their wages to specific labor market conditions, which is more difficult for public employers. For example, private correctional officers are paid less in rural communities, which usually have lower cost of living than in metropolitan areas. The state cannot differentiate wages to the same extent, and therefore overpays in rural areas or underpays in metropolitan areas. State officials in our examined states provided these explanations.

Two additional explanations for the savings achieved by the contracting firms are beyond the scope of this study. One relates to competition versus monopoly, and the other is beyond the control of state governments. Several of the interviews with state officials suggested significant competition among the firms in responding to the request for bids to operate prisons. The interviews and OPPAGA of Florida suggest that competition from private firms yield more efficient operation in public prisons. Blumstein et al. (2007) found that states with contract prisons within the state experienced greater savings for public prisons than states that either do not contract our prisoners or contract out-of-state. Even though contract prisons house less than seven percent of all inmates, their competitive effect is strong. The lack of such competition in government often leads to less efficient operations.

Texas provides a good example to the benefits of competition. Prices of privately operated prisons increased from $37.48 per inmate per day in FY2010 to $39.13 in FY2011, and then declined to $37.97 in FY2012. Short run costs for the prototype 1,000-bed state facility over the same period varied from $44.50 to $44.89, and then declined to $41.99 (Texas Legislative Budget Board, 2013). It is typical in competitive industries that prices and costs constantly vary. Indeed, in a three-year period, we witness fluctuations in private prices and state costs, which may indicate the effects of competition.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 30 of 50 PageID #: 20760

BLACKSTONE0019128

Interestingly, state governments could become competitive and reduce expenses if states were allowed to compete for inmates and use prisons as an export base for economic development for their distressed localities. The other explanation that is beyond the control of state governments is the fact that private firms operate newer facilities, often enriched with technology, that are cheaper to operate than the older, labor intensive public prisons. The Legislative Analyst's Office (CLAO) in California recognized this advantage of newer prisons (CLAO, 2012B: 16). One qualification relates to the medical costs. The contracts with the private contractors differ with respect to the private contractor's responsibilities towards medical services. In some states, sick prisoners were not assigned to private prisons. In other cases, the state becomes responsible for medical costs above a certain level once a prisoner from a private prison is sent to another location for medical services. Florida and Arizona tried to correct the data for the greater responsibility of public prisons for medical costs. Since a similar correction for the other states is beyond our ability to determine, we calculated how high medical expenses could become in order to just maintain the legislative mandatory savings. Noteworthy, Arizona awarded a contract for a 1,000 medium-security beds beginning January 1, 2014, which is a full-risk medical contract for the private provider (see http://www.azcorrections.gov/adc/divisions/adminservices/Request_for_Proposal_ADOC1200001388.aspx ).

Given uncertainties about the exact financial responsibilities of the state for medical care of inmates in private correctional facilities, we determined the maximum level that medical expenses could be while the statutory requirements were just met. Then, we observed whether medical costs of that magnitude are reasonable. The actual range of per diem reported medical expenses in public prisons is $5.97 in Texas to $43.95 in California (rows 2a, and 2b). Our calculated range for maximum "allowable" additional unknown medical costs (rows 36a, and 38b) is $11.23 in Kentucky to $100.62 in California. Thus, it appears that these "allowable" medical expenses are very high and therefore contracting out is still attractive regardless of our "unknown" additional state medical responsibilities for inmates in private facilities.

Another indicator for the validity of the savings is the ratio of the maximum allowable medical expenses to the actual medical expenses. This ratio suggests the maximum extent to which medical expenses could reach due to extra public support of contracted prisons' medical costs, while still maintaining desirability of contracting out. The range of the ratios is 0.93 for Mississippi to 3.96 for Texas. Intermediate ratios were for California and Oklahoma medium security, both at 1.8. Thus, California could support the medical expenses of its inmates in contracted prisons by almost twice its existing level and still benefit from contracting out (rows 40a, and 42b).

## 12.    Summary and Conclusions

This study compares costs of state prisons to the prices paid for contractor-operated prisons. The data used were from government sources, interviews with officials of state departments of corrections, and analysts from state legislative oversight agencies. We analyzed nine states and incorporated detailed federal data to supplement incomplete state data. Especially detailed data were available for Maine and Mississippi.

There are three primary reasons for the use of private prisons:  to generate cost savings and avoid large capital expenditures; to relieve overcrowding whether ordered by the courts or required because of threat of litigation perceived by DOCs; and sale of a state prison to private operators for budgetary reasons. The statutory savings requirements for private prisons are Florida (seven percent), Kentucky (ten percent), Mississippi (ten percent), Ohio (five percent), and Texas (ten percent). The statutory requirement applies both to where the contractor operates state prison and to where prisoners are

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 31 of 50 PageID #: 20761

BLACKSTONE0019129

placed in private prisons. In cases like Florida and Mississippi, the contractor operates state prisons. In Kentucky and Oklahoma, the prisoners are transferred to private prisons. Texas uses both models.

Overcrowding, which is the second reason for the use of private prisons includes, both the out-of-state transfer of inmates and the in-state use of private facilities. In California, the courts required a timely reduction of overcrowding, leading to the use of out-of-state contract prisons. The examined states that experienced overcrowding in addition to California were Arizona, Kentucky, Ohio, Oklahoma, Tennessee, and Texas.

Contracting out by selling a state prison to private operator generates an immediate lump sum amount to narrow a state budgetary deficit. This occurred in Ohio, which sold the Lake Erie Correctional Institution to a private contractor.

The nature of the private prison contract suggests what is appropriately included in the state avoidable costs. The calculated state costs should reflect the avoidable costs to the state when private contractors are considered. The state legislators normally do not specify the costs to be considered for the statutory savings, and this is left to the interpretation of DOC staff. It is important to emphasize that even if the categories of the avoidable costs are specified, the measurements are difficult, and could be subject to individual interpretation.

Economic theory helps us determine the types of costs that should be taken into consideration because of the use of private prisons. In statutory states without overcrowding, the appropriate comparison is between the state short run or operating costs and the contractor price. When overcrowding exists, the total of the operating and capital costs should be compared to the contractor price. When a public prison is sold, as in Ohio, total or long run cost is used for the comparison with the contractor's price. When overcrowding exists, both the operating and capital costs, namely long run costs, are the avoidable costs.

Table 1 specifies the short run direct and indirect costs, which are linked to the operation of the state prisons. The long run costs include the short run costs, in addition to depreciation and the government interest payments for the bonds that are used to finance a prison. These two items, which are also termed capital costs, become avoidable costs when a DOC avoids building new prisons by sending inmates to private prisons. Our estimation of the avoidable costs includes a few categories of actual costs, which were missing in prior studies. In the short run, costs included data on underfunded pensions and retiree healthcare of current employees. These costs are easily ignored when state budgets are tight, and are not reflected in the then current delivery of prison services. However, these costs are real and are being postponed to be paid in the future. Neglecting these costs lowers the state's apparent avoidable costs, and distorts legislative intent. California has by far the highest underfunded costs at $15.18 per inmate per day, followed by Maine's $6.86. The others range from $0.55 per inmate per day in Florida to $4.44 in Texas.

The indirect costs are the administrative costs incurred by DOCs and other state agencies linked to and for inmates. These costs are difficult to obtain and especially to determine what proportion is avoidable. We used conservative estimates of these costs as derived jointly by the U.S. General Accountability Office (GAO) and the US Bureau of Prisons (BOP). Again, maintaining our conservative approach, based on data for Tennessee, we chose to include only one-fourth of the state indirect costs as avoidable.

For Florida and Mississippi where contractors manage the state prisons, we use the short run costs as avoidable costs to the states. In Florida, the short run savings were seven percent as required by the state law. In Mississippi, the short run savings were 8.69 percent, slightly below the ten percent statutory requirement. The Joint Legislative Committee on Performance Evaluation and Expenditure

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 32 of 50 PageID #: 20762

BLACKSTONE0019130

Review (PEER) found that the costs of the private contractor met the statutory requirements (Mississippi, PEER, 2011, and 2012: 1). The long run savings are irrelevant for both states.

