EXHIBIT 52
[Filed Under Seal]

| From: | Metcalf, Natasha |
|---|---|
| Sent: | Tuesday, December 23, 2014 4:38 AM |
| To: | MURRAY, Don; Wengler, Valerie |
| Cc: | Odubeko, Ashley; Baxley Jr, Stephen; Pryor, Joe; Hall, Keith; Baxter, John; Robinson, John; Verhulst, Bart; Beasley, Jeb |
| Subject: | RE: October 2014 CFM Rebuttal Draft (2) |
| Attachments: | CibolaCFM Oct 2014 Followup.docx |

I understand everyone has not seen the report from the Oct followup. Attached is a copy. It includes 9 deficiencies- 4 are new and 5 are repeats.

**From:** MURRAY, Don
**Sent:** Tuesday, December 23, 2014 12:51 AM
**To:** Wengler, Valerie; Metcalf, Natasha
**Cc:** Odubeko, Ashley; Baxley Jr, Stephen; Pryor, Joe; Hall, Keith; Baxter, John; Robinson, John; Verhulst, Bart; Beasley, Jeb
**Subject:** RE: October 2014 CFM Rebuttal Draft (2)

Historically, that's generally what we have seen, but not always.  Based on our more recent experiences in particular, not all BOP CFM deficiencies have had more than one noncompliant file or case cited to be considered a deficiency by BOP auditors.  We have seen CFM findings indicating "Not all cases reviewed..." or "…policy was not always followed in managing…" or "an inmate's care was not consistent with…" "or "a CIM case was not….".  Part of the evidence cited for a recent deficiency at McRae's most recent CFM follows below:

**"A review of 10 dental records of inmates having recently undergone dental surgery revealed 1 of 10 surgical extraction forms was not completed timely."**

I am happy to support the facility and the will of the group.  I am concerned, however, as to how the basis of the rebuttal (unfair sampling methodology) might be received by the BOP. As Jeb pointed out in a subsequent email, we have already made nearly the identical case with Sara Revell, AD of PRD, without success.

Even if the Privatization Management Branch and other BOP officials are highly empathetic with our situation and supportive of our proposed corrective action plans, the independent BOP Program Review Division auditors will always cite what they see as operational deficiencies regardless of extenuating circumstances.  Further, PRD auditors have historically audited from the date of their last review forward. To my knowledge we have not received any information to suggest that they will do anything differently in our upcoming reviews.

**From:** Wengler, Valerie
**Sent:** Monday, December 22, 2014 8:20 PM
**To:** Metcalf, Natasha
**Cc:** Odubeko, Ashley; Baxley Jr, Stephen; Pryor, Joe; Hall, Keith; Baxter, John; Robinson, John; Verhulst, Bart; Beasley, Jeb; MURRAY, Don
**Subject:** Re: October 2014 CFM Rebuttal Draft (2)

1

CONFIDENTIAL                                                                                                                  CORECIVIC_1473393

To answer your first question one finding is not a deficiency its an advised item.  Two findings are a deficiency.  Therefore if they would not have used files from the corrective action period we would not be receiving a repeat

Sent from my iPhone

On Dec 22, 2014, at 7:42 PM, Metcalf, Natasha <Natasha.Metcalf@cca.com> wrote:

> I have quickly scanned the rebuttal and understand our desire to note that for the PPD deficiency 3 of the 4 cases found deficient are from the corrective action period following the April CFM. However, I assume that means we agree they correctly found one of the cases deficient after the corrective action period. As I understand, if one case is deficient it can be included in the report and counted as a deficiency so I am unclear on our justification for asking them to reconsider making this a repeat deficiency.
>
> I also note that we have included POAs for both of the deficiencies we are requesting them to reconsider. One the one hand we are saying we want them to reconsider these deficiencies and on the other hand we seem to be saying we acknowledge they are deficiencies and have implemented a corrective plan. There seems to be a disconnect in our strategy.
>
> Also, I do not see any POAs for the deficiencies we are not disputing and with which I assume we agree. Why did we not include POAs for those deficiencies?
>
> Thanks.
>
> *Natasha K. Metcalf*
> *Vice President, Partnership Development*
> <image001.png>- "America's Leader in Partnership Corrections"
> 10 Burton Hills Boulevard
> Nashville, Tennessee 37215
> EMail: natasha.metcalf@cca.com
> Office: (615) 263-3290
> Cell:  (615) 804-5968
> Fax:  (615) 263-3100
>
>
> **From:** Odubeko, Ashley
> **Sent:** Monday, December 22, 2014 3:36 PM
> **To:** Baxley Jr, Stephen; Pryor, Joe; Hall, Keith; Wengler, Valerie; Baxter, John; Metcalf, Natasha
> **Cc:** Martin, Kevin; Cook, Robert; Russell, Don; Robinson, John; Verhulst, Bart; Beasley, Jeb; MURRAY, Don
> **Subject:** RE: October 2014 CFM Rebuttal Draft (2)
>
> All,
>
> Please find attached a revised draft of the Cibola rebuttal. Please provide any additional changes and comments. Please keep in mind that the purpose of this response is to state that we don't agree with how they conducted the review of the files for the audit, so if that is our basis for disputing the deficiencies, you have to assume that but for the files being pulled during a period that we think was unfair (before the corrective action period and in some cases before the CFM) then they would have found files that were in compliance with policy and procedure.

