# EXHIBIT 64
# [Filed Under Seal]

**From:** Metcalf, Natasha
**Sent:** Monday, March 16, 2015 9:00 AM
**To:** Hininger, Damon; Lappin, Harley; White, Kim; Mayberry, Lucibeth; Garfinkle, David; Groom, Steve; Grande, Tony; Nalley, Michael; Hall, Keith; Craddock, Scott; Baxter, John; Verhulst, Bart; Beasley, Jeb; Pfeiffer, John; Robinson, John
**Cc:** Odubeko, Ashley; MURRAY, Don; Jackson, Terri; Linville, Miriam
**Subject:** Adams - BOP CFM
**Attachments:** ACC_CFM3.docx

Attached is the report resulting from the BOP CFM conducted January 6-8, 2015 at the Adams facility. The report includes a Significant Finding in Health Services based on failure to timely conduct preventive care baseline evaluations (repeat deficiency) and records that revealed the management of 5 inmates prior to their death was not in accordance with policy and standards of care. The report also notes Deficiencies in the following areas:

Information Systems and Security (2)
Correctional Programs (1)
Education and Recreation Services (2)
Food Service (1)
Health Services (1)
Safety and Environmental Health/Facilities (6)

Thanks.

*Natasha K. Metcalf*
*Vice President, Partnership Development*
CCA - "America's Leader in Partnership Corrections"
10 Burton Hills Boulevard
Nashville, Tennessee 37215
EMail: natasha.metcalf@cca.com
Office: (615) 263-3290
Cell: (615) 804-5968
Fax: (615) 263-3100

**U.S. Department of Justice**

Federal Bureau of Prisons

PROGRAM REVIEW DIVISION

---

*Washington, D.C. 20534*

March 13, 2015

MEMORANDUM FOR BARBARA WAGNER, WARDEN
ADAMS COUNTY CORRECTIONAL CENTER
NATCHEZ, MISSISSIPPI

/s/

FROM: Crystal G. Smith, Core Section Chief
Program Review Division

SUBJECT: Contract Facility Monitoring Final Report and Closure
Adams County Correctional Center

This is the report of the Adams County Correctional Center Contract Facility Monitoring conducted January 6-8, 2015. There was one significant finding and one repeat deficiency identified as a result of this monitoring.

Please ensure all deficiencies identified in this report are resolved and controls are in place to prevent recurrence. Should you disagree with any deficiencies, please forward an electronic copy of your response to the BOP-PRD/Correspondence~ GroupWise mailbox within 15 calendar days after receipt of this report. Please include any additional supporting documentation with your response. Otherwise, we will consider this contract facility monitoring officially closed.

Please thank your staff for their efforts and cooperation in preparing for and completing this monitoring. The next monitoring is scheduled to be conducted in fiscal year 2016.

cc: BOP-ADM/Assistant Director
BOP-CPD/Assistant Director
BOP-FPI/Assistant Director
BOP-HRM/Assistant Director
BOP-HSD/Assistant Director
BOP-IPP/Assistant Director
BOP-OGC/Assistant Director
BOP-ADM/Privatized Corr Contracting
BOP-CCD/Privatization
BOP-PRD/Contract Facility Monitoring
BOP-CPD/PFA Sector 2
CAC/Oversight Mgr
keith.hall@correctionscorp.com
ACC/Warden

CONTRACT FACILITY MONITORING REPORT

ADAMS COUNTY CORRECTIONAL CENTER

NATCHEZ, MISSISSIPPI

CONTRACT #DJB1PC-010

Conducted:

January 6-8, 2015

Approved by:

/s/
Shannon D. Withers
Administrator
Program Review Division
Washington, DC

March 13, 2015

CONFIDENTIAL

## SCOPE OF REVIEW

The monitoring was a comprehensive examination of the Adams County Correctional Center operations with attention given to vital functions identified in the Contract Performance Requirements Summary Table.

