# EXHIBIT 87
# [Filed Under Seal]



Office of the Inspector General
U.S. Department of Justice



# Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi



EXHIBIT

297 Beach
CAZ 2/11/20

Audit Division 17-08                    December 2016

Case 3:16-cv-02267    Document 401-12    Filed 01/22/21    Page 2 of 74 PageID #: 22137

# AUDIT OF THE FEDERAL BUREAU OF PRISONS' CONTRACT WITH CORECIVIC, INC. TO OPERATE THE ADAMS COUNTY CORRECTIONAL CENTER IN NATCHEZ, MISSISSIPPI

## EXECUTIVE SUMMARY

In April 2009, the Federal Bureau of Prisons (BOP) awarded a contract to Corrections Corporation of America (CCA), which is now known as CoreCivic, Inc., to house up to 2,567 low-security, non-U.S. citizen adult male inmates in the Adams County Correctional Center (Adams County).[1] The BOP exercised the contract's second of three 2-year option periods in 2015, extending it through July 2017 and increasing its value to about $468 million. As of June 2016, it was the third largest Department of Justice (Department or DOJ) contract in terms of dollars obligated since fiscal year (FY) 2009.

The DOJ Office of the Inspector General (OIG) conducted this audit, covering the period April 1, 2012, through March 31, 2015, to: (1) assess CoreCivic's contract performance; (2) determine whether CoreCivic complied with the terms, conditions, laws, and regulations applicable to the contract; and (3) assess the BOP's formation and administration of the contract. We found that CoreCivic's execution of the contract's requirements did not fully accomplish the BOP's program goals in several respects.

In May 2012, an inmate riot at the facility resulted in a correctional officer's death and injuries to approximately 20 staff and inmates. The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence systems. The report specifically cited the lack of Spanish-speaking staff and staff inexperience.

Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage.[2] Yet CoreCivic's monthly reports to the BOP,

---

[1] CCA changed its name to CoreCivic, Inc. and began the process of modifying its federal contracts to reflect that name in November 2016. Throughout this report we refer to the company as CoreCivic.

[2] A recent OIG audit identified similar concerns about post-riot health services staffing levels at a BOP contract prison. That audit of the Reeves County Detention Center I/II found that while correctional staffing levels were typically above contractually required post-riot minimum staffing levels, that was not the case with health services staffing in 34 of 37 months we reviewed. U.S. Department of Justice Office of the Inspector General, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015).

Case 3:16-cv-02267    Document 401-12    Filed 01/22/21    Page 3 of 74 PageID #: 22138

which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.  With regard to Spanish-speaking staff, while the BOP's post-riot after-action plan recommended adding to the contract minimum requirements for bilingual staff, we found that the BOP did not modify the contract to include this requirement until June 2015, subsequent to the start of our audit.  Moreover, the contract modification does not define the level of speaking proficiency required and has no deadline or target date for compliance.  As of July 2015, the facility's inmate population consisted of approximately 2,300 aliens, predominately Mexican-nationals, yet only 4 of 367 staff spoke fluent Spanish.  By February 2016, CoreCivic officials told us the number of fluent Spanish-speaking staff actually dropped to three people, and CoreCivic's January 2016 job announcements for correctional officers stated no preference for bilingual applicants.  In addition, the BOP told us that it does not validate the contractor's staff for Spanish-speaking skills, and has not established any validation criteria for doing so.

We also found lower qualification levels and significantly higher staffing turnover rates for Adams County correctional officers and believe these factors contributed to the facility's lack of experienced staff, which the BOP identified in its after-action report as a systemic problem in the area of safety and security at the facility.  We reviewed CoreCivic's hiring practices and determined the facility employs correctional officers with qualifications that would have been insufficient for employment at BOP-managed institutions.  For example, the BOP requires entry-level correctional officers to have either a 4-year college degree or equivalent work experience, while CoreCivic does not require education beyond high school.  Additionally, we found significantly higher turnover rates at the facility than those at comparable BOP institutions and believe it likely results from the substantially lower pay and benefits provided by CoreCivic.  We found CoreCivic pays significantly lower wages and offers less time off than the BOP, and provides fewer career advancement opportunities.  For example, the BOP pays entry-level correctional officers $18.69 per hour, 48 percent higher than the $12.60 per hour paid by CoreCivic.  The State of Mississippi also offers its correctional officers more generous wages and paid time off than CoreCivic.  Furthermore, the BOP offers new correctional officers noncompetitive promotion potential to $26.91 an hour, while CoreCivic pays correctional officers, throughout their careers, only the required prevailing wage rates set forth by the Department of Labor's Service Contract Act wage determinations.  The BOP's contract with CoreCivic does not address either correctional officer qualification requirements or staff pay and benefits.  We believe the BOP should evaluate the extent to which employee qualification levels and turnover rates impact safety and security concerns, and whether its contractual terms should be modified to address those concerns.

In addition, while the BOP's solicitation that resulted in the Adams County contract required companies to develop a staffing plan that would illustrate the "total number of full-time equivalents (FTE) for each position title," based on our discussions with BOP and CoreCivic officials, it became apparent that the contract was vague about how staffing levels should be calculated.  A 2011 contract modification provided that staffing levels should not fall below a monthly average of 90 percent for Correctional Services and 85 percent for Health Services of the

BOP-approved staffing plan. Both the BOP and CoreCivic told us they interpreted the contract to allow the calculation of staffing levels to be based on headcounts rather than FTE, and leave the determination of day-to-day staff assignments to the discretion of CoreCivic. As a result, we found the staffing levels CoreCivic reported to the BOP reflected neither actual staffing at the facility nor staffing insufficiencies. Specifically, CoreCivic reported to the BOP simple headcounts of staff recorded on payroll records, regardless of the hours each employee actually worked. When we re-calculated correctional services staffing levels based on FTEs using time and attendance records, we found that, throughout the 4-year period we reviewed, staffing levels were lower than the levels represented by CoreCivic's headcounts and were frequently lower than the BOP's minimum staffing threshold. We found similar issues regarding CoreCivic's reporting of health services staffing. Because the BOP was unaware of these staffing insufficiencies, it was unable to assess the adequacy of staffing levels at the facility. When we reported these issues and our concerns about them to BOP officials, they told us CoreCivic's reporting was consistent with the contract. We found that had the contract clearly specified that staffing levels should be measured using FTEs, between July 2011 and July 2015 the BOP could have taken $1,927,307 in invoice deductions as a result of inadequate correctional and health services staffing levels. We believe this nearly $2 million that the BOP expended could have been avoided with more precise contract language and was wasteful.

We also found that, beginning in December 2012, CoreCivic excluded from its required staffing reports the status of five critical health services positions identified in the approved staffing plan, namely two dentists, two physicians, and one advanced registered nurse practitioner. As a result, the BOP, which was not notified of and did not identify the change, was unable to assess the effect of any vacancies on service provision or invoice amounts. We believe that this gap in oversight had a negative effect on CoreCivic's ability to provide quality health care at the Adams County facility. In fact, we found that between December 2012 and September 2015, the Adams County facility was staffed with only a single physician for 434 days (43 percent of the time) and a single dentist for 689 days (69 percent of the time), resulting in inmate-to-provider ratios that were about double those specified in BOP program statements.

Finally, we found several aspects of the BOP's control and oversight of the contract performance to be inadequate. The BOP structured this contract as a performance-based acquisition, for which the Federal Acquisition Regulation requires a performance work statement, measurable performance standards, and a method of assessing contractor performance against those standards. However, the BOP did not implement appropriate performance standards to measure and evaluate CoreCivic's performance. For example, the BOP's oversight of staffing levels is limited because the contract requirements do not sufficiently specify how CoreCivic should measure and report facility staffing levels. We also found CoreCivic inconsistently used industry-standard dietary guidelines to evaluate the nutritional adequacy of food service offerings at the facility, an issue that may have been avoided had the contract specified which standards CoreCivic should have followed. Additionally, the BOP's oversight of billings was inadequate in several

ways, resulting in the BOP failing to identify instances where CoreCivic did not apply mandatory invoice deductions.

In August 2016, the Deputy Attorney General directed the BOP to begin reducing, and ultimately end, its use of privately operated prisons. Because this order was issued after the close of our audit period, any analysis of its basis or effect were outside of this audit's scope.

This report makes 9 recommendations to assist the BOP in improving operations under the Adams County contract and in addressing $42,300 we have identified as questioned costs.

# AUDIT OF THE FEDERAL BUREAU OF PRISONS' CONTRACT WITH CORECIVIC, INC. TO OPERATE THE ADAMS COUNTY CORRECTIONAL CENTER IN NATCHEZ, MISSISSIPPI

## TABLE OF CONTENTS

INTRODUCTION..................................................................................... 1

Background .................................................................................. 1

The Federal Bureau of Prisons ...................................................... 1

The BOP's Use of Contract Prisons.................................................. 1

CoreCivic, Inc.............................................................................. 3

Adams County Correctional Center ................................................ 3

Federal Bureau of Prisons Contract Administration........................... 4

OIG Audit Approach ............................................................... 4

FINDINGS AND RECOMMENDATIONS.................................................. 6

Contract Performance.................................................................. 6

Facility Staffing – Correctional Services.......................................... 7

Facility Staffing – Health Services ............................................... 13

Recruiting and Retention of Correctional Officers ........................... 15

Language Barrier ................................................................. 15

Correctional Officer Qualifications and Retention.................... 17

Contract Compliance ........................................................................ 21

Compliance with Reporting Requirements for Facility Staffing Levels  21

Compliance with the Service Contract Labor Standards Statute ....... 25

Contract Formation and Administration ............................................... 27

Performance-Based Contracting ................................................. 27

Inmate Grievance Processes............................................... 28

Food Services................................................................. 30

Contract Type ........................................................................ 31

Billing Procedures ................................................................. 32

Contract Oversight................................................................. 32

Recommendations ...................................................................... 35

STATEMENT ON INTERNAL CONTROLS........................................................ 36

STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS ......................... 37

APPENDIX 1: OBJECTIVES, SCOPE, AND METHODOLOGY................................. 38

APPENDIX 2: SCHEDULE OF DOLLAR-RELATED FINDINGS .............................. 42

APPENDIX 3: THE BOP'S RESPONSE TO THE DRAFT AUDIT REPORT................. 43

APPENDIX 4: CORECIVIC'S RESPONSE TO THE DRAFT AUDIT REPORT ............. 47

APPENDIX 5: OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY OF ACTIONS NECESSARY TO CLOSE THE REPORT ....................................... 60

# AUDIT OF THE FEDERAL BUREAU OF PRISONS' CONTRACT WITH CORECIVIC, INC. TO OPERATE THE ADAMS COUNTY CORRECTIONAL CENTER IN NATCHEZ, MISSISSIPPI

## INTRODUCTION

The Department of Justice Office of the Inspector General (OIG) audited the Federal Bureau of Prisons' (BOP) contract number DJB1PC010, awarded April 1, 2009 to Corrections Corporation of America (CCA), which is now known as CoreCivic, Inc.[3] The purpose of this contract is to provide for detention and correctional services for up to 2,567 low-security, non-U.S. citizen inmates at the Adams County Correctional Center in Natchez, Mississippi. The contract has a fixed-price with the possibility of an award fee for quality performance. It has a 4-year base period beginning on August 1, 2009 and three 2-year option periods. In July 2015, the BOP exercised the contract's second option period, extending contract performance through July 2017 and increasing the total contract value to approximately $468 million. If the BOP exercises the third option period, the contract will have an estimated value of about $580 million and extend through July 2019. As of June 2016, the Adams County Correctional Center contract is the third largest in the Department of Justice in terms of dollars obligated since fiscal year (FY) 2009.

## Background

### The Federal Bureau of Prisons

The BOP's mission is to protect society by confining offenders in prisons and community-based facilities that are safe, humane, cost-efficient, appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens. The BOP directly operates 122 government-owned facilities and utilizes 13 privately managed facilities. The BOP provides administrative oversight and support through its central and regional offices. As of April 7, 2016, the BOP was responsible for the custody and care of 196,285 inmates.

### The BOP's Use of Contract Prisons

As a strategy to help control prison overcrowding, the BOP places low security, criminal aliens serving sentences for 90 months or less in contracted facilities. These facilities are supported by Criminal Alien Requirement contracts, which are fixed-price, performance-based service contracts for the management

---

[3] CCA changed its name to CoreCivic, Inc. and began the process of modifying its federal contracts to reflect that name in November 2016. Throughout this report we refer to the company as CoreCivic.

1

and operation of correctional facilities housing low-security, non-U.S. citizen male inmates in BOP custody.

The BOP began using Criminal Alien Requirement contracts after Congress directed the BOP in 1996 to begin a 5-year prison-privatization demonstration project at a federal prison in Taft, California; thereafter, the Taft Prison Facility became the first fully-privatized federal correctional institution for which an outside contractor would assume primary responsibility. Under the eighth Criminal Alien Requirement solicitation, the BOP awarded contract number DJB1PC010 to CCA on April 1, 2009, for the management and operation of the Adams County Correctional Center, and CCA subsequently changed its name to CoreCivic.

In FY 2016, the BOP's budget for contract confinement was $1 billion, and it reports being the largest user of contract confinement in the United States. As shown in Table 1, as of April 7, 2016, the BOP housed 22,646 inmates in privately-managed facilities, accounting for approximately 11.5 percent of the total BOP inmate population.

**Table 1**

**BOP's Criminal Alien Requirement Privately-Managed Contract Facilities as of April 7, 2016**

| Facility Name | Location | Security Level | Population |
|---|---|---|---|
| Adams County Correctional Center | Natchez, MS | Low | 1,906 |
| Big Spring Correctional Center | Big Spring, TX | Low | 3,174 |
| Cibola County Correctional Center | Milan, NM | Low | 1,112 |
| D. Ray James Correctional Facility | Folkston, GA | Low | 2,016 |
| Eden Detention Center | Eden, TX | Low | 1,345 |
| Giles W. Dalby Correctional Institution | Post, TX | Low | 1,599 |
| Great Plains Correctional Facility | Hinton, OK | Low | 1,639 |
| McRae Correctional Facility | McRae, GA | Low | 1,613 |
| Moshannon Valley Correctional Center | Philipsburg, PA | Low | 1,608 |
| Reeves County Detention Center I and II | Pecos, TX | Low | 2,127 |
| Reeves County Detention Center III | Pecos, TX | Low | 1,170 |
| Rivers Correctional Institution | Winton, NC | Low | 1,132 |
| Taft Correctional Institution | Taft, CA | Low and Minimum | 2,205 |
| **Total Inmate Population** | | | **22,646** |

Source: BOP

2

In a memorandum dated August 18, 2016, the Deputy Attorney General directed the BOP to begin reducing, and ultimately end, its use of privately operated prisons. The memorandum concluded that private prisons "simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security."[4] Consequently, the Deputy Attorney General directed that, as each private prison contract reaches the end of its term, the BOP "either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population."

*CoreCivic, Inc.*

Founded in 1983, CoreCivic is a publicly-traded, for-profit private corrections and detention company based in Nashville, Tennessee. The contractor manages more than 70 correctional facilities that house nearly 70,000 inmates from federal, state, and local jurisdictions. Of those 70 facilities, 4 are operated under contracts from the BOP and 11 from the U.S. Marshals Service. During FY 2015, the federal government spent approximately $535 million for CoreCivic contracted facilities, of which about $467 million was spent by the Department of Justice. The name CoreCivic, Inc. was adopted by the company in November 2016 as part of what it characterized as a rebranding effort. Prior to that, the company was known as Corrections Corporation of America or CCA.

*Adams County Correctional Center*

The Adams County Correctional Center (Adams County) is a contractor-owned 75-acre correctional facility located in Natchez, Mississippi. The Adams County facility contains seven housing units, food service and medical operations, indoor and outdoor recreation areas, visitation space, and administrative buildings. Constructed for CoreCivic at a cost of approximately $128 million, the Adams County facility opened in 2009. The inmate population consists predominately of Mexican-nationals.

In May 2012, the Adams County facility experienced an inmate riot that resulted in the death of one correctional officer, injuries to approximately 20 other staff members and inmates, and multiple convictions on murder and rioting charges. According to an affidavit filed by the Federal Bureau of Investigation on August 8, 2012, the disturbance was a consequence of what the inmates perceived to be substandard food, inadequate medical care, and disrespectful staff members at the Adams County facility.

The BOP performed a review of the event and issued an after-action report making 15 recommendations. The report concluded that a lack of effective intelligence operations directly contributed to the inability to prevent the disturbance. The BOP found deficiencies in communication between staff and

---

[4] U.S. Department of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons,* Evaluation and Inspections Report 16-06 (August 2016).

3

inmates, staffing, and CoreCivic's intelligence systems. The report specifically stated that a lack of Spanish-speaking staff and staff inexperience, particularly in the Intelligence Office, had an adverse effect on communication and intelligence gathering at the prison.

*Federal Bureau of Prisons Contract Administration*

The BOP's administration, monitoring, and oversight responsibilities for its 13 privately operated correctional facilities are shared among 3 Divisions.

Within the BOP's Administration Division, the Privatized Corrections Contracting Section is responsible for both contract procurement and contract administration, which it accomplishes through the assignment and supervision of an Administrative Contracting Officer for each contract. Each Administrative Contracting Officer typically appoints Contracting Officer's Representatives, who monitor contract performance on a daily basis and help the Administrative Contracting Officer ensure that the contractor is adhering to the terms and conditions of the contract.

Within the BOP's Correctional Programs Division, the Privatization Management Branch is responsible for managing and overseeing the operation of secure contract facilities. The Privatization Management Branch maintains at least two full-time staff at each private facility, including a Senior Secure Institution Manager and a Secure Oversight Manager. These two managers are Contracting Officer's Representatives whose functions include conducting routine reviews of critical performance areas at the Adams County facility and identifying possible deficiencies or concerns. They are responsible for examining all areas of the contract including health services, education, recreation, food service, correctional services, correctional programs, safety, inmate services, and any other area in which inmates voice concerns during interactions with BOP staff.

The Contract Facility Monitoring Section is located within the BOP's Program Review Division and it consists of a team of subject matter experts who perform comprehensive reviews of the contract facilities to identify areas of concern with respect to the vital contracted functions at the facilities.

**OIG Audit Approach**

The objectives of our audit were to: (1) assess CoreCivic's contract performance; (2) determine whether CoreCivic complied with the terms, conditions, laws, and regulations applicable to the contract; and (3) assess the BOP's formation and administration of the contract. The scope of this audit, unless otherwise stated, is the period of contract performance from April 1, 2012, through March 31, 2015.

