EXHIBIT 89
[Filed Under Seal]

Office of Acquisition Management

U.S. Department of Homeland Security
801 I Street, NW
Washington, DC 20536



**U.S. Immigration and Customs Enforcement**

NOV 08 2016

Mr. Damon Hininger
Chief Executive Officer
Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, TN 37215

Dear Mr. Hininger:

As you know, U.S. Immigration and Customs Enforcement (ICE) takes extremely seriously the health and safety of aliens detained in our custody. We have read with concern media reporting which indicates that the medical unit at the Cibola County Correctional Center, in Milan, New Mexico, had repeatedly failed to comply with federal standards of care for Bureau of Prisons (BOP) inmates. Pursuant to Article 2 A of the Inter-Governmental Service Agreement (IGSA) entered into between ICE and Cibola County on October 27, 2016, entitled "Commencement of Services," the Facility must meet ICE requirements and be in compliance with the ICE 2011 Performance-Based National Detention Standards (PBNDS). In particular, Article 2 A specifically allows ICE to perform numerous assessments to ensure compliance prior to presenting detainees for housing.

One of the media accounts that causes ICE particular concern (attached) states that, in April 2014, BOP monitors found that Cibola's medical unit was operating far out of compliance with federal standards, and the agency warned Corrections Corporation of America (CCA) to correct course; however, when the monitors returned they discovered that CCA failed to comply. The noncompliance was alleged to have occurred on several occasions. Accordingly, given our commitment to immigration detainee health and safety, and consistent with Article 2 A of the IGSA, ICE requests that you provide the following information:

1. What areas with the medical unit were out of compliance in 2014?
2. What actions did CCA and/or Cibola County take to correct the deficiencies?
3. Why were the deficiencies not corrected?
4. Was there an inspection by BOP of the medical facilities for 2015 and 2016?
5. What deficiencies were noted in those investigations?
6. What actions did CCA take to overcome the identified deficiencies?
7. Did BOP accept that the actions of CCA and/or Cibola overcame the noted deficiencies? If not, what deficiencies remained? Why were these not corrected? What deficiencies were resolved?
8. The article notes that prisoners had not been treated appropriately for tuberculosis (TB) for five consecutive years. What protocols are in place at Cibola for the detection and treatment of TB? What deficiencies were noted in inspections? What changes, if any, have been made for the detection and treatment of TB? How many prisoners are alleged to have not received proper treatment for TB? What obstacles hampered compliance with the treatment of TB?
9. The article also notes a multi-year pattern of deficient care for patients with the Human Immunodeficiency Virus (HIV). What protocols are in place at Cibola for the detection and treatment of HIV? What deficiencies were noted in inspections? What changes, if any, have

CONFIDENTIAL                                                                    CORECIVIC_0185119

been made for the detection and treatment of HIV? How many prisoners are alleged to have not received proper treatment for HIV? What obstacles hampered compliance with the treatment of HIV?
10. Further, the article mentions that for the last four inspections, Cibola failed to properly assess inmates for medical issues. What protocols are in place at Cibola to assess inmates for medical issues? What deficiencies were noted in inspections? What changes, if any, have been made for the assessment of detainee medical issues? How many prisoners are alleged to have not received proper treatment for medical issues? What obstacles hampered compliance with the treatment of detainee medical issues?
11. How many deaths have occurred at Cibola over the last five years? Please list what the cause of death was and any investigations concerning the deaths? Was a determination made of medical negligence? Please list by prisoner name or identifier.
12. Please list all claims and/or law suits made for medical negligence at Cibola in the last five years, describing the area of medical negligence, the prisoner's name or identifier, and the result of the claim or lawsuit.
13. Please list all inmate or Non-Governmental Organizations complaints regarding medical care at Cibola during the last two years.
14. Was the prior contractor at Cibola for medical services Correct Care Solutions (CCS)? If so, how long has CCS been the medical care provider at Cibola? Which facilities has CCS provided medical services to during the last five years?
15. Please provide the credentialing files for all medical (including mental health and dental) staff that will staff the current contract at Cibola. With the credentialing files, please state what duties the person will be providing along with a staffing chart by provider's name. If not in the file, please indicate any claims or lawsuits made against each individual provider and the results of the claim or law suit.
16. A recent article in the *Washington Post* (attached) states, quoting the American Civil Liberties Union, that Cibola "was found unfit and unsuitable for federal prisoners." Has such a determination been made regarding Cibola? If so, who made the finding and what was the basis for the finding?
17. What were the results of inspections of the facility by the National Commission on Correctional Health Care (NCCHC)? Did Cibola meet all of the standards? Can you provide ICE with a copy of the inspections?
18. What was the average response time from when a request for medical services is made and the provision of the services during the last two years?

We would ask that you provide the information requested above no later than November 14, 2016. You may provide the information via email to William Quigley, Deputy Assistant Director, Office of Acquisition Management. Thank you for your cooperation. We are hopeful that your responses will help us ensure the ability of the facility to comply with ICE requirements and meet our obligations to our detainees.

Sincerely,

J. William Weinberg
Head of the Contracting Activity

Attachments

CONFIDENTIAL                                                                                          CORECIVIC_0185120



(https://www.thenation.com/login/)

CRIMINAL JUSTICE    IMMIGRATION POLICY
SPECIAL INVESTIGATION: DYING IN PRIVATE PRISONS

# The Feds Will Shut Down the Troubled Private Prison in a 'Nation' Investigation

*The facility is among several in which our reporting has uncovered dozens of deaths that involved substandard medical care.*

By Seth Freed Wessler

AUGUST 15, 2016



A storm forms over Interstate 40 in New Mexico near Cibola County Correctional Facility, a private prison that will close at the end of September. *(Reuters / Lucas Jackson)*

Case 3:16-cv-02267    Document 401-14    Filed 01/22/21    Page 4 of 14 PageID #: 22202
CONFIDENTIAL                                                                                    CORECIVIC_0185121

The BOP notified one of the country's leading private prison companies, Corrections Corporation of America, on July 29 that a long-troubled federal prison the company had operated for 16 years will be closed down. The notice is exceptional in the BOP's history of overseeing its privatized prisons—in the last decade, it has ended only three other private prison contracts before they were set to expire—and it follows reporting by *The Nation* and the Investigative Fund that documented poor medical care at the prison, including at least three questionable deaths.

The minimum-security Cibola County Correctional Center, in Milan, New Mexico, holds 1,200 prisoners, all noncitizens convicted of federal crimes, who will be moved to other prisons before the facility is shuttered at the end of September.

Cibola is one of several facilities that have been the focus of a *Nation* and Investigative Fund series that has uncovered dozens of questionable deaths in 11 privatized federal prisons. Drawing from 30,000 pages of previously unreleased federal records obtained through an open-records lawsuit, we documented dozens of premature deaths following shoddy medical care in these federal prisons, which are used to hold noncitizens. The documents, as well as interviews with former BOP officials and contractors' medical staff, reveal the BOP's own oversight monitors issuing

increasingly stern warnings about medical neglect, understaffing of medical units, and underperforming internal quality-control systems. Yet federal administrators repeatedly extended contracts at the same prisons that the agency's monitors declared to be in trouble.

The standard contract offers private companies a 10-year agreement to operate the prisons. Cibola marks only the fourth time in the last decade that the BOP has walked away from a contract prior to the end of that 10-year period. Each time it has done so, including with CCA's Cibola contract, it has ended the contracts as no-fault terminations. Not once has the BOP terminated a contract for default, which could negatively affect a company's ability to acquire a new federal contract.

The last privatized federal prison to lose a contract before the end of the normal 10-year agreement was the Willacy County Correctional Center in southern Texas. As I reported in *The Nation* last year, Willacy erupted in a major riot in February 2015, after guards responded to a protest over medical care with tear gas and rubber bullets. The prisoners so ransacked that facility that the BOP declared it uninhabitable and was forced to end the contract it had signed with Management & Training Corporation.

Case 3:16-cv-02267   Document 401-14   Filed 01/22/21   Page 6 of 14 PageID #: 12204
CONFIDENTIAL                                                                    CORECIVIC_0185123

As *The Nation* detailed in June, Cibola has been among the BOP's most problem-prone private prisons, accumulating more demerits from BOP monitors than any other private facility for repeated and systemic violations in the medical unit. Prison medical staff repeatedly failed to evaluate and treat patients in accordance with policy, and for months on end the prison operated without a single medical doctor.

CCA's spokesperson Jonathan Burns told *The Nation* in an e-mail that the company is "disappointed with the decision" to end the Cibola contract, which was not set to expire until 2020. He did not reply to a question about any attempts by the company to address medical deficiencies.

The Bureau of Prisons did not respond substantively to questions about whether the decision to close Cibola was related to documented health-services problems. A BOP spokesperson wrote, "The Bureau decided it was not in our best interests" to extend the contract.

In April 2014, BOP monitors found Cibola's medical unit was operating far out of compliance with federal standards, and the agency warned CCA to correct course. When monitors returned, however, they discovered that CCA had failed to comply. For the fifth time in a row, monitors found that the prison hadn't appropriately treated inmates with TB. For the third consecutive time, HIV care was also not up to standard. For the fourth time, inmates were not

CONFIDENTIAL  CORECIVIC_0185124

properly assessed for medical issues. And the oversight monitors discovered a prisoner had died after a long delay in care following a heart attack.

"The contractor failed to implement corrective action for the past 5 years," a BOP official wrote CCA in a 2015 letter I obtained last week, through my open-records lawsuit.

The BOP continued to warn CCA about the facility, and it even appeared to show some improvement, according to BOP records. But in March of 2015 another prisoner died: a 39-year-old Mexican man named Jelacio Martinez-Lopez, whom federal officials had previously flagged as suicidal, hanged himself after he was left alone and untreated in a cell.

Renee Wilkins, a psychologist, served as Cibola's mental-health director for a decade until her retirement shortly after Martinez-Lopez's suicide. She said last week that the prison's health and mental-health departments were consistently understaffed, and that she lacked necessary resources to treat seriously mentally ill patients.

Despite what Wilkins called "constant problems with staffing of our medical department," an issue the BOP has noted across the federal prison system, BOP administrators have renewed or extended the agreement with CCA nine times since the Cibola contact was first inked in 2000.

CONFIDENTIAL CORECIVIC_0185125

"The Bureau of Prisons' decision to cancel the Cibola private prison contract is welcome but long overdue," said Carl Takei of the ACLU, "given the Corrections Corporation of America's well-documented, sometimes deadly history of failing to meet contractually mandated medical standards. But it's important to remember that the bureau still contracts with 10 other private prisons that hold noncitizen prisoners with little transparency, limited oversight, and similarly grisly records."

The Department of Justice's inspector general last week released an investigation of the bureau's system of contract prisons and the federal oversight of them. The report found that on a set of safety measures the private prisons, which at the time of the study held 22,000 men, performed more poorly than BOP-run facilities. In the area of medical care, the BOP's efforts to monitor the prisons were hobbled by poor communication between various parts of the oversight infrastructure, and weak evaluation tools. When prisoners died in the contract facilities, the investigators discovered, the bureau had not set up adequate procedures "to require corrective action from the contractor." Echoing our own investigation, the report said that problems went "uncorrected for extended periods," because the BOP had no systems in place to "proactively take action before a problem becomes acute or systemic."

CONFIDENTIAL    CORECIVIC_0185126

In the next nine months, 10 more contracts will be up for renewal or extension. "The bureau should be moving more quickly to shut down this entire network of shadow prisons," Takei added.

## 4 COMMENTS

SETH FREED WESSLER    Seth Freed Wessler is an independent journalist and Senior Fellow at the Schuster Institute for Investigative Journalism. He is the recipient of a 2014–15 Soros Justice Media Fellowship.

To submit a correction for our consideration, click *here*.
For Reprints and Permissions, click *here*.

**The Washington Post**

National Security

# The Justice Department closed this troubled private prison. Immigration authorities are reopening it.

By Matt Zapotosky October 27

When the Justice Department announced two months ago that it wanted to end the use of private prisons, Cibola County Correctional Center was exactly the kind of facility that officials desired to shut down. After a history of questionable deaths and substandard medical care, the New Mexico facility lost its contract. In recent weeks, it was emptied of inmates.

But the vacancies won't last for long.

As soon as this week, U.S. Immigration and Customs Enforcement — which is separate from the Justice Department — is going to begin moving immigrant detainees into the facility under a new set of agreements with Corrections Corporation of America, a county official said.

The country's immigration enforcement agency is expanding its use of for-profit prisons, even while another government agency says the facilities are less safe and effective than government-run prisons. The move illustrates the difficulties of ending the government's reliance on private prisons and jails, especially as immigration authorities deal with an influx of detainees.

Case 3:16-cv-02267 Document 401-14 Filed 01/22/21 Page 11 of 14 PageID #: 22269
CONFIDENTIAL CORECIVIC_0185128

In addition to inking a new contract for up to 1,116 beds at Cibola County, Immigration and Customs Enforcement, or ICE, recently extended a contract with Corrections Corporation of America for a 2,400-bed facility in Texas. The agency also seems to be eyeing jail space in Youngstown, Ohio, where Corrections Corporation of America has posted advertisements for several job openings, according to the American Civil Liberties Union.

The Justice Department's announcement in August that it would eventually stop using private prisons was a significant critique of the industry. Deputy Attorney General Sally Yates wrote that for-profit facilities "do not maintain the same level of safety and security" as government-run prisons.

Yates referred to an inspector general report that found private facilities had higher rates of assaults and eight times as many contraband cellphones confiscated each year on average. The report listed many examples of mayhem at private facilities, including a May 2012 riot at the Adams County Correctional Center in Mississippi in which 20 people were injured and a correctional officer was killed. That incident, according to the report, involved 250 inmates who were upset about low-quality food and medical care.

Jennifer D. Elzea, an ICE spokeswoman, said in a statement the agency was "committed to providing a safe and humane environment for all those in its custody." She said the agency used various contractors and other arrangements to house inmates "to meet the agency's detention needs while achieving the highest possible cost savings for the taxpayer."

The Department of Homeland Security, of which ICE is a part, said soon after the Justice Department's announcement that it would consider whether to follow suit. The department has created a subcommittee to study the issue, and its evaluation is due Nov. 30. If DHS ultimately decides to end its use of private prisons, the long-term future of a facility such as Cibola would be unclear.

Gang- and drug-related violence in El Salvador, Guatemala and Honduras has been driving a surge of asylum seekers from Central America, who are winding up in the detention centers. Until two years ago, such asylum seekers were generally not held in detention.

For the first years of the Obama administration, the United States kept fewer than 100 beds for family detention, but — under pressure to show border security was of concern — had plans to expand to more than 3,000 beds by the end of 2014.

As of August, ICE had an average daily population of 33,957 across the facilities it uses, according to data provided by the agency.

Case 3:16-cv-02267 Document 401-14 Filed 01/22/21 Page 12 of 14 PageID #: 22270

CONFIDENTIAL CORECIVIC_0185129

On Wednesday, the ACLU sent a letter to that subcommittee blasting Immigration and Customs Enforcement for moving forward with private prison contracts while the advisory council's review was ongoing.

Singling out the Cibola facility in particular, the advocacy organization wrote that the case "illustrates how CCA is literally operating a revolving door — shuttling out prisoners one month, shuttling in immigration detainees the next month."

"It's astonishing that a prison that was found unfit and unsuitable for federal prisoners is now going to be used to lock up immigration detainees," said Joanne Lin, legislative counsel with the ACLU's Washington Legislative Office.

Lin acknowledged that immigration detention rates have "exploded," which she attributed to the government's tough stance on detaining asylum seekers crossing the southern border. Those detainees are not criminals, but often people who have fled countries where violence has grown rampant.

A Corrections Corporation of America spokesman did not return messages seeking comment.

In the meantime, demand remains for the facilities to remain open, one way or another.

Cibola County Board of Commissioners Chair T. Walter Jaramillo said local authorities had been pushing for the private prison deal since the Bureau of Prisons decided to end its contract to use the facility this summer.

"It's employment," Jaramillo said, adding the contract would prevent 350 people from losing jobs. "It's all about the economics in the community."

At the time of the Justice Department's directive, the Bureau of Prisons had just 13 contract facilities, including Cibola, totaling a little more than 22,000 inmates.

Facilities contracted by both the Bureau of Prisons and ICE house those in the country without documentation. The Bureau of Prisons is responsible for those convicted of federal crimes, while ICE detains illegal immigrants convicted of state offenses that render them deportable and those pursuing asylum or other claims in immigration court.

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　CORECIVIC_0185130

The private-prison industry has been lobbying against the Justice Department's directive to end the use of its facilities. The industry has argued that the government's comparison of for-profit facilities to government-run prisons was unfair because they house different populations.

Officials have said the successful implementation of the directive depends on continued reductions in the federal prison population. As the inmate population goes down, the Bureau of Prisons plans to modify or allow contracts with private prison operators to expire, with the goal of ultimately ending their use entirely.

Matt Zapotosky covers the Justice Department for the Washington Post's National Security team.    Follow @mattzap

CONFIDENTIAL

CORECIVIC_0185131