# EXHIBIT 97
# [Filed Under Seal]



Exhibit 552
Marlowe, J.
10/16/20
@plus

| | |
|---|---|
| **From:** | Katie Lilley [katielilley@hillenby.com] |
| **Sent:** | 10/25/2011 9:12:18 PM |
| **To:** | SIMON HAKIM [shakim@temple.edu] |
| **CC:** | ERWIN A. BLACKSTONE [erwin.blackstone@temple.edu]; ANDREW J. BUCK [andrew.buck@temple.edu]; Owen, Steve [Steve.Owen@cca.com]; Rob Hoppin [robhoppin@hillenby.com] |
| **Subject:** | Re: Prposal on Private vs. Public Prisons |
| **Attachments:** | NYT Private Prisons Found to Offer Little in Savings 05.18.11.doc; Utah Criminal Justice Center April 2007.pdf; Policy Matters Ohio April 2011.pdf; AZ Auditor General Report Sept. 2010.pdf; Florida Center for Fiscal and Economic Policy April 2010.pdf; ACLU_Prisons for Profit_April 2011 (1).pdf; JPI_Gaiming the System_June 2011.pdf; CCA Arizona Impact Report_2009_FINAL_011810.pdf; MTC Privatization in Corrections-Final.pdf |

Drs. Hakim, Blackstone and Buck,
Thank you all for your time last week. We have provided responses to the questions you had below and are happy to answer any additional ones that you have.

1. Please send us the references or the actual reports on the "agenda driven anti PPP studies".

I have attached several studies that might be helpful to you. First is not a study, but a New York Times article that captures much of the general sentiment around the cost savings issue. Beyond that, I've included reports on the savings issue from the Utah Criminal Justice Center, Policy Matters Ohio, the Arizona Auditor General and the Florida Center for Fiscal and Economic Policy. Additionally, you will find reports from the ACLU and Justice Policy Institute that are broader condemnations of private prisons but still touch on the savings issue.

I also wanted to share with you a few more positive pieces. I sent over the Vanderbilt study CCA commissioned after we had our meeting last month. I've included here a study CCA commissioned in Arizona, as well as a recent study from CCA competitor MTC, just for background.

2. In a second thought, the relevant comparison between public and private run prison relates to the level of security of a prison. We might consider two prisons that are similar in that respect. It is not difficult to correct for wage differences between states for the same security level prison.

The challenge with such a targeted comparison, as we discussed on the call, is that CCA potentially crosses that sensitivity threshold where the company ends up pointing the finger at a specific government partner that they work with, with potential repercussions with them as well as with other customers not selected. It's also nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public costs/factors.

I think we prefer instead the idea of a regional approach, where we compare CCA data on cost/quality to regions of the country. In that approach, the priority regions to research/compare with would be the Northeast and Midwest, followed by the West, Rocky Mountains, and/or Pacific Northwest. The South and Southeast are not targets as the costs are generally so low for everyone. Keeping in mind that this profession (public or private) is a labor-intensive cost, and that factors such as pension costs are more significant and readily available in the above mentioned regions, this approach seems to make more sense. It also enables us to put CCA in the best possible light by averaging our performance/costs, as opposed to depending on a specific facility(ies) which may or may not put our best foot forward.

3. Are we dealing also with the capital/construction aspects of prisons, contructing-out specific prison services? We discussed only the complete management/operation issue.

We should be comprehensive and look at both construction and operational aspects, as well as ancillary benefits (government being able to divert funds/resources to other needs, improvements to existing public systems, etc). We would, however, like to be able to separate the savings out for the different phases. Also, an important piece of this is the "how." How does the company save money and offer higher quality -- technology, efficient design, procurement, etc.

BLACKSTONE0000080

We look forward to your proposal. As discussed, we will look for a range of options in the proposal (modest, medium and most extensive). For each, we'd like to have a general sense of the methodology, a proposed timeline for completion and a budget. As part of that budget, please include some of your time following the completion of the study for media interviews, etc.

We provided regional guidance above, but we will also provide some specific target states as soon as we can. I've included the contact information for Steve and Rob below. (They also are both cc'ed on this email.)

Steve Owen
Senior Director, Public Affairs
Corrections Corporation of America
615-263-3107
steve.owen@cca.com

Rob Hoppin
President
Hillenby
703-889-8504 x1
robhoppin@hillenby.com

Thanks,
Katie

On Fri, Oct 21, 2011 at 1:12 PM, SIMON HAKIM <shakim@temple.edu> wrote:

Hi Katie,


Thank you very much for arranging and directing the telephone conference of today. We are very interested in studying the topic of PPP in correctional institutions. As you may know, our Center for Competitive Government has conducted several studies, published academic and professional articles and published books in this field (see, www.fox.temple.edu/ccg). We have few requests for the preparation of our proposal:


1. Please send us the references or the actual reports on the "agenda driven anti PPP studies".

2. In a second thought, the relevant comparison between public and private run prison relates to the level of security of a prison. We might consider two prisons that are similar in that respect. It is not difficult to correct for wage differences between states for the same security level prison.

3. Are we dealing also with the capital/construction aspects of prisons, contructing-out specific prison services? We discussed only the complete management/operation issue.


We are looking forward to hearing from you. Best regards, Simon Hakim.


---

**From:** Katie Lilley [katielilley@hillenby.com]
**Sent:** Monday, October 17, 2011 6:34 PM
**To:** SIMON HAKIM
**Cc:** ANDREW J. BUCK; ERWIN A. BLACKSTONE
**Subject:** Re: Discussion on Potential Study

BLACKSTONE0000081

Hello all,
I sent a calendar invite today for the meeting, but just to confirm:

Friday 10/21
11:00 a.m. - 12:00 p.m. Eastern
Call-In Number: 703-889-8504; Press "1" to dial by extension; Enter "111" as extension; Password: 1216

Look forward to speaking with you then,
Katie

On Mon, Oct 17, 2011 at 9:31 AM, SIMON HAKIM <shakim@temple.edu> wrote:

Hi Katie.


We are o.k. for this coming Friday at 11. Best regards, Simon Hakim.

**From:** Katie Lilley [katielilley@hillenby.com]
**Sent:** Thursday, October 13, 2011 4:53 PM
**To:** SIMON HAKIM; ERWIN A. BLACKSTONE
**Subject:** Discussion on Potential Study

Dr. Hakim and Dr. Blackstone,
Thank you again for meeting with Tony Grande and me in Philadelphia a couple of weeks ago. We are interested in seeing what opportunity there may be to work with you on a study of partnership corrections. Could you provide us some times you might be available next week to have a conference call with our team? We want to take a few minutes to lay out our thoughts on such a study and answer any questions you might have. Following that, we would like to see if we can get a proposal from you. Appreciate your help on this.
Thanks,
Katie


--
Katie Lilley
o: 703-889-8504 x2
c: 202-253-5026
katielilley@hillenby.com
www.hillenby.com
-------------------------------------
The information contained in this communication is confidential and is intended only for use of the addressee. It is the property of Hillenby, LLC. Unauthorized use, disclosure, or copying of this communication is prohibited. If you have received this communication in error, notify Hillenby, LLC immediately and destroy this e-mail including all attachments.


--
Katie Lilley
o 703-889-8504 x2

BLACKSTONE0000082

c: 202-253-5026
katielilley@hillenby.com
www.hillenby.com

The information contained in this communication is confidential and is intended only for use of the addressee. It is the property of Hillenby, LLC. Unauthorized use, disclosure, or copying of this communication is prohibited. If you have received this communication in error, notify Hillenby, LLC immediately and destroy this e-mail including all attachments.

--
Katie Lilley
o: 703-889-8504 x2
c: 202-253-5026
katielilley@hillenby.com
www.hillenby.com

The information contained in this communication is confidential and is intended only for use of the addressee. It is the property of Hillenby, LLC. Unauthorized use, disclosure, or copying of this communication is prohibited. If you have received this communication in error, notify Hillenby, LLC immediately and destroy this e-mail including all attachments.

BLACKSTONE0000083

# The New York Times

May 18, 2011

# Private Prisons Found to Offer Little in Savings

By **RICHARD A. OPPEL** Jr.

PHOENIX — The conviction that private prisons save money helped drive more than 30 states to turn to them for housing inmates. But Arizona shows that popular wisdom might be wrong: Data there suggest that privately operated prisons can cost more to operate than state-run prisons — even though they often steer clear of the sickest, costliest inmates.

The state's experience has particular relevance now, as many politicians have promised to ease budget problems by trimming state agencies. Florida and Ohio are planning major shifts toward private prisons, and Arizona is expected to sign deals doubling its private-inmate population.

The measures would be a shot in the arm for an industry that has struggled, in some places, to fill prison beds as the number of inmates nationwide has leveled off. But hopes of big taxpayer benefits might end in disappointment, independent experts say.

"There's a perception that the private sector is always going to do it more efficiently and less costly," said Russ Van Vleet, a former co-director of the University of Utah Criminal Justice Center. "But there really isn't much out there that says that's correct."

Such has been the case lately in Arizona. Despite a state law stipulating that private prisons must create "cost savings," the state's own data indicate that inmates in private prisons can cost as much as $1,600 more per year, while many cost about the same as they do in state-run prisons.

The research, by the Arizona Department of Corrections, also reveals a murky aspect of private prisons that helps them appear less expensive: They often house only relatively healthy inmates.

BLACKSTONE0000084

"It's cherry-picking," said State Representative Chad Campbell, leader of the House Democrats. "They leave the most expensive prisoners with taxpayers and take the easy prisoners."

In the 1980s, soaring violent crime, tougher sentencing and overcrowding led lawmakers to use private prisons to expand. Then, as now, privatization advocates argued that corporations were more efficient. Over time, most states signed contracts, one of the largest transfers of state functions to private industry.

Nationally, the number of state inmates in private prisons grew by a third over the past decade to more than 90,000, but it has stagnated, and some states have reduced total prison populations — shifting nonviolent offenders to treatment programs while bolstering probation. Now, Ohio lawmakers want to privatize prisons with 6,000 inmates, and Florida will transfer institutions with 15,000 inmates to private management. The Arizona plan would add 5,000 private prison beds.

Matthew Benson, spokesman for Gov. Jan Brewer of Arizona, a Republican, did not dispute the state research. But he said officials had a "pretty wide lens" to interpret the cost-savings mandate, like taking into account the ability of private companies to recoup hundreds of millions in construction costs over the life of contracts.

"It is a significant advantage to have a private firm be able to come in and front the costs," he said.

Privatization advocates play down the data. Leonard Gilroy, director of government reform for the Reason Foundation, a libertarian research organization, questioned whether all costs were included and said the figures were too narrowly drawn, particularly on medium-security prisons, to prompt conclusions. "It is looking at a limited slice," Mr. Gilroy said.

Competing studies — some financed by the prison industry — have argued over claims of savings. But when a University of Utah team including Mr. Van Vleet reviewed years of research, it concluded in 2007 that "cost savings from privatizing prisons are not guaranteed and appear minimal."

Steve Owen, spokesman for the largest operator, Corrections Corporation of America, said: "There is a mixed bag of research out there. It's not as black and white and cut and dried as we would like."

BLACKSTONE0000085

A number of states mandate that contracts save money. But Arizona is one of the few — if not only — places to measure the outcome so rigorously.

While private prisons collect a daily rate per inmate, some expenses disproportionately borne by states are not counted. The most significant are terms limiting sicker inmates.

Five of eight private prisons serving Arizona did not accept inmates with "limited physical capacity and stamina" or severe physical illness or chronic conditions, according to the state's analysis, issued last month. None took inmates with "high need" mental health conditions. Some inmates who became sick were "returned to state prisons due to an increase of their medical scores that exceeds contractual exclusions."

"Unlike the private contractors," the analysis said, the state "is required to provide medical and mental health services to inmates regardless of the severity of their condition." Medical costs averaged up to $2.44 a day more for state inmates, a third higher than private prisons.

That gap can be wider. In Florida, officials found that two private prisons spent only about half as much on health care per inmate as comparable state prisons, a difference of $9 million over two years. Florida officials say that the new plan will better balance costs, and that private prisons comply with a 7-percent-savings law. But skeptics like State Senator Mike Fasano, a Republican, fear cherry-picking may be the only way they can do that.

In Arizona, minimum-security state inmates cost 2.6 percent — or $1.39 per day — more than those in private prisons, before accounting for extra costs borne by the state. But after eliminating these, state prisoners cost only three cents more per day, the analysis found.

And state medium-security inmates cost 4.4 percent less before adjustments and 8.7 percent less afterward. That is more than $2 million annually at one prison, or $1,679 per inmate. Using 2009 corrections data, state auditors calculated the difference at up to $2,834 per inmate.

Charles L. Ryan, the Arizona corrections director, said private prisons "often negotiate restrictions on the type of inmates" and limit "inmates with medical conditions to a specific cost level." The new contracts seek to reduce this practice.

BLACKSTONE0000086

Mr. Owen did not dispute the Arizona research, but said the industry saved money. He pointed to a study — partly financed by the industry — that found states with private prisons had lower growth in public prison costs.

"We do provide value to our government partners," he said.

However, Mr. Owen acknowledged that most contracts had cost caps, and that terms barring the sickest prisoners were not unusual. He said his company never voiced a preference for such terms. "The myth is that we are somehow hand-selecting" inmates.

According to Arizona officials, the data account for costs as varied as guards' pensions and inmate food. They track past results publicized in the state, but those have not prompted any privatization rethinking: contracts on the state's expansion could be awarded by the summer.

BLACKSTONE0000087

Running Head: PRISON PRIVATIZATION: META-ANALYSIS

Prison Privatization:

A Meta-Analysis of Cost Effectiveness and Quality of Confinement Indicators

Brad Lundahl, PhD
Chelsea Kunz
Cyndi Brownell
Norma Harris, PhD
Russ Van Vleet, MSW

Utah Criminal Justice Center

College of Social Work

University of Utah

April 26, 2007

BLACKSTONE0000088

Abstract

Opinions vary about privatizing prisons. In an effort to provide an empirical base from which decisions about privatization might be made, we conducted a meta-analysis of reports on head-to-head comparisons between an identifiable privately managed and publicly managed prison(s). Our search identified 12 studies. Indicators of cost effectiveness and confinement quality were assessed. Results suggest privately managed prisons provide no clear benefit or detriment. Cost savings from privatizing prisons are not guaranteed and appear minimal. Quality of confinement is similar across privately and publicly managed systems, with publicly managed prisons delivering slightly better skills training and having slightly fewer inmate grievances.

BLACKSTONE0000089

## Introduction

Government leaders seek to establish and manage programs that best meet citizens'

needs. Therefore, it is sensible that government leaders investigate whether privately managed

prison systems represent an improvement over publicly managed prisons. Investigating the

potential benefits of privatization is timely because imprisonment rates across the United States

are increasing which pressures budgets and prison facilities (Camp, 1997). Privatization of

services that are typically managed by public entities is seen as a means to deliver higher quality

services at reduced costs through encouragement of competition. Privatizing prisons may be one

mechanism to reduce pressures currently facing prison systems and has been used in 31 states

within the U.S. (Blakely & Bumphus, 2004).

Privatizing prisons is, however, controversial. Proponents argue privatization will lead to

innovative, cost effective, and high-quality programs. Dissidents argue privatization violates

important ethical principles, carries considerable risk, and does not improve upon publicly

managed systems. The intensity of the debate suggests that a clear, obvious choice about

privatizing prisons does not exist. In addition, the stakes of prison privatization are high because

multiple stakeholders will be influenced by the decision. At a broad level, public safety is a

concern as is responsible spending of tax revenue. At an individual level, inmates and prison

management staff may be positively or negatively influenced by such decisions.

Privatization of prisons has a history of over 22 years (Lanza-Kaduce, Parker, & Thomas,

1999). Thus, policy makers currently investigating whether prison privatization best meets its

citizens need have the benefit of learning from the pioneering efforts of others. In this study we

compared publicly managed and privately managed prisons on two outcomes, cost effectiveness

BLACKSTONE0000090

and delivery of quality services, through a quantitative literature review known as a *meta-analysis*. Our literature search and meta-analysis provide two benefits. First, we report on the conclusions of previous literature reviews that we identified in our literature search. Second, and more important, we present what we believe to be the most extensive quantitative literature review of the very best studies investigating prison privatization – those that compared privately managed and publicly managed prisons. Prior to presenting how we conducted our study and the findings, we offer a brief introduction and history of prison privatization and the controversy it has engendered.

*What is prison privatization?*

Prison privatization involves a business contracting with a branch of the government to operate a prison facility. Many of the large businesses operating prisons today are publicly traded companies (Chang & Thompkins, 2002). Private companies generally charge the government a daily rate per inmate to cover investment, operating costs, and profit. Under this rate, private companies supply many or most of the services needed to operate a prison system, including guards, staff, food, program costs, medical care (partial), and other services. Private companies may also build new facilities without direct tax expenditures or public bonds (Lanza-Kaduce et al., 1999).

The trend to privatize prisons began in earnest in 1984 when Hamilton County, Tennessee and Bay County, Florida entered into contracts with the private sector (Anderson, 2000). By the end of 1988, 20 federal, state, and local level privately operated detention facilities were in operation in nine states. In the 1980s the size of the average facility under private contract swelled from the initial experimental 80-bed detention facilities to 500 and 600-bed facilities. The type and classification of the privately operated facilities changed from

BLACKSTONE0000091

predominantly low security to many facilities with medium and maximum-security levels and several facilities which housed inmates at all levels of security (Calvert, 1999). As of 1990, there were 15,000 private prison beds in existence; by 1996 this number had increased by 435% (Blakely & Bumphus, 2004).

By the year 2000, privately operated prisons held more than 101,000 federal, state and local jail inmates. At the time, this represented 11% of all federal inmates, 6% of all state inmates, and 2% of local jail inmates. The majority of private prison operations (63%) were concentrated in the southern states. Texas has the highest private prison capacity with 30,000 beds and the largest number of inmates (14,000) housed in private facilities (Chang & Thompkins, 2002). As of 2004, 31 states use 158 private correctional facilities designed to house 122,871 inmates (Blakely & Bumphus, 2004).

*Controversy surrounding prison privatization*

Changing to a privately managed prison system is controversial and seems to have been polarizing in many instances. A healthy percentage of the articles we examined for this meta-analysis, not all of which were peer-reviewed, took clear positions about the value and/or risks of privatization while seeming to "sell" their position. As an example, there are situations where opposite conclusions about the same data are reached (OPPAGA, 1997).

We highlight the arguments advanced by proponents and critics of prison privatization in Table 1. Two limitations need to be considered in reviewing this table. First, these summarizations were gathered as we read articles to determine whether they meet our inclusion criteria and do not reflect a systematic or scientific compilation of the varied arguments or positions on prison privatization. Thus, we may have missed arguments or concerns advanced by advocates and critics. Second, in our effort to highlight the arguments we do not provide the

BLACKSTONE0000092

detail needed to fully understand some of the positions. Despite these limitations, we believe Table 1 provides a summary of the positions, arguments, and concerns typically advanced by proponents and critics of prison privatization.

[INSERT TABLE 1 ABOUT HERE]

*Previous Literature Reviews*

In our literature search, we found two systematic reviews and one meta-analysis on prison privatization. Two of the studies (Perrone & Pratt, 2003; Pratt & Maahs, 1999) published in peer-reviewed sources. The third (Segal & Moore, 2002) was published, without obvious blind peer review, by the *Reason Public Policy Institute* which appears to be a think tank that supports privatization.

Pratt and Maahs (1999) conducted a meta-analysis investigating whether privately managed prisons are more cost effective than public prisons. They identified 24 studies that examined cost-effectiveness from 33 evaluations of private and public prisons. In their meta-analysis the prisons compared were not matched and did not involve head-to-head comparisons. Pratt and Maahs found that, at first glance, privately managed prisons appeared more cost effective than publicly managed sites, on average $2.45 U.S. dollars less per prisoner per day. However, these authors also found that the best predictors of cost were number of inmates served ($r = -.345$), age of the physical facility ($r = .511$), and security level ($r = .347$). After considering these factors, locus of management (i.e., private or public) did not significantly predict cost effectiveness ($r < .05$). In their concluding remarks the authors state "Although specific privatization policy alternatives may result in modest cost savings… relinquishing the

BLACKSTONE0000093

responsibility of managing prisons to the private sphere is unlikely to alleviate much of the financial burden on state correctional budgets" (pp. 367-368).

Through a non-quantitative review Perrone and Pratt (2003) investigated whether privately managed prisons, compared to publicly managed prisons, would perform better with regard to two issues: quality of confinement and cost effectiveness. These authors found nine studies that assessed the relative quality of private versus public prisons. That is, in each of their nine studies an identified privately managed prison (or small group of privately managed prisons) was compared to an identified public prison (or a small group of publicly managed prisons). Although all of the studies were matched with regard to security level, in four of the nine studies the private prison facility was newer than that of the public facility and none of the comparisons involved a public facility that was newer than the compared private prison. With regard to capacity, 3 of the studies involved public facilities with larger capacity compared to 1 study where the private facility was larger. Drawing confident inferences about the impact of prison privatization is difficult when variables other than management could account for such differences in outcomes. Despite the fact that prison sites were not well matched, Perrone and Pratt compared private and public prisons on the following indicators of quality: condition (e.g., clean), management (e.g., staff stress and burnout), inmate activity (e.g., educational and vocational training), safety (e.g., assaults on inmates, staff), security (e.g., escapes), order (e.g., disturbances), and care (e.g., medical attention). From their analyses, the authors noted "comparisons of the quality of confinement between public and private prisons is inconclusive" (p. 309). With regard to cost effectiveness, Perrone and Pratt found that the daily median per diem for private prisons was approximately $3.40 U.S. dollars cheaper than publicly managed facilities. However, the authors also note that only 2 of the 9 comparisons offered firm

BLACKSTONE0000094

conclusions with regard to cost effectiveness. Of these, one comparison favored public management and the other private management. In their concluding section, the authors indicated that neither privately or publicly managed prisons can boast a clear advantage in cost effectiveness or quality. We note that the conclusions Perrone and Pratt (2003) made were technically the result of a systematic review, not a meta-analysis. That is, with the exception of providing the average cost savings the authors did not extract and combine effect sizes from the 9 identified studies.

In the third systematic review, Segal and Moore (2002) reviewed numerous studies on privatization and reported the overall findings from each study. The authors did not report parameters for which studies were included in their analyses. With regard to cost effectiveness, Segal and Moore noted that in 22 of the 28 studies they reviewed, privately managed prisons were more cost effective an average savings of 12.38 % (Standard Deviation = 8.53%).These authors also reported that that 11 of the 16 indicators of quality of confinement favored privately managed prisons. Segal and Moore cite their findings as a strong rationale for privatization. It is our opinion, however, that Segal and Moore's analyses are suspect for several reasons. First, these authors report no instances where a publicly managed prison was more cost effectiveness than a privately managed prison, which stands in contrast to the other reviews and our own analyses (see below). Second, Segal and Moore provided a relatively less sophisticated analysis compared to the other reviews; for each study reviewed they provide, on average, a one paragraph summary giving data but no indication on the internal validity of the reviewed studies. This review style leaves open questions of potential confounds to the inferences made. Third, the authors' affiliation is with a group that is clearly aligned with promoting privatization.

BLACKSTONE0000095

Conclusions from the Perrone and Pratt (2003), Pratt and Maahs (1999), and Segal and Moore (2002) studies diverge significantly. The two studies authored by Pratt and colleagues concluded that the evidence about the proposed benefit of privatization is inconclusive whereas Segal and Moore reported "there is clear and significant evidence that private prisons actually improve quality" and "private prisons are providing quality services, while remaining cost-efficient and providing significant cost savings" (p. 14). Our opinion, which we believe is scientifically defensible, is that Pratt and colleagues engaged in a more sophisticated approach to reviewing studies by considering issues related to internal validity and, therefore, provide a more accurate perspective on prison privatization.

*Our Study*

To date it appears that only one meta-analytic review on prison privatization has been published: the Pratt and Maahs (1999) study on cost-effectiveness which used a regression model. To help fill this void, we conducted a meta-analysis looking at cost effectiveness and quality using a group-differences model. Our study offers two advantages to the other published reviews. First, we conducted a meta-analysis on indicators of confinement quality in addition to cost effectiveness. Second, our investigation relied upon "gold standard" reports – those that compared identified privatized systems to identified public systems and presented data which could translate into effect size statistics.

Meta-analysis is a research design that extracts and summarizes the quantitative findings from published studies or completed reports. In this study, the numeric findings from 12 published reports on the relative effectiveness of privately operated prisons, compared to publicly operated prisons, were summarized. Meta-analysis is a powerful research design, compared to simple reviews, because it (a) combines a body of findings to provide an overall

BLACKSTONE0000096

estimate, (b) uses objective procedures to produce numeric indicators on the strength of an intervention or relationship, (c) avoids considerable subjectivity by detailing precise rules and steps taken, and (d) allows for replication because findings are based on quantitative data not subjective interpretations of the data.

## Method

In general, a meta-analytic review follows the following 8 steps: (1) developing a research question, (2), determining criteria for study inclusion and exclusion, (3) developing a strategy to identify the relevant literature, (4) securing the relevant literature, (5) coding studies and extracting effect sizes, (6) combining effect sizes and investigating moderator effects (results), (7) interpreting the results, and (8) presenting the findings. The description of our study is organized around these steps.

*Research Question*

We compared privately managed and publicly managed prisons on two domains: cost effectiveness and quality of care. Although we approached this study from an objective position, testing research questions requires the establishment of a research question and null hypothesis.[2] For the sake of convenience we structured our questions in an orientation that favored privately managed prisons; that is, we temporarily adopted the assumption that privatization would produce more desirable outcomes. Thus, a positively valenced (+) effect size represented an advantage for privately managed systems and a negatively (-) valenced effect size represented an advantage for publicly managed systems. These valences could have been reversed without changing the interpretations and, therefore, have no influence on the outcome.

Two questions focused on cost effectiveness: Are privately managed prisons more cost effective than publicly managed prisons? How much more cost effective are privately managed

BLACKSTONE0000097

prisons compared to publicly managed prisons? The measure of cost effectiveness was the average savings per-prisoner per day. The next two questions centered on quality of services rendered. Are privately managed prisons delivering higher quality services compared to publicly managed prisons? How much better are publicly managed prisons at delivering quality services compared to publicly managed facilities?

*Inclusion and Exclusion Criteria*

Determining which studies will be included in a meta-analysis strongly influences confidence levels in the findings. A typical phrase used in research is "garbage in, garbage out." If low quality studies are included, the findings are suspect because there is a high chance that alternative explanations may provide a better explanation. Because the stakes are high in making a decision to privatize, we only included high quality studies. Our assessment of the literature on privatization is that high quality studies involve those that directly compared a specific, identifiable private prison(s) with a closely matched, identifiable public prison(s). While randomization or exact matching are clearly superior designs and produce superior outcomes, pragmatic and ethical considerations all but prohibit such designs in this area. A lower quality study would be one that reports group averages from privately and publicly managed prisons that cannot be identified. For example, Blakely and Bumphus (2003) presented national findings. While this type of study is very valuable for certain questions, it does not permit a rigorous comparison of privately and publicly managed prisons.

For inclusion in our meta-analysis, studies needed to meet six criteria. First, studies had to report on a comparison study of a privately managed *and* publicly managed prison(s) that could be identified. To be identified the study simply had to name the facilities and their geographic location. Studies that reported findings from an evaluation of only a private *or* a

BLACKSTONE0000098

public prison were excluded. Second, studies had to provide statistical data from their analyses that could be transformed into an effect size or percentage of cost effectiveness. Third, studies had to report on their own analyses from primary or secondary data. That is, we excluded studies who simply commented on another report or study (there are many such studies). Fourth, we only accepted studies targeting prisons for adults. Fifth, we limited our study to reports or publications that could be found through electronic databases and reference sections of such reports. Sixth, we excluded articles that reported hypothetical data or projections rather than actual findings. Determining whether a study fit these six criteria was an iterative process and is described below.

*Identifying the Retrieving Relevant Literature*

We utilized three search strategies: electronic data bases, searching reference lists, and consultation with an expert in adult corrections.[3] Most of our efforts were directed to the electronic data bases and searching references of key studies (i.e., the previously mentioned reviews). In an effort to not miss key studies from the electronic database search, we used the following broad search terms: *prison, privatization, privatisation* (British or Canadian spelling), *correction,* and *jail* connected by the term "or." The following data bases were searched: Criminal Justice Abstracts, ERIC, PsychInfo, CSA Social Services Abstracts, CSA Sociological Abstracts, Recent References Related to the Social Sciences/Humanities, Academic Search Premier, PsycARTICLES, Psychology and Behavioral Sciences Collection, and Family & Society Studies Worldwide. We limited our search to reports published between 1980 and October of 2006 that were written in English. This strategy yielded approximately 1,110 articles.

The abstracts of these articles were then read with two guiding screening criteria for inclusion, that they: (a) provided an investigation into prison privatization, and (b) provided

BLACKSTONE0000099

statistical data rather than theory or opinion. This strategy identified 259 articles that were then retrieved using interlibrary loan and other retrieving strategies. Of these, 44 were never considered in the final analyses because they were either duplicates of already retrieved articles, only accessible through microfiche or other media that was inaccessible, or could not be found in any libraries or public journals. This left 215 articles that were then screened based on phase two of the article selection process. At this stage we also identified 53 studies by reviewing the reference sections of the reviews previously mentioned and we reviewed 48 studies provided by a local expert.[3] Thus, 316 articles were secured and reviewed based on the inclusion criteria. Of these, only 12 articles met all criteria.

*Coding Studies*

Studies varied on several dimensions and needed to be organized to complete analyses. We limited coding to variables believed to have a relationship to the outcomes of interest or to variables that may influence the internal validity of a study. We certainly did not code the universe of possible variables; prison management systems are very complex and not all studies follow a standardized approach to measuring inputs and outputs.

In an effort to provide a profile of the prisons being compared we coded characteristics of the prisons being compared. The results can be found in Table 2. All studies that met the inclusion criteria were independently double coded by a combination of the first 3 authors. Disagreements were resolved through reviewing the articles and discussion.


[INSERT TABLE 2 ABOUT HERE]

BLACKSTONE0000100

Information about how data was collected is important in that it provides a possible indicator of objectivity. Five categories of *data source* were coded: official records (OR) which included financial audits and state or federal reports; agency records (AR) which included prison records or year-end reports or surveys; staff interview (SI) which involved data based on reports from prison staff members; inmate interviews (II) which involved comments or impressions from inmates; and lastly researcher observations (RO) which included impressions from the report authors or researchers assigned to compare the prisons.

The number of *prisons compared* being compared was also coded. Some studies compared one publicly managed prison to one privately managed prison (e.g., Brown, 1994). Other studies compared several specific prisons. For example, Archambeault (1996) compared 1 government or publicly managed prison with 2 privately managed prisons. *Security level* details the classification level of the inmates incarcerated. As can be seen in Table 2, each study compared prisons that were matched on security level. The levels we coded included: minimum, medium, mixture (combination of minimum and medium security), and closed/high-security.

Some of the prisons only housed males or females, while others housed both genders; thus we coded *inmate gender*. As *prison age* has been shown to predict costs (Pratt & Maahs, 1999), we coded such information when it was available. Next, we coded *facility type* which provides information about whether the prison belonged to the federal, state, or county system.

The number of inmates housed in a prison, *prison capacity*, was also coded as it has been shown to be related to effectiveness indicators (Pratt & Maahs, 1999). We also coded whether the comparison of prisons was contemporaneous; that is we examined whether the *time frame* of the comparison was equal across the private and public systems. As can be seen in Table 2, all

BLACKSTONE0000101

comparisons were contemporaneous. Lastly, we examined whether the facility was constructed under private management or public management.

*Dependent Variables*

Two broad-based outcomes were assessed: cost effectiveness and quality of confinement. Understandably, the studies included in this meta-analysis investigated different outcomes of interest and used dissimilar instruments to measure such outcomes. Such variability is considered to be both a strength and weakness of meta-analyses. As a strength, the diversity of outcomes and measurement tools provides some protection against relying on a sole indicator. As a weakness, not all instruments measure exactly the same construct and some outcome classes include varied indicators – factors which limit precision.

*Cost effectiveness.* Formulas to derive cost effectiveness, generally a per diem amount per inmate, varied with regard to what factors were considered. Our first preference for calculating percentage of savings was to utilize raw data. This was done by determining the difference between a publicly and privately operated prison and then dividing this value by the lower of the two per diem rates. When multiple indicators of cost effectiveness were provided, an average was taken based on the expectation that this would provide the most stable estimate of costs (Howell, 1997). If raw data was not available, we simply reported what the authors listed. Again, if multiple indicators were presented, an average was taken. We note that some studies included the costs associated with government monitoring and/or facility construction expenses while others did not (see Table 3).

*Quality of confinement.* In order to organize and consolidate the many indicators of confinement quality, outcome classes were created. Logan (1992) identified eight dimensions of confinement quality: security, safety, order, care, activity, justice, conditions, and management.

BLACKSTONE0000102

We slightly adapted this model to more easily accommodate the indicators we encountered. This was done by consensus. Four of the five authors jointly reviewed and decided which outcome class best captured each indicator for which an effect size was calculated. This process resulted in nine outcome classes which are described below.

*Public safety* is made up of indicators of prisoner escape rates and visitors being harmed. *Prison safety* is made up of indicators of harm to prison staff or inmates arising from violence or disciplinary action. *Order* was a broad category that involved indicators such as compliance with prison rules and regulations, drug use within the prison, protection from communicable diseases, exposure to medical risks, and suicide prevention. *Heath care* is made up of indicators reflecting delivery of medical, dental, mental health, and/or drug and alcohol counseling. *Skills training* reflects delivery or availability of programs designed to equip inmates with useful life skills, such as general education classes, work opportunities, job skill development, and/or career planning. A *miscellaneous inmate benefits* category was developed to capture measurements of some combination of health care and skills training that could not be separated because of their data presentation or other generic benefits such as physical fitness time, leisure time, or visitation opportunities. Several of the studies reported on *inmate grievances* comprised of complaints to the ARPS or civil suits. A high number of grievances is believed to reflect inmate dissatisfaction with prison conditions. *Facility conditions* reflects indicators of prison cleanliness, nutrition being offered, and satisfaction. Lastly, some studies sampled prison staff for their reflections of employee morale, job satisfaction, or looked at employee turnover rates; such variables were collapsed into the employee *work climate outcome*.

Studies often reported several indicators that fell within a single outcome class. Consider, for example, the outcome class of safety. Archambeault et al. (1996) report highly detailed

BLACKSTONE0000103

information such as inmate assault on other inmates resulting in (a) serious injury $[d - .071]$, (b) no injury $[d - -.119]$, or (c) some injury $[d - -.094]$. In this case, effect sizes [reported above as $d$] were averaged, $d = -.047$, and this average was advanced for the "safety" grouping. This practice follows best practices in meta-analyses (Lipsey & Wilson, 2001).

*Effect Size Calculations*

Cohen's $d$ was used as the effect size (Lipsey & Wilson, 2001). An effect size is a statistic that represents impact strength or magnitude. As a guide, a $d$ in the 0.20 range is considered small, though significant, a $d$ in the 0.50 is considered to be moderate in magnitude, and a $d$ in the range of 0.80 is considered to be large (Cohen, 1988). Effect sizes can be calculated from various types of data, including means, proportions, frequencies, and p-values (Cooper & Hedges, 1994; Lipsey & Wilson, 2001). Effect size computations and summary analyses were done using DSTAT, a meta-analytic software program (Johnson, 1993).

One methodological issues arose in calculating effect sizes: several studies failed to clearly present full information needed to calculate effect sizes with confidence. At times assumptions were made to calculate effect sizes, which slightly undermines the confidence we have in this report. For example, the number of participants involved in a given comparison often had to be estimated from other information. In an effort to be transparent, we note such instances in Table 3 and will make available a detailed account of how effect sizes were calculated. When assumptions were made to calculate an effect size (see Table 3), a conservative approach was followed. Such decisions are common in meta-analyses and we followed authoritative recommendations (Cooper & Hedges, 1994).

BLACKSTONE0000104

One of the values in the public safety outcome class was an outlier (Bowery, 1996). To control the undue leverage it would have on the average, this value was *Windorized* by adjusting it to the next highest value.

## Results

Eight of the 12 studies that met inclusion criteria provided information on cost effectiveness (see Table 3). Half of these 8 revealed that privately managed prisons outperformed publicly managed prisons, with a range of cost effectiveness from 4.6% to 15.2%. Of the remaining 4 studies, 2 showed that publicly managed prisons were more cost effective than their privately managed counterparts (10.0% and 14.2%). The remaining 2 studies revealed a statistical tie: that is neither system outperformed the other. Thus, 50% of the time privately managed prisons showed a financial advantage over publicly managed prisons, while publicly managed prisons showed an advantage only 25% of the time. The average cost savings across all 8 studies was 2.2% (SD = 11.5%) favoring privately managed prisons.

[INSERT TABLE 3 ABOUT HERE]

Several patterns can be detected from examining the results from indicators of quality of confinement. First, no more than half of the studies contributed effect sizes to any one construct. This situation tends to undermine confidence in inference making. Second, most effect sizes in Table 3 are very near to zero ("0.00"). This suggests that, in general, there is not much difference between privately and publicly managed prison systems. Third, effect size valences are not predominately positive or negative. With these patterns in mind, we briefly discuss each outcome class.

BLACKSTONE0000105

Publicly managed prisons tended to perform better with regard to public safety. Five of the 6 studies that presented data in this area favored public prisons, although the effect sizes are small. Similarly, the average effect size across the six studies was small, -.04, but may represent concern when considering the scope of the prison system across the nation and the magnitude of risks associated with public safety issues. With regard to prison safety within a prison's walls, 3 of the 5 studies revealed privately managed prisons were safer; the other 2 favored publicly managed systems. The overall or average effect, however was nil. Of the 5 studies which provided indicators related to prison order, 4 showed slight advantages to privately managed prisons. The 1 publicly managed prison that outperformed its private counterpart, revealed a rather large advantage (i.e., $d = -.12$), which brought the overall effect to nil.

Indicators of health care delivery suggest no real advantage or disadvantage from private management. By contrast, each of the 3 publicly managed systems who reported data on skills training outperformed privately managed prisons. Of these, 2 showed sizeable effect sizes while 1 was near zero, resulting in an overall effect size of -.10. There was no observed advantage for miscellaneous benefits for publicly or privately managed systems. However, a slight advantage was noted in the grievance category which favored publicly managed prisons. Here, 3 of the 4 studies reporting on this dimension favored public managed systems with an overall effect size of -.07. Only 1 study reported on facility conditions, which favored privately managed prisons – though the effect size was small, $d = .02$. The last category, employee work conditions, showed a slight advantage to privately managed prisons with 3 of the 4 studies showing positive effect sizes. Again, the overall advantage was very small, .03.

In addition to rather small effect sizes, the distribution of positive and negative valences was balanced. There were 45 outcome indicators overall. Of these, 21 (47%) favored privately

BLACKSTONE0000106

managed prisons, 20 (44%) favored publicly managed prisons, and 4 (9%) favored neither. Of the 10 summaries of these 45 values 50% favored publicly managed prisons, 30% favored privately managed systems, and 20% showed no difference.

## Discussion

Our conclusion is that prison privatization provides neither a clear advantage nor disadvantage compared to publicly managed prisons. Cost savings from privatization are not guaranteed and quality of services is not improved. Across the board effect sizes were small, so small that the value of moving to a privately managed system is questionable. An empirical argument against privatization may be made based on the finding that publicly managed prisons tended to provide better skills training programs and seemed to generate fewer complaints or grievances. However, improved training programs may not result in benefits to inmates or society, and the number of grievances filed may not accurately reflect the quality of life in prison.

Understanding the interpretation of small effect sizes based on prison management is difficult given the complex issues and goals involved in the criminal justice system. The largest average effect size was found for skills training where publicly managed prisons outperformed privately managed prisons. The average effect size ($d = .10$) suggests that publicly managed prisons are 4% better at skills training (Lipsey & Wilson, 2001, p. 153). An example may help in interpreting the impact of this level. If a matched comparison was made between a privately and publicly prison, for every 100 inmates in a privately managed prison who received skills training there would be 104 from the public section. Does this level of advantage represent a significant value? It depends on (a) the presumed or proven relationship between skills training and healthy living and (b) the scope or number of prisoners affected. That is, does skills training result in

BLACKSTONE0000107

lowered recidivism, better employment, or fewer social and emotional difficulties? If there is a relationship, then the value would be significant for the additional 4 inmates (per 100) and their families who received skills training. The benefits to society as a whole would need to be considered in relation to the costs and benefits of skills training. Unfortunately, our lack of expertise in this area limits our ability to comment authoritatively on these issues. That said, our evidence suggests that the costs of publicly managed prisons is not statistically different from privately managed systems. Thus, the 4% benefit in skills training may be "free."

How do our findings compare with the previous reviews? Our findings on cost savings concur with the meta-analysis done by Pratt and Maahs (1999), that minimal, if any, advantages are realized through privatization. Our findings on quality concur with the review conducted by Perrone and Pratt (2003), that the data are equivocal. Our findings differ with those of Segal and Moore (1998) on both accounts. The "score" of findings from these four reviews is 3 to 1, favoring an interpretation of minimal or no benefit from privatization. This finding is similar to the experience auditors in the State of Florida had when trying to evaluate the value of privatization. This group indicted that despite being able to compare their 5 privately managed prisons with their public counterparts, it was not possible to determine whether there was a benefit or liability from privatization (OPPAGA, 1997).

What recommendations can we offer? The data we reviewed do not support a move toward privatization. Similarly, the data do not clearly discourage privatization despite a slight advantage for publicly managed prisons in skills training. How should decisions be made when clear evidence does not exist? Arguments in favor of privatization will fall back on ideology. Arguments against privatization will likely center on ideology and the lack of support for privatization.

BLACKSTONE0000108

*Limitations.*

Like all studies, ours contains several limitations which need to be considered in judging the implications and inferences. First, although we did a broad literature search our findings are based on only 12 studies. However, we believe that to date, this is the most comprehensive review and represents the best available evidence. Second, the literature on prison quality and cost does not provide a standardized approach to measuring outcomes. A criticism of meta-analysis is that varied indicators of a given construct are combined when there may not be sufficient scientific rationale for doing so. On the other hand, it can be argued that relying on a single indicator of a given construct is akin to not diversifying one's investment portfolio. Our assessment of the literature is that too much variability exists, making interpretations of our findings difficult. That said, some form of objective measurement of constructs, in our opinion, is better than subjective judgment. Third, at times we made some minor assumptions in calculating effect sizes because sufficient data was not always present. To protect against being subjective, we documented how each effect size was calculated and related decisions. This information can be obtained from the first author. Moreover, we examined the impact of making such assumptions and believe that they would have in no way changed the pattern of findings. Fourth, while we performed a comprehensive search for studies detailing head-to-head comparisons of privately and publicly managed prisons, we are not sure that all were found. We do not believe the net effect of these limitations is serious because we believe we executed a high quality meta-analysis. The limitations reflect the rather poor literature base on prison privatization and the complexity of the questions.

Prior to concluding, we present findings from a unique model that involved a blending of private and public entities. Shichor (1999) discussed how California allowed several public

BLACKSTONE0000109

facilities to be managed by municipalities or small cities with weak economic bases to bolster budgets. This system appeared to produce results that were much more desirable than traditional privately managed prisons. While firm conclusions cannot be made from a single study, it is instructive to know that models beyond full privatization exist which may blend the arguments of both sides on this debate.

BLACKSTONE0000110

# References

Note. Articles noted with an "*" were included in the meta-analysis.

Abt Associates Inc. (2005). *Contracting for Imprisonment in the Federal Prison System. Cost and Performance of the Privately Operated Taft Correctional Institution.* Cambridge, MA: Douglas C. McDonald, Ph.D. & Kenneth Carlson.

Anderson, G. M. (2000). Prisons for Profit. *America, 183-16, 12-16.*

*Archambeault, W. G. Ph.D. & Deis, D., R. Jr., Ph.D. (1996). *Cost Effectiveness Comparisons of Private versus Public Prisons in Louisiana: A Comprehensive Analysis of Allen, Avoyelles, and Winn Correctional Centers.* Baton Rouge, LA: Louisiana State University, School of Social Work, Office of Correctional Services.

Blakely, C. R. & Bumphus, V. W. (2004). Private and Public Sector Prisons—A Comparison of Select Characteristics. *Federal Probation, 68-1, 27-31.*

*Brown, A. (1994). *Economic and Qualitative Aspects of Prison Privatization in Queensland (Australia).* Annandale, New South Wales: Pluto Press.

*Bowery, M. (1996). NSW Department of Corrective Services. (1996). *Private Prisons in NSW: Junee    Year Two.* (Research Publication No. 35, May 1996). Sydney, New South Wales.


Calvert-Hanson, L. S. (1991). The Privatization of Corrections Movement: A Decade of Change. *Journal of Contemporary Criminal Justice, 7-1, 1-20.*

Camp, C. & Camp, G. (1997). The Corrections Yearbook. *Criminal Justice Institute. 1997,* 11.

Cikins, W., I. (1986).Privatization of the American Prison System; An idea whose time has come? *Notre Dame Journal of Law and Ethics. 2,* 445-64.

BLACKSTONE0000111

Chang, T.F.H. & Thompkins, D. E. (2002). Corporations Go to Prisons: The Expansion of Corporate Power in the Correctional Industry. *Labor Studies Journal, 22-1, 45-69.*

Cohen, J. (1988). *Statistical power analysis for the behavioral sciences* (2nd ed.). Hillsdale, NJ: Erlbaum.

Cooper, H., & Hedges, L. V. (1994). *The handbook of research synthesis.* New York: Sage.

Culp, R. F. (2005). The Rise and Stall of Prison Privatization: An Integration of Policy Analysis Perspectives. *Criminal Justice Policy Review, 16-4, 412-442.*

*Drowata, C. & Don S.  Select Oversight Committee on Corrections. (1995). *Comparative Evaluation of Privately-managed CCA Prison (South Central Correctional Center) and State-managed Prototypical Prisons (Northeast Correctional Center, Northwest Correctional Center).*

*Greene, J. (1999).  Comparing Private and Public Prison Services and Programs in Minnesota: Findings from Prisoner Interviews. *Current Issues in Criminal Justice, 11-2, 202-225.*

*Hatry, H. P., Brounstein, P. J. & Levinson, R.B. (1989). Comparison of Privately and Publicly Operated Corrections Facilities in Kentucky and Massachusetts.

Howell, D. C. (1997). *Statistical methods for psychology* (4th Ed.). Belmont, CA: Wadsworth Publishing Company.

Johnson, B. T. (1993). DSTAT 1.10: *Software for the meta-analytic review of literatures* [Computer software and manual]. Hillsdale, NJ: Erlbaum.

Lanza-Kaduce, L., Parker, K., & Thomas, C. (1999). A comparative recidivism analysis of releases from private and public prisons. *Crime & Delinquency. 45,* 28-47.

Lipsey, M. W., & Wilson, D. B. (2001). *Practical meta-analysis.* Thousand Oaks, CA: Sage.

BLACKSTONE0000112

Logan, C. H. (1992). Well Kept: Comparing Quality of Confinement in Private and Public
    Prisons. *The Journal of Criminal Law and Criminology, 83-3, 577-613.*

*Maximus, Inc. (2006). *Report on the Evaluation of Arizona Department of Corrections'
    Operating Per Capital Cost Report and Private Prison Cost Mode.* Phoenix, AZ: Dora
    Schriro.

*McDonald, D. C. Ph.D. & Kenneth Carlson Abt Associates Inc. (2005). *Contracting for
    Imprisonment in the Federal Prison System. Cost and Performance of the Privately
    Operated Taft Correctional Institution.* Cambridge, MA: Douglas C. McDonald, Ph.D. &
    Kenneth Carlson.

Moore, A. (1998).Private prisons: Quality corrections at a lower cost. *Reason Public Policy
    Institute Study No. 240.* 18.

*OPPAGA Private Prison Review. (2000). *South Bay Correctional Facility Provides Saving and
    Success; Room for Improvement.* (Report No. 99-39, March 2000).  Tallahassee, FL:
    Office of Program Policy Analysis and Government Accountability.

Perrone, D., & Pratt, T. C. (2003). Comparing the quality of confinement and cost-effectiveness
    of public versus private prisons: What we know, why we do not know more, and where to
    go from here. *The Prison Journal, 83,* 301-322.

Pratt, T. C., & Maahs, J. (1999). Are private prisons more cost-effective than public prisons? A
    meta-analysis of evaluation research studies. *Crime & Delinquency, 45,* 358-371.

Sechrest, D., & Shichor, D.  (1993). Corrections goes public (and private) in California. *Federal
    Probation. 57,* 3-8.

BLACKSTONE0000113

Segal, G. F., & Moore, A. T. (2002). Weighing the watchmen: Evaluating the costs and benefits of outsourcing correctional services. Part II: Reviewing the literature on cost and quality comparisons. Reason Public Policy Institute.

Select Oversight Committee on Corrections. (1995). *Comparative Evaluation of Privately-managed CCA Prison (South Central Correctional Center) and State-managed Prototypical Prisons (Northeast Correctional Center, Northwest Correctional Center).* City, ST: Clair Drowata, Claire & Don Stoughton.

*Sellers, M.P. (1989). Private And Public Prisons: A Comparison Of Costs, Programs And Facilities. *International Journal of Offender Therapy and Comparative Criminology, 33, 241 - 256.*

Shichor, D. (1999). Privatizing Correctional Institutions: An Organizational Perspective. *The Prison Journal, 79-2, 226-249.*

*Thomas, C. Ph.D. (August, 1997). *Comparing the Cost and Performance of Public and Private Prisons in Arizona: An Overview of the Study and Its Conclusions.* Retrieved December, 2006, from http://www.anarchistblackcross.org/content/essays/articles/priv/ariz.htm.

Urban Institute. (1989). Comparisons of privately and publicly operated corrections facilities in Kentucky and Massachusetts. *Urban Institute.*

BLACKSTONE0000114

Notes

[1]This study was undertaken to provide information that the State of Utah's Legislature might use in making a decision to privatize Utah's prison system.

[2]To assist readers of this report judge the findings, we make the following disclosure. The primary investigator, Brad Lundahl, PhD, and his research team did not begin this project with an opinion about the value, or lack thereof, of prison privatization. Dr. Lundahl initiated and completed this study conditioned upon an agreement that an objective and independent investigation would proceed and that all results would be presented regardless of whether such results would support or not support a move toward prison privatization. Dr. Lundahl was invited to conduct a meta-analysis on prison privatization outcomes by Mr. Russ Van Vleet, co-Director of the Utah Criminal Justice Center (UCJC) as a means of informing the State of Utah's legislative body about the potential risks and rewards of prison privatization. Dr. Lundahl did not receive funding from the UCJC, although two master-level graduate research assistants who worked on this project were paid through the UCJC. Dr. Lundahl has not previously researched issues related to criminal justice and will not likely research privatization in the future as his research agenda is far-a-field from this area. Thus, he truly comes to the question of privatization without a biased history and without pressure to bias the results.

[3]Mr. Cliff Butter from the State of Utah's Department of Corrections served as an outside consultant. Mr. Butter provided us with several articles, none of which met final the 5 inclusion criteria.

BLACKSTONE0000115

Table 1

Arguments regarding prison privatization

---

### Argument In Favor of Privatization

1.  Cost Effectiveness
    a.  Innovative practices are developed to contain costs
    b.  Reduce labor costs through improved scheduling and management
    c.  Negotiate for lower prices more effectively
    d.  Respond to problems and opportunities faster because they are not encumbered by the "red tape" and restrictions common to government bureaucracies
    e.  Construct buildings faster and more efficiently
    f.  Pay taxes to government because they are a business

2.  Restraining Costs System-Wide
    a.  Increase market competition which lowers overall prison costs

3.  Provide Higher Quality of Confinement
    a.  Provide high quality services to avoid inmate grievances/legal action
    b.  Implement programs in an efficient and streamlined manner
    c.  Emphasize quality to secure repeat contracts and a positive public image

4.  Government Abetment
    a.  Reduce the pressure and costs of overcrowding in the public prison system

5.  Privatization has worked in other sectors and should work for prison management

### Arguments Against Privatization

1.  Ethical Conflicts of Interest
    a.  Pressure to show profit may lead to compromised service quality (e.g., lower staff to inmate ratio, fewer rehabilitative services, reduced range of services, etc)
    b.  Potential for abuse when a profit making company has authority to restrict basic civil liberties
    c.  Profit motives may supersede the interests of the public and inmates
    d.  Fear of negative financial consequences may lead to nondisclosure of problems (e.g., may adopt in-house grievance system that circumvents traditional judicial system)
    e.  Creates an environment that may support corruption such as bid rigging, bribes, kickbacks

2.  Lobbying
    a.  Private companies may attempt to influence legislation that would favor profit (e.g., change laws that drive up incarceration rates and sentences)

BLACKSTONE0000116

Table 1 (continued)

3. Workforce Quality May Suffer And Degrade Overall Quality
    a. Discourage unionization
    b. Pay lower salaries and benefits, which leads to lower morale and may promote corruption
    c. Low morale among employees increases turnover rates, which can compromise basic prison functioning (e.g., security, safety)

4. Cost Effectiveness Defense
    a. Large economy of scale also applies to the government
    b. Cost comparisons with private companies overlook hidden costs (e.g., government monitoring, triage, major medical costs)
    c. Accountable to the public for approval of costs

5. Long Term Obligations
    a. If the private company goes out of business, the government retains liability
    b. The government is responsible for building depreciation
    c. The state is in a poor bargaining position when their prison is overcrowded or at maximum capacity and the private company's contract is up for renewal

BLACKSTONE0000117

BLACKSTONE0000118

Table 2

*Characteristics of Compared Prisons*

| Study name | Information source | Number of prisons compared | Security level | Inmate gender | Prison age (in months) | Facility type | Prison capacity | Same time frame? | Construction managed by private company |
|---|---|---|---|---|---|---|---|---|---|
| Archambeault 1996 | RO,SI, II,OR | G=1 P=2 | NR | Mix | G1=204 P1=192 P2=192 | State | P1=1,474 G1=1,474 G2=1,474 | Yes | No |
| Bowery 1996 | AR, SI | G=3 P=1 | Mix | NR | G=NR P=168 | Federal/ State | 3068/2yrs 1,481/2nd yr | Yes | Yes |
| Brown 1992 | OR | G=1 P=1 | Mix | NR | G=NR P=204 | State | G=NR P=244 | Yes | No |
| Drowota 1995 | OR, II, SI, RO | G=2 P=1 | Medium | Mix | NR | State | NR | Yes | Yes |
| Greene 1999 | SI | G=3 P=1 | Medium | Male | G1=348 G2=228 G3=204 P1=156 | State | NR | Yes | No |
| Hatry 1989 | AR, SI, II, RO | G=1 P=1 | Minimum | Mix | G=240 P=NR | State | NR | Yes | Yes |
| Logan 1992 | OR, SI, II | G=2 P=1 | Mix | Female | G=48 G=NR P=0 | State/ Federal | G1=609 G2=NR P=200 | Yes | Yes |
| Maximus 2006 | AR | G=1 P=3 | Mix | NR | NR | State | NR | Yes | NR |
| McDonald 2005 | OR | G=Survey P=1 | Minimum | G=Mix P=Male | G=N/A P=108 | Federal | G=N/A P=2,048 | Yes | NR |
| OPPAGA 2000 | AR | G=1 P=2 | Close | Male | G=144 P=120 | State | G=1,093 P=1,318 | Yes | Yes |
| Sellers Part 1 | SI, II, RO | G=1 P=1 | High | Mix | NR | County | G=95 P=106 | Yes | NR |

BLACKSTONE0000119

| Sellers Part 2 | SI, II, RO | G=1 P=1 | High | Mix | G=240 P=264 | State | G=87 P=350 | Yes | Yes |
| Thomas 1997 | OR | G=Survey P=1 | Minimum | Mix | G=N/A P=144 | State | NR | Yes | NR |

Date 3-29-07

Notes. SI = staff interview. OR = official records. AR = agency records. II = inmate interviews. RO = research observations. G = Government managed facility. P = Privately managed facility. NR = Not reported.

BLACKSTONE0000120

Table 3

Percent Economic Savings and Effect Size for Quality Performance of Private versus Public Prisons

| Study | Cost Saving[1] | Public Safety | Prison Safety[1] | Prison Order | Health Care | Skills Training | Misc Benefits | Griev-ance | Facility Conditions | Employee Work condition |
|---|---|---|---|---|---|---|---|---|---|---|
| Archambeault, 1996[3] | 13.0% | -.04 | .05 | .03 | – | -.01 | – | -.07 | – | .10 |
| Bowery, 1996 | – | -.38[4] | -.06 | .05 | – | -.12 | -.15 | -.05 | – | – |
| Brown, 1994 | 0.0%[1] | – | – | – | – | – | – | – | – | – |
| Drowota, 1995 | – | -.04 | -.11 | – | .01 | – | – | – | – | -.01 |
| Greene, 1999 - | – | – | – | – | -.13 | -.17 | -.06 | – | – | – |
| Hatry, 1989  - | -10.0%[1] | – | – | .03 | – | – | .00 | – | – | .01 |
| Logan, 1992 | – | .02 | .03 | .02 | .00 | – | .01 | .01 | .02 | .03 |
| Maximus, 2006 | -14.2%[1] | – | – | – | – | – | – | – | – | – |
| Mcdonald, 2005 | 9.0%[1] | -.07 | .09 | -.12 | – | – | – | -.18 | – | – |
| OPPAGA, 2000 | 4.6%[1] | -.06 | – | – | .06 | – | – | – | – | – |
| Sellers, 1989[3] | 0.0%[1,2] | – | -- | – | – | – | 0.16 | – | – | – |
| Thomas, 1997 | 15.2%[1] | – | – | – | – | – | – | – | – | – |
| Mean (SD) | 2.2% (11.5) | -.04[3] (.03) | .00 (.08) | .00 (.07) | -.02 (.08) | -.10 (.08) | -.01 (.11) | -.07 (.08) | .02 (n/a) | .03 (.05) |

BLACKSTONE0000121

Note. SD = Standard Deviation. Effect sizes were calculated so that a positive valence reflects an advantage for privately managed prisons and a negative valence reflects an advantage for publicly managed prisons. [1]Controlled for or made adjustments for administrative costs or costs of managing a private sector prison. [2]We did not average in difference of Silverdale versus Warren County because sites not properly matched and a huge difference, in favor of private (126% better) would have been an outlier and given undue weight to one study. [3]In computing the average, the original value was Windorized to the next highest value within a column to limit the undue influence of an outlier.

BLACKSTONE0000122

# CELLS FOR SALE: UNDERSTANDING PRISON COSTS & SAVINGS

## A REPORT FROM
# POLICY MATTERS OHIO

BOB PAYNTER

APRIL, 2011

BLACKSTONE0000123

**AUTHOR**

An investigative reporter and editor for nearly 25 years in Akron and Cleveland, Bob Paynter took an early retirement buyout from The Plain Dealer in 2008. He continues to investigate, research and write about matters affecting public policy on a contract basis.

**POLICY MATTERS OHIO** is a nonprofit, nonpartisan research institute dedicated to researching an economy that works for all in Ohio. We seek to broaden debate about economic policy by providing research on issues that matter to Ohio's working people and their families. Areas of inquiry for Policy Matters include work, wages and benefits; education; economic development; energy policy; and tax policy.

BLACKSTONE0000124

# Preface to the Report

A few months ago, Policy Matters Ohio asked journalist Bob Paynter to take a deep look at Ohio's current record on prison privatization. Though we had no way of knowing that Governor John Kasich's first budget would propose selling five publicly owned prisons, we thought it likely that prison privatization would be considered. Paynter's excellent analysis of the cost issues in private prisons follows.

To be clear, Policy Matters believes that there are many reasons to be concerned about prison privatization and to be skeptical even if cost savings exist. If "savings" result from higher prisoner-to-guard ratios, more crowding, less psychiatric or medical care, lower hourly pay for guards, less spending on training, or less spending on prison education, food, or recreation, they will likely cost us more in the long run. All of these can result in lower quality supervision, more morale problems, or overall declines in quality. This in turn can mean less rehabilitation, more recidivism, and possible increases in tension within the facility.

Second, accountability and transparency are significantly lower in private companies than in public entities. Incarceration is, by definition, a tremendous incursion on liberty. The isolation and tarnished reputation of inmates makes them prime targets for abuse. Thus, this is an area of government where we should want the highest levels of transparency and accountability, even if that results in slightly higher costs.

Third, private prisons must have room for profit. This can result in perverse incentives, where the interest of the operator is to maximize the number of inmates. That is not the same interest as those of Ohioans. In addition, if compensation of guards is lower, then Ohio communities are receiving less of the return for this state spending, increasing what economists call "leakage". In other words, if pay is reduced but profits for out-of-state operators are increased, the money is not staying and circulating in the Ohio economy. This reduces the positive impact of state spending, making it less helpful to Ohio's beleaguered communities.

The above concerns are all reasonable to raise about publicly-owned, privately-managed prisons. The concerns intensify when we consider outright private ownership. Once prisons are sold or privatized, there is reason to worry that the state will have reduced bargaining power to change course or switch vendors, giving private operators more leverage and more ability to garner excessive profits.

For these reasons and more, critics are rightly skeptical about prison privatization. A demonstration of lower cost is not sufficient reason to give over this most sensitive government function to private, profit-making companies. This study finds that, in fact, the cost calculations performed over a number of years by the State of Ohio have not reliably demonstrated the private-prison savings required under Ohio law. This history makes it difficult to have confidence in new claims of cost savings. Policy Matters recommends that policy makers reject the proposal to sell Ohio prisons to private bidders. We encourage you to read this detailed examination.

-- Amy Hanauer,
Executive Director

BLACKSTONE0000125

# Executive Summary

Ohio taxpayers have purportedly saved more than $45 million over the last decade from the private operation of two state prisons. Now, with the substantial expansion of prison privatization recently proposed by Republican Gov. John Kasich, they're being promised tens of millions more in savings over the next one.

But if past is prologue, there is little reason to be confident in such promises.

Since the first private prisons were opened here in 2000, Ohio law has required that any private operator produce savings of at least 5 percent compared to what it would cost the state to run the same facility. And if you believe past state pronouncements, the savings have exceeded that threshold by a factor of three.

But a closer look reveals that, as of last month – 10 years into the privatization experiment, and one day before Kasich's announced expansion – Ohio officials still hadn't developed an accurate, reliable way to compute how much, if anything, they had actually saved.

Their methods for calculating the seemingly robust savings have changed substantially and, in some case, inexplicably over the last several biennia. A detailed examination of those calculations shows them not only to be riddled with errors, oversights and omissions of significant data, but also potentially tainted by controversial accounting assumptions that many experts consider deeply flawed.

Acknowledging that previous efforts were both inconsistent and imprecise, state officials more than two years ago started re-tooling those cost-savings calculations, beginning with the 2010-2011 biennium that's now coming to a close. And in preparation for the coming biennium, they started instituting even more fundamental alterations last fall – many of which, had they been instituted in earlier calculations, would have raised significant red flags about the savings Ohio has been touting over the years.

Even last month, on the eve of Kasich's proposal to sell five prisons – which, in a stroke, would triple the number of Ohio prisoners under private supervision – numbers crunchers at the Ohio Department of Rehabilitation and Correction (ODRC) were still tinkering with the cost-savings calculations in fundamental ways, saying they hoped a new formula could be proposed and approved by the state budget office sometime this month (April).

Work on a reconstituted formula may well be ongoing. (Officials, promising transparency in the revision process, said the new methodology would appear on the ODRC website upon completion and approval. As of April 15, it had not appeared.)

On April 6, the state posted its bid request for the purchase and operation of the five prisons. And even though the savings formula was still being modified when the sale was proposed, ODRC's chief budget analyst, Kevin Stockdale, said he is confident the private-prison savings are there, "even without all the decimal places double checked."

But an examination of the calculations the state has relied on to proclaim those savings since 2006 shows that – once apparent errors are corrected and revisions being proposed by ODRC are made – it's far from clear that Ohio's private prisons are producing the savings required by law. Or that they ever have.

In fact, revised calculations suggest that it may actually have cost taxpayers MORE to contract with a private vendor for operations at the Lake Erie Correctional Facility in Conneaut for fiscal years 2006 and 2007 than to have allowed the state to run it. And for both the 2008-09 and the

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 48 of 279 PageID #: 22677

BLACKSTONE0000126

2010-11 biennia, revised calculations for Lake Erie project savings that appear to fall below – and in some years, well below – the 5 percent minimum required by state law.

If that's been the case, and the touted savings have been largely illusory, then Ohio's 10-year-experiment with prison privatization becomes considerably less successful than its billing, leaving little more than blind ideology or political preference to justify the dramatic expansion now underway. And without a strong fiscal rationale, critics' concerns about the effectiveness and security of private prisons – underscored by dramatic events last summer in Arizona, where three inmates escaped from a private prison near Kingman and allegedly murdered a couple, take on that much more weight.

Stockdale and his fellow number crunchers at ODRC, working with the state's office of budget and management, may still devise and publicize a formula that documents the savings that state law requires. That they haven't previously is both telling, given the claims the state has made, and not terribly surprising.

Nationally, there is little or no consensus about whether private prisons save taxpayers much of anything. The private corrections industry and its allies claim substantial savings – in the range of 5 to 15 percent a year. Skeptics say there is little credible evidence for that. What independent research there is tends to be ambiguous.

The hunt for these savings is also politically charged – with Republicans and Democrats and their supporters tending to land on opposite sides of the debate. And it's an exceedingly difficult task to begin with, because it essentially involves comparing the operating costs of a real, privately operated prison with a make-believe facility, identical in every way to the private one, except that it's staffed by state employees and run by the state. That's what Ohio has been trying to do with its various calculations.

But a host of assumptions can crop up in such analyses, some of them quite controversial, which can tip the scale one way or the other depending on how they're handled. For instance, how should one account for the corrections department's central office expenses? And how should the state's payments for inmate labor in the private prison be handled – or reimbursements to the private vendor for outsized medical costs?

In interviews as recently as the day before Kasich's prison-sale announcement, Stockdale said these are among the items the state is now revisiting, in addition to trying to clean up the inconsistencies, oversights and imprecision in past calculations.

The problem is that once past errors in the state calculations are corrected and revisions made, the private-prison savings computed by the state over the years appear to shrink dramatically.

For the 2006-07 biennium, for instance, when apparently distorted staffing and overhead estimates are revised in the calculation, the computed savings of $2.4 million for each of the two years becomes a COST of between $380,000 and $700,000 a year.

For the 2008-09 biennium, potential savings of as much as 21 percent a year shrivel to between 1.2 percent and -0.3 percent when errors are corrected and state-proposed revisions made, depending on how state overhead is handled. For 2010, the computed savings could drop from 13.9 percent to 3.6 percent, and for 2011, from 15 percent to 4.7 percent. In each year, once proposed revisions are made to the state's calculations, the computed savings could fall below the 5 percent required by law.

At the very least, that should give taxpayers pause. It may eventually turn out that private prisons do save money. But after 10 years of claiming it, Ohio has fallen well short of proving it.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 49 of 279 PageID #: 22678

BLACKSTONE0000127

# Cells for Sale: Understanding Prison Costs & Savings

If you believe what you hear from the state of Ohio, then more prison privatization is a fiscal no-brainer.

For the last decade, the state has consistently claimed annual savings in the 10-to-17 percent range for the operation of its two privately run prisons – Lake Erie Correctional Institution, in Conneaut, and North Coast Correctional Treatment Facility, in Grafton. Both have been operated under contract by Management and Training Corporation (MTC) of Centerville, Utah since 2001 (Lake Erie, a year earlier). And, if you believe the state, they have combined to generate savings in excess of $45 million for taxpayers compared to what the state would have spent to run them itself.[1]

What's not to like about that?

Even before last fall's election, when a pre-disposition toward downsizing government was firmly established in Columbus, ferment for more privatization was building.

Nationally, from 2000 to 2009, the number of state and federal inmates in private prisons had grown by 48 percent, to nearly 130,000 – about 8 percent of all prisoners in the U.S.[2] With an established footprint in at least 32 states, private corrections had become a $22.7 billion industry, Fortune Magazine reported last summer, with an annual growth rate of 4.7 percent and an optimistic outlook for the future.[3]

Citing Ohio's "successful 10-year experiment" with private management of two facilities, a pair of state senators introduced legislation last June to privatize at least half of the state's 31 prisons, arguing the move could save between 10 and 20 percent a year.[4] The bill didn't go far.

But with the virtual clean sweep by Republicans at the polls in November, and the $8 billion hole opened in Ohio's budget for the next biennium by the state tax cuts approved in 2005 and the financial meltdown of 2008-2009, a surge in prison privatization seemed all but inevitable.

So, on March 15, when Gov. John Kasich proposed the outright sale of five state-owned prisons, including the two already operated privately, the only real surprise was in the scope of the proposal – which in a single stroke would nearly triple the number of Ohio inmates under private supervision – and even that was mild. The idea just seemed to make sense:

- On ideological grounds – to those for whom private enterprise is *always* better and more efficient than government.

- On political grounds – to those who find far more support in business circles than in the public-employee unions most likely to be hurt, and

- Most importantly, on financial grounds. Not only would the proceeds from the sale – pegged at $200 million, but estimated to provide only $50 million to the General Revenue Fund budget – help with immediate budget problems. But, given the requirement in Ohio

---

[1] Ohio Legislative Service Commission (Joseph Rogers, Senior Budget Analyst), "Privately Operated State Prisons save $5.5 million in FY 2010," Budget Footnotes, July 2010, page 30.

[2] Heather C. West, William J. Sabol and Sarah J. Greenman, "Prisoners in 2009," Bureau of Justice Statistics, page 34, December 2010 at http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf

[3] D. M. Levine, "What's costlier than a government run prison? A private one," Fortune Magazine, Aug. 18, 2010 at http://money.cnn.com/2010/08/17/news/economy/private_prisons_economic_impact.fortune/index.htm

[4] Jon Craig, "Privatization Sought for Ohio Prisons," The Cincinnati Enquirer, June 21, 2010, page B1.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 50 of 279 PageID #: 22679

BLACKSTONE0000128

law that any private prison must produce a 5 percent savings compared to state operations, the move would arguably save taxpayers a minimum of $55 million over the next decade.[5]

But it's over this fiscal argument – the only legitimate rationale from a policy perspective – that deep skepticism is in order. If Ohio is basing the promise of future savings from private prisons on its evaluation of their past performance, then there is little reason for confidence in that promise.

The state's method for calculating the hefty savings it has claimed for private prisons does not stand up well to scrutiny. It has shifted substantially and in some cases mysteriously and inexplicably, from biennium to biennium. And a detailed examination of the calculations over the last six years shows them to be riddled with errors, oversights and omissions of significant data and potentially tainted by controversial accounting assumptions that many experts consider deeply flawed.

Acknowledging that previous efforts were both inconsistent and imprecise, state officials decided on their own to re-tool the cost-savings calculations for the 2010-2011 biennium that's now coming to a close. And last fall, in preparation for the private-prison contract renewal for the coming biennium, they started instituting even more fundamental alterations in the calculations[6] – changes that were still being proposed and considered last month, even as Kasich was unveiling his proposed prison sale.

On March 14, the day before the governor's announcement, the budget chief for the Ohio Department of Rehabilitation and Correction (ODRC) disclosed in an interview that a fundamental proposed change was under review in the way department overhead should be addressed in the calculation – a change that would substantially reduce the savings projected for the private prisons – and that a new method for calculating cost savings had neither been finalized nor approved.

Asked if, in an ideal world, the method to calculate privatization savings ought to be in place *before* a major expansion in privatization is proposed based on those very savings, ODRC budget chief Kevin Stockdale replied:

"Well, we don't live in that world."[7]

Stockdale said he transferred to ODRC from the state budget office in September of 2008 and immediately saw problems with the way the private-prison savings projections were done for the two previous biennia – 2006-2007 and 2008-2009. "It wasn't very precise in the way it was done," Stockdale said. "It was not consistent. As an outsider, it sort of shocked me. So we decided to change it."

Stockdale said he has no stake in the privatization argument one way or the other. But despite the continuing flux in the methodology, he said that he and his department superiors, not to mention the state's political leaders, are convinced that private-prison savings are real.

"I didn't come into this with a pre-disposition either way," Stockdale said. "But after looking at the numbers, I'm confident that … even without all the decimal places double checked, the savings are definitely there. At least in my opinion."

---

[5] Timothy S. Keen, Ohio Office of Budget and Management, "The Savings Book," State of Ohio Executive Budget, Fiscal Years 2012 and 2013, page 68 at http://www.scribd.com/doc/50798366/Ohio-2012-13-Budget-Book-Four-The-Savings-Books

[6] Interview with Kevin Stockdale, Chief, Budget Planning and Analysis, Ohio Department of Rehabilitation and Correction, conducted Feb. 24, 2011.

[7] Interview with Kevin Stockdale, Chief, Budget Planning and Analysis, Ohio Department of Rehabilitation and Correction, conducted March 14, 2011.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 51 of 279 PageID #: 22680

BLACKSTONE0000129

But if they are, the state has fallen far short of proving it.

For simplicity's sake, this examination will focus on the calculations as they apply to Lake Erie Correctional Institution, a medium security prison with similarities to several of Ohio's state-run facilities. (The cost-savings calculations follow the same pattern with the North Coast facility in Grafton. But that facility was designed especially for felony DUI offenders and its unique mission makes it much more difficult to compare to others.)

In a pair of recent interviews, Stockdale said he has proposed significant changes to virtually every phase of the calculations for the Lake Erie facility. Several apparent errors have been discovered as well. But, once the errors are corrected and proposed changes made to the calculations, it's not at all clear that Lake Erie is producing the 5 percent savings required by law. Or that it ever has.

In fact, in fiscal years 2006 and 2007, revised calculations suggest that it may actually have cost taxpayers MORE to contract with MTC for operations at Lake Erie than to have allowed the state to run it.

If that's the case, and the touted savings have been largely illusory, then Ohio's 10-year-experiment with prison privatization becomes something less than "successful," leaving little more than blind ideology, or political preference – or the prospect of the one-time injection of cash from an initial sale of assets – to justify further ventures in that direction.

And absent a strong fiscal rationale, concerns about the effectiveness and security of private prisons take on more weight.

## National research

The cost question is unresolved in the national discussion as well.

While debate over prison privatization has been heated and divisive, there is little or no consensus on whether it actually saves money and, if so, how much. Industry leaders typically claim savings of from 5 to 15 percent, sometimes more, for a private versus public facility,[8] but the research – such as it is – has been highly ambiguous and often seems more emotional than analytical.

"A lot of the arguments are very hypothetical and are more based on theory than on fact, more on ideology than anything," said Dr. Gerry Gaes, director of research at the federal Bureau of Prisons from 1988 to 2002 and a visiting scientist with the National Institute of Justice, the research, development and evaluation agency of the U.S. Department of Justice, from 2002 to 2007.[9]

Given the stakes and the fervor of the debate, one would expect the issue to have been thoroughly vetted by now. But Gaes's own review of the literature last year found very few studies that compared privately and publicly operated facilities. Many of the studies that were found were "of questionable value" and often contained widely differing conclusions about what the research actually shows.

For instance, Gaes noted a triangular dispute over privatization costs several years ago in Florida that involved the state department of corrections, a private prison contractor and the Office of Program Policy Analysis and Government Accountability, a research arm of the state legislature. "All three produced separate and contradictory results regarding the per capita costs of public and private facilities in the state. The Florida Department of Corrections showed that the private contractors were

---

[8] Fortune, note 3
[9] Interview with Dr. Gerald G. Gaes, director of research, Federal Bureau of Prisons from 1988 to 2002; visiting scientist at National Institute of justice, 2002 to 2007, conducted March 23, 2011.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 52 of 279 PageID #: 22681

BLACKSTONE0000130

more expensive than the public operators. The private contractor showed that the privately operated facilities were less costly than the public counterpart. OPPAGA showed that the costs of the publicly and privately operated prisons were about the same."

His conclusion on the state of the research? "Direct comparisons of cost and quality neither favor the public nor the private sector."[10]

In 2007, researchers at the University of Utah reached essentially the same conclusion: "The intensity of the debate suggests that a clear, obvious choice about privatizing prisons does not exist. Eight of the 12 studies … (that were sufficiently rigorous to review) provided information on cost effectiveness. Half of these eight revealed that privately managed prisons outperformed publicly managed prisons, with a range of cost effectiveness from 4.6 percent to 15.2 percent. Of the remaining four studies, two showed that publicly managed prisons were more cost effective than their privately managed counterparts (10.0 percent and 14.2 percent). The remaining two studies revealed a statistical tie: that is neither system outperformed the other. Our conclusion is that prison privatization provides neither a clear advantage nor disadvantage compared to publicly managed prisons. Cost savings from privatization are not guaranteed and quality of services is not improved."[11]

Because of political and ideological forces that often drive them, government analyses typically have not been helpful, others have found. Not only have governments generally neglected to develop independent estimates of what privatization would actually cost before deciding to do it, they also have typically failed to follow consistent accounting procedures in evaluating the results.[12]

If privatization decisions were left to public corrections officials, and if such decisions were not so politically contentious, Abt Associates concluded in a 2003 privatization study that most officials could probably be counted on to do the analysis necessary to identify the most cost-effective course to follow. "But most prison privatization decisions are initiated not by correctional administrators but by their political masters – the governors or legislatures," Abt found. "And these decisions are often surrounded by much politicking by private firms and public employee union representatives who feel their jobs may be at stake."[13]

Complicating the process further, according to Abt, is the inherent difficulty of trying to estimate what the government *would have spent* to operate a facility that's actually being run by a private firm – or trying to quantify what Abt describes as "the course not taken."[14] That's exactly what Ohio has tried to do.

## An exercise in make believe

Since no state-run facility is directly comparable to Lake Erie Correctional (or the North Coast facility, for that matter), the state's calculations essentially involve an exercise in make believe: Creating a hypothetical prison – identical in every respect to that run by the private company except that it's fully staffed and operated by the state, and then calculating what this make-believe prison

---

[10] Gerald G. Gaes, "The Current Status of Prison Privatization Research on American Prisons," August, 2010 at http://works.bepress.com/cgi/viewcontent.cgi?article=1000&context=gerald_gaes&sei-redir=1#search=%22current+status+of+prison+privatization+research+on%22
[11] Lundhal, Brad W., Kunz, Chelsea, Brownell, Cyndi; Harris, Norma; Van Vleet, Russ (2009). "Prison privatization: A meta-analysis of cost and quality of confinement indicators." *Research on Social Work Practice*, vol 19(4), July 2009, pp. 383-394, or at http://ucjc.law.utah.edu/wp-content/uploads/86.pdf
[12] Douglas McDonald and Carl Patten, Abt Associates Inc., "Governments' Management of Private Prisons," Sept. 15, 2003 for the National Institute of Justice at http://www.ncjrs.gov/pdffiles1/nij/grants/203968.pdf
[13] ibid.
[14] ibid.

BLACKSTONE0000131

would cost to operate per inmate per day compared to what the state is paying MTC to run the actual one.

As Abt noted in 2003, and Gaes and others have noted since, such analyses of hypotheticals are vulnerable to controversial accounting assumptions that can radically skew the results.[15] What, for instance, is an analyst to do about governmental overhead expenses, which often are figured as high as 10–15 percent of a prison's direct operating costs? In Ohio's case, how do you handle Lake Erie's share of ODRC's expenses for central office functions like planning, research and administration, to name just a few?

Are such expenses actually "saved" by the act of privatization, which is how Ohio has treated them in past calculations? Or, are they the ongoing costs of running a prison system that taxpayers still must shoulder whether Lake Erie is public or private and, thus, not really savings at all? As will be seen, the difference in the two approaches can be huge.

"Whenever you compare a real facility against a hypothetical facility, this becomes an issue," said Travis Pratt, an Arizona State University criminologist who has studied privatization questions. Treating a facility's share of central office functions as a savings from privatization "is a disingenuous way of doing the accounting. You fabricate a cost savings that way." Pratt said the approach is typical of how private corrections firms "creatively budget to show a savings that is not there. That savings is not real. The state is not going to be saving money off of that."

But that's not to say privatization doesn't save money, Pratt said. It might, even if there is little systematic evidence to prove it. But if there are savings, Pratt said, they are likely to come from only one place: staffing.[16]

"If you look at a department of corrections budget, there isn't a line item that says 'waste' that you can just go ahead and cut. The cuts have to come from somewhere and there are very few places where you can actually cut costs, whether a public institution or a private. Where you get that savings is usually going to be in the number of staff, how they are compensated and how extensively they are trained."

And as Arizona has experienced recently, Pratt said, "those kinds of cost savings don't come without consequences."[17]

Arizona has been a more aggressive – and some might argue, less careful – privatizer than Ohio. The number of inmates in private prisons there has grown more than six-fold since 2000 and now accounts for about 22 percent of the state's prisoners,[18] compared to what would only be about 13 percent in Ohio – even after the contemplated prison sale is completed.[19] Two years ago, the Arizona legislature passed, and the governor signed, a bill allowing the sale of virtually all of the state's prisons

---

[15] ibid. Gerry Gaes, "Cost, Performance Studies Look at Prison Privatization," National Institute of Justice Journal No. 259, March 2008, or at http://www.nij.gov/journals/259/prison-privatization.htm
[16] Interview with Travis Pratt, professor of criminology and criminal justice, Arizona State University, conducted March 23, 2011
[17] ibid.
[18] Prisoners in 2009, note 2.
[19] Ohio Department of Administrative Services, Request for Proposals for Operation, Maintenance and Purchase of Correctional Facilities, RFP # CSP901412, April 6, 2011 at http://procure.ohio.gov/PDF/462011163521CSP901412.pdf (the private prisons would have combined capacity of 6,561, about 13 percent of current overall prison population of 50,500).

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 54 of 279 PageID #: 22683

BLACKSTONE0000132

to private vendors willing to pay $100 million in cash upfront. The provision was later stricken from the budget bill after no suitors came forward.[20]

Last July, Arizona officials got a sudden wake-up call when three inmates escaped from a private prison near Kingman, led authorities on a manhunt throughout the western United States and allegedly murdered a couple in New Mexico before they were apprehended. Family members of the slain couple have filed a $40 million claim against Arizona and the prison operator – Management and Training Corporation (MTC), the same company that operates both of Ohio's private prisons.[21]

Among the culprits identified by state investigators was an inexperienced, poorly trained staff at the MTC facility and apparently lax monitoring by the state that left that and other serious security lapses undetected.[22]

The day after Ohio's prison-sale proposal was unveiled last month, Gary C. Mohr – the director of ODRC and a veteran of both public and private corrections[23] was grilled by skeptical Democratic lawmakers on precisely that potential vulnerability. Asked where the savings from privatization would come from, Mohr essentially agreed with Pratt: From personnel. Not only do private firms typically pay less than the state, Mohr said, but they also allow less vacation and less sick and personal time off, so they can hire fewer people to cover the same number of required positions.

"We are paying more often for people to be off work than they are," Mohr said. As a result, for some security posts, it would take two state employees to staff a position that a private firm could cover with 1.7.[24]

When lawmakers expressed concern about a possible falloff in quality among these less expensive staffers, Mohr was reassuring. As is currently the case, he said, the private prisons will be required to meet the same operating standards as the state. And in a change from current practice, ODRC spokesman Carlo LoParo said the state will require that the private prisons' corrections officers be trained by the state – at the private vendor's expense – at the department's training academy alongside their counterparts from state-run institutions.

Currently, MTC, although required to meet ODRC standards, trains its own staff. LoParo said the change is designed to ensure a "uniform system" where not only are procedures identical in public

---

[20] Casey Newton, Ginger Rough and JJ Hensley, "Arizona inmate escape puts spotlight on state private prisons," The Arizona Republic, Aug. 22, 2010 at http://www.azcentral.com/news/articles/2010/08/22/20100822arizona-private-prisons.html

[21] JJ Hensley and Ginger Rough, "Kingman prison still under scrutiny," The Arizona Republic, Jan. 30, 2011 at http://www.azcentral.com/news/articles/2011/01/30/20110130kingman-prison-still-under-scrutiny0130.html

[22] ibid.

[23] Mohr is a former consultant and managing director for Corrections Corporation of America, the Nashville-based corrections giant. Mohr moved to the private sector in 2005 after an extensive career in Ohio's prison system. He was an ODRC deputy director under two different administrations and a warden at three Ohio prisons. Mohr was a managing director for CCA from 2007 to 2009. The company also was a client of his consulting firm, Mohr Correctional Insight, before and after his CCA employment. CCA would be eligible to bid on the state prison sales, but Mohr has promised to remove himself from all consideration of those bids. Joe Guillen, "Private corrections company with ties to government officials will not get special treatment while Ohio sells five prisons, director says," The Cleveland Plain Dealer, March 21, 2011 at http://www.cleveland.com/open/index.ssf/2011/03/private_corrections_company_wi.html. On March 30, according to The Columbus Dispatch, the interim executive director of the Ohio Ethics Commission said Mohr does not have a conflict of interest with regard to the state's privatization plans.

[24] Laura A. Bischoff, "Ohio wants 5 prisons sold by August," The Dayton Daily News, March 22, 2011 at http://www.daytondailynews.com/news/dayton-news/ohio-wants-5-prisons-sold-by-august-1114455.html ;
Alan Johnson, "Sale of prisons, fewer inmates part of budget plan," The Columbus Dispatch, March 22, 2011 at http://www.dispatchpolitics.com/live/content/local_news/stories/2011/03/22/copy/sale-of-prisons-fewer-inmates-part-of-plan.html?sid=101;
Gongwer News Service, "Administration pitches prison sales, sentencing changes to House panel," March 22, 2011

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 55 of 279 PageID #: 22684

BLACKSTONE0000133

and private facilities, but staff training is also. He and Mohr emphasized that, as is currently the case with Lake Erie and North Coast, state-paid monitors would be on hand at all times to oversee compliance with state requirements. But as was discovered last year at MTC's facility in Kingman, Arizona, the presence of state-paid monitors isn't always a panacea.

### In the beginning

Ohio was a relative late-comer to the era of private prisons, which dawned in the U.S. in 1983 with the founding of Corrections Corporation of America (CCA) and the opening in Texas the following year of its first privately designed, built and operated facility. CCA still has the largest private-corrections footprint in the nation, according to Gaes, with 17,000 employees and 75,000 inmates housed in 60 facilities in 19 states, 44 of which are company owned.[25] A close second is The GEO Group, formerly Wackenhut Corrections Corporation, which, following a merger last year with former competitor Cornell Corrections, now claims some 80,000 prison beds under contract worldwide, including operations in Canada, South Africa, Australia and the United Kingdom.[26] The corrections division of Wackenhut was formed in 1984. MTC started in 1981 as a job training organization operating U.S. Department of Labor Job Corps centers. The company entered private corrections in 1987 and now operates 20 state and federal facilities with 25,000 beds in seven states, including Arizona and Ohio.[27]

The first private prison on Ohio soil was the Northeast Ohio Correctional Facility, initially a troubled facility for federal inmates that was opened by CCA in Youngstown in 1997.[28] By the time the state of Ohio first opened its own privately operated prisons three years later, nearly 70,000 inmates were already under private supervision in 29 other states, along with more than 15,500 federal prisoners.[29]

By the end of 2009, the number of federal inmates in private prisons had more than doubled and those under state authority had increased by a third. With about 4 percent of its prisoners under private supervision at the end of 2009, Ohio ranked 20th among the states in the percentage of privatized beds (behind New Mexico, with 43.3 percent; Montana, Alaska and Vermont, with between 30 and 40 percent; and Hawaii, Idaho, Mississippi, Oklahoma, Colorado and Arizona, all with 20 percent or more). The federal government, with 34,087, had the largest number of privately held prisoners at the end of 2009. Ohio had roughly 2,200, ranking it 15th in the number of privately held inmates, behind Texas – far and away the national leader with more than 19,000 – and Florida, Arizona, Oklahoma, Mississippi, Georgia and Tennessee, all with 5,000 or more.[30]

If the Kasich plan is realized[31], Ohio's private prisons would have a combined population of about 6,560. Assuming no change elsewhere, that would put Ohio in the top five in the number of privatized beds and roughly 12th among the states in percentage of private prisoners.

---

[25] Gaes, note 10; Corrections Corporation of America website at http://www.cca.com/about/

[26] The GEO Group Inc. website at http://www.thegeogroupinc.com/about.asp

[27] Management & Training Corporation website at http://www.mtctrains.com/about-mtc/overview

[28] Michael Hallett and Amy Hanauer, "Selective Celling: Inmate Population in Ohio's Private Prison," Policy Matters Ohio, May 2001 at http://www.policymattersohio.org/pris.html

[29] Prisoners in 2009, note 2

[30] ibid.

[31] The state issued its request for proposals (RFP) for the prison sale on April 6. All proposals are due by June 16, with an estimated contract-award date of Aug. 31 and transfer of operations by Dec. 31. ODRC director Mohr has said he expects five to seven bidders.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 56 of 279 PageID #: 22685

BLACKSTONE0000134

Ohio's prison population and corrections budget have exploded since the 1970s just as they have in virtually every other jurisdiction. But unlike Arizona and most of the other private-prison states, Ohio appears to have ventured into private corrections almost exclusively as an experiment in cost control. In a survey conducted by Abt Associates, of the 23 states (plus the federal government, District of Columbia and the Commonwealth of Puerto Rico) that reported having prison contracts with private firms at the end of 1997, only eight reported that cost savings were of primary importance in the privatization decisions. For the rest, privatization was seen as a means to reduce overcrowding and to acquire prison beds quickly.[32] For Ohio, private prisons were seen as a way to save money. In fact, the requirement that any private prison firm operate at least 5 percent below ODRC's estimated costs for a comparable state institution was inserted into law from the outset.[33]

But the process for assuring that that goal is met has been both mysterious and something short of rigorous.

In 2001, after CiviGenics – the first operator of the North Coast Correctional Treatment Facility – ran afoul of state officials for contract violations and other issues there, ODRC offered to pay potential replacements significantly more than CiviGenics was getting per inmate per day to operate the facility. But when an insufficient number of bids met the 5 percent savings goal, ODRC simply raised its estimate of what the state would have spent to run it. That allowed would-be operators to ask for as much as $62.88 per inmate per day – 13.5 percent more than CiviGenics had been receiving – and still meet the 5 percent "savings" requirement.[34]

That contract was eventually awarded to MTC, the original contractor hired (without a competitive bid and to the chagrin of competitors) to operate Lake Erie Correctional Institution, a 1380-bed institution that opened in Conneaut in April of 2000, about a month after North Coast Correctional.[35]

For Lake Erie, ODRC estimated that MTC would save 12 percent annually over what the state would incur to run the facility, based on the contract per diem of $36.47 awarded to the company and the department's estimate that it would have cost the state $41.47 per inmate per day to run it. ODRC used a hypothetical model to derive this estimated cost and released limited information about the variables that went into that model.[36]

Mystery has shrouded the state's savings calculations almost ever since.

In fact, officials of the Ohio Civil Service Employees Association, the public-employees union whose members' jobs are most threatened by the push toward privatization, are deeply skeptical about the savings the department has claimed. But they say they have never seen the actual calculations that produced those savings projections.[37]

Last December, union officials submitted a public records request to ODRC for "all documents that explain the process whereby the 5 percent savings that private prisons must demonstrate was calculated." In return, they received a document entitled "Overview of Privately-Operated Prison Cost Comparison" that described the components of the calculations, but contained no calculations.

---

[32] Abt. note 12
[33] Selective Celling note 28
[34] ibid.
[35] ibid.
[36] ibid.
[37] Interview with Tim Roberts, vice president of the Ohio Civil Service Employees Association/AFSCME Local 11, conducted on Feb. 16, 2010

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 57 of 279 PageID #: 22686

BLACKSTONE0000135

In response to its own public records request, Policy Matters Ohio in January received electronic copies of the actual spreadsheets that ODRC officials have used to calculate the projected savings from private prisons in each of the last three biennia – 2006-07; 2008-09 and 2010- 2011.

The three spreadsheets contain significant detail on how the recent calculations have been made. However, it's clear they were not designed to determine an appropriate per diem for the private prisons, one that would ensure that the required 5 percent savings is realized. Rather, the per diem is negotiated with the private provider first. The calculation is then used to determine that the per diem would generate the requisite savings.

The process has always been the same, Stockdale said in an interview: Negotiate a rate acceptable to the private vendor, then run a series of calculations to show it saves 5 percent.[38]

Focusing, as mentioned earlier, on Lake Erie Correctional, and based on a detailed examination of the recent spreadsheets, here's how the process has worked.

In order to calculate Lake Erie's projected savings, one needs to imagine a hypothetical institution that looks exactly like Lake Erie, but is operated by the state, and then ask how much it would cost:

- to staff such a facility with state employees;
- to stock, supply and equip such a facility and to provide an appropriate menu of services; and
- to provide the facility with heat, electricity, water and sewer services.

Utilities appear to be the smallest of these cost components and the most straightforward to calculate. State officials have simply assumed that utilities would cost the same whether the state or a private firm was in charge. So Lake Erie's actual utility costs for previous years, adjusted for inflation and divvied up per inmate per day, are simply inserted into the per diem cost calculation for its hypothetical twin.[39]

Since there is no state-run facility that works just like Lake Erie, calculating costs for equipment, supplies and contract services for the hypothetical is much trickier. So, the ODRC has tried to create a composite facility of sorts by selecting five prisons that share some of Lake Erie's characteristics, averaging their non-utility, non-personnel expenses, dividing the total by the average of their inmate populations per day and inserting the result into the hypothetical's per diem calculation.[40]

Staffing requirements – the number of posts that need to be manned per shift – are established for Lake Erie by contract. But because private firms have had different training regimens than the state, offer less time off and tend to pay less overall, real cost differences may exist here. To measure that, state officials determine how many state employees would be needed to fill the required number of positions and how much those employees would receive in state pay. That total is also divided by the number of inmates per day and added to the previous two components to produce a payroll+costs+utilities per diem for the hypothetical.

Then, the spreadsheets show, an estimate or calculation has been made of the hypothetical's share of "indirect costs," which essentially are all ODRC costs associated with running prisons – as opposed to functions like community-based corrections and parole operations. These, too, are divided by the number of inmates per day and added to the hypothetical's per diem.

---

[38] Stockdale interview, Feb. 24, 2011, note 6.
[39] ibid.
[40] ibid.

Case 3:16-cv-02267      Document 401-22      Filed 01/22/21      Page 58 of 279 PageID #: 22687

BLACKSTONE0000136

Under the private-prison contract, ODRC-paid staffers must be on hand at the private prison to maintain correctional records and to monitor adherence to contractual obligations. Salaries and benefits for those staffers are totaled, divided by the number of inmates per day and added to Lake Erie's negotiated per diem – because these are additional costs associated with privatization, as opposed to savings.[41]

Finally, the hypothetical's per diem costs for payroll, supplies and equipment, utilities and indirect expenses are adjusted for inflation where appropriate and added together to create a total per diem for the facility if it were state run. That, in turn, is compared to Lake Erie's negotiated per diem, plus the daily per-inmate cost for contract monitors and records staff. If the Lake Erie figure is at least 5 percent lower than the hypothetical's, then the statutory savings requirement has been met.

But a close examination of the ODRC spreadsheets shows that errors, omissions and inconsistencies have dramatically distorted the savings projected by the state.


**The Spreadsheets**

Take the 2006-07 biennium, for instance. ODRC officials calculated the savings for Lake Erie over its hypothetical, state-run counterpart for those fiscal years at 10.2 percent, or about $2.4 million for each year of the biennium **(Table 1, Column A)**. But a detailed examination of the state's calculations shows that they include an apparently bloated staffing estimate for the state-run hypothetical – a figure nearly 20 percent higher than the actual number of employees at Lake Erie and approximately 12 percent higher than what the state would have needed to operate it.

The calculation also assesses the hypothetical for central office "indirect costs" at the rate of about 10 percent of its payroll+costs+utility per diem. As was mentioned earlier, it is controversial to include such central office "savings" at all. But granting for a moment that it should be included, based on the size of the adjustments now being considered by the state, that assessment was at least six times too high. Once those figures are adjusted, the picture of Lake Erie as a clear bargain for taxpayers is tarnished considerably.

In fact, with more realistic treatment of overhead costs, the savings projected by the state's calculation for a privatized Lake Erie could slip to as low as 1.1 percent to 2.5 per cent, well below the minimum required by law. **(Table 1, Columns B and C)** And when staffing levels for the state-run hypothetical are cut to their proper size, the privatized Lake Erie actually appears to have cost between 1.8 percent and 3.4 percent MORE to operate that its state-run twin – a loss for taxpayers of between $380,000 and $700,000 for each of those fiscal years. **(Table 1, Columns D and E)**

---

[41] ibid.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 59 of 279 PageID #: 22688

BLACKSTONE0000137

Table 1

**Ohio's Cost Savings Calculations for *2006-2007* biennium including revisions
for hypothetical state-run prison identical to Lake Erie Correctional Institution, both with 1360 inmates**

|  | Column A | Column B | Column C | Column D | Column E |
|---|---|---|---|---|---|
|  | Per diem* costs and savings computed by state officials | With adjusted central office costs per new state revision | With no central office costs as some recommend | With corrected staff levels and central office costs | With corrected staff levels; no central office costs |
| Utilities | $2.34 | $2.34 | $2.34 | $2.34 | $2.34 |
| Costs** | $6.94 | $6.94 | $6.94 | $6.94 | $6.94 |
| Payroll | $33.68 | $33.68 | $33.68 | $31.81 | $31.81 |
|  |  |  |  |  |  |
| Payroll+costs+utilities per diem | $42.96 | $42.96 | $42.96 | $41.08 | $41.08 |
| Central Office costs *** | $4.36 | $0.64 | $0.00 | $0.64 | $0.00 |
| Hypothetical's per diem cost | $47.32 | $43.60 | $42.96 | $41.72 | $41.08 |
|  |  |  |  |  |  |
| Negotiated per diem for Lake Erie | $42.27 | $42.27 | $42.27 | $42.27 | $42.27 |
| State monitor, other charges | $0.22 | $0.22 | $0.22 | $0.22 | $0.22 |
| Lake Erie's per diem | $42.49 | $42.49 | $42.49 | $42.49 | $42.49 |
|  |  |  |  |  |  |
| Lake Erie's savings vs hypothetical | $4.83 | $1.11 | $0.47 | -$0.77 | -$1.41 |
| Percent savings per year | 10.2 | 2.5 | 1.1 | -1.8 | -3.4 |
| Dollar savings per year (per diem savings*365*1360) | $2,397,580 | $551,575 | $233,879 | -$380,420 | -$698,116 |

Source: Ohio Department of Rehabilitation and Correction; author's calculations
* amounts per inmate, per day
** equipment, supplies, other expenses
*** about 10% of payroll+costs+utilities

For the 2008-09 biennium, officials calculated the projected savings for Lake Erie over its hypothetical, state-run counterpart at about 6 percent per year, or roughly $1.4 million for each year of the biennium. **(Table 2, Column A)** Actually, had state analysts been consistent with the previous biennium, those projected savings would have been dramatically higher – a whopping 21 percent, or nearly $6 million a year for Lake Erie alone.[42] **(Table 2, Column B)**

---

[42] Here's why the projected savings reported by the state were so much lower. A detailed examination of the calculations reveals two apparent oversights by state officials that, if corrected, would have produced the much more dramatic savings figures. As with the previous biennium, the spreadsheet contains the calculation of a percentage assessment for "indirect costs" (although for the 2008-09 biennium, the assessment was for about 13.9 percent of the payroll+costs+utilities per diem instead of the 10 percent used previously). For whatever reason, however, officials either neglected or declined to apply the assessment to the state-run facility as they had in the previous biennium and would again in the next one. Had they applied the assessment, the projected annual savings for Lake Erie would have been 17.6 percent – or more than $4.6 million each year. The spreadsheet also reveals that, after estimating the position-by-position wages and salaries that state employees would earn in fiscal 2008 if they were staffing the Lake Erie facility, officials inadvertently used an earlier year's pay estimates in the final cost calculations – seemingly understating the payroll costs. If both of those errors are corrected, the purported savings shoot to 21 percent per year.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 60 of 279 PageID #: 22689

BLACKSTONE0000138

Table 2

**Ohio's Cost Savings Calculations for *2008-2009* biennium, including revisions
for hypothetical state-run prison identical to Lake Erie Correctional Institution, both with 1380 inmates**

| | Column A | Column B | Column C | Column D | Column E | Column F |
|---|---|---|---|---|---|---|
| | Per diem* costs and savings computed by state officials**** | With oversights restored and payroll errors corrected | With adjusted central office costs per state's revision | With no central office costs as some recommend | With inmate pay, revised staffing central office costs | With inmate pay, revised staffing, no central office costs |
| Utilities | $2.87 | $2.87 | $2.87 | $2.87 | $2.87 | $2.87 |
| Costs ** | $7.94 | $7.94 | $7.94 | $7.94 | $7.94 | $7.94 |
| Payroll | $35.25 | $37.46 | $37.46 | $37.46 | $33.11 | $33.11 |
| | | | | | | |
| Payroll+costs+utilities per diem | $46.06 | $48.27 | $48.27 | $48.27 | $43.93 | $43.93 |
| Central Office costs *** | $6.42 | $6.71 | $0.68 | $0.00 | $0.68 | $0.00 |
| Hypothetical's per diem cost | $46.06 | $54.98 | $48.95 | $48.27 | $44.61 | $43.93 |
| | | | | | | |
| Negotiated per diem for Lake Erie | $43.25 | $43.25 | $43.25 | $43.25 | $43.25 | $43.25 |
| Inmate pay (columns E and F) | 0 | 0 | 0 | 0 | $0.71 | $0.71 |
| State monitor; other required charges | $0.10 | $0.10 | $0.10 | $0.10 | $0.10 | $0.10 |
| Lake Erie's per diem | $43.25 | $43.35 | $43.35 | $43.35 | $44.06 | $44.06 |
| | | | | | | |
| Lake Erie's savings vs hypothetical | $2.81 | $11.63 | $5.60 | $4.92 | $0.55 | -$0.13 |
| Percent savings per year | 6.1 | 21.2 | 11.4 | 10.2 | 1.2 | -0.3 |
| Dollar savings per year (per diem savings*365*1380) | $1,416,721 | $5,857,496 | $2,820,185 | $2,477,669 | $276,039 | -$66,477 |

* amounts per inmate, per day
** equipment, supplies, other expenses
*** originally (Columns A and B) about 13.9 % of payroll+costs+utilities
**** the central office costs for the hypothetical, and the state monitor costs for Lake Erie apparently were overlooked and the wrong year's pay estimates used in this calculation

Numbers like that make the privatization experiment look even more like a slam dunk.

But, as with the 2006-07 figures before them, the 2008-09 calculations for the hypothetical are burdened by dubious overhead assumptions and even more bloated staffing estimates (16 percent more employees than the state would actually have needed) which make the mythical state-run institution appear more expensive than it actually would be.

When those figures are cut to size in the calculation, and when previously ignored state costs (like inmate pay) are inserted, the projected savings virtually disappear – shrinking to between 1.2 percent and -0.3 percent, depending on how central office costs are handled, well below the 5 percent savings required by law. **(Table 2, Columns E and F)**

It should be mentioned that Stockdale was not with ODRC when those calculations were made and can't speak directly to how they were constructed. Arriving from the state budget office, Stockdale became chief of budget planning and analysis for ODRC in the fall of 2008. The following year, as he and his staff began preparing for the renewal of the private-prison contracts for Lake Erie and its sister institution, Stockdale said that several inconsistencies and problems with the state's earlier calculations became apparent and he set out to fix them.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 61 of 279 PageID #: 22690

BLACKSTONE0000139

Some of the more obvious concerns were rectified in the 2010-11 calculations, including the use of more precise salary figures for various positions in the state-run hypothetical and a more realistic estimate of its staffing levels. Stockdale also began to refine the calculations for "indirect costs," using actual figures for the department's prison-related central office expenses as a starting point instead of the shifting percentage estimation (about 10 percent for 2006-07, 13.9 percent in 2008-09) used previously.

"That is one of the things where it's inconsistent from year to year," Stockdale said in an interview. "Instead of trying to calculate the cost of central office, they applied a flat percentage. That is one of the things that bothered me."

One result of Stockdale's revision is what appears to be a much cleaner analysis for 2010-11, one that still shows an attractive projected savings for Lake Erie of 13.9 percent ($3.8 million) in fiscal 2010 and an even more attractive 15 percent ($4.2 million) for 2011.[43] **(Table 3, next page, Columns C and D)**

But there are ample reasons to be wary about these savings figures as well. In their ongoing review of the cost-saving calculations, Stockdale and his superiors at ODRC have discovered a number of other problems with the methodology – problems with significant implications not only for the savings attributed to the private facilities in the past, but also for projected savings in the future.

Multiple changes to the methodology – proposed by ODRC and awaiting approval by the Office of Budget and Management – were expected to be in place by this month (April), Stockdale said, before the department was scheduled to renew contracts for Lake Erie and North Coast. In the interest of transparency, he said the new methodology would appear on the ODRC website upon completion and approval. As of April 15, it had not appeared. Stockdale disclosed several of those proposed revisions during an interview in February.

They include probable changes in the complement of comparison facilities used to calculate cost estimates for equipment and supplies for the state-run hypothetical. While similar in size to Lake Erie, Grafton Correctional Institution (one of the five prisons, including the two already under private supervision, to be sold) and Allen Correctional Institution don't compare well otherwise, ODRC has concluded. Both have mental-health residential components within or attached to them that make them considerably more expensive to operate and the inmate populations of both are generally older and less healthy than at Lake Erie.[44]

---

[43] Actually, the projected savings figures the state had been using for 2010-2011 are somewhat lower because, in the original calculation, Stockdale's office mistakenly used Lake Erie's actual staffing figures for the state-run hypothetical, instead of the higher number the state would have needed to fill the same number of posts. As a result, the original calculations for the current biennium understated the personnel costs for the state-run hypothetical by about $1.36 per inmate per day, which amounts to about $725,000 per year. **(Table 3, Columns A and B)**

[44] ibid.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 62 of 279 PageID #: 22691

BLACKSTONE0000140

Table 3

| | Column A | Column B | Column C | Column D | Column E | Column F | Column G | Column H |
|---|---|---|---|---|---|---|---|---|
| **Ohio's Cost Savings Calculations for the _2010-2011_ biennium, with revisions** <br> **For hypothetical state-run prison identical to Lake Erie, both with projected average inmate population of 1450** | | | | | | | | |
| | 2010 per diem costs and savings computed by state* | 2011 per diem costs and savings computed by state* | 2010 calculation with hypo-thetical's staff level corrected | 2011 calculation with hypo-thetical's staff level corrected | 2010 cal-culation, adjusted to reflect state revisions *** | 2011 cal-culation, adjusted to reflect state revisions *** | Revised 2010 cal-culation (Column E), no central office costs *** | Revised 2011 cal-culation (Column F), no central office costs *** |
| Utilities | $3.06 | $3.15 | $3.06 | $3.15 | $3.06 | $3.15 | $3.06 | $3.15 |
| Costs | $8.75 | $9.02 | $8.75 | $9.02 | $8.65 | $8.90 | $8.65 | $8.90 |
| Payroll | $35.50 | $35.70 | $36.86 | $37.07 | $36.86 | $37.07 | $36.86 | $37.07 |
| State monitor; records staff for Lake Erie | ($0.56) | ($0.57) | ($0.56) | ($0.57) | ($0.56) | ($0.57) | ($0.56) | ($0.57) |
| Payroll+costs+ utilities per diem | $46.74 | $47.29 | $48.10 | $48.67 | $48.00 | $48.55 | $48.01 | $48.55 |
| Central office costs** | $3.94 | $4.06 | $3.94 | $4.06 | $0.72 | $0.75 | $- | $- |
| Hypothetical's per diem | $50.68 | $51.35 | $52.04 | $52.72 | $48.72 | $49.30 | $48.01 | $48.55 |
| Negotiated per diem | 44.25 | 44.25 | 44.25 | 44.25 | 44.25 | 44.25 | 44.25 | 44.25 |
| State monitor; records staff | $0.56 | $0.57 | $0.56 | $0.57 | $0.56 | $0.57 | $0.56 | $0.57 |
| Inmate pay and over-the-cap medical (Actual 2010 figures) | | | | | $1.44 | $1.44 | $1.44 | $1.44 |
| Lake Erie's per diem | $44.81 | $44.82 | $44.81 | $44.82 | $46.25 | $46.26 | $46.25 | $46.26 |
| Lake Erie's savings vs hypothetical | $5.87 | $6.53 | $7.23 | $7.91 | $2.46 | $3.04 | $1.75 | $2.30 |
| Percent savings per year | 11.6 | 12.7 | 13.9 | 15.0 | 5.1 | 6.2 | 3.6 | 4.7 |
| Dollar savings per year | $3,104,102 | $3,458,641 | $3,825,454 | $4,184,278 | $1,303,602 | $1,609,635 | $926,199 | $1,214,713 |

\* officials mistakenly used actual Lake Erie staffing levels instead of higher number of employees that the state would need to hire

\*\* share of actual prison-related department functions

\*\*\* includes costs for remaining comparison facilities, actual 2010 inmate pay and over-the-cap medical payments and revised central office costs based on proposed state adjustment

By way of illustration: in 2009, 7.4 times more prescriptions were written per 100 inmates at Allen than at Lake Erie, according to state data, and nearly 3 times more at Grafton.[45] As of the middle of last year, about 12 percent of the combined inmate population of Allen and Grafton were considered seriously mentally ill, compared to just about 4 percent at Lake Erie.[46] According to ODRC data, both Allen and Grafton were also carrying about 35 percent more staffers per inmate at the beginning of this year than Lake Erie and the three other comparison prisons.[47]

Stockdale said analysts would probably retain the more similar, albeit larger, facilities now used as comparables – North Central Correctional Institution, in Marion, (which also is to be sold under the Kasich plan); Noble Correctional Institution and Belmont Correctional Institution. Allen and Grafton, he said, would probably by replaced by Southeastern Correctional Institution, in Lancaster, which is roughly the same size and has a younger, healthier inmate population more similar to Lake Erie's.

Changes to the calculations are also likely to include assurances, in Stockdale's words, "that all of the costs that should be assigned to private prisons are assigned." Because it's a projection for the coming fiscal year, the per diem negotiated for Lake Erie (and North Coast) doesn't include some of the actual costs incurred by the state for the facility during the course of a year's operations.

For instance, the state typically reimburses Lake Erie for payments made to inmates for work performed in the prison (at the estimated rate of $18 per inmate, per month) and for the amounts they are given for initial expenses upon their release. Those costs have not been included in the department's previous cost-savings calculations, Stockdale said.[48]

A more significant example is what Stockdale described as "over-the-cap medical payments." Beginning with the 2007-08 biennium, according to an amendment to Lake Erie's contract, the state agreed to reimburse MTC for all hospitalization costs beyond $20,000 for any inmate per admission. Such reimbursements, which totaled $484,000 in fiscal year 2010, should be added to Lake Erie's per diem in the savings calculation, but haven't been to date.

Stockdale acknowledged that those changes would tend to make the hypothetical state-run facility look more competitive with Lake Erie in the savings analysis.[49]

But one of the biggest changes the department is proposing – a dramatic alteration in the way the department's "central office" overhead expenses are handled in future calculations, wasn't disclosed until Stockdale was specifically asked about the issue in a follow-up interview on March 14 – the day before the announcement of Kasich's intention to sell five prisons.[50]

The significance of this "central office" issue is dramatically illustrated by a pair of in-depth privatization studies by private research firms that were commissioned by the federal government and completed in 2005. Both were designed to compare the cost to the government of contracting with what was then the Wackenhut Corrections Corporation (now The GEO Group) to run a low-security prison in Taft, California, from 1998 through 2002 with what it would have cost the federal bureau of prisons to run it.

---

[45] Gregory T. Geisler, "The Cost of Correctional Health Care," Ohio Correctional Institution Inspection Committee, December 15, 2010 at http://www.ciic.state.oh.us/health-care-or-medical-services/view-category.html page 11, Table 1
[46] CIIC Progress Report and Staff Briefing, Ohio Correctional Institution Inspection Committee, June 29, 2010 at http://www.ciic.state.oh.us/199-ciic-progress-report-and-staff-briefing-2010.html pages 7 and 8, Tables 3 and 4
[47] Ohio Department of Rehabilitation and Correction website at http://www.drc.ohio.gov/web/prisprog.htm
[48] Stockdale interview, February 24, 2011
[49] ibid.
[50] Stockdale interview, March 14, 2011

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 64 of 279 PageID #: 22693

BLACKSTONE0000142

Both studies – one by Abt Associates, the other by The CNA Corporation – used the same three federally operated prisons for cost comparisons. And yet they came to dramatically different conclusions which, according to Gaes, should hammer home two key lessons for would-be privatizers and their foes:

- ■ Public-private cost comparisons are "deceivingly complex," and
- ■ Be careful with overhead.[51]

The "problem of overhead costing is so pervasive and difficult," Gaes wrote last year, "that … this calculation alone can tip the balance (often erroneously) in favor of one sector over the other." Unless considerable effort is made to determine which overhead expenses represent actual "savings" for taxpayers, "large errors in the cost comparisons between private and public sector comparisons can occur."[52]

In the studies at issue, Abt found that Taft, the privately operated prison, was much less expensive to operate than the public facilities – by an average of about 14 percent in fiscal years 2001 and 2002. CNA, on the other hand, found a statistical dead heat: Taft appeared cheaper, but only by 1 percent. The much bigger cost difference found by Abt between the public and private facilities was, almost dollar for dollar, equivalent to government overhead expenses it calculated for the public facilities but did not charge against the private one.

Abt concluded that Taft's share of "government overhead" – which it calculated for the public facilities at 12 percent of their salary, wages and fringe benefits – should be counted as a savings from privatization even while conceding that taxpayers didn't actually save that money because the Bureau of Prisons' overhead didn't actually change.[53]

By contrast, CNA reasoned that if the government doesn't actually avoid an expense as a result of privatization – if the taxpayers don't experience an actual savings – than the expense should not be included in the calculation. CNA analyst Julianne Nelson concluded what Abt conceded – that most Bureau of Prison (BOP) overhead costs associated with Taft would continue to be incurred by the government even though a private company was operating the prison.[54]

"Many of these support expenditures – such as central office costs—benefit *all* BOP facilities, both publicly- and privately-managed," Nelson wrote. "As a result, these costs are essentially independent of outsourcing – they are the same whether GEO runs Taft as a BOP contractor or the BOP runs Taft directly on its own behalf." According to CNA's Nelson, "central office expenditures are *un*avoidable and can thus be ignored when evaluating the merits of outsourcing." An alternative to ignoring them completely, Nelson wrote, would be to add them to both the public and the private scenarios, which would have roughly the same effect.

When asked about Nelson's argument on March 14, the day before Kasich's budget was released,  Stockdale acknowledged that state officials were re-evaluating the overhead charges even in the refined 2010-2011 calculation and were proposing significant reductions. Instead of charging the hypothetical state-run institution a per-inmate share of $67.9 million in central office functions – essentially for all prison-related activity in the department's Columbus headquarters – he said what

---

[51] Gaes, NIJ journal, note 15

[52] Gaes, research review, note 10

[53] Douglas C. McDonald and Kenneth Carlson, Abt Associates, Inc., "Contracting for Imprisonment in the Federal Prison System: Cost and Performance of the Privately Operated Taft Correctional Institution," November 2005 for National Institute of Justice at http://www.ncjrs.gov/pdffiles1/nij/grants/211990.pdf

[54] Julianne Nelson, The CNA Corporation, "Competition in Corrections: Comparing Public and Private Sector Operations," December 2005 at http://www.bop.gov/news/research_projects/published_reports/pub_vs_priv/cnanelson.pdf

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 65 of 279 PageID #: 22694

BLACKSTONE0000143

"we are going toward" is a function-by-function breakdown of what should be included and what shouldn't.

For instance, the department's office of prisons oversees facility operations whether they are public or private, Stockdale said. By excluding that office, the central office figure becomes "significantly smaller," he said, somewhere in the $10 million to $15 million range.[55] Taking the mid-point, that's a cut of more than 80 percent in the "central office" costs attributed in past calculations to the state-run hypothetical. When that adjustment is inserted in the calculation along with the other changes already discussed, the projected 2010 savings for Lake Erie suddenly shrinks by nearly two thirds – from 13.9 percent to just 5.1 percent, just a hair above the minimum allowed by state law (or from $3.8 million to about $1.3 million). **(Table 3, Column E)**

But even those changes may not be enough.

The central office calculation could still include Lake Erie's share of such functions as the department director's office, public affairs, legal services, human resources, planning, research, budgeting, accounting, purchasing and other department-wide operations, most of which would have to be performed from Columbus whether the facility is publicly or privately operated.

Following Nelson's argument – ignoring such expenses or charging them to both the public and private scenarios in the 2010-2011 calculations – would drop the projected savings for Lake Erie to about 3.6 percent for 2010 and 4.7 percent for 2011, **(Table 3, Columns G and H)** below the legal requirement for privatized facilities.

Stockdale said he and other ODRC officials are aware of the argument Nelson puts forward. "It's something that we kick around too," he said.

"You could make that argument – I'm not saying whether it's appropriate or not. I am not judging either way. I want to be as accurate as possible. I don't want to put my finger on the scale either way, because all this affects people and I recognize that. So I just try to take as dispassionate a stance as possible and that's why we wanted to re-look at this."

**A race to the bottom?**

Whether or nor the Lake Erie facility meets Ohio's 5 percent savings requirement, it's clear from ODRC calculations that personnel costs – which account for about 70 percent of facilities' operating expenses – are the likeliest place a private vendor would look to for cuts. One question, from a public policy point of view, is how far can such expenses be trimmed before effectiveness and safety are compromised?

According to Gaes, it's an area of privatization that has received even less research attention – and may be even harder to quantify – than cost. "What is the impact of lower labor costs on staff turnover or staff performance?" he asked in his research review last year. "How do private companies develop training for workers with fewer skills? Do private companies, in fact, hire lower skilled workers? Have private companies re-engineered the prison employee's job?" Gaes fears what he calls a "McDonaldization" of prison labor.[56]

Once you introduce the profit motive into prisons, says Arizona State University's Travis Pratt, there's always a danger that cost cutting in the most expensive areas – personnel and programming – can impact quality and security. "It's difficult to keep good people," Pratt said, "when they are

---

[55] Stockdale interview March 14, 2011
[56] Gaes, research review, note 10

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 66 of 279 PageID #: 22695

BLACKSTONE0000144

understaffed and not compensated very well. If the cost saving is coming in the form of staffing, if it's coming in the form of encouraging turnover, than there is a safety risk at that point."[57]

In a 2009 letter to the governor protesting Arizona's later-scuttled initiative to put for-sale signs on virtually all of the state's prisons, the state's corrections chief issued a prophetic warning: "Undoubtedly, a private company would pay its employees significantly lower wages and provide them lesser training to realize cost savings," department director Charles Ryan wrote. "This would lead to higher staff turnover, low morale and place public safety at risk."

A year later, that prophecy was seemingly fulfilled with the escape from the MTC facility near Kingman and its tragic aftermath.

State investigators found that turnover at the facility was high, leading to a lack of training, the Arizona Republic reported; some officers struggled to load and use their weapons during a security review. The warden reported that nearly 80 percent of the staff was new or newly promoted and investigators found that many showed a lack of experience and "command presence." One investigator estimated that a third of the security employees had less than three months on the job. Inmates at the facility were found to be unkempt, unruly and poorly controlled. And false alarms were so frequent that the staff simply ignored them. During a 16-hour review period before and after the escape, 89 alarms sounded and only two were legitimate. The rest were false.[58]

After the investigation, MTC was warned that if it didn't comply with revised safety standards it could lose its contract to run the facility. Some of the prison's administrators resigned; others were re-assigned and the state increased the number of state employees on hand to monitor MTC's operations.[59]

As Ohio readies itself to triple the number of inmates under private supervision, the debacle at Kingman Arizona last year stands as a cautionary tale. Ohio officials say they have experienced no such security lapses with MTC in its 10-year operation of Lake Erie and North Coast. ODRC's LoParo said there have been no prisoner walk-aways from either facility on MTC's watch. Records provided by LoParo show that over the last three fiscal years combined, Lake Erie has experienced inmate-on-inmate assaults at only about half the rate of the state's designated comparison facilities (three per 100 inmates, compared to 5.8 on average at the five comparables.) Lake Erie has experienced about the same level of inmate-on-staff assaults as the comparables over the period (just over 3 per 100 inmates).[60]

As for staff stability, average corrections-officer turnover for the last two years has been higher at the MTC facilities than at state-run prisons (12.5 percent at Lake Erie and 10.2 percent at North Coast, compared to 8.7 percent for ODRC as a whole), according to figures provided by LoParo. But the private-prison turnover rate is still below what LoParo described as the maximum permissible rate of about 20 percent. "Anything less than that is acceptable," he said.

Still, MTC's problems in Arizona raise questions. It's not as if the company was a newcomer to corrections last year and didn't know better. MTC had been running prisons for nearly 25 years at the time and had operated the Kingman facility for six. Surely, experience had taught company officials

---

[57] Travis Pratt interview, March 23, 2011

[58] JJ Hensley, "State rips private prison, begins making changes," The Arizona Republic, Aug. 20, 2010 at http://www.azcentral.com/news/articles/2010/08/19/20100819arizona-prison-escape-report-brk19-ON.html ; Arizona Department of Corrections, Security Review of MTC Facility at Kingman, Aug. 4-6, 2010 at http://www.azcorrections.gov/adc/news/2010/kingman_sec_review/Kingman_Assessment_1.pdf

[59] ibid, Arizona Republic, note

[60] Ohio Department of Rehabilitation and Correction, Inmate on Staff Assault Report – Fiscal Years 2008, 2009, 2010, and Inmate on Inmate Assault Report – Fiscal Years 2008, 2009, 2010.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 67 of 279 PageID #: 22696

BLACKSTONE0000145

how to maintain a stable, well-trained staff. So, one is entitled to ask, were the staff deficiencies at Kingman a result of corner-cutting to boost the bottom line?

In 1998, after six prisoners, including five murderers, escaped from the CCA-operated federal prison in Youngstown, many of the guards were found to have had little or no experience in corrections and conditions at the prison were described as generally chaotic.[61] And yet, CCA had been in the corrections business for a decade and a half at that point and presumably knew better.

Escapes can happen. Prisons tend to be volatile and unpredictable places. So, when seasoned prison operators staff their facilities in one location with inexperienced, insufficiently trained employees, one is entitled to ask what motives are at work and whether similar problems could crop up again elsewhere.

Whatever the answers to such questions, one thing is probably safe to assume: Once the commitment is made to aggressively go private – for whatever reason – it's a decision that's unlikely to be reversed.

Many commentators have warned that once a jurisdiction delegates its authority to manage and operate a correctional facility to a private corporation, the jurisdiction also runs the risk of becoming overly dependent upon that corporation for services.[62] The limited number of private corrections firms makes it difficult for states to shop around for replacements if they are unhappy with the services – especially if the vendor owns the facility. In its prison-sale RFP, Ohio has asked would-be purchasers to outline a procedure for transferring the facility operations and assets to the state or a new vendor if their contract is terminated.

If the vendors happen to become political players, the dynamic can be that much more complicated. Last August, the Arizona Republic cited a 2006 report from the National Institute on Money in State Politics stating that the private-prison industry had contributed to the campaigns of 29 of 42 Arizona lawmakers who heard a 2003 proposal to increase state private-prison beds there. Between 2001 and 2004, according to the report, the industry contributed $77,267 to Arizona's legislative and gubernatorial candidates, most through lobbyists representing company interests at the legislature.[63]

Last year, before the Kingman episode, Arizona lawmakers approved 5,000 more private-prison beds, an expansion that was slowed by the outcry over the escape last summer and fall. But those beds have since gone out for bid[64], while multiple bills to increase state oversight of for-profit prisons have languished – without so much as a hearing – in the legislature.[65]

Meanwhile it's not at all clear that Arizona's private prisons are saving taxpayers anything.

In fact, when the comparison is apples-to-apples, the evidence shows the opposite. In a study completed last year, the state department of corrections concluded that, overall, it costs taxpayers about $2.45 less per inmate per day to house medium- and minimum-security prisoners in private facilities. But that comparison is skewed by the fact that contract provisions allow some operators to screen inmates based on medical conditions. As a result, private prisons spend about 35 percent less per prisoner on health care than the state-run facilities do. Once the playing field is leveled, the tables are

---

[61] Hallett and Hanauer, note 28

[62] ibid.

[63] Newton, Rough and Hensley, Arizona Republic, note 20

[64] Hensley and Rough, Arizona Republic, note 21

[65] Mary K. Reinhard, "Arizona private prison oversight bills die," The Arizona Republic, Feb. 12, 2011 at http://www.azcentral.com/news/articles/2011/02/15/20110215arizona-private-prison-bills.html

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 68 of 279 PageID #: 22697

BLACKSTONE0000146

turned. Setting medical costs aside, Arizona's state-run facilities cost $1.78 per inmate LESS per day to operate than its private facilities – or about $5.8 million less per year.[66]

The bottom line?

"I don't want to be ideological about this," said Gaes, who acknowledges deep skepticism on the wisdom of private prisons.

"There are going to be occasions where you are going to save money," he said in an interview. "You can begin to squeeze money out of the system. Maybe you can squeeze a half a percent out, who knows? But it's not as if these systems are overfunded to begin with. And at some point, you start to lose quality. And because quality is very difficult to measure in prisons, I'm just worried that you're getting into a race to the bottom."

---

[66] Arizona Department of Corrections, "Revised FY 2009 Operating Per Capita Cost Report," Sept. 28, 2010 at http://www.azcorrections.gov/adc/reports/ADC_FY2009_PerCapitaRep_revised.pdf

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 69 of 279 PageID #: 22698

BLACKSTONE0000147

POLICY MATTERS OHIO IS A NON-PROFIT, NON-PARTISAN RESEARCH INSTITUTE DEDICATED TO RESEARCHING AN ECONOMY THAT WORKS FOR ALL IN OHIO. WE SEEK TO BROADEN DEBATE ABOUT ECONOMIC POLICY BY PROVIDING RESEARCH ON ISSUES THAT MATTER TO OHIO'S WORKING PEOPLE AND THEIR FAMILIES. AREAS OF INQUIRY FOR POLICY MATTERS INCLUDE WORK, WAGES, AND BENEFITS; EDUCATION; ECONOMIC DEVELOPMENT; ENERGY POLICY; AND TAX POLICY. TO THOSE WHO WANT A MORE PROSPEROUS, EQUITABLE, SUSTAINABLE AND INCLUSIVE ECONOMY... POLICY MATTERS.

MAIN OFFICE: 3631 PERKINS AVENUE, SUITE 4C-E • CLEVELAND, OHIO 44114

COLUMBUS: 300 E. BROAD STREET, SUITE 490 • COLUMBUS, OHIO 43215

HTTP://WWW.POLICYMATTERSOHIO.ORG/



© 2011 Policy Matters Ohio. Permission to reproduce this report is granted provided that credit is given to Policy Matters Ohio. All rights reserved.



A REPORT
TO THE
**ARIZONA LEGISLATURE**

Performance Audit Division

Performance Audit

# Department of Corrections—
Prison Population Growth

September • 2010
REPORT NO. 10-08



STATE OF ARIZONA
OFFICE OF THE
**AUDITOR
GENERAL**

**Debra K. Davenport**
Auditor General

BLACKSTONE0000149

The **Auditor General** is appointed by the Joint Legislative Audit Committee, a bipartisan committee composed of five senators and five representatives. Her mission is to provide independent and impartial information and specific recommendations to improve the operations of state and local government entities. To this end, she provides financial audits and accounting services to the State and political subdivisions, investigates possible misuse of public monies, and conducts performance audits of school districts, state agencies, and the programs they administer.

## The Joint Legislative Audit Committee

Representative **Judy Burges,** Chair

Senator **Thayer Verschoor,** Vice Chair

Representative **Tom Boone**
Representative **Cloves Campbell, Jr.**
Representative **Rich Crandall**
Representative **Kyrsten Sinema**
Representative **Kirk Adams** (*ex officio*)

Senator **John Huppenthal**
Senator **Richard Miranda**
Senator **Rebecca Rios**
Senator **Bob Burns** (*ex officio*)

## Audit Staff

**Dale Chapman**, Director and Contact Person

**Jeremy Weber**, Team Leader
**Kerry Howell**

Copies of the Auditor General's reports are free.
You may request them by contacting us at

**Office of the Auditor General**
2910 N. 44th Street, Suite 410 • Phoenix, AZ 85018 • (602) 553-0333

Additionally, many of our reports can be found in electronic format at
**www.azauditorv.gov**

BLACKSTONE0000150



**STATE OF ARIZONA**
OFFICE OF THE
**AUDITOR GENERAL**

**DEBRA K. DAVENPORT, CPA**
**AUDITOR GENERAL**

**MELANIE M. CHESNEY**
**DEPUTY AUDITOR GENERAL**

September 30, 2010

Members of the Arizona Legislature

The Honorable Janice K. Brewer, Governor

Mr. Charles L. Ryan, Director
Department of Corrections

Transmitted herewith is a report of the Auditor General, A Performance Audit of the Department of Corrections—Prison Population Growth. This report is in response to a November 3, 2009, resolution of the Joint Legislative Audit Committee. The performance audit was conducted as part of the sunset review process prescribed in Arizona Revised Statutes §41-2951 et seq. I am also transmitting within this report a copy of the Report Highlights for this audit to provide a quick summary for your convenience.

As outlined in its response, the Department of Corrections agrees with all of the findings and plans to implement all of the recommendations directed at it.

My staff and I will be pleased to discuss or clarify items in the report.

This report will be released to the public on October 1, 2010.

Sincerely,

Debbie Davenport
Auditor General

Attachment



### STATE OF ARIZONA
## OFFICE OF THE
# AUDITOR GENERAL



# Department of Corrections—
## Prison Population Growth

## REPORT
## HIGHLIGHTS
**PERFORMANCE AUDIT**

### Our Conclusion

Arizona's prison population has grown significantly in the last 30 years and is expected to continue growing. The State has addressed this growth by constructing new prison facilities and contracting with private prisons, among other things. The State has several options for addressing this growth in the future. The State could continue to build prisons and/or contract for private prisons. The State could also consider diverting more nonviolent, low-risk offenders from prison or reducing their time in prison, and expanding the use of nonprison alternatives for these offenders, such as home arrest. In addition, using more nonprison alternatives for parole violators could also reduce the prison population.

## Significant growth in prison population and spending

The State's population has doubled in about the last 30 years, but the State's prison population has increased tenfold, from 3,377 inmates in June 1979 to 40,477 inmates in June 2010. Arizona's prison growth rate exceeded that of every other western state between 2000 and 2008. In 2008, 1 in every 170 Arizonans was in prison, compared to 1 in 749 in 1980.

The growth in prison population has come at a substantial cost. The Legislature has appropriated nearly $949 million in State General Fund monies to the Department of Corrections (Department) for fiscal year 2011. This represents 11.2 percent of the State General Fund budget and trails only K-12 education and healthcare appropriations.

## Expanding the prison system

To address prison population growth, the State has constructed new prison facilities, expanded existing prison facilities by adding new and temporary prison beds, and contracted with private prisons for more beds. However, the Department expects the prison population to continue to increase, growing to nearly 50,000 inmates by 2016. Although under revision as of September 2010, the Department's plan proposes to add another 6,500 private prison beds at an estimated cost of about $640.7 million through 2017. The plan also calls for more state construction to add another 2,000 beds at an estimated cost of $334.1 million through 2017.

**Private prisons cost slightly more—** According to a 2009 department report, the State paid more per inmate in private prisons than for equivalent services in state facilities. After adjusting costs to make the expenditures comparable, the State paid private prisons $55.89 for each medium-custody inmate per day compared to a daily cost of $48.13 per medium-custody inmate in state facilities. The State also paid private prisons slightly more for each minimum-custody prisoner.

## Alternatives to imprisonment

State laws largely determine how long an offender is imprisoned. Before 1994, judges had broad discretion in sentencing defendants. However, Arizona's presumptive sentencing system requires judges to impose a "presumptive" sentence prescribed by statute for a given offense. The sentence may be increased or decreased based on mitigating and aggravating factors.

Further, Arizona began adopting mandatory sentences in 1978, that require harsher penalties for certain offenders, such as repeat or violent offenders. Arizona also adopted "truth in sentencing" in 1993, which abolished discretionary parole and requires all inmates to serve at least 85 percent of their sentences in prison. Although truth in sentencing requires inmates to serve more of their sentences, other law changes shortened sentences for some offenders, which has contributed to some inmates serving less time in prison.



## 2010

September • Report No. 10 - 08

**Expanding diversion**—The Legislature could consider diverting some additional low-risk offenders from prison to nonprison alternatives. Statute requires some drug offenders to be sentenced to probation and treatment instead of prison, and this approach could be considered for other nonviolent, low-risk offenders. According to a 2006 Arizona Supreme Court report, diverting 1,072 offenders to probation and treatment in fiscal year 2005 avoided an estimated $11.7 million in net costs. Depending on how diversion is expanded, sentencing law changes may be needed.

**Expanding early release**—Currently, some nonviolent, low-risk offenders who make satisfactory progress on their corrections plans, maintain behavior, and meet other criteria may be released 3 months earlier than their sentences require. During those 3 months, they receive treatment, transitional housing, education, and other services. At the end of the 3 months, they are placed on regular community supervision. Most inmates successfully complete the 3-month supervised release.

The Legislature could consider other alternatives for expanding early release. This could include revising the truth-in-sentencing laws to reduce the amount of time nonviolent, low-risk offenders serve. Mississippi reinstated parole for such offenders and, as a result, has avoided prison costs of about $37 to $42 per inmate per day. The Mississippi Department of Corrections also reported that between January 31, 2009 and January 31, 2010, the state's prison population decreased by 1,360 inmates when an increase of 1,000 inmates was expected. The Legislature could also authorize earned time credits for inmates, which reduce inmate sentences. These credits can be earned for completing education, vocational training, and/or treatment.

**Nonprison alternatives such as drug treatment, home arrest, and day reporting centers**—Another approach would be to expand drug treatment alternatives beyond drug court. Some states, notably Texas, have created secure facilities to provide treatment to drug offenders. As a result, Texas has reduced its prison costs.

Arizona law allows home arrest with electronic monitoring for a small number of nonviolent, first-time offenders. According to a Florida study, home arrest costs a fraction of the cost of imprisonment. Expanding this program in Arizona, which would require legislative action, could potentially reduce prison costs.

Day reporting centers are nonprison alternatives that blend high supervision levels with intensive services and programming. A 2005 Georgia State University study reported that offenders completing a day reporting center program had a lower recidivism rate than those not completing or not in the program. Georgia Department of Corrections officials reported that its day reporting centers cost $16.50 daily per inmate as compared to $48 per inmate, per day in prison. Although a 1999 study showed that Maricopa County's day reporting center program was no more effective at reducing recidivism for repeat DUI offenders than probation, it was more cost-effective. Maricopa County ended its day reporting center program in 2002.

**Reducing parole violation revocations**—Parolees returned to prison on revocation typically serve about 3 months, which costs about $1,222, compared to $774 for one who remains in the community. In some cases, the Department uses graduated sanctions, such as reprimands and increased supervision, before it revokes parole. However, it lacks nonprison facilities to also use as a graduated sanction. Other states use nonprison facilities to house parole violators, including residential treatment facilities, day reporting centers, halfway houses, and assessment centers. Texas uses secure facilities to provide treatment programs and confine parole violators. Such facilities cost about $35 to $41 per offender per day compared to $47.50 per offender per day in a Texas prison.

Options—The Legislature could:

- Continue to expand the prison system. If it decides to expand, the Legislature should consider directing the Department to further study state costs for building and operating new prisons compared to contracting with private prisons.
- Consider diverting more nonviolent, low-risk offenders from prison and/or reducing the time they serve.
- Consider directing the Department and/or the courts to further study the use and costs of nonprison alternatives for nonviolent, low-risk offenders.
- Consider expanding nonprison alternative sanctions for parole violators.

**Department of Corrections—**
Prison Population Growth

A copy of the full report is available at:
www.azauditor.gov
Contact person:
Dale Chapman (602) 553-0333

REPORT
HIGHLIGHTS
**PERFORMANCE AUDIT**
September 2010 • Report No. 10 - 08

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 75 of 279 PageID #: 22704

BLACKSTONE0000153

# TABLE OF CONTENTS



Introduction & Scope                                                    1

## Chapter 1: Arizona's prison population and corrections spending have grown significantly                                    3

Arizona's prison population has grown considerably and
may continue growing                                                    3

Arizona has expanded prison system to accommodate
growth                                                                  8

Prison population growth results from both policy and
social factors                                                        13

Arizona has increased corrections spending to help
keep pace with growth                                                 14

## Chapter 2: Option 1—Expanding prison system to address prison population growth                          17

Continued expansion will require significant spending                 17

State should further study cost-effectiveness of privately
operated prisons compared to state-operated prisons                   19

## Chapter 3: Option 2—Diverting more nonviolent, low-risk offenders or reducing the time they serve to address prison population growth                      23

Arizona laws largely determine prison sentences                       23

• continued

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 76 of 279 PageID #:
22705

BLACKSTONE0000154



# TABLE OF CONTENTS

## Chapter 3 (Continued)

Sentencing laws have affected State's prison population — 25

Other potential sentencing law changes have been under study for many years — 27

Options to divert nonviolent, low-risk offenders from prison or reduce time they serve could be expanded — 28

Permanent sentencing commission could review sentencing policies and laws — 34

## Chapter 4: Option 3—Expanding use of nonprison alternatives to slow or reverse prison population growth — 37

Arizona uses probation as nonprison alternative — 37

Nonprison alternatives could take several forms — 40

State should further study expansion of nonprison alternatives, including costs and needed legislative action — 45

## Chapter 5: Option 4—Reducing revocations from parole violations — 47

Most inmates serve part of sentence in community — 47

Parole violations contribute to prison population growth — 48

Expanding range of nonprison alternatives for parole violators could help reduce prison population growth — 49

Expanding alternatives for parole violations would require action — 52

State of **Arizona**

page vi

# TABLE OF CONTENTS



**Chapter 6:** Recommendations for legislative and department consideration     53

**Appendix A:** Data and methodology     a-i

**Appendix B:** References     b-i

**Agency Response**

**Tables**

1    Number and Percentage of Total Inmates by Crime Category
Calendar Years 1989, 1999, and 2009
(Unaudited)     5

2    Arizona Prison Capacity and Population
June 30, 2010
(Unaudited)     12

3    Estimated Prison Construction and Privatization
Costs for 8,500 Projected Beds
Fiscal Years 2012 through 2017
(Unaudited)     18

4    Comparison of Department Calculations
for Actual and Adjusted Private Prison
Per Capita Rates and State Prison Per Capita Costs
Fiscal Year 2009
(Unaudited)     20

5    Median Sentence Lengths for Admitted Offenders
by Offense Type, in Years
Calendar Years 1990, 1993, 1996, 1999,
2002, 2005, and 2008
(Unaudited)     27

continued

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 78 of 279 PageID #: 22707

BLACKSTONE0000156



# TABLE OF CONTENTS

## Figures

1   Arizona Prison Population
    Fiscal Years 1979 through 2010
    (Unaudited)                                                          4

2   Comparison of Western States' Average Annual
    Prison Population Growth
    December 31, 2000 to December 31, 2008
    (Unaudited)                                                          7

3   Arizona Prison Complex Locations
    Fiscal Year 2010                                                     9

4   Comparison of State General Fund Expenditures for Fiscal Year 1979
    and Appropriations for Fiscal Year 2011
    (Unaudited)                                                          16

concluded   •

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 79 of 279 PageID #: 22708

BLACKSTONE0000157

# INTRODUCTION & SCOPE

The Office of the Auditor General has conducted a performance audit of the Department of Corrections (Department) pursuant to a November 3, 2009, resolution of the Joint Legislative Audit Committee. This audit, conducted as part of the sunset review process prescribed in Arizona Revised Statutes (A.R.S.) §41-2951 et seq., focuses on prison population growth and options for addressing this growth. The Office of the Auditor General will issue two additional reports, one of which will address the 12 statutory sunset factors.

This report discusses prison population growth in Arizona and the resultant growth in state spending on corrections (see Chapter 1, pages 3 through 16). It offers various options for legislative and department consideration to address this growth, including:

- Continuing to expand the prison system to address anticipated growth in the prison population (see Chapter 2, pages 17 through 21);

- Diverting more nonviolent, low-risk offenders from prison and/or reducing the time they serve—alternatives that may require changes to the State's sentencing laws (see Chapter 3, pages 23 through 35);

- Expanding the use of nonprison alternatives for nonviolent, low-risk offenders (see Chapter 4, pages 37 through 46); and

- Reducing admissions from parole revocations by expanding nonprison options for responding to offenders who violate the conditions of their community supervision (see Chapter 5, pages 47 through 52).

This audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

The Auditor General and staff express appreciation to the Department's Director and staff for their cooperation and assistance throughout the audit.

State of **Arizona**

page 2

BLACKSTONE0000159

# Chapter 1

## Arizona's prison population and corrections spending have grown significantly

Arizona's prison population has grown significantly, leading to increased spending on corrections. Specifically, Arizona's prison population has grown from 3,377 inmates in fiscal year 1979 to 40,477 inmates in fiscal year 2010 and is expected to continue growing. Several factors have contributed to Arizona's prison population growth, including the State's general population growth, sentencing policies, and social factors such as crime and unemployment. As a result of the increase, the State has expanded its prison system and appropriated a correspondingly greater portion of State General Fund monies to corrections—11.2 percent in fiscal year 2011, compared with expenditures of 4.3 percent in fiscal year 1979. This substantial increase means that less funding is available for other priorities.

## Arizona's prison population has grown considerably and may continue growing

Arizona has not only experienced significant prison population growth since fiscal year 1979, but this growth is expected to continue into the future. The growth rate in Arizona's prison population has outpaced the growth rate in most other states and, based on Department of Corrections (Department) and state budget office projections, is projected to grow annually through 2016 to potentially 49,700 inmates.

**Arizona's prison population has grown by more than 37,000 inmates since fiscal year 1979**—As shown in Figure 1 (see page 4) and according to department data, the State's prison population grew from 3,377 inmates as of June 30, 1979, to 40,477 inmates as of June 30, 2010—an average increase of approximately 1,200 inmates per fiscal year. According to department data, annual admissions to Arizona's prison system have consistently exceeded releases.

From fiscal years 1979 through 2010, Arizona's prison population has increased by approximately 1,200 inmates annually.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 82 of 279 PageID #: 22711

BLACKSTONE0000160



Figure 1: Arizona Prison Population
Fiscal Years 1979 through 2010
(Unaudited)

Source: Auditor General staff analysis of the Department's March 2010 *Two-Year Prison Population Trend Report* and the *ADC Institutional Capacity Committed Population* report for June 30, 2010.

Although the State's general population has also increased, the State's prison population has grown even faster. Specifically, according to Arizona Department of Economic Security estimates, Arizona's general population more than doubled between fiscal years 1980 and 2008. During this same time, the State's prison population increased more than tenfold. As a result, while 1 in every 749 persons in Arizona was in prison as of June 30, 1980, 1 in every 170 Arizonans was in prison as of June 30, 2008.

In addition to this growth, the demographics of Arizona's prison population have changed. Specifically, auditors' analysis of department annual reports and data highlighted the following changes in the prison population:

- **Various categories of offenders have increased**—Although Arizona's prison population consists of inmates sentenced to prison for a wide variety of crimes, as shown in Table 1 (see page 5), certain categories of criminal offense have increased as a percentage of the prison population. For example, the number of imprisoned drug offenders increased from 1,975, or 15.6 percent of the prison population as of June 30, 1989, to 8,271, or 20.5 percent of the prison population as of December 31, 2009. The number of persons imprisoned for assaults has also increased, from 989, or 7.8 percent of the prison population as of June 30, 1989, to 4,875, or 12.1 percent of the prison population as of December 31, 2009.

Drug offenders accounted for 20.5 percent of the prison population as of December 31, 2009.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 83 of 279 PageID #: 22712

BLACKSTONE0000161

**Table 1:** Number and Percentage of Total Inmates by Crime Category
Calendar Years 1989, 1999, and 2009
(Unaudited)

| | June 30, 1989 | | June 30, 1999 | | December 31, 2009 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Crimes Against Persons** | | | | | | |
| Homicide | 1,144 | 9.1% | 2,090 | 8.1% | 3,406 | 8.4% |
| Kidnapping | 276 | 2.2 | 443 | 1.7 | 1,232 | 3.1 |
| Sexual Assault | 785 | 6.2 | 1,460 | 5.7 | 2,151 | 5.3 |
| Robbery | 1,170 | 9.3 | 2,014 | 7.8 | 3,454 | 8.6 |
| Assault | 989 | 7.8 | 3,118 | 12.1 | 4,875 | 12.1 |
| | 4,364 | 34.5[4] | 9,125 | 35.3[4] | 15,118 | 37.5 |
| **Property Crimes** | | | | | | |
| Arson | 50 | 0.4 | 69 | 0.3 | 88 | 0.2 |
| Burglary | 1,899 | 15.0 | 2,395 | 9.3 | 2,948 | 7.3 |
| Theft/Larceny | 1,565 | 12.4 | 2,404 | 9.3 | 4,477 | 11.1 |
| Forgery-Fraud | 459 | 3.6 | 1,000 | 3.9 | 1,610 | 4.0 |
| Other[1] | 507 | 4.0 | 634 | 2.5 | 167 | 0.4 |
| | 4,480 | 35.4[4] | 6,502 | 25.2[4] | 9,290 | 23.0 |
| **Morals-Decency Crimes** | | | | | | |
| Drugs | 1,975 | 15.6 | 5,575 | 21.6 | 8,271 | 20.5 |
| Sex Offenders | 641 | 5.1 | 1,286 | 5.0 | 1,906 | 4.7 |
| Other[2] | 99 | 0.8 | 197 | 0.8 | 427 | 1.1 |
| | 2,715 | 21.5 | 7,058 | 27.3[4] | 10,604 | 26.3 |
| **Public Order Crimes** | | | | | | |
| DUI | 621 | 4.9 | 1,238 | 4.8 | 2,135 | 5.3 |
| Other[3] | 280 | 2.2 | 808 | 3.1 | 2,803 | 6.9 |
| | 901 | 7.1 | 2,046 | 7.9 | 4,938 | 12.2 |
| **Miscellaneous Crimes** | 180 | 1.4 | 1,103 | 4.3 | 390 | 1.0 |
| **Total Crimes** | 12,640 | 100.0%[4] | 25,834 | 100.0% | 40,340 | 100.0% |

[1] Other Property Crimes can include criminal damage, criminal littering or pollution, and unlawful failure to return rented property

[2] Other Morals-Decency Crimes can include domestic violence, child or adult abuse, prostitution, and public display of obscene materials

[3] Other Public Order Crimes can include disorderly conduct, stalking, rioting, smuggling, and weapons offenses

[4] Amounts do not total due to rounding

Source: Auditor General staff analysis of department annual reports for fiscal years 1989 and 1999 (data as of June 30) and prison population data obtained from the Department's Adult Inmate Management System as of December 31, 2009

Office of the Auditor General

Page 5

- **Violent and nonviolent offenders**—The percentage of prison admissions for violent offenses has remained at about 24 percent (see textbox for definitions of violent and nonviolent offenses). However, the percentage of inmates incarcerated for violent crimes has increased from 41 percent as of June 30, 1995, to approximately 49 percent as of December 31, 2009. An additional 10.6 percent were incarcerated for nonviolent crimes but had at least one prior violent offense.

---

### Violent and Nonviolent Offenses

**Violent**—Arizona Revised Statutes (A.R.S.) §13-901.03(B) defines violent offenses as offenses that include any criminal act that results in death or physical injury, or any criminal use of a deadly weapon or dangerous instrument. For purposes of auditors' analysis, the following crimes, among others, were defined as violent: assault, homicide, kidnapping, robbery, sex offenses (except indecent exposure and voyeurism), and weapons offenses.

**Nonviolent**—The Bureau of Justice Statistics defines nonviolent offenses as property, drug, and public order offenses that do not involve a threat of harm or an actual attack upon a victim. For purposes of auditors' analysis, the following crimes, among others, were defined as nonviolent: drug crimes, driving under the influence, forgery and fraud, property damage, and theft.

Source:  Auditor General staff analysis of A.R.S. §13-901.03(B), the Bureau of Justice Statistics Web site, and department data.

---

**Arizona's prison population has grown faster than most states' prison populations**—Arizona's prison population has grown at a faster rate than most other states' since at least 2000. According to a 2010 federal Bureau of Justice Statistics report, Arizona ranked third nation-wide and, as illustrated in Figure 2 (see page 7), first among western states in its average annual prison population growth rate between 2000 and 2008.[1,2] Further, this report indicated that prison populations in many states decreased in 2009. Specifically, 24 states, including 6 western states, experienced a decline in their prison populations, resulting in a 0.2 percent nation-wide decline in the number of state prisoners. According to the report, Arizona's prison population grew by an average annual increase of 5.1 percent between 2000 and 2008, but grew by just 2.6 percent between 2008 and 2009. However, Arizona's percentage increase in 2009 was still higher than most other states', including all western states except Alaska.

Many states experienced a decline in their prison populations in 2009.

---

- See West, 2010
[2] According to report data, Arizona experienced the largest average annual growth in its prison population among western states between December 31, 2000 and December 31, 2008, in terms of both actual and percentage growth.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 85 of 279 PageID #: 22714

BLACKSTONE0000163



Figure 2: Comparison of Western States' Average Annual
Prison Population Growth
December 31, 2000 to December 31, 2008
(Unaudited)

| State | Growth |
|---|---|
| Arizona | 5.1% |
| Colorado | 4.1% |
| Oregon | 3.7% |
| Idaho | 3.5% |
| Nevada | 3.0% |
| Wyoming | 2.7% |
| Alaska [1] | 2.3% |
| New Mexico | 2.3% |
| Washington | 2.3% |
| Hawaii [1] | 2.1% |
| Utah | 1.9% |
| Montana | 1.7% |
| California | 0.8% |

[1] Numbers for Alaska and Hawaii include total jail and prison populations because they form one integrated system in these states.

Source: Auditor General staff analysis of state prison population data reported in the Bureau of Justice Statistics' *Prisoners at Yearend 2009—Advanced Counts*.

A 2010 Pew Center on the States (Pew) report described the reasons for many states' 2009 prison population decline.[1,2] According to the report, an important contributor to prison population declines nation-wide was that "states began to realize they could effectively reduce their prison populations and save public funds, without sacrificing public safety. In the past few years, several states, including those with the largest population declines, have enacted reforms designed to get taxpayers a better return on their public safety dollars." However, the report cautioned that it is too soon to say whether the 2009 decline will be temporary or the beginning of a downward trend.

Arizona's prison population expected to grow—Both state budget offices—the Joint Legislative Budget Committee (JLBC) and the Governor's Office of Strategic Planning and Budgeting (OSPB)—and the Department have projected that Arizona's prison population will continue growing based upon historical growth trends. According to OSPB's *General Fund Executive Budgets* and JLBC's

---

[1] Pew, 2010

[2] The Pew Center on the States is a division of the Pew Charitable Trusts, a nonprofit organization that seeks to identify and advance solutions to critical issues facing states. According to the Pew report, 26 states experienced a decline in their prison populations in 2009.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 86 of 279 PageID #:
22715

BLACKSTONE0000164

*Appropriations Reports* for fiscal year 2010, the prison population was expected to grow by 150 or 151 inmates per month, respectively, in fiscal year 2010. The OSPB and JLBC reports projected growth of 114 or 126 inmates per month, respectively, in fiscal year 2011. The Department previously projected growth of 151 inmates per month for November 2009 through December 2016, but it has revised its projections downward to reflect the OSPB projected growth of 114 inmates per month beginning in August 2010. However, none of these projections predicted the significant slowing in prison population growth for fiscal year 2010. According to department records, the State's prison population experienced a net increase of only 65 inmates in fiscal year 2010, growth that fell substantially below projections. Department staff reported that this less-than-expected increase in the prison population is based on decreased prison admissions from Maricopa County, although they have been unable to determine the exact cause for this decrease. The Department is continuing to research this unexpected small increase in the State's prison population for fiscal year 2010 to determine whether this was a 1-year anomaly or whether it should revise its longer-term growth forecasts. If the growth that occurred in fiscal year 2010 is an anomaly and the previously projected growth at 114 inmates per month resumes, this would result in a state prison population of nearly 49,700 inmates by December 31, 2016.

Arizona's prison population may grow to nearly 49,700 inmates by the end of 2016.

## Arizona has expanded prison system to accommodate growth

The State has significantly expanded its prison system to accommodate the growth in the prison population. As of June 30, 2010, the State operated 10 prison complexes with a total capacity of more than 33,400 beds and contracted with 5 in-state private prisons and 1 out-of-state private prison for 7,440 additional beds (see Figure 3, page 9, for a map of the prison locations in Arizona). These 40,840 beds represent nearly a nine-fold increase from the approximately 4,730 beds the Department operated prior to 1980.

The State has expanded the prison system in the following ways:

- **Arizona has constructed several new prison complexes adding thousands of beds**—According to information provided by Department of Corrections and Arizona Department of Administration (ADOA) staff, the State added six new prison complexes and expanded its four existing prison complexes between 1981 and 2004. These new and expanded complexes cost the State at least $561 million to build and added more than 22,100 beds to the state system.[1] The Department gained an additional 300 beds in February 2010 when the Eagle Point facility, which is part of the Lewis prison complex and formerly housed juveniles under the jurisdiction of the Arizona Department of Juvenile

---

[1] The $561 million figure does not include the costs to build six units within the prison complexes because these costs were not available from ADOA.

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 87 of 279 PageID #: 22716

BLACKSTONE0000165

**Figure 3:** Arizona Prison Complex Locations
Fiscal Year 2010



**Legend**

■ State-Operated Prisons

▲ Private Prisons

Source: Auditor General staff depiction of information from Department's Web site.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 88 of 279 PageID #: 22717

BLACKSTONE0000166

Corrections, was transferred to its control. The Department reported that it spent more than $107,100 preparing the Eagle Point facility for its use.

According to the ADOA, construction was completed in early 2010 on another 4,000 beds in new buildings at existing prison complexes as authorized by Laws 2007, Ch. 261. The Department received funding in fiscal year 2011 to begin filling these beds. According to the ADOA, this expansion cost almost $194 million. Although the new buildings were designed to house 4,000 inmates, according to department officials, the necessary infrastructure was included to accommodate an additional 1,000 beds should they be needed.

- **Arizona has contracted for thousands of private prison beds**—The Department began contracting for beds in private prisons in fiscal year 1994 and, as of June 30, 2010, contracted for a total of 5,680 beds in 5 private prisons in Arizona. The State plans to expand its use of in-state private prison beds. Specifically, Laws 2009, 3rd S.S., Ch. 6, §37, requires the Department to contract for an additional 5,000 private prison beds. Although the Department had issued a request for proposals for these beds, according to department officials, as of September 2010, the request for proposals had been canceled and was in the process of being revised for re-issuance.

  The Department has also used private facilities in other states, but this policy is changing. As of December 31, 2009, the Department had contracted for nearly 4,500 beds at three privately operated facilities in Colorado and Oklahoma. However, the State has decided to discontinue out-of-state prison contracts. As a result, the Department began moving prisoners housed at the out-of-state facilities back into the State in March 2010. As of June 30, 2010, there were still 1,765 inmates housed at a private facility in Oklahoma, but the Department plans to return all of these prisoners to in-state facilities by November 2010.

  From fiscal year 1993 through fiscal year 2010, the Department reported that it spent more than $731.5 million to contract for private prison beds.[1]

- **Department has added temporary beds to existing prison facilities**— Despite the extensive expansion of Arizona's prison system, the State has been unable to keep pace with prison population growth. According to a department official, the Department first used temporary beds—that is, beds in excess of what a facility is designed or rated to house—in July 1982 when the prison population exceeded the rated bed capacity. The Department has added these temporary beds by double bunking occupied single cells, adding more beds to occupied dormitories, and adding beds in prison spaces not designed to house inmates. For example, at the Eyman prison complex, the Department has added double bunks to maximum security cells originally designed for single occupancy and has expanded lower custody units that were designed for 24

The Department contracted for 5,680 beds in 5 private prisons as of June 30, 2010.

---

[1]  This total does not include private prison contract costs for fiscal years 2002 through 2004 and includes only a part of those costs for fiscal year 2005 because the JLBC *Appropriations Reports* that the Department used to compile this information did not separately account for these costs in those years.

inmates to hold 48 beds. At the Perryville prison complex, which houses most of the State's female inmates, the Department temporarily converted serving kitchens to 56-bed dorms and former programming rooms into cells that hold 8 to 10 inmates in bunk beds. According to department officials, alternative spaces are only occasionally used for temporary beds and on an emergency basis, although they have been used for extended periods of time.

Department officials also reported that, although the use of temporary beds is less costly than constructing new ones, it carries several disadvantages. According to the Department, the primary costs associated with temporary beds are for providing food and healthcare to the inmates. However, adding temporary beds increases capacity beyond what industry standards have deemed safe.[1] This increase, in turn, can create overcrowded conditions at prisons, which can lead to additional stress for staff, inmates, and the physical plant facilities. For instance, according to department officials, the kitchen and restroom facilities and the state prisons' electricity, water, and sewer systems were built to accommodate only these prisons' design capacities. When capacity is exceeded, problems can arise with these systems. For example, according to the Department, the growing inmate population at the Perryville prison complex increased demand for food service from the complex's central kitchen, which was originally designed in 1981 to supply 3,600 meals per day. A department official explained that, as of July 2010, the Perryville prison's central kitchen was producing 10,200 meals per day for the Perryville complex alone and an additional 2,100 meals for the Phoenix prison complex. The official further stated that the prolonged overuse of Perryville's kitchen has resulted in the need for significant upgrades to the facility's physical structure as well as the plumbing, electricity, and other equipment in order to be in compliance with building and health codes.

Table 2 (see page 12) shows the number of beds each prison complex was rated to accommodate, the total bed capacity, and the inmate population as of June 30, 2010, at both state-operated and privately operated facilities. For example, the Florence prison complex was rated to hold 3,692 inmates, but had a total operating capacity of 4,439 inmates as of June 30, 2010. The total operating capacity includes temporary beds. However, as of June 30, 2010, the Florence prison complex had 4,495 inmates.[2]

Use of temporary beds can stress the prison system.

---

[1] The American Correctional Association (ACA) sets prison capacity design standards to safeguard the life, health, and safety of staff and offenders. Although the State's prisons are not certified by the ACA, the Department reported that it builds prisons with these standards in mind.

[2] As indicated in Table 2 (see page 12), the Florence prison complex inmate population as of June 30, 2010, included inmates placed in special use beds that are not reflected in the prison's total operating capacity, but that the Department uses for temporary placements due to sickness and other reasons.

BLACKSTONE0000168

**Table 2:** Arizona Prison Capacity and Population
June 30, 2010
(Unaudited)

| | Rated Capacity | Total Operating Capacity[1] | Inmate Population[2] | % Total Operating Capacity Reached[3] |
|---|---|---|---|---|
| **State Prisons** | | | | |
| Douglas | 2,055 | 2,684 | 2,663 | 99% |
| Eyman | 4,588 | 5,252 | 5,530 | 105 |
| Florence | 3,692 | 4,439 | 4,495 | 101 |
| Lewis | 4,952 | 5,356 | 5,256 | 98 |
| Perryville[4] | 3,002 | 3,958 | 3,454 | 87 |
| Phoenix[4] | 563 | 714 | 539 | 75 |
| Safford | 1,486 | 1,934 | 1,934 | 100 |
| Tucson | 3,932 | 4,572 | 4,608 | 101 |
| Winslow | 1,754 | 1,890 | 1,896 | 100 |
| Yuma | 2,448 | 2,604 | 2,695 | 103 |
| **State Bed Totals** | 28,472 | 33,403 | 33,070 | 99 |
| **Private Prisons** | | | | |
| Central Arizona Correctional Facility | 1,000 | 1,280 | 1,272 | 99 |
| Florence West | 600 | 750 | 743 | 99 |
| Great Plains-Cornel, OK | 1,760 | 1,760 | 1,765 | 100 |
| Kingman | 2,542 | 2,650 | 2,650 | 100 |
| Marana | 450 | 500 | 490 | 98 |
| Phoenix West | 400 | 500 | 487 | 97 |
| **Private Bed Totals** | 6,752 | 7,440 | 7,407 | 100 |
| **Total Prison System** | 35,224 | 40,843 | 40,477 | 99 |

[1] The total operating capacity includes temporary beds, but does not include special use beds, which are beds where inmates stay temporarily for various reasons such as detention or sickness. The Department does not include these beds in its operating capacity because there must be general population beds available for these inmates when released from detention or the sick ward.

[2] The inmate population as of June 30, 2010, includes inmates housed in special use beds, as described in footnote 1, as well as inmates who are under the jurisdiction of the Department but were outside of the prisons because of reasons such as a court date or hospital stay.

[3] For prisons where the total inmate population exceeds total operating capacity, some inmates were in special use beds.

[4] The operating capacities of the Perryville and Phoenix prisons include beds used during the intake process. All prison admissions must pass through one of these two facilities before being assigned a permanent bed. Because of these intake beds, the percentage of capacity reached appears lower than actual conditions at the facility.

Source: Auditor General staff analysis of the Department's *ADC Institutional Capacity Committed Population* report for June 30, 2010.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 91 of 279 PageID #: 22720

BLACKSTONE0000169

# Prison population growth results from both policy and social factors

Various factors contribute to growth in prison populations. According to an August 2005 Vera Institute of Justice report (Vera report) that studied the impact of state-level sentencing and corrections policies between 1975 and 2002, these policies and social factors affect states' incarceration rates.[1,2] The incarceration rate is the number of inmates per 100,000 residents. An increase in the incarceration rate would indicate a growing prison population. The Vera report identified a number of social factors associated with the size or growth of incarceration rates. For example, states with larger minority populations, more state revenue per capita, a higher rate of arrests for drug offenses, and more law enforcement personnel per capita had higher incarceration rates, while states with higher personal income per capita and more generous welfare benefits had lower incarceration rates. States with higher property crime rates experienced larger growth in incarceration rates. In addition, the Vera report found that higher levels of unemployment, greater increases in unemployment, higher levels of income inequality, and larger youth populations were also associated with larger growth in incarceration rates, but the size of minority populations was not related to growth. The Vera report also found that some state sentencing policies can affect incarceration rates. For example, states with more provisions for increasing sentences for drug offenses (such as drug sales near a school, offenses involving minors, or weapon use), had higher incarceration rates, as did states with more mandatory sentencing laws (laws requiring courts to impose incarceration for a specific offense and/or a longer prison term). See Chapter 3 (pages 23 through 35) for more information on Arizona's sentencing laws and their effect on the State's incarceration rate and prison population.

Further, Arizona's incarceration rate has continued to increase despite the fact that Arizona's crime rate has generally declined since the mid-1990s. According to crime rate data compiled by the Bureau of Justice Statistics, while Arizona had 1 crime for every 12 residents in 1995, the figure had dropped to 1 for every 22 residents in 2008. A 2010 Arizona Prosecuting Attorneys' Advisory Council report suggested the drop in the crime rate could be due to the State's increased imprisonment rate.[3] However, literature auditors reviewed indicates that the effect of incarceration on crime is limited compared to the combined effect of other factors (such as increased law enforcement, employment, and education) and diminishes as prison populations grow.[4] In addition, although Arizona's crime rate has dropped, the State has one of the highest reported crime rates in the nation despite also having one of the highest incarceration rates (see textbox, page 14).

Arizona's crime rate has generally declined since the mid-1990s.

---

[1] See Stemen, Rengifo, & Wison, 2005

[2] The Vera Institute of Justice (Vera) is a nonpartisan, nonprofit center for justice policy and practice. According to its Web site, Vera combines expertise in research, demonstration projects, and technical assistance to help leaders in government and civil society improve the systems people rely on for justice and safety.

[3] See Fischer, 2010

[4] See Stemen, 2007; Liedka, Piehl, & Useem, 2006

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 92 of 279 PageID #: 22721

BLACKSTONE0000170

> **Arizona's incarceration rate**
>
> A 2009 Pew report reviewed state incarceration rates for 2007 and reported that Arizona had the highest incarceration rate among western states and tied with South Carolina to rank ninth nation-wide, behind the District of Columbia and seven other states.
>
> Source: Auditor General staff review of the Pew Center on the State's *1 in 31: The Long Reach of American Corrections* report.

According to auditors' analysis of Federal Bureau of Investigation (FBI) data, Arizona had one of the top five highest reported crime rates among all 50 states, the District of Columbia, and Puerto Rico in 2006 through 2008.[1]

# Arizona has increased corrections spending to help keep pace with growth

Regardless of the reasons for the increased prison population, the growth has led to substantially increased corrections spending, which accounted for $1 in every $8.77 of State General Fund estimated operating expenditures in fiscal year 2010. To accommodate the growth in Arizona's prison population, the Legislature has significantly increased State General Fund spending on corrections operations. In fact, the Legislature has appropriated nearly $949 million in State General Fund monies to the Department for fiscal year 2011, a significant increase from the $41.4 million spent in fiscal year 1979 for corrections. However, the Department has implemented several cost-saving measures to keep per-inmate costs low, helping to avoid even greater correctional expenses.

**Department operations compose 11.2 percent of State General Fund appropriations**—The Legislature has significantly increased the amount of State General Fund monies it spends on department operations. According to JLBC data, State General Fund corrections operating expenditures totaled more than $41.4 million in fiscal year 1979. For fiscal year 2011, the Legislature has appropriated nearly $949 million in State General Fund monies to the Department, including $58 million in startup and operational costs, which will cover the first year of operations for the 4,000 new inmate beds the State added in 2010.

For fiscal year 2011, the Legislature has appropriated nearly $949 million in State General Fund monies to the Department.

---

[1] Auditors compared estimated state crime rates reported by the FBI in its annual *Crime in the United States* publications for 2006 through 2008. The FBI develops the estimated crime rates based on crimes reported as part of the FBI's Uniform Crime Reporting (UCR) Program. The UCR Program collects crime statistics on eight crime categories: murder and nonnegligent manslaughter, forcible rape, robbery, aggravated assault, burglary, larceny-theft, motor vehicle theft, and arson (however, arson is not included in the estimated state crime rates for 2006 through 2008 because of insufficient data). Arizona ranked second after the District of Columbia in 2006, third in 2007, and fifth in 2008.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 93 of 279 PageID #: 22722

BLACKSTONE0000171

According to JLBC reports and as shown in Figure 4 (see page 16), this increase has meant that spending on the Department constitutes a greater portion of available State General Fund monies, thus impacting monies that are available for other state priorities. Specifically, the Department's fiscal year 2011 State General Fund appropriation accounts for 11.2 percent of all State General Fund appropriations for the fiscal year, which is more than double the 4.3 percent of State General Fund operating monies spent on corrections in fiscal year 1979. For fiscal year 2011, corrections will be the third largest State General Fund operating expense, trailing only K-12 education and health. By contrast, university spending has decreased from nearly 19.1 percent of State General Fund operating expenditures in fiscal year 1979 to only about 10.5 percent of State General Fund appropriations in fiscal year 2011. In fiscal year 2011, for every State General Fund operating dollar appropriated to the Department, $0.94 was appropriated to the universities.

## Department has kept per-inmate daily costs low—Even though state spending on the Department's operations has increased significantly, the Department has taken steps to keep the per-inmate daily cost (per capita rate) low. In fact, although the per capita rate increased from $42.46 per day in fiscal year 1986 (the earliest year data was available) to $64.96 per day in fiscal year 2009, it actually decreased to $32.98 per day when adjusted for inflation. A department letter prepared in response to a request for information from the Commission on Privatization and Efficiency—a commission the Governor established to identify state services and agencies whose functions can be eliminated, consolidated, streamlined, or outsourced to achieve greater operational efficiency—noted several ways in which the Department has kept per capita rates low. According to this letter, the Department has contracted for services (such as food, health, and work-based education) with private organizations and community colleges; downsized administrative office staff; placed responsibility for more costs on the inmates; taken advantage of volunteer support; replaced typical mattresses with ones made from recycled materials; and used inmate labor and inmate-produced products whenever feasible, among numerous other efficiencies. The Department's ability to keep its per-inmate costs low has helped the State to avoid even higher spending on department operations in light of the significant prison population growth.

Prison per capita costs have decreased when adjusted for inflation.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 94 of 279 PageID #: 22723

BLACKSTONE0000172

Figure 4: Comparison of State General Fund Expenditures for Fiscal Year 1979
and Appropriations for Fiscal Year 2011
(Unaudited)



Fiscal Year 1979 Expenditures

Fiscal Year 2011 Appropriations

- Department of Corrections [1]
- Total Health Services (includes AHCCCS) [2]
- Universities/Regents
- All Other Agencies
- Department of Education (K-12)

[1] In fiscal year 1979, incarcerated juveniles not convicted as adults were housed under the Department of Corrections; in fiscal year 2011, they are housed in the Arizona Department of Juvenile Corrections. The adult corrections portion of fiscal year 1979 was less than 4.3 percent of the State General Fund.

[2] The Arizona Health Care Cost Containment System (AHCCCS) is the State's Medicaid agency.

Source:   Auditor General staff analysis of the JLBC *General Fund Operating Budget Spending Fiscal Years 1979 -2011* report and the fiscal year 2011 *Appropriations Report*.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 95 of 279 PageID #: 22724

BLACKSTONE0000173

# Chapter 2

## Option 1—Expanding prison system to address prison population growth

One option to address Arizona's prison population growth is to continue expanding the prison system. Specifically, the Legislature could consider constructing new prison facilities and/or contracting for more private beds. Based on the Department of Corrections' (Department) proposed plan for expanding the prison system to meet expected growth using a combination of state and private facilities, this option could cost an estimated $975 million between fiscal years 2012 and 2017, and actual costs could be higher. If the Legislature decides to continue expanding the prison system, it should consider directing the Department to further study and analyze the costs for the State to build and operate prison facilities compared to contracting with private prisons to determine which option would be more cost-effective while still ensuring public safety.

### Continued expansion will require significant spending

As discussed in Chapter 1, the Department has projected that the State's prison population could reach nearly 50,000 inmates by December 31, 2016, based on a growth rate of 114 inmates per month (see Chapter 1, page 8). Based on the projected growth, the Department estimates that the State will need 8,500 new beds—in addition to the 4,000 new beds that became operational in fiscal year 2011—and has developed a plan to meet this demand. The proposed plan recommends adding both state-operated and private beds because statute requires the Department to consider contracting for private prisons before expanding or constructing new minimum- or medium-security prison facilities for certain offenders. As illustrated in Table 3 (see page 18), the plan could cost approximately $975 million for construction and operating costs between fiscal years 2012 and 2017 and includes the following:

Expanding the prison system to meet expected prison population growth could cost approximately $975 million between fiscal years 2012 and 2017.

- **Private prison beds**—The Department's plan recommends an additional 6,500 private prison beds for minimum- and medium-custody level male inmates. This

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 96 of 279 PageID #: 22725

BLACKSTONE0000174

Table 3: Estimated Prison Construction and Privatization
Costs for 8,500 Projected Beds
Fiscal Years 2012 through 2017
(Unaudited)

| Custody Level | Ownership | Gender | Beds | Construction Costs[1] | Start-Up Costs[2] | Operating Costs 2012-2017[3] | Total Costs |
|---|---|---|---|---|---|---|---|
| Units to be Built in Fiscal Year 2012 | | | | | | | |
| Minimum | Private | Male | 2,000 | N/A[4] | N/A[4] | $213,422,880 | $213,422,880 |
| Medium | Private | Male | 3,000 | N/A[4] | N/A[4] | 371,210,880 | 371,210,880 |
| Units to be Built in Fiscal Year 2013 | | | | | | | |
| Minimum | State | Female | 500 | $23,500,000 | $1,762,975 | 48,318,900 | 73,581,875 |
| Maximum | State | Male | 1,000 | 93,000,000 | 3,525,950 | 125,348,589 | 221,874,539 |
| Units to be Built in Fiscal Year 2015 | | | | | | | |
| Medium | Private | Male | 500 | N/A[4] | N/A[4] | 24,182,593 | 24,182,593 |
| Units to be Built in Fiscal Year 2016 | | | | | | | |
| Minimum | State | Female | 500 | 23,500,000 | 1,762,975 | 13,421,100 | 38,684,075 |
| Medium | Private | Male | 1,000 | N/A[4] | N/A[4] | 31,902,920 | 31,902,920 |
| Totals | | | 8,500 | $140,000,000 | $7,051,900 | $827,807,862 | $974,859,762 |

[1] Amounts estimated by the Arizona Department of Administration (ADOA) are based on previous construction costs for adding similar types of units at existing prison complexes and construction-specific inflation rates as of the second quarter of 2010. According to ADOA, the estimates also include some infrastructure improvements beyond what exists at existing complexes. Actual costs may differ based on the sites chosen for each facility and the utility and infrastructure costs. No land costs are included.

[2] Amounts are based on the Department's estimated start-up costs for its 2010 4,000-bed expansion project. The 4,000-bed project was for minimum- and medium-custody level beds. Start-up costs for higher custody level beds could vary.

[3] Amounts are derived by multiplying the number of beds by a per capita rate. Per capita rates are taken from the Department's *Fiscal Year 2009 Operating Per Capita Cost Report.* The private minimum-custody level rate was calculated by auditors by averaging all private minimum-custody level per capita rates, weighted by number of prisoners in each facility. Per capita rates may fluctuate between fiscal years 2012 and 2017, which would affect these results.

[4] Private prison construction and start-up costs are covered under the per capita rate paid to private prison contractors included in the Operating Costs column.

Source: Auditor General staff analysis of ADOA prison construction cost estimates, ADOA-reported actual costs for the 2010 4,000-bed expansion project, the Department's Fiscal Year 2011 Budget Request Decision Package, and the Department's *Fiscal Year 2009 Operating Per Capita Cost Report.*

number includes the 5,000 private prison beds required by Laws 2009, 3rd S.S., Ch. 6. In addition to these beds, the Department proposes to contract for an additional 1,500 private prison beds in fiscal years 2015 and 2016. Contracting for these 6,500 total private beds could cost the State an estimated $640.7 million through fiscal year 2017 based on the average rate paid to private prisons in fiscal year 2009. However, the actual per capita rates for future private prison beds could be higher than the 2009 rates used to develop the estimates.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 97 of 279 PageID #: 22726

BLACKSTONE0000175

- **State-operated beds**—The Department's plan also recommends constructing additional facilities, either by expanding existing prison facilities or by constructing new facilities, to add 2,000 beds, including 1,000 maximum-custody level beds for male inmates and 1,000 minimum-custody level beds for female inmates. According to the Department's plan, these beds would become available in fiscal years 2013 and 2016. Adding these beds could cost at least $334.1 million to construct and operate through fiscal year 2017. Again, however, actual costs could be higher. For example, both Arizona Department of Administration and department officials reported that the estimated construction costs for the proposed state-operated facilities—estimated to be $140 million of the $334.1 million—are conservative because they are based on estimated 2010 costs, and actual costs will depend on when and where the facilities will be built. Costs are highly dependent on the location chosen for the facilities, and it is possible that additional monies could be needed to account for higher construction costs in various parts of the State, land costs, or costs to expand waste and water treatment facilities at existing prison complexes.

Although auditors used different per capita rates for the private and state-operated beds in developing the cost estimates, the stated costs represent different custody level beds and bed activation years and should not be used to compare the costs of private versus state-operated prisons. Moreover, these estimates are largely based on the number of needed beds identified in the Department's bed plan and operating costs reported in its *Fiscal Year 2009 Operating Per Capita Cost Report*. As of September 2010, department officials reported that they were in the process of updating both of these documents. Consequently, the projected bed need and cost estimates could change

*Projected bed need and estimated costs for these beds could change.*

# State should further study cost-effectiveness of privately operated prisons compared to state-operated prisons

Part of the deliberations about adding capacity is determining whether the State should contract with private prisons for additional beds or construct and operate its own prisons. As discussed in Chapter 1 (see pages 3 through 16), the State has pursued both of these options to help meet the prison housing demands that the State's growing prison population has required. Although statute requires the Department to consider contracting for private prisons before expanding or constructing prison facilities for certain offenders and allows the Department to enter into private prison contracts, statute also stipulates that such contracts offer "cost savings" to the State. However, department analysis of private prison and state prison costs indicated that it may be more costly to house inmates in private prisons. Specifically, according to the Department's *Fiscal Year 2009 Operating Per Capita Cost Report*, the State paid private prisons a higher per inmate rate than it spent on equivalent services at state-operated facilities in fiscal year 2009. After adjusting state and private rates to make them more comparable, the Department's study found that rates paid to private facilities were higher for both minimum- and medium-custody

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 98 of 279 PageID #: 22727

BLACKSTONE0000176

beds—the two categories of beds for which the Department contracts (see Table 4).[1,2] Specifically:

Table 4: Comparison of Department Calculations for Actual and Adjusted Private Prison Per Capita Rates and State Prison Per Capita Costs Fiscal Year 2009 (Unaudited)

| | State-Operated Facilities | Privately Operated Facilities | Cost Savings From Use of Private Prisons Per Inmate Per Day | Cost Savings From Use of Private Prisons Per Inmate Per Year |
|---|---|---|---|---|
| **Actual per capita rate** | | | | |
| Minimum-custody inmates | $58.80 | $54.78 | $4.02 | $1,468 |
| Medium-custody inmates | $60.51 | $63.52 | -$3.01 | -$1,099 |
| **Adjusted per capita rate[1]** | | | | |
| Minimum-custody inmates | $46.81 | $47.14 | -$0.33 | -$121 |
| Medium-custody inmates | $48.13 | $55.89 | -$7.76 | -$2,834 |

[1] Includes adjustments for healthcare costs, depreciation costs, and costs for functions provided only by the State to make private and state prison comparisons more comparable.

Source: Auditor General staff analysis of the Department's *Fiscal Year 2009 Operating Per Capita Cost Report*.

- **Minimum-custody beds**—The Department's study found that although the State paid less per inmate, per day to private prisons than the cost to house a minimum-custody inmate at a state-operated facility ($54.78 vs. $58.80), state costs were not directly comparable to the private prison rate because private prisons do not have all the same responsibilities and costs as state-operated facilities. For example, according to the report, private prisons do not accept inmates in need of more serious medical care, nor do they intake and classify inmates because the Department does this. After removing dissimilar costs and adding a depreciation cost to the state rate to mirror construction costs captured in the private prison rate, the Department found that the State paid private prisons a slightly higher rate than it spent to house minimum-custody inmates in state-operated facilities ($47.14 vs. $46.81).

- **Medium-custody inmates**—For these inmates, both the actual and adjusted rates paid to privately operated facilities were higher, according to the Department's study. Specifically, the per day rate paid to privately operated facilities was $3.01 higher than the cost at state-operated facilities ($63.52 vs. $60.51). Again, however, state costs and private-prison rates were not directly

---

[1] Auditors assessed the reliability of the unadjusted per capita costs reported by the Department and concluded that they were based on a reasonable method and appeared reasonably accurate. However, auditors did not assess the Department's method for adjusting the per capita rates for comparing state-operated and private prison costs.

[2] As of September 2010, department officials reported that they were in the process of updating its *Fiscal Year 2009 Operating Per Capita Cost Report*, and its comparison of private and state-operated prison operating per capita costs could change pending completion of the revision.

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 99 of 279 PageID #: 22728

BLACKSTONE0000177

comparable for the reasons described above. After making the adjustments, the difference grew to $7.76 ($55.89 vs. $48.13).

Other studies auditors reviewed were consistent with the Department's analysis. These studies indicated that costs savings from contracting with private prisons in place of state-operated prisons are not guaranteed. For example, a 2009 University of Utah review of eight studies comparing private and state prison costs found that results were mixed. Specifically, four studies identified private prison cost savings ranging from 4.6 percent to 15.2 percent, two studies found no difference in costs, and two studies—including a 2006 study the Department commissioned—found that costs of private prisons were 10.0 to 14.2 percent higher.[1] In addition to prison operational costs, consideration should be given to whether the State can construct new prisons at a lower cost. According to a 2001 U.S. Department of Justice report, evidence suggested that private companies can construct new facilities faster and cheaper than the public sector.[2] Additionally, this report noted that there is no consensus among academics and professionals in the field regarding the potential cost savings that private prisons can offer. Therefore, if the Legislature decides to expand the prison system, it should consider directing the Department to further study and analyze the costs for the State to build and operate prison facilities compared to contracting with private prisons to determine which option would be more cost-effective while still ensuring public safety.

Studies have indicated that contracting with private prisons does not guarantee cost savings.

---

[1] See Lundahl et al., 2008

[2] See Austin and Coventry, 2001

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 100 of 279 PageID #: 22729

BLACKSTONE0000178

State of **Arizona**

BLACKSTONE0000179

# Chapter 3

## Option 2—Diverting more nonviolent, low-risk offenders or reducing the time they serve to address prison population growth

A second option for addressing projected prison population growth is to divert more nonviolent, low-risk offenders from prison or reduce the time they serve—alternatives that may require changes to the State's sentencing laws. Arizona's sentencing laws largely dictate prison sentences and have contributed to the growth that has occurred to date in the prison population. The Legislature has studied changing these laws several times, and an ad hoc committee in the House of Representatives is addressing the subject again in 2010. Although some steps have been taken to divert nonviolent, low-risk offenders from prison and reduce the time they serve, the Legislature could consider expanding these efforts. Establishing a permanent sentencing commission to periodically review Arizona's sentencing laws and help monitor the State's prison population would be a way to provide ongoing attention to this area.

## Arizona laws largely determine prison sentences

Arizona's sentencing laws largely determine prison sentences. Since 1978, Arizona has enacted several sentencing laws to provide equity in the sentencing process and harsher penalties for certain crimes, and to ensure that offenders serve most of the sentence imposed. These laws include presumptive sentencing, which requires that judges impose certain sentences based on the felony offense; mandatory sentencing, which provides for harsher penalties for certain offenses; and truth in sentencing, which dictates how long a sentenced offender must serve. Specifically:

- **Presumptive sentencing**—Arizona's presumptive sentencing system, which became effective in 1978, requires judges to impose a statutorily defined sentence for a given offense. Prior to this change, judges had broad discretion in determining sentences, which resulted in sentencing disparities for similar crimes. Presumptive sentencing was adopted to provide more equitable

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 102 of 279 PageID #: 22731

BLACKSTONE0000180

punishment for similar offenders who commit similar crimes. Under the State's presumptive sentencing system, felony offenses are assigned to one of six classes depending on their seriousness, with class 1 being the most serious and class 6 the least serious. Judges are required to impose a recommended, or "presumptive," sentence for a given offense class, but may give shorter or longer sentences within a statutorily defined range based on mitigating or aggravating circumstances. According to a 2005 Vera Institute of Justice report (Vera report), nine states, including Arizona, adopted some form of presumptive sentencing between 1975 and 2002.[*] In contrast, between 1980 and 2002, 17 other states adopted sentencing guidelines rather than presumptive sentencing.[2]

Presumptive sentencing shifts discretion from judges to the Legislature and prosecutors.

Although presumptive sentencing does not preclude judges from sentencing eligible offenders to probation rather than prison time, it largely shifts discretion in determining sentence lengths to the Legislature, which determines sentence length in statute, and to prosecutors, who determine which violations to charge. Prosecutors can also offer plea bargains that reduce the seriousness or number of charges against the defendant in exchange for a guilty plea.

- **Mandatory sentences**—Arizona also began adopting mandatory sentence provisions in 1978 that provide for harsher penalties for certain groups of offenders, such as repeat offenders, violent offenders, sex offenders, and certain DUI and drug offenders. Mandatory sentencing provisions require the judge to send the offender to prison (i.e., make the offender ineligible for probation) and/or to lengthen the presumptive sentence for the offense (see the textbox below for an example of how mandatory sentences can affect sentencing). However, the judge can apply a mandatory sentence only when the prosecutor presses charges that require a mandatory penalty. According to the

> **Example of how mandatory sentencing can affect sentence length:**
>
> A person convicted of robbery, a class 4 felony offense, can either be sentenced to probation or sent to prison for 2.5 years, the presumptive sentence for a class 4 felony. However:
>
> - If the offender had a prior felony conviction (regardless of what it was), the prosecutor could press charges that invoke the repetitive offender mandatory sentence depending on when the prior offense occurred. If proven, the offender would be ineligible for probation and the imposed presumptive sentence would increase from 2.5 to 4.5 years.
>
> - If the offender used or threatened to use a gun during the robbery, the prosecutor could invoke the dangerous offender mandatory sentence. If proven, the offender would be ineligible for probation and the imposed presumptive sentence would increase from 2.5 to 6 years.

---

[*] See Stemen, Rengifo, & Wilson, 2005

[2] According to the Vera report, sentencing guidelines are a system of multiple recommended sentences and dispositions and a set of procedures designed to guide judicial sentencing decisions and sentencing outcomes that account for the severity of the offense and prior criminal history. Guidelines can be presumptive, which requires judges to impose a sentence within a range or provide written justification for imposing some other sentence (which sentence can be appealed), or voluntary, which does not require judges to impose the sentence recommended by the guidelines.

BLACKSTONE0000181

Vera report, all 50 states had adopted various mandatory sentencing laws by 2002.

- **Truth in sentencing**—In 1993, Arizona adopted truth-in-sentencing laws that abolished discretionary release by a parole board for any offense committed after 1993 and require offenders to serve at least 85 percent of their sentences before becoming eligible for community supervision (the 85 percent requirement applies to both violent and nonviolent offenders).[1] Prior to this change, prisoners were required to serve at least 67 to 75 percent of their sentences (depending on the offense), but typically became eligible for parole after serving one-half or two-thirds of their sentences.[2] Truth in sentencing was adopted to promote truth and accountability in sentencing by requiring offenders to serve the majority of their sentence. According to the Vera report, 17 states had abolished discretionary parole release by 2002, while 33 states still had it.[3] In addition, according to a 1999 Bureau of Justice Statistics report, most states had laws requiring offenders to serve a specific percentage of their sentences.[4] According to this report, by 1998, 27 states required violent offenders to serve at least 85 percent of their sentences. However, the report noted that only a few states— such as Florida, Mississippi, and Ohio—also required nonviolent offenders to serve a substantial portion of their sentences, similar to Arizona.

According to a 1999 Bureau of Justice Statistics report, only a few states required nonviolent offenders to serve a substantial portion of their sentences, similar to Arizona.

# Sentencing laws have affected State's prison population

Arizona's sentencing laws affect the State's prison population by determining who goes to prison and how long they stay. Prison population growth is essentially a function of prison admissions and length of stay. In Arizona, the combination of sentencing laws has contributed to increased prison admissions, but the actual time inmates served has decreased.

Specifically, consistent with national trends, Arizona's imprisonment rate has steadily increased since adopting presumptive sentencing. However, the rate of increase slowed after abolishing discretionary parole when the State made various sentencing changes in 1993. These results are consistent with the Vera report, which found that states that controlled sentencing decisions through presumptive sentencing but did not control release decisions by abolishing discretionary parole release—such as Arizona between 1978 and 1993—had higher incarceration rates.[5] In contrast, the

---

[1] Parole is a period of conditional supervised release outside of prison before an entire prison term is completed. It is granted by the Arizona Board of Executive Clemency after the inmate has served a portion of his or her sentence and has applied for release on parole. Parole eligibility dates are calculated in accordance with the provisions of the committing offense and the laws in effect at the time the offense was committed. Only inmates who committed offenses before January 1, 1994, are eligible for parole. Community supervision is a portion of a felony sentence and is served consecutive to the inmate's period of imprisonment. The term of community supervision is a period equal to 1 day for every 7 days of the sentence and is imposed on the convicted person by the court at the time of sentencing. Community supervision replaced parole after truth in sentencing was adopted.

[2] Alternatives to Sentencing Workgroup, 2005

[3] See Sternen, Rengifo, & Wilson, 2005

[4] See Ditton & Wilson, 1999

[5] See Sternen, Rengifo, Wilson, 2005

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 104 of 279 PageID #: 22733

BLACKSTONE0000182

report found that states that controlled both sentencing and release decisions through presumptive sentencing and abolishing discretionary parole, such as Arizona after 1993, had lower incarceration rates and smaller growth in incarceration rates.

The Vera report also found that states with more mandatory sentences have higher incarceration rates. The report noted that mandatory sentencing laws may not lead directly to increased incarceration, but likely act as proxies for a state's general approach to sanctioning offenders. Specifically, mandatory sentences may lead to higher incarceration rates because they can provide prosecutors additional leverage in plea bargains.[1] Literature further suggests that mandatory sentences are applied only in a few cases and are instead used by prosecutors to obtain a conviction through plea bargaining that does not have a mandatory penalty attached.[2] In Oregon, for example, incarceration rates have increased, but more offenders were convicted for nonmandatory offenses while convictions under mandatory sentencing statutes have declined.[3] Although a 1992 Department of Corrections (Department) study reported that mandatory sentencing had caused a buildup of longer-term offenders in the prison system, a 2010 Arizona Prosecuting Attorneys' Advisory Council report indicated that only 25 percent of the prison population was incarcerated with mandatory or flat term sentences as of September 30, 2009.[4,5,6]

Finally, although it was thought that truth in sentencing would require inmates to serve longer in prison, other changes instituted when Arizona adopted truth in sentencing have diminished its expected impact. Specifically, when Arizona adopted the 85 percent truth-in-sentencing requirement in 1993, it also shortened sentences for nondangerous offenders without two or more prior felony convictions. As shown in Table 5 (see page 27), auditors' analysis of department admissions data indicates that median sentence lengths have generally decreased for several nonviolent and violent crimes (except for homicide, manslaughter, and sexual assault) since adopting truth in sentencing. However, although median sentence lengths for several nonviolent crimes have decreased, truth in sentencing has meant that actual time served in prison for nonviolent offenses has not changed appreciably. According to auditors' analysis of inmates released from prison between 1990 and 2009, inmates sentenced for nonviolent offenses committed before 1994 served a median of 2 years in prison, while inmates sentenced for nonviolent offenses committed in or after 1994 served a median of 1.9 years. In contrast, the actual time served for violent offenses has decreased from a median of 4.8 years for offenses committed before 1994 to a median of 2.6 years for offenses committed in or after 1994. Thus, for offenders sentenced under truth in sentencing, the typical violent offender spends only a few months longer in prison than the typical nonviolent offender.

Since adopting truth in sentencing, the median time violent offenders serve in prison is only a few months longer than the median time nonviolent offenders serve in prison.

---

[1] Merritt, Fain, & Turner, 2006

[2] Ulmer, Kurlychek, & Kramer, 2007; Tonry, 2009

[3] Merritt, Fain, & Turner, 2006

[4] See Fischer & Thaker, 1992

[5] See Fischer, 2010

[6] Flat term sentences are a form of mandatory sentencing that require the offender to serve 100 percent of the imposed sentence.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 105 of 279 PageID #: 22734

BLACKSTONE0000183

**Table 5:** Median Sentence Lengths for Admitted Offenders by Offense Type, in Years [1] Calendar Years 1990, 1993, 1996, 1999, 2002, 2005, and 2008 (Unaudited)

| | 1990 | 1993 | 1996 | 1999 | 2002 | 2005 | 2008 |
|---|---|---|---|---|---|---|---|
| **Violent Crimes** | | | | | | | |
| Assault | 5.00 | 5.00 | 3.50 | 3.50 | 3.00 | 3.00 | 3.50 |
| Homicide | 15.00 | 15.00 | 17.25 | 16.00 | 16.00 | 14.50 | 16.00 |
| Manslaughter | 7.50 | 9.00 | 10.00 | 10.50 | 10.50 | 10.50 | 10.50 |
| Robbery | 7.00 | 7.00 | 5.00 | 5.00 | 5.00 | 5.00 | 7.00 |
| Sex Offender | 10.00 | 10.00 | 10.00 | 6.00 | 5.00 | 6.00 | 5.00 |
| Sexual Assault | 10.00 | 10.00 | 7.50 | 10.00 | 8.00 | 10.00 | 10.00 |
| Weapons Offense | 4.00 | 4.00 | 2.50 | 2.50 | 2.50 | 2.50 | 2.50 |
| | | | | | | | |
| **Nonviolent Crimes** | | | | | | | |
| Burglary | 5.00 | 5.00 | 3.00 | 3.00 | 2.50 | 2.50 | 2.50 |
| Drugs | 5.00 | 4.00 | 2.50 | 2.50 | 3.00 | 2.50 | 2.50 |
| DUI | 0.50 | 0.50 | 0.33 | 0.33 | 0.33 | 0.33 | 0.33 |
| Forgery-Fraud | 5.00 | 5.00 | 2.50 | 2.50 | 2.50 | 2.50 | 2.50 |
| Theft | 4.00 | 5.00 | 2.75 | 2.50 | 2.25 | 1.75 | 1.75 |

[1] The analysis includes admissions resulting from new court commitments, except for inmates sentenced to life in prison.

Source: Auditor General staff analysis of department prison admissions data.

## Other potential sentencing law changes have been under study for many years

The Legislature has been studying whether to change Arizona's sentencing laws as far back as 1991, and an ad hoc committee in the House of Representatives (House) studied this issue in 2009 and 2010. Various organizations have issued reports calling for changes that would address the State's growing prison population and set up other ways to equitably hold offenders accountable for their crimes. For example:

- In a 1991 report that the Arizona Legislative Council commissioned, the Institute for Rational Public Policy recommended that the Legislature repeal all mandatory sentencing provisions, replace presumptive sentences with presumptive guidelines, and create a sentencing commission to establish the guidelines.[*]

- In 2004, Families Against Mandatory Minimums recommended that the Legislature give judges authority to set aside mandatory prison sentences, make drug court an option for all nonviolent offenders with underlying substance abuse problems, provide alternatives to prison for drunk drivers, make probation

[*] Institute for Rational Public Policy, 1991

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 106 of 279 PageID #: 22735

BLACKSTONE0000184

a sentencing option for more nonviolent offenders, and use alternatives to prison for probation violators.[1,2]

- In 2005, the Alternatives to Sentencing Workgroup formed by the House and comprising nine house members made similar recommendations, which included allowing judges to ignore mandatory penalties for some offenders, creating a sentencing commission, reforming truth-in-sentencing laws for nonviolent first-time offenders, and expanding the use of alternatives to prison such as treatment, drug courts, and electronic monitoring.[3,4]

A House of Representatives ad hoc committee reviewed Arizona's sentencing laws during 2009 and 2010.

The House is again reviewing the need for sentence reform. In 2009, it formed an ad hoc Committee on Sentencing comprising six house members to "review and assess Arizona's sentencing laws and evaluate the purpose, history, and evidence of effectiveness of the laws regarding criminal sentencing." The committee is charged with reporting its findings and recommendations for improving Arizona's sentencing laws to the Speaker of the House on or before November 1, 2010. Since its formation, the committee has held two meetings, one in December 2009 and the other in May 2010. At these meetings, the committee has received testimony from various stakeholders regarding Arizona's prison population, the impact of mandatory sentences and truth in sentencing, and areas in which the Legislature could make changes to reduce the prison population. Members of the committee have also met with stakeholder groups and received and reviewed applicable literature.

## Options to divert nonviolent, low-risk offenders from prison or reduce time they serve could be expanded

Although Arizona voters and the Legislature have taken steps to divert some nonviolent, low-risk offenders from prison or reduce the time served in prison, the Legislature could consider expanding these efforts to further address prison population growth, some of which may require changes to the State's sentencing laws. Specifically, Arizona voters passed Proposition 200 in 1996, which requires some nonviolent drug offenders to be sentenced to probation and treatment rather than prison. The Legislature could consider expanding this program by diverting more nonviolent, low-risk offenders to nonprison alternatives (see Chapter 4, pages 37 through 46, for more information). Additionally, the Legislature established an early release program in 2003 for nonviolent, low-risk offenders and could consider other early release options, such as reducing the time served requirement for nonviolent, low-risk offenders and establishing earned time credits.

---

[1] See Greene & Pranis, 2004

[2] Families Against Mandatory Minimums is a nonpartisan, nonprofit organization that promotes judicial sentencing discretion.

[3] Alternatives to Sentencing Workgroup, 2005

[4] With regard to its recommendation to reform truth-in-sentencing laws for nonviolent first-time offenders, the Workgroup's report did not include specific criteria for defining nonviolent first time offenders, although it stated the recommendation particularly applied to women offenders.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 107 of 279 PageID #: 22736

BLACKSTONE0000185

If the Legislature expands diversion or early release options, it also should consider taking the following steps:

1. Further defining diversion and/or early release eligibility criteria for other nonviolent, low-risk offenses in statute; and/or

2. Ensuring the use of valid and reliable risk assessment tools in determining offender eligibility for these options.

## Diversion opportunities could be expanded to more nonviolent, low-risk offenders—In 1996, Arizona voters passed Proposition 200, adding Arizona Revised Statutes (A.R.S.) §13-901.01, which requires nonviolent persons convicted of a first or second offense for the personal possession or use of drugs to be sentenced to probation and mandatory treatment. According to a 2004 Vera report, Arizona's law was the nation's first successful effort to replace incarceration with treatment for some substance-abusing offenders.[1] According to a 2006 Arizona Supreme Court report, an estimated 1,072 offenders were diverted to probation and treatment in fiscal year 2005, resulting in an estimated $11.7 million in net costs avoided.[2,3] The Legislature could consider this same approach for other nonviolent, low-risk offenders, particularly those whose crimes are related to substance abuse. As illustrated in Table 1 (see page 5), offenders convicted of property crimes, such as burglary, theft, and fraud, made up 23 percent of the inmate population as of December 31, 2009, and these crimes are often associated with drugs.

Arizona law diverts some nonviolent drug offenders to probation and treatment.

## Expanding diversion may require sentencing law changes—In order to divert more nonviolent, low-risk offenders from prison, the Legislature may need to consider revising some of the State's sentencing laws. Specifically, the Legislature could consider revising some sentencing laws to allow nonviolent, low-risk offenders to be diverted to nonprison alternatives. Revising these laws would allow judges to consider individual cases in determining whether prison or some alternative such as treatment would be more appropriate for the offender. Other states have taken steps to divert a wider range of nonviolent, low-risk offenders from prison. For example:

- Similar to Arizona, Hawaii passed legislation in 2002 requiring probation with treatment for first-time, nonviolent offenders convicted of drug possession or use. However, Hawaii later expanded the availability of diversion to treatment for first-time, nonviolent drug offenders with prior nondrug convictions in 2004 and for first-time property offenders whose offense was committed in response to substance abuse problems in 2006.

---

[1] See Wool & Stemen, 2004

[2] Arizona Supreme Court, Administrative Office of the Courts, Adult Probation Services Division, 2006

[3] The estimate is based on marginal costs (department costs to house, feed, and supervise one additional inmate) for state-operated prisons, the full per capita costs for private prisons, and probation costs. It assumes that one-third of the diverted offenders would have been sent to state-operated prisons and two-thirds would have been sent to private prisons. The estimated net costs avoided had all diverted offenders been sent to state-operated prisons was more than $1.4 million. The estimated net costs avoided had they all been sent to private prisons was approximately $16.9 million.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 108 of 279 PageID #: 22737

BLACKSTONE0000186

- Florida passed legislation in 2009 that requires courts to sentence nonviolent, low-risk offenders to a new diversion program unless they pose a risk to the public. This law is not limited to drug offenders.

- New York passed legislation in 2009 that reformed its drug laws. These reforms included providing discretion to judges to place convicted drug offenders into treatment; diverting people who have committed crimes other than a drug offense but whose crime was related to substance abuse; and providing diversion eligibility to some second-time repeat offenders.

If the Legislature decides to divert more offenders to alternatives other than prison, it could consider expanding the availability of these alternatives. Chapter 4 discusses potential nonprison alternatives that the Legislature might consider in more detail (see pages 37 through 46).

## Legislature could consider expanding early release alternatives—The Legislature enacted Laws 2003, Ch. 256, which established an early release program for nonviolent, low-risk drug offenders who make satisfactory progress in their individualized corrections plans, maintain civil behavior, and meet other criteria. Inmates who participate in this program are released 3 months earlier than they otherwise would be under truth in sentencing and receive a variety of services, including substance abuse treatment, transitional housing, education and employment services, help in accessing social services, and mentoring relationships. At the end of the 3 months, they are placed on regular community supervision to complete the remaining 15 percent of their sentence. According to department reports, the number of participating inmates grew from approximately 500 offenders in calendar year 2005 to approximately 1,000 offenders in fiscal year 2009, and most participants successfully complete the 3-month early supervised release and continue their term of community supervision (896 inmates successfully completed the supervised early release during fiscal year 2009, while only 72 inmates did not complete it). In addition, A.R.S. §31-285 requires the program to result in a cost reduction of at least $17 per inmate, per day.

The Legislature enacted a 3-month early release program for certain nonviolent, low-risk offenders.

In April 2010, the Legislature amended A.R.S. §31-281 to expand program eligibility to include all nonviolent, low-risk offenders who have not been convicted of a sexual offense, arson, or driving under the influence. The Department expects the number of eligible offenders to double based on this law change.

The Legislature could consider other alternatives for expanding early release to reduce the amount of time nonviolent, low-risk offenders serve in prison. There is always a risk that an offender will commit new crimes once released from prison. However, according to a 2002 Bureau of Justice Statistics study, the deterrent effect of incarceration on recidivism is mixed.[1] The study, which measured recidivism rates for prison inmates from 15 states who were released in 1994, found that recidivism rates (measured as rearrest within 3 years of release) did not

---

[1] See Langan & Levin, 2002

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 109 of 279 PageID #: 22738

BLACKSTONE0000187

differ significantly for anyone serving less than 5 years in prison.[1] However, there was a significant reduction in recidivism for inmates serving more than 5 years. The study also found no evidence that spending time in prison raises the recidivism rate. A 2008 National Council on Crime and Delinquency review of more than 12-peer reviewed articles or reports on early release programs and their effect on recidivism found no significant difference in rates of recidivism among accelerated release and full-term prisoners, and, in some cases, early release prisoners had lower recidivism rates.[2] These results have led at least one group of advocates to conclude that modest changes in the length of stay, such as reducing it by a few months, likely would have no impact on recidivism rates or aggregate level crime rates.[3]

Additional alternatives that the Legislature might consider for early release include:

- **Reducing time served requirements for nonviolent offenders**—The Legislature could consider revising truth-in-sentencing laws to reduce the amount of time that nonviolent, low-risk offenders must serve in prison. As previously discussed (see page 25), truth-in-sentencing laws that most states adopted generally focused on violent offenders, and only a few states required both violent and nonviolent offenders to serve a substantial portion of their sentences, similar to Arizona. At least one of these states has revised its policy for nonviolent offenders. Like Arizona, Mississippi abolished discretionary parole as a release mechanism and required all offenders to serve 85 percent of their sentences when it adopted truth in sentencing in 1995. However, in 2001, it reinstated parole eligibility for first-time, nonviolent offenders and, in 2008, expanded eligibility to all offenders never convicted of a violent crime or a crime with an enhanced penalty regardless of the number of prior convictions. These inmates are eligible for parole after serving 25 percent of their sentence (although there are minimum-time-served requirements for inmates with shorter sentences). The law took effect in July 2008, and was applied retroactively for nonviolent offenses committed after June 30, 1995. According to a 2010 Pew Center on the States report, 3,076 prisoners were released between July 2008 and August 2009.[4] These inmates served a median of 13 months' less time in prison than they would have under the previous truth-in-sentencing requirements. According to Mississippi Department of Corrections staff, this has resulted in costs savings—its parole costs were $1.55 per day in fiscal year 2009 while its prison costs were between $36.67 and $41.61 per day. Moreover, the Mississippi Department of Corrections reported that between January 31, 2009 and January 31, 2010, the state's prison population decreased by 1,360, although it had been expected to increase by 1,000 before revising the truth-in-sentencing laws.

Mississippi has revised its truth-in-sentencing laws for nonviolent offenders.

---

[1] The analysis included only offenders leaving prison for the first time since the beginning of their sentence. It excluded offenders who left prison in 1994 but who had previously been released under the same sentence and had returned to prison for violating the conditions of release.

[2] See Guzman, Krisberg, & Tsukida, 2008

[3] Austin & Fabelo, 2004

[4] See Pew Center on the States, 2010

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 110 of 279 PageID #: 22739

BLACKSTONE0000188

Arizona could potentially realize a reduction in its prison population and corrections spending if it similarly revised its truth-in-sentencing requirements. The Legislature could reinstate discretionary parole release for nonviolent offenders similar to Mississippi. However, as noted previously, the 2005 Vera report suggested that reestablishing discretionary parole could lead to higher incarceration rates.[1] Alternatively, the Legislature could reduce the 85 percent time-served requirement for nonviolent, low-risk offenders. For example, if the Legislature reduced the time served requirements for nonviolent, low-risk offenders to 50 percent instead of 85 percent, actual time served would be reduced by 10.5 months based on a 2.5-year sentence. For every day that an inmate spends on community supervision (parole) rather than prison, the State would save an estimated $4.62, which represents the difference between the daily marginal cost of housing an inmate in a state-operated prison compared to supervising an inmate on parole in fiscal year 2009.

- **Creating earned time credits**—Another approach would be for the Legislature to authorize earned time credits for inmates. According to a 2009 National Conference of State Legislatures report, earned time credits are reductions to the portion of a sentence that must be served in prison that inmates can earn for completing education, vocational training, treatment, or work programs or participating in other productive activities.[2] Earned time credits are different from, and can be offered in addition to, "good time" credits that are given for following prison rules (such as the credits that allow Arizona offenders to serve 15 percent of their sentences on community supervision). According to the report, at least 31 states offer earned time credits to inmates. Earned time credits are usually made available to lower-risk offenders, and the typical range for a credit is between 30 and 120 days. For example, Kansas offers a 60-day earned time credit for successfully completing substance abuse treatment, a general education diploma, a technical or vocational training program, or any program that the secretary of corrections believes will reduce an inmate's risk of violating release conditions. Texas offers 10 to 30 days for each month an inmate works or participates in educational, vocational, or rehabilitation programs while in prison.

## Legislative options may require further action—If the Legislature expands diversion or early release options, it should also consider taking the following steps:

- **Defining offender eligibility**—Similar to A.R.S. §13-901.01, which requires diversion for first or second drug use or possession offenses, the Legislature could consider further defining diversion and/or early release eligibility criteria for other nonviolent, low-risk offenses in statute. Other states have made other crimes eligible for diversion, including first-time property offenders whose offense involved substance abuse, low-level offenders whose drug and

According to the National Conference of State Legislators, 31 states offer earned time credits that reduce the time inmates who participate in rehabilitative and productive activities serve in prison.

---

1 See Sternen, Rengfio, & Wilson, 2005

2 See Lawrence, 2009

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 111 of 279 PageID #: 22740

BLACKSTONE0000189

alcohol use contributed to the criminal activity, and other nonviolent, low-risk offenders.

- **Ensuring the use of valid and reliable risk assessment tools**—In addition to or instead of defining offender eligibility in law, the Legislature could consider ensuring the use of a valid and reliable risk assessment tool to determine offender eligibility for diversion and/or early release. According to a 2007 report prepared for the Crime and Justice Institute and the National Institute of Corrections, assessing an offender's level of risk and criminogenic needs through both the use of an actuarial tool and sound professional judgment is important for determining an offender's suitability for diversion.[1] Additionally, according to the Justice Policy Institute, a growing number of states are beginning to use actuarial risk and needs assessments in various parts of the criminal justice system.[2] For example, according to a 2007 evaluation, Virginia uses an actuarial risk assessment in conjunction with the state's voluntary sentencing guidelines to divert 25 percent of nonviolent, prison-bound offenders with the lowest risk of recidivating.[3] Finally, both the county probation departments and the Department have developed risk assessment tools. The county probation departments use the offender screening tool (OST) to assess a defendant's risk of reoffending and criminogenic needs and make diversion recommendations in the pre-sentencing reports prepared for the judges. They also use the field reassessment offender screening tool (FROST) to reassess probationers. The Department has developed a tool for assessing an offender's risk of recidivism that it uses to determine initial supervision levels for inmates released to the community, to help determine eligibility for the 3-month early release program, and to rank offenders for in-prison programming (see text-box, page 34). The Department also uses the FROST to determine community supervision levels. According to Administrative Office of the Courts and department officials, these tools may be appropriate for determining offender eligibility for expanded diversion and/or early release options.

Based on the Department's assessment of offender risk, auditors identified a number of inmates in the prison population on December 31, 2009, who appear to be at a lower risk for committing new felony offenses. Specifically, auditors identified 3,538 inmates (nearly 9 percent of the prison population) who have never been sentenced to prison for a violent offense, whose recidivism risk scores are 3 or less (considered lower risk by the Department), and who were incarcerated for less serious offenses (offense classes 4, 5, or 6). Crimes for which these offenders were convicted include drug offenses, burglary, driving under the influence, forgery/fraud, and theft. Although the number of offenders is a relatively small percentage of the overall prison population, consistently diverting even a small number of low-risk offenders from prison could have a significant impact on the prison population over time. It could also reduce prison costs. Estimated marginal prison costs for the

*Auditors identified 3,538 nonviolent inmates who appear to be at a lower risk for committing new felony offenses.*

---

[1] See Warren, 2007

[2] Justice Policy Institute, 2010

[3] See Kleiman, Ostrom, & Cheesman, 2007

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 112 of 279 PageID #: 22741

BLACKSTONE0000190

Department risk assessment instrument

The instrument is composed of two assessments, one that assesses an offender's general risk of committing new felony offenses and one that assesses the risk of committing new violent felony level offenses. The general risk score ranges from G1 (lowest risk) to G8 (highest risk), and the violence risk score similarly ranges from V1 to V9. Offenders with both general and violence risk scores of 3 or less are considered lower risk. The scores are based on the following risk factors: Age at most recent commitment and current age

- Number of prior adult felony convictions and incarcerations
- Number of prior juvenile felony adjudications
- History of addictive drug use (primarily heroin, cocaine, and methamphetamine)
- Affiliation with a prison or street gang
- Gender
- Current or most recent prison custody level (minimum, medium, close, or maximum)
- History of felony violence or other serious offenses

3,538 offenders total approximately $26.9 million for the total time they are required to serve in prison. Further, more savings could be realized if enough inmates were diverted to close a prison unit. However, a significant number of inmates would need to be diverted before a prison unit would close. As of August 31, 2010, the Department had over 4,800 temporary beds in the prison system, and department officials indicated that the Department would likely stop using these beds before closing a unit.

## Permanent sentencing commission could review sentencing policies and laws

Finally, the Legislature could consider establishing a permanent sentencing commission to assist in reviewing and recommending changes to the State's sentencing laws. According to a 2009 Vera report, sentencing commissions are typically neutral permanent bodies that analyze data and research to inform sentencing and corrections policies.[1] The report noted that while sentencing commissions were often established to develop sentencing guidelines, many states are creating or expanding commissions to address broader criminal justice policy agendas. As of April 2010, 19 states, the District of Columbia, and the federal government had sentencing commissions that were members of the National

---

[1] See Scott-Hayward, 2009

Association of Sentencing Commissions, and at least 4 other states had adopted sentencing commissions as well.

Sentencing commissions in other states perform a variety of functions. For example, Virginia tasked its sentencing commission with developing discretionary sentencing guidelines; developing an offender risk assessment instrument for assessing felons' risk to the public; preparing guidelines for sentencing courts to use in determining appropriate candidates for alternative sanctions; monitoring sentence lengths, crime trends, correctional facility population trends, and correctional resources; and making recommendations regarding correctional capacity and resource needs. Washington's sentencing commission is similarly responsible for evaluating sentencing policies and practices and recommending modifications to the governor and legislature. It conducts ongoing research of recidivism, disparities in sentencing, prison and jail capacity, deterrence, drug policy, and sentence enhancements for weapons-related crime.

Arizona has made some efforts to establish a sentencing commission in the past. Laws 2002, Ch. 311, created a temporary sentencing commission charged with reviewing the State's sentencing practices and making recommendations for changes by December 31, 2003. The commission was also charged with reviewing class 6 felonies and considering whether any should be repealed or reclassified. This commission comprised 27 members representing all three branches of government, various members of the criminal justice system, and the community. However, the commission disbanded before submitting its final report. The Legislature establishing a permanent sentencing commission (with a similar membership to ensure all criminal justice stakeholders' participation) is one option for taking long-term action in this area. Possible functions or responsibilities of a state sentencing commission could include reviewing and recommending changes to the State's sentencing laws, determining eligibility criteria for diversion, recommending guidelines for determining appropriate candidates for alternative sanctions, and monitoring reform results to ensure they are having the intended effect.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 114 of 279 PageID #: 22743

BLACKSTONE0000192

State of **Arizona**

page 36

# Chapter 4

## Option 3—Expanding use of nonprison alternatives to slow or reverse prison population growth

A third option for addressing prison population growth is to expand the use of nonprison alternatives for nonviolent, low-risk offenders—a step that, similar to revising sentencing laws, could limit or reverse growth in the number of inmates. Like all states, Arizona uses probation as an alternative to prison. Auditors identified both counties and other states that have expanded their nonprison alternatives to include forms of substance abuse treatment (in addition to drug court), home arrest with electronic monitoring, or day reporting centers. Arizona could use similar alternatives in lieu of prison sentences or in conjunction with earlier release from prison. Although the Department of Corrections (Department) and the courts have statutory authority to establish nonprison alternatives, the Legislature could consider directing the Department and/or courts to further study the use and costs of nonprison alternatives to identify the right mix of these alternatives for Arizona. Additionally, depending on whether the Legislature provides funding for expanded nonprison alternatives and which alternatives are expanded, some statutes will need to be revised, such as the home arrest statute.

## Arizona uses probation as nonprison alternative

Similar to other states, many Arizona felony offenders are sentenced to probation in lieu of prison or as part of their sentence. Although probation serves as an alternative to prison, probationers who violate the terms of their probation can be sent to prison or jail, and, according to the Department, approximately 14 percent of fiscal year 2010 prison admissions were probation violators. Additionally, in some cases, probationers also participate in drug court programs, which provide monitoring and

Approximately 14 percent of prison admissions in fiscal year 2010 were probation violators.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 116 of 279 PageID #: 22745

BLACKSTONE0000194

drug treatment services, and impose other requirements on offenders charged with or convicted of drug- or alcohol-related crimes.

## Probation serves as nonprison alternative

—Like all states, Arizona uses probation as an alternative to prison. Probation is a criminal sentence in which an offender agrees to fulfill certain court-mandated conditions and remains in the community under supervision instead of serving time in jail or prison. These conditions typically include a probation officer's supervision, fines, participation in treatment programs, community service, restitution, or other activities. Arizona has three types of probation: standard, intensive, and administrative (see textbox). The State's adult probation system is decentralized and operates under the jurisdiction of Arizona counties, each of which maintains a separate probation department.

### Probation types

**Standard Probation**—Offenders placed on standard probation are under the care and control of the court and are supervised by probation officers. Offenders typically must report to a probation officer, maintain employment, pay fees or fines, and pay restitution.

**Intensive Probation**—Offenders placed on intensive probation are those who would otherwise have been sent to prison at initial sentencing or for a technical violation of standard probation. Offenders must comply with strict control, surveillance, and supervision of their movement and activities in the community.

**Administrative Probation**—Offenders on administrative probation are not directly supervised by probation officers because of incarceration in jail or prison, having absconded or been deported, or being placed on unsupervised probation at sentencing.

Arizona courts sentence the majority of felony offenders to probation for at least part of their sentence, and many offenders sentenced to probation also serve some time in jail or prison. A felony offender is eligible for probation if a sentence of probation is not prohibited by law. According to the Arizona Superior Court's case activity report for fiscal year 2009, approximately 44 percent of the State's felony cases resulted in a sentence of only probation, 20 percent resulted in probation with jail time, and 4 percent resulted in probation with prison time. As of May 31, 2010, almost 84,500 offenders were involved with the probation system (see textbox).

## Probation Populations as of May 31, 2010

| | |
|---|---|
| Standard | 44,199 |
| Intensive | 2,226 |
| Administrative | 38,063 |
| Total | 84,468 |

Source: Auditor General staff analysis of Fiscal Year 2010 Monthly Statistics. Statewide Population obtained from the Administrative Office of the Courts Web site; see http://www.azcourts.gov/apsd/MonthlyStatistics.aspx.

## Probation violations can lead to jail or prison

—If a probationer violates the court's conditions, the court can revoke probation and impose a new sentence sending the probationer to jail or prison. According to the Department, probation violators accounted for approximately 14 percent of prison admissions in fiscal year 2010, and, based on auditors' analysis, almost 8 percent of the prison population

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 117 of 279 PageID #: 22746

BLACKSTONE0000195

as of December 31, 2009, consisted of inmates who had violated the terms of their probation.

In 2008, the Legislature took action to reduce the number of probation revocations by providing Arizona counties with a financial incentive to keep offenders on probation. Laws 2008, Ch. 298, requires the Legislature to appropriate funding to counties that reduce their total probation revocations and probation revocation rates for new felony offenses using fiscal year 2008 revocation rates as a benchmark. Specifically, the law requires the Legislature to appropriate 40 percent of any cost savings resulting from reduced probation revocations and reduced probation revocation rates for new felony offenses to eligible counties beginning in fiscal year 2011. Statute also requires counties to use these monies to provide substance abuse treatment and other risk reduction programs and interventions for probationers, and to provide grants to nonprofit victims' services groups that partner with the county probation departments to assist victims and increase restitution payments collected from probationers. In fiscal year 2009, according to the Joint Legislative Budget Committee, eight counties met both reduction requirements resulting in a cost savings of just over $6 million, of which approximately $2.4 million should be allocated to the counties for fiscal year 2011. However, because of budget considerations, the Legislature passed Laws 2010, 7th S.S., Ch. 6, §29, which suspends the requirement to allocate the funding to the counties in fiscal year 2011.

Probation can involve drug court—Some probationers also participate in drug court programs. Drug courts are voluntary programs that combine the efforts of judges, probation departments, and treatment providers into a coordinated intervention for offenders charged with or convicted of drug-related crimes. Drug courts provide supervision, drug testing, and treatment services such as counseling and education, and participants must follow certain rules such as abstaining from drugs and alcohol. Arizona has adult drug courts in nine counties, and the Superior Court in which the programs operate determines program eligibility.[1] According to the *Fiscal Years 2009-2011 Master List of State Government Programs*, there were 1,154 adult participants sentenced to drug court and 389 drug court graduates in fiscal year 2009. Some counties also have similar programs for offenders convicted of driving under the influence or domestic violence or who have mental health issues. The literature on the overall effectiveness of drug courts is mixed, suggesting that its success may be limited to specific interventions, outcomes, or participants.[2] However, researchers have evaluated individual drug courts in Coconino and Yuma Counties and identified several positive outcomes, including lower recidivism and drug-use rates. Additionally, a 2005 U.S. Government Accountability Office evaluation of eight drug court programs, including Maricopa County's drug court, found that while recidivism was reduced, other results, such as treatment outcomes and cost reductions,

Drug courts are voluntary programs that coordinate interventions for offenders charged or convicted of drug-related crimes.

---

[1] These counties are Cochise, Coconino, Gila, Maricopa, Navajo, Pima, Pinal, Yavapai, and Yuma.

[2] See Banks & Gottfredson, 2003; Gottfredson, Najaka, & Kearley, 2003; Shaffer, 2006; Wilson et al., n.d.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 118 of 279 PageID #: 22747

BLACKSTONE0000196

were mixed.[1] In addition, this evaluation found that drug court programs tend to be more expensive than conventional case processing.

# Nonprison alternatives could take several forms

In addition to probation, auditors identified a number of counties and other states that have implemented other nonprison alternatives in an effort to reduce their prison populations. Advocates suggest that providing nonprison alternatives provides several benefits. This section discusses three of these alternatives and any recognized costs and benefits: (1) expanding treatment alternatives in conjunction with or beyond drug courts, (2) expanding home arrest with electronic monitoring, and (3) establishing day reporting centers. These or other alternatives could be used in lieu of prison sentences or in conjunction with earlier release from prison.

## Nonprison alternatives may offer benefits other than reducing prison populations—In addition to potentially reducing or slowing prison population growth, nonprison alternatives may provide other benefits. Specifically, keeping offenders in the community rather than behind bars allows them to maintain family ties, be employed, and perhaps regain their place in the community.[2] Advocates of alternative sanctions also argue that nonprison alternatives are an effective solution that reduces crime and recidivism and are a better investment for tax-payer dollars.[3] However, the scientific research does not fully support this claim. Specifically, testimony presented on July 10, 2009, before the United States Sentencing Commission on the effectiveness of alternative sanctions concluded that no definitive statements can be made on the comparative effectiveness of alternative sanctions to incarceration, but a recent meta-study suggested there is promise.[4] Despite the mixed effects for alternatives, some states are using alternative sanctions, especially for low-risk offenders.

Some states are using nonprison alternatives, especially for low-risk offenders.

## Substance abuse treatment could be expanded—Some states, such as Texas, Virginia, Vermont, and Kansas, have expanded substance abuse treatment alternatives beyond drug courts in an effort to reduce prison admissions and prevent recidivism. For example:

- **Texas**—Texas has received national attention for its efforts to divert some offenders from prison to treatment alternatives. According to a 2007 Council of State Governments Justice Center report, in 2007, the state projected a need for 14,000 additional prison beds by 2012.[5] Building and operating new prison facilities to meet this growth was estimated to cost $523 million for fiscal years 2008 and 2009 alone. Instead of building new prison facilities, the Texas

---

[1] U.S. Government Accountability Office, 2005
[2] Demlietner, 2005
[3] Drake, Aos, & Miller, 2009
[4] See Byrne, 2009; Also see Drake, Aos, & Miller, 2009
[5] Council of State Governments Justice Center, 2007

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 119 of 279 PageID #: 22748

BLACKSTONE0000197

Legislature appropriated $241 million to expand substance abuse treatment and prison diversion programs in order to address two of the state's contributing factors to prison population growth—substance abuse and probation and parole revocations. According to a 2009 Council of State Governments Justice Center report, this expansion included 800 residential treatment beds and 3,000 outpatient treatment slots for probationers; 2,200 treatment slots for jail and prison inmates; and 1,250 transitional treatment center beds for offenders transitioning from institutional treatment programs.[*] In addition to these programs, Texas also funded 1,500 beds as part of a residential treatment program for probationers and parolees who violate the conditions of their supervision because of substance abuse problems. This program includes 6 months of treatment in a secure facility, followed by 3 months in a transitional treatment center, and 3 to 9 months of outpatient counseling.

These treatment and diversion programs have helped Texas reduce its prison population. According to a March 2010 Council of State Governments Justice Center presentation to the Texas House Corrections Committee, Texas' year-end 2009 prison population was about 1,000 inmates fewer than in September 2007 and about 9,000 inmates fewer than it had been projected to be. Moreover, according to prison population projections Texas' Legislative Budget Board released for fiscal years 2010 through 2015 in June 2010, the state's prison population is expected to remain below its prison operational capacity through fiscal year 2015, assuming no additional changes to its treatment and diversion programs. Because of the reduced prison population, Texas has been able to cancel contracts with county jails to house prisoners, which has resulted in annual savings of approximately $36 million. Additionally, according to the March 2010 presentation, offenders diverted from prison represent $292 million in avoided annual incarceration costs; about 2,000 more low-risk offenders had been released on parole one year after the reform, but parole revocations had declined by 27 percent since 2006; and the felony probation population has increased by about 8 percent since before the reform, but the yearly probation revocation rate has stayed about the same at 7.5 percent.

Arizona could consider expanding substance abuse treatment alternatives, either by expanding the use of drug courts and/or establishing additional substance abuse treatment alternatives. These additional alternatives could include counseling services, in-patient beds, and secure residential treatment beds.

## Home arrest with electronic monitoring could be expanded—The use of home arrest with electronic monitoring for nonviolent, low-risk offenders is almost nonexistent in Arizona (see textbox for definitions, page 42). Although Arizona Revised Statutes (A.R.S.) §41-1604.13 allows the Board of Executive Clemency to release certain nonviolent, first-time offenders to home arrest with electronic monitoring, statute limits its use to persons who committed offenses

Texas has expanded substance abuse treatment and prison diversion programs to address prison population growth.

---

[*] Council of State Governments Justice Center, 2009

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 120 of 279 PageID #: 22749

BLACKSTONE0000198

**Home Arrest**—A sanction that requires inmates to remain at their place of residence at all times except for movement outside the residence for mandated reasons, such as employment or drug screening. In Arizona, home arrest is conditioned on electronic monitoring surveillance, participation in employment and other beneficial activities, and submission to alcohol and drug tests.

**Electronic Monitoring (EM)**—A sanction that typically requires offenders to wear a wrist or ankle bracelet or global positioning unit, use voice verification systems, or wear or breathe into alcohol testing devices. EM may be passive, such as requiring an offender to answer the telephone and verify his/her presence at home, or active, emitting a constant signal to a home-monitoring device that communicates the inmate's location to a central computer. Although often used with home arrest, EM is also used with other forms of offender supervision such as probation or parole.

Source:  Auditor General staff review of A.R.S. §41-1604.13(D) and the National Law Enforcement and Corrections Technology Center October 1999 bulletin.

before 1994. According to a department official, only three inmates were serving time on home arrest as of June 30, 2010.

Some states that use home arrest with electronic monitoring have reduced corrections spending without negatively impacting recidivism. For example:

- **Florida**—Florida began using home arrest with electronic monitoring in 1983 as an alternative to parole for offenders who needed more intensive supervision after prison as well as for offenders who violated conditions of their probation and would otherwise be sent to prison. According to the Florida Department of Corrections (FDOC), the program is less expensive than prison and allows offenders to remain active community members who can work to assist their families and pay victim restitution. Further, according to a 2000 FDOC study, offenders on home arrest did not pose any greater risk to the community than probationers—both groups had reoffense rates of about 15 percent after 2 years.

  In an effort to reduce state spending on prison costs, a 2009 Florida Office of Program Policy Analysis and Government Accountability (OPPAGA) report recommended the state expand various alternative sanctions, including home arrest. The report estimated that about 350 additional offenders projected to be sentenced to prison for probation violations might be eligible for home arrest with electronic monitoring and other nonprison sanctions. OPPAGA said if this were the case, the state would save $5.7 million annually because the average cost to incarcerate an inmate in Florida is $16,410 per year, whereas the cost to monitor an inmate on home arrest in the state is only $2,730 to $5,285 per year, depending on the type of electronic monitoring device used.

According to the Florida Department of Corrections, Florida's home arrest program is less expensive than prison.

- **Mississippi**—A judge can sentence offenders in Mississippi to home arrest with electronic monitoring, or the Mississippi Department of Corrections (MDOC) can place offenders on this sanction after they are sentenced to prison. In fiscal year 2009, nearly 1,200 offenders were serving time on home arrest in the state at a cost savings of nearly $29 per offender per day (prison costs an average of $40.68 per day whereas home arrest costs $11.74 per day in Mississippi). MDOC officials believe home arrest is a safe and effective program and told auditors they are actively trying to expand the program to alleviate pressure on the prison system.

Expanding home arrest in Arizona has been considered in recent years. The January 2009 *Appropriations Chairmen Budget Options* report for fiscal years 2009 and 2010 proposed revising eligibility criteria to expand the State's home arrest program. The Department reported in April 2009 that almost 2,500 offenders—935 inmates who were incarcerated at the time, plus an additional 1,522 offenders the Department estimated would be admitted in fiscal year 2010—would likely be eligible for home arrest based on the proposed criteria at the time. The actual number of eligible inmates would depend on the criteria adopted. In addition to the offense date requirement, statute limits eligibility to inmates who have served at least 6 months of their sentence; were convicted of a class 4, 5, or 6 felony that did not involve intentionally or knowingly inflicting serious physical injury or using or exhibiting a deadly weapon or dangerous instrument; were not convicted of a sexual offense; have not previously been convicted of a felony; have violated parole by committing a violation that was not chargeable or indictable as a criminal offense; and are eligible for work furlough or parole.

Expanding home arrest in Arizona has been considered.

Placing more inmates on home arrest with electronic monitoring could reduce costs. According to department estimates, home arrest could cost approximately $19 per inmate, per day, including $7.50 for monitoring equipment. Although this estimate is higher than the marginal cost of $12.60 to house, feed, and supervise an additional inmate in prison, statute requires offenders to pay some home arrest costs. Specifically, A.R.S. 41-1604.13(D) requires that offenders on home arrest pay an electronic monitoring fee of between $1 per day and the total cost of electronic monitoring and a home arrest supervision fee of at least $65 per month if they have the ability to pay these fees. Depending on the amount offenders pay, the daily cost of the program could be less than the marginal cost of a day in prison. In addition, more savings could be realized if enough inmates were diverted to close a prison unit. However, a significant number of inmates would need to be diverted before a prison unit would close. As of August 31, 2010, the Department had over 4,800 temporary beds in the prison system, and department officials indicated that the Department would likely stop using these beds before closing a unit.

## Day reporting centers could be used—Many states and/or counties use day reporting centers to reduce jail and prison populations and associated costs (see

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 122 of 279 PageID #: 22751

BLACKSTONE0000200

textbox for definition).[1] Georgia reported lower recidivism rates for offenders who participated in day reporting centers rather than being incarcerated. Specifically:

> **Day reporting centers**—A nonprison alternative that blends high levels of supervision with intensive services and programming. Offenders typically report to the centers during the day but sleep at home and are responsible for providing their own meals and means of transportation to and from the centers. According to a 1995 National Institute of Justice report that surveyed 114 day reporting centers in 22 states (all of the centers that existed at the time), the centers have strict requirements for monitoring the whereabouts and behavior of participating offenders, and most centers' surveillance policies include graduated phases of supervision, frequent on-site contact, close monitoring of offenders when off-site, and vigilant surveillance of certain behaviors such as drug use.
>
> Although day reporting centers are commonly used for nonviolent offenders who need substance abuse treatment, some states have also used them for arson, sex or weapons offenses, and other violent offenses.
>
> Source    Auditor General review of the literature on day reporting centers; see Parent et al., 1995; Parent and Corbett 1996; Craddock, 2000; Martin, Lurigio, and Olson, 2003.

- **Georgia**—Georgia, which began using day reporting centers in 2001, had 13 day reporting centers state-wide as of August 2010. According to a Georgia Department of Corrections (GDOC) official, a judge can sentence offenders to these centers at initial sentencing or if they violate the conditions of their probation. A 2005 Georgia State University study on a day reporting center in Atlanta reported that offenders who completed the day reporting center program had a recidivism rate of 9 percent compared to a rate of 31 percent for offenders who did not complete the program and 20 percent for a comparison group of released parolees.[2,3] Further, Georgia has experienced a significant per-inmate cost reduction by using the centers. According to GDOC officials, Georgia's day reporting centers only cost $16.50 per inmate, per day compared to the $48-per-inmate-per-day cost of prison. GDOC officials were unable to give estimates for the start-up costs associated with the centers because they already owned many of the buildings and furniture used for the centers prior to their opening. However, these officials did mention that construction and start-up costs are relatively low, especially in comparison to prison construction and start-up costs because the facilities are "basically a blend of office and classroom space," which "are relatively inexpensive to accommodate with furniture, fixtures, and equipment, unlike [their] incarceration facilities."

---

[1] According to a 1995 report by the National Institute of Justice, there were 114 day reporting centers in 22 states as of mid-1994. Although auditors did not determine whether these states continued to have day reporting centers, auditors identified at least 10 states that had day reporting centers as of May 2010: Georgia, Illinois, Kansas, Nebraska, New Jersey, Oregon, Pennsylvania, South Carolina, Utah, and West Virginia; see Parent et al., 1995.

[2] See Finn, 2005

[3] Recidivism numbers are based on a review of offenders discharged from either the day reporting center or the comparison parole center between April 2001 and April 2003, beginning from their referral date through September 15, 2004.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 123 of 279 PageID #: 22752

BLACKSTONE0000201

In Arizona, day reporting centers have been used at the county level. According to a 1995 National Institute of Justice (Institute) report, Maricopa County (County) began using day reporting centers in 1992 after a federal court ordered the County to reduce its jail population.[1] Although the Institute noted that no formal impact evaluation had been completed on the County's day reporting center program, it reported that the return rate for participants returned to jail for serious rule violations was quite low, especially compared to the return rate for intensive supervision programs. Further, according to the report, county staff estimated that the program had saved the equivalent of 35,426 days in jail between the time it opened the centers in 1992 and the time the report data was collected in 1994. Based on county-reported per diem costs for jail and day reporting centers ($37 and $16, respectively), the Institute suggested that day reporting centers represented a significant potential cost savings, but that evaluative research was needed to draw any conclusions about program effectiveness. A 1999 study on the effectiveness of the County's day reporting center program in reducing DUI recidivism for repeat DUI offenders found that, although the program was no more effective at reducing recidivism than a standard probation program, it was more cost-effective and helped reduce pressure on the county jail system.[2] However, the study noted that the day reporting center program offered general substance abuse treatment rather than alcohol-specific treatment, which could have affected the results. According to Maricopa County probation staff, the County stopped using its centers in May 2002. Staff report that the program was discontinued because county judges and prosecutors deemed fewer and fewer probationers eligible for the program and because of budget considerations.

Maricopa County used day reporting centers from 1992 to 2002.

# State should further study expansion of nonprison alternatives, including costs and needed legislative action

Although the Department and the courts have statutory authority to establish nonprison alternatives, further study should be conducted to identify the best mix of alternatives. A.R.S. §41-1613 authorizes the Department to establish and operate community correctional centers to provide housing, supervision, counseling, and other correctional programs for persons in prison or on community supervision. According to department officials, these centers could include day reporting centers, work release centers, residential treatment centers, and halfway houses. Similarly, A.R.S. §12-299.01 authorizes the county courts to establish and operate community punishment programs for probationers that include noncustodial programs such as house arrest, electronic monitoring, and drug and alcohol outpatient treatment; residential programs such as restitution centers, halfway houses, and inpatient drug or alcohol treatment; and individualized services, such as counseling and education.

---

[1] See Parent et al., 1995

[2] Jones and Lacey, 1999

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 124 of 279 PageID #: 22753

BLACKSTONE0000202

Further study could
identify the best mix of
nonprison alternatives for
Arizona.

The Legislature could consider directing the Department and/or the courts to conduct a study to identify the best mix of nonprison alternatives for Arizona, which could be used in lieu of prison or in conjunction with earlier release, as well as develop recommendations for nonprison alternatives. For example, before Washington invested in nonprison alternatives, it commissioned a study of numerous evidence-based programs for adult corrections, juvenile corrections, and crime prevention to determine what evidenced-based alternatives could be used to reduce the need for prison but still be fiscally sound and reduce future crime.[1] The study recommended that Washington adopt a moderate-to-aggressive portfolio of evidenced-based options, which, if successfully implemented, would reduce future prison construction significantly. Specifically, the study projected that Washington could save about $2 billion and crime rates would be reduced. Cost benefits are a mix of savings from lower incarceration rates and cost avoidance based on fewer crimes committed in the future. The Legislature could also consider directing the Department and the courts to monitor the cost and impact of any or all of the new programs.

The costs of implementing alternatives would also need to be considered, including startup costs. However, these costs could be lessened by requiring offenders to pay some costs, especially for alternatives that allow them to work, such as home arrest with electronic monitoring, and by using other funding sources or cost-saving measures. For example, according to the National Institute of Justice's 1995 review of Maricopa County's day reporting center program, the County reallocated resources and developed new funding options to pay for the program.[2] Specifically, Maricopa County raised the charge for housing a federal inmate from $38 per day to $78 per day and received legislative approval to use funds from a 1986 bond issue for day reporting center facility acquisition. In addition, $150,000 in Bureau of Justice Assistance money was also applied to the project. Since the 1986 bond issue could be used only to improve the physical plant and not to support the program, the County offered free rent in their buildings to treatment providers in exchange for slots in the treatment programs for day reporting center offenders.

Depending on whether the Legislature provides funding for expanded nonprison alternatives and which alternatives are expanded, some statutes will need to be revised. For example, the Legislature would need to revise statute to expand eligibility for the home arrest program.

---

[1] See Aos, Miller, & Drake, 2006
[2] See Parent et al., 1995

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 125 of 279 PageID #: 22754

BLACKSTONE0000203

# Chapter 5

## Option 4—Reducing revocations from parole violations

A fourth option available for reducing prison population growth is to reduce prison admissions that result from offenders who violate the terms of their community supervision (commonly referred to as parole). After serving at least 85 percent of their sentences in prison, most Arizona inmates are conditionally released to the community under Department of Corrections (Department) supervision. Released inmates spend a median of about 5 months on community supervision. However, their parole can be revoked and they can be returned to prison for violating the conditions of their release, such as missing appointments with parole officers, using illegal substances, or engaging in criminal behavior. These violations accounted for 15 percent of the State's prison admittances in fiscal year 2010. Although the Department has developed policies and procedures to address parole violations, expanding the Department's alternatives for responding to them may help reduce prison admissions and associated costs. These include nonprison alternatives, such as those mentioned in Chapter 4 (see pages 37 through 46), residential treatment facilities, or other secure facilities. The Department has authority to establish alternative sanctions for parole violators and is in the process of studying potential options. Once it completes its study, the Department should present its findings to the Governor and Legislature for consideration and expand its use of nonprison sanctions in accordance with the direction it receives from state policymakers.

## Most inmates serve part of sentence in community

Most inmates serve about 15 percent or less of their sentence in the community under department supervision. As discussed in Chapter 3 (see pages 23 through 35), Arizona abolished discretionary parole as a release mechanism for offenses committed after 1993 and requires offenders to serve at least 85 percent of their sentence before becoming eligible for release to the community. Although release eligibility depends on prisoner behavior and other factors, department staff indicated

Most Arizona inmates serve about 15 percent or less of their sentence on community supervision.

•

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 126 of 279 PageID #: 22755

BLACKSTONE0000204

that most inmates are released after serving the minimum requirement. After release, department community corrections personnel (parole officers) evaluate released inmates' risk to the community and assign a level of supervision. In addition, inmates must agree in writing to follow several conditions of supervision and release (see textbox for examples). According to the Department, there were approximately 7,500 inmates on community supervision each month in fiscal year 2010. Based on auditors' analysis of department data, inmates serve a median of about 5 months on parole.

> **Examples of community release conditions**
>
> - Maintaining contact with parole officers
> - Living in approved housing
> - Securing and maintaining employment
> - Abstaining from alcohol and drugs and submitting to drug tests
> - Obeying all laws
> - Not engaging in violent or threatening behavior
> - Not possessing or using firearms or dangerous weapons
>
> Source: Auditor General staff review of the Department's community supervision agreement.

## Parole violations contribute to prison population growth

Offenders can have their parole revoked and be sent back to prison for violating the conditions of their release. According to the Department, parole revocations accounted for about 15 percent of prison admissions in fiscal year 2010 (up from 14 percent in fiscal year 2009). Parole can be revoked for any number of violations, including absconding, avoiding the parole officer, committing new crimes (misdemeanors or felonies), failing drug tests, carrying a dangerous weapon, or failing to maintain employment.[1,2] According to department information for calendar year 2009, the most common violations are absconding and substance abuse. The Department initiates the revocation process by issuing a warrant for a parole violator's arrest. When arrested, the offender is either returned to prison or, in some cases, may remain in the community to await a parole revocation hearing with the Board of Executive Clemency (Board; see textbox, page 49). According to department policies, department staff may allow a parole violator to remain in the community if he/she does not pose a threat to self or others and will likely appear at the hearing. The Board is responsible for determining whether offenders who have violated parole should finish serving their sentences in prison or remain in the community.

Parole revocations accounted for about 15 percent of prison admissions in fiscal year 2010.

---

[1] Absconding is where an inmate's location is unknown and/or the inmate fails to maintain contact with his/her parole officer.

[2] Although community supervision can be revoked for absconding or committing new crimes, the 15 percent of prison admissions from community supervision revocations in fiscal year 2010 does not include absconders still at large or supervised offenders convicted of new felonies and returned to prison.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 127 of 279 PageID #: 22756

BLACKSTONE0000205

Board of Executive Clemency

Formerly the Board of Pardons and Paroles, the Board of Executive Clemency is a five-member body appointed by the Governor that has exclusive power to pass upon and recommend reprieves, commutations, paroles, and pardons for persons who have committed offenses prior to 1994. The Board also has authority to revoke community supervision for offenders who have violated the terms of their release.

Source:    Auditor General staff review of A.R.S. §§31-401 and 31-402 and the Board of Executive Clemency Web site.

Arizona revokes a relatively low percentage of parolees compared to the national percentage. According to a Bureau of Justice Statistics report, approximately 25 percent of offenders exiting parole nationally in 2008 (excluding federal parolees) returned to incarceration with parole revocations; the rate for Arizona was 15.4 percent.[1] Arizona's significant absconder population, which the Department tracks separately and according to the same Bureau of Justice Statistics report was the third highest in the country in 2008, may partially explain why its revocation rate is lower than the national rate. Although Arizona revokes a relatively small percentage of its parolees, these revocations impose costs to the State. Based on auditors' analysis of department data, inmates who had their parole revoked in 2008 spent a median of more than 3 months in prison, which cost approximately $6,300 per revoked inmate (or approximately $1,222 per revoked inmate based on marginal costs) compared with approximately $774 per offender on community supervision.[2] Parolees who were returned to prison for parole violations in 2008, but subsequently released back to the community by the Board of Executive Clemency, spent a median of more than 2 months in prison before they were re-released.

## Expanding range of nonprison alternatives for parole violators could help reduce prison population growth

The Department provides guidance to its parole officers on what actions to take to address parole violations and when to return a parolee to prison. However, its methods for dealing with violators are limited by a lack of nonprison alternatives to confine parolees who face revocation. Other states use nonprison alternatives to address parole violations.

Department provides guidance on when to return parole violators to prison or use other sanctions—Department policies and procedures guide parole officers on when to initiate the revocation process or use other sanctions in response to violations. Similar to some other states, the Department can use a variety of sanctions to address violations. These sanctions, commonly called graduated or intermediate sanctions (see textbox, page 50), include verbal

---

[1]  See Glaze and Bonczar, 2009

[2]  These cost estimates are based on the Department's reported 2009 per capita costs.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 128 of 279 PageID #: 22757

BLACKSTONE0000206

> **Graduated sanctions** include a wide range of actions that can be taken to swiftly respond to violations without returning parole violators to prison. They include, but are not limited to, electronic supervision tools; drug and alcohol testing or monitoring; day or evening reporting centers; restitution centers; forfeiture of earned compliance credits; rehabilitative interventions such as substance abuse or mental health treatment; reporting requirements to supervision officers; community service or work crews; secure or unsecure residential treatment facilities or halfway houses; and short-term or intermittent incarceration.
>
> Source: Pew Center on the States, *Policy Framework to Strengthen Community Corrections*, 2008.

or written reprimands, increased supervision or programming, increased drug testing, community service, curfews, or referrals to the Department's Community Accountability Pilot Program (see textbox). According to department guidelines, when and how these alternative sanctions are used depends on the seriousness of the violations, the offender's level of supervision, and the number of violations an offender has committed. However, department policy requires parole officers to request warrants for numerous specified violations. These include refusal to sign conditions of supervision and release, failure to contact the parole office within one working day of release to the community, absconding, violations involving firearms or dangerous weapons, verified personal injury to another person or threat of violence, arson, sex offense behavior, and all new felony arrests. Although the Department has a range of sanctions to address parole violations, it has no nonprison alternative facilities available, either for use as a graduated sanction or to hold offenders once it begins the parole revocation process.

> **Community Accountability Pilot Program (CAPP)**
>
> Laws 2004, Ch. 204, required the Department to establish the CAPP for eligible offenders. Eligible offenders must be either nonviolent but at a high risk of reoffending, or a lower-risk individual with a history of mental health or substance abuse issues and must be referred to the program by the Department. Offenders referred to this program are placed on electronic monitoring and provided life skills training, substance abuse education, and help finding employment. They may participate in the program for up to 90 days and remain on parole under the Department's supervision. As required by law, the Department contracts with a vendor to provide the CAPP services. The CAPP is only available to offenders in Maricopa County, and, according to the Department, 96 offenders were admitted to the program in fiscal year 2010.
>
> Source: Auditor General staff analysis of Laws 2004, Ch. 204, and department eligibility criteria.

**Other states have adopted nonprison alternatives for parole violators**—Some states have established various facilities to house parole violators instead of returning them to prison, including residential treatment facilities, day reporting centers, halfway houses, and assessment facilities. For example:

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 129 of 279 PageID #: 22758

BLACKSTONE0000207

- As discussed in Chapter 4 (see pages 37 through 46), Texas has expanded its use of substance abuse treatment and prison diversion programs, which has helped reduce its prison population and the number of parole revocations. According to a 2009 Council of State Governments Justice Center report, this expansion of programs accompanied an emphasis on releasing more eligible inmates on parole and allocating resources toward addressing their needs once on parole.[1] This included expanding Texas' use of intermediate sanction facilities for parole violators. Intermediate sanction facilities are secure facilities used to sanction parole violators instead of revoking them to prison. Parole violators are confined in these facilities for an average of 60 days. According to the Texas Legislative Budget Board *Criminal Justice Uniform Cost Report, Fiscal Years 2006—2008*, in fiscal year 2008, intermediate sanction facilities cost between $35.45 per day (privately contracted) and $41.29 per day (state-run), compared with the average cost of $47.50 per day for incarceration in a Texas state prison.

- New Jersey uses nonprison facilities to house parole violators awaiting parole revocation hearings. According to a 2010 Sentencing Project report, in July 2008, New Jersey began using regional assessment centers for parole violators, which are designed to confine up to 45 people at a time for 15 to 30 days of lockdown.[2,3] During their confinement, violators are assessed for their mental health, social, familial, and economic needs, and risk to reoffend. These assessments help the parole board make more informed decisions, which has resulted in fewer revocations. The 2010 Sentencing Project report also noted that of the 810 parolees assessed at these centers by February 2009, only 46 percent were returned to prison, compared to a return rate of 81 percent before their use. Additionally, according to the New Jersey State Parole Board's fiscal year 2009 annual report, an additional review of 181 parolees who continued on parole after being assessed in the centers found that 73.4 percent of them either successfully completed parole or, if still on parole, had not committed additional violations at the time of the review. The remainder eventually returned to prison. Finally, according to this annual report and a New Jersey parole official, the centers saved New Jersey an estimated $10 million in fiscal year 2009 because of decreased parole revocations and its use of regional assessment centers to hold parole violators rather than county jails.

New Jersey uses regional assessment centers for parolees facing revocation.

Arizona could use similar facilities as a graduated sanction or as holding facilities for parole violators awaiting a revocation hearing. In addition, the nonprison alternatives discussed in Chapter 4 (see pages 37 through 46), such as day reporting centers and home arrest with electronic monitoring, could also be used for parole violators.

---

[1] Council of State Governments Justice Center, 2009

[2] See Greene & Mauer, 2010

[3] The Sentencing Project is a criminal justice policy research and advocacy firm.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 130 of 279 PageID #: 22759

BLACKSTONE0000208

## Expanding alternatives for parole violations would require action

The Department is studying options for expanding alternative sanctions for parole violators.

As discussed in Chapter 4 (see pages 37 through 46), statute authorizes the Department to establish and operate community correctional centers to provide housing, supervision, counseling, and other correctional programs for offenders on community supervision. According to department officials, the Department previously used such centers but stopped doing so in the 1980s because of funding limitations. Department officials indicated that they are in the process of studying potential options for expanding the use of nonprison sanctions for parole violators. The Department should complete this study and present its findings to the Governor and Legislature for consideration. The Department should then expand its use of nonprison sanctions in accordance with the direction it receives from state policymakers.

Finally, if additional nonprison sanctions are implemented, the Department should incorporate their use in its community supervision policies and procedures. Other states have incorporated the use of formal sanction grids into their parole procedures. For example, Ohio has used its Progressive Sanction Grid to provide guidance in imposing sanctions based on offender risk and violation severity since 2005.[1] In 2008, California began using the Parole Violation Decision Making Instrument, a computer-based instrument that identifies a range of recommended responses to each parole violation based on the offender's risk level and the severity of the violation.[2]

---

[1] See Martin & Van Dine, 2008

[2] See Murphy & Turner, 2010

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 131 of 279 PageID #: 22760

BLACKSTONE0000209

# Chapter 6

## Recommendations for legislative and department consideration

The Legislature could consider a number of options for addressing Arizona's growing prison population. These options are not mutually exclusive and include the following:

- Option 1: The Legislature could continue to expand the prison system, either by constructing new prison facilities and/or contracting for more private beds. If the Legislature decides to expand the prison system, it should consider directing the Department of Corrections (Department) to further study and analyze the costs for the State to build and operate prison facilities compared to contracting with private prisons to determine which option would be more cost-effective while still ensuring public safety.

- Option 2: The Legislature could consider diverting more nonviolent, low-risk offenders from prison and/or reducing the time they serve—alternatives that may require changes to the State's sentencing laws. Specifically:

  - Similar to Arizona Revised Statutes (A.R.S.) §13-901.01, which requires nonviolent persons convicted of a first or second offense for the personal possession or use of drugs to be sentenced to probation and mandatory treatment, the Legislature could consider revising statute to expand diversion opportunities to other nonviolent, low-risk offenders, particularly those whose crimes are related to substance abuse. In order to divert more nonviolent, low-risk offenders from prison, the Legislature may need to consider revising some of the State's sentencing laws.

  - The Legislature could consider expanding early release options, such as reducing the time served requirement for nonviolent, low-risk offenders and establishing earned time credits. These options would also require changes to the State's sentencing laws.

  - If the Legislature expands diversion or early release options, it should also consider taking the following steps:

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 132 of 279 PageID #: 22761

BLACKSTONE0000210

- Further defining diversion and/or early release eligibility criteria for other nonviolent, low-risk offenders in statute, and/or

- Ensuring the use of valid and reliable risk assessment tools to determine offender eligibility for diversion and/or early release.

- The Legislature could consider establishing a permanent sentencing commission to assist in reviewing and recommending changes to the State's sentencing laws. Other possible functions this commission could perform include determining eligibility criteria for diversion, recommending guidelines for determining appropriate candidates for alternative sanctions, and monitoring reform results to ensure they are having the intended effect. If the Legislature establishes a sentencing commission, it should consider including representatives from all criminal justice system stakeholders.

- Option 3: The Legislature could consider using more nonprison alternatives for nonviolent, low-risk offenders. This could include:

  - Expanding substance abuse treatment alternatives by expanding the use of drug courts and/or establishing additional substance abuse treatment alternatives. This might include providing additional counseling services, in-patient beds, and secure residential treatment beds.

  - Expanding the use of home arrest with electronic monitoring.

  - Establishing day reporting centers.

  These or other alternatives could be used in lieu of prison sentences or in conjunction with earlier release. The Legislature could consider directing the Department and/or the courts to further study nonprison alternatives and develop recommendations for expanding their use, which should include an evaluation of the costs of these alternatives. Additionally, the Legislature could direct the Department and the courts to monitor the cost and impact of any nonprison alternatives established. Depending on whether the Legislature provides funding for expanded nonprison alternatives and which alternatives are expanded, some statutes will need to be revised, such as the home arrest statute.

- Option 4: Expanding nonprison alternatives for parole violators would require the following actions:

  - The Department should complete its study of potential options for expanding the use of nonprison alternatives for parole violators and present its findings to the Governor and Legislature for consideration. The Department should then expand its use of nonprison sanctions in accordance with the direction it receives from state policymakers.

BLACKSTONE0000211

- If nonprison alternatives or sanctions are implemented, the Department should incorporate the use of these additional sanctions in its community supervision policies and procedures.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 134 of 279 PageID #: 22763

BLACKSTONE0000212



State of **Arizona**

page 56

BLACKSTONE0000213

# APPENDIX A

## Data and methodology

Auditors used various methods to study the issues addressed in this report. These methods included interviewing Department of Corrections (Department) officials and staff, Arizona Department of Administration (ADOA) staff, Joint Legislative Budget Committee (JLBC) and Governor's Office of Strategic Planning and Budget staff, and various stakeholders; reviewing JLBC reports; reviewing statutes, department orders, director's instructions, department guidelines regarding supervising parole violators, and other department documentation; reviewing Arizona crime data for 1960 through 2008 obtained from the Bureau of Justice Statistics Web site, national crime data for 2006 through 2008 obtained from the Federal Bureau of Investigation Web site, and Arizona population estimates from the Arizona Department of Economic Security Web site; calculating Arizona's imprisonment rate for fiscal years 1980 through 2008; and attending and/or reviewing the minutes of the December 2009 and May 2010 Arizona House of Representatives Study Committee on Sentencing. In addition, auditors used the following data and methods:

- **Data Sources**—Auditors obtained the following data downloads from the Department's Adult Inmate Management System (AIMS):

  - One-day census of all Arizona prison inmates as of December 31, 2009;

  - All inmates admitted to Arizona prisons between January 1, 1985 and June 30, 2009; and

  - All Arizona prison inmates released between January 1, 1990 and December 31, 2009.

- **Data validation**—To validate the AIMS data, auditors assessed the Department's internal controls by reviewing applicable policies and procedures and interviewing various staff and management responsible for the data. Auditors also tested a sample of records in the data against inmates' hard copy files to validate specific fields used in auditors' analyses. This test work included 10 inmate

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 136 of 279 PageID #: 22765

BLACKSTONE0000214

records from the one-day census data and 27 records from release data. Auditors found some errors in some of the data fields. However, auditors either did not use those fields or determined that these errors would not be material to overall conclusions. In general, auditors concluded that the AIMS data was sufficiently reliable for audit purposes

- **Data analysis**—Auditors analyzed the AIMS data to determine the demographic makeup of the prison population as of December 31, 2009; identify nonviolent inmates as of December 31, 2009, who appeared to be at lower risk for committing new felony offenses; review sentence lengths for admitted offenders over time; determine the length and percentage of time served by violent and nonviolent inmates released before and under Arizona's truth-in-sentencing laws; determine the percentage of violent and nonviolent prison admissions over time; determine the length of time offenders spend on community supervision; and determine the length of time offenders who have had their parole revoked spend in prison.

- **Review of department reports (unaudited)**—To obtain and review historical Arizona State prison population, cost, and sentencing guideline information, auditors reviewed several department reports. These reports included per capita reports, bed plan reports, a 1992 sentencing report, a 2006 recidivism report, annual reports from fiscal years 1983 through 2003, daily count sheets, *Corrections at a Glance* reports, inmate admittance and release reports, and a 2010 prison population trend report. Auditors also assessed the reliability of the per capita costs reported in the Department's *Fiscal Year 2009 Operating Per Capita Cost Report* by reviewing the report for mathematical accuracy and internal consistency and reconciling a sample of reported costs to the Arizona Financial Information System. Auditors concluded that the report is based on reasonable methodology, appears to be materially mathematically accurate and internally consistent, and overall appears reasonably accurate. The test work was limited to the unadjusted per capita costs.

- **Observation of prison facilities**—Auditors conducted observations at the following three prison facilities: Arizona State Prison Complex (ASPC) Perryville in Goodyear, which holds most of the State's female prisoners; Phoenix West, a privately operated specialty DUI prison for minimum-security male inmates located in Phoenix; and ASPC Eyman in Florence, which holds male prisoners in medium, maximum, and close custody.

- **Analysis of prison construction costs**—Auditors developed cost estimates for expanding the State's prison system using a combination of state and private facilities to meet projected prison population growth between fiscal years 2012 and 2017. This included an analysis of ADOA prison construction cost estimates, ADOA-reported actual costs for the 2010 4,000-bed expansion project, the

BLACKSTONE0000215

Department's Fiscal Year 2011 Budget Request Decision Package, and the Department's *Fiscal Year 2009 Operating Per Capita Cost Report.*

- **Literature review**—Auditors reviewed literature and other reports on prison population growth and its causes, privatization of prisons, incarceration and crime, nonprison alternatives, and other states' efforts to address prison population growth. Auditors also reviewed prior studies and reports on Arizona's prison population and sentencing policies. See Appendix B, pages b-i through b-iv, for references cited in the report.

- **Other state information**—In addition to reviewing literature and other reports regarding other states' efforts to address prison population growth, auditors also interviewed representatives, obtained information, and/or reviewed the Web sites of nine states. These states were selected based on actions taken to address prison population growth. States reviewed were Florida, Georgia, Hawaii, Mississippi, New York, New Jersey, Texas, Vermont, and Virginia.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 138 of 279 PageID #: 22767

BLACKSTONE0000216



State of **Arizona**

BLACKSTONE0000217

# APPENDIX B

## References

Alternatives to Sentencing Workgroup. (2005). *Final report*. Phoenix, AZ: Arizona House of Representatives.

Aos, S. Miller, M, & Drake, E. (2006). Evidence-based public policy options to reduce future prison construction, criminal justice costs, and crime rates. Olympia, WA: Washington State Institute for Public Policy.

Arizona Supreme Court, Administrative Office of the Courts, Adult Probation Services Division. (2006). *Drug Treatment and Education Fund: Report detailing fiscal year 2005*. Phoenix, AZ: Author.

Austin, J., & Coventry, G. (2001). *Emerging issues on privatized prisons*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance.

Austin, J., & Fabelo, T. (2004). *The diminishing returns of increased incarceration: A blue print to improve public safety and reduce costs*. Washington, D.C.: The JFA Institute.

Banks, D., & Gottfredson, D.C. (2003). The effects of drug treatment and supervision on time to rearrest among drug treatment court participants. *Journal of Drug Issues*, 385-412.

Bryne, J.M. (2009, July 10). *A review of the evidence on the effectiveness of alternative sanctions and an assessment of the likely impact of Federal Sentencing Guideline reform on public safety [Written Testimony before the United States Sentencing Commission]*. New York, NY: Regional Hearings, U.S. Court of International Trade Ceremonial Courtroom.

Council of State Governments, Justice Center. (2009). *Justice reinvestment in Texas: As sessing the impact of the 2007 Justice Reinvestment Initiative*. Lexington, KY: Author.

Council of State Governments, Justice Center. (2007). *Justice reinvestment state brief: Texas*. Lexington, KY: Author.

Craddock, A. (2000). *Exploratory analysis of client outcomes, costs, and benefits of day reporting centers-Final Report*. Terre Haute, IN: Indiana State University, Department of Criminology.

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 140 of 279 PageID #: 22769

BLACKSTONE0000218

Demleitner, N.V. (2005). Smart public policy: Replacing imprisonment with targeted non prison sentences and collateral sanctions. *Stanford Law Review*, 58, 339-360.

Ditton, P., & Wilson, D.J. (1999), *Bureau of Justice Statistics special report: Truth in sentencing in state prisons* [NCJ 170032]. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Drake, E.K., Aos, S. & Miller, M.G. (2009). Evidence-based public policy options to reduce crime and criminal justice costs: Implications in Washington State. *Victims and Offenders*, 4, 170-196. doi: 10.1080/15564880802612615

Finn, M.A. (2005). *Atlanta Day Reporting Center outcome evaluation*. Atlanta, GA: Georgia Day Reporting Center Executive Committee.

Fischer, D. R. (2010). *Prisoners in Arizona: A profile of the inmate population*. Phoenix, AZ: Arizona Prosecuting Attorneys' Advisory Council.

Fischer, D.R., & Thaker, A. (1992). *Mandatory sentencing study*. Phoenix, AZ: Arizona Department of Corrections.

Glaze, L.E., & Bonczar, T.P. (2009). *Probation and parole in the United States*, 2008. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Gottfredson, D.C., Najaka, S.S., & Kearley, B. (2003). Effectiveness of drug treatment courts: Evidence from a randomized trial [Electronic version]. *Criminology & Public Policy*, 2(2), 171-196.

Greene, J., & Mauer, M. (2010). *Downscaling prisons: Lessons from four states.* Washington, D.C.: Justice Strategies & The Sentencing Project.

Greene, J., & Pranis, K. (2004). *Arizona prison crisis: A call for smart on crime solutions*. Washington, D.C.: Families Against Mandatory Minimums.

Guzman, C., Krisberg, B., & Tsukida. (2008). Accelerated release: A literature review. *Focus: Views from the National Council on Crime and Delinquency.* Retrieved July 21, 2010 from, http://www.nccd-crc.org/nccd/pubs/2008_focus_accleratedRlease.pdf

Institute for Rational Public Policy, Inc. (1991). *Arizona criminal code and corrections study: Final report to the Legislative Council.* Phoenix, AZ: State of Arizona, Legislative Council.

Jones, R.K., & Lacey, J.H. (1999). *Final report: Evaluation of a day reporting center for repeat DWI offenders* [DOT HS 808 989]. Washington, D.C.: U.S. Department of Transportation National Highway Traffic Safety Administration.

Justice Policy Institute. (2010). *How to safely reduce prison populations and support people returning to their communities.* Retrieved July 21, 2010, from, http://www.justicepolicy.org/images/upload/10-06_FAC_ForImmediateRelease_PS-AC.pdf

Kleiman, M, Ostrom, B.J., & Cheesman, F.L. (2007). Using risk assessment to inform sentencing decisions for nonviolent offenders in Virginia. *Crime & Delinquency*, 53(1), 106-132.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 141 of 279 PageID #: 22770

BLACKSTONE0000219

Langan, P.A., & Levin, D.J. (2002). *Bureau of Justice Statistics special report: Recidivism of prisoners released in 1994* [NCJ 193427]. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Lawrence, A. (2009). *Cutting corrections costs: Earned time policies for state prisoners.* Denver, CO: National Conference of State Legislatures.

Liedka, R.V., Piehl, A.M., & Useem, B. (2006). The crime-control effect of incarceration: Does scale matter? [Electronic version]. *Criminology & Public Policy, 5*(2), 245-276.

Lundahl, B.W, Kunz, C., Brownell, C., Harris, N., & Van Vleet, R. (2009). Prison privatization: *A meta-analysis of cost and quality of confinement indicators. Research on Social Work Practice,* 19(4), 383-394.

Martin, B., & Van Dine, S. (2008). *Examining the impact of Ohio's progressive sanction grid: Final report.* Ohio Department of Rehabilitation and Correction, Bureau of Research, Office of Policy and Offender Reentry.

Martin, C., Lurrigio, A.J., & Olson, D.E. (2003). An examination of rearrests and reincarcerations among discharged day reporting center clients. *Federal Probation* 67(1), 24-30.

Merritt, N., Fain, T., & Turner, S. (2006). Oregon's get tough sentencing reform: A lesson in justice system adaptation. *Criminology and Public Policy, 5*(1), 5-36.

Murphy, A., & Turner, S. (2010). *Parole violation decision-making instrument (PVDMI) process evaluation.* University of California, Irvine, Center for Evidence-Based Corrections.

Parent, D., Byrne, J., Tsarfaty, V., Valade, L., & Esselman, J. (1995). *Day reporting centers: Volume 1.* Washington, D.C.: U.S. Department of Justice, Office of Justice Pro grams, National Institute of Justice.

Parent, D. G., & Corbett, R.P. (1996). Day reporting centers: An evolving intermediate sanction. *Federal Probation, 60(4), 51-55.*

Pew Center on the States. (2010). *Prison count 2010: State population declines for the first time in 38 years.* Washington, D.C.: Pew Charitable Trusts.

Pew Center on the States. (2009). *One in 31: The long reach of American corrections.* Washington, D.C.: Pew Charitable Trusts.

Pew Center on the States. (2008). *Policy framework to strengthen community corrections.* Washington, D.C.: Pew Charitable Trusts.

Scott-Hayward, C.S. (2009). *The fiscal crisis in corrections: Rethinking policies and prac tices.* New York: Vera Institute of Justice.

Shaffer, D.K. (2006). *Reconsidering drug court effectiveness: A meta-analytic review.* Un published doctoral dissertation, University of Cincinnati.

Stemen, D. (2007). *Reconsidering incarceration: New directions for reducing crime.* New York: Vera Institute of Justice.

Stemen, D., Rengifo, A., Wilson, J. (2005). *Of fragmentation and ferment; The impact of state sentencing policies on incarceration rates.* New York: Vera Institute of Justice.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 142 of 279 PageID #: 22771

BLACKSTONE0000220

Tonry, M. (2009). *The mostly unintended effects of mandatory penalties: Two centuries of consistent findings*. Crime and Justice, 38, 65-114.

Ulmer, J.T., Kurlychek, M.C., & Kramer, J.H. (2007). Prosecutorial discretion and the impo sition of mandatory minimum sentences. *Journal of Research in Crime and Delin quency*, 44(4), 427-458. doi: 10.1177/0022427807305853.

United States Government Accountability Office. (2005). *Adult drug courts: Evidence indicates recidivism reductions and mixed results for other outcomes*. Washington, D.C.: Author.

Warren, R.K. (2007). *Evidence-based practice to reduce recidivism: Implications for state judiciaries*. Washington, D.C.: United States Department of Justice, National Institute of Corrections.

West, H.C. (2010). *Prisoners at yearend 2009—Advanced counts* [NCJ 230189]. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Wilson, D.B., Mitchell, O., MacKenzie, D. (n.d.) *Drug court effects on recidivism* [in-press draft]. Administration of Justice, George Mason University, Manassas, VA.

Wool, J., & Stemen, D. (2004). *Changing fortunes or changing attitudes? Sentencing and corrections reforms in 2003*. New York: Vera Institute of Justice.

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 143 of 279 PageID #: 22772

BLACKSTONE0000221

# AGENCY RESPONSE

# Arizona Department of Corrections



1801 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR

September 27, 2010

Debra K. Davenport, CPA
Auditor General
Office of the Auditor General
2910 North 44th Street, Suite 410
Phoenix, Arizona 85018

Re:   RESPONSE TO AUDITOR GENERAL'S PERFORMANCE AUDIT OF PRISON
      POPULATION GROWTH

Dear Ms. Davenport:

The mission of the Arizona Department of Corrections (ADC) is to serve and protect the people of Arizona by securely incarcerating convicted felons, by providing structured programming designed to support inmate accountability and successful community reintegration, and by providing effective supervision for those offenders conditionally released from prison. The Department's highest priority is maintaining effective custody and control over inmates in an environment that is safe and secure for staff and inmates.

We have reviewed your September 21, 2010, report of the performance audit of the Department of Corrections, Prison Population Growth.

Below please find our written response to the four (4) recommendations for Legislative and Department consideration.

## RECOMMENDATIONS FOR LEGISLATIVE AND DEPARTMENT CONSIDERATION:

**OPTION 1:** The Legislature could continue to expand the prison system, either by constructing new prison facilities and/or contracting for more private beds. If the Legislature decides to expand the prison system, it should consider directing the Department of Corrections (Department) to further study and analyze the costs for the State to build and operate prison facilities compared to contracting with private prisons to determine which option would be more cost effective while still ensuring public safety.

**RESPONSE:** The Department agrees that this finding of the Auditor General is an option available to the Legislature.

BLACKSTONE0000223

**OPTION 2:** The Legislature could consider diverting more nonviolent, low risk offenders from prison and/or reducing the time they serve - alternatives that may require changes to the State's sentencing laws. Specifically:

- Similar to Arizona Revised Statutes (A.R.S.) §13-901.01, which requires persons convicted of a first or a second offense for the personal possession or use of drugs to be sentenced to probation and mandatory treatment, the Legislature could consider revising statute to expand diversion opportunities to other low-risk offenders, particularly those whose crimes are related to substance abuse. In order to divert more nonviolent, low risk offenders from prison, the Legislature may need to consider revising some of the State's sentencing laws.

- The Legislature could consider expanding early release options, such as reducing the time served requirement for nonviolent, low risk offenders and establishing earned time credits. These options would also require changes to the State's sentencing laws.

- If the Legislature expands diversion or early release options, it should also consider taking the following steps:

  - Further defining diversion and/or early release eligibility criteria for other nonviolent, low risk offenders in statute, and/or

  - Ensuring the use a valid and reliable risk assessment tools to determine offender eligibility for diversion and/or early release.

- The Legislature could consider establishing a permanent sentencing commission to assist in reviewing and recommending changes to the State's sentencing laws. Other possible functions this commission could perform include determining eligibility criteria for diversion, recommending guidelines for determining appropriate candidates for alternative sanctions, and monitoring reform results to ensure they are having the intended effect. If the Legislature establishes a sentencing commission, it should consider including representatives from all criminal justice system stakeholders.

**RESPONSE:** The Department agrees that this finding of the Auditor General is an option available to the Legislature.

---

**OPTION 3:** The Legislature could consider using more nonprison alternatives for nonviolent, low risk offenders. This could include:

- Expanding substance abuse treatment alternatives by expanding the use of drug courts and/or establishing additional substance abuse treatment alternatives. This might include providing additional counseling services, in-patient beds, and secure residential treatment beds.

- Expanding the use of home arrest with electronic monitoring.

- Establishing day reporting centers.

These or other alternatives could be used in lieu of prison sentences or in conjunction with earlier release. The Legislature could consider directing the Department and/or the courts to further study nonprison alternatives and develop recommendations for expanding their use, which should include an evaluation of the costs of these alternatives. Additionally, the Legislature could direct the Department and the courts to monitor the cost and impact of any nonprison alternatives established. Depending on whether the Legislature provides funding for expanded nonprison alternatives and which alternatives are expanded, some statutes will need to be revised, such as the home arrest statute.

---

**RESPONSE:** The Department agrees that this finding of the Auditor General is an option available to the Legislature.

---

**OPTION 4:** Expanding nonprison alternatives for parole violators would require the following actions:

- The Department should complete its study of potential options for expanding the use of nonprison alternatives for parole violators and present its findings to the Governor and Legislature for consideration. The Department should then expand its use of nonprison sanctions in accordance with the direction it receives from state policymakers.

- If nonprison alternatives or sanctions are implemented, the Department should incorporate the use of these additional sanctions in its community supervision policies and procedures.

---

**RESPONSE:** The finding of the Auditor General is agreed to and the audit recommendation will be implemented.

On behalf of the Arizona Department of Corrections and its staff, I wish to extend my personal thanks to your staff for their professional work through the audit process.

Thank you for affording the Department this opportunity to respond.

Sincerely,


Charles L. Ryan
Director

cc:     File

BLACKSTONE0000226

# Performance Audit Division reports issued within the last 24 months

08-05   Arizona Biomedical Research Commission

08-06   Board of Podiatry Examiners

09-01   Department of Health Services, Division of Licensing Services— Healthcare and Child Care Facility Licensing Fees

09-02   Arizona Department of Juvenile Corrections Rehabilitation and Community Re-entry Programs

09-03   Maricopa County Special Health Care District

09-04   Arizona Sports and Tourism Authority

09-05   State Compensation Fund

09-06   Gila County Transportation Excise Tax

09-07   Department of Health Services, Division of Behavioral Health Services—Substance Abuse Treatment Programs

09-08   Arizona Department of Liquor Licenses and Control

09-09   Arizona Department of Juvenile Corrections—Suicide Prevention and Violence and Abuse Reduction Efforts

09-10   Arizona Department of Juvenile Corrections Sunset Factors

09-11   Department of Health Services Sunset Factors

10-01   Office of Pest Management Restructuring

10-02   Department of Public Safety— Photo Enforcement Program

10-03   Arizona State Lottery Commission and Arizona State Lottery

10-04   Department of Agriculture Food Safety and Quality Assurance Inspection Programs

10-05   Arizona Department of Housing

10-06   Board of Chiropractic Examiners

10-07   Department of Agriculture Sunset Factors

# Future Performance Audit Division reports

Office of Pest Management Regulation



FLORIDA CENTER FOR FISCAL
AND ECONOMIC POLICY

**Policy Brief**                                                                                      **April 2010**

# Are Florida's Private Prisons
# Keeping Their Promise?

*Lack of Evidence to Show They Cost Less
and Have Better Outcomes than Public Prisons*

### Introduction

Over the past 20 years, states have begun to contract with private companies to provide a number of services that had traditionally been government functions performed by public employees.  For the most part, supporters of privatization have argued that subjecting various functions to market competition would result in lower costs to taxpayers and higher levels of effectiveness.  Child welfare services, concessions in state parks, food services and student transportation in some school districts, and human resource management functions for state agencies are some functions that have been privatized in Florida.

Another area where privatization has taken place in Florida is the operation of adult prisons.   The professed potential for cost savings and improved effectiveness when prisons are privatized had a strong appeal to policy-makers.  However, the process implemented to gauge compliance with these policy objectives in Florida is flawed and as a result the evidence to show that private prisons cost less to operate or are more effective at reducing recidivism than public prisons is questionable.

### Florida's Crime Rates, Rates of Incarceration, and Costs

Between 1989 and 2008, the rate of crime in Florida significantly decreased.[1]  The rate of violent crime dropped by 41%, property crime rate by 46%, and the total crime index by 46%.  During this period of declining crime rates, Florida (and the country) experienced higher rates of incarceration.  The incarceration rate in the US increased substantially - by 80%.[2]  More recently,



Case 3:16-cv-02267      Document 401-22      Filed 01/22/21      Page 150 of 279 PageID #:
22779

BLACKSTONE0000228

between 1992 and 2008, the number of individuals incarcerated in state prisons in the US rose by 78% in Florida by a much higher 109%.[3] Florida's rate of incarceration was 3.6 inmates per 1,000 state residents in 1992 and 5.4 per 1,000 in 2008.

A national study of the period 1992 to 2001 found higher rates of incarceration to be widespread among the states and concluded:

> "...the entire increase was a result of changes in sentencing policy and practice. These include such measures as 'three strikes,' mandatory sentencing, and a widespread abandonment of parole in the state and federal system. "[4]

Tougher sentencing acted to keep criminals behind bars longer, preventing them from committing more crime in the community. Sentencing and incarceration data support this observation. In 1989, those released from state prisons in Florida had served less than 34% of their sentences. This increased to 65.4% of sentences completed among those released in 1996 and 86.8% among those released in 2008.[5]

However, higher rates of incarceration do not come without a price and result in substantially greater requirements for funding. National data indicate that the cost of corrections in the U.S. tripled from $23 billion in 1989 to $69 billion in 2006.[6] As illustrated in the graph the Florida Department of Corrections in 2009 spent $52 per day, or $18,980 per year, for those incarcerated in its prison facilities. Six years ago, the average daily cost for those incarcerated in state prison facilities was $47.36 or $17,286 per year with about 23,600 fewer inmates — making the Department's annual operating budget one-half the size it is currently.[7]



**Privatization of Prisons**

In the early to mid 1990s, Florida lawmakers began to consider a number of public services as good candidates for privatization, as did a number of other states. Despite strong opposition from public employee unions, many states including Florida chose to privatize a number of functions such as the operation of toll roads, child welfare services, adoption services, school transportation and food services, inpatient care for the mentally ill, public employee human resource management, information technology and prisons.

In the midst of spending cuts that reduced educational and rehabilitative services in public prisons but maintained resources for security, the private prison industry's claim that it could provide as many, if not more, services to inmates at lower costs attracted support. Educational and rehabilitative programs

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 151 of 279 PageID #: 22780

BLACKSTONE0000229

have been found to reduce recidivism – the return of fewer former inmates to prison after committing another crime.

In 1993, the state Correctional Privatization Commission was established to oversee and carry out privatization. By 2005, the Commission awarded four contracts for the construction and operation of private prisons.[8] In the years that followed, the Bureau of Private Prison Monitoring (the successor to the Correctional Privatization Commission) awarded contracts for two new private prisons. Today, all six contracts for the operation of prisons are with two companies – CCA and GEO.

CCA is responsible for about 75,000 inmates in 19 states and in the federal system. GEO is responsible for almost 50,000 inmates in 10 states, the federal system and in other countries.

As with any state-funded program it is important to review performance periodically. Privatization of prisons as reflected in state law is expected to operate at lower costs and produce lower recidivism rates compared to prisons operated by the state. But with over a decade of experience, there is no good evidence to conclude that Florida is getting the results that it expected and as the law requires, both in terms of cost and the rehabilitative impact on offenders.

**Florida's Private Prisons**

Six of Florida's 62 prisons are run by private companies - Bay, Gadsden, Graceville, Lake City, Moore Haven and South Bay. South Bay houses the largest inmate population, with 1,861 adult males. Gadsden is the state's only private prison for female adult offenders, with 1,520 inmates. Lake City is the state's only private facility for male youth offenders, with 893 inmates.[9] As of October 1, 2008, 7,725 inmates were housed in Florida's six private prisons (approximately 8% of the total state inmate population of 99,570) at a cost of $133 million per year, which averages to $17,216 per inmate.[10]

In the public prison facilities, the annual cost per inmate is higher, at $18,980. However, it is important to note that in many ways, this is an inappropriate comparison. There are differences between inmates in private and public prisons: those who are more costly to handle are usually incarcerated in public prisons, such as those who are the highest security risks and those with extensive medical issues. Also, most of the public prisons were constructed many years ago and do not offer the architectural advantages to supervision and custody that the newly constructed privately operated prisons have that lower operational costs.

In Florida, two state agencies are responsible for the procurement and contract management functions of the private prison system. According to the Office of Program Policy Analysis and Governmental Accountability (OPPAGA), only Florida has this dual system of oversight.[11] In all the other states, the state Department of Corrections handles the procurement and contract management functions. In Florida, the Department of Management Services (DMS) handles the procurement process and the contract management function, which includes a daily on-site presence. The Department of Corrections (DOC) randomly inspects private prisons to ensure that security standards are maintained.[12] Shared responsibilities among state agencies can be effective, but in many cases, it causes coordination and accountability problems.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 152 of 279 PageID #: 22781

BLACKSTONE0000230

**Statutory Requirements**

Florida law addresses both the cost savings and rehabilitation goals of prison privatization. The law requires that the use of private contractors to operate prisons must:

> "...result in a cost savings to the state of at least 7% over the public provision of a similar facility."[13]

And the statutes go on to require that private prisons must have:

> "...programs ... designed to reduce recidivism, and include opportunities to participate in such work programs as authorized ...."[14]

> In addition, the law requires that OPPAGA must:"...develop and implement an evaluation of the costs and benefits of each contract entered into ... This evaluation must include a comparison of the costs and benefits of constructing and operating prisons by the state versus by private contractors... also evaluate the performance of the private contractor at the end of the term of each management contract and make recommendations ... on whether to continue the contract." [15]

Finally, the law also establishes a Prison Per-Diem Workgroup to help set the 7% cost savings threshold:

> "At the request of the Speaker of the House of Representatives or the President of the Senate, the Prison Per-Diem Workgroup shall develop consensus per diem rates for use by the Legislature... The workgroup may consult with other experts to assist in the development of the consensus per diem rates."[16]

**The Issues**

1. Is there a 7% savings?

There is no compelling evidence that the privatization of prisons has actually resulted in savings. The state's efforts to comply with the cost-savings mandate involve a complex and problematic process with three state agencies involved; the departments of Management Services and Corrections, and the Auditor General.

First, DOC provides a cost estimate for the per diem rate (essentially, the cost of inmate custody) based on expenditure data from a comparable facility. Second, the Auditor General reviews this estimate and certifies it for accuracy. Third, DMS makes adjustments to the certified per diem rate to account for variations in the facility under bid (e.g., the size of the facility or the characteristics of the inmate population). Fourth, DOC provides estimates for programming costs from historic data (e.g., educational programs, health services, and counseling services) as a guide for DMS to establish an add-on or supplement to the per diem rate to cover programming requirements in the solicitation. This estimate is not subject to certification by the Auditor General because there is no actual cost basis that is current due to public prisons operated today lacking a comparable level of program services. Finally, DMS estimates the program add-on and then applies a 7% reduction to the combined per diem and

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 153 of 279 PageID #: 22782

BLACKSTONE0000231

programming rate and publishes the final per diem calculation as a maximum threshold in the Invitation to Bid document.

It is very difficult to ensure that a private prison is in fact 7% less costly to operate than a comparable public prison. This is partly due to the fact that finding a truly comparable public prison is a complex and ultimately impossible goal given the diversity of the inmate population and the nature of the facilities (e.g., size, age, and architecture) used to incarcerate them. Also, even though the Auditor General certifies the accuracy of the DOC costs, DMS makes adjustments to the certified per diem rate and other adjustments to cover the programming requirements in the procurement. These adjustments raise questions about the validity of any claim for a 7% savings.

OPPAGA has concerns about the feasibility of reaching conclusions regarding the 7% cost savings as illustrated by the following qualifying remarks:

> "While significant, these cost savings estimates are subject to caveats and should be evaluated cautiously. Cost comparisons between public and private prisons require a number of adjustments because prisons differ on several factors, including size and location; facility design and age; the physical and mental health of the inmates served; inmate custody level; and the educational, vocational, behavioral, and substance abuse programs provided. Adjustments used to 'equalize' Florida's public and private prisons historically have been controversial."[17]

Also, due to the current limited process used for contract and financial audits, the accuracy of the actual cost experience under the original contracted programmatic and inmate population requirements compared to the payable rates and specifications in the contract are questionable.

Considering all these issues, there is no definitive conclusion regarding the actual cost differences between prisons operated by DOC and those that are privately operated.

2. Is recidivism less among those incarcerated in private prisons?
Private prisons are required to provide inmates with educational programs designed to reduce recidivism, or recurrent criminal behavior.[18] These include academic and vocational classes as well as sessions that target behavioral and substance abuse problems.

Although private prisons are required to provide these services, the contracts and contract monitoring are focused on inputs (e.g., inmate program participation requirements) and do not include any provisions to ensure the desired outcomes of reduced recidivism. As a 2008 OPPAGA report notes, their contracts lack outcome results and indicators by which a program may be evaluated, including the successful completion of a GED or vocational program, or graduation from treatment.[19]

In a 2003 report, *Recidivism of Public and Private State Prison Inmates in Florida*, DOC compared the recidivism rates of inmates from comparable public and private prisons. It discovered that
> "... no statistically significant differences in recidivism rates were found between public and private inmate groups..." and that there was "...no empirical justification for the policy argument that private prisons reduce recidivism better than public prisons."[20]

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 154 of 279 PageID #: 22783

BLACKSTONE0000232

3. Are there criteria for deciding whether a new prison should be privatized?

OPPAGA has not conducted a comparison of the costs and benefits of constructing and operating prisons by the state versus private contractors as for consideration by the legislature before it decides to have a new prison operated publicly or by the private sector. The law suggests that this should happen, but perhaps greater clarity may be needed to ensure that it is done up front. Findings and criteria used in such an evaluation would prove useful to the legislature when it is making decisions about who should construct and operate a new prison.

**Conclusions**

The manner by which Florida delegates responsibilities for overseeing privatized prisons among different state agencies is unlike the pattern in all other states. With its shared system of contract and operational control (DOC and DMS) Florida's private prisons may be susceptible to inefficiencies and lack of clear accountability for inmate custody and public safety as well as reduction of recidivism rates.

While Florida's inmate population growth has slowed, at some time in the near future new prisons will be needed as current facilities grow obsolete. But as things stand, the process for determining whether a new prison should be operated by the DOC or a private contractor and the process used for the procurement -- especially the procedure to establish a 7% cost savings is flawed. Upfront analysis by an objective research organization such as OPPAGA should be undertaken to help guide the decision about whether the public or private sector will operate a new prison and to make that process more transparent.

Also, even OPPAGA strongly qualifies its analysis regarding whether a 7% cost savings actually is experienced when a prison is operated by the private sector. Comparable cost information is lacking, the certified cost experience provided by DOC is adjusted or changed, and follow-up audits of actual expenditures do not occur.

The procurement process should also be examined and modified. Publishing the maximum per diem rate representative of a 7% savings might not generate the best savings for the state. Adjustments for program requirements further constrain the process. As an example, knowing the maximum bid amount may encourage a private company to reduce its profits from 30% to 23% when a much lower profit margin could be realized as savings in a more competitive bidding arrangement.

Florida's experience with privatized prisons raises serious questions about whether the taxpayers are getting their money's worth. In order for a proper evaluation to made, several steps should be taken.

- The Department of Corrections should have primary responsibility for procurement and contract management functions. DOC has the expertise and capability to manage prisons, including those operated by the private sector and could collaborate with DMS for support in procurement.
- Rather than being informed of a per diem rate, bidders should be required to make their best and final offer as part of a competitive market and based upon their corporate capabilities and

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 155 of 279 PageID #: 22784

BLACKSTONE0000233

cost experience with operating prisons within parameters specified in the procurement. The state should continue to make every effort to calculate a rate that is in fact 7% less than the cost would be if the prison was operated by DOC. Bids that exceed that figure should be considered nonresponsive and either DOC should operate the new prison or new bids should be solicited.

- The Office of Program Policy Analysis and Government Accountability should conduct studies to determine if there are cost benefits in the construction and operation of new prisons by the private sector. Criteria should be developed to help the legislature decide who should operate a new prison – the state or a private company.
- The Auditor General should conduct annual performance and financial audits of private prison contractors to help ensure compliance with the 7% savings requirement.
- The Prison Per-Diem Workgroup should meet on a regular basis. A more open and deliberate process that includes specifying standards and procedures to adjust the AG-certified rates for a comparable public prison as well as the programming cost supplement would also improve the reliability of assessments regarding compliance with the cost savings mandate.

This report was co-authored by John Hall, Executive Director, and Kelly Walsh, Research Assistant, with assistance from Mike Walsh, Director of Research.

The Florida Center for Fiscal and Economic Policy conducts independent research and educates the public and policymakers on state fiscal and economic policies with particular attention to their impact on low- and moderate-income families, individuals and small businesses. This research was funded in part by generous support from the Kellogg, Stoneman Family and Annie E. Casey Foundations. The report and its findings do not necessarily reflect the views of the Foundations or the FCFEP Board of Directors.

Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 156 of 279 PageID #: 22785

BLACKSTONE0000234

## Endnotes

[1] Florida Statistical Analysis Center: FDLE (1989-2008), Crime in Florida, Florida Uniform Crime Report (Computer program) Tallahassee, FL.

[2] US Department of Justice, Bureau of Justice Statistics, Corrections Population, 2010, Washington, DC.

[3] Florida Department of Corrections, Bureau of Research and Statistics, population statistics as of June 30 of each year in all prison facilities.

[4] Jennifer C. Karberg and Allen J. Beck, "Trends in U.S. Correctional Populations: Findings from the Bureau of Justice Statistics," presented at the National Committee on Community Corrections, Washington, D.C., April 16, 2004.

[5] Florida Department of Corrections, Bureau of Research and Statistics, Sentencing Reports.

[6] US Department of Justice, Bureau of Justice Statistics, Corrections Expenditures by level of Government, 2010, Washington, DC.

[7] Florida Department of Corrections, Bureau of Research and Statistics, Annual Report Budget Summary – includes all public prisons facilities (e.g. prisons, work camps, work release centers, etc.).

[8] OPPAGA, 2008. "While DMS has Improved Monitoring, it Needs to Strengthen Private Prison Oversight and Contracts." *Office of Program Policy Analysis and Government Accountability, Report No. 08-71*:1.

[9] Ibid.

[10] Ibid.

[11] Office of Program Policy Analysis and Government Accountability.

[12] Ibid.

[13] 957.07(1), Florida Statutes.

[14] 957.04 (3)(f) , Florida Statutes.

[15] 957.11 Florida Statutes

[16] 957.07(5)(a) Florida statutes.

[17] Research Memorandum, Office of Program Policy Analysis and Government Accountability, April 2009.

[18] OPPAGA. 2008. "While DMS has Improved Monitoring, it Needs to Strengthen Private Prison Oversight and Contracts." *Office of Program Policy Analysis and Government Accountability, Report No. 08-71*:6.

[19] Ibid.

[20] Bales, William, Bedard, Laura, Quinn, Susan. Florida State University and Ensley, David T. and Holley, Glenn P., Florida Department of Corrections. 2003. Recidivism of Public and Private State Prison Inmates in Florida.

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 157 of 279 PageID #: 22786

BLACKSTONE0000235

# PRISONS

## A look at prison privatization

### FOR PROFIT





ACLU

AMERICAN CIVIL LIBERTIES UNION
of OHIO

FOUNDATION

BLACKSTONE0000236



# TABLE OF CONTENTS

Introduction.......................... page 1

Executive Summary.............. page 2

Overview of Private Prisons.. pages 3-5

Costs and Savings ................ pages 6-8

Community Costs ................. pages 9-12

Safety ................................... pages 13-14

Rehabilitation ................... pages 15-16

Transparency ........................... page 17

Sentencing Reform............. pages 18-20

References ....................... pages 21-22

The economic downturn has resulted in a budget crisis for Ohio, as it has for other states, and out-of-control prison costs have emerged as a key concern.

The ACLU of Ohio has been a forceful proponent of sentencing reform where policymakers may save taxpayer dollars and help create a more just society.

**Governor John Kasich**'s new budget plan includes a sweeping overhaul of Ohio's **Department of Rehabilitation & Correction**. The proposal includes common-sense sentencing reforms that would help ease our overcrowded prison system. Unfortunately, the proposed budget also includes a plan to sell five state correctional facilities to "prison for profit" operators like **Corrections Corporation of America** and contract with those companies to house inmates in them.[1] **Privatizing state prisons may in fact undermine sentencing reform's goal to remove low-level offenders from the justice system.**

Prisons for profit are different from public institutions because they must generate revenues for their shareholders. As a result, they have a direct interest in ensuring that Ohio's prison system stays full to maximize its profitability.

This is not the first time prison privatization has been proposed as a cost-saving measure for Ohio taxpayers. In the 1990s, Ohio experimented with a private penitentiary in Youngstown that resulted in serious safety and fiscal concerns. Currently, the state has limited private facilities to Northcoast Correctional Facility and Lake Erie Correctional Facility, which hold inmates with minimal health and behavioral issues.

Legislators are taking steps to correct our broken prison system, but privatization will negate this important work. This report seeks to explore the many problems that plague prisons for profit, in the areas of fiscal efficiency, safety, contributions to the community, accountability and effect on recidivism.

This report was compiled and drafted by senior staff at the American Civil Liberties Union of Ohio. The ACLU of Ohio would especially like to thank the following staff and volunteers for their contributions to this report:

Christine Link, executive director
James L. Hardiman, legal director
Mike Brickner, director of communications and public policy
Gary Daniels, associate director
Carrie L. Davis, staff counsel
Shakyra Diaz, policy director
Ann Rowlett, deputy director
Geoff Schotter, research assistant

BLACKSTONE0000237



## Current State of Incarceration

- Between 1987 and 2007, the national prison population tripled to 1,596,127. **Nine percent of the national prison population is housed in a private prison.**

- Private prisons have evolved since the 1980s into a permanent American industry grossing billions of dollars in revenues every year. **Corrections Corporation of America (CCA), the nation's leading private prison operator, reported revenues of $1.675 billion in 2010.**

## Costs and Savings

- **Many states have recently begun ending their contractual relationships with private prison operators**, concluding that the costs and risks of privatization far outweigh any short-term benefits.

- Ohio's proposal of selling five prisons will only yield a short-term infusion of cash. The state will lose all future revenue.

- Studies conducted by the U.S. Department of Justice and the U.S. General Accounting Office have shown that private prisons yield **little or no long-term savings.**

- Cost comparison studies of state-run and privately-run prisons are plagued not only by difficulties in controlling for variables like security level, gender, and age, **but also "hidden" costs associated with contract writing, financial liability, and monitoring.**

## Community Costs

- **Privatization will undermine sentencing reform.** Prisons for profit have a different mission than public prisons: they must earn revenue. This means they have an inherent interest in ensuring prisons stay filled, even at the expense of taxpayers.

- When a state government enters into a contract with a private prison company, it legally binds the taxpayer to pay the company a certain dollar amount per inmate per day. This has led to over-incarceration and violence at private facilities in Ohio and nationwide.

- The profit motive drives private prison operators to pay as little of their fair share of state and federal taxes as possible, and they often get away with shifting the costs of their prisons' failures directly onto the backs of taxpayers. **In 2002, the IRS had to sue CCA to get it to pay $54 million in back taxes.**

## Safety

- **A 2004 report found that private prisons had 50 percent more inmate on inmate assaults and almost 50 percent more inmate on staff assaults.**

- Private prison companies cut costs by hiring cheaper, lower-skilled staff and fewer of them. The result is a vicious cycle where poorly trained and poorly disciplined corrections officers are incapable of adequately responding to prison emergencies. Prison safety conditions deteriorate, and more staff quit, increasing the turnover rate.

## Rehabilitation

- Of the top five states in percentage of privatized prison beds, **each has a higher three-year recidivism rate than Ohio.**

- Ohio's two private prison facilities offer **fewer** rehabilitation and training courses than their public counterparts.

## Transparency

- Ohio case law is mixed as to whether private prisons are subject to public records requests and other important transparency measures. **Without these protections, private prisons are ripe for abuse.**

BLACKSTONE0000238



## Foundations of Prisons for Profit

Prison privatization has a long and troubled history in the United States — a history that offers a stark warning about the incentives motivating those who would turn punishment into a private, for-profit business. The Thirteenth Amendment to the U.S. Constitution was passed immediately after the end of the Civil War to formally abolish slavery throughout the country, but it contained an exception for "punishment for crime whereof the party shall have been duly convicted."[1] In the following decades, many states, particularly in the south, contracted out prison inmates as cheap farm, railroad, and mining laborers under what was called the Convict Lease System. Growing political opposition to the Convict Lease System during the Progressive Era of the 1920s led to its demise. Beginning in the 1980s, the War on Drugs, the introduction of mandatory minimum sentencing, and a general political climate across the country that looked to incarceration as the one and only solution to all aspects of crime combined during that decade to turn incarceration into an investment opportunity for private speculators.[2]

States increasingly began to sell off their correctional facilities to private operators and then enter into contracts



with those operators to house their inmates as a means of coping with a suddenly skyrocketing prison population.

Since then, private prisons have evolved into a permanent American industry. Today, the overwhelming majority of the 264 private prisons in the United States are operated either by Corrections Corporation of America (CCA) or the GEO Group (formerly Wackenhut Securities, Inc.).[3] **As of June 2010, 126,000 state and federal prisoners, 9 percent of the national inmate population, were housed in privately run prisons.**[4]

But state after state in recent years has ended its contracts with private operators, concluding that the costs and risks of privatization are just too high compared to any benefit privatization provides to taxpayers.[5] Texas, Oklahoma, California, Idaho, and Nevada

are among the states that have terminated or seriously considered terminating their contractual relationships with private prison operators.[6]

## Current Privatization in Ohio's Prisons

Ohio Department of Rehabilitation and Correction outsources various services in its many public prisons to private contractors. For example, inmates have collect-call telephone funds that are administered by Global Tel*Link, a private communications company that caters to prison inmates.[6]

In addition, a 1996 state law requires Ohio to contract for two private prisons as long as those prisons show annual cost savings of at least five percent in comparison to state-run prisons.

Ohio's two privately owned

BLACKSTONE0000239



state prisons include the **North Coast Correctional Treatment Facility** in Grafton, which is owned by the **Management and Training Corporation (MTC)** and hosts 700 minimum-security inmates, and the **Lake Erie Correctional Institution** in Conneaut, which is also owned by MTC and hosts 1,509 minimum-to-medium-security inmates.[7] In addition, Ohio hosts 2,016 out-of-state federal prisoners at the Northeast Ohio Correctional Center, a CCA-owned facility in Youngstown.[8]

The John Kasich administration, however, has indicated that it intends to pursue privatization as a major component of its correctional budget reforms. Kasich's appointment of private prison industry insider Gary C. Mohr as the new director of ODRC also signals a willingness to privatize the prisons. Mohr was CCA's managing director from 2007 to 2009, and "CCA was a client of Mohr's consulting firm before and after his employment with the company."[9]

Kasich's biennial budget proposal would transfer ownership of the Lake Erie and North Coast facilities from MTC to another private company, sell the currently state-run Grafton and North Central facilities to a private company, and reopen the Marion juvenile facility as an adult prison and sell it to a private company.

## Privatization versus reform

Governor Kasich says he is implementing both sentencing reform and privatizing prisons in order to save resources. While sentencing reform will lessen the overcrowding of Ohio's prisons, prison privatization may not have a substantial financial impact

The budget crisis in Ohio is not trivial, and the cost of prisons is indeed out of control, but privatizing state-run prisons will not fix the gaping corrections-related hole in the state budget, and will more likely than not make it even worse.

**State prisons are public assets. Selling them off will only yield a one-time infusion of cash.**

It is highly disputed whether the promised savings from a private prison's reduced operational costs will ever materialize, but even the most generous estimates of such savings are trivial in comparison to costs of housing an ever-expanding inmate population in the first place. **As of October 2009, Ohio taxpayers spent an average of $25,254 per year for each inmate housed in Ohio prisons.** In June of that year, the Ohio prison system held a total of 51,113 inmates, and ODRC projects that the number will grow to 52,546 in 2011.[10] The most generous estimates of operational cost savings at private prisons compared to public prisons range from 5 to 15 percent, and even these figures are highly disputed by impartial, reputable sources.[11] If Ohio's prison population continues to grow, neither of these dubious cost savings projections, nor the promised extra corporate tax revenue[12] will amount to anything more than a monetary drop in the bucket for Ohio's budget crisis.

## Short-Term Savings and Long-Term Costs

While taxpayers have an interest in saving funds and rehabilitating inmates, prison-for-profit companies like CCA



BLACKSTONE0000240

only have an interest in their bottom line. It is in their best interests to charge taxpayers as much as they can per inmate per day and cut programming. It is the profit motive that drives private prison operators to engage in cost-cutting measures. Since a company's profit is the difference between its costs and revenues, those measures will always benefit the shareholder when it comes time to pay out the dividends. But any cost savings that the taxpayer might realize as a result of such measures can quickly be eaten up by an increase in the number of inmate-occupied private prison beds within the state. Thus, even if we assumed the most generous cost-comparison figures to be the most accurate, it wouldn't change the fact that, the interests of a private prison company's shareholders and the interests of taxpayers in states that have contracts with that company are fundamentally opposed.



Private prison firms have a natural incentive to maximize both the number of inmates they imprison and the amount of time for which they imprison each inmate, because the state pays them for their service of housing convicts on a per-inmate per-day basis.

The prison population continues to swell both in Ohio[13] and nationally. [14] However, crime rates have also decreased substantially over the past several years. Prisons for profit will only exacerbate this problem as they have a vested interest in more people remaining incarcerated.[15]

Governor Kasich is not doing the taxpayers of Ohio any favors by selling off state prisons to a private prison company like CCA. Doing so will not only worsen the strain on Ohio's budget; it will also work strongly against the rehabilitation of low-level offenders and jeopardize the safety of ordinary Ohioans.

Only sentencing reforms and guidelines that systematically identify and invest in the rehabilitation of such inmates can reverse Ohio's hemorrhaging corrections budget because only these types of reforms will actually reduce the number of inmates incarcerated in Ohio. Rather than rewarding private prison operators like CCA with contracts that bind Ohio taxpayers, Ohio's corrections policy ought to try as hard as possible to end the cycle of

incarceration by enacting sentencing reforms that reverse the mushrooming of the prison population that has continued unabated for decades.

BLACKSTONE0000241





### Cost Comparisons

The idea that outsourcing traditional public-sector functions will lead to those functions being carried out more efficiently and less expensively is rooted in the philosophy that "the government which governs best is that which governs least." Those who support prison privatization believe that opening up the operation of prisons to the competitive free market will result not only in those prisons being run at a lower cost than public prisons but also in those prisons showing improved "quality, flexibility, and innovation."[16] This is the position of the conservative **Reason Institute**, one of the country's leading voices for privatization.

Even if one were to assume this argument to be true, the sheer number of inmates who are currently locked up in Ohio calls into question the wisdom of incarcerating many of them in the first place **73.5 percent of males and 85 percent of females in the Ohio prison system were classified as low-to-medium-security in 2009**, and the majority of Ohio prisoners were incarcerated for low-level, nonviolent offenses.[17] Taxpayer money could be better spent providing addiction treatment, job training, and job development programs outside of prison for many of these inmates than keeping them locked up. Paying a private contractor to house them in a



more "flexible" or "innovative" way than the state is capable of doing is hardly the best deal for the taxpayer.

Countless studies by independent agencies, state governments, and the federal government have compared the cost-effectiveness of public and private prisons since the modern era of prison privatization began in the 1980s.[18] Each of them seriously calls into question the argument that privatizing a correctional facility makes it significantly cheaper or more efficient to run.

One recent study of note was a performance audit of the **Arizona Department of Corrections** conducted by the state's Office of the Auditor General in 2010.[19] The audit noted that "Arizona's prison population has grown faster than most states' prison populations" and that the state

"has expanded [its] prison system to accommodate growth," relying heavily on privatization in order to contain costs.[20] In particular, the Department has:

- contracted for services (such as food, health, and work-based education) with private organizations and community colleges;

- downsized administrative office staff;

- placed responsibility for more costs on the inmates;

- taken advantage of volunteer support;

- replaced typical mattresses with ones made from recycled materials; and,

- used inmate labor and inmate-produced products

BLACKSTONE0000242



whenever feasible, among numerous other efficiencies.[21]

Yet the audit cautions that even though the Department of Corrections "has taken steps to keep the per-inmate daily cost (per capita rate) low," "State spending on the Department's operations has increased significantly" and "continued expansion will require significant spending."[22] **The Department's Operating Per Capita Cost Report found that "the state paid private prisons a higher per inmate rate than it spent on equivalent services at state-operated facilities in fiscal year 2009."[23]**

The Arizona audit only confirms decades of studies inquiring into wisdom and cost-effectiveness of prison privatization. Back in 1988, **John Donahue** of **Harvard's Kennedy School of Government** conducted a study of the benefits and drawbacks of prison privatization for the **Economic Policy Institute.** He concluded that "the evidence on potential cost savings is too weak and too questionable to warrant so radical and risky an experiment."[24] Since then, the evidence has not gotten any stronger or more certain.

A 1996 review by the **U.S. General Accounting Office** surveyed studies conducted between 1991 and 1995 in five states — Texas, California, Tennessee, New Mexico, and Washington — comparing



operational costs at public and private facilities.[25] It found that each study "reported little difference" and "could not conclude whether privatization saved money."[26]

In 2001, the **U.S. Department of Justice's Bureau of Justice Statistics** published an even more comprehensive survey of cost-comparison studies and concluded that private prisons offered only modest cost savings. "[R]ather than the projected 20 percent savings," the survey concluded, the average savings from privatization was only about one percent, and most of that was achieved through lower labor costs."[27] The minimal cost savings that were achieved through lower staffing levels did not come without a price — they were accompanied by "a significantly higher rate of assaults" on inmates and staff.[28]

The credibility of studies which do show cost savings at

private prisons is complicated by the less-than-scientific conditions in which they were conducted. Two analysts from the **Federal Bureau of Prisons** published a paper in 1999 which concluded that **"proponents of privatization make global, unsubstantiated, speculative claims which are rarely addressed with concrete evidence."[29]** In order to control properly for such studies, the researcher ideally would be able to look at two prisons that were identical in their design, inmate population, and inmate characteristics.[30] It is typically very hard to find such a perfect comparison, and many of the cost-comparative studies that have yielded pro-privatization results have suffered from this problem.

In 2008, the **National Institute of Justice** found that **private prisons tend to underestimate the cost of oversight, health care, and**

BLACKSTONE0000243



**background checks in their proposals and that states end up paying more than they were told they would be paying.** One of the key reasons for such errors, the study found, was the inherent differences in the way prison performance in the public and private sectors is measured. Private prisons' performance is measured by their compliance with the terms of their particular contracts (which, of course, may vary). Publicly-run prisons, by contrast, measure performance through auditing procedures.[31]

A 2009 "meta-analysis" of cost-comparative studies by five **University of Utah** researchers consciously took into account these methodological issues and surveyed only "high-quality"

> *State prisons are public assets. Selling them off will only yield a one-time infusion of cash.*

cost-comparison studies— studies that "directly compared . . . specific, identifiable, private prison[s] with . . . closely matched, identifiable public prison[s]."[32] **'Cost savings from privatizing prisons," the study concluded, "are not guaranteed and appear minimal."**[33]

In addition to control difficulties, there are often "'hidden' or indirect costs associated with contract writing,

financial liability, and monitoring that may or may not be included in the cost analysis."[34] Whenever a state contracts with a for-profit corrections company, it puts the responsibility of living up to state operational standards in private hands. While the contract may state that the private company has to meet those standards, doing so puts pressure on the company's bottom line that the company will naturally be compelled to resist.

One telling example of this problem happened at Ohio's own North Coast Correctional Treatment Facility in 2000. Two months after it opened, a judge cited contract violations at the facility.[35] Over the following year, "[a] pattern of contract violations, safety problems, and other issues continued to plague the institution." Four consecutive wardens resigned, "one of whom had to serve at two different points to substitute for sudden departures."[36]

**Sometimes, the language of the contract itself ends up costing more money for the state than it saves.** The North Coast facility was designed only to house drunk-driving offenders, but the ODRC's contract with CiviGenics, then the private company operating the facility, contained a clause committing ODRC to pay CiviGenics for 95 percent inmate capacity regardless of the actual number of inmates being held at

the facility. When the state found it was unable to fill North Coast solely with DUI offenders, however, it sent prisoners to the

> *"[R]ather than the projected 20 percent savings," the survey concluded, "the average savings from privatization was only about one percent, and most of that was achieved through lower labor costs."*

facility who had been convicted of serious felony offenses such as sexual battery, assault, arson, manslaughter, and robbery. In December 2000, ODRC withheld $74,499 from its monthly payment to the company to recover part of its cost and then declined to renew the contract when it came up for renewal. After Ohio failed to receive bids from other companies that were five percent below the state's estimated costs for North Coast, ODRC raised the per-prisoner per-day rate it allowed private companies to charge from $53.11 to $62.88.[37]

It is little wonder, then, that the 2010 Arizona audit suggested repealing the state's harsh mandatory sentencing laws and expanding community corrections as "fiscally sound" compared to building new prisons.[38]



## Two Ways of Looking at Cost

As taxpayers we all want our government to provide us with the best possible prisons to effectively rehabilitate and reform those who will one day re-enter our communities. We also want our government to use our tax dollars efficiently and effectively.

The private prison industry promises taxpayers that privately owned, for-profit prisons will both save on prison operating costs and generate public revenue from corporate taxes the industry pays to the states in which it operates.[39] Both of these promises, however, are empty.

CCA and other major private prison operators are publicly traded corporations. As such, their primary responsibility by law is not to the states who contract with them but to their shareholders. Since investors can sell their shares at any time, the managers and executives of private prison companies have immense pressure on them to consistently turn a profit. The argument that privately run prisons are more efficient and competitive than state-run prisons fails to take account of the very peculiar type of "competition" that exists within the private incarceration business.

Competition in most private-sector industries means the consumer gets to choose among competing providers of goods and services. Inmates in privately run facilities, however, are no more able to choose a different prison if they are dissatisfied with the conditions of their confinement than are inmates at state-run facilities.

Like firms in any for-profit industry, private prison companies are compelled to expand and capture an ever greater market share. CCA's current near total domination of the U.S. private prison industry dates from the second half of the 1990s, a time when the acceleration of prison construction was at its historical peak.

**Between 1987 and 2007, the national prison population tripled to 1,596,127.** CCA capitalized on this trend by acquiring their smaller rivals and lobbying states — with mixed success — to take over increasing portions of their prison systems.

In 1990, CCA's reported annual revenues were $50 million. By 1997, they had ballooned to $462 million,[40] and by 2006 they had reached $1.675 billion.[41] The company's reported revenues and profits have been steadily growing ever since.[42] In the words of one New Mexico county commissioner, "It's terrible to say, but prisoners and trash are big business."[43]

If companies in the private corrections industry seem to achieve greater success in the marketplace the more they fail at providing state taxpayers with



any substantial cost savings, the reason why is pretty straightforward. From the perspective of these companies' shareholders cost savings means something completely different than what it means from the perspective of the taxpaying citizens of the states in which private prisons operate.

The shareholder does not care whether the company's profits result from cutting costs in half while maintaining the same revenue inflow or from maintaining the same cost outflow but increasing revenues by expanding the number of occupied prison beds. As long as the value of his or her stock in the company continues to grow, it is not relevant to them how this is achieved.

But to the taxpayers of the state in which the company operates this prison, it is

BLACKSTONE0000245



extremely important in which of these two ways the company maximizes its profit. All of the abstract, quantitative talk about cost savings obscures the basic fact that **the taxpayer does not stop paying for a prison's operation after it becomes privatized.** When the state government enters into a contract with a private prison company, it legally binds the taxpayer to pay that company a certain dollar amount per-inmate per-day. There is therefore a direct correlation between the company's revenues and the taxpayer's expenses. Privatized prisons are not intended to make a profit for taxpayers — they generate revenue for shareholders.

A privately-operated correctional facility is nothing more than a barbed-wire-enclosed building filled with cells and beds; it only becomes capital — that is, a source of real economic value to the company's shareholders — when its cells and beds are filled with human beings at the taxpayer's expense. It is this prison's status as capital that prison privatization supporters point to when trying to persuade the taxpayer of its superior cost-effectiveness in comparison to its supposedly bureaucratic and cumbersome state-run counterpart.[44] But in reality, this is a comparison of apples to oranges, because the taxpayer does not measure prisons and other public services by how

profitable they are to him or her personally but by how useful they are to his or her community.

A 1992 study by the **New Mexico Corrections Department** showed that guards at a private CCA-run women's correctional facility were pressured to issue disciplinary infractions to inmates that resulted in prolonging their incarceration out of a desire on the part of CCA executives to maximize quarterly dividends

---

*Alongside the rise of private prisons in America has been the growing practice of "interstate commerce" in prison inmates.*

---

and satisfy shareholders. As a result, "inmates at the women's prison run by CCA lost good time at a rate nearly eight times higher than their male counterparts at a state-run lockup."[45]

Yet private prison firms are hardly indifferent as to which inmates they house. All things being equal, there would be a one-to-one correlation between a correction firm's profits for a given time period and the number of inmates it houses during that time period.

However, inmates who are unusually violent and difficult to control or who have unusual medical needs cost prison operators more to house than inmates who are compliant and healthy. In addition to having a natural financial incentive to maximize inmate capacity and time incarcerated, private prison operators have a simultaneous incentive to "cherry pick" those inmates who are the least costly for them to house.[46]

A 2001 report by **Policy Matters Ohio** found that **Lake Erie Correctional Facility** artificially inflated its cost savings by receiving only healthy, well-behaved inmates, and thereby demonstrated the 5 percent cost savings required of it by Ohio law.[47] This demonstrates one way that private prisons remain profitable to their shareholders. After cutting their operational costs, they aim to fill as many beds as possible with the most docile, healthy, and therefore inexpensive inmates they can find.

Alongside the rise of private prisons in America has been the growing practice of "interstate commerce" in prison inmates. On the eve of the mid-1980s birth of modern prison privatization, the U.S. Supreme Court held that "[j]ust as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 168 of 279 PageID #: 22797

BLACKSTONE0000246



will be incarcerated in any particular State."[49]

Private prison operators have therefore benefitted since the industry's very beginning from a national market in inmates, enabling them to compensate for convict "shortages" in the states in which they operate prisons by siphoning inmates from other states with convict "gluts" into those prisons and thereby fill them to capacity.

A 1972 study by the **California Department of Corrections** found "a strong and consistent positive relationship... between parole success and maintaining strong family ties while in prison."[50] In this context, private prison firms have a doubly perverse incentive. The compulsion of these firms to "import" prisoners from far away localities to fill empty prison beds imposes the "external" cost on society of more unrehabilitated offenders. This social cost ultimately falls on the state's taxpayers. It provides at the same time, however, yet another benefit to the private prison industry, because rehabilitated offenders do not fill private prison beds and therefore do not generate profits.

### Prisons for Profit and Taxes

When it comes to the question of private prison corporations paying taxes for the privilege of operating in that state, the interests of taxpayers

## "Cash for Kids" Scandal Rocks Pennsylvania

Sometimes private prison operators are so greedy for revenue-generating human beings to fill their cells that they bribe judges to sentence children to serious jail time for the most minor and trivial of offenses. In February 2011, a juvenile court judge in Luzerne County, Pennsylvania was convicted of racketeering in connection with a "kids for cash" scheme. The judge accepted money from a private prison operator in exchange for handing down ridiculously harsh sentences that would guarantee prisons were full to profit-maximizing capacity.[50]

This scandal led to the reversal of thousands of juvenile convictions and brought national embarrassment to the county. The conspiracy "lasted from 2003 to 2008" and involved as many as 6,500 juvenile cases and 4,000 individual children, over 50 percent of whom did not have an attorney.[51] One

youth was "sent to a boot camp for five months in 2004 for being a lookout for a friend who was stealing DVDs from a Wal-Mart." Another was "sent to a detention center for several days in 2006 for failing to appear at a hearing as a witness to a fight, even though his family had never been notified about the hearing and he had already told school officials that he had not seen anything." A state audit of the Pennsylvania juvenile facilities involved in the "cash for kids" scandal found that those facilities "were systematically overbilling the county and ... had fallen behind in their bills and begun receiving shut-off notices from utility companies."[52] In his closing argument at the disgraced judge's trial, the prosecutor said he had "turned his office into a cash-cow, into a money-making machine."[53]

and private prison shareholders are similarly opposed. Taxes are an expense to private corporations that cut into their profits, and the managers and directors of private prison companies therefore owe a duty to their shareholders to minimize the company's tax liability as much as possible.

The taxpayers of the state

where these companies operate their prisons, however, naturally want these companies to pay their state governments as much as possible in corporate taxes, because taxing outside corporations relieves the taxpayers of the burden of funding basic government services. **While private prison**





**companies publicly promise taxpayers that their presence in the state will generate revenue, they lobby behind the scenes and otherwise do everything they can to minimize the taxes they actually pay.** CCA, for example, pulled out of its contract at a Cleveland facility it operated in the 1990s because it refused to pay its share of local taxes.[54] In 1998 the industry even persuaded Arizona to pass a law retroactively prohibiting the state from taxing income derived from the detention or incarceration of prisoners by private companies.[55]

**Real estate tax shelters are another way private prison companies avoid paying their share.** A federal tax loophole allows such shelters to avoid taxation at the company level. Although this exemption "was established for legitimate real estate companies," CCA tried to funnel revenue generated by its prison operations into the loophole shelter in order to avoid paying taxes on it.[56] The loophole, while part of the federal tax code, shields companies from tax liability at both the state and federal levels.[57] The IRS sued CCA in 2002 after its audit of the company suggested it was abusing tax loopholes to avoid paying its share of federal taxes.[58] CCA settled with the IRS in 2002, agreeing to pay $54 million in back taxes.[59] While CCA's lawyers "continue[d] to appeal the IRS' findings," the IRS "questioned the validity of a previous tax avoidance structure, and CCA was forced to pay delinquent taxes."[60]

Tax-exempt bonds issued through partnerships with local governments and municipalities are another way private prison companies avoid tax liability. These "backdoor taxpayer subsidies" can cost the taxpayer more than public financing would because the local government might issue higher-interest securities than would be the case with ordinary public financing.

**Tax-exempt bonds can also shift the responsibility of economic failure from the private prison company to the taxpayer, leaving the taxpayer and the government completely liable for the company's failure.**

This happened in Texas in 1988 when Dallas-based **Detention Services, Inc.** convinced the government of Zavala County to finance one of its facilities with county bonds. The company was supposed to repay its debt to the county from its prison revenues. But after it cancelled another contract it had with the District of Columbia on account of excessive prisoner violence and staff corruption, the company had no revenue, and the Zavala County government had no choice but to make bond payments out of its operating fund, which sent it into deficit and default on the bonds.[61]

When private prison companies market their "services" to state governments, they often promise to "fully indemnify" those governments from liability for their failures. In other words, the companies promise to take total responsibility for all of the debts and other obligations that the state's taxpayers would ordinarily be stuck with in the event of failure.

Such promises, however, can be exceedingly difficult to enforce. CCA, for example, promised to indemnify the District of Columbia from liability arising from its operation of the Northeast Ohio Correctional Facility, a private facility for DC prisoners in Youngstown, Ohio. But when the District sued CCA to enforce its contract with the company, CCA "refused to indemnify District officials and failed to obtain the required insurance policy naming the District as insured."[62]

BLACKSTONE0000248


## Safety & Training

The fundamental economic tension between the private prison company shareholder and the state taxpayer is further reflected in various social consequences of prison privatization that reverse the very public benefits that prisons are supposed to provide to the community. Chief among these benefits is public safety. A study by a professor at **George Washington University** found that private prisons had a 50 percent higher incidence of inmate on staff assaults and two-thirds higher incidence of inmate on inmate assaults than state-run prisons.[63] **A 2004 report by the Federal Probation Journal that specifically controlled for prison security level found that private prisons had 50 percent more inmate on inmate assaults and almost 50 percent more inmate on staff assaults.**[64]

These dangerous conditions create a difficult working environment for prison staff, resulting in a far higher staff turnover rate at private prisons compared to public prisons. **The private prison industry's own statistics show that at private prisons the turn-over rate was 53 percent, while at public prisons it was a mere 16 percent.**

Prison safety depends on a stable workforce. The more frequently a larger number of employees quit, the more dangerous prisons become. High turnover rates mean existing staff are fewer in number and less experienced.

## Inmates feel effects of less trained staff: Minnesota case study

In 1999 the University of Minnesota Law School's Institute of Criminal Justice interviewed 106 prisoners in Minnesota, 57 of whom were housed in a public prison run by the Minnesota Department of Corrections (DOC) and 49 of whom were housed at the private, CCA-owned Prairie Correctional Facility (PCF).[66] Each prisoner was interviewed about his opinion on the professionalism of the prison staff, and security and safety inside the facility. The experiences and perceptions of the prisoners confirmed previous studies that showed the problems of lower wages, higher turnover, and poorer staff training in private prisons.[67] The study found

- Prison-for-profit inmates complained about the lack of professionalism of the staff. "The staff attitude here – they treat you like a commodity," one inmate reported, "its all about the money."[68]

- Prison-for-profit inmates were more likely to report a lack of structure in their day. The difference stems from the fact that public prisons force its inmates to participate in rehabilitation activities while the prison-for-profit does little to promote these programs.

- Prison for profit inmates consistently reported living in a more dangerous and poorly supervised environment than public prison inmates. Many

inmates used words like "unstable" and "disorganized" when describing their living conditions.[69]

Many of these inmates were highly aware of the two primary causes of this dangerous environment: the cost-cutting measure of hiring a low-paid, poorly-trained staff, many of whom quit after the first major disturbance, and the revenue-raising measure of "re-classifying" maximum-security inmates as minimum or medium-security in order to fill empty bed space.[70]

BLACKSTONE0000249


Workforce instability at private prisons has resulted in riots, rapes, assaults and escapes.[65]

The instability of private prison staffs is a direct consequence of the fierce cuts in labor costs that private prisons resort to in order to maintain short-term profitability. Containing labor costs "is the crux of the privatization movement."[71]

Running a prison is an incredibly labor-intensive endeavor. Not only do you need enough adequately trained guards to keep order and prevent escapes, you also need a staff to provide a wide variety of inmate services, including meals, health care, counseling and vocational assistance, and law library services.[72]

**Private prison operators control their labor costs by reducing the number of staff, hiring low-wage, non-union labor, and eliminating fringe benefits.**[73] Prison guards hired by private facilities often have little to no training or experience, and in some instances are barely out of high school.[74]

The result is a labor force that is ill-prepared for the violent crises that may erupt at any moment. Cost-cutting on labor at private prisons perpetuates a vicious cycle: poorly trained and poorly disciplined staff are incapable of adequately responding to prison emergencies, which creates extremely dangerous conditions at the facility, which then forces

a good many employees to quit, and raises the turnover rate.

### Youngstown Prison for Profit Threatened Community Safety

Vividly illustrating the consequesces this combination of cost-cutting and revenue-generating measures is an incident that occurred in 1999 at the private Northeast Ohio Correctional Facility in Youngstown, Ohio. Upon opening the facility in 1997, CCA staffed it "with guards who had little or no

> *A 2004 report by the Federal Probation Journal found that private prisons had 50 percent more inmate on inmate assaults and almost 50 percent more inmate on staff assaults.*

experience in corrections — and then imported 1,700 of the most violent inmates from Washington, DC, to fill what was supposed to be a medium-security prison."[75]

In its first 14 months of operation the facility experienced 13 stabbings, two murders, and six escapes.[74] When local residents complained to CCA about the dangers posed to their community, officials responded dismissively. "It's nice if your community is happy with you — that's an extra," the company's founder remarked, "[b]ut the

business is built around providing a valuable service to our customers."[77]

In March of 1998, the City of Youngstown sued CCA on behalf of the inmates at the prison, "alleging that prisoners were put at risk by being sheltered with maximum-security prisoners in a facility not designed for containing them."[77] The court ordered the 113 "reclassified" maximum-security inmates be removed from the prison. The litigation, cost of reclassifying inmates, and changes in security procedures posed extra costs to the state.

What the Youngstown incident shows is that even where a private prison demonstrates short term cost savings, "[i]t only takes one major disturbance for such costs to greatly accelerate."[78] More specifically, Youngstown offers a vivid example of how the very same short-term measures private prisons use to show cost savings — such as hiring cheap labor and cutting staff numbers — produce the conditions in which dangerous, violent incidents can occur. These incidents result in additional costs that could have been avoided had the facility been staffed with enough properly trained officers.

BLACKSTONE0000250



## Rehabilitation and Conditions of Confinement

Another benefit prisons should provide the community is inmate rehabilitation. Not only does it cost the taxpayer directly to keep an inmate in prison, it also costs the taxpayer more indirectly when inmates are released back into society without any ability to survive and function as productive, law-abiding citizens.

Supporters of prison privatization sometimes claim that privately operated prisons have more of an incentive than state-run prisons to maintain the quality of the environment in which they keep their inmates and to develop rehabilitation programs that will reduce inmate recidivism. They reason this because private prisons risk losing the state contract to operate the facility if it fails to show results.[80] Studies comparing the recidivism rates of inmates in public and private prisons, have been inconclusive.

However, states with the most private prisons do not have the lowest recidivism rates.

Ohio's prisons are, with the exception of two facilities, entirely state-operated. Only 4.4% of Ohio inmates are in private beds.[81] States with much higher percentages of inmates in private beds have significantly higher recorded recidivism rates.

The five states with the highest percentage of privatized prisons are New Mexico, Montana, Alaska, Vermont, and Hawaii.[82] According to 2005 statistics, four out of the five states had higher three-year recidivism rates than Ohio. 2005 data was not available from New Mexico, but its 2007 three-year recidivism rate of 43% was higher than Ohio's 2007 rate of 34%.

Privatizing more of Ohio's prisons will likely increase Ohio's comparatively low recidivism rates because privately run prisons have consistently proven not to invest in the types of programs and services that public prisons invest in order to enable their inmates to function in society upon their release. The same Minnesota study that interviewed inmates at public and private facilities about prison safety and staff training also interviewed them about the programs and services the facilities offered them. Seventy percent of the state-run DOC inmates reported having received HIV/AIDS education compared to zero of the private, CCA-run PCF inmates.[90] DOC inmates "were more likely [than PCF inmates] to report that participation in educational classes had proved very helpful to them, personally" and "gave significantly higher overall ratings to the educational programs available in their facilities" than PCF inmates.[91] The drug and alcohol treatment programs at PCF consisted of 1-3 hour counseling sessions that occurred weekly, while most of the DOC prisoners reported benefitting from "full-time,

### Percentage of prison beds that are privatized
New Mexico 43.4%
Montana 39.8%
Alaska 30.8%
Vermont 30.1%
Hawaii 28%
Ohio 4.4%

### Three-Year Recidivism Rates, 2005
New Mexico 43%*[83]
Montana 37.6%[84]
Alaska 66%*[85]
Vermont 50%[86]
Hawaii 52.5%[87]
Ohio 36.23%[88]

*No 2005 data was available for New Mexico and Alaska, so 2007 data is provided. Ohio's 2007 recidivism rate was 34%.[89]

highly structured 'therapeutic community' treatment programs."[92] Typical of the DOC experience is one inmate's report that the DOC prison "taught me how to read, how to evaluate my anger, how to understand myself — it has made big changes and improvements in my life."[93] Typical of the PCF experience was one inmate's statement that "I have learned nothing here."

## Effect of Rehabilitation on Recidivism

A comparison of the programs and services available to inmates at Ohio's two private facilities with



# REHABILITATION & PRISONS
### FOR PROFIT



those available to inmates at its state-run facilities suggests a similar dynamic at play and underscores the importance of health care — both physical and mental — in providing inmates the treatment necessary for their successful reintegration into society.

**Lake Erie Correctional Institute and North Coast Correctional Treatment Facility have no trauma recovery programs, no contract or grant-funded job-training programs, and no programs addressing mental illness, disease management, general health, or sex offender issues.**[94]

More troubling is the fact that, despite the many requests by inmates at these facilities for

medical attention by a licensed physician (as opposed to a nurse), none of them were sent off-site to the Ohio State University emergency room, whereas inmates in other, state-run facilities were.[95]

It is possible that the two facilities have been seeking to cut costs by relying on "telemedicine," a private technological service that public and private prisons alike in Ohio have been using since the 1990s. With telemedicine, inmates receive medical treatment from nurses or non-specialist doctors who receive treatment instructions from off-site specialists via a video teleconferencing device.[96]

It is important to remember

the elemental fact that recidivism is good for private prisons. **The more people are returned to prison, the more business private prisons get.** A 2008 study published by *Crime and Delinquency* found that "private prison inmates had a greater hazard of recidivism in all eight models tested, six of which were statistically significant."[97] A 2005 study of juvenile prisons published in the *Journal of Law and Economics* found that private prisons increased costs by promoting recidivism. Juveniles in private prisons were more likely to commit further crimes and be imprisoned again.

In purely financial terms – without giving any weight to the social harm caused by increased recidivism – the additional costs of increased future confinement alone exceeded any short-term savings offered by private prisons.[98] The study found that private prisons had "no contractual incentive to provide rehabilitation opportunities or educational/vocational training that might benefit inmates after release, except insofar as these services act to decrease the current cost of confinement."[99]

BLACKSTONE0000252



## Public Accountability and the Taxpayer's Right to Know

Prisons for profit also weaken the public's right to know. Governors' have less executive authority over the prison's management when it is privatized. **The governor cannot, for example, fire a warden at a privately-run prison for poor management the way he could at a state-run prison.**[100] Where governors are ultimately accountable to the people of the state, private prison managers and executives are accountable only to their shareholders. **Privatizing prisons remove responsibility from the state's elected representatives and makes it more difficult for the facilities to be held accountable by the public.**

The public has far less oversight of the operation of private prisons. In many states, private prisons are exempt from public records laws. This adds a layer of secrecy to their operations and makes it more difficult to learn about misconduct.[101]

Some states are also granted only partial information on inmates held in private prisons in their state. In Arizona, for example, private prisons are not required to provide the state with escape data or details of the crimes inmates committed.[102]

Because the operation of for-profit prisons is in private hands, states often face considerable legal hurdles when they try to

monitor the operation of those prisons.

For instance, in 1987 an Ohio state auditor tried to audit a Summit County correctional facility that was operated by the private contractor **Oriana House, Inc.**[103] Oriana House refused to cooperate with the



---

*The public has far less oversight of the operation of private prisons. In many states, private prisons are exempt from public records laws.*

---

audit, and when the state sued, it claimed "that it was not required to produce the requested records because it is not a public office as defined in" Ohio's Public Records Act.[104]

The case reached the Ohio Supreme Court, which ruled against the state's right to access the records, reasoning that "[a] private business does not open its records to public scrutiny merely by performing services on behalf of the state or a municipal government."[105] While the courts have not ruled on prisons for profit specifically, the decision in the *Oriana House* case poses serious questions over whether private prisons will be accountable to the public.

Even the most strenuous

proponents of prisons for profit argue for full public transparency. Countless studies of the pros and cons of privatizing prisons — including many that favor privatization — mention the necessity of public monitoring and oversight of private prison operations.[106] But if privatization shields for-profit prison operators from comprehensive state oversight, then Ohio's system will lack even the low thresholds proponents claim is necessary for its success.

BLACKSTONE0000253


## Sentencing Reform: The Real Solution to Ohio's Ballooning Corrections Budget

Prison overcrowding is the underlying cause of Ohio's bloated corrections budget. The state's prison population has quintupled since 1975.[107] But while prison overcrowding is obviously bad news for the Ohio taxpayer, it is good news for MTC, CCA, and other private prison companies operating in the state. The idea that privatizing any more of Ohio's already overcrowded prisons will help reverse this overwhelming burden on the state treasury is contrary to the nature of prisons for profit.

The prospect of simply releasing massive numbers of prisoners back into society or changing sentencing laws so that fewer convicts are imprisoned raises legitimate public safety concerns. However, the current policy of harsh sentencing and prison overcrowding results in 60 percent of Ohio prisoners being incarcerated for low-level, nonviolent offenses. Sentencing reforms that are carefully designed and correctly implemented will save taxpayer dollars and improve public safety whereas increased privatization will do the opposite on both fronts.

Legislation introduced during the 129th Ohio General Assembly presents a clear first step toward criminal justice reform in Ohio. One of the central innovations of this proposed legislation is to increase earned credit programs.

Unlike traditional "time off for good behavior," where inmates' sentences are reduced simply because they did not misbehave while serving their time, earned credit allows the inmate to shave time off of his or her sentence by "successful[ly] participat[ing] in education, vocational training, penal industries employment, or substance abuse treatment."[108] The maximum time off the inmate can earn under the legislation would be 8 percent of the sentence.[109]

Inmates would therefore have the incentive to participate in rehabilitative programming that will help them reintegrate into society while holding them accountable. Ohio's **Buckeye Institute** estimates that the earned credit provision, would "eliminate the need for 1,270 beds, resulting in annual savings of $5.48 million."[110]



BLACKSTONE0000254





Thirty-three states have earned credit laws on the books.

An increase in the use of community-based corrections is another feature of the bill that would save Ohio taxpayers money. In 1979, Ohio passed the **Community Corrections Act**, which established a system of prisoner diversion programs. In 2008, "more than 5,500 offenders were diverted into community-based corrections facilities (CBCF)," which are dormitory-style residential facilities "that receive capital and operations funding from the state."[111]

CBCFs offer such rehabilitative programming as drug treatment, education, and job training. The typical length of stay at these facilities is six months. The **Ohio Criminal Sentencing Commission** "has determined that CBCFs save taxpayers money because of shorter periods of confinement

and reduced recidivism rates when compared with prison."[112]

Other notable features of the bill include a provision that revises marijuana penalties and eliminates the sentencing disparity between crack and powder cocaine and a provision that narrows the definition of "escape" as it applies to prisoners on supervised release.[113]

---

*Privatizing state prisons may in fact undermine sentencing reform's goal to remove low-level offenders from the justice system.*

---

Both of these reforms correct the excesses of failed "tough-on-crime" policies that have fueled the costly explosion in prison population in Ohio and nationwide over the past generation. The majority of Ohio prisoners are incarcerated for low-level, nonviolent offenses,[114] and if only a fraction of those prisoners were diverted into treatment programs, Ohio taxpayers would already be saving millions. But mandatory drug sentencing laws prevent this from happening.

Likewise, many probationers and parolees are re-incarcerated for the crime of "escape" simply because of

honest mistakes or misunderstandings that they have "absconded" supervision. The new escape provision "would allow the Adult Parole Authority to utilize various sanctions at their disposal, thus avoiding new felony charges" and would "eliminate the need for more beds, thus creating additional incarceration cost savings."[115]

Finally, the bill would expand eligibility for medical parole among geriatric inmates. Elderly prisoners with serious medical conditions rarely if ever pose a serious threat to public safety. The provision would give parole boards the option of committing these inmates to nursing homes in lieu of releasing them.

Geriatric inmates "consume a disproportionate share of Ohio's growing correctional medical costs."[116] An April 2010 study by the **Vera Institute of Justice** found that "between 1999 and 2007 the number of people 55 or older in state and federal prisons grew 76.9 percent" and that "prisons spend about two to three times more to incarcerate geriatric individuals than younger inmates."[117] Removing these inmates from the prison system "could significantly reduce inmate health care costs"[118] without posing any substantial risk to public safety.

Studies on parolee recidivism find the probability of parole violations also decreases with age, with older parolees the

BLACKSTONE0000255


## ACLU leads the call for sentencing reform

In August 2010, the ACLU of Ohio released **Reform Cannot Wait**, an analysis of over 20 years of studies of Ohio's criminal justice system. The ACLU concluded the state needs to implement common sense sentencing reforms in order to alleviate overcrowded prisons, save resources, and create a more just society.



Leaders across the state have cited the ACLU's report as the calls for reform have continued.

**If you would like to download a free electronic copy of the report, go to www.acluohio.org.**

sentencing reform requires statewide coordination and a common set of central guidelines about inmate classification that private prison operators would have a natural economic incentive to resist.

It is troubling enough that the profit motive compels private prison companies to cut their costs by eliminating the very programs that would allow inmates to participate, for example, in earned credit activities. But the fact that such cost-cutting provides a further economic windfall for these companies by ensuring that inmates stay incarcerated (and generating revenue) as long as possible is obscene. Privatization, therefore, is not a sensible component of a "package" of cost-saving reforms to address a budget crisis; it will likely offset any savings derived from sentencing reforms and other budget-balancing measures.

least likely group to be re-incarcerated."[119]

In fiscal year 2010, ODRC spent $225,829,929 in medical costs. Thirty-nine states have laws providing for medical parole.

Reforms like these will only work if they are implemented correctly. Ohio will have to put forth clear criteria to guide the selection of inmates who will participate, provide adequate post-release supervision of those inmates who do participate, and establish a coordinated statewide system of administering these alternative sentencing programs.[121] By doing so, Ohio will be able to "focus supervision resources on those people who pose the greatest danger to the community" and "systematize how people are assigned to services in the community, which maximizes the value of these scarce program slots."[122]

All of these sentencing reforms save the taxpayer money by reducing the number of inmates occupying prison beds in Ohio at any given time. Prisons for profit undermine these reforms, because the reforms directly cut into their profit margins and threaten to put them out of business. The more a state privatizes its prison system, the less control and authority it will have to implement these reforms. True

BLACKSTONE0000256


[1] U.S. Const. Amend XIII, § 1.

[2] Robert Perkinson, *Texas Tough: The Rise of America's Prison Empire* (New York: Metropolitan Books, 2010), pps. 320-21

[3] Leonard Gilroy and Harris Kenny, The Reason Institute, *Annual Privatization Report 2010; Corrections*, pp. 1, 10, available at http://reason.org/files/corrections_annual_privatization_report_2010.pdf

[4] http://www.newsweek.com/2010/06/30/how-the-recession-hurts-private-prisons.html

[5] AFSCME, Five Empty Promises, available at: http://www.afscme.org/publications/2539.cfm

[6] http://www.texasprisonbidness.org/money/financial-interests/texas-2011-budget-plan-includes-private-prison-cuts-tdcj; **http://www.ccpoa.org/news/entry/oklahoma_seeks_exit_clause_in_private_prison_deal/**; http://www.freerepublic.com/focus/f-news/1336331/posts, http://www.idahopress.com/opinion/article_c79ec0a2-1963-11e0-8031-001c4c002e0.html, see also generally http://www.soros.org/initiatives/usprograms/focus/justice/articles_publications/publications/jailbreaks_20011001/jbch1.pdf.

[7] http://www.drc.ohio.gov/web/prisprog.htm

[8] http://www.correctionscorp.com/facility/northeast-ohio-correctional-center/

[9] Joe Guillen, Plain Dealer, "Gov.-elect John Kasich picks private corrections consultant and former warden to run Ohio's prisons system," 1/4/11 available at http://www.cleveland.com/open/index.ssf/2011/01/gov-elect_kasich_picks_private.html

[10] Buckeye Institute, "Smart on Crime," available at http://www.opd.ohio.gov/RC_Reports/BuckeyeInstituteSmartOnCrimeReport.pdf

[11] U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, Emerging Issues on Privatized Prisons (2011)

[12] Jeffrey E. Golan, Ohio Legislative Budget Office, Fiscal Pressure Pushes Prison Privatization, p 162, available at http://www.lsc.state.oh.us/fiscal/special/ohioissues/issue-09.pdf; John Jarvis, "Sale of two Marion prisons could boost tax revenue," Marion Star, Mar. 19, 2011, available at http://www.marionstar.com/article/20110319/NEWS01/103190302/Sale-two-Marion-prisons-could-boost-tax-revenue

[13] http://www.ucrdatatool.gov/Search/Crime/State/RunCrimeStatebyState.cfm

[14] http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/preliminary-crime-in-the-us-2009

[15] http://www.infowars.com/private-prison-industry-experiences-boom/;

[16] Reason Institute, *Watching the Watchmen Part II*, Policy Study No. 290

[17] http://www.drc.ohio.gov/web/Reports/Annual/Annual%20Report%202009.pdf, pps. 21, 24

[18] Lundahl, et al., "A Meta-analysis of Cost and Quality of Confinement Indicators," *Research on Social Work Practice*: July 2009, vol. 19, no. 4, pps. 383-394

[19] Arizona Dept. of Corrections, Audit, http://www.azauditor.gov/Reports/State_Agencies/Agencies/Corrections_Department_of/Performance/10-08/10-08.pdf

[20] Ibid., pps. 6-12.

[21] Ibid., pp. 15

[22] Ibid.

[23] Ibid., pp. 19

[24] http://epi3cdn.net/e6e28612a19ac589e8_ozm6ibbye.pdf, pp. 24

[25] http://www.gao.gov/archive/1996/gg96158.pdf

[26] Ibid., pp. 7,

[27] Bureau of Justice Assistance, pp iii

[28] Bureau of Justice Assistance report

[29] http://www.bop.gov/news/research_projects/published_reports/pub_vs_priv/oreprcampgaes.pdf, pp. 2.

[30] Bureau of Justice Assistance report, pp. 25

[31] **http://www.ncjrs.gov/pdffiles1/nij/221507.pdf**, at 35

[32] Lundahl, et al., 2009

[33] Ibid., 383.

[34] Perrone & Pratt, Comparing the Quality of Confinement and Cost-Effectiveness of Public Versus Private Prisons, available online at http://www.sagepub.com/stohrstudy/articles/11/Perrone.pdf, pps 311-312

[35] Ohio Policy Matters, pp. 5

[36] Ibid.

[37] Ibid., pp. 6

[38] Arizona audit, pps. 23, 37, 46

[39] http://www.afscme.org/publications/2556.cfm

[40] http://www.soros.org/initiatives/usprograms/focus/justice/articles_publications/publications/cca_20_years_20031201/CCA_Report.pdf, pp. 15.

[41] **http://www.sourcewatch.org/index.php?title=Corrections_Corporation_of_America**,

[42] http://www.businessofdetention.com/?p=71

[43] Cibola County Manager Joe Murrietta as quoted in Mark Oswald, "Cibola County: Transfers Might Doom Jail," The Santa Fe New Mexican, January 27, 1996, pp.B-3.

[44] Richard P. Seiter, Corrections Corporation of America, Inc., Private Corrections. A Review of the Issues, available at http://www.cca.com/static/assets/Private_Corr_Review_of_Issues.pdf

[45] http://www.prop1.org/legal/prisons/980105a.htm

[46] http://www.policymattersohio.org/pdf/prisrpt.pdf

[47] Ibid

[48] *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)

[49] Presbyterian Church (USA), Resolution Calling for the Abolition of For-Profit Prisons (2003)

[50] Craig R. McCoy, *Jury finds judge guilty in cash for kids case*, The Philadelphia Inquirer, Feb 18 2011, http://www.philly.com/philly/news/breaking/20110218_Jury_finds_judge_guilty_in_kids_for_cash_case.html

[51] http://www.jlc.org/luzerne/

[52] http://www.nytimes.com/2009/03/28/us/28judges.html?pagewanted=3&_r=2

[53] McCoy, 2011

[54] Cindy Horswell, "Private Prison Firm Pulling Out After Dispute With School District," *Houston Chronicle*, September 3, 1998, pp. 32

[55] National Conference of State Legislatures, State Crime Legislation: 1998, November 1998, Vol. 23, No. 19, pp. 13.

[56] http://www.afscme.org/publications/2556.cfm

[57] John R. Honovich, "Corrections Industry Financing Options," presentation at 4th Annual Privatizing Correctional Facilities, sponsored by World Research Group, Las Vegas, Nevada, September 23, 1999

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 179 of 279 PageID #: 22808

BLACKSTONE0000257



58 http://www.contractormisconduct.org/ass/contractors/170/cases/1077/1477/corrections-corp-of-america-irs-audit_8k.pdf

59 http://www.afscme.org/publications/2538.cfm

60 Ibid

61 Todd Mason, "Its A Bust: Many For-Profit Jails Hold No Profits — Nor Even Any Inmates; Still Promoters Keep Pushing Privately Run Prisons to Job-Hungry Towns; Texas Rent-A-Cell-Breakout," *The Wall Street Journal*, June 18, 1991

62 http://www.afscme.org/publications/2556.cfm; Cheryl W. Thompson, "D.C. Sues Private Prison Firm in Contract Dispute; CCA Failed to Protect and Defend the City in Two Lawsuits, Complaint Contends," *The Washington Post*, December. 19, 1998, pp. B07

63 AFSCME, The Five Empty Promises

64 Curtis R. Blakely and Vic W. Bomphus, *Private and Public Sector Prisons: A Comparison of Selected Characteristics* 68 Fed. Probation 27, 29 (2004) available at http://heinonline.org/HOL/Page?collection=journals&handle=hein.journals/fedpro68&id=27

65 Private Corrections Institute, Inc., Quick Facts About Prison Privatization (2009)

66 University of Minnesota study, http://archive.epinet.org/real_media/010111/materials/greene.pdf

67 Ibid., pp. 37

68 Ibid., pp. 29

69 Ibid., pp. 33

70 Ibid., pp. 35

71 Bureau of Justice Assistance report, pp. 16

72 W. G. Archambeault, "Management Theory Z - Its Implications for Managing the Labor Intensive Nature of Work in Prison," *Prison Journal* 62 No. 2 (Autumn/Winter 1982) pp.58-67

73 Bureau of Justice Assistance report, pp. 16

74 Edward J. Clarke, Deviant Behavior: A Text-Reader in the Sociology of Deviance (New York: Worth Publishers, 2008), pp. 354

75 http://motherjones.com/politics/2000/05/steel-town-lockdown

76 http://www.sentencingproject.org/doc/publications/n c_prisonprivatization.pdf, pp 3

77 http://motherjones.com/politics/2000/05/steel-town-lockdown

78 http://www.sentencingproject.org/doc/publications/inc_prisonprivatization.pdf, at 3

79 Bureau of Justice Assistance report 29

80 Bureau of Justice Assistance report, 32-33; Bales Fla. Study, 2003, pp. 2

81 http://www.progressivestates.org/files/privatization/PrivatizationReport.pdf

82 Reason Foundation, Annual Privatization Report 2010

83 http://www.corrections.state.nm.us/news/2008-2009_Annual_Report.pdf

84 http://sentencingproject.org/doc/publications/inc_StateRecidivismFinalPaginated.pdf

85 Ibid.

86 http://justiceinvestment.org/states/vermont

87 http://hawaii.gov/icis/documents/copy_of_SARA-DVSI%20Exploratory%20Study%20%28Oct%202008%29.pdf

88 http://www.drc.ohio.gov/web/Reports/reports29.asp

89 http://www.drc.ohio.gov/Public/press/press397.htm

90 University of Minnesota study, 15

91 Ibid., pp. 20

92 Ibid., pp. 23

93 Ibid., pp. 24

94 Corrections Institution Inspection Committee, March 2011 report

95 Ibid.

96 http://www.drc.ohio.gov/web/telemed.htm.

97 Andrew L. Spivak and Susan F Sharp, *Inmate Recidivism as a Measure of Private Prison Performance*, 45 Crime and Delinq. 482 (2008).

98 Patrick Bayer & David E. Pozen, *The Effectiveness of Juvenile Correctional Facilities: Public Versus Private Management*, 48 J. L. & Econ. 549 (2005)

99 Ibid., 557

100 James Austin and Garry Coventry, Bureau of Justice Assistance, Emerging Issues on Privatized Prisons (2001), pp. 14

101 Private Corrections Institute, Inc., Quick Facts About Prison Privatization (2009)

102 Casey Newton et al., Arizona Inmate Escape Puts Spotlight on State Private Prisons, *The Arizona Republic*, Aug 22 2010, http://www.azcentral.com/news/articles/2010/08/22/20100822arizona-private-prisons.html.

103 http://www.supremecourt.ohio.gov/rod/docs/pdf/0/2006/2006-Ohio-4854.pdf, pp. 4

104 Ibid.

105 Ibid., pp. 14

106 Ohio Policy Matters; Pozen; Raher; BJA

107 ACLU of Ohio, *Reform Cannot Wait*, pp. 8.

108 Buckeye Institute, *Smart on Crime*, pp 12.

109 Ibid.

110 Ibid., pp. 12-13.

111 Ibid., pp. 10.

112 Ibid., pp. 10-11

113 ACLU of Ohio, *Reform Cannot Wait*, pp. 7.

114 http://www.drc.ohio.gov/web/Reports/Annual/Annual%20Report%202009.pdf, pp. 24

115 Joseph Rogers, Ohio Legislative Service Commission, Fiscal Note and Impact Statement on S.B. 10 of the 129th G.A., February 22, 2011, pp. 5.

116 Buckeye Institute, *Smart on Crime*

117 Vera Institute report, http://www.vera.org/download?file=2973/its-about-time-aging-prisoners-increasing-costs-and-geriatric-release.pdf, pp. 4-5

118 Buckeye Institute, *Smart on Crime*, pp. 13

119 Vera Institute report, pp. 5

120 Justice and Public Systems, Ohio Facts 2010 Julian Rodgers OHIO LSC, pg 75 available at http://www.lsc.state.oh.us/fiscal/ohiofacts/sep2010/justiceandpublicsafetysystems.pdf

121 Justice Center, *The Council of State Governments, Justice Reinvestment in Ohio: Policy Framework to Reduce Correction Spending & Reinvest Savings in Strategies that Can Reduce Crime* (2011), pp. 2, available at http://justicereinvestment.org/states/ohio/pubmaps-oh.

122 Ibid., pp. 9.

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 180 of 279 PageID #: 22809

BLACKSTONE0000258

American Civil Liberties Union of Ohio
4506 Chester Ave.
Cleveland, OH 44103
P: (216)472-2200
F: (216)472-2210
contact@acluohio.org
www.acluohio.org

Published April 2011



BLACKSTONE0000259



# GAMING THE SYSTEM:

## HOW THE POLITICAL STRATEGIES OF PRIVATE PRISON COMPANIES PROMOTE INEFFECTIVE INCARCERATION POLICIES

JUSTICE POLICY INSTITUTE | JUNE 2011

BLACKSTONE0000260

# JUSTICE POLICY INSTITUTE

Justice Policy Institute is a national nonprofit organization that changes the conversation around justice reform and advances policies that promote well-being and justice for all people and communities.

1012 14th Street, NW, Suite 400
Washington, DC 20005
TEL (202) 558-7974
FAX (202) 558-7978

WWW.JUSTICEPOLICY.ORG

## TABLE OF CONTENTS

INTRODUCTION .................................................................. 2

    THE TRIANGLE OF PRIVATE PRISON POLITICAL INFLUENCE.................................................................. 3

    THE PLAYERS: TWO COMPANIES ARE AT THE CENTER OF PRIVATE PRISON POLITICAL INFLUENCE .................................................................. 5

    CORRECTIONS CORPORATION OF AMERICA ............. 6

    GEO GROUP (FORMERLY WACKENHUT CORRECTIONS CORPORATION)................................... 7

THE STAKES: MORE PRISON MEANS MORE REVENUES FOR PRIVATE PRISONS......................................................... 9

    MORE PRISON…............................................................... 9

    MORE REVENUE… .........................................................12

    BUT, STATE PRIVATE PRISON POPULATIONS ARE FALLING.........................................................................13

THE STRATEGIES: A THREE-PRONGED APPROACH TO INFLUENCING POLICY, CREATING MORE INCARCERATION, AND MAKING MORE MONEY ...............15

    STRATEGY 1: CAMPAIGN CONTRIBUTIONS ..............15

    STRATEGY 2: LOBBYING ..............................................21

    STRATEGY 3: RELATIONSHIPS AND ASSOCIATIONS 25

LOSING THE GAME ..........................................................31

    TAXPAYERS LOSE. .......................................................31

    THE COMMUNITY LOSES. ...........................................32

    PRIVATE PRISON EMPLOYEES ...................................34

    PEOPLE IN THE PRISONS ...........................................35

RECOMMENDATIONS .......................................................37

# PART 1
# INTRODUCTION

At a time when many policymakers are looking at criminal and juvenile justice reforms that would safely shrink the size of our prison population, the existence of private prison companies creates a countervailing interest in preserving the current approach to criminal justice and increasing the use of incarceration. [1]

Approximately 129,000 people were held in privately managed correctional facilities in the United States as of December 31, 2009;[2] 16.4 percent of federal and 6.8 percent of state populations were held in private facilities. Since 2000, private prisons have increased their share of the "market" substantially: the number of people held in private federal facilities increased approximately 120 percent, while the number held in private state facilities increased approximately 33 percent. During this same period, the total number of people in prison increased less than 16 percent. Meanwhile, spending on corrections has increased 72 percent since 1997, to $74 billion in 2007.[3] The two largest private prison companies, Corrections Corporation of America (CCA) and GEO Group, combined had over $2.9 billion in revenue in 2010.[4]

While private prison companies may try to present themselves as just meeting existing "demand" for prison beds and responding to current "market" conditions, in fact they have worked hard over the past decade to create markets for their product. As revenues of private prison companies have grown over the past decade, the companies have had more resources with which to build political power, and they have used this power to promote policies that lead to higher rates of incarceration.

The pro-incarceration policies that private prison companies promote do nothing to

The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are currently proscribed by our criminal laws. For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them. Legislation has been proposed in numerous jurisdictions that could lower minimum sentences for some non-violent crimes and make more inmates eligible for early release based on good behavior. Also, sentencing alternatives under consideration could put some offenders on probation with electronic monitoring who would otherwise be incarcerated. Similarly, reductions in crime rates or resources dedicated to prevent and enforce crime could lead to reductions in arrests, convictions and sentences requiring incarceration at correctional facilities.

— CORRECTIONS CORPORATION OF AMERICA 2010 ANNUAL REPORT

BLACKSTONE0000262



improve communities or cut costs, and may actually have the opposite effect. Policymakers should be focused on long-term solutions to improving public safety, saving money and promoting healthy communities by looking at ways to reduce the number of people in prison, not increase them, and by finding ways to keep people out of the justice system before they become involved. Private prison companies are in it for the money. Policymakers should be in it for healthy, safe communities.

## THE TRIANGLE OF PRIVATE PRISON POLITICAL INFLUENCE

While there are many pieces of the for-profit private prison industrial complex, this report will focus on for-profit private prison companies' political strategies to influence legislators responsible for criminal justice policy and, in some cases, influence legislation and policy, themselves. Therefore, any use of the term private prison refers only to for-profit private corrections companies and facilities.

For-profit private prison companies primarily use three strategies to influence policy: lobbying, direct campaign contributions, and building relationships, networks, and associations. [5]

Over the years, these political strategies have allowed private prison companies to promote policies that lead to higher rates of incarceration and thus greater profit margins for their company. In particular, private prison companies have had either influence over or helped to draft model legislation such as "three-strikes" and "truth-in-sentencing" laws, both of which have driven up incarceration rates and ultimately created more opportunities for private prison companies to bid on contracts to increase revenues. The recent Supreme Court decision in *Citizens United vs. FEC* further facilitates this influence by allowing corporations to engage freely in paid political speech such as television and radio ads and programs.

As policymakers and the public are increasingly coming to understand that incarceration is not only breaking the bank, but it's also not making us safer,[6] will this shrink the influence of the private prison companies? Or will they use their growing financial muscle to consolidate and expand into even more areas of the justice system? Much will depend on the extent that people understand the role for-profit private prison companies have already played in raising incarceration rates and harming people and communities, and take steps to ensure that in the future, community safety and well-being, and not profits, drive our justice policies. One thing is certain: in this political game, the private prison industry will look out for their own best interests.

BLACKSTONE0000263

### WHAT IS A FOR-PROFIT PRIVATE PRISON?

BLACKSTONE0000264

## PART 2

# THE PLAYERS: TWO COMPANIES ARE AT THE CENTER OF PRIVATE PRISON POLITICAL INFLUENCE

In 2011, the major players of the political game to sustain incarceration are the Corrections Corporation of America and the GEO Group, having recently acquired Cornell Companies in 2010. These companies have the most to gain by influencing legislation that could lead to more or less incarceration

The involvement of the private sector in public corrections dates back to the late 18th century, when local jails were run by for-profit providers paid by local governments to hold people awaiting trial.[9] The shift from private for-profit run jails to a government-run penitentiary system began with the first U.S. state prison established in Philadelphia in 1790.[10] Shortly after government assumed the role of incarcerating people, private firms began contracting with prisons for the use of labor,[11] as well as to provide medical, food and a variety of other services.[12]

Correlating with the increased use of incarceration, prison overcrowding, and rising corrections costs, private sector involvement in prisons moved from contracting of services to complete management and operations of entire prisons.[13]

The incarceration rate of people sentenced to more than a year of prison more than tripled

over the past 30 years, growing from 139 people in prison per 100,000 in the general population in 1980 to 502 per 100,000 in 2009.[14] The number of people in state and federal prisons alone increased 722 percent since 1970 from 196,429 people to 1.6 million people in 2009.[15]

The incarceration explosion created two practical problems: where to put the increasing number of people being sentenced to prison and how to pay for it. In 1984, Hamilton County, Tennessee and Bay County, Florida were the first local governments in modern times to enter into contracts with the private sector for operating correctional facilities.[16] With the promise of comparable corrections services at a greatly reduced cost,[17] state, federal, and local governments have increasingly contracted with the private sector for the financing, design, construction, management, and staffing of prisons, jails, and other correctional facilities.[18]

**The state and federal prison population increased 722 percent between 1970 and 2009.**

Sources: Heather C. West, William J. Sabol and Sarah J. Greenman, *Prisoners in 2009 - Statistical Tables.* Table 1 (Washington, D.C.: Bureau of Justice Statistics, 2010); Allen J. Beck and Paige M. Harrison, *Prisoners 2000* (Washington, D.C.: Bureau of Justice Statistics, 2001); Allen J. Beck and Darrell K. Gilliard, *Prisoners 1994* (Washington, D.C.: Bureau of Justice Statistics, 1995); Paige M. Harrison, *Prisoners in Custody of State or Federal Correctional Authorities, 1977-98* (Washington, DC: Bureau of Justice Statistics, 2000); Sourcebook of Criminal Justice Statistics Online, *Table 6.28.2006: Number and rate (per 100,000 resident population in each group) of sentenced prisoners under jurisdiction of State and Federal correctional authorities on December 31.* www.albany.edu/sourcebook/pdf/t6282006.pdf

The basis for the belief that private prisons would be more economical is that market competition would drive down costs.[19] And since private firms must compete not only with industry rivals, but also the government, it was assumed they'd have increased incentives to develop less expensive corrections practices and streamlined operations in order to win government contracts.[20] Despite no conclusive evidence in the cost savings of private corrections,[21] and growing evidence of significant collateral expenses borne by the public of incarcerating people in private prisons,[22] the trend of for-profit prison privatization continues.

Today, two companies own and/or operate the majority of for-profit private prisons, with a number of smaller companies running facilities across the country.

## CORRECTIONS CORPORATION OF AMERICA

Founded in 1983, the Corrections Corporation of America (CCA) is the first and largest private prison company in the U.S.[23] According to the company's website, CCA specializes in owning, operating, and managing prisons and other correctional facilities. In 2010, CCA operated 66 correctional and detention facilities, 45 of which they owned with contracts in 19 states, the District of Columbia and with the three federal detention agencies: Bureau of Prisons, Immigration and Customs Enforcement and the U.S. Marshal Service.[24]

In 2010, CCA saw record revenue of $1.67 billion, up $46 million from 2009.[25] The majority of that revenue (50 percent or $838.5 million) came from state contracts, with 13

BLACKSTONE0000266

percent ($214 million) from the state of California;[26] approximately 10,250 people from the state of California are held in prisons run by CCA.[27] The other significant portion of their revenue was from federal contracts, which accounted for 43 percent of revenue in 2010.



**50 percent of CCA's revenue comes from state contracts.**

Source: Corrections Corporation of America, *2010 Annual Report* (Nashville, TN: Corrections Corporation of America, 2010).

## CCA HAD POLITICAL CONNECTIONS FROM THE BEGINNING

A prime example of the influence underscoring the private prison industry is the development of Corrections Corporation of America (CCA). CCA cofounder, Tom Beasley, then-chairman of the Tennessee Republican Party, had served on a committee tasked with choosing a new state corrections officer.[28] Beasley's research uncovered a system plagued by overcrowding, tight budgets and high turnover, convincing him that with a few simple applications of business practices the corrections system could be transformed from an inefficient bureaucracy to a profitable business.[29] Joined by two friends, Doctor Crants, a lawyer and MBA Harvard graduate and Don Hutto, who at the time was the president of the American Correctional Association, CCA entered the market by attempting to take over the entire Tennessee prison system.[30] The combination of Beasley's political connections, Crants' business savvy, and Hutto's correctional credentials allowed for easy access to the necessary contacts and investors to launch America's first private prison company.

## GEO GROUP (FORMERLY WACKENHUT CORRECTIONS CORPORATION)

According to their website, the GEO Group is a private corporation that specializes in correctional and detention management, community residential re-entry services and behavioral and mental health services.[31] Currently, GEO operates 118 correctional, detention, and residential treatment facilities encompassing approximately 80,600 beds in the United States, Australia, South Africa, and the United Kingdom.[32] The U.S. Corrections Business Unit is the company's founding operating unit and accounts for over 60 percent of GEO's total annual revenue.[33] Founded in 1984 under the name Wackenhut Corrections Corporation, the company solidified its first contract, the Aurora ICE Processing Center with the Bureau of Immigration and Custody Enforcement, in 1987.[34]

Wackenhut was acquired by Group 4 Falck (now G4S) in 2002, and a year later repurchased all of its stock shares to become an independent company. In 2003 Wackenhut Corrections Corporation officially changed its name to The GEO Group, Inc.[35] As of 2010, GEO contracts with 13 states, the Federal Bureau of Prison, the U.S. Marshals Service, and U.S. Immigration and Customs Enforcement.[36] In 2010, 66 percent ($842 million) of GEO's $1.27 billion in revenue was from U.S. corrections contracts.[37] Of the $842 million in revenue, 47 percent came from corrections contracts with 11 states.[38]

On August 12, 2010 the GEO Group acquired Cornell Companies—a for-profit private prison company with revenues of over $400 million in 2009[39]—in a merger estimated at $730 million.[40] The acquisition of Cornell by GEO signifies a change in the landscape of the private prison industry with the majority of private prisons now under the management of either GEO or CCA.

**The majority of GEO's corrections revenue comes from state contracts.**



Source: The GEO Group, *2010 Annual Report* (Boca Raton, FL.: The GEO Group, 2011).

BLACKSTONE0000268

## PART 3
# THE STAKES: MORE PRISON MEANS MORE REVENUES FOR PRIVATE PRISONS

Over the past 15 years, while the incarceration rate in the U.S. has grown, it has been outpaced by the growth in the number of people placed in private prisons.

Due to ineffective criminal justice policies that promote incarceration over more effective alternatives, an increasing need for prison beds has resulted in more private prison contracts and subsequently more revenue for private prison companies as states have less money to pay for the construction of their own prison beds. As a result of this increasing trend of incarceration, private prison companies have seen exponential growth in revenues, benefiting greatly from more people being placed behind bars. However, between 2008 and 2009 the number of people in state prisons declined for the first time in 40 years.[41] While the number of people in federal prisons continues to rise, the decline in the state prison population—private prison companies' largest revenue stream—sets the stage

for private prison companies to implement an aggressive, multipronged strategy to ensure their growing revenues.

## MORE PRISON...
Some of the most rapid increases in incarceration occurred during the 1980s and 1990s, in part fueled by a policy shift toward "tough on crime" measures such as mandatory sentencing and "three strikes" laws, "truth-in-sentencing" laws that limit

**The number of people in private facilities grew between 2000 and 2008.**



Source: Heather C. West, William J. Sabol and Sarah J. Greenman, *Prisoners in 2009* - Appendix table 19 (Washington, D.C.: Bureau of Justice Statistics, 2010). http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf





**Similar to the overall number of people in prison, the number of people housed in private prisons has steadily increased over the past decade.**

——— Total Prison Population    ----- Private Prison Population

Sources: Allen J. Beck, *Prisoners 1999* (Washington, D.C.: Bureau of Justice Statistics, 2000) http://bjs.ojp.usdoj.gov/content/pub/pdf/p99.pdf; Kathleen Maguire and Ann L. Pastore, eds. *Sourcebook of Criminal Justice Statistics 1995*. Table 1.96: Private Correctional Facility Management Firms (Washington, D.C.: Bureau of Justice Statistics, 1996); Heather C. West, William J. Sabol and Sarah J. Greenman, *Prisoners in 2009 - Statistical Tables*. Table 1 and Appendix Table 19 (Washington, D.C.: Bureau of Justice Statistics, 2010); Allen J. Beck and Paige M. Harrison, *Prisoners in 2000* (Washington, D.C.: Bureau of Justice Statistics, 2001); Paige M. Harrison, *Prisoners in Custody of State or Federal Correctional Authorities, 1977-98* (Washington, DC: Bureau of Justice Statistics, 2000); Sourcebook of Criminal Justice Statistics Online, *Table 6.28.2006: Number and rate (per 100,000 resident population in each group) of sentenced prisoners under jurisdiction of State and Federal correctional authorities on December 31*. www.albany.edu/sourcebook/pdf/t6282006.pdf

parole eligibility and keep people in prison longer, and the "war on drugs." Such policies have sent more people — especially people convicted of drug offenses[42] — to prison, and keep them there longer, thus increasing the total number of people in prison. Such sentencing policies have been a primary contributor to the number of people in prison.[43]

During the time that prison populations grew, so, too, did the number of people in private prisons. By 1995 there were 36,567 people housed in private prisons in the U.S.,[44] in 2000 that number climbed to 87,369 and in 2009 there were 129,336 people housed in private correctional facilities in the U.S.[45]



**Over an 8-year span, federal prisons have seen the largest average annual increase in their private prison populations.**

Source: Heather C. West, *Prison Inmates at Midyear 2009* - Table 11 (Washington, D.C.: Bureau of Justice Statistics, 2010). http://bjs.ojp.usdoj.gov/content/pub/pdf/pim09st.pdf

BLACKSTONE0000270



In 2009, 8 percent of the state and federal prison population was housed in private prisons.

**Private Prison Population:**
State:    95,249
Federal:  34,087
Total:   129,336

**Number of people in private prisons by state.**
Source: Heather C. West, William J. Sabol and Sarah J. Greenman, *Prisoners in 2009* - Appendix table 20 (Washington, D.C.: Bureau of Justice Statistics, 2010). http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf

In 2009, the majority of people in private prisons were in state contracted facilities, with 8 percent of the total state and federal prison population in private prisons. Out of the 129,336 people housed in private prisons in 2009, 74 percent were within state contracted facilities.[46] The federal government accounted for the remainder of the private prison contracts – housing 34,087 people[47] for the U.S. Marshals, Federal Bureau of Prisons, and Immigration and Customs Enforcement. The five states with the highest number of people in private prisons in 2009 were Texas, Florida, Arizona, Oklahoma, and Mississippi – all of which had over 5,000 people housed in private prisons.

In the last decade, the federal government has had the fastest growing number of people in private prisons, largely due to federal agencies contracting with private prisons for immigration detention. Between 2000 and 2008, the largest annual percent change in the private prison population was from federally contracted private prisons, potentially making the federal government a more important source of revenue than states for private prisons in years to come.

BLACKSTONE0000271

**Corrections Corporation of America revenues continue to increase.**

Source: *2010 Annual Report* (Nashville, TN: Corrections Corporation of America, 2010); *2006 Annual Report* (Nashville, TN: Corrections Corporation of America, 2007); *2002 Annual Report* (Nashville, TN: Corrections Corporation of America, 2003).

## MORE REVENUE...

Steady increases in the number of people in private prisons, especially those coming from federally contracted beds, translate into increased revenues for private prison companies. Since private prison companies are in the business to make money, policies that maintain or increase incarceration boost their revenues; from a business perspective, the economic and social costs of mass incarceration are "externalities" that aren't figured into their corporate bottom line.

Since securing their first contracts in the 1980s, private prison companies have experienced over two decades of growth. In 2010 alone, GEO and CCA saw combined revenue of over $2.9 billion.[48] Since 2001, CCA has seen an 88 percent increase in their revenue, consistently earning over $1 billion annually for the past eight years. From 2002-2010, GEO's total revenue increased by 121

percent, with the portion of their revenue coming from their U.S. corrections division seeing a 87 percent increase – earning the company $842 million in 2010.

Despite their increasing portfolios of federal facilities, the largest portion of CCA and GEO Group's contracts are still with state governments, which accounted for about half of their revenues in 2009.[49] About three-quarters of the people held in private prisons that year were under state custody, adding up to 95,249 people.[50] Therefore, state criminal justice policies play a significant role in the profitability of both companies.

Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We believe we have been successful in increasing the number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration.

— CCA 2010 ANNUAL REPORT



The GEO Group has seen increasing revenues in corrections the past six years.

Source: The GEO Group, *2010 Annual Report* (Boca Raton, FL: The GEO Group, 2011); The GEO Group, *2006 Annual Report* (Boca Raton, FL: The GEO Group, 2007); *2005 Annual Report* (Boca Raton, FL: The GEO Group, 2006).

## BUT, STATE PRIVATE PRISON POPULATIONS ARE FALLING.

The trend of increasing incarceration and revenues for private prison companies which has existed over the last 15 years may be changing. Recently, a number of states have been working to reduce the number of people sentenced to prisons,[51] resulting in 4,574 fewer people in state prison - 1,071 of whom were serving their time in private prisons.[52] The number of people in prison continued to rise in 2009, in part, because more people are entering and staying in federal prisons, largely due to increased penalties for drug law violations. Between 2008 and 2009, the number of people sentenced to a year in federal prison increased by 5,553 people or 3 percent, with the number of people in private, federal facilities, increasing by 925 people or 2.8 percent.[53]

It is hard to say exactly how much money states and the federal government spend on private prisons in a year, but an estimate based on the average cost to incarcerate one person for one day in 2008 ($78.88)[54] sets the figure at approximately $3.7 billion. At that rate, the loss of 1,071 people in prison at the state level translates to about $30 million in savings.

Recognizing the opportunities behind increasing federal incarceration and the challenges around decreasing state incarceration, private prison companies must work hard to expand or maintain their market share. At the same time that some states may be looking to close private facilities, others may continue to move people to private facilities for a variety of reasons.[55] Stricter

We believe the long-term growth opportunities of our business remain very attractive as insufficient bed development by our customers should result in a return to the supply and demand imbalance that has been benefiting the private prison industry.

- CCA 2010 ANNUAL REPORT

immigration laws and enforcement increase the number of people in federal detention facilities, and increases in the number of offenses listed as federal crimes leads to more people held in federal prisons.[56] While private prison companies may claim that changes in criminal justice legislation are "outside our control,"[57] they are in fact engaged in a number of activities aimed at increasing their control of the market; this includes applying political pressure to lawmakers, working to influence elections, and building relationships within agencies or with government officials to directly formulate policy.



**While the number of people sentenced to state prison fell between 2008 and 2009, federal numbers increased.**

Source: Heather C. West, William J. Sabol, and Sarah J. Greenman, *Prisoners in 2009* (Bureau of Justice Statistics, Washington, DC: 2010). http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf

BLACKSTONE0000274

## PART 4

# THE STRATEGIES: A THREE-PRONGED APPROACH TO INFLUENCING POLICY, CREATING MORE INCARCERATION, AND MAKING MORE MONEY

Since private prison contracts are written by state and federal policymakers and overseen by state and federal agency administrators, it is in the best interest of private prison companies to build the connections needed to influence policies related to incarceration.

In order to ensure that they have a stable or increasing "market share" of incarceration (and therefore increasing revenue), private prison companies engage in a political game to influence policy and incarceration. Over the last two decades private prison companies have developed a three-pronged approach to influence incarceration policy and secure government contracts. Through campaign contributions, lobbying and building relationships and associations, private prison companies engage in an aggressive political strategy to influence criminal justice policies in ways that lead to more people in prison and more money in their pockets.

## STRATEGY 1: CAMPAIGN CONTRIBUTIONS

As elected policymakers initiate or approve decisions to enter into private prison

contracts, establishing positive connections to politicians is an important business strategy for private prison companies. By maintaining contacts and favorable ties with policymakers, private prison companies can attempt to shape the debate around the privatization of prisons and criminal justice policy. One way to do that is to make direct, monetary contributions to political campaigns for elected officials and specific policies.

### Where do the Big Private Prison Companies Spend their Money?

Private prison companies, through their Political Action Committees (PACs) and contributions by their employees, give millions of dollars to politicians at both the state and federal level.[58] Since 2000, the three largest private prison companies—CCA, GEO

and Cornell Companies[i]—have contributed $835,514 to federal candidates, including senators and members of the House of Representatives.[59] Giving to state-level politicians during the last five election cycles was much higher: $6,092,331.[60] This likely reflects two factors: that states collectively continue to be their largest client, and that at the federal level, elected officials may be less involved in the decisions to award private prison contracts than non-elected bureaucrats. Contributions to state politicians have been increasing over the past five major election cycles. For instance, 2010 marked the highest recorded year of state political giving by these private prison companies since 2000.[61]

These private prison companies tend to concentrate their efforts in specific states, particularly California, Florida, and to a lesser degree, Georgia. Florida, the home of the GEO Group, not only has the second highest private prison population in the country,[62] but has budgetary mandates that certain prison beds be privatized.[63] Attention to California is likely based on the state having the largest incarcerated population, and the existence of a U.S. Supreme Court-order to reduce its overcrowded prison system by as many as 46,000 people over the next two years;[64]



**State political giving by these private prison companies has been increasing over the past five major election cycles.**

Source: National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to All Candidates and Committees," accessed May 3, 2011. www.followthemoney.org/database/IndustryTotals.phtml?f=0&s=0&b[]=G7000

private prison companies are offering policymakers a way to transfer, rather than reduce, the number of people they lock up.[65] CCA gave $1 million in these three states combined between 2003 and 2010, accounting for two-thirds of its total giving in all states.[66] GEO Group had a similar pattern, with more than two-thirds of giving focused on California, Florida, and New Mexico.[67] These contributions signify a concentrated effort to influence policy in those states.

With most states and the federal government operating under record deficits and decreasing budgets, private prison companies have a growing desire to establish influential connections with policymakers, with two goals: pitching private prisons as a lower cost alternative to building or maintaining state facilities; and fighting policies that might reduce the use of incarceration.

---

[i] Cornell Companies was bought by The GEO Group in August of 2010. The impact of this merger on campaign contributions and prison policy is yet to be seen.

BLACKSTONE0000276

**State Campaign Contributions**

| Corrections Corporation of America (2003 to 2010) | |
|---|---|
| **State** | **Contributions** |
| California | $459,150 |
| Florida | $300,000 |
| Georgia | $241,750 |
| **Three-state TOTAL** | **$1,000,900** |
| Total in 27 states | $1,552,350 |
| GEO Group (2003 to 2010) | |
| Florida | $1,455,609 |
| California | $227,000 |
| New Mexico | $220,150 |
| **Three-state TOTAL** | **$1,902,759** |
| Total in 23 states | $2,400,679 |
| Cornell Companies (2006 to 2009) | |
| Georgia | $25,000 |
| Texas | $24,000 |
| Pennsylvania | $16,050 |
| **Three-state TOTAL** | **$65,050** |
| Total in 6 states | $72,650 |

Source: National Institute on Money in State Politics, "Lobbyist Link – Corrections Corp of America," accessed May 3, 2011. www.followthemoney.org/database/lobbyistclient.phtml?lc=100552; National Institute on Money in State Politics, "Lobbyist Link – GEO Group," accessed May 3, 2011.
www.followthemoney.org/database/lobbyistclient.phtml?lc=100516&y=0; National Institute on Money in State Politics, "Lobbyist Link – Cornell Companies," accessed May 3, 2011.
www.followthemoney.org/database/lobbyistclient.phtml?lc=103304
Notes: For a better picture of contributions given by this client, see the Noteworthy Contributor on the Institute for Money in State Politics website for Corrections Corporation of America, GEO Group, and Cornell Companies.

BLACKSTONE0000277

## FOR PROFIT PRISONS AND THE DANGER OF CORRUPTION AND ABUSE

The extent to which corporate campaign contributions influence elected officials' decision-making is a matter of much debate. But in one recent case, a private juvenile correctional facility crossed the line, making outright payments to judges in a clear quid pro quo with tragic results.

In Luzerne County, Pennsylvania, two local private youth prisons made illegal payments to two judges totaling over $2.6 million. In what came to be known as the "Kids for cash" scandal, the Mid-Atlantic Youth Service Corporation paid the judges for sentencing youth to confinement in their two private youth prisons. It is estimated that over 5,000 children appeared before the two judges over the past decade, and half of those who waived their right to counsel were sentenced to serve time in one of the private correctional facilities. According to the Office of Juvenile Justice and Delinquency Prevention, privately owned corporations operate more than 90 percent of youth correctional facilities in the United States.

Over the years, media attention has brought to light allegations of child abuse, sexual assault, and neglect regarding privately owned and operated youth correctional facilities. For instance, in 2000, the Department of Justice concluded that the private prison company running the Swanson Correctional Center for Youth in Tallulah, Louisiana was unfit to manage the facility. Such allegations raise questions about the human cost of privatization of prisons, especially when private prisons profit when more youth are incarcerated, which research shows produces the worst outcomes for youth (and for public safety as well).

Sources:
Annette Allen, February 23, 2009. "Pennsylvania scarred by jailing kids for cash" scandal." ABC News. abcnews.go.com/2020/...?id=6966577&page=1
Times 4?, p. 5 M GWMF.

Private facilities account for 95 percent of all correctional institutions for juveniles over the age 2010.
Department of Justice, Juvenile Justice Statistics Center 1. United States of America/report of Justice. Bull Terms, Texas. www.ojjdp.gov/ojstatbb/corrections/qa08201.asp
Justice Policy Institute, "Cost of Confinement," Washington, D.C. 2009.

## Contribution Strategies

Private prison companies have developed a strategic method of political giving and are less interested in political party, values or philosophy than in access to policymakers.[68] According to the Institute on Money in State Politics, private prison companies support incumbents who win elections, regardless of party.[69] Access to power, clearly, is more important than supporting particular political beliefs.

Recent giving, when analyzed by political party, reinforces the lack of adherence to a political ideology. Although on the whole, most private prison

**From 2003-2010, CCA, GEO, and Cornell largely contributed to winning campaigns.**



Losers - $266,867 (16%)

Not up for election - $162,350 (10%)

Sources: National Institute on Money in State Politics, "Corrections Corp of America – Figure C: Contributions to Candidates by Election Status from 2003 to 2010," accessed May 3, 2011. www.followthemoney.org/database/topcontributor.phtml?u=695&y=0; National Institute on Money in State Politics, "GEO Group – Figure C: Contributions to Candidates by Election Status from 2003 to 2010," accessed May 3, 2011. www.followthemoney.org/database/topcontributor.phtml?u=1096&y=0; National Institute on Money in State Politics, "Cornell Companies – Figure C: Contributions to Candidates by Election Status from 2003 to 2010," accessed May 3, 2011. www.followthemoney.org/database/topcontributor.phtml?u=6448&y=0

BLACKSTONE0000278



**Private prison companies give to federal candidates from both parties.**

Source: Center for Responsive Politics, "Miscellaneous Business: PAC Contributions to Federal Candidates – 2000, 2002, 2004, 2006, 2008, 2010," February 2011. www.opensecrets.org/pacs/industry.php?txt=N12&cycle=2010

company contributions have gone to Republican candidates (67.2 percent), 2010 saw the majority of contributions from these private prison companies going toward federal Democratic candidates (63.4 percent).[70]

At the state level, both Democrats and third party candidates have received a combined total of over $2.4 million in contributions since 2000.

In addition to mainly supporting winning candidates over those from a particular party, private prison companies are strategic in the timing of giving to campaigns. The pattern of giving shows these companies tend to contribute early and late in campaigns.[71] By contributing early and late in election cycles, private prison companies are able to achieve two goals: 1) solidifying a positive association with the candidate early and 2) reinforcing their connections to candidates who will become policymakers.

An example of CCA's strategic giving can be seen in its contribution to former

Hawai'i Governor Linda Lingle. Prior to 2009, Hawai'i primarily relied on private prisons in the continental U.S. to help manage their prison population. During Governor Lingle's administration the number of people in private prisons grew 58 percent from 1,347 in 2002 to an all-time high of 2,129 in 2007.[72] In 2004, CCA– the largest beneficiary of Hawai'i's use of private prisons– contributed $6,000 to Governor Lingle.[73] Interestingly, CCA's contribution, the maximum contribution limit for a gubernatorial candidate,[74] was given on an off election year – Lingle wasn't up for re-election until 2006. CCA's contribution to Governor Lingle's successful reelection bid came in the middle of the rapid increase of Hawai'i's efforts to ship people to private prisons on the "mainland." Although there is

**While most state money goes to GOP candidates, almost a third goes to Democrats and almost 9% to ballot measures.**



Source: National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to All Candidates and Committees," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=0&s=0&b[]=G7000

**In 2010, these private prison companies spent over
$2 million on state politics.**



Sources: National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to All Candidates and Committees," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=0&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Gubernatorial Candidates," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=G&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Senate Candidates," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=S&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to House/Assembly Candidates," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=H&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Other Statewide Candidates," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=O&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to High Court Candidates," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=J&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Appellate Court Candidates," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=K&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Ballot Measure Committees," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=B&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Party Committees," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=P&s=0&b[]=G7000

no clear "quid pro quo" between CCA's contribution to Lingle and increased contracts, the company did benefit greatly from the Lingle administration's increased use of exporting people in prison from Hawai'i to their private prisons on the "mainland." The number of people in private prisons continued to grow during the Lingle administration, until reports of sexual abuse and other abuse allegations of Hawaiians in private prisons forced the administration to start bringing women home in 2009.[75]

In addition, these private prison companies have contributed over $600,000 to ballot measure campaigns since 2000.[76] Such a wide range of state contributions by these companies indicates the attempt to influence both the public and policymaking debate around criminal justice and the privatization of prisons.

In 2010, the three largest private prison companies spent $2,223,941 on state political contributions with the majority ($1,057,594) of

**REDUCING THE NUMBER OF PEOPLE IN PRISONS IN HAWAI'I:
COMMUNITY ALLIANCE ON PRISONS**

Community Alliance on Prisons (CAP) works on a variety of issues related to criminal justice reform and maintains a strong presence in the Hawai'i Legislature and media.

CAP supported the effort to bring women home who were held on the continent in the Corrections Corporation of America (CCA)-operated Otter Creek Correctional Center after Hawaiian officials discovered that the women housed there were subjected to sexual abuse. CAP also is monitoring Governor Neil Abercrombie's proposal to bring home men currently housed in another CCA-owned facility in Arizona. For the last several years, suspicious deaths and complaints regarding the ability of people in the prison to participate in Native Hawaiian rituals have concerned advocates in Hawai'i.

CAP has recently been advocating for the passage of a bill (SB106/HD141), which addresses the 2005 decision by the Department of Public Safety (PSD) to recalculate the sentences of all the people serving multiple terms of imprisonment. Previously, unless otherwise specified by a judge, sentences were concurrent. PSD, without approval from the judiciary or legislature, recalculated all concurrent sentences to be consecutive, thus adding to the length of time that a person serves behind bars. Given that in 2005 around half of the people serving a sentence of a year or more were serving their sentences in a CCA facility, such an extension of the length of confinement would be in the interest of CCA.

A previous bill had made legislation conform to the practice of giving concurrent sentences unless otherwise specified, but it was prospective. The current bill would make the practice retroactive, potentially reducing the number of people in prison, especially in CCA facilities.

For more information about the Community Alliance, please visit
www.lifeofthelandhawaii.org/community_alliance_on_prisons.html

money going to state party committees.[77] Most notable is that every possible avenue of influence was covered in the contribution period – from work on state ballot measures to high court candidates. While the majority of contributions in 2010 went to state party committees, over 30 percent of political contributions went directly to candidates running for various positions in state government.[78]

# STRATEGY 2: LOBBYING

Lobbying efforts by companies, organizations, and constituencies are a well documented part of politics in the United States. Similar to other industries, private prison companies employ lobbying firms and lobbyists to advocate for their business interests in Congress and state legislatures. While giving to political candidates must be coordinated through employee contributions and PACs and is governed by donation limits, corporations can directly fund lobbyists without any spending limitations to push their business agenda. Since private prisons make money from putting people behind bars, their lobbying efforts focus on bills that affect incarceration and law enforcement, such as appropriations for corrections and detention.

Limited information is available to the general public regarding the paid lobbying efforts of private prison companies, and when this information is available it is often unclear how the company lobbied on a particular piece of legislation. The chart on page 23 highlights CCA's 2010 lobbying efforts on federal legislation; lobbyists are not required to report whether they supported or opposed the bills.

## A NEW WAY TO INFLUENCE CAMPAIGNS
### *Citizens United v. Federal Election Commission*

On January 21, 2010 the U.S. Supreme Court ruled on a challenge to a portion of the McCain-Feingold Campaign Reform Act barring corporations from using their general treasury funds to participate in independent election-season activities. In *Citizens United v. Federal Election Commission*, the court knocked down this restriction on corporate spending on political advertising, saying the use of their funds for such actions was protected under the First Amendment's freedom of speech provision. The ruling did affirm however, the requirement that corporations making election-related speech must be clearly identified as the author of such messaging.

The controversial 5-4 decision has been met with criticism largely concerning the effect of corporate money in politics. Retired Justice Sandra Day O'Connor stated "no state can possibly benefit from having that much money injected into a political campaign." Justice O'Connor's concerns also extended to the justice system and the potential impact of the ruling on an independent judiciary. Considering 80 percent of state court judges face elections at some point during their careers, the impact of corporate involvement in the judicial election process is unclear. With the increased ability for corporations to be actively involved in the political dialogue, it remains to be seen whether private prison corporations will use general funds for independent campaign expenditures, but the *Citizens United* ruling certainly opens the door for them to do so.

Source:
*Citizens United v. Federal Election Commission*. No. 08-205. Supreme Court of the United States. 2010. www.supremecourt.gov/opinions/09pdf/08-205.pdf
"This is Citizens united as corporate corporations as well as unions.
Matthew Mosk, "Supreme Calls Citizens United Ruling 'a Problem'", ABC News, 29 January 2010. http://abcnews.go.com/Blotter/sandra-day-oconnor-citizens-united-ruling-problem/story?id=9682244

Knowing that private prison companies bring in revenue from holding people in prison, it is likely that their lobbying efforts contribute to promoting the current approach to incarceration, and decrease the impetus for reform. By working to shape the debate on penalties, sentencing, and privatization of correctional services, private prison companies can galvanize the support from policymakers they need to secure private prison contracts for correctional services. Over the last decade, CCA, GEO and Cornell Corrections spent, on average, hundreds of thousands of dollars to employ lobbyists to represent their business interests to federal policymakers. Since 2003, CCA has spent upwards of $900,000 annually on federal lobbying.[79] In addition to direct political giving and work on model legislation, companies like CCA and GEO continue to pay lobbyists hundreds of thousands of dollars to promote their business interest in Congress.

These three companies also hire lobbyists for state legislation, as their clients are currently primarily states. In Florida alone, these companies utilized 30 lobbyists to advocate for private prison contracts and policies to promote the use of these prisons.[80]

Tracking state-level lobbying can prove challenging, as private prison company lobbyists often meet behind closed doors and do not necessarily testify in public,[81] and reporting requirements vary by state. The combined executive and legislative branch lobbying reported for GEO in the state of Florida from January 1 through March 31, 2011 ranged between $120,000 and $199,992,

# CCA LOBBIED ON SEVERAL PIECES OF FEDERAL LEGISLATION IN 2010.

| Bill Number | Bill Title | Bill Description | Specific Issues Lobbied | Outcome of Bill |
|---|---|---|---|---|
| H.R. 415 | Private Prison Information Act of 2009 | To require that Federal prisons and correctional facilities holding people in Federal custody under a contract with the Federal government to make the same information available to the public that Federal prisons and correctional facilities are required to make available. | All provisions | Died in House subcommittee |
| S. 951 | Safe Prisons Communications Act of 2009 | Provide the process of Federal funds to state and local governments for personnel at state prisons, to enable the Board of Governors of the Federal Reserve System and its secrecy disclosing state and local governments, and for other purposes. | All provisions | Moved forward, died in House subcommittee |
| S. 3607 | Department of Homeland Security Appropriations Act, 2011 | Appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2011 | FY2011 provisions and funding related to Immigration and Customs Enforcement (ICE); provisions related to ICE detention; FY2012 budget - provisions and funding related to the Office of Federal Detention Trustee and ICE. | Continuing resolution for FY 2011 budget included 5.3% increase in funding for the Federal Detention Trustee, while Department of Justice generally had a 17% decrease in funding |
| S. 3636 | Commerce, Justice, Science and Related Agencies Appropriations Act, 2011 | Appropriations for the Department of Commerce and Justice, and Science, and Related agencies for the fiscal year ending September 30, 2011 | FY2011 provisions and funding related to the Bureau of Prisons and the Office of the Federal Detention; provisions related to private prisons. | Continuing resolution for FY 2011 budget increased a 5.3 percent for the Bureau of Prisons, while the Department of Justice generally had a 17 decrease in funding |
| H.R. 3082 | Military Construction and Veterans Affairs and Related Agencies Appropriations Act, 2010 | Making appropriations for military construction, the Department of Veterans Affairs, and related agencies for the fiscal year ending September 30, 2010, and for other purposes. | FY2011 provisions and funding related to the Bureau of Prisons, the Office of the Federal Detention Trustee and ICE; FY2012 budget -provisions and funding related to the Office of Federal Detention Trustee and ICE. | Became Public Law No: 111-322 |

Sources: Center for Responsive Politics, "Lobbying Corrections Corp of America – Bills 2010," February 2011. www.opensecrets.org/lobby/clientbills.php?name=Corrections+Corp+of+America&year=2010
Govtrack, "Federal Legislation," May 2011. www.govtrack.us/congress/legislation.xpd
Note: Blue rows are justice-related pieces of legislation. All bills were introduced in the 111th Congress.

BLACKSTONE0000283



**Total expeditures on federal lobbying by CCA, GEO and Cornell have fluctuated over the past decade.**

Sources: Center for Responsive Politics, "Lobbying Corrections Corp of America – Summary 2010," February 2011. www.opensecrets.org/lobby/clientsum.php?lname=Corrections+Corp+of+America&year=2010; Center for Responsive Politics, "Lobbying GEO Group – Summary 2010," February 2011. www.opensecrets.org/lobby/clientsum.php?lname=GEO+Group&year=2010; Center for Responsive Politics, "Lobbying Cornell Companies – Summary 2010," February 2011. www.opensecrets.org/lobby/clientsum.php?lname=Cornell+Companies&year=2010

while in that same time period, CCA's combined legislative and executive branch lobbying ranged between $10,000 and $29,998.[82] That the private prison industry sees lobbying as critical to its bottom line is clear. Even in Montana, which has only 1.5 percent of the total population of people under state jurisdiction held in private prisons, CCA spend $36,666 in the off-year of a biennial session cycle.[83]

While the broad scope of private prison lobbying makes it too numerous to catalog, below are a few examples that have garnered media attention:
- In 1996, three former lobbyists from Wackenhut (now The GEO Group) sued the Texas Department of Corrections, alleging that agency officials pressured Wackenhut to have them fired because they were too successful at expanding private prisons at a time when the Department of Corrections did not want private contracts.[84]
- Due to lobbying largely led by the GEO Group, the Florida state legislature approved a budget deal that would require privatizing all of the prisons in South Florida – home to about one-fifth of the statewide prison population of 101,000.[85]
- Although there has been a lengthy courtship by CCA of the town of Milo, Maine to build a private prison, a CCA lobbyist recently assured a legislative panel that there had been no "quid pro quo" involved. Currently Maine does not house any of its prison population in private facilities because Maine Law forbids people under state custody from being sent to private facilities.[86]

BLACKSTONE0000284

State Lobbying

| Corrections Corporation of America (2003 to 2010) | |
|---|---|
| **State** | **Number of State Lobbyists** |
| Florida | 17 |
| Tennessee | 12 |
| Nevada | 12 |
| **Three-state TOTAL** | **41** |
| Total in 32 states | 179 |
| GEO GROUP (2003 to 2010) | |
| Florida | 13 |
| Texas | 8 |
| California | 7 |
| **Three-state TOTAL** | **28** |
| Total in 16 states | 63 |
| Cornell Companies (2006 to 2009) | |
| Illinois | 5 |
| Ohio | 1 |
| Alaska | 1 |
| **Three-state TOTAL** | **7** |
| Total in 4 states | 8 |

Source: National Institute on Money in State Politics, "Lobbyist Link – Corrections Corp of America," accessed May 3, 2011. www.followthemoney.org/database/lobbyistclient.phtml?lc=100552; National Institute on Money in State Politics, "Lobbyist Link – GEO Group," accessed May 3, 2011. www.followthemoney.org/database/lobbyistclient.phtml?lc=100516&y=0; National Institute on Money in State Politics, "Lobbyist Link – Cornell Companies," accessed May 3, 2011. www.followthemoney.org/database/lobbyistclient.phtml?lc=103304

Notes: Total # of lobbyists may include the same lobbyist working in multiple states. For a better picture of contributions given by this client, see the Noteworthy Contributor on the Institute for Money in State Politics website for Corrections Corporation of America, GEO Group, and Cornell Companies.

# STRATEGY 3: RELATIONSHIPS AND ASSOCIATIONS

Networks and relationships are immensely important to all businesses. Organizational theories about relationships and leadership indicate that individual people influence the operations and behavior of an organization through prior relationships, associations, experiences, and networks.[87] In other words, people bring with them the lens of previous affiliations, and a sense of obligation to represent their world view; they may also be subject to pressure from previous professional relations to act in ways that benefit these relations.

BLACKSTONE0000285

As government regulation impacts all businesses, there is always a desire for relationships with government officials. But for private prison companies, whose profits are almost completely dependent on public policies and funding, their relationships with those who can influence government decision making are paramount. Private prison companies have benefited from their relationships with government officials as evidenced by appointments of former employees to key state and federal positions.

The relationship between government officials and private prison companies has been part of the fabric of the industry from the start; Tom Beasley, one of the founders of CCA, was a former government official in Tennessee. The pervasiveness of these connections is evidenced with these recent examples:

## AN IMPOSSIBLE TASK: TOTALING UP STATE LOBBYING EXPENDITURES

Each state has different laws around the disclosure of lobbying activities. Some states require lobbyists to disclose the dollar amounts of lobbying contracts, either in exact figures or in ranges; others just require lobbyists to identify tangible expenditures, such as meals and gifts. Some don't require lobbyists to say what legislation they are being paid to try to influence, while others require both the bill numbers and whether the lobbyists are in support of or opposition to the legislation.

To show the challenges facing those trying to "follow the money," below is one example of one lobbyist in New Mexico, the state with the highest percentage (43.3 percent) of people in prison being held in private facilities. The Secretary of State's website allows a search by "Groups" engaging lobbyists; both GCA and Geo Group employ lobbyists. Judging by the disclosure reports, GCA's principal lobbyist in 2010 and 2011 was Edwin T. Mahr. In the May 1, 2010 report, Mahr indicated spending on meals and beverages in January and February of $1,938.22, including four dinners with named elected officials and $1,123.01 in undisclosed "lump sum expenditures under $75." There were also expenditures for an "HB100 Party" and the "Senate Dems Caucus." In 2011, Mahr reported 10 dinners in January and February with individual legislators or committees totaling $2,403. In these reports, Mahr was not required to report what legislation he was lobbying for, or the cost of his services. Additionally, Mahr represented several other clients, and was not required to identify which client's account paid for each dinner.

New Mexico also requires lobbyists to disclose their political contributions. Mahr made a $300 donation to the re-election campaign of Sen. Tim Eichenberg (D) on 4/25/2011, whose website reads, "A healthy, robust democracy is one in which legislators listen to and are beholden solely to the voters in their district, ... not big campaign donors and lobbyists." Sen. Eichenberg is a member of the Judiciary Committee, two bills he sponsored for which died in committee, S.B. 453 and S.B. 519, would likely have resulted in longer sentences of incarceration and greater costs. Mahr's January 15, 2011 report of political contributions showed 40 donations totaling $20,700, all made either before May 15, or after October 1st; 26 of these were noted as being "GCA" donations.

- **Stacia Hylton and The GEO Group:** President Obama's appointed Director of the United States Marshals Service, Stacia Hylton, has strong ties to the private prison industry.[88] In 2010, Hylton started a private prison consulting firm, called Hylton Kirk and Associates, while still working at the Department of Justice as the Federal Detention Trustee.[89] After retiring from the trustee position, Hylton agreed to a consulting contract with The GEO Group worth $112,500.[90] As Director of the U.S. Marshals, Hylton will head an agency that has a long-standing contractual relationship with The GEO Group. In 2010, the U.S. Marshal's accounted for 19 percent of GEO's revenue.[91] With Hylton in a position to oversee government contracts with private prisons, the ongoing influence of private prison companies in the public sphere is virtually guaranteed.

- **John Kasich, Lehman Brothers and CCA:** After serving 18 years in the U.S. House of Representatives John Kasich retired in 2000 and took a managing director position in Ohio with Lehman Brothers.[92] Lehman Brothers has a long standing history with private prison companies, spending most of the late 1990s and 2000s before their collapse underwriting bonds and managing credit for both CCA and Cornell.[93] After winning the governorship of Ohio in 2010, Kasich laid out his plans for privatizing state prison operations along with appointing a former CCA employee to head the Ohio Department of Rehabilitation and Correction.[94] Rounding out Kasich's connections to CCA is his close friend and former Congressional chief of staff whose lobbying firm was hired to represent CCA in January 2011.[95]

- **Former CCA Warden and Maine:** Governor Paul LePage appointed former CCA Warden Joe Ponte as the Commissioner of the Maine Department of Corrections.[96] While Maine currently does not have any private prisons, according to news reports, CCA has been in discussions with the town of Milo for the past 3 years over the possibility of building a $150 million facility.[97] The appointment of Ponte and the $25,000 in campaign contributions LePage received from CCA raise concerns of increased access for CCA to open private prisons in Maine.[98]

**TENNESSEANS AGAINST PURYEAR: A FIGHT FOR JUSTICE**

In 2007, President George W. Bush nominated CCA's general counsel, Gustavus Puryear IV, to a lifetime appointment on the U.S. District Court for the Middle District of Tennessee.

Alex Friedmann, currently of *Prison Legal News*, organized a campaign to prevent his appointment. Beyond the concern that general counsel of CCA would be serving as judge in a district where CCA Headquarters is also located, Puryear did not have the qualifications to hold the position. Among the most prominent issues, Puryear lacked litigation and trial experience, received a comparatively low rating in the American Bar Association's review of judicial nominees, had close, personal and professional ties to Vice President Dick Cheney, and was involved in representation of people involved in the case of a suspicious death of a woman held in a CCA facility.

In addition to compiling information about Puryear for the Senate Judiciary Committee tasked with approving the appointment, Friedmann also organized other organizations, including Alliance for Justice, Grassroots Leadership, and the American Federation of State, County and Municipal Employees, among others, to oppose his nomination. On January 2, 2009, the nomination was returned to the White House, effectively denying Puryear the appointment.

Source: Paul Wright and others. "Deconstructing Gus: A Former CCA Prisoner Takes On and Takes Down, CCA's Top Lawyer." *Prison Legal News*, March 2009. www.againstpuryear.org/pinsuiventory.pdf

- **Former New Mexico Secretary of Corrections and GEO:** Former New Mexico Secretary of Corrections Joe Williams was criticized in 2010 by a state senator for not fining GEO and CCA for contract violations. Prior to being Secretary of Corrections, Williams had served as a warden in one of GEO's correctional facilities.[99]

For private prison companies, their connections between the private and public spheres has provided access to the people with the most influence over policies that drive incarceration rates. Certainly, the firms might argue that this access is used primarily to secure their market share. But with two companies now controlling most of the private prisons, it is clear that increasing the size and scope of their business – is an ever more important target.

Arguments that political contributions and lobbying from private prison companies have little influence over policymaking because public facilities and agencies do their own lobbying[100] ignore the relationships that influence policymaking and the appointment of former private prison company officials and friends.

## Moving Policies Forward Through "Friendly" Associations

With former employees in positions within state and federal administrations, private prison companies have been able to gain access to the executive branch. In order to build relationships with the legislative branch, these firms have become active members of associations that include policymakers and are involved in formulating new policies. In this way, private prison companies have been able to insert their own agenda into the process of drafting new legislation that strengthens their bottom line.

The American Legislative Exchange Council (ALEC) is a Washington D.C.-based public policy non-profit organization whose stated mission is to advance conservative principles of free markets, limited government and individual liberty.[101] It is a membership organization comprised of state legislators, business professionals, and private corporations and seeks to build partnerships between state legislators and the private business sector. State legislators can join by paying an annual $50 membership fee, while private corporations such as Exxon Mobil, Pfizer, and CCA pay tens of thousands of dollars in dues annually.[102] According to an investigative report by NPR, ALEC's tax records show that corporations, collectively, pay as much as $6 million a year for membership and access to legislators at three yearly conferences.[103]

In 1981, ALEC's chairman was selected as a member of President Reagan's national Task Force on Federalism,[104] which encouraged direct interaction between ALEC's corporate members and administration officials. Subsequently, in 1986, ALEC developed internal Task Forces to respond to state policy[105] and develop model legislation. Now, ALEC primarily functions to develop model legislative proposals that advance free market principles with a significant focus on privatization.[106]
On average, ALEC drafts approximately 1,000 pieces of model legislation in a year, which are then introduced by ALEC's legislative members.[107] Annually, approximately 20 percent of its proposed legislation is passed and enacted as laws in various states throughout the country.[108]

Since its inception, ALEC has taken a strong interest in public safety and criminal justice policy, directing the Public Safety and Elections Task Force (formerly the Criminal

BLACKSTONE0000288

Justice and Homeland Security Task Force) that drafts legislation designed to "hold criminals accountable for their actions ... and provide swift and certain punishment for their crimes – without adding more government intrusions into law abiding citizens' lives."[109]

Both CCA and GEO are members and supporting contributors of ALEC, with both companies represented on ALEC Task Forces. CCA pays an additional annual membership fee for a seat on the Public Safety Task Force, [110] having, at times co-chaired the Task Force. [111] Belonging to ALEC allows these companies the opportunity to advocate for continued reliance on incarceration, generally, and the use of privately-run prisons, specifically, to state policymakers and even provide the legislation that meets that agenda.

Since the 1980s and 1990s, ALEC facilitated the production of model bills focusing on mandatory minimums, three strikes laws (giving 25 years to life in prison for repeat offenses), and "truth-in-sentencing" legislation (requiring people to serve most or all of their time without chance for parole),[112] all of which are significant contributors to the dramatic increase in incarceration in the last 30 years.[113] Although ALEC did not invent these ideas, they did play a significant role in helping to make them law in states.[114]

Being able, through ALEC, to have a hand in drafting model legislation and promoting its passage was a strategic move by the industry that has to date helped ensure continued profits.[115] However, with all legislators — including ALEC members — becoming increasingly interested in reducing correctional costs, there is no longer a guarantee that ALEC will support policies that result in higher rates of state incarceration. In competition with private prisons are other industries which are coming up with solutions to reduce incarceration costs that will benefit them. For instance, a 2007 brief by ALEC recommended releasing people early from prison with conditional release bonds, similar to bail bonds, effectively setting up bonding companies as private parole agencies.[116] ALEC's workgroup platform states that legislators should "pass legislation that expands community supervision, reinvest in and create treatment programs that work, and identify the individual needs of offenders and address those needs directly to help ensure successful reentry into the community."[117] Interestingly, much of CCA's lobbying in at least one state (Montana) was directed toward making it possible for a for-profit corporation such as themselves to provide such services.[118]

BLACKSTONE0000289

## CCA AND THE IMMIGRATION DEBATE IN ARIZONA

In the Spring of 2011, National Public Radio (NPR) investigated the role that CCA played in influencing Arizona legislation that would increase one of its fastest growing revenue bases—immigration detainees. The Support Our Law Enforcement and Safe Neighborhoods Act (SB 1070) increases police power to question and detain anyone who cannot prove they are in the country legally. It was originally conceived and drafted at an ALEC meeting that included officials from CCA. When the legislation was brought to the Arizona statehouse floor as a bill in January 2010, 36 legislators co-sponsored it — two-thirds of whom either attended the meeting where the bill was written or were members of ALEC. Over the next six months, 30 of the bill's co-sponsors received campaign contributions from private prison lobbyists or companies, including CCA and The GEO Group.

While CCA played a significant role in influencing state legislators, the connection between the private prison industry and SB 1070 did not end on the statehouse floor. Two of Arizona Governor Jan Brewer's top advisors had direct ties to the private prison industry. Prior to joining the Brewer administration, two senior advisors both worked as lobbyists with private prison companies as clients.

SB 1070 is expected to result in more people being placed into immigration and Customs Enforcement custody, increasing the need for immigration detention beds and the likelihood of private prison contracts. The events surrounding the passage of SB 1070 in Arizona demonstrates the ability private prison companies have to influence policymakers and legislation to increase profits. As NBC's Chris Matthew's Wayne Slabbate put it, "... [they] think it's going to be unmissed opportunities for what we do."

Since SB 1070 was signed into law in April 2010, five other state legislatures have introduced similar bills, including HB 87 in Georgia which became law on May 13, 2011. In comparison, home to CCA, 2011 immigration legislation may be stalled due to projected increased costs to law enforcement.

BLACKSTONE0000290

## PART 5
# LOSING THE GAME

**When private prison companies are successful at the game of political influence, their profits rise, benefitting their stockholders and top management. However, growing evidence shows that many people lose in this political game at the individual and community levels**

The policies that private prison companies promote negatively impact communities in terms of costs and public safety. And the increasing use of private prisons due to rising incarceration rates negatively impacts private prison employees. But the biggest losers in this political game are the people who are taken away from their families and communities due to the policies private prison companies promote to increase the number of people going into prisons and the length of time they spend behind bars.

## TAXPAYERS LOSE

Policies that promote incarceration over more effective public safety strategies cost more in both the short and long term. The average cost to incarcerate one person for one day in the U.S. is $78.88.[119] Thus, policies that increase the length of time that someone is incarcerated can have a significant fiscal impact. For example, one study found that 10 years after California enacted its Three Strikes law, the people added to the prison system under the law between March 1994 and September 2003 would cost taxpayers an additional $10.5 billion in prison and jail expenditures, including $6.2 billion in added

costs attributed to longer prison terms for nonviolent offenses.[120]

Most people agree that they would pay anything to be safe, but incarceration does not satisfy this requirement. Some of the most prominent criminologists in the country have found that incarceration has minimal, if any impact on public safety.[121] And serving time in prison has been shown to increase the risk of future offending, not decrease it.[122] Additionally, the trend of increasing prison sentences does not improve public safety. Data from the Department of Justice shows little difference in recidivism rates for people who spend short sentences in prison compared to those who are in prison longer.[123]

Research shows that investing in services and programs that keep people out of the justice system is more effective at improving public safety and promoting community well-being than investing in law enforcement.[124] Despite evidence that investing in education and other positive social institutions can improve public safety and save states money, policymakers continue to invest in incarceration.[125] Over the past 38 years corrections' spending has increased to three times that of state spending on education.[126] This misallocation of funding

BLACKSTONE0000291

has the potential for a significant negative impact on the future of our youth and communities.

## THE COMMUNITY LOSES

Communities primarily lose out when it comes to private, for-profit prisons in two ways: hidden costs and public safety. There may appear to be an immediate cost savings compared to that of facilities run by a government, but long-term costs negate those savings. In addition, the safety of communities is compromised as increasing incarceration rates are not shown to improve public safety—and may even make it worse—and adequate and appropriate reentry services are not available to ensure that people returning to the community are prepared to succeed in terms of employment and reintegration.

### Private Prisons are not Necessarily Cheaper than Government Facilities.

Communities often build private prisons because they are promised that they are cheaper and more quickly constructed than going through a typical governmental approval process to site, fund, and build a government-owned and operated prison. However, hidden costs related to the actual operation, lawsuits, and instances in which private prison companies don't fill their facilities end up costing communities more than anticipated.

Some studies, like those cited on CCA's website, purport to bring significant savings to communities.[127] Those studies, however, do not include assessments by the General Accounting Office, the National Institute of Justice, and the University of Utah, which find

little to no cost savings from private prisons.[128]

- A 2008 National Institute of Justice report compared a Bureau of Prisons study[129] with another study by Abt Associates on the same facilities and found that Abt Associates did not include overhead and indirect costs, thus making private facilities appear most cost effective.[130]
- In 1996, the General Accounting Office compared public and private prisons in five states (Texas, California, Tennessee, New Mexico, and Washington) and found little difference in costs.[131]
- A 2009 meta-analysis by researchers at the University of Utah found minimal cost-savings associated with prison privatization and that any cost savings are not guaranteed.[132]
- An Arizona Department of Corrections study looking at 2007 comparison costs between state and private prisons, found some savings for private medium security facilities, but significant losses for minimum security private prisons, $954,069 and $1,297,308 respectively.[133]

Many studies, including those by the General Accounting Office and National Institute of Justice, cite the difficulty in comparing private and public facilities. This is due to differences in how each facility operates under separate organizational styles, prison size, location, types of people they house, and programs and services provided,[134] as well as inadequate data and oversight of private facilities.[135]

Private prison firms generally only run minimum- to medium-security facilities and can choose not to house people with serious medical or mental health issues.[136] One advocate in Hawai'i mentioned that Corrections Corporation of America prefers Native Hawaiians for their facilities in

BLACKSTONE0000292

Arizona because they believe them to be docile.[137] By contrast, public facilities cannot choose who they imprison and are responsible for maintaining security and services regardless of the cost.

Issues related to a lack of available medical care, safety incidents in prisons, and poorly trained staff also result in lawsuits. The state or jurisdiction could be named in the suit in addition to the private prison company, but in some cases the state sues the private prison company directly. Either way, taxpayers shoulder the burden of the cost of damages and legal fees, either directly or through increased costs for future prison contracts. Examples include:

- In November 2008, the State of Texas indicted The Geo Group in the death of Gregorio de la Rosa, Jr.[138] One of the outcomes of the case was a $42.4 million dollar civil suit settlement out of court.[139]
- In 2010, the Southern Poverty Law Center and the ACLU National Prison Project filed a law suit against The GEO Group, the prison administration, and state officials for abuse, violence, sexual contact with staff, and other conditions at the Walnut Grove Youth Correctional Facility in Mississippi.[140]
- On March 11, 2011, the American Civil Liberties Union filed a class action lawsuit regarding the violent conditions inside the Idaho Corrections Center, which became known as "Gladiator School." The state corrections agency was originally implicated in the lawsuit as well as CCA and facility staff. However, the ACLU dropped the IDOC from the lawsuit to save the state taxpayers money.[141]

The community can also be hurt if they decide to pay for the construction of a private prison, in anticipation of future ongoing contract revenues. There is no guarantee that once a private prison facility is built that it will be filled and stay filled.

- In 2000, the town of Littlefield, Texas borrowed $10 million to build a prison that would be operated by The GEO Group and filled with contract beds from Idaho and Wyoming. But, given ongoing state budget crisis, Idaho removed all out of state prison contracts and the prison is now empty. GEO abandoned the prison too, which is now for sale or contract. As of early 2011, Littlefield was paying $65,000 per month against the original loan for construction.[142]
- In Hardin, Montana the city entered into a deal with a group of private investors to finance the construction of a private prison in 2006.[143] The idea behind footing the bill for the prison was that opening such a facility would bring jobs and revenue to the small town of 3,600 people. However, since construction was completed in 2007 the facility has remained vacant, leading to a technical default on $27.4 million in revenue bonds, further devastating the town's economic development prospects.[144]

## Private Prisons do not Improve Public Safety.

Non-monetary costs to taxpayers for private prisons are difficult, if not impossible, to capture. For instance, cost cutting techniques create safety concerns both for the people in the facility, as well as after a person is released.[145]

By 2008 there were only four known academic studies attempting to compare public and private prison recidivism rates.[146] At best, the most recent found no empirical evidence that private prisons reduce recidivism better than public prisons.[147] At worst, holding people in

private prisons far from home, like the in case of the 1,500 people from Hawai'i held in Arizona, does little to ensure their success upon release from prison.

While the overall lack of research[148] measuring recidivism rates for people serving time in private prisons makes it difficult to draw any substantial comparative conclusions,[149] it can be reasoned that without the same types and levels of services as public facilities that are intended to prevent returns to prison upon release,[150] recidivism may be higher for private facilities than public. Given that private prisons tend to hold people at minimum and medium-security levels, most of the people held in these facilities will be released and many will need services to succeed in the community.

# PRIVATE PRISON EMPLOYEES

People held in prison are the most vulnerable to abuse and violence, but people who work in private prisons are not immune from injury. Poor training and other cost-saving measures make the people who staff private prisons losers in the political battle for private prisons, too.

## Training and Benefits

Private run facilities often provide less training, pay substantially less, and have a higher turnover rate of staff than most state-run public facilities.[151] Private prisons often hire correctional officers who have less education and less training than those in public facilities. By using cheap and less skilled labor, private prisons are able to further reduce their spending and increase revenue. Most private prisons do not allow the formation of correctional officer unions, which helps to reduce the overall cost of running a private prison, but limits the staff's ability to negotiate pay, benefits, and proper training. Although proponents of private prisons argue that unions drive up prison costs, they appear to offer a level of stability and training that is not present in most private prisons.[152]

## Worker Safety

As a result of lower pay, less training and higher staff turnover in private facilities there is an increased likelihood of conflict between people in prison and prison staff. Working in a prison is a stressful job and training is key to preventing staff from abusing people in the prison, minimizing injuries to staff and to prevent violence between people held in prison.[153] When staff lacks adequate training covering topics such as procedures and conflict resolution it can often lead to more incidents occurring between officers and those incarcerated.[154]

Although some research shows similar rates of violent incidents between public and private facilities,[155] other studies comparing private and public prisons found that assaults on people in private facilities were nearly double that of public facilities, while assaults on correctional officers remained largely the same.[156] Since private prisons have greater control over who enters their facilities, likely if they held the same types of people as public prisons, there would be significant safety concerns due to under-qualified, poorly-trained staff. Given that private prisons are generally not subject to state or federal

> The data presented here indicate that less costly workers in private prisons have not produced an acceptable level of public safety or inmate care to date
>
> – SCOTT D. CAMP AND GERALD G. GAES, FEDERAL BUREAU OF PRISONS, GROWTH AND QUALITY OF U.S. PRISONS, 2001

BLACKSTONE0000294

"Freedom of Information" or "Sunshine" laws, it can be difficult to obtain accurate information.[157]

# PEOPLE IN THE PRISONS

The people who lose the most in the game that private prison companies play to increase incarceration are people in prison. Between the lack of services, violence, abuse, and an incentive to hold people for as long as possible, people in private prisons are the most vulnerable. And as incarceration disproportionately affects communities of color, it follows that private prisons also disproportionately affect communities of color.

While even public prisons have these problems, evidence suggests that private prisons are worse.[158] Incentives to keep costs low drive many of the problems that make private prisons more detrimental than public ones.

## Violence and Assault

Numerous reports have listed the abuses that people in private prisons have experienced. The Private Corrections Working Group keeps a list of cases involving abuses at private facilities.[159] Some of the more recent cases include:

- **Otter Creek Correctional Center, Kentucky:** Investigators from the Hawai'i Department of Public Safety found that at least five staff members at the facility, including a chaplain, had been charged with having sex with the women in the prison, including three cases of rape. As a result, all of the women returned to facilities in Hawai'i.[160] According to the *New York Times*, the rate of sexual assault at the facility was four times higher than the state-run facility for women in Kentucky. Kentucky also removed women from the facility.

- **Walnut Grove Youth Correctional Facility, Mississippi:** In a lawsuit filed by the Southern Poverty Law Center and the ACLU, boys and young men held in the facility operated by The GEO Group were subjected to physical, psychological, and sexual abuse, unlawful solitary confinement, abuse of youth with disabilities, withholding of medical treatment for youth who were injured during abuse, and withholding of educational opportunities for students with learning disabilities.[161]

## Services

Private prisons have an incentive to minimize costs by cutting services and treatment.[162] Whether a private prison provides rehabilitative services (such as job training or drug treatment) is dependent upon the private prison company's contract, which is drafted by legislators and susceptible to political influence by private prison companies.[163] Although most private prisons offer similar programming as state-run facilities as stipulated in their contracts, they are often not of the same caliber as those offered within public institutions.[164] For instance, most private prisons have control over who is placed in their care, often leaving people with the most expensive needs, like those who are the highest security risk and those with serious medical or mental health issues, in state run facilities.[165] Additionally, most private prison companies provide limited medical coverage, with advanced and additional costly care falling on the state.[166] For instance, when a person in a privately run facility requires medical treatment beyond the established contractual coverage of the private- prison, the private prison company

BLACKSTONE0000295

then bills the state for the additional medical costs.

This lack of services not only causes harm to the people in prison, but it also affects the community when people are eventually released without proper treatment or skills to effectively re-enter the community.

FIGHTING FOR PROFIT PRISONS IN TEXAS AND BEYOND: GRASSROOTS LEADERSHIP

## PART 6
# RECOMMENDATIONS

**States and the federal government should look for real solutions to the problem of growing jail and prison populations.** A number of states are already utilizing innovative strategies for reducing the number of people behind bars in their state.[ii] Reducing the number of people entering the justice system, and the amount of time that they spend there, can lower prison populations, making private, for-profit prisons unnecessary, and improving public safety and the lives of individuals.

**Invest in front-end treatment and services in the community, whether private or public.** Research shows that education, employment, drug treatment, health care, and the availability of affordable housing coincide with better outcomes for all people, whether involved in the criminal justice system or not. Jurisdictions that spend more money on these services are likely to experience lower crime rates and lower incarceration rates.[167] An increase in spending on education, employment and other services not only would improve public safety, but also would enhance and enrich communities and individual life outcomes.

**Additional research is needed to effectively evaluate the cost and recidivism reduction claims of the private prison industry.** With conflicting research on both the cost savings and recidivism reduction of private prisons, additional research is needed to determine the accuracy of such claims. Moreover, a clearer dialogue surrounding the difficulties of comparative research between private and public facilities would also be beneficial in providing a better understanding of the implications of prison privatization.

---

[ii] For examples of innovative strategies see: Amanda Petteruti and Jason Fenster, *Finding Direction: Expanding Criminal Justice Options by Considering Policies of Other Nations* (Washington, D.C.: Justice Policy Institute, 2011). www.justicepolicy.org/research/2322; Justice Policy Institute, *Due South: Looking to the South for Criminal Justice Innovations* (Washington, D.C. 2011). www.justicepolicy.org/research/2472

BLACKSTONE0000297

[1] Corrections Corporation of America, *2010 Annual Report* (Nashville, TN: Corrections Corporation of America, 2011). http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NDE5MTEwfENoaWxkSUQ9NDMyMjg1fFR5cGU9MQ==&t=1

[2] Heather C. West, William J. Sabol, and Sarah J. Greenman, *Prisoners in 2009* (Bureau of Justice Statistics, Washington, DC: 2010). http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf

[3] Camille Graham Camp and George M. Camp, *The Corrections Yearbook, 1997* (South Salem, NY: The Criminal Justice Institute, 1997); Tracey Kyckelhahn, *Justice Expenditure and Employment Extracts 2007*, Table 1(Washington, DC: Bureau of Justice Statistics, 2010).

[4] Corrections Corporation of America, *2010 Annual Report*, 2011; The GEO Group, *2010 Annual Report* (Boca Raton, FL: The GEO Group, 2011). http://www.geogroup.com/AR_2010/images/Geo_Group-AR2010.pdf

[5] Brigette Sarabi and Edwin Bender, *The Prison Payoff: The Role of Politics and Private Prisons in the Incarceration Boom* (Portland, OR: Western States Center and the Western Prison Project, 2000).

[6] See Justice Policy Institute, *Pruning Prisons: How Cutting Corrections Can Save Money and Protect Public Safety* (Washington, D.C.: 2010) www.justicepolicy.org/research/1928

[7] Brad W. Lundahl et al., "Prison Privatization: A Meta-analysis of Cost and Quality of Confinement Indicators," *Research on Social Work Practice* 39, no. 4 (2009): 383-394.

[8] Brad W. Lundahl et al., "Prison Privatization," 2009.

[9] Mary Sigler, "Private Prisons, Public Functions, and the Meaning of Punishment," *Florida University Law Review* 38, no. 1 (2010): 1-29.

[10] Suzanne M. Kirchhoff, *Economic Impacts of Prison Growth* (Washington, D.C.: Congressional Research Service, 2010). www.fas.org/sgp/crs/misc/R41177.pdf

[11] Mary Sigler, "Private Prisons, Public Functions, and the Meaning of Punishment," 2010.

[12] Douglas McDonald and others, *Private Prisons in the United States: An Assessment of Current Practice* (Cambridge, MA: Abt Associates Inc., 1998).

[13] Amy Cheung, *Prison Privatization and the Use of Incarceration* (Washington, D.C.: The Sentencing Project, 2004). www.sentencingproject.org/doc/publications/inc_prisonprivatization.pdf

[14] U.S. Department of Justice, *Correctional Populations in the United States, 1997* (Washington, D.C.; Bureau of Justice Statistics, 2000). http://bjs.ojp.usdoj.gov/content/pub/pdf/cpus97.pdf; Paige M. Harrison and Allen J. Beck, *Prisoners in 2005* (Washington, D.C.: Bureau of Justice Statistics, 2006); William J. Sabol, Heather Couture and Paige M. Harrison, *Prisoners in 2006* – Appendix table 6 (Washington, D.C.: Bureau of Justice Statistics, 2007); William J. Sabol, Heather C. West and Matthew Cooper, *Prisoners in 2008* – Appendix table 10 (Washington, D.C.: Bureau of Justice Statistics, 2009); Heather C. West and others, *Prisoners in 2009*, 2010.

[15] Heather C. West, William J. Sabol and Sarah J. Greenman. *Prison in 2009 - Statistical Tables*. Table 1 (Washington, D.C.: Bureau of Justice Statistics, 2010); Allen J. Beck and Paige M. Harrison, *Prisoners 2000* (Washington, D.C.: Bureau of Justice Statistics, 2001); Allen J. Beck and Darrell K. Gilliard, *Prisoners 1994* (Washington, D.C.: Bureau of Justice Statistics, 1995); Paige M. Harrison, *Prisoners in Custody of State and Federal Correctional Authorities, 1977-98* (Washington, DC: Bureau of Justice Statistics, 2000); Sourcebook of Criminal Justice Statistics Online, *Table 6.28.2006: Number and rate (per 100,000 resident population in each group) of sentenced prisoners under jurisdiction of State and Federal correctional authorities on December 31.* www.albany.edu/sourcebook/pdf/t6282006.pdf

[16] Brad W. Lundahl et al., "Prison Privatization," 2009.

[17] Mary Sigler, "Private Prisons, Public Functions, and the Meaning of Punishment," 2010.

[18] Suzanne M. Kirchhoff, *Economic Impacts of Prison Growth*, 2010.

[19] Mary Sigler, "Private Prisons, Public Functions, and the Meaning of Punishment," 2010.

[20] Mary Sigler, "Private Prisons, Public Functions, and the Meaning of Punishment," 2010.

[21] Brad W. Lundahl et al., "Prison Privatization," 2009.

[22] Suzanne M. Kirchhoff, *Economic Impacts of Prison Growth*, 2010.

[23] Corrections Corporation of America, "About CCA," November 2010. www.cca.com/about/

[24] Corrections Corporation of America, *2010 Annual Report*, 2011.

[25] Corrections Corporation of America, *2010 Annual Report*, 2011.

[26] Corrections Corporation of America, *2010 Annual Report*, 2011.

[27] Corrections Corporation of America, *2010 Annual Report*, 2011.

BLACKSTONE0000298

[28] Funding Universe, "Corrections Corporation of America," January 2011. www.fundinguniverse.com/company-histories/Corrections-Corporation-of-America-Company-History.html

[29] Funding Universe, "Corrections Corporation of America," January 2011.

[30] Randall G. Shelden, *The Prison Industry* (San Francisco, CA: Center on Juvenile and Criminal Justice, 2010).

[31] The GEO Group, Inc., "Who We Are," December 2010. www.geogroup.com/about.asp

[32] The GEO Group, Inc., "Who We Are," December 2010.

[33] The GEO Group, Inc., "Who We Are," December 2010; The GEO Group Inc., *2009 Annual Report* (Boca Raton, FL: The GEO Group, 2010). www.geogroup.com/AR_2009_ClientDL/images/GEO_Group-AR2009.pdf

[34] The GEO Group, Inc., "Historic Milestones," December 2010. www.geogroup.com/history.asp

[35] The GEO Group, Inc., "Historic Milestones," December 2010.

[36] The GEO Group, Inc., "Federal, State, and Local Partnerships," December 2010. www.geogroup.com/federal-state-local.asp

[37] The GEO Group, *2010 Annual Report*, 2011.

[38] Alaska, Louisiana, Virginia, Indiana, Texas, Oklahoma, Mississippi, California, Arizona, New Mexico and Florida; The GEO Group, *2010 Annual Report*, 2011.

[39] Cornell Companies, Inc., *2009 Annual Report – Form 10-K* (Washington, D.C.: U.S. Securities and Exchange Commission, 2010). www.sec.gov/Archives/edgar/data/1016152/000110465910010293/a09-36304_110k.htm#Item15_ExhibitsAndFinancialStatem_125526

[40] The GEO Group, Inc, *The GEO Group Completes Transformational Merger with Cornell Companies* (Boca Raton, FL: 2010). www.thegeogroupinc.com/documents/Merger.pdf

[41] Heather C. West and others, *Prisoners in 2009*, 2010.

[42] Alfred Blumstein and Allen J. Beck, "Population Growth in U.S. Prisons, 1980-1996," Crime and Justice 26 (1999): 17-61.

[43] Alfred Blumstein and Allen J. Beck, "Population Growth in U.S. Prisons, 1980-1996," 1999.

[44] Kathleen Maguire and Ann L. Pastore, eds. *Sourcebook of Criminal Justice Statistics 1995*. Table 1.96: Private Correctional Facility Management Firms (Washington, D.C.: Bureau of Justice Statistics, 1996).

[45] Heather C. West and others, *Prisoners in 2009*, 2010.

[46] Heather C. West and others, *Prisoners in 2009*, 2010.

[47] Heather C. West and others, *Prisoners in 2009*, 2010.

[48] Corrections Corporation of America, *2010 Annual Report*, 2011; The GEO Group, *2010 Annual Report*, 2011.

[49] Corrections Corporation of America, *2009 Annual Report* (Nashville, TN: Corrections Corporation of America, 2010). http://ir.correctionscorp.com/phoenix.zhtml?c=117983&p=irol-SECText&TEXT=aHR0cDovL2lyLmluddC53ZXN0bGF3YnVzaW5lc3MuY29tL2RvY3VtZW50L3xLzAwMDA5NTAxMjMtMTAtMDE2MzA5L3htbA%3d%3d; The GEO Group Inc., *2009 Annual Report*, 2010; Cornell Companies, Inc., *2009 Annual Report – Form 10-K*, 2010.

[50] Heather C. West and others, *Prisoners in 2009*, 2010.

[51] See for example, Justice Policy Institute, *Due South: Looking to the South for Criminal Justice Innovations* (Washington, D.C. 2011) www.justicepolicy.org/research/2472

[52] Heather C. West and others, *Prisoners in 2009*, 2010.

[53] Heather C. West and others, *Prisoners in 2009*, 2010.

[54] American Correctional Association, *Correctional Yearbook, 2008* (Alexandria, VA: American Correctional Association, 2009).

[55] Associated Press, "Alleged youth prison abuse detailed during hearing," *State News*, January 12, 2011; Rebecca Boone, "Idaho Man Sues Prison Company Over Severe Beating," *The Associated Press*, April 27, 2010; Craig Malisow, "Prison Pays: Despite a history of abuse and bad conditions, private prison corporation GEO keeps getting contracts from the state," *Houston Press*, December 30, 2010; Ian Urbina, "Hawaii to Remove Inmates Over Sex Abuse Charges," *The New York Times*, August 26, 2009; Brett Barrouquere, "Ky. inmate sues CCA, claims sexual assault," *Associated Press*, January 7, 2011; Gary Grado, "Series of prison security failures in Kingman allowed inmates' escape," *Arizona Capital Times*, September 20, 2010.

[56] Erik Luna, "Overextending the Criminal Law," in *Go Directly to Jail: The Criminalization of Almost Everything* (Washington, D.C.: CATO Institute, 2004), 1-7.

BLACKSTONE0000299

[57] Corrections Corporation of America, *2010 Annual Report*, 2011, p. 22-23.

[58] Edwin Bender, *Private Prisons, Politics & Profits* (Helena, Montana: National Institute on Money in State Politics, 2000). www.followthemoney.org/press/ZZ/20000701.phtml; Edwin Bender, *A Contributing Influence: The Private-Prison Industry and Political Giving in the South* (Helena, Montana: National Institute on Money in State Politics, 2002). www.followthemoney.org/press/ZZ/20020430.pdf; Center for Responsive Politics, "Miscellaneous Business: PAC Contributions to Federal Candidates," February 2011. www.opensecrets.org/pacs/industry.php?txt=N12&cycle=2010

[59] Includes 2000, 2002, 2004, 2006, 2008 and 2010. Center for Responsive Politics, "Miscellaneous Business: PAC Contributions to Federal Candidates," February 2011. www.opensecrets.org/pacs/industry.php?txt=N12&cycle=2010

[60] National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to All Candidates and Committees," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=0&s=0&b[]=G7000

[61] National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to All Candidates and Committees," February 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=0&s=0&b[]=G7000

[62] Heather C. West, William J. Sabol and Sarah J. Greenman, *Prisoners in 2009* - Appendix table 20 (Washington, D.C.: Bureau of Justice Statistics, 2010). http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf

[63] Joni James, "Private prison contracts may get a pass," *St. Petersburg Times*, May 5, 2005.

[64] David G. Savage, "Supreme Court orders California to release tens of thousands of prison inmates," Los Angeles Times, May 23, 2011. www.latimes.com/news/local/sc-dc-0524-court-prisons-web-20110523,0,2337401.story

[65] Solomon Moore, "Court Orders California to Cut Prison Population," *New York Times*, February 9, 2009.
www.nytimes.com/2009/02/10/us/10prison.html

[66] National Institute on Money in State Politics, "Lobbyist Link – Corrections Corp of America," accessed May 3, 2011.
www.followthemoney.org/database/lobbyistclient.phtml?lc=100552

[67] National Institute on Money in State Politics, "Lobbyist Link – GEO Group," accessed May 3, 2011.
www.followthemoney.org/database/lobbyistclient.phtml?lc=100516&y=0

[68] Edwin Bender, *Private Prisons, Politics & Profits*, 2000; Edwin Bender, *A Contributing Influence: The Private-Prison Industry and Political Giving in the South*, 2002; Brigette Sarabi and Edwin Bender, *The Prison Payoff*, 2000.

[69] Edwin Bender, *Private Prisons, Politics & Profits*, 2000; Edwin Bender, *A Contributing Influence: The Private-Prison Industry and Political Giving in the South*, 2002.

[70] Center for Responsive Politics, "Miscellaneous Business: PAC Contributions to Federal Candidates – 2000, 2002, 2004, 2006, 2008, 2010," February 2011. www.opensecrets.org/pacs/industry.php?txt=N12&cycle=2010

[71] Edwin Bender, *Private Prisons, Politics & Profits*, 2000; Edwin Bender, *A Contributing Influence: The Private-Prison Industry and Political Giving in the South*, 2002.

[72] Paige M. Harrison and Allen J. Beck, *Prisoners in 2002* (Washington, D.C.: Bureau of Justice Statistics, 2003); Heather C. West and William J. Sabol, *Prisoners in 2007* (Washington, D.C.: Bureau of Justice Statistics, 2008).

[73] National Institute on Money in State Politics, "Candidate Summary: Linda Lingle," April 21, 2011.
www.followthemoney.org/database/uniquecandidate.phtml?uc=3360

[74] State of Hawai'i Campaign Spending Commission, "Candidates and Candidate Committees," April 21, 2011.
http://hawaii.gov/campaign/contribution-limits/candidate-committees1

[75] Nelson Daranciang, "Isle Inmates Brought Home," *Honolulu Star Advertiser*, January 28, 2011.
www.staradvertiser.com/news/hawaiinews/20110128_Isle_inmates_brought_home.html; Kevin Dayton, "Female Inmates Claim Prison Staff Sex Abuse," *Honolulu Star Advertiser*, February 26, 2005.
http://the.honoluluadvertiser.com/article/2005/Feb/26/ln/ln03p.html; Ian Urbina, "Hawaii to Remove Inmates Over Abuse Charges," *New York Times*, August 25, 2009. www.nytimes.com/2009/08/26/us/26kentucky.html

[76] National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Ballot Measure Committees," accessed May 3, 2011.

[77] National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to All Candidates and Committees," accessed May 3, 2011.

[78] National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to All Candidates and Committees," accessed May 3, 2011.
www.followthemoney.org/database/IndustryTotals.phtml?f=0&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Gubernatorial Candidates,"

BLACKSTONE0000300

accessed May 3, 2011. www.followthemoney.org/database/IndustryTotals.phtml?f=G&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Senate Candidates," accessed May 3, 2011.

www.followthemoney.org/database/IndustryTotals.phtml?f=S&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to House/Assembly Candidates," accessed May 3, 2011. www.followthemoney.org/database/IndustryTotals.phtml?f=H&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Other Statewide Candidates," accessed May 3, 2011.

www.followthemoney.org/database/IndustryTotals.phtml?f=O&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to High Court Candidates," accessed May 3, 2011. www.followthemoney.org/database/IndustryTotals.phtml?f=J&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Appellate Court Candidates," accessed May 3, 2011.

www.followthemoney.org/database/IndustryTotals.phtml?f=K&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Ballot Measure Committees," accessed May 3, 2011. www.followthemoney.org/database/IndustryTotals.phtml?f=B&s=0&b[]=G7000; National Institute on Money in State Politics, "Correctional facilities construction & management/for-profit Contributions to Party Committees," accessed May 3, 2011.

www.followthemoney.org/database/IndustryTotals.phtml?f=P&s=0&b[]=G7000

[79] Center for Responsive Politics, "Lobbying Corrections Corp of America – Summary 2010," June 2011. www.opensecrets.org/lobby/clientsum.php?lname=Corrections+Corp+of+America&year=2010

[80] National Institute on Money in State Politics, "Lobbyist Link – GEO Group," accessed May 3, 2011. www.followthemoney.org/database/lobbyistclient.phtml?lc=100516&y=0

[81] For lobbying disclosure laws for states, see the National Conference of State Legislatures, http://www.ncsl.org/default.aspx?TabID=746&tabs=1116,84,211#211

[82] Florida State Legislature, "Lobbying Firm Compensation Reports by Principal," accessed May 19, 2011. http://olcrpublic.leg.state.fl.us/#C

[83] State of Montana, Office of Political Practices Website, https://app.mt.gov/cgi-bin/camptrack/lobbysearch/lobbySearch.cgi?ACTION=PRINCIPALDETAIL_ALL&PRINCIPALID=3974&SESSION=2012. Accessed May 12, 2011.

[84] Mike Ward, "Ex-lobbyists file lawsuits against state prisons office; Three former employees of private-prison company Wackenhut say corrections officials turned on pressure to have them fired," *Austin America-Statesman*, January 17, 1996.

[85] Tom Brown, "Private prison business eyes big Florida prize," *Reuters*, May 12, 2011. http://www.reuters.com/article/2011/05/12/us-usa-prisons-florida-idUSTRE74B49B20110512

[86] Marian McCue, "Bill would ease path for private prison in Milo," *The New Maine Times*, May 4, 2011. http://www.newmainetimes.org/articles/2011/05/04/bill-would-ease-path-private-prison-milo/

[87] Christine Oliver, "Determinants of Interorganizational Relationships: Integration and Future Directions," *The Academy of Management Review* 15, no. 2 (1990): 241-265.

[88] "President Obama Announces More Key Administration Posts," *The White House, Office of the Press Secretary*, September 17, 2010. http://m.whitehouse.gov/the-press-office/2010/09/17/president-obama-announces-more-key-administration-posts; Jim McElhattan, "Senate approves Hylton as marshal: Critics note ties to private prisons," *The Washington Times*, December 23, 2010. www.washingtontimes.com/news/2010/dec/23/senate-approves-hylton-as-marshal/

[89] Jim McElhatton, "Marshalls Service Nominee Answers Critics' Conflict-of-Interest Charge," *The Washington Times*, November 17, 2010. www.washingtontimes.com/news/2010/nov/17/marshals-service-nominee-answers-critics-conflict-/; United States Senate Committee on the Judiciary, *Questionnaire for Non-Judicial Nominees, Stacia Hylton*, October 6, 2010. http://judiciary.senate.gov/nominations/111thCongressExecutiveNominations/upload/StaciaHylton-PublicQuestionnaire.pdf

[90] Jim McElhatton, "Marshalls Service Nominee Answers Critics' Conflict-of-Interest Charge," November 17, 2010.

[91] The GEO Group, *2010 Annual Report*, 2011.

BLACKSTONE0000301

[92] *New York Times,* "Lehman Hires Kasich," January 11, 2001. www.nytimes.com/2001/01/11/business/lehman-hires-kasich.html

[93] Public Services International Research Unit, *Prison Privatization Report International* (London, England: University of Greenwich, 2001). www.psiru.org/justice/ppri44.asp

[94] Mark Niquette, "Private-prison Consultant Chosen to Run ODRC," *Columbus Dispatch,* January 4, 2011. www.dispatch.com/live/content/local_news/stories/2011/01/04/private-prison-consultant-chosen-to-run-ODRC.html

[95] Joe Hallett, "Kasich: Ex-advisers Won't Get Lobbying Favors," *Columbus Dispatch,* February 2, 2011. www.dispatchpolitics.com/live/content/local_news/stories/2011/02/02/copy/kasich-ex-advisers-wont-get-lobbying-favors.html?adsec=politics&sid=101

[96] Corrections Corporation of America, "CCA Nevada Southern Warden named Commissioner of Depart of Corrections in Maine," accessed May 5, 2011. www.cca.com/newsroom/news-releases/240/

[97] A.J. Higgins, "Maine Lawmakers Debate Bill to Allow Private Prisons," *Maine Public Broadcasting Network,* April 29, 2011. www.mpbn.net/Home/tabid/36/ctl/ViewItem/mid/3478/ItemId/16203/Default.aspx

[98] Lance Tapley, "At a turning point: LePage's nominee to head Corrections has the skills to fix Maine's broken prison system. Will the governor and lawmakers give Joe Ponte the tools?" *The Portland Phoenix,* February 9, 2011. http://portland.thephoenix.com/news/115404-at-a-turning-point/?page=1#TOPCONTENT

[99] Trip Jennings, "Sen. Smith: Williams' work for GEO casts 'cloud' over decision not to fin firms," *The New Mexico Independent,* September 21, 2010. http://newmexicoindependent.com/63562/sen-smith-williams-work-for-geo-casts-cloud-over-decision-not-to-fine-firms

[100] Alexander Volokh, "Privatization and the Law and Economics of Political Advocacy," *Stanford Law Review* 60, no. 4 (2008). www.stanfordlawreview.org/content/article/privatization-and-law-and-economics-political-advocacy

[101] ALEC, "Our Mission," November 2010. www.alec.org/AM/Template.cfm?Section=About&Template=/CM/HTMLDisplay.cfm&ContentID=11127

[102] Laura Sullivan, "Shaping State Laws with Little Scrutiny," *National Public Radio,* October 29, 2010. www.npr.org/templates/story/story.php?storyId=130891396&ps=cprs

[103] Laura Sullivan, "Shaping State Laws with Little Scrutiny," October 29, 2010.

[104] ALEC, "History," November 2010.

[105] ALEC, "History," November 2010.

[106] Brigette Sarabi and Edwin Bender, *The Prison Payoff,* 2000.

[107] ALEC, "History," November 2010.

[108] ALEC, "History," November 2010.

[125] ALEC, "Public Safety and Elections," December 2010. www.alec.org/AM/Template.cfm?Section=Public_Safety_and_Elections&Template=/CM/HTMLDisplay.cfm&ContentID=13312

[110] John Biewen, *Corrections Inc* (American RadioWorks: April 2002). http://americanradioworks.publicradio.org/features/corrections/laws4.html

[111] John Biewen, *Corrections Inc.,* April 2002.

[112] John Biewen, *Corrections Inc.,* April 2002.

[113] Alfred Blumstein and Allen J. Beck, "Population Growth in U.S. Prisons, 1980-1996," 1999.

[114] John Biewen, *Corrections Inc.,* April 2002.

[115] John Biewen, *Corrections Inc.,* April 2002.

[116] ALEC, *The State Factor: A Plan to Reduce Prison Overcrowding and Violent Crime* (Washington, D.C.: 2007). http://www.alec.org/am/pdf/Criminal_Justice_2007_State_Factor.pdf

[117] ALEC, "ALEC Corrections and Reentry Working Group," accessed June 13, 2011. http://www.alec.org/AM/Template.cfm?Section=Corrections_and_Reentry_Working_Group

[118] Montana Office of Political Practices, https://app.mt.gov/cgi-bin/camptrack/lobbysearch/lobbySearch.cgi?ACTION=PRINCIPALDETAIL&BACKACTION=PRINCIPALSEARCH&SEARCH_TYPE=PRINCIPAL&PRINCIPALID=3974&SESSION=2012&ENTITYNAME_SEARCH=Corrections and "LAWS" state legislative database, http://data.opi.mt.gov/bills/2011/billhtml/HB0344.htm

[119] American Correctional Association, *Correctional Yearbook, 2008* (Alexandria, VA: American Correctional Association, 2009).

BLACKSTONE0000302

[120] Scott Ehlers, Vincent Schiraldi and Jason Ziedenberg, *Still Striking Out: Ten Years of California's Three Strikes* (Washington, D.C.: Justice Policy Institute, 2004) www.justicepolicy.org/research/2028

[121] See Ryan S. King, *Incarceration and Crime: A Complex Relationship* (Washington, D.C.: The Sentencing Project, 2005) www.sentencingproject.org/doc/publications/inc_iandc_complex.pdf

[122] Lynne Vieraitis and others, "The Criminogenic Effects of Imprisonment: Evidence from State Panel Data, 1974 – 2002," *Criminology & Public Policy* 6, no. 3 (2007): 589-622. A number of other studies also found serving time in prison increases the risk of future offending.

[123] Patrick A. Langan and David J. Levin, *Recidivism of Prisoners Released in 1994* (Washington, D.C.: Bureau of Justice Statistics, 2002) http://bjs.ojp.usdoj.gov/content/pub/pdf/rpr94.pdf

[124] See Justice Policy Institute, *Pruning Prisons* and *Costs of Confinement*, www.justicepolicy.org

[125] Nastassia Walsh, Amanda Petteruti, and Ava Page, *Education and Public Safety* (Washington, DC: Justice Policy Institute, 2007).

[126] National Center for Education Statistics, Digest of Education Statistics, *Table 30: Amount and percentage distribution of direct general expenditures of state and local governments, by function: Selected years, 1970-71 through 2007-08*, August 2010. http://nces.ed.gov/programs/digest/d10/tables/dt10_030.asp

[127] Corrections Corporation of America, "Independent Studies on Prison Privatization," April 19, 2011. www.cca.com/cca-research-institute/research-findings/independent-studies-prison-privatization/

[128] For a compilation of studies, see: American Civil Liberties Union of Ohio, *Prisons For Profit: A Look at Prison Privatization* (Cleveland, OH, 2010). www.acluohio.org/issues/CriminalJustice/PrisonsForProfit2011_04.pdf

[129] Julianne Nelson, Competition in Corrections: Comparing Public and Private Sector Operations (Alexandria, VA: CNA Corporation, 2005). www.bop.gov/news/research_projects/published_reports/pub_vs_priv/cnanelson.pdf

[130] Gerry Gaes, "Cost, Performance Studies Look at Prison Privatization," NIJ Journal/Issue No. 259. www.ncjrs.gov/pdffiles1/nij/221507.pdf.

[131] General Accounting Office, *Private and Public Prisons: Studies Comparing Operational Costs and/or Quality of Service* (Washington, DC: General Accounting Office, 1996). www.gao.gov/archive/1996/gg96158.pdf.

[132] Brad W. Lundahl et al., "Prison Privatization," 2009.

[133] *Arizona Department of Corrections: State versus Private Prison FY 2007 Cost Comparison* (Scottsdale, AZ: Maximus, 2009). www.azcorrections.gov/adc/reports/ADC_FY2007_cost_comparison.pdf

[134] David W. Miller, "The Drain of Public Prison Systems and the Role of Privatization: An Analysis of State Correctional Systems," *ProQuest Discovery Guides*, February 2010. www.csa.com/discoveryguides/prisons/review.pdf

[135] Private prisons are not subject to Freedom of Information Act requests; a bill to address this at the federal level has been re-introduced in the 112th Congress: http://thomas.loc.gov/cgi-bin/query/z?c112:H.R.74:

[136] Kevin Pranis, *Cost-Saving or Cost Shifting: The Fiscal Impact of Prison Privatization in Arizona* (Tallahassee, FL: American Friends Service Committee, 2005). www.afscme.org/docs/AZ.pdf

[137] Anonymous Interview, April 18, 2011.

[138] *The State of Texas v. GEO Group Incorporated Formerly Wackenhut Corrections and David Forrest*, 2008-CR-0127-A, November 17, 2008. Found on Private Prison Working Group: www.privateci.org/private_pics/WillacyGEO2.pdf

[139] "Texas court upholds $42.4M verdict in prison death," *Seattle Times*, April 8, 2009, http://seattletimes.nwsource.com/html/nationworld/2009009800_apprisoncompanymurder.html.

[140] John Burnett, "Town Relies On Troubled Youth Prison For Profits," NPR, March 2011. www.npr.org/2011/03/25/134850972/town-relies-on-troubled-youth-prison-for-profits

[141] American Civil Liberties Union, "Riggs, et al. v. Valdez, et al. - Second Amended Complaint", March 11, 2010, www.aclu.org/files/assets/2010-3-11-Riggs-SecondAmendedComplaint.pdf.; Brad Iverson-Long, "ACLU drops IDOC from prisoner abuse lawsuit", Idaho Reporter, June 3, 2010, www.idahoreporter.com/2010/aclu-drops-idoc-from-prisoner-abuse-lawsuit/.

[142] John Burnett, "Private Prison Promises Leave Texas Towns In Trouble," *NPR*, March 28, 2011. www.npr.org/2011/03/28/134855801/private-prison-promises-leave-texas-towns-in-trouble

[143] Suzanne Smalley, "Development Scheme: How a small Montana town nearly handed over control of its prison to a mysterious security company headed by a former convict known as 'Captain Michael'," *Newsweek*, October 14, 2009. www.newsweek.com/2009/10/13/development-scheme.html

[144] Suzanne M. Kirchhoff, *Economic Impacts of Prison Growth*, 2010.

BLACKSTONE0000303

[145] Cost cutting techniques include: lower paid/less trained staff, higher ratio of correctional officers to people in prison, limited contractual coverage of health services/costs, control over facility population (i.e. limited people with mental health and serious medical conditions) and running only medium and minimum security facilities. David W. Miller, "The Drain of Public Prison Systems and the Role of Privatization," February 2010.

[146] William D. Bales et al., "Recidivism of Public and Private State Prison Inmates in Florida," *Criminology & Public Policy* 4, no. 1 (2005): 57-82; David W. Miller, "The Drain of Public Prison Systems and the Role of Privatization," February 2010. www.csa.com/discoveryguides/prisons/review.pdf

[147] William D. Bales et al., "Recidivism of Public and Private State Prison Inmates in Florida," 2005.

[148] To date all academic research conducted to compare private versus public prison recidivism has been conducted in Florida.

[149] David W. Miller, "The Drain of Public Prison Systems and the Role of Privatization," February 2010.

[150] John Hall and Kelly Walsh, *Are Florida's Private Prisons Keeping Their Promise? Lack of Evidence to Show They Cost Less and Have Better Outcomes than Public Prisons* (Tallahassee, Fl.: Florida Center for Fiscal and Economic Policy, 2010); Dina Perrone and Travis C. Pratt, "Comparing the Quality of Confinement and Cost-effectiveness of Publics Versus Private Prisons: What we know, why we do not know more, and where to go from here," *The Prison Journal* 83, no. 3 (2003): 301-322.

[151] Suzanne M. Kirchhoff, *Economic Impacts of Prison Growth*, 2010; Scott D. Camp and Gerald G. Gaes, *Growth and Quality of U.S. Private Prisons: Evidence from a National Survey* (Washington, DC: Bureau of Prisons, 2001). www.bop.gov/news/research_projects/published_reports/pub_vs_priv/oreprres_note.pdf

[152] David W. Miller, "The Drain of Public Prison Systems and the Role of Privatization," February 2010.

[153] James Austin & Gary Coventry, Emerging Issues on Privatized Prisons, (Washington DC: Bureau of Justice Assistance, 2001).

[154] David W. Miller, "The Drain of Public Prison Systems and the Role of Privatization," February 2010.

[155] James Austin & Gary Coventry, Emerging Issues on Privatized Prisons, 2001.

[156] Curtis R. Blakely and Vic W. Bumphus, "Private and Public Sector Prisons—A Comparison of Selected Characteristics," *Federal Probation* 68, no. 1 (June 2004): 27-33. www.uscourts.gov/uscourts/FederalCourts/PPS/Fedprob/2004-06/prisons.html

[157] Govtrack, "H.R. 74: Private Information Act of 2011," accessed May 5, 2011. www.govtrack.us/congress/bill.xpd?bill=h112-74

[158] Scott D. Camp and Gerald G. Gaes, *Growth and Quality of U.S. Private Prisons*, 2001. www.bop.gov/news/research_projects/published_reports/pub_vs_priv/oreprres_note.pdf

[159] Private Corrections Working Group, "Lawsuits," April 19, 2011. www.privateci.org/lawsuits.html

[160] Ian Urbina, "Hawaii to Remove Inmates Over Abuse Charges," *New York Times*, August 25, 2009. www.nytimes.com/2009/08/26/us/26kentucky.html

[161] American Civil Liberties Union, "C.B., et al. v. Walnut Grove Correctional Authority, et al. – Complaint", November 16, 2010, www.aclu.org/prisoners-rights-racial-justice/cb-et-al-v-walnut-grove-correctional-authority-et-al-complaint.; Clarionledger.com, "Mississippi lawmakers probe conditions at Walnut Grove youth prison", January 11, 2011, www.clarionledger.com/article/20110111/NEWS010504/110111015/Miss.+lawmakers+probe+youth+prison.

[162] Suzanne M. Kirchhoff, *Economic Impacts of Prison Growth*, 2010.

[163] D.M. Levine. "What's costlier than a government run prison? A private one." *CNNMoney.com*, August 18, 2010. http://money.cnn.com/2010/08/17/news/economy/private_prisons_economic_impact.fortune/index.htm

[164] Suzanne M. Kirchhoff, *Economic Impacts of Prison Growth*, 2010; Dina Perrone and Travis C. Pratt, "Comparing the Quality of Confinement and Cost-effectiveness of Publics Versus Private Prisons," 2003.

[165] John Hall and Kelly Walsh, *Are Florida's Private Prisons Keeping Their Promise?* 2010.

[166] Craig Malisow, "Prison Pays: Despite a history of abuse and bad conditions, private prison corporation GEO keeps getting contracts from the state." *Houston Press*, December 30, 2010.

[167] Justice Policy Institute, *Public Safety Series* (Washington, D.C.: 2007) www.justicepolicy.org

# ACKNOWLEDGEMENTS
## GAMING THE SYSTEM

This report would not have been possible without the generous support of the Open Society Foundations and the Public Welfare Foundation.

The Justice Policy Institute (JPI) would like to express gratitude to Mike Tartaglia, Bob Libal, Kat Brady, Mike Brickner, Shakyra Diaz, Ari Wohlfeiler, Paul Wright, Alex Friedmann, and Gail Tyree for their valuable insight on this report.

JPI would also like to thank Ashley King, Jessie Oxley, Matt Scalf, Keith Towery, Elisabeth Mulholland, Brad Merrin, Andrew Price, and Adrea Hernandez for their assistance gathering data and research and Nastassia Walsh for her significant contributions to the report.

JPI staff includes Paul Ashton, Jason Fenster, Zerline Hughes, Amanda Petteruti, Kellie Shaw, Tracy Velázquez, Keith Wallington and Nastassia Walsh.

# ABOUT THE AUTHORS

## PAUL ASHTON, RESEARCH ASSISTANT

Prior to joining JPI, Paul spent time as a sexual assault victim advocate and conducting research examining intimate partner violence in the LGBT community. Paul's experience with victim issues led him to author JPI's white paper: Moving Toward a Public Safety Paradigm: A Roundtable Discussion on Victims and Criminal Justice Reform. He has also served on the policy committee of the Delaware HIV Consortium, working to educate the Delaware State Legislature on the need for increased funding to address homelessness and HIV. Paul received his Bachelor's Degree in Criminology from The Ohio State University and a Master's Degree in Criminology from the University of Delaware.

## AMANDA PETTERUTI, ASSOCIATE DIRECTOR

Amanda Petteruti is a researcher and policy analyst with approximately seven years of combined experience in education and criminal justice policy. Early in her career, she organized a writing program for youth at the National Campaign to Stop Violence and provided general support to the National Juvenile Defender Center. Prior to joining the staff of the Justice Policy Institute, she conducted research on issues pertaining to education and at the Council of the Great City Schools. Petteruti has earned a Master of Arts in education policy and leadership from the University of Maryland College Park and a Bachelor of Arts in sociology from Bates College. Petteruti has contributed to several JPI reports related to education policy and co-authored The Vortex, The Concentrated Racial Impact of Drug Imprisonment and the Characteristics of Punitive Counties and JPI's Public Safety Policy Brief series.

BLACKSTONE0000306



**JUSTICE POLICY INSTITUTE**

Reducing the use of incarceration and the justice system and promoting policies
that improve the well-being of all people and communities.

1012 14th Street, NW
Suite 400
Washington, DC 20005
Telephone: 202-558-7974
Fax: 202-558-7978
www.justicepolicy.org

BLACKSTONE0000307

```
<<
  /ASCII85EncodePages false
  /AllowTransparency false
  /AutoPositionEPSFiles true
  /AutoRotatePages /None
  /Binding /Left
  /CalGrayProfile (Dot Gain 20%)
  /CalRGBProfile (sRGB IEC61966-2.1)
  /CalCMYKProfile (U.S. Web Coated \050SWOP\051 v2)
  /sRGBProfile (sRGB IEC61966-2.1)
  /CannotEmbedFontPolicy /Error
  /CompatibilityLevel 1.4
  /CompressObjects /Tags
  /CompressPages true
  /ConvertImagesToIndexed true
  /PassThroughJPEGImages true
  /CreateJobTicket false
  /DefaultRenderingIntent /Default
  /DetectBlends true
  /DetectCurves 0.0000
  /ColorConversionStrategy /CMYK
  /DoThumbnails false
  /EmbedAllFonts true
  /EmbedOpenType false
  /ParseICCProfilesInComments true
  /EmbedJobOptions true
  /DSCReportingLevel 0
  /EmitDSCWarnings false
  /EndPage -1
  /ImageMemory 1048576
  /LockDistillerParams false
  /MaxSubsetPct 100
  /Optimize true
  /OPM 1
  /ParseDSCComments true
  /ParseDSCCommentsForDocInfo true
  /PreserveCopyPage true
  /PreserveDICMYKValues true
  /PreserveEPSInfo true
  /PreserveFlatness true
  /PreserveHalftoneInfo false
  /PreserveOPIComments true
  /PreserveOverprintSettings true
  /StartPage 1
  /SubsetFonts true
  /TransferFunctionInfo /Apply
  /UCRandBGInfo /Preserve
  /UsePrologue false
```

BLACKSTONE0000308

```
/ColorSettingsFile ()
/AlwaysEmbed [ true
]
/NeverEmbed [ true
]
/AntiAliasColorImages false
/CropColorImages true
/ColorImageMinResolution 300
/ColorImageMinResolutionPolicy /OK
/DownsampleColorImages true
/ColorImageDownsampleType /Bicubic
/ColorImageResolution 300
/ColorImageDepth -1
/ColorImageMinDownsampleDepth 1
/ColorImageDownsampleThreshold 1.50000
/EncodeColorImages true
/ColorImageFilter /DCTEncode
/AutoFilterColorImages true
/ColorImageAutoFilterStrategy /JPEG
/ColorACSImageDict <<
  /QFactor 0.15
  /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/ColorImageDict <<
  /QFactor 0.15
  /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/JPEG2000ColorACSImageDict <<
  /TileWidth 256
  /TileHeight 256
  /Quality 30
>>
/JPEG2000ColorImageDict <<
  /TileWidth 256
  /TileHeight 256
  /Quality 30
>>
/AntiAliasGrayImages false
/CropGrayImages true
/GrayImageMinResolution 300
/GrayImageMinResolutionPolicy /OK
/DownsampleGrayImages true
/GrayImageDownsampleType /Bicubic
/GrayImageResolution 300
/GrayImageDepth -1
/GrayImageMinDownsampleDepth 2
/GrayImageDownsampleThreshold 1.50000
/EncodeGrayImages true
```

BLACKSTONE0000309

```
/GrayImageFilter /DCTEncode
/AutoFilterGrayImages true
/GrayImageAutoFilterStrategy /JPEG
/GrayACSImageDict <<
  /QFactor 0.15
  /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/GrayImageDict <<
  /QFactor 0.15
  /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/JPEG2000GrayACSImageDict <<
  /TileWidth 256
  /TileHeight 256
  /Quality 30
>>
/JPEG2000GrayImageDict <<
  /TileWidth 256
  /TileHeight 256
  /Quality 30
>>
/AntiAliasMonoImages false
/CropMonoImages true
/MonoImageMinResolution 1200
/MonoImageMinResolutionPolicy /OK
/DownsampleMonoImages true
/MonoImageDownsampleType /Bicubic
/MonoImageResolution 1200
/MonoImageDepth -1
/MonoImageDownsampleThreshold 1.50000
/EncodeMonoImages true
/MonoImageFilter /CCITTFaxEncode
/MonoImageDict <<
  /K -1
>>
/AllowPSXObjects false
/CheckCompliance [
  /None
]
/PDFX1aCheck false
/PDFX3Check false
/PDFXCompliantPDFOnly false
/PDFXNoTrimBoxError true
/PDFXTrimBoxToMediaBoxOffset [
  0.00000
  0.00000
  0.00000
  0.00000
```

BLACKSTONE0000310

```
    ]
    /PDFXSetBleedBoxToMediaBox true
    /PDFXBleedBoxToTrimBoxOffset [
      0.00000
      0.00000
      0.00000
      0.00000
    ]
    /PDFXOutputIntentProfile ()
    /PDFXOutputConditionIdentifier ()
    /PDFXOutputCondition ()
    /PDFXRegistryName ()
    /PDFXTrapped /False

    /CreateJDFFile false
    /Description <<
      /ARA
```

<FEFF06270633062A062E062F0645002006470630064700200627064406250639062F0627062F0627062A00
2006440625064606340627062100200648062B062706260642002000410640060F006200650020005000440
04600200645062A0648062706410642062900200644064406370628062706390629002006410640A00200627
0644064506370627062806390020063006300627062A0020062706270644064A0629061B0020064A0645064306460020064106
2A062D0020064806
2B062706260642002000500044004600200627064406450646063406230629002006280627063306A062E0
62F062706450020000410063007200F0620061007400200064800410640060F0062006500200520005200650061
006400650072002000620625065062F0627063100200035002E003000200064806270644062506350620F062706
310627062A0020062706440623062D062F062B002E0635062F062706310020003 5002E003000200064806270644062506350620F062706
31062062A0020020627064406440623062D062F062B002E>

      /BGR
<FEFF04180437043F043e043e043b043704320430043904420435002004420435043043703880020043d0430044104
20044043e0439043043043c002004370430002004340430043000200441044a04370434043043043430432043004420
435002000410064006F0062006500200050004400460020043042c043e0443043c043504d04420438002c
0020043c0430043043a0441043843c0430043b043d0d043e0020043f044400043e043043043e04340435043d0438002
0043704300200043203804410434043e043a043a043403004704350441104420432043543d0020043f043504
047043000442002043704300020043f044004360534043043f043504704300044202043d04300020043f043e043403
43043044043043e0432043a0430002000200421044a043703430343430043403443543d0438044204350020
005004400460020043403043a043c0438043c04420380002004c43e043304304344002204434043043d002004340
0020044104350020043c04442043043043044f044020020441102004104063007200F0062006100074000
20043800200044006F00620065002006500650061006406500720020003 5002e00300020043800200
441043b043504340432043400490438000200432043504044104380438002e>

      /CHS
<FEFF4f7f75288fd94e9b8bbe5b9a521b5efa7684002000410064006F006200650020005000440046002065
876863900275284e8e9ad88d2891cf76845370524d53705237300260a853ef4ee54f7f75280020004100630
072006F00620061007400020548c002000410064006F006200650020005200650061006400650072002000350
02e003000204ee553ca66f49ad87248672c676562535f00521b5efa7684002000500044004600206587686
33002>

      /CHT
<FEFF4f7f752890194e9b8a2d7f6e5efa7acb7684002000410064006F006200650020005000440046002065
874ef69069752865bc9ad854c18cea76845370524d537052378655740630020260a853ef4ee54f7f752800200
```

0410063007200 6f006200610074002 0548c002000410064006f0062006500 2000520065006 1006400650072
00200035002e003000020 4ee553ca66f49ad87248672c4f86958b555f5df25efa7acb7684002000500044004
6002065874ef63002>

/CZE

<FEFF005400610074006f0020006e00 6100730074006100760065006e00ed00200070006f0075017e006900
6a007400650020006b0020007600790074007600e101590065006e00ed00200064006f006b0075006d00650
06e0074016f00200004410064006f006200650020000500044046002c00 2000 6b0074006500720 0e900200073
00650020006e0065006a006c00e9007000650020006800 6f006400ed002000700072006f0020006b0076006
1006c00690074006e00ed0020007400690073006b00200061002000700072006500700072006500730073007300
2e00200020000560079007400760006f01590065006e0 0e900200064006f006b0075006d00650 06e007400790
02000500044004600 2000620075006400650020006 1006f017e006c00e900200006f007400650076015900ed
0074002000760020007000720006f00670072006 1006d00650060 06300680 020004100630072006f0062006 1007
40020000610020000410064006f006200650020000 5200650 06 1006400650 07200 200035002e00300020 0006100
20006e006f0076011b006a016100ed00630068068002e>

/DAN

<FEFF004200720075006700 200069006e00 6400730 07400 69006c006c00c0069006e006 006 700 65007200 2006e006500
2000740069006c002000610074002000 6f00700072006500740074006500 2000410064006f006200650020 0
05000440046002d00640006f006 6b0075006d0065006e00740006500720 02c0020006 4 006500720 020006 20065
006400730074004020006500670006e00650 06500720020200740006 9006c006c00 20006f0069006c0020002000068 00
20f8006a0020006b0070060 61006c00060 65006 07400740002e0020000440046 0500200006 f007000720065007007 400740
06500 640005200020000440064006f006b006 0075006d0065006e007400650 07200200025002e00306109001600
002000e5006200 06a006e00650 05007300020002000690002000410063007 2006 f00 62006100 74006200 06 0020006
2007740028 00520065006 06 106400650 072 00200025002e00 3000200006 f00
6700200006e0079006500720065002e>

/DEU

<FEFF005600650072007700 65006e006 40065006 00e00200005300 690065006002000640069006500 730 065002000
450069006e007300740065006c006c0075006e0067006 500 200205 00 20007a0075 05006d0026002000 45007200 300740
065006c006c0064006506e006 07400 06500 6e0002c00200 07 4006f006 00 6002000640006500e00 6e006500 20 00 200
006b0075 006 500e70065 0000e007400620065006e002c0020e02000 006004006 6f006f0062 00 65 002 0020000600 6300 06
900650 020 00680000 006f00 63000680 077 006500720074 000 06900 690065007000 200205000 0072 006500730073 07300
73 002 d00 04400200750063 006 000 65 002 000 6650072 07a00060 0500073 0006e006 00 e0020000 6 00 06 6006300 680
0740 06500 6e002e002 00200450072007 300740068 0 0740065006c006c007400 6500 0 04400046002d00 4400 4 006f006b
0075006d 006 5006e00 74 006 50020 006b0 0f6006e00 6e00 65006 c 006e006 0 020006 04006900 74 0 020004100630072006
f006200610074 0020007500 6006400 20004100640 006f0062 006 50020005200 65 006 06 1006 400 65 007200 200 0
35002 e0030 0020006f 006 4 006500 720 020 006800f60068 00650 072002 00 067 00650 06 f00 5 00 06f 00 660066006 006 e00 65 0
07400 020007700650 07200640065 0 006e0 02e>

/ESP

<FEFF005500740069006 c006 900630006500 020000650073 0740061 006 1 00200063006f006 00 6600690067 007500
72006100630 06900f3006e00 020007000 6100720 06100200063 07200 6500 6 10072002000640006f0063007 500 7
0 06d0 0065006e0074006 f00073 002000 5000440 046 0020 000 640006 400650020 0410064 006f006200 650020 0106 4
0065 006300 750065 0106 4006f0073 0 002 0007 00060061007200 610020 006 900650009 006d00 07000720 065007300690 0 f30 06
e0020 0007000720 065 002d00 700 720065006 40006 0069 00074006 1006 c00 20 0020200062006 006 f00 61006c00069006 c 007400
6100 200 0630061006c 00069006400610064002e00 2000053006 65006002 0007000 750065 0064 0065006 e00200061006
0620 07200 690 07 200200064006f0063 00 07500 6d 0065006e00 74 0 0006f 007 30 07 500640006 0069 0006 c006e00 6f006 30072
00650 06 06 100610 07 04073002000630006f 006 e0020006 020000 4100 63 0072006 f 00 6 002000410 06 4006
f 0062006 5 006 50 0200 052 00650 05 6 006 1006400650 07 200 20 003 5 002e00300 020006f0064006500720020 0068006 900
6f006 6006 5007300700072 0069006 f 0007300 74006 1006 5 007200 20069006 006 f00720006 500 073 002e>

BLACKSTONE0000312

/ETI

<FEFF004b006100730075007400610067006700650020006e006500690064004020007300e4007400740065006900
640020006b00760061006c006009074006500650074007300650020007400720 0fc006b006900650065006c00
07300650020007000720069006e00740069006d0064006d009730065020006a06061006f006b0073002002002073006f
006200690069006e006c006500200041006400460062006500200050002005000440046002d0064006f006b0075006
d0065006e0074006900640065002000e006f006f006d0064009730065006b0073002e00200020004c006f00
6f0064007500640002000500044004600202d0064006f006b0075006d0065006e00740065020007300610061006
074006500206100760061006d61006400200070007200f006700720061006d006f00690064006500670061
00200041006300720020f0062006100740002000e006900e006700200041006400460062006500202006520
050061006400650072002020350020e003002006a06102007500750065006d0061007400650020007600
6500720073006900f006e0069006400650067006100200020e000d000a>

/FRA

<FEFF005500740069006c0069007300650007a0020006300650073007300200f007000740069006f006e007300
20006600690069006e00020006400650020006300720e900650072002000640065007300200064006f00630
075006d0065006e0074007300200041006400460062006500200050004004600200070006f0075007200200
075006e006500200071007500610069006c0069007400e90020006400270069006d0070007200650073073006
9006f006e00200700702009070072006500730073065002e0020004c0065007300200064006f006300
75006d0065006e0074007300200050004004600200063007200e90e90073002007000650075007600650
06e00740020002000ea00740072006500200006f0075007600650072007400730020064061006e00730200041
0063007200f0062006100740002000200610069006e007300690002007100750027004100640046062006
50020005200650061006400650072002002035002e003002000650074002007600650072007300690f00
6e00200075006c007400e90072006900f0065007500720020065007300 2e>

/GRE

<FEFF03a703c103b703c303b903bc03bf03c003bf03b903ae03c303c403b5002003b103c503c403ad03c200
2003c403b903c2002003c103c503b803bc03af03c303b503b903c2002003b303b903b1002003bd03b100200
3b403b703bc03b903bf03c503c103b303ae03c303b503c403b5002003ad03b303b303c103b103c603b10020
0041006400460062006500200050004004600200 03c003bf03c5002003b503af03bd03b103b9002003ba03b
103c42019002003b503be03bf03c703ae03bd002003ba03b103c403ac03bb03bb03b703bb03b1002003b303
b903b1002003c003c103bf002d03b503ba03c403c503c903c003b903b903a03d03c2002003b503c103b30
3b103c303af03b503c2002003c503c803b703bb03ae03c2002003c003bf03b903cc03c403b703c403b103c2
002e002003a403b1002003500044006400602003ad03b303b303c103b103c603b1002003c003bf03c5002
003ad03c703b503c403b5002003b403b703bc03b903bf03c503c103b303ae03c303b503b9002003bc03c003
bf03c103bf03cd03bd002003bd03b1002003b103bd03bf03b903c703c403bf03cd03bd002003bc03b500200
3c403bf002000410063007200f006f006200610074002002003c403bf002000410064006f0062006500200052
006500610064006500720002000350023002e003002003ba03b103b9002003bc03b503c403b103b303b503bd03a
d03c303c403b503c103b503c2002003b503ba03b403cc03c303b503b903c2002e>

/HEB

<FEFF05D405E905EA05DE05E905D5002005D105D405D205D305E805D505EA002005D005DC05D4002005DB05
D305D9002005DC05D905E605D505E8002005DE05E105DE05DB05D900200041006400460062006500200050
0440046002005D405DE05D505EA05D005DE05D905DD002005DC05D405D305E405E105EA002005E705D305DD
002D05D305E405D505E1002005D005D905DB05D505EA05D905EA002E002005DE05E105DE05DB05D90020005
000440046002005E905E005D505E605E805D5002005E005D905EA05E005D905DD002005DC05E405EA05D905
D705D4002005D105D005DE05E605E205D505EA0020004100630072006f006200610074002005D5002D00410
064006F006200650002000520065006100640065007200200200035002E0030002005D505D205E805E105D005D5
05EA002005DE05EA05E705D305DE05D505EA002005D905D505EA05E8002E05D005DE05D905DD002005DC002
D005005440046002F0058002D0033002C002005E205D905D905E005D5002005D105D305D905E805D905DA00
2005DC05DE05E905EA05DE05E9002005E905DC0020004100630072006f006200610074002E002005DE05E10
5DE05DB05D90020005000440046002005E905E005D505E605E805D5002005E005D905EA05E005D905DD0020

BLACKSTONE0000313

05DC05E405EA05D905D705D4002005D105D005DE05E605E205D505EA002000410063007200 6F00620061007 4002005D5002D00410064006F0062006500200052006500610064006500720020003500 2E003002 0005D505 D205E805E105D005D505EA002005DE05EA05E705D305DE05D505EA002005D905D505EA05E8002E>

/HRV [Za stvaranje Adobe PDF dokumenata najpogodnijih za visokokvalitetni ispis prije tiskanja koristite ove postavke.  Stvoreni PDF dokumenti mogu se otvoriti Acrobat i Adobe Reader 5.0 i kasnijim verzijama.)

/HUN
<FEFF004b0069007600e1006c00f30020006d0069006e0151007300e9006701710020006e0079006f006d00 64006100690020006e0c0151006b00e90073007a00ed007401510020006e0079006f006d0074006100740 0e100730068006f007a0020006c006500670069006e006b00e1006200620020006d006500670066006500 6c 0065006c0151002000410064006f00620065002000500044004600200064006f006b0075006d0065006e007 40075006d006f006b00610074002000650072006b006f006500200074006500200062006500e1006c00 6c00ed007400e10073006f006b00610063002000620b00e90073007a00ed007400680065007400200074002e00200 2000410020006c00e900740074006100740069006b00650044046002000640046002000640046006b006b 0075006d0065006e00740075006d006f006b00200061007a002000410063007200 6f006200610074002000e 900730020006100 7a002000410064006f0062006500200052006500610064006500720020003502e003000 2c002000760061006700790020006100 7a00200061006740074006f0020006b00e900730151006200620 069000200760065007207a006900 3006b006b0061006c0020006e0079006900740068006100740f3006b 0020006d0065006067002e>

/ITA
<FEFF005500740069006c0069007a007a00610072006500200071007500650073007400650020006900d0 0700 6f007300740061007a0069006f006e0069002000700065007200200063007200650061007206500200 064006f00630075006d0065006e00740069002000410064006f006200650020005000440046002000700069 00f9002000610064006100740074006900200061002000750061007200700072006500730074006100 6d00700061002000640069006900200061006c0074006100200071007500610063006f0069007400002e00200049002 200064006f00630075006d0065006e00740069002000500044004600200063007200650064006100740069002000 070006f0073007300f006e006f00200065007300730065007200650020006100700065007207400690020 0063006f006e002000410063007200 6f00620061007400200065002000410064006f0062006500200052006 500610064006500720020003500 2e003002000065002000760065007207300690006f006e006900200073006 7500630063006500730073006900760065002e>

/JPN
<FEFF9ad854c18cea306a30d730ea30d730ec30b951fa529b7528002000410064006f006200650020005000 4400460020658766f8306e4f5c6210306b4f7f75283057307e305930023053306e8a2d5b9a30674f5c6210 3 055308c305f002000500044004600200030d530a130a43eb306f3001004100630072006f0062006100740020 304a30883073002000410064006f006200650020005200650061006400650072002000350 02e003000204ee 5964d3067958b304f30533068304c3067304d307e305930023053306e8a2d5b9a306b306f30d530a930f330 c8306c57cb30818fbc307f304c5fc59808306730593002>

/KOR
<FEFFc7740020c124c815c7440020c0acc6a9d558c5ec0020ace0d488c9c80020c2dcd5d80020c778c1c4c5 d00020ac00c7a50020c801d569d55c002000410064006f0062006500200050004400460020bb38c11cb97c0 020c791c131d569b2c8b2e4002e0020c774b807ac8c0020c791c131b41c00200050004400460020bb38c11c b29400200041006300720006f0062006100740020bc0f002000410064006f006200650020005200650061006 400650072002000350 02e00300020c774c0c1c5d0c11c0020c5f40020c2180020c788c2b5b2c8b2e4002e>

/LTH
<FEFF004e006100750064006f006b00690074006500200161006900750 06f0073002000700061007200610 06d006500740072007500730073002000e006f0072011700640061006d00690020006b007500720074006900 0410064006f00620065002000500044004600200064006f006b0075006d0065006e007400750073002c0020 006b00750072007200690065002000c0061006200690061007500730069006900200020007200690074006

10069006b007900740069002000610075006b01610074006f00730020006b006f006b007900620117007300
2000700061007200650069006700700074006900e00690061006d00200073007000610075007500300064006900e0
069006d00750069002e0020002000530075006b0075007200740069002000500044004600200064006f006b
0075006d0065006e0074006100690020006700610063006900200062016b00740069002000610074006900760
400610072006f006b0069002000410063007200f00620061007400200069007200200041006400f006200
650020005200650061006400650072002000350020e003000200069007200200076011700630065007300e0
117006d0069007300200076006500720073006900a006f006d0069007300e>

    /LVI

<FEFF0049007a006d0061006e00740066006a006900650074002001610066007300200069006500730074004
610074012b006a0075006d00750073002c0020006c0061006900690020007600650069006400f0074007500200
0410064006f006200650020005000440046006f006b0075006d0065006e0074007500730020c00200
06b006100730020006900720020012b0070006101610069006900070069006500d01130072006f00740006
9002006100750067006f0073007400610067007300200064006f00760061006c006c0069006900700740 01007400650073007300200065006e006900640061006f007400750073006f006b006100690
02e00200049007a0076006500690064006f006900690065006f006a0069006500700074002000500044004600200064006f006b0075
006d0065006e007400750073002c00200069006b006f007600610067002000610074007600110130072007400
2000610072002000410064006f006200650020006c006c006f00650020007300650067006e006500720065006500a0
0610075006e0101006b0101006d0020007600650072007300690a0101006d002e>

    /NLD (Gebruik deze instellingen om Adobe PDF-documenten te maken die zijn
geoptimaliseerd voor prepress-afdrukken van hoge kwaliteit. De gemaakte PDF-documenten
kunnen worden geopend met Acrobat en Adobe Reader 5.0 en hoger.)

    /NOR

<FEFF004200720075006b0020006400690073007300650020006900e006e007300740069006c006c006900
6e00670065006e0065002000740069006c002000e50020006f007000700072006500740074006500200041
0064006f0062006500200050004400460002d0064006f006b0075006d0065006e0074006500720020007300f
006d00200065007200200062006500730074002000650067006e006500740020007200200066006f00720020006600f
800720074007200790006b006b00730075007400730006b0072006900660074002000610076006000f800
790020006b00760061006c0069007400650074002e002005000440046002d0064006f006b0075006d00650
06e00740065006500720020006b0061006e0065002000500706e0065007300200069002000410063007200f006
2006100740065006c006c006500720020002000410064006f006200650020005200650061006400650007
200200035002e003000200065006c0065007200200073006e006500650072006500>

    /POL

<FEFF005500730074006100770069006500006900610020007400f00200740077006f0072007a006500
6e006900610020006400f006b0075006d0065006e007400300077002000500044004600200070007a006500
065007a006e00610063007a006f006e007900630068006f002000640069006f0020007700790064006f0075006b00f3
0077002000770020007700790073006f006b0069006900730065006a0020006a006100b006f015b00630069002e002
00020004400f006b0075006d0065006500006740079006700200074006f0020007700720061006900640069006900650020020004100
6f00740074006f006500061070072007002000740072006f006700610075006c0063007200f00620061007400200410
0630072006f0062006100740020006900200041006400f006200650020005200650061006400650072002 0
0035002e003000200069002000e006f00770073007a0079006d002e>

    /PTB

<FEFF005500740069006c0069007a0065002000650073007300610073002000630066006e00660069006700
750072006100e700f5006500730020006400650020006600f0072006d0061002000610020006300720069
0610072002000640069006300750006d006500740065006f007300200041006400f006200650020005000440
0460020006d06010069006900720073006101006100640065007100730074005006100640065006f007300610102
00070007200e9002d0069006900d00700720065007300730f007300f5006500730020006f07300200061006c006c0069006900740
610020007100750061006c00690064006400650002e00200004f00730020006400630075006d00650

06e0074006f00730020005000440046002000630072006900610064006f00730020007000f0064006500ed
0020007300650072002000610062006500720074006f007300200063006f006d0020006f002000410063007
2006f0062006100740020006500200065006f002000410064006f00620065002000520065006100640065007200
200035002e003002000650020007600650072007300f500650073002000070006f00730074006500720069
06f007200650073002e>

/RUM

<FEFF005500740069006c0069007a0061016300690020006100630065007300740074006500200073006500740
1030072006900200020007000650006e007400720075002000610020006300720065006100200064006300750
06d0065006e0074006500200041006400f00620065002000500044004600200061006400650063007600610
007400650020007000650006e00740072007500200074006900700010300720069007200200065006100200070007
20065007000720065007300700200064006500200063006100c0069007400610074006500200073007500
70006500720069006f0061007201030020002000200044006f00630075006d0065006e0074006500c00650
0200050004400460020006300720065006100740020007000650020007400650020006600690069002000650073
006300680069006900d007300050020006300750020007000610063007200610074006f002000410064006f006
200065002000520065006100640065007200200035002e00300020015f00690020007600650072007300690
75006e006900c006500200075006c007400650072006900f006100720065002e>

/RUS

<FEFF04180441043f043e043b044c04370443043904420435002004340430043d043d04350020043d04
30044104420440043e0439043a043800200434043b044f00200441043e043704340430043d0438044f00200
434043e043a0443043c0435043d04420430043200200041006400f006200650002000500044004600200
043c0430043a044104380443043d0430043d043b044c043d043e043d00200043f043e434044504104204043203435043d043043d04
3e0433043e00200434043e043f043504470442043d043e0433043e00200432044304320435043404300
02e002000200421043e043704340430043d043d043043b04350020005000440046002d0434043e043a04430043c
0435043d0442044b0020043c043e0436043d043e0020043e0442043a0440044b043204300442044c002000441
1002043f043e043c043e0449044c044e002000410063007200f006200650007400200438002000410064006400
6f006200650020002000520065006100640065007200200035002e0030002004380200431043e043b043504350
02004f043e0437043043d04380445002004320430435044004110438043804390439002e>

/SKY

<FEFF005400690065007400f0020006e0061007300740074006100760065006e0069061002000700006f00750
1e00690074006500200006e006100200007600790074007600e1007200061006900690065006500200064006f0006b0
075006d0065006e0074006f0007600200041006400f006200650002000500044004600200006b00740006f
0072006e0062007300610020006e0061006a006c006500070016100690065006500200068006f0064006900610
02000e0061002006b00760061006c00690074006e00fa00200074006c00610101d0020006100200070007200
65007000720065007300730002e0020006500790074007600f00720065006e00e900200200064006f006b00750
06d0065006e0074007900200006500440046002000620075006400650002000d006f017e006e00e90020006f
0074007600f0072006900650002007600200700072006f06700200610006d006f006300680680200041006
30072006f0062006100740020006100200041006400f00620065002000520065006100640065007200200
35002e0030002000610020006e006f0076016100ed0063006b08002e>

/SLV

<FEFF005400650020006e0061007300740074006100760069007600650074006500200075007700f00720061006200
69007400650020007a006100200075007300740074007600610072006a0061006e006a006500200064006f006b0
075006d0065006e0074006f00760020006100640066006200650002000500044004600200006b00690020
0073006f0020006e0061006a007000720069006d00650072006e0065006a016100690020007a006100200006
b0061006b006f0076006f007300740074006f006f002000740069006900730068006b006e0065006a006a00d0065005007300740
07600610061006d0065006e0069006500f0020006e006400650002000600430006800d020
006a00650020006d006f006f07006f010d00650020006f006400700072006500740069006900200007a00200041006e

30072006f006200610074002000690006e002000410064006f006200650020002000520065006100640065007200
200035002e003000200069006e0020006e006f00760065006a01610069006d002e>

/SUO

<FEFF004b00e40079007400e40020006e00e40069007400e40020006100730065007400750006b0073006900
61002c0020006b0075006e0020006c0075006f00740020006c00e400680069006e006e00e40020007600610
061007400690076006100610006e002000700061069006e006100740075006b00730065006e002000760061
006c006d0069007300740065006c00750074007900f6006800f6006e00200073006f0070006900760069006
1002000410064006f0062006500200050004400460020002d0064006f006b0075006d0065006e0074007400
65006a0061002e0020004c0075006f00640075007400200050004400460020002d0064006f006b0075006d0065
06e007400690074006400200076006f0069006400610061006e00200061007600610074006100200041006300720
06f00620061007400690069006c00610020006a006100200041006400f00620065002000520065006100
4006500720020003500 2e0030003a006c006c00610020006a006100200075007500640065006d0069006900
6c006c0061002e>

/SVE

<FEFF0041006e007600e4006e006400200064006500200068006e00e40072002000690006e0073007400e4006c00
6c006e006e0069006900e406007600610072002000690061002000f006d00200064007500200076006900c006e002000730
06b00610070007000610020002000410064006f006200650020005000440046002d0064006f006b0075006d0065006e
007400200073006f006d0020002e400720020006c00e4006d0070006c0069006700740061002000660006f00720020
007000720065007000720065007300730002d00750074007300b0072006900660074002000d0065006400
20006800f600670020006b00760061006c0069007400650074002e00200020053006b0061007000640
06500200050004400460020006400640f006b0075006d0065006e00740020006b0061006e006200200066006f0070007
006e006100730072006e0069006900200041006300720060072006f00620061007400200069006f006300680
0200041006e0064006f00620065002000520065006100640065006100640065007200200035002e0030003a006f0063006800200073006500e006100
200065002000650061006400650070007200200035002e00300020006f0063006800200073006500e006100
72006500>

/TUR

<FEFF005900fc006b00730065006b0020006b0061006c006900740065006c0069006e002000f006e0020007900
61007a00640131007200640061002000620061007300b013100730131006e006100200065006e002000690
0790069002000750079006100200069006c006500630065006b00200041006400f006200650020005000440
00460020002000620065006c00670065006c0065007200690009006c006c0075015007400750072006d0061006
b0020006900e70069006e002000200004f006c0075015007400740075007200750065006c006106e00200074006440
0460020002000620065006c0067006500670065007200690020004100630072006f006200610074002000760065
002000410064006f006200650020005200650065006100640065007200200035002e003000200076006500200
73006f006e007200610073013100e0064006006b006900200073fc007200fc006d0c00650072006c00
650020006100e70131006c006100620069006c00690072002e>

/UKR

<FEFF04120438043a043e04400438044104420043e043204430439044204350020044604560020043f043004
400430043c043504420440043800200434043b044f002004410442043204300400435043d043d044f00200
434043e043a0443043c0435043d04420456043200200041006400f006200650020005000440046002c0020
044f043a04560020043d043004390434043004490350020043f04560434043445043e0434044f0442044
c00200434043b044f002004320438044104430065043e044f043a0456044104230000043d043e0434003044302e002000020
42104420432043e0440043504300d04560020043430043a043043d04420438002005004400460046
0020043c043e0436043d043004300020043204560434043a0044404380042043800200043043044100200041006300720006
f0062006100740002000442043000200041006400f006200650020005200650065006100640065007200200035000
2e00300020043004310435043002000434042043d04560437043d04560430043e0457002043204350440041045604570
02e>

/ENU (Use these settings to create Adobe PDF documents best suited for high-quality

```
prepress printing.  Created PDF documents can be opened with Acrobat and Adobe Reader
5.0 and later.)
  >>
  /Namespace [
    (Adobe)
    (Common)
    (1.0)
  ]
  /OtherNamespaces [
    <<
      /AsReaderSpreads false
      /CropImagesToFrames true
      /ErrorControl /WarnAndContinue
      /FlattenerIgnoreSpreadOverrides false
      /IncludeGuidesGrids false
      /IncludeNonPrinting false
      /IncludeSlug false
      /Namespace [
        (Adobe)
        (InDesign)
        (4.0)
      ]
      /OmitPlacedBitmaps false
      /OmitPlacedEPS false
      /OmitPlacedPDF false
      /SimulateOverprint /Legacy
    >>
    <<
      /AddBleedMarks false
      /AddColorBars false
      /AddCropMarks false
      /AddPageInfo false
      /AddRegMarks false
      /ConvertColors /ConvertToCMYK
      /DestinationProfileName ()
      /DestinationProfileSelector /DocumentCMYK
      /Downsample16BitImages true
      /FlattenerPreset <<
        /PresetSelector /MediumResolution
      >>
      /FormElements false
      /GenerateStructure false
      /IncludeBookmarks false
      /IncludeHyperlinks false
      /IncludeInteractive false
      /IncludeLayers false
      /IncludeProfiles false
      /MultimediaHandling /UseObjectSettings
```

BLACKSTONE0000318

```
      /Namespace [
        (Adobe)
        (CreativeSuite)
        (2.0)
      ]
      /PDFXOutputIntentProfileSelector /DocumentCMYK
      /PreserveEditing true
      /UntaggedCMYKHandling /LeaveUntagged
      /UntaggedRGBHandling /UseDocumentProfile
      /UseDocumentBleed false
    >>
  ]
>> setdistillerparams
<<
  /HWResolution [2400 2400]
  /PageSize [612.000 792.000]
>> setpagedevice
```

BLACKSTONE0000319

# CCA
# Arizona Correctional Facilities
# Economic and Fiscal Impact Report



Prepared for:

CCA

January 2010

Prepared by:

 Elliott D. Pollack & Company
7505 East 6th Avenue, Suite 100
Scottsdale, Arizona 85251

BLACKSTONE0000320

# TABLE OF CONTENTS

**Key Findings**                                                                    **i**

**1.0    Introduction**                                                             **1**

**2.0    Methodology & Assumptions**                                                **3**
    2.1    Project Assumptions                                  3
    2.2    Economic Impact Methodology                          3
    2.3    Fiscal Impact Methodology                            4

**3.0    Impact of Stabilized Operations**                                          **7**
    3.1    Economic Impact of Operations                        7
    3.2    Fiscal Impact of Operations                          8

**4.0    Impact of Future 3,000-bed Facility**                                      **13**
    4.1    Economic Impact of Construction                      13
    4.2    Fiscal Impact of Construction                        13
    4.3    Economic Impact of Operations                        16
    4.4    Fiscal Impact of Operations                          16

**5.0    Conclusion**                                                               **19**

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 243 of 279 PageID #:
22872

BLACKSTONE0000321

# Key Findings

As America's leader in partnership corrections, CCA designs, builds, owns and manages more than 60 correctional facilities and detention centers across the country, providing corrections management services to federal, state and local clients. In Arizona, CCA owns and operates six facilities located in Eloy and Florence in Pinal County. These six facilities have a notable impact on both the local and regional economies of the State.

## Economic Impact
It is estimated that the six CCA facilities currently generate:

- 2,733 direct employees and 1,700 additional indirect and induced spin-off jobs.
- $205.4 million in total wages each year
- Annual economic output of over $435.2 million.

## Fiscal Impacts
Operations of the six facilities creates tax revenue for the State, county and local governments. Examples of taxes paid by CCA and the employees that are supported by CCA to the State and its political subdivisions include state income and unemployment taxes, sales taxes, property taxes and HURF and vehicle license taxes.

In addition to the economic impacts stated above, it is estimated that CCA operations result in an impact of approximately $26.2 million in taxes to the State of Arizona and its political subdivisions annually.

## New Construction Impacts
The continued expansion of CCA facilities in Arizona would create significant tax revenues for the communities and counties in which they are located, as well as for the State of Arizona as a whole. At an estimated cost of $200 million, the construction of a single 3,000-bed facility would generate:

- 2,528 direct, indirect and induced person years of employment
- $116.4 million in wages and
- $300.1 million in total economic output for the entire construction period.

As soon as the facility is constructed and operating it would create:

- 450 direct jobs, 187 indirect and induced jobs.
- $26.2 million in wages
- $55.0 million in economic output on an annual basis.

Each additional facility would generate revenues for State, County, and local governments of $16.9 million from construction-related activity and over $4.8 million annually from operations.

## Pinal County
Pinal County currently captures a significant portion of the impacts generated by CCA operations. The County collects over $6.1 million annually in revenue as a direct result of CCA's presence. With 2,733 direct employees, according to the Central Arizona Regional Economic Development Foundation, CCA is the County's largest non-governmental employer, representing approximately 4.9% of total employment in the County.

A significant portion of the County's workforce is currently traveling outside of the County for work. With a large percentage of their employees located in Pinal County, CCA's operations are a significant asset to the County in reaching its goal of increasing the employment base in order to provide residents more opportunities to work closer to home. According to the Central Arizona Association of Governments, there are approximately 185 jobs for every 1,000 residents within Pinal County, compared to 500 jobs per 1,000 residents in Maricopa County. CCA's operations in the County afford residents the opportunity to work closer to home, thus avoiding the cost of transportation and time spent traveling.



BLACKSTONE0000322

# 1.0 Introduction

Elliott D. Pollack and Company has been retained by CCA to perform an economic and fiscal impact study of the ongoing operations of their six correctional facilities in Pinal County, Arizona, as well as estimate the impacts from construction and operations of a 3,000-bed facility for perspective on future expansions. The CCA facilities are located within the City of Eloy (four facilities) and the Town of Florence (two facilities). This analysis will quantify the impacts from stabilized operations of these facilities as well as estimate the impact of potential future developments (in this analysis, a $200 million correctional facility is used).

The study focuses on the economic and fiscal impacts of the following:

1. Operations at the six current facilities.
2. Construction and operations of a future 3,000-bed facility.

Economic impact analysis examines the regional implications of an activity in terms of three basic measures: output, earnings, and job creation. Fiscal impact analysis evaluates the public revenues and costs created by a particular activity. In fiscal impact analysis, the primary revenue sources of a city, county, or state government are analyzed to determine how the activity may financially affect them.

This study prepared by Elliott D. Pollack & Company is subject to the following considerations and limiting conditions.

- It is our understanding this study is for the client's due diligence and other planning purposes. Neither our report, nor its contents, nor any of our work were intended to be included and, therefore, may not be referred to or quoted in whole or in part, in any registration Statement, prospectus, public filing, private offering memorandum, or loan agreement without our prior written approval.

- The reported economic and fiscal impact findings outlined in this report represent the considered judgment of Elliott D. Pollack and Company based on the assumptions, analyses, and methodologies described in the report.

- Except as specifically stated to the contrary, this study will not give consideration to the following matters to the extent they exist: (i) matters of a legal nature, including issues of legal title and compliance with federal, State and local laws and ordinances; and (ii) environmental and engineering issues, and the costs associated with their correction. The user of this study will be responsible for making his/her own determination about the impact, if any, of these matters.

- This study is intended to be read and used as a whole and not in parts.

- This economic and fiscal impact study evaluates the potential "gross impacts" of construction and operations on various governmental jurisdictions. The term "gross



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 245 of 279 PageID #: 22874

BLACKSTONE0000323

impacts" as used in this study refers to the total revenue, jobs and economic output that will be generated by the project.

- This analysis does not consider the costs associated with providing services to any of the facilities. Such analysis is beyond the scope of this study.

- The analysis is based on the current tax structure and rates imposed by the affected municipalities. Changes in those rates would alter the findings of this study.

- All dollar amounts are stated in constant 2009 dollars and, unless indicated, do not take into account the effects of inflation.

- The analysis outlined in this study is based on currently available information and estimates and assumptions about long-term future trends. Such estimates and assumptions are subject to uncertainty and variation. Accordingly, we do not represent them as results that will be achieved. Some assumptions inevitably will not materialize and unanticipated events and circumstances may occur; therefore, the actual results achieved may vary materially from the forecasted results. The assumptions disclosed in this study are those that are believed to be significant to the projections of future results.

The following section will describe the assumptions and methodologies used to estimate the economic and fiscal impact of both operations of current facilities and the construction and operations of a 3,000-bed facility. Section 3.0 outlines the effect of operations on the State of Arizona, counties within Arizona, and communities within Pinal County from the six currently operating facilities. Section 4.0 will describe the impact of construction and operations of a 3,000-bed facility that could be constructed in the future on the economy and the fiscal benefits to multiple levels of government (State, counties, cities and towns).



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 246 of 279 PageID #: 22875

BLACKSTONE0000324

## 2.0 Methodology & Assumptions

### 2.1 Project Assumptions

The assumptions used to estimate the economic and fiscal impacts of CCA correctional facilities have been developed from a variety of sources. Most operational estimates were provided by CCA. Exact construction costs for a future facility were unknown at the time of this report so a rounded estimate of $200 million was provided by the client.

The following table outlines the assumptions used in estimating impacts of currently operating facilities. As previously stated, there are six facilities operating in Arizona. It is estimated that there are 2,733 full time equivalent employees operating those six facilities. Wage and benefit salaries were estimated by the client at $130 million in constant 2009 dollars. It is also estimated that the Arizona CCA facilities will accrue over $39 million in taxable corporate income, pay nearly $5.0 million in electrical utility bills and be liable for real and personal property taxes to various taxing districts (county and municipal level) in the amount of over $3.2 million each year.

| Assumptions of Analysis<br>Economic and Fiscal Impact<br>CCA - Arizona Facilities | |
|---|---|
| Facilities | 6 |
| Employees | 2,733 |
| Annualized Wages & Benefits | $130,000,000 |
| Taxable Corporate Income | $39,000,000 |
| Electrical Utitlity Budget | $4,700,000 |
| Annual Property Tax Liability | $3,200,000 |
|   To Pinal County | $1,142,000 |
|   To Eloy or Florence | $538,564 |
| Sources: Elliott D. Pollack & Co., CCA | |

### 2.2 Economic Impact Methodology

Economic impact analysis examines the economic implications of an activity in terms of output, earnings, and employment. For this study, the analysis focuses on the jobs and corresponding output and wages that are created through currently operating facilities at a stabilized operating level as well as the employment and output that are created by the construction and ongoing operations of a 3,000-bed facility that could be developed in the future.

The different types of economic impacts are known as **direct**, **indirect**, and **induced**, according to the manner in which the impacts are generated. For instance, **direct** employment consists of permanent jobs held by employees. **Indirect** employment is created by businesses that provide goods and services essential to operations or construction of a facility. These businesses range from manufacturers (who make goods) to wholesalers (who deliver goods) to janitorial firms (who clean the buildings). Finally, the spending of wages and salaries of **direct** and **indirect**



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 247 of 279 PageID #: 22876

BLACKSTONE0000325

employees on items such as food, housing, transportation and medical services creates **induced** employment in all sectors of the economy, throughout the State. These secondary effects were captured in the analysis conducted in this study.

Multipliers have been developed to estimate the indirect and induced impacts of various direct economic activities. The Minnesota IMPLAN Group developed the multipliers used in this study. The economic impact is categorized into three types of impacts:

(1) <u>Employment Impact</u> – the total wage, salary and self employed jobs in a region. Jobs include both part time and full time workers.

(2) <u>Earnings Impact</u> – the personal income, earnings or wages, of the direct, indirect and induced employees. Earnings include total wage and salary payments as well as benefits of health and life insurance, retirement payments and any other non-cash compensation.

(3) <u>Economic Output</u> – the economic output, also referred to as economic activity, relates to the gross receipts for goods or services generated by a business's operations.

Economic impacts are by their nature regional in character. The direct impact of job creation is primarily concentrated in the surrounding Pinal County communities; however impacts are felt all throughout the State. All dollar figures, unless otherwise stated, are expressed in current dollars.

## 2.3 Fiscal Impact Methodology

Fiscal impact analysis studies the public revenues associated with a particular economic activity. The primary revenue sources of local, county, and state governments (i.e. taxes) are analyzed to determine how an activity may affect the various jurisdictions. This section will evaluate the impact of current CCA facilities on the State of Arizona, select Arizona counties, and communities in Pinal County. Since future expansions could locate anywhere throughout the State, estimates were formulated using broad, statewide averages of tax rates.

The fiscal impact figures cited in this report have been generated from information provided by a variety of sources including the U.S. Bureau of the Census, the U.S. Department of Labor, the Internal Revenue Service, the State of Arizona, the Arizona Tax Research Association, and the U.S. Consumer Expenditure Survey.

Elliott D. Pollack and Company has relied upon the client for estimates of construction cost. Unless otherwise stated, all dollar values are expressed in 2009 dollars.

Fiscal impacts are categorized by type in this study, similar to economic impact analysis. The major sources of revenue generation for governmental entities are related to the ongoing impact from operations as well as the construction and operations of a 3,000-bed facility.

Construction impacts relate to the revenues generated from the potential construction of a 3,000-bed facility and include the State and local sales taxes levied on construction materials. In



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 248 of 279 PageID #: 22877

BLACKSTONE0000326

addition, the State, county and community in which a facility is built will benefit from the spending of construction workers within city or town limits.

The ongoing fiscal impacts of current facilities are already creating revenue for the State, counties, and communities where the facilities are located as well as in the locations where employees reside. Future expansions would also begin creating additional revenue once they are constructed and start operating. For most levels of government, revenues will include sales taxes, property taxes, income taxes, and State shared revenues.

The following is a description of applicable revenue sources that will be considered for this analysis.

- Construction Sales Tax
  The State as well as counties and cities in Arizona levy a sales tax on materials used in the construction of buildings or development of land improvements. That tax is calculated by State law under the assumption that 65% of the construction cost of a facility and its land improvements are related to construction materials with the remaining 35% devoted to labor. The sales tax rate is applied to the 65% materials figure. The sales tax on construction materials is a one-time collection by the governmental entity. Construction sales tax is generated during any new building construction as well as from improvements. The tax rate for the State is 5.6%, and a portion is shared with counties, cities and towns through revenue sharing formulas.

- Sales Tax
  The State, counties, and local cities charge a sales tax on retail goods and services. These tax rates are applied to estimated taxable commercial sales. This includes a tax on utilities as well as on the spending of employees. The tax rate for the State is 5.6%, and a portion is shared with counties, cities and towns through revenue sharing formulas.

- Property Taxes
  Taxes on real and personal property are levied on the CCA facilities and equipment. Direct, indirect and induced employees supported by the project would also pay county and city property taxes on homes they occupy. In order to estimate property taxes, the value of a typical housing unit in the place of residence for all of the employees has been calculated at the median home value of each municipality or county in which the employee lives, including both single family homes and apartment units. This value assumes that employees would occupy units in a pattern similar to the current inventory of housing in each locality.

- State Shared Revenues
  Each city and town in Arizona receives a portion of State revenues from five different sources - State sales tax (as explained above), State income tax, State unemployment tax, vehicle license tax and highway user tax. The formulas for allocating these revenues are primarily based on population.



Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 249 of 279 PageID #: 22878

BLACKSTONE0000327

- **State Income Tax**
  The State of Arizona collects taxes on personal and corporate income. The tax rate used in the analysis averages about 1.6% for personal earnings and 6.968% for corporate income. These percentages are based on the most recently available income tax data from the State and the projected wage levels of jobs created by the construction and operations impact. The personal income tax is applied to the wages and earnings of direct, indirect and induced employment while the corporate income tax rate is applied to taxable income (income minus net operating loss) of the facilities. Portions of these taxes are redistributed through revenue sharing to cities and towns throughout Arizona based on population.

- **State Unemployment Tax**
  Unemployment insurance tax for employees is 2.7% on the first $7,000 of earned income. This factor is applied to the projected wages and earnings of direct, indirect, and induced employees.

- **HURF Taxes**
  The State of Arizona collects specific taxes for the Highway User Revenue Fund (HURF). Both the registration fees and the motor vehicle fuel tax (gas tax) are considered in this analysis. The motor vehicle fuel tax is $0.18 per gallon and is calculated based on a vehicle traveling 12,000 miles per year at 20 miles per gallon. Registration fees average $66 per employee in the State of Arizona. These factors are applied to the projected direct, indirect and induced employee count. Portions of these taxes are distributed to cities and counties throughout Arizona based on a formula that includes population and the origin of gasoline sales.

- **Vehicle License Tax**
  The vehicle license tax is a personal property tax placed on vehicles at the time of annual registration. This factor is applied to the projected direct, indirect and induced employee count. The average tax used in this analysis is $325 and portions of the total collections are distributed to the Highway User Revenue Fund. The remaining funds are shared between cities and counties in accordance with population-based formulas.

The above tax categories represent the largest sources of revenue generated to city, county and state governments. This analysis considers gross tax collections and does not differentiate among dedicated purposes or uses of such gross tax collections. All dollar figures, unless otherwise stated, are in constant 2009 dollars and do not take into account the effects of inflation.



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 250 of 279 PageID #: 22879

BLACKSTONE0000328

# 3.0 Impact of Stabilized Operations

The operations of CCA correctional facilities generate jobs and annual revenue for the State of Arizona as well as counties, cities and towns throughout the State. The following impacts are estimated to be achieved for each year of full operation.

## 3.1 Economic Impact of Operations

CCA's Arizona operations create significant employment opportunities for Arizona residents, especially the labor force residing within Pinal County. According to the Central Arizona Regional Economic Development Foundation, CCA is Pinal County's largest non-governmental employer.

Stabilized operations of CCA facilities in Arizona have a notable impact on the local and regional economies. Approximately 2,733 direct jobs are currently supported by CCA operations in Arizona. In total, approximately 4,433 permanent direct, indirect, and induced jobs are created throughout the State as a result of the business operations of CCA correctional facilities. This employment translates into $205.4 million in annual wages and over $435.2 million in annual economic output. Operational impacts have been expressed as a statewide benefit due to information provided by the client illustrating the variety in places of residence of their employees. Though many employees reside within Pinal County, employment figures in other counties were too significant to restrict the impact to just Pinal County. The following table displays ongoing economic impacts of the facilities at stabilized levels.

| Economic Impact of Operations State of Arizona CCA - Arizona Facilities (2009 Dollars) | | | |
|---|---|---|---|
| Impact Type | Jobs | Wages | Annual Economic Output |
| Direct | 2,733 | $130,000,000 | $225,771,700 |
| Indirect | 657 | $31,324,200 | $77,107,100 |
| Induced | 1,042 | $44,064,800 | $132,345,100 |
| **Total**[1] | **4,433** | **$205,389,000** | **$435,223,900** |

1/ The total may not equal the sum of the impacts due to rounding. All dollar figures are in constant dollars. Inflation has not been included in these figures.

Source: Elliott D. Pollack & Co., IMPLAN

Employment data for Pinal County as a whole was further analyzed. According to ESRI, a national demographics vendor, there are approximately 5,871 business establishments that employ just over 55,760 people. With 2,733 direct employees, CCA employment represents approximately 4.9% of total employment found within Pinal County. With a large percentage of



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 251 of 279 PageID #: 22880

BLACKSTONE0000329

their employees located in Pinal County, CCA's operations and their continual expansion are a significant asset to the County in reaching its goal of increasing the employment base in order to provide residents more opportunities to work closer to home.

The most current jobs to population estimate by CAAG (Central Arizona Association of Governments) for Pinal County was 0.185, or 185 jobs for every 1,000 residents within the County. That compares to Maricopa and Pima counties both with jobs to population ratios of 0.5, or 500 jobs for every 1,000 residents. A significant portion of Pinal County's workforce is traveling outside of the County for work, which costs employees in terms of both time and money. Large businesses that offer employment to local residents help to resolve these issues.

Of the existing CCA employment base, 71.3% reside within Pinal County. Maricopa County is home to approximately 18.1% of all CCA employees, while 8.5% reside in Pima County. Other counties, such as Gila County, Greenlee County, Mohave County, Navajo County and Yuma County, have a cumulative 1.7% of employment residing within their boundaries. This geographic discussion is the reason that the economic effects are expressed as a statewide benefit.

| Distribution of Employment CCA - Arizona Facilities | |
|---|---|
| **County** | **% of Total** |
| Pinal | 71.3% |
| Maricopa | 18.1% |
| Pima | 8.5% |
| Other Counties[1] | 1.7% |
| Out of State | 0.4% |
| Employment (FTE Equivalent) | 2,733 |

[1] "Other" counties consists of: Gila - 1.5%, Greenlee - 0.04%, Mohave - 0.04%, Navajo - 0.04%, and Yuma - 0.08%.

Source: Corrections Corporation of America

## 3.2 Fiscal Impact of Operations

Operations of the six facilities create tax revenue for the State, county and local governments. For this analysis, impacts to counties were quantified for Pinal County, Maricopa County and Pima County, with the remainder of the previously mentioned counties expressed cumulatively. Only municipalities within Pinal County were considered, though the incremental impact that will be discussed can likely be a generalized estimate for most municipalities in the State.

### Fiscal Impact of Operations on the State of Arizona

The table on the following page illustrates the fiscal impact of operations within CCA facilities on the State of Arizona. Excluding tax collections that are redistributed to cities and counties, the State collects nearly $10.3 million each year from stabilized operations at the six facilities.



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 252 of 279 PageID #: 22881

BLACKSTONE0000330

Nearly 84% is generated from income taxes (corporate and individual) and sales taxes from employee spending.

**Annual Fiscal Impact on the State of Arizona from Operations (Ongoing Annually)**
**CCA - Arizona Facilities**
**(2009 Dollars)**

| Impact Type | Primary Revenues | | Secondary Revenues from Employment | | | | | Total Annual Revenues |
|---|---|---|---|---|---|---|---|---|
| | Utility Franchise Tax | Corporate Income Tax | Employees Sales Tax | Income Tax | Vehicle License Tax | Unemployment Tax | HURF Fuel & Registration Tax | |
| Direct | $232,410 | $2,312,494 | $2,041,771 | $1,907,252 | $176,571 | $516,537 | $209,937 | **$7,397,000** |
| Indirect | N/A | N/A | $491,588 | $459,563 | $42,468 | $124,235 | $50,493 | **$1,168,300** |
| Induced | N/A | N/A | $729,545 | $646,482 | $67,347 | $197,015 | $80,073 | **$1,720,500** |
| **Total**[1/] | **$232,410** | **$2,312,494** | **$3,262,904** | **$3,013,297** | **$286,386** | **$837,788** | **$340,503** | **$10,285,800** |

1/ The total may not equal the sum of the impacts due to rounding. All dollar figures are in constant dollars. Inflation has not been included in these figures. All of the above figures are representative of the major revenue sources for the State and are intended only as a general guideline as to how the State could be impacted by the operations. All figures are based on the current economic structure and tax rates of the State.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; Arizona Tax Research Association.

## Fiscal Impact of Operations on Arizona Counties

The table on the following page illustrates the fiscal impact of operations from the six facilities on counties within the State. Arizona counties collect nearly $8.2 million each year from stabilized operations at CCA facilities. Over 75% percent of the collections are accrued by Pinal County due to facility property taxes, utility franchise taxes and State shared revenues from group quarters population (once the total inmate population is officially tabulated from a decennial or mid-decade census). Following Pinal County, Maricopa County is the next largest recipient (16.5%), followed by Pima County (6.6%). The cumulative total from all other affected counties is nominal, at 1.8% of total collections.


Case 3:16-cv-02267     Document 401-22     Filed 01/22/21     Page 253 of 279 PageID #: 22882

BLACKSTONE0000331

**Annual Fiscal Impact from Operations (Ongoing Annually)**
**County Level Impact**
**CCA - Arizona Facilities**
**(2009 Dollars)**

### Pinal County

| Impact Type | Primary Revenues Utility Franchise Tax | Direct Property Tax | Secondary Revenues Employees Sales Tax | Residential Property Tax | State Shared Revenues | Total Annual Revenues |
|---|---|---|---|---|---|---|
| Direct | $51,700 | $1,142,000 | $444,664 | $1,165,514 | $2,313,517 | $5,117,400 |
| Indirect | N/A | N/A | $107,050 | $280,325 | $4,879 | $392,300 |
| Induced | N/A | N/A | $159,848 | $444,546 | $7,504 | $611,900 |
| Total[1] | $51,700 | $1,142,000 | $711,561 | $1,890,385 | $2,325,899 | $6,121,600 |

### Maricopa County

| Impact Type | Primary Revenues Utility Franchise Tax | Direct Property Tax | Secondary Revenues Employees Sales Tax | Residential Property Tax | State Shared Revenues | Total Annual Revenues |
|---|---|---|---|---|---|---|
| Direct | N/A | N/A | $71,922 | $225,854 | $541,970 | $839,700 |
| Indirect | N/A | N/A | $17,315 | $54,322 | $127,461 | $199,100 |
| Induced | N/A | N/A | $25,855 | $86,145 | $196,038 | $308,000 |
| Total[1] | $0 | $0 | $115,092 | $366,321 | $865,469 | $1,346,800 |

### Pima County

| Impact Type | Primary Revenues Utility Franchise Tax | Direct Property Tax | Secondary Revenues Employees Sales Tax | Residential Property Tax | State Shared Revenues | Total Annual Revenues |
|---|---|---|---|---|---|---|
| Direct | N/A | N/A | $23,944 | $184,572 | $127,724 | $336,200 |
| Indirect | N/A | N/A | $5,764 | $44,393 | $30,038 | $80,200 |
| Induced | N/A | N/A | $8,607 | $70,399 | $46,200 | $125,200 |
| Total[1] | $0 | $0 | $38,316 | $299,364 | $203,962 | $541,600 |

### Other Counties[2]

| Impact Type | Primary Revenues Utility Franchise Tax | Direct Property Tax | Secondary Revenues Employees Sales Tax | Residential Property Tax | State Shared Revenues | Total Annual Revenues |
|---|---|---|---|---|---|---|
| Direct | N/A | N/A | $9,094 | $27,731 | $52,999 | $89,800 |
| Indirect | N/A | N/A | $2,189 | $6,670 | $12,465 | $21,300 |
| Induced | N/A | N/A | $3,269 | $10,577 | $19,171 | $33,000 |
| Total[1] | $0 | $0 | $14,553 | $44,978 | $84,635 | $144,100 |

### Cumulative County Impact

| Impact Type | Primary Revenues Utility Franchise Tax | Direct Property Tax | Secondary Revenues Employees Sales Tax | Residential Property Tax | State Shared Revenues | Total Annual Revenues |
|---|---|---|---|---|---|---|
| Direct | $51,700 | $1,142,000 | $549,624 | $1,603,672 | $3,036,210 | $6,383,200 |
| Indirect | N/A | N/A | $132,318 | $385,709 | $174,843 | $692,900 |
| Induced | N/A | N/A | $197,580 | $611,666 | $268,912 | $1,078,200 |
| Total[1] | $51,700 | $1,142,000 | $879,522 | $2,601,047 | $3,479,965 | $8,154,300 |

1/ The total may not equal the sum of the impacts due to rounding. All dollar figures are in constant dollars. All of the above figures are representative of the major revenue sources for counties and are intended only as a general guideline as to how counties could be impacted. All figures are based on the current economic structure and tax rates of counties.
2/ "Other" counties consists of: Gila, Greenlee, Mohave, Navajo, and Yuma.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; ATRA;

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 254 of 279 PageID #: 22883

BLACKSTONE0000332



## Cumulative Fiscal Impact of Operations on Pinal County Communities

The following table displays the ongoing tax revenue that cities and towns within Pinal County collect based on direct facility operations, population counts and employee generated impacts. In total, nearly $7.8 million is collected each year by communities throughout Pinal County. State shared revenues, property taxes (both direct facility property taxes and employee residential property taxes) and sales taxes from disposable income spending by employees are the largest revenue sources.

### Cumulative Fiscal Impact from Operations (Ongoing Annually) on Pinal County Communities
### CCA - Arizona Facilities
### (2009 Dollars)

| Impact Type | Primary Revenues | | Secondary Revenues from Employment | | | Total Annual Revenues |
| | Utility Franchise Tax | Direct Property Tax | Employees Sales Tax | Residential Property Tax | State Shared Revenues | |
| --- | --- | --- | --- | --- | --- | --- |
| Direct | $134,975 | $538,564 | $912,662 | $188,660 | $5,316,560 | $7,091,400 |
| Indirect | N/A | N/A | $219,717 | $45,376 | $5,960 | $271,100 |
| Induced | N/A | N/A | $328,085 | $71,958 | $8,970 | $409,000 |
| Total[1] | $134,975 | $538,564 | $1,460,464 | $305,993 | $5,331,490 | $7,771,500 |

1/ The total may not equal the sum of impacts due to rounding. All dollar figures are in constant dollars and do not consider the effects of inflation. All of the above figures are representative of the major revenue sources for a city or town and are intended only as a general guideline as to how each municipality could be impacted by the operations. All secondary revenue figures are based on the current average economic structure and tax rates of the communities within Pinal County. Primary revenues were estimated for each facility, using the appropriate tax rates of either the City of Eloy or Town of Florence.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; ATRA

## Incremental Fiscal Impact of Employment on Pinal County Communities

The following table depicts the ongoing tax revenue that any given city or town within Pinal County collects based on an incremental measure of 50 employees. Because it is difficult to track the locations of employees, average tax rates of applicable categories were used to estimate the impact that 50 employees of CCA facilities would have residing within a Pinal County municipality. This is to provide some perspective on how one municipality may benefit in proportion to the total impact of all employees. In other words, the following is the impact of 50 CCA employees on an average Pinal County community. If more than 50 CCA employees reside within a given municipality, the impact will be greater. Conversely, if fewer than 50 CCA employees reside in any given community, the impact would be less than stated.

In total, approximately $49,000 would be collected each year from various revenue sources (sales tax, property tax, and State shared revenues) for every 50 employees by an average Pinal County municipality.

As this is a reflection of the impact of employment, State shared revenues from inmate populations, direct property taxes and utility taxes from the facilities are not included. The



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 255 of 279 PageID #: 22884

BLACKSTONE0000333

communities of Eloy and Florence would add the corresponding revenues to calculate their entire impact.

### Incremental Fiscal Impact from Operations (Ongoing Annually)
### Impact of Every 50 Employees on Pinal County Communities
### CCA - Arizona Facilities
### (2009 Dollars)

| Impact Type | Secondary Revenues from Employment[1] | | | Total Annual Revenues |
| --- | --- | --- | --- | --- |
| | Employees Sales Tax | Residential Property Tax | State Shared Revenues | |
| Direct | $23,402 | $4,837 | $2,367 | $30,610 |
| Indirect | $5,634 | $1,163 | $526 | $7,320 |
| Induced | $8,413 | $1,845 | $811 | $11,070 |
| Total[1] | $37,448 | $7,846 | $3,704 | $49,000 |

[1] Employment is calculated as an incremental impact. The numbers peresented represent the impact of every 50 employees within a municipality

[2] The total may not equal the sum of the impacts due to rounding. All dollar figures are in constant dollars. Inflation has not been included in these figures. All of the above figures are representative of the major revenue sources for a city or town and are intended only as a general guideline as to how each municipality could be impacted by the operations. All figures are based on the current average economic structure and tax rates of the communities within Pinal County.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; ATRA



BLACKSTONE0000334

## 4.0 Impact of Future 3,000-bed Facility

This section of the report outlines the economic and fiscal impact of the hypothetical construction and operations of a 3,000-bed correctional facility. Construction phase impacts are generally short-term effects related to onsite and offsite construction employment and other supporting industries. The long-term consequences are the operational phase impacts.

The total construction value of a 3,000-bed facility was estimated to be $200 million. The economic impacts are expressed cumulatively over the entire duration of construction. If construction were to take two full years, it could reasonably be expected that approximately half of the impact would take place each year. For perspective, it was indicated that a project of this size could be finished within 15 to 18 months once the permitting process is complete.

### 4.1 Economic Impact of Construction

In terms of the economic impact from construction of a 3,000-bed facility, the project would generate 1,656 direct person years of employment during the construction phase. Person years of employment are the aggregate of each construction job that is recreated year after year throughout the construction time period. To derive the respective annual averages, employment, wages, and economic output can be divided by the expected number of years it may take to complete the development. About $80.2 million in direct wages would be generated based on the total construction activity. Another 872 indirect and induced person years of employment would be created in the economy, which would also produce wages and economic activity. Altogether, the project would create approximately 2,528 person years of employment during the construction timeframe and would generate $116.4 million in wages and $300.1 million in economic activity. These impacts would cease as construction is completed.

| Regional Economic Impact of Construction CCA - 3,000-Bed Facility (2009 Dollars) | | | |
|---|---|---|---|
| Impact Type | Person Years of Employment | Wages | Economic Output |
| Direct | 1,656 | $80,188,000 | $200,000,000 |
| Indirect | 409 | $19,710,000 | $48,037,000 |
| Induced | 464 | $16,507,000 | $52,089,000 |
| **Total**[1] | **2,528** | **$116,405,000** | **$300,126,000** |

1/ The total may not equal the sum of the impacts due to rounding. All dollar figures are in constant dollars. Inflation has not been included in these figures.
Source: Elliott D. Pollack & Co., IMPLAN

### 4.2 Fiscal Impact of Construction

The construction of a 3,000-bed facility would create significant tax revenues for the community and county in which it is located, as well as for the State of Arizona as a whole. For purposes of



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 257 of 279 PageID #: 22886

BLACKSTONE0000335

this analysis, tax rates across all Arizona counties and municipalities were averaged for a general estimate of tax impacts.

Revenues have been defined in this analysis as either <u>primary</u> or <u>secondary,</u> depending on their source and how the dollars flow through the economy into government tax accounts. For instance, some revenues, such as construction sales taxes, are straightforward calculations based on the cost of construction. These revenues are described in this study as <u>primary</u> revenues. <u>Secondary</u> revenues, on the other hand, flow from the wages of those direct, indirect and induced employees who are supported by the project as well as revenues that the State shares with counties and municipalities using a per capita formula. Revenue projections are based on typical wages of the employees working in the project, their spending patterns, and projections of where they might live.

## Fiscal Impact of Construction on the State of Arizona

The State of Arizona would benefit from primary sales tax revenue from construction as well as secondary impacts from the employees created by the development of the project. The following table shows the projected revenue collections for the State of Arizona that would be generated by the construction of a 3,000-bed CCA facility. For the State, to avoid double counting and overemphasizing impacts, collections only include those revenues that are not redistributed to local and county governments based on the State revenue sharing program.

The State of Arizona would collect more than $6.4 million in construction sales tax. There would also be $4.4 million in secondary revenues collected from employment activity for a total of $10.8 million in revenue. These figures are summarized in the table below.

| | Primary Revenues | Secondary Revenues from Employment | | | | | |
|---|---|---|---|---|---|---|---|
| Impact Type | Construction Sales Tax | Employees Spending Sales Tax | Income Tax | Vehicle License Tax | Unemployment Tax | HURF Fuel & Registration Tax | Total Revenues |
| Direct | $6,428,370 | $1,249,726 | $1,176,446 | $106,974 | $312,939 | $127,188 | **$9,401,643** |
| Indirect | N/A | $307,735 | $289,170 | $26,405 | $77,244 | $31,394 | **$731,949** |
| Induced | N/A | $296,879 | $222,888 | $29,949 | $87,611 | $35,608 | **$672,935** |
| **Total**[1/] | **$6,428,370** | **$1,854,340** | **$1,688,504** | **$163,328** | **$477,795** | **$194,191** | **$10,806,527** |

*Total Fiscal Impact on State of Arizona from New Construction*
*CCA - 3,000 Bed Facility*
*(2009 Dollars)*

1/ The figures exclude revenues collected by the State that are shared with counties and cities and are intended only as a general guideline as to how the State could be impacted by the project. All figures are based on the current economic structure and tax rates of the State.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; Arizona Tax Research Association.

## County Level Fiscal Impact of Construction

Similar to the State, the county in which the new facility is located would also benefit from construction sales tax revenue and secondary revenues from employees created by the construction of the facility. An average county would collect approximately $955,500 in primary construction sales tax revenue (based on a sales tax rate of 0.74%). There would also be



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 258 of 279 PageID #: 22887

BLACKSTONE0000336

nearly $1.2 million in secondary revenues from employment activity for a total of over $2.1 million in gross revenue.

| | Total Fiscal Impact on Average Arizona County from New Construction CCA - 3,000 Bed Facility (2009 Dollars) | | | | |
|---|---|---|---|---|---|
| | **Primary Revenues** | **Secondary Revenues** | | | |
| Impact Type | Construction Sales Tax | Employees Spending Sales Tax | Residents Property Tax | State Shared Revenues | **Total Revenues** |
| Direct | $955,500 | $220,555 | $534,629 | $26,042 | **$1,736,726** |
| Indirect | N/A | $53,986 | $131,965 | $3,127 | **$189,078** |
| Induced | N/A | $53,229 | $149,676 | $3,297 | **$206,202** |
| **Total[1/]** | **$955,500** | **$327,770** | **$816,271** | **$32,466** | **$2,132,006** |

[1/] Figures include revenues collected by the State and shared with counties and are intended only as a general guideline as to how an average Arizona county could be impacted by the project. All figures are based on the current average economic structure and average tax rates of Arizona counties.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; Arizona Tax Research Association.

## Municipal Level Fiscal Impact of Construction

Revenues generated to the average Arizona city or town from construction sales tax would total $3.5 million over the construction period (based on a sales tax rate of 2.7%). In addition, the city or town would benefit from the spending of construction workers. Sales tax collections for an average municipality were estimated at $466,500 for the duration of construction. Other secondary revenues include property taxes and State shared revenues. In total, an average municipality in Arizona would collect nearly $4.0 million from construction-related activity.

| | Total Fiscal Impact on Average Municipality from New Construction CCA - 3,000 Bed Facilty (2009 Dollars) | | | | |
|---|---|---|---|---|---|
| | **Primary Revenues** | **Secondary Revenues** | | | |
| Impact Type | Construction Sales Tax | Employees Spending Sales Tax | Residents Property Tax | State Shared Revenues | **Total Revenues** |
| Direct | $3,502,711 | $244,632 | $57,885 | $10,996 | **$3,816,224** |
| Indirect | N/A | $59,880 | $14,288 | $1,789 | **$75,956** |
| Induced | N/A | $59,039 | $16,206 | $1,746 | **$76,991** |
| **Total[1/]** | **$3,502,711** | **$363,551** | **$88,378** | **$14,530** | **$3,969,171** |

[1/] The figures include revenues collected by the State and shared with cities and are intended only as a general guideline as to how an average city or town could be impacted by the project. All figures are based on the current economic structure and average tax rates of Arizona cities and towns.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; Arizona Tax Research Association.



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 259 of 279 PageID #: 22888

BLACKSTONE0000337

## 4.3 Economic Impact of Operations

Once a facility is constructed and reaches a stabilized operating year, it would begin to produce jobs and revenue for the State as well as counties, cities and towns throughout the State on an annual basis.

The following table displays the ongoing economic impact of a 3,000-bed facility operating at stabilized levels. Stabilized operations of the facility would create approximately 450 direct jobs. In total, approximately 637 direct, indirect, and induced jobs would be created throughout the region as a result of the business operations of this facility. The operational impacts have been expressed as a regional benefit due to the uncertainty in places of residence of future employees.

| Regional Economic Impact of Operations CCA - 3,000 Bed Facility (2009 Dollars) | | | |
|---|---|---|---|
| Impact Type | Jobs | Wages | Annual Economic Output |
| Direct | 450 | $19,243,300 | $35,266,700 |
| Indirect | 83 | $3,237,200 | $8,075,100 |
| Induced | 104 | $3,699,200 | $11,656,500 |
| **Total**[1] | **637** | **$26,179,700** | **$54,998,300** |

1/ The total may not equal the sum of the impacts due to rounding. All dollar figures are in
Source: Elliott D. Pollack & Co., IMPLAN

## 4.4 Fiscal Impact of Operations

### Fiscal Impact of Operations on the State of Arizona

The table on the following page illustrates the fiscal impact of the operations of a 3,000-bed facility on the State of Arizona. Excluding tax collections that are redistributed to cities and counties, the State would collect nearly $1.5 million each year from operations.



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 260 of 279 PageID #: 22889

BLACKSTONE0000338

**Annual Fiscal Impact on the State of Arizona from Operations (Ongoing Annually)**
**CCA - 3,000 Bed Facility**
**(2009 Dollars)**

| | Primary Revenues | | Secondary Revenues from Employment | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| Impact Type | Utility Franchise Tax | Corporate Income Tax | Employees Sales Tax | Income Tax | Vehicle License Tax | Unemployment Tax | HURF Fuel & Registration Tax | Annual Revenues |
| Direct | $64,284 | $384,982 | $316,908 | $282,322 | $29,073 | $85,050 | $34,567 | **$1,197,200** |
| Indirect | N/A | N/A | $55,623 | $43,712 | $5,353 | $15,661 | $6,365 | **$126,700** |
| Induced | N/A | N/A | $66,456 | $49,951 | $6,696 | $19,589 | $7,962 | **$150,700** |
| **Total[1]** | **$64,284** | **$384,982** | **$438,987** | **$375,984** | **$41,123** | **$120,300** | **$48,894** | **$1,474,600** |

1/ The total may not equal the sum of the impacts due to rounding. All dollar figures are in constant dollars. Inflation has not been included in these figures. All of the above figures are representative of the major revenue sources for the State and are intended only as a general guideline as to how the State could be impacted by the operations. All figures are based on the current economic structure and tax rates of the State.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; Arizona Tax Research Association.

## County Level Fiscal Impact of Operations

The table below illustrates the fiscal impact of operations on an average county within the State. The county would collect over $1.8 million each year from the operations of one 3,000-bed CCA facility. Over 65% of this amount would be collected through property taxes, with an additional significant amount collected from State shared revenues due to population increases (once the inmate population is officially tabulated from a decennial or mid-decade census). The following table details anticipated tax revenue by category from the future expansion.

**Annual Fiscal Impact from Operations (Ongoing Annually)**
**County Level Impact**
**CCA - 3,000 Bed Facility**
**(2009 Dollars)**

| | Primary Revenues | | Secondary Revenues | | | Total |
|---|---|---|---|---|---|---|
| Impact Type | Utility Franchise Tax | Direct Property Tax | Employees Sales Tax | Residential Property Tax | State Shared Revenues | Annual Revenues |
| Direct | $9,555 | $953,498 | $64,989 | $167,763 | $517,392 | **$1,713,200** |
| Indirect | N/A | N/A | $11,460 | $30,891 | $602 | **$43,000** |
| Induced | N/A | N/A | $13,756 | $38,640 | $738 | **$53,100** |
| **Total[1]** | **$9,555** | **$953,498** | **$90,204** | **$237,294** | **$518,731** | **$1,809,300** |

1/ The total may not equal the sum of the impacts due to rounding. All dollar figures are in constant dollars. All of the above figures are
2/ "Other" counties consists of: Gila, Greenlee, Mohave, Navajo, and Yuma.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; ATRA;

## Municipal Level Fiscal Impact of Operations

The table on the following page displays the ongoing tax revenue that an average city or town within Arizona could expect to collect based on direct operations and employee generated impacts. In total, approximately $1.5 million would be collected each year by the respective community. State shared revenues from increased population (once the inmate population is officially tabulated from a decennial or mid-decade census) by far makes up the majority of expected tax revenue. Property taxes, both direct facility property taxes and employee



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 261 of 279 PageID #: 22890

BLACKSTONE0000339

residential property taxes, as well as sales taxes from disposable income spending by employees would be the next largest revenue sources.

| | Fiscal Impact from Operations (Ongoing Annually) Municipal Level Impact CCA - 3,000 Bed Facility (2009 Dollars) | | | | | |
|---|---|---|---|---|---|---|
| | Primary Revenues | | Secondary Revenues from Employment | | | |
| Impact Type | Utility Franchise Tax | Direct Property Tax | Employees Sales Tax | Residential Property Tax | State Shared Revenues | Total Annual Revenues |
| Direct | $28,717 | $217,754 | $62,432 | $15,732 | $1,169,960 | $1,494,600 |
| Indirect | N/A | N/A | $11,009 | $2,897 | $320 | $14,200 |
| Induced | N/A | N/A | $13,214 | $3,623 | $390 | $17,200 |
| Total[1] | $28,717 | $217,754 | $86,655 | $22,252 | $1,170,670 | $1,526,000 |

[1] The total may not equal the sum of impacts due to rounding. All dollar figures are in constant dollars and do not consider the effects of inflation. All of the above figures are representative of the major revenue sources for a city or town and are intended only as a general guideline as to how each municipality could be impacted by the operations. All secondary revenue figures are based on the current average economic structure and tax rates of the communities within Arizona. Primary revenues were estimated for each facility, using the average tax rates of Arizona cities and towns.

Source: Elliott D. Pollack & Co.; IMPLAN; Arizona Department of Revenue; ATRA



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 262 of 279 PageID #: 22891

BLACKSTONE0000340

# 5.0 Conclusion

With 2,733 direct employees creating 1,700 additional spin-off jobs, $205.4 million in total wages each year, and annual economic output of over $435.2 million, CCA contributes a significant economic benefit to the State of Arizona.

In addition to jobs, the company produces tax revenue for every level of government through both direct business operations and employee generated taxes. Operations of the six facilities produce state income and unemployment taxes, sales taxes, property taxes and HURF and vehicle license taxes. More specifically, CCA produces approximately $26.2 million in taxes to the State of Arizona and its political subdivisions annually.

As expressed previously, continued expansions of CCA facilities in Arizona would create significant employment opportunities and additional tax revenues for the State of Arizona as well as communities and counties in which they are located. At an estimated cost of $200 million, the construction of a single 3,000-bed facility would generate 2,528 direct, indirect and induced person years of employment, $116.4 million in wages and $300.1 million in total economic output for the entire construction period. After that, operating the facility would create 450 direct jobs (which would create an additional 187 indirect and induced jobs), $26.2 million in wages and $55.0 million in economic output on an annual basis.

Each additional facility would generate revenues for State, County, and local governments of $16.9 million from construction-related activity and over $4.8 million annually from operations.



BLACKSTONE0000341

# Privatization in Corrections:
## Increased Performance and Accountability
## Is Leading to Expansion



December
2009

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 264 of 279 PageID #: 22893

BLACKSTONE0000342

## ACKNOWLEDGEMENTS

The Institute is very grateful to various staff that provided input, improving the document including:

Neil Adler, Warden, Taft Correctional Facility, CA
Jill Elkins, Director, International Workforce Development
Leonard C. Gilroy, Director of Government Reform, Reason Foundation
Steve MacDonald, Public Policy Research Analyst, MTC Institute
Steve McAdams, Warden, Sanders Estes Unit, TX
Mike Murphy, VP Marketing, MTC Corrections
Rob Olding, Associate Dean, College of Health and Human Services, University of Phoenix
Erik Rasmussen, Director, Financial Planning & Analysis, Corrections Corporation of America
Terry Royal, Warden, Marana Community Correctional Treatment Facility, AZ
Hector Santiago, Warden, North Coast Correctional Treatment Facility
Keely Stubbs, MTC Human Resources, Intern
Franzi Walsh, Associate Dean, College of Social Sciences, Criminal Justice and Security Programs,
University of Phoenix

Their participation has enhanced the value of the information for elected officials, policy makers and Correctional Administrators.

We also extend thanks to the various MTC Executive staff who contributed their understanding and knowledge to the project. Finally, we recognize the valuable guidance and feedback of this project from Roberts T. Jones, President, MTC Institute as well as comments and observations from MTC Chairman of the Board, President & CEO, Scott Marquardt, whose input helped make this document stronger.

Privatization in Corrections: Increased Performance and Accountability Is Leading to Expansion

Published by MTC Institute. Copyright © December 2009.
Principal Author: Carl Nink
Comments are appreciated and should be directed to Carl Nink, Executive Director at:

MTC Institute
500 North Marketplace Drive
P.O. Box 10
Centerville, UT 84014
(801) 693-2870 - Fax: (801) 693-2900
carl.nink@mtctrains.com
www.mtcinstitute.com

Management & Training Corporation (MTC) is an international corporation dedicated to helping people realize their learning potential. MTC creates nurturing environments in which education is encouraged and recognized. MTC operates 16 contracted correctional facilities across the country with approximately 19,000 beds under contract. MTC also manages and operates 26 Job Corps centers in 19 states for the U.S. Department of Labor, preparing disadvantaged youth for meaningful careers. In addition, MTC has expanded their education and vocational expertise into the international arena, working in countries such as Iraq, Sudan, Tunisia, China, and Mongolia. The MTC Institute is the research division of MTC, which is dedicated to promoting innovations, exemplary practices, and projecting trends that are relevant to job training and corrections. The work of the Institute is geared towards a broad audience including policy makers, educators, researchers, practitioners, state and federal officials, workforce development entities, correctional agencies and Job Corps centers.

BLACKSTONE0000343

## INTRODUCTION

These are extraordinary times; the economy is in crisis nationwide. States are running out of money to fund necessary infrastructure improvements, education, medical care, and corrections. As a result, policymakers are looking for ways to stretch tight budgets without cutting services.

After cutting nearly $73 billion to make up for gaps in funding Fiscal Year (FY) 2009 budgets and over $113 billion in FY 2010, states are being forced to cut even more to make future budgets balance.[1] Nationwide, revenues were down in the first two quarters of FY 2009 almost 12 percent and 17 percent respectively.[2] As a consequence of substantial unemployment, resulting in lower revenue from income tax and lower state sales tax, as well as Medicaid spending that is up almost 8 percent in FY 2009,[3] many experts are predicting that there will be additional budget shortfalls of $14.5 billion in FY 2010 and $21.9 billion for FY 2011.[4] The situation California presents is not unique; there are at least nine additional states that are in a similar dire economic situation as California.[5] According to the report by the National Governors Association, "state revenues will likely not recover until 2014 or 2015" with some predictions that shortfalls could reach $350 billion.[6]

**National Governors Association reports state revenues will likely not recover until 2014 or 2015.**

With corrections budgets being the fifth largest state budget category, competition with other spending priorities, such as education, infrastructure, and health, is very tight.[7] In response, elected officials are calling for improved performance from corrections systems and specifically, reductions in recidivism.[8] Across 34 states, nearly 9 of 10 correctional dollars went to prisons in FY 2008.[9] During fiscal year 2009, correctional budgets were cut almost $700 million, much of it by eliminating staff and programming for inmates. Finally, at least 22 state correctional agencies, according to a report from the Vera Institute, have had budget cuts for FY2010.[10] This approach has a long-term cost associated with the decision in terms of inmates, without rehabilitation, returning to prison.[11]

**Contracted prisons have been successfully used in the US for more than 25 years, and are a viable option to limit costs without compromising service.**

State Corrections Budgets

2011

2008

1987

$74,000,000,000

$49,000,000,000

$12,000,000,000

Source: Pew Charitable Trust: *One in 100*

**Despite falling crime rates, the U.S. prison and jail population is actually growing at an alarming rate, from 744,000 inmates in 1985 to more than 2.3 million in 2008.**

As a result of the fiscal crisis, states are increasingly examining and turning to private contractors for a variety of services in order to save precious resources, increase performance, and enhance accountability.

HISTORY

Contracted prisons have been successfully used in the US for more than 25 years, and are a viable option to limit costs without compromising service.[12] Because they have been used for so long and studied so much, contracted prisons are no longer considered experimental. In many cases, even if prison operations are not contracted, other services such as medical, food, mental health, and commissary within a public facility may already be a contracted service.

CHANGES IN INMATE POPULATION

At present, more than 7.3 million people in the US are confined in a place of incarceration or are under some form of correctional supervision at a cost in excess of $68 billion annually.[13]



## US Inmate Population Growth

Despite falling crime rates, the U.S. prison and jail population is actually growing at an alarming rate, from 744,000 inmates in 1985[14] to more than 2.3 million in 2008.[15] Even though 16 prison systems reported decreases in their population since yearend 2007, between December 2000 and 2007, the average annual inmate population growth was 2.4 percent, with an incarceration rate (per 100,000 population) that has grown from 684 in December 2000 to 762 in June 2008.[16]

**Public-sector correctional systems are currently operating at or in excess of design capacity.**

PUBLIC PRISONS ARE OVERCROWDED

In California, which has the largest prison population, a federal judicial panel, noting conditions within the prisons are "appalling," directed the state to reduce its prison population by 40,000 in two years.[17]

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 267 of 279 PageID #: 22896

BLACKSTONE0000345

While these offenders would probably be low risk, the fact remains that the state has a 70 percent return to prison rate and with community support programs being eliminated or seriously reduced, help offenders could count on for support in past years is gone. Further, with a jobless rate of nearly 12.5 percent, many offenders will not be able to find work.[18] With few options for success, many will likely end up back in prison within a short period of time and once again become a tax burden.

Public-sector correctional systems are currently operating at or in excess of design capacity. According to the Bureau of Justice Statistics – Prisoners in 2007[19] report:

- 19 states were operating at 100 percent or more of their highest capacity measure (29 states were operating at 100 percent or more of their lowest capacity measure);

- In total, state prisons were operating at 96 percent of their highest capacity measure and 113 percent of their lowest capacity measure; and

- The federal prison system was at 136 percent of capacity.

## PRISON BED SUPPLY AND DEMAND IMBALANCE

It is projected demand will outpace supply for the next 5+ years, and the annual inmate/detainee population growth will be more than 30,000 per year.[20] However,

- Correctional systems already operate at or in excess of capacity (e.g., Bureau of Prisons (BOP) at 136 percent).[21]

- It is estimated that 120,000 new beds will needed to reduce state Department of Corrections (DOC) occupancy to 100 percent.[22]

- A recent survey of 30 states revealed just over 13,000 beds being slated for construction over several years with a corresponding annual increase of about 10,000 to 15,000 inmates.[23]

There are many budget constraints which limit government funds necessary for new construction or operating expenses for additional staffing. That is why most of the increase in offenders coming to prison are housed in private prisons. While inmate growth climbed almost 16,000 inmates (0.8 percent) from December 2007 to June 2008, over half of that number was housed in expanded capacity in private sector facilities.[24]

An analyst for Avondale Partners, LLC, following the performance of correctional companies, recently reported, 30 states indicated in a survey they would need to build more than 27,000 beds by 2011 at a time of significant budget deficit. Based on this and other factors, this demand will drive states using the private sector to expand their use of it, and those who are not using the private sector will start to seriously explore this option. As an example of movement in this direction, the budget transmitted to the Governor by the Arizona Legislature on August 20, 2009 requires the procurement of 5,000 private prison beds.[25]

**It is projected demand will outpace supply for the next 5+ years, and the annual inmate/detainee population growth will be more than 30,000 per year.**

**Most of the increase in offenders coming to prison are housed in private prisons.**

BLACKSTONE0000346

In addition, California recently filed a proposal with the Federal District Court, in response to a finding that its system is unconstitutionally overcrowded, that it would be expanding use of private prison beds by as much as 7,500 by the end of fiscal year 2012.[26]

## USE OF PRIVATELY CONTRACTED PRISONS IS EXPANDING

The current prison system is overcrowded and there are inadequate prison beds in the pipeline to satisfy the needs of the state and federal government. In response to this situation, the growth rate in the use of privately operated prisons has escalated. Since 2000, the number of private prison beds has been expanding, but averaging about 6.9 percent per year.[27] In March 2009, the US Bureau of Justice Statistics reported that privately contracted facilities, as of December 2008, now hold 7.8 percent of all adult inmates in the United States, up from 7.4 percent in June 2008, or about 1 in every 13 adults in prison.[28]

The use of the private sector by government to meet its expanding need for institutional bed space continues to out-pace the public sector. Over the last year (June 2007 to 2008) the inmate population has increased almost 16,000, inmates and over 50 percent of those offenders have been housed in beds provided by the private sector.[29] Since December 2000 and December 2007, public facilities have had an annual increase in inmates of 2.0 percent overall in comparison to privately operated facilities which increased by 4.8 percent overall.[30]

According to the Bureau of Justice Statistics, New Mexico leads the nation with 45.6 percent of their inmates in privately contracted prisons;

**Privately contracted facilities, as of December 2008, now hold 7.8 percent of all adult inmates in the United States, up from 7.4 percent in June 2008, or about 1 in every 13 adults in prison.**



**Percent of State and Federal Prisoners in Privately Contracted Correctional Facilities**

States with 20%+   States with 10-19.9%   States with .1 to 9.9%

Source: Bureau of Justice Statistics - March 2008

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 269 of 279 PageID #: 22898

BLACKSTONE0000347

overall there are 29 states with privately operated prisons. Of that group:

- Ten states have more than 20 percent of state inmates in privately operated facilities;
- Another six states have between 10 - 20 percent, and
- There are 13 states which have up to 10 percent of state and federal inmates in privately contracted prisons.[31]

Concern over correctional population growth and costs can also be observed in statements made by the National Conference of State Legislatures, which is predicting that the jail and prison population could grow by "nearly 200,000 inmates at a cost to states of $27.5 billion" by 2011. Given the state of the economy and government budgets, it is inevitable that the private sector will continue to be sought out to address capacity demands.[32]

As further evidence of government's reliance on the private sector, the director of the Federal Bureau of Prisons testified on July 21, 2009, in a congressional hearing, that their system was severely overcrowded and suggested greater use of privately operated prisons for low-security criminal aliens was one solution being actively considered.[33]

With current level of overcrowding, efficacy of the use of contracted prisons and the economic situation in most of the states, there will be limited construction of public institutions. It is predicted that there will be increased reliance on privately constructed and operated institutional beds. This prediction is based in part on an extrapolation of the baseline numbers, the fact that while private facilities require operating funds, there is no large capital outlays required to accommodate the growing inmate population. Finally, the projected supply of beds and the demand for beds, as well as the expansive nature of the budget gaps, it is believed that there will be in excess of 170,000 private adult correctional facility beds within the next four years.[34]

**With current level of overcrowding, efficacy of the use of contracted prisons and the economic situation in most of the states, there will be limited construction of public institutions.**



Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 270 of 279 PageID #: 22899

BLACKSTONE0000348

## GOVERNMENT IS EXPLORING ALL OPTIONS

**In the last 20 years states have seen corrections budgets increase 315 percent, from $10.6 billion to $44.06 billion in 2007.**

As states grapple with the increasing number of inmates, options on what to do during the national economic crisis presents a significant challenge for elected officials, who are now publicly discussing ideas that would not have surfaced in the past, such as:

- Reducing or eliminating rehabilitation programs
- Sentencing reform or releasing inmates early or earned time off for program completion
- Electronic monitoring, enabling offenders to live at home
- Severely overcrowding existing facilities
- Placing inmates in out-of-state facilities
- Exploring or piloting secure offender transition facilities, focused on the large group of parole violators and others, in need of intensive programming and reentry services
- Contracting for the financing, design, construction, and operation of prison beds

States face difficult questions regarding budget obligations. In the last 20 years states have seen corrections budgets increase 315 percent, from $10.6 billion to $44.06 billion in 2007.[35] As costs continue to increase, prison agencies and wardens are faced with the dilemma of how to save money while at the same time maintaining service levels. Therefore contracted prison operators are seen as a benefit to states facing larger budgets but smaller revenues, especially in light of their ability to reduce costs and perform in a way that ensures accountability for taxpayer resources.

## GREATER PERFORMANCE AND ACCOUNTABILITY

**Should a contractor not perform, they put themselves in a position to lose business on an existing contract and probably adversely impact any future contracts as well.**

Market forces play a major role in private contractors providing the best services and management of prison facilities. Should a contractor not perform, they put themselves in a position to lose business on an existing contract and probably adversely impact any future contracts as well. This business priority necessarily demands that the company, warden, and staff pay attention to their performance and ensure that every dollar is spent wisely and efficiently, minimizing waste.

Contractually, private companies must provide the level of performance required in such areas as security, management, and programs or face being sanctioned and/or losing the trust and confidence of their client. Most jurisdictions have contract monitoring and performance measures in the contract.[36] Of the 91 contracts studied by the Abt Associates for the National Institute of Corrections, all contracts had monitors assigned with 52 percent mandating daily monitoring and 23 percent mandating regular monthly visits. The remaining 25 percent of contracts specified quarterly visits or other forms of monitoring.[37] Typically, this contract monitoring takes place in at least three areas: [38]

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 271 of 279 PageID #: 22900

BLACKSTONE0000349

## 1. Administrative

- Evaluates the agency's compliance with the terms and conditions included in the contract (e.g., limiting staff vacancies and turnover, providing training, resolving grievances, holding offenders accountable for compliance with the rules, improving efficiency and actions designed to reduce costs).
- Ensures compliance with insurance coverage and any licensure requirements.

## 2. Fiscal

- Evaluates compliance with the fiscal requirements included in the contract.
- Reviews the agency's invoices to ensure that they are being submitted in a timely manner and in the format specified in the contract.
- Ensures that the billing rates included on the invoice meet the contractually agreed upon rates and those units of service, or activity being billed for, are supported by adequate documentation.

## 3. Program (Service Delivery)

- Evaluates the extent to which the operator is delivering the agreed upon services, specified in the contract in a timely manner, in the quantity required, and that the quality of the services provided are appropriate.
- Monitoring should ultimately, with the help of a third party in some instances, determine their impact on improving outcomes which includes reducing recidivism.
- Program assessments would likely be based on a review of offender records, interviews with offenders that received services and interviews/discussions with the facility staff and management, as well as observations made during tours of the facility.

Some states use legislators to inspect facilities. Ohio statutes provide for the operation of the Correctional Institutions Inspection Committee (CIIC) which is composed of legislators of each major political party.[39] On August 6, 2009, the CIIC conducted an on-site inspection of the MTC operated North Coast Correctional Treatment Facility (NCCTF). They stated in their report "the cleanliness of the entire facility was the best ever seen." They went on to report NCCTF "staff were very cordial and accommodating. Their positive attitude and motivation towards their mission were most impressive."[40]

Most contracts have performance measures in them. Depending on what government wants, some private prison contracts require higher program outcomes in academic areas, career and technical training, and reentry programs designed to help reduce the number of inmates returning to prison.

**Contractually, private companies must provide the level of performance required in such areas as security, management, and programs or face being sanctioned and/or losing the trust and confidence of their client.**

**Ultimately for all prisons, the determination of a successful facility includes the provision of a safe and secure environment where offender basic welfare needs are met within an institutional culture which promotes an appropriate quality of life.**

- Depending on desired outcomes private contractors will increase and expand programs for inmates.
- Contracts can also have incentives to reduce the number of inmates who return to prison once released.
- Quality companies invest in staff training, program development, and research, looking for more effective ways to improve outcomes.

When problems do arise, generally it is a contracting problem and not a problem with the contractor or with the agency. The contract dictates what will happen in a facility; if a contract is not clear and does not communicate all requirements, the contracting agency will not get what they want and the contractor will not deliver what is expected.

Ultimately for all prisons, the determination of a successful facility includes the provision of a safe and secure environment where offender basic welfare needs are met within an institutional culture which promotes an appropriate quality of life. Additionally, the successful prison must have programs that prepare the offenders for reentry into society, **thus** protecting the public from further effects of crime upon the release of the offenders from custody. Finally, the successful prison must be accountable for and manage the scarce taxpayer provided resources to achieve the greatest impact, while continuously looking for innovative, efficient, and effective ways to improve service while meeting identified outcome standards.

## USE OF CONTRACTED PRISONS RESULTS IN LOWER COSTS

**The use of privately contracted prisons reduced the growth of public expenditures for inmates by a statistically significant amount.**

An interest in the overall impact on state budgets where correctional agencies use privately contracted prisons led to a study which was recently published.

Vanderbilt University researchers studied the impact of contract corrections on state correctional systems over a period of eight years, publishing their findings in a report titled *Do Government Agencies Respond to Market Pressures? Evidence from Private Prisons.* The study found that the use of privately contracted prisons reduced the growth of public expenditures for inmates by a statistically significant amount. In a typical state correctional system with no private prisons and a budget of $493 million (2004), the introduction of private prisons resulted in a reduction in the overall budget from $13 - $15 million annually, when compared with states that do not make use of privately contracted prisons. In addition to these savings, government reaps the benefits from the lower per diems found at the privately operated prisons. The study also pointed to the fact that where a government monopoly exists, competition is lacking, as is any transfer of industry knowledge.[41]

A 2009 survey of 30 state correctional agencies, many of which use privately operated correctional facilities, also demonstrated contracted prisons are lower in cost than the public sector by 28 percent.[42]

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 273 of 279 PageID #: 22902

BLACKSTONE0000351

As a result of many factors, some elected officials are choosing to look closer at performance. The Oklahoma Legislature contracted a performance audit of the Oklahoma Department of Corrections. This performance audit was conducted by MGT of America Inc. and a final report was delivered to the legislature on December 31, 2007. The report states, the rates per day per inmate have decreased to $47.14 for contracted facilities while the public rate has increased to $51.94 for comparable facilities from 1996 to 2006. The Oklahoma Performance Audit report also suggested that "attaining high levels of operational performance through privatization requires:

1.  Contract terms and requirements that establish clear, well-defined duties and responsibilities consistent with the state's expectations;

2.  An effective system for monitoring contractor operations and compliance with contract terms; and

3.  Critical analyses of the reasons underlying good or bad contractor performance, and a willingness to apply such analysis to improve operations."[63]

To further substantiate the importance of privately contracted corrections and the benefit they provide to states, the non-partisan independently prepared report encouraged the state to "pursue additional privatization opportunities to obtain additional correctional system capacity quickly."[64]

Private companies are also usually more flexible than the public sector when it comes to completing tasks and projects. A private company can design and build a correctional facility faster than a public agency. This is usually because public agencies must initiate a cumbersome and lengthy process to hire a company to design the facility, and then bid to build the facility. Research proves this process can be done much more efficiently and with less cost by the private sector.[65]

Besides the reduced costs, research demonstrates there are many more benefits of contracted prison operations including greater accountability, performance management, and less bureaucracy.

## CONCLUSION

During this time of fiscal crisis, elected officials are paying attention. When contracted correctional facilities exist within a state, the budgets for the public correctional systems are reduced by millions of dollars, and savings are accrued through lower daily per inmate costs.[66]

With competition, managers and facilities provide input into operational practices, aiming to improve performance. Without competition, agencies tend to expect their line-item appropriations, usually greater than the ones given the year before, regardless of performance. Since the funding will be the same regardless of agency actions, there is limited incentive to develop more productive or cost-effective programs.

**A 2009 survey of 30 state correctional agencies, many of which use privately operated correctional facilities, also demonstrated contracted prisons are lower in cost than the public sector by 28 percent.**

**The contract and what is included in it are critical to operating a successful correctional facility: One that reduces cost to the taxpayer, operates effectively, and lowers the number of offenders that return to the prison system.**

Case 3:16-cv-02267    Document 401-22    Filed 01/22/21    Page 274 of 279 PageID #: 22903

BLACKSTONE0000352

The contract and what is included in it are critical to operating a successful correctional facility: One that reduces cost to the taxpayer, operates effectively, and lowers the number of offenders that return to the prison system. The contract dictates methods of accountability and transparency as well as what will happen in a facility. If a contract is not clear in communicating all requirements, the contractor may not deliver what is expected and the contracting agency probably will not get what they want.

Performance measurement is the great equalizer; which should be applied to all prisons regardless of what entity operates the facility. Those exceeding prescribed benchmarks are rewarded, whereas those failing to meet standards, performance measures and outcomes are sanctioned and ultimately replaced.

BLACKSTONE0000353

# ENDNOTES

[1] National Governors Association. The State Fiscal Situation: The Lost Decade. Retrieved November 30, 2009 from http://www.nga.org/Files/pdf/0911FISCALLOSTDECADE.PDF

[2] Ibid

[3] National Governors Association. The State Fiscal Situation: The Lost Decade. Retrieved November 30, 2009 from http://www.nga.org/Files/pdf/0911FISCALLOSTDECADE.PDF

[4] Ibid.

[5] The Pew Center on the States (2009). Beyond California-States in Peril. Retrieved December 1, 2009 from http://www.pewcenteronthestates.org/report_detail.aspx?id=56044

[6] National Governors Association. The State Fiscal Situation: The Lost Decade. Retrieved November 30, 2009 from http://www.nga.org/Files/pdf/0911FISCALLOSTDECADE.PDF

[7] Warren, J. (2008). One in 100: Behind Bars in America 2008. Pew Charitable Trust. Retrieved March 22, 2009 from http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS_Prison08_FINAL_2-1-1_FORWEB.pdf.

[8] Krause. M (2009). Reducing Recidivism and Lowering Corrections Costs. Independence Institute. Retrieved June 22, 2009 from http://www.i2i.org/main/article.php?article_id=1575

[9] National Conference of State Legislatures (2009). Prisons are expensive. Retrieved July 2, 2009 from http://www.ncsl.org/Portals/1/Documents/magazine/articles/2009/sl_0609-statestats.pdf

[10] Scott-Hayward, C. S. (2009). The fiscal Crisis in Corrections – Rethinking Policies and Practices. Retrieved December 1, 2009 from http://www.vera.org/files/The-fiscal-crisis-in-corrections_July-2009.pdf

[11] ACA audit of State Departments of Correction budget impact. January 2009.

[12] Segal, G. F., and Moore, A. T. (January 2002). Weighing the Watchmen: Evaluating the Costs and Benefits of Outsourcing Correctional Services—Part I: Employing a Best-Value Approach to Procurement; Part II: Reviewing the Literature on Costs and Quality Comparisons. Policy Study 289 and 290. Reason Public Policy Institute.

[13] Reggie B. Walton (2009). Prison Rape Elimination Act Commission Report. Retrieved on June 23, 2009 from http://nprec.us/publication/

[14] Coley, R. J., & Barton, P. E. (2006). Locked Up and Locked Out. Princeton: Education Testing Services.

[15] Heather C. West, Ph.D. and William J. Sabol (2009) Prison Inmates at Midyear 2008-Statistical Tables. Bureau of Justice Statistics, US Department of Justice. Retrieved on June 23, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf

[16] Ibid.

[17] Time for California to make a move concerning its prisons. Editorial: Contra Costa Times; August 26, 2009.

[18] Press Telegram. California Jobless Rate Hits 12.5%. Retrieved November 30, 2009 from http://www.presstelegram.com/ci_13833115

[19] West, H. C. & Sabol, W. J., (2008). Prisoners in 2007. U.S. Department of Justice, Office of Justice Programs. Washington D.C.: Bureau of JusticeStatistics. Retrieved March 7, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/p07.pdf

[20] Avondale Partners, LLC. (March 2, 2009). Corrections Industry Behind the Bars - An In-Depth View of the Corrections Industry.

[21] Heather C. West, Ph.D. and William J. Sabol (2009) Prison Inmates at Midyear 2008-Statistical Tables. Bureau of Justice Statistics, US Department of Justice. Retrieved on June 23, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf

[22] Heather C. West, Ph.D. and William J. Sabol (2009) Prison Inmates at Midyear 2008-Statistical Tables. Bureau of Justice Statistics, US Department of Justice. Retrieved on June 23, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf. MTC Institute calculations

[23] Avondale Partners, LLC. (March 2, 2009). Corrections Industry Behind the Bars - An In-Depth View of the Corrections Industry.

[24] Heather C. West, Ph.D. and William J. Sabol (2009) Prison Inmates at Midyear 2008-Statistical Tables. Bureau of Justice Statistics, US Department of Justice. Retrieved on June 23, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf. Calculation by MTC Institute.

[25] Arizona Legislative Budget Summary. Retrieved August 28, 2009 from http://www.azleg.gov/jlbc/budgetlegislationsummary082009.pdf

[26] California Department of Rehabilitation and Corrections (2009). Defendants Population Reduction Plan with exhibits. Retrieved on November 10, 2009 from http://www.cdcr.ca.gov/News/2009_Press_Releases/docs/Defendants_Pop_Reduction_Plan_wExhibits.pdf

[27] MTC Institute calculation using Bureau of Justice Statistics annual prisoner publications. Retrieved from http://www.ojp.usdoj.gov/bjs/prisons.htm.

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 276 of 279 PageID #: 22905

BLACKSTONE0000354

[28] Heather C. West, Ph.D. and William J. Sabol (2009) Prison Inmates at Midyear 2008-Statistical Tables. Bureau of Justice Statistics, US Department of Justice. Retrieved on June 23, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf.

[29] Heather C. West, Ph.D. and William J. Sabol (2009) Prison Inmates at Midyear 2008-Statistical Tables. Bureau of Justice Statistics, US Department of Justice. Retrieved on June 23, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf.

[30] Heather C. West, Ph.D. and William J. Sabol (2009) Prison Inmates at Midyear 2008-Statistical Tables. Bureau of Justice Statistics, US Department of Justice. Retrieved on June 23, 2009 from http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf.

[31] Ibid.

[32] National Conference of State Legislature (2008). NCSL's Annual Forecast: All Issues Take a Back Seat to Budgets: Top 9 issues of '09 fiscal conditions will dominate next year's legislative sessions. Retrieved December 16, 2008 from http://www.ncsl.org/programs/press/2008/pr12022008Top9.htm.

[33] Avondale Partners, LLC (July 22, 2009). BOP Director Suggests Increased Privatization. Retrieved July 22, 2009 from http://www.avondalepartnersllc.com/ResearchRepository/26545.pdf.

[34] Calculation by MTC Institute.

[35] Warren, J. (2008). One in 100: Behind Bars in America 2008. Pew Charitable Trust. Retrieved March 22, 2009 from http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS_Prison08_FINAL_2-1-1_FORWEB.pdf.

[36] McDonald, D., Fournier, E., Russell-Einhourne, M., and Crawford, S. (July 1998). Private Prisons in the United States—An Assessment of Current Practice. Abt Associates, Inc.

[37] Avondale Partners, LLC. (March 2, 2009). Corrections Industry Behind the Bars - An In-Depth View of the Corrections Industry.

[38] MTC Institute (2007) Contracting Prison Operations: A Plan to Improve Performance. Retrieved June 30, 2009 from http://www.mtctrains.com/institute/publications/Contracting_Prison_Operations.pdf. MTC Institute (2006). Measuring Success: Improving the Effectiveness of Correctional Facilities. Retrieved June 30, 2009 from http://www.mtctrains.com/institute/publications/MeasuringSuccess.pdf.

[39] Correctional Institutions Inspection Committee. More information at http://www.ciic.state.oh.us/members/index.html

[40] Correctional Institutional Inspection Committee report of inspection on August 6, 2009 of the North Coast Correctional Treatment Facility (yet to be posted - http://www.ciic.state.oh.us/publications/index.html#)

[41] J. F. Blumstein, M. A. Cohen, S. Seth (2007). Do Government Agencies Respond to Market Pressures? Evidence from Private Prisons. Vanderbilt Law and Economics Research Paper No. 03-16; Vanderbilt Public Law Research Paper No. 03-05, December 2007. Retrieved on August 18, 2009 from http://papers.ssrn.com/sol3/papers.cfm?abstract_id=441007

[42] Avondale Partners, LLC. (March 2, 2009). Corrections Industry Behind the Bars - An In-Depth View of the Corrections Industry.

[43] McGinnis, K. (2007). Performance Audit of the Department of Corrections for the Legislative Service Bureau of the Oklahoma Legislature - FINAL REPORT. Retrieved June 30, 2009 from http://www.oksenate.gov/publications/issue_papers/public_safety/OK%20RVSD%20Final%20Report%201.3.08.pdf.

[44] Ibid.

[45] Segal, G. F., and Moore, A. T. (January 2002). Weighing the Watchmen: Evaluating the Costs and Benefits of Outsourcing Correctional Services—Part I: Employing a Best-Value Approach to Procurement; Part II: Reviewing the Literature on Costs and Quality Comparisons. Policy Study 289 and 290. Reason Public Policy Institute.

[46] J. F. Blumstein, M. A. Cohen, S. Seth (2007). Do Government Agencies Respond to Market Pressures? Evidence from Private Prisons. Vanderbilt Law and Economics Research Paper No. 03-16; Vanderbilt Public Law Research Paper No. 03-05, December 2007.

Case 3:16-cv-02267   Document 401-22   Filed 01/22/21   Page 277 of 279 PageID #: 22906

BLACKSTONE0000355

BLACKSTONE0000356

MTC Institute

Privatization in Corrections: Increased Performance
and Accountability Is Leading to Expansion

500 North Marketplace Drive
P.O. Box 10, Centerville, UT 84014

(801) 693-2870 Fax (801) 693-2900

carl.nink@mtctrains.com
www.mtctrains.com/institute

BLACKSTONE0000357