# EXHIBIT 98
## [Filed Under Seal]

Exhibit 559
Marlowe, J.
10/16/20
@ptus

**United States Government Accountability Office**



GAO

Report to the Subcommittees on
Commerce, Justice, and Science,
Senate and House Appropriations
Committees

October 2007

# COST OF PRISONS

# Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities



**G A O**
Accountability * Integrity * Reliability

GAO-08-6

MARLOWE_0005923


October 2007

# COST OF PRISONS

## Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities

## Why GAO Did This Study

Over the last 10 years, the cost to confine federal Bureau of Prison (BOP) inmates in non-BOP facilities has nearly tripled from about $250 million in fiscal year 1996 to about $700 million in fiscal year 2006. Proponents of using contractors to operate prisons claim it can save money; others question whether contracting is a cost-effective alternative. In response to Conference Report 109-272, accompanying Pub. L. No. 109-108 (2005), this report discusses the feasibility and implications of comparing the costs for confining federal inmates in low and minimum security BOP facilities with those managed by private firms for BOP. GAO reviewed available data on a selection of 34 low and minimum security facilities; related laws, regulations, and documents; and interviewed BOP and contract officials.

## What GAO Recommends

GAO recommends that BOP develop a cost-effective way to collect comparable data across low and minimum security facilities and conduct analyses that compare the cost of confining federal inmates in these facilities, consistent with OMB requirements. BOP disagreed with GAO's recommendation and said it did not see the value of developing a methodology to compare facilities. GAO believes this comparison puts BOP in the best position to weigh alternatives for confining inmates to help ensure it is using the most cost-effective alternative. OMB did not comment on this report.

To view the full product, including the scope and methodology, click on GAO-08-6.
For more information, contact Eileen Larence at (202) 512-6510 or larencee@gao.gov.

## What GAO Found

A methodologically sound cost comparison analysis of BOP and private low and minimum security facilities is not currently feasible because BOP does not gather data from private facilities that are comparable to the data collected on BOP facilities. GAO's past work has shown that generally accepted evaluation criteria for comparing private and public prisons calls for the comparison to be based on a variety of factors, including selection of facilities with similar characteristics (i.e., staffing levels and educational programs offered) and quality of service (i.e., levels of safety and security for staff, inmates, and the general public). However, according to BOP officials, BOP and private facilities differ in characteristics and quality of service, and BOP does not collect or maintain sufficient data on private facilities to account or adjust for these differences in a cost comparison. According to private contractors, some characteristics data are maintained for their own purposes, but at present the data are not in a format that would enable a methodologically sound cost comparison. BOP officials stated that there are two reasons why they do not require such data of contractors. First, federal regulations do not require these data as a means for selecting among competing contractors. Second, BOP believes collecting comparable data from contractors could increase the cost of the contracts, but BOP officials did not provide support to substantiate these concerns.

Without comparable data, BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities. The Office of Management and Budget (OMB) requires agencies to consider and weigh various alternatives using analyses that help determine the benefits and costs of making decisions about the acquisition of assets, such as prisons. According to OMB requirements, selecting alternatives to meet capacity needs without adequate analysis by federal agencies has resulted in higher costs than expected. OMB provides guidance to help federal agencies analyze and weigh the costs and benefits of alternatives, which is important for BOP because BOP officials stated that the population for low and minimum security facilities continues to grow. OMB staff also added that they need more and better cost comparison information on the various alternatives for BOP's low and minimum security facilities to help them better understand the long-term costs and benefits of owning versus the short-term costs and benefits of privatization. Without analyses consistent with OMB requirements, it is difficult to know whether BOP is deciding on the most cost-effective alternative for acquiring low and minimum security facilities to confine inmates, including whether to contract, build, or expand.

# Contents

| **Letter** | | 1 |
|---|---|---|
| | Results in Brief | 4 |
| | Background | 8 |
| | BOP Lacks Data Needed to Perform a Methodologically Sound Cost Comparison and Is Not Positioned to Evaluate Alternatives for Confining Inmates in Low and Minimum Security Facilities | 10 |
| | Conclusions | 18 |
| | Recommendation for Executive Action | 18 |
| | Agency Comments and Our Evaluation | 18 |

| **Appendix I** | **Objectives, Scope, and Methodology** | 22 |
|---|---|---|

| **Appendix II** | **Comments from the Federal Bureau of Prisons** | 28 |
|---|---|---|

| **Appendix III** | **GAO Contact and Staff Acknowledgments** | 32 |
|---|---|---|

| **Related GAO Products** | | 33 |
|---|---|---|

| **Tables** | | |
|---|---|---|
| | Table 1: List of Low and Minimum Security Facilities within our Scope | 24 |

| **Figures** | | |
|---|---|---|
| | Figure 1: BOP Inmate Population at the End of Fiscal Year 2006 | 9 |

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 4 of 40 PageID #: 22912

MARLOWE_0005925

**Abbreviations**

| | |
|---|---|
| BOP | Federal Bureau of Prisons |
| FAR | Federal Acquisition Regulation |
| IGA | intergovernmental agreement |
| NIJ | National Institute of Justice |
| OMB | Office of Management and Budget |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 5 of 40 PageID #: 22913

MARLOWE_0005926



**United States Government Accountability Office**
**Washington, DC 20548**

October 5, 2007

The Honorable Barbara A. Mikulski
Chair
The Honorable Richard C. Shelby
Ranking Member
Subcommittee on Commerce, Justice, Science, and Related Agencies
Committee on Appropriations
United States Senate

The Honorable Alan B. Mollohan
Chairman
The Honorable Rodney Frelinghuysen
Ranking Member
Subcommittee on Commerce, Justice, Science, and Related Agencies
Committee on Appropriations
House of Representatives

At the end of fiscal year 2006, approximately 83,000 federal, adult male inmates within the Department of Justice's Federal Bureau of Prisons (BOP) were housed or confined in low or minimum security facilities, and in recent years BOP has relied on means other than building and operating its own facilities to confine many of these inmates, such as contracts with private sector firms. BOP's operating budget nearly doubled over the last decade from approximately $2.6 billion in fiscal year 1996 to just under $5 billion in fiscal year 2006. In fiscal year 1996, BOP received approximately $250 million of its $2.6 billion for contract confinement, including confining inmates in facilities owned and operated by private contractors and by state and local governments under intergovernmental agreements (IGA) with BOP.[1] By fiscal year 2006, the amount for contract confinement, including the cost of confining about 19,000 inmates housed in private and IGA facilities, had nearly tripled to $700 million of BOP's $5 billion operating budget.

There has been an ongoing debate over the privatization of prisons, that is, contracting for the management of prisons by private firms, whether the

---

[1]IGAs are agreements between BOP and state and local governments to confine BOP inmates in state and local prison facilities.

Case 3:16-cv-02267   Document 401-23   Filed 01/22/21   Page 6 of 40 PageID #: 22914

MARLOWE_0005927

prisons are owned by the private sector or by the government. In particular, proponents of privatization claim it can save money without reducing the levels or quality of service such as safety and security (i.e., levels of safety and security for staff, inmates, and the general public), whereas others have questioned whether privatization is a cost-effective alternative to publicly run facilities. Federal guidance from the Office of Management and Budget (OMB) requires that economic and cost comparison analyses be conducted to demonstrate the benefits of privatization, including how it would reduce the government's long-term costs. BOP's use of contracting to meet inmate bed space needs at low and minimum security facilities, in particular, has generated significant interest in the comparative costs of confining federal inmates in BOP, private, and IGA facilities. Conference Report 109-272, accompanying the Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006,[2] directed GAO to compare the costs of confining federal inmates in BOP, private, and IGA low and minimum security facilities.

Regarding IGA facilities, BOP has used IGAs for a number of years to confine low and minimum security inmates on a short term basis—less than 45 days—for the purposes of transferring them between facilities or as halfway houses when inmates are released from prison. These IGAs are in hundreds of locations throughout the country. However, according to BOP officials, over time four of the IGAs—located in western Texas, in the cities of Big Spring and Eden, Texas, and Garza County and Reeves County, Texas—evolved into facilities confining inmates on a long-term basis, similar to BOP-owned and -operated low and minimum security facilities. BOP officials told us that these four facilities confined approximately 83 percent of BOP's total IGA inmate population. During the course of our review, BOP did not renew the four Texas IGAs. Instead, BOP awarded five contracts to confine inmates in facilities with approximately 10,000 beds, which are about 3,000 more beds than the capacity provided under the four IGAs.[3] According to BOP officials, BOP chose to compete the bed space associated with these former agreements partly because the four Texas facilities outgrew their original purpose of confining small populations for short periods of time. BOP officials also stated that acquiring bed space via contracts rather than IGAs enhances their ability to oversee operations at the facilities. Because BOP no longer plans to use IGAs to confine inmates on a long-term basis, we shifted the

---

[2] Pub. L. No. 109-108, 119 Stat. 2290 (2005).

[3] BOP awarded these five contracts on January 17, 2007.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 7 of 40 PageID #: 22915

MARLOWE_0005928

focus of our review to BOP and private facilities only. Also, we did not include the five new contracts in the scope of our review because no federal inmates were housed under the new contract arrangements during fiscal years 2002 through 2006, the period covered by our review.

This report discusses the feasibility of comparing the cost of confining inmates in low and minimum security facilities owned and operated by BOP with the cost of confining these inmates in private facilities and the implications this has for making decisions on low and minimum security confinement.

To address this objective, we reviewed applicable laws, regulations, and studies on BOP programs, prison management, and contracting requirements.[4] We also examined available BOP and private facility documents on the management of low and minimum security facilities. In addition, we met with BOP officials and worked with them to identify potential BOP and private facilities that could be compared considering basic criteria, including inmate gender (male or female inmates, assuming that costs for programs and services might be different depending on gender) and whether cost data might be available on the individual facility level for a 5-year period covering fiscal years 2002 through 2006.[5] Our discussions with BOP officials resulted in the selection of 34 low and minimum security facilities managed by BOP and private operators that confined federally sentenced male inmates on a long-term basis over the 5-year period. Specifically, we focused on (1) 27 BOP-owned and -operated low and minimum security facilities that are not on the same campus as medium and high security prisons (BOP does not isolate the costs of operating individual low and minimum security facilities located on the same campus with high and medium security facilities), and (2) 7 facilities operated by private firms under contract to BOP.

Once we selected facilities, we interviewed BOP officials in Washington, D.C. and private contractors at their corporate headquarters to determine what data on prison costs and characteristics would be available. Where possible, we gathered and analyzed available data on the facilities and

---

[4]According to BOP, prison programs include services and classes that provide productive use-of-time activities and facilitate the successful reintegration of inmates into society, consistent with community expectations and standards.

[5]Because the private facilities we selected for our review do not confine female inmates or juveniles, we excluded all female and juvenile BOP facilities from our analysis.

Case 3:16-cv-02267      Document 401-23      Filed 01/22/21      Page 8 of 40 PageID #: 22916

MARLOWE_0005929

examined whether the data would lend themselves to a comparison based, in part, on key factors—such as similar facility characteristics and levels of service—needed to do a methodologically sound comparison as outlined in our 1996 report that provides lessons learned for comparisons of private and public correctional facilities.[6] In addition, we examined BOP efforts within the context of OMB requirements for capital planning and space acquisition. We also met with OMB staff responsible for BOP budget review and preparation to discuss BOP's efforts to acquire space to confine inmates in low and minimum security facilities in order to determine what information BOP provides OMB on capital investments, how this information is used to inform decisions, and what additional information OMB needs to make informed decisions. In addition, we met with officials from the Department of Justice's National Institute of Justice (NIJ) to discuss NIJ's current and past work on prison privatization and we met with experts from Florida State University College of Criminology and Criminal Justice and from the JFA Institute—a nonprofit agency conducting justice and corrections research for effective policy making—to further our understanding about prisons and the complexities of comparing the cost of operating private and public prisons. Appendix I contains more detailed information on our scope and methodology.

We conducted our work from May 2006 through August 2007 in accordance with generally accepted government auditing standards.

## Results in Brief

It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private low and minimum security facilities because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost. Our past work has shown that generally accepted evaluation criteria for any comparative study of private and public prisons call for the comparison to be based not just on operational costs, but on a variety of factors including selection of facilities with similar characteristics (i.e., staffing levels and programs offered) and quality of service. This is to ensure that cost comparison analyses either compare similar facilities or can account for differences in order to address whether facilities operating at lower costs can provide the same or better levels of service as those operating at higher costs. However, according to BOP officials and

[6] GAO, *Private and Public Prisons: Studies Comparing Operational Costs and/or Quality of Service*, GAO/GGD-96-158 (Washington, D.C.: Aug. 16, 1996).

Case 3:16-cv-02267 Document 401-23 Filed 01/22/21 Page 9 of 40 PageID #: 22917

MARLOWE_0005930

private contractors, facilities differed in characteristics and in quality of service. Although BOP collects and maintains characteristic data on its own low and minimum security facilities, BOP does not gather data on private contract facilities that would enable us or them to account or adjust for any differences. While private contractors told us that they maintain some data for their records, these officials said that the data are not readily available or in a format that would enable a methodologically sound cost comparison at this time. According to BOP officials and private contractors,

> In terms of facility characteristics, BOP facilities generally confine U.S. citizens, and programs are designed to teach inmates skills that they can use when they are released so as to avoid returning to prison. By contrast, private facilities primarily confine criminal aliens—non-U.S. citizens or foreign nationals who are serving time for a U.S. federal conviction. Programs that focus on preventing returns to prison are not required of private facilities because criminal aliens are released for removal from the country and are not expected to return to U.S. communities or BOP custody.

> BOP does not require private facility data comparable to what it maintains for its own facilities with regard to safety and security issues and, consequently, a facility's quality of service. These include data on the number of inmates attended to by health care professionals due to misconduct, staff turnover rates, and the experience level of the staff.

BOP does not collect comparable data on private facilities needed to conduct a methodologically sound cost comparison with BOP low and minimum security facilities because (1) federal regulations do not require BOP to do so when selecting among competing contractors, and (2) according to BOP officials, collecting additional facility characteristic and quality of service data could add costs to contracts. Regarding the latter, BOP's Senior Deputy Assistant Director stated that private contractors might charge higher contract prices as a result of having to collect and provide this information but that BOP has not determined what these additional costs would be. BOP officials told us they are committed to contracting to confine inmates in low and minimum security facilities. They said that their construction priority is medium and high security facilities because inmates in medium and high security facilities are at higher risk in terms of their behavior (i.e., rates of misconduct, assaults, and history of violence) and private contractors have yet to demonstrate the ability to handle these higher security populations. According to BOP

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 10 of 40 PageID #: 22918

MARLOWE_0005931

officials, because of its commitment to contracting, BOP has not recently considered, nor does it plan to evaluate contracting in relation to other alternatives for inmates confined in low and minimum security facilities. These alternatives can include constructing new BOP low and minimum security facilities, acquiring and using excess military properties, or expanding or renovating existing BOP facilities.

While BOP does not need to collect comparable data for selecting among contractors, the purpose of analyzing these data is to evaluate and justify whether confining inmates in private facilities is more cost-effective than these other confinement alternatives. In fact, OMB requires agencies to consider and weigh various alternatives using analyses, such as benefit-cost or cost-effectiveness analyses, when making decisions about the acquisition of capital assets, such as office buildings, hospitals, schools, and prisons.[7] According to OMB, selecting alternatives to meet space requirements without adequate analysis by federal agencies has resulted in higher costs than anticipated. Additionally, OMB staff stated that they need more and better cost comparison information on the various alternatives for BOP's low and minimum security facilities to help better understand the long-term costs and benefits of owning versus the short-term costs and benefits of privatization. These analyses are especially important because BOP officials stated that the population for these facilities continues to grow. Without such analyses, it is difficult to know whether BOP is deciding on the most cost-effective alternative for acquiring low and minimum security facilities to confine inmates, including whether to contract, build, or expand.

Recognizing that there is a cost associated with gathering and analyzing additional data needed to compare costs across BOP and private facilities, we are making one recommendation designed to help BOP evaluate alternatives for confining inmates in low and minimum security facilities. We are recommending that the Attorney General direct the Director of BOP to develop a cost-effective way to collect comparable data across

---

[7] Office of Management and Budget, Executive Office of the President, OMB Circular No. A-11, Part 7, *Capital Programming Guide* (2006). A benefit-cost analysis is a systematic quantitative method of weighing the costs associated with implementing or operating an alternative against any benefits expected from the alternative. A cost-effectiveness analysis is a systematic quantitative method for comparing the cost of alternatives when such alternatives achieve the same benefits. According to OMB, it is a less comprehensive technique than a benefit-cost analysis, but can be appropriate for ranking alternatives when the benefits of competing alternatives are the same. An alternative is considered cost-effective when it is determined to have the lowest cost for a given amount of benefit.

Case 3:16-cv-02267      Document 401-23      Filed 01/22/21      Page 11 of 40 PageID #: 22919

MARLOWE_0005932

BOP and private low and minimum security facilities confining inmates under BOP's custody, and design and conduct methodologically sound analyses that compare the cost of confining inmates in these facilities in order to consider contracting among other alternatives for low and minimum security confinement, consistent with OMB requirements.

BOP disagreed with our recommendation and stated that it does not own or operate facilities to house solely criminal aliens. BOP also said it does not expect to receive funding to construct such low security facilities. Therefore, BOP does not believe there is value in developing data collection methods to compare costs of confining these inmates in private facilities with other alternatives for confining inmates. BOP further commented that, through open competition, it has been able to determine a fair and reasonable price for its existing contracts and said that requiring contractors to provide specific comparable data would have the potential to increase current contract costs at a time when BOP is facing budget constraints. BOP also noted that it believes a 2005 study conducted for BOP by a private contractor has already met the intent of our recommendation because the study compares the cost of operating a government-owned, contractor-operated facility in Taft, California, with other low security BOP facilities.[8]

We agree that full and open competition can establish fair and reasonable costs for services provided by contractors. However, our recommendation is about selecting the most cost-effective alternative for confining inmates, not about selecting among contractors as the only alternative. We believe that developing data collection methods to determine the costs of confining inmates in low and minimum security facilities—regardless of whether those facilities are owned and operated by BOP or a contractor and regardless of whether the facility confines criminal aliens, U.S. citizens, or both—is critical to BOP's ability to evaluate the cost-effectiveness of contracting compared to other alternatives for confining inmates, such as constructing a new facility or modifying existing facilities. Absent this evaluation, key decision makers, including BOP managers, OMB, and Congress, are not positioned to have the information needed to make the most cost-effective investment decisions. We agree that requiring contractors to provide data so that BOP can conduct a comparison has the potential of increasing contract costs, but BOP has not

---

[8]Nelson, Julianne, *Competition in Corrections: Comparing Public and Private Sector Operations*, the Center for Naval Analysis Corporation (Virginia: December 2005).

GAO-08-6 Cost of Prisons

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 12 of 40 PageID #: 22920

MARLOWE_0005933

assessed what the costs of collecting the data would be or whether the costs would outweigh the benefit of being able to determine the most cost-effective alternative for confining inmates in low and minimum security facilities. Finally, we disagree that BOP has met the intent of our recommendation via the study referenced by BOP because it does not compare the costs of various alternatives for confining inmates in low and minimum security facilities, as we recommended.

## Background

BOP was established in 1930 to provide progressive and humane care for federal inmates in the 11 federal prisons in operation at the time. Since then, BOP's mission has evolved into protecting society by controlling offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

At the end of fiscal year 2006, there were over 114 federal prison facilities located throughout the country at four primary security levels—minimum, low, medium, and high. BOP facilities are given a security designation based on the level of security and staff supervision the facility is able to provide. According to BOP, minimum security facilities, also known as Federal Prison Camps, have dormitory housing and limited or no perimeter fencing; low security Federal Correctional Institutions have double-fenced perimeters and mostly dormitory or cubicle housing; medium security Federal Correctional Institutions have strengthened perimeters (often double fences with electronic detection systems) where inmates are mostly confined to prison cells; and high security institutions, also known as United States Penitentiaries, have highly secured perimeters (featuring walls or reinforced fences) and multiple- and single-occupant cell housing. BOP also maintains administrative facilities, which are institutions with special missions, such as the detention of pretrial offenders;[9] the treatment of inmates with serious or chronic medical problems; or the containment of extremely dangerous, violent, or escape-prone inmates. Administrative facilities are capable of holding inmates at all security levels.

---

[9]According to BOP, a pretrial inmate is a person who is legally detained but for whom BOP has not received notification of conviction. Thus, pretrial inmates include persons awaiting trial, being tried, or awaiting a verdict.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 13 of 40 PageID #: 22921

MARLOWE_0005934

According to BOP population data, at the end of fiscal year 2006, BOP's total inmate population was approximately 193,000 inmates, of which about 43 percent, or 83,000, were long-term, adult male inmates confined in BOP, private, or IGA low and minimum security facilities. About 52,000 (27 percent) of the total inmates were confined in medium security facilities, and approximately 18,000 (about 9 percent) were in high security facilities. Additionally, approximately 21 percent of the 193,000 total inmates, or 40,000 inmates, were females, juveniles, inmates in halfway houses, inmates in home confinement, or inmates confined in BOP's administrative facilities. See figure 1 for a breakout of these populations.

**Figure 1: BOP Inmate Population at the End of Fiscal Year 2006**



Source: GAO analysis of BOP population data.

<sup>a</sup>BOP other includes females, juveniles, inmates in halfway houses, inmates in home confinement, or inmates confined in BOP's administrative facilities (i.e., medical facilities or detention facilities).

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 14 of 40 PageID #: 22922

MARLOWE_0005935

# BOP Lacks Data Needed to Perform a Methodologically Sound Cost Comparison and Is Not Positioned to Evaluate Alternatives for Confining Inmates in Low and Minimum Security Facilities

A methodologically sound cost comparison analysis of BOP and private low and minimum security facilities is not currently feasible because BOP does not gather data from private facilities that are comparable to the data collected on BOP facilities. BOP is not required under federal contracting regulations to gather data that would enable a comparison, and although BOP has not evaluated the cost of collecting additional information, BOP officials maintain that it could increase the price contractors charge BOP for contract services. However, without comparable data, BOP is not able to analyze and justify whether confining inmates in private facilities would be more cost-effective than other confinement alternatives such as constructing new BOP facilities or renovating existing BOP facilities. Such an analysis would be consistent with OMB requirements, which call for agencies to identify and evaluate various alternatives when making decisions about the acquisition of capital assets (e.g., office buildings, hospitals, schools, and prisons).

## A Cost Comparison Is Not Currently Feasible because BOP Lacks Data Needed to Perform a Methodologically Sound Comparison

We determined that it is not currently feasible to compare the cost of confining male federal inmates in low and minimum security BOP and private facilities because data needed for a methodologically sound comparison are not currently available. Our review of BOP documentation showed that BOP collects basic cost data on a per inmate basis across BOP and private facilities. For BOP-owned and -operated facilities, BOP maintains per inmate costs that include salaries, employee benefits, equipment, and utilities. For private facilities, BOP maintains the negotiated per inmate contract price, award fees, and deductions made as a result of the performance-based contract terms. However, these cost data are not sufficient for doing a methodologically sound cost comparison. As we reported in 1996, any comparative study of private and public prisons should not only be based on operational costs but also on an analysis of similar facilities—including the design, capacity, security level, and types of inmates and quality of service—and on sufficient statistical controls to measure and account for any differences among facilities.[10] Otherwise, any comparative analysis of operational costs could

---

[10]GAO/GGD-96-158. While exploring how we would conduct a comparison for this report, we took into account factors outlined in our 1996 report on studies that compared the cost of private and public prisons to ensure that our comparison would be methodologically sound and generalizeable to federal low and minimum security facilities nationwide regardless of the operator. In addition to the factors mentioned above, our 1996 report stated that a variety of other factors could affect a cost comparison of prison facilities such as cost-of-living and economic differences among the nation's geographic regions.

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 15 of 40 PageID #: 22923

MARLOWE_0005936

be skewed. For example, one study we reviewed as part of our 1996 report did not assess quality of service as part of the cost comparison between private and public facilities and, as a result, could not conclude whether the levels of service affected the differences in costs.

According to BOP officials and private contractors, BOP and private facilities have different characteristics and provide different levels of service. Thus, statistical methods would need to be used to account for these differences once cost data were collected to determine the impact they have on the operating cost of the facilities. Using guidelines established in our previous work, we sought to compare facilities with similar characteristics to ensure results of a comparison would not be skewed. However, we were unable to do so because the data needed to do the comparison were not available. BOP and private contracting officials reported that there are numerous differences among BOP and private facilities, including inmate population, program requirements, and economic differences within the different geographic locations of the facilities. According to BOP officials, private contractor facilities have fewer contractual requirements for programming, such as vocational training and release preparation courses, than BOP facilities, in part, because of the different types of inmates confined in the facilities. In general, BOP facilities confine U.S. citizens and programs are designed to teach inmates skills that they can use when they are released, such as job training skills, so as to help avoid their return to prison. By contrast, private facilities primarily confine criminal aliens—non-U.S. citizens or foreign nationals, who are serving time for a U.S. federal conviction. Programs that focus on preventing returns to prison are not required of private facilities because criminal aliens are released for removal from the country and are not expected to return to U.S. communities or BOP custody.

Given the differences with regard to facility characteristics, statistical techniques such as analyzing the extent to which characteristics—including program differences—vary among facilities, would have to be applied to strengthen conclusions of a cost comparison analysis. For example, if BOP facilities provide more programs for inmates than contractors do, then comparable data on the number and types of programs across all facilities would be needed to adjust for this difference in order to conclude how the difference in programs affect operating costs. BOP maintains data on its own low and minimum security facilities and collects some similar facility data on private facilities, including the age of the facility, the citizenship status of inmates, and inmate population. However, BOP does not maintain comparable data on various aspects of

private facilities, such as inmate-to-staff ratios, size of the facility, specific programs available to inmates, and whether inmates in private facilities are completing those programs. Because BOP does not maintain comparable data for private facilities on the differing facility characteristics that could affect costs, we could not determine the extent to which these facilities differed nor use statistical methods to determine the impact of these differences on costs. Since we could not control or adjust for such differences, the results of a cost comparison analysis conducted at this time would be skewed.

With regard to quality of service, BOP also lacks sufficient data on measurements of safety and security for inmates, staff, and the general public for a methodologically sound cost comparison of BOP and private facilities. As we reported in 1996, a cost comparison analysis should include not just operational costs but also an assessment of quality to ensure that if a contractor is operating at lower costs than BOP, it is providing the same or a better level of service. We attempted to review numerous quality of service data—such as data that measure safety and security—so that differences could be accounted for by comparing data on what is achieved by these services. However, according to officials in BOP's Office of Research and Evaluation, BOP does not maintain data on private facilities that we could use to compare quality of service across the different facilities. This includes the number of grievances submitted by inmates, the number of inmates attended to by health care professionals due to misconduct,[11] staff turnover rates, and the experience level of the staff. As a result, we could not assess the trade-offs between the levels of services being offered and the costs of operating the facilities.

While the contract requirements for the private facilities direct contractors to maintain some data on inmates in BOP's central database system called SENTRY,[12] according to BOP officials, the data private contractors enter are not necessarily consistent with those data collected on BOP facilities, and BOP officials stated that they cannot attest to the reliability or validity

---

[11]Studies we reviewed identified misconduct incidences as inmate-on-inmate assaults, staff-on-inmate assaults, inmate-on-staff assaults, drug and contraband violations, sexual assaults, homicides, suicides, and escapes from the facility.

[12]SENTRY is BOP's online, real-time database system, used primarily for maintaining information about federal inmates including sentencing, work assignments, admission/release status, and other special assignments for monitoring inmate status. According to contracting requirements, each private contractor is required to provide and maintain hardware and software to access SENTRY.

of the private contractor data. For example, BOP officials and private contractors we spoke with stated that although private contractors are required to report incidences of misconduct to BOP, neither could confirm if the private contractor system for categorizing or tracking incidences of misconduct is consistent with BOP's misconduct categories.[13] BOP further reported that program data were not comparable. For example, according to BOP officials, private contractors reported that inmates completed the U.S. General Educational Development program, when the program actually completed by the inmates was a Mexican equivalent of the program. Additionally, private contractors we spoke with told us that they maintain some facility characteristic and quality of service data, but the data are not maintained in the same format as BOP facility data and are not readily available because they are only maintained in hard copies at some of the facilities contractors manage.

BOP officials provided two reasons why they do not collect or require contractors to collect comparable data that would facilitate a comparison of the cost of confining inmates in low and minimum security BOP and private facilities: (1) federal regulations do not require such data as a means for selecting among competing contractors, and (2) BOP believes collecting comparable data from contractors could add costs. However, BOP officials had not evaluated the probable amount of added costs.

When choosing among private contractors, federal regulations do not require BOP to collect comparable facility characteristic or quality of service information from private facilities. According to BOP officials, all BOP private contracts in our review are firm-fixed price and, under federal regulations for competing contracts, BOP does not need this information for technical evaluations of the proposals.[14] BOP officials added that during the acquisition process, BOP maintains data needed to evaluate proposed contract prices, such as the price to manage and operate each facility and the government's estimate of the price, in accordance with the

---

[13] Although we reviewed the available data maintained by BOP, for the purposes of this report, we did not assess the contractor's compliance with BOP's data entry requirements to confirm whether the private sector data were consistent with BOP's misconduct categories because BOP's monitoring and oversight of its contracts was beyond the scope of our review.

[14] Firm-fixed price contracts provide for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 18 of 40 PageID #: 22926

MARLOWE_0005939

Federal Acquisition Regulation (FAR). The FAR requires the contracting official to determine if proposed prices are fair and reasonable and further states that the performance of a cost analysis is not needed if there is adequate price competition.[15] In general, adequate price competition is established when two or more responsible parties independently submit prices for the solicitation that meet the government's requirements. The award is made to the party whose proposal represents the best value and there is no finding that the price of the other parties is unreasonable. In addition to price, the FAR recommends agencies evaluate one or more nonprice criteria, such as past performance and prior experience. However, agencies have broad discretion in the selection criteria and in determining the relative importance of each criterion. Consequently, the regulation does not require BOP to collect comparable data on various facility characteristics and quality of service measures needed to conduct a methodologically sound cost comparison.

Additionally, while BOP is concerned that the cost of contracts could increase if it were to require comparable data from private contractors because it would be beyond the scope of existing contract requirements, it has not evaluated the costs or benefits of acquiring the additional data. BOP's Senior Deputy Assistant Director and other BOP officials said they suspect that it is likely that private contractors would charge BOP a higher contract price if it required private contractors to meet additional requirements, such as providing data similar to those collected by BOP for its facilities. However, because BOP has not requested such data during the contract process or estimated the incremental costs and benefits of requiring comparable data from private facilities, BOP officials could not speak to the extent of the potential cost increase.

Although in the Department of Justice Fiscal Year 2003-2008 Strategic Plan BOP identified several alternatives for space acquisition, such as expanding or renovating existing facilities, acquiring military properties for prison use, contracting with private companies, and constructing new facilities, BOP officials stated that they do not consider all of these alternatives for confining inmates in low and minimum security facilities because they are committed to contracting with nonfederal entities for low and minimum security bed space.

---

[15]Federal Acquisition Regulation, 48 C.F.R. §§ 15.305(a)(1), 15.403-1(c) (2006).

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 19 of 40 PageID #: 22927

MARLOWE_0005940

Our past work has shown that over the long term, it is usually more cost-effective for an agency to own a facility than to lease one.[16] For example, we previously reported that for nine major operating lease acquisitions proposed by the General Services Administration—the central leasing agent for most federal agencies—construction would have been the least expensive option in eight cases and would have saved an estimated $126 million compared to two leasing options that spread payments out over time.[17] However, when funds for ownership are not available, leases become a more attractive option from the agency's budget perspective because they add much less to a single year's appropriation total than other alternatives. According to BOP officials, they consider alternatives for space acquisition only for medium and high security facilities, because medium and high security facilities are BOP's priority based on capacity needs. In addition to capacity needs, from BOP's perspective, inmates in medium and high security facilities are at higher risk in terms of their behavior (i.e., rates of misconduct, assaults, and history of violence) and private contractors have yet to demonstrate the ability to handle these higher security populations, so BOP has chosen to continue to confine the higher security inmates in BOP-owned and -operated facilities. As a result, BOP officials stated that they have not considered nor do they plan to consider alternatives besides contracting for low and minimum security facilities.

## BOP Cannot Evaluate whether Privately Contracted Facilities Provide Better or Worse Value than Other Low and Minimum Security Confinement Alternatives

Because BOP is not able to compare the cost of BOP and private facilities in a methodologically sound manner, it cannot determine if confining inmates in private facilities is more or less cost-effective than other confinement alternatives such as constructing and operating new BOP facilities, acquiring and using excess properties (i.e., former military bases), or expanding or renovating existing BOP facilities. OMB requires agencies to follow capital planning principles set forth in its *Capital Programming Guide*.[18] OMB's guide identifies the need for effective

---

[16]GAO, *Federal Real Property: Reliance on Costly Leasing to Meet New Space Needs Is an Ongoing Problem*, GAO-06-136T (Washington, D.C.: Oct. 6, 2005), 5-8.

[17]The cost of construction was compared to the options of (1) lease-purchases in which payments are spread out over time and ownership of the asset is eventually transferred to the government, and (2) operating leases in which periodic lease payments are made over the specified length of the lease.

[18]Office of Management and Budget, Executive Office of the President, OMB Circular No. A-11, Part 7, *Capital Programming Guide* (2006).

Case 3:16-cv-02267      Document 401-23      Filed 01/22/21      Page 20 of 40 PageID #: 22928

MARLOWE_0005941

planning and management of investments. Among other things, this guide articulates key principles agencies should follow when making decisions about the acquisition of capital assets such as prisons. The *Capital Programming Guide* requires that agencies consider as many alternatives as possible because, according to the guide, whenever the government lacks viable alternatives, it may lack a realistic basis to manage contract costs. Once a list of alternatives is established, the guide requires that agencies then compare those alternatives based on a systematic analysis of expected benefits and costs. The fundamental method for formal economic analysis is a benefit-cost analysis. OMB guidance on benefit-cost analyses can be found in OMB Circular A-94—a circular that helps agencies conduct a study on the benefits and costs of whether to acquire a new capital asset, undertake a major modification to an existing asset, or use some other method such as contracting for services.[19] More specifically, the goal of the circular is to promote efficient resource allocation through well-informed decision making by the federal government. The circular provides general guidance for conducting benefit-cost and cost-effectiveness analyses, and serves as a checklist of whether an agency has considered and properly dealt with all elements of a sound analysis.

OMB's *Capital Programming Guide* reports that credible cost and benefit analyses, such as those described in OMB Circular No. A-94, are the basis of sound management decision making, enabling agencies to determine the best investment option for meeting their goals and making them better equipped to evaluate alternatives. OMB's guide states that data are the most important piece of such analyses, including various procurement or contract data. Consequently, to do the analyses described in OMB Circular No. A-94, BOP would have to first collect and maintain comparable BOP and private facility data. BOP senior officials acknowledged that they have not done any such analyses to assess alternatives for confining inmates in low and minimum security facilities, and they were unable to explain why such analyses have not been done. Nonetheless, according to the OMB guide, selecting alternatives to meet space requirements without adequate analysis by federal agencies has resulted in higher costs than anticipated. Consequently, without such an analysis, it is difficult to know whether BOP is deciding on the most cost-effective alternative for acquiring low

---

[19]Office of Management and Budget, Executive Office of the President, OMB Circular No. A-94, *Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs* (1992).

Case 3:16-cv-02267　　　　Document 401-23　　　　Filed 01/22/21　　　　Page 21 of 40 PageID #: 22929

MARLOWE_0005942

and minimum security facilities to confine inmates, including whether to contract, build, or expand.

The results of any analysis conducted by BOP consistent with OMB requirements would be important because BOP officials expect inmate populations in low and minimum security facilities to rise. Inmates in low and minimum security facilities made up approximately 43 percent of BOP's total population in fiscal year 2006, and according to BOP officials, this population will continue to grow. As a result, there would be an increase of inmates requiring confinement in low and minimum security facilities. BOP also projects about a one-third increase in its long-term criminal alien population,[20] or approximately 5,700 more criminal alien inmates between fiscal years 2005 and 2008, which could further strain BOP resources as these inmates are confined primarily in low security facilities. While the private sector has additional capacity to accommodate at least some of this expected growth in inmate populations, BOP cannot determine whether private contracting is or would be the most cost-effective alternative because of the data limitations discussed above.

While there are costs associated with gathering data needed to compare costs across BOP and private facilities, without the data to conduct benefit-cost or cost-effectiveness analyses, BOP is not able to compare alternatives for confining inmates in a methodologically sound manner. Additionally, the absence of data also has potential long-term costs because BOP managers, OMB staff, and congressional decision makers do not have the information needed to weigh alternatives and make the best investment decisions. Although OMB staff told us that BOP provides several documents in accordance with the *Capital Programming Guide*, such as information about facilities in BOP's inventory and weekly reports about inmate population, OMB staff stated that it would be useful to have more and better comparison information on the cost of confining inmates in BOP and private low and minimum security facilities. They said that without such data, it is difficult to understand how BOP is making decisions on the most cost-effective way to manage and confine future inmates sentenced to low and minimum security facilities. OMB staff added that they consider contracting a viable option because it gives BOP the flexibility to immediately deal with population changes. However, according to OMB staff, they would not expect contracting to always be

---

[20]According to BOP, long-term criminal aliens are those criminal aliens confined in low and minimum security facilities for more than 45 days.

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 22 of 40 PageID #: 22930

MARLOWE_0005943

cheaper because owning a facility may be more cost-effective in the long run. As a result, comparative analyses would be beneficial to help them better understand the long-term costs and benefits of owning versus the short-term costs and benefits of privatization.

## Conclusions

Because of projections of future growth of inmate populations, BOP will need to continue to acquire additional capacity. However, deciding what to do in response to this need will be difficult because BOP does not have the data necessary to do a methodologically sound cost comparison of its various alternatives for confining inmates in low and minimum security facilities. Because contracting regulations do not require BOP to collect private facility data comparable to BOP facility data, BOP has not gathered or maintained data needed to conduct a methodologically sound cost comparison. Additionally, BOP is concerned with increased contract costs. However, BOP has not assessed the cost of collecting the data or whether the estimated costs would outweigh the benefits of having it. As a result, BOP is not in a position to meet OMB's capital planning requirements and evaluate whether contracting is more cost-effective than other alternatives, such as building new low and minimum security facilities, buying existing facilities that may be available, or expanding facilities already operated by BOP. Without such data, BOP cannot determine whether procuring prison confinement and services from private firms costs the government more or less than other confinement alternatives, as required by OMB.

## Recommendation for Executive Action

To help BOP evaluate alternatives for confining inmates in low and minimum security facilities, and recognizing that there is a cost associated with gathering and analyzing data needed to compare costs across BOP and private facilities, we recommend that the Attorney General direct the Director of BOP to develop a cost-effective way to collect comparative data on low and minimum security facilities confining inmates under BOP's custody and design and conduct methodologically sound analyses that compare the costs of confining inmates in these facilities in order to consider contracting among other alternatives for low and minimum security confinement, consistent with OMB requirements.

## Agency Comments and Our Evaluation

We requested comments on a draft of this report from the Director of the Office of Management and Budget and from the Attorney General. While OMB did not provide comments, in a September 17, 2007, letter, BOP

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 23 of 40 PageID #: 22931

MARLOWE_0005944

provided written comments, which are summarized below and included in their entirety in appendix II.

BOP disagreed with our recommendation and stated that it does not own or operate facilities to house solely criminal aliens. BOP also said it does not expect to receive funding to construct such low security facilities. Therefore, BOP does not believe there is value in developing data collection methods to compare costs of confining these inmates in private facilities versus other alternatives for confining inmates. BOP stated that, through open competition, it has been able to determine a fair and reasonable price for its contracts. In a related comment, BOP stated that our report does not reference that Congress has provided funds to contract out for inmate bed space but has not provided funding for new construction of low and minimum security facilities. BOP also noted that it does not currently have the capacity to confine low security criminal aliens and is dependent on private contractors to fill the gap, and, if construction funds were available for low and minimum security facilities, it would take several years before the bed space would become available. In addition, BOP noted that it is committed to contracting, in part, because OMB has directed BOP to take greater advantage of state and local governments and the private sector to meet its space requirements to confine inmates in low and minimum security facilities. With regard to the recommendation, BOP also stated that gathering data from contractors to aid in a cost comparison would have the potential to increase current contract costs at a time when BOP is facing budget constraints. Finally, BOP pointed out that an independent review conducted in 2005 which compared the operational cost of a BOP-owned, contractor-operated facility in Taft, California, with other low security BOP facilities meets the intent of our recommendation.[21]

We agree that full and open competition can establish fair and reasonable costs for services provided by contractors. However, our recommendation is about selecting the most cost-effective alternative for confining inmates, not about selecting among contractors as the only alternative. We believe that developing data collection methods to determine the costs of confining inmates in low and minimum security facilities—regardless of whether those facilities are owned and operated by BOP or a contractor and regardless of whether the facility confines criminal aliens, U.S. citizens, or both—is critical to BOP's ability to evaluate the cost-

---

[21]Nelson (2005).

Case 3:16-cv-02267      Document 401-23      Filed 01/22/21      Page 24 of 40 PageID #: 22932

MARLOWE_0005945

effectiveness of contracting compared to other alternatives for confining inmates, such as constructing a new facility, modifying an existing facility, or acquiring military properties for prison use. OMB's *Capital Programming Guide* requires agencies to undertake the kind of comparison we are recommending in order to consider alternatives when making decisions about the acquisition of capital assets, such as prisons. Adhering to OMB requirements better ensures that key decision makers, including OMB and Congress, have the information needed to make the most cost-effective investment decisions.

We recognize that BOP has not received funding to construct new low and minimum security facilities, but this does not mean that funds will not be appropriated in the future, especially if data demonstrate that this option is more cost-effective. Without these data, BOP is not in a position to justify funding for new construction or other alternatives because BOP cannot do a methodologically sound comparison among low and minimum security facilities. With regard to BOP's comment that it currently does not have the capacity to confine criminal aliens and must rely on contracting to address capacity issues, our report noted that, according to OMB staff, contracting may be a viable option because it provides BOP the flexibility to immediately deal with population changes. Nonetheless, OMB staff also said that they need more and better cost comparison information to help them understand the long-term costs and benefits of owning versus the short-term costs and benefits of privatization. OMB staff also stated that they would not always expect contracting to be cheaper because owning a facility may be more cost-effective over the long run, which is consistent with our past work.[22]

With regard to BOP's concern that requiring comparable data from contractors could raise the cost of current contracts, our report recognized that there is a cost associated with gathering and analyzing additional data needed to compare costs across BOP and private facilities. However, BOP has not determined the cost of collecting the data or whether the estimated costs would outweigh the benefits of knowing the most cost-effective alternative for confining inmates. Without a cost-effective way to collect comparable data, BOP cannot conduct a methodologically sound cost comparison analysis that takes into account factors, such as facility characteristics and quality of service, which can differ from facility to facility. Collecting and analyzing these data would

---

[22]GAO-06-136T.

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 25 of 40 PageID #: 22933

MARLOWE_0005946

provide key decision makers the information needed to make the most cost-effective investment decisions.

We disagree with BOP's assertion that it has met the intent of our recommendation via the 2005 study by the Center for Naval Analysis. In citing this study, BOP failed to recognize that this study does not compare the costs of various alternatives for confining inmates in low and minimum security facilities. Rather, it compares BOP-owned and -operated facilities with one BOP-owned and contractor-operated facility in Taft, California.

In addition, BOP stated it had provided detailed cost information and that it believed we would obtain comparable data from the private sector in order to conduct a methodologically sound cost comparison. As discussed throughout our report, the cost data BOP provided were not sufficient to conduct a methodologically sound cost comparison. As our report states, any comparative study of private and public prisons should not only be based on operational costs, but should also account for facility characteristics and the quality of services provided. We requested this information from the private sector. As our report notes, private contractors do not maintain similar data, because BOP does not require them to report or collect the data it requires of its own facilities.

BOP also provided technical comments, which we considered, and we have amended our report to incorporate these clarifications, where appropriate.

We are sending copies of this report to the Attorney General and the Director of OMB. Copies will also be made available to others on request. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov.

If you or your staff have any questions regarding this report, please contact me at (202) 512-6510 or larencee@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Key contributors are listed in appendix III.

Eileen Regen Larence
Director, Homeland Security and Justice Issues

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 26 of 40 PageID #: 22934

MARLOWE_0005947

# Appendix I: Objectives, Scope, and Methodology

Our work focused on the comparative cost of confining federal inmates in low and minimum security facilities owned by the Federal Bureau of Prisons (BOP) and privately managed facilities under contract to BOP. Specifically, our objective was to assess the feasibility of comparing the costs for confining inmates in low and minimum security facilities owned and operated by BOP with the cost to confine these inmates in private facilities and the implications this has for making decisions on low and minimum security confinement. Our work was initially designed to address Conference Report 109-272, accompanying the Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006,[1] which directed GAO to compare the costs of confining federal inmates in low and minimum security facilities owned by BOP, privately managed facilities under contract to BOP, and local facilities or jails via intergovernmental agreements (IGA) with BOP.[2] However, during the course of our review, BOP did not renew IGAs for four facilities in Western Texas—in the cities of Big Spring and Eden, Texas, and Garza County and Reeves County, Texas—that confined 83 percent of federal inmates in IGA facilities. Although BOP has, over time, used hundreds of IGAs across the country to confine inmates on a short term basis—45 days or less—the four Texas facilities had evolved into facilities confining inmates on a long-term basis, similar to BOP-owned and -operated low and minimum security facilities. In January 2007, BOP awarded five contracts to confine inmates in facilities with approximately 10,000 beds, which are about 3,000 more beds than the capacity provided under the four IGAs.[3] According to BOP officials, BOP chose to compete the bed space associated with these agreements partly because the four Texas facilities outgrew their original purpose of confining small populations for short periods of time. BOP officials also stated that acquiring bed space via contracts rather than IGAs enhances their ability to oversee operations at the facilities. Because BOP no longer plans to use IGAs to confine inmates on a long-term basis, we shifted the focus of our review to BOP and private facilities only.

---

[1]Pub. L. No. 109-108, 119 Stat. 2290 (2005).

[2]IGAs are agreements between BOP and state and local governments to confine BOP inmates in state and local prison facilities.

[3]Three of the five contracts were awarded to the private firms that operated the former IGA facilities for the local governments. The fourth contract was awarded directly to the local government that owns the facility, Reeves County. BOP also awarded a fifth contract to a new contractor in Pine Prairie, Louisiana.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 27 of 40 PageID #: 22935

MARLOWE_0005948

We did our work at BOP headquarters and the Office of Management and Budget (OMB) in Washington, D.C. We reviewed applicable laws, regulations, and studies on BOP programs, prison management, and contracting requirements.[4] We also examined available BOP and private contractor documents on the management of low and minimum security facilities. In addition, we met with BOP officials and worked with them to identify potential BOP and private facilities that could be compared considering basic criteria including inmate gender (male or female inmates, assuming that costs for programs and services might be different depending on gender) and whether cost data might be available on the individual facility level for a 5-year period covering fiscal years 2002 through 2006. In selecting low and minimum security facilities, we met with BOP officials to identify potential BOP and private facilities that could be compared over a 5-year period covering fiscal years 2002 through 2006. Our discussions with BOP officials resulted in the identification of 34 low and minimum security facilities operated by BOP and private contractors that confined federally sentenced male inmates over the 5-year period. Specifically, we focused on (1) 27 BOP-owned and -operated low and minimum security facilities, and (2) 7 facilities operated by private firms under contract to BOP. Table 1 lists the 34 facilities we selected.

---

[4]According to BOP, prison programs include services and classes that provide productive use-of-time activities and facilitate the successful reintegration of inmates into society, consistent with community expectations and standards.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 28 of 40 PageID #: 22936

MARLOWE_0005949

**Table 1: List of Low and Minimum Security Facilities within our Scope**

| BOP low and minimum security facilities[a] | Location | Security level | Security level of adjacent facility (if applicable) |
|---|---|---|---|
| Allenwood | Pennsylvania | Low | Minimum |
| Ashland | Kentucky | Low | Minimum |
| Bastrop | Texas | Low | Minimum |
| Beaumont | Texas | Low | Minimum |
| Big Spring | Texas | Low | Minimum |
| Butner | North Carolina | Low | |
| Coleman | Florida | Low | |
| Elkton | Ohio | Low | Minimum |
| Forrest City | Arkansas | Low | Minimum |
| Fort Dix | New Jersey | Low | Minimum |
| Fort Worth | Texas | Low | |
| La Tuna | Texas | Low | Minimum |
| Lompoc | California | Low | |
| Loretto | Pennsylvania | Low | Minimum |
| Milan | Michigan | Low | |
| Petersburg | Virginia | Low | Minimum |
| Safford | Arizona | Low | |
| Sandstone | Minnesota | Low | |
| Seagoville | Texas | Low | Minimum |
| Texarkana | Texas | Low | Minimum |
| Waseca | Minnesota | Low | |
| Yazoo City | Mississippi | Low | Minimum |
| Duluth | Minnesota | Minimum | |
| Montgomery | Alabama | Minimum | |
| Morgantown | West Virginia | Minimum | |
| Pensacola | Florida | Minimum | |
| Yankton | South Dakota | Minimum | |

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 29 of 40 PageID #: 22937

MARLOWE_0005950

| Private contract facilities | Location | Security level | Security level of adjacent facility (if applicable) |
|---|---|---|---|
| California City | California | Low | |
| Cibola | Arizona | Low | |
| Northeast Ohio | Ohio | Low | |
| McRae | Georgia | Low | |
| Moshannon Valley | Pennsylvania | Low | |
| Rivers | North Carolina | Low | |
| Taft | California | Low | Minimum |

Source: BOP.

Note: The facilities included in this table confined federal inmates for fiscal years 2002 through 2006.

ªDuring the early stages of our work, BOP identified the 27 BOP low and minimum security facilities listed above as those that had individual facility costs for fiscal years 2002 through 2006. However, in the later stages of our work, BOP officials clarified that 8 of the 27 facilities—Allenwood, Beaumont, Butner, Coleman, Forrest City, Lompoc, Petersburg, and Yazoo City—were part of complexes which included medium or high security facilities during some or all of this time period. Therefore, the individual costs for the low and minimum security facilities within these 8 complexes could not be isolated for fiscal years 2002 through 2006.

Several facilities were excluded from our scope because of issues with the availability of cost data for fiscal years 2002 through 2006. We excluded from our analysis those BOP low and minimum security facilities that are co-located with other facilities in a prison complex, since BOP does not isolate the costs of operating individual low and minimum security facilities located on the same campus with high and medium security facilities. Additionally, the Federal Correctional Institutions Miami, Oakdale, and Terminal Island are excluded from the list, as between November 2004 and June 2005 they were converted from medium to low security facilities so they do not have a comparable low security cost history. We did not include the competitive, private contract Reeves County Detention Center III in our study because the facility did not begin receiving federal inmates until 2007 and consequently did not have cost data associated with confining federal inmates. We also excluded the privately operated facility in Eloy, Arizona, as BOP chose to not exercise its option to continue contracting with the private operator at this facility in February 2006 and it became an Immigration and Customs Enforcement detention facility exclusively. In addition, because the private facilities do not confine female inmates or juveniles, we excluded all female and juvenile BOP facilities from our analysis, assuming that costs might be different depending on these inmate characteristics.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 30 of 40 PageID #: 22938

MARLOWE_0005951

Once we selected facilities, we interviewed BOP procurement officials;
budget officials; and officials from the Office of Research and Evaluation,
Office of Policy Development and Planning, and Office of Design and
Construction. We interviewed accounting, contracting, and operations
officials as well as general counsel representing the seven individual
prisons of the private firms. Over the course of our review, we used
numerous studies as well as data from the Bureau of Justice Statistics to
put together a list of variables that might affect a cost comparison
analysis. We coordinated with BOP officials from the Office of Research
and Evaluation to generate a list of comparable variables for BOP and
private facilities. Later, we were told by BOP officials that data for many
variables needed for a cost comparison analysis are not collected or
maintained for private facilities. Given the current status, we focused our
efforts on whether a methodologically sound cost comparison was
feasible. Where possible, we gathered and reviewed available data on the
facilities and examined whether the data would be suitable for a
comparison based, in part, on key factors—such as similar facility
characteristics and levels of service—needed to do a methodologically
sound comparison as outlined in our 1996 report and Office of
Management and Budget (OMB) Circular No. A-76: *Performance of
Commercial Activities*.[5] Some studies in our 1996 report, for instance,
used a variety of quality measures or outcomes such as safety, incident
data, and the extent of programs available to inmates.[6]

In order to determine if the selected BOP and private facilities were
sufficiently similar to allow a methodologically sound comparison, we
attempted to analyze facility characteristics data. In addition, we analyzed
the historical costs to the government including direct (i.e., salaries,
supplies, and cost of services) and indirect costs, such as support costs
and operating and maintenance costs for buildings, equipment, and
utilities and cost-related data between fiscal years 2002 and 2006
associated with operating low and minimum security BOP and private
facilities. Additionally, we met with prison experts from Florida State
University College of Criminology and Criminal Justice and from the JFA

---

[5]GAO/GGD-96-158 and Office of Management and Budget, Executive Office of the
President, OMB Circular No. A-76, *Performance of Commercial Activities* (2003).

[6]While we attempted to collect data to compare the level of service provided, we did not
attempt to assess BOP's monitoring and oversight of its contracts as they relate to the
contractor's performance and quality of service because doing so was beyond the scope of
our review.

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 31 of 40 PageID #:
22939

MARLOWE_0005952

Institute—a nonprofit agency conducting justice and corrections research
for effective policy making—to further our understanding about prisons
and the complexities of comparing the costs of operating private and
public prisons. We reviewed documentation on how BOP evaluates and
assesses contract proposals to determine what data are used to make
contracting decisions. In addition, we reviewed the Federal Acquisition
Regulation to determine what requirements were applicable to BOP with
respect to cost data and cost comparisons. Finally, we examined studies
done to compare the cost of operating one BOP facility in Taft, California,
that is owned by BOP but operated by a private contractor, as well as a
study conducted by the National Academy for Public Administration on
the feasibility of using low and minimum security BOP facilities to confine
federal medium and high security inmates.

To assess the implications a cost comparison has for making decisions on
low and minimum security facilities, we met with BOP officials and
reviewed BOP population data, population projection data, and data on
short-term and long-term facility planning. We also examined BOP
documents within the context of OMB requirements on capital planning
and space acquisition.[7] In addition, we met with OMB staff responsible for
BOP budget review and preparation to discuss BOP efforts to acquire
space to confine inmates in low and minimum security facilities in order to
determine the information BOP provides OMB on capital investments and
how this information is used to inform decisions. We also met with
officials from the National Institute of Justice (NIJ) to discuss NIJ's
current and past work on prison privatization and NIJ's role within the
Department of Justice.

We conducted our work from May 2006 through August 2007 in
accordance with generally accepted government auditing standards.

---

[7]Office of Management and Budget, Executive Office of the President, OMB Circular
No. A-11, Part 7, *Capital Programming Guide* (2006).

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 32 of 40 PageID #:
22940

MARLOWE_0005953

# Appendix II: Comments from the Federal Bureau of Prisons



**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*

*Washington, DC 20534*

September 17, 2007

Eileen Regan Larence, Director
Homeland Security and Justice Issues
Government Accountability Office
Washington, DC 20548

Dear Ms. Larence:

The Bureau of Prisons (Bureau) appreciates the opportunity to formally respond to the Government Accountability Office's (GAO's) draft report entitled <u>Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities</u>.

The purpose of the report was for the GAO to compare the costs incurred by the Bureau in operating stand-alone minimum and low security institutions to what it costs to operate private facilities or intergovernmental agreement facilities for the same type of operation. Over the course of this review, the Bureau provided GAO with considerable amounts of detailed cost comparison data for Fiscal Years 2002-2006. If the GAO staff believed that more detailed information from the private sector was needed, it was our understanding they would obtain the cost data and its basis from the private sector companies involved.

The current contracts the Bureau has in place were awarded after full and open competitions were conducted. Given the market, we believe the agency is paying a fair and reasonable cost for the services provided by the contractors.

In addition to the above general comments, we have the following specific comments:

- Page 2, paragraph 2, line 12 - Change the following wording from: "Instead, BOP awarded 5 contracts to confine..." to "Instead, the BOP conducted a full and open competition which resulted in 5 contract awards to confine inmates..."

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 33 of 40 PageID #: 22941

MARLOWE_0005954

- Page 5, paragraph 1 - The Bureau does maintain and collect sufficient data on real property owned by the Bureau. However, data is not collected on private contract facilities because the contracts are service contracts with a firm fixed rate for the care of inmates.

- Page 5, paragraph 4 - The Bureau does not collect facility data from private providers because, as stated above, the private providers have service contracts with a firm fixed rate. When private providers submit proposals, the rate includes all the costs to operate a facility. The report does not acknowledge the type of contracts involved (i.e., firm fixed price) and instead infers the Bureau does not collect this data only because it is not required.

- Page 5, paragraph 4 - The Bureau is committed to contracting out the confinement of inmates in low and minimum security facilities, as mandated by Office of Management and Budget (OMB). OMB has repeated the following direction regarding BOP "...take greater advantage of state and local and private sector bedspace to meet its space requirements..." in the FY 2006 and FY 2007 PART updates to the FY 2003 PART Improvement Plan. These updates are based on OMB's PART assessment of BOP's S&E budget. OMB has directed contracting out despite the cost evidence we have provided.

- Page 7, paragraph 1 - The Bureau's mission statement referenced should be reflected as follows:

  *The BOP's mission has evolved into protecting society by controlling offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure and that provide work and other self improvement opportunities to assist offenders in becoming law-abiding citizens.*

- There is no reference in the draft report indicating congressional appropriators have been committed to having the Bureau contract out (to the greatest extent possible) for bed space for minimum and low security inmates. This commitment is evidenced by the increases provided in enacted budgets for Contract Confinement, while no funding has been provided for New Prison Construction (for low and minimum security inmates) for over 14 years. Due to the continued increases in the inmate population and lack of bed space, crowding in Bureau facilities remains at high levels. The Bureau has become more and more dependent on the use of

2

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 34 of 40 PageID #: 22942

MARLOWE_0005955

private contractors to house certain low and minimum
security inmates (criminal aliens in particular).

- The Bureau does not currently have the capacity to house
  this particular group of inmates (low security criminal
  aliens) in any Bureau facility, or in the near future
  (2 to 5 years out). We are clearly dependent on private
  contractors. If funding were received to construct a low or
  minimum security facility, it would take at least 3 years
  before the bed space would become available. Meanwhile,
  private contractors anticipate the growing inmate
  populations (federal, state, local) and are continually
  prepared to expand their operations.

In addition to the above concerns, our response to the
recommendation is as follows:

**Recommendation:** BOP develop a cost-effective way to collect
comparative data on low and minimum security facilities confining
inmates under Bureau custody and design and conduct
methodologically sound analyses that compare the cost of
confining inmates in these facilities in order to consider
contracting among other alternatives for low and minimum security
confinement, consistent with the OMB requirements.

**Response:** We disagree with this recommendation. The Bureau does
not own or operate facilities to house solely criminal aliens and
will not be receiving funding to construct such low security
facilities. Accordingly, there is no value in developing data
collection methods in an attempt to determine the costs of
housing this particular group of inmates in a Bureau facility.

The Bureau has been able to determine what it actually costs to
contract out this particular population to private contractors
via open competition. In addition, we are able to determine what
is fair and reasonable with regard to pricing through the use of
firm fixed price contracts.

We do not see the value of requiring existing private contractors
to provide specific comparable data to aid in a cost comparison.
This requirement would have the potential to increase current
contract costs at a time when the Bureau is facing serious budget
constraints.

We believe the independent review by the Center for Naval
Analysis, which compared the operational cost of the contractor-
operated facility in Taft, California, with other low security
BOP facilities, meets the intent of the recommendation.

3

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 35 of 40 PageID #:
22943

MARLOWE_0005956

If you have any questions regarding this response, please contact
VaNessa P. Adams, Senior Deputy Assistant Director, Program
Review Division, at (202) 616-2099.

Sincerely,

Harley G. Lappin
Director

cc: Richard Theis, Assistant Director
    Audit Liaison Group, JMD

4

Case 3:16-cv-02267     Document 401-23     Filed 01/22/21     Page 36 of 40 PageID #:
22944

MARLOWE_0005957

# Appendix III: GAO Contact and Staff Acknowledgments

## GAO Contact

Eileen Larence, Director, Homeland Security and Justice Issues
(202) 512-6510

## Acknowledgments

In addition to the contact named above, John Mortin, Assistant Director; David Alexander; Ben Bolitzer; Billy Commons; Katherine Davis; Maria Edelstein; Erin Henderson; Carol Henn; Jeff Isaacs; Charles Johnson; Dawn Locke; Michele Mackin; Jan Montgomery; Don Neff; Bill Sabol; David Sausville; John Stambaugh; Stephanie Toby; Lacy Vong; and Michelle Zeidman made key contributions to this report.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 37 of 40 PageID #: 22945

MARLOWE_0005958

# Related GAO Products

*Federal Capital: Three Entities' Implementation of Capital Planning Principles Is Mixed*, GAO-07-274. Washington, D.C.: February 23, 2007.

*Federal Real Property: Reliance on Costly Leasing to Meet New Space Needs Is an Ongoing Problem*, GAO-06-136T. Washington, D.C.: October 6, 2005.

*Federal Real Property: Further Actions Needed to Address Long-standing and Complex Problems*, GAO-05-848T. Washington, D.C.: June 22, 2005.

*Courthouse Construction: Overview of Previous and Ongoing Work*, GAO-05-838T. Washington, D.C.: June 21, 2005.

*Budget Issues: Agency Implementation of Capital Planning Principles Is Mixed*, GAO-04-138. Washington, D.C.: January 16, 2004.

*Federal Drug Offenses: Departures from Sentencing Guidelines and Mandatory Minimum Sentences, Fiscal Years 1999-2001*. GAO-04-105. Washington, D.C.: October 24, 2003.

*Justice Impact Evaluations: One Byrne Evaluation Was Rigorous; All Reviewed Violence against Women Office Evaluations Were Problematic*. GAO-02-309. Washington, D.C.: March 7, 2002.

*Standards for Internal Control in the Federal Government*. GAO/AIMD-00-21.3.1. Washington, D.C.: November 1999.

*Executive Guide: Leading Practices in Capital Decision-Making*. GAO/AIMD-99-32. Washington, D.C.: December 1998.

*Courthouse Construction: Improved 5 Year Plan Could Promote More Informed Decisionmaking*. GAO/GGD-97-27. Washington, D.C.: December 31, 1996.

*Private and Public Prisons: Studies Comparing Operational Costs and/or Quality of Service*. GAO/GGD-96-158. Washington, D.C.: August 16, 1996.

*Federal Courthouse Construction: More Disciplined Approach Would Reduce Costs and Provide for Better Decisionmaking*. GAO/T-GGD-96-19. Washington, D.C.: November 8, 1995.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 38 of 40 PageID #: 22946

MARLOWE_0005959

*State and Federal Prisons: Factors That Affect Construction and Operations Costs.* GAO/GGD-92-73. Washington, D.C.: May 19, 1992.

*Designing Evaluations.* GAO/PEMD-10.1.4. Washington, D.C.: March 1991.

*Private Prisons: Cost Savings and BOP's Statutory Authority Need to Be Resolved.* GAO/GGD-91-21. Washington, D.C.: Feb. 7, 1991.

Case 3:16-cv-02267    Document 401-23    Filed 01/22/21    Page 39 of 40 PageID #: 22947

MARLOWE_0005960

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone: Voice: (202) 512-6000<br>TDD: (202) 512-2537<br>Fax: (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Susan Becker, Acting Manager, Beckers@GAO.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER