# EXHIBIT 107
# [Filed Under Seal]

# Grae vs. Corrections Corporation of America, et al.

Videotaped Deposition of
PATRICK SWINDLE - 30(B)(6)
January 09, 2019
***CONFIDENTIAL***



## Page 1

```
            UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF TENNESSEE
_____

NIKKI BOLLINGER GRAE,
Individually and on Behalf of
All Others Similarly Situated,
        Plaintiff,

vs.                       Civil Action No. 3:16-CV-02267

CORRECTIONS CORPORATION OF AMERICA,
et al.,
        Defendants.
_____


                      CONFIDENTIAL

    Videotaped Deposition of PATRICK SWINDLE - 30(b)(6)

            Taken on behalf of the Plaintiff
                   January 9, 2019




Reported by:
JEANNIE CHAFFIN, LCR
Job No. 10050083
```

## Page 2

```
                    A P P E A R A N C E S


For the Plaintiff:

        MR. CHRISTOPHER M. WOOD
        MR. CHRISTOPHER H. LYONS
        Attorneys at Law
        Robbins, Geller, Rudman & Dowd
        414 Union Street, Suite 900
        Nashville, TN  37219
        (615)244-2203
        cwood@rgrdlaw.com
        clyons@rgrdlaw.com

For the Defendants:

        MR. BRIAN GLENNON
        MR. ERIC PETTIS
        Attorneys at Law
        Latham & Watkins
        355 South Grand Avenue, Suite 100
        Los Angeles, CA  90071
        (213)891-7593
        brian.glennon@lw.com
        eric.pettis@lw.com


        MR. TREY McGEE
        Attorney at Law
        Riley, Warnock & Jacobson
        1906 West End Avenue
        Nashville, TN  37203
        (615)320-3700
        tmcgee@rwjplc.com


Also Present:
        MR. DANIEL GIBBONS, Videographer
```

## Page 3

```
                       I N D E X
                                                 Page
Examination
By Mr. Wood                                         7


                    E X H I B I T S
                                                 Page

Exhibit 33                                         26
     Notice of Deposition
Exhibit 34                                         26
     Notice of Deposition

Exhibit 35                                         28
     Answer to Complaint
Exhibit 36                                        167
     E-Mail, Bates CORECIVIC_1042634-1042637

Exhibit 37                                        170
     Memorandum, Bates CORECIVIC_0595047-0595054
Exhibit 38                                        173
     E-mail, Bates CORECIVIC_0029150-0029164

Exhibit 39                                        179
     Contract Award, Bates CORECIVIC_0001329-0001544
Exhibit 40                                        219
     E-Mail, Bates CORECIVIC_0994940-0994956

Exhibit 41                                        223
     Cure Notice, Bates CORECIVIC_1052260-1052282
Exhibit 42                                        225
     Progress Report, Bates CORECIVIC_0106154-0106199

Exhibit 43                                        231
     E-Mail, Bates CORECIVIC_0791070 with attachment
```

## Page 4

```
                                                 Page
Exhibit 44                                        266
     E-Mail, Bates GEO000050-000053

Exhibit 45                                        270
     E-Mail, Bates CORECIVIC_1367591
Exhibit 46                                        271
     Edited Transcript, August 19, 2016
```

Case 3:16-cv-02267   Document 401-32   Filed 01/22/21   Page 3 of 7 PageID #: 23439
www.aptusCR.com
Page 1..4

**Page 5**

S T I P U L A T I O N S

The videotape deposition of PATRICK SWINDLE was taken by counsel for the Plaintiff, at the offices of Riley, Warnock & Jacobson, 1906 West End Avenue, Nashville, Tennessee, on January 9, 2019, for all purposes under the Federal Rules of Civil Procedure.

All formalities as to caption, notice, statement of appearance, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

It is agreed that JEANNIE CHAFFIN, LCR, Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness was not discussed.

**Page 6**

\* \* \*

THE VIDEOGRAPHER: We are now on the record. Today is January 9th, 2019, and the time is 9:04 a.m. This is the video deposition of Corrections Corporation 30(b)(6) being taken in the matter of Nikki Bollinger Grae versus Corrections Corporation of America, et al., pending in the United States District Court, Middle District of Tennessee, case number 3:16-CV-02267.

We are at 1906 West End Avenue, Nashville, Tennessee, 37203. My name is Daniel Gibbons of Aptus Court Reporting located at 600 West Broadway, Suite 300, San Diego, California, 92101.

Will counsel please identify yourselves and state whom you represent.

MR. WOOD: Christopher Wood, Robbins Geller, on behalf of the Plaintiffs.

MR. LYONS: Christopher Lyons, Robbins Geller, on behalf of the Plaintiffs.

MR. GLENNON: Brian Glennon, Latham and Watkins, on behalf of the Defendants and the witness.

MR. McGEE: Trey McGee, Riley, Warnock and Jacobson, on behalf of the Defendants and

**Page 7**

witness.

MR. PETTIS: Eric Pettis, Latham and Watkins, on behalf of the Defendants and the witness.

THE VIDEOGRAPHER: The court reporter today is Jeannie Chaffin, and she may now swear in the deponent.

\* \* \*

PATRICK SWINDLE, was called as a witness and having first been duly sworn, testified as follows:

EXAMINATION
QUESTIONS BY MR. WOOD:
Q. Good morning, Mr. Swindle.
A. Good morning.
Q. Could you just state your full name for the record, please?
A. Sure. It's Patrick David Swindle.
Q. Thanks. And you've had your deposition taken before; is that right?
A. I've been deposed before.
Q. How many times, approximately?
A. Just once.

**Page 8**

Q. And what was that matter related to?
A. It was a personal matter.
Q. Okay. Not related to CCA?
A. No.
Q. Okay. You understand that you've been designated to provide testimony on behalf of CoreCivic or CCA today, right?
A. Yes.
Q. Okay. And approximately -- well, what did you do to prepare for this deposition?
A. So in my capacity as executive vice president and chief corrections officer, I'm very familiar with the operations of CoreCivic. So both our safety and our community business lines report to me.

So in that capacity, in my prior capacity as treasurer, I'm very familiar with the internal processes and approaches of the use of managing contracts, managing our facilities, or financial management in the contract management.

So as a result of that prior experience, I, in addition to that, met with a number of individuals internally. And so I'll mention my department, who I met with.

Within the operations department, I met with Stacy Stone. He's a managing director in our

**Page 57**

1  BY MR. WOOD:
2  Q.  Okay. Let's turn to the 15th affirmative
3  defense, which is on Page 33 of the answer. It says
4  failure to mitigate. And it says, "Plaintiff's
5  claims against Defendants are barred in whole or in
6  part by Plaintiff's failure to mitigate its alleged
7  damages."
8      Do you see that?
9  A.  Yes.
10 Q.  And what does the company believe the
11 Plaintiff could have done to mitigate its alleged
12 damages?
13 A.  Well, our -- our perspective would be that
14 the information around our quality and around our
15 operation is very publicly known. Or we also believe
16 that the market for correctional services is very
17 efficient.
18      And so to the extent that one were to
19 find that there were negative outcomes that were
20 occurring from performance, it would be very apparent
21 through a variety of potential vehicles, but we
22 certainly believe to the extent that one wanted to
23 fully understand or appreciate the quality of
24 operations, the information is publicly available to
25 do that.

**Page 58**

1      And we believe that, you know, a diligent
2  investor would have had the opportunity or has the
3  opportunity to -- to be fully aware of how the market
4  perceives us, the correctional services market, to be
5  specific.
6  Q.  Okay. Any other -- anything else beyond
7  that?
8  A.  Only -- only that, you know, we -- well, this
9  references alleged damages. So we would go back to,
10 we -- we don't believe damages were caused by the
11 withholding of information that was otherwise made --
12 otherwise not available.
13 Q.  Sure. Okay.
14      MR. WOOD: Why don't we take a little
15 break?
16      MR. GLENNON: Sure.
17      THE VIDEOGRAPHER: We are off the record
18 at 10:03 a.m.
19      (Short break.)
20      THE VIDEOGRAPHER: We are on the record
21 at 10:19 a.m.
22 BY MR. WOOD:
23 Q.  Before you joined CCA, you worked at Avondale
24 as an equities analyst; is that right?
25 A.  Yes, that's correct.

**Page 59**

1  Q.  And how long were you there for?
2  A.  I was at Avondale for approximately
3  three-and-a-half years.
4  Q.  Did you cover CCA during your time there?
5  A.  Yes.
6  Q.  You -- so you covered -- well, you covered
7  corrections, right?
8  A.  I covered -- outsource government services
9  was the sector that I covered. So it was
10 correctional services. It was correctional
11 healthcare services. And then it was healthcare
12 services beyond corrections. And so it would be
13 outsourced healthcare providers. And so it might be
14 an ambulance provider, an emergency room manager, a
15 behavioral hospital company. So it was companies in
16 and around -- not hospitals but not hospital
17 companies within healthcare.
18 Q.  Did you cover Psychiatric Solutions?
19 A.  I did.
20 Q.  Is that -- did you join CCA from Avondale?
21 A.  I did.
22 Q.  And you -- did -- do you -- I guess you got
23 to know the folks at CCA while you were covering them
24 at Avondale?
25 A.  Correct.

**Page 60**

1  Q.  Okay. And where were you before Avondale?
2  A.  I was at Morgan Joseph --
3  Q.  Okay.
4  A.  -- which was a start-up investment bank. It
5  was -- the full name of the prior firm is escaping
6  me. It was shortened to Morgan Joseph. It was New
7  York based. It was -- there was a time of
8  disaggregation within the small investment banking
9  industry where many of the small investment banks
10 were trying to debate whether they had sales security
11 platforms or whether they had -- were going to be
12 dedicated advisors.
13      And during that time period, Morgan
14 Joseph attempted to build a sales and trading
15 research operation, which ultimately wasn't
16 successful.
17 Q.  Okay. Did you -- when you finished college,
18 did you go straight into being an equities analyst?
19 A.  I was -- so immediately after college, I was
20 in the SunTrust corporate lending program for nine
21 months. That was -- SunTrust Bank transitioned into
22 SunTrust Equitable Securities immediately following
23 that. It was part of SunTrust Bank via the
24 acquisition of Equitable, which is a local national
25 investment bank, and began working as a research

**Page 61**

1 associate and then progressively promoted within that
2 role.
3 Q.   When you were working at Avondale, were you
4 writing research reports on CCA?
5 A.   Yes.
6 Q.   Okay.  And did CCA offer you a job at some
7 point?
8 A.   CCA did not offer me -- well, there was --
9 Irv Lingo, who was the prior CFO of CCA at the time,
10 retired.  Todd Mullenger stepped in the role of CFO.
11 Treasurer was a role that seemed like a reasonable
12 fit for me, so I approached John and I was ready to
13 make a transition out of investment banking because
14 of the -- or research because of the issues I
15 described around the -- the economics of that
16 industry declining, and very much was a strong
17 believer in the CCA business model at the time.  And
18 he gave me that opportunity to come onboard.
19 Q.   Okay.  So you applied for the job?
20 A.   I did.
21 Q.   Okay.  So I want to talk a little bit
22 about -- it's Topic Number 1 in the notice, if you
23 want to look at that.  Topic Number 1 -- well, as it
24 reads in the notice, says, "CCA's processes and
25 procedures."  It's on Page 5 of the Exhibit 33.

**Page 62**

1 A.   Yes.
2 Q.   "CCA's processes and procedures for
3 communicating to public investors and securities
4 analysts regarding the company's value proposition
5 including but not limited to representations,
6 disclosures, and explanations of the quality of the
7 company's operations and cost savings."
8      Can you describe -- well, I want to break it
9 down a little bit.  So can you describe in general
10 the company's processes and procedures for
11 communicating specifically with securities analysts
12 to start with?
13 A.   Yes.
14 Q.   And let me just stop you for a second, but
15 what I'm really focused on here is during the class
16 period.
17 A.   Sure.  Absolutely.
18 Q.   Okay.
19 A.   So securities analyst -- or securities
20 analysts are looking for information from the company
21 through a variety of vehicles.  So one of the
22 vehicles is obviously the 10-Ks and 10-Qs.  We
23 typically publish our 10-K or Q around the time of
24 our earnings announcements.
25      And so typically it's the day of or some

**Page 63**

1 immediately -- very shortly thereafter.  It's usually
2 between 24 to 48 hours of our press release and
3 conference call issuance.  That is a document that
4 sometimes creates analyst interest.  And so we may
5 receive questions about our 10-K or Q.
6      Our supplemental that we provide is a
7 supplemental document to our earnings press release.
8 It's also a tool that the analysts use and it is
9 particularly valuable for model building -- for model
10 building purposes.  And so it fills in blanks between
11 what you might see in the 10-K or the 10-Q, what you
12 might see in our earnings press release, and then
13 what you might -- there are gaps between those two
14 that we want to fill in with the supplemental to
15 allow folks to be able to effectively build their
16 financial models.  So that supplemental document
17 helps provide additional detail.
18      Oftentimes, the communication we have
19 with analysts are going to be around coordinating
20 responses to questions around each of those areas.
21 So the earnings release, the conference call, the
22 supplemental.  So if you're looking at sequencing, we
23 release our earnings release.  We have a conference
24 call with our analysts.  We -- you would have the
25 supplemental provided in advance of the conference

**Page 64**

1 call.  Conference call occurs.  10-K or 10-Q is
2 issued.
3      So through all of those lenses, we're
4 providing information.  The securities analyst asks
5 varying levels of information about each of those
6 documents.  So that's on a quarterly basis.  And so
7 that's sort of standard, fair communication.
8      In addition to that, Cameron Hopewell and
9 Dave are the two primary communicators -- David
10 Garfinkle, sorry about that.  David Garfinkle and
11 Cameron Hopewell are the two primary communicators
12 with our investors.  And so Dave has primary
13 responsibility for investor communication.  Cameron
14 supports him as managing director of investor
15 relations.
16      They very often get calls from analysts,
17 buy-side analysts or sell-side analysts, asking
18 questions about the company.  Describe -- you know,
19 describe the company, what's your value proposition,
20 how -- why -- why should we invest in you, why
21 shouldn't we, or what areas of risk exist for the
22 organization.
23      So that primary communication is going to
24 happen between the two of them.  Sometimes that does
25 include Damon.  So Damon is an active participant in

Page 113

1  them to Damon or to an executive officer.
2  So I would say that any -- so any of --
3  any of those vehicles could have resulted in -- in
4  that communication occurring.
5  Q.   And if it wasn't -- well, okay.
6  So is it fair to say that either at the
7  weekly meeting or through forwarding an e-mail, the
8  CEO would one way or another be notified of any NOCs?
9  A.   Yes.  I would say that there -- there's --
10 there's an organizational expectation because of
11 the -- the seriousness of a NOC and the desire to
12 resolve those, that we would highlight them and we
13 discuss them and we resolve them.
14 Q.   Okay.  We -- we talked a little bit earlier
15 about the way that the BOP communicates with CCA, as
16 well as also the -- the -- the industry in general.
17 Was it the case that the BOP would meet with CCA,
18 just with CCA to -- with perhaps a facilitator on an
19 annual basis to discuss in general the performance of
20 CCA's contracts?
21 A.   Yeah, so there were -- it wasn't every year,
22 but part of the BOP's -- they call it a partner
23 meeting -- part of the BOP's process of managing
24 relationships with its vendors would be to have an
25 annual partnering meeting.  Didn't happen every year.

Page 114

1  So depending on the budget availability, there might
2  be years when that would not happen.  But the spirit
3  of those meetings, my understanding, is to pull all
4  the team members into a room together and talk about,
5  what are our areas for opportunity; what are we doing
6  well; what are we not doing well; how do we need
7  to -- how do we resolve any gaps that may exist.
8  So I would say that would be the sort of
9  normal -- that would be the expectation for that
10 meeting.  And so wardens are present; managing
11 directors are present; executive vice presidents --
12 executive vice presidents are present.
13 Q.   And do you ever attend those meetings?
14 A.   I've attended one.  It was during my time as
15 the senior vice president in operations.  So it would
16 have been in --
17 Q.   2017?
18 A.   -- '17.
19 Q.   And do you know how many of those meetings
20 occurred during the class period?
21 A.   I do not.
22 Q.   Okay.
23 A.   The goal was annual, but I'm confident they
24 didn't occur annually because of budget challenges.
25 So if the BOP had budget challenges, they would

Page 115

1  sometimes cancel the meetings.
2  So, for example, we did have one in 2017.
3  We have not had one in -- we did not have one in
4  2018.  We had discussed having one, but because of
5  budget challenges, they chose not to do that.
6  Q.   And is that -- was the BOP responsible for
7  paying for at least part of that meeting?
8  A.   Well, the BOP -- we can't provide any funding
9  for the BOP, so the BOP has to self-fund.  We had the
10 meeting at their location, so we're meeting at their
11 site, and we have to buy our own lunch.
12 So the way the meeting is set up is that
13 it's very strictly managed by the BOP at their site.
14 We go to their site.  We pay for our own lunch.  And
15 then we talk for an extended period of time.
16 Q.   Is that a one-day meeting or...
17 A.   The one that I participated in was one day,
18 but I can't say that there haven't been different
19 durations.  Half day or two days.  But my -- my
20 understanding is the format we use with the
21 facilitator was a standard one-day format.
22 Q.   Okay.
23 MR. WOOD:  Why don't we take a little
24 break.
25 THE VIDEOGRAPHER:  We are off the record

Page 116

1  at 11:22 a.m.
2  (Short break.)
3  THE VIDEOGRAPHER:  We are on the record
4  at 11:35 a.m.
5  BY MR. WOOD:
6  Q.   Topic Number 2 says CCA's compliance with BOP
7  contracts.  And I want to talk a little bit about
8  that.
9  So with respect to the facilities that CCA
10 operated for the BOP during the class period, I
11 believe you previously testified that CCA only ever
12 received one cure notice with respect to those
13 facilities; is that correct?
14 A.   To my knowledge, yes.
15 Q.   Okay.  And -- well, so -- and what is a cure
16 notice?
17 A.   A cure notice, at least -- I'm not an
18 attorney, but my understanding of a cure notice is
19 that it's a very specific direction to fix an
20 identified challenge at risk of the contract being
21 cancelled.  So in the absence of resolving identified
22 areas of operating failure, the contract may be
23 cancelled.
24 Q.   Okay.  Was there anything -- were there any
25 kind of -- so it sounds fairly serious to me.  Was