# EXHIBIT A

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 3:16-cv-02267 |
| Plaintiff, | Honorable Aleta A. Trauger |
| vs. | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| CORRECTIONS CORPORATION OF AMERICA, et al., | |
| Defendants. | |

**[FILED UNDER SEAL]**

4837-9660-2072.v1

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    ARGUMENT ........................................................................................................2

    A.    Defendants Fail to Foreclose Multiple Issues of Material Fact Regarding
          Their Misleading Statements and Omissions........................................................3

    B.    Defendants' Statements and Omissions Were Materially Misleading ..................4

        1.    The Fatal Adams Riot Was a Unique Tragedy Directly Caused by
             CCA's Failures.........................................................................................5

        2.    CCA's Widespread Poor Performance and Fraud Led to an
             Unprecedented Lost Bid .........................................................................9

        3.    Defendants' Comprehensive Performance Failures Went Beyond
             the Adams Riot and Failed Northeast Ohio Bid .......................................11

        4.    CCA's Failures Cost It Three More BOP Contracts..................................15

        5.    Defendants' Misleading Cost Statements Are Intertwined with
             Their Misleading Quality Statements ........................................................18

    C.    If Anyone Is Entitled to Summary Judgment, It Is Plaintiff..................................19

        1.    Literal Truth Is Literally Not a Basis for Summary Judgment .................19

        2.    Defendants Repeatedly Rely on Non-Dispositive Evidence ....................21

             a.    CPARs Are Unreliable..................................................................21

             b.    The Existence of a Quality Assurance Division Is Irrelevant
                  to Summary Judgment .................................................................22

             c.    CCA Lost Millions in Award Fees ................................................22

             d.    Defendants' Cost "Studies" Were Biased.....................................22

    D.    Defendants Had Actual Knowledge of Their Misconduct....................................23

    E.    Defendants Are Not Entitled to Summary Judgment on Loss Causation.............24

        1.    The Yates Memo Is Directly Linked to Defendants' Misconduct............26

        2.    Defendants Cannot Establish a Truth-on-the-Market Defense.................27

        3.    The Yates Memo Was Within the Zone of Risk Concealed by
             Defendants' Misstatements.......................................................................28

4.  Plaintiff and the Class Would Not Have Suffered the Same Loss Absent Defendants' Fraud ........................................................................29

5.  The Cibola Non-Renewal Was a Manifestation of the Concealed Risk .............................................................................................................30

III.  CONCLUSION..............................................................................................................30

4837-9660-2072.v1

# TABLE OF AUTHORITIES

Page

**CASES**

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
888 F. Supp. 2d 431 (S.D.N.Y. 2012)........................................................................23

*AUSA Life Ins. Co. v. Ernst & Young*,
206 F.3d 202 (2d Cir. 2000)......................................................................................25

*Ballan v. Upjohn Co.*,
814 F. Supp. 1375 (W.D. Mich. 1992) ......................................................................23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................................................4

*Davis v. McCourt*,
226 F.3d 506 (6th Cir. 2000) .......................................................................................3

*Delphi Auto. Sys., LLC v. United Plastics, Inc.*,
418 F. App'x 374 (6th Cir. 2011) ................................................................................4

*Green Party of Tenn. v. Hargett*,
767 F.3d 533 (6th Cir. 2014) .......................................................................................3

*In re: BP p.l.c. Sec. Litig.*,
2016 WL 3090779 (S.D. Tex. May 31, 2016) ...........................................................26

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) .............................................................30

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) .......................................................28

*In re Iso Ray, Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash. 2016) ..................................................................27

*In re Moody's Corp. Sec. Litig.*,
2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013)...........................................................29

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)......................................................................................28

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) .....................................................................................27

*In re St. Jude Med., Inc. Silzone Heart Valves Prod. Liab. Litig.*,
2004 WL 45503 (D. Minn. Jan. 5, 2004)....................................................................5

- iii -

*Levinson v. Basic Inc.*,
  786 F.2d 741 (6th Cir. 1986),
  *vacated on other grounds*, 485 U.S. 224 (1988) ..................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................................20

*McDonald v. Seabold*,
  780 F.2d 1022, 1985 WL 13919 (6th Cir. 1985) ......................................................4

*Michaelian v. Lawsuit Fin., Inc.*,
  2019 WL 1281953 (E.D. Mich. Mar. 20, 2019) ......................................................23

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018), *cert. denied*,
  _U.S. _, 139 S. Ct. 2741 (2019) .............................................................................27

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, California*,
  730 F.3d 1111 (9th Cir. 2013) ................................................................................29

*Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ...........................................................................25, 30

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .............................................................................................18, 19

*Omnicom. Wieglos v. Commonwealth Edison Co.*,
  892 F.2d 509 (7th Cir. 1989) ............................................................................28, 29

*Saddle Rock Partners, Ltd. v. Hiatt*,
  1996 WL 859986 (W.D. Tenn. Mar. 26, 1996) ...............................................23, 27

*SEC v. Conaway*,
  698 F. Supp. 2d 771 (E.D. Mich. 2010) ..................................................................19

*Smilovits v. First Solar Inc.*,
  119 F. Supp. 3d 978 (D. Ariz. 2015) ......................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .............................................................................................23, 24

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ................................................................................................23

4837-9660-2072.v1

*Weiner v. Tivity Health, Inc.*,
    365 F. Supp. 3d 900 (M.D. Tenn. 2019),
    *reconsideration denied*, 2019 WL 2211764
    (M.D. Tenn. May 22, 2019) ........................................................................................5

**STATUTES, RULES AND REGULATIONS**

28 U.S.C.
    §1292(b) ..................................................................................................................27

Federal Rules of Civil Procedure
    Rule 56(a) ................................................................................................................3

## I.   INTRODUCTION[1]

Defendants' Motion for summary judgment (ECF No. 352-1) ("Motion" or "MSJ") can be summed up in two words: "stuff happens."  That is their entire defense.  But the "stuff" that happened at CCA's for-profit Federal Bureau of Prisons ("BOP") did not happen anywhere else.  Ever.  CCA's systemic staffing, intelligence gathering, healthcare and security deficiencies were uniquely chronic to the point where it became the only prison operator to ever allow a riot at a low-security prison during which two dozen staff members were taken hostage and a corrections officer was murdered; it incurred unprecedented numbers of recurring deficiencies – largely in Health Services – including for causing the deaths of multiple inmates; it could not win a BOP contract even as the lowest and incumbent bidder due to its past problems providing healthcare to inmates at other facilities – another unprecedented failure; and its relationship with the BOP had deteriorated to the point that its CEO and CFO plotted a $1 million "inducement" to the BOP that they planned to disguise as a "fine" – a scheme CCA's own expert described as illegal.

CCA's business model was built for a "beggars can't be choosers" environment of rampant prison overpopulation.  But as soon as the BOP could afford to be more selective, CCA's past performance killed any chance of winning competitive bids against other for-profit prison operators.  After the riot and murder at Adams, it never won another competitively-bid BOP contract, a winless streak spanning President Obama's second term ***and*** President Trump's lone term.  CCA's disastrous operations stood in stark contrast to the image Defendants schemed to portray, which is why investors were so shocked when the Department of Justice ("DOJ") finally revealed that it had had enough, as reflected in CCA's even lower share price today.  Rather than delivering high-quality,

---

[1]   "Plaintiff" is Lead Plaintiff and Class Representative Amalgamated Bank, as Trustee for the LongView Collective Investment Fund.  "Defendants" are Corrections Corporation of America ("CCA" or the "Company") and "Individual Defendants" Damon T. Hininger ("Hininger"), David M. Garfinkle ("Garfinkle"), Todd Mullenger ("Mullenger") and Harley G. Lappin ("Lappin"). Following the filing of this action, Defendants rebranded CCA and now refer to it as CoreCivic.

4837-9660-2072.v1

cost-effective services as it claimed, CCA generated short-term profits by cutting corners on fundamental services. Defendants' Motion is wholly without merit and should be denied.

## II.    ARGUMENT

There is no good faith basis for Defendants' Motion. At least four categories of evidence confirm that Plaintiff is much closer to deserving summary judgment than are Defendants. First, audits and other reports and investigations demonstrate that CCA was regularly, wantonly and sometimes criminally to blame for the repeat failures at its BOP prisons. Second, BOP communications show the BOP repeatedly warned CCA of its performance failures and that such failures would and did cost CCA its BOP business. Third, internal CCA documents show that Defendants knew of these failings and losses, were alarmed by them and knew they would "spook[]"investors but consciously chose not to disclose them or the underlying facts. Fourth, Defendants' own admissions in depositions and written discovery confirm their culpability.

Defendants' entire brief is based on the indefensible assertion that Plaintiff has no evidence Defendants knew or should have known CCA's BOP business was in peril. *See generally* MSJ. Defendants argue that only Plaintiff's expert, Donna Mellendick ("Mellendick"),[2] "bridge[s] th[e] gap" between "discrete operational metrics" (*i.e.*, critical audits and investigations) and CCA's deteriorating relationship with the BOP. MSJ at 12-13. This is absurd as there is no gap to bridge. These operational metrics reflected the BOP's actual assessment of CCA's performance and were the backbone of the relationship, as confirmed by CCA's unprecedented lost bid related to its Northeast Ohio prison. CCA submitted its bid in early 2014; in December 2014, the BOP expressly informed Defendants that ███████████████████████████████████████

---

[2]    *See* PEx. 94 ("Mellendick Report"). All "PEx. _" citations herein are to the Declaration of Christopher M. Wood in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed concurrently herewith. All "SUF No. _" and "SUFr No. _" citations herein are to Defendants' Statements, and Plaintiffs' responses thereto (Defendants SUF Nos. 1-197; Plaintiff's SUF Nos. 198-268), respectively, in Plaintiff's Response to Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, filed concurrently herewith.

4837-9660-2072.v1

███████████████████████ as measured by the very "operational metrics" Defendants seek to ignore.[3] Defendants saw this unprecedented failure coming long before it became official. For example, Garfinkle had acknowledged that BOP's "express[ion of] serious concerns about [CCA's past] performance . . . [was] very alarming." *See* SUF No. 231; SUFr No. 238. Indeed, the BOP was no longer in the beggar's position for prison space, and CCA was not built to compete.

While Defendants schemed throughout the Class Period[4] to paint a picture of high-quality, cost-effective prison services that enabled CCA to retain and grow its business, the evidence Defendants ignore reflects a far different reality.

## A. Defendants Fail to Foreclose Multiple Issues of Material Fact Regarding Their Misleading Statements and Omissions

The party moving for summary judgment has both an initial burden of production and the ultimate burden of proving that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This is a "heavy burden." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 551 (6th Cir. 2014). "In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).

The MSJ does not even attempt to meet these high standards. The evidence overwhelmingly proves that Defendants made intentionally and recklessly misleading statements about the quality and cost of CCA's services and its ability to retain business from the BOP and others due to that purported quality. Defendants have no legitimate basis for summary judgment yet ignore all of the evidence to argue Plaintiff has not carried a burden that belongs to them alone. "It is not enough to move for summary judgment . . . with a conclusory assertion that the [opposing party] has no

---

[3]  *See, e.g.,* SUFr No. 233 (in rejecting CCA, the BOP relied on ███████████████████

███████████████████████████████████████████████████████████████

[4]  The "Class Period" is between February 27, 2012 and August 17, 2016, inclusive.

evidence to prove his case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J. concurring). "If the moving party fails to [come forward with competent evidence], summary judgment will be denied even [if the opposing party presents] no evidence in support of his allegations." *McDonald v. Seabold*, 780 F.2d 1022 (Table), 1985 WL 13919, at *2 (6th Cir. 1985); *Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 381 (6th Cir. 2011) (same).

## B. Defendants' Statements and Omissions Were Materially Misleading

Throughout the Class Period, Defendants represented that one of the primary reasons CCA's contract renewal rates were so high was because of "the quality of our operations." SUF Nos. 198-200; *see also* ECF No. 76 ("Order") at 14 (one "theme[] that appeared ***throughout***" Defendants' communications with investors was CCA "providing detention and incarceration services at a level of quality that its government clients would consider satisfactory"). Defendants went further, claiming the quality, cost and type of their services meant they retained business ***despite*** declining prison populations and shifting political winds.[5] Defendants, for example, claimed to have "made sure" they provided high quality operations and could "demonstrate" savings regardless of the Presidents' political parties:

> "We have operationally ***made sure*** that we are providing high quality and standard and consistent services . . . . And with that, we've had some nice growth in our business under those three respective Presidents. . . . ***And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings . . . , then I think we'll be just fine***."

SUF No. 201. These and similar statements,[6] individually and as part of a scheme, materially "misled the market about [CCA's] history of performance relative to BOP expectations." Order at

---

[5] *See* SUF Nos. 202-203; *see also* Order at 31.

[6] Plaintiff provided Defendants with a detailed interrogatory response setting forth Defendants' allegedly misleading statements. *See* PEx. 39 at 4-144. Unable to defend the statements at issue, Defendants attempt to rewrite them and defy the Court's page limits on briefs with a lengthy argument they label as "Appendix A." Plaintiff's Exhibit 39 is the only valid compilation of the statements at issue here and the Court should disregard Defendants' so-called Appendix A. *See, e.g.*,

42.    Defendants knew their performance was not high quality and was not meeting BOP expectations, in significant part because the BOP told them so, yet Defendants falsely told investors that CCA's services would "'improve safety [and] inmate quality of life'" and "'provide taxpayers an essential government service at equally high standards of quality and efficiency.'"  SUF Nos. 204-206.

Defendants were under no obligation to discuss CCA's renewal rates, to represent that CCA's renewal rates were "high" or to represent why they were high.  But once they chose to do so, they were obligated to disclose all material information necessary not to mislead investors regarding CCA's relationship with the BOP and the quality of services it provided.  Order at 25; *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019), *reconsideration denied*, 2019 WL 2211764 (M.D. Tenn. May 22, 2019).

CCA's performance failed to meet the standards of the BOP and others; it was consistently poor, in absolute terms and as compared to chief rival GEO, which crushed CCA in competitive bids. *See, e.g.*, SUF Nos. 232, 246, 265.  In short, Defendants' statements about CCA's quality were materially misleading, whether or not directly tied to contract retention or related issues.

### 1.    The Fatal Adams Riot Was a Unique Tragedy Directly Caused by CCA's Failures

The May 20, 2012 riot at CCA's Adams County prison was a unique disaster of incompetence. *See* SUFr No. 85; SUF Nos. 212-215. It was massive, involving

SUF No. 212.  Even CCA employees and one of Defendants' experts, each with decades of experience in corrections, admitted this was an unprecedented failure for a low-security prison. *See, e.g.*, PEx. 99 at 120:3-6;

---

*In re St. Jude Med., Inc. Silzone Heart Valves Prod. Liab. Litig.*, 2004 WL 45503, at *17 (D. Minn. Jan. 5, 2004) (striking similar document).

PEx. 3 at 65:22-66:2, 66:13-67:5, 108:1-15, 110:2-7, 11:25-112:5, 117:7-15; PEx. 2 at 152:6-153:15; PEx. 63 at 96:7-97:16.

Though uniquely disastrous, the riot was also emblematic of CCA's systemic failures. Inmates rioted after failed attempts to secure from CCA medical services and other basic necessities. *See* SUF No. 261. Adams was ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ SUF No. 214; *see also* SUFr No. 85. Further, CCA had been lying to the BOP about its staffing numbers: "'When the Bureau of Prisons would perform their audits at the Prison, Prison officials would call in all possible Prison employees so it would appear as though the Prison was adequately staffed.'" PEx. 48, ¶3; *see also* SUF No. 261.

CCA's failures at Adams violated express provisions of its contract with the BOP.[7] For example, the BOP learned that ████████████████████████████████████

████████████████████████████████████████ SUF No. 214. Similarly, CCA was required to ████████████████████████████████████████

████████████████████████████ SUF No. 214. CCA also ████████████████████

████████████████████████████████████████████████████

████████████████████████████ SUF No. 214.

- ████████████████████████████████████████████
  ████████████████████ SUFr Nos. 93-94; SUF No. 214.
  Defendants' own handpicked expert testified that it was unprecedented for a prison to not have ████████████████████████████████████

---

[7]   Not only was CCA aware of these failings, it was also aware of the BOP's awareness, as the failings were included in a July 27, 2012 BOP After-Action Report that Lappin received and discussed with CCA's executives, including co-Defendants Hininger and Mullenger, and board members. SUF No. 216. Despite efforts to get Lappin to recant this testimony, he reaffirmed it at a subsequent deposition. SUF No. 216.

[REDACTED] PEx. 3 at
81:23-82:4.

- [REDACTED] SUF No.
214.

This disaster was also unprecedented in other unforgettable ways, as Defendants' expert confirmed that Adams was the only low-security prison for BOP prisoners that allowed a riot in which: (i) prisoners took staff members hostage (PEx. 3 at 66:4-11); and (ii) prisoners murdered a corrections officer. *Id*. at 66:24-67:5; PEx. 63 at 96:7-97:1; *see also* SUFr Nos. 89, 93-95; SUF No. 214.

Understandably, these failures permanently damaged CCA's relationship with the BOP, which immediately reduced the maximum number of prisoners CCA would be allowed to house and never again awarded CCA a competitively bid prison contract. *See* PEx. 94 at 22-24; *see also* SUFr No. 85 (" [REDACTED]

[REDACTED] "); SUF No. 215 (same); *see generally* PEx. 47. Over a year later, CCA lost out on a proposed lucrative expansion of Adams because the BOP no longer trusted CCA. *See* SUF No. 221 ("'The BOP still has concerns about our ability to staff a proposed 480-bed expansion given the fact that we have not met our contractually obligated minimum staffing requirements in 13 of the previous 17 months at Adams County.'"); SUF No. 248 ("'The BOP has expressed their displeasure in the [staffing] vacancies being vacant for such a long time, given the security issues we have experienced at Adams.'"). Yet Defendants publicly disclosed only that a "disturbance" had occurred at Adams while concealing CCA's many failures, which caused the disaster and permanently damaged its relationship with the BOP. *See, e.g.*, SUF No. 88; SUFr No. 88; Ex. H[8] at 30 (generally

---

[8] All "Ex. _" citations herein labeled alphabetically (Exs. A-Y) correspond to the exhibits to the Declaration of Patrick Swindle in Support of Defendants' Motion for Summary Judgment (ECF

referencing "'adverse [workers compensation] claims resulting from an inmate disturbance at our Adams County Correctional Center [in] the second quarter of 2012'"). To this day, Defendants have withheld as privileged their own after-action report on the unprecedented tragic failures at Adams. PEx. 3 at 123:3-127:17.

Not even a massive riot and the murder of a young correctional officer convinced CCA to address its fundamental and systemic failure to provide necessary services. The facility remained woefully understaffed, as the Office of the Inspector General ("OIG") documented after the Class Period (and Defendants knew all along): "'four years after the riot we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staff'"; in fact, CCA "'staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage.'" SUF No. 261. Adams was plagued by "'morale problems,'" and staff "'fear[ed] that they [would] be retaliated against if they raise[d] any issue.'" SUF No. 245.[9] Health Services, the precipitating cause of the riot, remained terrible for years. *See infra* §II.B.2.-4.

BOP staff took exception to CCA repeatedly "giving [them] the same plan that they had given . . . before," which "hadn't worked significantly to correct the problem yet." PEx. 8 at 104:23-105:11. The OIG later observed that CCA's staffing was "'even lower . . . than at the time of the riot'" even as its "'monthly reports to the BOP . . . showed that correctional staffing levels had improved.'" SUF No. 261. As discussed below, CCA lost the Adams contract, worth tens of

---

No.355); those labeled numerically (Exs. 1-160) correspond to the exhibits to the Declaration of Meryn C.N. Grant in Support of Defendants' Motion for Summary Judgment (ECF No. 360).
[9]    Fear of retaliation and similar issues were not limited to Adams and contributed to CCA's inability to fix anything. *See* SUF No. 245 ("employees who 'stir the pot' are humiliated by having their names printed on large wooden spoons displayed in the Warden's office for other employees to see," "overwhelming and strikingly forceful feedback . . . from the staff at all levels is that they fear that they will be retaliated against if they raise any issue").

millions of dollars, to competitor GEO when it came up for renewal and would have lost it far earlier were it not for CCA's corrupting influence on BOP officials. *Infra* §II.B.4.

**2.    CCA's Widespread Poor Performance and Fraud Led to an Unprecedented Lost Bid**

In 2014, CCA submitted a bid for what effectively would have been a renewal of a BOP contract for its Northeast Ohio prison. This "CAR XV" competitive solicitation consisted of two separate "Requirements": "A" for a facility located in one of six specific states and "B" for a facility located anywhere in the continental United States. SUF Nos. 102-106. The public CAR solicitation materials made clear that past performance would be the leading non-price factor in awarding bids. SUF No. 220.

In May 2014, the BOP told CCA it had learned "'[t]he FBI is investigating CCA and looking at whether various federal fraud statutes were violated'" in connection with CCA fraudulently recording and billing for staff hours not actually worked in Idaho, which "'resulted in thousands of hours being understaff and was a violation of state law.'" SUF No. 225. It had. SUF No. 225; *see also* PEx. 99 at 158:2-159:23. On November 13, 2014, the BOP sent another letter raising "serious concerns" about CCA's "pattern" of poor performance at its Eden facility:

> "The Bureau of Prisons (Bureau) has serious concerns about the performance at the Eden Detention Center. Specifically, we are addressing the results of the recent CFM conducted in August of 2014, to include the "inadequate controls in the clinical care and staffing area in Health Services." Please address what has caused this area of services to develop ***a pattern of contract non-conformance***."

SUF No. 230. CCA received a similar letter concerning Cibola. SUF No. 229.[10]

Defendants were under no illusions what these – and numerous other – BOP concerns meant. As Garfinkle wrote to defendants Hininger and Lappin: "'Is it customary for the BOP to express

---

[10]    The BOP relied on "CFMs" – contract facility monitoring reports – to measure CCA's performance. As described *infra* §II.C.1.; *see also* §II.B.3., the MSJ would have the Court dismiss these audit-identified deficiencies (and worse) as "isolat[ed] discrete operational metrics." MSJ at 13.

serious concerns about contractor performance during the RFP stage, *e.g.*, first Cibola, now Eden. ***To me, it seems very alarming***.'" SUF No. 231.

CCA lost both contracts. The BOP's Source Selection Authority ("SSA") commented that ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ SUF No. 233. ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* ████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Id.*

CCA's CAR XV bid was for their Northeast Ohio prison, not Cibola or Eden. GEO's bid was ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* ████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████ *Id.* Two of Defendants' purported experts, including Lappin himself, both admitted that this was an unprecedented failure. PEx. 3 at 196:19-197:6; PEx. 62 at 255:21-256:17. Defendants were well aware of these damning facts (*see, e.g.*, SUF No. 241; PEx. 68) yet told investors just weeks later in CCA's FY14 report that its "'renewal rate remains high as a result of a variety of reasons including . . . the quality of our operations.'" SUF No. 199-201.

Tellingly, GEO's past performance was rated ████████████ SUF No. 233; *see also* SUFr No. 109. That fact alone disproves CCA's "stuff happens" defense. *See also, e.g.*, SUF No. 246 (BOP notes for "partnering topics" to discuss with for-profit prison operators; "CCA has lagged behind the other contractors"; "'the two mentioned CCA facilities have difficulty sustaining staff after CFM

Reviews or other audits . . . [i]n other words, the contractor only staff these critical areas after a CURE Notice is issued or a Significant Finding'"; "'Cibola . . . has not met the required staffing plan in Correctional Services for approximately 10 years'"; "'[n]o one from the field provided any suggestions for partnering [meeting topics] with GEO'").

Hininger testified that to protect CCA's Board of Directors from being "blindsided" by CCA's CAR XV failures, he apprised them of CCA's performance issues with the BOP, including findings of deficiencies, contract deductions, Notices of Concern, and significant findings (PEx. 99 at 234:17-235:21); yet he admitted that CCA did **not** disclose to investors these same performance issues. *Id.* at 235:24-238:9.[11] To this day, Defendants continue to conceal from investors the two most important facts concerning this loss: (1) ███████████████████████████████ and (2) ███████████████████████████████████████████████ While Defendants disclosed CCA's lost CAR XV bid in CCA's Form 10-K, Hininger admitted that he and others discussed and decided **not** to disclose the damning information of losing as ████████ ████████████████████████████████████████████ PEx. 99 at 247:13-252:14, 258:2-259:24; *see also* PEx. 62 at 256:25-257:8.[12]

### 3. Defendants' Comprehensive Performance Failures Went Beyond the Adams Riot and Failed Northeast Ohio Bid

While Defendants were concealing from investors why they lost the Northeast Ohio contract to their chief rival, other bad news from the BOP poured in. On January 9, 2015, Jeb Beasley

---

[11] Notes from a BOP debrief regarding this unprecedented loss reveal that the BOP's performance ███████████████████████n with CCA's Board. SUF No. 238 ████████ ██████████████████████; *see also* SUF No. 240 ("these sign ████████████████████████actor in the CAR 15 awards . . . which . . . went to two GEO facilities'" instead of C███████████████████████████████

[12] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████SUF No. 233 ████████████████████████

("Beasley"), who managed CCA's relationship with the BOP, emailed his father, CCA founder Tom Beasley, to say: "'Worst two weeks of my professional career . . . the house is on fire and not getting the type of response we need.'" SUF No. 239. Though Beasley was writing right after the Northeast Ohio loss, the fire was at Adams and Cibola.

Concerning Adams, Beasley wrote: "'we are going to receive Significant Finding in patient care at Adams as a result of this week's CFM . . . the BOP auditor after reviewing five deaths at Adams Co. over the last year was of the opinion that delivery of healthcare led, in part, to these deaths.'" SUF No. 237.[13] The news on Cibola was worse: "'[W]e will be receiving a Cure Notice at Cibola for Health Services. They referenced the recent rereview and the new deficiencies from that re-review as well as the eyes of the IG audit as reasons for the Cure Notice.'" SUF No. 237.[14]

Defendants were also anxious about the Notices of Concern ("NOCs") that they knew were imperiling their BOP business. For example, when Garfinkle received a NOC for Cibola in 2015, he privately admitted: "'Between you and me, I don't like having the [Cibola] contract expiration in September 2016 with BOP populations system-wide declining so much. I don't want them with any more excuses to not renew the contract. Do we have a good response?'" SUF No. 249. As Beasley wrote, Cibola's continuing to "'perform[] poorly'" meant "'we are close to going from 5 BOP facilities to 2.'" SUF No. 247. CCA had no response; it lost the Cibola contract. SUF No. 254.

---

[13]  *See also* PEx. 94 at 23-24 ("Yet again, CFM identified a Significant Finding in Health Services comprised of a Repeat Deficiency and five instances where their medical management of an inmate's condition prior to his death was not handled properly. This alarming Deficiency appeared yet again. It was identified earlier on in their contract in 2011, and 2012, and was now known as 'the' common and most concerning Deficiency among CCA contract facilities. The BOP imposed over $888,000 in Deductions as a result of these findings.").

[14]  True professionals, such as Doug Martz, former BOP Chief of Privatized Corrections Contracting, agree. Martz, for example, in discussing the July 2013 through June 2014 performance period for Cibola (as reflected in the award fee determination letter before him, PEx. 100), described the Cibola triple repeat deficiency and significant finding as a "complete program failure" – which ultimately resulted in the cure notice (demonstrating how deficiencies, serious enough on their own, roll up into increasingly serious demerits). *See* PEx. 8 at 120:17-121:23.

Defendants concealed their peril, despite continuing to pat themselves on the back. Concerning the role Cibola's poor past performance played in CCA's loss of the Northeast Ohio contract and concerning the Cibola cure notice, for example, Defendants consciously chose concealment to avoid "'spooking the market.'" SUF No. 244.[15]

All the deficiencies, Repeat Deficiencies, significant findings, notices of concern and other "operational metrics" Defendants attempt to brush off as "discrete" were anything but. In total, during the Class Period, at just five BOP facilities, CCA received 338 Deficiencies, 44 Repeat Deficiencies, 6 repeat Repeat Deficiencies, 2 triple-Repeat Deficiencies, 1 quadruple-Repeat Deficiency and 3 significant findings. PEx. 94 at 7-18. CCA also received less than 20% of available award fees, missing out on more than $30 million in possible revenue. SUFr Nos. 22-23. CAA's poor performance was pervasive in 2012 and a trend by 2013, as revealed through the BOP "CFM" reports. PEx. 94 at 22.

These failures remained pervasive because Defendant never fixed anything. At Eden, where Defendants were unable to hire or retain a doctor for months on end,[16] the BOP warned: "'***[T]he aggregate of sustained evidentiary deficiencies***, *and repeat deficiencies*, support the conclusion that *your* health services program lacked appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment, and thus constituted a significant finding.'" SUF No. 227. At Adams, not only had CCA's Spanish-speaking staff ***declined*** following the riot, CCA stopped even ***trying*** to hire them. SUF No. 261 (understaffed 93% of the time). And CCA was inflating its actual staffing numbers. SUF No. 261 ("'[W]e found the staffing levels CoreCivic reported to the BOP reflected neither actual staffing at the facility nor staffing insufficiencies. Specifically, CoreCivic

---

[15] Between receipt of the Cibola cure notice (Ex. 92) and its lifting (Ex. 105), CCA issued its annual report (Ex. C) and a quarterly report (Ex. O), published an investor presentation (Ex. 9) and held two earnings conference calls (SUF Nos. 242-243), in which they failed to disclose this extreme repudiation of CCA's performance. *See also* SUF Nos. 241, 244; SUFr Nos. 123, 128.
[16] *See, e.g.*, SUF No. 227.

4837-9660-2072.v1
Case 3:16-cv-02267   Document 413-1   Filed 02/12/21   Page 20 of 41 PageID #: 23517

reported to the BOP simple headcounts of staff recorded on payroll records, regardless of the hours each employee actually worked.'"); *id*. (CCA reported "'nominal,'" not "'actual,'" staffing).

CCA's own executives acknowledged that the fallout from its staffing deficiencies was worse than what the OIG described publicly in August 2016: "[The OIG] totally overlooked the ***consequences*** of our staff vacancies. They mentioned staffing at the end ***but could have been much more critical***." PEx. 85. As Mellendick summarizes: "By 2014, it was apparent the BOP had lost confidence in CCA's ability to perform the major contract requirements. CCA was still not reacting, and their continued failure to address these serious and repetitive problems caused their performance to worsen." PEx. 94 at 23.

Defendants recognized their failures were comprehensive and hurting their relationship with the BOP and other customers. CCA employees admitted internally that Cibola had "'always'" been understaffed. SUF No. 260. Before CCA had even lost the Northeast Ohio contract, CCA employees discussed a "'partnering meeting'" with the BOP, in which the BOP had criticized not only the "'numerous repetitive deficiencies'" impairing CCA's performance at both Cibola and Eden but also CCA's inability (or refusal)[17] to detect those deficiencies themselves. SUF Nos. 222, 228. According to CCA's head of audits, Don Murray, "'[t]here is not the degree of overlap'" between BOP and CCA audits "'that we had hoped.'" SUF No. 228. In fact, the comparison was terrible: CCA only identified 18% and 30% of the Health Services deficiencies that the BOP did in 2013 and 2014, respectively. SUF No. 228; *see also* PEx. 8 at 85:20. In fact, as early as 2012, the BOP had to call CCA to warn that the McRae facility was out of compliance with its contract because CCA was

---

[17] The BOP was clearly frustrated with CCA's failure to acknowledge and redress the problems the BOP was telling CCA to fix. For example, the BOP was displeased that CCA was improperly documenting medical staffing at the understaffed Eden facility: "'Your claim to be unaware of documentation discrepancies is contradicted by the CFM review findings, which were reported to you in detail.'" SUF No. 227.

unable to meet the "'baseline'"[18] contractual requirement of maintaining ACA accreditation. SUF No. 208; *see also* PEx. 8 at 123:18-124:8. Defendants disclosed ***none*** of the peril the BOP told them CCA was in, nor did they disclose their own concerns related to accumulated and Repeat Deficiencies, NOCs, or significant findings.

### 4. CCA's Failures Cost It Three More BOP Contracts

By 2016, Defendants were desperate. The problems at Cibola mimicked the ones at Eden and other facilities. As a May 11, 2016 "'Talking Points for Discussion with Mr. Lappin'" summarized, "'Medical Staffing: Cibola and Eden continue to struggle. . . . The concern with Cibola is the long term effect on the contract.'" SUF No. 250. The talking points revealed CCA's resulting concern for all four remaining BOP contracts, especially Eden, which was due for renewal in 2017: "'With the BOP drop in population at their facilities and the 4 CCA contracts, concerned on the renewal of Eden with the current contract ending 5/2017.'" *Id.*

A month later, a CCA vice president concluded: "'I see no way to save Cibola.'" SUF No. 251. So Hininger set a meeting with the BOP in July 2016, for which he and Garfinkle approvingly discussed a scheme to offer them a bribe – that is, a million-dollar "'inducement'" that they planned to disguise as a ""'fine"'" – to convince the BOP to renew the Cibola contract. SUF No. 252. Even Defendants' own experts rightly condemned such a scheme as unheard of, "illegal" and one for which Lappin testified that he "cannot think of a legitimate reason to do this." PEx. 3 at 211:3-16; PEx. 62 at 230:18-231:9.[19]

On July 29, 2016, the BOP made official its inevitable decision not to renew the Cibola contract in a private notice to CCA. SUF No. 254. As CCA's auditor wrote for fiscal year 2016:

---

[18]   SUF No. 207; SUFr No. 49.
[19]   Such unprecedented desperation discredits Defendants' assertion regarding the supposed lack of testimony "that CoreCivic should have known, based on losing the [Northeast Ohio] bid that it would not receive ***any*** future contracts from the BOP." MSJ at 18 (emphasis in original) (citing Mellendick (PEx. 95 at 150:16-20), who was asked only: "[D]id anybody at the BOP tell CCA after December 2014 that it was unlikely that they would win any new contract with the BOP?").

"'[T]he vacancy at Northeast Ohio from mid-2015 to the end of 2016, and the ramp-down of BOP populations and ramp-up of ICE populations during the fourth quarter of 2016 at Cibola negatively impacted financial results in 2016.'" SUF No. 262. Such losses of renewable contracts are "'extremely rare.'" SUF No. 255 (Mellendick Report: "'Declining to exercise option years of a private prison contract based on poor performance is an extremely rare occurrence in the BOP.'"). Defendants failed to inform investors the most damning aspect of this extremely rare loss: it was due to CCA's chronic poor performance.

Defendants also knew their failures at Cibola, Eden and Adams had imperiled their entire business with the BOP. One July 28, 2016 email, shared amongst lobbyists and others, stated that the "BOP has informed CCA that Cibola, NM (1200 beds) will be cancelled . . . . The beds being cancelled . . . establish credibility to our concerns that BOP is moving forward with a larger plan to cancel all contract confinement beds . . . and this is merely the first step." PEx. 81 at -428. While that email also involved cancelled beds at CCA's competitors, internal emails confirm that even Beasley believed Hininger was being dishonest about the reasons for the Cibola loss: "'The board cannot accept [Hininger]'s spin of "outside factors"'" for the loss of Cibola. SUF No. 256 (also lamenting GEO's "'largest ever'" dividend at a time CCA was likely to lower theirs and worrying CCA was "'ripe for an activist investor to issue some demands of our Board'").

These chronic failures affected CCA's business with other customers as well. On November 8, 2016, Immigration and Customs Enforcement ("ICE") sent CCA a letter expressing "serious" concerns based on CCA's performance going back to at least 2014:

> "We have read with concern media reporting which indicates that the medical unit at . . . Cibola . . . had *repeatedly failed to comply* with federal standards of care for Bureau of Prisons (BOP) inmates. . . .
>
> One of the media accounts that causes ICE particular concern (attached) states that, in April 2014, BOP monitors found that Cibola's medical unit was *operating far out of compliance* with federal standards, and *the agency warned*

*[CCA] to correct course; however, when the monitors returned they discovered that CCA failed to comply*."

SUF No. 264.

Hininger, meanwhile, while publicly trying to "spin" CCA's own failures as being external (or even "political"), was in full damage-control mode: "'My number one goal has been to keep Eden under contract with the BOP.'" SUF No. 257. Hininger's explanation for why Eden was a priority was telling: "'rural'" facilities like Eden (and Cibola and Adams) were hard to staff and run, or even get contracts for: "'I think if we lose the BOP, it is a hard facility to remarket. . . . Eden is a lower price but after the events of last weekend [*i.e.*, loss of Cibola], I worry about the rural location and the facility not being as secure as [the] Tallahatchie [facility] from a physical plant perspective might be more top of mind for the BOP.'" *Id*. In other words, CCA's nominally lower price was unattractive to the BOP because the BOP knew that price was obtained only by placing poorly constructed facilities in poor labor markets, practically guaranteeing understaffing and other problems.

It is against this history of chronic poor performance and understaffing that on August 18, 2016 Deputy Attorney General Sally Yates issued the Yates Memo[20] directing the BOP not to renew contracts with private operations, including CCA:

> Private prisons served an important role during a difficult period, but time has shown that they compare poorly to our own Bureau facilities. They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office Inspector General, they do not maintain the same level of safety and security.

Ex. 123 at -913. The Yates Memo also specifically identified the non-renewal of the Cibola contract as an action taken for these very reasons. *Id*.; SUFr No. 140.

---

[20] Sally Q. Yates, "Reducing our Use of Private Prisons," dated August 18, 2016 ("Yates Memo").

Although then-Attorney General Sessions later rescinded the Yates Memo, CCA still lost

both the Eden and Adams contracts to GEO *during the Trump administration* when they came up

for renewal, just as they had lost the Northeast Ohio contract.[21]  SUF No. 265.  Defendants refused

to produce documents explaining those decisions, but witnesses confirm that they lost the facilities

due to both quality and cost.  Vice President VerHulst, for example, explained: "'Adams was the

same way [as Eden].  *We could not compete* with a 10-year-old state-of-the-art facility . . . we're not

able to . . . go with low-cost beds.'"  *Id*.

### 5.  Defendants' Misleading Cost Statements Are Intertwined with Their Misleading Quality Statements

The picture Defendants painted interwove CCA's supposed high quality and great value.  As

this Court has previously recognized, CCA's value proposition was to offer cost savings while

providing operational quality.  Order at 14-16.  Defendants' MSJ erroneously tries to separate the

quality of CCA's services from the cost of those services.  MSJ at 15-16; *see also* SUFr Nos. 168,

177, 180; SUF No. 206, 268.

First, quality and cost are inseparable for all practical purposes.  Even Lappin previously

acknowledged this fact: "'cost and performance issues should be seen as opposite sides of the same

coin and jointly examined.'"  SUFr Nos. 177, 180; *see also* SUF No. 268.  CCA's own statements

speak of not "'sacrificing quality'" in the same breath as emphasizing the Company's value

proposition to investors.  SUF No. 206.  Defendants' own "cost expert" agrees that value proposition

can include quality.  SUF No. 268.

Second, Defendants' statements are not caged with limiting opinion language but are asserted

as fact.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187

(2015) (there are no words like "'I think' or 'I believe' . . . [that] convey some lack of certainty as to

---

[21]  Even if CCA had not lost the entirety of these contracts, it was planning to lose significant business.  SUF No. 263.  CCA did not disclose these planned losses.

4837-9660-2072.v1

the statement's content"). CCA "chose to couch its statements in terms of actual history of performance." Order at 35. Regardless, Defendants had no reasonable basis for their material misrepresentations and omissions because investors were not informed with the requisite intensity and credibility that there is no reliable means to evaluate the costs of comparable facilities run by the BOP and CCA, and CCA had not compared its cost savings with those run by its private competitors – GEO and MTC. *Omnicare*, 575 U.S. at 194 (the omission of "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have" rendered their "statement[s] at issue misleading to a reasonable person reading the statement fairly and in context"). The evidence demonstrates that any apples-to-apples comparison of the BOP and CCA is impossible given the vast differences in the facilities, the varied security levels and the services offered. SUF No. 268; SUFr No. 168. Against this backdrop, Defendants cannot possibly establish CCA's wide-sweeping cost-savings claims. MSJ at 14-16.

Finally, CCA performed so poorly on its BOP contracts that the BOP concluded even where CCA did offer the lowest price. ██████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████ *See supra* §II.B.2.; SUFr No. 109.

**C.  If Anyone Is Entitled to Summary Judgment, It Is Plaintiff**

**1.  Literal Truth Is Literally Not a Basis for Summary Judgment**

Any one of the foregoing massive failures is sufficient to defeat summary judgment here, but the combination of them puts ***Plaintiff*** on the brink of establishing Defendants' liability as a matter of law. While Defendants quibble about literal truth and falsity (MSJ at 12), that is not even the standard. *SEC v. Conaway*, 698 F. Supp. 2d 771, 830 (E.D. Mich. 2010) ("whatever the language used to explain why a statement, that may be literally true, is misleading, the concept of implied representation is well established").

Putting aside that it is largely Defendants' omissions that render their statements materially misleading, there is evidence of literal falsity.[22] For example, when testifying about CCA's falsified staffing reports, Garfield admitted that: "'[W]e were, you know, disappointed in ourselves that we didn't live up to the expectations of our – of our operations, or of our partner in this case . . . .'" SUF No. 226. Similarly, concerning the Cibola facility, "'BOP monitors found that Cibola's medical unit was operating far out of compliance with federal standards, and the agency warned [CCA] to correct course; however, when the monitors returned they discovered that CCA failed to comply.'" SUF No. 264; *see also* SUF No. 259 (listing hundreds of failures to comply with facility contracts).

And CCA's relationship with the BOP began to "fray" by 2012, not 2014 as Defendants claim. MSJ at 12. After the 2012 Adams Riot, CCA's deficient performance left it unable to compete in an environment of decreased desperation. SUF No. 219; Order at 3 As early as March 2012, a CCA executive warned that Defendants had put BOP complaints "'on the back burner'" for far "'too long.'" SUF No. 209. Hininger himself told CCA's Board in January 2015, that Defendants had "'had [performance-related] challenges in the past 18 months . . . [they] *knew* we would have to overcome'" (*i.e.*, back to mid-2013). SUF No. 241.

Even if Defendants' facilities were not "failing," even if the failures were not "complete," there is no requirement that a statement be 100% false for it to be actionably misleading under the securities laws. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39-40, 45, 49 (2011) (rejecting argument that only "a handful of anecdotal reports . . . of adverse event[s]" fail to plead material misstatements). Yet Defendants' argument here – that Plaintiff must show CCA's services to "all" its partners across "all operational" metrics were deficient (MSJ at 13) – demands just that. It also ignores that they alone bear the burden on summary judgment and that Plaintiff has identified

---

[22] *See* Order at 26 (noting that Defendants touted their services as complying with "*particular standards* – such that CoreCivic was an attractive option for continued and future government contracts").

"a long-running series of deficiencies at [CCA]'s BOP facilities" that impacted the overall quality of CCA's services and imperiled CCA's government business.  Order at 3.

### 2.    Defendants Repeatedly Rely on Non-Dispositive Evidence

Defendants further demonstrate their disregard for the burden they must carry at summary judgment with repeated references to *arguments* they can make to a jury that fall far short of dispositive confirmations of their statements.

### a.    CPARs Are Unreliable

Defendants make much of CPARS, which generally said ███████████████████ ███████████████ and intermittently granted award fees to CCA.  But as Martz testified: "'CCA had the opportunity to provide all of their influence on how [the CPAR] was generated and put positive spins on it,'" rendering the CPARs unreliable.  SUFr No. 69.  The more credible assessments were in "'the documents that don't have that opportunity for CCA to . . . tell a different story, and that's the contract facility monitoring.  That's the notices of concerns, . . . repeat-repeat deficiencies when there's not a doctor there for two years . . . .'"  *Id.*

While the contracting officers who completed the Contractor Performance Assessment Reports ("CPAR") forms may have recommended ████████████████████ (at which they worked full time), many of the cited CPARs rated CCA's performance as ████████ with respect to "Quality."  *See* SUFr Nos. 76, 127-128, 135.  And a rating of ██████████ was hardly a ringing endorsement.  *See, e.g.*, SUFr No. 73 (facts ███████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ ).

Defendants do not believe their own arguments about CPARs' conclusiveness, as they repeatedly expressed concerns about CCA's BOP relationship, despite the CPARs.

### b. The Existence of a Quality Assurance Division Is Irrelevant to Summary Judgment

There is also no credible evidence of a "robust" Quality Assurance Division ("QAD") that ensured Defendants' statements were materially accurate and complete. MSJ at 16-17. The evidence shows the division to be a bust: "'While [CCA] has an extensive Quality Control audit tool however the tool has not been effective in all areas as evidenced in the January 2013 Contract Facility Monitoring (CFM)'" and "'in the January 2014 CFM.'" SUF No. 234; SUFr Nos. 75-76. The head of the QAD, Don Murray, admitted that he did not even have the tools necessary to replicate third-party audits of CCA. SUF No. 235. The mere existence of a QAD proves nothing given evidence that it was, at best, a paper tiger (and, at worst, a Potemkin Village component of Defendants' scheme).[23]

### c. CCA Lost Millions in Award Fees

While Defendants note instances in which they received award fees, they ignore the millions in award fees on which CCA missed out – more than 80% of the possible awards – because of unsatisfactory performance, not to mention numerous significant deductions for contract noncompliance. *See* SUFr Nos. 22-23, 129, 135; SUF No. 236, 259.

### d. Defendants' Cost "Studies" Were Biased

A jury should decide whether it was misleading for Defendants to cite "studies," "articles" and "working papers" in support of their value assertions while concealing the extent of CCA's influence over these sources. For example, on October 2, 2013, CCA began years of citing what they called a "Temple University Study." SUF Nos. 158-159. The "study" was not endorsed by Temple University and was not a peer-reviewed study at all but was just a working paper CCA orchestrated through lobbyists and supported by other articles CCA financed. SUFr Nos. 160, 163-

---

[23] Defendants' contentions regarding the QAD are also the subject of Plaintiff's pending Motion to Preclude Defendants from Relying on an Advice of Counsel Defense and therefore should be excluded. ECF No. 266 at 4, 9, 15-16.

165.  Moreover, Defendants cannot immunize themselves from liability for their misleading statements simply because others, such as the *Prison Legal News*, questioned their veracity.  SUFr No. 166.[24]

### D.  Defendants Had Actual Knowledge of Their Misconduct

Scienter "can be proven by a showing that the defendants issued false or misleading public statements with knowledge that those statements were false or misleading, or with reckless disregard as to their false or misleading character."  *Levinson v. Basic Inc.*, 786 F.2d 741, 749 (6th Cir. 1986), *vacated on other grounds*, 485 U.S. 224 (1988).  Scienter is a contextual analysis based on *all* the facts.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Except in rare circumstances, scienter is a jury question.  *E.g.*, *TSC Indus.*, 426 U.S. at 450; *Michaelian v. Lawsuit Fin., Inc.*, 2019 WL 1281953, at \*16 (E.D. Mich. Mar. 20, 2019).  Because it is "the rare defendant who admits to having had fraudulent intent . . . courts should be "'lenient in allowing scienter issues to withstand summary judgment'" so as not to impermissibly take on the role of the fact-finder."  *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 458-59 (S.D.N.Y. 2012).

As detailed above, Defendants received a constant stream of warnings from the BOP and internally that the BOP relationship was crumbling.  SUF Nos. 216, 266-267; *see also* SUF Nos. 210, 238-239, 241, 244, 259; SUFr No. 112.  Yet Defendants' Motion is written as if *Plaintiff* has moved for summary judgment on this issue, protesting that "Plaintiff also cannot establish as a matter of law that Defendants acted with scienter – the 'intent to deceive, manipulate, or defraud.'"  MSJ at 19.  Of course, Plaintiff does not have to establish Defendants' scienter as a matter of law but

---

[24]  *See, e.g.*, *Saddle Rock Partners, Ltd. v. Hiatt*, 1996 WL 859986, at \*16 (W.D. Tenn. Mar. 26, 1996) ("The court finds that whether defendants have presented sufficient evidence to establish a truth on the market defense – namely, that the market had full knowledge of the omissions and misrepresentations by defendants – is an issue for the factfinder."); *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1382 (W.D. Mich. 1992) ("although information may trickle into the market from third-party sources, statements from the company itself, or the absence thereof, may be 'viewed by a reasonable investor as having significantly altered the "total mix" of information made available.'") (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

rather by a preponderance of the evidence *at trial*. And contrary to Defendants' misdirection, the issue is not whether Defendants "failed to predict the Yates Memorandum" but rather their "failure to give a full and truthful contemporaneous representation of the business fundamentals and client relationships on which an investor's own prediction could be based." Order at 33.

The "evidence" Defendants submit does not *prove* that "its executives truly were in the dark about the peril facing their relationship with the BOP," or that "its most important decision makers were simply unaware of the mountain of evidence made available to them," regarding the Company's performance relative to BOP expectations. Order at 36, 41-42. Defendants' self-serving testimony about "expectations" of contract renewals (MSJ at 20) cannot negate the mountain of evidence regarding their specific knowledge of CCA's performance issues and the BOP's resulting concerns. *Supra* §II.B.2.-4.[25] The bottom line: the jury could easily find that by touting the supposed high quality, great value proposition that enabled CCA to maintain such a high renewal rate with its governmental partners, such as the BOP, while concealing critical information about major quality issues and rapidly diminishing competitiveness, Defendants knowingly deprived investors of indispensable information to appraise for itself CCA's risks.

### E.   Defendants Are Not Entitled to Summary Judgment on Loss Causation

This Court has already upheld Plaintiff's theory of loss causation. ECF Nos. 76 at 36-37, 143 at 12-14, 165 at 25-26. While Defendants now frame their arguments in terms of evidentiary sufficiency, their Motion offers nothing more than a rehash of their *thrice* rejected contentions that the Yates Memo reflected a "political shift" unrelated to the alleged fraud. As this Court previously

---

[25]   Given the direct evidence of Defendants' actual knowledge here, Defendants' fictional motive requirement is superfluous. *Compare* MSJ at 19 *with Tellabs*, 551 U.S. at 325. Defendants also ignore that CCA's performance-based compensation provided them with motive to conceal CCA's deteriorating relationship with the BOP so they could reap millions in compensation. *See, e.g.*, Ex. 99 at 134:2-11 (Hininger: "absolutely . . . accurate" that in addition to $675,000 salary he was awarded over $2 million in stocks, cash retirement contributions, insurance premiums and other benefits).

4837-9660-2072.v1

held, and is still true today, "[n]othing in the record . . . supports [a] vision of politics as an external force unrelated to the BOP's quality concerns." ECF No. 143 at 14.

"'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.' It partakes of the traditional elements of loss and proximate causation." *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016). Under the "materialization of the risk" theory of loss causation, a plaintiff must show that "'the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged.'" *Id.* at 384-85; ECF Nos. 76 at 36-37, 143 at 12-14, 165 at 25-26.[26]

There is ample evidence sufficient for a jury to conclude that the Yates Memo was within the zone of risk concealed by the alleged misrepresentations and omissions. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 235 (2d Cir. 2000).

Defendants' repeated assurances about high renewal rates directly tied to high quality and value prevented investors from accurately valuing CCA's relationship with the BOP. Order at 18-19, 32, 34. Defendants even reassured investors that such population declines within the BOP were ***not*** expected to impact CCA because "'BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses.'" Order at 18; SUF No. 202. The truth, however, was that CCA was in dire straits with the BOP, as discussed in detail above.[27] None of Defendants' contentions to the contrary comes close to establishing the absence of a genuine issue of material fact with respect to loss causation.

---

[26] While Defendants contend Plaintiff has put forth an "evolving" theory of loss causation, in fact the materialization of risk theory is precisely what the Court endorsed in denying Defendants' motion to dismiss and certifying the class. ECF Nos. 76 at 36-37, 143 at 12-14, 165 at 25-26.

[27] Defendants' contention that CCA had "no nonpublic information that would have allowed investors to weigh the risk that the Yates Memo would issue on August 18, 2016" is a strawman. MSJ at 24. Defendants cite no authority to suggest that they must have been able to precisely predict the date and manner in which the risks concealed by their fraud would manifest.

### 1. The Yates Memo Is Directly Linked to Defendants' Misconduct

Defendants' suggestion that the Yates Memo was too attenuated from the risks Defendants concealed, including that there "is no evidence" that "the Yates Memo was linked in some way to the BOP's relationship with [CCA]," is absurd. *See* MSJ at 21. The causal connection between Defendants' failure to disclose the risks to CCA's BOP business due to CCA's poor performance and the DOJ announcing that the BOP would end its relationship with CCA due to poor performance could not be more direct.

Unlike *In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *27 (S.D. Tex. May 31, 2016), these disclosures were not "indirectly corrective." There, the plaintiff claimed that "news of a potential dividend-cut 'further revealed the severity and financial impact of the [Deepwater Horizon oil] spill,'" but the Court disagreed, holding there was no evidence that the potential dividend cut was related to misrepresentations about the flow rate of the leak. *Id.* at *27. Those facts cannot be analogized to this case, where Defendants concealed performance-related threats to CCA's relationship with the BOP and the DOJ's performance-related termination of that relationship caused the relevant stock price declines.

Similarly, Defendants contend that the Yates Memo did not reveal new information about CCA's risk of losing contracts due to its quality or costs and that "Plaintiff has failed to provide any evidence linking the Yates Memo with the risks allegedly concealed." MSJ at 24. This is nonsense. Defendants never warned of what they concealed: that CCA's unprecedented chronic performance problems put its relationship with the BOP in grave danger. When and how the realization of that risk was revealed is irrelevant. The Yates Memo expressly tied the DOJ's decision to performance issues ("time has shown that [private prisons] compare poorly to our own Bureau facilities") and expressly referred to the BOP's recent non-renewal of CCA's Cibola contract as an important first

step to phasing out poorly performing prisons. Ex. 123 at -913. And, of course, the Yates Memo's stated findings have been confirmed in discovery – CCA's BOP operations were abysmal. *Supra* at §II.B.2.-4.

### 2. Defendants Cannot Establish a Truth-on-the-Market Defense

Contrary to Defendants' argument, by concealing CCA's poor performance, Defendants necessarily concealed the relationship risks from this poor performance. *See* MSJ at 24-26. For Defendants to prevail on a truth-on-the-market defense, "'any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations.'" *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016). In any case, "whether defendants have presented sufficient evidence to establish a truth on the market defense – namely, that the market had full knowledge of the omissions and misrepresentations by defendants – is an issue for the factfinder." *Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2362 GA, 1996 WL 859986, at *16 (W.D. Tenn. Mar. 26, 1996).[28]

First, the OIG Review alone could not meet this standard because Defendants were still actively misleading investors. The Court specifically rejected this contention in certifying the Class (ECF No. 165 at 30-33), and Defendants offer nothing beyond their prior submissions now.[29] Second, disclosures about the Adams riot and the Cibola non-renewal did not reveal the most

---

[28] While Defendants rely on *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010), for the proposition that "[i]t is not enough to show 'that the market reacted to the purported "impact" of the alleged fraud" (MSJ at 24), they fail to inform the Court that following a 28 U.S.C. §1292(b) certification in *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978 (D. Ariz. 2015), where the district court specifically concluded that *Oracle* was irreconcilable with other Ninth Circuit precedent, the Ninth Circuit disclaimed any such requirement, holding: "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018), *cert. denied*, _U.S._, 139 S. Ct. 2741 (2019).

[29] The Allen Report is substantially identical to the report Allen authored in connection with Class certification (ECF No. 99-3) and upon which the Court declined to rely. ECF No. 143 at 11-14. In any event, it is woefully and intentionally unreliable and should be excluded. ECF No. 345.

damning aspects of both these failures; and Defendants denied and attempted to discredit reporting regarding their Deficiencies, rendering summary judgment wholly improper. SUFr Nos. 91, 129; SUF Nos. 212-218. Finally, Defendants' risk warnings were not meaningful. With respect to "declines in the overall federal prison population," CCA specifically said it did "'***not*** expect a significant impact'" from declines in BOP populations. Order at 18. Moreover, because any risks they warned of had already occurred, they cannot have been meaningful as a matter of law. *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *16 (M.D. Tenn. Nov. 19, 2019). Defendants have not come close to establishing that there is no genuine issue of material fact with respect to their purported truth-on-the-market defense.

### 3. The Yates Memo Was Within the Zone of Risk Concealed by Defendants' Misstatements

Defendants have not come close to establishing as a matter of indisputable fact that they could not foresee "something like" (Order at 33) the BOP phasing out its relationship with CCA as result of its concealed unprecedented chronic performance failures. *See* MSJ at 26-27.

It is simply not true that CCA had received "almost exclusively good news from the BOP." *Supra* §II.B.3.-4. The evidence in fact demonstrates that individuals at the BOP wanted to terminate CCA's contracts long before the Yates Memo yet were prevented from doing so because of the "revolving door" between the BOP and CCA. SUF No. 215. For example, Martz specifically testified that the BOP would have ended CCA's contract with Adams after the 2012 riot, yet Dalius (who went on to be paid millions of dollars by CCA) "blocked his proposal." *Id.*[30]

---

[30] "The securities laws require disclosure that is adequate to allow investors to make judgments about a company's intrinsic value." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010). This Court said the same thing in denying Defendants' motions to dismiss. Order at 32. But these facts bear no relation to the facts in *Omnicom*. *Wieglos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989), is also inapposite, as the Seventh Circuit there held: "*Basic, Inc. v. Levinson* emphasizes that materiality is a 'fact-specific' inquiry, 485 U.S. at 239-40, 108 S. Ct. at 987-88, and that close cases should not be resolved by summary judgment. Even very improbable events may be material if the injury is great enough. Just as tort cases often must go to trial so that

### 4. Plaintiff and the Class Would Not Have Suffered the Same Loss Absent Defendants' Fraud

As this Court previously held:

> While it may be true that the Yates Memorandum would have had some negative effect on the value of CoreCivic's stock no matter what, the scope of that loss was determined by the degree to which the market was able to evaluate the probability of such a shift and therefore price that risk into its valuation of CoreCivic.

Order at 36-37.[31] The record is more than sufficient for a jury to conclude that Defendants' deceptive statements prevented investors from accurately assessing the risks associated with CCA's BOP contracts. *Supra* §II.B. Defendants' suggestion that Plaintiff's loss would have been the same absent the alleged fraud is baseless and misrepresents controlling precedent.[32] Likewise, the Court has already rejected Defendants' contention that the Yates Memo represented "additional political risks" unrelated to the alleged fraud. MSJ at 28; ECF No. 143 at 14.[33] The fact that GEO's stock price also declined is irrelevant to loss causation. Dalrymple Opp. at 15-16. So, too, is the fact that

---

juries may decide whether the cost of taking precautions was less than the gravity of the loss discounted by its probability . . . securities cases presenting similar questions may require trials." *Id.* at 517.

[31] As discussed in Plaintiff's Opposition to Defendants' Motion to Exclude the Testimony of Scott Dalrymple (ECF No. 386) ("Dalrymple Opp."), filed contemporaneously herewith, Darlymple calculated and excludes the "no matter what" portion of the stock price decline associated with the Yates Memo in his opinion. Dalrymple Opp. at 13-14.

[32] It is unclear what Defendants mean when they suggest that *Dura* requires Plaintiff to disaggregate "'changed economic circumstances, changed investor expectations, new industry-specific or firm specific facts, conditions, or other events' *resulting from the alleged materialization of the risk*." MSJ at 28. To be clear, the only disaggregation required by *Dura* is for those losses *unrelated* to the alleged fraud. *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *10 (S.D.N.Y. Aug. 23, 2013) (citing *Dura* for the proposition that a plaintiff need only "'disaggregate the declines or some rough percentage of the declines from losses resulting from *other, non-fraud-related events*'"). And even then a plaintiff need only show that the revelation of corrective information was the "substantial cause" of the drop. *E.g.*, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, California*, 730 F.3d 1111, 1119-20 (9th Cir. 2013). To the extent the materialization of the risk results in "changed investor expectations," for example, which will *necessarily* be the case if the concealed risk was material, it cannot be the case, and there is no authority supporting the proposition that such losses should be disaggregated. *Id.* at 1123.

[33] Whether analysts speculated that the Yates Memo resulted from a shift in politics, as opposed to CCA's (concealed) quality deficiencies, is irrelevant. At bottom, CCA's stock price decline was driven by the expectation of decreased future cash flows after the Yates Memo. *See* ECF No. 340-4, ¶¶52-78. The fact that GEO's stock price declined is also irrelevant to loss causation. Darlymple Opp. at 15-16. So, too, is the fact that CCA's stock price temporarily rebounded after the 2016 election before resuming a steady collapse as CCA continued to lose additional contracts with the BOP. *See* ECF No. 340-2, ¶¶24-29, 33-36.

CCA's stock price temporarily rebounded after the 2016 election before subsequently declining even further as CCA continued to lose additional contracts with the BOP. ECF No. 340-2, ¶¶25, 27-28.

### 5. The Cibola Non-Renewal Was a Manifestation of the Concealed Risk

As discussed in Plaintiff's Dalrymple Opp., the Cibola non-renewal caused a stock price decline and recoverable losses to Plaintiff and the Class. Dalrymple Opp. at 4, §IV.B. There is no question that the non-renewal *was* due to CCA's performance issues.[34]

## III. CONCLUSION

Defendants' Motion should be denied.

DATED: January 22, 2021

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

---

[34] It is silly for Defendants to suggest that a manifestation of a concealed risk is not enough to cause damages (price deflation) absent an admission of wrongdoing. *OPERS*, 830 F.3d at 385 ("We are mindful of the dangerous incentive that is created when the success of any loss causation argument is made contingent upon a defendant's acknowledgement that it misled investors."). Moreover, the Cibola non-renewal was a factor analysts specifically recognized and incorporated in analyst guidance. ECF No. 340-4, ¶¶63-64 ("our updated 2017 estimate assumes a full-year negative impact related to the announced non-renewal of a [BOP] contract at [Cibola]"). Cases such as *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) are inapposite. The language quoted by Defendants is only relevant when the "fraud is disclosed indirectly through the disclosure of a different event." *Id.* at *24. Here, the Cibola non-renewal is *directly* related to Plaintiff's allegations that Defendants failed to disclose the extent of the risks to their BOP contracts.

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
KENNETH J. BLACK
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
JASON A. FORGE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
    & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 22, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

      s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth J. Black**
  kennyb@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **Meryn C.N. Grant**
  Meryn.Grant@lw.com

- **Dennis J. Herman**
  dherman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,adonovan@barrettjohnston.com,eseaborn@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Faraz Mohammadi**
  faraz.mohammadi@lw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,WillowR@ecf.courtdrive.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian Schall**
  brian@goldberglawpc.com

- **David J. Schindler**
  david.schindler@lw.com

- **Sarah A. Tomkowiak**
  sarah.tomkowiak@lw.com

- **Morgan E. Whitworth**
  morgan.whitworth@lw.com,morgan-whitworth-8044@ecf.pacerpro.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,smorris@rgrdlaw.com,CWood@ecf.courtdrive.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com,smorris@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)