# EXHIBIT B

NIKKI BOLLINGER GRAE, Individually and
on Behalf of All Others Similarly Situated,

                      Plaintiff,

    vs.

CORRECTIONS CORPORATION OF
AMERICA, et al.,

                  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:16-cv-02267

Honorable Aleta A. Trauger

PLAINTIFF'S RESPONSE TO
DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS IN
SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND
PLAINTIFF'S STATEMENT OF
ADDITIONAL FACTS

**FILED UNDER SEAL**

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Lead Plaintiff and Class Representative Amalgamated Bank, as Trustee for the Longview

Collective Investment Fund ("Plaintiff"), submits this response to defendants CoreCivic, Inc.,

Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger and Harley G. Lappin's (collectively,

"Defendants") Statement of Undisputed Material Facts in Support of Their Motion for Summary

Judgment (ECF No. 353), filed November 20, 2020 ("Defendants' Statement"). Plaintiff

respectfully submits that Defendants' Statement blatantly violates Rule 56.01(b) of the Civil Local

Rules and should be stricken from the record, justifying denial of Defendants' Motion for

Summary Judgment (ECF No. 352) ("Defendants' Motion" or "Motion") in its entirety.

As Judge Higgins explained nearly 20 years ago:

> The Court is compelled to comment on plaintiffs' Statement of Additional
> Material Facts, which is far from "concise," and which contains many assertions
> that are not facts, many facts that are immaterial to the issues raised on summary
> judgment, and many facts that are inadequately supported by citations to evidence
> in the record. The purpose of these statements is to aid the Court in quickly
> identifying any issues of material fact that might preclude summary judgment. It
> does not aid the Court to be forced to re-read every assertion made in a party's brief
> that has been reformulated into a numbered paragraph. Plaintiffs are admonished

to discontinue this practice regarding Local Rule 8(b)(7) statements or risk having such statements stricken from the record.

*Bridgeport Music, Inc. v. Dimension Films*, 230 F. Supp. 2d 830, 835 n.6 (M.D. Tenn. 2002), *rev'd in part on other grounds*, 410 F.3d 792 (6th Cir. 2005) (citations omitted).  Defendants' Statement epitomizes the type of blunderbuss and unworkable filing that Judge Higgins found should be stricken in *Bridgeport Music*.

As a result, Plaintiff has had to wade, and the Court may yet find itself "wading through the record and reviewing matters which are collateral to the real issue at hand," reviewing a document that provides no assistance whatsoever to the Court to determining "'whether there are any material facts in dispute.'"  *Mitchell v. Six Continents Hotels, Inc.*, No. 3:05-0705, 2006 WL 3227336, at *1 (M.D. Tenn. Nov. 3, 2006) ("a 129-paragraph statement of facts in a case such as this is hardly the 'concise statement' contemplated by Local Rule 56.01"), *aff'd*, 255 F. App'x 74 (6th Cir. 2007) (citation omitted).

In these circumstances, the Court would be well within its discretion to strike Defendants' Statement and deny Defendants' Motion outright:

> Where a party fails to comply with Rule 56(e) or to file a proper statement of material facts in dispute pursuant to a local rule, the circuits are in agreement that the district court is under no obligation to sift through the record, which often contains voluminous deposition transcripts, interrogatory responses, and document productions, in order to evaluate the merits of that party's case.

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996) (affirming trial court's strict adherence to local rules of civil procedure pertaining to statements of undisputed facts).  Nonetheless, Plaintiff submits the following response:

## I.    CORECIVIC'S BUSINESS

1.    CoreCivic, Inc. ("CoreCivic" f/k/a Corrections Corporation of America or CCA) specializes in owning, operating and managing prisons and other correctional facilities.  Ex. A,

CoreCivic, Annual Report (Form 10-K) (Feb. 27, 2014) ("2013 Form 10-K") at 5[1]; Consolidated Compl. ("Compl.") ¶33.

> **Response**: This statement is undisputed.

2. CoreCivic's customers are federal, state and local correctional and detention authorities. Ex. B, CoreCivic, Annual Report (Feb. 27, 2013) ("2012 Form 10-K") at 7; Ex. 1, CORECIVIC_0122295 at -308-313[2]; Compl. ¶34.

> **Response**: This statement is undisputed.

3. During the Class Period, CoreCivic owned, controlled or managed between 64 and 85 contracts with federal, state and local correctional, detention, and residential reentry facilities. Ex. B, 2012 Form 10-K at 5 (67 facilities); Ex. A, 2013 Form 10-K at 5 (66 facilities); Ex. C, CoreCivic, Annual Report (Feb. 25, 2015) ("2014 Form 10-K") at 5 (64 facilities); Ex. D, CoreCivic, Annual Report (Feb. 25, 2016) ("2015 Form 10-K") at 5 (77 facilities); Ex. E, CoreCivic, Annual Report (Feb. 23, 2017) ("2016 Form 10-K") at 5 (85 facilities); Ex. F, CoreCivic, Quarterly Report (Nov. 3, 2016) ("3Q 2016 Form 10-Q") at 6 (85 facilities).

> **Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Plaintiff further responds that this is not a material fact in the context of this Motion.

4. From 2014 to 2016, CoreCivic reported a year-over-year revenue increase in its Form 10-Ks. Ex. C, 2014 Form 10-K at F-4 (revenue for 2014 was $1,646,867,000); Ex. D, 2015

---

[1] Exhibits labeled alphabetically (Exs. A-Y) correspond to the exhibits to the Declaration of Patrick Swindle in Support of Defendants' Motion for Summary Judgment (ECF No. 355).

[2] Exhibits labeled numerically (Exs. 1-160) correspond to the exhibits to the Declaration of Meryn C.N. Grant in Support of Defendants' Motion for Summary Judgment (ECF No. 360).

- 3 -

Form 10-K at F-4 (revenue for 2015 was $1,793,087,000); Ex. E, 2016 Form 10-K at F-4 (revenue for 2016 was $1,849,785,000).

       **Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802.  Plaintiff further responds that this is not a material fact in the context of this Motion.

       5.      During the Class Period, CoreCivic's contract retention rate across all government partners averaged over 91%.  Ex. 1, CORECIVIC_0122295 at -308; Ex. 2, Dep. Tr. of David Garfinkle ("Garfinkle Tr.") 57:9-58:9; Ex. 3, Dep. Tr. of Tony Grande 185:7-185:24.

       **Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802.  Plaintiff further responds that this is not a material fact in the context of this Motion.  Plaintiff also notes that the quoted "retention rate" is itself a misleading statistic because it excludes instances where government customers chose not to renew CCA contracts after their final option periods.

       6.      The Company's contract retention rate for 2011 was 100%.  Ex. 1, CORECIVIC_0122295 at -308.

       **Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802.  Plaintiff further responds that this is not a material fact in the context of this Motion.  Plaintiff also notes that the quoted "retention rate" is itself a misleading statistic because it excludes instances where government customers chose not to renew CCA contracts after their final option periods.

       7.      The Company's contract retention rate for 2012 was 93.1%.  Ex. 1, CORECIVIC_0122295 at -308.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Plaintiff further responds that this is not a material fact in the context of this Motion. Plaintiff also notes that the quoted "retention rate" is itself a misleading statistic because it excludes instances where government customers chose not to renew CCA contracts after their final option periods.

8. The Company's contract retention rate for 2013 was 87.8%. Ex. 1, CORECIVIC_0122295 at -308.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Plaintiff further responds that this is not a material fact in the context of this Motion. Plaintiff also notes that the quoted "retention rate" is itself a misleading statistic because it excludes instances where government customers chose not to renew CCA contracts after their final option periods.

9. The Company's contract retention rate for 2014 was 89.7%. Ex. 1, CORECIVIC_0122295 at -308.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Plaintiff further responds that this is not a material fact in the context of this Motion. Plaintiff also notes that the quoted "retention rate" is itself a misleading statistic because it excludes instances where government customers chose not to renew CCA contracts after their final option periods.

10. The Company's contract retention rate for 2015 was 92.3%. Ex. 1, CORECIVIC_0122295 at -308.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Plaintiff further responds that this is not a material fact in the context of this

Motion. Plaintiff also notes that the quoted "retention rate" is itself a misleading statistic because it excludes instances where government customers chose not to renew CCA contracts after their final option periods.

11. The Company's contract retention rate for 2016 was 93.5%. Ex. 1, CORECIVIC_0122295 at -308.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Plaintiff further responds that this is not a material fact in the context of this Motion. Plaintiff also notes that the quoted "retention rate" is itself a misleading statistic because it excludes instances where government customers chose not to renew CCA contracts after their final option periods.

## II. PLAINTIFF

12. Lead Plaintiff is Amalgamated Bank, as Trustee for the LongView Collective Investment Fund ("Amalgamated Bank"). Lead Plaintiff began purchasing CoreCivic securities as early as March 29, 2012 and continued to purchase securities throughout the Class Period. Certification of Named Pl., Dkt. No. 40-2, at 3-6.

**Response**: This statement is undisputed.

13. Lead Plaintiff purchased CoreCivic securities after the end of the Class Period. Ex. 4, Pl.'s Resp. RFA No. 37.

**Response**: This statement is undisputed.

14. This lawsuit was initially filed on August 23, 2016. Compl.

**Response**: This statement is undisputed.

## III. CORECIVIC'S BOP CONTRACTS

### A. Background

15. During the Class Period, CoreCivic had contracts to operate five correctional facilities housing BOP inmates: Adams County Correctional Center ("Adams"), Cibola County Correctional Center ("Cibola"), Eden Detention Center ("Eden"), McRae Correctional Facility ("McRae"), and the Northeast Ohio Correctional Center ("NEOCC") (collectively, the "BOP Facilities"). Compl. ¶¶42 n.2, 43, 68, 87, 108.

**Response**: This statement is undisputed.

16. During the Class Period, the revenue derived from contracts with the BOP made up between 9% and 13.7% of the Company's total revenue. Ex. B, 2012 Form 10-K at 9; Ex. A, 2013 Form 10-K at 9; Ex. C, 2014 Form 10-K at 9; Ex. D, 2015 Form 10-K at 10; Ex. E, 2016 Form 10-K at 10; *see also* Ex. 5, CORECIVIC_1356105 at 16; Ex. 6, CORECIVIC_1377899 at 12; Ex. 7, CORECIVIC_1325572 at -585; Ex. 8, CORECIVIC_1209387 at -387; Ex. 9, CORECIVIC_0394417 at -430; Ex. 10, CORECIVIC_1211835 at -848; Ex. 11, CORECIVIC_0395027 at -040; Ex. 12, CORECIVIC_0121824 at -837; Ex. 1, CORECIVIC_0122295 at -308.

**Response**: This statement is undisputed for the purpose of summary judgment only.

17. Throughout the Class Period, CoreCivic earned an average of 12% of its total revenue from the BOP. Ex. B, 2012 Form 10-K at 9 (12%); Ex. A, 2013 Form 10-K at 9 (13%); Ex. C, 2014 Form 10-K at 10 (13%); Ex. D, 2015 Form 10-K at 10 (11%); Ex. E, 2016 Form 10-K at 10 (9%); Ex. 1, CORECIVIC_0122295 at -308 (9% in 2016).

**Response**: This statement is undisputed for the purpose of summary judgment only.

18. CoreCivic's BOP contracts were to operate low security facilities, which housed primarily criminal aliens (*i.e.*, non-U.S. citizens). Ex. 13, CORECIVIC_0000001 at -012 (Beach

Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -703 (Cibola); Ex. 15, CORECIVIC_0001329 at -389 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -097 (McRae); Ex. 17, CORECIVIC_0003791 at -801 (NEOCC).

      **Response**: This statement is undisputed for the purpose of summary judgment only.

      19.     Adams, Cibola, Eden, McRae and NEOCC were fixed-price type contracts that included award-fee incentives. *See, e.g.*, Ex. 13, CORECIVIC_0000001 at -005 (Beach Dep. Ex. 277) (Adams); *see also* Ex. 14, CORECIVIC_0000692 at -696 (Cibola); Ex. 15, CORECIVIC_0001329 at -381 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 (McRae) at -158, -198; Ex. 17, CORECIVIC_0003791 at -852, -854 (NEOCC).

      **Response**: This statement is disputed. Award-fee incentives were "offered in four of the five CCA contracts. The McRae Correctional Center contract began in late 2012, and this incentive was excluded due to recent changes in the Federal Acquisitions Regulations ('FAR')." ECF No. 336-3 at 5.

      20.     Each contract has a Statement of Work that sets forth the contract performance requirements for the management and operation of a contract correctional institution. Each Statement of Work listed 18 Performance Objectives. Ex. 13, CORECIVIC_0000001 at -012, -019-061 (Beach Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -703, -710-755 (Cibola); Ex. 15, CORECIVIC_0001329 at -389, -395-428 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -097, -104-148 (McRae); Ex. 17, CORECIVIC_0003791 at -801, -808-844 (NEOCC).

**Response**: Subject to the clarification that each contract's Statement of Work sets forth only the minimum contract performance requirements, this statement is undisputed for the purpose of summary judgment only.

21.     CoreCivic's contracts with the BOP provided the opportunity to earn Award Fees. Award Fees are discretionary and may be awarded to contractors for optimal performance, or performance above the acceptable level.  Ex. 18, Dep. Tr. of Douglas Martz ("Martz Tr.") 170:20-171:3; Ex. 13, CORECIVIC_0000001 at -005 (Beach Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -696 (Cibola); Ex. 15, CORECIVIC_0001329 at -381 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -198-201 (McRae); *see also* Ex. 17, CORECIVIC_0003791 at -875-877 (NEOCC); Ex. 19, Expert Rpt. of D. Scott Dodrill ("Dodrill Rpt.") ¶83 (Dodrill Dep. Ex. 545).

**Response**: This statement is disputed.  Four of CCA's five contracts with the BOP provided the "opportunity to earn an award fee commensurate with the achievement of performance above the acceptable level." *E.g.*, PEx. 1 at -920.[3]

22.     Of the 18 instances where a CoreCivic Facility was eligible for an Award Fee during the Class Period, the BOP awarded CoreCivic an award fee 10 times, as reflected in Exhibits 20-29. Ex. 20, CORECIVIC_0065110 at -111 ($292,449.88, or 10% of maximum award fee) (Martz Dep. Ex. 430); Ex. 21, CORECIVIC_0096381 at -382 ($156,063.60, or 8% of maximum award fee); Ex. 22, CORECIVIC_1337569 at -570 ($277,723.25, or 10% of maximum award fee); Ex. 23, CORECIVIC_1084667 at -667 ($157,525.10, or 15% of maximum award fee); Ex. 24, CORECIVIC_0990221 at -221 ($324,801.88, or 20% of maximum award fee); Ex. 25,

---

[3]   All "PEx. _" citations herein are to the Declaration of Christopher M. Wood in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed contemporaniously herewith.

CORECIVIC_0025298 at -298 ($1,401,516.79, or 85% of maximum award fee); Ex. 26, CORECIVIC_1086611 at -611 ($1,296,311.44, or 59% of maximum award fee); Ex. 27, CORECIVIC_0990234 at -234 ($728,228.67, or 35% of maximum award fee); Ex. 28, CORECIVIC_0047207 at -208 ($1,553,388.09, or 82% of maximum award fee); Ex. 29, CORECIVIC_0184605 at -606 ($1,765,255.56, or 90% of maximum award fee); *see also* Ex. 19, Dodrill Rpt. ¶84 (Dodrill Dep. Ex. 545).

**Response**: This statement is disputed because it is not supported by any admissible evidence and, in particular, there is no evidentiary support for the total number of instances in which a CCA facility was eligible for an award fee. Plaintiff does not dispute that Exhibits 20-29 reflect ten award fees during the Class Period.

23. Four of those times the award fee was greater than 50% of the maximum allowable award fee, and 3 of those times it was greater than 80%. Ex. 25, CORECIVIC_0025298 at -298 ($1,401,516.79, or 85% of maximum award fee); Ex. 26, CORECIVIC_1086611 at -611 ($1,296,311.44, or 59% of maximum award fee); Ex. 28, CORECIVIC_0047207 at -208 ($1, 553,388.09, or 82% of maximum award fee); Ex. 29, CORECIVIC_0184605 at -606 ($1,765,255.56, or 90% of maximum award fee); *see also* Ex. 19, Dodrill Rpt. ¶84 (Dodrill Dep. Ex. 545).

**Response**: This statement is disputed because it is incomplete and lacks the necessary context that in six of the instances where a CCA facility did receive an award fee (together with the eight instances where Defendants claim a CCA facility was eligible for a fee award but received none – a total of 14 instances, or 78% of eligible instances), the award fee was less than 50% of the maximum allowable award fee, and that in seven of the instances where a CCA facility did receive an award fee (together with the eight instances where Defendants claim a CCA facility was

eligible for a fee award but received none – a total of 15 instances, or over 83% of eligible instances), the award fee was less than 60%. Exs. 25-29. Not once during the Class Period did a CCA facility receive the maximum allowable award fee. *See* Exs. 20-29.

24. Pursuant to the terms of its contracts, CoreCivic could also face deductions for failing to meet certain contractual terms, including failure to maintain a quality control program and failing to meet the required staffing levels. Ex. 13, CORECIVIC_0000001 at -051, -065, -071, -106 (Beach Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -710, -759, -767, -801 (Cibola); Ex. 15, CORECIVIC_0001329 at -399, -453-454 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -110, -190 (McRae); Ex. 17, CORECIVIC_0003791 at -813, -866-867 (NEOCC).

**Response**: This statement is undisputed for purposes of summary judgment only.

### B. Adams Facility

25. CoreCivic's Adams County Correctional Center is located in Natchez, Mississippi. Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶43; Ex. 31, Expert Rpt. of Donna Mellendick ("Mellendick Rpt.") at 7 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed.

26. The BOP awarded Adams the DJB1PC010 contract (the "Adams Contract") resulting from Request for Proposals (RFP)-PCC-0012 (Criminal Alien Requirement 8) on April 1, 2009. This contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP. Ex. 13, CORECIVIC_0000001 at -001, -134 (Beach Dep. Ex. 277).

**Response**: This statement is undisputed for purposes of summary judgment only.

27.    The Bureau of Prisons ("BOP") exercised Option Period 1 for the Adams Contract on July 31, 2013.  The BOP exercised Option Period 2 for the Adams Contract on July 17, 2015. Ex. 32, CORECIVIC_0000403 at -403-404; Ex. 33, CORECIVIC_0000473 at -473-474.

Response: This statement is undisputed for purposes of summary judgment only.

### C.    Cibola County Correctional Facility

28.    CoreCivic's Cibola County Correctional Facility is located in Milan, New Mexico. Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶68; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

Response: This statement is undisputed.

29.    The BOP awarded Cibola the DJB1PC011 contract (the "Cibola Contract") resulting from Requests for Proposals (RFP)-PCC-0014 (Criminal Alien Requirement 10) on January 12, 2010.  The Cibola Contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP.    Ex. 14, CORECIVIC_0000692 at -692, -696.

Response: This statement is undisputed for purposes of summary judgment only.

30.    On October 1, 2014, the BOP exercised Option Period 1 for the Cibola Contract. Ex. 34, CORECIVIC_0001082 at -083.

Response: This statement is undisputed for purposes of summary judgment only.

31.    On July 29, 2016, the BOP notified CoreCivic that it would not be exercising Option Period 2 for the Cibola Contract.  Ex. 35, CORECIVIC_0031085 at -085.

Response: This statement is disputed to the extent that it implies July 29, 2016 was the first notification to CCA that the BOP would not renew the Cibola contract, but it is undisputed that on July 29, 2016, the BOP sent CCA a formal letter "to notify Corrections Corporation of

4817-7024-6872.v1

America (CCA) that the Bureau of Prisons (BOP) will not be exercising option period two of contract DJB1PC-011." Ex. 35 at -085.

**D. Eden**

32.     CoreCivic's Eden Detention Center ("Eden") is located in Eden, Texas.  Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶87; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed.

33.     The BOP awarded Eden the DJBPCC005 contract (the "Eden Contract") resulting from Request for Proposals (RFP)-PCC-0010 (Criminal Alien Requirement VI) on January 17, 2007.  This contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP.  Ex. 15, CORECIVIC_0001329 at -329, -381 (Swindle 30(b)(6) Dep. Ex. 39).

**Response**: This statement is undisputed for purposes of summary judgment only.

34.     The BOP exercised Option Period 1 for the Eden Contract on April 26, 2011.  The BOP exercised Option Period 2 for the Eden Contract on April 30, 2013.  The BOP exercised Option Period 3 for the Eden Contract, which began on May 1, 2015.   Ex. 36, CORECIVIC_0001925 at -925; Ex. 37, CORECIVIC_0002185 at -185; Ex. 38, CORECIVIC_0002228 at -228.

**Response**: This statement is undisputed for purposes of summary judgment only.

**E. McRae Correctional Facility**

35.     CoreCivic's McRae Correctional Facility ("McRae") is located in McRae, Georgia.  Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶108; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed.

- 13 -

36. The BOP awarded McRae the DJB1PC016 contract (the "McRae Contract") resulting from Request for Proposals (RFP)-PCC-0017 (Criminal Alien Requirement 12) on October 27, 2011. This contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP. Ex. 16, CORECIVIC_0003082 at -082, -155.

**Response**: This statement is undisputed for purposes of summary judgment only.

37. The BOP exercised Option Period 1 for the McRae Contract, which began on December 1, 2016. The BOP exercised Option Period 2 for the McRae Contract on November 26, 2018. Ex. 39, CORECIVIC_0092519 at -519; Ex. 40, BOP_0049552 at -552.

**Response**: This statement is undisputed for purposes of summary judgment only.

### F. Northeast Ohio Correctional Center

38. CoreCivic's Northeast Ohio Correctional Center ("NEOCC") is located in Youngstown, Ohio. Ex. 30, CORECIVIC_1341482 at -484; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed.

39. The BOP awarded NEOCC the DJB1PC002 contract (the "NEOCC Contract") resulting from Request for Proposals (RFP)-PCC-0008 (Criminal Alien Requirement 4) on December 23, 2004. This contract was to house BOP inmates for a four year base period, with up to three two-year option periods that could be exercised by the BOP. Ex. 17, CORECIVIC_0003791 at -791, -793-794.

**Response**: This statement is undisputed for purposes of summary judgment only.

40. The BOP exercised Option Period 1 for the NEOCC contract on June 1, 2009. The BOP exercised Option Period 2 for the NEOCC contract on May 31, 2011. The BOP exercised

Option Period 3 for the NEOCC Contract on May 29, 2013.  Ex. 41, CORECIVIC_0004197 at -197-198; Ex. 42, CORECIVIC_0004317 at -317; Ex. 43, CORECIVIC_0004481 at -481-482.

**Response**: This statement is undisputed for purposes of summary judgment only.

## IV.    FACILITY AUDITS AND FEEDBACK

41.    CoreCivic's BOP facilities were audited by the BOP, CoreCivic, the American Correctional Association ("ACA") and the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission").  Ex. 44, Dep. Tr. of Keith Hall 103:6-104:10; Ex. 45, 30(b)(6) Dep. Tr. of Patrick Swindle ("Swindle 30(b)(6) Tr.") 182:22-183:21; Declaration of Patrick Swindle ("Swindle Decl.") ¶¶3, 5.

**Response**: This statement is disputed.  This statement is not supported by admissible evidence, Fed. R. Evid. 602, 802, and Plaintiff disputes that all of these entities performed actual audits.  To the contrary, the ACA's "review" consisted only of checking paperwork and accepting representations therein to assume that facilities complied with their policies and procedures.  *See* PEx. 2 at 230:24-232:1; *see generally id*. at 229:20-253:9.  Further, CCA's internal "audit" results were inadequate.  *See, e.g.*, PEx. 58 at -637.  Plaintiff further objects that this statement is vague as to the time and frequency of the purported "audit[s]."

### A.    CoreCivic's Internal Audits

42.    CoreCivic conducted annual internal audits of its facilities.  *See, e.g.*, Ex. 46, CORECIVIC_1009202 at -202-209; *see also* Ex. 47, U.S. Dep't of Just. Off. of the Inspector Gen., *Audit of the United States Marshals Service Contract No. DJJODT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Det. Ctr. Leavenworth, Kansas* at 19 (Apr. 2017) (Murray Dep. Ex. 583); Swindle Decl. ¶5.

**Response**: This statement is disputed.  This statement is not supported by admissible evidence, Fed. R. Evid. 602, 802, 901, and Plaintiff disputes this statement because there is no

- 15 -

evidence that CCA conducted anything that could reasonably be defined as an "audit." This statement is disputed for the additional reason that Defendants withheld hundreds of documents relating to "audits" as privileged; thus, Defendants should be precluded from relying on the outcomes of audits pursuant to Plaintiff's Motion to Preclude Defendants from Relying on an Advice of Counsel Defense (ECF No. 265). Plaintiff further states that this statement is immaterial because there is no admissible evidence that the "audits" were in any way reliable or bore any relationship to the number of deficiencies or concerns identified by the BOP. *See, e.g.*, PEx. 58 at -637.

43.     The audits for CoreCivic's BOP facilities tracked each facility's performance on over 1,400 guidelines. Ex. 48, Dep. Tr. of Michael Nalley 75:8-14; Ex. 49, CORECIVIC_0684697 at -698 (Martz Dep. Ex. 431); Ex. 50, BOP_0077775 at -778 (Bland Dep. Ex. 442); Ex. 51, CORECIVIC_0990432 at -432 (Garfinkle Dep. Ex. 529).

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 602, 802. Plaintiff further disputes this statement because it is not clear as to which "audits" it refers, when those "audits" were performed or by whom those "audits" were performed and because there is no evidence that any person actually "tracked" the facilities' performance on these guidelines or that the guidelines were sufficient to track each facility's performance.

44.     CoreCivic's internal audit tool evaluated more performance indicators than the BOP's audit tool. Ex. 50, BOP_0077775 at -778 (Bland Dep. Ex. 442) ("███████████████ ██████████████████████████████████████████████████████████"); Ex. 52, CORECIVIC_0054224 at -225 (listing 184 total indicators in BOP Contract Facility Monitoring Tool); Ex. 53, CORECIVIC_0054354 at -354 (same); Ex. 54, CORECIVIC_0056715 at -715 (same); Ex. 51, CORECIVIC_0990432 at -436 (Dep. Ex. 529) ("That significant difference in the

- 16 -

tools sets was corrected earlier this year with the BOP's approval (received April 8, 2014 – See Attachment A) to incorporate the full CFM audit tool into CCA's internal audit tools."); *see also* Ex. 45, Swindle 30(b)(6) Tr. 176:2-177:6; Ex. 56, Dep. Tr. of Emilee Beach ("Beach Tr.") 279:7-12.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Plaintiff further responds that this is not a material fact in the context of this Motion; there is no evidence that the sheer number of performance indicators makes an audit more reliable or useful. It is further disputed that any person meaningfully "evaluated" all of the performance indicators in the CCA audit tool. There is no admissible evidence showing any actual evaluation of such indicators. To the contrary, CCA's audit tool was deficient. *See, e.g.*, PEx. 58 at -637.

### B. Third-Party Audits

45.     Each of CoreCivic's BOP facilities was required by its contract to obtain and maintain ACA accreditation. Ex. 57, Dep. Tr. of Paul Kelly ("Kelly Tr.") 78:15-79:11; *id.* at 120:5-14; Ex. 58, Dep. Tr. of Donna Mellendick ("Mellendick Tr.") 58:23-59:1; *see also* Ex. 13, CORECIVIC_0000001 at -019 (Adams) (Beach Dep. Ex. 277); Ex. 14, CORECIVIC_0000692 at -710 (Cibola); Ex. 15, CORECIVIC_0001329 at -395 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -104 (McRae); Ex. 17, CORECIVIC_0003791 at -808 (NEOCC).

**Response**: This statement is undisputed for purposes of summary judgment only.

46.     All BOP facilities were required to maintain ACA accreditation. Ex. 57, Kelly Tr. 120:5-14; Ex. 58, Mellendick Tr. 58:23-59:1.

**Response**: This statement is undisputed for purposes of summary judgment only, but it lacks the necessary context that every BOP facility, whether or not operated by CCA, maintained

ACA accreditation; and there is no evidence that any such facility ever lost accreditation, no matter how deficient that facility's performance was. *See* PEx. 3 at 223:22-224:5 (admitting inability to "identify a single private for-profit BOP prison operator that did not receive ACA accreditation during the class period").

47.     The ACA audited and accredited CoreCivic's BOP facilities every three years. CoreCivic's BOP facilities maintained accreditation throughout the Class Period and were accredited on the following dates during the Class Period:

- Adams – February 3, 2014; August 8, 2016;

- Cibola – January 29, 2011; February 2, 2014;

- Eden – January 23, 2012; February 9, 2015;

- McRae – April 9, 2012; August 2, 2014;

- NEOCC – August 10, 2013; August 7, 2016.

Swindle Decl. ¶4; Ex. 45, Swindle 30(b)(6) Tr. 183:16-21.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 602, 802. This statement is further disputed because there is no evidence that the ACA conducted anything that could reasonably be defined as an "audit." Plaintiff further states that this statement is immaterial because there is no admissible evidence that the "audits" were in any way reliable or bore any relationship to the number of deficiencies or concerns identified by the BOP. For example, Defendants' purported expert, D. Scott Dodrill, had "no idea whether in this so-called audit the ACA so-called auditors would pull patient files to determine the adequacy of medical services being performed . . . even though when BOP did that, pulled patient files pursuant to the contract facility monitoring, they found multiple deficiencies." PEx. 3 at 218:10-219:13; *see also id.* at 221:2-222:3 (admitting that he did not "know whether ACA so-called auditors used" video records to verify staffing, even though the BOP had used that tool to "catch

- 18 -

CCA as falsely reporting correction officers working certain assignments during hours when, in fact, they were not").

48. To be accredited by the ACA, a facility must comply with all mandatory ACA standards and at least 90 percent of all non-mandatory standards. *See* Ex. 59, CORECIVIC_0338317 at -335; Ex. 60, CORECIVIC_0343063 at -081.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802, 901. This statement is further disputed because there is no evidence of any facility ever losing ACA accreditation for any reason, much less for failure to comply with standards. *See* PEx. 3 at 223:22-224:5 (admitting inability to "identify a single private for-profit BOP prison operator that did not receive ACA accreditation during the class period"). The cited pages do not provide any evidence (much less admissible evidence) that the ACA would deny accreditation if a facility does not "comply with all mandatory ACA standards and at least 90 percent of all non-mandatory standards." Nor is there any admissible evidence about the standards that are "mandatory," the standards that are "non-mandatory" or how the ACA determines that a facility "compl[ies] with" those standards. Plaintiff further states that this statement is immaterial because there is no admissible evidence that compliance with ACA standards bore any relationship to the number of deficiencies or concerns identified by the BOP. *See* PEx. 4 at 3 ("[I]t appears the ACA is a conflicted party with twisted incentives, a lack of transparency, and lax inspection policies that appear to have turned accreditation into a rubber-stamp process that does little to hold facilities accountable.").

49. CoreCivic's BOP facilities maintained ACA accreditation throughout the Class Period. Swindle Decl. ¶4; *see also* Ex. B, 2012 Form 10-K at 8; Ex. A, 2013 Form 10-K at 7; Ex. C, 2014 Form 10-K at 6; Ex. D, 2015 Form 10-K at 6; Ex. E, 2016 Form 10-K at 8-9.

- 19 -

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 602, 802. Defendants could have deposed the ACA to obtain admissible evidence on this point, but opted not to because: (a) this point is immaterial to the claims and defenses in this action, particularly given the lack of evidence about how the ACA conducts its "audits" (*see* PEx. 3 at 218:10-219:13, 221:2-222:3); (b) at best, ACA accreditation provides only "a baseline of acceptable performance" (PEx. 5 at 5); and (c) as their purported expert, D. Scott Dodrill, admitted, Defendants and their expert have not "identif[ied] a single private for-profit BOP prison operator that did not receive ACA accreditation during the class period" (PEx. 3 at 223:22-224:5).

50. The Joint Commission is a national accreditation process designed to assess healthcare performance. Ex. 57, Kelly Tr. 83:7-13.

**Response**: This statement is undisputed for purposes of summary judgment only. Plaintiff further states that this statement is immaterial to this Motion.

51. Each of CoreCivic's BOP facilities were audited by and maintained accreditation by the Joint Commission during the Class Period. Ex. 57, Kelly Tr. 83:7-84:6; Ex. 45, Swindle 30(b)(6) Tr. 187:3-189:18.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 602, 802. This statement is further disputed because there is no evidence that the Joint Commission conducted anything that could reasonably be defined as an "audit." The cited testimony does not support the proposition that "[e]ach" of CCA's BOP facilities was "audited by and maintained accreditation by the Joint Commission during the Class Period." Plaintiff further states that this statement is immaterial because there is no admissible evidence that the "audits" were in any way reliable or bore any relationship to the number of deficiencies or concerns identified by the BOP.

## C.    BOP Audits and Monitoring

52.     The BOP's Program Review Division conducts at least annual reviews to monitor its contract facilities.  Ex. 61, U.S. Dep't of Just. Off. of the Inspector Gen., *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* at 10 (Aug. 2016) ("August 2016 OIG Review") at 10 (VerHulst Dep. Ex. 118).

**Response**: This statement is undisputed for purposes of summary judgment only.

53.     During the Class Period, CoreCivic's BOP facilities were subject to a Program Review to inspect their performance, test the adequacy of their internal quality controls and assess risks for all programs and administrative areas of contract performance.     Ex. 13, CORECIVIC_0000001 at -106 (Adams) (Beach Dep. Ex. 277); Ex. 14, CORECIVIC_0000692 at -801 (Cibola); Ex. 15, CORECIVIC_0001329 at -453 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -190 (McRae); Ex. 17, CORECIVIC_0003791 at -866 (NEOCC); *see also* Ex. 31, Mellendick Rpt. at 1-2 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed for purposes of summary judgment only that, during the Class Period, CCA's BOP facilities were subject to a Program Review to inspect their performance, test the adequacy of their internal quality controls and assess risks for all programs of contract performance and all administrative areas of contract performance.

54.     The review guidelines for the Program Review is based on the Contractor's Quality Control Program (ACP), the Statement of Work (SOW), professional guidelines reference by the SOW, applicable BOP policy and any other appropriate measures within the contract's scope of work.     Ex. 13, CORECIVIC_0000001 at -106 (Adams) (Beach Dep. Ex. 277); Ex. 14, CORECIVIC_0000692 at -801 (Cibola); Ex. 15, CORECIVIC_0001329 at -453 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -190 (McRae); Ex. 17, CORECIVIC_0003791 at -866 (NEOCC).

- 21 -

**Response**: This statement is undisputed for purposes of summary judgment only.

55.     The Contract Facility Monitoring ("CFM") Section of the BOP provides subject matter expertise in the form of routine monitoring of contract prisons.  Ex. 61, August 2016 OIG Review at 10; Ex. 19, Dodrill Rpt. ¶61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 1 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed for purposes of summary judgment only.

56.     At the conclusion of each review, a CFM Report is written to document any findings identified during the review.  Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118); Ex. 62, Dep. Tr. of Kim White ("White Oct. 30, 2020 Tr.") 15:20-16:2; Ex. 19, Dodrill Rpt. ¶61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 1 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed for purposes of summary judgment only that CFM provides written reports of its findings to the contractor, the privatization management branch and the privatized corrections contracting section.

57.     A CFM Report makes finding s of deficiencies, repeat deficiencies, repeat repeat deficiencies, and significant findings.  Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118); *see also* Ex. 19, Dodrill Rpt. ¶61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 5-6 (Mellendick Dep. Ex. 585).

**Response**: This statement is undisputed for purposes of summary judgment only.  Plaintiff also notes that, as demonstrated by multiple CFM Reports for BOP facilities operated by CCA, a CFM Report may also make findings of repeat repeat repeat deficiencies and repeat repeat repeat repeat deficiencies.  *E.g.*, PEx. 6 at -475.  In contrast to the CFM Reports for CCA, Defendants' purported expert, D. Scott Dodrill, could not "identify a single BOP facility that incurred a quadruple repeat deficiency."  PEx. 3 at 204:2-25.

58.      A deficiency is defined by the BOP as "[p]roblems or weaknesses noted by the reviewer which are in need of correction.  In its broadest sense, a deficiency includes any condition needing improvement.  A deficiency can include: noncompliance from policy/regulation; lack of adequate internal controls; poor or unprofessional practice; inefficient practice; ineffective results; poor quality, etc."  Ex. 63, U.S. Dep't of Just. Fed. Bureau of Prisons Program Statement 1210.23 at Attachment A; *see also* Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118).

**Response**: This statement is disputed as phrased.  Plaintiff does not dispute for purposes of summary judgment only that the quoted language is contained in the document cited.

59.      Repeat deficiencies indicate a deficiency in the same category as a deficiency from a prior audit that is present on the day the audit is conducted.  Ex. 62, White Tr. Oct. 30, 2020 107:2-9; *id.* at 107:21-109:3; *see also* Ex. 64, Dep. Tr. of Don Murray ("Murray Tr.") 194:10-197:11; Ex. 65, Dep. Tr. of D. Scott Dodrill ("Dodrill Tr.") 164:1-13.

**Response**: This statement is disputed as phrased.  A "repeat deficiency" is "[a] deficiency that was also listed as a deficiency during the last program review.  A repeat deficiency is the result of the failure of internal controls that were developed to correct a noted deficiency.  In determining if a repeat exists, the evidence does not have to be a mirror image of the prior evidence."  Ex. 63 at Attachment A (Page 4).

60.      During the Class Period, CoreCivic's BOP Facilities were reviewed at least annually by the BOP's CFM Branch and received CFM Reports.  Ex. 66, Defs.' Resps. to Interrog. No. 25; *see also* Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118).

**Response**: This statement is undisputed for purposes of summary judgment only.

61.      During the Class Period, all privately operated prisons under BOP contract were reviewed annually by the BOP's CFM Branch.  Ex. 61, August 2016 OIG Review at 10 (VerHulst

Dep. Ex. 118); Ex. 19, Dodrill Rpt. ¶61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 1 (Mellendick Dep. Ex. 585); Ex. 58, Mellendick Tr. 66:15-23.

     **Response**: This statement is undisputed for purposes of summary judgment only. This statement is also immaterial to the extent it relates to for-profit prisons not operated by CCA.

     62.    During the Class Period, ████████████████████████████████████ ████████████████████████████ Ex. 67, BOP_0116379 at -382.

     **Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802, 901. This statement is further disputed because the cited document is only a snapshot for one quarter for 12 facilities and because the reviews listed in the cited document are not "audits." Plaintiff further states that this statement is immaterial to this Motion.

     63.    All privately operated facilities under contract with the BOP have two full-time employees from the BOP's Privatization Monitoring Branch ("PMB") monitoring the facility. Ex. 57, Kelly Tr. 59:12-19; Ex. 61, August 2016 OIG Review at 8 (VerHulst Dep. Ex. 118); *see also* Ex. 13, CORECIVIC_0000001 at -042 (Adams) (Beach Dep. Ex. 277); Ex. 14, CORECIVIC_0000692 at -735 (Cibola); Ex. 15, CORECIVIC_0001329 at -414 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -128 (McRae); Ex. 17, CORECIVIC_0003791 at -830 (NEOCC).

     **Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. This statement is further disputed because: (i) there is no evidence that the BOP has a "Privatization Monitoring Branch;" rather, the BOP has a "Privatization Management Branch"; (ii) there is no evidence that two full-time employees of any branch of the BOP were in fact "monitoring" each of the facilities; (iii) there is no evidence that two full-time employees from the BOP actually were present at every facility; and (iv) it is vague as to time frame. Plaintiff does

not dispute that all privately operated facilities under contract with the BOP were supposed to have two full-time employees from the Privatization Management Branch on site.

64.     These on-site monitors provide oversight and real-time information about how the facility is operating.  Ex. 57, Kelly Tr. 59:16-60:9; Ex. 61, August 2016 OIG Review at 8-9 (VerHulst Dep. Ex. 118); *see also* Ex. 31, Mellendick Rpt. at 1, 6 (Mellendick Dep. Ex. 585); Ex. 19, Dodrill Rpt. ¶¶57-59 (Dodrill Dep. Ex. 545).

**Response**: This statement is disputed because it is not supported by admissible evidence that oversight actually occurred at each facility and that real-time information was actually conveyed.  Fed. R. Evid. 602, 802.  It is undisputed for purposes of summary judgment only that the PMB has staff on site at facilities and that PMB is responsible for general oversight of contract prisons.  The statement is also vague as to time.

65.     The BOP does not have full-time on-site monitors from the PMB at its own facilities.  Ex. 57, Kelly Tr. 60:14-18; *see also* Ex. 19, Dodrill Rpt. ¶80 (Dodrill Dep. Ex. 545).

**Response**: This statement is immaterial to this Motion, but it is undisputed for purposes of summary judgment only that BOP-operated prisons are not privatized prisons and therefore do not have the luxury of two full-time staff paid by a third party (Privatization Management Branch or otherwise).

66.     A Notice of Concern ("NOC") is issued to the contractor by the on-site monitor when the contractor is performing below a satisfactory level and the deficiency is more than minor or is a repetitive deviation from the contract requirement.  Ex. 61, August 2016 OIG Review at 9; *see also* Ex. 19, Dodrill Rpt. ¶62.

**Response**: This statement is disputed to the extent that it implies an NOC is issued every time a contractor is performing below a satisfactory level and the deficiency is more than minor or

- 25 -

is a repetitive deviation from the contract requirement. Plaintiff does not dispute that the August 2016 OIG Review says an NOC "is a memorandum the PMB staff submits to a contractor when the contractor is performing below a satisfactory level and the deficiency is more than minor or is a repetitive deviation from the contract requirements." Ex. 61 at 9.

67. CoreCivic received NOCs during the Class Period. Ex. 66, Defs.' Resp. Interrog. No. 23 (identifying NOCs and closure letters).

**Response**: This statement is undisputed.

68. Contractor Performance Assessment Reports ("CPARS") measure the quality of the contractor's past performance and is the official source of past performance information. Ex. 68, FAR §42.1501(b); Ex. 18, Martz Tr. 162:21-163:4.

**Response**: This statement is disputed because it is not supported by admissible evidence as to what the CPARs actually "measure" and because the evidence does not support the conclusion that CPARs are the only or even primary "official source of past performance information." ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ Ex. 85 at -097. ███████████████████████

██████████████████████████████████ *Id.* at -077 n.4. █████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ *Id.* at -084 to -094.

69.     Each CPAR contains a section where the contracting officer recommends whether the contractor should have been awarded the contract given the contractor's ability to execute what was promised in its proposal or whether the contractor should be recommended for similar contract requirements in the future.     Ex. 57, Kelly Tr. 84:22-85:2; *see also e.g.*, Ex. 49, CORECIVIC_0684697.

**Response**: This statement is disputed.   Each CPAR does not comment on whether a contract "should have been awarded" or recommend whether a "contractor should be recommended for similar contract requirements in the future."   Instead, the CPARs just contain standard language to the effect that: " ███████████████████████████

███████████████████████████████████████████████

████████████     *E.g.*, PEx. 7 at -443.     In addition, Douglas Martz explained that the

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

PEx. 8 at 175:4-10.   He also explained that CPARs were not reliable sources of information because they were "sent to CCA and CCA had the opportunity to provide all of their influence on how that report was generated and put positive spins on it," whereas "the documents that don't have that opportunity for CCA to do that tell a different story, and that's the contract facility monitoring.   That's the notices of concerns, all those, you know, repeat-repeat deficiencies when there's not a doctor there for two years or whatever the time period is."   *Id*. at 181:14-182:21.

70.     Before making a recommendation in the CPAR, the contracting officer documents the CFM Reports and NOCs received by the facility.   *See, e.g.*, Ex. 49, CORECIVIC_0684697 at -697.

**Response**: This statement is disputed because it is not supported by any admissible evidence. Defendants have adduced no evidence, and cited none, regarding what is "document[ed]" as a consistent practice. Indeed, not all CPARs even mention the CFM Reports and NOCs. *See, e.g.*, PEx. 9; PEx. 10.

71.     The Federal Acquisition Regulations ("FAR") defines a CPAR evaluation score of "Exceptional" to mean "Performance meets contractual requirements and exceeds many to the Government's benefit." Ex. 69, FAR §42.1503, Table 42-1(a).

**Response**: This statement is disputed. The relevant definition is two sentences long with a three-sentence note; Defendants quote only one of the five sentences. The "contractual requirements" are set forth in the relevant facility contracts. Exs. 13-17.

72.     The FAR defines a CPAR evaluation score of "Very Good" to mean "Performance meets contractual requirements and exceeds some to the Government's benefit." Ex. 69, FAR §42.1503, Table 42-1(b).

**Response**: This statement is disputed. The relevant definition is two sentences long with a two-sentence note; Defendants quote only one of the four sentences. The "contractual requirements" are set forth in the relevant facility contracts. Exs. 13-17.

73.     The FAR defines a CPAR evaluation score of "Satisfactory" to mean "Performance meets contractual requirements." Ex. 69, FAR §42.1503, Table 42-1(c); *see also* Ex. 57, Kelly Tr. 87:14-22 ("█████████████████████████████████████████████████

███████████████████████████████████████

**Response**: This statement is disputed. The relevant definition is two sentences long with a three-sentence note; Defendants quote only one of the five sentences. The "contractual requirements" are set forth in the relevant facility contracts. Exs. 13-17. Defendants also misquote

the transcript of Paul W. Kelly's deposition. The BOP has further made clear that "Satisfactory performance" can support an overall "Poor" rating if it is part of "an overall negative trend." *See, e.g.*, Ex. 85 at -094 (facts "that there are serious issues at Cibola, developing issues at the Eden and only Satisfactory performance at the Adams facility" showed "an overall negative trend for Quality of Services" supporting "an overall grade of Poor in the[] Past Performance rating").

## V.   CORECIVIC FACILITIES' MONITORING AND COMPLIANCE

### A.   Adams

74.    During the Class Period, the BOP issued five Contractor Performance Assessment Reports ("CPARs") regarding Adams. Ex. 49, CORECIVIC_0684697; Ex. 70, CORECIVIC_0606109; Ex. 71, CORECIVIC_1974933; Ex. 72, CORECIVIC_1337633; Ex. 73, CORECIVIC_0728682.

**Response**: This statement is disputed because it is not supported by admissible evidence. Exhibit 72 is not a CPAR regarding Adams, meaning Defendants have cited only four CPARs regarding Adams. This statement is further disputed because all CPARs identified by Defendants are inadmissible hearsay. Fed. R. Evid. 802. Defendants have failed to establish any exception that would allow the Court to consider the CPARs. Moreover, the CPARs and the manner in which they were prepared indicate a lack of trustworthiness. Douglas Martz testified that REDACTED were not reliable sources of information because they were "sent to CCA and CCA had the opportunity to provide all of their influence on how that report was generated and put positive spins on it." PEx. 8 at 181:14-182:21.

75.    Adams' CPARs issued for the performance periods of August 1, 2011, through July 31, 2012; and August 1, 2012, through July 31, 2013, stated, ███████████

████████████████████████████████████████████████████████

- 29 -

███████████████████████████████████████████████ " Ex. 49, CORECIVIC_0684697 at -698; Ex. 70,

CORECIVIC_0606109 at -110.

**Response**: This statement is disputed because it is not supported by admissible evidence.

Fed. R. Evid. 802.  Even if the CPARs were considered, this statement lacks the additional context

that the CPAR for the period August 1, 2011 through July 31, 2012 for Adams scored CCA only

████████████ with respect to "Quality of Product or Service," "Management of Key Personnel"

and "Utilization of Small Businesses," and it noted that:



Ex. 49 at -697.

*Id.*

*Id.*

*Id.*

Likewise, the CPAR for the period August 1, 2012 through July 31, 2013 for Adams scored CCA

only ████████████ with respect to "Quality of Product or Service" and "Management of Key

Personnel" and ████████████ with respect to "Utilization of Small Businesses," and it noted

that:

Ex. 70 at -109.

- 30 -



*Id.*

76.     Adams' CPARs issued for the performance periods of August 1, 2013, through July 31, 2014; August 1, 2014, through July 31, 2015; and August 1, 2015, through July 31, 2016, stated,

Ex. 71,   CORECIVIC_1974933   at   -935;   Ex. 72, CORECIVIC_1337633 at -367; Ex. 73, CORECIVIC_0728682 at -689.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period August 1, 2013 through July 31, 2014 for Adams scored CCA only

with respect to "Quality," "Management" and "Utilization of Small Business," and it noted that:



Ex. 71, CORECIVIC_1974933 at -934.



*Id.*

Defendants also failed to cite or provide a copy of the Adams CPAR for the period August 1, 2014 through July 31, 2015. According to the CPAR for the following year, however, the CPAR for the period August 1, 2014 through July 31, 2015 rated CCA's performance at Adams as ███████ or "Quality" and only ██████████ for "Management" and "Utilization of Small Business." Ex. 73. Exhibit 72, meanwhile, is not an Adams CPAR; it is an Eden CPAR for the period May 1, 2015 through April 30, 2016, but it similarly reflects a rating of ████████ for both "Quality" and "Management." Ex. 72.

The CPAR for the period August 1, 2015 through July 31, 2016 for Adams scored CCA only ████████ with respect to "Quality," "Management" and "Utilization of Small Business," and it noted that:

- ████████████████████████████████████
  ████████████████████████████████████
  Ex. 73, CORECIVIC_0728682 at -683.

- ████████████████████████████████████
  *Id.*

- ████████████████████████████████████
  ████████████████████████████████████
  *Id.*

- ████████████████████████████████████
  *Id.*

- ████████████████████████████████████
  ████████████████████████████████████
  *Id.* at -684.

77.    ████████████████████████████████████████ as reflected in Ex. 74, BOP_0293137.

**Response**: This statement is disputed.  On May 20, 2012, there was a riot at the Adams facility.  *See* PEx. 11.

78.    ████████████████████████████████████████ Ex. 74, BOP_0293137 at 5.

**Response**: This statement is undisputed.

79.    ████████████████████████████████████████ ██████████ Ex. 74, BOP_0293137 at 8.

**Response**: This statement is undisputed.

80.    During the disturbance, an Adams facility staff member was killed.  Ex. 74, BOP_0293137 at 1.

**Response**: This statement is disputed to the extent it implies that the Adams riot was something less than a riot, but it is undisputed that, during the riot, an Adams facility correctional officer named Catlin Carithers was murdered.

81.    ████████████████████████████████████████ ██████████ Ex. 57, Kelly Tr. 18:24-20:15; *id.* at 23:19-23:23.

**Response**: This statement is disputed to the extent it implies that the Adams riot was something less than a riot, but it is undisputed that ████████████████████████ ██████████████████████████

82.    The senior security information manager is one of the BOP's two on-site monitors. Ex. 57, Kelly Tr. 59:12-19; Ex. 61, August 2016 OIG Review at 8.

**Response**: This statement is disputed because it is not supported by admissible evidence to the extent it implies that every facility has two on-site monitors at all times, but it is undisputed that the senior secure institution manager was one of the BOP's two on-site monitors at the Adams facility.

83.  Ex. 57, Kelly Tr. 28:15-21.

**Response**: This statement is undisputed.

84. Following the disturbance, the BOP created an After-Action Report reflected in Exhibit 74, BOP_0293137.

**Response**: This statement is undisputed.

85. The After-Action Report Ex. 74, BOP_0293137 at 17.

**Response**: This statement is disputed to the extent that

Ex. 74, BOP_0293137 at 9, 17-20.

86. On May 30, 2012, the SunTrust analysts issued an analyst report reflected in Exhibit G. That report stated, "Last week, there was a riot in a CXW [CoreCivic] prison in MS."

- 34 -

Ex. G, SunTrust Robinson Humphrey, *Corrections Corporation of America Upgrading to Buy; REIT Conversion Presents Upside* at 2 (May 30, 2012).

**Response**: This statement is disputed because the analyst report is inadmissible hearsay. Even if the analyst report were considered, Defendants have not presented any admissible evidence that the cited report was, in fact, issued on May 30, 2012. In addition, if the analyst report were considered, it also stated that: "The company's response to the riot has been solid so far. Disturbances are a risk intrinsic to the corrections industry, despite extensive efforts to mitigate such risks. In the end, we believe thorough, appropriate and timely responses are what will ultimately be judged by customers." Ex. G at 2.

87.     On September 13, 2012, Justice Strategies published an article that discussed the May 20, 2012 disturbance at Adams. Ex. 75, Greene, Judith, and Alexis Mazon. "Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary." *Justice Strategies*, Sept. 13, 2012.

**Response**: This statement is disputed because Defendants have not presented any admissible evidence that the cited article was, in fact, published on September 13, 2012.

88.     CoreCivic disclosed the May 2012 disturbance at its Adams facility in its Form 10-Q for the quarter ended June 30, 2012. Ex. H, CoreCivic, Quarterly Report (Form 10-Q) (Aug. 9, 2012) ("2Q 2012 Form 10-Q") at 30 ("we also experienced negative claims in workers compensation during the first six months of 2012, including adverse claims resulting from an inmate disturbance at our Adams County Correctional Center during the second quarter of 2012.").

**Response**: This statement is disputed to the extent it implies that CCA disclosed any of the pertinent information about the riot or any of the negative findings from the BOP After-Action Report, but it is undisputed that CCA's 2Q 2012 Form 10-Q contained the quoted language.

89.     On October 5, 2015, Cannacord Genuity issued an analyst report reflected in Ex. I. The analyst wrote that "prison incidents are no stranger to both public and private operators, it's simply an issue of the environment prison life unfortunately propagates."  Ex. I, Cannacord Genuity, *Behind the Bars: Bi-Weekly Prison Update 10-5-15* at 4 (Oct. 5, 2015).

**Response**: This statement is disputed because the analyst report is inadmissible hearsay. Even if the analyst report were considered, Defendants have not presented any admissible evidence that the cited report was, in fact, issued on October 5, 2015.  In addition, if the analyst report were considered, the report contained no indication of knowledge about the deterioration of CCA's relationship with BOP or that the Adams riot was the only riot in low-security prison history in the United States where over two dozen officers were taken hostage and a guard was murdered.  *See* PEx. 3 at 65:12-67:5.

90.     On January 31, 2017, SunTrust issued an analyst report reflected in Ex. J.  That analyst report stated, "[t]he corrections space is subject to headline risk , including riots, deaths or escapes from facilities managed by CXW [CoreCivic]."  Ex. J, SunTrust Robinson Humphrey, *Human Capital & Government Services – Best Ideas for 2017* at 2 (Jan. 31, 2017).

**Response**: This statement is disputed because the analyst report is inadmissible hearsay. Even if the analyst report were considered, Defendants have not presented any admissible evidence that the cited report was, in fact, issued on January 31, 2017.  Plaintiff further objects to this statement on the grounds that it is not material given that the cited analyst report was purportedly issued after the Class Period.

91.     On June 15, 2016, an article published in *The Nation* described certain findings of the BOP's After Action Report on the Adams Disturbance.  Ex. 76, CORECIVIC_0029731 at -740.

- 36 -

**Response**: This statement is disputed because Defendants have not presented any admissible evidence that the cited article was, in fact, published on June 15, 2016. Plaintiff further notes that the cited article discusses events in 2012 and does not discuss or reflect knowledge of numerous issues relevant to the deteriorating relationship between CCA and the BOP as of 2016 – CCA executives themselves referred to the content as "dated." PEx. 12, CORECIVIC_1331683 at -683. Knowledgeable CCA employees who had been in the industry for years had never heard of *The Nation*, *see* PEx. 13, CORECIVIC_0996379 (Lappin: "What is the Nation?"), and CCA devoted significant resources to discrediting the reporting, *see, e.g.*, PEx. 12, CORECIVIC_1331683 at -683, -688, -689 (talking points developed by CCA public affairs team for *The Nation* article include: "[t]his is a bought and paid for hit piece by an activist writer funded by anti-privatization groups and individuals," the author's alleged links to "Soros' Open Society Foundations," and the claim that the "piece contains numerous false and misleading statements"), albeit in ways that CCA employees did not always find credible or legitimate, *e.g.*, PEx. 14, CORECIVIC_0047960 (Beasley: "Seriously?? This is our defense?").

92.     In 2008 there was a disturbance at Federal Correctional Institution, Three Rivers, a BOP-operated correctional facility. Ex. 77, Blumenthal, Ralph. "Gang Fights in Prison Injure 22 and Kill One." *The New York Times*, March 29, 2008, available at https://www.nytimes.com/2008/03/29/us/29prison.html; Ex. 19, Dodrill Rpt. ¶98; Ex. 65, Dodrill Tr. 114:15-18.

**Response**: This statement is disputed because Defendants have not presented any admissible evidence concerning this purported disturbance. Fed. R. Evid. 602, 802. Moreover, this purported disturbance is not material to this Motion and is irrelevant because, among other differences: the Three Rivers facility was not limited to low-security prisoners like Adams (PEx. 3

at 116:14-24); this "disturbance" did not involve a murder of a guard or staff member (*id.* at 117:7-15); and there was no finding that ████████████████████████████████████

████████████████████████████████████ (*id.* at 118:7-19).

93.     There have been disturbances at facilities operated by other private contractors other than CoreCivic housing criminal alien populations, including facilities operated by Cornell Corrections in Big Spring, Texas; The Geo Group in Reeves Country, Texas; Management and Training Corporation in Willacy County, Texas.  Ex. 61, August 2016 OIG Review at 2; Ex. 19, Dodrill Rpt. ¶97; Ex. 65, Dodrill Tr. 106:6-12.

**Response**: This statement is disputed because Defendants have not presented any admissible evidence concerning these purported disturbances. Fed. R. Evid. 602, 802. Moreover, these purported disturbances are not material to this Motion and are irrelevant because, among other differences: no staff members were taken hostage in those disturbances compared to the 25 CCA staff members who were taken hostage at Adams; no guards were murdered in those disturbances compared to the guard who was murdered at Adams; in none of those three disturbances did the BOP make a finding that ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ *See*

PEx. 3 at 106:18-114:13.

94.     Following the disturbance at Management and Training Corporation's Willacy County facility, the BOP terminated the contract with that facility.  Ex. 61, August 2016 OIG Review at 2; Ex. 19, Dodrill Rpt. ¶101.

- 38 -

**Response**: This statement is disputed because it is not supported by admissible evidence; it is also not material to this Motion and is irrelevant. Fed. R. Evid. 802. As noted above, the disturbance at Willacy was not comparable to the Adams riot, including because no staff members were taken hostage, no guard was killed, █████████████████████████████████████████ ████████████████████████ and the BOP did not make a finding that ██████████████ ████████████████████████████████████████████ *See* PEx. 3 at 110:14-114:13. In addition, inmates "were transferred to other facilities" because the prisoners at Willacy had "set fire to the Kevlar tents in which they were housed, rendering the facility uninhabitable," and the BOP did not "terminate" its contract with the Willacy facility but instead did "'not exercis[e] [its] option to renew.'" Sarah Childress, *After Riot, Feds End Contract for Private Texas Prison*, Frontline (Mar. 17, 2015), https://www.pbs.org/wgbh/frontline/article/after-riot-feds-end-contract-for-private-texas-prison/ (last visited Jan. 21, 2021). The inmate population at CCA's BOP facilities declined by more than 800 inmates during the 6 months ending March 31, 2015, even as over 2,600 inmates were transferred out of Willacy. PEx. 15, CORECIVIC_0104291 at -306. For that 6-month period, CCA's BOP population declined by over 10% while the population at MTC's BOP facilities other than Willacy *increased* by 17 inmates (0.4%), and the population at GEO's BOP facilities decreased by only 1.2%. *Id.*

95. News of riots at CoreCivic's facilities during the Class Period did not cause a decline in the Company's stock price. Ex. 78, Expert Rpt. of Lucy Allen ("Allen Rpt.") ¶¶38-41; *see generally* Ex. 79, Dalrymple Rpt. (no discussion of Adams disturbance effect on price).

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 702, 802. This statement also refers to "riots" but does not identify the riots. Plaintiff further disputes this statement because CCA concealed from the market material facts about the

riot at Adams and because it concealed material facts about the relationship, including the BOP's

findings that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████ there was no meaningful "[n]ews of riots at CoreCivic's

facilities during the Class Period."  Ex. 74, BOP_0293137 at 15, 17-18.

**B.    NEOCC**

96.    NEOCC housed inmates from both the BOP and the United States Marshal Service

("USMS").    Ex. 45, Swindle 30(b)(6) Tr. 50:9-52:2 ("Northeast Ohio is separation of the

compound.  So at Northeast Ohio, we have Marshal service and the BOP.").

**Response**: This statement is disputed and is not material to the motion.  It is disputed that

NEOCC housed inmates from the BOP after May 31, 2015.

97.    During the Class Period, the BOP issued four Contractor Performance Assessment

Reports    ("CPARs")    regarding    NEOCC.        Ex. 80,    CORECIVIC_0046207;    Ex. 81,

CORECIVIC_0095065; Ex. 82, CORECIVIC_1337756; Ex. 83, CORECIVIC_0578404.

**Response**: This statement is disputed because it is not supported by admissible evidence.

All CPARs identified by Defendants are inadmissible hearsay.  Fed. R. Evid. 802.  Defendants

have  failed  to  establish  any  exception  that  would  allow  the  Court  to  consider  the  CPARs.

Moreover,  the  CPARs  and  the  manner  in  which  they  were  prepared  indicate  a  lack  of

trustworthiness.  Martz testified that CPARs were not reliable sources of information because they

were  "sent  to  CCA  and  CCA  had  the  opportunity  to  provide  all  of  their  influence  on  how  that

report was generated and put positive spins on it."  PEx. 8 at 181:14-182:21.

98.    NEOCC's  CPAR  issued  for  the  performance  period  of  June 1, 2011, through

May 31, 2012, stated ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ "

Ex. 80, CORECIVIC_0046207 at -208. This statement is further disputed because all CPARs identified by Defendants are inadmissible hearsay. Defendants have failed to establish any exception that would allow the Court to consider the CPARs. Moreover, the CPARs and the manner in which they were prepared indicate a lack of trustworthiness. Martz testified that CPARs were not reliable sources of information because they were "sent to CCA and CCA had the opportunity to provide all of their influence on how that report was generated and put positive spins on it." PEx. 8 at 181:14-182:21.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period June 1, 2011 through May 31, 2012 for NEOCC scored CCA only ▮▮▮▮▮▮▮ with respect to "Quality of Product or Service," "Business Relations" and "Utilization of Small Business" and noted that:



Ex. 80, CORECIVIC_0046207 at -207.

99. NEOCC's CPAR issued for the performance period of June 1, 2012, through May 31, 2013, stated "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 81, CORECIVIC_0095065 at -066.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the

period June 1, 2012 through May 31, 2013 for NEOCC scored CCA only ██████████ with respect to "Utilization of Small Business"; and it noted that, ███████████████████

████████████████████████████████████████████████████████

██████████████ Ex. 81, CORECIVIC_0095065 at -065.

100. NEOCC's CPARs issued for the performance periods of June 1, 2013, through May 31, 2014; and June 1, 2014 through May 31, 2015, stated ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████" Ex. 82, CORECIVIC_1337756 at -757; Ex. 83, CORECIVIC_0578404 at -407.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period June 1, 2013 through May 31, 2014 for NEOCC noted that: ████████████████████

████████████████████████ Ex. 82, CORECIVIC_1337756 at -757, and that, ████████████

████████████████████████████ the BOP opted not to award another contract to CCA at NEOCC in CAR XV even though CCA offered ████████████████████ and moving inmates would impose additional cost on the BOP. Ex. 85, BOP_0334043.

101. The third and final option period for the NEOCC contract ended on May 31, 2015. Ex. 43, CORECIVIC_0004481 at -481-482.

**Response**: This statement is undisputed.

102. On March 25, 2013, the BOP issued a Pre-Solicitation Notice pursuant to Criminal Alien Requirement XV ("CAR 15"), soliciting Requests for Proposal. Ex. 84, CORECIVIC_1340862.

**Response**: This statement is undisputed for purposes of summary judgment only.

103.    CAR 15 had two requirements – Requirement A and Requirement B – for the management and operation of a contractor-operated correctional facility.    Ex. 84, CORECIVIC_1340862 at -862-863.

**Response**: This statement is undisputed.

104.    CAR 15 Requirement A solicited proposals from facilities in Ohio, Michigan, Pennsylvania, Delaware, New Jersey, or New York to house approximately 1,565 to 2,000 low security, adult male inmates that are primarily criminal aliens.  Ex. 84, CORECIVIC_1340862 at -862-863.

**Response**: This statement is undisputed.

105.    Requirement B solicited proposals to house approximately 1,565 to 2,000 low security, adult male inmates that are primarily criminal aliens.  Requirement B did not have a geographic restriction. Ex. 84, CORECIVIC_1340862 at -863.

**Response**: This statement is undisputed.

106.    ███████████████████████████████████████████████████ ███████████████████████████████ Ex. 85, BOP_0334043 at -044.

**Response**: This statement is undisputed.

107.    CoreCivic submitted a bid for NEOCC pursuant to Requirement A.  Ex. 85, BOP_0334043 at -044.

**Response**: This statement is undisputed.

108.    CoreCivic's NEOCC bid proposed to continue to share services between BOP inmates and other DOJ inmates from the USMS – *i.e.*, NEOCC would house two inmate populations. Ex. 85, BOP_0334043 at -051, -054, -059, -063, -074; Ex. 45, Swindle 30(b)(6) Tr. 50:9-52:12.

- 43 -

**Response**: This statement is undisputed for purposes of summary judgment only but lacks

the additional context that at least one CPAR for NEOCC had specifically noted that █████████████

██████████████████████████████████████████████████████████████

████████████████████████████████ Ex. 83, CORECIVIC_0578404 at -406. ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████ Ex. 85, BOP_0334043 at -074. ████████████████████████

██████████████████████████████████████████ *Id*. at -075.

██████████████████████████████████████████████████████████████

████████████████████████ *Id*. at -098.

109.    GEO was awarded the contracts pursuant to Requirements A and B of CAR 15.

Ex. 85, BOP_0334043 at -099; Ex. 87, CORECIVIC_1198504 at -504-505.

**Response**: This statement is disputed because it is incomplete and lacks the necessary

context that even though █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████ Ex. 85, BOP_0334043 at -097 to -098. █████████████████

██████████████████████████████████████████████████████████████

- 44 -

*Id.* at -099.

*Id*. at -097.

*Id*. at -098.

110.    On December 29, 2014, the BOP sent CoreCivic a Notice to Unsuccessful Offeror related to CAR 15, reflected in Exhibit 86.  In the Notice to Unsuccessful Offeror, the BOP stated that CoreCivic's "prices were assessed against the evaluation results of the Non-Price areas, [and] it was determined that the proposal submitted by GEO was the best value to the Government." Ex. 86, CORECIVIC_0759554 at -554, -556.

**Response**: This statement is undisputed for purposes of summary judgment only.

111.    The BOP created an internal document entitled "Source Selection Decision RFP-PCC-0022 Criminal Alien Requirement XV" (the "Source Selection Decision"), reflected in Exhibit 85, which includes the reasons for the BOP's decision regarding the CAR 15 Award. Ex. 85, BOP_0334043.

**Response**: This statement is undisputed for purposes of summary judgment only.

112.    The Source Selection Decision was labeled Source Selection Information, and therefore was not shared with CoreCivic.  Ex. 85, BOP_0334043; Ex. 88, Dep. Tr. of Robert Bland ("Bland Tr.") at 201:2-202:3; Ex. 89, FAR §3.104-4(a).

- 45 -

**Response**: This statement is disputed because, while it is undisputed that the Source Selection Decision was labeled Source Selection Information, there is no admissible evidence that the Source Selection Decision was not shared with CCA. Mr. Bland testified that he "couldn't say one way or the other." Ex. 88 at 201:15-20. Defendants' internal documents also show that the content of the decision was shared with CCA. *See, e.g.*, PEx. 16; PEx. 17, CORECIVIC_0393682 at -694 ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ 91, CORECIVIC_0036536 at -537 ("For Part A, CCA proposed a lower price than GEO but our total proposal was unsuccessful because of two weaknesses: . . . First, in the Past Performance section of our proposal, concerns about our performance in medical services at our Cibola, NM and Eden, TX facilities were raised. We have had challenges in the past 18 months in the staffing and management of these two medical departments, and with that, knew we would have to overcome that in other parts of our proposal."); PEx. 18, CORECIVIC_0683821.

113.    On January 6, 2015, employees from CoreCivic attended a telephone call with BOP officials to debrief on the BOP's decision to award CAR 15 to GEO. Ex. 90, July 30, 2020 Dep. Tr. of Damon Hininger 371:15-21; Ex. 91, CORECIVIC_0036536 at -537.

**Response**: This statement is undisputed for purposes of summary judgment only,

114.    After the NEOCC rebid, no one at the BOP told CoreCivic that CoreCivic was unlikely to win new contracts with the BOP. Ex. 58, Mellendick Tr. at 150:16-20.

**Response**: This statement is disputed. As an initial matter, this statement is not supported by admissible evidence. Fed. R. Evid. 602. Ms. Mellendick's testimony is necessarily limited to her own personal knowledge, and she was not responsible (much less exclusively responsible) for direct communications with CCA. This statement is further disputed because the BOP told CCA that the NEOCC rebid was unsuccessful because ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

PEx. 49 at 74; PEx. 36 at 109:8-20 ("If there was a formal RFP put on the street from the purchasing people, they did the full review . . . based upon FAR requirements."). Therefore, CCA knew or was reckless in not knowing that it was unlikely to win new contracts with the BOP.

115.     In December 2016, CoreCivic announced a new contract award from Immigration and Customs Enforcement to house up to 2,016 inmates at its NEOCC facility. Ex. E, 2016 Form 10-K at 11.

**Response**: This statement is disputed because it is not supported by admissible evidence and is not material to the Motion. Fed. R. Evid. 802. Defendants have refused to allow discovery with respect to customers other than the BOP, including ICE, because they contended that no such events were relevant to the claims and defenses in this case. *See, e.g.*, PEx. 21 at 12-19 (objecting to several requests "to the extent it seeks documents pertaining to CoreCivic's operation of facilities other than the BOP Prisons at issue in this lawsuit").

### C.     Cibola

116.     On January 9, 2015, Cibola received a Cure Notice reflected in Ex. 92. The Cure Notice listed seven items of non-conformance in health services and stated that "unless the conditions are cured by April 21, 2015 the Government may terminate this contract." Ex. 92, CORECIVIC_0038055 at -055.

- 47 -

**Response**: This statement is disputed because it is incomplete, but it is undisputed that the Cure Notice reflected in Ex. 92 was formally issued on January 9, 2015; that the Cure Notice listed seven items of non-conformance in health services; and that the Cure Notice specifically noted: "Cibola County Correctional Center has numerous and repetitive items of critical non-conformance in the area of Health Services, specifically, Patient Care," including that "[m]edical management prior to an inmate's death was not in accordance with policy" where "emergency medical care prior to an inmate's death was not provided by on-site medical staff as required by policy," including because "the only medical staff on duty left the scene during CPR and did not return." Ex. 92, CORECIVIC_0038055 at -055, -060 to -061. The Cure Notice further stated: "Failure to provide proper healthcare in accordance with the contract requirements can seriously jeopardize inmate, staff, and public health. The failure of CCA in correcting the deficiencies, some of which have been noted deficient back to 2011 are cause for the Federal Bureau Of Prisons to issue this Cure Notice, and is considered appropriate at this time." *Id.* at -064.

117. Prior to the Cure Notice, Cibola did not have a full-time physician on staff. Ex. 93, CORECIVIC_0098789 at -789 (Cibola response to Notice of Concern re staffing); Ex. 92, CORECIVIC_0038055; Ex. 94, Dep. Tr. of John Baxter ("Baxter Tr.") 141:19-25; *id.* at 241:12-242:12; *see also* Ex. 95, Nov. 15, 2019 Dep. Tr. of Kim White ("White Nov. 15, 2019 Tr.") 120:13-121:4.

**Response**: This statement is undisputed.

118. Operational challenges in staffing and the provision of medical services were not unique to Cibola or CoreCivic. Ex. 64, Murray Tr. 95:15-98:11; *id.* at 103:12-104:10; Ex. 2, Garfinkle Tr. 41:25-42:24; Ex. 96, July 8, 2020 Dep. Tr. of Harley Lappin ("Lappin July 28, 2020

- 48 -

Tr.") 97:19-98:21; *id.* at 140:8-24; Ex. 62, White Oct. 30, 2020 Tr. 28:8-23; *see also id.* at 78:11-79:21.

 **Response**: This statement is disputed and not supported by admissible evidence. Fed. R. Evid. 602, 802. While the term "[o]perational challenges" is vague, it was "unique" to receive a cure notice; it was unique for a prison not to have a doctor on staff for an extended period of time; and it was unique for the foregoing to happen shortly after being denied a rebid, despite offering the lowest price available, due to health services deficiencies. This statement is also not limited by time frame.

 119. BOP-operated facilities have received deficiencies and repeat deficiencies when audited. Ex. 64, Murray Tr. 179:12-23; *see also* Ex. 97, Oct. 28, 2020 Dep. Tr. of William Dalius ("Dalius Oct. 28, 2020 Tr.") 81:10-18; Ex. 45, Swindle 30(b)(6) Tr. 43:17-49:15; Ex. 96, Lappin July 28, 2020 Tr. 97:19-98:21.

 **Response**: This statement is disputed because it is not supported by admissible evidence, Fed. R. Evid. 602, 802, and is irrelevant because there is no evidence of BOP-operated facilities receiving "repeat repeat repeat deficiencies" or "repeat repeat repeat repeat deficiencies." The statement is also irrelevant because it is not limited by time frame.

 120. BOP-operated facilities faced difficulties in staffing and health services as well. Ex. 99, "The Federal Bureau of Prison's Efforts to Manage Inmate Health Care," Office of the Inspector General, Audit Division, Audit Report 08-08, February 2008 at xiv-xv; Ex. 94, Baxter Tr. 141:1-18; Ex. 100, Dep. Tr. of Bart VerHulst 101:9-17; Ex. 101, BOP_0080016 at -016 (Mellendick email) ██████████████████████████████████████████████
████████████████████████████████████ ").

- 49 -

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 602, 802.  This statement is also irrelevant because there is no evidence of BOP-operated facilities receiving "repeat repeat repeat deficiencies" or "repeat repeat repeat repeat deficiencies."   This statement is also irrelevant because it is not limited by time frame.  It is undisputed that Ms. Mellendick wrote an email containing the referenced quote in the context of expressing concern that, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████" Ex. 101, BOP_0080016 at -016.

121.    To improve Cibola's health services, CoreCivic provided signing bonuses for healthcare professionals, requested to temporarily staff Cibola with healthcare professionals from its other BOP facilities, and hired (at its own expense) a third party healthcare vendor.  Ex. 93, CORECIVIC_0098789 at -790 (Cibola response to Notice of Concern); Ex. 102, CORECIVIC_2209170 at -170; Ex. 103, CORECIVIC_1317716; Ex. 94, Baxter Tr. 177:1-178:8.

**Response**: This statement is disputed because there is no admissible evidence that CCA actually provided signing bonuses for Cibola healthcare professionals.  It is undisputed that, after repeated failures and receipt of a Cure Notice, CCA was forced to tell the BOP it had taken additional measures, including by seeking permission to pull healthcare professionals from other BOP facilities that already had staffing concerns.  As one CCA executive noted, the changes were "[t]oo little, too late."  PEx. 19, CORECIVIC_1003322.  Further, this statement is irrelevant because it is not limited by time frame.

122.    On April 27, 2015, Matt Nace, the Procurement Executive for the BOP, sent an email to the Warden of the Cibola facility reflected in Exhibit 104.  Mr. Nace stated that there was

"excellent progress made by [Cibola]," and "[i]t goes without saying that these results didn't occur without significant contributions from Cibola staff and the support of Headquarters. I was pleased to see the significant improvement in Heath Services." Mr. Nace congratulated Cibola's Warden and "all Cibola staff for a job well done!" Ex. 104, CORECIVIC_0058268 at -268.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802, 901.

123. On May 18, 2015, the BOP lifted the Cure Notice, and informed CoreCivic that "the failures by [CoreCivic] indicated in the cure notice, are no longer endangering the performance of the contract." Ex. 105, CORECIVIC_0038054.

**Response**: This statement is disputed because it is incomplete, but it is undisputed for purposes of summary judgment only that on or about May 18, 2015, the BOP sent CCA a letter that stated: "During the week of April 21, 2015, the Bureau of Prisons (Bureau) conducted a Contract Facility Monitoring (CFM) to inspect any progress made at the Cibola County Correctional Center (CCCC). The preliminary results of the CFM indicate substantial progress has been made in the services provided by CCA. Of the seven deficiencies listed within the Cure Notice, CCA as [sic] adequately assured the Bureau that six of the seven have been cured. The Bureau has determined that the failures by CCA indicated in the cure notice, are no longer endangering the performance of the contract." Ex. 105, CORECIVIC_0038054.

124. During the Class Period, the BOP issued five CPARs regarding Cibola reflected in Exs. 106-110. Ex. 106, CORECIVIC_0674188; Ex. 107, CORECIVIC_1337444; Ex. 108, CORECIVIC_0473652; Ex. 109, CORECIVIC_0722785; Ex. 110, CORECIVIC_1337493.

**Response**: This statement is disputed because it is not supported by admissible evidence. All CPARs identified by Defendants are inadmissible hearsay. Fed. R. Evid. 802. Defendants

have failed to establish any exception that would allow the Court to consider the CPARs. Moreover, the CPARs and the manner in which they were prepared indicate a lack of trustworthiness. Martz testified that CPARs were not reliable sources of information because they were "sent to CCA and CCA had the opportunity to provide all of their influence on how that report was generated and put positive spins on it." PEx. 8 at 181:14-182:21.

125. Cibola's CPAR issued for the performance period of October 1, 2011 through September 30, 2012, stated, ██████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ Ex. 106, CORECIVIC_0674188 at -189.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period October 1, 2011 through September 30, 2012 for Cibola scored CCA only ████████ with respect to "Quality of Product or Service" and "Utilization of Small Business," and it noted that:

- ████████████████████████████████████████████████████
████████████████████████████████████████████ Ex. 106,
CORECIVIC_0674188 at -188.

- ████████████████████████████████████████████████████
████████████████████████████████████ *Id.*

126. Cibola's CPAR issued for the performance period of October 1, 2012 through September 30, 2013, stated ████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ Ex. 107, CORECIVIC_1337444 at -445.

- 52 -

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period October 1, 2012 through September 30, 2013 for Cibola scored CCA only ▮▮▮▮ with respect to "Quality of Product or Service" and "Utilization of Small Business," and it noted that:



Ex. 107, CORECIVIC_1337444 at -445.

*Id.*

127.   Cibola's CPAR issued for the performance period of October 1, 2013 through September 30, 2014, stated, ▮▮▮▮▮▮▮▮▮▮

Ex. 108, CORECIVIC_0473652 at -655.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement is further disputed that Cibola's CPAR issued for the performance period of October 1, 2013 through September 30, 2014 stated: "▮▮▮▮

but it also scored CCA ▮▮▮▮ with respect to "Quality" and "Timely Performance" and only ▮▮▮▮ with respect to "Utilization of Small Business" and "Business Relations" and noted:



PEx. 20, CORECIVIC_1337456 at -457, -459 (another version of CPAR is attached as Ex. 108).

- *Id.* at -457.

- *Id.*

- *Id.*

- *Id.*

- *Id.* at -458.

- *Id.* at -458 to -459.

128. Cibola's CPARs issued for the performance periods of October 1, 2014 through September 30, 2015; and October 1, 2015 through October 30, 2016, stated, ███████████

████████████████████████████████████████████

████████████████████████████████████████ "

Ex. 109, CORECIVIC_0722785 at -789; Ex. 110, CORECIVIC_1337493 at -497.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period October 1, 2014 through September 30, 2015 for Cibola scored CCA ███████ with respect to "Quality" and only ████████ with respect to "Utilization of Small Business," "Business Relations," "Managment [sic] of Key Personnel" and "Timely Performance," and it noted that:



Ex. 109, CORECIVIC_0722785 at -786.

*Id.*



*Id.* at -787 to -788.

*Id.* at -788.

*Id.*

*Id.*

*Id.*

*Id.*

*Id.*

*Id.* at -789.

*Id.*

Likewise, the CPAR for the period October 1, 2015 through September 30, 2016 for Cibola scored

CCA ████████ with respect to "Quality" and only ████████████ with respect to "Utilization of

4817-7024-6872.v1

Small Business," "Business Relations," "Management of Key Personnel" and "Timely Performance," and it noted that:



- Ex. 110, CORECIVIC_1337493 at -493 to -494.

- Id. at -494.

- Id.

- Id. at -495.



*Id.*

*Id.* at -496.

*Id.*

*Id.*

4817-7024-6872.v1



*Id.*

*Id.*

*Id.* at -497.

*Id.*

129. On June 15, 2016, an article published in *The Nation* reported that Cibola had received the Cure Notice and provided information about medical deficiencies at the facility. Ex. 76, CORECIVIC_0029731 at -744.

**Response**: This statement is disputed because Defendants have not presented any admissible evidence that the cited article was, in fact, published on June 15, 2016. Plaintiff disputes that any article published in *The Nation* provided all material information about medical deficiencies at the Cibola facility, including with respect to the continued failures at Cibola in 2015 and 2016, during which time Cibola's

Ex. 110, CORECIVIC_1337493 at -497. Plaintiff also disputes that any article published in *The Nation* provided all material information with respect to the fact that – contrary to the article's implications that the BOP was unlikely to terminate or fail to renew contracts (*e.g.*, Ex. 76, CORECIVIC_0029731 at -744 to -745 ("Not once has the BOP terminated a contract for default. . . . In January 2015, monitors found that at least five inmates had died in the preceding year in the wake of substandard medical care [at Adams]. Perhaps because federal watchdogs were

now paying attention, contracting officials in Washington imposed a large, $811,000 deduction. Then the contract was quietly extended for two years.")) – CCA's failures ████████████

████████████████████████████████████████████████████████████████

████████ Ex. 85, BOP_0334043 at -097 to -098. In addition, knowledgeable CCA employees who had been in the industry for years had never heard of *The Nation*, *see* PEx. 13, CORECIVIC_0996379 (Lappin: "What is the Nation?"), and CCA devoted significant resources to discrediting the reporting, *see, e.g.*, PEx. 12, CORECIVIC_1331683 at -683, -688 (talking points developed by CCA public affairs team for *The Nation* article include: "[t]his is a bought and paid for hit piece by an activist writer funded by anti-privatization groups and individuals," the author's alleged links to "Soros' Open Society Foundations," and the claim that the "piece contains numerous false and misleading statements"), albeit in ways that CCA employees did not always find credible or legitimate, *e.g.*, PEx. 14, CORECIVIC_0047960 (Beasley: "Seriously?? This is our defense?").

130.    News articles published on August 1 and 2, 2016, reported that the BOP had decided not to renew the Cibola contract. Ex. 111, *Cibola County Correctional Center closing*, KOAT Albuquerque, (Aug. 1, 2016); Ex. 112, Kathy Helms, *Milan Prison to Close; 254 Facing Layoffs*, The Gallup Independent (Aug. 2, 2016); *see also* Ex. 79, Dalrymple Rpt. ¶53; Ex. 78, Allen Rpt. ¶¶78-79.

**Response**: This statement is disputed because Defendants have not presented any admissible evidence that the cited articles were, in fact, published on August 1 and 2, 2016. This statement is also irrelevant because Defendants have not provided any evidence or asserted that the articles were disseminated in any way that made them likely to be noticed by investors or that any investor in fact noticed them and because the articles themselves are ambiguous as to the

- 60 -

finality of the decision. *See, e.g.*, Ex. 112 at 2 ("'We're hoping this is just a power play between the county and CCA, but we won't know until it's finally said and done.'").

131.    On August 4, 2016, CoreCivic's Form 10-Q for the second quarter of 2016, reflected in Exhibit K, also stated that the BOP was not renewing the Cibola contract and that ICE was renegotiating the South Texas Residential Center contract. Ex. K, CoreCivic, Quarterly Report (Form 10-Q) (Aug. 4, 2016) ("2Q 2016 Form 10-Q") at 43-44.

**Response**: This statement is undisputed.

132.    In October 2016, CoreCivic entered into a contract with ICE to house up to 1,116 inmates at the Cibola facility. Ex. E, 2016 Form 10-K at 11.

**Response**: This statement is not supported by any admissible evidence, Fed. R. Evid. 802, and is irrelevant. Notably, Defendants prevented discovery into interactions with customers other than the BOP, including ICE, because they contended that no such events were relevant to the claims and defenses in this case. *See, e.g.*, PEx. 21 at 12-19 (objecting to several requests "to the extent it seeks documents pertaining to CoreCivic's operation of facilities other than the BOP Prisons at issue in this lawsuit").

**D.    Eden**

133.    During the Class Period, the BOP issued five Contractor Performance Assessment Reports ("CPARs") regarding Eden. Ex. 113, CORECIVIC_0606193; Ex. 114, CORECIVIC_0669245; Ex. 115, CORECIVIC_1337591; Ex. 72, CORECIVIC_1337633; Ex. 116, CORECIVIC_1337660.

**Response**: This statement is disputed because it is not supported by any admissible evidence. All CPARs identified by Defendants are inadmissible hearsay. Fed. R. Evid. 802. Defendants have failed to establish any exception that would allow the Court to consider the CPARs. Moreover, the CPARs and the manner in which they were prepared indicate a lack of

- 61 -

trustworthiness. Martz testified that CPARs were not reliable sources of information because they were "sent to CCA and CCA had the opportunity to provide all of their influence on how that report was generated and put positive spins on it." PEx. 8 at 181:14-182:21.

134. The CPARs issued for Eden for the performance periods of May 1, 2012 through April 30, 2013; and May 1, 2013 through April 30, 2014, stated ███████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ Ex. 113, CORECIVIC_0606193 at -193; Ex. 114, CORECIVIC_0669245 at -245-246.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period May 1, 2012 through April 30, 2013 for Eden scored CCA only ██████████ with respect to "Key Personnel," and it noted that:

- ██████████████████████████████████████ Ex. 113,
  CORECIVIC_0606193 at -193.

- ██████████████████████████████ *Id*.

Likewise, the CPAR for the period May 1, 2013 through April 30, 2014 for Eden noted that

████████████████████████████████████████████████████████████

██████████████ Ex. 114, CORECIVIC_0669245, at -245.

135. The CPARs issued for Eden for the performance periods of May 1, 2014 through April 30, 2015; May 1, 2015 through April 30, 2016; and May 1, 2016 through April 30, 2017, stated ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ Ex. 115, CORECIVIC_1337591 at -593; Ex. 72, CORECIVIC_1337633 at -635; Ex. 116, CORECIVIC_1337660 at -663.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period May 1, 2014 through April 30, 2015 for Eden scored Eden ████████ with respect to "Quality" and "Management," and it noted that:



- ██████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████ Ex. 115, CORECIVIC_1337591 at -591.

- ██████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████ *Id.*

- ██████████████████████████████████████████████
  ████ *Id.* at -591 to -592.

- ██████████████████████████████████████████████
  *Id.* at -592.

- ██████████████████████████████████████████████
  ████████ *Id.*

- ██████████████████████████████████████████████ *Id.*

- ██████████████████████████████████████████████ *Id.*

4817-7024-6872.v1



The CPAR for the period May 1, 2015 through April 30, 2016 for Eden scored Eden ██████████ with respect to "Quality" and "Management" and only ██████████ with respect to "Timeliness," and it noted that:



PEx. 22 at -645 (more legible version of relevant portions of Exhibit 72).

── redacted block ──



*Id.* at 646.

- *Id.*

- *Id.*

*Id.*

- *Id.*

- *Id.* at -647.

- *Id.*

- *Id.*

- *Id.*

The CPAR for the period May 1, 2016 through April 30, 2017 for Eden is not relevant because it relates almost entirely to periods after the end of the Class Period; and it was not received

until more than a year after the end of the Class Period, a time for which Defendants have blocked discovery on relevance grounds. Plaintiff notes, however, that that CPAR states:



Ex. 116, CORECIVIC_1337660 at -662.

*Id.*

*Id.*

*Id.*

*Id.* at -662 to -663

*Id.* at -663.

E.    McRae

136.    During the Class Period, the BOP issued five Contractor Performance Assessment Reports ("CPARs") regarding McRae.    Ex. 117, CORECIVIC_0660735; Ex. 118, CORECIVIC_0606206; Ex. 119, CORECIVIC_0720859; Ex. 120, CORECIVIC_0722041; Ex. 121, CORECIVIC_1337713.

- 66 -

**Response**: This statement is disputed because it is not supported by admissible evidence. All CPARs identified by Defendants are inadmissible hearsay. Fed. R. Evid. 802. Defendants have failed to establish any exception that would allow the Court to consider the CPARs. Moreover, the CPARs and the manner in which they were prepared indicate a lack of trustworthiness. Martz testified that CPARs were not reliable sources of information because they were "sent to CCA and CCA had the opportunity to provide all of their influence on how that report was generated and put positive spins on it." PEx. 8 at 181:14-182:21.

137.    McRae's CPARs issued for the performance periods of December 1, 2011, through November 30, 2012; and December 1, 2012, through November 30, 2013, stated, ███████████

████████████████████████████████████████████

████████████████████████████ Ex. 117, CORECIVIC_0660735 at -736; Ex. 118, CORECIVIC_0606206 at -207.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period December 1, 2011 through November 30, 2012 for McRae also noted that: "███████████

████████████████████████████████████████████

[BLACK REDACTION] Ex. 117, CORECIVIC_0660735; Ex. 118, CORECIVIC_0606206.

138. McRae's CPARs issued for the performance periods of December 1, 2013, through November 30, 2014; December 1, 2014, through November 30, 2015; and December 1, 2015, through November 30, 2016, stated, [BLACK REDACTION]

[BLACK REDACTION]

[BLACK REDACTION] Ex. 119, CORECIVIC_0720859 at -860; Ex. 120, CORECIVIC_0722041 at -043; Ex. 121, CORECIVIC_1337713 at -715.

**Response**: This statement is disputed because the CPARs are inadmissible hearsay. Even if the CPARs were considered, this statement lacks the additional context that the CPAR for the period December 1, 2013 through November 30, 2014 for McRae also noted that:



Ex. 119, CORECIVIC_0720859 at -860.

*Id.*

The CPAR for the period December 1, 2014 through November 30, 2015 for McRae also noted that:



Ex. 120, CORECIVIC_0722041 at -042.

*Id.*

*Id.*

- 68 -

The CPAR for the period December 1, 2015 through November 30, 2016 for McRae is not relevant because it was neither issued nor received during the Class Period. This CPAR rated McRae only ██████████ with respect to "Schedule" and "Utilization of Small Business," and it also noted that "



Ex. 121, CORECIVIC_1337713 at -715.

## VI. THE OIG REVIEW

139.    On August 11, 2016, the Department of Justice publicly released a report titled, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "OIG Review"), reflected in Exhibit 122. The OIG Review documented findings that, among other things, (i) in a majority of categories, contract prisons incur more safety and security incidents per capita than comparable BOP institutions; (ii) past disturbances in contract prisons had caused property damage, injury, and the death of one Correctional Officer; and (iii) contract prisons had higher rates of assaults and staff uses of force than comparable BOP institutions. Ex. 122, U.S. Dep't of Justice Off. of the Inspector Gen., *DOJ OIG Releases Report on the Federal Bureau of Prisons' Monitoring of Contract Prisons* (Aug. 11, 2016); Ex. 61, August 2016 OIG Review at i-ii; Ex. 78, Allen Rpt. ¶28, exhibit 1 at 5; Compl. ¶¶12, 38-39.

- 69 -

**Response**: This statement is disputed because it is incomplete.  It is undisputed for purposes of summary judgment only that the OIG Review was issued on August 11, 2016 and that it stated that: "in most key areas, contract prisons [specifically including CCA] incurred more safety and security incidents *per capita* than comparable BOP institutions"; that contract prisons (including CCA) "had more frequent incidents of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances"; and that the OIG "d[id] not draw, and caution[ed] against drawing the conclusion . . . that contract prisons are necessarily lower cost than BOP institutions on an overall basis."  Ex. 61 at i, 11-12, 44.  The OIG Review also suggested that the BOP would continue using private prisons.  *E.g.*, *id.* at iii (making "recommendations to the BOP to improve the monitoring and oversight of its contract prisons").

## VII.    THE YATES MEMO

140.    On August 18, 2016, the Department of Justice released a two-page memorandum from Deputy Attorney General Sally Yates addressed to the Acting Director of the BOP (the "Yates Memo"), reflected in Exhibit 123.  Ex. 123, CORECIVIC_2207912 ("Yates Memo") at -913-914; Compl. ¶13.

**Response**: This statement is disputed because it is incomplete.  In addition to the Yates Memo being released on August 18, 2016, the Yates Memo noted that, before that date, the BOP was "already taking steps in this direction.  Three week ago, the Bureau declined to renew a contract for approximately 1,200 beds."  Ex. 123 at -914.  This was a reference to Cibola.

141.    On August 23, 2016, Pamela Jones, an Administrator for the BOP's Privatization Management Branch, sent an email to Angela Dunbar, the BOP's Assistant Director for the Correctional Programs Division, reflected in Exhibit 124. ████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████ Ex. 124, BOP_0148858 at -858, -860.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802, 901.

142.    On November 8, 2016, Donald Trump won the 2016 Presidential Election. Ex. 125, "Donald J. Trump 45th President of the United States," The White House, whitehouse.gov/people/donald-j-trump/ (last visited Nov. 13, 2020).

**Response**: This statement is disputed. Donald Trump was elected President of the United States on December 19, 2016 by a vote of the Electoral College, as tallied and certified by the U.S. Congress on January 6, 2017.

143.    On November 9, 2016, CoreCivic's stock price increased 43%. Ex. 126, CXW Historical Data, Yahoo Finance, https://finance.yahoo.com/quote/CXW/history?period1=1330214400&period2=1488412800&interval=1d&filter=history&frequency=1d&includeAdjusted Close=true (closing price on November 8, 2016 was $14.19; closing price on November 9, 2016 was $20.31); Ex. 4, Pl.'s Resp. to RFA No. 31 (admitting, in response to RFA 31, that CoreCivic's closing stock price on November 9, 2016, was 43% higher than its closing stock price on November 8, 2016).

**Response**: This statement is undisputed.

144.    On January 13, 2017, CoreCivic's closing stock price was $27.22. Ex. 126, CXW Historical Data, Yahoo Finance.

**Response**: This statement is undisputed.

145.    On February 9, 2017, Jeff Session was sworn in as Attorney General.  Ex. 78, Allen Rpt.  ¶70; Ex. 127, "Attorney General:  Jeff Sessions," U.S. Dep't of Justice, justice.gov/ag/bio/attorney-general-jeff-sessions (last visited Nov. 13, 2020).

**Response**: This statement is undisputed.

146.    On February 21, 2017, Attorney General Sessions rescinded the Yates Memo, stating that "[t]he memorandum changed long-standing policy and practice, and impaired the Bureau's ability to meet the future needs of the federal correctional system."  Ex. 128, Attorney General Jeff Sessions, Rescission of Memorandum on Use of Private Prisons (Feb. 21, 2017) (Allen Dep. Ex. 13) ("I hereby rescind the memorandum dated August 18, 2016, sent to you by former Deputy Attorney General Sally Q. Yates, entitled 'Reducing Our Use of Private Prisons.'"); Compl., at 67, n.14; *see also* Ex. 4, Pl.'s Resp. to RFA No. 29.

**Response**: This statement is undisputed for purposes of summary judgment only.

147.    On February 21, 2017, CoreCivic's stock price rose as high as $34.10.  Ex. 126, CXW Historical Data, Yahoo Finance; *see also* Ex. 78, Allen Rpt. ¶¶69-70.

**Response**: This statement is disputed because it is incomplete.  It is undisputed that on February 21, 2017, CCA's stock price opened at $32.79 and closed at $34.06, with an intraday high of $34.10 and an intraday low of $32.75 per share.

148.    Before the Yates Memo was released, on August 17, 2016, CoreCivic's stock price was $27.22.  Ex. 126, CXW Historical Data, Yahoo Finance; Ex. 78, Allen Rpt. ¶75.

**Response**: This statement is disputed because it is incomplete.  It is undisputed that on August 17, 2016, CCA's stock price opened at $26.81 per share and closed at $27.22 per share.

149.    On February 23, 2017, CoreCivic's stock price reached a high of $34.69.  Ex. 126, CXW Historical Data, Yahoo Finance; Ex. 78, Allen Rpt. ¶¶69-70.

- 72 -

**Response**: This statement is disputed because it is incomplete. It is undisputed that on February 23, 2017, CCA's stock price opened at $34.59 and closed at $34.00, with an intraday high of $34.69 and an intraday low of $33.78 per share.

## VIII. RELEVANT RISK DISCLOSURES REGARDING CORECIVIC'S BUSINESS

### A. Risk Disclosures

150. CoreCivic's SEC filings during the Class Period, reflected in Exhibits A-E, included risk disclosures regarding (i) the potential effects of its operational performance and compliance with regulations on its ability to obtain, renew, and retain contracts; (ii) the possibility that inmate disturbances may occur, and the potential effects on its ability to obtain, renew, and retain contracts; and (iii) the potential effects of losing BOP business on its financial performance. Ex. B, 2012 Form 10-K at 26-31; Ex. A, 2013 Form 10-K at 26-31; Ex. C, 2014 Form 10-K at 25-31; Ex. D, 2015 Form 10-K at 28-34; Ex. E, 2016 Form 10-K at 30-36.

**Response**: This statement is disputed because it is incomplete and contains improper paraphrasing. It is undisputed that CCA's SEC filings during the Class Period included risk disclosures. Plaintiff refers to the SEC filings for their full, complete and accurate contents.

151. Starting in November 2015, CoreCivic's SEC filings disclosed that BOP prison populations had declined, and were expected to continue declining. Ex. L, CoreCivic, Quarterly Report (Form 10-Q) (Nov. 5, 2015) ("3Q 2015 Form 10-Q") at 38; Ex. D, 2015 Form 10-K at 10; Ex. M, CoreCivic, Quarterly Report (Form 10-Q) (May 5, 2016) ("1Q 2016 Form 10-Q") at 34; Ex. K, 2Q 2016 Form 10-Q at 40.

**Response**: This statement is disputed because it is incomplete and contains improper paraphrasing and to the extent it could be read to imply that these disclosures were complete in all material respects and were not materially misleading. It is undisputed for purposes of summary

judgment only that the cited CCA SEC filings contained statements that "inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system are expected to decline further . . . primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses." Ex. L at 38; *see also* Exs. D, M, K (slight variants on this language). Plaintiff refers to the SEC filings for their full, complete and accurate contents.

### B. BOP Populations

152. During the Class Period, the BOP reported to Congress that "federal prisons [were] significantly overcrowded." Ex. 130, U.S. Dep't. of Justice, *FY 2016 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities* at 2; *see also id.* at 5 (listing the percent overcrowd[ing] of BOP population as 38% (2012), 36% (2013) 30% (2014), 24% (2015), 15% (2016)).

**Response**: This statement is undisputed for purposes of summary judgment only.

153. In 2016, the BOP had a population of 192,170 and was 16% overcrowded. Ex. 131, *FY 2020 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities*, U.S. Dept. of Justice at 4; *see also* Ex. 132, Feb. 26, 2020 Dep. Tr. of William Dalius ("Dalius Feb. 26, 2020 Tr.") at 98:21-25 (acknowledging there was "generally a downward trend from July 2013 to August 2016 with respect to the BOP population.").

**Response**: This statement is disputed because it is incomplete and to the extent that it implies having populations in excess of rated capacities necessarily means a facility is "overcrowded" by the precise amount by which the population exceeds rated capacity. It is undisputed for purposes of summary judgment only that Exhibit 131 contains the cited figures.

- 74 -

154.    As one consequence of the overcrowding, the BOP contracted during the Class Period with private companies to house federal inmates.  Ex. 19, Dodrill Rpt. ¶¶22-23, Figure 1 (showing the growth of the inmate population over time); Ex. 133, Dep. Tr. of Todd Mullenger 142:16-143:5; *see also* Ex. 123, Yates Memo, CORECIVIC_2207912 at -913.

**Response**: This statement is undisputed for purposes of summary judgment only.

155.    Literature on the use of private prisons shows that there are three principal bases for the cost savings generated by private correctional facilities: construction related costs, personnel costs, and private sector competition.  Ex. 134, Expert Rpt. of Justin Marlowe ("Marlowe Rpt.") ¶¶27-29 (citing numerous sources); *see also* Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5-138:23.

**Response**: This statement is disputed because it is not supported by admissible evidence, including because Justin Marlowe's opinions concerning cost should be excluded under Federal Rule of Evidence 702 as Marlowe is not qualified to provide expert testimony and Marlowe's opinions are unreliable, speculative, not helpful to a jury, irrelevant and impermissible, *see generally* ECF No. 358; and because Dalius is not qualified to offer an opinion on the quality, costs or operational performance of CCA/BOP facilities and Dalius' lawyer-drafted opinions are unreliable because they are not based on data or methodology, *see generally* ECF No. 354 at 8-12. This statement is further disputed because it contains no citation that could reasonably be considered "literature."  This statement is also disputed because: (i) it is vague as to "cost savings" and "literature"; (ii) it is not fact but rather opinion; (iii) it does not provide context, including that "literature" was paid for by CCA; and (iv) it ignores that cost savings cannot be separated from quality of services provided.  *See* ECF No. 359-4 at 81-82 ("It's . . . nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public

cost/factors."); ECF No. 359-5 at -924 (GAO report concluding: "Without comparable [private prison] data, the BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities"); *id.* at -930 ("It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilities because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost."); *id.* at -931 (private contractors told GAO: "[T]he data are not readily available or in a format that would enable a methodologically sound cost comparison at this time").

156.    If the BOP contracts with a private prison operator to house inmates that it does not have room for in its own facilities, it can avoid the capital expenditure and construction costs of building a new prison.  It can also avoid the cost of pensions for employees.  Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5-138:23; Ex. 134, Marlowe Rpt. ¶¶27-28; *see also, e.g.*, Ex. 135, U.S. Gov't Accountability Office, *Prison Construction: Clear Communication of the Accuracy of Cost Estimates and Project Changes is Needed*, GAO-08-634 (May 2008), MARLOWE_0005967 at -973.

**Response**: This statement is disputed because it is not supported by admissible evidence, including because it is hearsay; because Justin Marlowe's opinions concerning cost should be excluded under Federal Rule of Evidence 702 as Marlowe is not qualified to provide expert testimony and Marlowe's opinions are unreliable, speculative, not helpful to a jury, irrelevant and impermissible, *see generally* ECF No. 358; and because Dalius is not qualified to offer an opinion on the quality, costs or operational performance of CCA/BOP facilities and Dalius' lawyer-drafted opinions are unreliable because they are not based on data or methodology, *see generally* ECF No. 354 at 8-12.  This statement is also disputed because it disregards the fact that taxpayers fund

the privatization management branch, which oversees the contract; taxpayers fund the public sector employees who write the contract; taxpayers fund the BOP employees who manage the process of awarding a contract; taxpayers fund the public sector staff who monitor the contract while the prison is being operated; taxpayers fund the staff who write and update policies and procedures to cover the operations of for-profit prisons within the BOP's correctional system; taxpayers fund the senior management of the BOP who had responsibility with respect to BOP inmates who are in private prisons; and taxpayers fund the various other overhead costs associated with letting a contract, overseeing a contract and maintaining ultimate accountability for the inmates in private prisons such that an approach to cost comparison that does not allocate overhead costs to the private vendor would underestimate the true costs of contracting for the services. *See, e.g.*, PEx. 36 at 140:1-147:16; PEx. 37 at 9-10 ("The most general problem [with cost comparisons between for-profit prisons and government-run prisons] is that overhead costs of the contracting agency are not typically separated into those costs that should be charged against the private prison (as well as the public prisons being compared) and those that should not be charged against the private sector facility. Some analysts go as far as to suggest that no overhead costs of the public agency letting the contract should be charged against the private prison, but this position is not defensible. Clearly, there are overhead costs associated with letting a contract, overseeing the contract, and maintaining ultimate accountability for the inmates in private prisons. These costs and others must be counted against the private prison if there is to be an accurate accounting of how much the state spends to incarcerate inmates in private prisons. . . . There is an intuitive simplicity to the notion that a private vendor only be charged for the amount of contract costs minus any receipts received from the vendor either directly or indirectly (such as commissary profits returned to the state or state taxes collected) when comparing the costs of private and public prisons. However, such an

approach grossly underestimates the true costs of contracting for the services. As mentioned above, public sector staff wrote the contract, awarded the contract, as well as monitored the contract once the prison was operating. Additionally, policies had to be written to cover the operations of private systems within the correctional system. All of these actions, and related tasks, had costs associated with them, but the costs are not always properly recognized when comparing the costs of public and private prisons."). This statement is also disputed because if the BOP contracts with for-profit prisons, it incurs all of the listed costs indirectly through the contractor as it is built into the price; and it may also incur building costs to the extent the for-profit prison is an inadequate short-term substitute for BOP prisons, necessitating the BOP to start building prisons into which to move inmates in the medium term. Moreover, even if it were true that CCA generates substantial cost savings for the BOP, the record shows those savings were not enough to convince BOP to contract with CCA. *See, e.g.*, Ex. 85. This statement is further disputed because it is not a statement of fact but an argument based on an incomplete hypothetical and is therefore inappropriate for a Statement of Undisputed Facts. There is no reliable method for ascertaining cost savings. *See* ECF No. 359-4 at 81-82 ("It's . . . nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public cost/factors."); ECF No. 359-5 at -924 (GAO report concluding: "Without comparable [private prison] data, the BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities"); *id*. at -930 ("It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilities because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of

4817-7024-6872.v1

these differences on cost."); *id.* at -931 (private contractors told GAO: "[T]he data are not readily available or in a format that would enable a methodologically sound cost comparison at this time").

## IX.   CORECIVIC'S PUBLIC DISCLOSURES REGARDING COST COMPARISONS

157.    BOP published per capita daily cost across all security classifications after each full fiscal year in the Class Period – *i.e.*, 2012-2015.   Ex. 134, Marlowe Rpt. ¶33; Ex. 136, MARLOWE_0004824 at -826-829.

**Response**: This statement is disputed.   Exhibit 134 is inadmissible evidence, and Defendants have not established the admissibility of Exhibit 136.  Fed. R. Evid. 602, 802, 901. Plaintiff further responds that this is not a material fact in the context of the motion for summary judgment, and this statement is irrelevant.

158.    On October 2, 2013, CoreCivic held a "2013 Analyst Day," in which certain executives made a presentations to investors and analysts reflected in Ex. 137.  Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013).

**Response**: This statement is undisputed.

159.    The 2013 Analyst Day presentation contained a slide entitled "The Value CCA Provides to Government Partners and Taxpayers."   That slide contained a bullet which stated: "[A]nnual cost savings of 12% or more substantiated by Temple University Study."   Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013) at 15.

**Response**: This statement is disputed because it is incomplete and contains improper paraphrasing and to the extent it could be read to imply these disclosures were complete in all material respects and were not materially misleading.  It is undisputed for purposes of summary judgment only that Defendants made the quoted representations, but it is disputed that these

representations were materially accurate. Contrary to the statement: (i) there was never a Temple University Study regarding cost savings; (ii) cost savings were not substantiated by a Temple University study; and (iii) the presentation does not adequately disclose that CCA funded a working paper by certain professors that cites other CCA-funded articles or CCA's substantial influence on the cited "study." PEx. 23-28. The presentation also is more than 60 pages long, and the particular slide quoted by Defendants contains the bullet point under the heading: "The Value CCA Provides to Government Partners and Taxpayers": "Reduce overcrowding: improve safety & inmate quality of life." Ex. 137 at 15. Elsewhere the presentation states: "Safety is our Number One Priority," indicating a "Proactive Well Trained Staff," *id*. at 38, and further, that: "Quality, in the form of Operational Excellence, is a core value and essential guiding principle for CCA." *Id*. at 44.

160. The 2013 Analyst Day presentation cited a footnote in support of the above statement. The footnote stated: "Temple University's Center for Competitive Government in April 2013: Contracted Prisons Cut Costs without Sacrificing Quality" ("Temple University Study"). The footnote also stated: "This study received funding by members of the private corrections industry." Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013) at 15 n. 1.

**Response**: This statement is disputed because it is incomplete and to the extent it could be read to imply these disclosures were complete in all material respects and were not materially misleading. Plaintiff does not dispute for purposes of summary judgment only that the presentation included the quoted language. Contrary to the statement, the April 29, 2013 working paper (not study) was titled: "Cost Analysis of Public and Contractor Operated Prisons," not "Contracted Prisons Cut Costs without Sacrificing Quality" as reflected in Exhibit 137. *Compare* Ex. 137 at

15 n.1 *with* Ex. 138; PEx. 32.  It is also disputed that the "study" was in fact a study, as opposed to a working paper that had been withdrawn, and disputed that Temple endorsed or had any "connection" to the working paper.  PEx. 30 (noting that "the working paper was withdrawn and is no longer widely available" and that Temple had "many months ago . . . directed that correction[s] be made to any publication that inaccurately attributed Temple's connection to this work"); PEx. 31 (CCA executive telling the professors that: "The study, which is not a Temple study . . . .").  It is also disputed that the buried footnote adequately disclosed that CCA funded the "study" or provided pertinent information such as CCA's involvement in designing and drafting the "study."  *See, e.g.*, PEx. 23; PEx. 24 at -359 (CCA executives emailing with authors of study about using analytical approach that "enables us to put CCA in the best possible light," as opposed to an approach "which may or may not put our best foot forward" and admitting "[i]t's nearly impossible to ever get an apples-to-apples comparison," as well as providing professors with studies including one CCA "commissioned"); PEx. 25 (authors of study incorporating edits from CCA executive and requesting references for inserted factual assertions); PEx. 26 (authors of study to group of executives from CCA and other for-profit prison companies: "we will follow all decisions that you make"); PEx. 27; PEx. 28 at -565 to -566 (CCA agreeing to pay the professors $45K for the study and drafting of the "Method of Analysis" for the study); PEx. 29 (CCA executive attaching an update of the previous working paper on May 23, 2013, purportedly including funding language).

161.    The 2013 Analyst Day presentation stated for a second time later in the presentation: "CCA provides cost savings of 12% or more," and cited the Temple University Study in the footnote in support of the statement.  Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013) at 51, 51 n. 1.

**Response**: This statement is disputed because it is incomplete and to the extent it could be read to imply these disclosures were complete in all material respects and were not materially misleading. It is undisputed for purposes of summary judgment only that Defendants made the quoted representations, but it is disputed that these representations were materially accurate. Contrary to the statement: (i) no "cost savings" were substantiated by any Temple University study; and (ii) the presentation did not adequately disclose that CCA funded and had substantial influence on the cited study. PEx. 23-27. Nor is there any evidence submitted that there is any methodology that can reasonably support a claim of cost savings of "12% or more." *See* ECF No. 359-4 at 81-82 ("It's . . . nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public cost/factors."); ECF No. 359-5 AT -924 (GAO report concluding: "Without comparable [private prison] data, the BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities"); *id*. at -930 ("It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilites because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost."); *id*. at -931 (private contractors told GAO: "[T]he data are not readily available or in a format that would enable a methodologically sound cost comparison at this time").

162. The Temple University Study cited in the 2013 Analyst Day presentation slides 15 and 51 was a publicly available working paper dated April 2013. Ex. 138, Simon Hakim and Erwin A. Blackstone, Cost Analysis *of Public and Contractor [O]perated Prisons* (Temple Univ. Ctr. For Competitive Gov., Working Paper Apr. 29, 2013) MARLOWE_0008000 (Marlowe Dep. Ex. 550); Ex. 139, Dep. Tr. of Justin Marlowe 107:10-16 (authenticating 2013 working paper).

- 82 -

**Response**: This statement is disputed because it is not supported by admissible evidence. *See* Fed. R. Evid. 602, 802, 901. This statement is also contradicted by slides 15 and 51 that do not reference the title of the "paper" cited in Exhibit 138. They reference a nonexistent Temple University document. This statement is further disputed insofar as there is no evidence in the record as to what, if any, working paper was publicly available. Exhibit 138 indicates on the first page that it was "updated May 23, 2013." It is also disputed that Marlowe could have authenticated or did authenticate the working paper, much less whether and when it was "publicly available." Contrary to the statement, Marlowe references a working paper issued after April 2013. PEx. 33 at 15 n.61.

163.     The Temple University Study working paper disclosed that it had "received funding by members of the private corrections industry." Ex. 138, Simon Hakim and Erwin A. Blackstone, Cost Analysis *of Public and Contractor [O]perated Prisons* (Temple Univ. Ctr. For Competitive Gov., Working Paper Apr. 29, 2013) MARLOWE_0008000 at -004 (Marlowe Dep. Ex. 550) ("The study received funding by members of the private corrections industry.").

**Response**: This statement is disputed because it relies on inadmissible evidence and is vague as to time. For example, contrary to the statement, the cover page of Exhibit 138 reflects that it was "updated May 23, 2013"; thus it is disputed that it is an April 2013 document. This statement is also disputed because Exhibit 138 is not a "Temple University Study" working paper. PEx. 30 (noting "the working paper was withdrawn and is no longer widely available" and that Temple had "many months ago . . . directed that correction[s] be made to any publication that inaccurately attributed Temple's connection to this work"); PEx. 31 (CCA executive telling the professors: "The study, which is not a Temple study . . . ."). Further, there is no admissible evidence that CCA or any paper adequately disclosed CCA's influence over the paper, including

that CCA had funded and directly influenced its content. *See, e.g.*, PEx. 23; PEx. 24 at -359 (CCA executives emailing with authors of study about using analytical approach that "enables us to put CCA in the best possible light" as opposed to an approach "which may or may not put our best foot forward" and admitting "[i]t's nearly impossible to ever get an apples-to-apples comparison" as well as providing professors with studies including one CCA "commissioned"); PEx. 25 (authors of study incorporating edits from CCA executive and requesting references for inserted factual assertions); PEx. 26 (authors of study to group of executives from CCA and other for-profit prison companies: "we will follow all decisions that you make"); PEx. 27; PEx. 28 at -565 to -566 (CCA agreeing to pay the professors $45K for the study and drafting the "Method of Analysis" for the study); PEx. 29 (CCA executive attaching an update of the previous working paper on May 23, 2013 purportedly including funding language).

164.    The Temple University Study was eventually published in 2014, as reflected in Exhibit 140.  Ex. 140, Simon Hakim and Erwin A. Blackstone, Prison Break*: A New Approach to Public Cost and Safety*, Independent Policy Report (Jun. 2014), MARLOWE_0007885 (Marlowe Dep. Ex. 549).

**Response**: This statement is disputed because Defendants have not presented any admissible evidence that any working paper (including Exhibit 138) was a "Temple University Study" or that it was "eventually published in 2014."  PEx.30 (noting "the working paper was withdrawn and is no longer widely available" and that Temple had "many months ago . . . directed that correction[s] be made to any publication that inaccurately attributed Temple's connection to this work"); PEx. 31 (CCA executive telling the professors: "The study, which is not a Temple study . . . .").

165.     The Temple University Study published in 2014 disclosed that "[t]he authors of the study were partially funded by members of private corrections industry.  No other funding was provided."  Ex. 140, Simon Hakim and Erwin A. Blackstone, Prison Break: *A New Approach to Public Cost and Safety*, Independent Policy Report (Jun. 2014), MARLOWE_0007885 at -887 (Marlowe Dep. Ex. 549).

**Response**: This statement is disputed because Defendants have not provided any admissible evidence that Exhibit 140 is a "Temple University Stucy" or that it was "published in 2014."  The statement is also disputed because it implies that the material facts about CCA's influence on the "study" were adequately disclosed.  PEx. 30 (noting "the working paper was withdrawn and is no longer widely available" and that Temple had "many months ago . . . directed that correction[s] be made to any publication that inaccurately attributed Temple's connection to this work"); PEx. 31 (CCA executive telling the professors: "The study, which is not a Temple study . . . .").  The exhibit also did not disclose that CCA specifically funded it or that CCA designed the study, edited the study and had substantial input on its content.  *See, e.g.*, PEx. 23; PEx. 24 at -359 (CCA executives emailing with authors of study about using analytical approach that "enables us to put CCA in the best possible light" as opposed to an approach "which may or may not put our best foot forward" and admitting "[i]t's nearly impossible to ever get an apples-to-apples comparison" as well as providing professors with studies including one CCA "commissioned"); PEx. 25 (authors of study incorporating edits from CCA executive and requesting references for inserted factual assertions); PEx. 26 (authors of study to group of executives from CCA and other for-profit prison companies: "we will follow all decisions that you make"); PEx. 27; PEx. 28 at -565 to -566 (CCA agreeing to pay the professors $45K for the

- 85 -

"study" and drafting the "Method of Analysis"); PEx. 29 (CCA executive attaching an update of the previous working paper on May 23, 2013 purportedly including funding language).

166.    During the Class Period, there was publicly available information regarding CoreCivic's funding of certain studies, including the Temple University Study. *See, e.g.*, Ex. 141, Prison Legal News, Research Study *Finding Benefits from Prison Privatization Funded by Private Prison Companies* (Jun. 15, 2013), https://www.prisonlegalnews.org/news/2013/jun/15/research-study-finding-benefits-from-prison-privatization-funded-by-private-prison-companies/;  Ex. 138, Simon Hakim and Erwin A. Blackstone, Cost Analysis *of Public and Contractor [O]perated Prisons* (Temple Univ. Ctr. For Competitive Gov., Working Paper Apr. 29, 2013) MARLOWE_0008000 (Marlowe Dep. Ex. 550); Ex. 140, Simon Hakim and Erwin A. Blackstone, Prison Break*: A New Approach to Public Cost and Safety*, Independent Policy Report (Jun. 2014), MARLOWE_0007885 (Marlowe Dep. Ex. 549); Ex. 142, Louie Brogdon, *Critics point [fi]nger at CCA: For-pro[fi]t prison operator taken to task for campaign giving, operations*, Local Regional News, (May 5, 2014)  MARLOWE_0006999.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 901.  This statement is further disputed because Defendants have not established when and where information concerning CCA's funding of and influence on the "studies," including the so-called "Temple University Study," was publicly available. *See, e.g.*, PEx. 23-28, 34 (initially posted version of the working paper, including no statement about funding); PEx. 32 (forwarding revised "version of the working paper, to include the funding disclosure language"). Nor have Defendants established that any of the disclosures of the vague and unidentified studies were viewed as credible, particularly in light of CCA's own representations. *See, e.g.*, PEx. 35 at

- 86 -

73:4-23 (CCA director Thurgood Marshall, Jr. testified that he had "reason to doubt the accuracy" of any statement for which "Prison Legal News is the source.").

167. For every quarter between the third quarter of 2014 and first quarter of 2016, CoreCivic published an investor presentation ("Investor Presentations") reflected in Exhibits 143-149. Ex. 143, CoreCivic, CoreCivic Third Quarter 2014 Investor Presentation (Nov. 2014), CORECIVIC_0116477; Ex. 144, CoreCivic, CoreCivic Fourth Quarter 2014 Investor Presentation (Feb. 2015), CORECIVIC_0118664; Ex. 145, CoreCivic, CoreCivic First Quarter 2015 Investor Presentation (May 2015), CORECIVIC_0437869; Ex. 146, CoreCivic, CoreCivic Second Quarter 2015 Investor Presentation (Aug. 2015), CORECIVIC_0119192; Ex. 147, CoreCivic, CoreCivic Third Quarter 2015 Investor Presentation (Nov. 2015), CORECIVIC_1202106; Ex. 148, CoreCivic, CoreCivic Fourth Quarter 2015 Investor Presentation (Feb. 2015), CORECIVIC_0119881; Ex. 149, CoreCivic, CoreCivic First Quarter 2016 Investor Presentation (May 2016), CORECIVIC_0401036.

**Response**: This statement is undisputed for purposes of summary judgment only.

168. The Third Quarter 2014 Investor Presentation and Fourth Quarter 2014 Investor Presentation contained the following statement: "*Prison Break – A New Approach to Public Cost and Safety*, a recent Policy Report indicates short-and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality." These statements referenced the following footnote: "A Policy Report issued by the Independent Institute in June 2014. This study received funding by members of the private corrections industry." Ex. 143, CORECIVIC_0116477 at 486; Ex. 144, CORECIVIC_0118664 at -673.

**Response**: This statement is disputed because it is incomplete and to the extent it could be read to imply these disclosures were complete in all material respects and were not materially

- 87 -

misleading. It is undisputed for purposes of summary judgment only that the presentations contained the quoted language. While finally removing the inaccurate "Temple University" language, the presentations did not adequately disclose that CCA funded the "study" or that CCA designed, edited and had substantial input on its content. *See, e.g.*, PEx. 23; PEx. 24 at -359 (CCA executives emailing with authors of study about using analytical approach that "enables us to put CCA in the best possible light" as opposed to an approach "which may or may not put our best foot forward"); PEx. 25 (authors of study incorporating edits from CCA executive and requesting references for inserted factual assertions); PEx. 26 (authors of study to group of executives from CCA and other for-profit prison companies: "we will follow all decisions that you make"); PEx. 27; PEx. 28 at -565 to -566 (CCA agreeing to pay the professors $45K for the study and drafting the "Method of Analysis" for the study). The presentation also did not disclose that cost savings cannot be divorced from quality or that reliable cost-savings comparisons between the BOP and private prison operators were impossible. *See* PEx. 37 at 9-10; ECF No. 359-4 at 81-82 ("It's . . . nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public cost/factors."); ECF No. 359-5 at -924 (GAO report concluding: "Without comparable [private prison] data, the BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities"); *id*. at -930 ("It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilities because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost."); *id*. at -931 (private contractors told GAO: "[T]he data are not readily available or in a format that would enable a methodologically sound cost comparison at this time").

- 88 -

169.    The Investor Presentations for first quarter 2015 through the first quarter of 2016 contained the statement: "Short-and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality," which referenced a footnote stating: "A Policy Report issued by the Independent Institute in June 2014.  This study received funding by members of the private corrections industry."  Ex. 145, CORECIVIC_0437869 at -878; Ex. 146, CORECIVIC_0119192 at -201; Ex. 147, CORECIVIC_1202106 at -116; Ex. 148, CORECIVIC_0119881 at -891; Ex. 149, CORECIVIC_0401036 at -047.

**Response**: This statement is disputed because it is incomplete and to the extent it could be read to imply these disclosures were complete in all material respects and were not materially misleading.    While finally removing the inaccurate "Temple University" language, the presentations did not adequately disclose that CCA funded the "study" or that CCA designed, edited and had substantial input on its content.  *See, e.g.*, PEx. 23; PEx. 24 at -359 (CCA executives e-mailing with authors of study about using analytical approach that "enables us to put CCA in the best possible light as opposed to an approach "which may or may not put our best foot forward"); PEx. 25 (authors of study incorporating edits from CCA executive and requesting references for inserted factual assertions; PEx. 26 (authors of study to group of executives from CCA and other for-profit prison companies: "we will follow all decisions that you make"); PEx. 27; PEx. 28 at -565 to -566 (CCA agreeing to pay the professors $45K for the study and drafting the "Method of Analysis" for the study).   The presentation also did not disclose that cost savings cannot be divorced from quality or that reliable cost-savings comparisons between the BOP and private prison operators were impossible.  *See* PEx. 37 at 9-10; ECF No. 359-4 at 81-82 ("It's . . . nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public cost/factors."); ECF No. 359-5 at -924 (GAO report concluding: "Without comparable

[private prison] data, the BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities"); *id*. at -930 ("It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilities because these facilities differe in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost."); *id*. at -931 (private contractors told GAO: "[T]he data are not readily available or in a format that would enable a methodologically sound cost comparison at this time").

170.    The Third Quarter 2014 Investor Presentation contained a chart entitled "Operational Cost Savings," which compared "Operating Cost Per Day in Government Facilit[ies]" reported by the BOP, California and Colorado with "CCA Average Owned Per Diem" and calculated a "Percent Savings." Ex. 143, CORECIVIC_0116477 at -487; Ex. 134, Marlowe Rpt. ¶33, Exhibit 2.1 (regarding the source of the BOP data); Ex. 132, Dalius Feb. 26, 2020 Tr. 65:15-68:14 (regarding the BOP data).

**Response**: This statement is undisputed for purposes of summary judgment only to the extent it contains the quoted language. This statement is disputed with respect to the accuracy of the language or whether the presentations misled investors because of omitted information. Defendants have not submitted any admissible evidence establishing the accuracy of the language.

171.    The Third Quarter 2014 Investor Presentation Operational Cost Savings Chart contained per day (or "per diem") operating costs reported by the BOP for the fiscal year ended 2013 ($73.00), an estimate for "real estate cost per day" ($12.00) and combined those two numbers to calculate a "Total Government-Run Cost Per Day" for the BOP of $85.00. It then compared that to CCA's Averaged Owned Per Diem for the quarter ended September 30, 2014 ($69.65), to reach a Percent Savings of 18.1%. Ex. 143, CORECIVIC_0116477 at -487; Ex. 136,

MARLOWE_0004824 at -828; Ex. 45, Swindle 30(b)(6) Tr. 285:23-289:12 (explaining per diem comparison).

      **Response**: This statement is undisputed for purposes of summary judgment only to the extent it contains the quoted language.  This statement is disputed with respect to the accuracy of the language or whether the presentations misled investors because of omitted information. Defendants have not submitted any admissible evidence establishing the accuracy of the language.

      172.    Investor Presentations for the fourth quarter 2014 through the first quarter of 2016 also contained a chart entitled "Operational Cost Savings."  Those charts used the same methodology for calculating a "Percent Savings" as the Operational Cost Savings' charts in the Third Quarter 2014 Investor Presentation.  Ex. 144, CORECIVIC_0118664 at -674; Ex. 145, CORECIVIC_0437869 at -879; Ex. 146, CORECIVIC_0119192 at -202; Ex. 147, CORECIVIC_1202106 at -117; Ex. 148, CORECIVIC_0119881 at -892; Ex. 149, CORECIVIC_0401036 at -048.

      **Response**: This statement is undisputed for purposes of summary judgment only to the extent it contains the quoted language.  This statement is disputed with respect to the accuracy of the language or whether the presentations misled investors because of omitted information. Defendants have not submitted any admissible evidence establishing the accuracy of the language.

      173.    Using the methodology outlined in UF 171, CoreCivic's Investor Day Presentations reported the following "Percent Savings" as compared to BOP facilities:

          4Q 2014: 17%;

          1Q 2015: 15%;

          2Q 2015: 9.2%;

          3Q 2015: 17.9%;

          4Q 2015: 17.3%;

1Q 2016: 14.4%;

Ex. 144, CORECIVIC_0118664 at -674; Ex. 145, CORECIVIC_0437869 at -879; Ex. 146, CORECIVIC_0119192 at -202; Ex. 147, CORECIVIC_1202106 at -117; Ex. 148, CORECIVIC_0119881 at -892; Ex. 149, CORECIVIC_0401036 at -048.

**Response**: This statement is undisputed for purposes of summary judgment only to the extent it contains the quoted language. This statement is disputed with respect to the accuracy of the language or whether the presentations misled investors because of omitted information. Defendants have not submitted any admissible evidence establishing the accuracy of the language.

174.    CoreCivic's "Average Owned Per Diem" or "Average Per Diem" figures used in each Operational Cost Savings Chart in the Investor Presentations were consistent with the average per diem revenue figures presented in its SEC filings – *i.e.* the average per diem rates for all of CoreCivic's facilities it runs for government partners. Ex. 134, Marlowe Rpt. ¶34; *compare* Ex. 143, CORECIVIC_0116477 at -487 *with* Ex. N, CoreCivic, Quarterly Report (Form 10-Q) (Nov. 5, 2014) ("3Q 2014 Form 10-Q") at 41 (revenue per compensated man-day $69.65); *compare* Ex. 144, CORECIVIC_0118664 at -674 *with* Ex. C, 2014 Form 10-K at 59 ($70.55); *compare* Ex. 145, CORECIVIC_0437869 at -879 *with* Ex. O, CoreCivic, Quarterly Report (Form 10-Q) (May 7, 2015) ("1Q 2015 Form 10-Q") at 31 ($70.16); *compare* Ex. 146, CORECIVIC_0119192 at -202 *with* Ex. P, 2Q 2015 Form 10-Q at 40 ($79.91); *compare* Ex. 147, CORECIVIC_1202106 at -117 *with* Ex. L, 3Q 2015 Form 10-Q at 36 ($72.22); *compare* Ex. 148, CORECIVIC_0119881 at -892 *with* Ex. D, 2015 Form 10-K at 60 ($72.76); *compare* Ex. 149, CORECIVIC_0401036 at -048 *with* Ex. M, 1Q 2016 Form 10-Q, at 33 ($75.30).

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. The SEC filings and investor presentations speak for themselves, and Plaintiff

disputes any characterization – including with respect to vague and subjective terms such as "consistent with" – that is contradicted by the documents themselves.

175.    The figures labelled "Operating Cost Per Day in Government Facility" were consistent with the most recent BOP published per diem costs for all BOP facilities. Specifically:

3Q 2014: $73 (from BOP FY 2013);

4Q 2014: $73 (from BOP FY 2013);

1Q 2015: $76 (from BOP FY 2014);

2Q 2015: $76 (from BOP FY 2014);

3Q 2015: $76 (from BOP FY 2014);

4Q 2015: $76 (from BOP FY 2014);

1Q 2016: $76 (from BOP FY 2014).

*Compare* Ex. 143, CORECIVIC_0116477 at -487 *with* Ex. 136, MARLOWE_00004824 at -828; *compare* Ex. 144, CORECIVIC_0118664 at -674 *with* Ex. 136, MARLOWE_00004824 at -828; *compare* Ex. 145, CORECIVIC_0437869 at -879 *with* Ex. 136, MARLOWE_00004824 at -827; *compare* Ex. 146, CORECIVIC_0119192 at -202 *with* Ex. 136, MARLOWE_00004824 at -827; *compare* Ex. 147, CORECIVIC_1202106 at -117 *with* Ex. 136, MARLOWE_00004824 at -827; *compare* Ex. 148, CORECIVIC_0119881 at -892 *with* Ex. 136, MARLOWE_00004824 at -827; *compare* Ex. 149, CORECIVIC_0401036 at -048 *with* Ex. 136, MARLOWE_00004824 at -827.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802. The BOP reports and investor presentations speak for themselves, and Plaintiff disputes any characterization – including with respect to vague and subjective terms such as "consistent with" – that is contradicted by the documents themselves.

- 93 -

176.    The BOP per diem figures published by the BOP and used in CoreCivic's Investor Presentations do not include all costs related to BOP facilities.  Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5-138:23; Ex. 150, CORECIVIC_1327565 at -573; *see also* Ex. 134, Marlowe Rpt. ¶¶35, 39.

**Response**: This statement is disputed because it is not supported by admissible evidence, including because Justin Marlowe's opinions concerning cost should be excluded under Federal Rule of Evidence 702 as Marlowe is not qualified to provide expert testimony and Marlowe's opinions are unreliable, speculative, not helpful to a jury, irrelevant impermissible, *see generally* ECF No. 358; and because Dalius is not qualified to offer an opinion on the quality, costs or operational performance of CCA/BOP facilities, and Dalius' lawyer-drafted opinions are unreliable because they are not based on data or methodology, *see generally* ECF No. 354 at 8-12. The statement is also vague as to "CoreCivic's Investor Presentations," "costs related to BOP facilities" and time frame.

177.    The per diem figures published by the BOP and used in CoreCivic's Investor Presentations do not include costs to construct BOP facilities, capital expenditures over $10,000, administrative overhead costs, costs of funding pensions for BOP employees and monitoring costs. Ex. 136, MARLOWE_0004824 at 826-829 (Federal Prison System, Per Capita Costs, FY 2012-2015); Ex. 97, Dalius Oct. 28, 2020 Tr. 137:5-138:23; Ex. 98, Feb. 21, 2020 Dep. Tr. of Patrick Swindle ("Swindle Feb. 20, 2020 Tr.") 73:3-74:1; *see also* Ex. 134, Marlowe Rpt. ¶35; Ex. 150, CORECIVIC_1327565 at -573; Ex. 151, Douglas C. McDonald and Kenneth Carlson, Contracting *for Imprisonment in the Federal Prison System: Cost and Performance of the Privately-Operated Taft Correctional Institution*," Abt Associates, Inc. (Oct. 1, 2005), MARLOWE_0007431 at -493.

**Response**: This statement is disputed because it is not supported by admissible evidence, including because it is inadmissible hearsay; it is not supported by a witness with personal

knowledge of the matter; Justin Marlowe's opinions concerning cost should be excluded under Federal Rule of Evidence 702 as Marlowe is not qualified to provide expert testimony and Marlowe's opinions are unreliable, speculative, not helpful to a jury, irrelevant impermissible, *see generally* ECF No. 358; and because Dalius is not qualified to offer an opinion on the quality, costs or operational performance of CCA/BOP facilities, and Dalius' lawyer-drafted opinions are unreliable because they are not based on data or methodology, *see generally* ECF No. 354 at 8-12. The "CCA Average Owned *Per Diem*" did not include costs associated with the fact that taxpayers fund the privatization management branch, which oversees the contract; taxpayers fund the public sector employees who write the contract; taxpayers fund the BOP employees who manage the process of awarding a contract; taxpayers fund the public sector staff who monitor the contract while the prison is being operated; taxpayers fund the staff who write and update policies and procedures to cover the operations of for-profit prisons within the BOP's correctional system; taxpayers fund the senior management of the BOP who had responsibility with respect to BOP inmates who are in private prisons; and taxpayers fund the various other overhead costs associated with letting a contract, overseeing a contract and maintaining ultimate accountability for the inmates in private prisons such that an approach to cost comparison that does not allocate overhead costs to the private vendor would underestimate the true costs of contracting for the services. *See* PEx. 36 at 140:1-147:16; PEx. 37 at 9-10 ("The most general problem [with cost comparisons between for-profit prisons and government-run prisons] is that overhead costs of the contracting agency are not typically separated into those costs that should be charged against the private prison (as well as the public prisons being compared) and those that should not be charged against the private sector facility. Some analysts go as far as to suggest that no overhead costs of the public agency letting the contract should be charged against the private prison, but this position is not

defensible. Clearly, there are overhead costs associated with letting a contract, overseeing the contract, and maintaining ultimate accountability for the inmates in private prisons. These costs and others must be counted against the private prison if there is to be an accurate accounting of how much the state spends to incarcerate inmates in private prisons. . . . There is an intuitive simplicity to the notion that a private vendor only be charged for the amount of contract costs minus any receipts received from the vendor either directly or indirectly (such as commissary profits returned to the state or state taxes collected) when comparing the costs of private and public prisons. However, such an approach grossly underestimates the true costs of contracting for the services. As mentioned above, public sector staff wrote the contract, awarded the contract, as well as monitored the contract once the prison was operating. Additionally, policies had to be written to cover the operations of private systems within the correctional system. All of these actions, and related tasks, had costs associated with them, but the costs are not always properly recognized when comparing the costs of public and private prisons."). Moreover, as Lappin acknowledged in a report for which he was the lead author, "cost and performance issues should be seen as opposite sides of the same coin and jointly examined." *Id.* The terms "administrative overhead costs," "monitoring costs" and "CoreCivic Investor Presentations" are also vague. This statement is also immaterial to Defendants' Motion.

178. The "Average Owned Per Diem" or "CCA Average Per Diem" costs used to calculate operational savings in the Investor Presentations were lower than the per diem revenue CoreCivic earned during the Class Period for its BOP facilities only. Ex. 134, Marlowe Rpt. at ¶38 ("[T]he per diem revenue used as a basis for CoreCivic's 'average owned per diem' in the cost comparisons was higher than the per diem revenue CoreCivic received on average for its BOP-contracted facilities"); *id.* exhibit 5; *id.* exhibit 6.

**Response**: This statement is not supported by admissible evidence. Fed. R. Evid. 802. This statement is further disputed to the extent that it implies the quoted language in the citation, which does not support the proposition in the text, is accurate. Plaintiff does not dispute that the "Average Owned Per Diem" or "CCA Average Per Diem" reported in CCA Investor Presentations "***were lower***" than the *per diem* revenue CCA earned during the Class Period for its BOP facilities only, but there is no admissible evidence of the accuracy of the figures. To the contrary, apples-to-apples cost comparisons between the BOP and CCA were impossible. *See* ECF No. 359-4 at 81-82 ("It's . . . nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public cost/factors."); ECF No. 359-5 at -924 (GAO report concluding: "Without comparable [private prison] data, the BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities"); *id.* at -930 ("It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilities because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost."); *id.* at -931 (private contractors told GAO: "[T]he data are not readily available or in a format that would enable a methodologically sound cost comparison at this time"). This statement is also irrelevant to the motion for summary judgment because quality and cost cannot be divorced. PEx. 37 at 9-10. Further, terms used such as "operational savings" are vague.

179.    The real estate adjustment cost per day ($12) used in the Operational Cost Savings chart in each Investor Presentation from Third Quarter 2014 to Fourth Quarter 2015 was lower than the average per diem construction cost reported by the BOP for the period of 2011-2015.

Ex. 134, Marlowe Rpt. ¶36, exhibit 4 (the average per diem construction cost to the BOP per facility was $17.50 for 2011-2015)).

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 602, 702, 802. This statement is also irrelevant because the term "real estate adjustment cost" is undefined, and Defendants provide no basis that it is synonymous with "construction cost."

180. During the Class Period, each of CoreCivic's BOP-contract facilities reported lower per diem revenues than the BOP's per diem cost for BOP-operated low security facilities. Ex. 134, Marlowe Rpt. at ¶37, exhibit 5 (comparing daily operating costs per capita of CoreCivic BOP-contracted facilities and BOP low security facilities); Ex. 4, Pl.'s Resp. to RFA Nos. 45-49; *see also* Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5-138:23.

**Response**: This statement is disputed because it is not supported by admissible evidence, including because it is inadmissible hearsay; it is not supported by a witness with personal knowledge of the matter; Justin Marlowe's opinions concerning cost should be excluded under Federal Rule of Evidence 702 as Marlowe is not qualified to provide expert testimony and Marlowe's opinions are unreliable, speculative, not helpful to a jury, irrelevant impermissible, *see generally* ECF No. 358; and because Dalius is not qualified to offer an opinion on the quality, costs or operational performance of CCA/BOP facilities, and Dalius' lawyer-drafted opinions are unreliable because they are not based on data or methodology, *see generally* ECF No. 354 at 8-12. The "CCA Average Owned *Per Diem*" did not include costs associated with the fact that taxpayers fund the privatization management branch, which oversees the contract; taxpayers fund the public sector employees who write the contract; taxpayers fund the BOP employees who manage the process of awarding a contract; taxpayers fund the public sector staff who monitor the contract

- 98 -

while the prison is being operated; taxpayers fund the staff who write and update policies and procedures to cover the operations of for-profit prisons within the BOP's correctional system; taxpayers fund the senior management of the BOP who had responsibility with respect to BOP inmates who are in private prisons; and taxpayers fund the various other overhead costs associated with letting a contract, overseeing a contract and maintaining ultimate accountability for the inmates in private prisons such that an approach to cost comparison that does not allocate overhead costs to the private vendor would underestimate the true costs of contracting for the services. *See* PEx. 36 at 140:1-147:16; PEx. 37 ("The most general problem [with cost comparisons between for-profit prisons and government-run prisons] is that overhead costs of the contracting agency are not typically separated into those costs that should be charged against the private prison (as well as the public prisons being compared) and those that should not be charged against the private sector facility. Some analysts go as far as to suggest that no overhead costs of the public agency letting the contract should be charged against the private prison, but this position is not defensible. Clearly, there are overhead costs associated with letting a contract, overseeing the contract, and maintaining ultimate accountability for the inmates in private prisons. These costs and others must be counted against the private prison if there is to be an accurate accounting of how much the state spends to incarcerate inmates in private prisons. There is an intuitive simplicity to the notion that a private vendor only be charged for the amount of contract costs minus any receipts received from the vendor either directly or indirectly (such as commissary profits returned to the state or state taxes collected) when comparing the costs of private and public prisons. However, such an approach grossly underestimates the true costs of contracting for the services. As mentioned above, public-sector staff wrote the contract, awarded the contract, as well as monitored the contract once the prison was operating. Additionally, policies had to be written to cover the

4817-7024-6872.v1

operations of private systems within the correctional system. All of these actions, and related tasks, had costs associated with them, but the costs are not always properly recognized when comparing the costs of public and private prisons."). Moreover, as Lappin acknowledged in a report for which he was the lead author, "cost and performance issues should be seen as opposite sides of the same coin and jointly examined." *Id*. This statement is also immaterial to Defendants' Motion.

181. For its BOP facilities, CoreCivic was contractually entitled to a guaranteed fixed payment (the Monthly Operating Price or "MOP") up to 90% occupancy for that facility, and in addition a fixed per diem payment (the Fixed Incremental Unit Price or "FIUP") for each inmate housed above 90% occupancy. Ex. 13, CORECIVIC_0000001 at -008 (Adams); Ex. 16, (CORECIVIC_0003082) at -084-085(McRae); Ex. 15, (CORECIVIC_0001329) at -1384 (Eden); Ex. 14, CORECIVIC_0000692 at -699 (Cibola); Ex. 17, CORECIVIC_0003791 at -3798 (NEOCC).

**Response**: This statement is disputed because it is incomplete. It is undisputed for purposes of summary judgment only that, for the BOP prisons, after the first year "ramp up" period, CCA would receive a fixed Monthly Operating Price for inmates up to 90% and a Fixed Incremental Unit Price per inmate day above 90% occupancy up to 115% occupancy, subject to the terms and conditions of the contracts, including compliance with minimum staffing requirements and other contractual covenants and conditions.

182. Under the terms of its contracts with CoreCivic, the cost to the BOP does not increase based on the number of staff hired by CoreCivic to work at a particular facility. Ex. 13, CORECIVIC_0000001 at -008 (Adams); Ex. 16, (CORECIVIC_0003082) at -084-085(McRae); Ex. 15, (CORECIVIC_0001329) at -1384 (Eden); Ex. 14, CORECIVIC_0000692 at -699

- 100 -

(Cibola); Ex. 17, CORECIVIC_0003791 at -3798 (NEOCC); Ex. 61, August 2016 OIG Review at 11; *see also* Ex. 97, Dalius Oct. 28, 2020 Tr. 139:22-25.

**Response**: This statement is undisputed because the term "cost" is undefined.

183.    CoreCivic would receive vacancy fines in revenue for failing to meet the minimum staffing requirements in its contracts with the BOP.  *See e.g.,* Ex. 152, CORECIVIC_0094237; *see also* Ex. 153, CORECIVIC_0094238 (same); Ex. 154, CORECIVIC_0094239 (same); Ex. 18, Martz Tr. 45:7-47:22.

**Response**: This statement is disputed to the extent it implies that CCA only "would" receive vacancy fines or that it implies CCA accurately reported its vacancies to the BOP.  It is undisputed that CCA could and did repeatedly receive vacancy fines for failing to meet the minimum staffing requirements in its contracts with the BOP during the Class Period.

184.    In 2011, CoreCivic conducted an internal analysis to compare the private sector's cost of services versus the Bureau of Prisons reflected in Exhibit 143.    Ex. 150, CORECIVIC_1327565 (presentation of analysis); Ex. 98, Swindle Feb. 20, 2020 Tr. 65:21-66:6 (authenticating), 69:1-25, 73:1-74:13, 93:10-99:4; *see also* Ex. 45, Swindle 30(b)(6) Tr. 95:19-97:3.

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 402, 602, 802.  This statement is disputed for the additional reason that Exhibit 150 is a draft analysis, and the cover email explicitly states that the individual who created the draft analysis "d[id]n't know how best to" do material portions of the analysis and that the individual "need[ed] . . . direction on" how to complete the analysis.  Ex. 150 at -565.  There is no evidence (and certainly no admissible evidence) that this analysis was ever completed, much less that it was completed during the Class Period or that any analysis was accurate or supported by information

- 101 -

available to CCA. To the contrary, an apples-to-apples comparison of costs between CCA and the BOP was impossible. *See* ECF No. 359-4 at 81-82 ("It's . . . nearly impossible to ever get an apples-to-apples comparison, no matter how hard you try to capture all the public cost/factors."); ECF No. 359-5 at -924 (GAO report concluding: "Without comparable [private prison] data, the BOP is not able to evaluate and justify whether confining inmates in private facilities is more cost-effective than other confinement alternatives such as building new BOP facilities"); *id.* at -930 ("It is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilities because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost."); *id.* at -931 (private contractors told GAO: "[T]he data are not readily available or in a format that would enable a methodologically sound cost comparison at this time").

185. Neither the OIG Review, nor the Yates Memorandum contained a direct comparison of overall costs between BOP facilities and any private contractor. Ex. 61, August 2016 OIG Review; Ex. 123, Yates Memo, CORECIVIC_2207912 at -913.

**Response**: This statement is disputed and is irrelevant because the OIG Review compared costs between BOP facilities and for-profit prisons and "d[id] not draw, and caution[ed] against drawing the conclusion . . . that contract prisons are necessarily lower cost than BOP institutions on an overall basis," Ex. 61 at 11-12, and it is further disputed because it is contradicted by Statement No. 186 below. This statement is also disputed because the term "direct" is vague.

186. The OIG Review contained a comparison of Annual Per Capita Costs for BOP Institutions and Annual Per Capita Costs for Contract Prisons for fiscal years 2011-2014. That comparison showed that Annual Per Capita Costs were consistently lower for contract prisons. It

reported that "the average annual costs in the BOP institutions and the contract prisons per capita were $24,426 and $22,488, respectively."  Ex. 61, August 2016 OIG Review at 12, Figures 2-3.

**Response**: This statement is disputed and is irrelevant because the OIG Review "d[id] not draw, and caution[ed] against drawing the conclusion . . . that contract prisons are necessarily lower cost than BOP institutions on an overall basis," Ex. 61 at 11-12, and it is further disputed because it is contradicted by Statement No. 185 above.

## X.    STOCK PRICE MOVEMENTS

187.    Securities analysts released periodic reports referencing CoreCivic during the Class Period, as reflected in Exhibits 155 and Q-Y, regarding CoreCivic's business, financial performance, expectations for and risks to future performance; CoreCivic's competitors; and significant events that affected CoreCivic's business.  *See, e.g.*, Ex. 155, Wells Fargo, *CXW: First Look – South TX Uncertainty Likely to Weigh On Shares* (Aug. 4, 2016), CORECIVIC_0688135; Ex. Q, Canaccord Genuity, *2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD* at 1(Aug. 4, 2016) ; Ex. R, SunTrust Robinson Humphrey, *Renegotiation with ICE Ongoing; Maintain Neutral*, at 1 (Aug. 4. 2016); Ex. S, Sadif, *Is Corrections Corp of America a Good Long-Term Investment?* (Aug. 12, 2016); Ex. T, Compass Point Research & Trading LLC, *Quick Thoughts on DOJ's For-Profit Prison Memo*, at 1 (Aug. 18, 2016); Ex. U, Canaccord Genuity, *Private prisons aren't going anywhere, but risks could continue to weigh on stocks* at 1-5 (Aug. 23, 2016); Ex. V, SunTrust Robinson Humphrey, *CXW, GEO – Lowering estimates & PTs Amid Political Shift* at 7-8 (Sept. 1, 2016); Ex. W, SunTrust Robinson Humphrey, *Increasing PT To $26 On Outlook For Increasing Estimates*, at 1 (Nov. 14, 2016); Ex. X, Cannacord Genuity, *Raising GEO and CXW price targets on lower risk post election* at 1-2 (Nov. 11, 2016); Ex. Y, *Cannacord Genuity, 2017 private prison outlook and primer: an attractive investment opportunity* at 1, 9 (Jan. 13, 2017).

- 103 -

**Response**: This statement is disputed because it is not supported by admissible evidence. Fed. R. Evid. 802, 901. Even if the analyst reports wre admissible, such analysts had conflicts and material financial relationships with CCA. For example:

- Wells Fargo Securities, LLC maintains a market in the common stock of Corrections Corporation of America.

- Wells Fargo Securities, LLC or its affiliates managed or comanaged a public offering of securities for Corrections Corporation of America within the past 12 months.

- Wells Fargo Securities, LLC or its affiliates intends to seek or expects to receive compensation for investment banking services in the next three months from Corrections Corporation of America.

- Wells Fargo Securities, LLC or its affiliates received compensation for investment banking services from Corrections Corporation of America in the past 12 months.

- Corrections Corporation of America currently is, or during the 12‐month period preceding the date of distribution of the research report was, a client of Wells Fargo Securities, LLC. Wells Fargo Securities, LLC provided investment banking services to Corrections Corporation of America.

\* \* \*

- Wells Fargo Securities, LLC received compensation for products or services other than investment banking services from Corrections Corporation of America in the past 12 months.

- Wells Fargo Securities, LLC or its affiliates has a significant financial interest in Corrections Corporation of America**.**

Ex. 155 at -137.

188. There was no statistically significant decline in CoreCivic's stock price on May 21-25, 2012. Ex. 126, CXW Historical Data, Yahoo Finance, (closing price on May 18, 2012 was $26.01; closing price on May 21, 2012 was $26.28; closing price on May 22, 2012 was $26.14; closing price on May 23, 2012 was $26.34; closing price on May 24, 2012 was $26.26; closing price on May 25, 2012 was $26.08); Ex. 78, Allen Rpt. ¶¶38-39; Feinstein Rpt. Exhibit 4, Dkt. 93-3.

4817-7024-6872.v1

**Response**: This statement is undisputed for purposes of summary judgment only.

189.    There was no statistically significant decline in CoreCivic's stock price on June 15, 2016. Ex. 126, CXW Historical Data, Yahoo Finance, (closing price on June 14, 2016 was $33.62; closing price on June 15, 2016 was $33.65); *see also* Feinstein Rpt. exhibit. 4, Dkt. 93-3 at 109; Ex. 78, Allen Rpt. ¶¶43-44.

**Response**: This statement is undisputed for purposes of summary judgment only.

190.    CoreCivic's stock price increased over the previous day's closing stock price every day between June 15 and June 21, 2016. Ex. 4, Pl.'s Resp. to RFA No. 9; Ex. 126, CXW Historical Data, Yahoo Finance (closing price on June 15, 2016 was $33.65; closing price on June 16, 2016 was $33.84; closing price on June 17, 2016 was $33.90; closing price on June 20, 2016 was $34.16; closing price on June 21, 2016 was $34.37).

**Response**: This statement is undisputed for purposes of summary judgment only.

191.    There was no statistically significant reaction in CoreCivic's stock price on August 2, 2016. Ex. 126, CXW Historical Data, Yahoo Finance, (closing price on August 1, 2016 was $32.54; closing price on August 2, 2016 was $31.86); *see also* Ex. 78, Allen Rpt. ¶¶23, 81; Ex. 79, Dalrymple Rpt. ¶53.

**Response**: This statement is undisputed for purposes of summary judgment only.

192.    There was no statistically significant reaction in CoreCivic's stock price on August 3, 2016. Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 2, 2016 was $31.86; closing price on August 3, 2016 was $31.03); *see also* Ex. 79, Dalrymple Rpt. ¶53.

**Response**: This statement is undisputed for purposes of summary judgment only.

- 105 -

193. CoreCivic's stock price dropped 6.2% on August 4, 2016. Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 3, 2016 was $31.03; closing price on August 4, 2016 was $29.11); *see also* Ex. 79, Dalrymple Rpt. ¶52.

**Response**: This statement is undisputed.

194. There was no statistically significant reaction in CoreCivic's stock price on August 11, 2016. Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 10, 2016 was $27.56; closing price on August 11, 2016 was $27.39); Ex. 78, Allen Rpt. ¶28; Feinstein Rebuttal Rpt. ¶27, Dkt. 120-1.

**Response**: This statement is undisputed for purposes of summary judgment only.

195. On August 18, 2016, CoreCivic's stock priced decreased by 35.5%. Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 17, 2016 was $27.22; closing price on August 18, 2016 was $17.57); Ex. 78, Allen Rpt. ¶75; Ex. 79, Dalrymple Rpt. ¶55.

**Response**: This statement is undisputed for purposes of summary judgment only.

196. On August 18, 2016, GEO's stock price decreased by 39.6%. Ex. 4, Pl.'s Resp. to RFA No. 26; Ex. 78, Allen Rpt. ¶75.

**Response**: This statement is undisputed for purposes of summary judgment, but Plaintiff notes that GEO's stock price closed at $13.00 per share on August 18, 2016 and at $16.61 per share on December 31, 2019, an increase of 24.9%. CCA's stock price closed at $17.57 per share on August 18, 2016 and at $17.38 per share on December 31, 2019, a decrease of 1.1%.

197. CoreCivic's performance at McRae and NEOCC was above satisfactory, throughout the Class Period. Ex. 58, Mellendick Tr. 119:19-23 (Q: And so with respect to the other two facilities, McRae and Northeast Ohio, you found CCA's performance to be well above satisfactory; is that right? A: That is correct.); *see also* Ex. 117, CORECIVIC_0660735; Ex. 118,

CORECIVIC_0606206; Ex. 119, CORECIVIC_0720859; Ex. 120, CORECIVIC_0722041;

Ex. 121, CORECIVIC_1337713; Ex. 80, CORECIVIC_0046207; Ex. 81,

CORECIVIC_0095065; Ex. 82, CORECIVIC_1337756; Ex. 83, CORECIVIC_0578404.

**Response**: This statement is disputed because it is not supported by admissible evidence.

Fed. R. Evid. 402, 602, 802.  This statement is also disputed because the CPARs for NEOCC and

McRae show ratings that were only ████████ (not "above satisfactory") in multiple categories

(including "Quality") and during multiple rating periods.  *See supra* ¶¶98-99, 138.

**ADDITIONAL MATERIAL FACTS THAT
PRESENT GENUINE ISSUE TO BE TRIED**

## XI.    EXAMPLES OF DEFENDANTS' MISLEADING STATEMENTS

198.    Hininger's annual letter to shareholders, dated March 30, 2016, emphasized:

"Every day we remain focused on providing high-quality, safe and secure facilities that meet the

needs of our government partners.  By consistently doing so, we have experienced more than three

decades of continued growth and contract retention rates in excess of 90 percent."  PEx. 38 at 10.

The letter also stated that it was "CCA's value proposition to our government partners [that]

continue[d] to make [it] the premier provider in the industry and an ideal solution for correctional

systems seeking new or replacement facilities."  *Id.* at 16.  The letter went on:

> We take pride in our strong record of operational excellence that has earned
> CCA the confidence of our government partners.  To maintain this confidence CCA
> is focused on our long-term performance.  This requires we provide our facilities
> and staff with the necessary resources to operate the best corrections, detention and
> residential reentry facilities.  It is only through our commitment to our long-term
> performance that CCA will drive future growth and increase shareholder value.

*Id.* at 10.

**Response**:

199.    In discussing the renewal or non-renewal of facility management contracts, the

November 4, 2011 quarterly report filed on Form 10-Q with the SEC ("3Q11 report") stated:

- 107 -

We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

PEx. 39 at 7.

**Response**:

200.    CCA repeated this identical statement in its 2011 through 2015 annual reports filed on February 27, 2012, February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016, respectively, and in its quarterly reports filed on May 7, 2012, August 9, 2012, November 8, 2012, May 9, 2013, August 8, 2013, November 7, 2013, May 8, 2014, August 7, 2014, November 5, 2014, May 7, 2015, August 6, 2015, November 5, 2015, May 5, 2016 and August 4, 2016. *Id.* at 10, 15, 17, 21, 26, 29, 34, 39-40, 47, 53, 58, 69, 74, 83, 93, 107, 118, 137.

**Response**:

201.    On June 8, 2016, CCA gave a presentation at REITWeek: NAREIT's Investor Forum. Hininger and Garfinkle participated on behalf of CCA. In response to a question about the political climate with respect to private prisons, Hininger stated:

> One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements. But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well. We have operationally made sure that we are providing high quality and standard and consistent services to our partners and being very flexible and innovative in the solutions. And with that, we've had some nice growth in our business under those three respective Presidents. We had a lot of growth under Clinton, we had a lot of growth under Bush, and we've had a lot of growth under President Obama. And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings both on capital voids, but also cost savings in our services, then I think we'll be just fine.

*Id.* at 133.

**Response**:

202.     On November 5, 2015, CCA filed with the SEC its quarterly report ("3Q15 report")

for the three months ended September 30, 2015.  The 3Q15 report stated:

> Despite our increase in federal revenue, inmate populations in federal
> facilities, particularly within the BOP system nationwide, have declined over the
> past two years.  Inmate populations in the BOP system are expected to decline
> further in the fourth quarter of 2015, and potentially future quarters, primarily due
> to the retroactive application of changes to sentencing guidelines applicable to
> federal drug trafficking offenses.  However, we do not expect a significant impact
> because BOP inmate populations within our facilities are primarily criminal aliens
> incarcerated for immigration violations rather than drug trafficking offenses.

*Id*. at 93.

**Response**:

203.     CCA repeated this statement in its 2015 annual report filed on February 25, 2016,

and in its quarterly reports filed on May 5, 2016 and August 4, 2016, with the only alteration being

to change the second sentence to state: "Inmate populations in the BOP system declined in 2015

and are expected to decline further in 2016 due, in part, to the retroactive application of changes

to sentencing guidelines applicable to federal drug trafficking offenses."  *Id*. at 107, 119, 137.

**Response**:

204.     On March 5, 2012, the *Lewiston Morning Tribune* in Idaho ran an article titled:

"Can private prisons be run cheaper?: In Idaho, no one has actually done the math to find out."

The article questioned whether or not private prisons in fact save taxpayers any money.  In an

email, a CCA spokesman asserted that the Company:

> "do[es] better than the competition. . . .  As a business we are able to provide
> taxpayers an essential government service at equally high standards of quality and
> efficiency, . . .  Competitive private-sector entities are motivated to move swiftly,
> evaluate and refine success each day, and maintain the highest operating standards
> at least cost."

*Id*. at 14.

**Response**:

205.    On October 2, 2013, CCA held a "2013 Analyst Day" to market itself to investors and analysts, particularly those interested in REIT investments in light of the Company's then-recent conversion to an REIT structure. Hininger, Mullenger and Lappin each participated in the presentations to investors and analysts. Among other things, CCA asserted that use of its services generates "[a]nnual costs savings of 12% or more," which savings "can fund programs to reduce population growth and recidivism." The presentation claimed that CCA's total cost per 1,000 beds was $55 to $65 million, with an average length of construction of one to three years, whereas government's total cost was $80 to $250 million, with an average length of construction of three to seven years. The presentation also claimed that use of CCA's services would "improve safety & inmate quality of life." CCA described this as a "[c]ompelling value proposition [that] has driven privatized market penetration higher." The presentation also claimed that CCA achieves an "[o]ptimal balance between . . . meeting or exceeding customer and [American Correctional Association] quality standards[,] minimizing construction cost per bed[,] minimizing operating and maintenance costs[,] maximizing desirability of beds (competitive *per diem*, location suitable for multiple customers, ability to house various security levels and multiple customers, 'just-in-time' availability)[, and] exceeding ROI hurdle rates." Ex. 137 at 15-16, 39; PEx. 39 at 33.

**Response**:

206.    On November 7, 2014, CCA published a "Third Quarter 2014 Investor Presentation," which was provided to investors and posted on the "Investor Relations" section of the Company's website (the "3Q14 Presentation"). In that presentation, CCA emphasized to its investors an industry-funded report claiming that "short- and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality." CCA cited the

same report in its "Fourth Quarter 2014 Investor Presentation," published February 24, 2015 (the "4Q14 Presentation"); its "First Quarter 2015 Investor Presentation," published May 19, 2015 (the "1Q15 Presentation"); its "Second Quarter 2015 Investor Presentation," published August 21, 2015 (the "2Q15 Presentation"); its "Third Quarter 2015 Investor Presentation," published November 12, 2015 (the "3Q15 Presentation"); its "Fourth Quarter 2015 Investor Presentation," published February 24, 2016 (the "4Q15 Presentation"); and its "First Quarter 2016 Investor Presentation," published May 17, 2016 (the "1Q16 Presentation"). In each of those presentations (except the 4Q14 Presentation, which used the phrasing of the original presentation), CCA just slightly modified the wording to state that "Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality." The 3Q14 Presentation also claimed that "Safety & Security is our **First** priority" and that CCA "[p]erform[s] quality services for our government partners and the offenders entrusted in our care." This statement was repeated in the 4Q14 Presentation, the 1Q15 Presentation, the 2Q15 Presentation, the 3Q15 Presentation, the 4Q15 Presentation and the 1Q16 Presentation.

**Response**:

## XII. COMMUNICATIONS ABOUT THE CCA/BOP RELATIONSHIP

207. On October 7, 2005, the BOP published a report, with Harley G. Lappin as the lead author, titled: "Evaluation of the Taft Demonstration Project: Performance of a Private-Sector Prison and the BOP." PEx. 5. The report explained: "[t]he BOP did specify that the contractor for the [the private prison being evaluated] had to meet the requirements established by the American Correctional Association (ACA) accreditation standards. The BOP uses ACA accreditation at its own prisons to establish a baseline of acceptable performance." *Id.* at 5. The report observed: "since BOP prisons and [the private prison being evaluated] are accredited by the American Correctional Association (ACA), it is likely that all prisons indeed did meet the baseline

- 111 -

standards for correctional practices codified by ACA," even though "performance at [that prison] was problematic in a relative sense, *e.g.*, that performance did not compare favorably to similar BOP prisons." *Id.* at 89.

**Response**:

208. On January 18, 2012, CCA employees had a call with BOP representatives, including Doug Martz, Chief of Privatized Corrections Contracting. PEx. 40. The call "did not go well." *Id.* "Doug Martz stated he would not allow [CCA] to 'tap dance' around the requirement for 100% compliance" with ACA standards by contending that the McRae facility was "accredited" even though it "did not meet all non-mandatory standards for their 2004 and their 2007 audits." *Id.* Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

209. On March 22, 2012, CCA employees, including Lappin, discussed by email a "recent BOP partnership meeting," at which:

> [W]e were confronted with our shortcomings in our BOP sites regarding our Subcontracting Plans. In short, and reading between the lines, if we don't conform to the contract requirements we are going to get hit with substantial financial penalties. This issue has gone on too long. . . . This can no longer be put on the back burner. It's critically important that we address this in going forward.

PEx. 41 at -177. A later email in the chain stated: "Just know that they are serious about and we continue to struggle with meeting the goals." *Id.* at -176. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

210. The BOP began to see a decline in CCA's performance at their Adams and Cibola facilities in March 2012. The March and April 2012 CFMs at these facilities documented

- 112 -

numerous, serious, repetitive, and similar problems in Health Services. CCA's Repeat Deficiency at Adams that their management of an inmate's condition prior to his death was not handled properly is unacceptable and alarming. In addition to the concerns in Health Services, BOP oversight staff at Adams documented CCA's failure to maintain minimum staffing requirements in Correctional Services, their high staff turnover rate, and inexperienced staff in this department. Cibola's CFM, conducted in April 2012, also identified numerous and repetitive Deficiencies in Health Services, noting the problems were the result of the facility not having a physician for the past year, a vacancy that facility had difficulty filling and retaining throughout the life of their contract. ECF No. 336-3 at 22; *see also* PEx. 42 (Adams 2012 CFM report); PEx. 43 (Cibola 2012 CFM report). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

211. CCA's performance continued to decline over the next year. The CFM conducted at Adams in January 2013 again identified numerous and repetitive Deficiencies in Health Services. In addition, they continued to fail to meet minimum staffing requirements. ECF No. 336-3 at 22; *see also* PEx. 44 (Adams 2013 CFM report).

Cibola experienced an inmate disturbance in March 2013.

A month after this disturbance, Cibola's annual CFM conducted April 23-25, 2013, again identified serious, repetitive, and numerous Deficiencies, many in Health Services, some of which continued to go uncorrected for three years. At this point, CCA had now demonstrated their ineffective quality control program in two of their contracts by failing to identify Deficiencies and implement corrective action before contract performance became unsatisfactory. In addition, Cibola failed to maintain minimum staffing requirements throughout 2013.

ECF No. 336-3 at 22; *see also* PEx. 45 (Cibola 2013 CFM report sent to Lappin). "The Eden facility also began showing concerns in the Health Services area. Their August 6-9, 2013 CFM identified several Deficiencies, one of which was their medical management of an inmate's

condition prior to his death was not handled properly. This alarming Deficiency was now a trend in CCA facilities." ECF No. 336-3 at 22; *see also* PEx. 46 (Eden 2013 CFM report). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

212.    On or about July 27, 2012, the BOP created an "After-Action Report" addressing the riot at Adams. PEx. 47. It noted that ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ *Id.* at -035, -041.

**Response**:

213.    The riot also involved 1,200 to 1,500 prisoners "demanding to speak to the Warden." PEx. 48, ¶7.

**Response**:

214.    The After-Action Report explained that ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ PEx. 47 at -045, -048, -051.

████████████████████████████████████████████████ *Id.* at -047. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* at -049. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* at -046. ████████████████████████████

████████████████████████████████████████████████████████████████

4817-7024-6872.v1

[black redaction bar]

[black redaction bar]

[black redaction] *Id.* at -051 to -052. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

215. [black redaction]

[black redaction] *Id.* at -051. The BOP's Chief of Privatized Corrections Contracting testified that: "after the riot, [he] moved to end CCA's contract at Adams," but Dalius – who went on to work for CCA – "blocked his proposal." PEx. 8 at 129:13-18. He also testified that it was his opinion "that the BOP's failure to shut down Adams was due in part to a cozy relationship between bureau leadership and private prison operators, illustrated by a revolving door between BOP and the industry." *Id.* at 127:20-128:1. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

216. Not only was CCA aware of all the failings at Adams, but they were also aware of BOP's awareness. Defendant Lappin testified that Defenadnts and CCA's executives had knowledge of and discussed the BOP's After-Action Report concerning the Adams riot "at the time it was issued . . . back in 2012." When Lappin was asked: "With whom did you discuss it?", *i.e.*, the After-Action Report, he testified: "The leadership of CCA . . . . The executives. We – I am sure that at a board meeting, we had a conversation about Adams. But primarily, the executives

and vice presidents." Asked if that included Mr. Hininger and Mr. Mullenger, he responded: "Yes" to both. PEx. 62, 48:25-49:6, 49:19-51:13, 54:16-55:10. Despite efforts to get Lappin to recant this testimony, he reaffirmed it at a subsequent deposition. PEx. 63 at 67:5-74:8.

**Response**:

217. Deborah Temple, a correctional officer who worked at Adams at the time of the riot, executed an affidavit on July 17, 2014, in which she stated: "When the Bureau of Prisons would perform their audits at the Prison, Prison officials would call in all possible Prison employees so it would appear as though the Prison was adequately staffed." PEx. 48, ¶3.

**Response**:

218. After the 2012 Adams riot, CCA's deficient performance left it unable to compete now that the BOP was becoming less desperate for space to house inmates. ECF No. 336-3 at 21. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

219. On June 26, 2013, the BOP issued a Solicitation seeking bids for "Criminal Alien Requirement #15" ("CAR 15" or "CAR XV"). PEx. 49. This "CAR XV" competitive solicitation consisted of two separate "Requirements": "A" for a facility located in one of six specific states and "B" for a facility located anywhere in the continental United States. ECF No. 336-3 at 18-19.

**Response**:

220. Among the information to be submitted with bids, the Solicitation provided: "Past Performance – Offerors shall submit a list of all contracts and subcontracts related to secure corrections/detention services completed during the past three years and all contracts currently in

progress.  Contracts listed shall include those entered into with the federal government, agencies of state and local governments' customers."  PEx. 49 at 70.  The Solicitation also provided:

> The non-price evaluation criteria are listed below in descending order of importance with Environmental and Small Disadvantage Business Utilization equal in order of importance:
>
> 1.    Past Performance
>
> 2.    Technical Proposal
>
> 3.    Environmental
>
> 4.    Small Disadvantaged Business Utilization
>
> The non-price evaluation factors, when combined, are significantly more important than price.  However, price becomes a major factor in award selection when other criteria are substantially equal.

*Id.* at 74.

**Response**:

221.    In September 2013, Hininger received a "Progress Report" stating: "[t]he BOP still has concerns about our ability to staff a proposed 480-bed expansion given the fact that we have not met our contractually obligated minimum staffing requirements in 13 of the previous 17 months at Adams County."  PEx. 50; at -231, -252.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

222.    By 2014, it was apparent the BOP had lost confidence in CCA's ability to perform the major contract requirements.  CCA was still not reacting, and their continued failure to address these serious and repetitive problems caused their performance to worsen.  Cibola's annual CFM conducted April 22-24, 2014, had now identified a Significant Finding in Health Services that consisted of numerous repetitive Deficiencies that had gone uncorrected for as many as three and

- 117 -

four years.  ECF No. 336-3 at 23; *see also* PEx. 51 (Cibola 2014 CFM report).  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

223.  A CFM follow-up monitoring conducted October 21-23, 2014 at Cibola again revealed numerous serious and repetitive Deficiencies, some that had gone uncorrected for as many as 4.5 years, as well as the alarming Deficiency that their medical management of an inmate's condition prior to his death was not handled properly."  ECF No. 336-3 at 23; *see also* PEx. 52 (Cibola 2014 follow-up CFM report).  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

224.  Also in 2014, CCA's Eden facility was demonstrating performance failures in Health Services and their ability to maintain minimum staffing requirements.  ECF No. 336-3 at 23.  Eden's CFM conducted August 5-7, 2014, also identified a Significant Finding in Health Services comprised of Repeat Deficiencies, one of which was an instance of their medical management of an inmate's condition prior to his death was not handled properly.  ECF No. 336-3 at 23; *see also* PEx. 53 (Eden 2014 CFM report).  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

225.  By letter dated May 21, 2014, the BOP told CCA it had learned "'[t]he FBI is investigating CCA and looking at whether various federal fraud statutes were violated and possibly other federal statutes connected with" CCA fraudulently recording and billing for staff hours not actually worked in Idaho, which "resulted in thousands of hours being understaff and was a

violation of state law.'" PEx. 54 at -553. CCA "acknowledged . . . that its employees falsified staffing records given to the state [of Idaho], making it look as though thousands of hours of mandatory guard posts were filled when they were actually left vacant for months." PEx. 55. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

226. Regarding CCA's falsified staffing reports, Garfinkle admitted: "we were, you know, disappointed in ourselves that we didn't live up to the expectations of our – of our operations, or of our partner in this case . . . ." PEx. 56 at 42:14-19. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

227. On August 5-7, 2014, The BOP conducted a contract facility monitoring review at Eden. *See* PEx. 57 at -649. The BOP issued a report and CCA disputed it. *Id.* Among other things, CCA disputed a "Significant Finding" with respect to Health Services. *Id.* at -652. The original finding stated:

> "There were inadequate controls in the clinical care and staffing area of Health Services to ensure compliance with established procedures and practices. These inadequacies create a lack of appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment. Many issues from previous monitorings have not been corrected. Medical needs and documentation were incomplete, including reports."

*Id.* On October 17, 2014, the BOP upheld the significant finding, explaining that "the aggregate of sustained evidentiary deficiencies, and repeat deficiencies, support the conclusion that your health services program lacked appropriate intervention, treatment, and programs to promote a

- 119 -

healthy, safe, and secure environment, and thus constituted a significant finding." *Id.* at -653. It further noted:

> At the time of the review (August 5-7, 2014), CFM reviewing staff were informed by the HSA, contractor personnel, and BOP on-site staff that the on-site physician quit his full-time position in December 2013. Since then, he only performed on-site services on occasional (not every) weekends. Additionally, your response verifies that an on-site, full-time physician was only recently hired, August 11, 2014.

> Policy CCA-13-76 requires a physician to be responsible for overseeing the medical care of all inmates. The lack of an on-site, full-time physician for 8 months caused the other health services staff to work without supervision. A physician is the clinical authority in the medical department and should be available to supervise clinical staff, including physician assistants and nurses. This is a key position that should not have been vacant for such an extensive period of time. Finally, it was also determined during the review that nine (9) other positions were vacant (6 nurses, a dentist, a medical records clerk, and a dental assistant), as indicated on a document obtained during the review.

*Id*. With respect to documentation in Health Services, the letter continued: "Your claim to be unaware of documentation discrepancies is contradicted by the CFM review findings, which were reported to you in detail." *Id.* at -653 to -654. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

228. On October 15, 2014, CCA and BOP employees exchanged emails discussing a "Partnering Meeting" in which the BOP had criticized not only the "numerous repetitive deficiencies in Health Services at Cibola and Eden" but also the limited extent to which CCA had been able to detect those deficiencies themselves. PEx. 58. According to CCA's head of audits, Don Murray: "[t]here is not the degree of overlap" between BOP and CCA audits "that we had hoped." *Id.* at -633. In fact, CCA only identified 18% and 30% of the Health Services deficiencies that the BOP did in 2013 and 2014, respectively. *Id.* at -637. Defendants concealed this

- 120 -

information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

229.    On October 28, 2014, the BOP sent a letter to CCA with respect to CAR 15 raising "serious concerns" about CCA's "pattern" of poor performance at its Cibola facility:

> The Bureau of Prisons (Bureau) has serious concerns about the performance at the Cibola County Correctional Center. Specifically, the pattern of performance since the CFM conducted in April 2011 has continued to regress in specific CFM indicators. Since the April 2011 CFM, repeat deficiencies have been steadily increasing from 0 to 13. Deficiencies have also been on a similar pattern of increase from 12 to 26 with a high of 37 in the April 2013 CFM. The majority of these contract non-conformance issues are occurring in the Health Services area.

> The six month CFM review completed on 10/23/14 resulted in more issues of contract non-conformance. This pattern of contract non-conformance issues is a reason for serious concern for the Bureau. Please address what has caused these repeated patterns of contract non-conformance issues from 2011 to now and what will be done to reverse this trend. Please be specific in listing corrective actions that have taken place or will take place to resolve these performance issues.

PEx. 59 at -827. The letter was forwarded to Hininger the next day. *Id*. at -822. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

230.    On November 13, 2014, the BOP sent a letter to CCA with respect to CAR 15 raising "serious concerns" about CCA's "pattern" of poor performance at its Eden facility:

> The Bureau of Prisons (Bureau) has serious concerns about the performance at the Eden Detention Center. Specifically, we are addressing the results of the recent CFM conducted in August of 2014, to include the "inadequate controls in the clinical care and staffing area in Health Services." Please address what has caused this area of services to develop ***a pattern of contract non-conformance***.

PEx. 60 at -310. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

231.    Regarding the BOP's November 13, 2014 letter, that same day, Garfinkle emailed defendants Hininger and Lappin: "Is it customary for the BOP to express serious concerns about contractor performance during the RFP stage, *e.g.*, first Cibola, now Eden. To me, it seems very alarming." PEx. 61 at -940. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

232.    On December 29, 2014, the BOP awarded the contracts for both "Requirement A" and "Requirement B" to CCA's competitor, GEO. Ex. 85.

**Response**:

233.    For both CAR XV awards, the BOP's Source Selection Authority ("SSA") commented that ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *Id.* at -087. ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.* at -094. ████████████████████

████████████████████████████████████████████

███████████████████████████████████████████ *Id.*

CCA's CAR 15 bid on Requirement A was for its Northeast Ohio prison. *See id.* at -097. ██████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████ *Id.* ████████

████████████████████████████████████████████████████████████████

████████████████████ *Id.* at -094, -097 to -098. ████████████████████████

*Id.* at -094. Defendants concealed this information from the public throughout the Class Period –

never revealing it in detail, summary, directly or indirectly.

**Response**:

234.   With respect to Adams, the BOP's SSA noted: ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at -085.  Defendants

concealed this information from the public throughout the Class Period – never revealing it in

detail, summary, directly or indirectly.

**Response**:

235.   The head of CCA's Quality Assurance Division, Don Murray, admitted that he did

not have the tools necessary to replicate third-party audits of CCA.   PEx. 2 at 164:17-21.

Defendants concealed this information from the public throughout the Class Period – never

revealing it in detail, summary, directly or indirectly.

**Response**:

236.   The BOP's annual CFM, conducted January 6-8, 2015, at the Adams County

Correctional Center, again CFM identified a Significant Finding in Health Services comprised of

a Repeat Deficiency and five instances where their medical management of an inmate's condition

prior to his death was not handled properly.  ECF No. 336-3 at 23-24; *see also* PEx. 64 (Adams

2015 CFM report, sent to Hininger, Lappin and Garfinkle).  The BOP imposed over $888,000 in

Deductions  as  a  result  of  these  findings.   ECF  No. 336-3  at  24; *see also* PEx. 65  at  -813

- 123 -

(notification of deduction sent to Lappin). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

237. On January 8, 2015, CCA managing director Jeb Beasley wrote to his father (one of CCA's founders): "we are going to receive Significant Finding in patient care at Adams as a result of this week's [BOP audit, *i.e.*] CFM . . . the BOP auditor after reviewing five deaths at Adams Co. over the last year was of the opinion that delivery of healthcare led, in part, to these deaths." PEx. 66 at -158 to -159. He continued: "we will be receiving a Cure Notice at Cibola for Health Services. They referenced the recent re-review and the new deficiencies from that re-review as well as the eyes of the IG audit as reasons for the Cure Notice." *Id*. at -159. Beasley's father replied: "Ouch!!" *Id*. at -158. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

238. On January 9, 2015, CCA executives attended a formal "debriefing" meeting with the BOP regarding the CAR 15 solicitation and award. CCA's notes from that meeting state:



- 124 -

PEx. 18 at -821 to -822 (typographical errors in original). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

239. Also on January 9, 2015, Beasley wrote an email to his father with the subject line "Adams/Cibola": "Worst two weeks of my professional career . . . the house is on fire and not getting the type of response we need." PEx. 66 at -157. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

240. On January 20, 2015, BOP employees circulated draft "talking points . . . that provide an overview of the performance failures in Health Services at 3 of our 5 CCA secure contract facilities." PEx. 67 at -690. Those talking points summarized "CCA Performance Failures in Health Services" at Cibola, Eden and Adams and stated: "PMB/PCC have voiced our disappointment with these continued problems with CCA throughout this period. CCA CEO has met in person with CPD and ADM staff indicating CCA is taking all necessary measures to correct these problems." *Id.* at -733. They continued: "It is also important to note – these significant findings played a major factor in the CAR 15 awards (recompete of NEO-CCA facility, and MVC-GEO facility), in which the awards went to two GEO facilities. NEO contract will expire 5/31/15." *Id*. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

- 125 -

**Response**:

241.     On January 22, 2015, Hininger sent an email to CCA's board of directors that

stated:

> The purpose of this email is to update you on several significant events since our
> December 2014 Board meeting.
>
>     First of which is the disappointing news we received on December 29th
> from the Federal Bureau of Prisons (BOP) that they were not renewing our contract
> at our Northeast Ohio Correctional Center in Youngstown, Ohio.  As you know, we
> have talked about this renewal for several quarters during our Board meetings
> noting that this was going to be a very competitive renewal between us and GEO.
>
>     As customary for these federal procurements, we asked for a debriefing
> from the BOP and we received it on January 6th.  As a reminder, there were two
> parts to the procurement.  Part A of the procurement placed us in a head to head
> competition with CCA and our Ohio facility versus GEO's facility in Pennsylvania.
> For Part A, CCA proposed a lower price than GEO but our total proposal was
> unsuccessful because of two weaknesses:
>
>     1.     First, in the Past Performance section of our proposal, concerns
> about our performance in medical services at our Cibola, NM and Eden, TX
> facilities were raised.  We have had challenges in the past 18 months in the staffing
> and management of these two medical departments, and with that, knew we would
> have to overcome that in other parts of our proposal.
>
>         a.     As for these two locations presently, over the last twelve
>     months, we have terminated physicians at both locations in addition to
>     terminating the Heath Services Administrator at Cibola as a result of the
>     BOP and our Quality Assurance and Operations teams noting in frequent
>     reviews and audits that their performance was not at the level expected by
>     us or the BOP.  Both facilities over the last year have been constantly
>     supported by our team here in Nashville and both facilities will have their
>     next full audits by the BOP with Cibola in April and Eden being in August
>     of this year.  Finally, the BOP issued on January 9th a cure notice on the
>     Cibola contract formally expressing their concerns at this facility and they
>     will use the BOP audit in April to determine if we have satisfactory cured
>     the medical issues at the facility.  Resolution of this issue is of high
>     importance to the Management Team and I am confident of a positive
>     outcome in April.
>
>     2.     Second, in the Technical Proposal section of our proposal, the
> operation plan at our Northeast Ohio facility was considered a weakness because
> the facility was going to be operating with two customers, the BOP and the United
> States Marshals Service.  The key concern by the BOP was the sharing of services

- 126 -

and personnel for both customers. This wasn't a complete surprise as the BOP had expressed concerns about this approach during the procurement process and we had proposed additional staff and management structures to help alleviate their concerns but it wasn't enough in the final analysis. More frustrating, we have been operating for ten years under the current contract with these two customers at Northeast Ohio without a single customer compliant [sic] or concern. GEO's facility in Pennsylvania would be exclusively used by the BOP.

PEx. 68 at -536 to -537; PEx. 99 at 233:17-235:11. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

242. On February 12, 2015, CCA convened a conference call to discuss its financial results for the 3 months and the 12 months ended December 31, 2014. PEx. 69. Defendants Hininger and Garfinkle participated on behalf of CCA. *Id.* at 2.

**Response**:

243. On May 7, 2015, CCA convened a conference call to discuss its financial results for the three months ended March 31, 2015. PEx. 70. Defendants Hininger and Garfinkle participated on behalf of CCA. *Id.* at 2.

**Response**:

244. On February 26, 2015, in response to a question from a CCA director about why CCA had not opened its "trading window" to permit insiders to trade CCA securities, Garfinkle (blind copying Hininger) wrote:

the primary reason we kept the [insider trading] window closed was for the cure notice we received from the BOP last month at Cibola for the issues we discussed at the board meeting associated with health services deficiencies . . . trading in company securities with knowledge of the cure notice would be subject to much scrutiny if we were to lose the contract at Cibola, particularly following the loss of the BOP contract at Northeast Ohio. For competitive reasons we did not disclose the reasons the BOP did not renew the Northeast Ohio contract which, as you know from Damon's discussion at the board meeting, was at least in part for health service deficiencies at Cibola.

- 127 -

*        *        *

We could have opened the window if we publicly disclosed receipt of the cure notice, but obviously that would have been a difficult disclosure to explain without spooking the market, perhaps unnecessarily.

PEx. 71.

**Response**:

245.    On or about July 27, 2015, Affiliated Monitors, Inc. issued a Briefing Report on the Adams Correctional Facility.  PEx. 72.  Adams was plagued by "morale problems," and staff "fear[ed] that they [would] be retaliated against if they raise[d] any issue."  *Id.* at -993, -995. Similar issues had been noted at other CCA facilities.  *See* PEx. 73 at -335 (employees who "'stir the pot'" are humiliated by having their names printed on large wooden spoons displayed in the Warden's office for other employees to see); *id.* at -345 ("'overwhelming and strikingly forceful feedback . . . from the staff at all levels, is that they fear that they will be retaliated against if they raise any issue'").  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

246.    On September 2, 2015, BOP employees circulated notes regarding "CCA Partnering Topics from the Field."  The topics for CCA included:

- "CCA has lagged behind the other contractors regarding complying with Emergency Preparedness Mod.  Since the original partnering meeting was scheduled for October which was prior to the upcoming deadlines, I thought we should mention.  The approaching dates are included in my Sector's weekly PFA reports."  PEx. 74 at -071.

- "Mike Nalley has called to notify the previous PMB Administrator without giving Keith Hall or the Warden time to notify.  He has also not followed the matrix when discussing problems or concerns at the CCA facilities.  We addressed last year but it has not changed."  *Id.*

- "Although both facilities have improved regarding staffing in Health Services, the two mentioned CCA facilities have difficulty sustaining staff after CFM Reviews

- 128 -

or other audits.  In other words, the contractor only staff these critical areas after a CURE Notice is issued or a Significant Finding.  What is CCA's long term plan to address this issue." *Id.*

- "The Cibola County Correctional Center has not met the required staffing plan in Correctional Services for approximately 10 years.  What is the contractors plan to address this continued issue of non compliance?" *Id.*

"No one from the field provided any suggestions for partnering [meeting topics] with GEO." *Id.* at -072.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

247.    On October 24, 2015, Jeb Beasley wrote to CCA appropriations lobbyist Robert Hobart: "I hate to send this email but it appears that I am going to have to miss Pinehurst.  We had a surprise BOP health services audit last week at Cibola and performed poorly.  This is the same facility we recently had a Cure Notice lifted and now we could find ourselves under another one (or a canceled contract)."  PEx. 75 at -121.  Later that morning, he wrote to Hobart: "[t]hey are firing the doc out there and we are close to going from 5 BOP facilities to 2.  Just trying to keep my job." *Id.* at -120.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

248.    On December 7, 2015, CCA employee Keith Hall wrote: "[t]he BOP has expressed their displeasure in the [staffing] vacancies being vacant for such a long time, given the security issues we have experienced at Adams."  PEx. 76 at -509.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

- 129 -

249.     On January 4, 2016, CCA received a notice of concern from the BOP for the Cibola facility regarding failure to meet staffing requirements in Correctional Services from October to December 2015, which was sent to Hininger, Lappin and Garfinkle.  PEx. 77.  After receiving the notice, Garfinkle wrote: "We need a good response.  Between you and me, I don't like having the [Cibola] contract expiration in September 2016 with BOP populations system-wide declining so much.  I don't want them with **any more excuses** to not renew the contract.  Do we have a good response?"  *Id*. at -715.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

250.     A May 11, 2016 internal email authored by a CCA employee, with the subject line "Talking Points for Discussion with Mr. Lappin," stated: "Medical Staffing: Cibola and Eden continue to struggle . . . .  The concern with Cibola is the long term effect on the contract."  PEx. 78.  It also stated: "CAR 16 – With the BOP drop in population at their facilities and the 4 CCA contracts, concerned on the renewal of Eden with the current contract ending 5/2017."  *Id*.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

251.     On June 16, 2016, CCA vice president Bart Verhulst wrote to Jeb Beasley: "I see no way to save Cibola."  PEx. 79 at -369.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

252.     On July 17, 2016, Hininger wrote an email to Garfinkle stating:

I had a thought Friday night that immediately after the CFM at Cibola, regardless of the results, John and I do a quick trip to DC to meet with the BOP.  With that,

again depending on the results, we offer up voluntarily a deduction, up to $1 million. We have never done that and I think it might be viewed as an extraordinarily [sic] gesture on our part. I have some other thoughts I can provide tomorrow.

PEx. 80 at -917. Garfinkle replied: "I like your thought . . . . [W]e could structure the $1.0 million 'fine' as a renewal inducement, which would be amortized over the renewal period." *Id*. To that, Hininger responded, "Good ideas, thanks Dave. I agree on huddling. Have a good Sunday." *Id*. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

253. In a July 28, 2016 email, CCA employees and various lobbyists and others acknowledged the following about the BOP's decision to cancel CCA's Cibola contract: "The beds being cancelled . . . establish credibility to our concerns that BOP is moving forward with a larger plan to cancel all contract confinement . . . beds and this is merely the first step." PEx. 81 at -428. Lappin forwarded the email to Hininger, who forwarded it to Garfinkle. *Id*. at -426 to -427. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

254. On July 29, 2016, CCA received a letter from the BOP "notify[ing] Corrections Corporation of America (CCA) that the Bureau of Prison (BOP) will not be exercising option period two of contract DJB1PC-011," *i.e.*, the contract for the Cibola facility. PEx. 82 at -122. The letter explained: "It has been determined the above stated option period would not be the most advantageous offer for these services. . . . The BOP anticipates all inmates to be transferred from the Cibola County Correctional Center by October 1, 2016." *Id*. Hininger, Garfinkle and Lappin received a copy of the letter. *Id*. at -117.

**Response**:

255. Such losses of renewable contracts are "extremely rare." ECF No. 336-3 at 15 ("Declining to exercise option years of a private prison contract based on poor performance is an extremely rare occurrence in the BOP."). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

256. In an August 1, 2016 email, Jeb Beasley wrote: "The board cannot accept Damon [Hininger]'s spin of 'outside factors'" for the loss of Cibola. PEx. 83 at -867 (also lamenting GEO's "largest ever" dividend at a time CCA was likely to lower its own and worrying that CCA was "ripe for an activist investor to issue some demands of our Board."). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

257. According to an email Hininger sent August 3, 2016: "My number one goal has been to keep Eden under contract with the BOP." PEx. 84. Hininger continued, "I think if we lose the BOP, it is a hard facility to remarket. . . . Eden is a lower price but after the events of last weekend [*i.e.*, loss of Cibola], I worry about the rural location and the facility not being as secure as [the] Tallahatchie [facility] from a physical plant perspective might be more top of mind for the BOP." *Id.* Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

258. On August 11, 2016, CCA employee Ronald Thompson wrote to CCA employee Michael Nalley about the OIG report issued earlier that day: "What I'm shocked over is they totally

- 132 -

overlooked the consequences of our staff vacancies. They mentioned staffing at the end but could have been much more critical." PEx. 85. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

259. In total, during the Class Period, at just five BOP facilities, CCA received 338 deficiencies, 44 repeat deficiencies, 6 repeat repeat deficiencies, 2 triple-repeat deficiencies, 1 quadruple-repeat deficiency, 3 significant findings and more than $2.7 million of deductions. ECF No. 336-3 at 7-18, 24. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

260. On September 14, 2016, CCA employee Brien Koehn wrote an email to his colleagues with the subject line "RE: Staffing Pattern," in which he wrote: "Cibola is a facility that has always been under the contract 90% security staffing so shortages have been deducted from the monthly bill . . . ." PEx. 86. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:

261. In December 2016, the OIG issued a report titled: "Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi." PEx. 87. Among other things, that report stated the May 2012 riot "was a consequence of what the inmates perceived to be substandard food, inadequate medical care, and disrespectful staff members at the Adams County facility." *Id.* at 3. It also stated: "we found the staffing levels CoreCivic reported to the BOP reflected neither actual staffing at the facility nor staffing insufficiencies. Specifically, CoreCivic reported to the BOP simple headcounts of staff

recorded on payroll records, regardless of the hours each employee actually worked." *Id.* at iii; *see also id.* at 10 (CCA reported "nominal," not "actual," staffing). The report explained: "[f]our years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing," and in fact CCA "staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage." *Id.* at i. This continued even as CCA's "monthly reports to the BOP . . . showed that correctional staffing levels had improved." *Id.* at i-ii. The OIG "found that CoreCivic staffed fewer than all of the agreed-upon posts for 43 of the 46 months, or 93 percent of the time, prior to the start of our audit." *Id.* at 10.

**Response**:

262.    According to CCA's auditor, Ernst & Young, for fiscal year 2016: "the vacancy at Northeast Ohio from mid-2015 to the end of 2016, and the ramp-down of BOP populations and ramp-up of ICE populations during the fourth quarter of 2016 at Cibola negatively impacted financial results in 2016." PEx. 88 at -342 to -343.

**Response**:

263.    According to CCA's auditor, Ernst & Young: "The 2017 Management Plan also anticipates a significant reduction in economics at the 2,232-bed Adams County Correctional Center, which is set to expire in July 2017. We have assumed that the re-negotiation of that contract results in a 50% reduction to annual EBITDA levels, which resulted in a $5.3 million reduction to EBITDA in 2017 for the period following expiration." PEx. 88 at -367.

**Response**:

- 134 -

264.    Immigration and Customs Enforcement ("ICE") was also concerned about CCA's past performance, including at its BOP facilities, and sent CCA a letter telling it to explain its poor past performance.  PEx. 89 at -119.  ICE noted:

> We have read with concern media reporting which indicates that the medical unit at . . . Cibola . . . had repeatedly failed to comply with federal standards of care for Bureau of Prisons (BOP) inmates. . . .
>
> One of the media accounts that causes ICE particular concern (attached) states that, in April 2014, BOP monitors found that Cibola's medical unit was operating far out of compliance with federal standards, and the agency warned [CCA] to correct course; however, when the monitors returned they discovered that CCA failed to comply.

*Id*.

**Response**:

265.    After the end of the Class Period and during the Trump administration, CCA lost the Adams and Eden contracts with the BOP to competitor GEO for the same reason: "'Adams was the same way [as Eden].  We could not compete with a 10-year-old state-of-the-art facility . . . we're not able to . . . go with low-cost beds."  PEx. 90 at 180:14-22; *see also* PEx. 91 at 5; PEx. 92 at 3; *see also* ECF No. 340-2, ¶¶33-34.

**Response**:

266.    Defendants regularly received, reviewed and discussed operational metrics and performance evaluations that they received from the BOP.  One CCA executive, Vice President of Health Services John Baxter, was asked: "[T]hose regular conversations that you describe involving Mr. Hininger, they would include discussions of the topics we have been discussing today, the deficiencies, significant findings[,] cure notices[,] and the deductions?"  PEx. 101.  He responded: "Yes.  Over the course of the years referenced that we've talked about from – I think from 2010 all the way up through 2016, we have reviewed a number of memos, a number of audit findings and CFMs, a number have deductions.  So as those would occur, through whatever cycle,

- 135 -

they would be discussed in that management meeting in the company." PEx. 101. Baxter also testified that management meeting was held "weekly." PEx. 101. Hininger, similarly, testified: "[O]n a weekly basis, usually on a Friday, I'll get a summary from the General Counsel's Office of all findings." PEx. 99, 170:22-25. He clarified that the findings he received included BOP deficiencies and other performance metrics, including details about the severity of any negative performance: "It would have the detail of if it's a deficiency or a repeat deficiency . . . ." Ex. 99, 173:23-176:12; *see generally id.* at 170:22-178:15; *see also* PEx. 107 at 113:6-13 (On behalf of CCA, Swindle was asked: "[I]s it fair to say that either at the weekly meeting or through forwarding an e-mail, the CEO would one way or another be notified of any NOCs?". Swindle answered: "Yes I would say that there – there's an organizational expectation because of the – the seriousness of a NOC . . . that we would highlight them and we discuss them . . . .").

**Response**:

267. Defendants claimed to rely on BOP operational metrics in making the alleged false and misleading statements. Defendants CCA and Hininger claimed to rely on "a variety of indicators from the BOP including the percentage of compliance in the Contract Facility Monitoring Reports." PEx. 102 at 4, 6-7, 10; PEx. 103 at 4, 6, 8-11. Lappin claimed to rely on "regular communications with the BOP." PEx. 104 at 4-6.

**Response**:

268. An apples-to-apples comparison of the quality and/or cost of CCA's prison services and the BOP is not possible. *See* PEx. 37; PEx. 93 at 270:6-274:5; *id.* at 210:22-215:21; PEx. 94 at 26; PEx. 95 at 165:14-169:21; PEx. 96; PEx. 97; PEx. 98.

- 136 -

**Response**:

DATED: January 22, 2021

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853

_____s/ Christopher M. Wood_____
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
KENNETH J. BLACK
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
JASON A. FORGE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

- 137 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 22, 2021, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service

to the non-CM/ECF participants indicated on the attached Manual Notice List.

  s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
      & DOWD LLP
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

E-mail:  cwood@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth J. Black**
  kennyb@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **Meryn C.N. Grant**
  Meryn.Grant@lw.com

- **Dennis J. Herman**
  dherman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,adonovan@barrettjohnston.com,eseaborn@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Faraz Mohammadi**
  faraz.mohammadi@lw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,WillowR@ecf.courtdrive.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian Schall**
  brian@goldberglawpc.com

- **David J. Schindler**
  david.schindler@lw.com

- **Sarah A. Tomkowiak**
  sarah.tomkowiak@lw.com

- **Morgan E. Whitworth**
  morgan.whitworth@lw.com,morgan-whitworth-8044@ecf.pacerpro.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,smorris@rgrdlaw.com,CWood@ecf.courtdrive.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com,smorris@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`