# EXHIBIT D

# EXHIBIT 105
# [Filed Under Seal]

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and ) Civil Action No. 3:16-cv-02267
on Behalf of All Others Similarly Situated, )
)  Honorable Aleta A. Trauger
Plaintiff, )
)  **DECLARATION AND EXPERT REPORT**
vs. )  **OF DONNA MELLENDICK**
)
CORRECTIONS CORPORATION OF )
AMERICA, et al., )
)
Defendants. )
_____ )

I, Donna Mellendick declare as follows.

1.    My name is Donna Mellendick. I am over 18 years of age and am fully competent in all respects to make this declaration. I have personal knowledge of the facts and statements contained in this declaration, and each of them is true and correct.

2.    I have been asked by counsel for Lead Plaintiff and Class Representative Amalgamated Bank, as Trustee for the LongView Collective Investment Fund and the Class to provide expert testimony in the above-captioned case.

3.    Attached hereto is a true and correct copy of my expert report entitled Expert Report of Donna Mellendick, dated August 7, 2020. I declare under penalty of perjury that this report accurately sets forth the opinions I have formed in this matter. I hereby incorporate this report into this declaration as if set forth fully herein. If asked to testify at trial, I will testify to the opinions set forth in this report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 22nd day of January, 2021, at Woodstock Georgia.

DONNA MELLENDICK

4841-1717-7559.v1

- 2 -

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, ) ) | Civil Action No. 3:16-cv-02267 |
| ) | Honorable Aleta A. Trauger |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CORRECTIONS CORPORATION OF AMERICA, et al., ) ) | |
| ) | |
| Defendants. ) | |
| ) | |

EXPERT REPORT OF DONNA MELLENDICK
of D1 Corrections Consulting, LLC

August 7, 2020

CONFIDENTIAL / SOURCE SELECTION INFORMATION
4849-9823-8150.v1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND QUALIFICATIONS ...................................................................1

II.  HISTORY OF BOP SECURE CORRECTIONAL CONTRACTS ...................................2

III.  OVERVIEW OF ASSIGNMENT/SCOPE OF *GRAE v. CCA* ............................................2

IV.  BACKGROUND ............................................................................................................5

V.  CCA's PERFORMANCE ................................................................................................7

    A.  Adams County Correctional Center Chronology of Performance and Events ..................................................................................................................7

    B.  Cibola County Correctional Center Chronology of Performance and Events ................................................................................................................11

    C.  Eden Detention Center Chronology of Performance and Events .........................15

    D.  McRae Correctional Facility Summary of Performance ......................................18

    E.  Northeast Ohio Correctional Center Summary of Performance ...........................18

    F.  Other Performance-Related Events/Factors .........................................................18

        1.  CAR XV Solicitation ................................................................................18

        2.  BOP Decision to Not Exercise the September 2016 Option Year for the Cibola County Correctional Center Contract ................................19

        3.  OIG Review of BOP's Monitoring of Contract Prisons .........................20

        4.  DAG Memorandum to the BOP Director ................................................20

        5.  Additional CAR Solicitations ..................................................................20

        6.  BOP Inmate Population ............................................................................21

VI.  SUMMARY AND CONCLUSION ...............................................................................21

# I.    INTRODUCTION AND QUALIFICATIONS

I am a retired professional with over 30 years of experience in prison administration. From 2010 until my retirement in 2015, I served as the Administrator for the Privatization Management Branch of the Federal Bureau of Prisons ("BOP"). In this role, I directed a team of approximately 55 staff responsible for the management and oversight of the agency's large secure correctional contract facilities. These privately-operated contract prisons housed up to 30,000 federally sentenced inmates (15% of the BOP's population), with an annual operating budget of more than $600 million.

My experience with the oversight of the BOP's privately operated secure correctional facilities dates back to 2000, when I was assigned as a Program Review Branch Section Chief in the BOP's Program Review Division ("PRD"). In early 2000, I was detailed to a workgroup to study and recommend a more in-depth plan to monitor and evaluate these facilities. Our group recommended a three-prong approach to oversee these facilities. In December 2001, the BOP Executive Staff approved this plan. The Contract Facility Monitoring ("CFM") Section was formulated in PRD, the Privatization Management Branch ("PMB") was created in the Correctional Programs Division ("CPD"), and the Privatized Corrections Contracting ("PCC") Section was created within the Acquisitions Branch of the Administration ("ADM") Division. Beginning in January 2002, three Sections among three different Divisions of the BOP were responsible for the management and oversight of the BOP's privately operated secure correctional contract facilities. These three branches work in different ways to ensure contract compliance and consistency in the monitoring and oversight of the contract prisons' operations. PMB is responsible for general oversight of the contract prisons, the CFM provides subject matter expertise in the form of formal routine monitoring, and the PCC provides contractual oversight. Prior to this, staff working under the supervision of the respective BOP Regional Offices were on-site at these facilities and responsible for these functions.

PMB is led by a Branch Administrator and has staff in the Central Office and staff on-site at each contract facility (a Senior Secure Institution Manager ("SSIM") and a Secure Oversight Monitor ("SOM")). The SSIM and SOM are Contracting Officer Representatives ("CORs") on the contracts and conduct routine inspections of the facility. I was promoted to the PMB Administrator position in August 2010, and remained in this position until my retirement in August 2015.

PCC is led by a Section Chief and has staff in the Central Office and one Contracting Officer ("CO") on-site at each facility. PCC is responsible for all contractual matters between the BOP and the contractor.

CFM is led by a Section Chief and oversees a group of subject matter experts ("SMEs"), located in the Central Office, that are responsible for monitoring the BOP's privately operated secure correctional contract facilities utilizing a Quality Assurance Plan ("QAP"). The QAP is a monitoring instrument developed to evaluate contractor performance in all areas of correctional management as outlined in the contract's Performance Requirements Summary Table, which identifies all 29 vital functions and assigns a value to each vital function. The QAP is based on BOP policy, contractor policy, American Correctional Association ("ACA") standards and other national and local guidelines. CFM conducts annual monitoring of facilities utilizing SMEs and provides written reports of their findings to the contractor, PMB, and PCC. I was the first CFM Section Chief (2002), and held this position for a few years, later taking on other managerial roles within the PRD

with increased responsibilities. The CFM Section was under my chain of supervision throughout my tenure within PRD.

Prior to those roles, I held management positions at BOP Federal Correctional Institutions in West Virginia and Kentucky; was a Correctional Programs Specialist in the Inmate Systems Branch in the BOP Central Office; and began my career in 1984 in the BOP's Community Corrections Office in Baltimore, Maryland. Throughout my BOP career, I received a variety of training to include: Introduction to Correctional Techniques; training in the BOP's SENTRY system (the BOP's database for all inmate related issues); Sentence Computation to include advanced levels; Core Skills for Department Heads; Executive Leadership Development; Forward Thinking; GAO Performance Auditing; and various Contract Management courses. As I advanced in my career, I was also an instructor for many of these courses.

Since August 2016, approximately one year after my retirement, I have been working as an independent corrections consultant. The compensation for the work performed in this matter is based on the number of hours worked times my billable rate. My billable rate for this matter is $600 per hour. My compensation is not contingent upon my opinions or the outcome of this case.

## II.    HISTORY OF BOP SECURE CORRECTIONAL CONTRACTS

The BOP has been using contract beds since the 1980s to house inmates in halfway-house type facilities and through the use of Intergovernmental Agreements ("IGAs") to house low numbers of inmates in facilities and jails. The BOP expanded this in the mid-1990s when the Clinton Administration and Congress were pushing to privatize some government functions. Congress mandated the BOP contract with a correctional facility within 500 miles of the District of Columbia, to house inmates from the District of Columbia for whom the BOP would assume responsibility, and to contract with a company to operate a newly built federal correctional facility in California. Wackenhut was awarded both these contracts. The Rivers Correctional Institution in Winton, North Carolina, was selected as the contract facility within 500 miles of the District of Columbia, and the Wackenhut Company was awarded the contract to operate the BOP's facility in Taft, California (Taft Correctional Institution). Wackenhut is now The GEO Group.

The BOP Executive Staff made the decision to house a specialized inmate population in the majority of these secure contract facilities. Populations housed in the majority of these contract prisons are made up of male, low security, criminal aliens, with sentences of less than 90 months remaining to serve. During this time, the BOP was experiencing tremendous growth and decided to expand its use of these facilities to help manage the overcrowding within its own facilities. Congress was not providing funds for the construction of new BOP facilities but was providing contract funds. Contracting with these types of facilities provided flexibility for the BOP as contracts could be activated and terminated quickly based on population increases or decreases.

## III.    OVERVIEW OF ASSIGNMENT/SCOPE OF *GRAE v. CCA*

My understanding is that this is a class-action securities case against Corrections Corporation of America ("CCA") and certain individuals. I am not familiar with the details of this lawsuit, but I understand that this most relevant time period is approximately February 27, 2012 through August 17, 2016.

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████, as well as my review of
a substantial number of documents provided to me by the law offices of Robbins Geller Rudman &
Dowd LLP,[1] and information made available via public domains, including:

1.    CFM Reports;

2.    Notices of Concern;

3.    Deductions for Non-conformance;

4.    Award Fee Determination Letters;

5.    Contractor Performance Assessment Reports ("CPAR");

6.    Oversight Facility Summary Reports;

7.    Contractor Self-assessment Reports;

8.    Bi-annual Performance Monitoring Reports and Meeting Minutes;

9.    BOP's "After-Action Report" for the disturbance at the Adams County Correctional Center in Natchez, Mississippi (May 20-21, 2012);

10.    "Cure Notice" issued to CCA for failure to perform in the area of Health Services at the Cibola County Correctional Center;

11.    Letter to CCA from the BOP regarding "Option Period Two" for the Cibola County Correctional Center (October 1, 2016 through September 30, 2018);

12.    "Contract DJB1PC011 Determination NOT to Exercise Option Option Performance Period Two" (October 1, 2016 through September 30, 2018);

13.    E-mail correspondence among CCA staff;

---

[1]    Though I have received and reviewed hundreds of documents, I do not believe I have received all relevant documents. For example, some documents refer to events such as follow-up reviews, but I have not seen the actual reports of the events. Moreover, I understand that more documents may still be produced in this case (or others discovered that had been produced previously). Therefore, I would like to reserve the right to supplement this report based on any new information I receive.

CONFIDENTIAL / SOURCE SELECTION INFORMATION    3
4849-9823-8150.v1
Case 3:16-cv-02267    Document 413-4    Filed 02/12/21    Page 9 of 37 PageID #: 23736

14. E-mail correspondence among BOP staff;

15. "Departmental Executive Summary to CCA Board of Directors," dated February 20, 2015;

16. Conference Call Transcript between CCA and analysts from Canaccord Genuity, SunTrust, and Wells Fargo "Corrections Corporation of America Responds to the Department of Justice's [("DOJ")] Decision to Reduce Reliance on Privately Operated Prisons," dated August 19, 2016 at 4:00 p.m. GMT;

17. CCA's "Summary Review Memorandum for the year ended December 31, 2016;"

18. BOP letter to CCA "Notice to Unsuccessful Offeror for Request for Proposals ("RFP") No. RFP-PCC-0022 and Criminal Alien Requirement ("CAR") No. CAR XV, dated December 29, 2014;

19. "Source Selection Decision" for RFP-PCC-022 and CAR XV;

20. "CCA Performance Failures in Health Services – AD [Assistant Director ("AD")] Talking Points;"

21. Partnering meeting minutes among BOP and CCA;

22. Office of the Inspector General's ("OIG") "Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi," Audit Division 17-08, dated December 2016;

23. OIG's "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," Evaluation and Inspections Division 16-06, dated August 2016;

24. Various media articles regarding private prisons contracted by the BOP;

25. "Memorandum for the Acting Director Federal Bureau of Prisons," from Sally Q. Yates, Deputy Attorney General ("DAG"), regarding "Reducing our Use of Private Prisons," dated August 18, 2016;

26. "Memorandum for the Acting Director Federal Bureau of Prisons," from Jefferson B. Sessions III, Attorney General, regarding "Rescission of Memorandum on Use of Private Prisons," dated February 21, 2017;

27. "Contract DJB1PC010, Management and Operation of a Private Correctional Facility/ Criminal Alien Requirement (CAR) 8" for the Adams County Correctional Center, Natchez, Mississippi;

28. "Contract DJB1PC011, Management and Operation of a Private Correctional Facility/ Criminal Alien Requirement (CAR) 10" for the Cibola County Correctional Center, Milan, New Mexico; and

29.     Contract DJBPCCC005, Management and Operation of a Private Correctional Facility/ Criminal Alien Requirement (CAR) VI for the Eden Detention Center, Eden, Texas).

████████████████████████████████████, it is my opinion the quality of CCA's performance in the majority of their BOP private prison contracts, for the timeframe of this case, was largely deficient, particularly in their requirements to provide quality healthcare and a safe and secure environment to the inmate population.  By April 2013, CCA's past performance had reached a point where CCA was unlikely to win any competitively bid BOP contract.  Given the vast differences among the services CCA offered the BOP and the services the BOP provides in its own institutions, it is my opinion it is impossible to make an apples-to-apples comparison.  Therefore, it is not an accurate claim that contracting with CCA did and/or would save the BOP money.

The Background, Performance, Summary, and Conclusion Sections of this report will further elaborate on my analysis of this information in support of my opinions.

████████████████████████████████████████.
As stated earlier, I would like to reserve the opportunity to supplement this report based on any additional information I may receive.

## IV.     BACKGROUND

**Performance-Based Contracts**:  BOP contracts for privately operated secure correctional facilities encompass a performance-based process which allows the contractor to perform in accordance with basic standards and their own procedures.  Paramount to the performance-based process is that the BOP explains the desired outcome rather than how the contractor is to provide the services. Contractors are required to develop quality control procedures to identify Deficiencies and implement corrective action before contract performance becomes unsatisfactory.  These contracts usually have a ten-year life, with a four-year base period followed by one- or two-year option periods.

To motivate exceptional performance, the majority of the contracts during this period offered an award-fee incentive allowing for an award fee of up to 5% of the paid annual invoice for contractor performance exceeding a satisfactory level.  This incentive was offered in four of the five CCA contracts.  The McRae Correctional Center contract began in late 2012, and this incentive was excluded due to recent changes in the Federal Acquisitions Regulations ("FAR").

**BOP Evaluation Methods**:  The BOP relies upon various methods to evaluate contractor performance for its secure adult correctional contract facilities.  Below is a description of the various performance tools and methods used to evaluate and document contractor performance.

1.     CFM Report: This annual (sometimes bi-annual) monitoring and subsequent report will outline all areas of contract non-compliance identified by the CFM team of subject matter experts.  The types of findings identified in CFM Reports are classified as follows:

(a)     Deficiency – describes non-compliance with a contract requirement, a deviation from policy or regulation, and it can also describe a failure to observe accepted standards of practice for a particular profession.

(b)    <u>Repeat Deficiency</u> – failure to implement and maintain corrective action from the prior monitoring resulting in the same Deficiency. Repetitive Deficiencies will be labeled accordingly (Repeat Deficiency, Repeat Repeat Deficiency, etc.) and will demonstrate the continued trend of ineffective corrective action.

(c)    <u>Significant Finding</u> – describes serious and/or repetitive Deficiencies identified in a program area indicating a breakdown in a program area.

Additionally, if serious and/or repetitive findings were identified during the CFM, follow-up monitoring would determine if the contractor's corrective action was effective in correcting the Deficiencies. Findings identified through CFMs indicate to the BOP the contractor's quality control program is ineffective in those areas.

2.    <u>Notice of Concern ("NOC")</u>: issued to the contractor when PMB oversight staff identify noncompliance issues. The warden is required to respond to these issues with a corrective action plan. The contractor and PMB oversight staff monitor to ensure corrective action is effective.

3.    <u>Deductions</u>: assessed when serious and/or repetitive Deficiencies are identified, typically from a CFM or a NOC. PMB staff propose the deduction to the CO. The CO determines the monetary value of the service not performed, notifies the contractor, and the deduction amount is withheld from the contractor's monthly invoice.

4.    <u>Cure Notice</u>: a notice issued by the government notifying the contractor it considers their failure to perform as a condition that is endangering performance of the contract. The government provides a timeframe within which to cure the issues. Failure by the contractor to cure the problems may result in termination of the contract for default.

5.    <u>Oversight Facility Summary Report</u>: an annual report completed by the PMB oversight staff and the CO assigned to the contract. The report addresses all evaluation methods and reports for the rating period and summarizes them. It is utilized to assess the contractor's performance for the rating period and determines if the contractor should be considered for an award fee (if applicable to the contract).

6.    <u>Contractor Self-assessment Report</u>: an annual report completed by the contractor to summarize their performance for the rating period. This report is also considered when determining if the contractor should be considered for an award fee (if applicable to the contract).

7.    <u>Award Fee Determination</u>: most contracts allowed for an annual award fee for above-satisfactory performance of up to 5% of the annual contract value. Given the high-dollar amount of these contracts, an annual award fee for superior performance could be in the ballpark of $1-2 million per contract. The BOP would evaluate all performance tools (*e.g.*, CFM Reports, NOCs, Oversight Facility Summary Report, and the contractor's Self-assessment Report) to determine an award-fee rating and if applicable, recommended award fee amount. The BOP Fee Determination Official ("FDO") would determine the final award fee amount. The award fee, if any, would be added to the contractor's next monthly invoice.

CONFIDENTIAL / SOURCE SELECTION INFORMATION    6
4849-9823-8150.v1
Case 3:16-cv-02267    Document 413-4    Filed 02/12/21    Page 12 of 37 PageID #: 23739

8.     Contractor Performance Assessment Reporting System ("CPARS"): is the Federal Government-wide system used to capture contractor report cards. For the BOP's private contract facilities, the CO was responsible for completing this report on an annual basis. The report rates the following areas: Quality of Service; Business Relations; Utilization of Small Business; Key Personnel; Timely Performance; and provides a narrative of these areas.

**CCA Contract Performance**: During this timeframe, the BOP was under contract with CCA for the housing of federal offenders in five secure correctional contract facilities – Adams County Correctional Center located in Natchez, Mississippi; Cibola County Correctional Center located in Milan, New Mexico; Eden Detention Center, located in Eden, Texas; McRae Correctional Facility located in McRae, Georgia; and the Northeast Ohio Correctional Center located in Youngstown, Ohio.

As this report will outline, CCA often failed to provide satisfactory performance at three of their five contracts (Adams, Cibola, and Eden) with the BOP, particularly in the areas of Health Services and Correctional Services. Below is a chronology of their performance at each of these facilities and noteworthy events occurring during the timeframe for this case.

## V.     CCA's PERFORMANCE

### A.     Adams County Correctional Center Chronology of Performance and Events

Since the activation of the Adams County Correctional Center in August 2009, annual CFMs conducted by subject matter experts from PRD's CFM revealed serious, numerous, and repetitive Deficiencies. Although some of the below-mentioned performances are prior to the timeframe of this case, it is important to note the less-than-acceptable performances this facility demonstrated from the beginning.

The very first CFM conducted February 2-4, 2010, identified two Significant Findings, one in Health Services/Patient Care, and the other in Correctional Programs/Central Inmate Monitoring classification. In addition to these Significant Findings, a total of 49 Deficiencies were identified throughout all program areas during this CFM. As a result of these findings, a Deduction of $283,120.54 was imposed.

The second CFM conducted July 26-29, 2010, identified 13 Repeat Deficiencies – nine in Health Services, three in Correctional Programs, and one in Correctional Services. In addition, 12 new Deficiencies were identified (four in Correctional Programs, one in Correctional Services, six in Health Services, and one in Safety/Environmental Health). As a result of these findings, a Deduction of $100,371.38 was imposed.

The third CFM conducted March 15-17, 2011, identified a Repeat Repeat Deficiency in Health Services (CD4 viral loads of inmates with HIV were not done timely) along with five new Deficiencies in this component, one of which involved the death of an inmate (medical management of an inmate's condition prior to death was not in accordance with policy and standards of care). The specifics of this inmate death revealed that the inmate died following his transfer to a community hospital. The SME examined all aspects of the inmate's treatment, to include steps taken while at the facility. The review revealed the inmate did not receive adequate on-site emergency

medical management despite evidence he was in the institution's Health Services department during the two hours prior to being transported to the hospital. Three new Deficiencies in Correctional Programs were also identified. As a result of these findings, a Deduction of $20,576.19 was imposed.

The fourth CFM conducted March 27-29, 2012, identified a Repeat Deficiency in Health Services (medical management of an inmate's condition prior to death was not in accordance with policy and standards of care). Seventeen new Deficiencies were identified during this CFM (four in Correctional Programs, one in Correctional Services, one in Education and Recreational Services, two in Food Service, eight in Health Services, and one in Inmate Systems). As a result of these findings, a Deduction of $62,500.00 was imposed.

Two months after the March 2012 CFM, the Adams County Correctional Center experienced a major inmate disturbance on May 20, 2012 that escalated into a riot. The inmate riot resulted in a CCA correctional officer's death and injuries to approximately 20 staff and inmates. The riot, according to an FBI affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. The BOP's After-Action Report of the events at Adams County Correctional Center dated July 27, 2012, ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████

The BOP's After-Action Report, also pointed out that ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████

The fifth CFM conducted January 8-10, 2013, identified a Repeat Deficiency in Health Services (follow-up of inmates with MRSA was not conducted as indicated in the policy), and 28 new Deficiencies were identified during this CFM (one in Correctional Programs, two in Correctional Services, two in Education, 19 in Health Services, and four in Safety). Numerous and serious Deficiencies were identified in Health Services. As a result of these findings, a Deduction of $58,780.00 was imposed.

On October 31, 2013, the contractor was issued a Deduction for three NOCs for Failure to Provide Adequate Inmate Accountability. A Deduction of $106,178.15 was imposed.

The sixth CFM conducted January 7-9, 2014, identified three Repeat Deficiencies in Health Services (antiviral drug treatment plans were not discussed, and evaluation and management was not conducted for Hepatitis as per policy; HIV counseling was not completed in all cases; and immunizations were not current for diabetic inmates). In addition, 13 new Deficiencies were identified (one in Correctional Programs, 11 in Health Services, and one in Safety). As a result of these findings, a Deduction of $15,754.87 was imposed.

The seventh CFM conducted January 6-8, 2015, again identified a Significant Finding in Health Services in Clinical Care. One Repeat Deficiency (preventive care baseline evaluations were not completed in accordance with policy) was included in this Significant Finding as well as a very serious and concerning Deficiency (review of records revealed management of five inmates prior to their deaths was not in accordance with policy and standards of care) that had been identified in two previous CFMs in March 2011, and March 2012. Specifics on each of these five cases can be found in this CFM Report. Typically, Significant Findings are comprised of numerous Deficiencies within a component. This Significant Finding was comprised of only two Deficiencies which is indicative of just how alarming these findings were. In addition, 13 new Deficiencies were also identified (two in Information Systems and Security, one in Correctional Programs, two in Education, one in Food Service, one in Health Services, and six in Safety). As a result of these findings, a Deduction of $811,730.00 was imposed. This was the largest Deduction imposed on CCA during the timeframe of this case.

On June 5, 2015, the contractor was issued a Deduction for six NOCs for various security-related failures such as improper key control, failure to provide adequate inmate accountability, failing to properly restrain inmates in the Special Housing Unit, and improper use of force to restrain an inmate. A Deduction of $76,562.52 was imposed.

The eighth CFM conducted January 5-7, 2016, identified 17 Deficiencies (three in Correctional Programs, six in Correctional Services, and eight in Health Services). Several of the Deficiencies identified in Health Services were serious and had been identified in previous CFMs, just not the most recent. The PMB Health Services Specialist conducted a follow-up review of these June 7-9, 2016 Health Services Deficiencies - and identified three repetitive Deficiencies in Health Services, from the January 2016 CFM. As a result, on July 26, 2016, a NOC was issued for Failure to Provide Quality Control in Health Services.

From 2012 through mid-2016, BOP oversight staff issued Adams County Correctional Center 30 NOCs for various issues of non-conformance. Of these 30 NOCs, 17 were issued for non-conformance in Correctional Services, seven of which involved inadequate inmate accountability, the most important and basic function for a correctional facility. Of these 30 NOCs issued during this time, five of them were issued for not maintaining minimum staffing in Correctional Services for the quarter; three of them were issued for not maintaining minimum staffing in Health Services for the quarter. It is important to note, there were most likely additional months where minimum staffing requirements were not met. PMB issued a NOC when two or more months in a fiscal quarter did not meet minimum staffing requirements.

This contract did include the incentive of the annual award fee for above satisfactory performance of up to 5% of the annual contract value. From the beginning of this contract in 2009 through March 2017, no award fees were awarded for five of those eight years. In the other three

years, CCA only achieved a slightly above satisfactory award-fee ratings and minimal award-fee amounts. BOP Award Fee Determination Letters (Bates numbers cited in this paragraph), issued to CCA since 2012, all note the contractors' significant turnover rate in Health and/or Correctional Services as well as struggles to maintain minimum staffing requirements in these components. BOP Award Fee Determination Letters (Bates numbers cited in this paragraph), also commented on their lack of bilingual staff given the majority of the inmate population is comprised of Mexican nationals, and also on the limited information provided in their own Self-assessment Reports regarding program weaknesses, despite the BOP's observations of their performance.

CPAR Quality of Product or Service ratings for the Adams County Correctional Center contract during this period were rated as ██████████████████████████ █

██████████████████████████████████████████████████████

In December 2016, the OIG published their "Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi." The OIG conducted the audit covering the period from April 1, 2012 through March 31, 2015, to: (1) assess CCA's contract performance; (2) determine whether CCA complied with the terms, conditions, laws, and regulations applicable to the contract; and (3) assess the BOP's formation and administration of the contract. They found that CCA's execution of the contract's requirements did not fully accomplish the BOP's program goals in several respects. They noted that four years after the May 2012 riot, the facility was plagued with the same significant Deficiencies in Correctional and Health Services and Spanish-speaking staffing. In 19 of the 38 months following the riot, the OIG found CCA staffed Correctional Services at an even lower level than at the time of the riot in terms of actual post coverage.

The OIG also found lower qualification levels and significantly higher staffing turnover rates for Adams County COs and believe those factors contributed to the facility's lack of experienced staff, which the BOP identified in its After-Action Report as a systemic problem in the areas of Safety and Security at the facility. They determined CCA's hiring practices employed COs with qualifications that would have been insufficient for employment at BOP-managed institutions. Additionally, they found significantly higher staff turnover rates at the facility than those at comparable BOP institutions and believed it likely resulted from the substantially lower pay and benefits provided by CCA. They found CCA paid significantly lower wages, offered less time off than the BOP and the State of Mississippi, and provided fewer career advancement opportunities.

The OIG noted the BOP's CFM findings in Health Services at Adams County in January 2015. They interviewed inmates and noted 10 of the 12 inmates they'd interviewed expressed concerns about the quality of health care provided to them and other inmates. The OIG provided the BOP with nine recommendations, the majority dealing with additional oversight and improvements to staffing levels and qualifications of staff in BOP contracts.

The Adams County Correctional Center contract expired on July 31, 2019. The contract completed its full 10-year life span.

Performance Synopsis of the Adams County Correctional Center Contract:

From the beginning of this contract, CCA struggled to provide acceptable performance in Health and Correctional Services. Numerous, serious, and repetitive findings were documented by CFM in the Health Services component since 2010, and continued throughout the timeframe in this case. BOP oversight staff documented many serious issues in Correctional Services as well as staff inexperience, high turnover, lack of bilingual staff, and the contractor's inability to maintain minimum staffing requirements. ███████████████████████████████████
████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████
███████████████ The government encouraged and incentivized exemplary performance as evidenced by the award-fee clause of these contracts. CCA failed to meet this expectation for the majority of this contract. Since the beginning of this contract, millions of dollars in annual award fees were not awarded to CCA due to their inability to achieve above-satisfactory performance, and more than $1.5 million in Deductions were imposed for inadequately performed services.

**B.    Cibola County Correctional Center Chronology of Performance and Events**

Since the activation of this second contract with the BOP, the Cibola County Correctional Center did not perform well in the area of Health Services. The first CFM under this contract conducted May 17-19, 2011, identified 12 Deficiencies, ten of which were in Health Services. Also noted in the General Comments Section of that report was a serious concern that the CFM felt they needed to document regarding the medical management of an inmate prior to his death which was not conducted by the on-site doctor as required by policy. Since this issue was documented via a NOC by PMB oversight staff, it was not listed as a Deficiency in this report.

The second CFM conducted April 17-19, 2012, identified two Repeat Deficiencies in Health Services (inmates with positive PPD were not receiving follow-up and treatment; in most cases, the physician was not involved in the management and follow-up of off-site care (hospital and ER visits)). In addition, 15 new Deficiencies were identified (one in Information Systems and Security, three in Correctional Programs, and 11 in Health Services). The General Comments Section in that report was quite concerning. The CFM physician specifically pointed out the facility had been without a physician for a year and that nurse practitioners and nurses were working without clinical guidance of a physician. Additionally, although records reflected chronic care clinics had been conducted, they were in violation of policy because physicians were required to evaluate all patients in chronic care clinics. Several of the Health Services Deficiencies also identified a physician's lack of involvement. These findings resulted in a Deduction of $52,857.46 being imposed.

Cibola experienced an inmate demonstration on March 27, 2013. Approximately 800 inmates went to the West recreation yard and refused to return to their housing units. The inmates were protesting over the recently implemented controlled movement, food, meals, clothing issues, medical treatment, and commissary prices. Inmates refused to leave the recreation yard until their concerns were addressed. Additional state and local law enforcement arrived and surrounded the facility to assist CCA in controlling the situation. This demonstration began at approximately 10:00 a.m. and ended peacefully at approximately 7:30 p.m. I recall it was a BOP oversight staff member,

the SSIM, who was responsible for bringing this demonstration to a peaceful end by communicating with the inmate leaders of this demonstration, and that CCA was unwilling to share much information regarding this disturbance with the BOP. The BOP was extremely frustrated with CCA in that they failed to identify any leaders and subsequently no inmates were held accountable for this demonstration, another example of CCA's weak intelligence operations.

The third CFM conducted April 23-25, 2013, identified one Repeat Repeat Deficiency (inmates arriving at the institution with positive PPD were not receiving follow-up treatment), and two Repeat Deficiencies (not all inmates placed in an observation room were in compliance with policy; health appraisals were not conducted per policy) in Health Services. Another Repeat Deficiency was identified in Correctional Programs (apparent program needs of the inmates were not always identified, stated in measurable terms, and reviewed at subsequent teams). In addition, 41 new Deficiencies were identified (two in Correctional Programs, one in Correctional Services, one in Education, two in Food Service, 14 in Health Services, three in Information Security, and 18 in Safety). As a result of these findings, a Deduction of $82,142.86 was imposed.

The fourth CFM conducted April 22-24, 2014, was the most alarming. This CFM identified a Significant Finding in Administration and Patient Care. This Significant Finding was comprised of numerous, very serious, and repetitive Deficiencies. A Repeat Repeat Repeat Deficiency was identified (inmates arriving at the institution with positive PPD were not receiving follow-up treatment), two Repeat Repeat Deficiencies were identified (not all inmates placed in an observation room were in compliance with policy; health appraisals were not conducted per policy), eight Repeat Deficiencies (all dealing with problems in chronic care clinics), and 15 new Deficiencies. Causes cited by CFM for this finding were lack of knowledge and oversight of the Health Services department by responsible management staff; lack of controls to ensure compliance with Patient Care, policy compliance, and proper administration of health records by the physician; and that the department was under-staffed by three nurses. A new physician had been hired two months prior to the CFM but was still in new employees training. In addition, two other Repeat Deficiencies and five new Deficiencies were identified in Safety, four new Deficiencies were identified in Information Security, and two in Food Service. As a result of these findings, a Deduction of $474,278.45 was imposed.

Given the serious and numerous Deficiencies identified during the April 2014 CFM, a follow-up CFM was conducted on October 21-23, 2014. This monitoring focused on the evaluation of the areas for which there was a Significant Finding. Emphasis was placed on corrective actions taken and the effectiveness of such in both yielding compliance and providing the government reasonable assurance continued compliance could be expected. Again, CCA failed to correct ongoing repetitive Deficiencies. This follow-up monitoring identified a Repeat Repeat Repeat Repeat Deficiency (inmates arriving at the institution with positive PPD were not receiving follow-up treatment), a Repeat Repeat Repeat Deficiency (health appraisals were not conducted per policy), a Repeat Repeat Deficiency (treatment for HIV inmates was not completed in accordance with policy), and two Repeat Deficiencies (not all medication administration records were accurate; and preventive care evaluations were not completed as per policy). Four new Deficiencies were identified in Health Services to include the medical management prior to an inmate's death was not in accordance with policy. As a result of these findings, a Deduction of $45,106.53 was imposed.

Given the outcome of CFMs since the beginning of this contract, it is apparent that CCA's quality control plan and corrective actions particularly in the area of Health Services were ineffective. When Deficiencies have been identified for three, four, or more consecutive years, as was the case during this CFM, it demonstrates CCA's continued lack of commitment to correct these serious problems.

On January 9, 2015, the BOP issued a Cure Notice to CCA notifying them the government considered the failure to perform in the area of Health Services a condition that was endangering performance of the contract and advising them if the conditions were not cured by the next CFM scheduled for April 21-23, 2015, the government might terminate the contract for default.

The fifth routine CFM conducted April 21-23, 2015, identified two Repeat Deficiencies. One in Information Security and one in Health Services for medical management of an inmate's condition resulting in death not in accordance with policy and standards of care. Twelve additional Deficiencies were identified (eight in Health Services, one in Human Resources, one in Information Security, and two in Safety). While not considered consecutive repetitive Deficiencies, two of the Health Services Deficiencies identified in this CFM were identified in previous CFMs. In April 2012, a Health Services Deficiency (inmates in oncology clinics revealed that medical diagnosis, management, and follow-up were delayed) was identified, and another in the April 2013 CFM (diabetic inmates were not managed in accordance with policy) was identified, which is indicative of the contractor's inability to maintain effective corrective action. As a result of these findings, a Deduction of $63,963.81 was imposed.

On May 18, 2015, the BOP removed the Cure Notice after the CFM, in April 2015, indicated six of the seven items contained in the Cure Notice were resolved.

CFM conducted another follow-up monitoring on October 20-22, 2015, to assess the Health Services findings from the April 2015 CFM. Three Repeat Deficiencies were identified in Health Services (medical in-transit forms not written in lay terms; inmates with uncontrolled diabetes were not managed in accordance with policy; and inmates in oncology clinics revealed medical diagnoses, management, and follow-up were not always completed). As noted above, two of these Repeat Deficiencies had been identified in earlier CFMs as well. In addition, 14 additional Deficiencies were identified, many of which were serious in nature involving the mismanagement of chronic care cases such as HIV, diabetics, asthma, lipids, hypertension, Hepatitis C, and infectious disease cases. As a result of these findings, a Deduction of $6,171.47 was imposed.

To address the continued concerns in Health Services at this facility, in January 2016, CCA brought in a subcontractor, Correct Care Solutions, to deliver Health Services for the facility.

The sixth routine CFM conducted April 19-21, 2016, identified a Repeat Repeat Deficiency (a review of inmates in the oncology clinics revealed medical diagnoses, management, and follow-up were not always completed), a condition which had not only been identified for the third consecutive CFM, it had also been identified in the April 2012 CFM, and two Repeat Deficiencies (inmates with diabetes did not receive immunizations in accordance with policy; and Hepatitis C clinic evaluations did not always address a plan for the management of the Hepatitis C virus). In addition, 13 other Deficiencies were identified (two in Correctional Services, two in Education, and eight in Health Services). As a result of these findings, a Deduction of $13,548.49 was imposed.

From 2012 through the end of this contract in 2016, BOP oversight issued the Cibola County Correctional Center 19 NOCs.  Of these 19 NOCs, 15 were for failing to meet minimum staffing requirements in Health and/or Correctional Services.  CCA failed to meet minimum staffing requirements in one or both of these components from January 2013 through the end of this contract in September 2016.

The Cibola County Correctional Center contract included the award-fee incentive.  During the timeframe for this case, CCA received a minimal Award Fee Determination in 2012 (BOP FOIA 2015-06019), and did not receive above-satisfactory award-fee ratings or award fees for any subsequent years  through the end of this contract in September 2016 (four years early).

As described earlier in this report, the BOP evaluates all performance tools (*e.g.*, CFM Reports, NOCs, Oversight Facility Summary Report, and the Contractor's Self-assessment Report) to determine an award-fee rating and if applicable, recommended award fee amount.  The BOP Award Fee Determination Letter dated August 30, 2013, for the rating period October 1, 2012 through June 30, 2013, addressed to the Managing Director of CCA, made a point to note that: "***The contractor's self-assessment did not identify any program weaknesses.  One point of weakness in the self-assessment is that CCA went out of their way indicating that they exceeded contract requirements when describing routine work while meeting minimal contract requirements***."  CCA again provided a weak Self-assessment Report of their performance for the next rating period, July 1, 2013 through June 30, 2014.  During this performance period is when Cibola received the most alarming CFM findings in April of 2014, along with four NOCs issued for failing to meet minimum staffing levels in Correctional Services.  CCA's Self-assessment Report failed to mention either, and further suggested their performance was above the expectations of the contract and recommended a "good" award-fee rating.  The BOP's Award Fee Determination Official assigned an unsatisfactory rating for this performance period.

BOP award-fee ratings were noted as unsatisfactory in 2014, and 2015.  The BOP Award Fee Determination Letter dated August 4, 2015, addressed to the Managing Director of CCA, made a point to note "***it is considered less than acceptable as they improved their Health Services operation only after a Cure Notice was issued***."  Cibola's final Award Fee Determination Letter, for the performance period July 1, 2015 through June 30, 2016, cited an overall performance rating as satisfactory and no award fee was authorized.  The letter cited no notable improvement in the area of Health Services and their failure to maintain minimum staffing requirements in both Health and Correctional Services for 9 months of the 12-month period.

CPAR Quality of Product or Service ratings for the Cibola County Correctional Center contract during this time period were rated as ████████████████████████████████████ ██████  ████████████████████████████████████████████████████████ ████████████████████ .

The contractor's continued poor performance, especially in Health Services, and not meeting minimum staffing requirements, resulted in the Cibola County Correctional Center not receiving award fees for the last four years of the contract and ████████████████████████████ ██████████

On July 29, 2016, the BOP notified CCA of its intention to not exercise the contract's second option year, citing their action was "*a result of market research which included other factors*." According to the "Contract DJB1PC011 Determination NOT to Exercise Option Option Performance Period Two" (October 1, 2016 through September 30, 2018), ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ As a result, the Cibola County Correctional Center contract ended four years earlier than if the BOP had exercised its options.

<u>Performance Synopsis of the Cibola County Correctional Center Contract</u>:

From the beginning of this contract, CCA struggled to provide acceptable performance in Health Services. Numerous, serious, and repetitive Deficiencies were documented by CFM in Health Services since 2011 and worsened throughout the timeframe in this case. Quality control is the very first contract requirement and vital function identified in the contract requiring the contractor's quality control program serve to identify Deficiencies in the quality of the services throughout the entire scope of the contract and implement corrective action before the level of performance becomes deficient. It was inexcusable that the BOP had to continue to document the same serious conditions. Repeat Deficiencies identified two, three, four, and five times, over consecutive years, reflects a failure on the part of CCA to implement and maintain effective corrective action. It wasn't until a Cure Notice was issued, threatening contract termination for default, that CCA attempted to improve its performance. Additionally, CCA failed to maintain minimum staffing requirements for the last four years of this contract.

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ The government encouraged and incentivized exemplary performance as evidenced by the award fee clause of these contracts. CCA failed to meet this expectation for this contract. Cibola received no award fees for the last four years of this contract. Millions of dollars in annual award fees were not awarded to CCA due to their inability to achieve above satisfactory performance. In addition, more than $738,000.00 in Deductions were imposed for inadequately performed services.

As a result of CCA's inability to perform in the area of Health Services, the BOP determined it was not in the government's best interest to continue this contract. Declining to exercise option years of a private prison contract based on poor performance is an extremely rare occurrence in the BOP.

## C. Eden Detention Center Chronology of Performance and Events

The CFM conducted September 11-13, 2012, identified a total of 13 Deficiencies (one Repeat Deficiency, and six other Deficiencies in Correctional Programs, two Deficiencies in Correctional Services, and four Deficiencies in Health Services). The findings in Correctional Services during this CFM were concerning. Although only two Deficiencies were noted, they both dealt with basic and critical security policies that were not being followed. Count procedures and

inmate pat searches were not being performed in accordance with policy. The CFM team felt it important enough to elaborate on the circumstances of these findings in the General Comments Section of that report. As a result of these findings, a Deduction of $9,952.80 was imposed.

The CFM conducted August 6-8, 2013, identified four Deficiencies, all in Health Services. One of the Deficiencies identified during this CFM was considered serious (medical management of an inmate's condition prior to his death was not in accordance with policy).

The CFM conducted August 5-7, 2014, identified a Significant Finding in Health Services which was comprised of four Repeat Deficiencies (medical management of an inmate's condition prior to his death was not in accordance with policy; immunizations were not in accordance with policy in the pulmonary, Hepatitis C, and diabetes clinics; antiviral therapy for inmates with Hepatitis C was not provided in accordance with policy; follow-up of PPD positive inmates was not in accordance with policy); and five other Deficiencies. The CFM physician identified two causes for this Significant Finding: (1) lack of controls to ensure compliance with Patient Care, policy compliance, and proper administration of health records by the physician; and (2) the Health Services department was understaffed in several clinical positions. Specifically, the on-site physician quit his full-time position in December 2013, and since that time only performed on-site services on occasional weekends. CCA's own policy requires a physician to be responsible for overseeing the medical care of all inmates. The lack of an on-site, full-time physician for eight months caused the other Health Services staff to work without supervision. In addition, nine other positions were vacant including six nurses, a dentist, a dental assistant, and a medical records clerk. Further, 11 other Deficiencies were identified in other components during this CFM (two in Information Security, and nine in Safety). As a result of these findings, a Deduction of $401,869.34 was imposed.

CFM conducted a follow-up on February 10-12, 2015, to assess Health Services and the Significant Finding identified in the August 2014 CFM. During this CFM, one Repeat Repeat Deficiency was identified and eight other Deficiencies. As a result of these findings, a Deduction of $6,142.11 was imposed.

The CFM conducted August 4-6, 2015, identified two Repeat Deficiencies. One in Health Services (management of HIV inmates was not always in accordance with policy) and one in Safety (periodic inspections did not contain all required elements). In addition, 21 other Deficiencies were identified (one in Information Security, five in Correctional Programs, one in Correctional Services, two in Education, seven in Health Services, one in Human Resources, three in Inmate Systems, and one in Safety). Two of the Deficiencies in Health Services during this monitoring were identified as Repeat Deficiencies during the August 2014 CFM, (inmates arriving at the institution with positive PPD or converted to positive PPD were not provided appropriate follow-up and treatment per policy; not all immunizations were completed in accordance with policy in the diabetic clinic). Therefore, CCA failed to correct these conditions for the past three years (2013-2015). As a result of these findings, a Deduction of $8,073.92 was imposed.

On July 29, 2016, the Eden Detention Center experienced an inmate demonstration. Over 1,000 inmates participated in a planned non-violent demonstration. CCA's Regional Special Operations Response Team provided support and additional resources to the facility. The situation was resolved peacefully.

4849-9823-8150.v1

The CFM conducted August 2-4, 2016, identified one Repeat Deficiency in Safety and 21 other Deficiencies (six in Correctional Services, one in Food Service, six in Health Services, four in Information Security, and four in Safety). As a result of these findings, a Deduction of $13,512.44 was imposed.

From 2012 through 2016, 23 NOCs were issued by BOP oversight staff to the contractor. Of these, 11 of them were issued for failure to maintain minimum staffing requirements in Health and/or Correctional Services for two or more months in a quarter. Minimum staffing levels in Correctional Services were not maintained for 14 consecutive months (August 2014 - September 2015).

The Eden contract did include the incentive of the annual award fee for above-satisfactory performance of up to 5% of the annual contract value. The facility received substantial award fees for good and superior performance for the rating periods October 2011 through September 2012, and October 2012 through September 2013. Eden received no award fees for the three consecutive rating periods from October 2013 through September 2016 as a result of their performance during this time. Of note, Eden's Self-assessment Report for the period from October 1, 2013 through September 30, 2014, the rating period in which they received the Significant Finding in Health Services, downplayed the seriousness of this finding and concluded their report stating, in part, "***they provided an excellent level of performance and responsiveness to the BOP, and recommended they receive an Excellent rating and 80% of the available award fee***." The BOP Award Fee Determination Official actually rated Eden as unsatisfactory for this rating period. Their performance on this contract went from receiving a superior award-fee rating for the period October 1, 2012 through September 30, 2013, and a more than $1.4 million award fee, to an unsatisfactory award-fee rating the following performance period, ending September 30, 2014, and no award fee.

CPAR Quality of Product or Service ratings for the Eden Detention Center contract during this time period were ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████

This contract expired on April 30, 2017. The contract completed its full 10-year life span.

<u>Performance Synopsis of the Eden Detention Center Contract</u>:

In 2014, this contract began showing signs of struggle to perform at an acceptable level in Health Services. The August 2014 CFM identified a Significant Finding consisting of serious and repetitive Deficiencies. Of particular concern for the BOP was the pattern of common repetitive Repeat Deficiencies among CCA's contract facilities. Those being "[m]edical management of an inmates' condition prior to his death we[re] not in accordance with policy; and [i]nmates arriving with positive PPD [we]re not receiving follow-up and treatment by the physician." Lack of a full-time physician, and other critical Health Services personnel contributed to these problems. CCA also struggled to maintain minimum staffing requirements in Health and Correctional Services and failed to maintain Correctional Services levels for a 14-month consecutive period.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████ Eden received ████████████████████████████, and
they received no award fees for 2014 through 2016.  Again, millions of dollars in annual award fees
were not awarded to CCA for this contract due to their inability to consistently achieve above-
satisfactory performance.  In addition, more than $490,000 in Deductions were imposed for
inadequately performed services.

### D.    McRae Correctional Facility Summary of Performance

CCA was awarded its second 10-year contract at this facility by the BOP in 2011.  It has a
scheduled completion date of November 30, 2022.  ████████████████████████████████
████████████████████████.  CFM Reports identify some Deficiencies across components,
however, there were no serious or repetitive Deficiencies of concern.  BOP oversight staff have
issued only nine NOCs during this four-year timeframe.  NOCs do not reflect serious nor repetitive
issues.  The contractor has maintained staffing at required levels.  Very few Deductions were
imposed during this timeframe.  This contract does not include the incentive of the annual award fee.
CPAR Quality of Product or Service ratings for this facility have been rated as ███████ for this
timeframe.

### E.    Northeast Ohio Correctional Center Summary of Performance

CCA was awarded this 10-year contract at this facility in late 2004.  It was activated on June
1, 2005.  This contract expired on May 31, 2015, fulfilling its 10-year life span.  █████████████
█████████████████████████████████████████████████.  CFM Reports identify some Deficiencies
across components, however, there were no serious or repetitive Deficiencies of concern.  BOP
oversight staff issued ten NOCs which do not reflect serious issues.  The contractor maintained
staffing at required levels.  It appears only one Deduction was imposed during this timeframe.  This
contract did include the incentive of the annual award fee.  Award-fee ratings were in the good to
excellent range and the contractor received substantial award fees.  The contractor's CPAR Quality
of Product or Service ratings for this facility were rated as ██████ for the timeframe of this case.

### F.    Other Performance-Related Events/Factors

#### 1.    CAR XV Solicitation

During the timeframe of this case, the BOP had an active procurement referred to as CAR
XV for secure contract beds (GovTribe Federal Contract Opportunity: CAR XV).  This solicitation
included the rebid of CCA's Northeast Ohio facility and The GEO Group's Moshannon Valley
facility in Pennsylvania, both facilities had contract expiration dates in 2015.  The BOP issued the
RFPs for two requirements for the management and operation of a correctional facility operated
and owned/leased by a contractor.  Each requirement must have fallen within the range of 1,500 to 2,000
beds.  The population consisted of low security, adult, male inmates who were criminal aliens,
ordinarily with 90 months or less remaining on their sentences.  An offeror could submit for one or
both requirements.  Proposed institutions were to house inmates in a secure correctional institution

that met BOP standards as set forth in the resulting solicitation/contract. Requirement A stipulated a geographical restriction stating the proposed facility must have been located in one of the following states: Ohio, Michigan, Pennsylvania, Delaware, New Jersey, or New York. Requirement B allowed for the proposed facility to be located anywhere in the continental United States.

In addition, the offeror awarded a contract must have been ready to accept inmates at an existing facility within 150 days after contract award, or no later than April 1, 2016, at a rate specified in the resulting contract. Any construction, expansion, or renovation must not have interfered with, or delayed, the arrival of inmates as required by the solicitation/contract. In addition, the RFP stipulated offerors were prohibited from housing non-DOJ inmates within the same fence perimeter, however, multiple populations at a prison complex with separate fence lines were acceptable. Services received from, or provided to, the resulting contract should not have been shared with other non-DOJ contractual obligations. The BOP population must have remained separate from other populations at all times. All proposals offering shared services would be evaluated to determine the soundness and effectiveness of the approach to managing and operating the shared institution and/or services.

For this solicitation, CCA submitted their Northeast Ohio Correctional facility in connection with Requirement A. They submitted three of their facilities (Diamondback Correctional Facility in Oklahoma, Prairie Correctional Facility in Minnesota, and Northeast Ohio Correctional Center in Ohio) for Requirement B.

Pursuant to the Federal Acquisitions Regulations ("FAR") Part 15.308, the Source Selection Authority's ("SSA") decision was based on a comparative assessment of proposals against all source selection criteria in the solicitation. Sections M.3 and M.4 of the solicitation notified the offerors of the evaluation scheme and the overall importance of non-price and price-evaluation criteria. Section M.4 stipulated that past performance would be the most important non-price evaluation criteria in determining award.

On December 29, 2014, the BOP announced the contract awards for this RFP. For Requirement A, the award went to The GEO Group for their Moshannon Valley Correctional Center in Pennsylvania. For Requirement B, the award went to The GEO Group for their Great Plains Correctional Facility in Oklahoma. For both awards, the BOP SSA ████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████    ██████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████

2.    **BOP Decision to Not Exercise the September 2016 Option Year for the Cibola County Correctional Center Contract**

On July 29, 2016, the BOP notified CCA of its intention to not exercise the contract's second option year, citing their action was "*a result of market research which included other factors*." According to the "Contract DJB1PC011 Determination NOT to Exercise Option Option

Performance Period Two" (October 1, 2016 through September 30, 2018), ███████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
███████ As a result, the Cibola County Correctional Center contract ended on September 30, 2016, four years earlier than if the BOP had exercised its options.

### 3. OIG Review of BOP's Monitoring of Contract Prisons

In August 2016, the OIG completed their "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons." This review examined how the BOP monitored these facilities. It also assessed whether contractor performance met certain inmate safety and security requirements and analyzed how contract prisons and similar BOP institutions compared with regard to inmate safety and security data. The OIG found that in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions and that the BOP could improve how it monitors contract prisons in some areas.

### 4. DAG Memorandum to the BOP Director

On August 18, 2016, on the heels of the OIG's "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," Sally Yates, DAG, issued a memorandum to the Acting Director of the BOP regarding "Reducing our Use of Private Prisons." This memorandum discussed the BOP's declining inmate population, how private contract prisons served an important role for the BOP when they experienced tremendous growth, but that over time they had shown they did not compare to the same quality level provided by the BOP nor did they save on ██████ And as cited in OIG's report, they did not maintain the same level of safety and security. For those reasons, she directed the BOP to begin reducing, and ultimately end, its use of private prisons. She referenced the BOP's decision three weeks prior to this memorandum, to decline to renew what was the Cibola County Correctional Center contract for approximately 1,200 beds. Additionally, she referenced the BOP amending its existing contract solicitation for the renewal of 10,800 beds to 3,600 beds. These actions would allow the BOP to end housing of inmates at three or more private contract prisons over the next year, and reduce the total private prison population to less than 14,200 inmates by May 2017, a more than 50% decrease since 2013.

### 5. Additional CAR Solicitations

Since the BOP's contract awards under the CAR XV solicitation, two additional CAR solicitations were issued and awarded.

CAR XVI was issued in 2015, for the recompete for several contract prisons the BOP had in Texas (approximately 6,000 beds) that were due to expire in 2017. CCA submitted four proposals for this solicitation (Eden Detention Center, Diamondback Correctional Facility, North Fork Correctional Facility, and the Tallahatchie County Correctional Center). In May 2017, the BOP contract awards went to The GEO Group for their two Big Spring facilities in Texas.

CAR XVII was issued in 2015, and canceled on January 1, 2016. CAR XVIII was the solicitation for a company to manage the BOP-owned correctional facility in Taft, California. The

Management and Training Corporation ("MTC") was the operator since 2007, and was again awarded the contract to remain the contractor managing this facility. However, it did not remain open much longer after this award. The BOP closed this facility due to major structural issues.

CAR XVIIII was a solicitation for 9,540 contract beds. It appears CCA proposed at least one of their facilities for this solicitation, the Adams County Correctional Center, which was due to expire in July 2019. In May 2019, the BOP contract awards went to Reeves County, Texas, The GEO Group, and the MTC, for a total of four facilities (two Reeves County Detention Centers owned by the county and managed by The GEO Group; The GEO Group's Northlake Facility in Baldwin, Michigan; and MTC for their Dalby Correctional Center in Post, Texas).

In 2015, CCA was under contract with the BOP for five of their 14 contract prisons. Today, CCA is under contract with the BOP for one of their 11 contract prisons. From 2014 to date, the BOP has solicited for, and awarded, contracts for more than 15,000 contract prison beds. CCA has not been awarded a contract for a secure correctional facility with the BOP since October 28, 2011, which was the award for the McRae Correctional Facility (CCA press release, dated October 28, 2011), and is due to end in November 2022.

### 6.    BOP Inmate Population

In 2013, the BOP saw its highest population of 220,000 inmates, approximately 30,000 (15%) of which were confined in 15 private contract prisons. Since that time, the BOP population has been decreasing as the result of several initiatives including the retroactive application of revised drug sentencing guidelines, new charging policies for low-level, non-violent offenders, and the Obama Administration's ongoing clemency initiative. The BOP inmate population as of August 7, 2020 was approximately 157,500 inmates, with 14,600 confined in 11 private contract prisons. It should be noted the BOP population in early February 2020, was approximately 175,000 with 17,000 confined in 11 private prisons. I believe this reduction is attributed to the COVID-19 pandemic and the BOP's early release of non-violent offenders in recent months.

Although there has been a significant decrease in the BOP's population in the past five years, it is important to note the BOP was experiencing extreme overcrowding in its own facilities from the 1990s through 2013. Its use of low-security contract prisons has assisted in reducing the level of overcrowding over the years. Given the fact the BOP has continued to solicit for new contract beds as some of these contracts have expired, and that there are currently 11 active private contract prisons today, it is evident the BOP still has a need for these contract beds to offset overcrowding in its own facilities. Again, though, CCA has not won a competitively bid BOP contract since 2011.

## VI.    SUMMARY AND CONCLUSION

I have been asked to opine on: (1) the quality of CCA's performance of its contracts with the BOP; (2) whether (and if so when) its past performance ever reached a point as to render CCA unlikely to win any competitively bid BOP contract (and therefore unlikely to receive any additional BOP business beyond the option years of existing contracts); and (3) whether the services CCA provided to the BOP were sufficiently comparable to the services BOP provided at its own facilities as to be able make an apples-to-apples ▓ comparison such that anyone could have accurately claimed that contracting with CCA did and/or would save the BOP money.

1. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████
██████████████████████████████████

    In focusing on the timeframe for this case (February 2012 through August 2016), the BOP began to see a decline in CCA's performance at their Adams and Cibola facilities in March 2012. The March and April 2012 CFMs at these facilities documented numerous, serious, repetitive, and similar problems in Health Services. CCA's Repeat Deficiency at Adams that their management of an inmate's condition prior to his death was not handled properly is unacceptable and alarming. In addition to the concerns in Health Services, BOP oversight staff at Adams documented CCA's failure to maintain minimum staffing requirements in Correctional Services, their high staff turnover rate, and inexperienced staff in this department. Cibola's CFM conducted in April 2012, also identified numerous and repetitive Deficiencies in Health Services, noting the problems were the result of the facility not having a physician for the past year, a vacancy that facility had difficulty filling and retaining throughout the life of their contract. This was merely the beginning. In May 2012, just two months after their annual CFM, Adams County experienced a major inmate riot that sadly resulted in a correction officer's death and injuries to 20 staff and inmates. ████████
████████████████████████████████████████████
████████████████████████████████████ After this riot, the BOP was concerned about their contractors' ability to control this size population (Adams housed more than 2,500 inmates at the time of the riot), and recognized the need to reduce the number of inmates housed at private prisons to no more than 1,800-2,000, with the hope that the private prisons could better manage a smaller inmate population. From this point, the BOP began to reduce the number of beds for all future contract prisons.

    CCA's performance continued to decline over the next year. The CFM conducted at Adams in January 2013, again identified numerous and repetitive Deficiencies in Health Services. In addition, they continued to fail to meet minimum staffing requirements. Cibola experienced an inmate disturbance in March 2013. Inmates refused to leave the recreation yard until their concerns were addressed. "BOP oversight staff member, the SSIM, was responsible for bringing this demonstration to a peaceful end by communicating with the inmate leaders of this demonstration. The BOP was extremely frustrated with CCA in that they were unwilling to share much information regarding this disturbance and that they failed to identify any leaders. Subsequently, no inmates were held accountable for this demonstration, another example of CCA's weak intelligence operations."

    A month after this disturbance, Cibola's annual CFM conducted April 23-25, 2013, again identified serious, repetitive, and numerous Deficiencies, many in Health Services, some of which continued to go uncorrected for three years. At this point, CCA had now demonstrated their ineffective quality control program in two of their contracts by failing to identify Deficiencies and implement corrective action before contract performance became unsatisfactory. In addition, Cibola failed to maintain minimum staffing requirements throughout 2013. The Eden facility also began showing concerns in the Health Services area. Their August 6-9, 2013 CFM identified several Deficiencies, one of which was their medical management of an inmate's condition prior to his death was not handled properly. This alarming Deficiency was now a trend in CCA facilities.

CONFIDENTIAL / SOURCE SELECTION INFORMATION      22
4849-9823-8150.v1
Case 3:16-cv-02267   Document 413-4   Filed 02/12/21   Page 28 of 37 PageID #: 23755

By 2014, it was apparent the BOP had lost confidence in CCA's ability to perform the major contract requirements. CCA was still not reacting, and their continued failure to address these serious and repetitive problems caused their performance to worsen. Cibola's annual CFM conducted April 22-24, 2014, had now identified a Significant Finding in Health Services that consisted of numerous repetitive Deficiencies that had gone uncorrected for as many as three and four years. A CFM follow-up monitoring conducted October 21-23, 2014, at Cibola again revealed numerous serious and repetitive Deficiencies, some that had gone uncorrected for as many as 4.5 years, as well as the alarming Deficiency that their medical management of an inmate's condition prior to his death was not handled properly. In addition, Cibola continued failing to maintain minimum staffing requirements. The CFM conducted January 7-9, 2014, at Adams also identified numerous repetitive Deficiencies in Health Services. In addition, Adams continued struggling to maintain minimum staffing requirements. At this time, CCA's Eden facility was also demonstrating performance failures in Health Services and their ability to maintain minimum staffing requirements. Eden's CFM conducted August 5-7, 2014, also identified a Significant Finding in Health Services comprised of Repeat Deficiencies, one of which was an instance of their medical management of an inmate's condition prior to his death was not handled properly. This serious and now repeat problem had been identified at three of the five CCA contract prisons (Adams, Cibola, and now Eden). In addition to the BOP imposing significant Deductions as a result of these performance failures, the BOP met with CCA executives to make clear that CCA's performance was unacceptable and could not continue in this manner.

The impact of CCA's poor performance would soon be realized. As referenced above, during this time, the BOP had an active procurement, CAR XV, which was the rebid for beds at two of the BOP's existing contract prisons, CCA's Northeast Ohio Correctional Center and another facility in Pennsylvania, owned and operated by The GEO Group. These two contracts were nearing their expiration dates in 2015. The Fall of 2014 is when the BOP began wrapping up their evaluations of all proposals for this solicitation. As noted earlier in my report, past performance was the most important non-price evaluation criteria when determining contract award. On December 29, 2014, CCA was notified they were not awarded either of the two contracts under the CAR XV Solicitation. The BOP's Source Selection Decision █████████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████ CCA had now lost a facility that was performing at an exceptional level, their Northeast Ohio Correctional Center, ██████████████████████████████ ████████████████

2.     The CAR XV awards in late 2014, concretely determined the BOP would not grant CCA a new contract based on their poor past performance. ████████████████████████

As outlined in this report, by this point in time, CCA had demonstrated their inability to perform essential services of the contracts to include providing an effective quality control program and maintain minimum staffing requirements at their facilities.

A week after the CAR XV awards, the annual CFM was conducted January 6-8, 2015, at the Adams County Correctional Center. Yet again, CFM identified a Significant Finding in Health Services comprised of a Repeat Deficiency and five instances where their medical management of an inmate's condition prior to his death was not handled properly. This alarming Deficiency appeared

yet again.  It was identified earlier on in their contract in 2011, and 2012, and was now known as "the" common and most concerning Deficiency among CCA contract facilities.  The BOP imposed over $888,000 in Deductions as a result of these findings.  A day after CCA received these findings at their Adams facility, the BOP issued a Cure Notice on January 9, 2015, to their Cibola facility for their continued performance failures in Health Services.  The Cure Notice put them on notice to correct the continued repetitive findings by the next CFM in April 2015, or the BOP would pursue contract termination for default.  The April 21-23, 2015 CFM revealed CCA finally corrected most of the previous repetitive findings, and on May 18, 2015, the BOP removed their Cure Notice.  In addition, both Cibola and Eden failed to maintain minimum staffing requirements throughout 2015.  It seems it took CCA receiving more than $2.7 million in Deductions, the loss of millions of dollars in award fees, the loss of their Northeast Ohio contract facility, and a Cure Notice to finally recognize the BOP would not continue to tolerate their poor performance.

Heading into 2016, CCA was showing slight improvement among these problem facilities.  The CFMs at Adams and Eden revealed no repetitive findings in Health Services.  However, the Cibola CFM conducted April 19-21, 2016, once again identified Repeat Repeat and Repeat Deficiencies in Health Services and eight new Deficiencies.  The BOP had such concerns with CCA's ability to maintain adequate performance at Cibola, it placed this facility on a six-month CFM cycle since 2014, to review Health Services.  CCA continued to demonstrate their failure to provide adequate healthcare for the inmate population even after CCA hired a subcontractor to provide health services at this facility in January 2016.  In addition, Cibola had demonstrated for the fourth consecutive year they were unable to maintain minimum staffing requirements.

Three months after Cibola's April 2016 CFM, on July 29, 2016, the BOP notified CCA of its intention to not exercise the contract's second option year, citing their action was "*a result of market research which included other factors*."  According to "Contract DJB1PC011 Determination Report NOT to Exercise Option Option Performance Period Two" (October 1, 2016 through September 30, 2018), the Contracting Officer ███████████████████████████████████████████



███████████████████████  As a result, the Cibola County Correctional Center contract ended four years early, on September 30, 2016.

It is my opinion, the continued struggles the BOP endured with the poor performance of the Cibola contract was the main reason the BOP made the decision in July 2016, to not exercise the remaining two-option-year periods. ████████████████████████████████████ ████████████████████████████████████████████

I also believe the past poor performance at these facilities has been a significant factor in CCA's inability to win any additional contract prison awards with the BOP.  Since the CAR XV contract awards in December 2014, the BOP has solicited, and awarded, contracts for more than 15,000 contract prison beds.  CCA has not been awarded a contract for a private prison since 2011.  Less than five years ago, CCA held five competitively awarded contracts with the BOP.  Today, they have only one, and it is due to expire in 2022.

3. Comparison of services CCA provided to the BOP versus services the BOP provided at its own facilities. The BOP mission is complex. Examples include:

- BOP houses various security level inmates (minimum, low, medium, and high).

- BOP has an Administrative Max facility (the most secure facility within the BOP) which houses inmates who have exhibited extremely violent or disruptive behaviors such as serious assaults or killings of staff or other inmates, inmates who are considered threats to the security of our nation, and domestic and international terrorists.

- The BOP has numerous Metropolitan Detention Centers in major cities throughout the country housing inmates that are in pre-trial status or awaiting sentencing. All security levels are housed in these facilities.

- The BOP has numerous Medical Centers throughout the country that provide significantly enhanced medical services for inmates whose functioning may be so severely impaired they require 24-7 medical attention.

- Institutions for all security levels that solely house female inmates.

- Institutions that solely house inmates with serious mental health issues.

- Institutions that are dedicated to the management of sex offenders.

Across all of these security levels and types of facilities, the BOP provides a vast array of programs such as drug treatment, residential drug treatment, a wide range of reentry programs to include placement in residential reentry centers prior to their release, behavior management, industries, GED, college level courses, apprenticeship programs, mental health management, various health clinics, etc.

In contrast, the CCA facility contracts required them to house inmates who were male, low security (inmates with little to no current or history of serious violence or detainers), criminal aliens (non-U.S. citizens who will be deported back to their countries of birth upon their release), serving less than 90 months of their sentence. BOP designators would not designate inmates who were classified as medium or high security levels; sex offenders; had serious physical or mental health problems; presented serious correctional management issues; required drug treatment; or other court-imposed programs to the BOP's private prisons. If any of these conditions presented themselves after an inmate's placement in a private prison, the BOP would transfer the inmate to an appropriate BOP-run institution. Because these inmates were not reentering the United States upon their release, contracts did not require much programming for this population.

In summary, this population requires a low level of correctional management, basic Health Services, no complex programming, and is viewed by the BOP as an easy-to-manage population. Despite being presented with a low-security-risk population, CCA was unable to successfully manage these inmates, resulting in dozens of Deficiencies and Repeat Deficiencies a major riot, disturbances, deaths of inmates, death of a staff member, and other serious issues.

In addition, as noted in the "OIG's Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi," published in December 2016, there are vast differences between BOP and CCA qualifications and incentives for correctional officers. The BOP requires entry-level correctional officers to have either a 4-year college degree or equivalent work experience, while CCA does not require education beyond high school. The OIG also found CCA pays substantially lower wages and offers less time off than the BOP and provides fewer career advancement opportunities. CCA's lower staff qualifications, incentives, and career advancement opportunities make it difficult for them to hire and maintain experienced and professional staff.

█████████████████ In its "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" the OIG also noted the inability to compare costs of incarceration between BOP and contract prisons citing these same reasons. ███████████████

Respectfully submitted,

Donna Mellendick
D1 Corrections Consulting, LLC

**EXHIBIT 1**

**Documents and Other Information Considered**

ALLEN_017393
BOP FOIA 2015-06019
BOP_0008068
BOP_0009201
BOP_0020124
BOP_0119713
BOP_0119736
BOP_0119775
BOP_0246733
BOP_0293033
BOP_0322222
BOP_0323738
BOP_0329852
BOP_0332598
BOP_0334043
BOP_0334154
BOP_0334255
BOP_0334920
BOP_0334922
BOP_0334926
BOP_0334930
BOP_0334931
BOP_0334932
BOP_0334958
BOP_0334960
BOP_0334975
BOP_0335010
BOP_0335020
BOP_0335126
BOP_0335129
BOP_0335131
BOP_0335134
BOP_0335136
BOP_0335137
BOP_0335140
BOP_0335146
BOP_0335151
BOP_0335155
BOP_0335160
BOP_0335163
BOP_0335165
BOP_0335167
BOP_0335171
BOP_0335176
BOP_0335178
CORECIVIC_0000001
CORECIVIC_0001329
CORECIVIC_0008068
CORECIVIC_0024022

CORECIVIC_0024796
CORECIVIC_0024798
CORECIVIC_0024802
CORECIVIC_0024804
CORECIVIC_0024808
CORECIVIC_0028995
CORECIVIC_0029150
CORECIVIC_0029153
CORECIVIC_0035976
CORECIVIC_0043786
CORECIVIC_0044374
CORECIVIC_0044795
CORECIVIC_0047430
CORECIVIC_0049073
CORECIVIC_0049076
CORECIVIC_0049078
CORECIVIC_0059412
CORECIVIC_0076530
CORECIVIC_0086675
CORECIVIC_0088386
CORECIVIC_0095251
CORECIVIC_0121477
CORECIVIC_0125304
CORECIVIC_0186382
CORECIVIC_0334920
CORECIVIC_0334958
CORECIVIC_0393682
CORECIVIC_0502774
CORECIVIC_0507792
CORECIVIC_0660298
CORECIVIC_0660301
CORECIVIC_0660304
CORECIVIC_0678573
CORECIVIC_0683222
CORECIVIC_0891831
CORECIVIC_0960355
CORECIVIC_0966584
CORECIVIC_0975908
CORECIVIC_0975912
CORECIVIC_0990186
CORECIVIC_0990221
CORECIVIC_0990291
CORECIVIC_0994540
CORECIVIC_0995243
CORECIVIC_0996986
CORECIVIC_1001453
CORECIVIC_1001457
CORECIVIC_1002812
CORECIVIC_1002813
CORECIVIC_1008314
CORECIVIC_1008573
CORECIVIC_1008742
CORECIVIC_1008990
CORECIVIC_1009039

CORECIVIC_1009058
CORECIVIC_1009218
CORECIVIC_1011291
CORECIVIC_1017410
CORECIVIC_1047809
CORECIVIC_1048125
CORECIVIC_1048127
CORECIVIC_1048130
CORECIVIC_1048594
CORECIVIC_1049784
CORECIVIC_1051670
CORECIVIC_1052021
CORECIVIC_1057091
CORECIVIC_1057300
CORECIVIC_1057675
CORECIVIC_1057950
CORECIVIC_1058102
CORECIVIC_1060946
CORECIVIC_1062186
CORECIVIC_1064324
CORECIVIC_1072604
CORECIVIC_1072610
CORECIVIC_1084364
CORECIVIC_1084365
CORECIVIC_1084370
CORECIVIC_1084374
CORECIVIC_1084378
CORECIVIC_1084381
CORECIVIC_1084389
CORECIVIC_1084392
CORECIVIC_1084397
CORECIVIC_1084401
CORECIVIC_1084409
CORECIVIC_1084413
CORECIVIC_1084426
CORECIVIC_1084430
CORECIVIC_1084440
CORECIVIC_1084873
CORECIVIC_1084878
CORECIVIC_1084882
CORECIVIC_1084886
CORECIVIC_1085940
CORECIVIC_1085944
CORECIVIC_1085965
CORECIVIC_1085971
CORECIVIC_1085976
CORECIVIC_1085990
CORECIVIC_1086031
CORECIVIC_1086048
CORECIVIC_1086664
CORECIVIC_1086669
CORECIVIC_1086670
CORECIVIC_1088594
CORECIVIC_1089461

CORECIVIC_1089677
CORECIVIC_1101398
CORECIVIC_1101411
CORECIVIC_1131511
CORECIVIC_1131928
CORECIVIC_1137602
CORECIVIC_1145995
CORECIVIC_1153036
CORECIVIC_1153235
CORECIVIC_1153605
CORECIVIC_1153773
CORECIVIC_1157988
CORECIVIC_1164202
CORECIVIC_1168850
CORECIVIC_1179376
CORECIVIC_1191980
CORECIVIC_1197219
CORECIVIC_1204519
CORECIVIC_1233702
CORECIVIC_1248881
CORECIVIC_1255135
CORECIVIC_1255758
CORECIVIC_1255871
CORECIVIC_1272428
CORECIVIC_1288741
CORECIVIC_1314138
CORECIVIC_1331967
CORECIVIC_1337320
CORECIVIC_1337332
CORECIVIC_1337342
CORECIVIC_1337379
CORECIVIC_1337417
CORECIVIC_1337426
CORECIVIC_1337442
CORECIVIC_1337450
CORECIVIC_1337493
CORECIVIC_1337585
CORECIVIC_1337591
CORECIVIC_1337660
CORECIVIC_1337672
CORECIVIC_1337756
CORECIVIC_1473396
CORECIVIC_1473714
CORECIVIC_1477235
CORECIVIC_1478950
CORECIVIC_1501382
CORECIVIC_1984392
CORECIVIC_2029724
CORECIVIC_2029728
CORECIVIC_2037897
CORECIVIC_2037899
CORECIVIC_2038385
CORECIVIC_2044941
CORECIVIC_2079558

4849-9823-8150.v1

CORECIVIC_2155593
EY-CORE-EWP-00000065
NOC 2014-001
RFP-PCC-0022

Office of the Inspector General, *U.S. Department of Justice, Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi* (December 2016), https://oig.justice.gov/reports/2016/a1708.pdfOIG.hhs.gov

Office of the Inspector General, U.S. Department of Justice, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* (August 2016), https://oig.justice.gov/reports/2016/e1606.pdf