# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and )
on Behalf of All Others Similarly Situated, )
                                                    )
                      Plaintiff,  )
                                                      )
      vs.                                              )
                                                    )
CORRECTIONS CORPORATION OF )
AMERICA, et al., )
                                                    )
                   Defendants.  )
_____)

Civil Action No. 3:16-cv-02267

Honorable Aleta A. Trauger

Magistrate Judge Jeffrey S. Frensley

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### REDACTED VERSION FILED PUBLICLY

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT .........................................................................................................3

        A.      Plaintiff Does Not Credibly Dispute Material Facts Regarding CoreCivic's
                Overall Performance ..................................................................................3

        B.      Plaintiff Cannot Overcome Summary Judgment On Falsity ...................5

                1.      The Pre-December 2014 Statements Were Not False Or
                        Misleading..........................................................................................6

                2.      The Post-December 2014 Statements Were Not False Or
                        Misleading..........................................................................................7

                3.      The Cost Statements Were Not False Or Misleading .................9

        C.      Plaintiff Cannot Manufacture A Genuine Dispute As To Scienter......10

        D.      Plaintiff Offers No Evidence To Support Its Loss Causation Theory ..................11

                1.      There Is No Evidence That The Yates Memo Was The
                        Materialization Of A Concealed Risk.......................................12

                2.      There Is No Evidence That The Yates Memo Was Foreseeable ...............14

                3.      Plaintiff's Losses Would Have Been The Same No Matter What............15

III.    CONCLUSION....................................................................................................15

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**CASES**

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ...........................................................................13, 14

*Bondali v. YumA Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) .............................................................................5

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec.(USA) LLC*,
   752 F.3d 82 (1st Cir. 2014)......................................................................................14

*Delphi Auto. Sys., LLC v. United Plastics, Inc*.,
   418 F. App'x 374 (6th Cir. 2011) .............................................................................5

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).................................................................................................12

*In re Iso Ray, Inc. Sec. Litig.*,
   189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...............................................................13

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
   881 F.3d 750 (9th Cir. 2018) ..................................................................................13

*Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   830 F.3d 376 (6th Cir. 2016) .............................................................................11, 15

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...............................................................................11, 15

*Wielgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir. 1989) ..................................................................................15

*Zeller Corp. v. Federal-Mogul Corp.*,
   1996 WL 903951 (N.D. Ohio July 25, 1996) .........................................................11

**REGULATIONS**

Exec. Order No. 14006, 86 Fed. Reg. 7,483 (Jan. 26, 2021).........................................10

ii

# OTHER AUTHORITIES

Crim. Div. U.S. Dep't of Just. & Enf't Div. U.S. Secs. & Exch. Comm'n,
  *Resource Guide to the U.S. Foreign Corrupt Practices Act*, 64 (2d ed. 2020),
  https://www.justice.gov/criminal-fraud/file/1292051/download.............................................11

Case 3:16-cv-02267   Document 418   Filed 02/19/21   Page 4 of 22 PageID #: 23885

## I.    INTRODUCTION

Plaintiff's Opposition comes nowhere close to creating a genuine issue of material fact sufficient to overcome Defendants' Motion for Summary Judgment. Plaintiff does not demonstrate that *any* of the statements at issue here—which are generalized observations regarding the quality, contract renewals, and relative costs of the services CoreCivic provided to all of its government partners—were false or misleading, or made with scienter. Moreover, Plaintiff's loss causation theory—that the Yates Memo, which does not mention CoreCivic by name and impacted the entire industry, somehow revealed the fraud—defies undisputed facts and common sense.

Rather than engage in a statement-by-statement analysis, as it must, Plaintiff glosses over what the statements at issue actually said and attempts to redirect the Court's focus to two isolated events which, according to Plaintiff, show that Defendants "knew or should have known CCA's BOP business was in peril": the Adams disturbance in May 2012, and the BOP's decision not to execute a new contract with CoreCivic for the Northeast Ohio Correctional Center ("NEOCC") in December 2014. The undisputed events following the Adams incident paint a clear picture of the state of the relationship between the BOP and CoreCivic in the days, months, and years that followed. The BOP could have cancelled the Adams contract with CoreCivic immediately following the disturbance, as it did following a disturbance at one of CoreCivic's competitor's facilities. It did not. Instead, the BOP renewed the Adams contract with CoreCivic *twice* after the disturbance. The BOP even gave CoreCivic an award fee for Adams following the incident. In fact, CoreCivic was still operating the Adams facility for the BOP on the date of the Yates Memo, four years later. The Adams disturbance was tragic. But to claim it created a risk that Defendants knew about and fraudulently concealed for over four years is belied by the BOP's own conduct.

As for the December 2014 NEOCC contract non-renewal, the undisputed evidence demonstrates that the BOP chose not to award the contract to CoreCivic for a number of reasons,

the challenges CoreCivic faced in providing health services at other facilities being just one of them. But even if, as Plaintiff suggests, deficiencies in the provision of health services was the sole reason CoreCivic lost the NEOCC opportunity, that still does not create a genuine issue of material fact as to falsity or scienter for statements made after December 2014. The statements at issue referred to CoreCivic's "government partners," not just the BOP. In that context, the NEOCC facility was one of 64 to 85 facilities that CoreCivic operated for its "government partners" during the Class Period. Plaintiff does not dispute that CoreCivic's renewal rate with its government partners was 91% throughout the Class Period. Even at NEOCC, for example, the Marshals Service contracted with CoreCivic throughout the Class Period, and ICE contracted with CoreCivic to occupy the portion of the facility the BOP relinquished in December 2014. These undisputed facts powerfully undermine any assertion that Defendants' statements following the December 2014 NEOCC non-renewal were false or misleading, or made with scienter.

Plaintiff's loss causation theory is based on nothing more than Plaintiff's say so. It is undisputed that the Yates Memo did not refer to CoreCivic by name; that CoreCivic's biggest publicly traded competitor, GEO—who is not alleged to have engaged in any fraud—suffered an even more severe stock drop the same day; and that CoreCivic's and GEO's stock prices fully recovered following the 2016 presidential election and subsequent rescission of the Yates Memo. Not a single financial analyst attributed the Yates Memo to any quality or cost-related issues at CoreCivic. Not a single BOP or DOJ employee testified that the Yates Memo had anything to do with CoreCivic's quality or costs. And there is no evidence that any Defendant foresaw the Yates Memo. Simply put, even if Plaintiff could create a genuine issue of material fact with respect to falsity and scienter (it cannot), there is no evidence that the "fraud" proximately caused the stock drop that followed the Yates Memo. That failure alone requires summary judgment.

2

## II. ARGUMENT

### A. Plaintiff Does Not Credibly Dispute Material Facts Regarding CoreCivic's Overall Performance

The Opposition fails to address the disconnect between the undisputed evidence and Plaintiff's liability theory with respect to Defendants' statements regarding the quality of services provided to, and CoreCivic's relationship with, its government partners. Mot. at 12-14, ECF 367.

First, Plaintiff cannot credibly dispute that, during the Class Period, CoreCivic's renewal rate on its contracts with all government partners averaged over 91%, Mot. at 4; UF 3, and the BOP exercised all but one of CoreCivic's renewal options. UF 26, 27, 29, 30, 33, 34, 36, 37, 39, 40. Rather, Plaintiff asserts that CoreCivic's renewal rates are misleading because they "exclude[] instances where government customers chose not to renew CCA contracts after their final option periods." UF 5-11. But Plaintiff deliberately and incorrectly conflates an option *renewal* with a new contract *award*. *Cf.* Opp. at 9, ECF 396. The statements at issue refer to "renewal rates," not "new contract award" rates. Renewal rates are what they sound like: instances where government partners opted to renew an existing contract with CoreCivic—not instances where CoreCivic won a new competitive bid. CoreCivic's statements regarding its high renewal rates are true.

Second, Plaintiff cannot plausibly dispute that, in every CPAR during the Class Period, the official report of the BOP at each of CoreCivic's BOP facilities ███████████████████████ ████████████████████████████████ Mot. at 5; UF 74-76, 97-100, 124-28, 133-35, 136-38. Understandably, Plaintiff seeks to downplay the BOP's own determinations. So, Plaintiff suggests that CoreCivic purportedly "had the opportunity to provide all of [its] influence on" the CPARs and insinuates that this "influence" taints the conclusions. Opp. at 21. But this is nothing more than pure, unsupported speculation that the BOP failed to do its job; there is no evidence that the BOP did not honestly and independently reach the conclusions contained in the

3

CPARs.  PEx. 8 at 175:21-176:1 (Douglas Martz confirming there was "no reason to believe that [the] contracting officer wouldn't be honest" in the CPAR assessments).

The importance of this undisputed fact cannot be overstated because it powerfully demonstrates the truth of the statements at issue: *every year, at every facility, the BOP, in its official report regarding CoreCivic's performance, told CoreCivic that* █████████████ ███████████████████████████ UF 75-76, 97-100, 124-128, 133-38.  Plaintiff urges the Court to ignore this evidence because other audit results and notices of concern were, according to Plaintiff, the real "backbone of the relationship" between CoreCivic and the BOP.[1]  Opp. at 2.  But Plaintiff admits that those same deficiencies and notices of concern are considered in the CPARS, *id*., which "is the *official source* for past performance information."  Ex. 68 (FAR § 42.1501(b)) (emphasis added); PEx. 8 at 163:6-12.  The undisputed fact is that, despite the deficiencies identified by the BOP upon which Plaintiff relies, *the BOP still* ████████████████████ █████████████ throughout the Class Period.  *See* UF 74-76, 97-100, 125-128, 133-138, 197.  Plaintiff also does not dispute that during this same period, CoreCivic earned millions in award fees.  UF 21-23.  Instead, Plaintiff argues that CoreCivic could have earned even *more*. Opp. at 22.  But the fact that CoreCivic, theoretically, could have performed "above acceptable" on more occasions is irrelevant to the present analysis.  *See* UF 21, 24.

Finally, while Plaintiff persists in criticizing the quality of CoreCivic's performance in certain discrete areas, Plaintiff provides no basis for comparing CoreCivic's BOP facilities to any BOP-operated facilities (nor any other government partners' facilities) to establish a benchmark

---

[1] Plaintiff does not—and cannot—explain how the official record by statute (the CPARs) would be inadmissible while all of the BOP documents Plaintiff cites (such as notices of concern and CFMs) which are completed by the same on-site monitors would be admissible. *E.g.* Opp. at 13.

by which CoreCivic's performance could be measured. UF 63-65, 197; Ex. 19 ¶¶ 72-74.[2] There

is no evidence from which a jury could conclude that CoreCivic's facilities were not operated at a

level of quality at least equal to that of facilities operated by its government partners, thus rendering

Defendants' statements regarding CoreCivic's value proposition misleading.[3] *See* Mot. at 12-14.

### B. Plaintiff Cannot Overcome Summary Judgment On Falsity

Rather than attempting to identify evidence showing that a jury could find each challenged

statement false or materially misleading (or even each category of statement),[4] Plaintiff focuses

myopically on two events, one in May 2012 and one in December 2014, without connecting those

events to any statement. Because a trier of fact must decide whether each statement was false or

misleading at trial—through a separate question on the verdict form—Plaintiff must adduce

evidence sufficient to show that each statement was false when made. *Bondali v. YumA Brands,*

*Inc.*, 620 F. App'x 483, 491-92 (6th Cir. 2015). It has not done so. *Cf.* ECF 352-2 Appx. A.[5]

---

[2] Plaintiff's sole reference to another government partner is a claim that ICE was concerned with medical care at Cibola, but there is no evidence that this purported concern affected contracting decisions. During the Class Period, CoreCivic won two more contracts with ICE. UF 115, 132.

[3] Plaintiff cannot dispute that the BOP faced challenges at its facilities similar to those CoreCivic experienced in the areas of health services and staffing (among others), so it resorts to incorrectly arguing that this evidence is irrelevant. *See, e.g.*, UF 92-94, 118-20. But, as the Court previously recognized, the issue is whether CoreCivic truthfully or falsely represented that it provided a level of quality at its corrections facilities "at least equivalent to those that the governments provided themselves." ECF 76 at 24. Evidence regarding the quality of the BOP's performance at its facilities is unquestionably relevant to, and indeed critical to answering, that fundamental question.

[4] Plaintiff argues that the burden is on *Defendants* to "come forward with competent evidence" to disprove Plaintiff's allegations. Opp. at 4. That is not the law. Defendants must "present facts necessary to demonstrate that there was 'no genuine dispute as to any material fact[.]'" *Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 381–82 (6th Cir. 2011).

[5] Plaintiff asserts that Defendants are "attempt[ing] to rewrite" the challenged statements in Appx. A (Opp. at 4 n.6), which sets forth and categorizes the challenged statements (as identified in the Consolidated Complaint, ECF 57) in one document for the Court's convenience. Plaintiff argues that its Response to Interrogatory No. 13 (Ex. 156) is "the only valid compilation of the statements at issue here," (Opp. at n.6) but that response identifies *entire SEC filings* as "challenged statement(s)," and only identifies actual statements within those filings as "examples." *See, e.g.*,

## 1. The Pre-December 2014 Statements Were Not False Or Misleading

For each of the 63 challenged statements made prior to December 29, 2014 (*i.e.*, those made before CoreCivic's unsuccessful re-bid of the NEOCC facility) Plaintiff relies entirely on the May 2012 Adams disturbance in an effort to create a genuine dispute as to falsity, claiming that the Adams incident "permanently damaged [CoreCivic's] relationship with the BOP" and thus rendered every later statement CoreCivic made misleading. *See* Opp. at 5-9; *cf.* Mot. at 12, n.6. This effort fails. Most importantly, the inference Plaintiff attempts to draw regarding the state of CoreCivic's relationship with the BOP in the years that followed the incident is unsupportable, as reflected by the BOP's own actions. The BOP did not terminate the Adams contract; to the contrary, it renewed that contract, twice. UF 27, 30, 34, 37, 40. The BOP even gave CoreCivic an award fee at Adams following the incident. *See* Ex. 22. Four years later, BOP staff observed that CoreCivic's Adams facility was an example of why the Yates Memo's ████████████

████████████████████████████████████████████████

████████████████████████████████████████████[6]

---

Ex. 156 at 7 (identifying "CCA's Form 10-Q filed with the SEC on November 4, 2011" as a Challenged Statement). Plaintiff never alleged that entire SEC filings were false or misleading, and cannot amend its claims via its Interrogatory Responses.

[6] Plaintiff labels this tragic event as "unprecedented" and "unique," Opp. at 5-7, but prison disturbances were not unprecedented in 2012. *See, e.g.,* UF 92, 93. Certain details of the Adams disturbance made it different, but in that sense, all disturbances are "unique." *See* UF 92-94. Plaintiff cites testimony by witnesses who asserted they were not aware of riots at BOP-run low security prisons that followed the exact fact pattern as the events that transpired at Adams in May 2012. *See* Opp. at 5-6; *see, e.g.,* PEx. 2 at 153:7-15 (asking if witness was aware of "a BOP low security BOP-run facility where a riot or murder happened where hostages were taken, and not only was the facility plagued by the same significant deficiencies four years later, but for roughly half of the months that the staffing shortages were even lower than at the time of the riot"); PEx. 63 at 97:3-16 (asking if witness could "identify a single BOP-run low security facility that failed to notify local law enforcement for nearly two hours later than required in the event of a riot"). Plaintiff does not explain why this testimony—based only on the witnesses' memories and personal knowledge—is relevant to what impact this incident actually had on CCA's relationship with the BOP (or even what these witnesses believed in that regard). *Cf.* UF 92-94. Nor does

6

The inescapable truth is that from the start of the Class Period through December 2014, three out of CoreCivic's five BOP facilities never fell below satisfactory levels under their contracts, as Plaintiff's own purported expert conceded. Mot. at n.5. The first time that CoreCivic failed to win *new* business from the BOP (for a host of reasons) was its failed re-bid of NEOCC in December 2014. Plaintiff speculates that CoreCivic "saw [the 2014 failed bid at NEOCC] coming long before it became official," Opp. at 3, but its sole support is an email from CoreCivic's CFO in November 2014 asking whether a BOP request for clarification on CoreCivic's bid was "customary" and expressing his opinion that it was "alarming." PEx. 61. This email fails to show that anyone—including the CFO[7]—predicted, much less knew, that CoreCivic would lose the re-bid a month later. *Id.*; *see also* ECF 338-1 at 139:9-18 (Plaintiff's expert testifying that, to her knowledge, no one at the BOP told CoreCivic that they were unlikely to win this contract).

Plaintiff has no evidence that statements made before CoreCivic lost its re-bid for NEOCC were false when made. Summary judgment should be granted with respect to these statements. Appx. A, Stmt. 1-3, 6-8, 11-13, 16-18, 21-32, 44-56, 63, 70, 77, 78, 96, 105-107, 110-127.

### 2.    The Post-December 2014 Statements Were Not False Or Misleading

Similarly, Plaintiff relies on isolated events at two CoreCivic facilities to support its theory that all 71 statements made after December 29, 2014 were false or misleading: (i) the loss of the NEOCC bid on that date; and (ii) the Cibola Cure Notice in January 2015.[8] Neither event (the fact of which Defendants do not dispute) is sufficient to defeat summary judgment.

---

Plaintiff dispute that the incident was publicly reported on during the Class Period. UF 86, 87, 91.

[7] Mr. Garfinkle explained that, at the time, he was "new to [his] role," and this was the "first . . . rebid that [he] had gone through" as CFO, whereas previously he "did not . . . review procurements and exchanges back and forth between customers and CoreCivic." PEx. 56 at 211:8-15.

[8] Plaintiff does not dispute that the BOP exercised its option periods at CoreCivic's Eden and McRae facilities at every opportunity during the Class Period. *See* UF 34, 37.

First, Plaintiff's claim that CoreCivic lost the NEOCC contract award based solely on past performance is contradicted by the record. Opp. at 9-11. Plaintiff cites an internal BOP document, Ex. 85 (the Source Selection Decision), which lists █████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████ UF 111. That undisputed evidence, on its face, debunks Plaintiff's theory. Moreover, there is no evidence that the BOP shared this confidential Source Selection Decision with CoreCivic.[9] The evidence shows that CoreCivic executives had a debriefing call where the BOP informed CoreCivic that its decision was based on several factors, including ████████████████████████████████████████

████████████████████████████████████████████████████████ *See* PEx. 17 at 13; Ex. 91; PEx. 18. There is no evidence or testimony that the BOP told CoreCivic during this meeting that it was unlikely to be awarded other contracts in the future, or that CoreCivic believed the decision to be based solely on its past performance.[10] But even if, as Plaintiff claims without support, "past performance" was the sole reason why CoreCivic was not selected by the BOP, this single lost opportunity *still* does not create a genuine issue of material fact about the falsity of all statements Defendants made after December 2014 regarding CoreCivic's relationships with, and quality of services provided to, its government partners generally.

Plaintiff's claims about deficiencies at Cibola fare no better. The Cure Notice, received on

---

[9] The only evidence Plaintiff cites to dispute this issue is the testimony of Robert Bland, a BOP employee, who "couldn't say one way or the other" whether the Source Selection Decision was shared with CoreCivic. *See* UF 112 (citing Ex. 88 at 201:15-20).

[10] Plaintiff makes much of Hininger's so-called "admi[ssion]" that he failed to disclose this "damning information." Opp. at 11. Hininger acknowledged that based on CoreCivic's disclosure process—where "all that information" is "take[n] . . . into account"—CoreCivic determined that no disclosure was required. *See* PEx. 99 at 247:15-260:7. That this fact was not disclosed is undisputed; the question is whether Defendants had a duty to disclose it and Plaintiff cannot show disclosure was necessary to render CoreCivic's otherwise truthful statements not misleading.

January 9, 2015, UF 116, was lifted after just five months, a month prior to which the BOP had congratulated CoreCivic on its "excellent progress." UF 122-123. Hyperbolic accusations aside, Plaintiff presents no evidence that the staffing and healthcare challenges CoreCivic experienced at Cibola (or for that matter, Eden and Adams) were unique to CoreCivic, UF 118, or that CoreCivic did not believe it had appropriate plans in place to address them. The record does not support the illogical leap Plaintiff makes from CoreCivic's knowledge of certain *deficiencies*, to a claim that CoreCivic knew its entire relationship with the BOP was in peril. UF 76, 100, 128, 135, 138.

### 3. The Cost Statements Were Not False Or Misleading

With regards to the cost-specific statements, Plaintiff asks the Court to ignore the language of the statements at issue—*i.e.*, that CoreCivic provided a cost-effective option to its government partners—based on an erroneous assertion that "any apples-to-apples comparison of BOP to CCA is impossible." Opp. at 19; UF 155-56, 161, 168-69, 178, 184; *see also* UF 157, 174-76 (arguing facts demonstrating literal truth of statements are irrelevant). This *non sequitur* cannot relieve Plaintiff of its burden to prove falsity or come forward with a genuine factual dispute.

There is no dispute that an apples-to-apples comparison of overall costs is not possible. Ex. 134 ¶¶ 22-25; ECF 382 at 1. That does not matter, because CoreCivic never said it made such a comparison. UF 159, 161, 170-175. CoreCivic made specific and reasonably qualified statements including quantitative and qualitative comparisons of particular categories of costs, while disclosing the assumptions and adjustments it made.[11] *See* Ex. 134 ¶¶ 8, 30, 43; *see also* UF 155, 156, 161, 168-169, 178, 184. Plaintiff cannot dispute that similar methodology is regularly

---

[11] Plaintiff also makes the argument that "Defendants had no reasonable basis for their material misrepresentations and omissions because . . . CCA had not compared its costs savings with those run by its private competitors." Opp. at 19. But Defendants have never purported to make any statements comparing its costs to those of other private contractors.

applied by academics, nor can it offer any evidence demonstrating that the actual cost comparisons are inaccurate. Ex. 134 ¶¶ 21-25 (summarizing academic literature); Opp. at 18-19. Plaintiff cannot avoid summary judgment by simply saying "impossible." It has to come forward with facts from which a jury could conclude that the statements *actually made* were misleading.

### C. Plaintiff Cannot Manufacture A Genuine Dispute As To Scienter

Plaintiff cannot dispute that, while the BOP consistently informed CoreCivic through the CPARs that it would ███████████████████████, no one at the BOP ever told anyone at CoreCivic that CoreCivic was at risk of losing all of its BOP contracts before the Yates Memo gave that message to all private contractors.[12] Ex. 58 at 150:16-20; SUF 114. Unable to establish scienter for any Defendant as to any specific statement, Plaintiff just rehashes a number of false accusations in an attempt to manufacture a dispute:

- First, Plaintiff falsely claims that Defendants had access to the BOP's After-Action Report concerning Adams, Opp. at 6 n.7, when in fact the report was not shared with CoreCivic until it was produced in this litigation; Plaintiff's claim to the contrary was specifically investigated and rejected by the Special Master. ECF 305 at 13-15; ECF 381 at 4.

- Second, Plaintiff falsely alleges that CoreCivic hurt its BOP relationship by "lying" or "inflating" its staffing numbers at Adams. Opp. at 6. The report Plaintiff cites states that "[b]oth the BOP and CoreCivic [said] they interpreted the contract to allow the calculation of staffing levels" according to the method CoreCivic utilized, and BOP officials told OIG that "CoreCivic's reporting was consistent with the contract." PEx. 87 at iii.[13]

- Third, and most egregiously, Plaintiff falsely accuses Defendants of criminal bribery based on nothing more than selective and misleading quotations from innocuous internal

---

[12] Indeed, CoreCivic's relationship with the BOP was *not* at risk, *see supra* pp. 3-4, and CoreCivic continues to serve the BOP to this day, *see* Ex. 165 at 10. Shortly after his election, President Biden issued an Executive Order reinstituting the policy announced in the Yates Memo, citing the same OIG Review, and like the Yates Memo, making no distinction between the various private operators. *See* Exec. Order No. 14006, 86 Fed. Reg. 7,483 (Jan. 26, 2021), https://www.govinfo.gov/content/pkg/FR-2021-01-29/pdf/2021-02070.

[13] Plaintiff tries to bolster its argument regarding alleged staffing issues at Adams by citing a completely unrelated issue involving lower-level employees at a facility CoreCivic operated for the State of Idaho. *See* Opp. at 6, 9, 13. This was not a BOP contract, and while the BOP was aware of the issue, there is no evidence that it affected CoreCivic's BOP relationship. UF 225.

CoreCivic correspondence. The email discussed an idea about possibly offering the BOP a voluntary $1 million discount on the Cibola contract price—to improve the prospects for renewal. PEx. 80. Even if this proposal had been made—it was not—there is nothing illegal about it. Offering a discount to a customer is not bribery.[14] And no one (other than Plaintiff in its briefing in this case) has suggested that the discount discussed in the email was in any way illegitimate, improper, or criminal.[15]

In short, none of the facts Plaintiff points to is sufficient to allow a trier of fact to reasonably conclude that Defendants knew or recklessly disregarded the risk, at any time, that CoreCivic's entire BOP business would collapse (which it never did), or that should have caused Defendants to know that their general statements regarding quality and cost for all government partners were misleading because of operational challenges at a handful of BOP facilities (which they were not).

### D.     Plaintiff Offers No Evidence To Support Its Loss Causation Theory

Plaintiff bears the burden to prove that the alleged fraud was the proximate, but-for cause of the losses suffered. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 345-46 (2005); *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010).[16] Plaintiff first attempts to avoid this burden altogether by claiming (wrongly) that the Court already decided the issue. Opp. at 24.

---

[14] *Cf. Zeller Corp. v. Federal-Mogul Corp.*, 1996 WL 903951, at *3-4 (N.D. Ohio July 25, 1996) (dismissing bribery claim because the case involved "a discount given directly to a buyer by a seller"); Crim. Div. U.S. Dep't of Just. & Enf't Div. U.S. Secs. & Exch. Comm'n, *Resource Guide to the U.S. Foreign Corrupt Practices Act*, 64 (2d ed. 2020), https://www.justice.gov/criminal-fraud/file/1292051/download (discounts are not inherently problematic).

[15] Plaintiffs mischaracterize deposition testimony in an effort to bolster their baseless bribery accusation. Defendants' expert, Scott Dodrill, was asked whether he ever "request[ed] money to be paid to the BOP as an inducement *disguised as a deduction*[.]" PEx. 3 at 211:3-5 (emphasis added). Similarly, Mr. Lappin, who had no knowledge of the discount proposal Hininger and Garfinkle discussed, never opined on the "legitimacy" of the proposal. PEx. 62 at 228:23-229:5.

[16] Plaintiff does not seriously contest the applicable legal standards for its materialization of risk theory or that it is ripe for summary judgment. Defendants identified numerous cases granting or affirming summary judgment for failure to establish loss causation under this theory. *See* Mot. at 21-22 & n.14. Plaintiff did not cite any to the contrary. Opp. at 24-30.

But the Court could not have done so, and indeed it did not.[17]  Plaintiff only offers this desperate suggestion now because, more than two years later, it is clear that there is no evidence whatsoever that CoreCivic's allegedly deteriorating relationship with the BOP was a proximate cause of the Yates Memo.[18]  This failure of proof is fatal, and warrants summary judgment.

1.      **There Is No Evidence That The Yates Memo Was The Materialization Of A Concealed Risk**

Plaintiff claims that "[t]he causal connection between Defendants' failure to disclose the risks to CCA's BOP business due to CCA's poor performance and the DOJ announcing that the BOP would end its relationship with CCA due to poor performance could not be more direct." Opp. at 26.  That is not what the Yates Memo said.  Ex. 123.  Nor is it reflective of the opinion of senior BOP officials, who stated that the Yates Memo's █████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████  UF 141.  Nor can Plaintiff rely on any expert testimony for this proposition, because neither of its "experts" were willing to sponsor it.  ECF 417.[19]

_____

[17] Plaintiff flip-flops on this issue, having taken the opposite (and correct) position at class certification: "[W]hether there was a causal connection between [the] price declines and Plaintiff's loss . . . . is a common question of loss causation that the Supreme Court has repeatedly held *cannot* be answered at class certification."  ECF 120 at 5 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807–08 (2011)); *see also* ECF 390 at 9-11.  At class certification, the Court accepted Plaintiff's representation that "the record suggests that, insofar as the Yates Memorandum can be said to reflect a political decision, that political decision was driven by precisely the deficiencies that Amalgamated has highlighted."  ECF 143 at 14.  But to be clear, Plaintiff's side of the "record" at that point consisted of nothing but conjecture from counsel, because Plaintiff had not put forth any evidence, fact or expert, on loss causation.

[18] Plaintiff also fails to identify a triable issue with respect to the stock drop following the Cibola non-renewal.  Mot. at 30.  Plaintiff concedes that the same information about the Cibola non-renewal that allegedly caused a decrease in CoreCivic's stock price on August 3, 2016, had previously been disclosed on August 1 and 2 to no price reaction.  ECF 386 at 8; *see* ECF 342 at 9-11; Ex. 78 ¶¶ 77-83.

[19] Numerous cases flatly contradict Plaintiff's suggestion that expert testimony on loss causation is impermissible, and Plaintiff's counsel routinely submit expert testimony in support of their

There is not a single securities analyst report or news article agreeing with Plaintiff's theory that the Yates Memo was caused by CoreCivic's supposedly deficient BOP relationship. *See* Ex. 78 ¶¶ 50, 52-61; Ex. 158 ¶¶ 21-24. To the contrary, *every* analyst report and news article on the Yates Memo (including those Plaintiff appended to its *Daubert* Motion to Exclude Lucy Allen) said it was driven by non-fraud concerns: namely, the recent OIG Review and the Obama Administration's policy agenda. *See* Ex. 78 ¶¶ 50, 52-61; Ex. 158 ¶¶ 21-24; ECF 390 at 14-16.

The Yates Memo did not reveal any new information about CoreCivic's quality or cost-effectiveness, or their supposed impact on CoreCivic's relationship with the BOP. Mot. at 24-26.[20] Plaintiff's only substantive arguments—that "Defendants were still actively misleading investors" until the Yates Memo, and "disclosures about the Adams riot and the Cibola non-renewal did not reveal the most damning aspects of both these failures," Opp. at 27-28—falter for the same reason: the Yates Memo revealed *nothing* about these supposedly concealed "aspects" of CoreCivic's operations, and there is no evidence that the Yates Memo was motivated by this supposedly concealed information rather than the publically disclosed findings of the OIG Review—which is the only source cited in the Yates Memo. Plaintiff has no idea what motivated

---

clients' loss causation theories when, unlike in this case, they are able to find experts willing to offer supporting opinions. *See* ECF 390 at 7-8 & n.9; *see also* ECF 417 at 5 n.4.

[20] Unable to rebut this point on the merits, Plaintiff misclassifies it as a "truth-on-the-market defense." Opp. at 27-28. "Truth-on-the-market" is an affirmative defense to material falsity that "excuses a defendant's failure to disclose material information where the information was made credibly available to the market by other sources." *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016). It has no application to Defendants' loss causation argument: that investors were not reacting to new information about CoreCivic's allegedly "poor performance," Opp. at 27, because the Yates Memo did not reveal new information about CoreCivic. Plaintiff also misrepresents the effect of the Ninth Circuit's *First Solar* decision. Opp. at 27 n.28. While it restated the familiar maxim that "the alleged fraud" need not be "revealed prior to the economic loss," the facts concealed by the defendants' fraud still must be revealed. *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). That, indisputably, was not the case here.

the Yates Memo, because its counsel never deposed anyone who worked on it and they never sought document discovery from the DOJ.[21]  The undisputed facts are clear:  Plaintiff's Yates Memo causation theory is not just wrong, it is not supported by any evidence.  Mot. at 26, 28-29; *see* ECF 76 at 37 (the alleged "issues" must be what "ultimately resulted in the DOJ's shift"); *In re BofI*, 977 F.3d at 792 (the "relevant question" is whether the market "reasonably perceived" an event as revealing the allegedly concealed facts); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec.(USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014).

### 2.    There Is No Evidence That The Yates Memo Was Foreseeable

Plaintiff fails to submit evidence showing when the DOJ conceived the Yates Memo's policy shift, whether it consulted with the BOP prior to doing so, or how CoreCivic should have known that such a directive was forthcoming.  Plaintiff also ignores the frequent contradictory signals that the BOP sent CoreCivic and other private prison companies—the numerous contract renewals during the Class Period, the unblemished CPAR record, and the fact that the only contract re-bid that CoreCivic lost for a BOP facility was lost to GEO.  Mot. at 4-6.  While Plaintiff cites deficiency notices and other examples of negative BOP feedback, there is nothing that suggested a foreseeable risk of the DOJ eliminating the BOP's ability to contract with private prisons.

Plaintiff's only response is to assert, without factual support or legal citation, that Defendants need not be able to "precisely predict the date and manner in which the risks concealed by their fraud would manifest" because "[w]hen and how the realization of that risk was revealed is irrelevant."  Opp. at 25 n.27, 26.  But Plaintiff concedes, as it must, that the "particular event"

---

[21] Plaintiff's reference to the unfounded "revolving door" allegation of Douglas Martz, a former BOP employee, proves that the Yates Memo did not reveal new information about the alleged fraud.  Opp. at 28.  Martz was quoted extensively on the very same allegation in The Nation *prior to* the Yates Memo, Ex. 76 at 11-12, to no stock price reaction, Ex. 78 ¶ 44.

that "caused the loss" must have been "foreseeable" to be within the "zone of risk" allegedly concealed by the alleged misstatements. *Ohio Pub. Emps.*, 830 F.3d at 384-85, 387; *see* Mot. at 21-22; Opp. at 25. Plaintiff mischaracterizes the Yates Memo as revealing "the BOP phasing out its relationship with CCA as result [sic] of its . . . performance failures," Opp. at 28, but that is not what happened. The DOJ, not the BOP, decided to limit future contracts with the entire industry, not just CoreCivic, and there is no indication that its decision was based on CoreCivic's performance. That was not remotely foreseeable. Summary judgment is thus required. *Omnicom*, 597 F.3d at 513-14; *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989).

### 3. Plaintiff's Losses Would Have Been The Same No Matter What

For four years, Plaintiff has failed to explain the almost identical changes in CoreCivic's and GEO's stock prices following the Yates Memo and 2016 presidential election. If it were true, as Plaintiff claims, Opp. at 5, 10-11, 19; Ex. 157 ¶¶ 30-36, that GEO did *not* suffer from the same operational deficiencies and an impaired relationship with the BOP, why did the DOJ treat GEO *exactly* the same as CoreCivic in the Yates Memo? And if the Yates Memo revealed fraud by CoreCivic, but *not* GEO, why did both companies' stock prices plummet by almost exactly the same percentage? The answer is simple: neither company's stock drop following the Yates Memo was caused by fraud. *See* Mot. at 28-29; Ex. 78 ¶¶ 75-76; Ex. 158 ¶¶ 25, 36.[22]

### III. CONCLUSION

Defendants respectfully request that the Court grant summary judgment in their favor.

_____

[22] Plaintiff's attempt to distinguish the case law on this point falls flat. Opp. at 29 n.32. Plaintiff concedes that *Dura* requires disaggregation of "losses *unrelated* to the alleged fraud." *Id.* That is exactly the point: there is ample evidence showing that the market reacted to something *other than* the Yates Memo's supposed revelation of fraud. Mot. at 28-29. Plaintiff's naked assertion to the contrary is insufficient to survive summary judgment. *Id.*

DATED:  February 19, 2021                    Respectfully submitted:

                                       /s/ *Steven A. Riley*
                                       Steven A. Riley (TN #6258)
                                       Milton S. McGee, III (TN #024150)
                                       RILEY WARNOCK & JACOBSON, PLC
    1906 West End Avenue
    Nashville, TN 37203
    T: (615) 320-3700
    F: (615) 320-3737
    sriley@rwjplc.com
    tmcgee@rwjplc.com

    David J. Schindler (admitted *pro hac vice*)
    Brian T. Glennon (admitted *pro hac vice*)
    Meryn C. N. Grant (admitted *pro hac vice*)
    LATHAM & WATKINS LLP
    355 South Grand Avenue, Suite 100
    Los Angeles, CA 90071
    T: (213) 485-1234
    F: (213) 891-8763
    david.schindler@lw.com
    brian.glennon@lw.com
    meryn.grant@lw.com

    Morgan E. Whitworth (admitted pro hac vice)
    LATHAM & WATKINS LLP
    505 Montgomery Street, Suite 2000
    San Francisco, CA 94111
    T: (415) 391-0600
    F: (415) 395-8095
    morgan.whitworth@lw.com

    Sarah A. Tomkowiak (admitted *pro hac vice*)
    LATHAM & WATKINS LLP
    555 Eleventh Street, NW, Suite 1000
    Washington, DC 20004-1304
    T: (202) 637-2335
    F: (415) 637-2201
    sarah.tomkowiak@lw.com

    *Attorneys for Defendants Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway, Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike,  Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Mark H. Wildasin
FEDERAL BUREAU OF PRISONS
110 9th Avenue South, Suite A-961
Nashville, TN 37203
mark.wildasin@usdoj.gov

Christopher T. Cain
SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com

this 19th day of February, 2021.

/s/ *Steven A. Riley*
Steven A. Riley