# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and
on Behalf of All Others Similarly Situated,

                         Plaintiff,

    vs.

CORRECTIONS CORPORATION OF
AMERICA, et al.,

                       Defendants.

) Civil Action No. 3:16-cv-02267
)
) Honorable Aleta A. Trauger
)
) Magistrate Judge Jeffrey S. Frensley
)
)
)
)
)
)
)
)

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS THAT PRESENT GENUINE ISSUE TO BE TRIED

### REDACTED VERSION FILED PUBLICLY

## I. EXAMPLES OF DEFENDANTS' MISLEADING STATEMENTS[1]

198. Hininger's annual letter to shareholders, dated March 30, 2016, emphasized: "Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners. By consistently doing so, we have experienced more than three decades of continued growth and contract retention rates in excess of 90 percent." PEx. 38 at 10. The letter also stated that it was "CCA's value proposition to our government partners [that] continue[d] to make [it] the premier provider in the industry and an ideal solution for correctional systems seeking new or replacement facilities." *Id.* at 16. The letter went on:

> We take pride in our strong record of operational excellence that has earned CCA the confidence of our government partners. To maintain this confidence CCA is focused on our long-term performance. This requires we provide our facilities and staff with the necessary resources to operate the best corrections, detention and residential reentry facilities. It is only through our commitment to our long-term performance that CCA will drive future growth and increase shareholder value.

*Id.* at 10.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the exhibited letter. Defendants dispute that the letter "emphasized" the quoted language; the letter speaks for itself.

199. In discussing the renewal or non-renewal of facility management contracts, the November 4, 2011 quarterly report filed on Form 10-Q with the SEC ("3Q11 report") stated:

> We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

PEx. 39 at 7.

---

[1] Defendants have included the headings from Plaintiff's Statement, ECF No. 397, in this Response for completeness. Defendants dispute that they made any misleading statements.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the referenced SEC filing.  Defendants object on the basis that the evidence cited in support of this Fact—PEx. 39, Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories—is inadmissible as hearsay, *Granberry v. Baptist Memoriall Hospital*, 145 F.3d 1331 (6th Cir. 1998) (holding that interrogatory response was inadmissible hearsay), and a violation of the best evidence rule, *see* Federal Rule of Evidence 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").

200.    CCA repeated this identical statement in its 2011 through 2015 annual reports filed on February 27, 2012, February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016, respectively, and in its quarterly reports filed on May 7, 2012, August 9, 2012, November 8, 2012, May 9, 2013, August 8, 2013, November 7, 2013, May 8, 2014, August 7, 2014, November 5, 2014, May 7, 2015, August 6, 2015, November 5, 2015, May 5, 2016 and August 4, 2016.  *Id.* at 10, 15, 17, 21, 26, 29, 34, 39-40, 47, 53, 58, 69, 74, 83, 93, 107, 118, 137.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the referenced SEC filings.  Defendants object to this Fact for the same reasons set forth in response to Fact 199 above:  the evidence cited in support of this Fact—PEx. 39, Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories—is inadmissible as hearsay, *Granberry*, 145 F.3d 1331, and a violation of the best evidence rule, *see* Federal Rule of Evidence 1002.  Defendants also object to the Fact as mischaracterizing the evidence; Plaintiff does not identify the quarterly report filed on August 9, 2012 in PEx. 39.

201.     On June 8, 2016, CCA gave a presentation at REITWeek: NAREIT's Investor Forum.  Hininger and Garfinkle participated on behalf of CCA.  In response to a question about the political climate with respect to private prisons, Hininger stated:

> One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements.  But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well.  We have operationally made sure that we are providing high quality and standard and consistent services to our partners and being very flexible and innovative in the solutions.  And with that, we've had some nice growth in our business under those three respective Presidents.  We had a lot of growth under Clinton, we had a lot of growth under Bush, and we've had a lot of growth under President Obama.  And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings both on capital voids, but also cost savings in our services, then I think we'll be just fine.

*Id.* at 133.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the transcript of the presentation referenced.  *See* Ex. 161 at 6.[2] Defendants dispute this Fact to the extent that Plaintiff mischaracterizes the evidence through selective quotation; the transcript speaks for itself.  Defendants object to this Fact for the same reasons set forth in response to Fact 199 above:  the evidence cited in support of this Fact—PEx. 39, Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories—is

---

[2] References to Exs. 1 through 161 correspond to the exhibits in the Declaration of Meryn C. N. Grant, filed concurrently with Defendants' Motion for Summary Judgment.  ECF No. 360. References to Exs. A through Y correspond to the exhibits in the Declaration of Patrick Swindle, also filed concurrently with Defendants' Motion for Summary Judgment.  ECF No. 355. References to PExs. 1 through 107 correspond to the exhibits in the Declaration of Christopher M. Wood, filed concurrently with Plaintiff's Opposition to Defendants' Motion for Summary Judgment.  ECF No. 398.

inadmissible as hearsay, *Granberry*, 145 F.3d 1331, and a violation of the best evidence rule, *see* Federal Rule of Evidence 1002.[3]

202.     On November 5, 2015, CCA filed with the SEC its quarterly report ("3Q15 report") for the three months ended September 30, 2015.  The 3Q15 report stated:

> Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years.  Inmate populations in the BOP system are expected to decline further in the fourth quarter of 2015, and potentially future quarters, primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses.  However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses.

*Id*. at 93.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the referenced SEC filing.  *See* Ex. N at 38.  Defendants object to this Fact for the same reasons set forth in response to Fact 199 above:  the evidence cited in support of this Fact—PEx. 39, Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories—is inadmissible as hearsay, *Granberry*, 145 F.3d 1331, and a violation of the best evidence rule, *see* Federal Rule of Evidence 1002.

203.     CCA repeated this statement in its 2015 annual report filed on February 25, 2016, and in its quarterly reports filed on May 5, 2016 and August 4, 2016, with the only alteration being to change the second sentence to state: "Inmate populations in the BOP system declined in 2015

---

[3] As noted, Plaintiff relies solely on its own Objections and Responses to Defendants' Second Set of Interrogatories in support for its Additional Facts Nos. 199-205 in Plaintiff's Section I: Examples of Defendants' Misleading Statements.  For the Court's benefit, where the original disclosures in which these statements were made have been previously submitted to the Court, Defendants cite to the record in these responses.  Upon request, if it would enhance the efficiency of the Court's review, Defendants are happy to supplement the record to include the underlying disclosures that have not previously been submitted to the Court.

and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses." *Id*. at 107, 119, 137.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the referenced SEC filings.  Defendants dispute this Fact to the extent that Plaintiff mischaracterizes the evidence through selective quotation; the SEC filings speak for themselves.  Defendants also object to this Fact for the same reasons set forth in response to Fact 199 above:  the evidence cited in support of this Fact—PEx. 39, Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories—is inadmissible as hearsay, *Granberry*, 145 F.3d 1331, and a violation of the best evidence rule, *see* Federal Rule of Evidence 1002.

204.    On March 5, 2012, the *Lewiston Morning Tribune* in Idaho ran an article titled: "Can private prisons be run cheaper?: In Idaho, no one has actually done the math to find out." The article questioned whether or not private prisons in fact save taxpayers any money.  In an email, a CCA spokesman asserted that the Company:

> "do[es] better than the competition. . . .  As a business we are able to provide taxpayers an essential government service at equally high standards of quality and efficiency, . . .  Competitive private-sector entities are motivated to move swiftly, evaluate and refine success each day, and maintain the highest operating standards at least cost."

*Id.* at 14.

**Response**:  Defendants object on the basis that this Fact relies on multiple levels of inadmissible hearsay, *see* Federal Rules of Evidence 802, 805, and for the same reasons set forth in response to Fact 199 above:  the evidence cited in support of this Fact—PEx. 39, Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories—is inadmissible as hearsay, *Granberry*, 145 F.3d 1331, and a violation of the best evidence rule, *see* Federal Rule of Evidence 1002.

If admitted, for the purposes of ruling on summary judgment only, it is undisputed that on March 5, 2012, an article in the Lewiston Morning Tribune titled: "*Can private prisons be run cheaper?: In Idaho, no one has actually done the math to find out*," was published and included the quoted language. Defendants dispute the second sentence of the Fact to the extent that it mischaracterizes the article, which speaks for itself. Defendants dispute the third sentence of the Fact as mischaracterizing the evidence; the article states that "Steve Owen, the spokesman for [CCA], says the company is highly motivated to comply with its contracts, meet its own standards of excellence and always 'do better than the competition.'" *See* Ex. 162, MARLOWE_0006997 at -998.[4]

205.    On October 2, 2013, CCA held a "2013 Analyst Day" to market itself to investors and analysts, particularly those interested in REIT investments in light of the Company's then-recent conversion to an REIT structure. Hininger, Mullenger and Lappin each participated in the presentations to investors and analysts. Among other things, CCA asserted that use of its services generates "[a]nnual costs savings of 12% or more," which savings "can fund programs to reduce population growth and recidivism." The presentation claimed that CCA's total cost per 1,000 beds was $55 to $65 million, with an average length of construction of one to three years, whereas government's total cost was $80 to $250 million, with an average length of construction of three to seven years. The presentation also claimed that use of CCA's services would "improve safety & inmate quality of life." CCA described this as a "[c]ompelling value proposition [that] has driven privatized market penetration higher." The presentation also claimed that CCA achieves an "[o]ptimal balance between . . . meeting or exceeding customer and [American Correctional

---

[4] References to Exs. 162 through 166 correspond to the exhibits in the Declaration of Meryn C. N. Grant, filed concurrently herewith.

Association] quality standards[,] minimizing construction cost per bed[,] minimizing operating and maintenance costs[,] maximizing desirability of beds (competitive *per diem*, location suitable for multiple customers, ability to house various security levels and multiple customers, 'just-in-time' availability)[, and] exceeding ROI hurdle rates." Ex. 137 at 15-16, 39; PEx. 39 at 33.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the presentation cited. Defendants dispute this Fact to the extent that the Fact speculates as to, or mischaracterizes, the purpose of the presentation or its contents. Defendants also dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation; the presentation speaks for itself. Defendants object to the first two sentences of the Fact because they are not supported by the cited evidence, violating Local Rule 56.01(b) ("Each fact must be supported by a specific citation to the record."). Defendants also object to the Fact to the extent that it relies on PEx. 39 for the same reasons set forth in response to Fact 199 above: PEx. 39 (Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories) is inadmissible as hearsay, *Granberry*, 145 F.3d 1331, and citing to it here is a violation of the best evidence rule, *see* Federal Rule of Evidence 1002.

206. On November 7, 2014, CCA published a "Third Quarter 2014 Investor Presentation," which was provided to investors and posted on the "Investor Relations" section of the Company's website (the "3Q14 Presentation"). In that presentation, CCA emphasized to its investors an industry-funded report claiming that "short- and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality." CCA cited the same report in its "Fourth Quarter 2014 Investor Presentation," published February 24, 2015 (the "4Q14 Presentation"); its "First Quarter 2015 Investor Presentation," published May 19, 2015 (the "1Q15 Presentation"); its "Second Quarter 2015 Investor Presentation," published August 21,

2015 (the "2Q15 Presentation"); its "Third Quarter 2015 Investor Presentation," published November 12, 2015 (the "3Q15 Presentation"); its "Fourth Quarter 2015 Investor Presentation," published February 24, 2016 (the "4Q15 Presentation"); and its "First Quarter 2016 Investor Presentation," published May 17, 2016 (the "1Q16 Presentation"). In each of those presentations (except the 4Q14 Presentation, which used the phrasing of the original presentation), CCA just slightly modified the wording to state that "Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality." The 3Q14 Presentation also claimed that "Safety & Security is our **First** priority" and that CCA "[p]erform[s] quality services for our government partners and the offenders entrusted in our care." This statement was repeated in the 4Q14 Presentation, the 1Q15 Presentation, the 2Q15 Presentation, the 3Q15 Presentation, the 4Q15 Presentation and the 1Q16 Presentation.

**Response**: This Fact violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record." Plaintiff cites no evidence in support of this Fact. For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the presentations referenced. *See* Ex. 143 at 10, 36; Ex. 144 at 10, 36; Ex. 145 at 10, 33; Ex. 146 at 10, 31; Ex. 147 at 11, 32; Ex. 148 at 11, 33; Ex. 149 at 12, 34. Defendants dispute this Fact to the extent that Plaintiff mischaracterizes the evidence through selective quotation; the presentations speak for themselves. The presentations do not "emphasize to its investors an industry-funded report." Rather, the cited slides state "Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality" (or a variant), followed by a citation in a footnote: "A Policy Report issued by the independent Institute in June 2014. This study received funding by members of the private corrections industry." Also, whereas the last two sentences of this Fact

assert that certain slides state that CoreCivic "[p]erform[s] quality services for our government partners and the offenders entrusted in our care," in fact, that language appears on a slide entitled, "Operational Philosophy" and includes under the sub-heading "CCA integrates several Correctional Components," a bullet point stating: "Perform quality services for our government partners and the offenders entrusted in our care."

## II. COMMUNICATIONS ABOUT THE CCA/BOP RELATIONSHIP

207.  On October 7, 2005, the BOP published a report, with Harley G. Lappin as the lead author, titled: "Evaluation of the Taft Demonstration Project: Performance of a Private-Sector Prison and the BOP."  PEx. 5.  The report explained: "[t]he BOP did specify that the contractor for the [the private prison being evaluated] had to meet the requirements established by the American Correctional Association (ACA) accreditation standards.  The BOP uses ACA accreditation at its own prisons to establish a baseline of acceptable performance."  *Id.* at 5.  The report observed: "since BOP prisons and [the private prison being evaluated] are accredited by the American Correctional Association (ACA), it is likely that all prisons indeed did meet the baseline standards for correctional practices codified by ACA," even though "performance at [that prison] was problematic in a relative sense, *e.g.*, that performance did not compare favorably to similar BOP prisons."  *Id.* at 89.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay.  *See* Fed. R. Evid. 802.  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the report.  Defendants also dispute this Fact to the extent that it mischaracterizes the report's conclusions through selective quotation; the report speaks for itself.  Since the report only addresses "prison performance for the Taft Correctional Institution (TCI), operated by Wackenhut Corrections Corporation," PEx. 5 at vii, the report's conclusions as to the performance of TCI and Wackenhut Corrections Corporation is

immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

208. On January 18, 2012, CCA employees had a call with BOP representatives, including Doug Martz, Chief of Privatized Corrections Contracting. PEx. 40. The call "did not go well." *Id.* "Doug Martz stated he would not allow [CCA] to 'tap dance' around the requirement for 100% compliance" with ACA standards by contending that the McRae facility was "accredited" even though it "did not meet all non-mandatory standards for their 2004 and their 2007 audits." *Id.* Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 802, 805. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email. Defendants dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation; the email speaks for itself. *See* PEx. 40.

This Fact is also immaterial: the Fact quotes an email, sent more than a month before the Class Period, regarding the findings of ACA audits that occurred in 2004 and 2007, many years before the Class Period. The ACA audit findings with respect to one BOP-contract facility from years before the Class Period are immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners during the Class Period were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1407 (6th Cir. 1991). ("Under Rule 10b–5, the relationship between corporate insiders and the stockholders of a corporation gives rise to an obligation to 'disclose ***material*** facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment.'" (emphasis added) (quoting *Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed. 2d 348 (1980))).

209. On March 22, 2012, CCA employees, including Lappin, discussed by email a "recent BOP partnership meeting," at which:

> [W]e were confronted with our shortcomings in our BOP sites regarding our Subcontracting Plans. In short, and reading between the lines, if we don't conform to the contract requirements we are going to get hit with substantial financial penalties. This issue has gone on too long. . . . This can no longer be put on the back burner. It's critically important that we address this in going forward.

PEx. 41 at -177. A later email in the chain stated: "Just know that they are serious about and we continue to struggle with meeting the goals." *Id.* at -176. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: To the extent that this Fact relies on statements in an email regarding what was said by BOP employees, Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 802, 805. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited emails. Defendants dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation, and

mischaracterizes Mr. Lappin's involvement in the email chain, as he was cc-d on some but not all of the emails and did not respond to the emails. *See* PEx. 41. Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

210. The BOP began to see a decline in CCA's performance at their Adams and Cibola facilities in March 2012. The March and April 2012 CFMs at these facilities documented numerous, serious, repetitive, and similar problems in Health Services. CCA's Repeat Deficiency at Adams that their management of an inmate's condition prior to his death was not handled properly is unacceptable and alarming. In addition to the concerns in Health Services, BOP oversight staff at Adams documented CCA's failure to maintain minimum staffing requirements in Correctional Services, their high staff turnover rate, and inexperienced staff in this department. Cibola's CFM, conducted in April 2012, also identified numerous and repetitive Deficiencies in Health Services, noting the problems were the result of the facility not having a physician for the past year, a vacancy that facility had difficulty filling and retaining throughout the life of their contract. ECF No. 336-3 at 22; *see also* PEx. 42 (Adams 2012 CFM report); PEx. 43 (Cibola 2012 CFM report). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that the CFM reports on which the Fact relies are inadmissible hearsay.  *See* Fed. R. Evid. 802.  If admitted, for the purposes of ruling on summary judgment only, Defendants do not dispute the content of the cited CFM reports; the reports speak for themselves.  This Fact also violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record."

The remainder of this Fact is argument, and Defendants dispute it as unsupported by the evidence.  In particular, a finding of a deficiency simply means there is a "condition needing improvement," UF 58, and there is no language in the cited CFM reports supporting the assertion that the BOP viewed the CFM audit results as indicating a "decline in CCA's performance" or as "unacceptable and alarming."  There is also no language in the cited Adams 2012 CFM report to support the assertion that "BOP oversight staff at Adams documented CCA's failure to maintain minimum staffing requirements in Correctional Services, their high staff turnover rate, and inexperienced staff in this department."  Defendants' dispute of this unsupported assertion does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment.  *See Nix v. O'Malley*, 160 F.3d 343, 347 (6th Cir. 1998) ("The non-moving party cannot rely on conclusory allegations to counter a motion for summary judgment." (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1992)); *see also Bradley v. Wal-Mart Stores East, LP*, 587 F. App'x. 863, 866 (6th Cir. 2014) ("A properly supported motion for summary judgment will not be defeated by conclusory allegations, speculation and unsubstantiated assertions."  (also citing *Lujan*, 497 U.S. at 888)).

Defendants also dispute this Fact to the extent that it relies on the expert report of Donna Mellendick.  Defendants have moved to exclude the expert testimony of Ms. Mellendick as

inadmissible under Federal Rule of Evidence 702.  *See* ECF No. 336.  Even to the extent the Court finds Ms. Mellendick's testimony admissible, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010) ("Expert testimony may not be based on mere speculation, and assumptions must be supported by evidence in the record." (citation omitted)); *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) ("[T]he law is clear . . . that an expert report cannot be used to prove the existence of facts set forth therein.").

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

211.    CCA's performance continued to decline over the next year.  The CFM conducted at Adams in January 2013 again identified numerous and repetitive Deficiencies in Health Services.  In addition, they continued to fail to meet minimum staffing requirements.  ECF No. 336-3 at 22; *see also* PEx. 44 (Adams 2013 CFM report).

Cibola experienced an inmate disturbance in March 2013.

A month after this disturbance, Cibola's annual CFM conducted April 23-25, 2013, again identified serious, repetitive, and numerous Deficiencies, many in Health Services, some of which continued to go uncorrected for three years.  At this point, CCA had now demonstrated their ineffective quality control program in two of their contracts by failing to identify Deficiencies and implement corrective action before contract performance became unsatisfactory.  In addition, Cibola failed to maintain minimum staffing requirements throughout 2013.

ECF No. 336-3 at 22; *see also* PEx. 45 (Cibola 2013 CFM report sent to Lappin).  "The Eden facility also began showing concerns in the Health Services area.  Their August 6-9, 2013 CFM

14

identified several Deficiencies, one of which was their medical management of an inmate's condition prior to his death was not handled properly. This alarming Deficiency was now a trend in CCA facilities." ECF No. 336-3 at 22; *see also* PEx. 46 (Eden 2013 CFM report). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that the CFM reports on which the Fact relies are inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, Defendants do not dispute the content of the cited CFM reports; the reports speak for themselves. This Fact also violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record."

The remainder of this Fact is argument, and Defendants dispute it as unsupported by the evidence. There is nothing in the cited CFM reports supporting the assertion that the BOP viewed the identified deficiencies as a "continued [] decline," "alarming" or a "trend," or that the BOP perceived CoreCivic's quality control program to be "ineffective." There is also nothing in the cited 2013 Adams CFM supporting the assertion that they "continued to fail to meet minimum staffing requirements."

Defendants also dispute this Fact to the extent that it relies on the expert report of Donna Mellendick for the same reasons set forth in response to Fact 210 above: Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them." *Brooke Grp. Ltd.*, 509 U.S. at 242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102.

Discrete performance issues at individual BOP-contract facilities are immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248. Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

212. On or about July 27, 2012, the BOP created an "After-Action Report" addressing the riot at Adams. PEx. 47. It noted that ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* at -035, -041.

**Response**: Defendants object to this Fact on the basis that the After-Action Report on which it relies is inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the BOP created an After-Action Report on or about July 27, 2012 and the quoted language appears in the Report; the Report speaks for itself. Defendants dispute this Fact to the extent that Plaintiff mischaracterizes the evidence through selective quotation, and through the use of the term "riot"; the BOP's Report itself describes the incident as a "disturbance." *See generally* PEx. 47. Defendants also dispute this Fact to the extent that it implies that the BOP After-Action Report was shared with Defendants. As the Special Master found, CoreCivic did not receive the BOP's Adams After-Action Report until it was produced in this matter. ECF No. 305 at 13-15.

213.    The riot also involved 1,200 to 1,500 prisoners "demanding to speak to the Warden." PEx. 48, ¶7.

**Response**:  Defendants object to this Fact as unsupported by admissible evidence; Ms. Temple's affidavit is inadmissible hearsay.  *See* Fed. R. Evid. 802.  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that that the disturbance occurred, *see* UF 77-85, and that the quoted language appears in the cited affidavit.  This Fact is also immaterial to the analysis of whether CoreCivic's statements were materially misleading.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.

214.    The After-Action Report explained that



PEx. 47 at -045, -048, -051.

*Id.* at -047.

*Id.* at -049.

*Id.* at -046

*Id.* at -051 to -052.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that the After-Action Report on which it relies is inadmissible hearsay.  *See* Fed. R. Evid. 802.  If admitted, for the purposes of ruling on summary judgment, it is undisputed that the quoted language appears in the After-Action Report.  Defendants dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation; the Report speaks for itself.  Defendants also dispute this Fact to the extent that it implies that the BOP After-Action Report was shared with Defendants.  As the Special Master found, CoreCivic did not receive the BOP's Adams After-Action Report until it was produced in this matter.  ECF No. 305 at 13-15.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  The disturbance was disclosed in CoreCivic's Form 10-Q for the quarter ended June 30, 2012, *see* UF 88, and the Adams disturbance was publicized in the media, *see, e.g.*, UF 87, 91, and discussed in analyst reports.  *See* UF 86.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

215.  ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████  *Id.* at -051.  The BOP's Chief of Privatized Corrections Contracting testified that: "after the riot, [he] moved to end CCA's contract at Adams," but Dalius – who went on to work for CCA – "blocked his proposal."  PEx. 8 at 129:13-18.  He also testified that it was his opinion "that the BOP's failure to shut down Adams was due in part to a cozy

relationship between bureau leadership and private prison operators, illustrated by a revolving door between BOP and the industry." *Id*. at 127:20-128:1. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: This Fact violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record." To the extent that this Fact relies on the BOP After-Action Report, Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 802. For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the After-Action Report and in Mr. Martz's testimony. Defendants dispute this Fact to the extent that it mischaracterizes the conclusions of the Report through selective quotation; the Report speaks for itself.

The Fact also mischaracterizes Mr. Martz's testimony. In relevant part, Mr. Martz also testified that he was the direct supervisor of the contracting officer who signed the CPAR[5] issued after the Adams disturbance, in which the contracting officer stated that Adams ███████████ ████████████ and asserted that ████████████████████████████████████ ████████████████████████████ *See* PEx. 8 at 156:25-157:7; UF 75; Ex. 49. Mr. Martz further testified that he had no reason to believe the contracting officer would not have been honest in this assessment. *See* PEx. 8 at 175:21-176:1. Defendants further object to Mr. Martz's

---

[5] Plaintiff asserts without explanation that the CPARs are inadmissible hearsay. *See e.g.*, Plaintiff's response to UF 74. But the CPARs are business records, which are not excluded by the rule against hearsay. *See* Fed. R. Evid. 803(6). And, in any event, even if not admitted under an exception to the hearsay rule to prove the truth of the matter asserted, the CPARs are admissible for the alternate purpose of establishing Defendants' mental state and perception of CoreCivic's relationship with the BOP. *See* Fed. R. Evid. 801(c)(2).

testimony as speculation. As there is no evidence to show that Mr. Martz's opinion on the Adams disturbance was ever shared with CoreCivic, and since the BOP exercised two Option Periods on Adams after the disturbance, UF 27, the second and third sentences of the Fact are immaterial to the legal analysis of whether CoreCivic's statements were materially misleading or Defendants acted with scienter. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Defendants also dispute this Fact to the extent that it implies that the BOP After-Action Report was shared with Defendants. As the Special Master found, CoreCivic did not receive the BOP's Adams After-Action Report until it was produced in this matter. ECF No. 305 at 13-15.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. The disturbance was disclosed in CoreCivic's Form 10-Q for the quarter ended June 30, 2012, *see* UF 88, and the Adams disturbance was publicized in the media, *see, e.g.*, UF 87, 91, and discussed in analyst reports. *See* UF 86.

216. Not only was CCA aware of all the failings at Adams, but they were also aware of BOP's awareness. Defendant Lappin testified that Defenadnts and CCA's executives had knowledge of and discussed the BOP's After-Action Report concerning the Adams riot "at the time it was issued . . . back in 2012." When Lappin was asked: "With whom did you discuss it?", *i.e.*, the After-Action Report, he testified: "The leadership of CCA . . . . The executives. We – I am sure that at a board meeting, we had a conversation about Adams. But primarily, the executives and vice presidents." Asked if that included Mr. Hininger and Mr. Mullenger, he responded:

"Yes" to both. PEx. 62, 48:25-49:6, 49:19-51:13, 54:16-55:10. Despite efforts to get Lappin to recant this testimony, he reaffirmed it at a subsequent deposition. PEx. 63 at 67:5-74:8.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited deposition transcripts. Defendants dispute the first sentence of this Fact as vague and ambiguous as to "all the failings at Adams." Defendants also dispute this Fact to the extent that it implies that the BOP After-Action Report was shared with Defendants. As the Special Master found, CoreCivic did not receive the BOP's Adams After-Action Report until it was produced in this matter. ECF No. 305 at 13-15.

Defendants also dispute that Mr. Lappin maintains that he or other CoreCivic executives received the BOP After-Action Report during the Class Period. Mr. Lappin's initial testimony on this issue was corrected through errata, *see* Ex. 163, and the subsequent testimony cited by Plaintiffs, PEx. 63 at 67:5-74:8, merely confirmed that his previous testimony was truthful to his knowledge at the time he gave it. *See also id*. at 125:24-126:4 (confirming that his testimony was accurate based on his recollection at the time that he gave it). Defendants' dispute of this unsupported assertion does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment. *See Nix*, 160 F.3d at 347 ; *see also Bradley*, 587 F. App'x. at 866.

217. Deborah Temple, a correctional officer who worked at Adams at the time of the riot, executed an affidavit on July 17, 2014, in which she stated: "When the Bureau of Prisons would perform their audits at the Prison, Prison officials would call in all possible Prison employees so it would appear as though the Prison was adequately staffed." PEx. 48, ¶3.

**Response**: Defendants object to this Fact as unsupported by admissible evidence; Ms. Temple's affidavit is inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited

affidavit. Defendants also dispute this Fact to the extent that it is unsupported by the evidence; all privately operated facilities under contract with the BOP have two full-time employees monitoring the facility (including staffing). UF 63.

218.  After the 2012 Adams riot, CCA's deficient performance left it unable to compete now that the BOP was becoming less desperate for space to house inmates. ECF No. 336-3 at 21. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants dispute this Fact as legal conclusion and argument, in violation of Local Rule 56.01, and because it relies solely on the expert testimony of Donna Mellendick for the same reasons set forth in response to Fact 210 above: Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them." *Brooke Grp. Ltd.*, 509 U.S. at 242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102. Defendants also dispute this Fact as unsupported by the cited evidence; nowhere in her Report does Ms. Mellendick assert that CoreCivic was "unable to compete" due to the Adams disturbance, or that the BOP was "becoming less desperate for space to house inmates" after the Adams disturbance. *See generally* ECF No. 336-3; *see id.* at 21 ("In 2013, the BOP saw its highest population of 220,000 inmates . . .").

The record evidence also shows that the Fact is inaccurate; the BOP exercised all but one of CoreCivic's contract options during the Class Period, UF 26, 27, 29, 30, 33, 34, 36, 37, 39, 40, and the on-site monitor indicated that they would ████████████████████████ in every CPAR for CoreCivic's BOP facilities during the Class Period. UF 74-76, 97-100, 124-128, 133-135, 136-138. In fact, even after the Yates Memo was issued, the BOP staff viewed

CoreCivic's Adams facility as an example of why the Yates Memo's █████████████ ███████████████████████████████████████████████████████ *See* Ex. 124 ████████████████████████████████████████████████████████████████ ████████████████ Accordingly, the evidence does not support the assertion that "CCA's deficient performance left it unable to compete[.]"

Defendants' dispute of this unsupported assertion does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment. *See Nix*, 160 F.3d at 347; *see also Bradley*, 587 F. App'x. at 866.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

219. On June 26, 2013, the BOP issued a Solicitation seeking bids for "Criminal Alien Requirement #15" ("CAR 15" or "CAR XV"). PEx. 49. This "CAR XV" competitive solicitation consisted of two separate "Requirements": "A" for a facility located in one of six specific states and "B" for a facility located anywhere in the continental United States. ECF No. 336-3 at 18-19.

**Response**: This Fact is undisputed for the purposes of ruling on summary judgment only. Defendants object to this Fact as violating the best evidence rule to the extent that the Fact relies on evidence other than the CAR XV solicitation. *See* Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").

220.    Among the information to be submitted with bids, the Solicitation provided: "Past Performance – Offerors shall submit a list of all contracts and subcontracts related to secure corrections/detention services completed during the past three years and all contracts currently in progress.  Contracts listed shall include those entered into with the federal government, agencies of state and local governments' customers."  PEx. 49 at 70.  The Solicitation also provided:

> The non-price evaluation criteria are listed below in descending order of importance with Environmental and Small Disadvantage Business Utilization equal in order of importance:
>
> 1.    Past Performance
>
> 2.    Technical Proposal
>
> 3.    Environmental
>
> 4.    Small Disadvantaged Business Utilization
>
> The non-price evaluation factors, when combined, are significantly more important than price.  However, price becomes a major factor in award selection when other criteria are substantially equal.

*Id.* at 74.

**Response**:  This Fact is undisputed.

221.    In September 2013, Hininger received a "Progress Report" stating: "[t]he BOP still has concerns about our ability to staff a proposed 480-bed expansion given the fact that we have not met our contractually obligated minimum staffing requirements in 13 of the previous 17 months at Adams County."  PEx. 50; at -231, -252.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay.  *See* Fed. R. Evid. 802, 805.  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited document (although the

language in the cited document includes a typo, using the word "meet" instead of "met," which is not accurately reflected in Plaintiff's quotation). Defendants dispute this Fact to the extent that it mischaracterizes the evidence; the document speaks for itself. Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248. Indeed, the BOP exercised its second option period at Adams on July 17, 2015. UF 27.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

222. By 2014, it was apparent the BOP had lost confidence in CCA's ability to perform the major contract requirements. CCA was still not reacting, and their continued failure to address these serious and repetitive problems caused their performance to worsen. Cibola's annual CFM conducted April 22-24, 2014, had now identified a Significant Finding in Health Services that consisted of numerous repetitive Deficiencies that had gone uncorrected for as many as three and four years. ECF No. 336-3 at 23; *see also* PEx. 51 (Cibola 2014 CFM report). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that the CFM report on which it relies is inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, Defendants do not dispute the content of the cited CFM report; the report

speaks for itself.  This Fact also violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record."

Defendants dispute the remainder of the Fact, which is argument.  Defendants also dispute the remainder of the Fact as supported solely by the expert testimony of Donna Mellendick for the same reasons set forth in response to Fact 210 above:  Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them."  *Brooke Grp. Ltd.*, 509 U.S. at 242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102.

The first sentence of the Fact is inaccurate and unsupported by the evidence; the BOP exercised all but one of CoreCivic's contract options during the Class Period, including Option Period 1 for the Cibola Contract, which was exercised on October 1, 2014.  UF 26, 27, 29, 30, 33, 34, 36, 37, 39, 40.  And in every CPAR for CoreCivic's BOP facilities during the Class Period, the on-site monitor indicated that they would ███████████████████████████, including the CPARs for Cibola.  UF 74-76, 97-100, 124-128, 133-135, 136-138.  The cited evidence therefore does not support the assertion that, "[b]y 2014, it was apparent the BOP had lost confidence in CCA's ability to perform the major contract requirements."

The second and third sentences of the Fact are also unsupported by the evidence.  A finding of a repeat deficiency does not necessarily mean that the same problem was identified across multiple audits.  Rather, a repeat deficiency indicates that one or more deficiencies were found in prior audits that fall into the same audit category.  *See* PEx. 2 at 195:15-197:11.  Accordingly, the cited evidence does not support the assertion that "CCA was still not reacting" and had "fail[ed]

to address" any identified deficiencies, or that the identified deficiencies had "gone uncorrected for as many as three and four years."

Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248. In any event, Defendants' dispute of these unsupported assertions does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment. *See Nix*, 160 F.3d at 347; *see also Bradley*, 587 F. App'x. at 866.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

223. A CFM follow-up monitoring conducted October 21-23, 2014 at Cibola again revealed numerous serious and repetitive Deficiencies, some that had gone uncorrected for as many as 4.5 years, as well as the alarming Deficiency that their medical management of an inmate's condition prior to his death was not handled properly." ECF No. 336-3 at 23; *see also* PEx. 52 (Cibola 2014 follow-up CFM report). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that the CFM report on which it relies is inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, Defendants do not dispute the content of the cited CFM report; the report speaks for itself. Defendants also dispute the remainder of this Fact, including the characterization

of the deficiency as "alarming," which is supported solely by the expert testimony of Donna Mellendick, for the same reasons set forth in response to Fact 210 above: Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them." *Brooke Grp. Ltd.*, 509 U.S. at 242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102.

Defendants also dispute the Fact as unsupported by (or mischaracterizing) the evidence. A finding of a repeat deficiency does not necessarily mean that the same problem was identified across multiple audits. Rather, a repeat deficiency indicates that one or more deficiencies were found in prior audits that fall into the same audit category. *See* PEx. 2 at 195:15-197:11. Accordingly, the cited evidence does not support that any identified deficiencies had "gone uncorrected for as many as 4.5 years."

Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248. In any event, Defendants' dispute of these unsupported assertions does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment. *See Nix*, 160 F.3d at 347; *see also Bradley*, 587 F. App'x. at 866.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

224. Also in 2014, CCA's Eden facility was demonstrating performance failures in Health Services and their ability to maintain minimum staffing requirements. ECF No. 336-3 at 23. Eden's CFM conducted August 5-7, 2014, also identified a Significant Finding in Health Services comprised of Repeat Deficiencies, one of which was an instance of their medical management of an inmate's condition prior to his death was not handled properly. ECF No. 336-3 at 23; *see also* PEx. 53 (Eden 2014 CFM report). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that the CFM report on which it relies is inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, Defendants do not dispute the content of the cited CFM report; the report speaks for itself. Defendants also dispute the remainder of the Fact, including the characterization of identified deficiencies as "performance failures," which is solely supported by the expert testimony of Donna Mellendick, for the same reasons set forth in response to Fact 210 above: Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them." *Brooke Grp. Ltd.*, 509 U.S. at 242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102.

Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248. Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").

Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

225. By letter dated May 21, 2014, the BOP told CCA it had learned "'[t]he FBI is investigating CCA and looking at whether various federal fraud statutes were violated and possibly other federal statutes connected with" CCA fraudulently recording and billing for staff hours not actually worked in Idaho, which "resulted in thousands of hours being understaff and was a violation of state law.'" PEx. 54 at -553. CCA "acknowledged . . . that its employees falsified staffing records given to the state [of Idaho], making it look as though thousands of hours of mandatory guard posts were filled when they were actually left vacant for months." PEx. 55. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 802, 805. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibits.

This Fact is also irrelevant and immaterial to Plaintiff's claims. The investigation referenced in the Fact concerned low-level employees improperly recording time at a facility operated for the State of Idaho. CoreCivic took significant steps to remediate the issue, upon learning of it. *See* PEx. 56 at 41:25-45:14. There is no evidence that the investigation played a significant role in the BOP's decision on CAR XV, its decision not to exercise Option Period 2 for the Cibola Contract or the issuance of the Yates Memo, or that CoreCivic should have known that an investigation at another partner's facility would have any impact on BOP's contract awards or the Department of Justice. Accordingly, Plaintiff has not shown—and cannot show—that it would "affect the outcome of the suit" if ultimately proven true. *Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407. Also, PEx. 55 quotes an Associated Press story discussing the issue, and Defendants disclosed the agreement reached with Idaho relating to this incident. *See, e.g.*, Ex. C at 30 ("In February 2014, we reached an agreement to pay $1.0 million in compensation to the state of Idaho regarding contractual disputes related to staffing at the Idaho Correctional Center stemming in part from an audit by the Idaho Department of Corrections.").

226. Regarding CCA's falsified staffing reports, Garfinkle admitted: "we were, you know, disappointed in ourselves that we didn't live up to the expectations of our – of our operations, or of our partner in this case . . . ." PEx. 56 at 42:14-19. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in Mr. Garfinkle's deposition transcript. Defendants dispute the characterization of Mr. Garfinkle's testimony as "admitting" to anything, and as mischaracterizing his testimony through selective quotation. The Fact is also immaterial because there is no evidence that the investigation played a significant role in the BOP's decision on CAR XV, its decision not to exercise Option Period 2 for the Cibola Contract or the issuance of the Yates Memo, or that CoreCivic should have known that an investigation at another partner's facility would have any impact on BOP's contract awards or the Department of Justice. Nor is this investigation relevant

to any of the challenged statements. Accordingly, Plaintiff has not shown—and cannot show—that it would "affect the outcome of the suit" if ultimately proven true. *Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407. Defendants disclosed the agreement reached with Idaho relating to this incident in CoreCivic's Form 10-K for the period ending December 31, 2013. *See* Ex. C at 30 ("In February 2014, we reached an agreement to pay $1.0 million in compensation to the state of Idaho regarding contractual disputes related to staffing at the Idaho Correctional Center stemming in part from an audit by the Idaho Department of Corrections.").

227. On August 5-7, 2014, The BOP conducted a contract facility monitoring review at Eden. *See* PEx. 57 at -649. The BOP issued a report and CCA disputed it. *Id.* Among other things, CCA disputed a "Significant Finding" with respect to Health Services. *Id.* at -652. The original finding stated:

> "There were inadequate controls in the clinical care and staffing area of Health Services to ensure compliance with established procedures and practices. These inadequacies create a lack of appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment. Many issues from previous monitorings have not been corrected. Medical needs and documentation were incomplete, including reports."

*Id.* On October 17, 2014, the BOP upheld the significant finding, explaining that "the aggregate of sustained evidentiary deficiencies, and repeat deficiencies, support the conclusion that your health services program lacked appropriate intervention, treatment, and programs to promote a

healthy, safe, and secure environment, and thus constituted a significant finding." *Id.* at -653. It further noted:

> At the time of the review (August 5-7, 2014), CFM reviewing staff were informed by the HSA, contractor personnel, and BOP on-site staff that the on-site physician quit his full-time position in December 2013. Since then, he only performed on-site services on occasional (not every) weekends. Additionally, your response verifies that an on-site, full-time physician was only recently hired, August 11, 2014.

> Policy CCA-13-76 requires a physician to be responsible for overseeing the medical care of all inmates. The lack of an on-site, full-time physician for 8 months caused the other health services staff to work without supervision. A physician is the clinical authority in the medical department and should be available to supervise clinical staff, including physician assistants and nurses. This is a key position that should not have been vacant for such an extensive period of time. Finally, it was also determined during the review that nine (9) other positions were vacant (6 nurses, a dentist, a medical records clerk, and a dental assistant), as indicated on a document obtained during the review.

*Id*. With respect to documentation in Health Services, the letter continued: "Your claim to be unaware of documentation discrepancies is contradicted by the CFM review findings, which were reported to you in detail." *Id.* at -653 to -654. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants dispute this Fact on the basis that it relies on inadmissible hearsay. *See* Fed. R. Evid. 802, 805. If admitted, for the purposes of ruling on summary judgment only, it is undisputed the quoted language appears in the cited letter. This Fact also violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record." Defendants also dispute the Fact to the extent that it mischaracterizes the evidence through selective quotation; the letter speaks for itself.

Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services

provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248. Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

228. On October 15, 2014, CCA and BOP employees exchanged emails discussing a "Partnering Meeting" in which the BOP had criticized not only the "numerous repetitive deficiencies in Health Services at Cibola and Eden" but also the limited extent to which CCA had been able to detect those deficiencies themselves. PEx. 58. According to CCA's head of audits, Don Murray: "[t]here is not the degree of overlap" between BOP and CCA audits "that we had hoped." *Id.* at -633. In fact, CCA only identified 18% and 30% of the Health Services deficiencies that the BOP did in 2013 and 2014, respectively. *Id.* at -637. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibit. Defendants dispute this Fact to the extent that it mischaracterizes the Partnering Meeting, the email and the attachment to the email; Plaintiff's characterization is unsupported by any evidence. In addition to the quoted language, the attachment to the email also lists "several factors that must be taken into consideration when viewing the readily apparent differences between the numbers of BOP deficiencies cited and those reported by CCA internal audits" including, *inter alia*, the timing of audits and sampling variation. *See* PEx. 58 at -638 (noting that "[d]ifferences in timing of the BOP CFM and CCA internal audits

are likely to produce different results.  With CCA and BOP audits conducted 4-6 months apart at some facilities, we actually hope *not* to replicate deficiency findings at those locations" and "[a]uditors for CCA and BOP will most likely review different subsets of the applicable documentation in the review of a process. This variation can, and often does, lead to different determinations about the adequacy of the process under review").

This Fact is also immaterial; to the extent that CoreCivic's quality assurance program failed to detect certain deficiencies, that information is immaterial to the analysis of whether CoreCivic's general statements regarding the existence and activities of the quality assurance program were materially misleading.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.  Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

229.    On October 28, 2014, the BOP sent a letter to CCA with respect to CAR 15 raising "serious concerns" about CCA's "pattern" of poor performance at its Cibola facility:

> The Bureau of Prisons (Bureau) has serious concerns about the performance at the Cibola County Correctional Center.  Specifically, the pattern of performance since the CFM conducted in April 2011 has continued to regress in specific CFM indicators.  Since the April 2011 CFM, repeat deficiencies have been steadily increasing from 0 to 13.  Deficiencies have also been on a similar pattern of increase from 12 to 26 with a high of 37 in the April 2013 CFM.  The majority of these contract non-conformance issues are occurring in the Health Services area.

> The six month CFM review completed on 10/23/14 resulted in more issues of contract non-conformance.  This pattern of contract non-conformance issues is a reason for serious concern for the Bureau.  Please address what has caused these repeated patterns of contract non-conformance issues from 2011 to now and what will be done to reverse this trend.  Please be specific in listing corrective actions that have taken place or will take place to resolve these performance issues.

35

PEx. 59 at -827. The letter was forwarded to Hininger the next day. *Id.* at -822. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

 **Response**: Defendants object to this Fact on the basis that it relies on inadmissible hearsay. *See* Fed. R. Evid. 802, 805. For the purposes of ruling on summary judgment only, it is undisputed that this email contained the quoted language. Defendants dispute this Fact to the extent that it mischaracterizes the evidence, including due to selective quotation. Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

 Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407. Defendants disclosed the result of the CAR XV bid in the CoreCivic Form 10-K for the period ending December 31, 2014. *See* Ex. C at 27.

 230. On November 13, 2014, the BOP sent a letter to CCA with respect to CAR 15 raising "serious concerns" about CCA's "pattern" of poor performance at its Eden facility:

> The Bureau of Prisons (Bureau) has serious concerns about the performance at the Eden Detention Center. Specifically, we are addressing the results of the recent CFM conducted in August of 2014, to include the "inadequate controls in the clinical care and staffing area in Health Services." Please address what has caused this area of services to develop ***a pattern of contract non-conformance***.

PEx. 60 at -310. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies on inadmissible hearsay. *See* Fed. R. Evid. 802, 805. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited letter. Defendants dispute this Fact to the extent that it mischaracterizes the evidence due to selective quotation. Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407. Defendants disclosed the result of the CAR XV bid in the CoreCivic Form 10-K for the period ending December 31, 2014. *See* Ex. C at 27. Plaintiff also challenges no statements made between the date of this communication and receipt of the BOP's decision on the CAR XV.

231. Regarding the BOP's November 13, 2014 letter, that same day, Garfinkle emailed defendants Hininger and Lappin: "Is it customary for the BOP to express serious concerns about contractor performance during the RFP stage, *e.g.*, first Cibola, now Eden. To me, it seems very alarming." PEx. 61 at -940. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed the quoted language appears in the cited email. Defendants assert that Mr. Garfinkle's statements are speculation, immaterial, and mischaracterized by this Fact. Mr. Garfinkle explained in his

deposition that he sent this email when he was "new to [his] role," and during the "first . . . rebid that [he] had gone through" as CFO, having come from a previous position where he "did not . . . review procurements and exchanges back and forth between customers and CoreCivic." PEx. 56 at 211:8-15. "So I was asking Harley . . . whether it was customary for the BOP to express concerns about another contract in its rebid." *Id*. at 211:16-19.

Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407. Defendants disclosed the result of the CAR XV bid in the CoreCivic Form 10-K for the period ending December 31, 2014. *See* Ex. C at 27. Plaintiff also challenges no statements made between the date of this communication and receipt of the BOP's decision on the CAR XV award.

232. On December 29, 2014, the BOP awarded the contracts for both "Requirement A" and "Requirement B" to CCA's competitor, GEO. Ex. 85.

**Response**: This Fact is undisputed. *See* UF 109.

233. For both CAR XV awards, the BOP's Source Selection Authority ("SSA") commented that ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at -087. ████

████████████████████████████████████████████████████████████████



*Id.* at -094.

*Id.*

CCA's CAR 15 bid on Requirement A was for its Northeast Ohio prison. *See id.* at -097.

*Id.*

*Id.* at -094, -097 to -098.

*Id.* at -094. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that the Source Selection Decision on which it relies on inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, it is undisputed the Source Selection Decision was the BOP's internal documentation of the BOP's decision regarding the CAR XV award. Defendants dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation; the document speaks for itself.

Defendants also dispute the Fact to the extent that it implies that the Source Selection Decision was shared with CoreCivic, that the BOP's decision was made solely based on concerns regarding CoreCivic's past performance, or that CoreCivic was told that the BOP's decision was made solely based on concerns regarding CoreCivic's past performance. The BOP Source Selection Decision

39

 UF 111; Ex. 85.  And, at the formal debrief of the award decision, the BOP informed CoreCivic its decision was ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*See* PEx. 17 at -694; Ex. 91; PEx. 18.  This is reflected in the Source Selection Decision as well. *See, e.g.*, Ex. 85 at -051 ███████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ *see also id.* at -054.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.  Defendants disclosed the result of the CAR XV bid in the CoreCivic Form 10-K for the period ending December 31, 2014.  *See* Ex. C at 27.  Plaintiff also challenges no statements made between the date of this communication and receipt of the BOP's decision on the CAR XV award.

234.    With respect to Adams, the BOP's SSA noted: ███████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* at -085.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that the Source Selection Decision document on which it relies on inadmissible hearsay.  *See* Fed. R. Evid. 802.  If admitted, for the

purposes of ruling on summary judgment only, it is undisputed the Source Selection Decision was the BOP's internal documentation of the BOP's decision regarding the CAR XV award. Defendants dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation; the document speaks for itself.

Defendants also dispute the Fact to the extent that it implies that the Source Selection Decision document was shared with CoreCivic, that the BOP's decision was made solely based on concerns regarding CoreCivic's past performance, or that CoreCivic was told that the BOP's decision was made solely based on concerns regarding CoreCivic's past performance. The BOP Source Selection Decision document ███████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ UF 111; Ex. 85. And, at the formal debrief of the award decision, the BOP informed CoreCivic its decision was ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ *See* PEx. 17 at -694; Ex. 91; PEx. 18. This is reflected in the Source Selection Decision as well. *See, e.g.*, Ex. 85 at -051 ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ *see also id.* at -054.

And, to the extent that CoreCivic's quality assurance program failed to detect certain deficiencies, that information is immaterial to the analysis of whether CoreCivic's general statements regarding the existence and activities of the quality assurance program were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

41

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407. Defendants disclosed the result of the CAR XV bid in the CoreCivic Form 10-K for the period ending December 31, 2014. *See* Ex. C at 27.

235. The head of CCA's Quality Assurance Division, Don Murray, admitted that he did not have the tools necessary to replicate third-party audits of CCA. PEx. 2 at 164:17-21. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants dispute this Fact as unsupported by the cited evidence. The full answer provided by Mr. Murray in the cited portion of his transcript, in which he responds to a question regarding a report produced by Affiliated Monitors in 2015, a private company hired by CoreCivic to conduct an "'ethical culture' evaluation" at the Adams facility, PEx. 72 at -991, is:

> That's a very good question in the sense that I'm not sure how Affiliated Monitors actually reached that conclusion. I don't know what they utilized or what's in their -- I believe proprietary surveys, what types of questions they utilized to, you know, to help make that determination versus what might be used by other type of survey materials. So I -- I would like to be able to answer that, but not having access to Affiliated Monitors' tools that they used to interview and evaluate this section in terms of generating an idea about management challenges, I'm afraid I can't be very illuminating.

PEx. 2 at 164:10-21. This testimony does not support the assertion that Mr. Murray "admitted that he did not have the tools necessary to replicate third-party audits of CCA." Defendants' dispute of this unsupported assertion does not create a genuine material factual dispute sufficient to

preclude the entry of summary judgment. *See Nix*, 160 F.3d at 347; *see also Bradley*, 587 F. App'x. at 866.

Defendants also dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

236. The BOP's annual CFM, conducted January 6-8, 2015, at the Adams County Correctional Center, again CFM identified a Significant Finding in Health Services comprised of a Repeat Deficiency and five instances where their medical management of an inmate's condition prior to his death was not handled properly. ECF No. 336-3 at 23-24; *see also* PEx. 64 (Adams 2015 CFM report, sent to Hininger, Lappin and Garfinkle). The BOP imposed over $888,000 in Deductions as a result of these findings. ECF No. 336-3 at 24; *see also* PEx. 65 at -813 (notification of deduction sent to Lappin). Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that the CFM report on which it is inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, Defendants do not dispute the content of the cited CFM report; the report speaks for itself. Defendants also dispute this Fact as unsupported by the cited evidence. To the extent that the Fact is supported solely by the expert testimony of Donna Mellendick, Defendants object for the same reasons set forth in response to Fact 210 above: Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them." *Brooke Grp. Ltd.*, 509 U.S. at

242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102. Defendants also dispute this Fact to the extent that it mischaracterizes the CFM findings, for example in the assertion that certain medical management "was not handled properly."

Defendants do not dispute that a deduction was imposed following the issuance of the CFM report, but Defendants dispute the assertion that the BOP "imposed over $888,000 in Deductions" as unsupported by the cited evidence. The letter of non-conformance to which the Fact cites shows that the BOP imposed a deduction for non-conformance in the amount of $811,730 on July 31, 2015. *See* PEx. 65 at -813. Defendants' dispute of this unsupported assertion does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment, *see Nix*, 160 F.3d at 347, *see also Bradley*, 587 F. App'x. at 866, and in any event discrete performance issues at individual BOP-contract facilities, and the exact quantity of the deduction, are immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

237. On January 8, 2015, CCA managing director Jeb Beasley wrote to his father (one of CCA's founders): "we are going to receive Significant Finding in patient care at Adams as a result of this week's [BOP audit, *i.e.*] CFM . . . the BOP auditor after reviewing five deaths at Adams Co. over the last year was of the opinion that delivery of healthcare led, in part, to these

deaths." PEx. 66 at -158 to -159. He continued: "we will be receiving a Cure Notice at Cibola for Health Services. They referenced the recent re-review and the new deficiencies from that re-review as well as the eyes of the IG audit as reasons for the Cure Notice." *Id*. at -159. Beasley's father replied: "Ouch!!" *Id*. at -158. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 801, 802. The email exchange between Mr. Beasley and his father was personal in nature, and not within the scope of his employment. *See Spurlock v. Fox*, No. 3:09-CV-0756, 2010 WL 3807167, at *10 (M.D. Tenn. Sept. 23, 2010) ("Generally, for a statement to be considered within the scope of the declarant's agency [pursuant to Federal Rule of Evidence 801(d)(2)(D)] . . . 'the subject matter of the admission [must] match the subject matter of the employee's job description.'" (quoting 5 Matthew Bender & Co., Weinstein's Federal Evidence § 801.33 (2010))). If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email.

Defendants also dispute this Fact as violating the best evidence rule, *see* Federal Rule of Evidence 1002, and mischaracterizing the evidence. The CFM report issued following the audit to which the email refers did not conclude that the "delivery of healthcare led, in part, to these deaths." Rather, it concluded that "[r]eview of records revealed management of five inmates prior to their death was not in accordance with policy and standards of care." PEx. 64 at -318. In any event, discrete performance issues at individual BOP-contract facilities are immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

238.    On January 9, 2015, CCA executives attended a formal "debriefing" meeting with the BOP regarding the CAR 15 solicitation and award.  CCA's notes from that meeting state:



PEx. 18 at -821 to -822 (typographical errors in original).  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  For the purpose of ruling on summary judgment, it is undisputed that CoreCivic executives attended a debriefing meeting with the BOP on January 9, 2015 regarding the CAR XV solicitation and award, and the cited exhibit includes the quoted language.  Defendants dispute the Fact as mischaracterizing the evidence through selective quotation.  The debriefing notes also

include the following under the sub-heading 

PEx. 18 at -822; *see also* PEx. 90 at 175:5-13 (when asked why CoreCivic lost the NEOCC contract, Bart VerHulst stated, "I remember the predominant factor was the mixed use . . . issue"); Ex. 166, Dep. Tr. of William Dalius at 56:12-15 (when asked why CoreCivic lost the contract, Mr. Dalius stated that his "understanding was, it was predominantly a  cost issue and the dual population issue.  That was  a dual population with BOP and marshals."); PEx. 62 at 243:4-18 (Mr. Lappin testified that "there was discussions about [past performance] as well as the -- the shared -- the  shared population at Northeast Ohio."); PEx. 99 at 250:15-19 (Mr. Hininger testified that the BOP decision not to renew was "[i]n part, performance-related issues and in part, being cohabited with the Marshals Service."); PEx. 90 at 69:9-22 (when asked why GEO won the CAR XV contract, Mr. Verhulst stated, "Knowing the procurement, the competition, knowing the BOP's preferences through conversations, it was clear even during the existing term of the contract that the BOP did not like shared facilities.").

Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407. Defendants disclosed the result of the CAR XV bid in the CoreCivic Form 10-K for the period ending December 31, 2014. *See* Ex. C at 27.

239. Also on January 9, 2015, Beasley wrote an email to his father with the subject line "Adams/Cibola": "Worst two weeks of my professional career . . . the house is on fire and not getting the type of response we need." PEx. 66 at -157. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 801, 802. The email exchange between Mr. Beasley and his father was personal in nature, and not within the scope of his employment. *See Spurlock*, 2010 WL 3807167, at *10. If admitted, it is undisputed for the purposes of ruling on summary judgment only that the quoted language appears in the cited email. Defendants also dispute this Fact to the extent that it mischaracterizes the evidence and because Mr. Beasley's personal opinions regarding discrete performance issues at individual BOP-contract facilities are immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule

56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

240. On January 20, 2015, BOP employees circulated draft "talking points . . . that provide an overview of the performance failures in Health Services at 3 of our 5 CCA secure contract facilities." PEx. 67 at -690. Those talking points summarized "CCA Performance Failures in Health Services" at Cibola, Eden and Adams and stated: "PMB/PCC have voiced our disappointment with these continued problems with CCA throughout this period. CCA CEO has met in person with CPD and ADM staff indicating CCA is taking all necessary measures to correct these problems." *Id.* at -733. They continued: "It is also important to note – these significant findings played a major factor in the CAR 15 awards (recompete of NEO-CCA facility, and MVC-GEO facility), in which the awards went to two GEO facilities. NEO contract will expire 5/31/15." *Id*. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 802. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibit. Since there is no evidence that this document was ever shared with CoreCivic, this Fact is immaterial to the analysis of whether Defendants acted with scienter. *See Liberty Lobby, Inc.*, 477 U.S. at 248. Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See id.* Defendants also dispute the Fact to the extent that it mischaracterizes the evidence through selective quotation.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

241. On January 22, 2015, Hininger sent an email to CCA's board of directors that stated:

> The purpose of this email is to update you on several significant events since our December 2014 Board meeting.
>
> First of which is the disappointing news we received on December 29th from the Federal Bureau of Prisons (BOP) that they were not renewing our contract at our Northeast Ohio Correctional Center in Youngstown, Ohio. As you know, we have talked about this renewal for several quarters during our Board meetings noting that this was going to be a very competitive renewal between us and GEO.
>
> As customary for these federal procurements, we asked for a debriefing from the BOP and we received it on January 6th. As a reminder, there were two parts to the procurement. Part A of the procurement placed us in a head to head competition with CCA and our Ohio facility versus GEO's facility in Pennsylvania. For Part A, CCA proposed a lower price than GEO but our total proposal was unsuccessful because of two weaknesses:
>
> 1. First, in the Past Performance section of our proposal, concerns about our performance in medical services at our Cibola, NM and Eden, TX facilities were raised. We have had challenges in the past 18 months in the staffing and management of these two medical departments, and with that, knew we would have to overcome that in other parts of our proposal.
>
> > a. As for these two locations presently, over the last twelve months, we have terminated physicians at both locations in addition to terminating the Heath Services Administrator at Cibola as a result of the BOP and our Quality Assurance and Operations teams noting in frequent reviews and audits that their performance was not at the level expected by us or the BOP. Both facilities over the last year have been constantly supported by our team here in Nashville and both facilities will have their next full audits by the BOP with Cibola in April and Eden being in August of this year. Finally, the BOP issued on January 9th a cure notice on the Cibola contract formally expressing their concerns at this facility and they will use the BOP audit in April to determine if we have satisfactory cured

the medical issues at the facility.  Resolution of this issue is of high importance to the Management Team and I am confident of a positive outcome in April.

2.    Second, in the Technical Proposal section of our proposal, the operation plan at our Northeast Ohio facility was considered a weakness because the facility was going to be operating with two customers, the BOP and the United States Marshals Service.  The key concern by the BOP was the sharing of services and personnel for both customers.  This wasn't a complete surprise as the BOP had expressed concerns about this approach during the procurement process and we had proposed additional staff and management structures to help alleviate their concerns but it wasn't enough in the final analysis.  More frustrating, we have been operating for ten years under the current contract with these two customers at Northeast Ohio without a single customer compliant [sic] or concern.  GEO's facility in Pennsylvania would be exclusively used by the BOP.

PEx. 68 at -536 to -537; PEx. 99 at 233:17-235:11.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email.  Defendants dispute the Fact to the extent that it mischaracterizes the evidence through selective quotation.  Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Defendants also dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

242.     On February 12, 2015, CCA convened a conference call to discuss its financial results for the 3 months and the 12 months ended December 31, 2014.  PEx. 69. Defendants Hininger and Garfinkle participated on behalf of CCA.  *Id.* at 2.

**Response**:  This Fact is undisputed.

243.     On May 7, 2015, CCA convened a conference call to discuss its financial results for the three months ended March 31, 2015.  PEx. 70. Defendants Hininger and Garfinkle participated on behalf of CCA.  *Id.* at 2.

**Response**:  This Fact is undisputed.

244.     On February 26, 2015, in response to a question from a CCA director about why CCA had not opened its "trading window" to permit insiders to trade CCA securities, Garfinkle (blind copying Hininger) wrote:

> the primary reason we kept the [insider trading] window closed was for the cure notice we received from the BOP last month at Cibola for the issues we discussed at the board meeting associated with health services deficiencies . . . trading in company securities with knowledge of the cure notice would be subject to much scrutiny if we were to lose the contract at Cibola, particularly following the loss of the BOP contract at Northeast Ohio.  For competitive reasons we did not disclose the reasons the BOP did not renew the Northeast Ohio contract which, as you know from Damon's discussion at the board meeting, was at least in part for health service deficiencies at Cibola.
>
> *         *         *
>
> We could have opened the window if we publicly disclosed receipt of the cure notice, but obviously that would have been a difficult disclosure to explain without spooking the market, perhaps unnecessarily.

PEx. 71.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email.  Defendants dispute the Fact to the extent that it mischaracterizes the evidence through selective quotation by omitting the following from the quoted excerpt:

> While the Cibola contract isn't individually material, and we believe we can cure the deficiencies, trading in company securities with knowledge of the cure notice would be subject to much scrutiny if we were to lose the contract at Cibola, particularly following the loss of the BOP contract at Northeast Ohio.
>
> . . .
>
> After discussions with Latham, we concluded that the disclosure of the specifics about the cure notice weren't required, particularly because we believe we have the ability to cure the deficiencies. We did, however, add disclosures in our Risk Factors about the potential for contract terminations resulting from contract non-compliance.

PEx. 71 at -064.

245.    On or about July 27, 2015, Affiliated Monitors, Inc. issued a Briefing Report on the Adams Correctional Facility.  PEx. 72.  Adams was plagued by "morale problems," and staff "fear[ed] that they [would] be retaliated against if they raise[d] any issue."  *Id.* at -993, -995. Similar issues had been noted at other CCA facilities.  *See* PEx. 73 at -335 (employees who "'stir the pot'" are humiliated by having their names printed on large wooden spoons displayed in the Warden's office for other employees to see); *id.* at -345 ("'overwhelming and strikingly forceful feedback . . . from the staff at all levels, is that they fear that they will be retaliated against if they raise any issue'").  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay.  *See* Fed. R. Evid. 802, 805.  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that on or about July 27, 2015, Affiliated Monitors, Inc. issued a Briefing Report regarding the Adams Correctional Facility; the report speaks for itself.  In any event, the existence of a morale problem at one BOP-contract facility is immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

246. On September 2, 2015, BOP employees circulated notes regarding "CCA Partnering Topics from the Field." The topics for CCA included:

- "CCA has lagged behind the other contractors regarding complying with Emergency Preparedness Mod. Since the original partnering meeting was scheduled for October which was prior to the upcoming deadlines, I thought we should mention. The approaching dates are included in my Sector's weekly PFA reports." PEx. 74 at -071.

- "Mike Nalley has called to notify the previous PMB Administrator without giving Keith Hall or the Warden time to notify. He has also not followed the matrix when discussing problems or concerns at the CCA facilities. We addressed last year but it has not changed." *Id.*

- "Although both facilities have improved regarding staffing in Health Services, the two mentioned CCA facilities have difficulty sustaining staff after CFM Reviews or other audits. In other words, the contractor only staff these critical areas after a CURE Notice is issued or a Significant Finding. What is CCA's long term plan to address this issue." *Id.*

- "The Cibola County Correctional Center has not met the required staffing plan in Correctional Services for approximately 10 years. What is the contractors plan to address this continued issue of non compliance?" *Id.*

"No one from the field provided any suggestions for partnering [meeting topics] with GEO." *Id.* at -072. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 802, 805. If admitted, for the purposes of ruling on summary judgment only, it is undisputed the quoted language appears in the cited exhibit. The Fact is also immaterial

because there is no evidence that these notes were ever shared with CoreCivic. Discrete performance issues at individual BOP-contract facilities, or isolated commentary regarding the quality of services at CoreCivic's competitors, are also immaterial to the analysis of whether Defendants acted with scienter or whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248. Defendants also dispute the Fact to the extent that it mischaracterizes the evidence with selective quotation to imply that CoreCivic was the only contractor for whom topic were proposed.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

247. On October 24, 2015, Jeb Beasley wrote to CCA appropriations lobbyist Robert Hobart: "I hate to send this email but it appears that I am going to have to miss Pinehurst. We had a surprise BOP health services audit last week at Cibola and performed poorly. This is the same facility we recently had a Cure Notice lifted and now we could find ourselves under another one (or a canceled contract)." PEx. 75 at -121. Later that morning, he wrote to Hobart: "[t]hey are firing the doc out there and we are close to going from 5 BOP facilities to 2. Just trying to keep my job." *Id.* at -120. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 801, 802. The email exchange between Mr. Beasley and Mr. Hobart

was personal in nature, and not within the scope of his employment. *See Spurlock*, 2010 WL 3807167, at *10. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email. Defendants dispute the Fact to the extent that it mischaracterizes the evidence. Also, Mr. Beasley's personal opinion regarding discrete performance issues at individual BOP-contract facilities—which, in any event, may not have been accurately reflected in this email, *see* Ex. 164, Dep. Tr. of Jeb Beasley ("Beasley Tr.") at 140:3-12; *see also id*. at 139:9-16; 141:4-9—is immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

248.     On December 7, 2015, CCA employee Keith Hall wrote: "[t]he BOP has expressed their displeasure in the [staffing] vacancies being vacant for such a long time, given the security issues we have experienced at Adams." PEx. 76 at -509. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay. *See* Fed. R. Evid. 802, 805. If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email. Defendants dispute the Fact to the extent that it mischaracterizes the evidence through selective quotation; the quoted

language refers specifically to two vacancies at Adams—the Assistant Shift Supervisor and Shift Supervisor positions.  PEx. 76 at -509.

Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.  Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

249.  On January 4, 2016, CCA received a notice of concern from the BOP for the Cibola facility regarding failure to meet staffing requirements in Correctional Services from October to December 2015, which was sent to Hininger, Lappin and Garfinkle.  PEx. 77.  After receiving the notice, Garfinkle wrote: "We need a good response.  Between you and me, I don't like having the [Cibola] contract expiration in September 2016 with BOP populations system-wide declining so much.  I don't want them with ***any more excuses*** to not renew the contract.  Do we have a good response?"  *Id*. at -715.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  This Fact violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record."  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email.  A notice of concern for one BOP-contract facility is immaterial to the analysis of whether CoreCivic's statements regarding the quality of the

corrections services provided to all government partners were materially misleading, or to the analysis of whether Defendants acted with scienter. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. CoreCivic disclosed the decline in BOP populations and the associated risks on November 5, 2015 in its 10-Q filing for the three months ended September 30, 2015:

> Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system are expected to decline further in the fourth quarter of 2015, and potentially future quarters, primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses. Further, the BOP correctional system remains overcrowded at approximately 122.4% at September 30, 2015. Nonetheless, increases in capacity within the federal system could result in a decline in BOP populations within our facilities.

Ex. N at 38. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

250.    A May 11, 2016 internal email authored by a CCA employee, with the subject line "Talking Points for Discussion with Mr. Lappin," stated: "Medical Staffing: Cibola and Eden continue to struggle . . . . The concern with Cibola is the long term effect on the contract." PEx. 78. It also stated: "CAR 16 – With the BOP drop in population at their facilities and the 4 CCA contracts, concerned on the renewal of Eden with the current contract ending 5/2017." *Id.* Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email.  Defendants dispute the Fact to the extent that it mischaracterizes the evidence through selective quotation.  Defendants also dispute the Fact as unsupported by the evidence to the extent that it implies that these "talking points" were shared with Mr. Lappin; the cited email was sent from Mr. Nalley to himself.  For the same reason, this Fact is immaterial to the analysis of whether Defendants acted with scienter.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

251.    On June 16, 2016, CCA vice president Bart Verhulst wrote to Jeb Beasley: "I see no way to save Cibola."  PEx. 79 at -369.  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay.  *See* Fed. R. Evid. 802; *see also United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019) ("[a]n email is not a business record for purposes of the relevant hearsay exception simply because it was sent between two employees in a company or because employees regularly conduct business through emails").  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email.  Defendants dispute the Fact to the extent that it mischaracterizes the evidence and because it is immaterial.  Mr. Beasley testified that he disagreed with the email because "[e]very option period we had prior to that had been

exercised, so I had no reason to believe it wouldn't be" exercised again. Ex. 164, Beasley Tr. at 160:11-161:10. Also, as Plaintiffs do not challenge any statements made by CoreCivic between the date of this email and July 29, 2016 (the date that the BOP notified CoreCivic that it would not be exercising Option Period 2 for the Cibola contract, UF 31), *see generally* Appendix A, ECF No. 352-1, it's unclear at what point Plaintiff asserts Mr. Verhulst's opinion at the time of this email should have been disclosed.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

252. On July 17, 2016, Hininger wrote an email to Garfinkle stating:

> I had a thought Friday night that immediately after the CFM at Cibola, regardless of the results, John and I do a quick trip to DC to meet with the BOP. With that, again depending on the results, we offer up voluntarily a deduction, up to $1 million. We have never done that and I think it might be viewed as an extraordinarily [sic] gesture on our part. I have some other thoughts I can provide tomorrow.

PEx. 80 at -917. Garfinkle replied: "I like your thought . . . . [W]e could structure the $1.0 million 'fine' as a renewal inducement, which would be amortized over the renewal period." *Id*. To that, Hininger responded, "Good ideas, thanks Dave. I agree on huddling. Have a good Sunday." *Id*. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email. Defendants dispute this Fact as mischaracterizing the evidence to the extent that the Fact implies attempted misconduct on the part of Defendants. In

this email, Messrs. Hininger and Garfinkle discuss offering to the BOP that CoreCivic would accept a voluntary $1 million discount on the Cibola contract price—which was described informally in the correspondence as a "renewal inducement" or "fine"—to improve the prospects for renewal, given Cibola's known staffing issues. PEx. 80 at -917. Offering a discount to a customer is not bribery. *Cf. Zeller Corp. v. Federal-Mogul Corp.*, No. 3:95CV7501, 1996 WL 903951, at *3-4 (N.D. Ohio July 25, 1996) (dismissing commercial bribery claim because the case involved "a discount given directly to a buyer by a seller"); Crim. Div. Dep't of Just. & Enf't Div. Secs. & Exch. Comm'n, Resource Guide to the U.S. Foreign Corrupt Practices Act 64 (2d ed. 2020), https://www.justice.gov/criminal-fraud/file/1292051/download (discounts are not inherently problematic). In any event, the Fact is immaterial; since the proposal was never made to the BOP, it is relevant to neither falsity nor scienter. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

253. In a July 28, 2016 email, CCA employees and various lobbyists and others acknowledged the following about the BOP's decision to cancel CCA's Cibola contract: "The beds being cancelled . . . establish credibility to our concerns that BOP is moving forward with a larger plan to cancel all contract confinement beds . . . and this is merely the first step." PEx. 81 at -428. Lappin forwarded the email to Hininger, who forwarded it to Garfinkle. *Id*. at -426 to -427. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibit.  Defendants dispute this Fact as mischaracterizing the evidence; the email discusses the end of all contract confinement, by any provider, unrelated to CoreCivic's performance.  PEx. 81 at -428.  Plaintiff also omits critical context, i.e. that the quoted language is speculation by third-parties who state that cancelations they were speculating about were "completely inconsistent with the conversation Acting Director Kane [of the BOP] had with Chairman Culberson just 2 weeks ago.  While nothing was put in stone, we believe the intent was clear: absent a realignment plan that is presented to—and approved by—Congress, a realignment of this magnitude would not move forward."  *Id*.  That email was forwarded to Mr. Lappin, who sent it to various other CoreCivic executives.  *Id*. at -426 to -427.  The CoreCivic recipients of these emails did not speculate further as to the significance of the cancellations.  *Id*.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

254.    On July 29, 2016, CCA received a letter from the BOP "notify[ing] Corrections Corporation of America (CCA) that the Bureau of Prison (BOP) will not be exercising option period two of contract DJB1PC-011," *i.e.*, the contract for the Cibola facility.  PEx. 82 at -122.  The letter explained: "It has been determined the above stated option period would not be the most advantageous offer for these services. . . .  The BOP anticipates all inmates to be transferred from the Cibola County Correctional Center by October 1, 2016."  *Id*.  Hininger, Garfinkle and Lappin received a copy of the letter.  *Id*. at -117.

62

**Response**: This fact is undisputed. UF 31.

255.    Such losses of renewable contracts are "extremely rare."  ECF No. 336-3 at 15 ("Declining to exercise option years of a private prison contract based on poor performance is an extremely rare occurrence in the BOP.").  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants dispute this Fact, which is supported solely by the expert testimony of Donna Mellendick, for the same reasons set forth in response to Fact 210 above:  Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them." *Brooke Grp. Ltd.*, 509 U.S. at 242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102.

Defendants also dispute this Fact to the extent that it implies that the BOP's decision not to exercise its Option Period on the Cibola contract was anticipated by Defendants; if anything, the rareness of contract cancelations shows that Defendants had a good faith belief that the BOP would continue to exercise its options during the Class Period.  Defendants' dispute of this unsupported assertion does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment.  *See Nix*, 160 F.3d at 347; *see also Bradley*, 587 F. App'x. at 866. Defendants also dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

256.    In an August 1, 2016 email, Jeb Beasley wrote: "The board cannot accept Damon [Hininger]'s spin of 'outside factors'" for the loss of Cibola.  PEx. 83 at -867 (also lamenting GEO's "largest ever" dividend at a time CCA was likely to lower its own and worrying that CCA was "ripe for an activist investor to issue some demands of our Board.").  Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay.  *See* Fed. R. Evid. 801, 802.  The email exchange between Mr. Beasley and his parents was personal in nature, and not within the scope of his employment.  *See Spurlock*, 2010 WL 3807167, at *10.  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibit.  Defendants dispute this Fact as mischaracterizing the evidence through selective quotation and through the argumentative use of the words "lamenting" and "worrying."  Mr. Beasley's personal opinions regarding Mr. Hininger's leadership are also immaterial to the analysis of whether CoreCivic's statements were materially misleading.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.  Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").  Defendants' public disclosures speak for themselves.  Defendants are not required to disclose non-material information.  *See Aschinger*, 934 F.2d at 1407.

257.    According to an email Hininger sent August 3, 2016: "My number one goal has been to keep Eden under contract with the BOP."  PEx. 84.  Hininger continued, "I think if we lose the BOP, it is a hard facility to remarket. . . .  Eden is a lower price but after the events of last

weekend [*i.e.*, loss of Cibola], I worry about the rural location and the facility not being as secure as [the] Tallahatchie [facility] from a physical plant perspective might be more top of mind for the BOP." *Id.* Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited email. Defendants dispute this Fact as mischaracterizing the evidence through selective quotation. In this email, Mr. Hininger was responding to an email thread discussing whether CoreCivic should "remov[e]" their "Tallahatchie offer[s]" that were "in for CAR 16." PEx. 84 at -891. As a response to that discussion, Mr. Hininger opined, *inter alia*, that "Eden is somewhat competing with Tallahatchie" and therefore his "number one goal has been to keep Eden under contract" because Eden "is a hard facility to remarket." *Id.* at -890. Accordingly, the focus of the email was a discussion of strategy relating to contract bids, not any anticipated loss of the Eden contract.

Defendants also dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

258. On August 11, 2016, CCA employee Ronald Thompson wrote to CCA employee Michael Nalley about the OIG report issued earlier that day: "What I'm shocked over is they totally overlooked the consequences of our staff vacancies. They mentioned staffing at the end but could have been much more critical." PEx. 85. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay.  *See* Fed. R. Evid. 801, 802; *see also Daneshvar*, 925 F.3d at 777; *Spurlock*, 2010 WL 3807167, at *10.  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibit.  Defendants dispute this Fact as mischaracterizing the evidence through selective quotation; the quote excerpted in this Fact is stated in the context of an email in which Mr. Thompson generally observes that the authors of the OIG Report had an "agenda going in," and points out several "positives" in the report that were "give[n ] little attn.":

> Just finished reading it. Some observations:
>
> *table 2 shows our monthly incident average is 7.6 while BOP is 6.6 (we're not far apart!!) *Pvt had lower inmate death rate ( a huge issue that should have been amplified; instead they act like the numbers need further investigation) *Pvt had lower grievance rate (again, why not amplify instead of skirting past) *Pvt had fewer positive UA's ( this is a big issue, but again not recognition by the authors) *Pvt had fewer sexual assaults, again a huge issue in Corrections now, but again they give it little attn.,
>
> Finally, I like the way MTC responded with a kick in the teeth to the IG; rather than a passive, polite response. What I'm shocked over is they totally overlooked the consequences of our staff vacancies. They mentioned staffing at the end but could have been much more critical.
>
> With their conclusions about our incident rate and not any positives, it's pretty obvious that was their agenda going in.

PEx. 85.  In any event, one CoreCivic employee's opinion regarding the OIG Report is immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record").

Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

259.    In total, during the Class Period, at just five BOP facilities, CCA received 338 deficiencies, 44 repeat deficiencies, 6 repeat deficiencies, 2 triple-repeat deficiencies, 1 quadruple-repeat deficiency, 3 significant findings and more than $2.7 million of deductions. ECF No. 336-3 at 7-18, 24. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:  Defendants object to this Fact, which is supported solely by the expert testimony of Donna Mellendick, for the same reasons set forth in response to Fact 210 above: Ms. Mellendick's expert testimony is inadmissible, *see* ECF No. 336, and even to the extent admitted, "[e]xpert testimony is useful as a guide to interpreting [] facts, but it is not a substitute for them." *Brooke Grp. Ltd.*, 509 U.S. at 242; *see also Rose*, 388 F. App'x at 535; *In re Citric Acid Litig.*, 191 F.3d at 1102. Defendants also object to the Fact to the extent that it relies on CFM reports as relying on inadmissible hearsay. *See* Fed. R. Evid. 801. If admitted, for the purposes of ruling on summary judgment only, Defendants do not dispute the content of any CFM reports; the reports speak for themselves.

Defendants also dispute this Fact as mischaracterizing the evidence; notwithstanding these individual deficiencies, the BOP exercised all but one of CoreCivic's contract options during the Class Period, UF 26, 27, 29, 30, 33, 34, 36, 37, 39, 40, and the BOP contracting officers indicated that they would ████████████████████████ in every CPAR for CoreCivic's BOP facilities during the Class Period.  UF 74-76, 97-100, 124-128, 133-135, 136-138.  Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of

whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

260.    On September 14, 2016, CCA employee Brien Koehn wrote an email to his colleagues with the subject line "RE: Staffing Pattern," in which he wrote: "Cibola is a facility that has always been under the contract 90% security staffing so shortages have been deducted from the monthly bill . . . ." PEx. 86. Defendants concealed this information from the public throughout the Class Period – never revealing it in detail, summary, directly or indirectly.

**Response**:   For the purposes of the ruling on summary judgment, it is undisputed the quoted language appears in the cited email. Defendants dispute this Fact to the extent it mischaracterizes the evidence through selective quotation. Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

Finally, Defendants dispute Plaintiff's allegation that Defendants "concealed" any information as a legal conclusion, unsupported by admissible evidence and/or violating Local Rule 56.01(b) (requiring that "[e]ach fact must be supported by specific citation to the record"). Defendants' public disclosures speak for themselves. Defendants are not required to disclose non-material information. *See Aschinger*, 934 F.2d at 1407.

261.    In December 2016, the OIG issued a report titled: "Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi." PEx. 87.  Among other things, that report stated the May 2012 riot "was a consequence of what the inmates perceived to be substandard food, inadequate medical care, and disrespectful staff members at the Adams County facility." *Id.* at 3.  It also stated: "we found the staffing levels CoreCivic reported to the BOP reflected neither actual staffing at the facility nor staffing insufficiencies.  Specifically, CoreCivic reported to the BOP simple headcounts of staff recorded on payroll records, regardless of the hours each employee actually worked." *Id.* at iii; *see also id.* at 10 (CCA reported "nominal," not "actual," staffing).  The report explained: "[f]our years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing," and in fact CCA "staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage." *Id.* at i.  This continued even as CCA's "monthly reports to the BOP . . . showed that correctional staffing levels had improved." *Id.* at i-ii.  The OIG "found that CoreCivic staffed fewer than all of the agreed-upon posts for 43 of the 46 months, or 93 percent of the time, prior to the start of our audit." *Id.* at 10.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the report.  Defendants dispute this Fact to the extent that it mischaracterizes the evidence.  First, the report does not conclude that the disturbance "was a consequence of what inmates perceive to be inadequate medical care, substandard food, and disrespectful staff members."  Rather, the report merely notes that such an assertion was made in an affidavit filed by the BOP.  See PEx. 87 at 3.  Second, with respect to CoreCivic's reported staffing levels, the Fact's selective excerpts misleadingly imply that CoreCivic's reports to the

69

BOP regarding staffing levels were improper. In fact, as the report states, "Both the BOP and CoreCivic told us they interpreted the contract to allow the calculation of staffing levels to be based on headcounts rather than FTE, and leave the determination of day-to-day staff assignments to the discretion of CoreCivic . . . When we reported these issues and our concerns about them to BOP officials, they told us CoreCivic's reporting was consistent with the contract." *Id*. at iii. The BOP exercised all available Option Periods for the Adams contract during the Class Period. UF 27.

Discrete performance issues at individual BOP-contract facilities are also immaterial to the analysis of whether CoreCivic's statements regarding the quality of the corrections services provided to all government partners were materially misleading. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

262. According to CCA's auditor, Ernst & Young, for fiscal year 2016: "the vacancy at Northeast Ohio from mid-2015 to the end of 2016, and the ramp-down of BOP populations and ramp-up of ICE populations during the fourth quarter of 2016 at Cibola negatively impacted financial results in 2016." PEx. 88 at -342 to -343.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibit; the document speaks for itself. Defendants dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation. The assertion that this statement was made by Ernst & Young is also unsupported by the evidence; this document was prepared by CoreCivic.

This Fact is also immaterial; any negative impact on CoreCivic's financial results due to "the vacancy at Northeast Ohio from mid-2015 to the end of 2016" is immaterial to Plaintiff's claimed damages from CoreCivic's stock price decline following the Yates Memo in August 2016, and any negative impact on CoreCivic's financial results due to "the ramp-down of BOP

populations and ramp-up of ICE populations during the fourth quarter of 2016 at Cibola" necessarily occurred after the Class Period ended on August 17, 2016. *See Liberty Lobby, Inc*., 477 U.S. at 248.

263.     According to CCA's auditor, Ernst & Young: "The 2017 Management Plan also anticipates a significant reduction in economics at the 2,232-bed Adams County Correctional Center, which is set to expire in July 2017.  We have assumed that the re-negotiation of that contract results in a 50% reduction to annual EBITDA levels, which resulted in a $5.3 million reduction to EBITDA in 2017 for the period following expiration."  PEx. 88 at -367.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited exhibit; the document speaks for itself.  Defendants dispute this Fact to the extent that it mischaracterizes the evidence through selective quotation; shortly before the selected excerpt, the document states:

> We are pleased to report that in November of 2016, we announced that the BOP exercised a two-year renewal option at the 1,978-bed McRae Correctional Facility. The amended contract commenced on December 1, 2016, and provides for similar economics to the existing contract. In other words, we successfully negotiated the renewal without any reduction in EBITDA even though the occupancy guarantee was reduced by about 150 inmates. The renewal of this contract is a positive sign that, despite the DOJ directive, the BOP plans to continue to extend their partnership with CoreCivic.

PEx. 88 at  -366.  Immediately after the selected excerpt, the document states:

> Lastly, with the November election of Donald J. Trump as President of the United States, we anticipate there will be significant changes at the DOJ. We fully anticipate that the Deputy Attorney General who drafted the directive to discontinue the reliance on the private sector will not be a part of the Trump administration. While it is difficult to predict what the DOJ will look like under the Trump administration, we would expect a more favorable tone toward partnership corrections . . . It is possible that the new administration could reverse the current policy on the use of the private sector.

*Id*. at -367.  The assertion that this statement was made by Ernst & Young is also unsupported by the evidence; this document was prepared by CoreCivic.

This Fact is also immaterial; any negative impact on CoreCivic's 2017 financial results due to a "significant reduction in economics at the 2,232-bed Adams County Correctional Center, which is set to expire in July 2017" is immaterial to Plaintiff's claimed damages from CoreCivic's stock price decline following the Yates Memo in August 2016, and it would necessarily occur (if at all) after the Class Period ended on August 17, 2016. *See Liberty Lobby, Inc.*, 477 U.S. at 248.

264.     Immigration and Customs Enforcement ("ICE") was also concerned about CCA's past performance, including at its BOP facilities, and sent CCA a letter telling it to explain its poor past performance.  PEx. 89 at -119.  ICE noted:

> We have read with concern media reporting which indicates that the medical unit at . . . Cibola . . . had repeatedly failed to comply with federal standards of care for Bureau of Prisons (BOP) inmates. . . .
>
> One of the media accounts that causes ICE particular concern (attached) states that, in April 2014, BOP monitors found that Cibola's medical unit was operating far out of compliance with federal standards, and the agency warned [CCA] to correct course; however, when the monitors returned they discovered that CCA failed to comply.

*Id*.

**Response**:  Defendants object to this Fact on the basis that it relies upon inadmissible hearsay.  *See* Fed. R. Evid. 802, 805.  If admitted, for the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the cited letter; the letter speaks for itself. Defendants dispute this Fact to the extent that it mischaracterizes the evidence; there is no evidence that this letter or its content affected ICE contracting decisions and, during the Class Period, CoreCivic won two contracts with ICE.  UF 115,  132.  For the same reasons, the Fact is immaterial.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.

265.     After the end of the Class Period and during the Trump administration, CCA lost the Adams and Eden contracts with the BOP to competitor GEO for the same reason: "'Adams was the same way [as Eden].  We could not compete with a 10-year-old state-of-the-art facility . . .

we're not able to . . . go with low-cost beds." PEx. 90 at 180:14-22; *see also* PEx. 91 at 5; PEx. 92 at 3; *see also* ECF No. 340-2, ¶¶33-34.

**Response**: For the purposes of ruling on summary judgment only, it is undisputed that that the BOP did not renew the Adams and Eden contracts on May 1, 2019 and April 30, 2017, respectively, *see* PEx. 91 at 5; PEx. 92 at 3, and that the quoted language appears in the deposition transcript of Bart Verhulst.

Defendants also dispute this Fact as ambiguous with respect to the assertion that CoreCivic lost the contracts "for the same reason." To the extent the Fact intends to assert that the Adams and Eden contracts were not renewed due to concerns regarding poor performance, it is disputed as unsupported by the evidence cited. Bart Verhulst testified that these contracts were lost because, after the Yates Memo reduced the quantity of contracts available to the market, it "became a race to the bottom" and CoreCivic's "state-of-the-art facility that's 10 years old" could not compete "with older, more antiquated facilities in Texas" so they "made a conscientious decision to hold [the] pricing":

> Yeah. So, I mean, as I said, when the BO[P] put that out for the rebid of Eden and the other Texas facilities, the Yates memo came out, they lowered the quantity, and it became a race to the bottom. And that is -- you know, the BOP treated it as a commodity, and they were going to go with the lowest priced beds. They had been signaling that for some period of time. We as a company were not going to go to the race to the bottom. And those both – that affected both Adams and Eden. Adams was the same way. We could not compete with a 10-year-old state-of-the-art facility -- with ours being a state-of-the-art facility that's 10 years old with older, more antiquated facilities in Texas. We just made a conscientious decision to hold our pricing, and we're not able to do that when people are willing to, you know, basically go with low-cost beds.

PEx. 90 at 178:2-180:22. The other exhibits cited simply reflect the non-renewal of the contracts. *See* PEx. 91 at 5 (announcing the BOP did not renew the Adams contract); PEx. 92 at 3 (announcing the BOP did not renew the Eden contract); *see also* ECF No. 340-2, ¶¶ 33-34 (Scott

Dalrymple rebuttal expert report outlining timeline of non-renewals). Defendants also dispute this Fact to the extent that this Fact relies on the rebuttal expert report of Scott Dalrymple for the same reasons set forth in response to Fact 210 above.

Defendants' dispute of this unsupported assertion does not create a genuine material factual dispute sufficient to preclude the entry of summary judgment. *See Nix*, 160 F.3d at 347; *see also Bradley*, 587 F. App'x. at 866.

266.    Defendants regularly received, reviewed and discussed operational metrics and performance evaluations that they received from the BOP. One CCA executive, Vice President of Health Services John Baxter, was asked: "[T]hose regular conversations that you describe involving Mr. Hininger, they would include discussions of the topics we have been discussing today, the deficiencies, significant findings[,] cure notices[,] and the deductions?" PEx. 101. He responded: "Yes. Over the course of the years referenced that we've talked about from – I think from 2010 all the way up through 2016, we have reviewed a number of memos, a number of audit findings and CFMs, a number have deductions. So as those would occur, through whatever cycle, they would be discussed in that management meeting in the company." PEx. 101. Baxter also testified that management meeting was held "weekly." PEx. 101. Hininger, similarly, testified: "[O]n a weekly basis, usually on a Friday, I'll get a summary from the General Counsel's Office of all findings." PEx. 99, 170:22-25. He clarified that the findings he received included BOP deficiencies and other performance metrics, including details about the severity of any negative performance: "It would have the detail of if it's a deficiency or a repeat deficiency . . . ." Ex. 99, 173:23-176:12; *see generally id*. at 170:22-178:15; *see also* PEx. 107 at 113:6-13 (On behalf of CCA, Swindle was asked: "[I]s it fair to say that either at the weekly meeting or through forwarding an e-mail, the CEO would one way or another be notified of any NOCs?". Swindle answered:

"Yes  I would say that there – there's an organizational expectation because of the – the seriousness of a NOC . . . that we would highlight them and we discuss them . . . .").

**Response**:  This Fact violates the requirements in Local Rule 56.01(b) that "[e]ach fact must be set forth in a separate, numbered paragraph" and "supported by specific citation to the record."  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the exhibits cited.  This Fact is disputed to *the* extent that it implies that Defendants should have anticipated the loss of any BOP contracts, or the Department of Justice's decision to issue the Yates Memo, based on their knowledge of these operational metrics.  No evidence supports these conclusions.  This Fact is immaterial on the same grounds.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.

267.    Defendants claimed to rely on BOP operational metrics in making the alleged false and misleading statements.  Defendants CCA and Hininger claimed to rely on "a variety of indicators from the BOP including the percentage of compliance in the Contract Facility Monitoring Reports."  PEx. 102 at 4, 6-7, 10; PEx. 103 at 4, 6, 8-11.  Lappin claimed to rely on "regular communications with the BOP."  PEx. 104 at 4-6.

**Response**:  For the purposes of ruling on summary judgment only, it is undisputed that the quoted language appears in the exhibits cited.  Defendants dispute this Fact as mischaracterizing the evidence through selective quotation to the extent that it implies that Defendants only relied on BOP operational metrics.  Defendants also dispute that they made any false or misleading statements.

268.    An apples-to-apples comparison of the quality and/or cost of CCA's prison services and the BOP is not possible.  *See* PEx. 37; PEx. 93 at 270:6-274:5; *id*. at 210:22-215:21; PEx. 94 at 26; PEx. 95 at 165:14-169:21; PEx. 96; PEx. 97; PEx. 98.

75

**Response**:  For the purposes of the ruling on summary judgment only, it is undisputed that no "apples-to-apples" comparison of all costs associated with operating public versus private prisons can be done.  Defendants dispute this Fact as mischaracterizing the evidence and to the extent that it implies that CoreCivic attempted to conduct such an "apples-to-apples" comparison, or represented that it had conducted such an "apples-to-apples" comparison.  UF 159, 161, 170-176.  CoreCivic made specific and reasonably qualified quantitative and qualitative comparisons on particular categories of costs, stating the assumptions and adjustments it made.  *See* Ex. 134 ¶¶ 8, 30, 43; *see also* UF 155, 156, 161, 168, 169, 178, 184.

DATED:  February 19, 2021                    Respectfully submitted:

        /s/ *Steven A. Riley*
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Meryn C. N. Grant (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

Morgan E. Whitworth (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600

F: (415) 395-8095
morgan.whitworth@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

*Attorneys for Defendants Corrections Corporation
of America, Damon T. Hininger, David M.
Garfinkle, Todd J. Mullenger, and Harley G.
Lappin*

77

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway,  Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Mark H. Wildasin
FEDERAL BUREAU OF PRISONS
110 9th Avenue South, Suite A-961
Nashville, TN 37203
mark.wildasin@usdoj.gov

Christopher T. Cain
SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com

this 19th day of February, 2021.

/s/ *Steven A. Riley*
Steven A. Riley

2