# EXHIBIT 164

```
 1       IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF TENNESSEE
 2
 3
 4    NIKKI BOLLINGER GRAE, Individually
   and Behalf of All Others Similarly
 5    Situated,
 6              Plaintiff,
 vs.                  CASE NO.
 7                 3:16-CV-02267
   CORRECTIONS CORPORATION OF
 8    AMERICA, et al.,
 9              Defendants.
10
11
12            CONFIDENTIAL
13      VIDEO DEPOSITION OF JEB BEASLEY
14          Nashville, Tennessee
15           March 10, 2020
16
17
18
19
20
21
22   Reported by:
23   Elisabeth A. Miller Lorenz
24   RMR, CRR, LCR No. 66
25   Job No.:  10066909
```

1            IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF TENNESSEE
2
3
4    NIKKI BOLLINGER GRAE, Individually
   and Behalf of All Others Similarly
5    Situated,
6              Plaintiff,
   vs.                CASE NO.
7                        3:16-CV-02267
   CORRECTIONS CORPORATION OF
8    AMERICA, et al.,
9              Defendants.
10
11
12
13
14
15
16
17      Video deposition of JEB BEASLEY was taken on
18    behalf of Plaintiff, at Riley, Warnock & Jacobson,
19    1906 West End Avenue, Nashville, Tennessee,
20    beginning at 9:33 a.m., and ending at 3:16 p.m., on
21    Tuesday, March 10, 2020, before Elisabeth A. Miller
22    Lorenz, RMR, CRR, and LCR No. 66.
23
24
25

```
 1    APPEARANCES:
 2
 3     For the Plaintiff:
 4        ROBBINS GELLER RUDMAN & DOWD
       BY:  CHRISTOPHER H. LYONS
 5        BY:  CHRISTOPHER WOOD
       414 Union Street
 6        Suite 900
       Nashville, Tennessee 37219
 7        615.252.3798
       clyons@rgrdlaw.com
 8        cwood@rgrlaw.com
 9
10     For the Defendants:
11        RILEY, WARNOCK & JACOBSON
       BY:  TREY McGEE
12        1906 West End Avenue
       Nashville, Tennessee 37203
13        615.320.3700
       tmcgee@rwjplc.com
14
       LATHAM & WATKINS
15        BY:  ERIC C. PETTIS
       BY:  BRIAN T. GLENNON
16        355 South Grand Avenue
       Los Angeles, California 90071-1560
17        213.485.1234
       eric.pettis@lw.com
18        brian.glennon@lw.com
19
20     Also Present:
21     David Drumel, Videographer
22
23
24
25
```

1    Warnock & Jacobson, on behalf of the defendants and
2    witness.
3            THE VIDEOGRAPHER:  Thank you.
4            If the court reporter would please
5    swear in the witness.
6                    * * *
7                 JEB BEASLEY
8    was called as a witness, and after having been first
9    duly sworn, testified as follows:
10                E X A M I N A T I O N
11   BY MR. WOOD:
12   Q     Good morning, Mr. Beasley.
13   A     Good morning.
14   Q     How would you describe the state of CCA's
15   relationship with the BOP in the first half of 2016?
16   A     The relationship?  Good.
17   Q     It was good?
18   A     Yes.
19   Q     In the first half of 2016?
20   A     It was.
21   Q     And you had confidence in CCA's ability to
22   adequately execute on its BOP contracts in 2016?
23           MR. GLENNON:  Objection, vague.
24           THE WITNESS:  Repeat the question,
25   please.

1　BY MR. WOOD:

2　Q　Passing you Exhibit 382.  Let me know when
3　you've had a chance to review.

4　A　Okay.

5　Q　Who is Robert Hobart?

6　A　A good friend, also colleague.

7　Q　What -- what does he do for CCA?

8　A　Does some consulting work for us.

9　Q　And what type of consulting?

10　A　He works -- I guess you would say
11　Capitol Hill, does appropriations work.

12　Q　And what type of appropriations work does he
13　do for CCA?

14　A　He's charged with making sure our partners
15　are fully funded, our government partners.

16　Q　So advocate for -- with respect to the BOP,
17　for example, advocate that the government fully fund
18　the BOP?

19　A　Correct.

20　Q　And CCA pays him to do that work, right?

21　A　Correct.

22　Q　And -- and how long have you known him?

23　A　A long time.

24　Q　And when did you first meet --

25　A　We both met -- we both worked for members of

1  Congress together.
2  Q    And is that where you met him?
3  A    Uh-huh.
4  Q    So you guys were going to go golfing, right?
5  Is that --
6  A    Correct.
7  Q    And is that an annual trip that you take?
8  A    No.
9  Q    Just an ad hoc trip?
10 A    Yes.
11 Q    And you decide -- did you end up not going
12 on this trip?
13 A    I did not go on the trip.
14 Q    And why did you not go on the trip?
15 A    I stayed back to work, but partly it was
16 because I didn't want to go on the trip.  It was
17 going to be a longer trip than I wanted to be on,
18 and I felt a little guilty given the amount of
19 preparation Mr. Hobart had put into it.
20 Q    So this is another one of those trips you
21 didn't want to go on?
22 A    Uh-huh.  I've got small children, so I try
23 to stay home as much and as often as I can.
24 Q    So you tell him that you had a surprise BOP
25 health services audit last week at Cibola and

1　prefer -- performed horribly, right?

2　A　　I see where I said that, yes.

3　Q　　And that was a true statement, right?

4　A　　I don't recall, because, again, it could

5　have been hyperbole to try to justify getting out of

6　the trip.

7　　　　He's -- again, like my wife, these are two

8　friends talking.

9　Q　　So you don't recall whether or not it's true

10　that the BOP audit at Cibola in October 2015,

11　whether CCA performed poorly?

12　　　　　　MR. GLENNON:  Object to form.

13　　　　　　THE WITNESS:  Based upon the end of the

14　last e-mail that said we had eight findings, I don't

15　know that I would consider that to be performed

16　poorly.

17　BY MR. WOOD:

18　Q　　That's what you said to your friend, though,

19　right?

20　A　　Right.

21　Q　　And then you say, This is the same facility

22　we recently had a cure notice lifted at.

23　　　　That was true, right?

24　A　　Correct.

25　Q　　And we could find ourselves under another

1   one or a canceled contract.

2   And that was also your opinion, right?

3   A   That -- there's potential for that in any

4   facility we have, to lose a contract, certainly.

5   Q   Right.

6   But there's a higher potential when you have

7   a cure notice, right?

8   MR. GLENNON:  Objection, foundation.

9   THE WITNESS:  Again, I'm using

10  hyperbole because I feel guilty, amount of

11  preparation that he's put into this trip, and I'm

12  backing out the week of.

13  BY MR. WOOD:

14  Q   And so your testimony is that it was not

15  possible that you could find yourself under another

16  cure notice at Cibola?

17  MR. GLENNON:  Object to form.

18  THE WITNESS:  I just said it could

19  happen at any contract we have.

20  BY MR. WOOD:

21  Q   Right.

22  But it's more likely to happen when you've

23  just had one lifted, right?

24  MR. GLENNON:  Same objection.

25  THE WITNESS:  I mean, I don't know the

1  precedent for that, so I don't know if it's more
2  likely.
3  BY MR. WOOD:
4  Q     And you were just -- but you were just
5  telling him this at the time because you didn't want
6  to go on the trip?
7  A     I was explaining that I needed to be home,
8  and I probably used a little bit of hyperbole to do
9  that.
10 Q     And so it's not -- you didn't actually
11 believe at the time that you could be under another
12 cure notice at Cibola?
13        MR. GLENNON:  Object to form.
14        THE WITNESS:  Again, we had a cure
15 notice.  There's always a potential.  So I'm going
16 to work under that premise.
17 BY MR. WOOD:
18 Q     Right.
19    But -- there's always a potential, but when
20 things are going well, you're probably not going to
21 get a cure notice, right?
22        MR. GLENNON:  Objection, foundation,
23 vague.
24        THE WITNESS:  I mean, my understanding,
25 this is the only one we ever received, so I don't

1   know -- there wasn't precedent for that.  I don't
2   know what happens next.
3   BY MR. WOOD:
4   Q     Well, it was the only one you ever received,
5   and then you got an audit with eight deficiencies,
6   right?
7   A     Right.
8   Q     And so --
9   A     CFM has over 400 indicators.  So if 8
10  performed poorly, I don't know.
11  Q     You don't know?
12  A     8 out of 400?  I mean, you would -- you
13  might define that differently than I.
14  Q     How do you define it?
15  A     8 out of 400 --
16  Q     Uh-huh.
17  A     -- I don't -- I don't deem to be poorly.
18  Q     So you weren't concerned about that?
19  A     Of course, I was concerned.  We had a cure
20  notice.
21  Q     Right.
22  A     You're asking the likelihood that we're
23  going to receive another cure notice.
24  Q     Right, based on your e-mail from what you
25  told your friend.

1   A     Again, hyperbole talking one friend to
2   another.
3   Q     Uh-huh.  All right.
4         Then you say to him, They are firing the doc
5   out there.
6         That's at Cibola, right?
7   A     Yes.
8   Q     Now, is that true, or did you just make that
9   up?
10  A     That was true.
11  Q     And we are close to going from five BOP
12  facilities to two.
13        Now, was that hyperbole, or you were
14  making -- or was that true?
15  A     I had no knowledge of that, so certainly it
16  was hyperbole.
17  Q     You had no knowledge?
18  A     That we were going to go to two facilities?
19  No.
20  Q     You had no knowledge that it was a
21  possibility that you could go from five facilities
22  to two?
23        MR. GLENNON:  Object to form.
24        THE WITNESS:  Again, hyperbole.
25

1  BY MR. WOOD:
2  Q     And then you say, Just trying to keep my job
3  again.
4        Was that also hyperbole?
5  A     Yes.
6  Q     So all the times you're telling people
7  you're afraid of losing your job is just hyperbole?
8  A     When two friends talking together,
9  absolutely.
10 Q     All right.
11       (Marked Exhibit No. 383.)
12 BY MR. WOOD:
13 Q     Passing you Exhibit 383.
14       Have you had a chance to review the
15 document?
16 A     Just one moment.
17 Q     Sure.
18 A     Okay.
19 Q     Exhibit 383 is an e-mail that you received
20 in March 2016, right, with a draft of an
21 appropriations strategy memo, right?
22 A     Correct.
23 Q     So what -- what was happening in 2016 with
24 the BOP's contract confinement account?
25 A     The criminal alien population was dwindling

1　recall receiving -- you recall reading this article
2　in The Nation that's attached to this e-mail, right?
3　A　I'm not sure if I actually read that article
4　or not.  I don't put a lot of stock in The Nation.
5　Q　So you don't know if you read it?
6　A　I don't recall.
7　Q　Mr. Thompson sends the article to
8　Mike Nalley, and he says, Doug Martz was a passive
9　bystander most of the time.  That is when we could
10　get an answer from him.  I bet Jeb is stewing he had
11　to deal with this doofus.
12　　　　Do you see that?
13　A　I do.
14　Q　And it's true that you had to deal with
15　Doug Martz in the course of your job
16　responsibilities, right?
17　A　That's true.
18　Q　And do you agree with Mr. Thompson's
19　statement that Mr. Martz was a passive bystander?
20　　　　MR. GLENNON:  Objection, vague.
21　　　　THE WITNESS:  I don't agree with that.
22　BY MR. WOOD:
23　Q　And why not?
24　A　He was chief of acquisitions, so he had a
25　role in the procurement process.

1　Q　　Was Mr. Thompson correct that it was hard to
2　get answers out of Mr. Martz?
3　A　　I'm sure there were occasions where there
4　were.
5　Q　　And you -- you think Mr. Martz was a doofus
6　as Mr. Thompson says?
7　　　　　MR. GLENNON:  Objection, vague.
8　　　　　THE WITNESS:  I don't agree with that.
9　BY MR. WOOD:
10　Q　　You don't agree with it?
11　　　　So Mr. VerHulst says in the top e-mail, I
12　see no way to save Cibola.
13　　　　Do you see that?  And that's just to you,
14　right?
15　A　　I see that.
16　Q　　And did you agree in June 2016 that -- that
17　CCA was likely to lose the Cibola facility?
18　A　　I did not.
19　Q　　Why not?
20　A　　They had exercised option periods before.  I
21　saw no reason to believe that they wouldn't exercise
22　an option period again.
23　Q　　No reason to believe that?
24　A　　Every option period we had prior to that had
25　been exercised, so I had no reason to believe it

1  wouldn't be.
2  Q     You had no reason to believe that the option
3  on Cibola wouldn't be exercised?
4  A     Again, I'm not making the decision, but I'm
5  telling you what premise I'm working from, which is
6  every single option period with the BOP had been
7  exercised prior to that.
8  Q     So you -- you disagreed with your boss'
9  assessment?
10 A     I disagreed.
11 Q     He turned out to be right, right?
12       MR. GLENNON:  Objection, vague.
13       THE WITNESS:  They chose not to
14 exercise an option period.
15 BY MR. WOOD:
16 Q     Right.
17       If you -- I want to ask you about one
18 paragraph in this article.  And if you feel like you
19 need to read more, you should do that.  I don't want
20 to limit your ability to review the document.
21       But on Page 5, there's a paragraph that
22 starts, Doug Martz.
23       Do you see that?
24 A     Uh-huh.
25 Q     And they're referring to the -- the riot or

1   the disturbance or whatever you want to call it at
2   the Adams facility in 2012 that we talked about
3   earlier.
4          And the first sentence says, Doug Martz was
5   the chief of the BOP's private prison contracting
6   office at the time of the riot.
7          Now, that -- that's a true statement, right?
8   He was the chief of that office in 2012?
9   A      Chief of acquisitions.  And at the time --
10  that was 2012, best of my recollection, yes.
11  Q      And the article quotes Mr. Martz as saying,
12  Even before the officer was killed, there was
13  significant issues with CCA's management, Martz
14  says.
15         Do you agree with that statement?
16  A      Significant, no.
17  Q      It goes on to say, Inadequate medical care,
18  low staffing levels, food service issues, when you
19  put all those together, it became ignitable.
20         Do you agree that there were problems with
21  inadequate medical care in Adams in 2012?
22             MR. GLENNON:  Objection, vague.
23             THE WITNESS:  Repeat the question,
24  please.
25

1  I, the undersigned, a Licensed Court
2  Reporter of the State of Tennessee, do hereby
3  certify:
4  That the foregoing proceedings were
5  taken before me at the time and place herein set
6  forth; that any witnesses in the foregoing
7  proceedings, prior to testifying, were duly sworn;
8  that a record of the proceedings was made by me
9  using machine shorthand, which was thereafter
10 transcribed under my direction; that the foregoing
11 transcript is a true record of the testimony given.
12 Further, that if the foregoing pertains
13 to the original transcript of a deposition in a
14 federal case, before completion of the proceedings,
15 review of the transcript was not requested.
16 I further certify I am neither
17 financially interested in the action nor a relative
18 or employee of any attorney or party to this action.
19 IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21
22 Dated: March 19, 2020
23
24 _____
   Elisabeth A. Miller Lorenz
25 RMR, CRR, LCR No. 66