# EXHIBIT 13
# [Filed Under Seal]

Videotaped Deposition of

# William Dalius

February 26, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential**



Page 89

1  A    No, that was a totally different
2  appropriation.
3  Q    You can go ahead and put that aside.
4       Did you ever provide any analysis to
5  lobbyists on behalf of CCA?
6  A    Can you give me a specific example of
7  what --
8  Q    Sure.
9       I mean, I guess generally what I'm asking
10 is, did you perform work for CCA that was intended
11 to be provided to lobbyists?
12 A    I provided data to our office in
13 Washington, D.C. that I assume worked with
14 lobbyists.
15 Q    And what kind of data did you provide them?
16 A    It would -- typically, it would have been
17 financial data, similar to that, and -- and -- and
18 overviews of the BOP budget process so they
19 understood the budget process.
20 Q    Do you know who Stacia or Stacia Hylton is?
21 A    I do.
22 Q    And who is she?
23 A    She's currently on our board of directors,
24 but she was also the previous director of the
25 Marshals Service.

Page 90

1  Q    And did you have the opportunity to work
2  with her while you were at CCA or providing
3  consulting services for CCA?
4  A    To work with Stacia?
5  Q    Yes.
6  A    A little bit.
7  Q    And in what subject matters did you work
8  with her?
9  A    I don't recall specifically, but I'm
10 guessing if we worked on anything together, it would
11 have been financial related since that's my primary
12 expertise, as well as prisoner operations.
13           MS. RADCLIFFE: I'm going to mark as
14 Exhibit 325...
15           (Marked Exhibit No. 325.)
16 BY MS. RADCLIFFE:
17 Q    Mr. Dalius, do you see that this appears to
18 be an e-mail sent to you from Stacia Hylton to
19 yourself on August 20th, 2016?
20 A    Yes, ma'am.
21 Q    Do you have any reason to believe that you
22 did not receive this e-mail?
23 A    No, ma'am.
24 Q    And at this time, it's not clear to me in
25 August 20th, 2016, whether you are actually employed

Page 91

1  at CCA or still doing analyst work. It appears,
2  based on the context of the e-mail, that you are
3  actually employed at this time.
4  A    Where it says I'm in temporary quarters
5  would indicate I was full-time.
6  Q    And so you don't have any reason to believe
7  you didn't receive this e-mail while employed at
8  CCA?
9  A    Correct.
10 Q    Do you see here -- and I believe this is
11 consistent with what you testified earlier -- that
12 you indicated that you didn't have any specific
13 numbers in my old job, but you didn't bring them
14 with you?
15 A    Repeat that question, please.
16 Q    Sure.
17      So there's a reference here to some analysis
18 that you've done with lobbyists in D.C.
19 A    Okay.
20 Q    Do you see that?
21 A    Yeah. In the first sentence, yes.
22 Q    Does that refresh your recollection of
23 whether you did work for lobbyists on behalf of CCA?
24 A    As I told you earlier, I did meet with our
25 D.C. office that works with our lobbyists.

Page 92

1  Q    And would that have been Mr. Wiley?
2  A    Jeremy Wiley, correct.
3  Q    How often did you meet with him?
4  A    No more than a couple times.
5  Q    And when did you first meet with him?
6  A    I think the first time -- again, I may be
7  off on the date. But it would have been probably
8  January of 2016.
9  Q    And I believe you testified that you had
10 provided by -- financial data; is that accurate?
11 A    Yes, ma'am.
12 Q    Okay.
13 A    It would have been similar data that
14 would -- that we just went over.
15 Q    Do you recall what the purpose was intended
16 for the use of that data?
17 A    I don't know what they wanted it for.
18 Q    Do you recall the nature of the data that
19 you provided?
20 A    Other than financial based -- I was the CFO,
21 so they were looking for financial information.
22 Q    There's a reference to her e-mail below, and
23 it says, I like -- you had specific numbers in my
24 old job but didn't bring any of it with me.
25      Would that be consistent with your testimony

Page 93

1 earlier that you didn't bring any specific data from
2 the BOP with you once you left?
3  A    That was my goal.
4  Q    And do you recall discussing with Ms. Hylton
5 cost comparison for a hypothetical or simulated
6 facility?
7  A    I remember generally speaking cost data with
8 her, not specifics.
9  Q    Do you have any reason -- let me restate
10 that.
11       You didn't actually perform the analysis,
12 did you --
13       MR. McGEE:  Object to form of the
14 question as vague.
15 BY MS. RADCLIFFE:
16  Q    -- regarding --
17  A    I don't recall doing an analysis.
18  Q    And do you recall seeing any analysis done
19 with respect to a cost comparison between BOP and
20 CCA for a simulated facility?
21  A    I don't recall that.
22  Q    You can go ahead and put that one aside.
23       MS. RADCLIFFE:  I'll mark the next one
24 326.
25       (Marked Exhibit No. 326.)

Page 94

1 BY MS. RADCLIFFE:
2  Q    So, Mr. Dalius, do you see here that you
3 received an e-mail from Ms. Hylton on
4 approximately -- on August 21st, 2016?
5  A    Yes, ma'am.
6  Q    Do you have any reason to believe that you
7 did not receive this e-mail while employed at CCA?
8  A    No, ma'am.
9  Q    Do you see here a reference in -- to
10 Mr. Vanyur?
11  A    Yes, ma'am.
12  Q    He's also on the e-mail chain, correct?
13  A    Yes.
14  Q    And do you recall discussions with
15 Ms. Hylton or Mr. Vanyur regarding cost comparison?
16  A    I don't remember specifically, but
17 generally, yes.
18  Q    Do you see here that Mr. Vanyur indicates
19 that the model being discussed was beyond his and
20 your capabilities?
21  A    Where does it say that?
22  Q    Sure.  It's in the e-mail from Mr. Vanyur,
23 which is the second e-mail down.  You can go ahead
24 and go -- read it if you want.
25  A    Yeah, I see that.

Page 95

1  Q    Do you recall discussions with Mr. Vanyur
2 regarding building this model and your capabilities?
3  A    No, ma'am.
4  Q    As you sit here today, do you believe you
5 have the capabilities to build such a model?
6  A    A model like this?
7  Q    Yes.
8  A    Depends on what the specifics were for the
9 model.
10  Q    Okay.
11  A    I don't know the exact specifics of the
12 model.  I've got the abilities to build what I knew
13 in the BOP.
14  Q    But you didn't actually perform any analysis
15 with respect to modeling the cost comparisons
16 between the BOP and CCA other than the per diem
17 rate?
18  A    Other than what I do with -- for the Bureau
19 of Prisons.
20  Q    So do you believe you have the capabilities
21 to prepare a simulated facility model that was
22 discussed in the prior exhibit?
23       MR. McGEE:  Object to the form of the
24 question as vague.
25       THE WITNESS:  Again, I would have to

Page 96

1 see the specific requirements as to whether or not I
2 could do it or not.
3 BY MS. RADCLIFFE:
4  Q    So without knowing what the specific
5 criteria were for the model, you wouldn't know one
6 way or another whether you had the capabilities?
7  A    That's correct.
8  Q    Fair enough.
9       Do you recall that while you were consulting
10 with CCA or were employed there that CCA monitored
11 the private prison inmate populations?
12       MR. McGEE:  Object to the form of the
13 question.  It's vague.
14       THE WITNESS:  Yeah.
15       Can you give me more specifics as to --
16 BY MS. RADCLIFFE:
17  Q    Sure.
18       Do you recall whether or not the -- CCA
19 prepared reports that tracked the numbers of
20 prison -- private prison inmate populations at CCA
21 and its competitors?
22  A    Certainly we do at CCA.  I'm not sure about
23 the competitors.
24  Q    And in those reports, does CCA track the
25 inmate population not only at CCA but at, for