Whenever overcrowding exists, the statutory requirement is less relevant since the overcrowding has to be alleviated in a timely fashion. California is a classic example of the cost encountered for not avoiding substantial overcrowding and for preventing the operation of private prisons in the state. Overcrowding requires that the long run avoidable costs be compared against the contractor's price. The long run costs are appropriate because the state avoids building its own prisons. The long run consideration is also relevant when the state owns old prisons that need major renovations, prisons that are subject to demolition, or when the state faces difficulties in raising capital. The long run savings for Arizona's two prisons are 14.25 and 22.34 percent; California had 17.67 and 58.61 percent savings for two prisons; Kentucky's savings for its four prisons ranged between 12.46 and 23.5 percent; Ohio saved 20.28 and 26.81 percent in 2012 and 2010, respectively; Oklahoma saved on its four prisons 16.77 to 36.77 percent; Tennessee had 17.32 percent savings; and Texas had 44.95 percent savings. Maine, which does not utilize contract prisons, could have saved 47.65 percent when below capacity and 49.38 percent, if overcrowding exists.

At least equal performance to state prisons is required for contracting out. Indeed, the American Correctional Association established standards for prison performance, which the contract prisons generally met. Further, interviews with state DOCs reported that their contracts mandate performance levels, and DOCs closely monitor adherence to the contract requirements. Penalties can be and are imposed for performance violations. In Florida, contractors performed above the state level in training and educating inmates, which could be attributed to competition among contractors and the desire for contract renewal. Ohio and Texas require joint meetings of public and contract wardens, a practice that leads to greater cooperation and mutual learning. This practice seems to be beneficial and could be extended to other states.

A prison facility has limited alternative uses, capital costs are high (beyond the financing ability of most states), and the expected life span is long. At the same time, demand for prison space fluctuates and is expected to significantly drop in the near future, leaving some public prisons vacant. The existence of private prisons enables DOCs to avoid building new prisons when demand is high and prevents waste of these facilities when demand declines. This is a major long term cost savings that is not considered in the statutory calculation of the avoidable costs.

A major finding from the data and the interviews is that competition yields savings and better performance. The economics of industrial organization demonstrates the important benefits derived from even the presence of a small competitor in an otherwise monopolistic market. Examples include the transparent tape and physicians' services industries. In both industries, small firms have substantially increased competition and led to important gains for consumers. In the transparent tape industry, prices were reduced, and in the physicians' services industry, quality and innovations were introduced.

In the case of corrections, even though private contractors comprise less than seven percent of the industry, they have generated substantial competitive benefits. The benefits emanate from two sources. As more contractors compete, the prices are lower and the performance is better. But, savings also occur in public prisons. When private prisons become an available option, efforts are made by managers to lower costs, and demands by employees are constrained since public employees realize that the legislature might favor private corrections as a more cost effective option. Further, the greater the competition, the more managerial and technological innovations are introduced in both the public and private segments of the industry. It is important to note that the existence of public prisons also keeps in check price hikes by the private prisons. The knowledge that states could resort to the use of just public

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 33 of 50 PageID #: 20763

BLACKSTONE0019131

prisons encourages private contractors to offer their services at even lower prices than the statutory requirement.

This study leads to a possible moderate change that could encourage further competition and thereby achieve more efficient delivery of prison services. This is the model of managed competition initiated by then-Mayor Stephen Goldsmith of Indianapolis, Indiana, which encouraged public workers to participate in the bidding for their services to preserve their jobs along with the existence of private competitors. Mayor Goldsmith initiated the "yellow pages" test where he enabled contracting out of all city services whenever several providers were listed. But, he went one step further and allowed city employees to compete for the service, as well. By so doing, public employees, as well as private contractors, have an incentive to search for managerial and technological innovations and offer the service at competitive prices. This is possible when the outputs are quantifiable and the contract can clearly state what is required, and where oversight by government is relatively inexpensive. A third requirement is that a sufficient number of competitors, including the public workers, emerge. Contracting out to a monopolist private company that replaces a public provider is undesired. All relevant contractors, public and private, should be aware of upcoming contracts. The existing situation where public prisons operate indefinitely yields an unnecessary monopolistic power that could yield inefficient operation.

 Our discussions with state correctional executives suggested that contracts can specify the minimum performance levels required from the contractor that wins the bidding. Also, the private prison industry includes already a sufficient number of firms that compete across the United States. Thus, in each state where the legislature allows contracting out prisons, some existing state prisons could be auctioned as a "managed competition model" for a sufficient time period to encourage contractors to devote the appropriate resources for innovation and improved performance. This extension of competition could obviate to some degree the necessity for detailed contract specification and monitoring efforts. Reliance on markets like managed competition could reduce the necessity for such complicated calculations as in our Table 1.

The discussion above leads to a recommendation that could be considered. State legislators in the statutory states have established arbitrary levels of required savings of five, seven, and ten percent. High percentage savings may discourage some bidders and be counterproductive. It is not clear why the percentages differ and what the basis is for these numbers. By instituting managed competition where the public sector competes on a level field with the private sector, we let the market determine the savings. In such a case, the complicated calculations of what cost items should be considered as avoidable costs and how to measure these costs becomes unnecessary. Managed competition has worked for many local public services, and there is no reason why it cannot be successfully implemented in the state prison industry. Public and private competition and cooperation in service provision has worked and should be extended.

This study raises some important issues related to contracting out prison services that could improve the process and outcomes and may warrant further analysis:

1. Fluctuations in demand: Demand for beds fluctuates over time and is expected to decline because of the decreasing number of youth, changes in laws like the "three strikes" statue, and easing of penalties for drug-related crimes. As a result, we may witness a decline in occupancy in some states, while demand remains high in others. Easing of legislative rules and procedures of interstate transfer of inmates could save capital outlays for some states where the cost of imprisonment is high or overcrowding exists. At the same time, inmate transfers could raise revenues for states that are efficient in service provision, enjoy economies of scale, or have unused capacity.

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 34 of 50 PageID #: 20764

BLACKSTONE0019132

2. Medical services: Costs for medical services are very high, and the extent of the costs varies substantially among the states. One issue is whether contractors or the states should bear the risk. It seems that analysis of medical procedures of existing contracts and a search for a socially efficient procedure that maintains business viability is desired.

3. Length of contract: Our suggested managed competition model is relevant for the existing state prisons and does not apply to other cases. An important issue that is not addressed in this study is the length of time for a contract. This period has to be long enough to recover the initial investment and maintain incentives for adopting technological and managerial innovations. At the same time, a lengthy contract prevents new competitors from entering the market with innovations that could lead to lower prices than existing contractors. However, if a sufficient number of prisons join managed competition and contracts open at varying times, lengthy contracts are possible. Economic theory suggests that as the market increases with both competitive contractors and prisons available for contracting, the length of contract time could be extended, and the extent of regulation by government could be reduced. We suggest a follow-up study on the lessons of managed competition in similar states and local markets to learn of its implications for the prison industry. If indeed the model is "sound," then the study could follow with a model and stages of implementation.

Case 3:16-cv-02267　　　Document 399-9　　　Filed 01/22/21　　　Page 35 of 50 PageID #: 20765

BLACKSTONE0019133

# References

Arizona Joint Legislative Budget Committee (ULBC), Staff Memorandum, 2012. **State-Private Prison Cost Comparison**. September 19.

Arizona Governor, 2011. **The Master List of State Government Programs: Fiscal years 2010-2013.** Obtained from http://www.ospb.state.az.us/documents/2011/Masterlist2010-2013.pdf Last visited December 11, 2012.

Belenko, Steven, 1999. "Literature Review of Private Prison Costs", in Judith A. Greene, **Privatization of Correctional Services: Evaluating the Role of Private Prison Management in Minnesota,** Institute of Criminal Justice, University of Minnesota Law School.

Blumstein, James F., Mark A. Cohen, and Suman Seth, 2007. "Do Government Agencies Respond to Market Pressure? Evidence from Private Prisons." Owen Graduate School of Management, Vanderbilt University. http://www.cca.com/static/assets/Blumstein_Cohen_Study.pdf Last visited 1/20/13.

Brown Ben, 2011. "Alaskans deserve better than the not-so golden Goose Creek prison". **Juneau Empire.com**, March 6. http://juneauempire.com/stories/030611/opi_795369352.shtml Last visited December 20, 2012.

California Legislative Analyst's Office (CALAO), 2008. **Correctional Officer Pay, Benefits, and Labor Relations,** February 7. http://www.lao.ca.gov/2008/stadm/ccpoa_pay_020708/ccpoa_pay_020708.aspx Last visited December 11, 2012.

California Legislative Analyst's Office (CALAO), 2010. **California Out-of-State Correctional Facility Program,** January 20. Presented to the Assembly Accountability and Administrative Review Committee.

California Legislative Analyst's Office (CALAO), 2012A. **Providing Constitutional and Cost-Effective Inmate Medical Care**. April 19.

California Legislative Analyst's Office (CALAO), 2013. **California's Criminal Justice System: A Primer**. January. http://lao.ca.gov/laoapp/PubDetails.aspx?id=2682 Last visited February 3, 2013.

California Legislative Analyst's Office (CALAO), 2012B. The 2012-13 Budget: Refocusing CDCR After The 2011 Realignment. February 23. http://www.lao.ca.gov/analysis/2012/crim_justice/cdcr-022312.pdf Last visited December 11, 2012.

California State Auditor, 2009. California department of Corrections and rehabilitation: It Fail to Track and Use Data....September, Report 2009-107.1.

California State Works Board, 2012. **Agenda with Analysis for Meeting September 11, 2012.**

Elliott Pollack and Company, 2010. **Economic and Fiscal Impact of CCA-Arizona Correctional Facilities**. Scottsdale, Arizona. January. http://www.cca.com/static/assets/CCA_Arizona_Impact_Report_2009_FINAL_011810.pdf Last visited January 28, 2013.

Florida Chamber of Commerce, 2012. "Data shows privately run prisons can provide a better environment for effective inmate rehabilitation programs". February 13. Copy is available from the Chamber.

Case 3:16-cv-02267    Document 399-9    Filed 01/22/21    Page 36 of 50 PageID #: 20766

BLACKSTONE0019134

http://www.wctv.tv/blogs/editorial/Data_Privately_Run_Prisons_Can_Provide_Better_Rehabilitation_Programs_139216274.html. Last visited March 21, 2013.

Florida Department of Management Services, 2012. **Private Prison Monitoring**, Presentation before the Florida House Appropriations Committee. January 19. http://big.assets.huffingtonpost.com/FloridaDMSJan2012.pdf Last visited January 30, 2013.

Gaes, Gerald G. et al, 2004. **Measuring Prison Performance: Government Privatization and Accountability**. Altamira Press, N.Y. NY.

Gilroy, Leonard, and Harris Kenny, 2011. **Annual Privatization Report 2011: Corrections and Public Safety**. Reason Foundation, Los Angeles, California. http://reason.org/files/publicsafety_annual_privatization_report_2011.pdf Last visited December 14, 2012.

Kentucky legislative Research Commission (KLRC), 2009. **Cost of Incarcerating Adult Felons**. Research Report No. 373. http://www.lrc.ky.gov/lrcpubs/RR373.pdf Last visited November 19, 2012.

Kentucky Department of Corrections, 2013. Research and Statistics, Annual Reports**, Cost to Incarcerate.** http://corrections.ky.gov/about/Pages/ResearchandStatistics.aspx Last visited February 5, 2013.

MGT of America, 2007.**Performance Audit of the Department of Corrections for the Legislative Service Bureau of the Oklahoma Legislature**: **Final Report**. December 31. http://www.okhouse.gov/Documents/OKRVSDFinalReport080103.pdf Last visited December 21, 2012.

MGT of America, 2006. **Comparative Study of South Bay and Lake City Private Prison Facilities**, Prepared for Florida Department of Management Services. November 1.

Mississippi, Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), 2011, and 2012. **Mississippi Department of Corrections FY 2011, (and also for 2012) Cost Per Inmate Day.** December 13, 2011, and December 11, 2012.

Nelson, Julianne Nelson, 2005. **Competition in Corrections: Comparing Public and Private Sector Operations**, the CNA Corporation, Boston, December 2005.

Oklahoma Department of Corrections. "History and Development of Private Bed Space in Oklahoma Department of Corrections." Document provided by OKDOC, November 2012.

Ohio Department of Rehabilitation and Corrections (ODRC), **2011 Annual Report**. http://www.drc.ohio.gov/web/reports/Annual/Annual%20Report%202011.pdf Last visited February 13, 2013.

ODRC, 2007. **Basic Model for Estimating Operating Costs**. Attachment to the contracts for North Coast Correctional Treatment Facility and the Lake Erie Correctional Institution.

OPPAGA, 2010A. "Private Prisons Exceed Savings Requirements". Office of Program Policy Analysis and Government Accountability, Florida Legislature, April 20. Last visited April 8, 2013.

OPPAGA, 2010B. "Prison Construction: Research Memorandum". Florida Legislature, February 1.

Pew, Center on the States, 2010. **The trillion dollar gap: underfunded state retirement systems and the roads to reform**. Washington D.C. February.

http://www.hartfordinfo.org/issues/wsd/taxes/the_trillion_dollar_gap_final.pdf  Last visited April 8, 2013.

Pew, Center on the States, 2012.  **The Widening Gap Update**.  Issue Brief, June. http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Pew_Pensions_Update.pdf

Picard, Ken, 2011.  "Is It Cheaper to House Vermont Prisoners In or Out of State?  It Depends". http://7dvt.com/2011vermont-prisons  Last visited November 5, 2012.

Sanders, Katie, 2012.  "Private Prisons Can Chase Escapees", **Tampa Bay Times**, February 14 Page 18.

Segal, Geoffrey F. and Adriane T. Moore, 2002. **Weighing the Watchman: Evaluating the Costs and Benefits of Outsourcing Correctional Services**.  Reason Public Policy Institute, Policy Study 289, Los Angeles CA.  Jan.

State of Washington, 2012.  **The Washington State Budget Process**, Office of Financial Management, Budget Division, June.

Strumpf, Dan, 2013.  "With Fewer to Lock Up, Prisons Shut Doors", **The Wall Street Journal**, February 11: A-3.

US Army Corps of Engineers, 2011. **Civil Works Construction Cost Index System**, March 31, pages A-15, A-20.  http://planning.usace.army.mil/toolbox/library/EMs/em1110.2.1304.pdf

Tennessee General Assembly, Fiscal Review Committee, 2010.  Memorandum on "Cost Comparison: State and Private Prison Contractors".  April 26.

Texas Legislative Budget Board, 2013.  **Criminal Justice Uniform Cost Report: Fiscal years 2010-2012.** January. http://www.lbb.state.tx.us/Public_Safety_Criminal_Justice/Uniform_Cost/Criminal%20Justice%20Uniform%20Cost%20Report%20Fiscal%20Years%202010%20to%202012.pdf  Last visited February 11, 2013.

Texas Legislative Budget Board, 2011.  **Criminal Justice Uniform Cost Report: Fiscal years 2008-2010**. January. http://www.lbb.state.tx.us/Public_Safety_Criminal_Justice/Uniform_Cost/Criminal%20Justice%20Uniform%20Cost%20Reports2008-2010.pdf  Last visited February 11, 2013.

US Bureau of Justice Statistics (US BJS), 2011.  **Prisoners in 2010**.US DOJ.  Report NCJ 236096. http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf  Last visited February 27, 2013.  Appendix Table 20. Last visited February 27, 2013.

US Bureau of Justice Statistics (US BJS), 2005.  **Census of State and Federal Correctional Facilities**, 2005. http://bjs.ojp.usdoj.gov/content/pub/pdf/csfcf05.pdf  Last visited February 25, 2012.

US Government Accountability Office (GAO), 2012.**Federal Bureau of Prisons: Methods for Estimating Incarceration and Community Corrections Costs and Result of the Elderly Offender Pilot**, July 27.

Vera Institute of Justice (Vera), 2012.  **The Price of Prisons: Incarceration Costs Taxpayers.**  Updated March 20, 2012.The Vera Institute of Justice, New York, NY.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 38 of 50 PageID #: 20768

BLACKSTONE0019136

## Appendix 1: Data Sources for the Table on State Costs, Contract Prices, and Savings

**Arizona:** We used the following three sources:

(1) Auditor General Staff Analysis of the Department of Corrections, **Fiscal 2009 - Fiscal 2010.**
http://www.azauditor.gov/Reports/State_Agencies/Agencies/Corrections_Department_of/Performance/10-08/10-08.pdf Last visited December 24, 2012.

(2) Arizona Department of Corrections, 2011. **FY 2010 Operating Per Capita Cost Report**, Bureau of Planning, Budget and Research, April 13.

(3) Arizona Joint Legislative Budget Committee, 2012. **Staff Memorandum: State-Private Prison Cost Comparison**. September 19.

For the short run costs of male inmates in minimum- and medium-security prisons, we used data from page 3 in (2). Depreciation and other capital expenses were calculated by the Arizona Joint Legislative Budget Committee Staff, 2012 to be $10.71 instead of the $1.41 reported by the AZ DOC. A similar adjustment of $2.67 was made to account for underfunded pension liabilities as reported in (3) for Arizona.

The following unaccounted costs were obtained from the Vera Report. We calculated $0.16 to be hierarchical costs per inmate per day for both minimum and medium prisons. We did not include this figure. Instead, we used the more comprehensive figure of 11 percent, which also includes the administrative functions of DOC provided by BOP/GAO. This calculated figure for Arizona was $5.42, which falls in the range of $1.40 to $6.64 of the other examined states, and the GAO benchmark figure of $8.09. Debt service per inmate per day was $0.04. This was calculated from the $530,000 reported by Vera for 2010. To be conservative, we did not include the $2.2 million in judgment costs reported by Vera since we were unsure whether such costs should be fully allocated to public correctional facilities.

**California:** For California, wages can be separated from benefits. California State Auditor, California Department of Corrections and Rehabilitation: It Fails to Track and Use Data…, September 2009, Report 2009-107.1. For California, wages and salaries were $36.72 per inmate per day, overtime was $6.63, and benefits were $16.25. Facilities and operations include food, repair, clothing, and other items. Education and training of inmates are included in state-provided professional services. The hierarchical cost of $4.04 per inmate per day includes both administration and headquarters costs. Vera reports unattributed statewide administrative costs for corrections to be $438 million. We added the per diem per inmate of $0.62 to the $44.04 to obtain $44.66. Since no data are available on interest and depreciation for California, we therefore used the $4.61 figure from BOP/GAO. The annual price per inmate was $29,100 obtained from the above California State Auditor Report: 36. The daily fee was therefore $79.73 per inmate.

Monitoring costs for California have been exceptionally high. The state sent 73 monitors to the out-of-state facilities resulting in a total costs for oversight and monitoring for 2010/11 of $15,981,000 or $4.42 per inmate per day. The cost and inmate population were obtained from the California Budget for Department of Corrections and Rehabilitation, 2011/12: CR5, and CR15.

Data for 2011/12 were obtained from California Legislative Analyst's Office (CALAO), 2013. California's Criminal Justice System: A Primer. January, 17: 50. Obtained from http://www.lao.ca.gov/reports/2013/crim/criminal-justice-primer/criminal-justice-primer-011713.pdf Last visited March 21, 2013.

Case 3:16-cv-02267    Document 399-9    Filed 01/22/21    Page 39 of 50 PageID #: 20769

BLACKSTONE0019137

We had to make some minor adjustments to the data in this report in order to fit the categories of Table 1. However, this did not distort the values for the total short run and long run government costs. Security in the report was classified as personnel services. Facility operations, which include maintenance and utilities, were incorporated in Table 1 as utilities. The remaining items under facility operation and records were classified in Table 1 as hierarchical. "Food and Clothing" were incorporated in Table 1 under the same categories. The remaining items under the category "Inmate Food and Activities" were added to the miscellaneous category, which was classified in Table 1 as "All other." Finally, "Rehabilitation Programs" were classified in Table 1 as 'State Provided Professional Services."

Vera reported 167,276 inmates in fiscal year 2011. It reported $320.1 million in underfunded retiree healthcare contributions and $607 million in underfunded retiree healthcare contributions for current employees, totaling $927.1 million. The latest California State Auditor Report (up to November, 2012) provides the costs for 2007/8, while Vera's underfunded and statewide contributions are for 2009/10. Vera also reported education and training costs provided by the California Department of Forestry and Fire Protection of $4.5 million. Since it is unclear whether these costs are recurring expenses, we chose the conservative approach of excluding them.

**Florida**: We chose to use Table A-5 Adult Male-Size Adjusted for 2008/9 from the Office of Program Policy Analysis and Government Accountability, Private Prisons Exceed Savings Requirements. Research Memorandum, the Florida Legislature, April 20, 2010. Indirect costs entail costs imposed on the Departments of Corrections and Management Services. Our interviews revealed that there may be unfunded pensions for state employees, so the current state costs could be understated. However, Vera reports underfunding of only $0.55 per inmate per day. As for education and training programs, the cost for public facilities was $0.79 per inmate per day. However, the spending by contractor-operated male prisons for the same services, adjusted for size so as to be comparable to state facilities, was in the range of $3.92 to $5.88 (Table A-5). For Table 1, we used the average of the two values, which is $4.90. Table A-7 of the above report provides the per inmate per day price of $50.68 for the Bay Correctional Facility and $50.48 for the Moore Haven Correctional Facility. The average for the two private prisons was $50.57 per inmate per day. For the construction costs, we used OPPAGA, 2010B for the publicly built, close custody Suwannee Correctional Institution of $97.8 million for 1,521 inmates. At the interest rate of four percent, the cost per inmate per day is $7.05. This cost item is presented in Table 1, but is not used in the calculation.

**GAO adjusted figures:** The calculation of costs for the individual states does not include the long-term costs for the facilities. However, it is reasonable to assume that state capital costs are similar to federal costs. We used the report by the U.S. Government Accountability Office (GAO), Incarceration Costs and Elderly Offender Pilot Results, report GAO-12-807R, Briefing before the Subcommittee on Crime, Terrorism, and Homeland Security, Washington DC, July 27, 2012 to obtain short- and long-term costs. GAO provides capital and indirect cost percentages, which allowed us to obtain labor costs. We term labor costs as personnel services. In this case, personnel services include, in addition to the usual manpower costs, education and training of inmates. The GAO reported marginal costs, which includes food and medical, so that we were able to subtract such costs from the total direct costs to obtain just labor costs.

**Kentucky:** Most of the data were obtained from officials at the Kentucky DOC and from the Kentucky Legislative Research Commission (KLRC), 2009. An official from the Kentucky DOC provided us with the following public short run direct costs for the most comparable facilities to the contract prisons:

Public prison: Roederer Correctional Complex, minimum/medium 2011, $53.78, and $51.31 for 2012; private prison: Marion Adjustment Center, $47.21, and $$43.98, respectively.

Case 3:16-cv-02267      Document 399-9      Filed 01/22/21      Page 40 of 50 PageID #: 20770

BLACKSTONE0019138

Public prison: Little Sandy Correctional Complex, minimum 2011, $48.76, and $50.53 for 2012; private prison: Otter Creek, medium $44.14, and $49.63, respectively.

For 2011:
http://corrections.ky.gov/about/Documents/Research%20and%20Statistics/Annual%20Reports/Cost%20to%20Incarcerate%202011.pdf

For 2012:
http://corrections.ky.gov/about/Documents/Research%20and%20Statistics/Annual%20Reports/Cost%20to%20Incarcerate%202012.pdf

Vera provided data on underfunded pensions, retiree healthcare contributions, underfunded retiree healthcare, and the number of inmates in the state. We used all that data to calculate the underfunded category (W19, X19, Y19, and Z19) to be (200,000+13,700,000+7,900,000)/ (21,347*365=$2.80). The short run hierarchical costs were termed statewide administrative costs in the Vera report for 2009/2010 and calculated to be $2,800,000/(21,347 inmates*365)=$0.33. Again from Vera, we obtained the total interest costs of $14.8 million. We then calculated the long run interest costs per inmate per day to be $14.8 million/ (21,347 inmates*365) =$1.90. KLRC, fiscal 2009 page 17 provided the cost of monitoring to be $105,362 for 2009. We calculated the monitoring cost to be $0.23 per inmate per day for the 1,234 private inmates. The state monitoring cost was included as Central Office Overheads attributed to Private (row 26a). The source for the amount is the KLRC, 2009, while the entries in Table 1 are for 2011 and 2012. The number of private inmates and the total number of inmates appears in the minimum/medium prison column, 2011. Again, the data on private and total inmates, as in all other examined states, come from BJS, 2011 for the year 2010. Inmate numbers change on a daily basis. Also, Vera's data refer to the fiscal year 2009/2010, while BJS refers to the calendar year 2010. The differences among the various sources are minor.

**Maine:** Main data were obtained from its Office of Program Evaluation & Government Accountability, Cost per Prisoner in the State Correctional System, June 2012. Included in the state's report are all adult prisoners of 3 levels. Personnel services include pensions and benefits. We calculated the individual items by multiplying the $42,538 annual per inmate costs by the percentage category on page 5 of the Maine report. Maine paid $1.6 million in interest. According to the Vera Report, underfunded retiree healthcare amounted to $5.1 million. Per diem underfunded retiree healthcare per inmate was then $5,100,000/ (number of inmates, 2,038* 365)= $6.85. Unaccounted hierarchical costs were $1.4 million according to the Vera Report, and Maine reported general administration costs of $2,520,425. Thus, hierarchical costs, which incorporate the two elements, are $5.27 per inmate per day. The Vera Report provides $1.6 million for capital costs which translates to $2.16 per inmate per day.

**Mississippi:** Data were derived from the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), Mississippi Department of Corrections FY2011 Cost per Inmate Day. The Mississippi Legislature, December 13, 2011. Data were extracted from page 8. For "Personnel Services," we added other costs to salary costs. Annual debt services are hypothetical costs that reflect what it would cost the MDOC to finance a new prison and are included in Table 1 as "Interest on Debt." These costs incorporate depreciation. Hierarchical costs include "Administrative Costs," which are costs imposed on other state agencies. Vera did not obtain data from Mississippi for any underfunded contributions or other unattributed costs for corrections.

Monitoring of the five private prisons is paid by the contracted prison as part of its per diem. The amount is about $60,000 per prison, where four prisons house 1,000 inmates and the fifth 1,500 inmates, and occupancy is 98 percent. Thus, the cost per inmate per day is around $0.15. Clearly, since

the cost is part of the price charged by the contracted prison, it is not separately incorporated in our matrix.

**Ohio:** Ohio Department of Rehabilitation and Corrections (ODRC) must achieve at least a five percent savings in the per diem for private contracts after adding the costs of monitoring. This is the maximum price to be charged by the private company. The 2000 data were more detailed than the data in the recent years. However, since the precise source is incomplete, we chose to present the data without evaluating it. The 2010 and 2012 data were provided by the ODRC. The short run average variable cost for the public prisons of ODRC was calculated as a weighted average of the two public prisons most comparable to Lake Erie Correctional Institution, the privately contracted prison. These were Richland Correctional Institution and Southeastern Correctional Institution. The weighting was done by the inmate population. The 2010 calculation was done by ODRC, while we followed the same procedure for 2012. Vera determined that the costs for 2010 were understated by 3.8 percent, and the same should be applied for 2012. We did not make the adjustment for the higher indirect and underfunded costs of 3.8 percent. Instead, in order to avoid double counting, we added the hierarchical costs and the federally determined 11 percent indirect costs calculated on the direct costs. Hierarchical costs are derived from the Vera Report for 2010 by dividing the statewide administrative costs of $1,400,000 by the total number of inmates of 50,960 and by 365 to obtain $0.075. Underfunded retiree healthcare of $49,100,000 was similarly calculated to obtain $2.64 per inmate per day. Indirect costs were calculated in the GAO Report, 2012 as 11 percent of short run direct costs. We applied that figure to calculate Ohio's short run indirect costs.

Ohio sold a 1,570-bed male prison to CCA in 2011 for $72 million. Depreciation costs for both 2010 and 2012 were $72.7 million/20 years/1,570 inmates/365= $6.34. However, we chose to be conservative and therefore used the BOP/GAO modernization, depreciation, and repair figure of $4.61. For interest paid on state bonds we used four percent on the actual Ohio's sale price of $72.7 million to obtain a cost of $5.07 per inmate per day. Since the prison was sold in 2011, we then calculated the short and long run percentage savings just for 2012.

**Oklahoma:** Data were obtained from Oklahoma Department of Corrections, Total Cost to State, "Statement of Operating Cost per Inmate Based on FY2011 Actuals." The category "Actual Costs" is assumed to refer to labor, education, and training, including all benefits for such personnel. The unfunded pensions for 2010 were calculated as: $11,600,000/(24,549*365)=$1.29. These figures were obtained from Vera, the Oklahoma page. We included depreciation costs based on the $4.61 figure calculated by the U.S. Bureau of Prisons (US GAO, 2012), which was used to charge states for holding their inmates in federal prisons. OKDOC purchased in 2000 a 600-inmate private prison for about $27 million. Computing interest (0.04 percent) per inmate (600) per day (365) yields $4.93. Modernization, repair and depreciation of $4.61 were obtained from the U.S. GAO based on the U.S. BOP study.

The number of private and total inmates, for every state was available from the U.S. DOJ, Bureau of Justice Statistics, 2011. Prisoners in 2010. Appendix tables 1, and 20 (see http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf). For Oklahoma (and also for Mississippi and Kentucky), we included the total for the state statistics under the medium category. The prices per diem paid by OKDOC to the three medium-security male private prisons and to the one maximum-security male private prison are available at http://www.doc.state.ok.us/field/private_prisons/privates.htm. This website also includes the daily occupancy rates http://www.doc.state.ok.us/offenders/count.htm and ages of all prisons http://www.doc.state.ok.us/facilities/facilities.htm.

**Tennessee:** The Tennessee DOC provided a document from the General Assembly of the State of Tennessee Fiscal Review Committee, Memorandum on "Cost Comparison: State and Private Prison Contractors", April 26, 2010. The state is responsible for major maintenance of the privately operated

prison, which is owned by the state. The central overhead allocation reflects state costs for private contract prisons. This allocation is 76-77 percent of its own cost for state prisons. Both items were added to the price by the legislature to determine whether the state five percent statutory savings were met. The data for the number of inmates (27,451), and number of inmates in private facilities (5,120) are for 2010, and derived from U.S. BJS, 2011.

**Texas:** Data were obtained from the Texas Legislative Budget Board Staff, Criminal Justice Uniform Cost Report, Fiscal Years 2008-2010, January, 2011. Personnel services include just wages and salaries. Benefits were calculated by dividing the total benefits ($564,800,000) from Vera's report, by the average number of offenders (22,798) in the 1,000-bed prototype institutions (Table 14, p. 29) to obtain the daily cost. The calculation is as follows: (564,800,000/139,061)/365=$11.12. Hierarchical costs were calculated for Texas from the Vera report as statewide administrative costs of $9,400,000/(139,061*365)=$0.19. The 139,061 number of inmates was taken from the Texas legislative report, p. 39. Interest for capital outlays to fund repairs and rehabilitation was $208.7 million in 2010, which is found in the Vera report. We ratioed the share of adult prisoners in prototype institution out of the total prisoners (22,798/139,061*208.7M)/(365*22,798)=$4.11. Texas has underfunded pensions and retiree healthcare that it has neglected to pay. The Vera Report for fiscal year 2010 provides these numbers: $48.1 million of underfunded pensions, $177.2 million underfunded retiree healthcare, adding to $225.3 million. The underfunded total per inmate per day is $225,000,000/(139,061 inmates*365)=$4.44. Indirect short term cost was $1.30 per inmate per day was reported in the Uniform Cost Report, January 2011. We chose to use the standardized BOP/GAO figure of eleven percent which is consistent with the data of most states.

## Table 1: State Costs and Private Prices

| Itemized Costs by State, Custody & Year (Custody/Year) | AZ Min 2010 | AZ Med 2010 | CA 2007/8 | CA All 2011/12 | FL 2008/9 | KY Min/Med 2011 | KY Min/Med 2012 | KY Med 2011 | KY Med 2012 | ME 2011 | MS Min 2011 | MS Med/Max 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a Personnel Services (mainly security) | | | 59.60 | 67.01 | 38.83 | | | | | 79.25 | 21.19 | 20.58 |
| 2a Medical Services | | | 21.89 | 43.95 | 8.65 | | | | | 16.67 | 8.78 | 8.78 |
| 3a Food | | | | | 4.61 | | | | | 3.50 | 3.01 | 3.01 |
| 4a Utilities | | | | | | | | | | 3.38 | | |
| 5a Fuel | | | | | | | | | | 2.68 | | |
| 6a Contracted Professional services | | | | | | | | | | 2.10 | | |
| 7a Office & Supplies | | | | | | | | | | 2.10 | | |
| 8a State Provided Professional Services | | | 4.20 | 2.54 | 4.90 | | | | | 1.52 | 2.31 | 0.83 |
| 9a Technology | | | | | | | | | | 1.28 | | |
| 10a Rents | | | | | | | | | | 0.58 | | |
| 11a General Operations | | | 9.08 | 13.91 | | | | | | 0.58 | | |
| 12a Repairs | | | | | | | | | | 0.58 | | |
| 13a All Other | | | | 2.10 | | | | | | 0.58 | | |
| 14a Paid Short Run Costs | 46.59 | 48.32 | 94.77 | 134.12 | | 53.78 | 51.31 | 48.76 | 50.53 | 114.79 | 35.29 | 33.20 |
| 15a Underfunded Pensions (incl. healthcare) | 2.67 | 2.67 | 15.18 | 15.18 | 0.55 | 2.80 | 2.80 | 2.80 | 2.80 | 6.86 | | |
| 16a Short Run Direct Costs | 49.26 | 51.09 | 109.95 | 149.30 | 52.93 | 56.58 | 54.10 | 51.56 | 53.33 | 121.65 | 35.29 | 33.20 |
| 17a Parole Board | | | | | | | | | | | 0.15 | 0.15 |
| 18a Hierarchical | | | 4.66 | 7.11 | 0.18 | 0.33 | 0.33 | 0.33 | 0.33 | 5.27 | 2.81 | 2.81 |
| 19a Other Short Run Indirect Costs | | | | | 3.54 | 5.91 | 5.64 | 5.36 | 5.56 | 1.37 | | |
| 20a Short Run Indirect Costs | 5.42 | 5.62 | 12.09 | 7.11 | 5.82 | 6.22 | 5.95 | 5.67 | 5.87 | 13.38 | 3.88 | 3.65 |
| 21a Total short Run Costs | 54.68 | 56.51 | 122.05 | 156.41 | 58.75 | 62.80 | 60.05 | 57.23 | 59.20 | 135.03 | 39.17 | 36.85 |
| 22a Depreciation (capital cost) | 9.30 | 9.30 | 4.61 | 4.61 | | | | | | 2.15 | | |
| 23a Interest on Debt | 0.04 | 0.04 | | | 7.05 | 1.90 | 1.90 | 1.90 | 1.90 | 2.15 | 11.26 | 7.57 |
| 24a Total Long Run Costs | **64.01** | **65.84** | **126.66** | **165.44** | **65.80** | **64.93** | **62.18** | **59.36** | **61.33** | **139.33** | **50.43** | **44.42** |
| 25a State Maintenance Expense | | | | | | | | | | | | |
| 26a Central Office Overhead Added Private | | | | **4.42** | | **0.23** | **0.23** | **0.23** | **0.23** | | | |
| 27a Contractor Per Diems | 46.56 | 53.02 | 79.73 | 64.82 | 50.58 | 47.21 | 43.98 | 44.14 | 49.63 | 65.75 | | 31.15 |
| 28a # of Private Inmates | 2,979 | | 2,170 | 9,000 | 11,796 | | | 2,127 | | | | 5,241 |
| 29a # of All Inmates | 12,981 | 14,521 | 165,062 | 134,000 | 104308 | 20,544 | | 20,544 | | 2,038 | | 21,067 |
| 30a SR percent Savings Prison 1 | 14.85 | 6.17 | 34.68 | 58.56 | 13.91 | 24.83 | 26.76 | 22.8 | 16.16 | 51.31 | | 15.47 |
| 31a SR Percent Savings Prison 2 | | | | | | | | | | | | |
| 32a LR Percent Savings Prison 1 | 27.27 | 19.48 | 37.05 | 60.82 | 23.13 | 27.29 | 29.27 | 25.64 | 19.07 | 52.81 | | 29.88 |
| 33a LR Percent Savings Prison 2 | | | | | | | | | | | | |
| 34a Percent Private Inmates | 22.95 | 11.35 | 1.31 | 6.72 | 11.31 | 10.35 | | 10.35 | | | | 24.88 |
| 35a Statutory Savings requirements per $1 | | | | | 0.07 | 0.10 | 0.10 | 0.10 | 0.10 | NR | 0.10 | 0.10 |
| 36a Max Med costs to Reach statutory Limit | 17.45 | 12.82 | 46.93 | 100.62 | 10.61 | 11.23 | 11.98 | 9.28 | 5.56 | | 45.39 | 8.83 |
| 37a Unfunded pen & Ret per inmate/day | 0.04 | 0.04 | 0.12 | 0.09 | 0.01 | 0.04 | 0.05 | 0.05 | 0.05 | 0.05 | | |
| 38a Percent labor costs of long run costs | | | 47.06 | 40.50 | 59.01 | | | | | 56.88 | 42.02 | 46.33 |
| 39a Existing & statutory Medical | | | 68.82 | 144.57 | 19.26 | 11.23 | 11.98 | 9.28 | 5.38 | | 54.17 | 17.61 |
| 40a Statutory medical/Existing medical | | | 2.14 | 2.29 | 1.23 | | | | | | | 1.01 |
| 41a Long Run Costs | 59.95 | 61.83 | 117.59 | 155.69 | 61.43 | 60.03 | 57.49 | 54.88 | 56.70 | 129.30 | 47.52 | 41.68 |
| 42a Indirect Costs 25 Percent | 1.35 | 1.40 | 3.02 | 1.78 | 1.46 | 1.56 | 1.49 | 1.42 | 1.47 | 3.35 | 0.97 | 0.91 |
| 43a Percent SR Savings Indirect 25 | 8.01 | -1.00 | 29.43 | 57.09 | 7.00 | 18.79 | 20.88 | 16.68 | 9.43 | 47.40 | | 8.69 |
| 44a Percent LR Savings Indirect 25 | 22.34 | 14.25 | 32.20 | 58.37 | 17.67 | 21.36 | 23.50 | 19.57 | 12.46 | 49.15 | | 25.27 |

Legend: "Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison

Case 3:16-cv-02267    Document 399-9    Filed 01/22/21    Page 44 of 50 PageID #: 20774

BLACKSTONE0019142

| | Itemized Costs by State, Custody & Year | OH | OH | OH | OK | OK | OK | OK | TN | TX | BOP/GAO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Custody/Year | 2010 | 2000 | 2012 | 2010 | Min 2011 | Med 2011 | Max 2011 | Med 2011 | Prototype 2010 | Low 2011 |
| 1b | Personnel Services (mainly security) | | 27.87 | | | 28.94 | 29.61 | 65.29 | | 40.92 | 41.16 |
| 2b | Medical Services | | | | | 8.28 | 9.37 | 10.56 | | 5.97 | |
| 3b | Food | | | | | | | | | | |
| 4b | Utilities | | | | | | | | | | |
| 5b | Fuel | | | | | | | | | | |
| 6b | Contracted Professional Services | | 1.58 | | | | | | | 0.02 | |
| 7b | Office & Supplies | | 7.64 | | | 0.72 | 0.71 | 0.72 | | | |
| 8b | State Provided Professional Services | | | | | | | | | NA | |
| 9b | Technology | | | | | | | | | | |
| 10b | Rents | | | | | | | | | | |
| 11b | General Operations | | | | | | | | | 4.53 | |
| 12b | Repairs | | | | | | | | 0.43 | | |
| 13b | All other | | | | | | | | | | |
| 14b | Paid Short Run Costs | 48.92 | 37.09 | 43.92 | | 39.23 | 39.69 | 76.57 | 50.86 | 53.76 | 65.48 |
| 15b | Underfunded Pensions (incl. healthcare) | 2.64 | | 2.64 | | 1.29 | 1.29 | 1.29 | | 4.44 | |
| 16b | Short Run Direct Costs | 51.56 | 37.09 | 46.56 | | 40.52 | 40.98 | 77.86 | 51.29 | 58.20 | 65.48 |
| 17b | Parole Board | | | | | | | | | | |
| 18b | Hierarchical | | | | | | | | 2.03 | 0.19 | |
| 19b | Other Short Run Indirect Costs | 5.67 | 4.08 | 5.12 | | 4.46 | 4.51 | 8.57 | 5.64 | 6.40 | 7.20 |
| 20b | Short Run Indirect Costs | 5.67 | 4.08 | 5.12 | | 4.46 | 4.51 | 8.57 | | 6.59 | 7.20 |
| 21b | Total short Run Costs | 57.23 | 41.17 | 51.68 | | 44.98 | 45.49 | 86.43 | 58.96 | 64.79 | 72.68 |
| 22b | Depreciation (capital cost) | 4.61 | | 4.61 | | 4.61 | 4.61 | 4.61 | | 4.11 | 4.61 |
| 23b | Interest on Debt | 5.07 | | 5.07 | | 4.93 | 4.93 | 4.93 | | 4.11 | |
| 34b | Total Long Run Costs | **66.92** | **41.17** | **61.37** | **0.00** | **54.52** | **55.03** | **95.97** | **60.66** | **73.01** | **77.29** |
| 25b | State Maintenance Expense | | | | | | | | 0.13 | | |
| 26b | Central Office Overhead Added Private | | | | | | | | 1.57 | | |
| 27b | Contractor Per Diems | | | | | | 43.02 | 56.62 | | | |
| 28b | Contractor Per Diem Prison1 | 45.86 | | 45.86 | | | 40.28 | 57.96 | 42.29 | 37.47 | |
| 29b | Contractor Per Diem Prison 2 | | | | | | 43.02 | 56.62 | | | |
| 30b | # of Private Inmates | 3,038 | | | 6,019 | | | | | 5,120 | 19,155 |
| 31b | # of All Inmates | 51,712 | | | 26,252 | 6,684 | 7,802 | 961 | 27,451 | 173,649 | |
| 32b | SR percent Savings Prison 1 | 19.87% | | 11.26% | | | 11.46 | 32.94 | 25.39 | 42.16 | |
| 33b | SR Percent Savings Prison 2 | | | | | | 5.44 | 34.49 | | | |
| 34b | LR Percent Savings Prison 1 | 31.47 | | 25.27 | | | 21.83 | 41.00 | 30.29 | 48.68 | |
| 35b | LR Percent Savings Prison 2 | | | | | | 21.83 | 41.00 | | | |
| 36b | % Private Inmates | 5.87 | | | 22.93 | 45.74 | 27.13 | | 18.70 | 11.03 | |
| 37b | Statutory Savings requirements per $1 | 0.05 | 0.05 | 0.05 | | | | | | 0.10 | NR |
| 38b | Max Med costs to Reach statutory Limit | 17.71 | | 12.44 | | | 14.75 | 38.01 | | 28.24 | |
| 39b | Unfunded pen & Ret per inmate/day | 0.04 | | 0.04 | | 0.02 | 0.01 | 0.00 | | 0.06 | |
| 40b | Percent labor costs of long run costs | | 67.70 | | | 53.08 | 53.80 | 68.03 | | 56.05 | 53.25 |
| 41b | Existing & statutory Medical | 17.71 | | 12.44 | | NR | 24.12 | 48.57 | | 34.21 | |
| 42b | Statutory medical/Existing medical | | | | | 1.57 | 3.60 | | | 4.73 | |
| 43b | Indirect Costs 25 Percent | 1.42 | 1.02 | 1.28 | 1.11 | 1.13 | 2.14 | | 1.92 | 1.65 | 1.80 |
| 44b | Percent SR Savings Indirect 25 Prison 1 | 13.44 | | 4.14 | | | 4.35 | 27.56 | 17.32 | 37.39 | |
| 45b | Percent SR Savings Indirect 25 Prison 2 | | | | | | -2.16 | 29.23 | | | |
| 46b | Percent LR Savings Prison 1 Indirect 25 | 26.81 | | 20.28 | | | 22.02 | 35.27 | 17.32 | 44.95 | |
| 47b | Percent LR Savings Prison 2 Indirect 25 | | | | | | 16.71 | 36.77 | | | |

Legend:   "Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison

Case 3:16-cv-02267     Document 399-9     Filed 01/22/21     Page 45 of 50 PageID #: 20775

BLACKSTONE0019143

**Executive Summary: Cost Analysis of Public and Contractor-Operated Prisons**

Examining state data as the primary source, research conducted by scholars at Temple University has found that **contract (private) prisons generate significant savings without sacrificing the quality of the services delivered**. As states continue to grapple with aging facilities, overcrowding, underfunded retiree obligations and other significant budget constraints, this research provides independent validation for the value of this solution available to government leaders.

The study titled *Cost Analysis of Public and Contractor-Operated Prisons* examined nine states that currently use private corrections and one state, Maine, that does not. The table below outlines their short and long run savings. Short run calculations include operational costs, such as personnel costs and medical and food services. Long run calculations include the short run costs combined with capital costs, such as facility modernization and financing costs. Data published by government or provided by government executives were used as the sources for the calculations. The ranges reflect the savings that vary from facility to facility for a single state.

| STATES | SHORT RUN SAVINGS | LONG RUN SAVINGS |
|---|---|---|
| Arizona | -1.00% - 8.01% | 14.25% - 22.34% |
| California | 29.43% - 57.09% | 32.20% - 58.37% |
| Florida | 7.00% | 17.67% |
| Kentucky | 9.43% - 20.88% | 12.46% - 23.50% |
| Maine | 47.40% (estimated) | 49.15% (estimated) |
| Mississippi | 8.69% | 25.27% |
| Ohio | 4.14% - 13.44 | 20.28% - 26.81% |
| Oklahoma | -2.16% - 29.23% | 16.71% - 36.77% |
| Tennessee | 17.32% | 17.32% |
| Texas | 37.39% | 44.95% |

The study uses economic models to determine each state's avoidable costs, which are compared to the per diem charges of the private operators. The study includes often-ignored government costs such as underfunded pensions and retiree healthcare costs. This is especially critical because the Pew Center on the States has reported a $1.38 trillion gap between states' assets and pension and healthcare retiree obligations.

In addition to the finding of significant cost savings, major conclusions of the study include:

- **Contract prisons save money while maintaining at least the same quality as public prisons:** The private facilities generally met industry standards established by the independent American Correctional Association and, in several cases, private facilities offered more rehabilitation programming than their public counterparts. Further, interviews with Departments of Corrections reported that contracts with private companies mandate performance levels, which are closely monitored by the states. Additionally, in terms of staff quality, private correctional officers are generally paid comparable wages and receive substantially similar training to their public counterparts.

- **Competition yields savings and better performance for private *and* public facilities:** Even though private contractors comprise less than 7 percent of the state corrections industry overall, they have generated substantial competitive benefits. As more contractors compete, both private and public facilities work to provide lower cost and higher quality service. Further, more managerial and technological innovations are introduced in both segments of the industry.

- **Contract prisons provide additional benefits to state governments beyond savings:** Although not included in the study's savings figures, private prisons pay income and property taxes, while state facilities do not. These revenues can be used to reduce taxes or finance other public services. Additionally, private facilities provide an important relief valve for overcrowding, which promotes safer conditions and better inmate treatment.

- **Adoption of the "managed competition" model could foster even greater efficiency in the delivery of corrections services:** In this model, public workers *and* private contractors engage in a competitive process to provide public services. As a result, both groups have an incentive to search for managerial and technological innovations and offer services at competitive prices.

BLACKSTONE0019144

**Cost Analysis of Public and Contractor Operated Prisons Q&A**

**Q: Who funded this study?**
A: This study was conducted by independent academics at Temple University using only data published or provided by government. It received funding from members of the private corrections industry.

**Q: How much did the companies pay for the study?**
A: While we do not disclose funding figures, the study was conducted by independent academics at Temple University using only data published or provided by government.

**Q: Was this study influenced by the fact that it was funded by the private prison industry?**
A: No. This study was conducted by independent academics at Temple University. Additionally, the only data used for the study was published or provided by government.

**Q: Can't much of the savings generated by private prisons be attributed to the fact that they pay correctional officers much less and offer less generous benefits than their state counterparts?**
A: Contract prisons pay competitive wages. For example, Ohio private correctional officers are paid $1 less per hour. In Oklahoma in 2012, the beginning base salary for a correctional officer was $2,153 per month at the public Northeast Oklahoma Correctional Center and $2,068 per month at the private Davis Correctional Facility. In terms of benefits, private contractors typically offer workers matching contributions up to 5 percent of their salaries for their 401k accounts, which is in line with other private entities.

**Q: Aren't much of these savings also attributable to private facilities not offering as much programming or cutting other corners in terms of service?**
A: No. In fact one of the key findings of the study was that private company prisons are able to deliver savings while maintaining at least the same quality as public prisons. The private facilities generally met industry standards established by the independent American Correctional Association and, in several cases, private facilities offered more rehabilitation programming than their public counterparts. For example, the Legislative Research Commission in Kentucky stated in a 2009 report that all three private company prisons in the state offer more programming than the comparable state prisons. Further, interviews with Departments of Corrections reported that contracts with private companies mandate performance levels, which are closely monitored by the states. Additionally, in terms of staff quality, private correctional officers are generally paid comparable wages and receive substantially similar training to their public counterparts.

**Q: Where do these savings come from?**
A: The long run savings are attributed to the long-term consideration of costs (such as modernization and financing costs), the inclusion of unfunded pensions and retiree healthcare, and the lower private costs of labor. Other drivers include the purchasing power and flexibility in purchasing of private firms, and the private firms' hiring flexibility and ability to tailor wages to specific labor market conditions, which is more difficult for public employers. For example, private correctional officers are paid less, but still competitive wages in rural communities, which usually have lower cost of living than in metropolitan areas. States typically cannot differentiate wages to the same extent, and therefore often overpay in rural areas or underpay in metropolitan areas.

BLACKSTONE0019145

**Q: Why do private prisons lose money in the short run in Arizona and Oklahoma?**
A: Please note that in both of those cases the long run savings were significant, and even short run savings were significant at other private facilities in the states. As noted in the study for Oklahoma, comparing public costs with the private per diem charges for 2011, we find that in the short run, one contractor-operated, medium-security prison was 2.16 percent more expensive while the other saved 4.35 percent. However, this is an inappropriate comparison because Oklahoma's prisons were operating at full capacity even with the use of private prisons. Thus, the only alternative for Oklahoma is to build more prisons and, therefore, the long run state costs should be considered.

**Q: Overcrowding is mentioned frequently in the report, but the inmate population for many states is now leveled off or declining. Does that impact the ability for private prisons to effectively save money?**
A: Use of private prisons increases the flexibility of government corrections in a variety of ways. Easing overcrowding is one of those ways but by no means the only one. Private prisons provide savings in general, which means that turning to those partnerships will continue to be beneficial, even in situations where there is no overcrowding.

**Q: The report states that there are usually safeguards to keep private facilities from incurring unexpected medical expenditures. Does that mean private facilities are cherry picking the healthier inmates?**
A: No. The contractual agreements differ with respect to the contractor's responsibilities regarding medical services, but the bottom line is the states contract for the level of medical services they feel will meet their needs. State corrections systems classify all inmates, including those with medical problems, and determine to which prison they are sent.

**Q: The short run savings for Mississippi falls below the state's statutory requirement of 10 percent. What does that mean for the state and its continued use of these facilities?**
A: The Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER) found that the costs of the private contractor met the statutory requirements. The studies' authors were conservative in their calculations. Additionally, in their conservative approach, the study's authors did not include unfunded retiree costs for Mississippi because there was not specific data for corrections employees. However, these are significant overall for the state. Research from the Pew Center found that the state has a $12 billion shortfall overall, and its pensions are only 64% funded (http://www.pewstates.org/research/state-fact-sheets/widening-gap-update-mississippi-85899399340).

**Q: The study advocates for managed competition, but how do you address the failures and detractors of that system?**
A: There are also numerous successes with managed competition. For example, Indianapolis has produced $28 million in annual cost savings using managed competition, and Phoenix estimates that it saves over $25 million annually.[1] The key is to set standards that ensure a level playing field and adherence to quality measures.

**Q: Why were these specific states chosen?**
A: These states were chosen because of the availability of state data, the geographic diversity and the combination of those with mandated savings for the use of private prisons and those without. The list also encompasses many of the states with the highest number of inmates in private facilities.

---

[1] http://www.seattle.gov/audit/report_files/9501-ManageCompete.pdf

BLACKSTONE0019146

**Q: You say facility safety was comparable, so how do you address serious issues and incidents reported at private correctional facilities?**

No corrections system -- public or private -- is immune to issues like these. What we saw in the research is that levels of safety are comparable.

BLACKSTONE0019147

**DOCUMENT PRODUCED IN NATIVE FORMAT**

BLACKSTONE0019148