CONFIDENTIAL                                                                                                                    CORECIVIC_1473394

Thanks,

Ashley

**From:** Baxley Jr, Stephen
**Sent:** Thursday, December 18, 2014 2:56 PM
**To:** Pryor, Joe; Hall, Keith; Odubeko, Ashley; Wengler, Valerie; Baxter, John
**Cc:** Martin, Kevin; Cook, Robert; Russell, Don
**Subject:** RE: October 2014 CFM Rebuttal Draft (2)

Joe,
 I have some corrections for you to look at.

Stephen Baxley, FNP-C, MSN, MSc, CCHP
Corrections Corporation of America
Managing Director/Chief Nursing Officer, Health Services
1-615-263-3072 Office
1-615-973-6182 Cell
1-615-263 6902 Fax

---

**From:** Pryor, Joe
**Sent:** Thursday, December 18, 2014 2:04 PM
**To:** Hall, Keith; Odubeko, Ashley; Baxley Jr, Stephen; Wengler, Valerie; Baxter, John
**Cc:** Martin, Kevin; Cook, Robert; Russell, Don
**Subject:** October 2014 CFM Rebuttal Draft (2)

Attached is a draft response to the CFM Report. We are providing a rebuttal to the three peat and four peat deficiencies. It is due Tuesday, December 23.

CONFIDENTIAL                                                                                          CORECIVIC_1473395

# U.S. Department of Justice

## Federal Bureau of Prisons

## PROGRAM REVIEW DIVISION

*Washington, D.C. 20534*

December 8, 2014

```
MEMORANDUM FOR JOE PRYOR, WARDEN
               CIBOLA COUNTY CORRECTIONAL CENTER
               MILAN, NEW MEXICO



                    /s/
FROM:          Crystal G. Smith, Core Section Chief
               Program Review Division

SUBJECT:       Contract Facility Monitoring Follow-up Report
               Cibola County Correctional Center
```

Attached is the follow-up report of the Cibola County Correctional Center Contract Facility Monitoring of the Health Services Department conducted October 21-23, 2014.

This monitoring focused on the evaluation of those areas for which there was a significant finding during the monitoring conducted April 22-24, 2014. Particular emphasis was placed on the review of the corrective actions taken pertaining to any noncompliant area, and the effectiveness of the prescribed corrective action in both yielding compliance and providing reasonable assurance continued compliance can be expected.

Should you disagree with any deficiencies, please forward an electronic copy of your response to the BOP-PRD/Correspondence~GroupWise mailbox within 15 calendar days after receipt of this report. Please include any additional supporting documentation with your response. Otherwise, we will consider this Contract Facility Monitoring officially closed.

CONFIDENTIAL         CORECIVIC_1473396

Please thank your staff for their efforts and cooperation in preparing for and completing this monitoring.  The next monitoring is scheduled to be conducted April 21-23, 2015.

cc:   BOP-ADM/Assistant Director
      BOP-CPD/Assistant Director
      BOP-FPI/Assistant Director
      BOP-HRM/Assistant Director
      BOP-HSD/Assistant Director
      BOP-IPP/Assistant Director
      BOP-OGC/Assistant Director
      BOP-ADM/Privatized Corr Contracting
      BOP-CCD/Privatization
      BOP-CPD/PFA Sector 1
      BOP-PRD/Contract Facility Monitoring
      CCB/Oversight Mgr
      keith.hall@cca.com
      CIB/Warden

CONFIDENTIAL                                                                    CORECIVIC_1473397

CONTRACT FACILITY MONITORING REPORT

CIBOLA COUNTY CORRECTIONAL CENTER

MILAN, NEW MEXICO

CONTRACT #J1PCc-007

Conducted:

October 21-23, 2014

Approved By:

/s/
Shannon D. Withers
Administrator
Program Review Division
Washington, DC

December 8, 2014

CONFIDENTIAL                                                                        CORECIVIC_1473398

A follow-up Contract Facility Monitoring for the Cibola County Correctional Center was conducted on October 21-23, 2014, by: Mohammad Adil, CFM Health Services Examiner, Daniel De Jesus, CFM Physician, and Anthony Do, CFM Information Systems and Security Examiner, was the monitor-in-charge. The purpose of the follow-up monitoring was to assess contract compliance in Health Services. A significant finding was identified in this area during the April 22-24, 2014, monitoring visit.

Based on the follow-up monitoring, the course of action taken in specific areas proved to be inadequate to prevent recurrence. Several deficiencies were not corrected, resulting in several repeat deficiencies. In addition, four new deficiencies were identified during this follow-up monitoring.

GENERAL COMMENTS

1. **Documentation in HIV health records is poor.** Many HIV health records reveal poor legibility, inadequate correction of errors, and missing inmate names and dates on many pages/forms. Specific examples are listed in the working papers, Step 6.2.1 pp 1-23. These discrepancies can jeopardize inmate health care by not clearly providing accurate and complete information to staff and community health care providers.

2. **Refusal of treatment by inmates is not always documented properly.** Pre-printed refusals forms are used, which in many cases do not list the treatment or evaluation that the inmate is refusing. Therefore, some refusal forms had additional handwritten notes or strikeouts. These discrepancies can diminish the credibility of the refusal, as well as allow the inmate to claim the form was corrected after it was signed.

DEFICIENCIES

1. **Inmates arriving at the institution with positive PPDs were not receiving follow-up care and treatment as per policy.** This deficiency was identified in the four previous reviews, resulting in a four time repeat deficiency.

    a. The Contractor is obligated to comply with CCA 13-6 Chronic Care & Disease Management, p 3, Sec. D(1)(a), which states

2

CONFIDENTIAL
CORECIVIC_1473399

in relevant part: "Inmates/residents enrolled in chronic clinics will receive an initial visit within one 1 month of enrollment." P 3, Sec. D(1)(c), which states in relevant part: "At this facility (applicable to BOP contract), all initial chronic care visits will be seen/evaluated by a physician." P 8, Sec. F. (3), which states in relevant part: "Inmates/Residents diagnosed with TB or inmates/residents who are receiving TB prophylactic treatment will be monitored monthly by health services staff and enrolled in TB Chronic Care." P 11, Sec. I, which states in relevant part: "At this facility, (applicable to BOP contract only), will adhere to the guidelines of BOP P6190.03, Infectious Disease Manual."

   b. A review of 10 medical records of inmates arriving at the institution with positive or converted PPDs revealed that in four cases, the proper clinical follow-up was not completed. Clearance for general population and appropriate therapy were not always completed per policy. Examples are referenced in working papers 6.1.1 pp 1-115.

   c. There continues to be significant, repeat deficits in the treatment of active TB, positive TB conversion, and TB treatment, which can jeopardize inmate and staff health. In the May 2011 CFM review, 4 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician and 1 of 10 inmates did not receive HIV testing. In the April 2012 review, 9 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician and 2 of 10 inmates did not receive X-Ray testing after converting to a positive PPD. In the April 2013 review, 4 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician. In the April 2014 CFM review and six month follow-up review conducted October 2014, 4 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician.

2. **Health appraisals were not completed as per policy.** This deficiency was identified in the three previous reviews, resulting in a three time repeat deficiency.

   a. The Contractor is obligated to comply with CCA 13-40 Health Appraisals, P 2, Sec. B. (1)(a), which states in relevant part: "A comprehensive health appraisal for each patient

3

CONFIDENTIAL                                                                                                          CORECIVIC_1473400

inmate/resident, excluding intrasystem transfer, will be completed, by a physician or LIP, within 14 days of arrival to the facility." A comprehensive health appraisal should be conducted on every newly committed inmate within 14 days of arrival and must include: (1) referral to medical and mental health professional to determine past or recent history of alcohol and substance abuse, identify acute or chronic care conditions, and to determine if there were any pending consultations or referrals to specialists; (2) Extensive dental examination to determine any pre-existing and current dental problems such as tooth, gum and other oral health abnormality; (3) Requests for necessary laboratory and diagnostic tests.

b. Four of ten health appraisals were not completed within the required time frame of 14 days of arrival to the facility. Examples are referenced in working papers 6.3.4 pp 1-41.

c. Failure to complete health appraisals within the timeframes required can significantly jeopardize inmate and staff health. In the April 2012 CFM review, 7 of 10 newly committed inmates did not have health appraisals completed within 14 days. In the April 2013 review, 3 of 10 newly committed inmates did not have health appraisal completed within 14 days. In the April 2014 review, 7 of 10 newly committed inmates did not have health appraisals completed within 14 days. In the October 2014 follow-up review, 4 of 10 newly committed inmates did not have health appraisal completed within 14 days.

3. **Treatment for HIV inmates is not completed in accordance with policy.** This deficiency was identified in the two previous reviews, making it a two time repeat deficiency.

   a. The contractor is obligated to comply with CCA 13-6, Chronic Care Clinic, P 3, Sec. a, which states in relevant part:… "Patient inmates/residents enrolled in chronic care clinics will receive an initial visit within one 1 month of enrollment. At BOP contract facilities, BOP inmates/residents arriving from other institutions that have a chronic care assignment will be seen by a physician within 14 days of arrival to establish a treatment plan and follow-up intervals appropriate for the inmate/resident's medical needs." All inmates with HIV positive status should be

4

CONFIDENTIAL                                                                 CORECIVIC_1473401

offered treatment as soon as possible in order to avoid
decompensation of his condition.  Per CCA 13-6 P 3. Sec. (a),
requires all inmates with chronic care assignment to be
evaluated by a physician within 14 days of arrival to
establish a treatment plan.  Inmates diagnosed at the
facility, need to be seen within a month.  CD4 levels lower
than 200 predispose HIV inmates to develop opportunistic
infections like pneumonia and others that can be fatal.  Per
BOP Clinical Practice Guidelines for HIV infection P 13, Sec.
8. (a) and 8. (b) (continues on page 14) indicates that CD4
is one of the most important factors in the decision to
initiate therapy for HIV cases.  It mentions that low CD4
count is an indication to rapid initiation of therapy.  Note
that CCA 13-6 P 6, states that BOP Clinical Practice
Guidelines will be used.

b. A review of four records of inmates with HIV revealed that in three cases treatment was not in accordance with policy. Examples are referenced in working papers 6.9.5 pp 1-56.

c. All inmates with HIV positive status should be offered treatment as soon as possible in order to avoid decompensation of their condition.  Failure to provide treatment according to policy to inmates with HIV can seriously jeopardize their health, and the health of other inmates and staff.  In past reviews, records revealed that in April 2013 there was one inmate diagnosed with HIV in which evaluation, treatment and counseling were not completed in accordance with policy.  In the April 2014 review there were two of three inmates diagnosed with HIV in which evaluation, treatment and counseling were not completed in accordance with policy.  In October, 2014 a six month follow-up was conducted, and revealed three of four inmates diagnosed with HIV did not receive treatment in accordance with policy.

4. **Not all Medication Administration Records (MAR) are accurate.** This deficiency was identified in a previous review, making it a repeat deficiency.

    a. The contractor is obligated to comply with SOW, BOP National Formula, and CCA 13-70.  Per SOW, P 56, Sec 2, which states in relevant part:  "The contractor shall adhere to Part 1 of the Pharmacy TRM, the National Formulary."  Per CCA 13-70, Pharmaceuticals, P 1, Sec. 6, (a)(f)(g)(j)(k), which states

5

CONFIDENTIAL                                                                                      CORECIVIC_1473402

in relevant part: "Each prescription/medication order must contain the patient inmate/resident's name and ID number; administration instructions and duration of prescription." P 12, Sec. 4, which states in relevant part: "A Medication Administration Retirement will be initiated and medication will be administered and documented per policy." Per BOP National Formulary, P 9, which states in relevant part: "A staged administration of antiretroviral medications is recommended for most inmates. Complete adherence to antiretroviral medications is critical for treatment effectiveness."

b. A review of 10 prescriptions made by a physician, MLP, or nurse revealed six records for prescriptions administered to inmates were not accurate. In addition to inaccuracies in quantity and dates, in some cases documentation did not show the medication was actually provided to the inmate as ordered. Examples are referenced in working papers 6.9.14 pp 1-20.

c. Documentation in the MAR is crucial for the medical management of inmates. Giving extra amounts of medications can confuse the inmate in terms of how much he should take, and can cause him to take more than prescribed, resulting in an overdose. On the other hand, not providing the ordered medications to a diabetic inmate may cause him to develop serious problems such as retinopathy and nephropathy. In the case of HIV inmates, delayed treatment can give opportunity for the virus to spread, resulting in an increased viral load and decreased CD4. High viral load and low CD4 predispose the HIV patient to opportunistic infections that can be fatal. Medications for hyperlipidemia are also important because they help to decrease the risk factors for coronary artery disease. In April 2014 a random review of the MARs revealed documentation was not accurate in 4 of 10 cases, particularly the quantity of medications and dates they were provided. In October 2014, a six month follow-up was conducted. A random review of MARs revealed documentation was not accurate in 6 of 10 cases.

5. **Preventive care evaluations are not completed as per policy.** This deficiency was identified in a previous review, making it a repeat deficiency.

CONFIDENTIAL                                                                    CORECIVIC_1473403

a. The contractor is obligated to comply with SOW and BOP Clinical Practice Guidelines.  Per SOW, Sec. 5, p 57 which states in relevant part:  "The contractor shall provide preventive health care to include immunizations and medical screening procedures consistent with those recommended by the United State Preventive Services Health Task Force."  The U.S. Preventive Services Health Task Force is an independent panel of experts in primary care and prevention who systematically review the evidence of effectiveness of services and develop recommendations for clinical preventive services.

b. A random review of 10 inmate records revealed 7 of 10 cases where the prevention baseline evaluations were not completed in accordance with policy.  Examples are referenced in working papers 6.9.20 pp 1-22.

c. Preventive care evaluations are essential in order to identify and manage inmates at risk of certain medical conditions including, but not limited to diabetes, colon cancer, hyperlipidemia, tuberculosis, HIV and hepatitis C.  Screening tests required by policies (SOW, US Health Task Force, CDC and BOP Clinical Practice Guidelines) will assist medical practitioners in identifying those cases.  Immunizations are of vital importance in decreasing the occurrence of serious infectious diseases particularly in inmates with medical conditions such as HIV, diabetes, asthma and hepatitis C.  A baseline preventive care evaluation can also help in identifying inmates who may have potentially serious conditions that can be a threat to the wellbeing of the general population e.g. TB and MRSA.  Previous reviews revealed that in April 2014, 10 out of 10 records were not completed as required by policy.  Specifically, there were no initial preventive baseline evaluations completed and inmates were missing immunizations and other risk based studies and tests.  In October 2014, a six month follow-up was conducted, and a review of 10 random records revealed that in seven cases the preventive baseline evaluations were not completed as required by policy.  As in the previous reviews, inmates were missing records of the initial preventive baseline evaluations, immunizations and risk based studies and tests.

7

CONFIDENTIAL    CORECIVIC_1473404

6. **Not all diabetic inmates were screened for microalbuminuria.**

    a. The contractor is obligated to comply with BOP Clinical Practice Guidelines for diabetes, P 20, which states in relevant part: "Annually screen for microalbuminuria in all type 2 diabetes patients."

    b. A review of five diabetes inmate medical records revealed two cases where the screening for microalbuminuria was not completed. Examples are referenced in working papers 6.9.2 pp 1-16.

    c. Microalbuminuria is an early stage of kidney disease associated with diabetes. It often progresses to clinical albuminuria and subsequently causes a decline in renal (kidney) function. In addition, hypertension usually develops during the onset of microalbuminuria and if left untreated can hasten progression of renal disease. Because of the above mentioned reasons, policy requires that diabetic inmates be screened for microalbuminuria annually. Early recognition is essential in order to optimize the general management of the diabetic inmate and to decrease the occurrence of major complications like renal disease. Failure to screen diabetic inmates for microalbuminuria can cause decompensation of an inmate's kidneys, possibly resulting in kidney failure.

7. **Not all pp in medical records had inmates' full name and register number.**

    a. The contractor is obligated to comply with CCA 13-58, Medical Records, CCA 13-58, P 2, Sec. A. (3), which states in relevant part: "All documentation placed in the medical record will include patient identification on each page."

    b. A review of 10 inmate health records revealed four inmate records did not contain the inmates' full names and registration numbers. Examples are referenced in working papers 6.2.1 pp 1-23.

    c. Inmate records with improper names and registration numbers can lead to a misdiagnosis and equivocal medical treatment for the incorrect inmate.

8

CONFIDENTIAL                                                                                       CORECIVIC_1473405

8. **Not all errors in medical records were corrected as required by policy.**

   a. Per BOP P6090.03, P 3, Sec b, which states in relevant part: "A neat line will be drawn through the incorrect information with an explanatory note (i.e., error, wrong chart). The date of the correction and the person's initials will be added to the correct data. The 'error entry' function of BEMR will record errors as above, providing a line through the incorrect information, a field for an explanatory note, and the date and time of the correction along with the provider name." And, p 4, Sec. 4, (a), which states in relevant part: "Each page filed within the record must be clearly identified with the inmate's name and number as well as the institution's name."

   b. A review of 10 inmate health records revealed three cases with errors that were not corrected as required by policy. Specifically, there was no date or initial of the person who made corrections to the data. Examples are referenced in working papers 6.2.1, pp 1-23.

   c. Inadequate correction of medical records can lead to a misdiagnosis and equivocal medical treatment of inmates.

9. **Medical management prior to an inmate's death was not in accordance with policy.**

   a. The contractor is obligated to comply with SOW and CCA 13-34, Medical Emergency Response. Per SOW, P 54, Sec. 19, which states in relevant part: "24/7 access to urgent/emergency medical treatment, including medical, mental health and dental emergencies." Per CCA 13-34, P 1, Sec. 3, which states in relevant part: "Clinical Emergency: The sudden development of a clinical situation requiring urgent evaluation and/or treatment when delayed would reasonably be expected to threaten life, limb, or bodily functions." And p 2, Sec. A (1), which states in relevant part: "Emergency services (medical, dental, and mental health) will be provided 24on hours a day. At a minimum, services will include." And p 2, Sec. A. (3)(a), which states in relevant part: "24/7 On-Call Schedules will be prepared each month to ensure that an LIP is on-call at all times to provide sufficient formal supervision and consultation for Qualified

9

CONFIDENTIAL                                                                                        CORECIVIC_1473406

Health Care Provider (QHCP)." And p 3, Sec. A. (4)(b), which states in relevant part: "When life-threatening conditions exist, inmates/residents will be transported to the nearest emergency institution via EMS. Facility staff will assist responding EMS personnel until the inmate(s)/resident(s) is safely in the emergency vehicle." And p 3, Sec. 1 (i)(ii)(iii), which states in relevant part: "Recognizing the need for emergency care and intervention in life-threatening situations (e.g. absence of breath and/or pulse); recognition of signs and symptoms, and knowledge of action that is required in potential emergency situations; administration of basic first-aid."

b. There was one death at Cibola since the previous CFM monitoring. In this case, emergency medical care prior to an inmate's death was not provided by on-site medical staff as required by policy. Several issues in the medical management of this inmate were identified: (1) the response time by medical staff was not documented. It is not known at what time medical staff arrived at scene. It is essential that medical staff arrive within four minutes in order to perform life saving measures; (2) the only medical staff on duty left the scene during CPR and did not return. She should have remained at the scene during the CPR administration. (3) the on-site nurse did not start an IV access. An IV access was started by EMS personnel 26 minutes after CPR was started. Earlier placement of an IV access by onsite nurse would have facilitated earlier administration of emergency medications; (4) documentation is not specific in regard to what the inmate was doing prior to the incident, e.g., assaulted, or engaged in physical activity; (5) the names of the officers who provided CPR are not documented, and they did not provide memos of their participation in the CPR. Examples are referenced in working papers 6.9.19 pp 1-22.

c. Early intervention is crucial in the management of cardiac arrest cases. In addition to saving the subject inmate's life, it is vital that the inmate population believe competent emergency medical care will be provided to them when necessary.

10

CONFIDENTIAL                                                            CORECIVIC_1473407