## BACKGROUND INFORMATION

The Adams County Correctional Center is a low security facility, located near Natchez, Mississippi. The facility currently houses approximately 2,109 male sentenced criminal aliens.

Barbara Wagner is the warden, Leroy Pitts, and Virgil Ensey are the assistant wardens.

## SIGNIFICANT FINDING

HEALTH SERVICES

Condition and Effect:

> There were inadequate controls in the clinical care area of Health Services to ensure compliance with established procedures and practices. These inadequacies created a lack of appropriate intervention, treatment and programs to promote a healthy, safe and secure environment. Additionally, corrective action plans in regard to mortality reviews were not completed as required.

Evidence:

1. **Preventive care baseline evaluations were not completed in accordance with policy. This deficiency was identified in the previous monitoring, making it a repeat deficiency.**

    a. The contractor is required to comply with the Statement of Work (SOW). CCA 13-6, Chronic Care and Disease Management, mandates the contractor to follow the BOP Clinical Practice Guidelines (CPG) in lieu of National Commission on Correctional Health Care (NCCHC) Guidelines. The most current BOP CPG will be used for the treatment of all chronic care conditions. Those guidelines state in relevant part: "A prevention baseline visit should be conducted for all sentenced inmates within 6 months

Case 3:16-cv-02267 Document 400-14 Filed 01/22/21 Page 6 of 20 PageID #: 21894

CONFIDENTIAL CORECIVIC_1008317

of incarceration."

b. A review was conducted of 10 inmate records to determine if prevention baseline visits were completed in accordance with the BOP CPG, to include lab tests and studies. Nine out of ten inmates did not receive preventive baseline evaluations in accordance with the BOP CPG. Examples are referenced in working papers 6.9.20, pp 1-12.

c. A Failure to complete preventive baseline evaluations within 60 days of arrival can lead to the discovery of more serious health concerns, as well as risk the spread of infectious diseases.

2. **Review of records revealed management of five inmates prior to their death was not in accordance with policy and standards of care.**

a. CCA 13-6, Chronic Care and Disease Management, states the contractor will use BOP CPG. The BOP CPG states "inmates enrolled in chronic care clinics will receive an initial visit within 1 month of enrollment and will provide an assessment and plan for continuity of care." CCA 13-6 also requires the contractor to adhere to BOP P6190.03, Infectious Disease Management. The SOW requires the contractor to provide the date of death in their report. CCA 13-34, Emergency Medical Training and Care, states training will be provided to staff. It also states on-site emergency care will be provided by any and all qualified personnel as soon as possible, and mobile emergency drugs and equipment will be easily accessible. Health Services staff will ensure all documentation is completed timely and entered into the inmate's medical record. CCA 13-71A, Patient Care Protocol, states nurses will consult providers when abnormalities are noted." The BOP CPG for coronary artery disease states, "the management of inmates with suspected acute Myocardial Infarction (MI), while awaiting emergent ambulance transfer to a community hospital, should include the following whenever feasible: baseline vital signs and targeted physical examination; continuous monitoring of cardiac rhythm and preparation for CPR; nasal prong oxygen at 2-4 L/minute; Nitroglycerin tablets of 0.4 mg; Aspirin of 325 mg; and IV normal

saline." CCA 13-63, Observation Beds, states observation beds are for stable non-urgent temporary illness/injuries, and if needed, inmates will be transferred out. BOP CPG for influenza states "all staff and inmates should be offered vaccination. Inmates with evidence of influenza like illness should be isolated. Morbid obesity is a high risk factor for influenza. U.S. Preventive Health Task Force, states the influenza vaccine is recommended for persons in high risk groups." The Centers for Disease Control and Prevention/Morbidity and Mortality Weekly Report (CDC/MMWR), titled Prevention and Control of Tuberculosis in Correctional Facilities, states "persons who have a positive Tuberculin Skin Test (TST) result and no symptoms suggestive of TB disease should be evaluated with a chest radiograph within 72 hours after the skin test is interpreted. All correctional staff and inmates should be considered for treatment of Latent Tuberculosis Infection (LTBI) if their TST results are 10 mm induration or higher. CCA 13-71A, Patient Care Protocol for Shortness of Breath, states in relevant part: "If in acute distress (life threatening), call 911. If distress is not acute, notify the Licensed Independent Provider (LIP) immediately. CCA 13-70, Pharmaceuticals, states a prescription/medication order must contain the medication name. The contractor is obligated to follow BOP CPG for diabetes which states the A1C goal is <7 percent. The use of intensive insulin regimen is emphasized. The physician should review the plan with the inmate. Until the glycemic goal for A1C is achieved, the patient should be seen at least monthly to adjust medications. Insulin should be initiated for inmates with A1C> 8.5 percent. Neutral Protamine Hagedorn (NPH) evening doses should be administered at bedtime or as close to bedtime as feasible. Frequent monitoring of blood glucose (three times per day) is optimal for patients who are on insulin. Hospitalization criteria include moderate to severe hyperglycemia that is unresponsive to standard therapies.

    b.    A review of five mortality cases was completed. The first case resulted in an incomplete examination and documentation to the inmate's record. The second inmate developed cardiorespiratory arrest. Medical

CONFIDENTIAL                                                                                             CORECIVIC_1008319

management was not in accordance with policies and CPR protocols were not followed. Documentation is incomplete, to include conflictive information on the timing of CPR and defibrillation, the date of death was incorrectly documented in the local mortality report, and there were no memos submitted from staff who participated in the administration of CPR. The third inmate had influenza like symptoms. He was admitted to observation; however, physician's orders were ambiguous and documented treatment was very vague. The inmate developed cardiorespiratory arrest before the ambulance arrived to the institution. However, documentation in records is incomplete as to the time of death and series of events. The fourth inmate was morbidly obese and developed flu like symptoms. He was not isolated and received conservative treatment. He developed respiratory distress with a saturation as low as 47 percent. Physician orders were not accurate regarding maintaining oxygen saturation. Despite being high risk, the inmate did not receive a flu vaccine. There was a delay in identifying the severity of the inmate's condition. The fifth inmate had uncontrolled diabetes and he was not managed as per policy. Insulin treatment was not started timely and labs were not monitored regularly. Extremely elevated blood glucose levels were not properly treated with insulin. Inmate showed several signs of decompensation; however, symptoms were not identified and managed in a timely manner. Examples are referenced in working papers 6.9.19, pp 1-406.

c. Inadequate medical management can cause decompensation of the inmate's medical condition, ultimately resulting in death. Corrective action and proper follow-up measures must be taken in order to avoid additional deaths.

## DEFICIENCIES

INFORMATION SYSTEMS AND SECURITY

3. **Virus scanning is not completed daily on the file server.**

a. The SOW obligates the contractor to comply with BOP P1237.13, Information Security Programs, CH 2, Sec

g(2), which states in relevant part: "Anti-virus software must be configured to scan daily."

b. Examination of three file servers connected to the BOP network (ACC-ZCM1, ACC-AV and ACC-ADM1) revealed virus scanning was not completed daily on the ACC-AV file server. The last virus scanning was completed on January 3, 2015. Examples are referenced in working papers 1.1.4(a), pp 1-15.

c. The lack of daily virus scanning allows the system to become vulnerable to viruses and system security breaches.

4. **A file server did not contain current virus definition files.**

a. The SOW obligates the contractor to comply with BOP P1237.13, Information Security Programs, CH 2, Sec g(3), which states in relevant part: "Anti-virus software and virus definition files (DEF) should be updated as required and current."

b. Examination of three file servers connected to the BOP network (ACC-ZCM1, ACC-AV and ACC-ADM1) revealed the virus definition files on the ACC-ADM1 server were 6 days old (dated January 1, 2015). The most current virus definition files were available as of January 6, 2015. Examples are referenced in working papers 1.1.4(b), pp 1-15.

c. When virus definition files are not updated as required the system becomes vulnerable to security concerns.

CORRECTIONAL PROGRAMS

5. **The contractor is not compliant with procedures found in the Central Inmate Monitoring (CIM) Manual.**

a. The SOW obligates the contractor to comply with BOP P5180.04, Central Inmate Monitoring Manual, Sec 701-704, and CCA 18-101, Central Inmate Monitoring, p 2, Sec 2, which states in relevant part: "When a telephone inquiry is received regarding an inmate, the receiver shall first determine if the inmate is on the sanitized roster."

b. On January 7, 2015, a locator center test was conducted on the morning watch shift at 5:00 a.m. Upon contact, the locator center officer asked if the call was in reference to an inmate. The examiner replied "yes." The examiner was advised to call back between 8:00 - 8:30 a.m. There was no attempt to ensure the call was screened properly and the sanitized roster was not checked as required by policy. Example is referenced in working paper 2.2.1, pp 1-5.

c. Failure to properly screen calls in reference to inmates may jeopardize the safety of the inmate and security of the institution.

EDUCATION AND RECREATION SERVICES

6. **Not all inmate electronic education files contained initial inmate interviews, nor the appropriate GED/ESL assignments loaded in SENTRY.**

a. The SOW obligates the contractor to comply with BOP P5350.28, Literacy Program (GED standard), Sec 15, and CCA 20-1, Facility Education Programs, p 22, Sec 15, and 18 U.S.C. § 3624(f), which states in relevant part: "Ordinarily, you should enter the appropriate EDI GED needs assignment and the Update Periodic Review/Withdrawal Interview form in SENTRY within 60 days of each inmate's arrival at the current institution. Pursuant to the Crime Control Act of 1990, 18 U.S.C. § 3624(f), limited English proficient inmates confined in Federal Bureau of Prisons institutions are required to attend an English-as-a-Second Language (ESL) program until they function at the equivalence of the eighth grade level in competency skills."

b. An examination of electronic education files of inmates who had arrived at the facility since the last monitoring January 7-9, 2014, determined 5 of 20 inmates did not receive the initial interview as per policy. Additionally, 9 of 20 were granted class exemptions for GED (GED XN) but did not have any documentation in SENTRY on the Justification of Exemption form (PEJE) verifying exemption. Examples are referenced in working papers 4.1.1(a&b), pp 1-24.

c. Lack of an initial interview and improper use of assignment codes, prevent education staff from properly tracking and identifying inmate needs.

7. **Progress assignments are not always documented properly for inmates sentenced under VCCLEA/PLRA provisions.**

a. The SOW obligates the contractor to comply with BOP P5350.28, Literacy Program (GED Standard), p 28, Sec 17, and CCA 20-1, Facility Education Programs, p 22, Sec 15, and 18 U.S.C. § 3624(f), which states in relevant part: "For the purposes of 18 U.S.C. 3624, an inmate subject to the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA) or the Prison Litigation Reform Act of 1995 (PLRA) shall be deemed to be making satisfactory progress toward earning a GED credential or high school diploma unless and until the inmate receives a progress assignment confirming: The inmate refuses to enroll in the literacy program. The inmate has been found to have committed a prohibited act that occurred in a literacy program during the last 240 instructional hours of the inmate's most recent enrollment in the literacy program; or the inmate has withdrawn from the literacy program."

b. An examination of electronic education files of inmates sentenced under VCCLEA/PLRA provisions revealed many inmates were assigned GED SAT but were not enrolled in class or placed on the waiting list for the literacy program (GED or ESL). Additionally, another inmate had an assignment of GED UNSAT without justification of the unsatisfactory progress. Examples are referenced in working papers 4.1.2, pp 1-38.

c. Failure to properly document and update progress assignments can affect an inmate's release date.

FOOD SERVICE

8. **Food is not protected from the possibility of cross-contamination.**

a. The contractor is obligated to comply with the SOW, which mandates compliance with all applicable local, state and federal laws. Additionally, the

        contractor follows CCA 11-1, Food Service, p 12, Sec 2(b), which states in relevant part: Equipment and hood systems shall be clean and in good repair at all times. Food Service areas and equipment (to include pots, pans, and food trays) will be cleaned after each use. USFDA Food Code 2013, Secs 3-304.14, 3-305.11, 3-305.12, 3-307.11, 4-101.19, and 4-204.11, is relevant to cross-contamination within a Food Service area.

b. A food and sanitation inspection of all areas where food is stored, prepared, and served revealed food products are not always protected from cross-contamination. Specifically, cloths, stainless steel scrubbers, and green scratch pads are not always stored in a sanitizing solution when not in use within the main kitchen, serving line, dining room, dish room, and pots and pans area. Additionally, several utensils, cutting boards, and lids contained stains and deep scratches allowing bacteria to harbor within these items. Lastly, one hot box was corroded and cracked, the large mixer in the main kitchen had been repainted which caused the topcoat of paint to peel and chip. The slicer in the main kitchen, hoods above the steam kettles, and food tray lids are in need of additional cleaning and showed evidence of food residue. Examples are referenced in working papers 5.1.1, pp 1-58.

c. Failure to protect food from cross-contamination risks the possibility of a food borne illness outbreak.

HEALTH SERVICES

9. **Confidentiality and security of inmate's health related data are not being maintained.**

a. The contractor complies with the SOW, CCA 13-74, Privacy of Protected Health Information, Sec c, 1(a), p 3 & Sec g, 1(e), p 7, and the Federal Health Insurance Probability and Accountability Act of 1996, which states in relevant part: "All clinical encounters shall be conducted in private."

b. During examination of pill line on January 7, 2015, the examiner observed and overheard the medication

Case 3:16-cv-02267 Document 400-14 Filed 01/22/21 Page 13 of 20 PageID #: 21901

CONFIDENTIAL CORECIVIC_1008324

being prescribed to an inmate. Additionally, the examiner overheard clinical conversations between the attending clinician and several other inmates. Lastly, inmates awaiting their appointments had access to the previously mentioned practices. Examples are referenced in working papers 5.1.1, pp 1-11.

c. The contractor's current practice is not in compliance with established policy. Based on these observations, non-compliance of policy could violate the inmates' right to privacy. This could lead to legal encumbrances and cause undue burden on the agency.

SAFETY AND ENVIRONMENTAL HEALTH/FACILITIES

**10. Not all aspects of the Lockout/Tagout Program are met.**

a. The contractor is obligated to comply with the SOW, which obligates compliance with all state, local and federal laws, specifically, 29 CFR 1910.147(c)(6)(A), which states in relevant part: "The inspections are to be performed by an authorized employee who normally would not be the employee to lockout the specific piece of machinery."

b. A review of the training records and training documentation revealed periodic inspections of potentially hazardous multi-energy source equipment did not include all authorized employees in accordance with 29 CFR. Additionally, training for all affected employees to include staff and inmates was not on file. Lastly, training for authorized employees was on file; however, no documentation (i.e., training outline) was available. Examples are referenced in working papers 10.2.1, pp 1-17.

c. Lack of a sound periodic inspection program can place staff and inmates at risk of serious injury and jeopardize life safety.

**11. Not all elements of the Respiratory Protection Program are being met.**

a. The contractor is obligated to comply with the SOW, which obligates compliance with all state, local and

federal laws, specifically, 29 CFR 1910.134(c)(1), which states in relevant part: "In any workplace where respirators are necessary to protect the health of employees or whenever respirators are required by the employer, the employer shall establish and implement a written respiratory protection program with work-site specific procedures. The employer shall include the following:

1. Medical evaluations of employees required to use respirators,
2. Fit testing procedures for tight-fitting respirators.
3. Procedures for cleaning, storing and maintaining.
4. Training of employees in the proper use, donning, and doffing, along with limitations and maintenance of respirators."

b. Observation of the Respiratory Protection Program revealed only five staff received the required annual training. The Advantage 1000 gas respirators within the 30 percent gear area revealed expired filters. To date, staff had not been fit-tested nor received annual medical/clearance for 2014. Lastly, Health Services is using two brands of N95 respirators, Moore Medical and Alpha Pro Tech. Staff had not been fit-tested for the Alpha Pro Tech model. Examples are referenced in working papers 10.3.1, pp 1-6.

c. Employees exposed to industrial or occupational air contaminants can be exposed to possible long-term health issues or death, depending on exposure.

**12. Not all corrosive chemicals are stored properly and not all employees are receiving proper training.**

a. The contractor is obligated to comply with SOW, which obligates compliance with all state, local and federal laws, specifically, NFPA 30, CH 9.17, Separation of Incompatible Materials, and 29 CFR 1910.1200, which states in relevant part: "Except as provided for in 9.17.3, liquids shall be separated from incompatible materials where the stored materials are in containers having a capacity of more than 5 lbs. (2.268 kg) or ½ gal (1.89 L). Segregating incompatible materials storage by a distance of not

less than 20 ft. (6.1 m). Isolating incompatible materials storage by a noncombustible partition extending not less than 18 in. (460 mm) above and to the sides of the storage materials. Storing liquid materials in flammable liquids storage cabinets in accordance with Sec 9.5. Liquids shall be separated from level 2 and level 3 aerosols in accordance with NFPA 30B, Code for the Manufacture and Storage of Aerosol Products. Flammable and combustible liquids shall be separated form oxidizers by at least 25 ft. (7.6 m)." 29 CFR 1910.1200 states in relevant part: "Employers shall provide employees with effective information and training on hazardous chemicals in their work area at the time of their initial assignment, and whenever a new chemical hazard the employees have not previously been trained about is introduced into their work area. Information and training may be designed to cover categories of hazards (e.g., flammability, carcinogenicity) or specific chemicals. Chemicals-specific information must always be available through labels and safety data sheets."

b. Review of chemicals within five work areas revealed the following: The laundry area contained two incompatible chemicals stored (oven grill and demur). Additionally, the laundry and dental areas contained corrosive and flammable materials stored within 25 feet of each other. The dental corrosive cabinet contained etching tubes with a pH of 1; all other products contained a higher pH level. There was no documentation that inmates working with the chemicals were trained. Lastly, the mandated Global Harmonization Systems, required under the OSHA Hazard Communication Standard, has not been completed. Examples are referenced in working papers 10.3.3, pp 1-19.

c. Improper storage of incompatible corrosive chemicals can react in an explosive or dangerous environment. Lack of training for the proper handling/storage/labeling of hazardous chemicals can cause serious health issues or death.

**13. Not all elements of the storage, disposal and training of bio-hazardous and P&U listed wastes are being met.**

a. The contractor is obligated to comply with the SOW, which mandates the contractor follow all local, state, and federal regulations. Additionally, the contractor follows CCA 13-70, Hazardous Material, p 7, Sec 3(d), which states in relevant part: "Disposition of controlled substance waste shall be in accordance with state guidelines. Where state guidelines do not exist, any controlled substances that must be disposed of will be disposed of in sharps containers and disposed of as a bio-hazard."

b. A review of storage, disposal, and training of biohazardous and P&U listed wastes revealed; staff signing manifests for biohazardous waste have not received the required training. Four staff that signed manifests did not receive training, and one manifest was not signed by the "generator" facility staff. Biohazardous waste is not being dated when "packaged" or put into "storage." Those two dates are required on the outside of each waste container. Pharmaceutical waste, "P&U narcotics," are not disposed of according to local policy or in accordance with state regulations. Local policy states that it should be disposed of in accordance with state regulations; however, policy states in the next paragraph that waste should be discarded into sharps containers and disposed of as biohazardous waste. Examples are referenced in working papers 10.6.1, pp 1-15.

c. Improper training, storage, and handling of bloodborne pathogens and biohazardous waste can result in an exposure to microorganisms and can cause disease in humans.

**14. Fire drills in Health Services did not conform to policy.**

a. The contractor is obligated to comply with the SOW; and National Fire Protection Association (NFPA 101), CH 21, Ambulatory Care, Sec 21.7.1.6, which states in relevant part: "Drills shall be conducted quarterly on each shift to familiarize facility personnel (nurses, interns, maintenance engineers, and administrative staff) with signals and emergency action required under varied conditions."

b. A review of fire drills conducted over the past 4

quarters within the health services department, revealed fire drills were not conducted in accordance with policy. As a result of the Health Services Department having two 12-hour shifts within a 24-hour work schedule, fire drills should have been conducted on each shift, during each quarter per the Ambulatory Care requirement. Examples are referenced in working papers 10.7.5, pp 1-5.

c. Failure to conduct fire drills on each shift within an Ambulatory Care Unit, diminishes the knowledge and familiarization of staff required to respond to signals and take emergency action required under varied conditions.

**15. The fire alarm test (Delta Unit) failed to activate as required. The test within the Commissary resulted in inoperable notification devices (horns).**

a. The contractor is obligated to comply with the SOW, which mandates the contractor follow all local, state, and federal regulations. NFPA 72, CH 1, Sec 1.1.2 states in relevant part: "The purpose of this code is to define the means of signal initiation, transmission, notification, and annunciation; the levels of performance; and reliability of various types of fire alarm systems, supervising station alarm systems; public emergency alarm reporting systems; fire warning equipment; emergency communication systems and there components."

b. Fire alarm testing was conducted in Delta Unit. Testing of the pull station in Delta Housing Unit resulted in the fire alarm system for that area being nonoperational. The fire alarm system did not activate locally at the test site or in the Control Center. A second test was performed in the Commissary, which resulted in the test area not having activation of audible devices (horns) in the local area. The second test did activate into the Control Center and visually at the test site. Examples are referenced in working papers 6.5.1, pp 1-4.

c. A lack of proper fire detection can result in a lack of proper response of emergency personnel, the loss of property, and possibly the loss of life.

Case 3:16-cv-02267 Document 400-14 Filed 01/22/21 Page 18 of 20 PageID #: 21906

CONFIDENTIAL CORECIVIC_1008329

## REVIEWER ASSURANCE STATEMENT

As monitor-in-charge, I certify the contract monitoring was conducted in accordance with generally accepted government auditing standards. Findings of noncompliance or inadequate controls contained in the report are supported by evidence that is sufficient and reliable. The evidence is contained in the Contract Facility Monitoring working papers filed in the Program Review Division.

William A. Lee, Monitor-in-Charge
Contract Facility Monitoring Section
Program Review Division

Members of the Monitoring Team:

Daniel De Jesus, CFM Physician, PRD
Mohammed Adil, CFM Health Services Examiner, PRD
Anthony Do, CFM Information Systems and Security Examiner, PRD
Marshall D. Grissom, CFM Correctional Programs Examiner, PRD
Michael Bink, CFM Safety Services Examiner, PRD
Brian McGorty, CFM Food Service Examiner, PRD
Anessa Riles, Examiner, Health Services Section, PRD
Andrew Temples, Examiner, Education Services Section, PRD
Ron J. Herman, Examiner, Human Resource Management Section, PRD
Mary Priddy-Nash, Examiner, Financial Management Section, PRD
Chris Bergan, Emergency Management Specialist, CPD


CONFIDENTIAL
CORECIVIC_1008331