To assess the contractor's performance, we evaluated the effectiveness of its efforts to fulfill the contract's requirements and provide a safe and secure environment for both staff and inmates. Specifically, we interviewed staff and examined Adams County staffing levels in the areas of correctional services and

4

health services to determine if CoreCivic complied with the staffing plan that it developed and the BOP approved.  We also assessed the extent to which language barriers exist and affect the safety and security of the Adams County facility. Finally, we reviewed correctional officers' qualifications to determine if the staff at Adams County was comparably qualified to that of similar BOP-managed facilities.

To determine whether the contractor complied with the terms, conditions, laws, and regulations applicable to the contract, we reviewed contract clauses related to staffing and reporting requirements, billing procedures, and labor laws. We also reviewed other applicable contract provisions.  We then reviewed supporting documentation from both the BOP and the contractor to determine whether the services delivered complied with the applicable contract requirements.

To assess the BOP's formation and administration of the contract, we evaluated the effectiveness of the performance-based acquisition strategy at achieving the goals of the BOP's privatization program.  Specifically, we assessed whether the contract's scope of work was effective at driving contractor performance by describing the program requirements in terms of objectively measurable goals.  To accomplish this, we reviewed the BOP's acquisition planning documentation, contract performance requirements, and applicable oversight and monitoring documentation.  We then compared that documentation to standards and guidance for the use of performance based service contracts.

A detailed explanation of the audit's scope and methodology is available in Appendix 1.

# FINDINGS AND RECOMMENDATIONS

CoreCivic's performance did not fully accomplish BOP program goals for maintaining adequate staffing levels and providing a safe and secure environment.[5] This occurred because the staffing levels at the Adams County facility were frequently insufficient during the 4 years we tested, even though systemic staffing deficiencies were cited as a contributing factor to the riot that occurred in May 2012 during which a correctional officer died. Our analysis found that CoreCivic staffed correctional services at a full-time equivalent level that was lower than at the time of the riot during 19 of the following 38 months. During the same period, CoreCivic reported to the BOP that staffing levels, based on simple staff headcounts, had improved during all but 2 of those months. In addition, CoreCivic did not hire sufficient bilingual staff, hired correctional officers who are less-qualified than comparable BOP officers, and experienced higher staff turnover rates than at comparable BOP facilities. Further, CoreCivic's invoices did not reflect actual staffing levels and, because of CoreCivic's and the BOP's shared interpretation of the contract's vague language pertaining to those levels, the BOP did not take $1,927,307 in additional invoice deductions that it could have taken had the contract been clearer. CoreCivic also improperly calculated the necessary wage determination fringe deductions for some invoices, resulting in about $42,300 in unallowable billings. Finally, the BOP exercised inadequate control and oversight for some aspects of CoreCivic's performance under the contract, including by failing to include objective metrics in the contract by which to measure CoreCivic's performance, and by failing to detect the shortfalls of CoreCivic's monthly staffing reports.

## Contract Performance

CoreCivic's performance under the contract did not fully accomplish the program goals, which included maintaining adequate staffing levels and providing a safe and secure environment for staff and inmates. This occurred because the staffing levels at the Adams County facility were frequently insufficient during the 4 years we tested, and the levels reported to the BOP reflected neither the actual staffing levels nor any staffing insufficiencies. Because the BOP was unaware of these staffing insufficiencies, it was unable to assess the adequacy of staffing levels at the facility. However, even when we reported these issues and our concerns about them to BOP officials, they told us CoreCivic's reporting was consistent with the contract. We found that had the contract clearly specified that staffing levels should be measured using FTEs, between July 2011 and July 2015 the BOP could have taken $1,927,307 in invoice deductions as a result of inadequate correctional and health services staffing levels. We believe this nearly $2 million that the BOP

---

[5] After reviewing a preliminary draft of this report, CoreCivic asserted that this conclusion regarding its accomplishment of the BOP's program goals is not adequately supported by our findings. We disagree. The bases for our conclusion are contained in the remainder of this report.

6

expended could have been avoided with more precise contract language and was wasteful. In addition, more than 3 years after the BOP attributed a 2012 riot in part to a lack of Spanish-speaking staff, the contractor employed only 4 fluent Spanish speakers, none of whom worked in the Adams County facility's intelligence office, for a predominately Mexican-national inmate population of approximately 2,300 individuals. Finally, we found that correctional officers at the Adams County facility had lower job qualifications and higher turnover than correctional officers at comparable BOP facilities. We believe that the inadequate staffing levels, language barriers, lower qualifications, and higher turnover of correctional officers have reduced the safety and security of the Adams County facility.

*Facility Staffing – Correctional Services*

Consistent with the overall mission of the BOP, the Adams County contract requires CoreCivic to provide a safe and secure environment for staff and inmates through adequate staffing, communication of operational concerns, and effective intelligence gathering. We examined the effectiveness of the contractor's efforts by evaluating the adequacy of correctional services staffing levels at the Adams County facility over a 4-year period. Adequate staffing levels are fundamental to providing a safe and secure environment, and the adequacy of the Adams County facility's staffing was emphasized in the BOP's after-action report as a factor contributing to the May 2012 riot.

When the Adams County contract was awarded in April 2009, it provided the contractor with broad authority to develop and restructure the staffing plan. At that time, the contractor was not required to seek BOP approval prior to making any changes to the staffing plan. In April 2011, approximately 2 years after the contract award, the BOP issued a modification requiring the contractor to obtain approval from the BOP's Administrative Contracting Officer for any future revisions to the staffing plan. The contract modification also established minimum thresholds for determining when performance would be considered nonconforming and billing deductions would be imposed. According to that contract modification, CoreCivic is required to maintain monthly average staffing levels of:

- 90 percent of the BOP-approved staffing plan for correctional services,
- 85 percent of the BOP-approved staffing plan for health services, and
- 85 percent of the BOP-approved staffing plan for all other departments.

The BOP intended these additional staffing controls to improve its oversight of staffing at the Adams County facility, but we identified significant weaknesses in the BOP's implementation of the controls. Specifically, the contract does not provide meaningful procedures for measuring and reporting staffing levels to the BOP.

The BOP solicitation that resulted in the Adams County contract required all companies responding to the solicitation to develop a staffing plan that would clearly and concisely illustrate the "total number of full-time equivalents for each

position title."[6]  The resulting staffing plan was based on a calculation of a certain number of hours, for a certain number of shifts, for a certain number of days each year.  Because an employee is not available to perform job specific duties directly related to job performance the entire time the employee is on duty, the calculated number of hours included a "relief factor" to account for the time necessary to cover such matters as leave, training, and other administrative duties.  The total of these calculated hours, incorporating the relief factor, was then converted to a number of staff members required, thereby reflecting the number of "full time equivalent" employees required to fulfill the function to be contracted.  This purpose of the staffing plan is to provide a reasonable estimate of the number of employees needed to perform the duties under the contract.  The actual use of staff to accomplish the necessary functions may vary and may incorporate the use of overtime or the use of part-time employees.  For example, a smaller staff working overtime could provide for the same functions as a larger staff without overtime.  Conversely, the use of part-time employees would require a larger staff working fewer hours to fulfill the same functions.  In either event, however, the use of headcounts would not result in a true representation of the time spent performing duties directly related to the contract services.

The contract was modified in April 2011 to provide a minimum staffing threshold for enforcement of the staffing plan.  Despite developing a staffing plan based on full-time equivalents, officials from both CoreCivic and the BOP told us that the threshold provision of the contract was intended to allow CoreCivic to use headcounts when calculating and reporting staffing levels, and did not require CoreCivic to calculate the actual FTEs necessary to adequately perform under the contract.

Consequently, we found that CoreCivic reported staffing levels to the BOP for each of the three categories as simple headcounts of staff recorded on payroll records, regardless of the hours each employee was actually performing duties directly related to contract requirements during the month.  We discussed this with an official from the BOP's Privatization Management Branch who acknowledged that payroll headcounts do not reflect actual staffing at the Adams County facility.  The official also noted that newly hired correctional officers were added to the contractor's headcounts as soon as their employment was approved by the BOP. This was done despite the fact that new recruits spent their first full month in training rather than covering posts required by the staffing plan.  As a result, when CoreCivic reported staffing levels to the BOP based on headcounts, they often appeared to meet the BOP's required thresholds even though they would not have if staffing levels had been measured using full-time equivalents.

---

[6] "Full-time equivalent" is a term used to translate staffing needs into the number of full-time staff members needed to fill the required hours.  For example, two individuals who each work half-time count as one "full-time equivalent."  In comparison, the headcount methodology for measuring staffing levels used by CoreCivic counts individuals without regard for the hours they work; as a result, two individuals would simply be counted as two staff members regardless of whether they work half-time, full-time, or some other work schedule.

8

We believe the practice of measuring staffing levels using employee headcounts rather than actual time spent filling a required position does little to ensure appropriate staffing for a safe and secure facility. In the "Contract Formation and Administration" section of this report, we discuss how the BOP's oversight of contract performance allowed this to happen.

We assessed the contractor's actual staffing levels as supported by time and attendance records. To determine the actual staffing levels, we included all of the direct labor hours that CoreCivic employees charged, excluding leave, holidays, and training. We then calculated the number of full-time equivalents represented by those direct labor hours and compared the results to the minimum staffing thresholds identified in the contract and the staffing headcounts reported by CoreCivic. Figure 1 presents our comparison.

**Figure 1**

**Correctional Services Staffing Levels at the Adams County Correctional Center**



Source: OIG analysis of the BOP-approved staffing plans for Adams County and CoreCivic's time and attendance records, training records, and monthly staffing levels reported to the BOP.

Figure 1 illustrates that, throughout the 4-year period we reviewed, actual time spent performing contract duties directly related to correctional services, as supported by time and attendance records, was lower than the staffing levels represented by CoreCivic's headcounts. It was also frequently lower than the staffing levels required under the established minimum staffing threshold. The figure also shows that, at the time we initiated this audit in April 2015, staffing levels had not significantly improved since the May 2012 riot. In fact, during 19 of the 38 months following the May 2012 riot, CoreCivic staffed correctional services at a level lower than it was at the time of the riot in terms of actual time spent

9

performing duties directly related to contract requirements. Meanwhile, and in contrast, CoreCivic delivered headcount reports to the BOP that reflected improved staffing levels during 36 of those 38 months. We believe that this history of understaffing and ineffective oversight has had a direct effect on the safety and security of the Adams County facility.

During this audit, we provided our staffing findings to both the BOP and CoreCivic, and in May 2016 CoreCivic expressed several objections to our staffing analysis methodology. CoreCivic managers told us that they viewed the contractually-required staffing plan as a target pool of staff available for deployment based on the anticipated needs of the facility and not as a list of posts that CoreCivic should be required to staff at all times. CoreCivic managers also said that CoreCivic, not the BOP, was responsible for determining which posts actually needed to be staffed day-to-day based upon the real time needs of the Adams County facility. The BOP managers said that it is not the intent of the BOP to monitor the staffing of each post because, in the view of the BOP, it is the contractor's responsibility to determine the most appropriate use of staff on a daily basis to maintain a safe and secure facility.

The BOP managers stated that giving CoreCivic control over the day-to-day staffing levels has helped the contractor meet the contract's performance objectives. However, we found that CoreCivic staffed fewer than all of the agreed-upon posts for 43 of the 46 months, or 93 percent of the time, prior to the start of our audit. BOP managers also acknowledged that the purpose of introducing minimum staffing levels was to strengthen their controls over staffing. However, under the BOP and CoreCivic managers' interpretations of the staffing requirements, the BOP's controls over actual post coverage are nominal, and actual staffing levels within the Adams County facility remained for long periods at or below the level of staffing at the time of the May 2012 riot. Under this interpretation, the risk of inadequate staffing remained and there could be no deductions so long as sufficient personnel were listed on CoreCivic's payroll, regardless of the number of hours worked or how many of the agreed-upon posts were actually being covered day-to-day. For that reason, we do not believe the contract is as explicit as it needs to be with regard to how CoreCivic's staffing performance must be accomplished or evaluated. We therefore recommend that the BOP modify the contract to provide specific procedures for CoreCivic to follow for measuring and reporting staffing levels based on full-time equivalents. In making this modification, the BOP should ensure that it will be able to monitor the extent to which required stations are actually covered.

The understaffing identified by our analysis should also have had a direct effect on the amount the BOP paid to CoreCivic under the contract, as the contract provides for invoice deductions whenever any contract requirements, including staffing requirements, are not met. However, the reporting of staffing levels as simple headcounts did not provide sufficient information for the BOP to recognize the understaffing at the Adams County facility or to calculate the appropriate invoice deductions. For example, during the period July 2013 through March 2015, the contractor-reported headcounts reflected correctional services staffing levels that were continually at or above the 90 percent minimum threshold, even though

10

the actual coverage of required stations only met or exceeded the threshold level during 3 of those 21 months, or about 14 percent of the time.

We determined the total value of the invoice deductions to which the BOP would have been entitled had its contract with CoreCivic more explicitly required the measurement of staffing levels by full-time equivalents. We did this by comparing the aggregate value of the actual deductions taken to the value of the deductions that would have been taken if the contractor had reported its staffing levels as full-time equivalents. In total, we concluded that the BOP could have taken $1,632,190 in additional invoice deductions relating to correctional services for the months July 2011 through July 2015 had the contract not allowed for CoreCivic's headcount-based staffing reports. Although we are not questioning this amount in light of the vague contract language to which the BOP agreed, we nevertheless believe that the additional amounts the BOP expended on this contract could have been avoided and were wasteful.

In their May 2016 correspondence, CoreCivic managers also objected to our comparison of the actual staffing level to the BOP's minimum staffing thresholds. CoreCivic managers stated that this comparison was not appropriate because our analysis measured staffing levels in terms of direct labor hours while the targets in the staffing plan were based on both direct and indirect labor hours represented by a "relief factor." We asked the BOP for its perspective on our analysis. The BOP specifically did not agree with our analysis. BOP officials told us that CoreCivic is responsible for submitting the current average monthly vacancy rate and indicating any positions that have been vacant more than 30 days. The BOP officials said that the relief factor is included in the overall staffing plan and the contractor is required to maintain 90 percent staff for Correctional Services under the overall staffing plan.

We recognize that the BOP-approved staffing plan includes additional staff incorporated as a "relief factor" to help cover posts while other employees are on leave, in training, or otherwise not available to work. The use of a relief factor may be an effective way for CoreCivic to account for employees' indirect time in setting internal hiring targets. However, we believe that including in our analysis the number of hours that CoreCivic employees spend on leave and in training would obscure the measurement of actual post coverage. We also note that our analysis compared the actual staffing levels at the facility to the BOP's minimum staffing thresholds, not the 100 percent level of the staffing plan that included relief factors. We chose this methodology because the minimum threshold staffing levels provide a reduction in the staffing plan that is roughly equivalent to the relief factors used to account for indirect time. In fact, these BOP-specified minimum thresholds provide an allowance that actually exceeds the relief factor, and they are so low that, at this minimum threshold, CoreCivic would be incapable of filling every post listed on the BOP-approved staffing plan even if every employee worked a full-time schedule with no leave, holidays, or training. In other words, the minimum threshold levels permitted by the BOP, on which we based our comparison, already provide CoreCivic a level of flexibility beyond the buffer of additional staff built into the staffing plan through the relief factors.

BOP officials told us they disagree with this approach, and in October 2016 BOP officials provided us with an alternative version to our correctional services staffing chart (Figure 1 above), which we have included as Figure 2 below. In the BOP's alternative chart, the BOP proposed to us that the acceptable range of staffing levels (the yellow shaded space in Figure 1) should be moved downward, reflected in the gray box in Figure 2 below, to provide for both the relief factor and the adjustment for a minimum threshold. We disagree with the BOP's interpretation and caution that such an approach would allow the contractor to remain in a perpetually understaffed position with no contractual consequences. And most significantly, using the BOP's proposed approach, staffing levels at the time of the May 2012 riot actually would have been adequate under the contract, even though the BOP's own after–action report characterized the staffing deficiencies at that time as a "systemic problem" that was impacting performance.

**Figure 2**

**The BOP's Version of Correctional Services Staffing Levels at the Adams County Correctional Center**



Note: The BOP asserted to us that, for an analysis of staffing by direct labor hours, the acceptable range of staffing levels (yellow band) should be moved downward to the position of the gray box.

Source: BOP

Moreover, the BOP and CoreCivic's comments do not address the core issue of our staffing finding, which is the effect that these insufficient staffing levels have had on the safety and security of the Adams County facility. A 2005 analysis performed internally by the BOP found a direct relationship between staffing levels and institutional safety. The analysis noted that an increase of 1 inmate in an institution's inmate-to-custody-staff ratio increases the prison's annual rate of serious assaults by 4.5 per 5,000 inmates. During our review, five of the seven

12

CoreCivic correctional services staff we interviewed expressed concerns about the low staffing levels at the facility, and two of those five also expressed concerns for their own personal safety due to the low staffing levels.

Finally, BOP and CoreCivic managers asserted to us that the practice of measuring staffing levels by simple headcount should be allowable since it is a strategy endorsed by the American Correctional Association standards. We acknowledge the American Correctional Association's industry guidelines, but we believe that use of a simple headcount without consideration of the fact that FTEs were used as the basis for developing the staffing plan is unreasonable. Such an approach also results in the BOP losing its ability to monitor actual contract performance. The fundamental purpose of staffing a prison is to accomplish necessary functions such as providing security, administering health care, and offering correctional programs. However, the BOP's current practice of monitoring only the contractor's hiring targets, and not the actual amount of time that critical functions are actually staffed, does not provide for reliable oversight. In light of the BOP's own reports and the historical consequences of these staffing deficiencies, we believe our analysis appropriately raises serious concerns about the safety and security of the facility.

*Facility Staffing – Health Services*

BOP Program Statement 6031.04, Patient Care, states that "Insufficient staffing will have an adverse effect on the quality, continuity, and cost-effectiveness of health care," and inmates' perception of substandard medical care was cited as a contributing factor to the May 2012 riot according to a Federal Bureau of Investigation affidavit filed with the U.S. District Court for the Southern District of Mississippi in August 2012. Staffing shortages in health units have also been cited as a contributing factor in at least one inmate riot at other BOP contract prisons.[7]

The Adams County contract thus requires the contractor to provide inmates with open access to quality health care from qualified personnel. We examined the effectiveness of the contractor's efforts in this regard by evaluating the adequacy of health services staffing levels at the Adams County facility over a 4-year period. As with correctional staffing, the contractor is required to achieve a minimum monthly average staffing level for health services, and failure to meet that minimum requirement results in deductions to the monthly invoice.

We found that the contractor's procedures for measuring and reporting staffing levels for health services contained flaws similar to those found in its procedures for correctional services. Specifically, the contractor reports health services staffing levels as simple headcounts of the number of staff recorded on the contractor's payroll records, regardless of the number of hours each employee actually worked during the month.

We performed an analysis similar to the one for correctional services, measuring the contractor's actual health services staffing levels as supported by the

---

[7] OIG, *Reeves County Detention Center*, 22.

Case 3:16-cv-02267    Document 401-12    Filed 01/22/21    Page 21 of 74 PageID #: 22156

contractor's time and attendance records. Figure 3 summarizes the acceptable range permitted by the established minimum thresholds in the contractor's approved staffing plan as compared to actual staffing of the prison, based on our analysis of time and attendance records for the health services category of staff.

**Figure 3**

**Health Services Staffing Levels at the Adams County Correctional Center**



[a] Time and attendance records for five subsidiary employees were included in the OIG's analysis of the contractor's actual staffing levels for health services.

[b] For the period December 2012 through July 2015, CoreCivic's reported figures did not account for the staff members occupying five health services positions because those positions were staffed through contractor subsidiaries. We added those employees back to the contractor's reported figures to provide a more accurate representation of its performance compared to the BOP-approved staffing plan. This issue is discussed in greater detail in the "Contract Compliance" section of the report.

Source: OIG analysis of the BOP-approved staffing plans for the Adams County facility and CoreCivic's time and attendance records, training records, and monthly staffing levels reported to the BOP.

Figure 3 shows that, during July 2011 through July 2015, actual staffing levels for health services at the Adams County facility, as supported by time and attendance records, have often been close to the levels represented by the contractor's headcounts, particularly in the more recent months. However, there were periods during which actual staffing levels were significantly lower than both the reported headcounts and the 85 percent threshold for deductions. As illustrated in Figure 3, in 25 of the 49 months we assessed, CoreCivic failed to meet the 85 percent minimum staffing level for health services units. However, for 13 of those 25 months, CoreCivic reported staffing levels that met or exceeded that minimum

14

threshold based on CoreCivic and the BOP's interpretation of the staffing requirements.[8]

We determined the total value of foregone invoice deductions that the BOP should have been entitled to by comparing the aggregate value of the actual deductions taken to the value of the deductions that should have been taken if the contractor had reported its staffing levels in terms of full-time equivalents. In total, we concluded that the BOP could have taken $295,117 in additional invoice deductions relating to health services for the months July 2011 through July 2015 had the contract not allowed for CoreCivic's headcount-based staffing reports. Although we are not questioning this amount in light of the vague contract language to which the BOP agreed, we nevertheless believe that the additional amounts the BOP expended on this contract could have been avoided and were wasteful.

*Recruiting and Retention of Correctional Officers*

We reviewed the adequacy of CoreCivic's efforts to recruit and retain correctional officers who have appropriate qualifications and experience to provide security, care, and direct supervision of inmates at the Adams County Correctional Center. We found that correctional officers at the Adams County facility lacked necessary language skills to communicate effectively with the majority of the inmate population. We also determined that correctional officers at the Adams County facility had lower job qualifications and experienced higher turnover rates than correctional officers at comparable BOP facilities.

<u>Language Barrier</u>

The BOP uses the majority of these contract facilities to confine sentenced criminal aliens. Consequently, language barriers often exist between inmates and staff, and they can pose a significant challenge for incarcerated criminal alien populations. They can also impede a contractor's ability to perform many vital functions, including the following functions that are required under the Adams County contract:

- Intelligence information related to security concerns must be gathered for dissemination to the appropriate contractor and BOP staff.

- Staff must evaluate the needs of inmates and manage their program participation.

- Staff must be accessible and must communicate effectively with inmates to promote positive institutional adjustment.

---

[8] Of the 25 months for which our analysis showed that CoreCivic failed to meet the 85 percent minimum staffing level for health services units, CoreCivic reported a compliant level of performance (85 percent or above) for 13 of those months. Because Figure 3 depicts an adjusted CoreCivic-reported staffing level to incorporate the vacancy status of five CoreCivic subsidiary positions, the figure may not reflect the same number of compliant months.

- A program for inmate grievances must exist to provide for the expression and resolution of inmate problems.

The ability of contractor staff to communicate effectively with the Adams County inmate population, which is comprised mostly of Spanish-speaking Mexican nationals, is critical to the contractor's successful performance of the contract requirements. The BOP's after-action report for the May 2012 riot strongly endorsed this assertion when it noted that language barriers had been a contributing factor in the disturbance. The report makes the following statements:

- "The contractor readily acknowledged that recruiting and retaining qualified Spanish-speaking staff in the remote Natchez, Mississippi, area is one of its greatest challenges."

- "The lack of Spanish-speaking staff in the [Intelligence] Office resulted in an inability to effectively communicate with the inmate population. The [Intelligence Office] staff expressed only a cursory understanding of how the inmates have constructed their own hierarchy of authority."

- "The previous intelligence officer focused efforts on staff investigations and failed to gather any meaningful intelligence with regard to the inmate population."

- "[Adams County facility] administration did not grasp the severity and degree of the Mexican national inmates' intent to orchestrate a meeting with approximately 1,700 Mexican national inmates and to escalate the situation to include violence toward staff if their demands were not met. Had the [Adams County facility] administration understood the inmates' intentions, a preventative lock down could have been initiated."

- "Specifically, the lack of Spanish-speaking staff, experienced staff, and experienced staff in the Intelligence Office, negatively affected the flow of communication and intelligence gathering."

- "Proper intelligence operations could have assisted in preventing this disturbance."

To mitigate the effect of the language barrier at the Adams County facility, the BOP after-action review team recommended adding minimum contract requirements for bilingual staff. However, the BOP did not modify the contract to implement minimum requirements for bilingual staff until almost 3 years after issuance of the after-action report, and subsequent to the start of our audit.

The eventual contract modification, effective June 1, 2015, required that, "A minimum of 5 percent of the overall staff complement must be Spanish speaking and 50 percent of the Intelligence Office staff must be Spanish speaking." However, the modification does not define the level of speaking proficiency required, and it specifically permits CoreCivic to meet the requirement through staffing changes due to attrition, with no deadline or target date for compliance.

In July 2015, approximately 5 weeks after the modification was issued, the contractor's Chief of Security told us that, including himself, only 4 of the 367 staff

16

employed at the Adams County facility spoke Spanish. In addition, we found no evidence that the contractor's existing staff included any fluent Spanish-speaking correctional officers or intelligence officers during our audit. At that time, the inmate population consisted of approximately 2,300 criminal aliens.

By February 2016, more than 8 months after the modification became effective, contractor officials told us that the employed staff had dropped to only 3 fluent Spanish-speakers. Contractor officials told us that 11 other Adams County facility staff members could communicate in Spanish well enough to convey messages and comprehend responses, but we received no evidence supporting those assertions.[9]

In its monthly oversight report for December 2015, BOP officials acknowledged that the contractor had made some progress by actively recruiting Spanish-speaking staff and using an outside instructor to teach basic Spanish to existing staff. However, we found that the contractor's January 2016 job announcements for correctional officers at the Adams County facility stated no preference for bilingual applicants.

The actions taken by the contractor have not been sufficient to hire additional Spanish-speaking staff and, consequently, the Adams County facility remains at risk. To ensure that the contractor takes prompt action to hire bilingual staff, we recommend that the BOP amend the contract modification that specified minimum levels of Spanish-speaking staff to incorporate specific deadlines for compliance, remedies for noncompliance, and the specific level of Spanish proficiency desired.

### Correctional Officer Qualifications and Retention

To further evaluate CoreCivic's recruiting efforts, we reviewed the job qualifications for entry-level correctional officers at the Adams County facility and assessed whether the contractor's minimum qualifications were equivalent to those for entry-level correctional officers employed by the BOP and the State of Mississippi. Table 2 provides the comparison.

---

[9] These 11 employees were also employed at the Adams County facility in July 2015, when the Chief of Security provided his own count of Spanish-speaking employees. The fact that the Chief of Security did not include them in his count at least raises the question of whether these 11 employees would meet the level of proficiency envisioned by the BOP.

Case 3:16-cv-02267    Document 401-12    Filed 01/22/21    Page 25 of 74 PageID #: 22160

**Table 2**

**Minimum Qualifications for New Correctional Officers**

| Qualifications | BOP | State of Mississippi[a] | CoreCivic |
|---|---|---|---|
| Education | 4-Year degree (either the education or experience requirement must be met) | High school diploma, General Educational Development credential, or equivalent | High school diploma, General Educational Development credential, or equivalent |
| Experience | 3 years full-time general experience, or 1 year specialized experience (either the education or experience requirement must be met) | 1 year experience required in addition to educational requirement | No experience required |
| Physical Fitness | Must be of sound health and physically fit | Trainees must pass a physical agility test and perform occasional lifting of loads | Must be able to perform occasional lifting and carrying of loads |

[a] The State of Mississippi employs five types of correctional officers, including a trainee position and four levels of correctional officer positions with full responsibilities. We determined that the job descriptions of the four correctional officer positions with full responsibilities were more comparable to CoreCivic's job description for correctional officers at Adams County. We therefore selected the Correctional Officer I position as our point of comparison since it was the most conservative option among the four.

Source: BOP qualifications obtained from a job announcement for GL-05 correctional officers. State of Mississippi qualifications obtained from the Mississippi State Personnel Board's job description for a Correctional Officer I. CoreCivic qualifications obtained from its correctional officer job description.

As noted in the table, the BOP requires entry-level correctional officers to have either a 4-year degree or equivalent work experience, while neither the State of Mississippi nor the contractor require education beyond the high school level. Similarly, the BOP requirement for prior experience exceeds that of Mississippi and the contractor. The BOP also appears to have higher physical fitness requirements. With the notable exception of the experience requirements, the contractor's qualifications for correctional officers are roughly equivalent to those of the State of Mississippi for state-run facilities. Nevertheless, we question whether a sufficient justification exists for why contract facilities under the BOP's purview should adopt hiring standards that are so clearly less stringent than the standards the BOP employs for its own, BOP-managed facilities.

To evaluate CoreCivic's correctional officer retention efforts, we reviewed the turnover of correctional officers at the Adams County facility for the period April 2012 through March 2015 and found that the turnover rate at the Adams County facility was much higher than that of comparable BOP facilities. For our comparison, we selected five BOP-managed facilities with similar features to the Adams County facility, such as security level, inmate population characteristics, and distance from major cities. Table 3 shows our comparison of turnover rates between facilities.

Case 3:16-cv-02267    Document 401-12    Filed 01/22/21    Page 26 of 74 PageID #: 22161

**Table 3**

**Comparison of Monthly Turnover Rates
for Correctional Officers**

| | | BOP Federal Correctional Institutions | | | | CoreCivic |
|---|---|---|---|---|---|---|
| | Ashland | Big Spring | Safford | Sandstone | Yazoo City Low | Adams County Correctional Center |
| Monthly Turnover | 0.21% | 2.00% | 0.29% | 0.32% | 0.26% | 3.65% |

Source: OIG analysis based on data provided by the BOP and CoreCivic

The high turnover rate at the Adams County facility is not a new problem. The BOP's after-action report for the May 2012 riot stressed the importance of staff continuity and noted that the BOP had previously cited the contractor's high turnover rates in Oversight Facility Summary reports as far back as April 2011. Additionally, as recently as May 2016, CoreCivic acknowledged to us that 48 percent of its employees at the Adams County facility had been employed for one year or less. As described below, we believe that the high turnover at Adams County is the result of inadequate retention efforts, including lower wages, fewer benefits, and a lack of advancement opportunities within the correctional officer occupation.

We evaluated the wage rates and benefits offered to correctional officers by CoreCivic by comparing the wages and paid time off to the BOP and the State of Mississippi's offerings. Table 4 presents the comparison.

**Table 4**

**Comparison of Pay Rates and Benefits for
Entry-Level Correctional Officers**

| | Bureau of Prisons | State of Mississippi | CoreCivic |
|---|---|---|---|
| Pay Rate (2014) | $18.69 | $12.71 | $12.60 |
| Paid Time Off (days)[a] | 36 | 40 | 30 |

[a] Paid Time Off includes holidays, personal leave, and sick leave.

Source: BOP pay rate obtained from the 2014 Office of Personnel Management Law Enforcement Officer locality pay table for "Rest of United States." State of Mississippi pay rate obtained from The Department of Labor, Bureau of Labor Statistics Occupational Employment Statistics program website at http://www.bls.gov/oes/. Contractor pay rates obtained from payroll data. BOP paid time off obtained from http://www.bop.gov. State of Mississippi paid time off obtained from the Mississippi State Personnel Board's job description for a Correctional Officer I. Contractor paid time off obtained from its 2016 Benefits Guidebook.

As the table above shows, the BOP offers entry-level correctional officers 48 percent higher wages and 20 percent more paid time off than CoreCivic, which gives the BOP a strong relative advantage over the contractor in terms of both recruiting and retention. The State of Mississippi also offers more generous wage

rates and paid time off than CoreCivic. Furthermore, in addition to the BOP offering starting correctional officers 48 percent higher wages than its contractor, it also offers noncompetitive promotion potential to $26.91 an hour, while CoreCivic continues to pay correctional officers only the minimum wage rate required by the Department of Labor throughout their careers.

The Department of Labor, Bureau of Labor Statistics, maintains an Occupational Employment Statistics program that produces nationwide employment and wage estimates annually for over 800 occupations, including correctional officers and jailers. Table 5 and Table 6 provide the May 2014 Occupational Employment Statistics summary of wage estimates for correctional officers and jailers.

**Table 5**

**May 2014 Nationwide Employment Estimate and Mean Wage Estimates for Correctional Officers and Jailers**

| Employment | Mean Hourly Wage | Mean Annual Wage |
|---|---|---|
| 434,420 | $21.59 | $44,910 |

Source: The Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics program website at http://www.bls.gov/oes/.

**Table 6**

**May 2014 Nationwide Percentile Wage Estimates for Correctional Officers and Jailers**

| | Percentile | | | | |
|---|---|---|---|---|---|
| | 10% | 25% | 50% (Median) | 75% | 90% |
| Hourly Wage | $13.12 | $15.57 | $19.12 | $26.76 | $34.99 |
| Annual Wage | $27,280 | $32,390 | $39,780 | $55,670 | $72,790 |

Source: The Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics program website at http://www.bls.gov/oes/.

The tables above show that the BOP provides starting correctional officers just under the median hourly wage for correctional officers and jailers, and those employees will be earning just above the 75th percentile wage rate by the end of their careers. In comparison, correctional officers working for CoreCivic at the Adams County facility begin their careers making less than the 10th percentile wage rate and continue to earn that same rate of pay for as long as they remain at the facility.

According to the BOP's oversight report for the period April 2014 through March 2015, the contractor has struggled with a significant number of correctional staff with no previous corrections experience and a high turnover rate for

correctional officers. CoreCivic's technical proposal for the contract stated, "To help ensure that vacancies are filled in a timely manner, we use every available option to recruit qualified employees." While we acknowledge that the wage rates and benefits offered by CoreCivic are permissible under the applicable Department of Labor wage determination for these positions, and although the Adams County contract does not require CoreCivic to impose education or work experience requirements on prospective correctional officers, we believe and the BOP confirmed to us that the lack of contract provisions results in the contractor hiring correctional officers who would not be eligible for employment in BOP-managed facilities, paying them lower wage rates, and providing them with fewer benefits. We also believe that these conditions contribute to the contractor's inability to hire and retain the required number of correctional officers, and that they inhibit the contractor's ability to attract and retain qualified staff.

We believe that CoreCivic's inability to retain qualified correctional officers may have had a negative effect on the safety and security of the Adams County facility. We recommend that the BOP evaluate the extent to which employee qualification levels and turnover rates affect safety and security concerns, and whether its contractual terms should be modified to address those concerns.

**Contract Compliance**

We found that CoreCivic did not always comply with contract requirements related to billing. Specifically, the contractor's invoices did not accurately report staffing levels or include all Health Services positions listed in the BOP-approved staffing plan, as required by the contract. Consequently, and because the BOP did not otherwise detect the staffing shortages, the BOP lacked knowledge and oversight of the vacancies for five critical health services positions and was therefore unable to assess appropriate contractual deductions. We also believe the frequent vacancies in these five medical positions had a negative effect on the contractor's ability to provide quality health care at the Adams County facility.

In addition, we found that CoreCivic's invoices were noncompliant because the contractor improperly calculated the necessary wage determination fringe deductions for its February 2013 through November 2015 invoices. As a result, we determined that CoreCivic understated wage determination fringe deductions by a total of approximately $42,300.

*Compliance with Reporting Requirements for Facility Staffing Levels*

The Adams County contract requires the contractor to report its staffing levels on a monthly average basis and to comply with minimum staffing thresholds of 90 percent for Correctional Services, 85 percent for Health Services, and 85 percent for all other departments. We tested the contractor's compliance with the reporting requirement by reviewing invoices for the months July 2011 through July 2015. As we described earlier in this report, we found that CoreCivic was reporting its staffing levels using simple headcounts rather than full-time equivalents, and that this method of calculation resulted in reporting higher than

actual staffing figures. As described below, we also identified other concerns regarding CoreCivic's compliance with other reporting requirements.

The contract requires CoreCivic to report each month's staffing levels as a monthly average, but we found that reported headcounts for the months prior to December 2012 were all based on end-of-month figures. Using end-of-month figures instead of monthly averages makes the staffing reports less reliable as a gauge of actual staffing levels over the course of the month, and CoreCivic acknowledged to us in December 2015 that those reports did not reflect monthly averages as required by the contract. However, we determined that the staffing levels reported on the December 2012 and later invoices were based on monthly averages as required. The contractor attributed the improved reporting capability to a new staffing report developed during 2012.

Additionally, for the Health Services staff category, we found that the contractor did not always report its staffing levels for all the positions identified in the approved staffing plan. Beginning with the December 2012 invoice, the contractor began reporting its staffing levels using a target that was five positions lower than the BOP-approved staffing plan at the time. CoreCivic officials told us that the target was reduced because CoreCivic assigned responsibility for filling five positions on the BOP-approved staffing plan to two of its subsidiaries, Correctional Medicine Associates and Correctional Dental Associates. These positions were:

- two dentists provided by Correctional Dental Associates,
- two physicians provided by Correctional Medicine Associates, and
- one advanced registered nurse practitioner provided by Correctional Medicine Associates.

Because CoreCivic did not directly provide these five positions, the employees were not captured in the staffing report that CoreCivic began using for the December 2012 invoice. To account for the discrepancy caused by the staffing report no longer capturing the same number of positions reflected in the staffing plan, CoreCivic changed its reports to show, and the BOP accepted, a reporting target that was five positions lower than the target specified in the staffing plan. BOP officials told us in September 2015 that they had not consented to any change to CoreCivic's reporting requirements and that CoreCivic had not reported the employment status of those five positions since December 2012.

CoreCivic's solution of excluding these positions from its monthly staffing reports was not allowable under the contract. The contract requires that staffing levels be evaluated and compared to the BOP-approved staffing plan, and that changes to the staffing plan be approved by the BOP's Administrative Contracting Officer. As the prime contractor, CoreCivic is responsible for ensuring compliance with the entire staffing plan, not just the portions that it elects to fill directly rather

than through the use of subsidiaries.[10]  A more appropriate solution would have been for CoreCivic to consolidate its own staffing reports with comparable reports from each of its subsidiaries so that it could report the overall staffing levels to the BOP in the manner specified by the contract.

We believe that CoreCivic's change to its reports impaired the BOP's oversight, which resulted in a negative effect on the BOP's ability to assess the quality of health care provided, and may have resulted in the overstatement of some of the contractor's invoices.  Specifically, from December 2012 through September 2015, we identified multiple vacancies in these five critical positions that would have cost the contractor approximately $651,591 to fill.  Had the BOP been aware of these vacancies, it could have considered invoice reductions.[11]

We note, however, that the amount of additional invoice reductions that the BOP would have realized would have been much less than the cost to CoreCivic of filling these five positions.  This is because these five positions would have been considered in the context of the overall staffing levels, and the marginal effect of such a small number of vacancies on the overall staffing level calculation would have been small.  In comparison, the cost of filling these five positions, which are among the most highly paid at the facility, would have been substantial.  Moreover, any additional reductions identified would have been calculated based on the salaries and benefits of the positions that had been vacant the longest, not on the salaries and benefits of these five subsidiary positions that represent some of the highest paid staff at the facility.  Consequently, even if CoreCivic had accurately reported these vacancies to the BOP, or if the BOP had otherwise been aware of them, CoreCivic would still have had a financial incentive to leave these positions vacant and incur the deductions rather than fill the vacancies.  Recommendation 8, discussed later in the report, addresses this and other risks resulting from undefined procedures for calculating invoice deductions.

We also found that, due to the nature of the jobs, the low staffing level of 77.6 percent for these five critical positions adversely affects patient care.  BOP Program Statement 6400.02 CN-1, Dental Services, states that "Generally, each institution should have one dentist for every 1,000 inmates," and BOP Program Statement 6031.04, Patient Care, provides an example staffing plan that includes one physician for a 1,000 inmate caseload.  The BOP guidelines also state that "Additional staffing will be required to provide health care services after hours and on weekends."

Between December 2012 and September 2015, the average daily inmate population at the Adams County facility exceeded 2,000 inmates.  Based on this population, BOP guidelines indicate that the Adams County facility should be staffed

---

[10]  A prime contractor is the company with whom the government has a direct contract, and who is obligated to deliver products or services.  The prime contractor can typically hire one or more subcontractors to assist with the work, but the ultimate responsibility to the government remains with the prime contractor.

[11]  Our previous analysis of Health Services staffing levels already captured the dollar effect of these missed invoice deductions.

with at least two dentists and two physicians, which is consistent with the levels required by the BOP-approved staffing plan. However, we found that during that same time, the Adams County facility was staffed with a single physician for 434 days (43 percent of the time) and a single dentist for 689 days (69 percent of the time), meaning that for these time periods, the patient loads at the Adams County facility were more than double those indicated by BOP guidelines.

We identified concerns regarding CoreCivic's provision of Health Services. During the January 2015 Contract Facility Monitoring assessment, the BOP's Program Review Division noted a significant finding related to the clinical care area of health services. The monitoring team first noted a repeat deficiency in CoreCivic's completion of required preventative care baseline evaluations. The team also reviewed five mortality cases and found that, in each case, CoreCivic had not followed the applicable policies and standards of care in its management of those inmates prior to their deaths. The BOP warned CoreCivic that inadequate medical management can cause deterioration of inmates' medical conditions, and that "Corrective action and proper follow-up measures must be taken in order to avoid additional deaths." Further, during our interviews of Adams County inmates in July 2015, 10 of the 12 inmates interviewed expressed concerns about the quality of health care provided to them or other inmates. The concerns included complaints about how difficult it was to see a physician.

We followed up on seven health care complaints expressed to us during inmate interviews, one of which illustrated the cause for the concerns we heard. Specifically, we learned that an Adams County inmate complained of a bump on his wrist during a medical checkup in November 2013, at which time the attending nurse ordered an X-Ray of the man's wrist. However, the X-Ray was not performed. We asked the Adams County facility's Medical Services Administrator why the X-Ray was never completed, but the Medical Services Administrator was unable to provide an explanation and said that it must have been an oversight. As of March 25, 2016, over 28 months after the original order, we confirmed that the X-Ray still had not been performed.

We also assessed the timeliness of outpatient services provided offsite to Adams County inmates by reviewing a sample of 93 such services provided during January and February of 2012, 2013, 2014, and 2015. For each service, we calculated the elapsed days from the physician's order to the date the inmate received the service. We then compared the average elapsed days for Adams County inmates to the elapsed days for similar outpatient services provided offsite to inmates at comparable BOP facilities. We found that outpatient services at the Adams County facility were delivered approximately as timely as services delivered at the comparable BOP facilities. We also noted several administrative omissions in the records, including 11 missing consultation sheets, 5 undated consultation sheets, and 2 missing physician order sheets, and we reported these omissions to the BOP, which responded that this type of omission could be a cause for concern if the number of discrepancies rises to the level of a deficiency. BOP officials also told us that the Contract Facility Monitoring Section conducts annual reviews to identify such deficiencies and recommend corrective action. Consequently, we make no recommendation.

24

Accurate reporting and oversight of health services staffing levels is required by the contract. It is also critical to the safety and security of the prison, as noted by the Federal Bureau of Investigation's assessment of the May 2012 riot, which cited the inmates' perception of inadequate medical conditions as a contributing factor of the disturbance. We therefore believe the BOP's lack of knowledge and oversight of the true health services staffing levels at the Adams County facility has diminished its ability to ensure that quality health services are provided by CoreCivic and reduced the security of the prison. As such, we recommend that the BOP ensure that CoreCivic reports the staffing levels for the entire staffing plan on its monthly invoices, including positions filled by subcontractors and subsidiaries, as required by the contract.

*Compliance with the Service Contract Labor Standards Statute*

The Service Contract Labor Standards statute, previously known as the Service Contract Act of 1965, requires that employees working on federal service contracts in excess of $2,500 be paid at least the minimum wages and fringe benefits required by law.[12] The Adams County contract exceeds this award threshold. Consequently, the contractor is required to pay employees the minimum wages and health and welfare fringe benefits specified in the applicable wage determination schedules issued by the Department of Labor. These wage determinations list the minimum wage and fringe benefit rates for different classes of laborers. The determinations are often adjusted over the term of a service contract.

For multi-year contracts, the Federal Acquisition Regulation (FAR) requires that the wage determinations be updated not less than once every 2 years.[13] When wage determinations are updated, the contractor becomes entitled to an equitable adjustment to the contract price for the amount of any actual increases in the contractor's costs resulting from compliance with the revised wage determinations.[14]

The contractor initiates the equitable adjustment process by calculating an estimate of the annual increase in costs expected to result from the revised rates. The estimate is sent to the Administrative Contracting Officer as a "request for equitable adjustment," and upon approving a request, the Administrative Contracting Officer issues a contract modification to adjust the annual operating prices of each future contract year by the amount of the equitable adjustment.

Increases of the contract price for equitable adjustments are estimates based on contractor assumptions about future staffing levels. However, the FAR limits these equitable adjustments to the amount of the contractor's actual increases in costs. Therefore, any time CoreCivic's actual staffing levels fall below the levels

---

[12] Effective May 2014, the Service Contract Act of 1965 was renamed the Service Contract Labor Standards statute, 41 U.S.C. §§ 6702 to 6703 (2011).

[13] FAR 52.222-41 (2014).

[14] FAR 52.222-43 (2014).

that were anticipated when past equitable adjustments were calculated, the contractor must make adjustments to the monthly invoice. The purpose of these adjustments is to back out the portion of past equitable adjustments that CoreCivic was not entitled to because the contractor's actual increase in costs was less than the increase expected. CoreCivic makes these adjustments to the monthly invoices by reporting a type of deduction referred to as "wage determination fringe deductions."

We reviewed the contractor's wage determination fringe deductions for a selection of nine invoices between July 2012 and March 2015 and found several errors. As previously mentioned, the amount of each equitable adjustment is applied to the annual operating price of each remaining contract year. Consequently, the annual operating price for later periods of performance will include the cumulative effects of all equitable adjustments leading up to those periods. However, for the February 2013 through November 2015 invoices, we found that the contractor miscalculated the appropriate wage determination fringe deductions in that it did not back out the full cumulative effect of all the previous equitable adjustments. Instead, the contractor typically only deducted the difference between the fringe benefit rate that was current at the time and the rate that became effective in August 2012. Simply stated, the contractor was still requesting payment for the full amount of the first four equitable adjustments, even when there were staff vacancies for which adjustments should have been made.

CoreCivic's use of the August 2012 fringe benefit rate had the effect of reducing the amount of invoice deductions taken on the February 2013 through November 2015 invoices, thereby overstating the invoices. We asked both CoreCivic and the BOP why the August 2012 rate was used in these calculations. Neither the contractor nor the BOP was able to provide a reason.

According to CoreCivic officials, wage determination fringe deductions did not apply to any invoices until August 2010, after the end of the first contract year. We therefore recalculated each of the contractor's wage determination fringe deductions reported on the August 2010 through November 2015 invoices. To do this, we determined the total amount of equitable adjustments the contractor was ultimately not entitled to because of staff vacancies that were not anticipated at the time the equitable adjustments were calculated. We found that the wage determination fringe deductions taken during this period were understated by a total of approximately $42,300, which had the effect of overstating the invoices by that amount. We therefore recommend that the BOP remedy $42,300 in questioned costs related to overstated invoices submitted by the contractor for August 2010 through November 2015.

We also found that for December 2012 and January 2013, CoreCivic did not report any wage determination fringe deductions. CoreCivic managers told us in March 2016 that wage determination fringe deductions were not applied to those two invoices to prevent duplication of the deductions that had already been taken for the staffing pattern vacancy deductions. However, we note that staffing pattern vacancy deductions are only taken when and to the extent that staffing levels fall below the minimum threshold levels specified by the BOP. In contrast, CoreCivic

26

should have been recognizing wage determination fringe deductions for all vacant wage-determined positions. Therefore, wage determination fringe deductions should have been reported to the BOP for December 2012 and January 2013. We were unable to estimate the amounts that should have been deducted due to the unavailability of essential records from those time periods.

**Contract Formation and Administration**

We found that the BOP exercised inadequate control and oversight for some aspects of CoreCivic's performance under the contract. As we describe below, this occurred because the BOP structured the contract around a performance work statement to encourage contractor innovation and cost savings, but it did not implement appropriate performance standards for measuring the contractor's performance. For example, CoreCivic met its contractual requirement to set up an inmate grievance program, but because the contract does not include adequate performance measures, CoreCivic's program affords inmates many fewer rights and protections than are available to inmates at BOP-managed facilities. Similarly, the contract allowed CoreCivic to inconsistently use industry-standard dietary guidelines to analyze food service menu offerings at the Adams County facility.

In addition to the performance issues, the BOP lacked control over billings because the contract did not adequately specify the procedures that the contractor must follow to calculate invoice deductions for deficient performance. The lack of predetermined billing procedures resulted in inconsistent billing practices from month to month and a CoreCivic-adopted methodology for calculating invoice deductions that allowed it—and in some cases created a financial incentive—to maintain staff vacancies in critical positions without contractual penalty.

*Performance-Based Contracting*

The BOP's Privatized Corrections Contracting Section developed the Criminal Alien Requirement contracts as performance-based acquisitions. Performance-based contracts differ from traditional contracts in the use of a performance work statement, which describes the agency's requirements in terms of the desired outcomes rather than how the contractor is required to accomplish the work.

Performance-based contracts are intended to reduce both costs and performance risks by promoting contractor innovation. By specifying only the outcomes that are actually required, a properly constructed performance work statement can incentivize the contractor to find new and better ways of delivering the required outcomes. Public Law 106-398, § 821 established an explicit preference for these types of contracts, and that preference is contained in FAR 37.102. The BOP's use of performance-based contracts for its Criminal Alien Requirement is consistent with the preference established by FAR 37.102. However, we found issues with the BOP's implementation of performance-based contracting principles in the Adams County contract.

FAR 37.102 states that "Agency program officials are responsible for accurately describing the need to be filled, or problem to be resolved, through

27

service contracting in a manner that ensures full understanding and responsive performance by contractors." A fundamental tenet of the performance-based acquisition concept is that the performance work statement must describe the agency's requirements in terms of measurable outcomes that can be assessed using established standards of performance. According to FAR 37.601, these performance standards should be measures of quality, timeliness, quantity, or similar attribute. Stating the contract requirements in terms of measurable outcomes is essential to the success of this type of acquisition because it clearly conveys the required performance to the contractor and allows for objective assessments of that performance.

We reviewed the Adams County contract to determine if the BOP structured it to allow for objective assessment of CoreCivic's performance. We found that, while the BOP generally stated in the contract CoreCivic's performance obligations and timeframes in a clear manner, it did not always describe in the contract how CoreCivic's efforts to meet those performance goals would be measured and evaluated. This was a particular problem in the area of staffing vacancies, which we described above, and in the areas of CoreCivic's inmate grievance process and food service obligations, which we describe below. CoreCivic's contract procedures would therefore benefit from more specific performance standards.

### Inmate Grievance Processes

According to 28 Code of Federal Regulations (C.F.R.) § 542, Administrative Remedy, federal inmates are allowed to seek formal review of an issue regarding any aspect of their confinement. For BOP-managed institutions, this regulation is met through the BOP's Administrative Remedy Program. Under the program guidelines, inmates are first given the opportunity to file formal complaints at the institutional level. If an inmate is not satisfied by the resolution of their grievance at the institutional level, the inmate can then appeal the decision up to the level of the BOP General Counsel.

The Adams County contract requires that, "A program for inmate grievances exists which provides for the expression and resolution of inmate problems." We reviewed the inmate grievance policies in place at the Adams County facility to determine if the contract provided for a grievance program that is comparable to those available to inmates at BOP facilities.

We found that CoreCivic clearly satisfied the requirement of establishing a program and is therefore in compliance with the contract as currently written. However, important differences between CoreCivic's program and the program offered at BOP-managed facilities do exist. Adams County inmates are allowed to utilize the BOP's Administrative Remedy Program only when their grievances are considered to be BOP-related, which is identified in BOP guidance as a matter outside of CoreCivic's scope of responsibility. An example of a BOP-related grievance would be a complaint related to an inmate's medical care provided at a BOP-managed facility before the inmate was transferred to the Adams County facility. All other grievances at the Adams County facility are only addressed at the institutional level, which means that the Warden, who is a CoreCivic employee, is

28

the final decision-making authority.  Consequently, and in contrast to inmates at BOP-managed facilities, inmates at the Adams County facility are rarely able to appeal their grievances to the BOP General Counsel, and rather the final decisions on their grievances are made by the CoreCivic-employed Warden, without BOP oversight.

We also found that CoreCivic policies allow inmates only 7 days to submit their initial informal grievance.  If necessary, subsequent formal grievances and appeals are required to be completed by the inmate within 5 days of each CoreCivic response.  In contrast, inmates at BOP-managed facilities are allowed up to 20 days to submit their initial formal grievance.  Those inmates are then allowed another 20 days to file an initial appeal, and an additional 30 days to file their second appeal.  See Figure 4 below for a comparison of BOP and CoreCivic grievance policies.

**Figure 4**

**Comparison of Grievance Policies at Adams County and BOP-Managed Facilities**

| Adams County | | BOP-Managed Facilities | Grievance or Appeal Submission Type | |
| --- | --- | --- | --- | --- |
| Submission Deadline | Grievance Resolution Authority | Submission Deadline | | |
| | General Counsel | ☒ 30 days | ☒ | Second Appeal |
| | | ↑ | ◇ | First Appeal |
| | Regional Director | ◇ 20 days | ● | Formal Grievance |
| | | ↑ | ○ | Informal Grievance |
| 5 days ◇ | Warden | ● 20 days[a] | | |
| ↑ | | ↑ | | |
| 5 days ● | Department Head | | | |
| ↑ | | | | |
| 7 days ○ | Any Staff Member | ○ Determined Locally[b] | | |

[a] For BOP-managed facilities, the submission deadline for formal grievances is 20 days from the date of the basis for the grievance.

[b] For BOP-managed facilities, submission deadlines for informal grievances, if imposed, are determined at the local level.

Source:  Adams County policies obtained from CoreCivic's Policy Number 14-5.  BOP policies obtained from Program Statement 1330.18 and Code of Federal Regulations Title 28, Section 542.10.

As Figure 4 illustrates, with the possible exception of the initial filing of informal grievances, inmates at BOP-managed facilities are allowed significantly longer to prepare their grievances and appeals than inmates at the Adams County facility, and they may appeal adverse decisions about their grievances outside of

29

their particular facility's management to the appropriate Regional Director or beyond, to the BOP General Counsel.[15]

In April 2016, we spoke with the BOP's National Inmate Appeals Administrator about the differences in submission deadlines between BOP-managed facilities and the Adams County facility. The National Inmate Appeals Administrator was not able to identify any significant effect of the shorter deadlines at the contract prison. Although the submission deadlines are shorter at the Adams County facility, the Administrator noted that appeals were infrequently granted at the General Counsel level, and successful appeals at that level were often based on procedural errors. Consequently, the Administrator believed that the inmates at the Adams County facility were still afforded an acceptable opportunity to submit grievances.

We considered the perspective of the National Inmate Appeals Administrator, but we do not believe that the value of a fair opportunity to appeal grievances to the General Counsel level is diminished simply because the rate of granted appeals is low. We believe that the disparities between Adams County and BOP-managed facilities in both levels of appeal and time limits for appeals constitute unjustifiably disparate treatment between the populations that the BOP places in BOP-managed facilities and the populations it places in its contract prisons. Even if the frequency of successful appeals at the BOP's Regional Director and General Counsel levels is relatively low, that does not diminish the requirement for offering inmates the opportunity to appeal legitimate concerns to officials outside of their local facility's management. Consequently, we recommend that the BOP implement additional administrative remedy procedures for its contract prisons to ensure that inmates are afforded fair opportunities to appeal their grievances beyond the management structure of the contractor to the BOP Regional Director and General Counsel, or other equivalent BOP levels outside of the inmates' local facilities.

Food Services

The BOP's Food Service Manual is designed to ensure that inmates in BOP custody are provided nutritionally adequate meals, which are prepared and served in a manner that meets established government health and safety codes. The Adams County contract expresses similar objectives, requiring that "Meals are nutritionally adequate, properly prepared and attractively served." CoreCivic executes these requirements through a subcontractor, Trinity Services Group. We reviewed the weekly cycle menus for calendar years 2012 through 2014 to

---

[15] BOP officials told us that they are aware of the differences between the Adams County grievance program and the grievance program operated in BOP-managed facilities, but they believe the Adams County program is adequate. BOP officials said that the American Correctional Association (ACA) standard for grievance programs requires only that a single level of appeal be offered to inmates for a "reasonable" period of time. While that may be true, plainly the BOP and the Department have put in place grievance procedures for BOP facilities that exceed those required by the ACA standard and our finding addresses the disparate treatment of inmates who are under BOP responsibility in contract facilities on the one hand, and inmates who are incarcerated in BOP-managed facilities on the other hand.

determine if CoreCivic, through its subcontractor, was providing the inmates with nutritionally adequate meals at the Adams County facility.

CoreCivic ensures that the meals served at the Adams County facility are nutritionally adequate by requiring that the menus be approved by a registered dietician at least annually in accordance with American Correctional Association standards. We verified that the menus for 2012 through 2014 were approved by a registered dietitian, but we noted that approximately 17 months elapsed between the 2013 and 2014 certifications. The menu certifications were therefore out of date for approximately 5 months during 2014, but we determined that this lapse was not detrimental to the inmates' nutritional offerings because the menu offerings did not change during that time period.

To assess the nutritional adequacy of the Adams County menus, we requested that a BOP dietician review the 2012 through 2014 weekly cycle menus and the associated analysis by Trinity Services Group's registered dietician. The BOP's dietician noted that the Adams County menu offerings contained somewhat high levels of calories, cholesterol, and sodium but did not indicate that these levels were causes for concern.

The dietician also found that, although the weekly menus remained unchanged from 2012 through 2014, Trinity Services Group used industry-standard dietary reference intake guidelines in an inconsistent fashion when conducting nutritional analyses.[16] Specifically, Trinity Services Group compared the first 2 weeks of the menu cycle to standards for a sedentary activity level, and it compared the last 3 weeks of the menu cycle to standards for a lightly active activity level. CoreCivic officials told us that the inconsistency was accidental, and as a result of our questions, Trinity Services Group updated all of the weeks' targets to reflect a sedentary activity level in December 2015. Additionally, we found that the menu offerings at Adams County would have been deemed satisfactory had the appropriate dietary standards been used for each week's menu. Although the inconsistency has now been resolved, as discussed in the following section, we believe that this mistake occurred because the Adams County contract does not specify the particular standards that should be used to measure the contractor's performance.

*Contract Type*

We reviewed the contract type used for the contract and compared the structure of the contract to the purposes and limitations of the various contract types. We found that the BOP's Privatized Corrections Contracting Section awarded the contract as a fixed-price with award fee type of contract, but also intended to establish the statement of work in keeping with performance-based contracting methods. According to FAR 16.404, the fixed price with award fee contract type is

---

[16] Dietary Reference Intakes are quantitative estimates of nutrient intakes to be used for planning and assessing diets for healthy people. These standards are developed and published by the Institute of Medicine and represent the most current scientific knowledge on the nutrient needs of healthy populations.

31

only permitted for use when contractor performance cannot be measured objectively. In contrast, performance-based contracts must specify the desired outcomes in objectively measurable terms so that the contractor's performance can be assessed using established standards. These performance standards are necessary to determine if the contractor has met the minimum standards of performance and therefore earned the fixed price that was agreed upon. Any incentive awarded as a part of the contract should be based on superlative performance beyond the basic requirements of the contract. Accordingly, we recommend that the BOP review all available guidance for performance-based acquisitions and implement additional, objectively measurable performance standards that can be effectively assessed for each contract requirement pertaining to staffing, inmate grievances, and food services.

*Billing Procedures*

We also found that the contract lacks prescribed procedures for calculating invoice deductions when staffing levels fall below the required thresholds. When staffing levels are insufficient, CoreCivic's current practice is to report an invoice deduction for each position below the threshold, and the amount of the deduction is equal to the salaries and benefits of the positions that have been vacant the longest. For example, if the contract threshold required 205 full-time equivalents and CoreCivic reported an actual staffing level of only 200 for the month, the contractor would take 5 deductions for the assumed salaries and benefits of the 5 positions that had been vacant the longest. We believe that this methodology is problematic in that it creates an opportunity for CoreCivic to ignore temporary vacancies in the highest paid positions. This is because filling those positions would result in higher salary costs than the invoice deductions that the contractor would otherwise have to take for the vacancies. We also found that after December 2012, when CoreCivic began reporting staffing levels as monthly averages, the contractor's handling of fractional staffing deficiencies became inconsistent. If the monthly average staffing level in the above example was 200.5 instead of 200, CoreCivic would inconsistently take either 4.5 deductions or 5 deductions.

Typically on fixed-price contracts, invoice review is a fairly straightforward process because the prices are predetermined. However, for the Adams County contract, invoice deductions are the norm rather than the exception, and the deduction amounts are heavily dependent on the contractor's calculations and claims. We therefore recommend that the BOP develop and implement mandatory procedures for calculating invoice deductions to ensure that deductions are computed consistently and do not inappropriately allow unfavorable contractor performance.

*Contract Oversight*

As previously mentioned, the BOP's Privatization Management Branch is responsible for day-to-day oversight of CoreCivic's management of the Adams County facility, while the Contract Facility Monitoring Section performs periodic, comprehensive reviews of facility operations. In August 2016, the OIG issued Report 16-06, which made four recommendations to improve the monitoring and

32

oversight of the BOP's contract prisons.[17]  In addition to the findings in that report, we considered the effectiveness of the BOP's oversight of CoreCivic's performance on this contract and identified issues with the BOP's oversight of billings.

The inadequate staffing identified earlier in this report could have been identified earlier in the contract performance period through more robust oversight. The BOP's Privatization Management Branch has responsibility for reviewing facility staffing levels in conjunction with each monthly invoice to ensure that CoreCivic is meeting the minimum staffing thresholds discussed earlier in this report.  However, according to BOP officials in April 2016, these reviews were limited to comparing the headcounts reported on the monthly invoice to a contractor-generated personnel report.  This validation procedure assumed that the personnel report was accurate.  It also assumed that every employee listed on the personnel report worked a full-time schedule.  This is because the staffing plan to which these figures were being compared utilized full-time equivalents as its unit of measure. Because the Privatization Management Branch's reviews would have identified discrepancies between only the invoice and CoreCivic's personnel report, these reviews did not adequately capture the actual staffing levels at the Adams County facility.

We also reviewed the periodic oversight functions conducted by the BOP's Contract Facility Monitoring Section under its Contract Facility Quality Assurance Plan to determine whether it conducted any thorough reviews of actual staffing levels at the Adams County facility.  We found that the Quality Assurance Plan section titled "Adequate Staffing Levels are Maintained" provided for evaluations of the contractor employees' background investigations, professional credentials, and mandatory trainings.  However, it required neither in-depth review of actual contractor staffing levels nor reviews of contractor procedures related to measuring and reporting those staffing levels.

Additionally, we identified multiple instances in which the invoice deductions reported by CoreCivic were inadequate based on the supporting documentation delivered with the invoice.  Between July 2011 and July 2015, we identified differences between the number of staffing insufficiencies reported by the contractor and the number of deductions actually taken for 19 of the 49 monthly invoices, or 38.8 percent.  These discrepancies remained uncorrected and were not attributable to rounding errors.  For example, in the July 2012 invoice, CoreCivic reported a staffing level that was 10 positions below the 90 percent contract staffing vacancy threshold for security, but deducted from the invoice the salary and benefits of only 5 positions.  When we inquired about the discrepancy, the contractor told us "It is our understanding that the deduction was taken consistent with discussions with the BOP at that time.  All these invoices were approved by the BOP."  BOP officials confirmed that the five deductions were taken in accordance with the BOP's interpretation of the contract language at the time.  In total, CoreCivic reported 156.9 monthly position insufficiencies for staffing levels that fell

---

[17] U.S. Department of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons,* Evaluation and Inspections Report 16-06 (August 2016), iii.

below the minimum thresholds. During the same period, the contractor only offered invoice deductions for 129.3 of those deficiencies, leaving 27.6 deficiencies, or 17.6 percent, unsettled.

We selected a sample of nine monthly invoices between July 2012 and March 2015 to perform a more detailed analysis of CoreCivic's supporting documentation. Within the 9 invoices, we identified 73 instances in which the contractor did not report necessary wage determination fringe deductions for positions that were listed on the monthly staff vacancy report. CoreCivic's explanation for 52 of the 73 instances was that its business manager at the time was not aware that those positions were subject to a wage determination fringe deduction. For the remaining 21 instances, CoreCivic again stated "It is our understanding that the deduction was taken consistent with discussions with the BOP at that time. All of these invoices were approved by the BOP." We asked the BOP for clarification as to why these 21 deductions were not taken, and BOP officials were able to provide us with justification for 5 of the 21 missing deductions. However, BOP officials were not able to locate any documentation explaining why the remaining 16 deductions were not taken.

For two of the nine monthly invoices we analyzed further, CoreCivic reported essential position vacancy deductions for four positions that were not listed as vacant on the staff vacancy report for the corresponding month. CoreCivic officials told us that the former business manager had used a different report to determine which positions should be included in these deductions. However, after reviewing the other reports, CoreCivic was unable to determine how the business manager had determined which positions should be included.

Finally, we requested support for an invoice deduction of $12,787 related to staffing deficiencies that occurred in October 2012. Although this amount represents a reduction to the price that would otherwise have been owed to CoreCivic, we requested support for the $12,787 to verify that the reduction should not have been larger. However, CoreCivic officials stated that they could not support the number of vacant hours used in their calculation of the $12,787. Given that the BOP paid these invoices, we believe that this and the other unsupported assertions that we identified in the contractor's invoices are indicative of weaknesses in the BOP's invoice verification procedures. In consideration of these weaknesses and the issue discussed earlier in this report in which CoreCivic stopped reporting the vacancy status of five employees, we recommend that the BOP implement additional invoice verification procedures to ensure that CoreCivic has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions.

**Recommendations**

We recommend that the BOP:

1. Modify the contract to provide specific procedures for CoreCivic to follow for measuring and reporting staffing levels so that the BOP will be able to monitor the extent to which required stations are actually covered.

2. Amend the contract modification that specified minimum levels of Spanish-speaking staff to incorporate specific deadlines for compliance, remedies for noncompliance, and the specific level of Spanish proficiency desired.

3. Evaluate the extent to which employee qualification levels and turnover rates affect safety and security concerns, and whether its contractual terms should be modified to address those concerns.

4. Ensure that CoreCivic reports the staffing levels for the entire staffing plan on its monthly invoices, to include positions filled by subcontractors and subsidiaries, as required by the contract.

5. Remedy $42,300 in questioned costs related to overstated invoices submitted by the contractor for August 2010 through November 2015.

6. Implement additional administrative remedy procedures for its contract prisons to ensure that inmates are afforded fair opportunities to appeal their grievances to the BOP Regional Director and General Counsel, or other equivalent BOP levels outside of the inmates' local facilities.

7. Review all available guidance for performance-based acquisitions and implement additional, objectively measurable performance standards that can be effectively assessed for each contract requirement pertaining to staffing, inmate grievances, and food services.

8. Develop and implement mandatory procedures for calculating invoice deductions to ensure that deductions are computed consistently and do not inappropriately allow unfavorable contractor performance.

9. Implement additional invoice verification procedures to ensure that CoreCivic has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions.

# STATEMENT ON INTERNAL CONTROLS

As required by *Government Auditing Standards*, we tested, as appropriate, internal controls significant within the context of our audit objectives. A deficiency in an internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect in a timely manner: (1) impairments to the effectiveness and efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations. Our evaluation of the Federal Bureau of Prisons' (BOP) administration of contract number DJB1PC010 awarded to Corrections Corporation of America, which subsequently changed its name to CoreCivic, Inc., to operate the Adams County Correctional Center was *not* made for the purpose of providing assurance on their internal control structures as a whole. The BOP's and CoreCivic's management are responsible for the establishment and maintenance of internal controls.

As discussed in our report, the BOP needs to improve its internal controls to ensure compliance with all rules, regulations, and guidelines related to the administration of contract number DJB1PC010 with CoreCivic to operate the Adams County Correctional Center. Specifically, the BOP needs to: (1) implement objectively measurable performance standards for each contract requirement so that contractor performance can be effectively assessed, (2) implement standard procedures for calculating invoice deductions to ensure that deductions are computed consistently and do not inappropriately incentivize unfavorable contractor performance, and (3) implement additional invoice verification procedures to ensure that CoreCivic has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions. The internal control deficiencies noted in this report prevent the BOP from ensuring that the CoreCivic's performance is adequate and that the proper amounts are billed by the contractor on each monthly invoice.

Because we are not expressing an opinion on the internal control structure of the BOP as a whole, this statement is intended solely for the information and use by the BOP and CoreCivic. This restriction is not intended to limit the distribution of this report, which is a matter of public record.

# STATEMENT ON COMPLIANCE
# WITH LAWS AND REGULATIONS

As required by *Government Auditing Standards*, we tested, as appropriate given our audit scope and objectives, selected transactions, records, procedures, and practices to obtain reasonable assurance that BOP and CoreCivic management complied with federal laws and regulations for which non-compliance, in our judgment, could have a material effect on the results of our audit. The BOP's and CoreCivic's management are responsible for ensuring compliance with federal laws and regulations. In planning our audit, we identified the following laws and regulations that concerned the operations of the auditee and that were significant within the context of the audit objectives:

- Federal Acquisition Regulation (FAR) Part 16, Types of Contracts
- FAR Part 37, Service Contracting
- FAR 52.222-43
- 29 Code of Federal Regulations § 4, Labor Standards for Federal Service Contracts
- 28 Code of Federal Regulations § 542, Administrative Remedy

Our audit included examining, on a test basis, the BOP's and CoreCivic's compliance with the aforementioned laws and regulations that could have a material effect on the BOP's and CoreCivic's operations. We interviewed auditee personnel, assessed internal control procedures, and examined accounting records and performance reports. As noted in the Findings and Recommendations section of this report, we found instances where the BOP did not comply with the FAR and Code of Federal Regulations provisions related to the establishment of measurable performance standards for federal service contracts and equitable adjustments under the Service Contract Labor Standards statute. Specifically, we found that the BOP did not implement effective performance standards for the Adams County Correctional Center contract and paid CoreCivic excessive amounts for equitable adjustments that exceeded the amounts to which the contractor was entitled.

## OBJECTIVES, SCOPE, AND METHODOLOGY

**Audit Objectives**

The primary objectives of our audit were to (1) assess CoreCivic's contract performance; (2) determine whether CoreCivic complied with the terms, conditions, laws, and regulations applicable to the contract; and (3) assess the BOP's formation and administration of the contract.

**Scope and Methodology**

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

This was an audit of BOP contract number DJB1PC010, awarded to Corrections Corporation of America, which subsequently changed its name to CoreCivic, Inc. Our audit generally covered, but was not limited to the period April 1, 2012, through March 31, 2015; and included 3 entities: (1) the BOP; (2) CoreCivic; and (3) Trinity Services Group.

To ensure compliance with contract requirements regarding billings and payments, we evaluated BOP payments of monthly invoices and award-fees to CoreCivic and reviewed the accuracy and completeness of contract modifications resulting in net increases or decreases of obligated funds. We also reviewed the BOP's and CoreCivic's compliance with Federal Acquisition Regulation (FAR) requirements related to the payment of prevailing wages and benefits to staff based on locality and CoreCivic's compliance with contract requirements related to minimum fringe benefit rates due to Adams County Correctional Center personnel.

To determine whether CoreCivic complied with contract staffing requirements, we reviewed contract provisions related to staffing, compared staffing information to timekeeping and payroll records, assessed whether Adams County Correctional Center filled vacant positions in a timely manner as required in the contract, compared staffing ratios for Adams County Correctional Center and comparable BOP-managed facilities, determined how staffing shortfalls were handled, and assessed the contractor's methodology for calculating staffing-related invoice deductions.

To assess the BOP's and CoreCivic's compliance with contract oversight and monitoring requirements, we reviewed the contractor's quality control program to determine whether CoreCivic's system of controls allowed it to ensure effective performance and identify areas of improvement or non-compliance before performance becomes unsatisfactory. We also reviewed the BOP's ongoing

monitoring efforts and Quality Assurance Plan to ensure that the BOP's oversight mechanisms would identify any performance deficiencies or areas of noncompliance.

*Analysis of Billings*

When we began this audit in May 2015, CoreCivic had submitted a total of 68 invoices to the BOP for contract performance during the months of August 2009 through March 2015. These invoices represented obligations of over $325 million. Using professional judgment, we selected a nonstatistical sample of nine of those invoices totaling $46 million for testing. We selected the March, July, and November invoices from July 2012 through March 2015. We employed this judgmental sampling design to identify a smaller number of invoices that we could reasonably review in greater detail, given the resources available to us. We reviewed each of the sample invoices to verify the completeness and accuracy of the invoice deductions, the accuracy and appropriateness of the contractor's calculations, and the consistency of invoicing procedures over time. However, this nonstatistical sample design does not allow for a projection of the sample results to all invoices or internal controls and procedures.

*Analysis of Staffing Levels*

The purpose of our staffing analyses for correctional services and health services was to determine the actual staffing level at the Adams County Correctional Center over time and to compare actual staffing levels at the Adams County facility to CoreCivic's reported staffing levels and contract requirements. The overall staffing targets in the BOP-approved staffing plan incorporate a "relief factor" to account for the portion of time that employees would not be available to work, such as time off, holidays, and training. However, our analysis focuses specifically on the number of hours that contractor employees actually spent covering required shifts. We believe that this is the most accurate and appropriate way to evaluate actual staffing levels over time. Additionally, it is notable that the BOP's minimum staffing thresholds for correctional services (90 percent) and health services (85 percent) are set below the staffing levels that would be necessary to cover every required shift in the staffing plan, even if all of its employees were working full-time schedules and taking no sick or personal time off, no holidays, and no training whatsoever.

To determine the actual staffing levels at Adams County Correctional Center, we compiled time and attendance data for CoreCivic's hourly staff and payroll data for CoreCivic's salaried staff. For each month, we determined the total number of full-time equivalents covering shifts required by the BOP-approved staffing plan as follows:

For CoreCivic's hourly staff, we first aggregated all regular and overtime hours worked across all employees for each pay date. We then backed out hours that these employees spent in training, since staff members attending training courses were not covering shifts in the BOP-approved staffing plan.

39

The hours that CoreCivic employees spent covering shifts in the BOP-approved staffing plan was divided by 80, the number of hours a full-time equivalent employee works in a biweekly pay period, to arrive at the total number of full-time equivalents represented by the number of hours worked. Since the contractor reports staffing levels on a monthly basis as part of its invoice support, we then averaged the full-time equivalents for each month to obtain comparable figures for presentation.

For CoreCivic's salaried staff, the contractor was unable to provide detailed time and attendance data showing the exact number of hours each employee worked. Therefore, we used CoreCivic's payroll data to identify the number of salaried employees who were on staff during each month. Since salaried employees are generally expected to work a full-time schedule, we considered each of these employees to be a full-time equivalent for every month in which they were paid at least once. For our health services staffing analysis, we incorporated the five health services staff members that were employed by CoreCivic subsidiaries by adding each of those employees back in as full-time equivalents for any month in which the position was filled for at least 15 days.

To determine the total number of full-time equivalent employees CoreCivic had covering shifts during a given month, we added together the hourly and salaried full-time equivalents and compared the result to the BOP-approved staffing plan and the staffing levels reported by CoreCivic.

*Review of Correctional Officer Qualifications, Wages and Benefits*

We reviewed the Adams County Correctional Center contract to identify any specific qualifications that the BOP required of correctional officers working at the Adams County Correctional Center. We then obtained information on the qualifications required and the wage and benefit packages offered to entry-level correctional officers at BOP-managed facilities, State of Mississippi correctional facilities, and the Adams County Correctional Center to determine whether the qualifications and offers were comparable. We obtained information on the BOP's correctional officers from a job announcement for GL-05 correctional officers that was open between March 2015 and March 2016. We obtained information on the State of Mississippi correctional officers from the Mississippi State Personnel Board's job description for the Correctional Officer I job title, and we obtained information on CoreCivic correctional officers from the contractor's own job description for correctional officers. We compared and contrasted this data by employer, and we compared the figures to national-level statistics reported by the Department of Labor, Bureau of Labor Statistics.

*Review of Compliance with the Service Contract Labor Standards Statute*

We assessed CoreCivic's compliance with the Service Contract Labor Standards statute by assessing whether contractor employees were paid the requisite amounts of wages and fringe benefits, whether CoreCivic's requests for equitable adjustments to the contract price were accurate and justified, and whether the BOP properly reviewed, approved, and monitored CoreCivic's requests

40

for reimbursement. To accomplish this, we obtained payroll records for contractor employees' actual wages, information on the cost of fringe benefits offered to employees, Department of Labor wage determinations containing the minimum required wage and benefit rates, and the contractor's requests for equitable adjustments sent to the BOP.

To verify the amounts claimed in CoreCivic's requests for equitable adjustments, we first reviewed a sample of wage rate increases that were required by revisions to the Department of Labor wage determinations and confirmed that the contractor's payroll records reflected the higher wage rates, effective as of the beginning of the contract year. For fringe benefits, we confirmed that the cost of CoreCivic's contributions to a fringe benefit plan for each employee met the required fringe benefit rates under the applicable wage determinations. We also confirmed the funds were used for appropriate fringe benefit programs, including health insurance, life insurance, retirement plans, and sick leave. In addition, we confirmed that the contractor accurately calculated its reimbursement from the BOP, and that the request for reimbursement was justified by actual increases in costs resulting from revisions to the wage determinations.

*Review of Inmate Grievance Programs*

We assessed the adequacy of CoreCivic's inmate grievance program for the Adams County Correctional Center by comparing that program's goals and procedures to those in place for BOP-managed facilities. We also compared the Adams County grievance program to applicable sections of the Code of Federal Regulations and the BOP's program statements.

*Review of Food Services*

We evaluated the adequacy of CoreCivic's delivery of food services through its subcontractor, Trinity Services Group, by reviewing weekly cycle menus for calendar years 2012 through 2014 and confirming that the menus were each approved by a registered dietician. We also evaluated the overall nutritional adequacy by asking a BOP dietician to perform an independent review of those menus and providing an opinion on them.

## SCHEDULE OF DOLLAR-RELATED FINDINGS

| Description | Amount | Page |
|---|---|---|
| **Questioned Costs[18]** | | |
| Improperly Calculated Invoice Deductions | $42,300 | 21 |
| Unallowable Costs | $42,300 | |
| **Net Questioned Costs** | **$42,300** | |
| **TOTAL DOLLAR-RELATED FINDINGS** | **$42,300** | |

---

[18] **Questioned Costs** are expenditures that do not comply with legal, regulatory or contractual requirements, or are not supported by adequate documentation at the time of the audit, or are unnecessary or unreasonable. Questioned costs may be remedied by offset, waiver, recovery of funds, or the provision of supporting documentation.

# THE BOP'S RESPONSE TO THE DRAFT AUDIT REPORT



**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*

*Washington, D.C. 20534*
November 30, 2016

```
MEMORANDUM FOR JASON R. MALMSTROM
                ASSISTANT INSPECTOR GENERAL
                OFFICE OF INSPECTOR GENERAL
                AUDIT DIVISION
```

*Thomas R. Kane*

```
FROM:          Thomas R. Kane, Acting Director

SUBJECT:       Response to the Office of Inspector General's (OIG)
               FORMAL Draft Report:   Audit of the Federal Bureau of
               Prisons' Contract Awarded to Corrections
               Corporations of America to Operate the Adams County
               Correctional Center in Natchez, Mississippi
```

The Bureau of Prisons (BOP) appreciates the opportunity to respond to the open recommendations from the formal draft report entitled Audit of the Federal Bureau of Prisons' Contract Awarded to Corrections Corporations of America to Operate the Adams County Correctional Center in Natchez, Mississippi.

Please find the BOP's response to the recommendations below:

**Recommendation 1:** Modify the contract to provide specific procedures for CCA to follow for measuring and reporting staffing levels so that the BOP will be able to monitor the extent to which required stations are actually covered.

**Response:** The BOP agrees with this recommendation. We will modify the contract, consistent with the Federal Acquisition Regulation and

subject to funds availability, to provide specific procedures for CCA to follow for measuring and reporting staffing levels so that the BOP will be able to monitor the extent to which required stations are actually covered.

**Recommendation 2:** Amend the contract modification that specified minimum levels of Spanish speaking staff to incorporate specific deadlines for compliance, remedies for noncompliance, and the specific level of Spanish proficiency desired.

**Response:** The BOP agrees with this recommendation. We will issue an additional contract modification that specifies minimum levels of Spanish speaking staff to incorporate specific deadlines for compliance, remedies for noncompliance, and the specific level of Spanish proficiency desired. This modification will be done consistent with the Federal Acquisition Regulation and subject to funds availability.

**Recommendation 3:** Evaluate the extent to which employee qualification levels and turnover rates affect safety and security concerns, and whether its contractual terms should be modified to address those concerns.

**Response:** The BOP agrees with this recommendation. We will evaluate the extent to which employee qualification levels and turnover rates affect safety and security concerns, and whether its contractual terms should be modified to address those concerns.

**Recommendation 4:** Ensure that CCA reports the staffing levels for the entire staffing plan on its monthly invoices, to include positions filled by subcontractors and subsidiaries, as required by the contract.

**Response:** The BOP agrees with this recommendation. We will ensure that CCA reports the staffing levels for the entire staffing plan on its monthly invoices, to include positions filled by subcontractors and subsidiaries, as required by the contract.

**Recommendation 5:** Remedy $42,300 in questioned costs related to overstated invoices submitted by the contractor for August 2010 through November 2015.

**Response:** The BOP agrees with this recommendation. We will remedy $42,300 in questioned costs related to overstated invoices submitted by the contractor for August 2010 through November 2015.

2

44

**Recommendation 6:** Implement additional administrative remedy procedures for its contract prisons to ensure that inmates are afforded fair opportunities to appeal their grievances to the BOP Regional Director and General Counsel, or other equivalent BOP levels outside of the inmates' local facilities.

**Response:** The BOP agrees with this recommendation. We will implement additional administrative remedy procedures for our contract prisons to ensure that inmates are afforded fair opportunities to appeal their grievances to the BOP Regional Director and General Counsel, or other equivalent BOP levels outside of the inmates' local facilities.

**Recommendation 7:** Review all available guidance for performance-based acquisitions and implement additional, objectively measurable performance standards that can be effectively assessed for each contract requirement pertaining to staffing, inmate grievances, and food service.

**Response:** The BOP agrees with this recommendation. We will review all available guidance for performance-based acquisitions and implement additional, objectively measurable performance standards that can be effectively assessed for each contract requirement pertaining to staffing, inmate grievances, and food service. If changes to the performance measures will require a contract modification, the modification will be consistent with the Federal Acquisition Regulation and pursuant to funds availability.

**Recommendation 8:** Develop and implement mandatory procedures for calculating invoice deductions to ensure that deductions are computed consistently and do not inappropriately allow unfavorable contractor performance.

**Response:** The BOP agrees with this recommendation. We will develop and implement mandatory procedures for calculating invoice deductions to ensure that deductions are computed consistently and do not inappropriately allow unfavorable contractor performance.

**Recommendation 9:** Implement additional invoice verification procedures to ensure that CCA has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions.

3

45

**Response:**  The BOP agrees with this recommendation.  We will implement additional invoice verification procedures to ensure that CCA has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

4

## CORECIVIC'S RESPONSE TO THE DRAFT AUDIT REPORT



Natasha K. Metcalf
Vice President, Partnership Development

November 23, 2016

Jason R. Malmstrom
Assistant Inspector General for Audit
1425 New York Avenue, N.W.
Suite 5000
Washington, D.C. 20530

Dear Mr. Malmstrom:

Corrections Corporation of America, recently rebranded as CoreCivic, Inc. ("the Company") appreciates the opportunity to review and comment on the Official Draft of the United States Department of Justice (DOJ) Office of the Inspector General (OIG) audit of the BOP contract for the Adams County Correctional Center (Adams or ACC) for the period April 1, 2012 through March 31, 2015 with the stated goals to: "(1) assess CCA's contract performance; (2) determine whether CCA complied with the terms, conditions, laws, and regulations applicable to the contract; and (3) assess the BOP's formation and administration of the contract."

The Company, which provides a diverse range of government solutions, has worked in close partnership with the Bureau of Prisons (BOP) at Adams for years, supporting the BOP's need to securely house individuals convicted of federal felonies who are not United States citizens. In terms of this audit:

- Since the tragic May 2012 incident at Adams, complementary internal and external review processes have resulted in enhancements yielding significant year-over-year improvements in safety and security at the facility, including reducing violent incidents and inmate-on-inmate assaults by nearly 40 percent.
- The inappropriate staffing measurement methodology used by OIG in the audit has never been used before and is not based on the contract, the BOP's staffing standards for its own facilities, or general correctional staffing best practices. The Company and the BOP have repeatedly objected to the OIG's approach.
- The robust grievance process available to inmates at Adams and the facility's qualifications and compensation for employees meet contract requirements and are approved by the BOP.
- Although we continue to work to meet certain requirements, significant progress has been made regarding the recruitment and retention of facility staff and facilitation of communication at the facility, including actively recruiting more Spanish speaking staff.

The safety and security of our facilities, staff, and those entrusted to our care is our top priority, and we reacted immediately to the tragic incident that occurred at Adams in May 2012, studying the incident and redoubling our efforts to enhance and strengthen operations at the facility. Since implementing the BOP's

1

focused after action recommendations and additional comprehensive recommendations identified through our own intensive review, the Company has complied with its contractual obligations and made improvements that have resulted in increased safety for inmates, staff, and the public. These improvements are validated by a host of objective measures and independent reviews.

The Company respects the OIG's audit process as one of the many oversight and audit tools that the Government employs to monitor contract performance and advance overall contracting processes and procedures, and we appreciate the audit report's identification of areas for improvement. This audit report, however, features prominently an OIG-devised staffing measurement methodology that the contract does not contemplate, that neither the BOP nor the Company believes is consistent with the contract, and to which both the BOP and the Company objected throughout the audit process. Adoption of the OIG's approach would not be consistent with industry-wide corrections practices and would retroactively impose an unwarranted and unprecedented new standard for measuring staffing on the BOP and its contractors.

In addition, although the OIG recognizes that the Company's qualification and compensation for employees and inmate grievance procedures meet contract requirements established by the BOP, the audit report's analysis and recommendations focus on differences between the Company and the BOP. This analysis and accompanying recommendations are appropriately characterized as suggestions for changes to the BOP's formation and administration of contracts in the future because they go beyond the assessment of the Company's adherence to and execution of existing contractual requirements.

The Company recognizes that it has experienced challenges in the recruitment and retention of staff, including that it currently is continuing to work to meet a recently-added contract requirement mandating that 5% of the facility's staff members be Spanish-speaking. Since the contract began, we have invested in a variety of meaningful recruiting and retention programs, as well as other mechanisms to provide Spanish translation and to provide temporary coverage for positions during the recruitment and training process for permanent hires, and we continue to implement new approaches and strategies to recruit and retain staff members and enhance communication between staff and inmates.

The Company remains dedicated to providing innovative solutions that benefit the public good, and looks forward to continued partnership with the BOP to ensure the safe and effective administration of Adams.

I.    **THE COMPANY**

The Company was founded on January 28, 1983 to create public-private partnerships for the management and operation of correctional facilities. Today, the Company, a publicly traded real estate investment trust, is a diversified government solutions company offering high quality corrections and detention services, innovative real estate solutions, and a network of residential reentry centers to help tackle America's recidivism crisis. The Company is proud of its decades-long record of serving as a critical tool to help the BOP meet some of its most pressing needs.

The Company has worked since its founding to support the BOP in its stated mission "to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens." The Company strives every day to deliver services in a way that honors our values of having PRIDE in all we do: Professionalism, Respect, Integrity, Duty, and Excellence.

In line with our values and obligations as a responsible federal contractor and our efforts to serve as a reliable, dependable partner, the Company has invested in a robust ethics and compliance program and

2

system of internal compliance controls. The Company's culture of ethics and compliance starts at the top, with our Board of Directors overseeing the ethics and compliance program in its work to promote company-wide awareness and ethical responsibility. Further, management has made investments in resources and technology to permit the Company to provide innovative and efficient services to its government partners while maintaining compliance with our legal and contractual obligations. Recent investments include the study and ongoing development of a new workforce management system to better manage, monitor, and report on staffing levels at Company facilities; enhancing the Quality Assurance Division's resources devoted to monitoring and auditing facility compliance with partner contract requirements; and implementing an "ethics liaison" program to further embed the compliance and ethics program at every Company facility.

## II.    THE COMPANY'S RESPONSE TO THE MAY 2012 INCIDENT

### A.    Our Efforts to Understand the May 2012 Incident and Make the Facility Safer and Stronger.

The May 2012 incident at Adams County was a tragedy and an aberration in the Company's years-long record of safe facility administration. The Company's top priority has always been safety and security, and we immediately began an internal review to understand the May 2012 incident and identify ways to make the facility safer and stronger in the future. The review was ordered by, and conducted under the guidance of, the Company's Office of General Counsel, and consisted of an intensive four-day, on-site investigation conducted by a team of experienced corrections professionals. Through this review, the Company identified a number of factors that contributed to the disturbance and developed fifteen recommendations to improve the areas of emergency management, training, inmate communications, intelligence gathering and sharing, and security. In October 2012, the Company shared a written report documenting this after action review with the BOP, and presented the report to all facility staff members. All strategies and action steps identified to implement the fifteen recommendations were completed.

Recognizing the opportunity for further emergency preparedness training and improvement across the Company, we also commenced a months-long planning process for "Operation Diamondback," an exercise designed to test Incident Command System-Command Post operations and incident management and tactical team operations related to facility control, which we held in the fall of 2013. Representatives from every Company facility participated, including wardens, assistant wardens, chiefs of security, investigators, and Special Operations & Response Teams/Disturbance Control Teams. To prepare, all participants first completed four separate National Incident Management Systems[1] courses, and technical teams received and developed breaching plans specific to their facilities. The Company then hosted two days of classroom activities and concluded the Operation with a scenario conducted over a 24-hour period.

The BOP conducted a separate review of the 2012 incident. The Company cooperated fully with and supported the BOP's review, but the full scope of the BOP's review and its findings were not provided to the Company. On September 21, 2012, the BOP provided an After Actions Recommendations letter to the Company, stating that the BOP had conducted "an After Action Review to assess [the facility's] policies, procedures, and response to the incident," and providing nine recommendations to the Company based on that review. After reviewing and considering each recommendation carefully, on October 19,

---

[1] The National Incident Management System is the comprehensive, nationwide, systematic approach to incident management directed by the Federal Emergency Management Agency.

3

2012, the Company responded to the BOP, confirming that it either had already implemented or would implement each one:

- *"Recommend ACC staff use their Shift Activity Report for staff to document and report signs of discord or their observations among the inmate population to the [Special Investigative Services (SIS)]."* The Company had already created an intelligence-sharing "Pass-On Worksheet," trained personnel on the procedure, and implemented daily submission of those sheets.

- *"Recommend ACC foster team building, for example, the SIS can prepare training lesson plans to educate staff on the proper procedures for recognizing and reporting suspicious inmate behavior, to include [Security Threat Group (STG)] specific tattoos, mail/phone monitoring and STG symbolism."* The Company acknowledged the importance of enhancing the facility's STG program and committed to frequent training and weekly Inmate Profile Presentations at department head meetings to review specific inmates of interest.

- *"Consider training to strengthen staff and inmate communication as it was reported the inmates stated they only wanted to talk with administration."* The Company described its existing Unit Team Management approach to ensure staff members are available to address inmate concerns and needs and existing training regarding the importance of communications and responsiveness, and set forth its successful efforts to recruit additional bilingual personnel to further enhance communications.

- *"Recommend the contractor use the Automated Inmate Management System (AIMS) as prescribed by the contract. (Contractual Requirement)."* The Company reiterated its previous notice to the BOP that technical problems had prevented consistent use of the BOP's AIMS since installation, but that AIMS was then operational and in use.

- *"Recommend the contractor document and confirm confidential informants. Currently no documentation exists to justify the credibility of any of the inmates used."* The Company indicated that all SIS staff members were trained on establishing, managing, documenting, and maintaining confidential informants.

- *"Re-evaluate safe haven locations to ensure safety of staff."* The Company stated that it had already re-evaluated safe haven locations, modified one safe haven and created additional locations, and scheduled training for staff.

- *"Consider reviewing state and local law enforcement's legal authority to enter a private facility when responding to significant institution events. Specifically, review the state and local law enforcement's legal ability to enter a private facility in order to prevent serious injury or loss of life of federal inmates and contractors."* The Company indicated that it had identified no prohibition on the usual power of state and local authorities during such an incident, and had applied its policy consistent with that power during the incident.

- *"Consider strengthening inmate accountability procedures by implementing controlled movement designed to contain inmates in controlled areas during non-move periods. This allows for immediate containment of all areas throughout the*

4

50

*institution."* The Company notified the BOP that it had already modified movement procedures to enhance immediate containment ability.

- *"Consider storage of less than lethal munitions, specifically, pyrotechnics CS, in secured areas that are inaccessible to inmates."* The Company advised that it had always been in compliance with this recommendation.

The Company has since continued to improve safety and security at the facility. We have strengthened staff and inmate communication by expanding the opportunities for productive interaction through, among other things, holding open houses with key departments, increasing the number of supervisory staff in the facility beyond the typical working day, distributing newsletters and informational posters, and engaging department heads in inmate issue resolution. We conduct regular training with staff about intelligence gathering and reporting, including through the creation and communication of educational profiles on various high risk inmates, gang activity, and other STG specific information. We have further enhanced inmate accountability procedures through additional physical and process safeguards throughout the facility; these upgrades have been key components of our strategy to ensure optimal facility security at all times. As always, we continue to work with the BOP to recognize and report suspicious inmate behavior, uploading STG information into a BOP-approved database and providing monthly intelligence reports and briefings.

    **B.**     <u>Documented Successes in Our Ongoing Efforts to Ensure Safety and Security at the Facility.</u>

Adams is subject to a variety of audits, internal reviews, surveys, and assessments that document success in our ongoing efforts to ensure safety and security. Since January 2011, Adams has been continuously accredited[2] by the independent American Correctional Association, the oldest and most prestigious professional association in the United States that develops correctional standards based on valid, reliable research and exemplary correctional practice. During the most recent reaccreditation survey conducted in May 2016, the American Correctional Association audit team found the facility in compliance with 100% of both the mandatory standards—those that address conditions or situations that affect the life, health, and safety of offenders, staff, and/or the public—and 100% of the non-mandatory standards. The team members commented favorably about the high levels of sanitation, the low number of inmate grievances, and inmate reports that they feel safe and that staff members treat them with respect.

In November 2015, Adams underwent an audit of its compliance with the Prison Rape Elimination Act (PREA) Commission standards with 100% compliance and certification. The visiting auditor noted that 100% of the inmates interviewed during the visit acknowledged receiving PREA training, and expressed if they had to file a PREA complaint the facility would respond appropriately and that staff take all PREA complaints very seriously.

During an internal audit conducted by the Company's Quality Assurance Division in March 2015, inmate climate survey results indicated the inmates at Adams feel safe and have confidence in staff control over disruptive behavior. In 25 of the 27 categories surveyed, Adams exceeded the overall Company's overall average facility scores, with notable improvements since the last survey in areas related to staff control over gang activity.

An internal tracking and comparison of incidents and contraband discoveries shows significant year-over-year improvement in areas affecting public, staff, and inmate safety at Adams. For example, in the last

---

[2] The accreditation process typically takes 12 to 18 months to complete, and maintaining continuous accreditation is an ongoing task that requires integration of the established standards into day-to-day facility operations.

5

year alone, the total number of violent incidents decreased by 38%, and the number of weapons found as a result of violent incidents dropped by 73.3% (2015 – 15, 2016 year-to-date – 4). In addition, inmate-on-inmate assaults are down by 39%, inmate-on-staff assaults have reduced by 56%, and suicide attempts have reduced from 5 in 2015 to none in 2016 to date.

In June 2016, the institution received a $277,723 award fee from the BOP for contract performance above the acceptable level. This award fee reflects fewer negative audit findings, improvements in partnership and responsiveness, and staff and inmate compliance with established policies that have enhanced facility safety.

## III.    AUDIT FINDINGS AND RECOMMENDATIONS

### A.    Our Adherence to the Contract's Staffing and Reporting Requirements, and Objection to OIG's Unprecedented New Approach to Measure Staffing.

*Facility Staffing and Reporting*

Throughout the contract, the Company maintained and reported its staffing complement consistent with industry standards and contract requirements.[3] During the performance period examined by the OIG's audit, the contract provided that the Company was responsible for maintaining a contract staffing plan:

> The number, type and distribution of staff described in the contract staffing plan shall be maintained throughout the term of the contract. Written requests to change the number, type, and distribution of staff described in the staffing plan must be submitted to the CO for approval prior to implementation. Staffing levels shall not fall below a monthly average of 90% for Correctional Services, 85% for Health Services and 85% for all other departments of the BOP approved staffing pattern. Staffing levels for all departments other than Correctional Services and Health Services will be calculated in the aggregate.

> Each month the contractor shall submit to the CO the current average monthly vacancy rate, by department, and indicate any individual positions that have been vacant for more than 30 days.

The approved contract staffing pattern for the facility is based on a correctional complement analysis that is consistent with the American Correctional Association's Standards for Adult Correctional Institutions, which dictate an analysis that accounts for holidays, regular days off, annual leave and average sick time. The purpose of this complement analysis is to ensure that staffing levels are sufficient for management to deploy personnel to the posts necessary to safely and securely operate the facility. Staffing levels are not determined based on one employee per post. Instead, staffing for mandatory, constant posts must be calculated to account for time off and non-productive time. Thus, the Company, like other correctional systems, builds a "relief factor" into its staffing plans. Further, the contract's staffing level percentage thresholds are negotiated allowances reflecting the parties' acknowledgement and understanding that the staffing pattern is important to the management of the institution, but also that maintaining 100% staffing at all times is not realistic given ordinary staff turnover and fluctuations in the labor market.

This correctional complement analysis is the accepted industry practice for analyzing prison staffing, and is used by the Company for other contracts, including those with the U.S. Marshals Service, U.S. Immigrations and Customs Enforcement, and state correctional agencies. It is also the practice used by the BOP in BOP-operated facilities. The Company followed the contract staffing plan to staff the facility

---

[3] The Company addresses an oversight that resulted in our omission of five health services positions from the staffing reports included with the Company's invoices below.

6.

and has consistently reported to the BOP according to the contract's requirement to report staffing levels based on the prescribed methodology—positions filled. In the few instances that the staffing fell short of the requirements, the Company incurred and accepted appropriate deductions.

The audit report reflects an OIG-devised staffing measurement methodology developed for the first time in the course of this audit that the contract does not contemplate and that neither the BOP nor the Company believes is consistent with the contract. Although the OIG's approach may be one possible way to estimate actual hours of post coverage, it is not consistent with either the industry understanding of a staffing pattern or, even more importantly, the contract. Indeed, both the Company and the BOP have repeatedly objected to the OIG's approach because its adoption would retroactively impose an unprecedented new standard for measuring staffing on the BOP and its contractors.

Correctional facilities are dynamic environments. A staffing pattern establishes the pool of staff available for deployment from which managers draw after determining in real time how to man the facility based on actual circumstances, including which individual posts should be covered. A staffing pattern is not designed as a list of posts that managers are required to fill at all times. Rather, a staffing pattern is a prospective measurement of the resources the parties expect are necessary to allow for appropriate management of the facility.

The OIG's comparison of the staffing pattern to direct hours recorded to posts is therefore an inapt measurement of BOP oversight and contract compliance in two principal ways. First, the staffing requirements in the contract are position requirements (*i.e.*, staffing headcount or staffing level requirements), not post coverage levels. This is clear from the language of the contract and the parties' course of performance.

Second, to the extent the staffing pattern expresses a general intent regarding post coverage, the OIG's methodology inflates the level of post coverage that would be required. In the OIG's analysis, the "BOP-Approved Staffing Plan" (the post coverage compliance requirement) assumes that the staffing pattern reflects a minimum full-time-equivalent count based upon 40 hours per week per position. The OIG's analysis therefore includes the relief factor to calculate approved staffing levels, but removes the time associated with the relief factor (*i.e.*, staff leave and training time) to calculate actual post coverage. For a comparison of like measurements, however, the relief factor must be excluded from both calculations.

To conduct this comparison of like measurements, the Company created a version of the contract staffing plan excluding the relief factor and compared it to the "Actual Staffing Level (Full-Time Equivalents Assigned to BOP Approved Posts)" used in the OIG's analysis. Based on this comparison, the Company met or exceeded the Health Services staffing threshold for all 49 months analyzed and met or exceeded the Correctional Services staffing threshold for 34 of the 49 months analyzed.

Ultimately, the contract defines staffing requirements based on positions filled, and the Company follows the plan to staff the facility and report compliance to the BOP. OIG's analysis, by contrast, is an evaluation of hours on post only, which may be useful in assessing the degree to which the contractual staffing requirements have translated into post coverage levels, but is not a requirement of the BOP contract itself. In the event that the BOP determines that it wishes to adopt a methodology similar to the one used by the OIG, the Company welcomes discussions with the BOP regarding adjustments to the contract staffing requirements. It is inaccurate, however, for OIG to retroactively employ a methodology that is not based in the BOP-defined contract, the parties' course of dealing, or correctional staffing best

7

53

practices to make findings that suggest that the Company did not fulfill its contractual obligations when, in fact, the Company did.[4]

The audit report defends OIG's methodology, asserting that the BOP and the Company's agreed-upon contractual approach does not allow for the BOP to monitor contract performance. Again, the Company's staffing and reporting was consistent with actual contract requirements. Moreover, BOP contracts are staffed by on-site BOP contract monitors who provide the BOP with real-time visibility into staffing levels and staff deployment. The BOP's monitoring of the Company's performance also includes a number of periodic checks, like Contract Facility Monitoring reviews, to identify any performance issues and recommend corrective actions.

The audit report asserts that the BOP and the Company have not addressed "the core issue" of the staffing finding, "which is the effect" of staffing levels on safety and security. Other objective audit, survey, and accreditation results discussed above, however, demonstrate that the Company does, in fact, maintain a safe and secure facility despite the OIG's staffing perception. Efforts at every level of the Company contributed to maintaining safety and security at Adams. We enhanced our disturbance control capability at the facility through additional training and the purchase of new and additional emergency response equipment and munitions, and continue to provide ongoing training to ensure staff's ability to manage disruptive behavior. The Company conducts quarterly training with all staff assigned to the Special Housing Unit (restrictive housing), and staff make frequent rounds through and conduct spot checks of those important areas, both live and via closed-circuit TV monitoring. Facility management ensures accountability at the highest levels by conducting live, on-site reviews of the facility's count time procedures on all shifts, along with live roster checks, and mandating frequent training on the most important security topics.

Nonetheless, we recognize that our efforts to enhance safety at the facility are continuing. Accordingly, the Company has formed stronger partnerships with Federal, State, and Local law enforcement. These improved relationships have resulted in, among other things, the filing of criminal charges against three persons for the introduction into or possession of contraband within the facility. A subsequent increase in the number of telephone calls made through the inmate telephone system suggests our efforts have succeeded in reducing contraband like cellphones. In short, despite the OIG's inappropriate methodology for assessing staffing, by a host of objective measures and independent reviews, the Company has complied with its contractual obligations and made improvements that have resulted in increased safety for inmates, staff, and the public.

**Recruiting and Retention**

The Company recognizes the importance of ensuring the facility is properly staffed for safe and secure operations, and has continuously and aggressively recruited for the Adams facility. Specific recruitment efforts at Adams have included advertising on numerous websites, posting flyers and handouts with the Mississippi Department of Employment Security and the Workforce Investment Network (WIN) Job Center in Natchez, participating in the Mississippi Law Enforcement Expo, and printing and distributing recruiting cards for staff to disseminate within the community.

Beyond those efforts, the Company has attended job fairs at the local high school with Open Session Foundation, a local mentoring and youth development program; fostered relationships at and conducted recruitment visits at Alcorn State University, Mississippi Valley State University, and Copiah-Lincoln Community College; provided a tour and presentation to members of the Natchez NOW Leadership

---

[4] It is particularly misleading for the audit report to include dollar figures to represent hypothetical invoice deductions that are not tied to or based on the contract's actual requirements.

Development program and leveraged its memberships with the Chamber of Commerce, Natchez, Inc., Rotary Club, Kiwanis, and Community Advisory Board to give recruitment presentations. The Company also partnered with agencies conducting force reductions for additional targeted recruiting efforts.

The audit report further compares the Company's employee qualifications and pay with BOP qualifications and pay and argues that any differences are the reason for staffing challenges. This comparison, however, falls outside of the audit's stated mission to assess the Company's contract performance and compliance. The Company establishes employee qualifications and pay that are consistent with American Correctional Association standards, industry standards, contract requirements, and regional conditions and factors specific to the labor market, including—as the audit report acknowledges—specifically applicable wage determinations published by the Department of Labor.

**B.**    **Our Ongoing Efforts to Ensure Effective Communication Between Inmates and Staff and Guarantee Productive Intelligence Gathering.**

The BOP has defined the mission of Adams as the housing of Criminal Aliens, non-United States citizens convicted of federal felonies. As a result, English is not the primary language of the vast majority of Adams inmates, and there is often a language barrier between many of the inmates and staff. The Company is committed to increasing effective communication between staff and inmates and has made significant strides in increasing the number of Spanish-speaking staff at Adams that can facilitate communication and guarantee productive intelligence gathering. Our general extensive recruiting efforts for Adams described above include a display on site at the WIN Job Center of Mississippi and nationwide position vacancy announcements aimed at Spanish-speaking applicants, and underscore our focus on recruiting and hiring Spanish speakers.

Since the contract began, we have relied on a variety of strategies to facilitate communication, including a translation service, Language Line Services, to conduct live, telephone translation for the inmate population. By using trained professional interpreters, we can reduce miscommunication, eliminate frustration, and ensure candid, open communication during medical examinations, investigative interviews, crises intervention, and responding to requests for assistance. All department managers have access to the language line, and recent expenditures on this service average $5,700 per month.

We have targeted the most critical needs for inmate management for recruitment and deployment of Spanish-speaking staff. These include staff tasked with intelligence gathering like the Special Investigative Supervisors area, in which three of the five staff members speak Spanish. We rely on these and other Spanish-speaking staff, the Language Line, and online translation tools to assist us with translations as needed, including during private interviews for intelligence gathering and assessment of written submissions. In addition, our contacts at the Mexican Consulate, who maintain frequent contact with our inmate population, serve as liaisons regarding inmate concerns, and our law enforcement contacts also help us to translate sensitive written correspondence, analyze evidence, and interview inmates. These contacts are one part of our multi-faceted intelligence gathering effort, which also includes, among other things, review of CCTV footage, electronic monitoring solutions, collaboration with local law enforcement and prosecutors to encourage prosecution of criminal activity that occurs within the facility and facilitate enforcement operations, education and training for staff in contraband, and cultivating relationships with inmate sources.

At this time, with a staff employment at 353, our 16 Spanish-speaking personnel, including a recently recruited Learning and Development Manager, make up 4.5% of our staff, and we have recruited a Spanish-speaking Unit Manager who will begin employment shortly and, again, increase the percentage of staff that speaks Spanish. We also have Spanish speaking staff in the Health Services and Psychology departments, the Education Department, recreation, security, and the institution's executive staff. We

9

are pleased to report that we meet the contract requirement, added in June 2015, for 50% of the Intelligence Office Staff to be Spanish-speaking, but recognize that our total number of Spanish-speaking staff currently falls slightly short of the separate requirement added at the same time for 5% of the overall staffing complement to be Spanish-speaking.

As we work to meet that element of the contract requirement and our own goals for Spanish speaking staff, we have taken several recent actions to boost recruiting and continue to promote communication.

First, we are currently actively recruiting bilingual personnel in Puerto Rico for employment at Adams, including by offering to pay relocation expenses. Our position announcements for Adams now specify that bilingual applicants are preferred. Second, we have held two Spanish Survival Skills for Correctional Workers classes through Command Spanish, Inc., in October 2015 and March 2016; another class is scheduled for November 28-29. At the same time, we continue to promote our English as a Second Language program for inmates at the facility.

The Company is committed to meeting this latest contractual requirement. But bilingual communication is, of course, just one element of responsiveness and open, professional communication and problem solving, and the Company is encouraged that the results of our internal Quality Assurance audit in March 2016 demonstrated inmates perceive Adams County staff as approachable, professional, responsive, and effective at resolving concerns with scores in those measured areas exceeding Company averages.

## C. Our Delivery of Quality Health Services In a Challenging Environment.

The Company takes seriously its obligation to provide health services to inmates entrusted to its care, and accordingly develops policies and procedures that meet or exceed the standards set by the American Correctional Association and two organizations that devote their work specifically to improving the quality of health services provided in corrections environments: the Joint Commission on Accreditation of Healthcare Organizations and/or the National Commission on Correctional Health Care.

We acknowledge that we have encountered challenges in recruiting and retaining health services staff at Adams. To combat those challenges, our health services team has aggressively recruited nurses and providers and, when vacancies persisted, launched a variety of other efforts to ensure timely and quality care to the inmates.

The facility is staffed with two physicians. Although physician turnover has occurred, we always endeavored to minimize the impact to the patients by, as discussed below, endeavoring to recruit another physician quickly and putting measures in place to supplement staffing in the meantime. Through our efforts, turnover resulted in no more than a five-month gap between physicians during the audit period; in several cases, as a physician left, another physician began prior to or immediately following that departure.

Our recruitment and retention efforts have involved a wide range of approaches including increases to pay and shift differentials for existing staff; recruitment through social media; vacancy postings on various professional websites (e.g., Health Callings, American Nurses Association, Nurses.com); local newspaper advertising; participation in local college career fairs and community job fairs; direct mailings to licensed health care professionals in the commuting area; and outreach to human resources staff in hospitals and other entities that were closing or laying off staff.

When a permanent provider has not been immediately available to fill a vacancy, we have contracted for locum tenens (*i.e.*, temporary) providers to fill the position while continuing our recruitment efforts. Locum tenens providers typically cost 50% to 100% more than a permanently placed provider per hour of service, which the Company absorbs. In multiple cases, we have retained physician placement firms to

10

56

assist us with recruiting. Our commitment to identifying additional means of providing health services, despite a higher cost, is further evidence of our commitment to providing necessary physician services to the inmates at Adams without regard to cost and refutes the audit report's implication that the Company might contemplate leaving positions vacant to avoid paying the salaries and benefits for those positions. The Company never purposefully declined to recruit for or fill a position based on the hypothetical manipulation of the vacancy deduction suggested in the report.

Moreover, in those periods when a physician position remained vacant, the Company ensured continuous patient care by staffing Adams with an additional mid-level provider not required by the staffing plan. Although the scope of practice of mid-level providers is not identical to physician providers, there is considerable overlap in the capability of these professionals. The Company has also supplemented services with other temporary mid-level provider coverage. To address nursing vacancies, the Company has drawn in nursing personnel from other facilities on a temporary basis. Similarly, other allied health positions (e.g., medical records) have served as a temporary resource for training and records corrective action when needed.

We recognize the importance of ensuring that the inmates entrusted to our care receive the appropriate health services, and we acted quickly and comprehensively to respond to the findings noted during the January 2015 Contract Facility Monitoring assessment, including those related to the five mortality cases. The Company implemented comprehensive corrective action to address each of the findings, including changes to the medicine distribution process to better ensure patient privacy and confidentiality; additional training, mock emergency drills, and the institution of an additional review process for emergency responses and mortality cases; and a chart review and database revision to better track preventative care baseline evaluations.

In addition, the Company's Headquarters & Facility Support Center (FSC) Compliance Coordinator, FSC Clinical Director of Operations, and FSC Regional Director of Health Services conducted multiple site visits to conduct chart reviews focused on assessing the effectiveness of processes, reviews, and compliance with the corrective action and overall general clinical practice. The FSC Quality Assurance Department also conducted a technical assistance visit at the facility to provide further guidance on addressing the deficiencies as well as to complete a full audit and provide feedback regarding the facility's quality control program. These efforts proved effective: In the October 2015 follow-up to the January 2015 assessment, the BOP acknowledged that the significant finding in health services, as well as the repeat deficiency and additional deficiency in health services, had been corrected.

The audit report identifies interviews of 12 inmates regarding the quality of healthcare.[5] By contrast to the concerns reported by that sample, Adams has recorded low numbers of health care and dental grievances that have steadily decreased since 2012:

- 2011: 25 grievances filed; 2 found in favor of the inmate.
- 2012: 32 grievances filed; none found in favor of the inmate.
- 2013: 17 grievances filed; none found in favor of the inmate.
- 2014: 15 grievances filed; none found in favor of the inmate.
- 2015: 9 grievances filed; none found in favor of the inmate.
- 2016 (year to date): 3 grievances filed; none found in favor of the inmate.

---

[5] To put this sample in context, the average daily populations at Adams last year and this year were 2,203 and 1,859 inmates, respectively.

Further, as the audit report itself reflects, outpatient services at Adams have been delivered approximately as timely as services at comparable BOP facilities. An internal annual inmate climate survey dating to 2012 reflects that inmate responses generally trended towards agreeing that they were able to see medical staff in a reasonable period of time and believed that medical staff would respond quickly to a life-threatening medical problem. Similarly, during the comprehensive questioning conducted by American Correctional Association auditors in 2014, there were "few complaints about the food or medical services."

During the audit timeframe, Adams was surveyed and re-accredited by the Joint Commission on Accreditation of Healthcare Organizations, an independent, not-for-profit organization that accredits and certifies nearly 21,000 health care organizations and programs in the United States. The Joint Commission again visited the facility this month, with similar results reported at the survey outbriefing. We received the Joint Commission's written report confirming that Adams had even further improved against the standards since the last survey in 2013, and expect confirmation of re-accreditation shortly.

### D. The Grievance Procedure Available to Inmates Is Consistent with the Goal of a Safe and Secure Facility and the BOP's Administration of a Performance-Based Contract.

In the portion of the audit report devoted to review of the BOP's formation and administration of the contract, OIG acknowledges that the Company clearly satisfied the contract requirement to establish a grievance procedure that allows inmates to seek formal review of an issue regarding any aspect of their confinement. Although the OIG notes "important differences" between the BOP and Company procedures, the grievance procedure available to Adams inmates nonetheless meets American Correctional Association standards and is consistent with the goal of a safe and secure facility and the BOP's administration of this performance-based contract.

First, the Company's procedure for any matter within the Company's scope of responsibility is to address grievances at the institutional level. This includes a multi-layer review that, as with all grievances, ultimately can be pursued through the federal courts. This grievance policy was specifically approved by the BOP in 2006 and again when it was updated in 2014.

Second, as required by the contract, in addition to this grievance procedure, the Company has developed procedures for inmates to file administrative remedy appeals for issues outside of the Company's scope of responsibility—the bounds of which are determined by the BOP—to the BOP. These grievance procedures reflect established, accepted divisions of responsibility between the Company and the BOP, and provide an accessible and compliant procedure for inmates to express and resolve problems.

### E. Our Work to Improve Our Support for the BOP's Administration of This Performance-Based Contract.

**Nutrition**

We are pleased that the audit found that the Company has been providing inmates with the nutritionally adequate meals required by the contract, and appreciate the audit's identification of two areas that presented opportunities for the Company to improve its internal controls and better support the BOP's administration of the contract. Specifically, after reviewing the audit's finding regarding the one-time lapse in the requirement to seek a registered dietician's approval of the menu on an annual basis, the Company's subcontractor instituted electronic reminders to prompt the dietician to institute the database-centered review and approval of the menu as scheduled. After reviewing the finding regarding the inconsistent application of dietary reference intake guidelines, the Company's subcontractor rolled out a new menu analysis program that better ensures application of the appropriate activity level.

12

58

*Billing*

The Company acknowledges that, for certain invoice deductions, our calculations did not always align directly with the portion of Service Contract Act wage determination and fringe benefits adjustments the OIG believes the Company should have made as a result of staffing vacancies, resulting in a $42,300 invoice overstatement over the audit's five-year period. The Company will work with the BOP to ensure that the BOP is credited appropriately.

The Company also acknowledges that it experienced a process failure regarding the inclusion of certain health services provider positions listed in the BOP-approved staffing plan in the staffing reports included with our invoices. This oversight stemmed from the Company's staffing of these positions through separate professional corporations, whose employee data is not included in the Company's employee information systems that are, in turn, the source of the staffing reports provided to the BOP.^ We disagree that this admitted error in reporting meant that the BOP was unaware of staffing levels in Health Services, because the BOP has a number of methods of oversight and quality assessment, including on-site contract monitors and audits that include Health-Services-specific components. Regardless, we understand the importance of reporting against the overall staffing plan, and the Company has corrected the reporting process in order to avoid this error in the future. The Company also is evaluating whether there are other opportunities for improvement in its reporting and billing processes, and looks forward to further study of this issue and, if appropriate, working collaboratively with the BOP to improve these processes in the future.

IV.    **CONCLUSION**

We are dedicated to our mission to advancing corrections through innovative solutions that benefit and protect all we serve, and appreciate the audit's efforts to identify areas for improvement in the execution and administration of the contract in the future. The Company remains committed to continued partnership with the BOP to ensure the safe and effective administration of Adams.

Sincerely,

Natasha K. Metcalf

---

^ As noted above, the audit report identifies an "incentive" for the Company to leave certain positions vacant because of the way in which BOP calculates vacancy deductions based on the longest vacant position. To reiterate, the Company never purposefully declined to recruit for or fill a position based on this hypothetical manipulation of the vacancy deduction.

13

# OFFICE OF THE INSPECTOR GENERAL
## ANALYSIS AND SUMMARY OF ACTIONS
## NECESSARY TO CLOSE THE REPORT

The Office of the Inspector General (OIG) provided a draft of this audit report to the Federal Bureau of Prisons (BOP) and CoreCivic, Inc., formerly Corrections Corporation of America or CCA, for review and official comment. The BOP's response is incorporated in Appendix 3 and CoreCivic's response is incorporated as Appendix 4. The BOP agreed with our recommendations and discussed the actions it will complete to address the recommendations. As a result, the status of the audit report is resolved. CoreCivic did not specifically address our recommendations but objected to several aspects of the methodology we used to assess staffing levels for Correctional and Health Services. The following provides the OIG analysis of the responses and summary of actions necessary to close the report.

**Analysis of CoreCivic Response**

While CoreCivic did not address our recommendations specifically, it responded to our findings in the areas of staffing, language barriers, the provision of health services, inmate grievance procedures, and the BOP's contract administration. In particular, CoreCivic reaffirmed its objection to the methodology we used to measure staffing levels at Adams County, as previously discussed in the report. CoreCivic asserted that the OIG's methodology is unprecedented and reiterated that the headcount-based reporting system in place is an industry standard practice endorsed by the American Correctional Association (ACA). CoreCivic also reemphasized that the OIG's methodology is inconsistent with the contract's requirements.

The report recognizes that CoreCivic was often in compliance with the contract staffing requirements as currently written and interpreted by both the BOP and CoreCivic. We also present and fully discuss both the nature and implications of the BOP's and CoreCivic's objections to our methodology.

However, none of those objections challenge the fact that, during 19 of the 38 months that followed the May 2012 riot, correctional services staffing at Adams County was at an even lower level than at the time of the riot, or that during that period CoreCivic delivered reports to the BOP that reflected improved staffing levels for 36 of those 38 months. This situation reflects an obvious impairment to the BOP's oversight efforts. Given that the BOP noted systemic staffing deficiencies as a contributing factor to the riot in May 2012, this impairment in oversight also has a predictable and negative effect on the safety and security of the facility. Our analytical approach allowed us to identify these risks because it provides for a more accurate portrayal of actual staffing levels within the Adams County facility than does a headcount methodology alone. We maintain that the approach of monitoring a contractor's staffing levels by focusing only on headcounts of

60

employed staff is insufficient to ensure adequate staffing, and that a monitoring system that considers the hours actually worked in addition to headcounts would be more effective.

In its response to the draft, CoreCivic asserted that its staffing plan was developed consistent with ACA standards. We acknowledge the ACA's roles in establishing best practices for the correctional industry and providing accreditation services for correctional facilities and programs. However, we also believe it is clear that the BOP needs additional controls to ensure that its contractor maintains staffing levels consistent with a safe and secure environment for both inmates and staff.

Finally, CoreCivic also stated, inaccurately, that our recommendation that the BOP modify the contract to improve the BOP's ability to monitor staffing levels has the effect of retroactively imposing a new standard. Our recommendation for modification of the contract has no retroactive implications.

**Recommendations for the BOP:**

1. **Modify the contract to provide specific procedures for CoreCivic to follow for measuring and reporting staffing levels so that the BOP will be able to monitor the extent to which required stations are actually covered.**

   Resolved. The BOP concurred with the recommendation and said it will modify the contract, consistent with the Federal Acquisition Regulation and subject to funds availability. The BOP stated that the modifications will provide procedures for CoreCivic to follow in measuring and reporting staffing levels so that the BOP can monitor coverage of required stations within the prison.

   CoreCivic did not agree or disagree with this recommendation but provided comments related to its objection to the audit methodology as discussed above.

   This recommendation can be closed when we receive documentation showing the BOP has established specific procedures for measuring and reporting staffing levels that reflect the actual extent to which the required stations are covered.

2. **Amend the contract modification that specified minimum levels of Spanish-speaking staff to incorporate specific deadlines for compliance, remedies for noncompliance, and the specific level of Spanish proficiency desired.**

   Resolved. The BOP concurred with the recommendation and said it will issue an additional contract modification that specifies minimum levels of Spanish-speaking staff, deadlines for compliance, remedies for noncompliance, and the level of Spanish proficiency desired. The BOP stated this modification will

61

be done consistent with the Federal Acquisition Regulation and subject to funds availability.

CoreCivic did not agree or disagree with this recommendation but acknowledged that it currently falls short of the contractual requirement for 5 percent of the overall staffing complement to be Spanish-speaking. The company also stated that it is continuing to actively recruit bilingual personnel and that it is committed to meeting the contractual requirement.

This recommendation can be closed when we receive documentation showing the BOP has issued a contract modification that establishes specific deadlines for compliance, remedies for noncompliance, and the specific level of Spanish language proficiency desired.

3. **Evaluate the extent to which employee qualification levels and turnover rates affect safety and security concerns, and whether its contractual terms should be modified to address those concerns.**

Resolved. The BOP concurred with the recommendation and said it will evaluate the extent to which employee qualification levels and turnover rates affect safety and security concerns. It will also evaluate whether its contractual terms should be modified to address those concerns.

CoreCivic did not agree or disagree with this recommendation and provided no comments on how qualification levels and turnover rates affect recruitment, retention, or ultimately the safety and security of the facility.

This recommendation can be closed when we receive documentation showing the BOP has determined the extent to which employee qualification levels and turnover rates affect safety and security, determined the extent to which contractual terms should be modified to address those concerns, and issued any such modifications determined to be appropriate.

4. **Ensure that CoreCivic reports the staffing levels for the entire staffing plan on its monthly invoices, to include positions filled by subcontractors and subsidiaries, as required by the contract.**

Resolved. The BOP concurred with the recommendation and said it will ensure that CoreCivic reports the staffing levels for the entire staffing plan on its monthly invoices. The reports will include positions filled by subcontractors and subsidiaries, as required by the contract.

CoreCivic did not agree or disagree with this recommendation but acknowledged that it experienced a process failure regarding the inclusion of certain positions in the staffing reports included with its invoices. CoreCivic stated that it has corrected its reporting process.

This recommendation can be closed when we receive documentation showing the BOP has established procedures to ensure that CoreCivic reports the

staffing levels for all positions included in the staffing plan on each monthly invoice.

5. **Remedy $42,300 in questioned costs related to overstated invoices submitted by the contractor for August 2010 through November 2015.**

Resolved. The BOP concurred with the recommendation and said it will remedy $42,300 in questioned costs related to overstated invoices.

CoreCivic did not agree or disagree with this recommendation but acknowledged that its calculations were at times inconsistent with the Service Contract Act and resulted in an overstatement of $42,300 in its invoices. The company stated that it will work with the BOP to ensure that the BOP is credited appropriately.

This recommendation can be closed when we receive documentation showing the BOP has remedied the $42,300 in questioned costs related to overstated invoices.

6. **Implement additional administrative remedy procedures for its contract prisons to ensure that inmates are afforded fair opportunities to appeal their grievances to the BOP Regional Director and General Counsel, or other equivalent BOP levels outside of the inmates' local facilities.**

Resolved. The BOP concurred with the recommendation and said it will implement additional administrative remedy procedures for contract prisons. These procedures will ensure that inmates are afforded fair opportunities to appeal grievances to the BOP Regional Director and General Counsel, or other equivalent BOP levels outside of the inmates' local facilities.

CoreCivic did not agree or disagree with this recommendation but stated that the company satisfied the contract requirement to establish a grievance procedure. The company also stated that the grievance procedure available to the Adams County inmates met ACA standards. However, the BOP has established grievance procedures for BOP-operated facilities that exceed ACA standards. This report highlights the disparate treatment of federal inmates who are under BOP responsibility in contract facilities compared to inmates who are incarcerated in BOP-managed facilities.

This recommendation can be closed when we receive documentation showing the BOP has implemented additional administrative remedy procedures for its contract prisons to ensure that inmates are afforded fair opportunities to appeal their grievances to the BOP Regional Director and General Counsel, or other equivalent BOP levels outside of the inmates' local facilities.

Case 3:16-cv-02267   Document 401-12   Filed 01/22/21   Page 71 of 74 PageID #: 22206

7. **Review all available guidance for performance-based acquisitions and implement additional, objectively measurable performance standards that can be effectively assessed for each contract requirement pertaining to staffing, inmate grievances, and food services.**

   <u>Resolved.</u> The BOP concurred with the recommendation and said it will review all available guidance for performance-based acquisitions and implement additional performance standards. These standards will permit objective measurement of requirements for staffing, inmate grievances, and food service. The BOP stated that if the standards require a contract modification, the modification will be consistent with the Federal Acquisition Regulation and pursuant to funds availability.

   CoreCivic did not agree or disagree with this recommendation but acknowledged the opportunities to improve its internal controls. The company stated that, after reviewing the dietary finding, its subcontractor began using a new menu analysis program that better ensures application of the appropriate activity level.

   This recommendation can be closed when we receive documentation showing the BOP has implemented additional, objectively measurable performance standards that can be effectively assessed for each contract requirement pertaining to staffing, inmate grievances, and food service.

8. **Develop and implement mandatory procedures for calculating invoice deductions to ensure that deductions are computed consistently and do not inappropriately allow unfavorable contractor performance.**

   <u>Resolved.</u> The BOP concurred with the recommendation and said it will develop and implement mandatory procedures for calculating invoice deductions. These procedures will ensure that deductions are computed consistently and do not inappropriately allow unfavorable contractor performance.

   CoreCivic did not agree or disagree with this recommendation but suggested the report implied that the company may have left positions vacant to avoid paying the salaries and benefits for those positions and choosing to suffer a lesser penalty of a vacancy deduction. The company stated that it had never purposefully declined to fill a position based on any manipulation of vacancy deductions. This report identified a risk based on weaknesses identified in the procedures for calculating invoice deductions. However, the report neither states nor implies that CoreCivic may have engaged in this type of activity.

   This recommendation can be closed when we receive documentation showing the BOP has implemented mandatory procedures for calculating invoice deductions to ensure that deductions are computed consistently and do not inappropriately allow unfavorable contractor performance.

**9. Implement additional invoice verification procedures to ensure that CoreCivic has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions.**

<u>Resolved.</u> The BOP concurred with the recommendation and said it will implement additional invoice verification procedures to ensure that CoreCivic has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions.

CoreCivic did not agree or disagree with this recommendation and provided no related comments.

This recommendation can be closed when we receive documentation showing the BOP has implemented additional invoice verification procedures to ensure that CoreCivic has complied with all contract requirements related to billings and has accurately calculated and reported all necessary deductions.

Case 3:16-cv-02267   Document 401-12   Filed 01/22/21   Page 73 of 74 PageID #: 22208

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations. Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig