EXHIBIT 7

# Grae vs. Corrections Corporation of America, et al.

## Videotaped Deposition of
## ELEANOR INNES - 30(B)(6)
## July 10, 2018
## ***CONFIDENTIAL***



**Confidential**

**Grae vs. Corrections**
**Corporation of America, et al.**

Eleanor Innes - 30(b)(6)

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF TENNESSEE
 3    --------------------------x
      NIKKI BOLLINGER GRAE,
 4    Individually and on Behalf
      of All Others Similarly     Civil Action No.
 5    Situated,                   3:16-cv-02267
 6            Plaintiffs,
 7        vs.
 8
      CORRECTIONS CORPORATION OF
 9    AMERICA, ET AL.,
10            Defendants.
11    --------------------------x
12                      885 Third Avenue
                        New York, New York
13                      July 10, 2018
                        9:07 a.m.
14
15            ***CONFIDENTIAL***
16        VIDEOTAPED DEPOSITION of ELEANOR INNES,
17    30(b)(6) witness in the above-titled action, held at
18    the above time and place, before Eileen Mulvenna,
19    CSR/RMR/CRR, Certified Shorthand Reporter,
20    Registered Merit Reporter, Certified Realtime
21    Reporter, and Notary Public of the State of New
22    York.
23    Job No. 10044536
24
25
```

**Page 2**

```
 1    A P P E A R A N C E S:
 2        ROBBINS GELLER RUDMAN & DOWD LLC
          Attorneys for Plaintiffs and the Witness
 3            414 Union Street, Suite 900
              Nashville, Tennessee  37219
 4        BY:   CHRISTOPHER WOOD, ESQ.
              cwood@rgrdlaw.com
 5
              -and-
 6
          ROBBINS GELLER RUDMAN & DOWD LLC
 7            Post-Montgomery Center
              One Montgomery Street, Suite 1800
 8            San Francisco, California  94104
          BY:   WILLOW RADCLIFFE, ESQ.
 9            wradcliffe@rgrdlaw.com
10
          LATHAM & WATKINS LLC
11        Attorneys for CoreCivic and the individual
          defendants
12            355 South Grand Avenue
              Los Angeles, California  90071-1560
13        BY:   BRIAN T. GLENNON, ESQ.
              brian.glennon@lw.com
14
              -and-
15
           LATHAM & WATKINS LLC
16            505 Montgomery Street, Suite 2000
              San Francisco, California  94111-6538
17        BY:   MORGAN E. WHITWORTH, ESQ.
              morgan.whitworth@lw.com
18
19        RILEY WARNOCK & JACOBSON PLC
          Attorneys for Defendants
20            1906 West End Avenue
              Nashville, Tennessee  37203
21        BY:   TREY McGEE, ESQ.
              tmcgee@rwjplc.com
22
23    A L S O   P R E S E N T:
24            ERIK DAVIDSON, VIDEOGRAPHER
25
```

**Page 3**

```
 1          IT IS HEREBY STIPULATED AND AGREED,
 2    by and between the attorneys for the respective
 3    parties herein, that filing and sealing be and the
 4    same are hereby waived.
 5
 6          IT IS FURTHER STIPULATED AND AGREED
 7    that all objections, except as to the form of the
 8    question, shall be reserved to the time
 9    of the trial.
10
11          IT IS FURTHER STIPULATED AND AGREED that
12    the within deposition may be signed and sworn to
13    before any officer authorized to administer an oath,
14    with the same force and effect as if signed and
15    sworn to before the officer before whom the
16    within deposition was taken.
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2    WITNESS          EXAMINATION BY        PAGE
 3
      ELEANOR INNES
 4
 5          MR. GLENNON              9
 6          MR. WHITWORTH          132
 7          E X H I B I T S
 8    INNES                        PAGE
 9
10    Exhibit D-1  No Bates numbers,        26
11                 Defendants' Notice of Rule
12                 30(b)(6) Deposition of Lead
13                 Plaintiff, Amalgamated
14                 Bank, as Trustee for the
15                 LongView Collective
16                 Investment Fund
17    Exhibit D-2  No Bates numbers,        28
18                 Plaintiffs' Objections and
19                 Responses to Defendants'
20                 Notice of Rule 30(b)(6)
21                 Deposition of Lead
22                 Plaintiff Amalgamated Bank
23                 as Trustee for the LongView
24                 Collective Investment Fund
25    (Continued)
```

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections
Corporation of America, et al.**

**Page 5**

```
 1            E X H I B I T S
 2   Exhibit D-3   No Bates numbers, Plaintiff  41
 3                 Amalgamated Bank's
 4                 Responses and Objections to
 5                 Defendant CoreCivic, Inc.'s
 6                 First Set of
 7                 Interrogatories to
 8                 Plaintiff
 9   Exhibit D-3A  No Bates numbers, E-mail    43
10                 Chain
11   Exhibit D-4   No Bates numbers, Complaint  75
12                 for Violations of the
13                 Federal Securities Laws
14   Exhibit D-5   No Bates numbers,          79
15                 Certification of Named
16                 Plaintiff Pursuant to
17                 Federal Securities Laws
18                 signed by William Hogan on
19                 or about the 18th of
20                 October, 2016
21   Exhibit D-6   No Bates numbers,          83
22                 Consolidated Complaint for
23                 the Violations of the
24                 Federal Securities Laws
25                 filed on March 13, 2017
```

**Page 6**

```
 1   (Continued)
 2            E X H I B I T S
 3   Exhibit D-7   No Bates numbers,          91
 4                 Declaration of Eleanor
 5                 Innes in Support of Lead
 6                 Plaintiff's Motion for
 7                 Class Certification,
 8                 Appointment of Class
 9                 Representative and
10                 Appointment of Class
11                 Counsel
12   Exhibit D-8   No Bates numbers,          97
13                 Memorandum of Law in
14                 Support of Lead Plaintiff's
15                 Motion for Class
16                 Certification, Appointment
17                 of Class Representative and
18                 Appointment of Class
19                 Counsel
20   (Continued)
21
22
23
24
25
```

**Page 7**

```
 1            E X H I B I T S
 2   Exhibit D-9   No Bates numbers, Plaintiff 108
 3                 Amalgamated Bank's
 4                 Responses and Objections to
 5                 Defendant CoreCivic Inc.'s
 6                 First Set of Requests for
 7                 Production of Documents to
 8                 Plaintiff
 9   Exhibit D-10  No Bates numbers, Movant's  166
10                 Purchases and Losses
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1        THE VIDEOGRAPHER:  We are now on the
 2   record.
 3        Today is Tuesday, July 10th, 2018, and
 4   the time is approximately 9:07 a.m.
 5        This is the videotaped deposition of
 6   Amalgamated Bank 30(b)(6) being taken in the
 7   matters of Nikki Bollinger Grae versus
 8   Corrections Corporation of America, et al.,
 9   pending in the United States District for the
10   Middle District of Tennessee, Case No.
11   3:16-cv-02267.
12        We are at 885 Third Avenue, New York,
13   New York.
14        My name is Erik Davidson of Aptus
15   Court Reporting.
16        At this time will counsel and all
17   parties present please identify themselves.
18        MR. GLENNON:  Brian Glennon of
19   Latham & Watkins on behalf of CoreCivic and
20   the individual defendants.
21        MR. WHITWORTH:  Morgan Whitworth from
22   Latham & Watkins on behalf of the defendants.
23        MR. McGEE:  Trey McGee, Riley
24   Warnock & Jacobson, on behalf of the
25   defendants.
```

Page 9

1      MR. WOOD:  Christopher Wood, Robbins
2      Geller, on behalf of plaintiff and the
3      witness.
4         MS. RADCLIFFE:  Willow Radcliffe from
5      Robbins Geller Rudman & Dowd on behalf of the
6      witness and the plaintiff.
7         THE VIDEOGRAPHER:  Will the court
8      reporter please swear in the witness.
9   ELEANOR INNES,
10      having been duly sworn by Eileen Mulvenna,
11      a Notary Public of the State of New York,
12      was examined and testified as follows:
13   EXAMINATION
14   BY MR. GLENNON:
15      Q.    Good morning, Ms. Innes.
16      A.    Good morning.
17      Q.    I introduced myself at the outset of
18   the deposition briefly for the record, but just to
19   introduce myself more formally to you, I'm Brian
20   Glennon.  I'm with the law firm of Latham & Watkins.
21   I represent CoreCivic and the four individual
22   defendants.
23         To my left is my associate Morgan
24   Whitworth.  He's also with my firm.  And to his left
25   is Trey McGee.  He's our local counsel in Tennessee.

Page 10

1         **Thank you very much for taking the**
2   **time to be with us this morning.**
3         **Can we begin by having you spell your**
4   **full name for the court reporter, please.**
5      A.    Eleanor Innes, E-L-E-A-N-O-R.  Innes,
6   I-N-N-E-S.
7      Q.    And, Ms. Innes, where do you presently
8   reside?
9      A.    In Jackson Heights, Queens in
10   New York.
11      Q.    Can I just get your address for the
12   record, please.
13      A.    8412 35th Avenue, Jackson Heights,
14   New York 11372.
15      Q.    Thank you.
16         Ms. Innes, have you been deposed
17   before?
18      A.    Yes.
19      Q.    I'll come back to that in a moment.
20         How many times?
21      A.    Once.
22      Q.    Once.  Okay.  I'll come back to that.
23         Just to ensure that we have a clean
24   transcript and that the deposition moves as
25   efficiently as possible, I'd like to begin by just

Page 11

1   going over a couple of ground rules, if you don't
2   mind.
3      A.    Okay.
4      Q.    The first is, throughout the course of
5   the day, I'll be asking you questions and you'll be
6   giving answers.  We have a court reporter.  This
7   deposition will be transcribed.  As a result, it's
8   very important for us to try our best not to talk
9   over one another.  If you allow me to finish my
10   questions, I'll allow you to finish your answers.
11   It just makes for a much cleaner transcript.
12         Is that okay?
13      A.    Yes.
14      Q.    The second is -- the second ground
15   rule is that because this is being recorded and
16   there's a written transcript -- obviously, there's a
17   video as well, but the written transcript will be
18   used -- it's very important to have audible, verbal
19   answers.  Uh-huhs and huh-uhs and nods or shakes of
20   the head don't always make for very clear testimony.
21         So to the extent possible, when I ask
22   you a question, if you could respond audibly and
23   verbally as opposed to with the nonverbal gestures.
24   And if I notice any nods or shakes of the head, I'll
25   try to point that out to you.

Page 12

1         Does that make sense?
2      A.    Yes.
3      Q.    Good.
4         If at any point during my questions
5   today you don't understand a question, please do not
6   hesitate to ask.  I will do my very best to ask as
7   clear of questions as I can, but I don't want you to
8   speculate as to what I mean.  If it's not clear, I'm
9   more than happy to clarify or try and figure out
10   what about my question is unclear to you so I can
11   correct it, adjust it and help you answer it
12   accurately.
13         Is that acceptable?
14      A.    Yes.
15      Q.    Now, you understand that you're under
16   oath in this deposition.  The court reporter at the
17   beginning of the deposition swore you in.  And what
18   that means is that even though we're not in a court
19   of law now, your testimony has the same force and
20   effect as if you were testifying in court.
21         Do you understand that?
22      A.    Yes.
23      Q.    You will have at the conclusion of
24   this deposition a period of time -- we'll work with
25   your counsel to allow you to review the transcript.

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections Corporation of America, et al.**

1 You can make corrections to the transcript. If you
2 substantively change your answers, I will have the
3 opportunity to comment on that at a later point in
4 time or at trial.
5         Do you understand that?
6     A.    Yes.
7     Q.    Your attorneys will from time to time
8 object. Unless they specifically instruct you not
9 to answer, you're still required to answer the
10 question.
11        Does that make sense?
12    A.    Yes.
13    Q.    If you need a break at any time,
14 please let me know, for any reason. The only thing
15 I ask is that if there is a question pending, you
16 answer the question, and then I'll accommodate your
17 desire to take a break.
18        Is that acceptable?
19    A.    Yes.
20    Q.    If I say "CoreCivic" in this case, I'm
21 also referring to Corrections Corporation of
22 America. You realize that over the course of this
23 lawsuit, Corrections Corporation of America
24 rebranded is now known as CoreCivic.
25        You'll understand that I'm referring

1 to CCA when I say "CoreCivic"; does that make sense?
2     A.    Yes.
3     Q.    Is there any reason why you can't give
4 complete and your best testimony today?
5     A.    No.
6     Q.    Ms. Innes, I'd like to start by
7 talking about some of the preparations you went
8 through in connection with this deposition.
9         I'm assuming you did do some
10 preparation for this deposition; is that correct?
11    A.    Yes.
12    Q.    Did you meet with anybody?
13    A.    Yes.
14    Q.    Who did you meet with?
15    A.    I've met with Amalgamated Bank's
16 internal general counsel, and I've also met with our
17 legal representation.
18    Q.    And by "legal representation," you
19 mean outside counsel?
20    A.    Yes.
21    Q.    With respect to inside counsel, how
22 many times did you meet with in-house counsel at
23 Amalgamated Bank?
24    A.    I'm not sure, but it was a handful of
25 times.

1     Q.    More or less than five times?
2     A.    Probably more than five, less than
3 ten.
4     Q.    Okay. More than five, less than ten.
5         Can you give me the rough time period
6 during which those meetings took place?
7     A.    It would have been from May 2018
8 through today.
9     Q.    Can you give me an estimate about how
10 long each of those meetings took place?
11    A.    Can you --
12    Q.    A ballpark would be fine, your best
13 estimate.
14    A.    Half hour to three hours, four hours.
15    Q.    So it ranged from between half an hour
16 to three or four hours?
17    A.    Yep -- yes.
18    Q.    And during the course of those
19 meetings, did you and in-house counsel review any
20 documents?
21    A.    Yes.
22    Q.    Did any of those documents refresh
23 your recollection on any of the events or the
24 allegations at issue in this lawsuit?
25    A.    I'm not sure I understand the

1 question.
2     Q.    Okay. You said you reviewed
3 documents.
4     A.    Yes.
5     Q.    Were they court filings?
6     A.    Some of them, yes.
7     Q.    And you familiarized yourself with
8 this lawsuit in connection with your preparation for
9 this case; is that correct?
10    A.    Yes.
11    Q.    And I don't need to ask about the
12 court filings. I'm now focused on documents other
13 than court filings that you may have reviewed with
14 in-house counsel during your prep period.
15    A.    Okay.
16    Q.    Did any of those documents refresh
17 your recollection or remind you of events, facts,
18 dates, times, people that are relevant to the
19 allegations and the litigation as reflected in the
20 pleadings?
21        MR. WOOD:  Objection to form.
22        THE WITNESS:  I'm -- if I could just
23 get clarification by what you mean by
24 "refresh," I guess is where I'm having
25 difficulty. Refresh from --

Page 17

1  BY MR. GLENNON:
2      Q.    Let me try it this way.  No, it's -- I
3  understand.
4            Were these all documents that you were
5  looking at and learning new facts, or are these
6  documents that you looked at and thought to
7  yourself, okay, now I remember what happened at the
8  time of this investment or what happened at the time
9  of this disclosure?
10            Do you understand the distinction I'm
11  drawing?
12      A.    I believe so.
13      Q.    Okay.
14      A.    I was familiar with the case from
15  internal meetings when we first -- when Amalgamated
16  Bank first decided to go forth with the litigation.
17  So I was aware of the litigation, but I did not have
18  details.
19      Q.    Okay.  And on those initial meetings,
20  were those meetings with in-house counsel?
21      A.    Yes.
22      Q.    Did anybody outside -- can you --
23  sorry.  Strike that.
24            Focusing now on those initial meetings
25  when you first became aware of the lawsuit, who --

Page 18

1  can you give me a general list of who attended those
2  meetings?
3      A.    These would be internal meetings with
4  Amalgamated Bank's trust committee, which would --
5  the people who attend the trust committee are
6  obviously the trust committee members and coworkers
7  of the investment management division.
8      Q.    And the general counsel as well,
9  members of the --
10      A.    Yes.
11      Q.    -- of the general counsel's office?
12      A.    Yes.
13      Q.    And just to be clear, those were
14  meetings in which you became initially familiar with
15  the allegations in the complaint or the nature of
16  the lawsuit?
17      A.    Yes.
18      Q.    And then sometime after that, you met
19  with the general counsel, in-house counsel on a
20  handful of the occasions ranging from 30 minutes to
21  four to five hours with the specific intent of
22  preparing for this deposition?
23      A.    Yes.
24      Q.    You also mentioned that you met with
25  outside counsel?

Page 19

1      A.    Yes.
2      Q.    How many times?
3      A.    To clarify, conference calls and in
4  person?
5      Q.    Conference calls and in person,
6  please.
7      A.    Four or five times.
8      Q.    When was the first time?
9      A.    I can't recall.
10      Q.    Would you say --
11      A.    In the last couple months.
12      Q.    Okay.  So the first meeting -- okay.
13  Strike that.
14            So all four or five meetings would
15  have taken place in the last couple months; is that
16  accurate?
17      A.    Yes.  Yes.
18      Q.    Can you give me some estimate as to
19  the length of those meetings.
20      A.    Anywhere from an hour to four hours.
21      Q.    An hour to four hours.
22      Q.    And during any of those meetings, did
23  you review any documents?
24      A.    Yes.
25      Q.    Now, earlier you had mentioned that

Page 20

1  you had reviewed documents initially, earlier in the
2  case, when you were with the trust committee and
3  counsel when you were first becoming familiarized
4  with the potential lawsuit.
5            Do you recall that testimony?
6      A.    Yes.
7      Q.    And then later you had the meetings
8  you just described with outside counsel?
9      A.    Yes.
10      Q.    Did any of the meetings with outside
11  counsel refresh your recollection on any of the
12  events at issue in the lawsuit?  And by that, by
13  example, but not by limitation, I mean the
14  investment decision, the dates of the investment,
15  the amount, that sort of thing.
16            MR. WOOD:  Objection to the form.
17            THE WITNESS:  So that was a little
18      long.
19  BY MR. GLENNON:
20      Q.    I can break it down.
21      A.    Can you just break it down?  Because
22  now you're adding additional --
23      Q.    That's fine.
24            Do you remember earlier when we talked
25  about the difference between becoming familiar, in

Case 3:16-cv-02267    Document 430-3    Filed 02/19/21    Page 7 of 71 PageID #: 24617
www.aptusCR.com
Pages 17..20

Confidential

Grae vs. Corrections
Corporation of America, et al.

Eleanor Innes - 30(b)(6)

Page 21

1 the first instance, with the allegations in the
2 complaints versus being refreshed on something that
3 you may have known previously?
4     A.    Okay.
5     Q.    Do you recall discussing that?
6     A.    Yes.
7     Q.    Okay.  Using that same distinction, my
8 question to you is, during any of the meetings now
9 with outside counsel, did you review any documents
10 in preparation for today's deposition that refreshed
11 your recollection as to the facts in this lawsuit?
12     A.    Yes.
13     Q.    What documents would those have been?
14     A.    Oh, there was many documents, so --
15     Q.    Can you give me your best
16 recollections of what those were.
17     A.    So there were the memorandums from
18 Judge Aleta Trauger.  There were the motion to
19 become lead plaintiff.  There was the initial motion
20 regarding the case.  I don't know what the official
21 legal name is, but there were many, many documents
22 that were reviewed.
23     Q.    Were they all court filings?
24     A.    No.
25     Q.    Can you describe for me the non-court

Page 22

1 filings that refreshed your recollection in
2 preparation for your deposition today?
3     A.    There were some internal documents
4 that we reviewed going back to when Amalgamated
5 first started to pursue the case in 2016.
6     Q.    Can you give me an estimate as to how
7 many internal documents you reviewed going back to
8 when Amalgamated first started to investigate the
9 case.
10     A.    There weren't many.  A handful.
11     Q.    Five?
12     A.    Less than five.
13     Q.    Less than five.
14         Can you describe generally for me the
15 content of those documents.
16     A.    It would be regarding our corporate
17 governance program and what litigation the bank was
18 pursuing.
19     Q.    And what about those documents
20 refreshed your recollection in connection with your
21 preparation for today's deposition?
22     A.    Can you just rephrase.  Because it was
23 just reviewing documents that I had seen before
24 through meetings.
25     Q.    When I was asking you about whether

Page 23

1 you looked at documents that sort of refreshed your
2 recollection, you were talking about court pleadings
3 to begin with.
4         Do you recall that?
5     A.    Yes.
6     Q.    So I'm focused now on the five
7 documents on corporate governance.
8     A.    Yes.
9     Q.    What were the contents specifically in
10 those documents that caused you to refer to them in
11 response to my question?
12         MR. WOOD:  Objection to form.
13         THE WITNESS:  They were the initial
14     documents that brought up the litigation
15     against CCA during our meeting.
16 BY MR. GLENNON:
17     Q.    So what --
18     A.    So I originally -- go ahead.
19     Q.    No, that was my fault.  You corrected
20 me.  Please.
21     A.    I originally saw those documents
22 when -- some of them -- I'm not sure all of them --
23 when they were first put together in 2016.
24     Q.    Do you have any more specific
25 recollection as to the date, beyond 2016, with

Page 24

1 respect to those documents you've been discussing?
2     A.    Can you just rephrase the question.
3     Q.    Yes.
4         Do you have any more specific date of
5 those documents?  If I understood your testimony
6 correctly, you said they were just the initial
7 documents that discussed the litigation from 2016.
8         And I'm asking, do you have a more
9 specific date as to when those documents were dated?
10     A.    Towards the end of 2016.  No, I don't
11 because I can't -- no, I don't.  I can't remember
12 exactly when those documents were dated.
13     Q.    That's fine.  Thank you.
14         Ms. Innes, how long have you been an
15 employee at Amalgamated Bank?
16     A.    Eight years.
17     Q.    And before joining Amalgamated Bank,
18 where were you employed?
19     A.    Mutual of America Capital Management.
20     Q.    How long were you at Mutual of
21 America?
22     A.    About ten years.
23     Q.    And what is your current job title at
24 Amalgamated?
25     A.    Senior vice president and director of

1  equities.
2      Q.    Can you provide me with a general
3  overview of your job responsibilities as senior
4  vice president and director of equities?
5      A.    I'm responsible for managing our
6  in-house indexed and custom indexed equity business,
7  along with oversight of subadvisors in conjunction
8  with the investment management team, along with
9  product development and client marketing and
10 reporting.
11     Q.    And going back for a moment to your
12 employment at Mutual of America Capital Management,
13 can you provide an overview of your job
14 responsibilities while you were employed there?
15     A.    I was an indexed fund manager and also
16 an equity analyst.
17     Q.    And you're not a lawyer?
18     A.    No.
19     Q.    Who do you report to at Amalgamated?
20     A.    Jim Lingberg.
21     Q.    Can you spell that for the record,
22 please.
23     A.    Jim, J-I-M, Lingberg, L-I-N-G-B-E-R-G.
24     Q.    What is Jim's title?
25     A.    Chief trust officer.

1      Q.    And do you have any individuals or
2  employees reporting directly to you?
3      A.    Yes.
4      Q.    And could you provide a list of those
5  employees for me, please.
6      A.    One, Kevin Kang.
7      Q.    Kevin is the only employee currently
8  reporting directly to you?
9      A.    Yes.
10     Q.    Ms. Innes, I am going to take a moment
11 to introduce a couple of exhibits.
12         MR. GLENNON:  We'll mark this as
13 Defendants' Exhibit 1.
14         (Innes Exhibit D-1, No Bates numbers,
15     Defendants' Notice of Rule 30(b)(6)
16     Deposition of Lead Plaintiff, Amalgamated
17     Bank, as Trustee for the LongView Collective
18     Investment Fund, marked for identification.)
19 BY MR. GLENNON:
20     Q.    Ms. Innes, if you could just take a
21 moment to familiarize yourself with this document.
22         (Reviewing.)
23     Q.    Ms. Innes, have you had an opportunity
24 to review Defendants' Exhibit 1?
25     A.    Yes.

1      Q.    Have you seen Defendants' Exhibit 1?
2      A.    Yes.
3      Q.    You understand that this is
4  Defendants' Notice of Rule 30(b)(6) Deposition of
5  Lead Plaintiff, Amalgamated Bank, as Trustee for the
6  LongView Collective Investment Fund?
7      A.    Yes.
8      Q.    Do you understand that this was our
9  notice of deposition for Amalgamated Bank?
10     A.    Yes.
11     Q.    And are you familiar generally with
12 the topics of deposition that are listed in
13 Defendants' Exhibit 1?
14     A.    Yes.
15     Q.    And you understand that you have been
16 designated by plaintiff as the corporate
17 representative of Amalgamated Bank in this
18 deposition?
19     A.    Yes.
20     Q.    And you realize that that means you're
21 testifying on behalf of Amalgamated Bank?
22     A.    Yes.
23     Q.    And you're generally familiar with the
24 topics that are listed in Defendants' Exhibit 1?
25     A.    Yes.

1          MR. WOOD:  Brian, I'll just note for
2  the record that we did serve objections to
3  certain of these --
4          MR. GLENNON:  They're coming next.
5          MR. WOOD:  All right.
6          (Innes Exhibit D-2, No Bates numbers,
7      Plaintiffs' Objections and Responses to
8      Defendants' Notice of Rule 30(b)(6)
9      Deposition of Lead Plaintiff Amalgamated Bank
10     as Trustee for the LongView Collective
11     Investment Fund, marked for identification.)
12 BY MR. GLENNON:
13     Q.    Ms. Innes, I'm handing you now what
14 will be marked as Defendants' Exhibit 2.
15         This is Plaintiffs' Objections and
16 Responses to Defendants' Notice of Rule 30(b)(6)
17 Deposition of Lead Plaintiff Amalgamated Bank as
18 Trustee for the LongView Collective Investment Fund.
19         If you could just take a moment to
20 familiarize yourself with that document.
21         (Reviewing.)
22     Q.    Ms. Innes, have you had an opportunity
23 to review Defendants' Exhibit 2?
24     A.    Yes.
25     Q.    And you understand that these are

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections**
**Corporation of America, et al.**

Page 29

1  plaintiffs' objections and responses to what I
2  previously marked as Defendants' Exhibit 1?
3       A.    Yes.
4       Q.    And without going through each and
5  every request, you'll see that a number of them,
6  such as Response to Topic of Examination No. 2,
7  No. 3, No. 4, No. 5, so on and so forth -- we'll
8  come back and talk about these individually
9  throughout the deposition, but you'll see that, in
10  response to a number of these, plaintiffs represent
11  that they will designate a witness to testify on
12  that particular topic?
13       If it would help, they're generally
14  the last sentence where there is such an agreement
15  of the response to the topic of examination.
16       A.    Yes.
17       Q.    And you understand, as we discussed
18  previously, that where plaintiffs have said that
19  they will designate a witness to talk about the
20  specific topics of examination, that witness is you?
21       A.    Yes.
22       Q.    And you're prepared to speak to those
23  topics of examination for which plaintiffs have
24  represented that they will designate a witness to
25  testify on that subject matter?

Page 30

1       A.    To the best of my ability, yes.
2       Q.    And Amalgamated is not going to put
3  forth any other witness to talk about any subset of
4  these requests, the requests that the plaintiffs
5  have represented they will designate a witness.
6  They've designated you for all such requests;
7  correct?
8       MR. WOOD:  Objection to form.
9       THE WITNESS:  I'm not sure.
10  BY MR. GLENNON:
11       Q.    Okay.  As you sit here today, are you
12  aware of any other witness from Amalgamated Bank
13  that is preparing to testify or will testify on any
14  of these subject matters other than you?
15       A.    No.
16       Q.    Thank you.
17       And to the best of your abilities, you
18  said you prepared to speak for Amalgamated on each
19  of the deposition topic areas for which counsel said
20  they would produce a witness?
21       A.    Yes.
22       Q.    Without disclosing any discussions you
23  had you either in privileged sessions with in-house
24  counsel or with your outside counsel, have you had
25  any discussions with anybody else at Amalgamated

Page 31

1  about who is the proper person to testify about
2  these subject matters on behalf of Amalgamated?
3       A.    Yes.
4       Q.    Who did you have those discussions
5  with?
6       A.    Jim Lingberg.
7       Q.    That's your supervisor?
8       A.    Yes.
9       Q.    And how many discussions with Jim did
10  you have about whether or not you were the best
11  person to testify about these subject matters?
12       A.    One.
13       Q.    And can you summarize that discussion
14  for me.
15       A.    It was a general discussion on the
16  amount of time it would take to go through the
17  depositions and the litigation.
18       Q.    Fair to say that the discussion was
19  basically logistic in terms of the demands it was
20  going to take out of your schedule to perform in
21  this capacity?
22       A.    Yes.
23       Q.    Did you discuss the substance of your
24  testimony with Jim in connection with that
25  discussion?

Page 32

1       A.    No.
2       Q.    Did you have any discussions with
3  anybody else, again outside of privileged
4  discussions, about whether you should be the
5  designee on behalf of Amalgamated to testify on the
6  subject matters we were just discussing?
7       A.    No.
8       Q.    Do you know why you were selected as
9  the designated Amalgamated witness?
10       MR. WOOD:  I'm just going to object to
11       the extent it calls for privileged
12       information.
13       But if you can answer that question
14       without divulging privileged information from
15       general counsel or outside counsel, you can
16       answer it.
17       THE WITNESS:  As the director of
18       equities and a portfolio manager for some of
19       the LongView funds, it makes sense for me to
20       be the designated witness.
21  BY MR. GLENNON:
22       Q.    Is that because you have unique and
23  specific knowledge about those investments and those
24  funds given your role?
25       A.    To clarify, I wouldn't say it would be

1  unique information, but I am the closest to managing
2  those portfolios.
3      **Q.    Outside of general counsel or outside**
4  **counsel, would you say you're the closest to the**
5  **claims asserted in this litigation?**
6          MR. WOOD:  Objection to form.
7          THE WITNESS:  Can you clarify what you
8      mean by "closest to."
9  BY MR. GLENNON:
10     **Q.    Sure.**
11     A.    Thank you.
12     **Q.    When we were asking how you were**
13 **designated to serve in this capacity today, one of**
14 **the things you said is that you were closest to**
15 **managing those portfolios.**
16         **Do you recall that testimony?**
17     A.    Yes.
18     **Q.    What I'm asking is, was any**
19 **consideration, to your knowledge, given to your**
20 **level of involvement or knowledge of the underlying**
21 **litigation, or was the primary driver in making the**
22 **decision to designate you your knowledge of the**
23 **portfolios?**
24         MR. WOOD:  Objection.
25         Again, just I caution you not to

1  reveal any privileged information, but you
2  can answer if you know and can do so without
3  revealing that information.
4          THE WITNESS:  I do not believe I was
5      chosen specifically because I am an index
6      fund manager.
7          Does that answer your question?
8  BY MR. GLENNON:
9      **Q.    It does.**
10     A.    Yeah.
11     **Q.    Why is it that you do not believe you**
12 **were chosen specifically because you were an index**
13 **fund manager?**
14     A.    There are other representatives of the
15 bank that would do just as good a job as I will in
16 representing the bank in this litigation.
17     **Q.    So without disclosing the contents of**
18 **privileged communications, why is it you believe you**
19 **were selected to sit in this chair today as opposed**
20 **to the other individuals that you felt would do just**
21 **as good a job in that capacity?**
22         MR. WOOD:  Objection to form.
23         THE WITNESS:  Part of it is schedule.
24     Part of it is timing.
25

1  BY MR. GLENNON:
2      **Q.    Was your particular unique or more**
3  **intimate knowledge of the litigation itself a factor**
4  **in selecting you to serve in this capacity?**
5          MR. WOOD:  Objection to form.
6          THE WITNESS:  Over some other
7      individuals, yes; but not a deciding factor
8      overall.
9  BY MR. GLENNON:
10     **Q.    Who was involved in making the**
11 **decision to designate you as the corporate**
12 **representative for Amalgamated?**
13     A.    I'm not sure of everyone who was
14 involved.
15     **Q.    Do you recall who informed you that**
16 **you were going to be designated as the corporate**
17 **representative for Amalgamated?**
18     A.    Jim Lingberg.
19     **Q.    Was this the same discussion you**
20 **talked about earlier where you said it was a general**
21 **discussion about the time and the requirements of**
22 **serving in this role?**
23     A.    No.  No.
24     **Q.    It was a different conversation?**
25     A.    It was a quick conversation in a

1  general meeting.  Not even -- a quick comment in a
2  general meeting.
3      **Q.    I see.**
4          **When did that general meeting take**
5  **place?**
6      A.    May of this year.
7      **Q.    I want to go back a moment.**
8          **You testified at the beginning that**
9  **you had been deposed before.**
10     A.    Yes.
11     **Q.    Were you deposed in your individual**
12 **capacity or were you giving testimony on behalf of**
13 **Amalgamated?**
14     A.    I was giving testimony on behalf of
15 Amalgamated Bank.
16     **Q.    That was in connection with another**
17 **litigation?**
18     A.    Yes.
19     **Q.    Which litigation was that?**
20     A.    Ebix.
21     **Q.    Can you spell that, please.**
22     A.    E-B-I-X.
23     **Q.    What kind of lawsuit was that?**
24     A.    It was a derivatives lawsuit.
25     **Q.    In this context, is that a shareholder**

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections
Corporation of America, et al.**

1  derivative lawsuit?

2      A.    Yes.

3      Q.    When was that testimony given?

4      A.    April of 2018, a couple months ago.

5  I'm not sure of the date.

6      Q.    Can you describe generally the nature

7  of the testimony you provided in the Ebix

8  shareholder derivative litigation.

9          MR. WOOD:  So my understanding is that

10     there's a protective order that covers that

11     testimony.

12         I think if you can describe it

13     generally, that's fine.

14         MR. GLENNON:  One moment.  On this --

15     that's fine.  We also can mark this portion

16     of the transcript confidential under

17     protective order.

18         MR. WOOD:  I'm going to mark the whole

19     transcript confidential, but it's not my

20     case, so I don't know how to deal with that.

21     I can't have her testify about information

22     which has been marked confidential by someone

23     else.

24         MR. GLENNON:  I understand.

25         MR. WOOD:  Again, she can talk about

1      it generally.  I think that's fine.

2  BY MR. GLENNON:

3      Q.    So keeping your testimony generally,

4  can you give me, in essence, the gist of your

5  testimony as corporate representative in the

6  shareholder derivative litigation that you were just

7  describing?

8      A.    On behalf of our shareholders in the

9  LongView funds, we were looking to -- or are looking

10 to recover shareholder value regarding the structure

11 of Ebix, corporate structure.

12     Q.    Can you clarify the "corporate

13 structure" piece of your testimony.

14     A.    There were misleading statements made

15 by senior officials in Ebix that led to a decrease

16 in valuation of the stock based on -- there were a

17 lot of different details regarding the corporate

18 structure of the security and also the involvement

19 of senior management that we were challenging -- or

20 are challenging.  Pardon me.

21     Q.    Is Amalgamated a named plaintiff in

22 the Ebix shareholder derivative litigation?

23     A.    I believe so, yes.

24     Q.    Is Amalgamated the lead plaintiff in

25 the Ebix shareholder derivative litigation?

1      A.    Yes.

2      Q.    Who's your counsel for Amalgamated in

3  the Ebix shareholder derivative litigation?

4      A.    I recall the lawyer's name, not the

5  firm.

6      Q.    Do you know whether it's the same firm

7  that's representing you in this litigation?

8      A.    No, it is not.

9      Q.    Going back quickly to the topics that

10 we discussed that you've been put forth to testify

11 about today in this litigation, do you believe that

12 you're the best person to represent Amalgamated at

13 this deposition in answering the questions that

14 you've been designated for?

15     A.    Yes.

16     Q.    Are there any other individuals at

17 Amalgamated that you feel, with respect, again, to

18 the topics we're talking about that are listed in

19 actually both Defendants' Exhibit 1 and 2, that have

20 more knowledge than you on those particular topics?

21         MR. WOOD:  Objection to form.

22         THE WITNESS:  At this time, no.

23 BY MR. GLENNON:

24     Q.    Ms. Innes, I'd like to direct your

25 attention to page 11 of Defendants' Exhibit 2, Topic

1  Examination -- Topic of Examination No. 20.

2          Do you have that in front of you?

3      A.    Yes.

4      Q.    I'm going to just read the topic into

5  the record.

6          Topic of Examination No. 20 provides,

7  "Facts, knowledge and information relating to

8  Amalgamated's past, present or prospective

9  participation as a named representative of a class

10 or purported class in any other action."

11         Do you see that?

12     A.    Yes.

13     Q.    And looking down at the response,

14 there's -- the response is made subject to

15 objections, but the second sentence reads, and I

16 quote, "Plaintiff will designate a witness to

17 testify generally about Amalgamated's role as a

18 class representative in other securities actions

19 since October 18, 2013."

20         Do you see that?

21     A.    Yes.

22     Q.    And we talked earlier that you

23 understand that person is you?

24     A.    Yes.

25     Q.    And you're prepared to discuss that

Page 41

1  topic; is that correct?
2      A.   Generally, I'm prepared to discuss
3  that topic, yes.
4      Q.   Has Amalgamated served as a lead
5  plaintiff in other securities class actions?
6      A.   Yes.
7      Q.   How many?
8      A.   I'm not sure.
9      Q.   Ms. Innes, I'm going to have the court
10 reporter mark as Exhibit 3 Plaintiff Amalgamated
11 Bank's Responses and Objections to Defendant
12 CoreCivic's First Set of Interrogatories to
13 Plaintiff.
14          If you could just take a moment to
15 familiarize yourself with that document, please.
16          (Innes Exhibit D-3, No Bates numbers,
17          Plaintiff Amalgamated Bank's Responses and
18          Objections to Defendant CoreCivic, Inc.'s
19          First Set of Interrogatories to Plaintiff,
20          marked for identification.)
21          (Reviewing.)
22 BY MR. GLENNON:
23      Q.   Ms. Innes, you had an opportunity now
24 to review what we have marked as Defendants'
25 Exhibit 3?

Page 42

1      A.   Yes.
2      Q.   And you understand that Defendants'
3  Exhibit 3 is Plaintiff Amalgamated Bank's Responses
4  and Objections to Defendant CoreCivic, Inc.'s First
5  Set of Interrogatories to Plaintiff?
6      A.   Yes.
7      Q.   Is this one of the documents that you
8  reviewed in preparation for your deposition today?
9      A.   If I recall correctly, yes.  Yes.
10      Q.   I'd like to direct your attention to
11 page 4, Interrogatory 1.
12      A.   Yes.
13      Q.   I won't read the entire interrogatory
14 or response into the record, but, to summarize,
15 Interrogatory 1 asked for a list of all actions and
16 lawsuits in which you, Amalgamated, has been named
17 as a plaintiff or class representative, along with
18 some other information.
19          And then lower on that page, subject
20 to general objections and objections, there's a
21 bullet point list of three lawsuits.
22          Do you see that?
23      A.   Yes.
24      Q.   Ms. Innes, I'm going to have the court
25 reporter mark as Defendants' Exhibit 3A an e-mail

Page 43

1  from Chris Wood dated Friday, July 6th, 2018, at
2  1:42 p.m., to Faraz Mohammadi, and a number of other
3  individuals listed on the cc line.
4          (Innes Exhibit D-3A, No Bates numbers,
5          E-mail Chain, marked for identification.)
6  BY MR. GLENNON:
7      Q.   You can take a moment to read the
8  e-mail.  It's not very long.
9          (Reviewing.)
10      Q.   Ms. Innes, have you had an opportunity
11 to review Defendants' Exhibit 3A?
12      A.   Yes.
13      Q.   And do you understand that in this
14 e-mail communication that we've marked as
15 Defendants' 3A, the plaintiff is essentially
16 supplementing the information on Exhibit 3, the
17 interrogatory responses, to add two additional
18 responsive lawsuits?
19          Do you see that?
20      A.   Yes.
21      Q.   That would be In Re Allergan Generic
22 Drug Pricing Securities Litigation; and Shenk v.
23 Mallinckrodt PLC, et al.
24          Do you see that?
25      A.   Yes.

Page 44

1      Q.   I'm going to ask you a few questions
2  generally about each of the five lawsuits that
3  plaintiff has identified in connection with their
4  interrogatory response.
5          Let's start with Nieman versus Duke
6  Energy.  That is listed on Tab 3.  That's page --
7  excuse me.  Defendants' Exhibit 3, page 4,
8  Interrogatory 1.
9          Are you familiar with the Nieman
10 litigation?
11      A.   Generally.
12      Q.   What can you tell me about the Nieman
13 litigation?
14      A.   I believe the Duke Energy litigation
15 was regarding corporate governance.
16      Q.   Do you recall anything more specific
17 about the corporate governance issues in the Duke
18 Energy litigation?
19      A.   No.
20      Q.   How did you first become aware of the
21 corporate governance allegations or issues alleged
22 in the Duke Energy lawsuit?
23      A.   Through general meetings internally at
24 Amalgamated Bank.
25      Q.   Do you know what investment fund --

1  through which investment fund Amalgamated owned the
2  relevant security?
3      A.   Specifically, no.
4      Q.   So you don't know whether it was
5  LongView or some other passive or managed fund?
6      A.   It would be one of our LongView funds.
7      Q.   So it was one of the LongView funds?
8      A.   Yes.
9      Q.   Do you recall whether Amalgamated was
10  approached by -- strike that.
11          Do you recall which law firm
12  represented Amalgamated in the Duke Energy case?
13      A.   No.
14      Q.   Do you know whether Amalgamated was
15  approached by a law firm or whether Amalgamated
16  approached a law firm in connection with pursuing
17  the claims in the Duke litigation?
18          MR. WOOD:  Objection.
19          THE WITNESS:  I'm not sure.
20          MR. WOOD:  I'm just going to caution
21      the witness not to reveal any privileged
22      information in responding to that question.
23  BY MR. GLENNON:
24      Q.   That's understandable, but I think the
25  answer was you don't know?

1      A.   I'm not sure.
2      Q.   Without revealing confidential
3  information, do you know how Amalgamated chose the
4  law firm that represented it in the Duke Energy
5  case?
6      A.   That would be decided by general
7  counsel.
8      Q.   And in the Duke Energy case, plaintiff
9  [sic] was, in fact, appointed as co-lead plaintiff;
10  is that correct?
11      A.   According to the document, yes.
12      Q.   You said, "According to the document."
13  Which document are you referring to?
14      A.   The one in front of me.  We were
15  appointed co-lead plaintiff.
16      Q.   Defendants' Exhibit 3?
17      A.   Yes.
18      Q.   That would be the Response to
19  Interrogatory No. 1 on Defendants' Exhibit 3,
20  page 4; is that correct?
21      A.   Yes.
22      Q.   And if you flip to page 11 -- excuse
23  me, not 11.
24          If you flip to the page which
25  should -- would be 13 if it had a page number.

1          Do you see that verification?
2      A.   Yes.
3      Q.   If you could take a moment just to
4  review that verification, please.
5          (Reviewing.)
6      Q.   Ms. Innes, do you know who Mark
7  Sullo-Choy [ph] is?
8      A.   Yes.
9      Q.   Who is Mark Sullo-Choy?
10      A.   He is part of the legal team at
11  Amalgamated Bank -- or was part of the legal team at
12  Amalgamated Bank.
13      Q.   You'll see he executed this
14  verification on or about May 21, 2018?
15      A.   Yes.
16      Q.   And he, to the best of his ability,
17  certifies the accuracy -- or verifies the accuracy
18  of the answer contained in Defendants' Exhibit 3?
19      A.   Yes.
20      Q.   Do you have any reason to believe that
21  there's any inaccuracies in Defendants' Exhibit 3?
22      A.   No.
23      Q.   Do you know who made the decision to
24  seek to become co-lead plaintiff in the Duke Energy
25  matter?

1          MR. WOOD:  And you can answer that if
2      you can do so without revealing privileged
3      information.
4          THE WITNESS:  That would be presented
5      by our general counsel to the trust committee
6      of Amalgamated Bank.
7  BY MR. GLENNON:
8      Q.   Is that -- is that an established
9  practice or procedure when Amalgamated seeks to
10  become lead plaintiff, that there's a presentation
11  from the general counsel to a committee at the bank?
12          In other words, in making those
13  decisions, did the bank follow that same general
14  procedure that you just described?
15      A.   Yes, there would be a discussion with
16  general counsel with the trust committee.
17      Q.   With the general counsel --
18      A.   There would be a discussion with the
19  general counsel with the trust committee.
20      Q.   And that would be true for all
21  litigations in which Amalgamated ultimately sought
22  to be named as lead or co-lead plaintiff in an
23  action?
24      A.   To the best of my knowledge, yes.
25      Q.   Try and move through the rest of these

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections
Corporation of America, et al.**

1  quickly.
2      I'd like to direct your attention back
3  to the Response to Interrogatory No. 1, page 4 on
4  Defendants' Exhibit 3.
5      You see the second bullet point,
6  Menold versus Navient?
7      A.   Yes.
8      Q.   It says here the case was before
9  District Judge Gregory Sleet, "Plaintiff moved to be
10 appointed as lead plaintiff, but was not appointed."
11      Are you familiar with that litigation?
12     A.   Generally.
13     Q.   Can you give me a general description
14 of that litigation.
15     A.   I believe this is also a corporate
16 governance issue.
17     Q.   By "corporate governance," do you have
18 any more specific understanding of what that
19 corporate governance issue is?
20     A.   No.
21     Q.   Or was?
22     A.   I do not recall, no.
23     Q.   Would I be correct in assuming that
24 this also -- the investment through which
25 Amalgamated owned the relevant security would have

1  been through one of the LongView trust funds?
2      A.   One or more of the LongView funds,
3  yes.
4      Q.   And do you recall whether, in
5  connection with the Navient Corp. lawsuit,
6  Amalgamated approached a law firm or a law firm
7  approached Amalgamated in connection with its
8  representation in that matter?
9      MR. WOOD:  And just again caution you
10     not to reveal any privileged information in
11     responding to that question.
12     THE WITNESS:  I'm not sure.
13 BY MR. GLENNON:
14     Q.   Do you know -- strike that.
15      Without disclosing any privileged
16 information -- strike that again.
17      Do you recall who represented you in
18 connection with the Navient Corp. litigation?
19     A.   No.
20     Q.   Do you recall one way or another as to
21 whether or not it was the same lawyers that
22 represent you in this litigation?
23     A.   No.
24     Q.   You don't recall or it's not the same
25 lawyers?

1      A.   I do not recall.
2      MR. WOOD:  Brian, I'm just going to
3      object to this line of questioning as being
4      beyond the scope of the notice.  I think that
5      we represented that we'd prepare someone to
6      talk about Amalgamated's role as a class
7      representative.  And, obviously, they were
8      not class representative certainly in that
9      action.
10     MR. GLENNON:  Noted.  I won't spend a
11     tremendous amount of time on this.  I'm just
12     going to move through it --
13     MR. WOOD:  Sure.
14 BY MR. GLENNON:
15     Q.   Do you recall the outcome of the
16 Navient case?
17     A.   No, I do not.
18     Q.   Going back to Defendants' Exhibit 3,
19 Response to Interrogatory No. 1, page 4, the third
20 bullet point on the list is In Re Cognizant.
21      Do you see that?
22     A.   Yes.
23     Q.   And that entry it says, "Plaintiff was
24 appointed co-lead plaintiff."
25     A.   Yes.

1      Q.   Are you familiar with that litigation?
2      A.   Generally, yes.
3      Q.   Can you describe, please, your general
4  understanding of that case.
5      A.   This is another corporate governance
6  issue.
7      Q.   And more specifically, do you know
8  what the corporate governance issue entailed?
9      A.   I do not recall, no.
10     Q.   And I assume it's the same answer,
11 that if I were to ask you through what investment
12 fund did Amalgamated own the relevant securities, it
13 would be one or more of the LongView funds?
14     A.   Yes.
15     Q.   Do you recall who represented you in
16 that case?
17     A.   No.
18     Q.   And you don't recall whether or not
19 it's the same counsel you have in connection with
20 this litigation, "this litigation" being the
21 CoreCivic lawsuit?
22     A.   I don't believe it is.
23     Q.   Am I safe in saying that you don't
24 know the circumstances surrounding your engagement
25 of counsel in that lawsuit?

Page 53

1        MR. WOOD:  Objection to form.
2        THE WITNESS:  Yes.
3  BY MR. GLENNON:
4        Q.    And I asked you earlier who at
5  Amalgamated would make the decision to seek or -- to
6  seek to become lead plaintiff, and I think you said
7  discussion between general counsel and the trustees?
8        A.    Trust committee.
9        Q.    The trust committee.  Thank you.
10              I assume that was the same process
11  that was generally followed here in connection with
12  the Cognizant litigation, to the best of your
13  knowledge?
14        A.    Yes.
15        Q.    Do you recall what the outset -- do
16  you recall what the outcome of that litigation was?
17        A.    No.
18        Q.    Ms. Innes, I'm going to move you now
19  to Defendants' Exhibit 3A.  There's just two
20  additional lawsuits.  I'll just ask you a couple of
21  general questions as to those two.
22              The first is In Re Allergan Generic
23  Drug Pricing Securities Litigation.
24              Do you see that?
25        A.    Yes.

Page 54

1        Q.    Are you familiar with that lawsuit?
2        A.    Generally.
3        Q.    Can you describe your general
4  understanding of the nature of that lawsuit.
5        A.    Again, it's a corporate governance
6  issue.
7        Q.    Do you recall anything more
8  specifically about the corporate governance issue
9  that's the focus of that lawsuit?
10        A.    No, I do not.
11        Q.    What about Shenk versus Mallinckrodt?
12              Do you see that on Defendants'
13  Exhibit 3A?
14        A.    Yes.
15        Q.    Do you have a general understanding of
16  the nature of that litigation?
17        A.    That it was a corporate governance
18  issue.
19        Q.    Do you recall anything more
20  specifically about the corporate governance issue
21  that was at the heart of that particular lawsuit?
22        A.    No.
23        Q.    In both of these lawsuits in this
24  response, it suggests that plaintiff, Amalgamated,
25  moved to be appointed as lead plaintiff, but was not

Page 55

1  appointed.  I'm assuming that your description of
2  the process through which Amalgamated makes the
3  decision to move to be appointed as lead plaintiff
4  in connection with the earlier cases we talked about
5  applies here, same process?
6        A.    Yes.
7        Q.    In these responses, it says that
8  Robbins Geller did not represent Amalgamated in
9  either of these two lawsuits.
10              Do you recall who represented
11  Amalgamated in either of these two lawsuits?
12        A.    No, I don't remember.
13        Q.    Do you recall the outcome or the
14  conclusion, if there was one, with respect to either
15  of these two lawsuits?  And, again, just for the
16  record, I'm referring to the two lawsuits listed as
17  bullet points in Defendants' Exhibit 3A.
18        A.    No.
19        Q.    Looking at Exhibits 3 and 3A combined,
20  there are three lawsuits which the interrogatory
21  answer provides, "Plaintiff moved to be appointed as
22  lead plaintiff, but was not appointed."
23              And those three are Menold or Navient
24  Corp; In Re Allergan; and Shenk versus Mallinckrodt.
25              Do you see that?

Page 56

1        A.    Yes.
2        Q.    Focusing on the Menold case, do you
3  know why Amalgamated was not appointed lead
4  plaintiff in that matter?
5        A.    No, I do not recall.
6        Q.    Turning to the Allergan Generic Drug
7  Pricing Securities Litigation, do you know why
8  Amalgamated was not appointed as lead plaintiff in
9  that case?
10        A.    No, I do not.
11        Q.    Then turning to the Shenk litigation,
12  do you know why plaintiff [sic] was not appointed
13  lead plaintiff in that lawsuit?
14        A.    No, I do not.
15        Q.    Ms. Innes, has Amalgamated retained
16  the law firm Robbins Geller in other securities
17  class action lawsuits?
18        A.    Yes.
19        Q.    How many?
20        A.    I'm not sure.
21        Q.    Can you give me an estimate?
22        A.    Over the years, I'm not sure.  No, I
23  can't give you an estimate.
24        Q.    What is your best understanding in
25  terms of following -- a small handful, a large

1  number, more than ten?
2          MR. WOOD:  Objection to form.
3          THE WITNESS:  I do not know.
4  BY MR. GLENNON:
5      Q.    So no idea at all.
6      A.    In relation to our entire litigation,
7  no, I do not know.
8      Q.    What about in connection with your
9  litigation regarding the LongView fund or -- yes,
10  LongView fund?
11          MR. WOOD:  Objection to form and
12      beyond the scope of the notice.
13          THE WITNESS:  I don't know.
14  BY MR. GLENNON:
15      Q.    You don't know.
16          But you do know that they've
17  represented Amalgamated in prior lawsuits?
18      A.    Yes.
19      Q.    Do you know whether they represented
20  Amalgamated in prior securities lawsuits?
21      A.    Yes.
22      Q.    Do you know how many securities
23  lawsuits Robbins Geller has represented Amalgamated
24  in?
25          MR. WOOD:  Objection to form and

1      beyond the scope.
2          THE WITNESS:  No, I do not.
3  BY MR. GLENNON:
4      Q.    Do you know -- strike that.
5          Can you give any litigation, by name
6  or description, in which the law firm Robbins Geller
7  has represented Amalgamated Bank in a securities
8  litigation?
9          MR. WOOD:  Same objection.
10          THE WITNESS:  A litigation against
11      Duke Energy we were represented by Robbins
12      Geller.  And Liquid Lumber -- Lumber
13      Liquidators.
14  BY MR. GLENNON:
15      Q.    What can you tell me about Duke
16  Energy?
17          MR. WOOD:  If you can respond
18      generally without revealing any privileged
19      information.
20          THE WITNESS:  That there were
21      corporate governance issues with the company.
22      And we were awarded approximately
23      $145 million for shareholders of the company.
24  BY MR. GLENNON:
25      Q.    Do you recall whether that was a

1  securities fraud case?
2      A.    I'm not sure.
3      Q.    Did you have any role on that Duke
4  Energy litigation?
5      A.    No, I did not.
6      Q.    You also mentioned Lumber Liquidators?
7      A.    Yes.
8      Q.    What can you tell me about that
9  litigation?
10          MR. WOOD:  I'll give you the same
11      caution.
12          THE WITNESS:  I'm not sure.
13  BY MR. GLENNON:
14      Q.    Do you know if it was a shareholder
15  lawsuit?
16      A.    I'm not sure.
17      Q.    You don't know what the nature of the
18  lawsuit --
19      A.    I do not recall.
20      Q.    Do you recall whether Amalgamated was
21  a plaintiff or a defendant?
22      A.    I don't remember.
23      Q.    You don't recall the outcome of that
24  lawsuit?
25      A.    No, I do not.

1      Q.    Are you familiar with the lawsuit
2  captioned Juan [ph] versus Facebook?
3      A.    Yes.
4      Q.    What do you know about the Juan versus
5  Facebook litigation?
6          MR. WOOD:  Same caution not to reveal
7      any privileged information.
8          THE WITNESS:  I'm not sure what's
9      privileged on that, but it's regarding the --
10      the company issuing Class B securities with
11      lower voting rights than the current
12      securities.
13  BY MR. GLENNON:
14      Q.    Do you recall what the outcome of that
15  lawsuit was?
16      A.    I believe it's still ongoing.
17      Q.    Do you have any knowledge of whether
18  or not the law firm Robbins Geller maintains a
19  portfolio monitoring program?
20          MR. WOOD:  I'm going to again caution
21      you not to reveal privileged information, but
22      you can answer that yes or no.
23          THE WITNESS:  Yes.
24  BY MR. GLENNON:
25      Q.    Do you know if Amalgamated uses

1 Robbins Geller's portfolio monitoring program?
2 Again without revealing privileged information, just
3 yes or no.
4     MR. WOOD: And I'm going to note for
5   the record that I object that it's beyond the
6   scope.
7     But you can answer if you know.
8     THE WITNESS: Yes.
9 BY MR. GLENNON:
10     Q.  Ms. Innes, has Amalgamated ever been
11 sanctioned by any financial industry regulator in
12 connection with its banking or investment practices,
13 to your knowledge?
14     MR. WOOD: Objection to form and
15   scope.
16     THE WITNESS: I would not be aware of
17   all of it, but, no, not to my knowledge.
18 BY MR. GLENNON:
19     Q.  So to the best of your knowledge,
20 Amalgamated has never been sanctioned by any
21 financial industry regulator in connection with
22 banking and investment practices?
23     MR. WOOD: Same objections.
24     THE WITNESS: I do not know.
25

1 BY MR. GLENNON:
2     Q.  Ms. Innes, we talked earlier about a
3 number of different lawsuits that Amalgamated was
4 involved in in one capacity or another.
5     Do you know whether any court has
6 sanctioned Amalgamated in connection with --
7 actually, strike that. I'm going to break this
8 question down and make it easier.
9     Do you know whether any court has
10 sanctioned Amalgamated in connection with banking or
11 investment business practices?
12     MR. WOOD: Objection to form and
13   scope.
14     THE WITNESS: No, I do not know.
15 BY MR. GLENNON:
16     Q.  Do you know whether Amalgamated has
17 ever been sanctioned by any court in connection with
18 its role as a litigant in connection with any of the
19 lawsuits that we've previously discussed?
20     MR. WOOD: Objection to form and
21   scope.
22     THE WITNESS: I don't know.
23     Can we take a break?
24     MR. GLENNON: I was just going to
25   suggest it. Thank you.

1     THE VIDEOGRAPHER: The time is
2 approximately 10:21 a.m. We're going off the
3 record.
4     (Recess from the record.)
5     THE VIDEOGRAPHER: We are back on the
6 record. This is DVD No. 2. The time is
7 approximately 10:35 a.m.
8 BY MR. GLENNON:
9     Q.  Good morning, Ms. Innes.
10     A.  Good morning.
11     Q.  Just to remind you, you are still
12 testifying under oath in this matter.
13     A.  Yes.
14     Q.  Ms. Innes, I'd like to turn your
15 attention now to the litigation for which you're
16 being offered as a corporate representative.
17     Is that okay?
18     A.  Yes.
19     Q.  Can you tell me at what point
20 Amalgamated became aware of the securities fraud
21 allegations that are asserted in this case?
22     A.  Outside of discussions with general
23 counsel, which may be privileged, I believe it was
24 sometime in 2016.
25     Q.  You can actually tell me the date of

1 the discussions with general counsel. I just can't
2 know the content.
3     A.  It was I believe October 2016.
4     Q.  And, again, without revealing the
5 substance or content of privileged communications,
6 do you know how Amalgamated became aware of the
7 alleged securities fraud claims at issue in this
8 lawsuit?
9     A.  I believe we were approached by
10 Robbins Geller.
11     Q.  And do you know when you were
12 approached by Robbins Geller?
13     A.  I do not have the exact date.
14     Q.  Do you know who from Robbins Geller
15 approached Amalgamated?
16     A.  I do not.
17     Q.  Do you know who at Amalgamated Bank
18 was on the receiving end of the approach by Robbins
19 Geller?
20     A.  I'm not sure of the specific person.
21     Q.  Without revealing the content of
22 privileged communications, do you know what
23 triggered Amalgamated's interest in becoming
24 involved in the lawsuit?
25     MR. WOOD: Objection to form.

**Page 65**

1 THE WITNESS: Because it is a
2 securities fraud issue, Amalgamated Bank
3 reviews those litigation proposals through
4 general counsel and the trust committee.
5 BY MR. GLENNON:
6 Q. Do you know who ultimately made the
7 decision by Amalgamated to become involved in this
8 lawsuit?
9 A. Can you clarify. Meaning one person
10 or --
11 Q. Person or persons.
12 A. It would be the trust committee.
13 Q. The trust committee is the entity that
14 makes the decision as to whether or not to pursue
15 litigation claims on behalf of Amalgamated?
16 A. Yes.
17 Q. I'm just going to direct your
18 attention, if I could, back to Defendants'
19 Exhibit 2, which are the responses to the
20 interrogatories we served in this case, specifically
21 Topic of Examination No. 15, which is at the bottom
22 of page 8, and the response, which is at the top of
23 page 9.
24 MR. WOOD: These are the topics of
25 examination, not the interrogatory responses;

**Page 66**

1 right?
2 MR. GLENNON: Correct. Did I say
3 Exhibit 2?
4 MR. WOOD: I think you said
5 interrogatory responses, but --
6 MR. GLENNON: Excuse me. I'm sorry.
7 Thank you.
8 MR. WOOD: Just trying to be clear.
9 MR. GLENNON: The topics of
10 examination, number 15 at the bottom of
11 page 8 of Defendants' Exhibit 2.
12 BY MR. GLENNON:
13 Q. Topic of Examination No. 15 is,
14 "Amalgamated's decision to retain any law firm
15 associated as its counsel in this action."
16 Do you see that?
17 A. Yes.
18 Q. And then, in response, which is on
19 page 9, after the general objections and objections,
20 it provides, "Plaintiff will designate a witness to
21 testify on this topic."
22 Do you see that?
23 A. Yes.
24 Q. And you're the designated witness on
25 this topic; correct?

**Page 67**

1 A. Yes.
2 Q. Other than Robbins Geller, did any
3 other law firms approach Amalgamated in connection
4 with potentially representing the bank in this
5 lawsuit?
6 A. I'm not sure.
7 Q. You don't know of any other law firms
8 that approached Amalgamated in connection with
9 potentially representing the bank in this lawsuit?
10 A. I do not know if any other law firms
11 approached Amalgamated Bank outside of Robbins
12 Geller.
13 Q. Did Amalgamated Bank reach out to any
14 other law firms to consider them to serve as counsel
15 for Amalgamated Bank in this lawsuit?
16 MR. WOOD: Objection to form and to
17 the extent it calls for privileged
18 information.
19 But you can answer yes or no if you
20 know.
21 THE WITNESS: I do not know.
22 BY MR. GLENNON:
23 Q. Do you know if Amalgamated Bank
24 considered any other law firm besides Robbins Geller
25 to serve as counsel in this lawsuit?

**Page 68**

1 A. I do not know.
2 Q. Do you know why you decided to engage
3 Robbins Geller to serve as counsel for Amalgamated
4 in this lawsuit?
5 MR. WOOD: I'll object to the extent
6 it calls for privileged information.
7 You can answer generally.
8 THE WITNESS: Can you just rephrase.
9 I'm sorry.
10 MR. GLENNON: Can I have you repeat
11 the question, please.
12 THE WITNESS: Thank you.
13 (Record read.)
14 THE WITNESS: Just to clarify, Robbins
15 Geller approached us in this lawsuit. But
16 it's a shareholder litigation regarding
17 securities fraud, so it is a lawsuit that
18 Amalgamated Bank will review in order to
19 pursue that litigation with the trust
20 committee.
21 BY MR. GLENNON:
22 Q. You're also represented by the law
23 firm Barrett Johnston Martin & Garrison LLC; is that
24 correct?
25 A. I believe so, although I don't know

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections**
**Corporation of America, et al.**

1  the full law firm name. I would have to refer back
2  to a document.
3  **Q.   Do you have an understanding, whether**
4  **by full name or abbreviated name, who is serving as**
5  **local counsel for you in the lawsuit for which**
6  **you're currently testifying?**
7  A.   I believe it's the law firm you just
8  mentioned.
9  **Q.   If I refer to that law firm as Barrett**
10 **Johnston, is it acceptable if we use that as**
11 **shorthand for Barrett Johnston Martin & Garrison?**
12 A.   Yes.
13 **Q.   Do you have an understanding of what**
14 **Barrett Johnston's role is in the case?**
15 A.   That they're just local counsel in
16 Tennessee.
17 **Q.   Do you know how they came to be**
18 **Amalgamated's local counsel in this lawsuit?**
19 A.   I do not.
20 **Q.   Are you familiar with the arrangement**
21 **between Amalgamated and Robbins Geller or Barrett**
22 **Johnston for the payment of attorneys' fees in this**
23 **case?**
24       MR. WOOD: Objection to form and to
25       the extent it calls for privileged

1  information. But that's a compound question.
2       MR. GLENNON: I can break it down.
3  BY MR. GLENNON:
4  **Q.   Are you familiar with the arrangement**
5  **for the payment of legal fees by Amalgamated to**
6  **Robbins Geller in connection with this lawsuit?**
7  A.   Broadly, generally, yes, I am
8  familiar.
9  **Q.   Can you provide me with your broad**
10 **understanding, please.**
11 A.   That that will be determined by the
12 court, any award that's provided to Amalgamated Bank
13 or Robbins Geller.
14 **Q.   Do you know how that award will be**
15 **determined by the court? Do you have an**
16 **understanding of how that award will be determined**
17 **by the court?**
18 A.   No, I do not.
19 **Q.   Do you have an understanding of**
20 **whether or not it's a contingency fee arrangement**
21 **with Robbins Geller?**
22 A.   I believe it is a contingency fee with
23 Robbins Geller.
24 **Q.   And is it your understanding that the**
25 **same arrangement applies with the law firm of**

1  **Barrett Johnston?**
2  A.   I do not know. I don't know.
3  **Q.   You don't know one way or another what**
4  **the fee arrangement is with Barrett Johnston?**
5  A.   I do not know, no.
6  **Q.   At least insofar as Robbins Geller is**
7  **concerned, you're not paying legal invoices on a**
8  **monthly or quarterly basis?**
9  A.   No, Amalgamated Bank is not paying
10 Robbins Geller.
11 **Q.   Do you know whether Amalgamated Bank**
12 **is paying Barrett Johnston on some periodic**
13 **agreed-upon basis?**
14 A.   Amalgamated Bank is not paying Barrett
15 Johnston.
16 **Q.   So Amalgamated Bank is not paying**
17 **legal fees in response to periodic invoices with**
18 **respect to either of the law firms representing**
19 **Amalgamated Bank in this lawsuit, to your knowledge?**
20 A.   Correct.
21 **Q.   Do you have an understanding of**
22 **whether or not the legal fees Amalgamated -- or**
23 **excuse me. Strike that.**
24       **Do you have a general understanding of**
25 **whether or not the fees paid, for instance, to**

1  **Robbins Geller would be a percentage of recovery**
2  **obtained in this litigation, if one were obtained?**
3  A.   I believe that would be decided by the
4  courts.
5  **Q.   I see.**
6       **You would believe that whether it was**
7  **a percentage of the recovery would be decided by the**
8  **courts or what the percentage of the recovery would**
9  **be decided by the courts?**
10 A.   Broadly speaking, to the best of my
11 knowledge, the courts will decide whether it's a
12 percentage or -- of the award or whatever the dollar
13 amount would be.
14 **Q.   I'm going to refer you back to**
15 **Defendants' Exhibit 2, the topics of examination and**
16 **the responses to the topics of examination,**
17 **specifically Topic of Examination No. 24 and**
18 **Response to Topic of Examination 24 on page 12.**
19       (Reviewing.)
20 **Q.   Ms. Innes, Topic of Examination No. 24**
21 **provides, "The amount and source of funding for**
22 **costs, legal fees, disbursements or other expenses**
23 **expected or anticipated to be incurred by or on**
24 **behalf of Amalgamated in this action."**
25       **And the response which follows, after**

1 the general objections and objections, the response
2 states, "Subject to and without waiving the
3 foregoing objections, plaintiff will designate a
4 witness on this topic."
5      Do you see where I've referred you to?
6    A.   Yes.
7    Q.   And, again, you understand that you're
8 the witness that's been designated on this specific
9 topic?
10   A.   Yes.
11   Q.   Can you describe for me, generally
12 speaking, what arrangements you have with the law
13 firm Robbins Geller for the payment of costs or
14 expenses or disbursements?
15      MR. WOOD:  Objection to form.
16      THE WITNESS:  Generally speaking,
17   Amalgamated Bank is not paying Robbins
18   Geller.
19 BY MR. GLENNON:
20   Q.   And that's true not just for fees, but
21 that's also the expenses, costs and disbursement; is
22 that your understanding?
23   A.   Yes.
24   Q.   If I ask you the same two questions
25 regarding the Barrett Johnston firm, would your

1 answer be the same?
2    A.   Yes.
3    Q.   Do you have agreements with anybody
4 else regarding the cost, disbursements or expenses
5 incurred in connection with this litigation?
6    A.   Not to my knowledge, no.
7    Q.   Do you have an understanding of
8 whether Amalgamated Bank might be obligated to pay
9 various expenses or costs associated with this
10 litigation as the class representative?
11   A.   Can you just repeat it.
12      MR. GLENNON:  Sure.
13      THE WITNESS:  Thank you.
14      MR. GLENNON:  Can you repeat the
15   question, please.
16      (Record read.)
17      THE WITNESS:  My understanding is
18   Amalgamated Bank does not have to pay any
19   cost in association with this litigation
20   outside of my time.
21 BY MR. GLENNON:
22   Q.   I apologize if I asked this earlier,
23 but can you remind me, does Robbins Geller represent
24 Amalgamated in any other active litigations at the
25 moment?

1    A.   I do not believe so.
2    Q.   So to the best of your knowledge,
3 Robbins Geller is not representing Amalgamated Bank
4 in any other lawsuits at this time?
5    A.   To the best of my knowledge, no active
6 litigation.
7    Q.   Ms. Innes, I'm going to have the court
8 reporter mark as Defendants' Exhibit 4 a pleading
9 filed August 23, 2016, entitled, Complaint for
10 Violations of the Federal Securities Laws.
11      (Innes Exhibit D-4, No Bates numbers,
12   Complaint for Violations of the Federal
13   Securities Laws, marked for identification.)
14      (Reviewing.)
15 BY MR. GLENNON:
16   Q.   Ms. Innes, I know the document that I
17 put in front of you is lengthy.  You can certainly
18 review as much of it as you'd like.  I will
19 represent to you, in the event it saves time, that
20 this is the first complaint filed by Nikki Bollinger
21 Grae in this litigation.  And the date filed is on
22 the stamp along the bottom of the page.
23      Do you see that?
24   A.   Yes.
25   Q.   Do you understand that this was the

1 initial complaint filed in the litigation in which
2 you've now been designated as a corporate
3 representative on behalf of Amalgamated?
4      MR. WOOD:  Objection; beyond the
5   scope.
6      THE WITNESS:  I'm sorry.  Can you
7   repeat the question.
8 BY MR. GLENNON:
9    Q.   Sure.
10   A.   Thank you.
11      (Record read.)
12   Q.   I can ask the question better.
13      Do you understand that this was the
14 first complaint filed in this litigation?
15      MR. WOOD:  Objection to scope.
16      THE WITNESS:  Because you've told me
17   that, yes.
18 BY MR. GLENNON:
19   Q.   Okay.  Besides my representation to
20 you, you recognize the caption?
21   A.   Yes.
22   Q.   And that's the same caption, of
23 course, as the litigation in which you're testifying
24 today?
25   A.   Yes.

Page 77

1      Q.    Quickly, I assume -- strike that.
2            Have you read this complaint before?
3            MR. WOOD:  Same objection.
4            THE WITNESS:  No, I have not.
5  BY MR. GLENNON:
6      Q.    And it's fair to say that you had no
7  involvement in drafting this particular complaint;
8  correct?
9      A.    Correct.
10     Q.    And you did not review this particular
11 complaint before it was filed; correct?
12           MR. WOOD:  Objection; scope.
13           THE WITNESS:  Correct.
14           MR. WOOD:  Brian, when you say "you,"
15     you're asking her personally?
16           MR. GLENNON:  Thank you for the
17     clarification.
18 BY MR. GLENNON:
19     Q.    You personally or anybody at
20 Amalgamated, to the best of your knowledge.
21     A.    To the best of my knowledge, yes, we
22 have not reviewed.
23           MR. GLENNON:  Thank you.  I appreciate
24     the clarification.
25           THE WITNESS:  Thank you.

Page 78

1  BY MR. GLENNON:
2      Q.    You can put that aside.
3            I'm going to just direct your
4  attention again, please, to Defendants' Exhibit 2,
5  which is Plaintiff's Objections and Responses to
6  Defendants' Notice of Rule 30(b)(6) Deposition of
7  Lead Plaintiff Amalgamated Bank.
8            And, more specifically, on the Topic
9  of Examination No. 10 and the response on page 7.
10           (Reviewing.)
11     Q.    On this particular -- strike that.
12           I'm focused on Topic of Examination
13 No. 10.  You'll see, Ms. Innes, it reads, "In
14 addition to the foregoing general objections" -- I'm
15 sorry.  Strike that again.
16           Topic of Examination No. 10 provides,
17 "The certification filed on October 24, 2016, in
18 support of the motion for an appointment of
19 Amalgamated as lead plaintiff in this action."
20           And then the response -- after stating
21 the general objections and objections, the response
22 provides, "Plaintiff will designate a witness to
23 testify on this topic."
24           Do you see that?
25     A.    Yes.

Page 79

1      Q.    Again, you understand that you're the
2  witness that has been designated to testify on this
3  topic?
4      A.    Yes.
5      Q.    Ms. Innes, I'm going to have the court
6  reporter mark as Defendants' Exhibit 5 Exhibit B,
7  which is certification of named plaintiff pursuant
8  to federal securities laws, signed by William Hogan
9  on or about the 18th of October, 2016.
10           (Innes Exhibit D-5, No Bates numbers,
11     Certification of Named Plaintiff Pursuant to
12     Federal Securities Laws signed by William
13     Hogan on or about the 18th of October, 2016,
14     marked for identification.)
15           (Reviewing.)
16 BY MR. GLENNON:
17     Q.    Ms. Innes, have you had an opportunity
18 to review what I've marked as Defendants' Exhibit 5?
19     A.    Yes.
20     Q.    Do you have an understanding of what
21 this document is?
22     A.    Yes.
23     Q.    And what is that understanding?
24     A.    That this is the initial legal
25 document putting forth Amalgamated Bank as the

Page 80

1  plaintiff in this case.
2      Q.    Would it be fair to say that this is
3  the certification of Amalgamated Bank which was
4  offered in support of its motion to be appointed
5  lead plaintiff?
6      A.    Yes.
7      Q.    Have you reviewed this document
8  before?
9      A.    Yes.
10     Q.    You'll see at the bottom there is a
11 signature on the certification by Mr. William Hogan,
12 senior vice president, investment manager.
13           Do you see that?
14     A.    Yes.
15     Q.    Do you know Mr. Hogan?
16     A.    Yes.
17     Q.    And is he, in fact, the senior
18 vice president, investment manager at Amalgamated
19 Bank, or was he at this time?
20     A.    Yes.
21     Q.    Is he no longer at Amalgamated, or is
22 he working in a different capacity?
23     A.    He's working in a different capacity.
24     Q.    What is that capacity now, if you
25 know?

Page 81

1    A.    He's part of the commercial banking
2  team.
3    Q.    Do you know -- other than Mr. Hogan,
4  who signed this certification, do you know who
5  actually was responsible for preparing this
6  document?
7    A.    Preparing the written document or the
8  information gathered for this document?
9    Q.    Both, please.
10    A.    I'm assuming Robbins Geller, it's an
11  assumption, put together the actual document.  And
12  there would have been numerous people who -- and
13  departments that put the actual data together.
14    Q.    Now, under -- strike that.
15        The certification itself has a list of
16  essentially six items.
17    A.    Uh-huh.
18    Q.    Do you see that?
19    A.    Yes.
20    Q.    And you'll see -- and we already
21  discussed the fact that the date of this
22  certification was on or around the 18th day of
23  October 2016.
24        Do you see that?
25    A.    Yes.

Page 82

1    Q.    And under Point 1, it says, "Plaintiff
2  has reviewed a complaint and authorized its filing."
3        Do you see that?
4    A.    Yes.
5    Q.    Do you know what complaint the
6  plaintiff had reviewed and authorized its filing as
7  of this date?
8    A.    I would have to review the documents.
9    Q.    Which documents would you need to
10  review?
11    A.    The documents provided to me by
12  counsel.
13    Q.    Okay.  Can you be more specific in
14  which document you would need to review in order to
15  understand which complaint plaintiff had reviewed
16  and authorized that's referred to here in this
17  certification which we've marked as Defendants'
18  Exhibit 5?
19    A.    I can't be more specific.  I received
20  a ton of documents.
21        MR. GLENNON:  I'm going to have the
22        court reporter mark as Defendants' Exhibit 6
23        what is -- a pleading that is titled,
24        Consolidated Complaint for the Violation of
25        the Federal Securities Laws filed on

Page 83

1  March 13, 2017.
2        (Innes Exhibit D-6, No Bates numbers,
3        Consolidated Complaint for the Violations of
4        the Federal Securities Laws filed on March
5        13, 2017, marked for identification.)
6        (Reviewing.)
7  BY MR. GLENNON:
8    Q.    Ms. Innes, I'm not going to ask you to
9  read this entire thing.  You can obviously review as
10  much as you would like, but I will refer you to a
11  couple of specific portions of this document.
12        If I could direct you first to page 5,
13  paragraph 20, of Defendants' Exhibit 6.
14        Do you have that in front of you?
15    A.    Yes.
16    Q.    And paragraph 20 provides, "Plaintiff
17  Amalgamated Bank, as trustee for the LongView
18  Collective Investment Fund ('Plaintiff') as set
19  forth in its certification (Docket No. 40-2
20  incorporated by reference) purchased the stock of
21  CCA during the class period and has been damaged
22  thereby."
23        Do you see that?
24    A.    Yes.
25    Q.    If you skip ahead to page 68, you'll

Page 84

1  see, after the jury demand, a signature block for
2  Robbins Geller Rudman & Dowd.
3        Do you see that?
4    A.    Yes.
5    Q.    And you'll see that it's signed by
6  Mr. Christopher Wood; correct?
7    A.    Yes.
8    Q.    And Mr. Wood represents Amalgamated
9  and you in connection with this deposition; right?
10    A.    Correct.
11    Q.    Is it your understanding that this is
12  the amended complaint that Amalgamated filed in this
13  action after being named lead plaintiff?
14    A.    Yes.
15    Q.    You've reviewed this document before;
16  correct?
17    A.    Yes.
18    Q.    I will represent to you, as indicated
19  at the bottom of the document itself, again
20  Defendants' Exhibit 6, it lists the case number, the
21  docket number and then it says, "Filed March 13,
22  2017."
23        Do you see that?
24    A.    Yes.
25    Q.    Do you have any reason to believe that

Page 85

1  this document wasn't actually filed on March 13,
2  2017?
3      A.    No.
4      Q.    Going back to Defendants' Exhibit 5,
5  which is the certification.
6      A.    Yes.
7      Q.    The certification is dated October 18,
8  2016; correct?
9      A.    Correct.
10     Q.    Having now viewed Defendants'
11  Exhibit 6 and testified that it is your
12  understanding that that is the complaint that
13  Amalgamated filed after being named lead plaintiff,
14  does that refresh your recollection as to which
15  complaint plaintiff says it reviewed in paragraph 1
16  of the certification?
17         MR. WOOD:  Objection to form.
18         THE WITNESS:  You would have to ask
19     Will Hogan which complaint he reviewed.  I
20     can't -- I do not know.
21  BY MR. GLENNON:
22     Q.    And do you know as of this date,
23  again, the date of the certification, October 18,
24  2016, which complaint Mr. Hogan authorized to be
25  filed?

Page 86

1         MR. WOOD:  Objection to form.
2         THE WITNESS:  I believe it would be
3      the complaint that was filed.
4  BY MR. GLENNON:
5      Q.    The complaint that was filed on
6  March 13, 2017?
7      A.    Yes.
8      Q.    Is that an assumption, or do you have
9  an independent basis for that testimony?
10     A.    That is an assumption.
11     Q.    Do you know whether Amalgamated filed
12  another complaint or authorized the filing of
13  another complaint between October 18, 2016, and
14  March 13, 2017?
15         MR. WOOD:  Objection to form.
16         And I'm going to caution you not to
17     reveal any privileged information, but you
18     can answer generally if you know.
19         THE WITNESS:  I would have to review
20     the documents.
21  BY MR. GLENNON:
22     Q.    Which documents would those be?
23     A.    Those provided by counsel.
24     Q.    Just turning your attention briefly
25  back to Defendants' Exhibit 6, which is the

Page 87

1  consolidated complaint.
2      A.    Yes.
3      Q.    Was Amalgamated involved in drafting
4  this complaint?
5      A.    I am not sure.
6      Q.    Do you know whether anybody at
7  Amalgamated reviewed this complaint before it was
8  filed?
9      A.    I believe they did, but I did not
10  specifically ask that question of Will Hogan and
11  counsel.
12     Q.    So by "they," you're referring to Will
13  Hogan and counsel?
14     A.    I'm not sure.
15     Q.    Okay.  Just to make sure I understand
16  your testimony, you're not sure whether --
17     A.    It was reviewed by Amalgamated Bank.
18     Q.    Before it was filed or at any point?
19     A.    Before it was filed.
20     Q.    You reviewed Defendants' Exhibit 6
21  prior to this deposition; correct?
22     A.    Correct.
23     Q.    Ms. Innes, I'm going to refer you back
24  to Defendants' Exhibit 2, which, again, is
25  Plaintiffs' Objections and Responses to Defendants'

Page 88

1  Notice of Rule 30(b)(6) Deposition of Lead Plaintiff
2  Amalgamated Bank, specifically relating to Topic 11,
3  which is at the bottom of page 7.
4         (Reviewing.)
5      Q.    Topic of Examination No. 11 provides,
6  "The motion for class certification and supporting
7  papers filed on June 1, 2018, in this action."
8         The response that follows, after the
9  general objections -- the general objections and
10  objections, concludes with "Plaintiff will designate
11  a witness to testify on this topic."
12         Do you see that?
13     A.    Yes.
14     Q.    And, again, you understand that you're
15  the witness that has been designated to testify on
16  Topic of Examination No. 11?
17     A.    Yes.
18         MR. GLENNON:  I'm going to have the
19     court reporter mark as Defendants' Exhibit 7,
20     Declaration of Eleanor Innes in Support of
21     Lead Plaintiff's Motion for Class
22     Certification, Appointment of Class
23     Representative and Appointment of Class
24     Counsel.
25         THE WITNESS:  Can I clarify my

1    response to a prior question?
2  BY MR. GLENNON:
3      Q.    Sure.
4      A.    As Amalgamated Bank -- I was referring
5  to myself before, but as Amalgamated Bank, Will
6  Hogan testified that -- or signed off that he has
7  reviewed the complaint before Robbins Geller filed
8  it. So I believe it was reviewed by Amalgamated
9  Bank.
10      Q.    Let's go back to that certification
11  for a moment.
12      A.    Thank you.
13      Q.    So we're talking about the
14  certification which has been marked as Defendants'
15  Exhibit 5?
16      A.    Correct.
17      Q.    And specifically under Item 1,
18  "Plaintiff has reviewed a complaint and authorized
19  its filing"?
20      A.    Correct.
21      Q.    Now, the certification says "a
22  complaint." Do you know whether or not it is the
23  complaint that we've marked as Defendants'
24  Exhibit 6?
25      A.    I believe it to be.

1      Q.    You believe that as of October 18,
2  2016, you reviewed a pleading that wasn't filed
3  until March 13, 2017?
4      A.    I cannot be sure, but if -- but if --
5  it says that Will Hogan reviewed the complaint and
6  authorized its filing. The complaint that would be
7  put together by Robbins Geller would have been
8  reviewed by Amalgamated Bank. So if this is the
9  complaint filed by Robbins Geller, it would have
10  been reviewed by Amalgamated Bank prior to filing.
11      Q.    Well, the sentence itself on
12  Defendants' Exhibit 5 says, "Plaintiff has reviewed
13  a complaint" --
14      A.    Correct.
15      Q.    -- "and authorized its filing";
16  correct?
17      A.    Correct.
18      Q.    It's possible that he could have
19  reviewed a different complaint and authorized its
20  filing; isn't that right?
21          MR. WOOD: Objection to form.
22          THE WITNESS: Correct.
23  BY MR. GLENNON:
24      Q.    You don't know which complaint he
25  reviewed and authorized as of October 18, 2016;

1  correct?
2      A.    Correct.
3          (Innes Exhibit D-7, No Bates numbers,
4          Declaration of Eleanor Innes in Support of
5          Lead Plaintiff's Motion for Class
6          Certification, Appointment of Class
7          Representative and Appointment of Class
8          Counsel, marked for identification.)
9  BY MR. GLENNON:
10      Q.    Ms. Innes, we were at Exhibit 7, which
11  was your declaration.
12      A.    Yes.
13      Q.    You're familiar with this document;
14  correct?
15          (Reviewing.)
16      A.    Correct.
17      Q.    In fact, you -- that's your signature
18  on page 2 of this particular exhibit?
19      A.    Correct.
20      Q.    And you signed this declaration on or
21  about the 1st day of June 2018 under penalty of
22  perjury; is that right?
23      A.    Correct.
24      Q.    Ms. Innes, can you describe for me
25  your understanding of Amalgamated's duties as class

1  representative, please.
2      A.    So Amalgamated Bank duty --
3  Amalgamated Bank's duties as class representative
4  would be to maximize recovery for our shareholders
5  and also monitor our legal counsel.
6      Q.    And directing your attention to
7  paragraph 4, it provides, "Amalgamated is committed
8  to continuing to actively direct this litigation and
9  maximize the recovery for the class. In addition,
10  Amalgamated, as lead plaintiff and proposed class
11  representative, understands that it owes fiduciary
12  duties to all members of the class, to provide fair
13  and adequate representation and intends to continue
14  to work with counsel to obtain the maximum recovery
15  possible for the entire class consistent with good
16  faith and meritorious advocacy."
17          Do you see that?
18      A.    Yes.
19      Q.    Is that consistent with your
20  description of Amalgamated's duties as a
21  representative plaintiff in this action?
22      A.    Yes.
23      Q.    And how do you define -- "you" being
24  the person who executed this declaration -- define
25  the phrase "consistent with good faith and

1  meritorious advocacy"?
2        MR. WOOD: Objection to form.
3        THE WITNESS: In -- Amalgamated Bank,
4  to the best of our ability, will pursue the
5  litigation in order to recover the maximum
6  benefit for the shareholders.
7  BY MR. GLENNON:
8     Q.    I was focusing more on how you defined
9  the last phrase of paragraph 4.
10        "Consistent with good faith and
11  meritorious advocacy," how do you define that?
12     A.    In good faith, doing the best of our
13  ability and meritorious advocacy, to get --
14  throughout being an advocate, Amalgamated Bank would
15  seek to recover the maximum possible recovery.
16     Q.    What is your understanding of the
17  class of persons Amalgamated is seeking to
18  represent?
19     A.    It would be those shareholders who
20  purchased the stock during the class action period.
21     Q.    What is your basis for your belief --
22  or Amalgamated's belief, I should say, that it will
23  fairly and adequately protect the interests of the
24  class members?
25        MR. WOOD: Objection to form.

1        THE WITNESS: Amalgamated Bank is
2  looking to recover the maximum benefit for
3  the shareholders, which, in turn, will
4  benefit the class action.
5  BY MR. GLENNON:
6     Q.    Paragraph 6 provides, "Amalgamated
7  will not accept any payment for serving as class
8  representative beyond its pro rata share of any
9  recovery, except for reimbursement of such
10  reasonable costs and expenses, including lost wages
11  directly relating to the representation of the class
12  as ordered or approved by the court."
13        Do you see that?
14     A.    Yes.
15     Q.    And is that representation accurate?
16     A.    Yes.
17     Q.    I believe you testified earlier that
18  Amalgamated Bank is not paying costs or expenses in
19  connection with this litigation; is that right?
20     A.    Can you clarify?
21     Q.    Sure.
22        Do you recall earlier when we were --
23  when I was asking you questions about the payment
24  arrangements between Amalgamated and the two law
25  firms?

1     A.    Yes.
2     Q.    And after we were talking about the
3  payment of the attorneys' fees, we were talking
4  about expenses, costs and disbursements?
5        Do you recall that testimony?
6     A.    Yes.
7     Q.    And I believe you testified that, to
8  the best of your knowledge, Amalgamated was not
9  paying any costs, expenses or disbursements in
10  connection with this lawsuit; is that correct?
11     A.    Correct.
12     Q.    Has anyone from Amalgamated
13  communicated with other persons or entities who
14  purchased or acquired CoreCivic securities during
15  the class period alleged in this lawsuit?
16        MR. WOOD: Objection to form.
17        THE WITNESS: To the best of my
18  knowledge, no.
19  BY MR. GLENNON:
20     Q.    And I believe you testified earlier
21  that the other plaintiffs in this lawsuit were other
22  investors in CoreCivic during the class period; is
23  that correct?
24        MR. WOOD: Objection to form and
25  misstates prior testimony.

1        MR. GLENNON: I can restate the
2  question.
3        THE WITNESS: Thank you.
4  BY MR. GLENNON:
5     Q.    Do you have an understanding as to who
6  the other plaintiffs that Amalgamated -- the
7  other -- strike that.
8        Do you have an understanding of who
9  the other plaintiffs in this lawsuit are?
10        MR. WOOD: Objection to form.
11        THE WITNESS: It would be those who
12  are part of the class action.
13  BY MR. GLENNON:
14     Q.    Who are those that are part of the
15  class action?
16     A.    Those shareholders who have purchased
17  the security during the class action period.
18     Q.    To the best of your knowledge, has
19  anyone from Amalgamated communicated to the other
20  shareholders who purchased securities during the
21  class period?
22        MR. WOOD: Objection to form.
23        THE WITNESS: No.
24  BY MR. GLENNON:
25     Q.    Ms. Innes, I'm going to have the court

Page 97

1  reporter mark as Defendants' Exhibit 8 the
2  Memorandum of Law in Support of Lead Plaintiff's
3  Motion for Class Certification, Appointment of Class
4  Representative and Appointment of Class Counsel.
5          (Innes Exhibit D-8, No Bates numbers,
6      Memorandum of Law in Support of Lead
7      Plaintiff's Motion for Class Certification,
8      Appointment of Class Representative and
9      Appointment of Class Counsel, marked for
10     identification.)
11         (Reviewing.)
12  BY MR. GLENNON:
13     Q.    Ms. Innes, you can obviously feel free
14  to review this as much as possible.  I am not
15  going -- I do not intend to ask you any specifics on
16  some discrete area in this brief.
17         Do you recognize this document?
18     A.    Yes.
19     Q.    And what is your understanding of this
20  document?
21     A.    That it's our motion for class
22  certification.
23     Q.    Did Amalgamated review this document
24  prior to the time that it was filed?
25     A.    I'm not sure.

Page 98

1      Q.    You don't know one way or another
2  whether or not Amalgamated reviewed this particular
3  document prior to the time that it was filed?
4      A.    Correct, I'm not sure.
5      Q.    Do you know whether anybody at
6  Amalgamated was involved in drafting this document?
7      A.    I am not aware.
8      Q.    Ms. Innes, I'm going to direct you
9  back to Exhibit 2 at this point, which is
10  Plaintiffs' Objections and Responses to Defendants'
11  Notice of Rule 30(b)(6) Deposition of Lead
12  Plaintiff, Amalgamated Bank.
13         And then, I'm going to direct you
14  to Topic of Examination No. 19 and the Response to
15  Topic of Examination No. 19 located on the bottom of
16  page 10.
17     A.    Which page?
18     Q.    10.
19     A.    Thank you.
20     Q.    Of course.
21         (Reviewing.)
22     Q.    Topic of Examination No. 19 states,
23  "Facts, knowledge and information relating to
24  Amalgamated's prospective participation as a named
25  representative in this -- representative of a class

Page 99

1  in this action."
2          The Response to Topic of
3  Examination 19 states, "Subject, of course, to the
4  general objections and objections, plaintiff will
5  designate a witness to testify as to what
6  Amalgamated has done, is doing and will do to
7  fulfill its duties as lead plaintiff and as proposed
8  class representative in this action."
9          Do you see that?
10     A.    Yes.
11     Q.    And, again, you understand that you
12  are the witness that has been designated in Response
13  to Topic of Examination No. 19?
14     A.    Yes.
15     Q.    Ms. Innes, can you, in your capacity
16  as Amalgamated's representative in this deposition,
17  describe Amalgamated's responsibilities in managing
18  this class action litigation?
19     A.    So Amalgamated Bank, with counsel, has
20  reviewed and will pursue to get the maximum recovery
21  for our shareholders in this litigation on behalf
22  the class action.
23     Q.    And how does Amalgamated Bank pursue
24  the maximum recovery for shareholders in this
25  litigation?

Page 100

1      A.    With counsel, we'll pursue and go
2  through the courts in order to get the maximum
3  recovery for our shareholders.
4      Q.    Can you be any more specific on what
5  you mean when you say "pursue"?
6      A.    By proving the fraud and the
7  misleading information by CCA.
8      Q.    Ms. Innes, is it correct to say that
9  you're not aware of whether Amalgamated has reviewed
10  any specific pleadings prior to them being filed in
11  connection with this lawsuit?
12         MR. WOOD:  Objection to form.
13         THE WITNESS:  Can you clarify
14  "pleadings."
15  BY MR. GLENNON:
16     Q.    Anything filed with the court.
17     A.    It's a very broad topic, so I know
18  that we have reviewed certain documents and -- but
19  I'm not aware of every single document if it has
20  been reviewed.
21     Q.    Let's go through a list.
22         We talked about the consolidated
23  complaint that Amalgamated filed on or about
24  March 13, 2017.
25         Do you recall that?  That's

1  Defendants' Exhibit 6 if that's helpful.

2      A.    Correct.

3      Q.    Do you know whether Amalgamated

4  reviewed this specific pleading before the time it

5  was filed?

6      A.    No, I'm not sure.

7          MR. WOOD:  Objection to form.

8  BY MR. GLENNON:

9      Q.    Then we talked about plaintiff's

10 motion to be appointed lead plaintiff in this case.

11         Do you recall that testimony?

12         MR. WOOD:  Objection to form.

13         THE WITNESS:  Yes.

14 BY MR. GLENNON:

15     Q.    You know, that plaintiff, in fact,

16 moved to be -- strike that.

17         And you know that, in fact,

18 Amalgamated moved to be named lead plaintiff;

19 correct?

20     A.    Correct.

21     Q.    And we talked about the certification

22 that accompanied plaintiff's motion to be appointed

23 lead plaintiff.

24         Do you recall that testimony?

25     A.    Yes.

1      Q.    Do you know whether anybody at

2  Amalgamated reviewed and approved the application to

3  be named lead plaintiff in this --

4          MR. WOOD:  Objection --

5  BY MR. GLENNON:

6      Q.    -- litigation?

7          MR. WOOD:  Objection to form.

8          THE WITNESS:  I'm not sure.

9  BY MR. GLENNON:

10     Q.    And then most recently we were talking

11 about Defendants' Exhibit 8.  This is the Memorandum

12 of Law in Support of Lead Plaintiff's Motion for

13 Class Certification, Appointment of Class

14 Representative and Appointment of Lead Counsel.

15         Do you see that?

16     A.    I'm sorry.  Which exhibit?

17     Q.    That's Defendants' Exhibit 8.

18     A.    8.  Correct.

19     Q.    Is it fair to say that you don't know

20 whether anybody at Amalgamated Bank reviewed and

21 approved this filing prior to the time when it was

22 filed on or about June 1, 2018?

23         MR. WOOD:  Objection to form.

24         THE WITNESS:  Correct.

25

1  BY MR. GLENNON:

2      Q.    Do you know, without discussing the

3  content of these discussions, whether anybody at

4  Amalgamated participates in strategy discussions

5  with outside counsel surrounding the pursuit of this

6  lawsuit?

7          MR. WOOD:  You can answer that

8      question if you can without revealing any

9      privileged information with counsel.

10         THE WITNESS:  Amalgamated Bank is in

11     constant communication with our lawyers, and

12     I am not privy to all the conversations that

13     happen with them.

14 BY MR. GLENNON:

15     Q.    That's perfectly acceptable.

16         When you say "constant communication,"

17 how much communication are we talking about?

18     A.    I believe it's regularly.  I believe

19 from -- from -- what I know, it's on a weekly to

20 biweekly --

21     Q.    A weekly to biweekly basis?

22     A.    Generally, broadly speaking.  I don't

23 want to seem like it's scheduled, but it's a regular

24 communication.

25     Q.    And your best understanding of that is

1  it's a weekly or biweekly communication?

2      A.    I won't put that on the record.  I

3  apologize.  Strike it.  But it's on a regular basis.

4      Q.    Do you know how regular the

5  communications are between Amalgamated and outside

6  counsel, again, without getting into the content of

7  those communications?

8          MR. WOOD:  Objection to form.

9          THE WITNESS:  Can you just repeat

10     that.  I'm sorry.

11 BY MR. GLENNON:

12     Q.    Sure.

13         MR. GLENNON:  Can you repeat that.

14         (Record read.)

15         THE WITNESS:  Right.  I've been told

16     by legal counsel that it's on a regular

17     basis.

18 BY MR. GLENNON:

19     Q.    But beyond that, you don't know how

20 regular?

21     A.    Correct.

22     Q.    You don't know whether it's weekly,

23 biweekly, monthly?

24     A.    No.  I misspoke.

25     Q.    So you don't know.

Page 105

1    A.    I was told that it's on a regular
2  basis.
3    Q.    Okay.  Just to clarify, but you don't
4  know specifically what "regular basis" means in this
5  context?
6         MR. WOOD:  Objection to form.
7         MR. GLENNON:  I can ask it more
8  specifically.  Sorry.
9  BY MR. GLENNON:
10    Q.    You don't have information to say with
11  more specificity what "regular basis" means in this
12  context?
13         MR. WOOD:  Objection to form.
14         THE WITNESS:  Correct.
15  BY MR. GLENNON:
16    Q.    Again, without revealing the content
17  of those discussions, do you know who is responsible
18  for having those regular discussions with outside
19  counsel?
20         MR. WOOD:  Objection to form.
21         THE WITNESS:  "Responsible" is -- can
22  you rephrase the question.
23  BY MR. GLENNON:
24    Q.    Yes, I can.
25         Do you know who is having those

Page 106

1  communications at Amalgamated Bank with outside
2  counsel?
3    A.    It would be our legal team.
4    Q.    But you yourself have never been on
5  one of those communications?
6    A.    And myself.
7    Q.    You have been on those communications?
8    A.    We have been in communication with our
9  legal counsel on a regular basis.  I have been part
10  of -- they're not scheduled.  And I have been part
11  of conference calls and meetings, and there have
12  been conference calls and meetings without me with
13  our legal counsel.
14    Q.    Do you know how many times Amalgamated
15  has communicated with outside counsel since
16  Amalgamated moved to become lead plaintiff in March
17  of 2014 [sic], just the number of times?
18         MR. WOOD:  Objection to form.
19         This is not a memory test, Brian.
20         THE WITNESS:  Can you rephrase -- can
21  you just repeat back the question.
22         (Record read.)
23         MR. GLENNON:  And, I'm sorry, let me
24  just correct that.  It was March of 2017.
25         THE WITNESS:  Thank you.

Page 107

1         MR. WOOD:  Same objection.
2         THE WITNESS:  I do not know.
3         Can we take a break?
4         MR. GLENNON:  Sure.
5         THE VIDEOGRAPHER:  The time is
6  approximately 11:40 a.m.  We're going off the
7  record.
8         (Recess from the record.)
9         THE VIDEOGRAPHER:  We are back on the
10  record.  This is DVD No. 3.  The time is
11  approximately 11:57 a.m.
12  BY MR. GLENNON:
13    Q.    Ms. Innes, thank you for being here
14  again.
15         You understand that you're still
16  testifying under oath?
17    A.    Yes.
18    Q.    Ms. Innes, I'm going to have the court
19  reporter mark as Defendants' Exhibit 9 Plaintiff
20  Amalgamated Bank's Responses and Objections to
21  Defendant CoreCivic, Inc.'s First Set of Requests
22  for Production of Documents to Plaintiff.
23         You don't have it yet.  It's coming to
24  you.
25

Page 108

1         (Innes Exhibit D-9, No Bates numbers,
2  Plaintiff Amalgamated Bank's Responses and
3  Objections to Defendant CoreCivic Inc.'s
4  First Set of Requests for Production of
5  Documents to Plaintiff, marked for
6  identification.)
7         (Reviewing.)
8  BY MR. GLENNON:
9    Q.    Ms. Innes, do you recognize this
10  document?
11    A.    Yes.
12    Q.    Have you seen it before?
13    A.    Yes.
14    Q.    And you're aware that this is
15  Amalgamated's responses and objections to
16  CoreCivic's requests for production of documents?
17    A.    Yes.
18    Q.    Do you know what Amalgamated did in
19  order to respond and produce documents that were
20  responsive to this request?
21         MR. WOOD:  I'll just instruct you not
22  to reveal any privileged communications with
23  counsel, but if you want to talk about
24  generally, it's okay.
25         THE WITNESS:  It's a very broad

Confidential

Grae vs. Corrections
Corporation of America, et al.

Eleanor Innes - 30(b)(6)

1    question with what Amalgamated Bank did in
2    putting together this response, but it would
3    be on the advice of legal counsel.
4  BY MR. GLENNON:
5       Q.    Without getting into legal counsel's
6  advice, did Amalgamated search for documents that
7  were requested in Exhibit 9?
8           MR. WOOD:  Objection; beyond the
9       scope.
10          THE WITNESS:  Those that were
11      requested by legal counsel, yes.
12 BY MR. GLENNON:
13      Q.    Those documents?
14      A.    That would have been requested by
15 Robbins Geller, yes.
16      Q.    Okay.  Do you -- again, we'll need to
17 be careful here because I don't want you to disclose
18 communications from counsel.
19          But it's your understanding that a
20 request came to go and locate documents responsive
21 to this production?
22          MR. WOOD:  Objection; scope.
23 BY MR. GLENNON:
24      Q.    Responsive to this request, I should
25 say.

1       A.    We produced documents in response to
2  requests, yes.
3       Q.    And how precisely did Amalgamated go
4  about identifying the documents and producing the
5  documents that are responsive to CoreCivic's
6  document request?
7           MR. WOOD:  Objection to scope and
8       form.
9           And if you can answer that without
10      revealing privileged communications with
11      counsel, you can do so.
12          THE WITNESS:  Can you just clarify
13      what you're looking for?
14 BY MR. GLENNON:
15      Q.    Sure.
16          Do you know whether Amalgamated
17 produced documents in response to this request?
18      A.    I know that Amalgamated produced
19 documents in response to many requests.
20      Q.    I'll represent to you that this is our
21 first request for production of documents and that,
22 since serving this, we have not served any
23 additional requests for documents on Amalgamated.
24 So this would be the request for documents that
25 CoreCivic served on Amalgamated.

1           With that understanding, is it your
2  testimony that Amalgamated produced documents
3  responsive to these requests?
4           MR. WOOD:  Objection to form and
5       scope.
6           THE WITNESS:  Yes, I believe
7       Amalgamated produced documents in response to
8       this request.
9  BY MR. GLENNON:
10      Q.    And who at Amalgamated was responsible
11 for identifying and producing those documents?
12          MR. WOOD:  Objection to form and
13      scope.
14          THE WITNESS:  In conjunction with
15      outside counsel, our legal counsel would be
16      responsible for reviewing and producing those
17      documents.
18 BY MR. GLENNON:
19      Q.    Understood, but do you know who at
20 Amalgamated -- strike that.
21          I'm assuming somebody at Amalgamated
22 has to go and look through its files or its computer
23 programs or its corporate repositories to locate
24 documents that it's going to produce; is that right?
25      A.    Correct.

1       Q.    Okay.  Who did that?
2       A.    Depending on what the request was, it
3  could be part of our operations team or part of our
4  IT team.  So I can't -- that's why I'm broadly
5  answering it.
6       Q.    Okay.  Is it fair to say that you
7  don't know who specifically at Amalgamated was
8  responsible for going and identifying the documents
9  to produce in response to these requests for
10 production?
11          MR. WOOD:  Objection to form and
12      scope.
13          THE WITNESS:  So legal counsel would
14      identify what documents and then ask the
15      appropriate person at Amalgamated Bank to
16      retrieve those documents.
17 BY MR. GLENNON:
18      Q.    Totally understood.
19          My question to you is, who at
20 Amalgamated Bank, on the receiving end of that
21 direction, went out and identified and collected the
22 documents that are responsive to this request?
23          MR. WOOD:  Same objections.
24          THE WITNESS:  Again, it would be -- it
25      would be numerous people.

1  BY MR. GLENNON:
2      Q.    But can you identify anyone
3  specifically?
4          MR. WOOD:  Same objections.
5          THE WITNESS:  Without a specific
6      example, no.
7  BY MR. GLENNON:
8      Q.    Well, in any of these requests, do you
9  know of any individual who participated in going out
10 and collecting documents responsive to these
11 requests?
12         MR. WOOD:  Same objections.
13         THE WITNESS:  Yes, I know of a couple
14     people who participate -- who gathered
15     documents, but I'm not aware of everyone who
16     gathered documents.
17 BY MR. GLENNON:
18     Q.    That's fine.
19         Who do you know that participated in
20 gathering documents in response to these requests?
21         MR. WOOD:  Same objections.
22         THE WITNESS:  O'Neil Martin, who is
23     head of our fund accounting unit in the
24     operations department, would have helped in
25     getting these documents.

1          We have people in our client-servicing
2      area who would have helped in producing
3      certain documents and also our compliance
4      officer who would have helped, in addition to
5      many others.
6          So not having -- that is a very broad
7      response.  I am not aware of every single
8      person who got documents for this case.
9  BY MR. GLENNON:
10     Q.    That's fair.
11         With respect to O'Neil Martin and the
12 individuals in the client-servicing area and the
13 compliance officer, is your testimony based on
14 personal knowledge that they participated in
15 responding to this request, or is your testimony
16 based on pattern or practice and a general
17 understanding of how Amalgamated operates generally?
18         MR. WOOD:  Objection to form and
19     scope.
20         THE WITNESS:  Both.
21 BY MR. GLENNON:
22     Q.    Okay.  So you know that the
23 individuals that I just identified, in fact,
24 participated in the collection and production of the
25 documents responsive to this request?

1          MR. WOOD:  Same objections.
2          THE WITNESS:  I know specifically
3      O'Neil Martin participated and -- in addition
4      to -- then broadly speaking, in general for
5      these types of requests, the other
6      individuals who may have been asked.
7  BY MR. GLENNON:
8      Q.    Okay.  And do you have an
9  understanding as to the volume of documents that
10 Amalgamated produced in response to these requests?
11         MR. WOOD:  Same objections.
12         THE WITNESS:  Do I have an
13     understanding.  I do not know exactly the
14     volume that was produced, but I can imagine
15     it was probably a significant amount.
16 BY MR. GLENNON:
17     Q.    Is that speculation?
18     A.    That is speculation.
19     Q.    Are you aware of any documents that
20 are responsive to these requests that have not been
21 produced?
22         MR. WOOD:  Objection to the form and
23     scope.
24         THE WITNESS:  No.
25

1  BY MR. GLENNON:
2      Q.    Ms. Innes, I'm going to bring you back
3  to Defendants' Exhibit 2 again, the Plaintiffs'
4  Objections and Responses to Defendants' Notice of
5  Rule 30(b)(6) Deposition of Lead Plaintiff,
6  Amalgamated Bank.
7          This time I will be focusing you on
8  Topic of Examination 17, which starts at the bottom
9  of page 9.  Response comes over to page 10.
10         Topic of Examination No. 17 provides,
11 "The basis for your claims in this action that
12 CoreCivic or the individual defendants violated the
13 federal securities laws."
14         The response at the top of page 10,
15 following the general objections and objections,
16 provides, "Plaintiff will designate a witness to
17 testify solely as to the general basis of the claims
18 articulated in the complaint."
19         Do you see that?
20     A.    Yes.
21     Q.    And you understand that you're the
22 witness that has been designated to testify on Topic
23 of Examination 17?
24     A.    Yes.
25     Q.    Prior to filing this lawsuit,

Page 117

1  actually -- strike that.
2       Do you know if Amalgamated has any
3  banking or other business relationships with
4  CoreCivic?
5       A.    I am not aware.
6       Q.    Prior to filing this lawsuit, have you
7  ever heard of CoreCivic or its predecessor named
8  Corrections Corporation of America?
9       A.    Yes, I've heard of the name.
10      Q.    You heard the name in the ordinary
11 course of business or just generally in discussions
12 or --
13      A.    As an index fund manager and as an
14 analyst, I have heard of the company before.
15      Q.    Were you aware that Amalgamated held
16 stock in CoreCivic on behalf of its clients?
17      A.    Yes.
18      Q.    What is your understanding of the
19 allegations that Amalgamated is asserting against
20 CoreCivic in this litigation?
21      MR. WOOD: Objection to form.
22      THE WITNESS: That CCA purposely
23     misled and defrauded its shareholders with
24     its statements regarding the quality and cost
25     savings that the correctional facilities were

Page 118

1  providing to its clients.
2  BY MR. GLENNON:
3       Q.    And those are the false statements
4  that are alleged in the complaint?
5       A.    Correct.
6       Q.    Are you aware -- strike that.
7       Are any of the -- as you sit here
8  today, do you believe that any of the alleged false
9  statements asserted in the complaint are, in fact,
10 not false or misleading?
11      MR. WOOD: Objection to form.
12      THE WITNESS: No.
13 BY MR. GLENNON:
14      Q.    As you sit here today, are you aware
15 of any false or misleading statements made by CCA,
16 or CoreCivic, that are not asserted in the
17 complaint?
18      MR. WOOD: Objection to form.
19      THE WITNESS: No.
20 BY MR. GLENNON:
21      Q.    And what is your basis for saying that
22 the alleged false or misleading statements asserted
23 in the complaint are, in fact, false or misleading?
24      MR. WOOD: Objection to form.
25      THE WITNESS: This is based on the

Page 119

1      Department of Justice memorandum and the
2      Yates memorandum that was issued in 2016 on
3      the state of the private prison companies.
4  BY MR. GLENNON:
5       Q.    And how did that memorandum inform
6  your belief that the statements alleged in the
7  complaint are, in fact, false or misleading?
8       MR. WOOD: Objection to form.
9       THE WITNESS: It pointed to the fraud
10     and the misleading statements by CCA
11     management in reference to their correctional
12     facilities.
13 BY MR. GLENNON:
14      Q.    So your testimony is that the
15 Department of Justice memorandum that was issued in
16 2016 pointed to the fraud and misleading statements
17 by CCA management?
18      MR. WOOD: Objection to form.
19      THE WITNESS: It's a very broad
20     question, but it is my understanding that
21     with the reports that were put out by the DOJ
22     and the Yates memorandum publicly, it was
23     reported that statements made by CCA
24     throughout the class action period were false
25     and misleading.

Page 120

1  BY MR. GLENNON:
2       Q.    So, again, your testimony is that the
3  reports put out by the DOJ reported that statements
4  by CCA made during the class period were false or
5  misleading; correct?
6       MR. WOOD: Objection to form.
7       THE WITNESS: That was not
8      specifically what was in the report, but it
9      has led to that there's a contradiction in
10     what CCA was saying versus what the company
11     was actually -- the results the company
12     actually had with its clients and with its
13     facilities.
14 BY MR. GLENNON:
15      Q.    Do you know what specific statements
16 by CCA the DOJ contended were false or misleading?
17      MR. WOOD: Objection to form;
18     misstates testimony.
19      THE WITNESS: The DOJ and the Yates
20     memorandum did not specifically state that
21     CCA had false and misleading statements, but
22     did report the fact that what CCA's
23     management team was reporting out to its
24     clients and prospective shareholders was
25     false and misleading. It contradicted what

1　　CCA's management team was putting out there.
2　BY MR. GLENNON:
3　　**Q.　I see.**
4　　　　**And my question for you is that -- did**
5　**the DOJ or the Yates memorandum, as you're**
6　**describing them --**
7　　A.　Yes.
8　　**Q.　-- did they specifically say that CCA**
9　**had been making false or misleading statements?**
10　　MR. WOOD:　Objection to form.
11　　　THE WITNESS:　No, it did not
12　　specifically say that there were false or
13　　misleading statements by CCA.
14　BY MR. GLENNON:
15　　**Q.　Okay.　So your testimony is that DOJ**
16　**and the Yates memorandum -- how did the DOJ and the**
17　**Yates memorandum result in your view that**
18　**CoreCivic's, or CCA's, statements during the class**
19　**period were false?**
20　　MR. WOOD:　Objection to form.
21　　　THE WITNESS:　In the DOJ and the Yates
22　　memorandum, it specifically stated that
23　　private prisons were -- the quality versus
24　　the Bureau of Prisons was not better, nor was
25　　there significant cost savings in the

1　services they were providing, which is in
2　　direct contradiction to statements made by
3　　senior management of CCA throughout the class
4　　action period.
5　BY MR. GLENNON:
6　　**Q.　You're familiar with the fact that**
7　**there's more than one private prison contractor;**
8　**correct?**
9　　A.　Correct.
10　　**Q.　And did the Yates memorandum identify**
11　**CCA, or CoreCivic, specifically?**
12　　　MR. WOOD:　Objection to form.
13　　　THE WITNESS:　I don't recall.　I think
14　　the Yates memorandum specifically cited CCA.
15　BY MR. GLENNON:
16　　**Q.　Is CCA the only private -- is it your**
17　**belief that CCA is the only private corrections**
18　**organization that engaged in -- or that made false**
19　**and misleading statements during the class period?**
20　　　MR. WOOD:　Objection to form.
21　　　THE WITNESS:　It is my belief that CCA
22　　is the worst of the private prison companies.
23　BY MR. GLENNON:
24　　**Q.　And what's that belief based on?**
25　　A.　Partially conversations with general

1　counsel and outside counsel.
2　　**Q.　So you can't reveal to me the basis of**
3　**your testimony that you believe CCA is the worst**
4　**without disclosing privileged communications?**
5　　A.　I believe it was in one of the --
6　　either the Department of Justice or the Yates
7　　memorandum.
8　　**Q.　That stated that CCA was the worst of**
9　**the private prison --**
10　　A.　Not in those specific terms, but that
11　it had, I believe, more of the significant and more
12　numerous violations.
13　　**Q.　Who are the other private prison**
14　**contractors?**
15　　　MR. WOOD:　Objection to scope.
16　　　THE WITNESS:　I believe that's the Geo
17　　Group, and also there's another private --
18　　not public, private prison's corp., but the
19　　name escapes me.
20　BY MR. GLENNON:
21　　**Q.　Do you know whether the Geo Group or**
22　**this other private prison entity, whose name you**
23　**can't presently recall, were also included in what**
24　**you've described as the DOJ memo and the Yates memo?**
25　　A.　I can't recall which one, whether it

1　was the Yates memorandum or the DOJ memorandum,
2　where they actually named CCA, but I believe the Geo
3　Group was also named.
4　　**Q.　Do you have a belief as you sit here**
5　**today as to whether or not the Geo Group engaged in**
6　**making false statements during the period of time**
7　**leading up between the DOJ memorandum and the Yates**
8　**memorandum?**
9　　　MR. WOOD:　Objection to form; calls
10　　for a legal conclusion.
11　　　THE WITNESS:　I'm not sure.　I've not
12　　reviewed that.
13　BY MR. GLENNON:
14　　**Q.　Now, you had said that -- if I**
15　**understand, that the DOJ memorandum and the Yates**
16　**memorandum had statements contained in there that**
17　**you believe demonstrated that statements during the**
18　**class period that CoreCivic made were false; is that**
19　**correct?**
20　　A.　Correct.
21　　**Q.　So, in other words, the -- your basis**
22　**for saying the class period statements are false**
23　**are, in fact, the DOJ memorandum and the Yates**
24　**memorandum?**
25　　　MR. WOOD:　Objection to the form;

Page 125

1    calls for a legal conclusion and misstates
2    prior testimony.
3        THE WITNESS:  Can you restate the
4    question.
5        MR. GLENNON:  Can you repeat the
6    question for me, please.
7        (Record read.)
8        MR. WOOD:  Same objections.
9        THE WITNESS:  In -- in addition to
10   other -- those were the two -- that was the
11   public catalyst -- strike that.  I'm sorry.
12       But that -- yes, those are the two
13   that as part of -- that led Amalgamated To
14   believe that there are false and misleading
15   statements by CCA.
16   BY MR. GLENNON:
17       Q.   You understand that you accused CCA,
18   or CoreCivic, and the individual defendants not just
19   of making false statements, but of engaging in
20   securities fraud; correct?
21       MR. WOOD:  Objection to form.
22       THE WITNESS:  Correct.
23   BY MR. GLENNON:
24       Q.   It is your belief, as you sit here
25   today, that the individual defendants, that would be

Page 126

1    the CEO, two CFOs and the chief corrections officer,
2    intended to defraud CoreCivic's shareholders?
3        MR. WOOD:  Objection to form; calls
4    for a legal conclusion.
5        THE WITNESS:  Correct.
6    BY MR. GLENNON:
7        Q.   You understand there's a difference
8    between saying something that's incorrect and
9    outright lying about it; right?
10       MR. WOOD:  Objection to form.
11       THE WITNESS:  Correct.
12   BY MR. GLENNON:
13       Q.   And you're accusing in this lawsuit my
14   clients of intentionally lying; correct?
15       MR. WOOD:  Objection to form; calls
16   for a legal conclusion.
17       THE WITNESS:  I believe your client's
18   purposely misled and said false and
19   misleading statements.
20   BY MR. GLENNON:
21       Q.   And what is your basis for that
22   belief?
23       MR. WOOD:  Objection to form; calls
24   for a legal conclusion.
25       And I would also caution you not to

Page 127

1    reveal any communications with counsel, but
2    if you can answer that without revealing
3    those communications, you can.
4        THE WITNESS:  The false and misleading
5    statements that your clients have made during
6    the class action period, based on the
7    information such as the Bureau of Prison
8    reports and the notices that were filed in --
9    showing that CCA had lower quality facilities
10   and there were not substantial cost savings
11   from their services, is the basis for why we
12   are pursuing litigation against CCA and why
13   we believe that there are intentional false
14   and misleading statements by the company in
15   addition to the Department of Justice and the
16   Yates memorandum.
17   BY MR. GLENNON:
18       Q.   Just to wrap this up, Ms. Innes, you
19   understand you're testifying on behalf of
20   Amalgamated; correct?
21       A.   Yes.
22       Q.   And Amalgamated is the lead plaintiff
23   in this case; correct?
24       A.   Yes.
25       Q.   And you've been designated to testify

Page 128

1    on the topic of the basis for your claims in this
2    action that CoreCivic or the individual defendants
3    violated the securities laws; correct?
4        MR. WOOD:  Objection to form.
5        THE WITNESS:  Yes.
6    BY MR. GLENNON:
7        Q.   And it's your testimony that the basis
8    for your assertion that my clients lied was based on
9    DOP and DOJ reports that came out somewhere near the
10   end of the class period --
11       MR. WOOD:  Objection to form --
12   BY MR. GLENNON:
13       Q.   -- is that correct?
14       MR. WOOD:  Objection to form; asked
15   and answered, calls for a legal conclusion.
16       And if you can answer without
17   revealing privileged information --
18       MR. GLENNON:  Let me just respond to
19   that objection, if I could.
20       She's designated on behalf of the lead
21   plaintiff for the basis for your claims that
22   the individual defendants violated the
23   federal securities laws.  I'm not asking for
24   a legal conclusion.  I certainly don't want
25   privileged information.

1    But I am entitled to understand the
2    basis for Amalgamated's views that my client
3    lied.
4  BY MR. GLENNON:
5    **Q.    And so my question is --**
6    MR. WOOD:  Before you ask your
7  question, so we keep the record clear, I'm
8  going to respond to your response, which is
9  that our response to Topic of Examination
10  No. 17 says that the basis for plaintiffs'
11  claims is fully set forth in the complaint in
12  this action.
13    And as you know, Brian, the court
14  issued a long order upholding that complaint
15  describing the basis for the claims and why
16  it was sufficient to state a claim under the
17  PSLRA.
18    She has answered in detail about what
19  the complaint is about, which is set forth in
20  the complaint.
21    So you can ask her anything you want,
22  but we have already responded to this in
23  writing, the court's upheld the complaint,
24  and she's testified about what this case is
25  about.

1    So you can keep asking your questions.
2  I'm going to make the same objections.
3    MR. GLENNON:  That's fine.  You can
4  make it a standing objection if you'd like.
5  I'm just trying to get at a very narrow
6  issue.
7    MR. WOOD:  You're not.  You're getting
8  at the entire case, which is set forth in a
9  long complaint, which we briefed and the
10  court upheld.
11    MR. GLENNON:  Let me ask it then as
12  succinctly as I possibly can.
13  BY MR. GLENNON:
14    **Q.    As the designee for Amalgamated on**
15  **this issue, which is the basis of the claims that**
16  **you have brought against my clients, what is your**
17  **basis, what is your understanding as to why you**
18  **think my clients intentionally lied?**
19    MR. WOOD:  Same objections.  Objection
20  to form; calls for a legal conclusion, asked
21  and answered.
22    And if you can answer the question
23  without revealing privileged information, you
24  can do so.
25    THE WITNESS:  Can you just rephrase

1  the question.
2    MR. GLENNON:  Let me have the court
3  reporter repeat the question.
4    THE WITNESS:  Thank you.
5    (Record read.)
6    MR. WOOD:  Same objections.
7    THE WITNESS:  I feel like the
8  question's been asked and answered.
9  Throughout the period, four CCA executives
10  had made false and misleading statements.
11  And this is based on various reports that we
12  have been provided and discussions with legal
13  counsel.
14    As to the specifics, I just refer to
15  the Yates memorandum and the DOJ as specific
16  public reports that contradicted or had
17  additional information regarding CCA's --
18  regarding CCA and the private prisons and
19  their institutions and how they're run and
20  the quality versus the cost savings.
21    MR. GLENNON:  Can we go off the record
22  just for one moment.
23    THE VIDEOGRAPHER:  The time is
24  approximately 12:32 p.m. and we're going off
25  the record.

1    (Recess from the record.)
2    THE VIDEOGRAPHER:  We are back on the
3  record.  The time is approximately 12:40 p.m.
4    MR. WHITWORTH:  I'll note for the
5  record that Brian Glennon has left of the
6  deposition to attend to another matter.
7  EXAMINATION
8  BY MR. WHITWORTH:
9    **Q.    Ms. Innes, my name is Morgan**
10  **Whitworth.  I introduced myself briefly before, but**
11  **I'm another one of the lawyers representing the**
12  **defendants.  And I'm going to ask you a few**
13  **questions about Amalgamated's background and**
14  **investment process.**
15    A.    Okay.
16    **Q.    First, is Amalgamated a publicly**
17  **listed company?**
18    A.    No.
19    **Q.    So it's privately held?**
20    A.    Yes.
21    **Q.    Who are the major shareholders of**
22  **Amalgamated?**
23    A.    Amalgamated Bank is primarily owned by
24  unions.
25    **Q.    Any union in particular?**

Case 3:16-cv-02267    Document 430-3    Filed 02/19/21    Page 35 of 71 PageID #: 20129
Page 129..132
www.aptusCR.com

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections**
**Corporation of America, et al.**

Page 133

1    A.    It's not coming to mind right now.

2    Q.    Does the Workers United union ring a

3 bell?

4    A.    I believe so.  That's one of them.

5 There's been many restructurings, so I couldn't

6 remember the name.

7    Q.    Are you familiar with an institutional

8 investor called WL Ross & Co.?

9    A.    Yes.

10    Q.    Is that another shareholder of

11 Amalgamated?

12    A.    Yes.

13    Q.    Are you familiar with Amalgamated's

14 corporate governance structure?

15    A.    Yes.

16    Q.    Does Amalgamated have a board of

17 directors?

18    A.    Yes.

19    Q.    Does the Workers United union control

20 a majority of the board?

21        MR. WOOD:  Objection.

22 BY MR. WHITWORTH:

23    Q.    If you know.

24    A.    I'm not sure.

25    Q.    Do you know if the Workers United

Page 134

1 union has any seats on Amalgamated's board?

2    A.    Yes, I believe the union does.

3    Q.    Do you know if WL Ross & Co. has a

4 seat on Amalgamated's board?

5    A.    Yes.

6    Q.    Approximately what are Amalgamated's

7 assets under management?

8    A.    So the trust department's or

9 investment management division assets under

10 management is approximately $11 billion as of

11 quarter end.

12    Q.    And what percentage of those assets

13 are managed on behalf of, if you know, individuals?

14    A.    Small percentage, if any.  So this is

15 Amalgamated Bank trust department, not Amalgamated

16 Bank the retail side.

17    Q.    So on whose behalf are those assets

18 managed?

19        MR. WOOD:  Objection to form.

20        THE WITNESS:  Primarily pension funds

21    of Taft-Hartley or unions and public funds.

22 BY MR. WHITWORTH:

23    Q.    Does Amalgamated invest its own money,

24 meaning for its own account?

25    A.    No, we do not.

Page 135

1    Q.    Is the same true for employees?

2        MR. WOOD:  Objection to form.

3        THE WITNESS:  Can you rephrase the

4    question.

5 BY MR. WHITWORTH:

6    Q.    Sure.

7        So outside of their participation in

8 any pension plan or Taft-Hartley plan, can

9 Amalgamated employees invest their own money

10 alongside customers?

11    A.    No, we cannot.

12    Q.    Now, if you could turn back to your

13 declaration in this matter, which is Exhibit 7.

14        If you could look in the first

15 paragraph, four lines down, do you see where it

16 says, "Amalgamated is a socially responsible bank"?

17    A.    Yes.

18    Q.    What does that mean?

19    A.    Amalgamated Bank has a mission to be

20 the preeminent bank of progressive organizations.

21 And the socially responsible bank is that we try to

22 do better.  We're a bank that tries to help our

23 undocumented -- undocumented -- try to help the

24 underbank- -- I'm sorry -- I'm sorry.  I was

25 interrupted.

Page 136

1        Amalgamated Bank, socially

2 responsible.  We try to do good.  We try to invest

3 for good.  We try to help those who are working with

4 ESG factors and corporate governance factors.  And

5 we also try to -- we were founded on the premise of

6 helping the underbanked, those that the larger banks

7 have overlooked.

8    Q.    You mentioned, "ESG factors."  What

9 does that mean?

10    A.    So environmental, social and

11 governance factors; companies that have better

12 environmental practices, have social programs, and

13 have better corporate governance.

14    Q.    Does your conception of being a

15 socially responsible bank affect your investment

16 decisions on behalf of your customers?

17    A.    No, they do not.

18    Q.    So in what way do you act on your

19 conception of social responsibility?

20    A.    So Amalgamated Bank as a socially

21 responsible bank, that is the retail commercial

22 side.  Amalgamated Bank, the trust department, which

23 is where I work in, as an ERISA fiduciary, we have

24 to do what's in the best interests of our clients.

25        And although we'll take into

1 certain -- certain of our investment strategies will
2 take into some ESG components, it's not the
3 overriding factor in how we invest. There has to be
4 a financial thesis behind our investments versus
5 just investing for good.
6 **Q. Does your conception of being socially**
7 **responsible affect your decisions to bring**
8 **litigation?**
9 A. Not all litigation, but we do take
10 into account those practices that we value as a
11 socially responsible bank and having better
12 corporate governance for our firms and, therefore,
13 our clients' money. So we do take that into account
14 when pursuing litigation.
15 **Q. I'll move to your investment strategy.**
16 **Could you describe the governance of**
17 **the LongView funds?**
18 A. Can you clarify "governance."
19 **Q. Sure.**
20 **So you testified earlier about a trust**
21 **committee. Does that trust committee oversee the**
22 **LongView funds?**
23 A. Yes.
24 **Q. And does the trust committee actively**
25 **manage the LongView funds?**

1 A. No.
2 **Q. Who actively manages them?**
3 A. So the investment management division
4 of Amalgamated Bank manages those assets. Just to
5 clarify, some of our assets are not actively
6 managed, they're passively managed. So I just want
7 to get away from the active management.
8 But the investment management division
9 is responsible for the investments, with the
10 oversight of the trust committee.
11 **Q. So in the same way that a company**
12 **might have corporate officers who direct the**
13 **day-to-day strategy of the company and a board? Is**
14 **that sort of the similar construct?**
15 A. I believe so, yes.
16 **Q. So you brought up the difference**
17 **between actively versus passively managed funds.**
18 **Does Amalgamated offer actively**
19 **managed funds?**
20 A. Yes, we do.
21 **Q. And passively managed funds?**
22 A. Yes.
23 **Q. Would you -- are passively managed**
24 **funds the same as index funds?**
25 A. Broadly speaking, yes.

1 **Q. Does Amalgamated offer any alternative**
2 **investment funds, for example, private equity hedge**
3 **funds, currencies?**
4 A. Yes. We do offer some broadly
5 termed -- depending on what your definition of
6 "alternative" is, yes, we do have some alternative
7 offerings.
8 **Q. So how would you define "alternative"?**
9 A. So in this case, we have a LongView
10 private equity fund that is closed, so no additional
11 assets are invested. We have a workforce housing
12 fund, which is not your general equity or fixed
13 income investments; it's loans in addition to real
14 estate. And we also have the LongView ultra real
15 estate fund.
16 **Q. Do you have any funds that you would**
17 **characterize as quantitative funds?**
18 A. Yes.
19 **Q. How would you define a quantitative**
20 **fund?**
21 A. Well, our quantitative funds use an
22 algorithm and also a quantitative model in order to
23 invest the assets.
24 **Q. Would you say that is separate and**
25 **apart from the passive and active funds?**

1 A. We consider those active.
2 **Q. Okay. So I want to focus just on --**
3 **set aside the alternative funds and just focus on**
4 **the active funds, including the quantitative funds,**
5 **and the passive funds.**
6 **Are there restrictions or limitations**
7 **in the policies of those funds, for example,**
8 **shorting stocks?**
9 MR. WOOD: Objection to form.
10 THE WITNESS: Generally speaking, we
11 are not allowed to short stocks in our quant
12 funds and our index funds.
13 BY MR. WHITWORTH:
14 **Q. For each of those funds -- I'm taking**
15 **them one by one to make it easier, starting with the**
16 **actively managed funds -- does Amalgamated -- does**
17 **Amalgamated manage its own active funds?**
18 A. No, we do not.
19 **Q. So Amalgamated relies on external**
20 **advisors for its active funds?**
21 A. We have a subadvisor for our active
22 funds.
23 **Q. Is the subadvisor -- is the subadvisor**
24 **a separate company from Amalgamated?**
25 A. Yes.

Page 141

1    Q.    Does Amalgamated have subadvisors for
2  index funds?
3    A.    Yes.
4    Q.    Does Amalgamated manage its own index
5  funds?
6    A.    Yes.
7    Q.    So you have both?
8    A.    Yes.
9    Q.    Does Amalgamated manage its own quant
10 funds?
11   A.    No, we have a subadvisor on our quant
12 funds.
13   Q.    For the funds that Amalgamated manages
14 on its own, which I believe are just the passive
15 funds, how do you decide -- "you" being
16 Amalgamated -- which companies to invest in?
17       MR. WOOD:  Objection to form.
18       THE WITNESS:  To clarify, for -- we
19   have numerous index funds.  And we do have a
20   subadvisor on some of them and some of them
21   are internally managed.  Broadly speaking,
22   the -- can you just repeat that question.  I
23   got caught up.
24 BY MR. WHITWORTH:
25   Q.    Sure.

Page 142

1        So focusing specifically on the
2  internally managed funds, how does Amalgamated
3  decide what to invest in?
4        MR. WOOD:  Objection to form.
5        THE WITNESS:  So depending on the
6    strategy of the underlying index, we will
7    invest in those securities held in the
8    specific index that the fund is trying to
9    reproduce.
10 BY MR. WHITWORTH:
11   Q.    Does Amalgamated make those decisions
12 automatically, for  lack of a better word, or is
13 there a person at the controls deciding how to
14 balance the fund to match the index?
15   A.    So I manage the internally -- I'm the
16 portfolio manager for the internally managed index
17 funds, and I will decide how to weight the
18 securities based on the benchmark that I'm trying to
19 reproduce.
20   Q.    Could you describe that process a
21 little bit.
22        What factors influence how you decide
23 to weight the securities based on the benchmark
24 you're trying to reproduce?
25   A.    So the fund will hold those securities

Page 143

1  in a given index or benchmark in the exact same
2  weight of the benchmark.  So we will buy and sell
3  securities based on the index weightings, based on
4  changes made by the underlying index, based on
5  corporate actions that happen in the stocks that are
6  held within that index, based on cash flows received
7  from income on that index in the fund, and based on
8  cash flows received from subscriptions and
9  redemptions within the fund.
10   Q.    But the overarching goal is to match
11 the index, not to match any particular exact
12 composition of companies in the index?
13   A.    Yes.
14   Q.    When deciding how to weight the
15 securities and build out that fund, do you consider
16 analyst reports?
17   A.    No, we do not, on the index funds.
18   Q.    Do you receive analyst
19 reports -- strike that.
20        In your role as portfolio manager, do
21 you consider analyst reports even if they don't
22 affect the trading in the fund?
23       MR. WOOD:  Objection to form.
24       THE WITNESS:  No, I do not.
25

Page 144

1  BY MR. WHITWORTH:
2    Q.    Do you participate in company
3  conference calls for companies that you hold in that
4  fund?
5    A.    In my capacity as portfolio for
6  Amalgamated Bank, no, I do not.
7    Q.    And in making those decisions on how
8  to balance the fund, do you consider portfolio
9  companies' public statements?
10   A.    No, I do not.
11   Q.    I want to switch gears a little bit
12 and go to the externally managed funds.
13        How many subadvisors do you have?
14   A.    Sorry.
15   Q.    Ballpark is fine.
16   A.    About four.
17   Q.    Four.  Okay.
18        And how did you select those
19 subadvisors, "you" being Amalgamated?
20   A.    Well, they go through -- the
21 investment management division will go through a
22 rigorous process of choosing candidates to be a
23 subadvisor and then present that to the trust
24 committee, where the trust committee will decide on
25 what subadvisor to use.

1    Q.    Could you describe some of the
2  criteria that flow in that rigorous process?
3        A.    So part of it is length of the
4  investment team, length of the investment history or
5  track record of a portfolio manager, assets under
6  management, also how they stack up to peer
7  comparisons in their peer universe of other
8  investment managers who are managing the money the
9  same way, the culture of the firm, that type of
10  thing.
11    Q.    Do you do that diligence on
12  subadvisors in-house or do you rely on any external
13  data provider or evaluator or anything like that?
14        A.    No, we do that in-house.
15    Q.    Do you monitor the performance of
16  those subadvisors?
17        A.    Yes, we do.
18    Q.    How do you do that?
19        A.    We have a trust investment committee,
20  which is part of the investment management division,
21  that will review performance and reporting from our
22  subadvisors on a monthly basis.
23    Q.    Do you communicate with your
24  subadvisors other than on the monthly basis for the
25  reporting?

1        A.    If required, yes.
2    Q.    When would it be required?
3        A.    If there's a question that comes up
4  that we need to speak to the subadvisor about.  If
5  there's an issue with the day-to-day performance,
6  we'll give them a call.  If there's a large cash
7  flow from a client, we'll speak to them.  If there's
8  some unusual activity or something that happens in
9  the market, we might get on the phone to discuss it.
10    Q.    So other than the regular monthly
11  reports and when issues crop up like you just
12  described, do you communicate with your subadvisors?
13        A.    I do, to see how they are.
14    Q.    Do you ever call them just to take
15  their temperature on the market or a particular
16  stock?
17        A.    Not regularly, no.
18    Q.    Do you or anyone at Amalgamated who is
19  tasked with overseeing the subadvisors have the
20  authority to overrule or otherwise change a
21  subadvisor's investment decision?
22        A.    Yes.  As trustee of the LongView fund,
23  Amalgamated Bank has the ability to direct the
24  subadvisor.
25    Q.    Can you think of an example of when

1  that's happened?
2        A.    There have been times when we're
3  pursuing shareholder litigation and we may hold a
4  certain amount of shares in order to continue the
5  litigation.
6    Q.    And other than yourself, are there
7  other Amalgamated officers or employees who are
8  responsible for the LongView fund?
9        MR. WOOD:  Objection to form.
10        THE WITNESS:  Yes.
11  BY MR. WHITWORTH:
12    Q.    Who are they?
13        A.    Well, in the investment management
14  division, you have myself and Kimani Oliviera, who
15  is our fixed income portfolio manager.  I'll spell
16  his name.  It's K-I-M-A-N-I, Kimani.  Oliviera is
17  his last name.  O-L-I-E-V-E-R-A [sic].  He's our
18  fixed income portfolio manager.
19        Jim Lingberg, who's the chief trust
20  officer, has oversight.  He's our direct boss.
21        And then ultimately the trust
22  committee of the investment management division.
23    Q.    Moving to your specific transactions
24  in CoreCivic stock, are the LongView family of funds
25  the only Amalgamated funds that owned CoreCivic

1  stock during the class period?
2        A.    Can you just repeat the question.  I'm
3  sorry.  Thank you.
4        (Record read.)
5        A.    Yes, they're the only Amalgamated
6  funds that would own the stock.
7    Q.    Could you please turn back to
8  Exhibit 3.  Those are -- these are the plaintiff's
9  responses to CoreCivic's interrogatories.
10        I'll direct your attention to page 5,
11  which is plaintiff's Response to Interrogatory
12  No. 3, and it carries over on to page 6.
13        (Reviewing.)
14    Q.    Do you see where plaintiff responded
15  "Certain of its funds that purchased and/or sold
16  CoreCivic securities are subadvised by Quantitative
17  Management Associates LLC ('QMA')?
18        A.    Yes.
19    Q.    What is QMA?
20        A.    Quantitative Management Associates is
21  an investment advisor out in Newark, New Jersey.
22  They are a subadvisor on the quantitative funds and
23  some of our index funds.
24    Q.    So it advises both quantitative funds
25  and the passive index funds?

1     A.    Not all of the passive index funds.
2     Q.    I see.
3           Did QMA make any decisions regarding
4  transactions in CoreCivic securities?
5     A.    Yes.
6     Q.    And do you see later in that
7  paragraph, where it says, "Plaintiff's primary
8  contact at QMA is Eileen Pinto"?
9     A.    No.
10    Q.    What is Eileen Pinto's role at QMA?
11    A.    She is our relationship manager.
12    Q.    Does she make investment decisions on
13 behalf of Amalgamated?
14    A.    No, she does not.
15    Q.    Do you know who makes investment
16 decisions on behalf of Amalgamated at QMA?
17        MR. WOOD:  Objection to form.
18        THE WITNESS:  It would be their -- for
19     the index funds, there is an index fund team.
20     And for the quant funds, there is a quant
21     team, investment management team.
22 BY MR. WHITWORTH:
23    Q.    Okay.  I want to focus a little bit on
24 the quant side of QMA's advisory services.
25        Do you know what information is

1  accounted for in the algorithm that the quant fund
2  uses?
3           MR. WOOD:  Objection to form.
4  BY MR. WHITWORTH:
5     Q.    Let me back up.
6           Are you -- how does the quant fund
7  make investment decisions?
8     A.    Well, broadly, the quant fund will --
9  has an investment universe.  And they will rank
10 those stocks based on different growth and value
11 characteristics in addition to fundamental
12 characteristics, such as corporate governance, the
13 quality and diversity of a company's board, public
14 filings, news headlines, conference call
15 information.
16          They use certain characteristics like
17 price to book, PE ratios, growth rates.  And then
18 those are -- those stocks are ranked by the quant
19 model and a portfolio is created based on other
20 parameters, such as a stock can't be plus or minus
21 1 percent over its benchmark weight, certain sector
22 weights are taken into account, liquidity measures
23 are taken into account, so the stock can easily be
24 traded.  But that's very broad.
25    Q.    So you'll have to bear with me.  I'm

1  just a lawyer here, not an investment manager.  If I
2  could ask you just a couple of follow-up questions
3  based on that.
4           So when you say the quant fund will
5  rank stocks based on those factors, does that mean
6  they create a program or an algorithm to account for
7  those factors?
8     A.    Yes, that's what the quant model will
9  do.  It will take all those factors into account --
10 all those data points into account to create factors
11 that they then create a portfolio.
12    Q.    How does the quant model account for a
13 company's public filings?
14    A.    So there are certain -- what they do
15 is they'll take a public filing and they will screen
16 scrape it, they call, or go through a transcript for
17 positive/negative words in order to rank a company
18 based on what they've said in their filings and
19 their conference calls.
20    Q.    So what kind of stuff might that pick
21 up on?
22    A.    That might pick up on, you know, if a
23 company's optimistic or if they've increased their
24 revenue projections or their earnings estimates or
25 if there's been any type of litigation brought

1  against them.  Or if there are news headlines that
2  are positive/negative for a company, it will pick up
3  those signals.
4     Q.    And just to clarify, there's not a
5  person reading those statements; it's just a model
6  that sort of --
7     A.    Yes, that is my understanding.
8     Q.    Does Amalgamated have any input into
9  designing the model?
10    A.    No, we do not.
11    Q.    Do you know how the model accounts for
12 news headlines?
13    A.    Just very broadly.
14    Q.    Is it sort of the same way?
15    A.    Meaning?
16    Q.    The same way it accounts for public
17 statements of the company and conference calls?
18    A.    Yes.  A news headline gets a
19 positive/negative ranking.
20    Q.    Does it evaluate the statement or the
21 news headline any further than positive or negative?
22    A.    Not that I know of.
23    Q.    So it doesn't evaluate it based on
24 degree, for instance, like degree of positivity or
25 negativity?

Page 153

1   A.   No.
2       Q.   So it's possible that a company could
3   say, we've had slow growth at one of our factories,
4   and that might be accounted for in the same way as a
5   company restating its earnings?
6          MR. WOOD:  Objection to form.
7          THE WITNESS:  I'm not sure.
8   BY MR. WHITWORTH:
9       Q.   And I apologize if you said this and I
10  missed it, but when the model gets new input from,
11  say, a public statement or a news headline or some
12  other indicator that it considers, will it make a
13  trade based on that information automatically, or
14  will some person see what the model says and they go
15  make a trade?
16      A.   I believe it's a combination of the
17  two.
18      Q.   Okay.  Do you know -- can you describe
19  how that process works.
20      A.   Broadly speaking, so the model will
21  indicate to buy or sell a security, and then the
22  team will decide on how to implement that trade.
23  It's not an automatic process.
24      Q.   Do you know, ballpark fine, what
25  percentage of the securities -- the CoreCivic

Page 154

1   securities that Amalgamated held either managed
2   by -- managed internally or managed by a subadvisor
3   or held in quant funds?
4       A.   No, I do not.
5       Q.   So I want to ask you about a few
6   specific transactions in CoreCivic stock, but not
7   too much on that.
8          First of all, did Amalgamated ever
9   purchase any CoreCivic security in order to
10  participate in this or any other lawsuit?
11      A.   No.
12      Q.   Did Amalgamated ever purchase any
13  CoreCivic security at the direction of an attorney?
14      A.   No.
15      Q.   So if you could look back, please, at
16  Exhibit 5.  And I note before we looked at the
17  certification, but now I want to look at Schedule A.
18         Do you recall this document was filed
19  in connection with Amalgamated's motion to be
20  appointed as lead plaintiff?
21      A.   Yes.
22      Q.   Do you recognize Schedule A?
23      A.   Yes.
24      Q.   Could you describe it.
25      A.   It has the buys and sells or

Page 155

1   acquisitions and sales of the CCA's stock during the
2   class action period, I believe.
3       Q.   Do you know who prepared it?
4       A.   It was O'Neil Martin of our fund
5   accounting group.
6       Q.   And do you know how it was prepared?
7       A.   No.
8       Q.   Do you think it was based on some
9   computer-generated data report?
10      A.   I'm sure it came from our accounting
11  system.
12      Q.   Do you know whether this schedule
13  accounts for all transactions in CoreCivic
14  securities by any of the Amalgamated funds that held
15  them?
16      A.   I believe so, yes.
17      Q.   So there are no transactions in
18  CoreCivic securities during the class period that
19  are not listed in this document?
20      A.   That were done in the Amalgamated Bank
21  LongView funds --
22      Q.   Yes.
23      A.   -- correct.
24      Q.   And do you have any reason to doubt
25  the accuracy of any of the dates, quantities or

Page 156

1   prices listed in this document?
2       A.   No.
3       Q.   I know it's not obvious based on this
4   document, but is it possible to determine which of
5   these trades were made by quantitative funds?
6       A.   No, based on this information.
7       Q.   I'm sorry.  I -- putting aside this
8   document for one second --
9       A.   I'm sorry.
10      Q.   -- is it possible -- does Amalgamated
11  have accounting data or software that would make --
12  be able to tell us whether a particular trade was
13  made by a particular Amalgamated fund?
14      A.   Yes.
15      Q.   To your knowledge, were any of the
16  transactions listed here made for any reason other
17  than to track an index or pursuant to a quantitative
18  model?
19      A.   No.
20      Q.   Do you know whether any of the
21  CoreCivic transactions were short sales?
22      A.   None would be short sales.
23      Q.   You testified earlier that the quant
24  fund is permitted to engage in short selling; is
25  that correct?

1    MR. WOOD:  Objection to form.
2    THE WITNESS:  No, they're not allowed
3  to short sell.
4  BY MR. WHITWORTH:
5    Q.    Which Amalgamated funds are allowed to
6  short sell?
7    A.    None.  So if I misspoke -- none of our
8  funds are allowed to sell stock short.
9    Q.    Do your funds engage in option
10  trading?
11    A.    No.
12    Q.    So none of these CoreCivic trades
13  would have been pursuant to option contracts?
14    A.    No.
15    Q.    If you look on the last page, the
16  bottom left of this document, do you see it says,
17  "Opening position of 38,479 shares"?
18    A.    Yes.
19    Q.    What does that refer to?
20    A.    I'm speculating, but I believe that
21  would be the opening -- amount of shares we owned on
22  the start date of when we requested transactions.
23    Q.    Okay.  Do you see -- I guess we'd call
24  them Footnotes A, B and D -- A saying "Shares that
25  were received in"; B, "Shares that were delivered

1  out"; and D, "Stock dividend."
2    What are shares that are received in?
3  What does that refer to?
4    A.    Shares that were received in -- I'm
5  speculating because I don't know what happened on
6  each date, but these could be due to a portfolio
7  transition.  So if we have a client who would like
8  to transition their portfolio into one of our funds,
9  we'll do a stock transition into the fund versus
10  buying or selling.
11    Same thing that -- at times we have a
12  client that wants to pull their -- pull their
13  investment from the fund, so we may deliver out
14  stock for those purposes.  They want it in stock,
15  not cash.  That's one -- I can't think of another
16  reason why shares would be received or delivered --
17  received in or delivered out.
18    It could be due to a corporate action.
19  If there was a restructuring or a stock split,
20  they'll show up as shares received in and the old
21  shares delivered out.
22    On the stock dividend,
23  self-explanatory.
24    Q.    Okay.  So looking back at the opening
25  position, you testified that you thought, but it

1  would be speculation, that these shares would have
2  predated -- would have been purchased prior to the
3  date on which you requested this report?
4    A.    Yes.
5    Q.    I take it you don't know what date
6  these shares were purchased?
7    A.    No.  Personally, no.
8    Q.    Do you know when Amalgamated -- any
9  Amalgamated fund first purchased CoreCivic
10  securities?
11    A.    Off the top of my head, no.
12    Q.    So you don't know what information you
13  or any subadvisor might have relied on in purchasing
14  these 38,479 shares?
15    MR. WOOD:  Objection to form.
16    THE WITNESS:  I do not know now, no,
17  but it would be in conjunction with the
18  investment strategy of the fund.
19  BY MR. WHITWORTH:
20    Q.    Do you know whether any of these
21  38,479 shares were purchased or held in what you
22  termed an actively managed fund?
23    A.    They may have been held in the
24  LongView quantitative funds.
25    Q.    What about a non-quantitative actively

1  managed fund?
2    A.    We don't have any.
3    Q.    Are you alleging any claims against
4  CoreCivic in connection with these 38,479 shares?
5    MR. WOOD:  Objection to form.
6    THE WITNESS:  No, it would be during
7  the class action period.
8  BY MR. WHITWORTH:
9    Q.    Your claims would be limited to the
10  class action period, is that what you --
11    A.    Yes.
12    Q.    So if you look back at the first page
13  of this Schedule A, it looks like the first purchase
14  occurred on March 29, 2012; is that correct?
15    A.    Yes.
16    Q.    First purchase listed on this report,
17  I should clarify.
18    A.    Yes.
19    Q.    Do you know why Amalgamated or its
20  subadvisor decided to purchase CoreCivic stock at
21  that date?
22    A.    No.
23    Q.    And I know we ran through a lot of the
24  information that your funds and your subadvisors
25  might consider in connection with investments, but

Case 3:16-cv-02267    Document 430-3    Filed 02/19/21    Page 42 of 71 PageID #: 15375
Page 157..160
www.aptusCR.com

Confidential

Eleanor Innes - 30(b)(6)

Grae vs. Corrections
Corporation of America, et al.

1   just to quickly do that with the same -- in
2   connection with purchasing CoreCivic stock or
3   selling CoreCivic stock, would your advisors
4   consider -- let me break this up -- would your
5   passively managed funds consider public filings in
6   connection with CoreCivic stock transactions?
7       A.   No.
8       Q.    Would your passively managed funds
9   consider analyst reports in connection with
10  CoreCivic stock transactions?
11      A.   No.
12      Q.    Public statements by the company?
13      A.   No.
14           MR. WOOD:  Objection to form.
15  BY MR. WHITWORTH:
16      Q.    Would your quantitative funds consider
17  public filings by CoreCivic in connection with
18  CoreCivic stock transactions?
19      A.   They could, yes.
20      Q.    And that would be as input to the
21  quantitative model; correct?
22      A.   Yes.
23      Q.    And the same thing for analyst
24  reports?
25      A.   Yes, if they're public information.

1       Q.    Did you ever correspond with anyone at
2   QMA specifically regarding CoreCivic securities?
3       A.   No.
4       Q.    Do you know whether anyone at
5   Amalgamated who is responsible for corresponding
6   with Eileen Pinto or QMA would have considered -- or
7   would have discussed CoreCivic securities?
8       A.   No.
9       Q.    So if you look at the end of the list
10  of CoreCivic purchases, is the last purchase in this
11  report July 29th, 2016?
12      A.   Yes.
13      Q.    Do you know whether CoreCivic -- or
14  excuse me -- whether any Amalgamated fund purchased
15  CoreCivic securities after this date?
16      A.   I do not know.
17      Q.    Do you know whether Amalgamated or any
18  Amalgamated fund purchased CoreCivic securities
19  after the end of the class period?
20      A.   I don't know.
21      Q.    Just for the record, that's August 17,
22  2016.
23           You don't know after that date?
24      A.   Not off the top of my head, no.
25      Q.    You testified earlier that Amalgamated

1   will sometimes instruct its subadvisors to hold
2   shares of companies they are pursuing litigation
3   against.
4           Do you recall that?
5       A.   Correct.
6       Q.    Do you know if that happened in this
7   situation?
8       A.   It has not.
9       Q.    I asked you several questions about
10  the types of information Amalgamated or its
11  subadvisors might consider in connection with buying
12  CoreCivic stock.
13           Would those same answers apply to
14  decisions to sell CoreCivic stock?
15      A.   Yes.
16      Q.    And based on this document, you
17  couldn't tell me what factors influenced any
18  particular purchase or sale; correct?
19      A.   On this document, no.
20      Q.    Take a look -- I promise this is the
21  last specific transaction.
22           On May 10, 2013, it looks like
23  Amalgamated sold 30,500 shares of CoreCivic.
24      A.   Yes.
25      Q.    At a price of $38.68?

1       A.   Yes.
2       Q.    Do you know why Amalgamated sold
3   30,500 shares of CoreCivic stock on that date?
4       A.   No.
5       Q.    If you could just briefly scan the
6   quantities sold.
7           Does this May 10 sale stand out for
8   being particularly large?
9       A.   It's the largest during this time
10  period.
11      Q.    So the last date on this document
12  showing CoreCivic stock sales is June 28, 2016.
13           Do you know if there were any sales of
14  CoreCivic stock after that date?
15      A.   No.
16      Q.    And this Schedule A lists all
17  transactions that occurred during the class period;
18  correct?
19      A.   Yes.
20      Q.    So if the class period went until
21  August 17, 2016, and the last date of a CoreCivic
22  sale is June 28, 2016, is it fair to say that there
23  were no sales between June 28 and August 17, 2016?
24      A.   Based on this document, yes.
25      Q.    Do you recall earlier testifying about

Page 165

1  the alleged corrective disclosures in this case?
2      A.   Can you clarify.
3      Q.   Sure.
4          The OIG report and the Yates
5  memorandum, do you remember those terms?
6      A.   Yes.
7      Q.   I'll represent to you that the OIG
8  report was released on August 11, 2016.
9      A.   Okay.
10     Q.   Were there any CoreCivic stock sales
11 between August 11, 2016, and the end of the class
12 period?
13     A.   I don't know.  If it's -- I don't
14 know.
15     Q.   Based on this document, are there any?
16     A.   Yeah, based on this document, there
17 are not.
18     Q.   Do you know how much CoreCivic stock
19 the Amalgamated funds hold today?
20     A.   No, I do not.
21     Q.   I want to talk a little bit about your
22 allegation of damages in this case.
23         MR. WHITWORTH:  I'm going to mark this
24     as Defendants' Exhibit 10.  This is a
25     document titled Movant's Purchases and

Page 166

1      Losses.
2  BY MR. WHITWORTH:
3      Q.   And if you look at the footer, this
4  Document, 40-3, filed October 24, 2016.
5          (Innes Exhibit D-10, No Bates numbers,
6      Movant's Purchases and Losses, marked for
7      identification.)
8          (Reviewing.)
9  BY MR. WHITWORTH:
10     Q.   Do you recall October 24th as the date
11 that Amalgamated moved to be appointed as lead
12 plaintiff in this action?
13     A.   Yes.
14     Q.   So this document was submitted in
15 connection with that motion?
16         MR. WOOD:  Objection to form.
17         THE WITNESS:  I would have to check
18     the documents just to be certain.
19 BY MR. WHITWORTH:
20     Q.   That's fine.
21         MR. WOOD:  There's another page on the
22     back, too.
23         THE WITNESS:  Oh.
24 BY MR. WHITWORTH:
25     Q.   So I apologize for the way this

Page 167

1  printed out, but does it look like a record of all
2  shares purchased is on the left half of the page
3  running across pages 2, 3 and 4, and then shares
4  sold on the right half of the page, both ordered by
5  date?
6      A.   Yes.
7      Q.   Do you see the very last column on the
8  right that says, "Total gain or," in parentheses,
9  "(loss)"?
10     A.   Yes.
11     Q.   It looks like there's nothing in that
12 column until the very last page, all the way at the
13 bottom, under the row "Movant's total."
14         Do you see that?
15     A.   Yes.
16     Q.   What does this document report as the
17 total gain or loss?
18     A.   $1,218,651.21.
19     Q.   Does that appear to be a gain or a
20 loss?
21     A.   That is a loss.
22     Q.   Is that Amalgamated's best estimate of
23 its losses as a result of the allegations in the
24 complaint?
25         MR. WOOD:  I'll object to the form of

Page 168

1      the question and caution you not to reveal
2      privileged information, but you can answer
3      the question.
4          I'll also object to the extent it
5      calls for a legal conclusion.
6          THE WITNESS:  It is my understanding
7      that this is one of the methods in providing
8      a gain/loss analysis during the class action
9      period.
10 BY MR. WHITWORTH:
11     Q.   If you could look back at Exhibit 8.
12 Do you still have that in front of you?
13 Specifically page 4.
14         For reference, Exhibit 8 is
15 Amalgamated's Memorandum of Law in Support of Lead
16 Plaintiff's Motion for Class Certification,
17 Appointment of Class Representative, and Appointment
18 of Counsel, filed June 1, 2018.
19         In the middle of page 4, do you see
20 where it says, "Amalgamated Bank acquired almost
21 159,000 shares of CCA common stock during the class
22 period and suffered over 1.2 million in damages as a
23 result of the violations of the federal securities
24 laws as alleged herein"?
25     A.   Yes.

Case 3:16-cv-02267    Document 430-3    Filed 02/19/21    Page 44 of 71 PageID #: 16500
Page 165..168
www.aptusCR.com

Page 169

1    Q.    And it cites ECF No. 40-3?
2    A.    Yes.
3    Q.    If you could look back at the document
4    we just marked as Exhibit 10.
5          Is that ECF -- or is there a footer on
6    the bottom that says, "Document 40-3"?
7    A.    Yes.
8    Q.    And I believe you just testified that
9    this document shows a loss of $1,218,651.21?
10   A.    Yes.
11   Q.    And that's roughly the same as
12   1.2 million in damages?
13         MR. WOOD:  Objection to form.
14         THE WITNESS:  Yes.
15   BY MR. WHITWORTH:
16   Q.    Still on Exhibit 10, do you see, on
17   page 3, on the right, where the right side column
18   ends, below the last date, it says, "Held 71,866
19   shares," and then a price and then a total proceeds?
20   A.    Yes.
21   Q.    What does "Held" mean?
22   A.    I believe those would be the
23   additional shares that were held and not bought and
24   sold during the time period.
25   Q.    And that would be after the last

Page 170

1    transaction above?
2    A.    Yes.
3    Q.    Do you still have Exhibit 4 in front
4    of you?
5          Do you see a date stamped on the
6    bottom of that document?
7    A.    Yes.
8    Q.    What is that date that it was filed?
9    A.    August 23, 2016.
10   Q.    Why would Amalgamated continue to hold
11   71,886 shares approximately a month and a half after
12   a complaint for securities fraud was filed against
13   CoreCivic?
14         MR. WOOD:  Objection to form.
15         THE WITNESS:  The funds that hold
16   CoreCivic are primarily index funds, and they
17   are required to hold all the securities that
18   are in its benchmark.
19   BY MR. WHITWORTH:
20   Q.    So those index funds did not make any
21   trades based on the information alleged in this
22   complaint dated August 23, 2016?
23         MR. WOOD:  Objection to form; calls
24   for a legal conclusion.
25         THE WITNESS:  Not that I know of, no.

Page 171

1    BY MR. WHITWORTH:
2    Q.    You just testified that these index
3    funds are required to hold the securities that are
4    in their benchmark.
5          Per their -- per the requirements of
6    these index funds, could they have made trades just
7    because a complaint was filed against the company of
8    the stock?
9          MR. WOOD:  Objection to form; calls
10   for speculation and legal conclusion.
11         THE WITNESS:  No, the investment
12   strategy would not buy or sell based on the
13   filing.
14   BY MR. WHITWORTH:
15   Q.    Would the same be true if CoreCivic
16   had announced particularly good news during the
17   class period?
18         MR. WOOD:  Objection to form.
19         THE WITNESS:  For the index funds,
20   yes.
21   BY MR. WHITWORTH:
22   Q.    Last thing.
23         Were any securities purchased or sold
24   by Amalgamated funds that were considered -- that
25   you would consider a hedge for CoreCivic stock?

Page 172

1    A.    No.
2    Q.    Were the funds that invested in
3    CoreCivic stock permitted to hedge what we'll call
4    long positions?
5    A.    No.
6    Q.    Okay.
7          (Discussion off the record.)
8          MR. WHITWORTH:  Can we go off the
9    record quickly.
10         THE VIDEOGRAPHER:  The time is
11   approximately 1:41 p.m. and we're going off
12   the record.
13         (Recess from the record.)
14         MR. WOOD:  Let's go back on the
15   record.
16         So we're going to read and sign
17   pursuant to the Federal Rules, and we'll mark
18   it confidential.  That's it.
19         MR. GLENNON:  Do we want to put on the
20   time that we'll send it to you and you have
21   30 days or --
22         MR. WOOD:  It's in the Rules, but,
23   yeah, 30 days from the time we get the
24   transcript.
25         (Examination concluded at 1:48 p.m.)

**Confidential**

**Grae vs. Corrections**
**Corporation of America, et al.**

Eleanor Innes - 30(b)(6)

```
1              C E R T I F I C A T E
2
3   STATE OF NEW YORK      )
4                          ) ss:
5   COUNTY OF WESTCHESTER  )
6
7           I, Eileen Mulvenna, CSR/RMR/CRR and a
8   notary public within and for the State of New York,
9   do hereby certify:
10          That I reported the proceedings in the
11  within-entitled matter, and that the within
12  transcript is a true record of such proceedings.
13          I further certify that I am not related by
14  blood or marriage to any of the parties in this
15  matter and that I am in no way interested in the
16  outcome of the matter.
17          Further, that if the foregoing pertains to
18  the original transcript of a deposition in a federal
19  case, before completion of the proceedings, review of
20  the transcript [X] was [ ] was not requested.
21          IN WITNESS WHEREOF, I have hereunto set my
22  hand this 10th day of July, 2018.
23
24          ----------------------------------
25                  Eileen Mulvenna, CSR/RMR/CRR
```

```
1           DECLARATION UNDER PENALTY OF PERJURY
2   Case Name: Grae vs. Corrections
3           Corporation of America, et al.
3   Date of Deposition: 07/10/2018
4   Job No.: 10044536
5
6           I, ELEANOR INNES - 30(B)(6), hereby certify
7   under penalty of perjury under the laws of the State of
8   _____ that the foregoing is true and correct.
9           Executed this _____ day of
10  _____, 2018, at _____.
11
12
13          _____
14                  ELEANOR INNES - 30(B)(6)
15
16  NOTARIZATION (If Required)
17  State of _____
18  County of _____
19  Subscribed and sworn to (or affirmed) before me on
20  this _____ day of _____, 20__,
21  by_____,     proved to me on the
22  basis of satisfactory evidence to be the person
23  who appeared before me.
24  Signature: _____ (Seal)
25
```

```
1   DEPOSITION ERRATA SHEET
2   Case Name: Grae vs. Corrections
        Corporation of America, et al.
    Name of Witness: Eleanor Innes - 30(b)(6)
3   Date of Deposition: 07/10/2018
    Job No.: 10044536
4   Reason Codes:  1. To clarify the record.
                   2. To conform to the facts.
5                  3. To correct transcription errors.
6   Page _____ Line _____ Reason _____
7   From _____ to _____
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24  Page _____ Line _____ Reason _____
25  From _____ to _____
```

```
1   DEPOSITION ERRATA SHEET
2   Page _____ Line _____ Reason _____
3   From _____ to _____
4   Page _____ Line _____ Reason _____
5   From _____ to _____
6   Page _____ Line _____ Reason _____
7   From _____ to _____
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  _____ Subject to the above changes, I certify that the
           transcript is true and correct
23  _____ No changes have been made. I certify that the
           transcript is true and correct.
24
           _____
25                 ELEANOR INNES - 30(B)(6)
```

Confidential

**Eleanor Innes - 30(b)(6)**

**Grae vs. Corrections Corporation of America, et al.**

---

**Exhibits**

---

**ALL COMBINED**

**EX D-1 - INNES, E**
4:10 26:14

**EX D-2 - INNES, E**
4:17 28:6

**EX D-3 - INNES, E**
5:2 41:16

**EX D-3A - INNES, E**
5:9 43:4

**EX D-4 - INNES, E**
5:11 75:11

**EX D-5 - INNES, E**
5:14 79:10

**EX D-6 - INNES, E**
5:21 83:2

**EX D-7 - INNES, E**
6:3 91:3

**EX D-8 - INNES, E**
6:12 97:5

**EX D-9 - INNES, E**
7:2 108:1

**EX D-10 - INNES, E**
7:9 166:5

---

**$**

---

**$1,218,651.21** 167:18
169:9

**$11** 134:10

**$145** 58:23

**$38.68** 163:25

---

**1**

---

**1** 26:13,24 27:1,13,24
29:2 39:19 42:11,15
44:8 46:19 49:3
51:19 82:1 85:15

88:7 89:17 102:22
150:21 168:18

**1.2** 168:22 169:12

**10** 78:9,13,16 98:16,
18 116:9,14 163:22
164:7 165:24 169:4,
16

**10:21** 63:2

**10:35** 63:7

**10th** 8:3

**11** 39:25 46:22,23
88:2,5,16 165:8,11

**11372** 10:14

**11:40** 107:6

**11:57** 107:11

**12** 72:18

**12:32** 131:24

**12:40** 132:3

**13** 46:25 83:1,5 84:21
85:1 86:6,14 90:3
100:24

**15** 65:21 66:10,13

**159,000** 168:21

**17** 116:8,10,23
129:10 162:21
164:21,23

**18** 40:19 85:7,23
86:13 90:1,25

**18th** 79:9,13 81:22

**19** 98:14,15,22 99:3,
13

**1:41** 172:11

**1:42** 43:2

**1:48** 172:25

**1st** 91:21

---

**2**

---

**2** 28:14,23 29:6

39:19,25 63:6 65:19
66:3,11 72:15 78:4
87:24 91:18 98:9
116:3 167:3

**20** 40:1,6 83:13,16

**2012** 160:14

**2013** 40:19 163:22

**2014** 106:17

**2016** 22:5 23:23,25
24:7,10 63:24 64:3
75:9 78:17 79:9,13
81:23 85:8,24 86:13
90:2,25 119:2,16
162:11,22 164:12,
21,22,23 165:8,11
166:4 170:9,22

**2017** 83:1,5 84:22
85:2 86:6,14 90:3
100:24 106:24

**2018** 8:3 15:7 37:4
43:1 47:14 88:7
91:21 102:22 168:18

**21** 47:14

**23** 75:9 170:9,22

**24** 72:17,18,20 78:17
166:4

**24th** 166:10

**28** 164:12,22,23

**29** 160:14

**29th** 162:11

---

**3**

---

**3** 29:7 41:10,25 42:3
43:16 44:6,7 46:16,
19 47:18,21 49:4
51:18 55:19 107:10
148:8,12 167:3
169:17

**30** 18:20 172:21,23

**30(b)(6)** 8:6 26:15
27:4 28:8,16 78:6
88:1 98:11 116:5

**30,500** 163:23 164:3

**35th** 10:13

**38,479** 157:17
159:14,21 160:4

**3:16-cv-02267** 8:11

**3A** 42:25 43:11,15
53:19 54:13 55:17,
19

---

**4**

---

**4** 29:7 42:11 44:7
46:20 49:3 51:19
75:8 92:7 93:9 167:3
168:13,19 170:3

**40-2** 83:19

**40-3** 166:4 169:1,6

---

**5**

---

**5** 29:7 79:6,18 82:18
83:12 85:4 89:15
90:12 148:10 154:16

---

**6**

---

**6** 82:22 83:13 84:20
85:11 86:25 87:20
89:24 94:6 101:1
148:12

**68** 83:25

**6th** 43:1

---

**7**

---

**7** 78:9 88:3,19 91:10
135:13

**71,866** 169:18

**71,886** 170:11

---

**8**

**8** 65:22 66:11 97:1
102:11,17,18
168:11,14

**8412** 10:13

**885** 8:12

---

**9**

**9** 65:23 66:19 107:19
109:7 116:9

**9:07** 8:4

---

**A**

**a.m.** 8:4 63:2,7 107:6,
11

**abbreviated** 69:4

**abilities** 30:17

**ability** 30:1 47:16
93:4,13 146:23

**able** 156:12

**accept** 94:7

**acceptable** 12:13
13:18 69:10 103:15

**accommodate** 13:16

**accompanied** 101:22

**account** 134:24
137:10,13 150:22,23
151:6,9,10,12

**accounted** 150:1
153:4

**accounting** 113:23
155:5,10 156:11

**accounts** 152:11,16
155:13

**accuracy** 47:17

155:25

**accurate** 19:16 94:15

**accurately** 12:12

**accused** 125:17

**accusing** 126:13

**acquired** 95:14
168:20

**acquisitions** 155:1

**act** 136:18

**action** 40:10 48:23
51:9 56:17 66:15
72:24 78:19 84:13
88:7 92:21 93:20
94:4 96:12,15,17
99:1,8,18,22 116:11
119:24 122:4 127:6
128:2 129:12 155:2
158:18 160:7,10
166:12 168:8

**actions** 40:18 41:5
42:15 143:5

**active** 74:24 75:5
138:7 139:25 140:1,
4,17,20,21

**actively** 92:8 137:24
138:2,5,17,18
140:16 159:22,25

**activity** 146:8

**actual** 81:11,13

**add** 43:17

**adding** 20:22

**addition** 78:14 92:9
114:4 115:3 125:9
127:15 139:13
150:11

**additional** 20:22
43:17 53:20 110:23
131:17 139:10
169:23

**address** 10:11

**adequate** 92:13

**adequately** 93:23

**adjust** 12:11

**advice** 109:3,6

**advises** 148:24

**advisor** 148:21

**advisors** 140:20
161:3

**advisory** 149:24

**advocacy** 92:16 93:1,
11,13

**advocate** 93:14

**affect** 136:15 137:7
143:22

**ago** 37:4

**agreed-upon** 71:13

**agreement** 29:14

**agreements** 74:3

**ahead** 23:18 83:25

**Aleta** 21:18

**algorithm** 139:22
150:1 151:6

**allegation** 165:22

**allegations** 15:24
16:19 18:15 21:1
44:21 63:21 117:19
167:23

**alleged** 44:21 64:7
95:15 118:4,8,22
119:6 165:1 168:24
170:21

**alleging** 160:3

**Allergan** 43:21 53:22
55:24 56:6

**allow** 11:9,10 12:25

**allowed** 140:11
157:2,5,8

**alongside** 135:10

**alternative** 139:1,6,8
140:3

**Amalgamated** 8:6
14:15,23 17:15 18:4
22:4,8 24:15,17,24
25:19 26:16 27:5,9,
17,21 28:9,17 30:2,
12,18,25 31:2 32:5,9
35:12,17 36:13,15
38:21,24 39:2,12,17
41:4,10,17 42:3,16
44:24 45:1,9,12,14,
15 46:3 47:11,12
48:6,9,21 49:25
50:6,7 52:12 53:5
54:24 55:2,8,11
56:3,8,15 57:17,20,
23 58:7 59:20 60:25
61:10,20 62:3,6,10,
16 63:20 64:6,15,17
65:2,7,15 67:3,8,11,
13,15,23 68:3,18
69:21 70:5,12 71:9,
11,14,16,19,22
72:24 73:17 74:8,18,
24 75:3 76:3 77:20
78:7,19 79:25 80:3,
18,21 83:17 84:8,12
85:13 86:11 87:3,7,
17 88:2 89:4,5,8
90:8,10 92:2,3,7,10
93:3,14,17 94:1,6,
18,24 95:8,12 96:6,
19 97:23 98:2,6,12
99:6,19,23 100:9,23
101:3,18 102:2,20
103:4,10 104:5
106:1,14,16 107:20
108:2,18 109:1,6
110:3,16,18,23,25
111:2,7,10,20,21
112:7,15,20 114:17
115:10 116:6 117:2,
15,19 125:13
127:20,22 130:14

---

**Confidential**

**Eleanor Innes - 30(b)(6)**

**Grae vs. Corrections**
**Corporation of America, et al.**

132:16,22,23
133:11,16 134:15,23
135:9,16,19 136:1,
20,22 138:4,18
139:1 140:16,17,19,
24 141:1,4,9,13,16
142:2,11 144:6,19
146:18,23 147:7,25
148:5 149:13,16
152:8 154:1,8,12
155:14,20 156:10,13
157:5 159:8,9
160:19 162:5,14,17,
18,25 163:10,23
164:2 165:19 166:11
168:20 170:10
171:24

**Amalgamated's** 40:8,
17 51:6 64:23 66:14
69:18 91:25 92:20
93:22 98:24 99:16,
17 108:15 129:2
132:13 133:13
134:1,4,6 154:19
167:22 168:15

**amended** 84:12

**America** 8:8 13:22,23
24:19,21 25:12
117:8

**amount** 20:15 31:16
51:11 72:13,21
115:15 147:4 157:21

**analysis** 168:8

**analyst** 25:16 117:14
143:16,18,21 161:9,
23

**and/or** 148:15

**announced** 171:16

**answer** 12:11 13:9,16
32:13,16 34:2,7
45:25 47:18 48:1
52:10 55:21 60:22
61:7 67:19 68:7 74:1

86:18 103:7 110:9
127:2 128:16 130:22
168:2

**answered** 128:15
129:18 130:21 131:8

**answering** 39:13
112:5

**answers** 11:6,10,19
13:2 163:13

**anticipated** 72:23

**anybody** 14:12 17:22
30:25 32:3 74:3
77:19 87:6 98:5
102:1,20 103:3

**apart** 139:25

**apologize** 74:22
104:3 153:9 166:25

**appear** 167:19

**application** 102:2

**applies** 55:5 70:25

**apply** 163:13

**appointed** 46:9,15
49:10 51:24 54:25
55:1,3,21,22 56:3,8,
12 80:4 101:10,22
154:20 166:11

**appointment** 78:18
88:22,23 91:6,7
97:3,4,8,9 102:13,14
168:17

**appreciate** 77:23

**approach** 64:18 67:3

**approached** 45:10,
15,16 50:6,7 64:9,
12,15 67:8,11 68:15

**appropriate** 112:15

**approved** 94:12
102:2,21

**approximately** 8:4
58:22 63:2,7 107:6,
11 131:24 132:3

134:6,10 170:11
172:11

**April** 37:4

**Aptus** 8:14

**area** 97:16 114:2,12

**areas** 30:19

**arrangement** 69:20
70:4,20,25 71:4

**arrangements** 73:12
94:24

**articulated** 116:18

**aside** 78:2 140:3
156:7

**asked** 42:15 53:4
74:22 115:6 128:14
130:20 131:8 163:9

**asking** 11:5 22:25
24:8 33:12,18 77:15
94:23 128:23 130:1

**asserted** 33:5 63:21
118:9,16,22

**asserting** 117:19

**assertion** 128:8

**assets** 134:7,9,12,17
138:4,5 139:11,23
145:5

**associate** 9:23

**associated** 66:15
74:9

**Associates** 148:17,
20

**association** 74:19

**assume** 52:10 53:10
77:1

**assuming** 14:9 49:23
55:1 81:10 111:21

**assumption** 81:11
86:8,10

**attend** 18:5 132:6

**attended** 18:1

**attention** 39:25 42:10
49:2 63:15 65:18
78:4 86:24 92:6
148:10

**attorney** 154:13

**attorneys** 13:7

**attorneys'** 69:22 95:3

**audible** 11:18

**audibly** 11:22

**August** 75:9 162:21
164:21,23 165:8,11
170:9,22

**authority** 146:20

**authorized** 82:2,6,16
85:24 86:12 89:18
90:6,15,19,25

**automatic** 153:23

**automatically** 142:12
153:13

**Avenue** 8:12 10:13

**award** 70:12,14,16
72:12

**awarded** 58:22

**aware** 17:17,25 30:12
44:20 61:16 63:20
64:6 98:7 100:9,19
108:14 113:15 114:7
115:19 117:5,15
118:6,14

**B**

**back** 10:19,22 22:4,7
25:11 29:8 36:7 39:9
49:2 51:18 63:5
65:18 69:1 72:14
85:4 86:25 87:23
89:10 98:9 106:21
107:9 116:2 132:2
135:12 148:7 150:5

Confidential

Eleanor Innes - 30(b)(6)

Grae vs. Corrections
Corporation of America, et al.

154:15 158:24
160:12 166:22
168:11 169:3 172:14

**background** 132:13

**balance** 142:14 144:8

**ballpark** 15:12 144:15
153:24

**bank** 8:6 14:23 17:16
22:17 24:15,17
26:17 27:5,9,17,21
28:9,17 30:12 34:15,
16 36:15 44:24
47:11,12 48:6,11,13
58:7 64:17 65:2
67:4,9,11,13,15,23
68:18 70:12 71:9,11,
14,16,19 73:17 74:8,
18 75:3 78:7 79:25
80:3,19 83:17 87:17
88:2 89:4,5,9 90:8,
10 92:2 93:3,14
94:1,18 98:12 99:19,
23 102:20 103:10
106:1 109:1 112:15,
20 116:6 132:23
134:15,16 135:16,
19,20,21,22 136:1,
15,20,21,22 137:11
138:4 144:6 146:23
155:20 168:20

**Bank's** 14:15 18:4
41:11,17 42:3 92:3
107:20 108:2

**banking** 61:12,22
62:10 81:1 117:3

**banks** 136:6

**Barrett** 68:23 69:9,11,
14,21 71:1,4,12,14
73:25

**based** 38:16 114:13,
16 118:25 122:24
127:6 128:8 131:11
142:18,23 143:3,4,6,

7 150:10,19 151:3,5,
18 152:23 153:13
155:8 156:3,6
163:16 164:24
165:15,16 170:21
171:12

**basically** 31:19

**basis** 71:8,13 86:9
93:21 103:21 104:3,
17 105:2,4,11 106:9
116:11,17 118:21
123:2 124:21 126:21
127:11 128:1,7,21
129:2,10,15 130:15,
17 145:22,24

**Bates** 26:14 28:6
41:16 43:4 75:11
79:10 83:2 91:3 97:5
108:1 166:5

**bear** 150:25

**becoming** 20:3,25
64:23

**beginning** 12:17 36:8

**behalf** 8:19,22,24 9:2,
5 27:21 31:2 32:5
36:12,14 38:8 65:15
72:24 76:3 99:21
117:16 127:19
128:20 134:13,17
136:16 149:13,16

**belief** 93:21,22 119:6
122:17,21,24 124:4
125:24 126:22

**believe** 17:12 34:4,
11,18 38:23 39:11
44:14 47:20 49:15
52:22 60:16 63:23
64:3,9 68:25 69:7
70:22 72:3,6 75:1
84:25 86:2 87:9
89:8,25 90:1 94:17
95:7,20 103:18
111:6 118:8 123:3,5,

11,16 124:2,17
125:14 126:17
127:13 133:4 134:2
138:15 141:14
153:16 155:2,16
157:20 169:8,22

**bell** 133:3

**benchmark** 142:18,
23 143:1,2 150:21
170:18 171:4

**benefit** 93:6 94:2,4

**best** 11:8 12:6 14:4
15:12 21:15 30:1,17
31:10 39:12 47:16
48:24 53:12 56:24
61:19 72:10 75:2,5
77:20,21 93:4,12
95:8,17 96:18
103:25 136:24
167:22

**better** 76:12 121:24
135:22 136:11,13
137:11 142:12

**beyond** 23:25 51:4
57:12 58:1 61:5 76:4
94:8 104:19 109:8

**billion** 134:10

**bit** 142:21 144:11
149:23 165:21

**biweekly** 103:20,21
104:1,23

**block** 84:1

**board** 133:16,20
134:1,4 138:13
150:13

**Bollinger** 8:7 75:20

**book** 150:17

**boss** 147:20

**bottom** 65:21 66:10
75:22 80:10 84:19
88:3 98:15 116:8
157:16 167:13 169:6

170:6

**bought** 169:23

**break** 13:13,17 20:20,
21 62:7,23 70:2
107:3 161:4

**Brian** 8:18 9:19 28:1
51:2 77:14 106:19
129:13 132:5

**brief** 97:16

**briefed** 130:9

**briefly** 9:18 86:24
132:10 164:5

**bring** 116:2 137:7

**broad** 70:9 100:17
108:25 114:6 119:19
150:24

**broadly** 70:7 72:10
103:22 112:4 115:4
138:25 139:4 141:21
150:8 152:13 153:20

**brought** 23:14 130:16
138:16 151:25

**build** 143:15

**bullet** 42:21 49:5
51:20 55:17

**Bureau** 121:24 127:7

**business** 25:6 62:11
117:3,11

**buy** 143:2 153:21
171:12

**buying** 158:10 163:11

**buys** 154:25

---

**C**

**call** 146:6,14 150:14
151:16 157:23 172:3

**called** 133:8

**calls** 19:3,5 32:11
67:17 68:6 69:25

**Confidential**

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections**
**Corporation of America, et al.**

106:11,12 124:9
125:1 126:3,15,23
128:15 130:20 144:3
151:19 152:17 168:5
170:23 171:9

**candidates** 144:22

**capacity** 31:21 33:13
34:21 35:4 36:12
62:4 80:22,23,24
99:15 144:5

**Capital** 24:19 25:12

**caption** 76:20,22

**captioned** 60:2

**careful** 109:17

**carries** 148:12

**case** 8:10 13:20 16:9
17:14 20:2 21:20
22:5,9 37:20 45:12
46:5,8 49:8 51:16
52:4,16 56:2,9 59:1
63:21 65:20 69:14,
23 80:1 84:20
101:10 114:8 127:23
129:24 130:8 139:9
165:1,22

**cases** 55:4

**cash** 143:6,8 146:6
158:15

**catalyst** 125:11

**caught** 141:23

**caused** 23:10

**caution** 33:25 45:20
50:9 59:11 60:6,20
86:16 126:25 168:1

**cc** 43:3

**CCA** 14:1 23:15 83:21
100:7 117:22 118:15
119:10,17,23 120:4,
10,16,21 121:8,13
122:3,11,14,16,17,
21 123:3,8 124:2

125:15,17 127:9,12
131:9,18 168:21

**CCA'S** 120:22 121:1,
18 131:17 155:1

**CEO** 126:1

**certain** 28:3 100:18
114:3 137:1 147:4
148:15 150:16,21
151:14 166:18

**certainly** 51:8 75:17
128:24

**certification** 78:17
79:7,11 80:3,11
81:4,15,22 82:17
83:19 85:5,7,16,23
88:6,22 89:10,14,21
91:6 97:3,7,22
101:21 102:13
154:17 168:16

**certifies** 47:17

**CFOS** 126:1

**Chain** 43:5

**chair** 34:19

**challenging** 38:19,20

**change** 13:2 146:20

**changes** 143:4

**characteristics**
150:11,12,16

**characterize** 139:17

**check** 166:17

**chief** 25:25 126:1
147:19

**choosing** 144:22

**chose** 46:3

**chosen** 34:5,12

**Chris** 43:1

**Christopher** 9:1 84:6

**circumstances** 52:24

**cited** 122:14

**cites** 169:1

**claim** 129:16

**claims** 33:5 45:17
64:7 65:15 116:11,
17 128:1,21 129:11,
15 130:15 160:3,9

**clarification** 16:23
77:17,24

**clarify** 12:9 19:3
32:25 33:7 38:12
65:9 68:14 88:25
94:20 100:13 105:3
110:12 137:18 138:5
141:18 152:4 160:17
165:2

**class** 40:9,10,18 41:5
42:17 51:6,8 56:17
60:10 74:10 83:21
88:6,21,22,23 91:5,
6,7,25 92:3,9,10,12,
15 93:17,20,24 94:4,
7,11 95:15,22 96:12,
15,17,21 97:3,4,7,8,
9,21 98:25 99:8,18,
22 102:13 119:24
120:4 121:18 122:3,
19 124:18,22 127:6
128:10 148:1 155:2,
18 160:7,10 162:19
164:17,20 165:11
168:8,16,17,21
171:17

**clean** 10:23

**cleaner** 11:11

**clear** 11:20 12:7,8
18:13 66:8 129:7

**client** 25:9 129:2
146:7 158:7,12

**client's** 126:17

**client-servicing**
114:1,12

**clients** 117:16 118:1

120:12,24 126:14
127:5 128:8 130:16,
18 136:24

**clients'** 137:13

**closed** 139:10

**closest** 33:1,4,8,14

**co-lead** 46:9,15 47:24
48:22 51:24

**Cognizant** 51:20
53:12

**collected** 112:21

**collecting** 113:10

**collection** 114:24

**Collective** 26:17 27:6
28:10,18 83:18

**column** 167:7,12
169:17

**combination** 153:16

**combined** 55:19

**come** 10:19,22 29:8

**comes** 116:9 146:3

**coming** 28:4 107:23
133:1

**comment** 13:3 36:1

**commercial** 81:1
136:21

**committed** 92:7

**committee** 18:4,5,6
20:2 48:5,11,16,19
53:8,9 65:4,12,13
68:20 137:21,24
138:10 144:24
145:19 147:22

**common** 168:21

**communicate** 145:23
146:12

**communicated** 95:13
96:19 106:15

**communication**
43:14 103:11,16,17,

24 104:1 106:8

**communications** 34:18 64:5,22 104:5, 7 106:1,5,7 108:22 109:18 110:10 123:4 127:1,3

**companies** 119:3 122:22 136:11 141:16 143:12 144:3 163:2

**companies'** 144:9

**company** 58:21,23 60:10 117:14 120:10,11 127:14 132:17 138:11,13 140:24 144:2 151:17 152:2,17 153:2,5 161:12 171:7

**company's** 150:13 151:13,23

**comparisons** 145:7

**complaint** 18:15 75:9,12,20 76:1,14 77:2,7,11 82:2,5,15, 24 83:3 84:12 85:12, 15,19,24 86:3,5,12, 13 87:1,4,7 89:7,18, 22,23 90:5,6,9,13, 19,24 100:23 116:18 118:4,9,17,23 119:7 129:11,14,19,20,23 130:9 167:24 170:12,22 171:7

**complaints** 21:2

**complete** 14:4

**compliance** 114:3,13

**components** 137:2

**composition** 143:12

**compound** 70:1

**computer** 111:22

**computer-generated** 155:9

**conception** 136:14, 19 137:6

**concerned** 71:7

**concluded** 172:25

**concludes** 88:10

**conclusion** 12:23 55:14 124:10 125:1 126:4,16,24 128:15, 24 130:20 168:5 170:24 171:10

**conference** 19:3,5 106:11,12 144:3 150:14 151:19 152:17

**confidential** 37:16, 19,22 46:2 172:18

**conjunction** 25:7 111:14 159:17

**connection** 14:8 16:8 22:20 31:24 36:16 44:3 45:16 50:5,7,18 52:19 53:11 55:4 57:8 61:12,21 62:6, 10,17,18 67:3,8 70:6 74:5 84:9 94:19 95:10 100:11 154:19 160:4,25 161:2,6,9, 17 163:11 166:15

**consider** 67:14 140:1 143:15,21 144:8 160:25 161:4,5,9,16 163:11 171:25

**consideration** 33:19

**considered** 67:24 162:6 171:24

**considers** 153:12

**consistent** 92:15,19, 25 93:10

**consolidated** 82:24 83:3 87:1 100:22

**constant** 103:11,16

**construct** 138:14

**contact** 149:8

**contained** 47:18 124:16

**contended** 120:16

**content** 22:15 64:2,5, 21 103:3 104:6 105:16

**contents** 23:9 34:17

**context** 36:25 105:5, 12

**contingency** 70:20, 22

**continue** 92:13 147:4 170:10

**continuing** 92:8

**contractor** 122:7

**contractors** 123:14

**contracts** 157:13

**contradicted** 120:25 131:16

**contradiction** 120:9 122:2

**control** 133:19

**controls** 142:13

**conversation** 35:24, 25

**conversations** 103:12 122:25

**Corecivic** 8:19 9:21 13:20,24 14:1 41:18 42:4 52:21 95:14,22 107:21 108:3 110:25 116:12 117:4,7,16, 20 118:16 122:11 124:18 125:18 128:2 147:24,25 148:16 149:4 153:25 154:6, 9,13 155:13,18 156:21 157:12 159:9 160:4,20 161:2,3,6,

10,17,18 162:2,7,10, 13,15,18 163:12,14, 23 164:3,12,14,21 165:10,18 170:13,16 171:15,25 172:3

**Corecivic's** 41:12 108:16 110:5 121:18 126:2 148:9

**corp** 50:5,18 55:24 123:18

**corporate** 22:16 23:7 27:16 35:11,16 38:5, 11,12,17 44:15,17, 21 49:15,17,19 52:5, 8 54:5,8,17,20 58:21 63:16 76:2 111:23 133:14 136:4,13 137:12 138:12 143:5 150:12 158:18

**Corporation** 8:8 13:21,23 117:8

**correct** 12:11 14:10 16:9 30:7 41:1 46:10,20 49:23 66:2, 25 68:24 71:20 77:8, 9,11,13 84:6,10,16 85:8,9 87:21,22 89:16,20 90:14,16, 17,22 91:1,2,14,16, 19,23 95:10,11,23 98:4 100:8 101:2,19, 20 102:18,24 104:21 105:14 106:24 111:25 118:5 120:5 122:8,9 124:19,20 125:20,22 126:5,11, 14 127:20,23 128:3, 13 155:23 156:25 160:14 161:21 163:5,18 164:18

**corrected** 23:19

**correctional** 117:25 119:11

Confidential

Eleanor Innes - 30(b)(6)

**Grae vs. Corrections**
**Corporation of America, et al.**

**corrections** 8:8 13:1,
21,23 117:8 122:17
126:1

**corrective** 165:1

**correctly** 24:6 42:9

**correspond** 162:1

**corresponding** 162:5

**cost** 74:4,19 117:24
121:25 127:10
131:20

**costs** 72:22 73:13,21
74:9 94:10,18 95:4,9

**counsel** 8:16 9:25
12:25 14:16,19,21,
22 15:19 16:14
17:20 18:8,19,25
20:3,8,11 21:9
30:19,24 32:15 33:3,
4 39:2 46:7 48:5,11,
16,17,19 52:19,25
53:7 63:23 64:1 65:4
66:15 67:14,25 68:3
69:5,15,18 82:12
86:23 87:11,13
88:24 91:8 92:5,14
97:4,9 99:19 100:1
102:14 103:5,9
104:6,16 105:19
106:2,9,13,15
108:23 109:3,11,18
110:11 111:15
112:13 123:1 127:1
131:13 168:18

**counsel's** 18:11
109:5

**couple** 11:1 19:11,15
26:11 37:4 53:20
83:11 113:13 151:2

**course** 11:4 13:22
15:18 76:23 98:20
99:3 117:11

**court** 8:15 9:7 10:4
11:6 12:16,18,20

16:5,12,13 21:23
23:2 41:9 42:24
62:5,9,17 70:12,15,
17 75:7 79:5 82:22
88:19 94:12 96:25
100:16 107:18
129:13 130:10 131:2

**court's** 129:23

**courts** 72:4,8,9,11
100:2

**covers** 37:10

**coworkers** 18:6

**create** 151:6,10,11

**created** 150:19

**criteria** 145:2

**crop** 146:11

**culture** 145:9

**currencies** 139:3

**current** 24:23 60:11

**currently** 26:7 69:6

**custom** 25:6

**customers** 135:10
136:16

---

## D

**D-1** 26:14

**D-10** 166:5

**D-2** 28:6

**D-3** 41:16

**D-3a** 43:4

**D-4** 75:11

**D-5** 79:10

**D-6** 83:2

**D-7** 91:3

**D-8** 97:5

**D-9** 108:1

**damaged** 83:21

**damages** 165:22
168:22 169:12

**data** 81:13 145:13
151:10 155:9 156:11

**date** 23:25 24:4,9
37:5 63:25 64:13
75:21 81:21 82:7
85:22,23 157:22
158:6 159:3,5
160:21 162:15,23
164:3,11,14,21
166:10 167:5 169:18
170:5,8

**dated** 24:9,12 43:1
85:7 170:22

**dates** 16:18 20:14
155:25

**Davidson** 8:14

**day** 11:5 81:22 91:21

**day-to-day** 138:13
146:5

**days** 172:21,23

**deal** 37:20

**decide** 72:11 141:15
142:3,17,22 144:24
153:22

**decided** 17:16 46:6
68:2 72:3,7,9 160:20

**deciding** 35:7 142:13
143:14

**decision** 20:14 33:22
35:11 47:23 53:5
55:3 65:7,14 66:14
146:21

**decisions** 48:13
136:16 137:7 142:11
144:7 149:3,12,16
150:7 163:14

**declaration** 88:20
91:4,11,20 92:24
135:13

**decrease** 38:15

**defendant** 41:11,18
42:4 59:21 107:21
108:3

**defendants** 8:20,22,
25 9:22 116:12
125:18,25 128:2,22
132:12

**Defendants'** 26:13,
15,24 27:1,4,13,24
28:8,14,16,23 29:2
39:19,25 41:24 42:2,
25 43:11,15 44:7
46:16,19 47:18,21
49:4 51:18 53:19
54:12 55:17 65:18
66:11 72:15 75:8
78:4,6 79:6,18
82:17,22 83:13
84:20 85:4,10 86:25
87:20,24,25 88:19
89:14,23 90:12 97:1
98:10 101:1 102:11,
17 107:19 116:3,4
165:24

**define** 92:23,24 93:11
139:8,19

**defined** 93:8

**definition** 139:5

**defraud** 126:2

**defrauded** 117:23

**degree** 152:24

**deliver** 158:13

**delivered** 157:25
158:16,17,21

**demand** 84:1

**demands** 31:19

**demonstrated** 124:17

**department** 113:24
119:1,15 123:6
127:15 134:15
136:22

Confidential

Grae vs. Corrections
Corporation of America, et al.

Eleanor Innes - 30(b)(6)

**department's** 134:8

**departments** 81:13

**depending** 112:2
139:5 142:5

**deposed** 10:16 36:9,
11

**deposition** 8:5 9:18
10:24 11:7 12:16,17,
24 14:8,10 18:22
21:10 22:2,21 26:16
27:4,9,12,18 28:9,17
29:9 30:19 39:13
42:8 78:6 84:9 87:21
88:1 98:11 99:16
116:5 132:6

**depositions** 31:17

**derivative** 37:1,8
38:6,22,25 39:3

**derivatives** 36:24

**describe** 21:25 22:14
37:6,12 52:3 54:3
73:11 91:24 99:17
137:16 142:20 145:1
153:18 154:24

**described** 20:8 48:14
123:24 146:12

**describing** 38:7
121:6 129:15

**description** 49:13
55:1 58:6 92:20

**designate** 29:11,19,
24 30:5 33:22 35:11
40:16 66:20 73:3
78:22 88:10 99:5
116:16

**designated** 27:16
30:6 32:9,20 33:13
35:16 39:14 66:24
73:8 76:2 79:2 88:15
99:12 116:22 127:25
128:20

**designee** 32:5 130:14

**designing** 152:9

**desire** 13:17

**detail** 129:18

**details** 17:18 38:17

**determine** 156:4

**determined** 70:11,15,
16

**development** 25:9

**difference** 20:25
126:7 138:16

**different** 35:24 38:17
62:3 80:22,23 90:19
150:10

**difficulty** 16:25

**diligence** 145:11

**direct** 39:24 42:10
49:2 65:17 78:3
83:12 92:8 98:8,13
122:2 138:12 146:23
147:20 148:10

**directing** 92:6

**direction** 112:21
154:13

**directly** 26:2,8 94:11

**director** 24:25 25:4
32:17

**directors** 133:17

**disbursement** 73:21

**disbursements** 72:22
73:14 74:4 95:4,9

**disclose** 109:17

**disclosing** 30:22
34:17 50:15 123:4

**disclosure** 17:9

**disclosures** 165:1

**discrete** 97:16

**discuss** 31:23 40:25
41:2 146:9

**discussed** 24:7 29:17
39:10 62:19 81:21
162:7

**discussing** 21:5 24:1
32:6 103:2

**discussion** 31:13,15,
18,25 35:19,21
48:15,18 53:7 172:7

**discussions** 30:22,25
31:4,9 32:2,4 63:22
64:1 103:3,4 105:17,
18 117:11 131:12

**distinction** 17:10
21:7

**District** 8:9,10 49:9

**diversity** 150:13

**dividend** 158:1,22

**division** 18:7 134:9
138:3,8 144:21
145:20 147:14,22

**divulging** 32:14

**docket** 83:19 84:21

**document** 26:21
28:20 41:15 46:11,
12,13 69:2 75:16
79:21,25 80:7 81:6,
7,8,11 82:14 83:11
84:15,19 85:1 91:13
97:17,20,23 98:3,6
100:19 108:10 110:6
154:18 155:19
156:1,4,8 157:16
163:16,19 164:11,24
165:15,16,25 166:4,
14 167:16 169:3,6,9
170:6

**documents** 15:20,22
16:3,12,16 17:4,6
19:23 20:1 21:9,13,
14,21 22:3,7,15,19,
23 23:1,7,10,14,21
24:1,5,7,9,12 42:7

82:8,9,11,20 86:20,
22 100:18 107:22
108:5,16,19 109:6,
13,20 110:1,4,5,17,
19,21,23,24 111:2,7,
11,17,24 112:8,14,
16,22 113:10,15,16,
20,25 114:3,8,25
115:9,19 166:18

**doing** 93:12 99:6

**DOJ** 119:21 120:3,16,
19 121:5,15,16,21
123:24 124:1,7,15,
23 128:9 131:15

**dollar** 72:12

**DOP** 128:9

**doubt** 155:24

**Dowd** 9:5 84:2

**drafting** 77:7 87:3
98:6

**drawing** 17:11

**driver** 33:21

**Drug** 43:22 53:23
56:6

**due** 158:6,18

**Duke** 44:5,14,17,22
45:12,17 46:4,8
47:24 58:11,15 59:3

**duly** 9:10

**duties** 91:25 92:3,12,
20 99:7

**duty** 92:2

**DVD** 63:6 107:10

---

**E**

**E-b-i-x** 36:22

**E-l-e-a-n-o-r** 10:5

**e-mail** 42:25 43:5,8,
14

**earlier** 19:25 20:1,24 35:20 40:22 53:4 55:4 62:2 74:22 94:17,22 95:20 137:20 156:23 162:25 164:25

**earnings** 151:24 153:5

**easier** 62:8 140:15

**easily** 150:23

**Ebix** 36:20 37:7 38:11,15,22,25 39:3

**ECF** 169:1,5

**effect** 12:20

**efficiently** 10:25

**Eight** 24:16

**Eileen** 9:10 149:8,10 162:6

**either** 30:23 55:9,11, 14 71:18 123:6 154:1

**Eleanor** 9:9 10:5 88:20 91:4

**employed** 24:18 25:14

**employee** 24:15 26:7

**employees** 26:2,5 135:1,9 147:7

**employment** 25:12

**ends** 169:18

**Energy** 44:6,14,18,22 45:12 46:4,8 47:24 58:11,16 59:4

**engage** 68:2 156:24 157:9

**engaged** 122:18 124:5

**engagement** 52:24

**engaging** 125:19

**ensure** 10:23

**entailed** 52:8

**entire** 42:13 57:6 83:9 92:15 130:8

**entities** 95:13

**entitled** 75:9 129:1

**entity** 65:13 123:22

**entry** 51:23

**environmental** 136:10,12

**equities** 25:1,4 32:18

**equity** 25:6,16 139:2, 10,12

**Erik** 8:14

**ERISA** 136:23

**escapes** 123:19

**ESG** 136:4,8 137:2

**essence** 38:4

**essentially** 43:15 81:16

**established** 48:8

**estate** 139:14,15

**estimate** 15:9,13 19:18 22:6 56:21,23 167:22

**estimates** 151:24

**et al** 8:8 43:23

**evaluate** 152:20,23

**evaluator** 145:13

**event** 75:19

**events** 15:23 16:17 20:12

**exact** 64:13 143:1,11

**exactly** 24:12 115:13

**examination** 9:13 29:6,15,20,23 40:1,6 65:21,25 66:10,13 72:15,16,17,18,20 78:9,12,16 88:5,16

98:14,15,22 99:3,13 116:8,10,23 129:9 132:7 172:25

**examined** 9:12

**example** 20:13 113:6 139:2 140:7 146:25

**excuse** 44:7 46:22 66:6 71:23 162:14

**executed** 47:13 92:24

**executives** 131:9

**exhibit** 26:13,14,24 27:1,13,24 28:6,14, 23 29:2 39:19,25 41:10,16,25 42:3,25 43:4,11,16 44:7 46:16,19 47:18,21 49:4 51:18 53:19 54:13 55:17 65:19 66:3,11 72:15 75:8, 11 78:4 79:6,10,18 82:18,22 83:2,13 84:20 85:4,11 86:25 87:20,24 88:19 89:15,24 90:12 91:3, 10,18 97:1,5 98:9 101:1 102:11,16,17 107:19 108:1 109:7 116:3 135:13 148:8 154:16 165:24 166:5 168:11,14 169:4,16 170:3

**exhibits** 26:11 55:19

**expected** 72:23

**expenses** 72:22 73:14,21 74:4,9 94:10,18 95:4,9

**extent** 11:21 32:11 67:17 68:5 69:25 168:4

**external** 140:19 145:12

**externally** 144:12

### F

**Facebook** 60:2,5

**facilities** 117:25 119:12 120:13 127:9

**fact** 46:9 80:17 81:21 91:17 101:15,17 114:23 118:9,23 119:7 120:22 122:6 124:23

**factor** 35:3,7 137:3

**factories** 153:3

**factors** 136:4,8,11 142:22 151:5,7,9,10 163:17

**facts** 16:17 17:5 21:11 40:7 98:23

**fair** 31:18 77:6 80:2 92:12 102:19 112:6 114:10 164:22

**fairly** 93:23

**faith** 92:16,25 93:10, 12

**false** 118:3,8,10,15, 22,23 119:7,24 120:4,16,21,25 121:9,12,19 122:18 124:6,18,22 125:14, 19 126:18 127:4,13 131:10

**familiar** 17:14 18:14 20:25 27:11,23 44:9 49:11 52:1 54:1 60:1 69:20 70:4,8 91:13 122:6 133:7,13

**familiarize** 26:21 28:20 41:15

**familiarized** 16:7 20:3

**family** 147:24

**Faraz** 43:2

Eleanor Innes - 30(b)(6)

Confidential

Grae vs. Corrections
Corporation of America, et al.

**fault** 23:19

**federal** 75:10,12 79:8,
12 82:25 83:4
116:13 128:23
168:23 172:17

**fee** 70:20,22 71:4

**feel** 39:17 97:13
131:7

**fees** 69:22 70:5
71:17,22,25 72:22
73:20 95:3

**felt** 34:20

**fiduciary** 92:11
136:23

**figure** 12:9

**filed** 75:9,20,21 76:1,
14 77:11 78:17
82:25 83:4 84:12,21
85:1,13,25 86:3,5,11
87:8,18,19 88:7 89:7
90:2,9 97:24 98:3
100:10,16,23 101:5
102:22 127:8 154:18
166:4 168:18 170:8,
12 171:7

**files** 111:22

**filing** 82:2,6 86:12
89:19 90:6,10,15,20
102:21 116:25 117:6
151:15 171:13

**filings** 16:5,12,13
21:23 22:1 150:14
151:13,18 161:5,17

**financial** 61:11,21
137:4

**fine** 15:12 20:23
24:13 37:13,15 38:1
113:18 130:3 144:15
153:24 166:20

**finish** 11:9,10

**firm** 9:20,24 39:5,6
45:11,15,16 46:4

50:6 56:16 58:6
60:18 66:14 67:24
68:23 69:1,7,9 70:25
73:13,25 145:9

**firms** 67:3,7,10,14
71:18 94:25 137:12

**first** 11:4 17:15,16,25
19:8,12 20:3 21:1
22:5,8 23:23 41:12,
19 42:4 44:20 53:22
75:20 76:14 83:12
107:21 108:4 110:21
132:16 135:14 154:8
159:9 160:12,13,16

**five** 15:1,2,4 18:21
19:7,14 22:11,12,13
23:6 44:2

**fixed** 139:12 147:15,
18

**flip** 46:22,24

**flow** 145:2 146:7

**flows** 143:6,8

**focus** 54:9 140:2,3
149:23

**focused** 16:12 23:6
78:12

**focusing** 17:24 56:2
93:8 116:7 142:1

**follow** 48:13

**follow-up** 151:2

**followed** 53:11

**following** 56:25
116:15

**follows** 9:12 72:25
88:8

**footer** 166:3 169:5

**Footnotes** 157:24

**force** 12:19

**foregoing** 73:3 78:14

**form** 16:21 20:16

23:12 30:8 33:6
34:22 35:5 39:21
53:1 57:2,11,25
61:14 62:12,20
64:25 67:16 69:24
73:15 85:17 86:1,15
90:21 93:2,25 95:16,
24 96:10,22 100:12
101:7,12 102:7,23
104:8 105:6,13,20
106:18 110:8 111:4,
12 112:11 114:18
115:22 117:21
118:11,18,24 119:8,
18 120:6,17 121:10,
20 122:12,20 124:9,
25 125:21 126:3,10,
15,23 128:4,11,14
130:20 134:19 135:2
140:9 141:17 142:4
143:23 147:9 149:17
150:3 153:6 157:1
159:15 160:5 161:14
166:16 167:25
169:13 170:14,23
171:9,18

**formally** 9:19

**forth** 17:16 29:7 30:3
39:10 79:25 83:19
129:11,19 130:8

**founded** 136:5

**four** 9:21 15:14,16
18:21 19:7,14,20,21
131:9 135:15
144:16,17

**fraud** 59:1 63:20 64:7
65:2 68:17 100:6
119:9,16 125:20
170:12

**free** 97:13

**Friday** 43:1

**front** 40:2 46:14
75:17 83:14 168:12

170:3

**fulfill** 99:7

**full** 10:4 69:1,4

**fully** 129:11

**fund** 25:15 26:18 27:6
28:11,18 34:6,13
44:25 45:1,5 52:12
57:9,10 83:18
113:23 117:13
139:10,12,15,20
142:8,14,25 143:7,9,
15,22 144:4,8
146:22 147:8 149:19
150:1,6,8 151:4
155:4 156:13,24
158:9,13 159:9,18,
22 160:1 162:14,18

**fundamental** 150:11

**funding** 72:21

**funds** 32:19,24 38:9
45:6,7 50:1,2 52:13
134:20,21 137:17,
22,25 138:17,19,21,
24 139:2,3,16,17,21,
25 140:3,4,5,7,12,
14,16,17,20,22
141:2,5,10,12,13,15,
19 142:2,17 143:17
144:12 147:24,25
148:6,15,22,23,24,
25 149:1,19,20
154:3 155:14,21
156:5 157:5,8,9
158:8 159:24 160:24
161:5,8,16 165:19
170:15,16,20 171:3,
6,19,24 172:2

**further** 152:21


**G**

**gain** 167:8,17,19

Eleanor Innes - 30(b)(6)

Confidential

Grae vs. Corrections
Corporation of America, et al.

**gain/loss** 168:8

**Garrison** 68:23 69:11

**gathered** 81:8
113:14,16

**gathering** 113:20

**gears** 144:11

**Geller** 9:2,5 55:8
56:16 57:23 58:6,12
60:18 64:10,12,14,
19 67:2,12,24 68:3,
15 69:21 70:6,13,21,
23 71:6,10 72:1
73:13,18 74:23 75:3
81:10 84:2 89:7
90:7,9 109:15

**Geller's** 61:1

**general** 14:16 18:1,8,
11,19 25:2 31:15
32:15 33:3 35:20
36:1,2,4 42:20 44:23
46:6 48:5,11,13,16,
17,19 49:13 52:3
53:7,21 54:3,15
63:22 64:1 65:4
66:19 71:24 73:1
78:14,21 88:9 99:4
114:16 115:4
116:15,17 122:25
139:12

**generally** 22:14
27:11,23 29:13 37:6,
13 38:1,3 40:17 41:2
44:2,11 49:12 52:2
53:11 54:2 58:18
68:7 70:7 73:11,16
86:18 103:22 108:24
114:17 117:11
140:10

**Generic** 43:21 53:22
56:6

**Geo** 123:16,21 124:2,
5

**gestures** 11:23

**getting** 104:6 109:5
113:25 130:7

**gist** 38:4

**give** 14:3 15:5,9 18:1
19:18 21:15 22:6
38:4 49:13 56:21,23
58:5 59:10 146:6

**given** 32:24 33:19
37:3 143:1

**giving** 11:6 36:12,14

**Glennon** 8:18 9:14,20
17:1 20:19 23:16
26:12,19 28:4,12
30:10 32:21 33:9
34:8 35:1,9 37:14,24
38:2 39:23 41:22
43:6 45:23 48:7
50:13 51:10,14 53:3
57:4,14 58:3,14,24
59:13 60:13,24 61:9,
18 62:1,15,24 63:8
65:5 66:2,6,9,12
67:22 68:10,21 70:2,
3 73:19 74:12,14,21
75:15 76:8,18 77:5,
16,18,23 78:1 79:16
82:21 83:7 85:21
86:4,21 88:18 89:2
90:23 91:9 93:7 94:5
95:19 96:1,4,13,24
97:12 100:15 101:8,
14 102:5,9 103:1,14
104:11,13,18 105:7,
9,15,23 106:23
107:4,12 108:8
109:4,12,23 110:14
111:9,18 112:17
113:1,7,17 114:9,21
115:7,16 116:1
118:2,13,20 119:4,
13 120:1,14 121:2,
14 122:5,15,23
123:20 124:13

125:5,16,23 126:6,
12,20 127:17 128:6,
12,18 129:4 130:3,
11,13 131:2,21
132:5 172:19

**go** 17:16 23:18 31:16
36:7 89:10 100:1,21
109:20 110:3 111:22
131:21 144:12,20,21
151:16 153:14
172:8,14

**goal** 143:10

**going** 11:1 22:4,7
25:11 26:10 29:4
30:2 31:20 32:10
35:16 37:18 39:9
40:4 41:9 42:24 44:1
45:20 51:2,12,18
53:18 60:20 61:4
62:7,24 63:2 65:17
72:14 75:7 78:3 79:5
82:21 83:8 85:4
86:16 87:23 88:18
96:25 97:15 98:8,13
107:6,18 111:24
112:8 113:9 116:2
129:8 130:2 131:24
132:12 165:23
172:11,16

**good** 9:15,16 12:3
34:15,21 63:9,10
92:15,25 93:10,12
136:2,3 137:5
171:16

**governance** 22:17
23:7 44:15,17,21
49:16,17,19 52:5,8
54:5,8,17,20 58:21
133:14 136:4,11,13
137:12,16,18 150:12

**Grae** 8:7 75:21

**Gregory** 49:9

**ground** 11:1,14

**group** 123:17,21
124:3,5 155:5

**growth** 150:10,17
153:3

**guess** 16:24 157:23

---

### H

**half** 15:14,15 167:2,4
170:11

**handful** 14:24 18:20
22:10 56:25

**handing** 28:13

**happen** 103:13 143:5

**happened** 17:7,8
147:1 158:5 163:6

**happens** 146:8

**happy** 12:9

**head** 11:20,24 113:23
159:11 162:24

**headline** 152:18,21
153:11

**headlines** 150:14
152:1,12

**heard** 117:7,9,10,14

**heart** 54:21

**hedge** 139:2 171:25
172:3

**Heights** 10:9,13

**held** 117:15 132:19
142:7 143:6 154:1,3
155:14 159:21,23
169:18,21,23

**help** 12:11 29:13
135:22,23 136:3

**helped** 113:24 114:2,
4

**helpful** 101:1

**helping** 136:6

Confidential

Eleanor Innes - 30(b)(6)

Grae vs. Corrections
Corporation of America, et al.

hesitate 12:6

history 145:4

Hogan 79:8,13 80:11,
15 81:3 85:19,24
87:10,13 89:6 90:5

hold 142:25 144:3
147:3 163:1 165:19
170:10,15,17 171:3

hour 15:14,15 19:20,
21

hours 15:14,16 18:21
19:20,21

housing 139:11

huh-uhs 11:19

---

**I**

I-n-n-e-s 10:6

idea 57:5

identification 26:18
28:11 41:20 43:5
75:13 79:14 83:5
91:8 97:10 108:6
166:7

identified 44:3
112:21 114:23

identify 8:17 112:14
113:2 122:10

identifying 110:4
111:11 112:8

imagine 115:14

implement 153:22

important 11:8,18

in-house 14:22 15:19
16:14 17:20 18:19
25:6 30:23 145:12,
14

inaccuracies 47:21

Inc.'s 41:18 42:4
107:21 108:3

included 123:23

including 94:10
140:4

income 139:13 143:7
147:15,18

incorporated 83:20

incorrect 126:8

increased 151:23

incurred 72:23 74:5

independent 86:9

index 34:5,12 117:13
138:24 140:12
141:2,4,19 142:6,8,
14,16 143:1,3,4,6,7,
11,12,17 148:23,25
149:1,19 156:17
170:16,20 171:2,6,
19

indexed 25:6,15

indicate 153:21

indicated 84:18

indicator 153:12

individual 8:20 9:21
36:11 113:9 116:12
125:18,25 128:2,22

individually 29:8

individuals 26:1
34:20 35:7 39:16
43:3 114:12,23
115:6 134:13

industry 61:11,21

influence 142:22

influenced 163:17

inform 119:5

information 32:12,14
33:1 34:1,3 37:21
40:7 42:18 43:16
45:22 46:3 48:3
50:10,16 58:19 60:7,
21 61:2 67:18 68:6

70:1 81:8 86:17
98:23 100:7 103:9
105:10 127:7
128:17,25 130:23
131:17 149:25
150:15 153:13 156:6
159:12 160:24
161:25 163:10 168:2
170:21

informed 35:15

initial 17:19,24 21:19
23:13 24:6 76:1
79:24

initially 18:14 20:1

innes 9:9,15 10:5,7,
16 14:6 24:14 26:10,
14,20,23 28:6,13,22
39:24 41:9,16,23
42:24 43:4,10 47:6
53:18 56:15 61:10
62:2 63:9,14 72:20
75:7,11,16 78:13
79:5,10,17 83:2,8
87:23 88:20 91:3,4,
10,24 96:25 97:5,13
98:8 99:15 100:8
107:13,18 108:1,9
116:2 127:18 132:9
166:5

input 152:8 153:10
161:20

inside 14:21

insofar 71:6

instance 21:1 71:25
152:24

institutional 133:7

institutions 131:19

instruct 13:8 108:21
163:1

intend 97:15

intended 126:2

intends 92:13

intent 18:21

intentional 127:13

intentionally 126:14
130:18

interest 64:23

interests 93:23
136:24

internal 14:16 17:15
18:3 22:3,7

internally 44:23
141:21 142:2,15,16
154:2

interrogatories
41:12,19 42:5 65:20
148:9

interrogatory 42:11,
13,15 43:17 44:4,8
46:19 49:3 51:19
55:20 65:25 66:5
148:11

interrupted 135:25

intimate 35:3

introduce 9:19 26:11

introduced 9:17
132:10

invest 134:23 135:9
136:2 137:3 139:23
141:16 142:3,7

invested 139:11
172:2

investigate 22:8

investing 137:5

investment 17:8 18:7
20:14 25:8 26:18
27:6 28:11,18 44:25
45:1 49:24 52:11
61:12,22 62:11
80:12,18 83:18
132:14 134:9 136:15
137:1,15 138:3,8

139:2 144:21 145:4, 8,19,20 146:21 147:13,22 148:21 149:12,15,21 150:7, 9 151:1 158:13 159:18 171:11

**investments** 32:23 137:4 138:9 139:13 160:25

**investor** 133:8

**investors** 95:22

**invoices** 71:7,17

**involved** 35:10,14 62:4 64:24 65:7 87:3 98:6

**involvement** 33:20 38:18 77:7

**issue** 15:24 20:12 49:16,19 52:6,8 54:6,8,18,20 64:7 65:2 130:6,15 146:5

**issued** 119:2,15 129:14

**issues** 44:17,21 58:21 146:11

**issuing** 60:10

**Item** 89:17

**items** 81:16

---

### J

**J-i-m** 25:23

**Jackson** 10:9,13

**Jacobson** 8:24

**Jersey** 148:21

**Jim** 25:20,23 31:6,9, 24 35:18 147:19

**Jim's** 25:24

**job** 24:23 25:3,13 34:15,21

**Johnston** 68:23 69:10,11,22 71:1,4, 12,15 73:25

**Johnston's** 69:14

**joining** 24:17

**Juan** 60:2,4

**Judge** 21:18 49:9

**July** 8:3 43:1 162:11

**June** 88:7 91:21 102:22 164:12,22,23 168:18

**jury** 84:1

**Justice** 119:1,15 123:6 127:15

---

### K

**K-i-m-a-n-i** 147:16

**Kang** 26:6

**keep** 129:7 130:1

**keeping** 38:3

**Kevin** 26:6,7

**Kimani** 147:14,16

**kind** 36:23 151:20

**know** 13:14 21:20 32:8 34:2 37:20 39:6 44:25 45:4,14,25 46:3 47:6,23 50:14 52:7,24 56:3,7,12 57:3,7,13,15,16,19, 22 58:4 59:14,17 60:4,25 61:7,24 62:5,9,14,16,22 64:2,6,11,14,17,22 65:6 67:7,10,20,21, 23 68:1,2,25 69:17 70:14 71:2,3,5,11 75:16 80:15,25 81:3, 4 82:5 85:20,22 86:11,18 87:6 89:22 90:24 98:1,5 100:17

101:3,15,17 102:1, 19 103:2,19 104:4, 19,22,25 105:4,17, 25 106:14 107:2 108:18 110:16,18 111:19 112:7 113:9, 13,19 114:22 115:2, 13 117:2 120:15 123:21 129:13 133:23,25 134:3,13 149:15,25 151:22 152:11,22 153:18,24 155:3,6,12 156:3,20 158:5 159:5,8,12,16, 20 160:19,23 162:4, 13,16,17,20,23 163:6 164:2,13 165:13,14,18 170:25

**knowledge** 32:23 33:19,20,22 35:3 39:20 40:7 48:24 53:13 60:17 61:13, 17,19 71:19 72:11 74:6 75:2,5 77:20,21 95:8,18 96:18 98:23 114:14 156:15

**known** 13:24 21:3

---

### L

**L-i-n-g-b-e-r-g** 25:23

**lack** 142:12

**large** 56:25 146:6 164:8

**larger** 136:6

**largest** 164:9

**Latham** 8:19,22 9:20

**law** 9:20 12:19 45:11, 15,16 46:4 50:6 56:16 58:6 60:18 66:14 67:3,7,10,14, 24 68:22 69:1,7,9 70:25 71:18 73:12

94:24 97:2,6 102:12 168:15

**laws** 75:10,13 79:8,12 82:25 83:4 116:13 128:3,23 168:24

**lawsuit** 13:23 15:24 16:8 17:25 18:16 20:4,12 21:11 36:23, 24 37:1 44:22 50:5 52:21,25 54:1,4,9,21 56:13 59:15,18,24 60:1,15 64:8,24 65:8 67:5,9,15,25 68:4, 15,17 69:5,18 70:6 71:19 95:10,15,21 96:9 100:11 103:6 116:25 117:6 126:13 154:10

**lawsuits** 42:16,21 43:18 44:2 53:20 54:23 55:9,11,15,16, 20 56:17 57:17,20, 23 62:3,19 75:4

**lawyer** 25:17 151:1

**lawyer's** 39:4

**lawyers** 50:21,25 103:11 132:11

**lead** 21:19 26:16 27:5 28:9,17 38:24 41:4 48:10,22 49:10 53:8 54:25 55:3,22 56:3, 8,13 78:7,19 80:5 84:13 85:13 88:1,21 91:5 92:10 97:2,6 98:11 99:7 101:10, 18,23 102:3,12,14 106:16 116:5 127:22 128:20 154:20 166:11 168:15

**leading** 124:7

**learning** 17:5

**led** 38:15 120:9 125:13

**left** 9:23,24 132:5
157:16 167:2

**legal** 14:17,18 21:21
47:10,11 70:5 71:7,
17,22 72:22 79:24
92:5 104:16 106:3,9,
13 109:3,5,11
111:15 112:13
124:10 125:1 126:4,
16,24 128:15,24
130:20 131:12 168:5
170:24 171:10

**length** 19:19 145:3,4

**lengthy** 75:17

**Let's** 44:5 89:10
100:21 172:14

**level** 33:20

**lied** 128:8 129:3
130:18

**limitation** 20:13

**limitations** 140:6

**limited** 160:9

**line** 43:3 51:3

**lines** 135:15

**Lingberg** 25:20,23
31:6 35:18 147:19

**Liquid** 58:12

**Liquidators** 58:13
59:6

**liquidity** 150:22

**list** 18:1 26:4 42:15,
21 51:20 81:15
100:21 162:9

**listed** 27:12,24 39:18
43:3 44:6 55:16
132:17 155:19
156:1,16 160:16

**lists** 84:20 164:16

**litigant** 62:18

**litigation** 16:19

17:16,17 22:17
23:14 24:7 31:17
33:5,21 34:16 35:3
36:17,19 37:8 38:6,
22,25 39:3,7,11
43:22 44:10,13,14,
18 45:17 49:11,14
50:18,22 52:1,20
53:12,16,23 54:16
56:7,11 57:6,9 58:5,
8,10 59:4,9 60:5
63:15 65:3,15 68:16,
19 72:2 74:5,10,19
75:6,21 76:1,14,23
92:8 93:5 94:19
99:18,21,25 102:6
117:20 127:12
137:8,9,14 147:3,5
151:25 163:2

**litigations** 48:21
74:24

**little** 20:17 142:21
144:11 149:23
165:21

**LLC** 68:23 148:17

**loans** 139:13

**local** 9:25 69:5,15,18

**locate** 109:20 111:23

**located** 98:15

**logistic** 31:19

**long** 15:10 20:18
24:14,20 43:8
129:14 130:9 172:4

**longer** 80:21

**Longview** 26:17 27:6
28:10,18 32:19 38:9
45:5,6,7 50:1,2
52:13 57:9,10 83:17
137:17,22,25 139:9,
14 146:22 147:8,24
155:21 159:24

**look** 111:22 135:14

154:15,17 157:15
160:12 162:9 163:20
166:3 167:1 168:11
169:3

**looked** 17:6 23:1
154:16

**looking** 17:5 38:9
40:13 55:19 94:2
110:13 158:24

**looks** 160:13 163:22
167:11

**loss** 167:9,17,20,21
169:9

**losses** 166:1,6
167:23

**lost** 94:10

**lot** 38:17 160:23

**lower** 42:19 60:11
127:9

**Lumber** 58:12 59:6

**lying** 126:9,14

---

**M**

**maintains** 60:18

**major** 132:21

**majority** 133:20

**making** 33:21 35:10
48:12 121:9 124:6
125:19 144:7

**Mallinckrodt** 43:23
54:11 55:24

**manage** 137:25
140:17 141:4,9
142:15

**managed** 45:5
134:13,18 138:6,17,
19,21,23 140:16
141:21 142:2,16
144:12 154:1,2
159:22 160:1 161:5,

**8**

**management** 18:7
24:19 25:8,12 38:19
119:11,17 120:23
121:1 122:3 134:7,9,
10 138:3,7,8 144:21
145:6,20 147:13,22
148:17,20 149:21

**manager** 25:15 32:18
34:6,13 80:12,18
117:13 142:16
143:20 145:5
147:15,18 149:11
151:1

**managers** 145:8

**manages** 138:2,4
141:13

**managing** 25:5 33:1,
15 99:17 145:8

**March** 83:1,4 84:21
85:1 86:6,14 90:3
100:24 106:16,24
160:14

**mark** 26:12 37:15,18
41:10 42:25 47:6,9
75:8 79:6 82:22
88:19 97:1 107:19
165:23 172:17

**marked** 26:18 28:11,
14 29:2 37:22 41:20,
24 43:5,14 75:13
79:14,18 82:17 83:5
89:14,23 91:8 97:9
108:5 166:6 169:4

**market** 146:9,15

**marketing** 25:9

**Martin** 68:23 69:11
113:22 114:11 115:3
155:4

**match** 142:14 143:10,
11

**matter** 29:25 47:25

Confidential

**Grae vs. Corrections**
**Eleanor Innes - 30(b)(6)** **Corporation of America, et al.**

50:8 56:4 63:12
132:6 135:13

**matters** 8:7 30:14
31:2,11 32:6

**maximize** 92:4,9

**maximum** 92:14 93:5,
15 94:2 99:20,24
100:2

**Mcgee** 8:23 9:25

**mean** 12:8 14:19
16:23 20:13 33:8
100:5 135:18 136:9
151:5 169:21

**meaning** 65:9 134:24
152:15

**means** 12:18 27:20
105:4,11

**measures** 150:22

**meet** 14:12,14,22

**meeting** 19:12 23:15
36:1,2,4

**meetings** 15:6,10,19
17:15,19,20,24 18:2,
3,14 19:14,19,22
20:7,10 21:8 22:24
44:23 106:11,12

**members** 18:6,9
92:12 93:24

**memo** 123:24

**memorandum** 97:2,6
102:11 119:1,2,5,15,
22 120:20 121:5,16,
17,22 122:10,14
123:7 124:1,7,8,15,
16,23,24 127:16
131:15 165:5 168:15

**memorandums** 21:17

**memory** 106:19

**Menold** 49:6 55:23
56:2

**mentioned** 18:24
19:25 59:6 69:8
136:8

**meritorious** 92:16
93:1,11,13

**met** 14:15,16 18:18,
24

**methods** 168:7

**middle** 8:10 168:19

**million** 58:23 168:22
169:12

**mind** 11:2 133:1

**minus** 150:20

**minutes** 18:20

**misleading** 38:14
100:7 118:10,15,22,
23 119:7,10,16,25
120:5,16,21,25
121:9,13 122:19
125:14 126:19
127:4,14 131:10

**misled** 117:23 126:18

**missed** 153:10

**mission** 135:19

**misspoke** 104:24
157:7

**misstates** 95:25
120:18 125:1

**model** 139:22 150:19
151:8,12 152:5,9,11
153:10,14,20 156:18
161:21

**Mohammadi** 43:2

**moment** 10:19 25:11
26:10,21 28:19 36:7
37:14 41:14 43:7
47:3 74:25 89:11
131:22

**money** 134:23 135:9
137:13 145:8

**monitor** 92:5 145:15

**monitoring** 60:19
61:1

**month** 170:11

**monthly** 71:8 104:23
145:22,24 146:10

**months** 19:11,15
37:4

**Morgan** 8:21 9:23
132:9

**morning** 9:15,16 10:2
63:9,10

**motion** 21:18,19
78:18 80:4 88:6,21
91:5 97:3,7,21
101:10,22 102:12
154:19 166:15
168:16

**Movant's** 165:25
166:6 167:13

**move** 48:25 51:12
53:18 55:3 137:15

**moved** 49:9 54:25
55:21 101:16,18
106:16 166:11

**moves** 10:24

**Moving** 147:23

**Mulvenna** 9:10

**Mutual** 24:19,20
25:12

---

**N**

**name** 8:14 10:4 21:21
39:4 58:5 69:1,4
117:9,10 123:19,22
132:9 133:6 147:16,
17

**named** 38:21 40:9
42:16 48:22 79:7,11
84:13 85:13 98:24

**monitor** 92:5 145:15

101:18 102:3 117:7
124:2,3

**narrow** 130:5

**nature** 18:15 37:6
54:4,16 59:17

**Navient** 49:6 50:5,18
51:16 55:23

**near** 128:9

**need** 13:13 16:11
82:9,14 109:16
146:4

**negative** 152:21

**negativity** 152:25

**never** 61:20 106:4

**new** 8:12,13 9:11
10:10,14 17:5
148:21 153:10

**Newark** 148:21

**news** 150:14 152:1,
12,18,21 153:11
171:16

**Nieman** 44:5,9,12

**Nikki** 8:7 75:20

**nods** 11:19,24

**non-court** 21:25

**non-quantitative**
159:25

**nonverbal** 11:23

**Notary** 9:11

**note** 28:1 61:4 132:4
154:16

**Noted** 51:10

**notice** 11:24 26:15
27:4,9 28:8,16 51:4
57:12 78:6 88:1
98:11 116:4

**notices** 127:8

**number** 29:5,10 43:2
46:25 57:1 62:3
66:10 84:20,21

Confidential

Eleanor Innes - 30(b)(6)

Grae vs. Corrections
Corporation of America, et al.

106:17

**numbers** 26:14 28:6
41:16 43:4 75:11
79:10 83:2 91:3 97:5
108:1 166:5

**numerous** 81:12
112:25 123:12
141:19

---

**O**

**O'neil** 113:22 114:11
115:3 155:4

**O-l-i-e-v-e-r-a** 147:17

**oath** 12:16 63:12
107:16

**object** 13:8 32:10
51:3 61:5 68:5
167:25 168:4

**objection** 16:21
20:16 23:12 30:8
33:6,24 34:22 35:5
39:21 45:18 53:1
57:2,11,25 58:9
61:14 62:12,20
64:25 67:16 69:24
73:15 76:4,15 77:3,
12 85:17 86:1,15
90:21 93:2,25 95:16,
24 96:10,22 100:12
101:7,12 102:4,7,23
104:8 105:6,13,20
106:18 107:1 109:8,
22 110:7 111:4,12
112:11 114:18
115:22 117:21
118:11,18,24 119:8,
18 120:6,17 121:10,
20 122:12,20 123:15
124:9,25 125:21
126:3,10,15,23
128:4,11,14,19
130:4,19 133:21

134:19 135:2 140:9
141:17 142:4 143:23
147:9 149:17 150:3
153:6 157:1 159:15
160:5 161:14 166:16
169:13 170:14,23
171:9,18

**objections** 28:2,7,15
29:1 40:15 41:11,18
42:4,20 61:23 66:19
73:1,3 78:5,14,21
87:25 88:9,10 98:10
99:4 107:20 108:3,
15 112:23 113:4,12,
21 115:1,11 116:4,
15 125:8 130:2,19
131:6

**obligated** 74:8

**obtain** 92:14

**obtained** 72:2

**obvious** 156:3

**obviously** 11:16 18:6
51:7 83:9 97:13

**occasions** 18:20

**occurred** 160:14
164:17

**October** 40:19 64:3
78:17 79:9,13 81:23
85:7,23 86:13 90:1,
25 166:4,10

**offer** 138:18 139:1,4

**offered** 63:16 80:4

**offerings** 139:7

**office** 18:11

**officer** 25:25 114:4,
13 126:1 147:20

**officers** 138:12 147:7

**official** 21:20

**officials** 38:15

**Oh** 21:14 166:23

**OIG** 165:4,7

**okay** 10:22 11:3,12
15:4 16:2,15 17:7,
13,19 19:12 21:4,7
30:11 63:17 76:19
82:13 87:15 105:3
108:24 109:16
112:1,6 114:22
115:8 121:15 132:15
140:2 144:17 149:23
153:18 157:23
158:24 165:9 172:6

**old** 158:20

**Oliviera** 147:14,16

**Once** 10:21,22

**ongoing** 60:16

**opening** 157:17,21
158:24

**operates** 114:17

**operations** 112:3
113:24

**opportunity** 13:3
26:23 28:22 41:23
43:10 79:17

**opposed** 11:23 34:19

**optimistic** 151:23

**option** 157:9,13

**order** 37:10,17 68:18
82:14 93:5 100:2
108:19 129:14
139:22 147:4 151:17
154:9

**ordered** 94:12 167:4

**ordinary** 117:10

**organization** 122:18

**organizations** 135:20

**originally** 23:18,21

**outcome** 51:15 53:16
55:13 59:23 60:14

**outright** 126:9

**outset** 9:17 53:15

**outside** 14:19 17:22
18:25 20:8,10 21:9
30:24 32:3,15 33:3
63:22 67:11 74:20
103:5 104:5 105:18
106:1,15 111:15
123:1 135:7

**overall** 35:8

**overarching** 143:10

**overlooked** 136:7

**overriding** 137:3

**overrule** 146:20

**oversee** 137:21

**overseeing** 146:19

**oversight** 25:7
138:10 147:20

**overview** 25:3,13

**owes** 92:11

**owned** 45:1 49:25
132:23 147:25
157:21

---

**P**

**p.m.** 43:2 131:24
132:3 172:11,25

**page** 39:25 42:11,19
44:6,7 46:20,22,24,
25 49:3 51:19 65:22,
23 66:11,19 72:18
75:22 78:9 83:12,25
88:3 91:18 98:16,17
116:9,14 148:10,12
157:15 160:12
166:21 167:2,4,12
168:13,19 169:17

**pages** 167:3

**paid** 71:25

**papers** 88:7

paragraph 83:13,16
85:15 92:7 93:9 94:6
135:15 149:7

parameters 150:20

Pardon 38:20

parentheses 167:8

part 34:23,24 47:10,
11 81:1 96:12,14
106:9,10 112:3
125:13 145:3,20

Partially 122:25

participate 113:14
144:2 154:10

participated 113:9,19
114:14,24 115:3

participates 103:4

participation 40:9
98:24 135:7

particular 29:12 35:2
39:20 54:21 77:7,10
78:11 91:18 98:2
132:25 143:11
146:15 156:12,13
163:18

particularly 164:8
171:16

parties 8:17

passive 45:5 139:25
140:5 141:14 148:25
149:1

passively 138:6,17,
21,23 161:5,8

pattern 114:16

pay 74:8,18

paying 71:7,9,12,14,
16 73:17 94:18 95:9

payment 69:22 70:5
73:13 94:7,23 95:3

PE 150:17

peer 145:6,7

penalty 91:21

pending 8:9 13:15

pension 134:20 135:8

people 16:18 18:5
81:12 112:25 113:14
114:1

percent 150:21

percentage 72:1,7,8,
12 134:12,14 153:25

perfectly 103:15

perform 31:20

performance 145:15,
21 146:5

period 12:24 15:5
16:14 83:21 93:20
95:15,22 96:17,21
119:24 120:4 121:19
122:4,19 124:6,18,
22 127:6 128:10
131:9 148:1 155:2,
18 160:7,10 162:19
164:10,17,20 165:12
168:9,22 169:24
171:17

periodic 71:12,17

perjury 91:22

permitted 156:24
172:3

person 19:4,5 31:1,
11 39:12 40:23
64:20 65:9,11 92:24
112:15 114:8 142:13
152:5 153:14

personal 114:14

personally 77:15,19
159:7

persons 65:11 93:17
95:13

ph 47:7 60:2

phone 146:9

phrase 92:25 93:9

pick 151:20,22 152:2

piece 38:13

Pinto 149:8 162:6

Pinto's 149:10

place 15:6,10 19:15
36:5

plaintiff 9:2,6 21:19
26:16 27:5,16 28:9,
17 38:21,24 40:16
41:5,10,13,17,19
42:3,5,17 43:15 44:3
46:8,9,15 47:24
48:10,22 49:9,10
51:23,24 53:6 54:24,
25 55:3,21,22 56:4,
8,12,13 59:21 66:20
73:3 78:7,19,22
79:7,11 80:1,5 82:1,
6,15 83:16 84:13
85:13,15 88:1,10
89:18 90:12 92:10,
21 98:12 99:4,7
101:10,15,18,23
102:3 106:16
107:19,22 108:2,5
116:5,16 127:22
128:21 148:14
154:20 166:12

Plaintiff' 83:18

plaintiff's 78:5 88:21
91:5 97:2,7 101:9,22
102:12 148:8,11
149:7 168:16

plaintiffs 29:10,18,23
30:4 95:21 96:6,9

plaintiffs' 28:7,15
29:1 87:25 98:10
116:3 129:10

plan 135:8

PLC 43:23

pleading 75:8 82:23

90:2 101:4

pleadings 16:20 23:2
100:10,14

please 8:17 9:8 10:4,
12 12:5 13:14 19:6
23:20 25:22 26:5
36:21 41:15 47:4
52:3 68:11 70:10
74:15 78:4 81:9 92:1
125:6 148:7 154:15

plus 150:20

point 11:25 12:4 13:3
42:21 49:5 51:20
63:19 82:1 87:18
98:9

pointed 119:9,16

points 55:17 151:10

policies 140:7

portfolio 32:18 60:19
61:1 142:16 143:20
144:5,8 145:5
147:15,18 150:19
151:11 158:6,8

portfolios 33:2,15,23

portion 37:15

portions 83:11

position 157:17
158:25

positions 172:4

positive 152:21

positive/negative
151:17 152:2,19

positivity 152:24

possible 10:25 11:21
90:18 92:15 93:15
97:14 153:2 156:4,
10

possibly 130:12

potential 20:4

potentially 67:4,9

**Confidential**

**Eleanor Innes - 30(b)(6)**

**Grae vs. Corrections
Corporation of America, et al.**

practice 48:9 114:16

practices 61:12,22
62:11 136:12 137:10

precisely 110:3

predated 159:2

predecessor 117:7

preeminent 135:20

premise 136:5

prep 16:14

preparation 14:10
16:8 21:10 22:2,21
42:8

preparations 14:7

prepare 51:5

prepared 29:22 30:18
40:25 41:2 155:3,6

preparing 18:22
30:13 81:5,7

present 8:17 40:8
144:23

presentation 48:10

presented 48:4

presently 10:7
123:23

president 24:25 25:4
80:12,18

previously 21:3 29:2,
18 62:19

price 150:17 163:25
169:19

prices 156:1

Pricing 43:22 53:23
56:7

primarily 132:23
134:20 170:16

primary 33:21 149:7

printed 167:1

prior 57:17,20 87:21
89:1 90:10 95:25

97:24 98:3 100:10
102:21 116:25 117:6
125:2 159:2

prison 119:3 122:7,
22 123:9,13,22
127:7

prison's 123:18

prisons 121:23,24
131:18

private 119:3 121:23
122:7,16,17,22
123:9,13,17,18,22
131:18 139:2,10

privately 132:19

privileged 30:23
32:3,11,14 34:1,18
45:21 48:2 50:10,15
58:18 60:7,9,21 61:2
63:23 64:5,22 67:17
68:6 69:25 86:17
103:9 108:22 110:10
123:4 128:17,25
130:23 168:2

privy 103:12

pro 94:8

probably 15:2 115:15

procedure 48:9,14

proceeds 169:19

process 53:10 55:2,5
132:14 142:20
144:22 145:2
153:19,23

produce 30:20
108:19 111:24 112:9

produced 110:1,17,
18 111:2,7 115:10,
14,21

producing 110:4
111:11,16 114:2

product 25:9

production 107:22

108:4,16 109:21
110:21 112:10
114:24

program 22:17 60:19
61:1 151:6

programs 111:23
136:12

progressive 135:20

projections 151:24

promise 163:20

proper 31:1

proposals 65:3

proposed 92:10 99:7

prospective 40:8
98:24 120:24

protect 93:23

protective 37:10,17

provide 25:2,13 26:4
70:9 92:12

provided 37:7 70:12
82:11 86:23 131:12

provider 145:13

provides 40:6 55:21
66:20 72:21 78:16,
22 83:16 88:5 92:7
94:6 116:10,16

providing 118:1
122:1 168:7

proving 100:6

PSLRA 129:17

public 9:11 123:18
125:11 131:16
134:21 144:9 150:13
151:13,15 152:16
153:11 161:5,12,17,
25

publicly 119:22
132:16

pull 158:12

purchase 154:9,12
160:13,16,20 162:10
163:18

purchased 83:20
93:20 95:14 96:16,
20 148:15 159:2,6,9,
21 162:14,18 167:2
171:23

purchases 162:10
165:25 166:6

purchasing 159:13
161:2

purported 40:10

purposely 117:22
126:18

purposes 158:14

pursuant 79:7,11
156:17 157:13
172:17

pursue 22:5 65:14
68:19 93:4 99:20,23
100:1,5

pursuing 22:18 45:16
127:12 137:14 147:3
163:2

pursuit 103:5

put 23:23 30:2 39:10
75:17 78:2 81:11,13
90:7 104:2 119:21
120:3 172:19

putting 79:25 109:2
121:1 156:7

---

**Q**

QMA 148:19 149:3,8,
10,16 162:2,6

QMA' 148:17

QMA'S 149:24

quality 117:24 121:23
127:9 131:20 150:13

Confidential

Grae vs. Corrections
Corporation of America, et al.

Eleanor Innes - 30(b)(6)

**quant** 140:11 141:9,
11 149:20,24 150:1,
6,8,18 151:4,8,12
154:3 156:23

**quantitative** 139:17,
19,21,22 140:4
148:16,20,22,24
156:5,17 159:24
161:16,21

**quantities** 155:25
164:6

**quarter** 134:11

**quarterly** 71:8

**Queens** 10:9

**question** 11:22 12:5,
10 13:10,15,16 16:1
21:8 23:11 24:2
32:13 34:7 45:22
50:11 62:8 68:11
70:1 74:15 76:7,12
87:10 89:1 96:2
103:8 105:22 106:21
109:1 112:19 119:20
121:4 125:4,6 129:5,
7 130:22 131:1,3
135:4 141:22 146:3
148:2 168:1,3

**question's** 131:8

**questioning** 51:3

**questions** 11:5,10
12:4,7 39:13 44:1
53:21 73:24 94:23
130:1 132:13 151:2
163:9

**quick** 35:25 36:1

**quickly** 39:9 49:1
77:1 161:1 172:9

**quote** 40:16

---

**R**

**Radcliffe** 9:4

**ran** 160:23

**ranged** 15:15

**ranging** 18:20

**rank** 150:9 151:5,17

**ranked** 150:18

**ranking** 152:19

**rata** 94:8

**ratios** 150:17

**reach** 67:13

**read** 40:4 42:13 43:7
68:13 74:16 76:11
77:2 83:9 104:14
106:22 125:7 131:5
148:4 172:16

**reading** 152:5

**reads** 40:15 78:13

**real** 139:13,14

**realize** 13:22 27:20

**reason** 13:14 14:3
47:20 84:25 155:24
156:16 158:16

**reasonable** 94:10

**rebranded** 13:24

**recall** 19:9 20:5 21:5
23:4 33:16 35:15
39:4 42:9 44:16
45:9,11 49:22 50:4,
17,20,24 51:1,15
52:9,15,18 53:15,16
54:7,19 55:10,13
56:5 58:25 59:19,20,
23 60:14 94:22 95:5
100:25 101:11,24
122:13 123:23,25
154:18 163:4 164:25
166:10

**receive** 143:18

**received** 82:19 143:6,
8 157:25 158:2,4,16,
17,20

**receiving** 64:18
112:20

**recess** 63:4 107:8
132:1 172:13

**recognize** 76:20
97:17 108:9 154:22

**recollection** 15:23
16:17 20:11 21:11
22:1,20 23:2,25
85:14

**recollections** 21:16

**record** 8:2 9:18 10:12
25:21 28:2 40:5
42:14 55:16 61:5
63:3,4,6 68:13 74:16
76:11 104:2,14
106:22 107:7,8,10
125:7 129:7 131:5,
21,25 132:1,3,5
145:5 148:4 162:21
167:1 172:7,9,12,13,
15

**recorded** 11:15

**recover** 38:10 93:5,
15 94:2

**recovery** 72:1,7,8
92:4,9,14 93:15 94:9
99:20,24 100:3

**redemptions** 143:9

**refer** 23:10 69:1,9
72:14 83:10 87:23
131:14 157:19 158:3

**reference** 83:20
119:11 168:14

**referred** 73:5 82:16

**referring** 13:21,25
46:13 55:16 87:12
89:4

**reflected** 16:19

**refresh** 15:22 16:16,
24,25 20:11 85:14

**refreshed** 21:2,10
22:1,20 23:1

**regarding** 21:20
22:16 38:10,17
44:15 57:9 60:9
68:16 73:25 74:4
117:24 131:17,18
149:3 162:2

**regular** 103:23 104:3,
4,16,20 105:1,4,11,
18 106:9 146:10

**regularly** 103:18
146:17

**regulator** 61:11,21

**reimbursement** 94:9

**relating** 40:7 88:2
94:11 98:23

**relation** 57:6

**relationship** 149:11

**relationships** 117:3

**released** 165:8

**relevant** 16:18 45:2
49:25 52:12

**relied** 159:13

**relies** 140:19

**rely** 145:12

**remember** 17:7 20:24
24:11 55:12 59:22
133:6 165:5

**remind** 16:17 63:11
74:23

**repeat** 68:10 74:11,14
76:7 104:9,13
106:21 125:5 131:3
141:22 148:2

**rephrase** 22:22 24:2
68:8 105:22 106:20
130:25 135:3

**report** 25:19 120:8,22
155:9 159:3 160:16
162:11 165:4,8

Confidential

Grae vs. Corrections
Corporation of America, et al.

Eleanor Innes - 30(b)(6)

167:16

**reported** 119:23
120:3

**reporter** 9:8 10:4 11:6
12:16 41:10 42:25
75:8 79:6 82:22
88:19 97:1 107:19
131:3

**reporting** 8:15 25:10
26:2,8 120:23
145:21,25

**reports** 119:21 120:3
127:8 128:9 131:11,
16 143:16,19,21
146:11 161:9,24

**repositories** 111:23

**represent** 9:21 29:10
39:12 50:22 55:8
74:23 75:19 84:18
93:18 110:20 165:7

**representation**
14:17,18 50:8 76:19
92:13 94:11,15

**representative** 27:17
35:12,17 38:5 40:9,
18 42:17 51:7,8
63:16 74:10 76:3
88:23 91:7 92:1,3,
11,21 94:8 97:4,8
98:25 99:8,16
102:14 168:17

**representatives**
34:14

**represented** 29:24
30:5 45:12 46:4
50:17 51:5 52:15
55:10 57:17,19,23
58:7,11 68:22

**representing** 34:16
39:7 67:4,9 71:18
75:3 132:11

**represents** 84:8

**reproduce** 142:9,19,
24

**request** 29:5 108:20
109:20,24 110:6,17,
21,24 111:8 112:2,
22 114:15,25

**requested** 109:7,11,
14 157:22 159:3

**requests** 30:4,6
107:21 108:4,16
110:2,19,23 111:3
112:9 113:8,11,20
115:5,10,20

**required** 13:9 146:1,2
170:17 171:3

**requirements** 35:21
171:5

**reside** 10:8

**respect** 14:21 24:1
39:17 55:14 71:18
114:11

**respond** 11:22 58:17
108:19 128:18 129:8

**responded** 129:22
148:14

**responding** 45:22
50:11 114:15

**response** 23:11 29:6,
10,15 40:13,14
42:14 44:4 46:18
49:3 51:19 54:24
65:22 66:18 71:17
72:18,25 73:1 78:9,
20,21 88:8 89:1
98:14 99:2,12 109:2
110:1,17,19 111:7
112:9 113:20 114:7
115:10 116:9,14
129:8,9 148:11

**responses** 28:7,16
29:1 41:11,17 42:3
43:17 55:7 65:19,25

66:5 72:16 78:5
87:25 98:10 107:20
108:2,15 116:4
148:9

**responsibilities** 25:3,
14 99:17

**responsibility** 136:19

**responsible** 25:5
81:5 105:17,21
111:10,16 112:8
135:16,21 136:2,15,
21 137:7,11 138:9
147:8 162:5

**responsive** 43:18
108:20 109:20,24
110:5 111:3 112:22
113:10 114:25
115:20

**rest** 48:25

**restate** 96:1 125:3

**restating** 153:5

**restrictions** 140:6

**restructuring** 158:19

**restructurings** 133:5

**result** 11:7 121:17
167:23 168:23

**results** 120:11

**retail** 134:16 136:21

**retain** 66:14

**retained** 56:15

**retrieve** 112:16

**reveal** 34:1 45:21
50:10 60:6,21 86:17
108:22 123:2 127:1
168:1

**revealing** 34:3 46:2
48:2 58:18 61:2
64:4,21 103:8
105:16 110:10 127:2
128:17 130:23

**revenue** 151:24

**review** 12:25 15:19
19:23 21:9 26:24
28:23 41:24 43:11
47:4 68:18 75:18
77:10 79:18 82:8,10,
14 83:9 86:19 97:14,
23 145:21

**reviewed** 16:2,13
20:1 21:22 22:4,7
42:8 77:22 80:7
82:2,6,15 84:15
85:15,19 87:7,17,20
89:7,8,18 90:2,5,8,
10,12,19,25 98:2
99:20 100:9,18,20
101:4 102:2,20
124:12

**reviewing** 22:23
26:22 28:21 41:21
43:9 47:5 72:19
75:14 78:10 79:15
83:6 88:4 91:15
97:11 98:21 108:7
111:16 148:13 166:8

**reviews** 65:3

**right** 28:5 66:1 84:9
90:20 91:22 94:19
104:15 111:24 126:9
133:1 167:4,8
169:17

**rights** 60:11

**rigorous** 144:22
145:2

**Riley** 8:23

**ring** 133:2

**Robbins** 9:1,5 55:8
56:16 57:23 58:6,11
60:18 61:1 64:10,12,
14,18 67:2,11,24
68:3,14 69:21 70:6,
13,21,23 71:6,10
72:1 73:13,17 74:23

75:3 81:10 84:2 89:7
90:7,9 109:15

**role** 32:24 35:22
40:17 51:6 59:3
62:18 69:14 143:20
149:10

**Ross** 133:8 134:3

**rough** 15:5

**roughly** 169:11

**row** 167:13

**Rudman** 9:5 84:2

**rule** 11:15 26:15 27:4
28:8,16 78:6 88:1
98:11 116:5

**rules** 11:1 172:17,22

**run** 131:19

**running** 167:3

---

## S

**safe** 52:23

**sale** 163:18 164:7,22

**sales** 155:1 156:21,
22 164:12,13,23
165:10

**sanctioned** 61:11,20
62:6,10,17

**saves** 75:19

**savings** 117:25
121:25 127:10
131:20

**saw** 23:21

**saying** 52:23 118:21
120:10 124:22 126:8
157:24

**says** 49:8 51:23 55:7
82:1 84:21 85:15
89:21 90:5,12
129:10 135:16 149:7
153:14 157:16 167:8

168:20 169:6,18

**scan** 164:5

**schedule** 31:20 34:23
154:17,22 155:12
160:13 164:16

**scheduled** 103:23
106:10

**scope** 51:4 57:12
58:1 61:6,15 62:13,
21 76:5,15 77:12
109:9,22 110:7
111:5,13 112:12
114:19 115:23
123:15

**scrape** 151:16

**screen** 151:15

**search** 109:6

**seat** 134:4

**seats** 134:1

**second** 11:14 40:15
49:5 156:8

**sector** 150:21

**securities** 40:18 41:5
43:22 52:12 53:23
56:7,16 57:20,22
58:7 59:1 60:10,12
63:20 64:7 65:2
68:17 75:10,13 79:8,
12 82:25 83:4 95:14
96:20 116:13 125:20
128:3,23 142:7,18,
23,25 143:3,15
148:16 149:4 153:25
154:1 155:14,18
159:10 162:2,7,15,
18 168:23 170:12,17
171:3,23

**security** 38:18 45:2
49:25 96:17 153:21
154:9,13

**see** 29:5,9 36:3
40:11,20 42:22

43:19,24 47:1,13
49:5 51:21 53:24
54:12 55:25 66:16,
22 72:5 73:5 75:23
78:13,24 80:10,13
81:18,20,24 82:3
83:23 84:1,3,5,23
88:12 92:17 94:13
99:9 102:15 116:19
121:3 135:15 146:13
148:14 149:2,6
153:14 157:16,23
167:7,14 168:19
169:16 170:5

**seek** 47:24 53:5,6
93:15

**seeking** 93:17

**seeks** 48:9

**seen** 22:23 27:1
108:12

**select** 144:18

**selected** 32:8 34:19

**selecting** 35:4

**self-explanatory**
158:23

**sell** 143:2 153:21
157:3,6,8 163:14
171:12

**selling** 156:24 158:10
161:3

**sells** 154:25

**send** 172:20

**senior** 24:25 25:3
38:15,19 80:12,17
122:3

**sense** 12:1 13:11
14:1 32:19

**sentence** 29:14 40:15
90:11

**separate** 139:24
140:24

**serve** 28:2 33:13 35:4
67:14,25 68:3

**served** 41:4 65:20
110:22,25

**services** 122:1
127:11 149:24

**serving** 35:22 69:4
94:7 110:22

**sessions** 30:23

**set** 41:12,19 42:5
83:18 107:21 108:4
129:11,19 130:8
140:3

**shakes** 11:19,24

**share** 94:8

**shareholder** 36:25
37:8 38:6,10,22,25
39:3 59:14 68:16
133:10 147:3

**shareholders** 38:8
58:23 92:4 93:6,19
94:3 96:16,20 99:21,
24 100:3 117:23
120:24 126:2 132:21

**shares** 147:4 157:17,
21,24,25 158:2,4,16,
20,21 159:1,6,14,21
160:4 163:2,23
164:3 167:2,3
168:21 169:19,23
170:11

**Shenk** 43:22 54:11
55:24 56:11

**short** 140:11 156:21,
22,24 157:3,6,8

**shorthand** 69:11

**shorting** 140:8

**show** 158:20

**showing** 127:9
164:12

**shows** 169:9

Eleanor Innes - 30(b)(6)

Confidential

Grae vs. Corrections
Corporation of America, et al.

**sic** 46:9 56:12 106:17
147:17

**side** 134:16 136:22
149:24 169:17

**sign** 172:16

**signals** 152:3

**signature** 80:11 84:1
91:17

**signed** 79:8,12 81:4
84:5 89:6 91:20

**significant** 115:15
121:25 123:11

**similar** 138:14

**single** 100:19 114:7

**sit** 30:11 34:19 118:7,
14 124:4 125:24

**situation** 163:7

**six** 81:16

**skip** 83:25

**Sleet** 49:9

**slow** 153:3

**small** 56:25 134:14

**social** 136:10,12,19

**socially** 135:16,21
136:1,15,20 137:6,
11

**software** 156:11

**sold** 148:15 163:23
164:2,6 167:4
169:24 171:23

**solely** 116:17

**somebody** 111:21

**sorry** 17:23 66:6 68:9
76:6 78:15 102:16
104:10 105:8 106:23
125:11 135:24
144:14 148:3 156:7,
9

**sort** 20:15 23:1
138:14 152:6,14

**sought** 48:21

**source** 72:21

**speak** 29:22 30:18
146:4,7

**speaking** 72:10
73:12,16 103:22
115:4 138:25 140:10
141:21 153:20

**specific** 18:21 23:24
24:4,9 29:20 32:23
44:16 49:18 64:20
73:8 82:13,19 83:11
100:4,10 101:4
113:5 120:15 123:10
131:15 142:8 147:23
154:6 163:21

**specifically** 13:8 23:9
34:5,12 45:3 52:7
54:8,20 65:20 72:17
78:8 87:10 88:2
89:17 105:4,8 112:7
113:3 115:2 120:8,
20 121:8,12,22
122:11,14 142:1
162:2 168:13

**specificity** 105:11

**specifics** 97:15
131:14

**speculate** 12:8

**speculating** 157:20
158:5

**speculation** 115:17,
18 159:1 171:10

**spell** 10:3 25:21
36:21 147:15

**spend** 51:10

**split** 158:19

**stack** 145:6

**stamp** 75:22

**stamped** 170:5

**stand** 164:7

**standing** 130:4

**start** 14:6 44:5 157:22

**started** 22:5,8

**starting** 140:15

**starts** 116:8

**state** 9:11 119:3
120:20 129:16

**stated** 121:22 123:8

**statement** 152:20
153:11

**statements** 38:14
117:24 118:3,9,15,
22 119:6,10,16,23
120:3,15,21 121:9,
13,18 122:2,19
124:6,16,17,22
125:15,19 126:19
127:5,14 131:10
144:9 152:5,17
161:12

**states** 8:9 73:2 98:22
99:3

**stating** 78:20

**stock** 38:16 83:20
93:20 117:16 146:16
147:24 148:1,6
150:20,23 154:6
155:1 157:8 158:1,9,
14,19,22 160:20
161:2,3,6,10,18
163:12,14 164:3,12,
14 165:10,18 168:21
171:8,25 172:3

**stocks** 140:8,11
143:5 150:10,18
151:5

**strategies** 137:1

**strategy** 103:4
137:15 138:13 142:6
159:18 171:12

**strike** 17:23 19:13
45:10 50:14,16 58:4

62:7 71:23 77:1
78:11,15 81:14 96:7
101:16 104:3 111:20
117:1 118:6 125:11
143:19

**structure** 38:10,11,
13,18 133:14

**stuff** 151:20

**subadvised** 148:16

**subadvisor** 140:21,
23 141:11,20
144:23,25 146:4,24
148:22 154:2 159:13
160:20

**subadvisor's** 146:21

**subadvisors** 25:7
141:1 144:13,19
145:12,16,22,24
146:12,19 160:24
163:1,11

**subject** 29:25 30:14
31:2,11 32:6 40:14
42:19 73:2 99:3

**submitted** 166:14

**subscriptions** 143:8

**subset** 30:3

**substance** 31:23 64:5

**substantial** 127:10

**substantively** 13:2

**succinctly** 130:12

**suffered** 168:22

**sufficient** 129:16

**suggest** 62:25

**suggests** 54:24

**Sullo-choy** 47:7,9

**summarize** 31:13
42:14

**supervisor** 31:7

**supplementing** 43:16

**support** 78:18 80:4
88:20 91:4 97:2,6
102:12 168:15

**supporting** 88:6

**sure** 14:24 15:25
23:22 30:9 33:10
35:13 37:5 41:8
45:19 46:1 50:12
51:13 56:20,22 59:2,
12,16 60:8 64:20
67:6 74:12 76:9
87:5,14,15,16 89:3
90:4 94:21 97:25
98:4 101:6 102:8
104:12 107:4 110:15
124:11 133:24 135:6
137:19 141:25 153:7
155:10 165:3

**surrounding** 52:24
103:5

**swear** 9:8

**switch** 144:11

**swore** 12:17

**sworn** 9:10

**system** 155:11

---

**T**

**Tab** 44:6

**Taft-hartley** 134:21
135:8

**take** 13:17 26:10,20
28:19 31:16,20 36:4
41:14 43:7 47:3
62:23 107:3 136:25
137:2,9,13 146:14
151:9,15 159:5
163:20

**taken** 8:6 19:15
150:22,23

**talk** 11:8 29:8,19 30:3
37:25 51:6 108:23

165:21

**talked** 20:24 35:20
40:22 55:4 62:2
100:22 101:9,21

**talking** 14:7 23:2
39:18 89:13 95:2,3
102:10 103:17

**tasked** 146:19

**team** 25:8 47:10,11
81:2 106:3 112:3,4
120:23 121:1 145:4
149:19,21 153:22

**tell** 44:12 58:15 59:8
63:19,25 156:12
163:17

**temperature** 146:15

**ten** 15:3,4 24:22 57:1

**Tennessee** 8:10 9:25
69:16

**termed** 139:5 159:22

**terms** 31:19 56:25
123:10 165:5

**test** 106:19

**testified** 9:12 36:8
85:11 89:6 94:17
95:7,20 129:24
137:20 156:23
158:25 162:25 169:8
171:2

**testify** 29:11,25 30:13
31:1,11 32:5 37:21
39:10 40:17 66:21
78:23 79:2 88:11,15
99:5 116:17,22
127:25

**testifying** 12:20
27:21 63:12 69:6
76:23 107:16 127:19
164:25

**testimony** 11:20
12:19 14:4 20:5 24:5
31:24 33:16 36:12,

14 37:3,7,11 38:3,5,
13 86:9 87:16 95:5,
25 101:11,24 111:2
114:13,15 119:14
120:2,18 121:15
123:3 125:2 128:7

**thank** 10:1,15 24:13
30:16 33:11 53:9
62:25 66:7 68:12
74:13 76:10 77:16,
23,25 89:12 96:3
98:19 106:25 107:13
131:4 148:3

**thesis** 137:4

**thing** 13:14 20:15
83:9 145:10 158:11
161:23 171:22

**things** 33:14

**think** 37:12 38:1
45:24 51:4 53:6 66:4
122:13 130:18
146:25 155:8 158:15

**third** 8:12 51:19

**thought** 17:6 158:25

**three** 15:14,16 42:21
55:20,23

**time** 8:4,16 10:2
12:24 13:4,7,13 15:5
17:8 19:8 31:16
35:21 39:22 51:11
63:1,6 74:20 75:4,19
80:19 97:24 98:3,13
101:4 102:21 107:5,
10 116:7 124:6
131:23 132:3 164:9
169:24 172:10,20,23

**times** 10:20 14:22,25
15:1 16:18 19:2,7
106:14,17 147:2
158:11

**timing** 34:24

**title** 24:23 25:24

**titled** 82:23 165:25

**today** 8:3 12:5 14:4
15:8 22:2 30:11
33:13 34:19 39:11
42:8 76:24 118:8,14
124:5 125:25 165:19

**today's** 21:10 22:21

**told** 76:16 104:15
105:1

**ton** 82:20

**top** 65:22 116:14
159:11 162:24

**topic** 29:6,12,15
30:19 39:25 40:1,4,6
41:1,3 65:21 66:13,
21,25 72:17,18,20
73:4,9 78:8,12,16,23
79:3 88:2,5,11,16
98:14,15,22 99:2,13
100:17 116:8,10,22
128:1 129:9

**topics** 27:12,24
29:20,23 39:9,18,20
65:24 66:9 72:15,16

**total** 167:8,13,17
169:19

**Totally** 112:18

**track** 145:5 156:17

**trade** 153:13,15,22
156:12

**traded** 150:24

**trades** 156:5 157:12
170:21 171:6

**trading** 143:22
157:10

**transaction** 163:21
170:1

**transactions** 147:23
149:4 154:6 155:13,
17 156:16,21 157:22
161:6,10,18 164:17

Confidential

Grae vs. Corrections
Eleanor Innes - 30(b)(6)                                    Corporation of America, et al.

transcribed 11:7

transcript 10:24
    11:11,16,17 12:25
    13:1 37:16,19
    151:16 172:24

transition 158:7,8,9

Trauger 21:18

tremendous 51:11

Trey 8:23 9:25

trial 13:4

tries 135:22

triggered 64:23

true 48:20 73:20
    135:1 171:15

trust 18:4,5,6 20:2
    25:25 48:5,16,19
    50:1 53:8,9 65:4,12,
    13 68:19 134:8,15
    136:22 137:20,21,24
    138:10 144:23,24
    145:19 147:19,21

trustee 26:17 27:5
    28:10,18 83:17
    146:22

trustees 53:7

try 11:8,25 12:9 17:2
    48:25 135:21,23
    136:2,3,5

trying 66:8 130:5
    142:8,18,24

Tuesday 8:3

turn 63:14 94:3
    135:12 148:7

turning 56:6,11 86:24

two 43:17 53:19,21
    55:9,11,15,16 73:24
    94:24 125:10,12
    126:1 153:17

type 145:9 151:25

types 115:5 163:10

## U

Uh-huh 81:17

Uh-huhs 11:19

ultimately 48:21 65:6
    147:21

ultra 139:14

unclear 12:10

underbank- 135:24

underbanked 136:6

underlying 33:20
    142:6 143:4

understand 12:5,15,
    21 13:5,25 15:25
    17:3,10 27:3,8,15
    28:25 29:17 37:24
    40:23 42:2 43:13
    73:7 75:25 76:13
    79:1 82:15 87:15
    88:14 99:11 107:15
    116:21 124:15
    125:17 126:7 127:19
    129:1

understandable
    45:24

understanding 37:9
    49:18 52:4 54:4,15
    56:24 69:3,13 70:10,
    16,19,24 71:21,24
    73:22 74:7,17 79:20,
    23 84:11 85:12
    91:25 93:16 96:5,8
    97:19 103:25 109:19
    111:1 114:17 115:9,
    13 117:18 119:20
    130:17 152:7 168:6

understands 92:11

understood 24:5
    111:19 112:18

undocumented
    135:23

union 132:25 133:2,
    19 134:1,2

unions 132:24 134:21

unique 32:22 33:1
    35:2

unit 113:23

United 8:9 133:2,19,
    25

universe 145:7 150:9

unusual 146:8

upheld 129:23 130:10

upholding 129:14

use 69:10 139:21
    144:25 150:16

uses 60:25 150:2

## V

valuation 38:16

value 38:10 137:10
    150:10

various 74:9 131:11

verbal 11:18

verbally 11:23

verification 47:1,4,14

verifies 47:17

versus 8:7 21:2 44:5
    49:6 54:11 55:24
    60:2,4 120:10
    121:23 131:20 137:4
    138:17 158:9

vice 24:25 25:4
    80:12,18

video 11:17

VIDEOGRAPHER 8:1
    9:7 63:1,5 107:5,9
    131:23 132:2 172:10

videotaped 8:5

view 121:17

viewed 85:10

views 129:2

violated 116:12
    128:3,22

Violation 82:24

violations 75:10,12
    83:3 123:12 168:23

volume 115:9,14

voting 60:11

## W

wages 94:10

waiving 73:2

want 12:7 36:7
    103:23 108:23
    109:17 128:24
    129:21 138:6 140:2
    144:11 149:23
    154:5,17 158:14
    165:21 172:19

wants 158:12

Warnock 8:24

wasn't 85:1 90:2

Watkins 8:19,22 9:20

way 17:2 50:20 71:3
    98:1 136:18 138:11
    145:9 152:14,16
    153:4 166:25 167:12

we'll 12:24 26:12 29:7
    100:1 109:16 136:25
    146:6,7 158:9 172:3,
    17,20

we're 12:18 39:18
    63:2 89:13 107:6
    131:24 135:22 147:2
    172:11,16

we've 43:14 62:19
    82:17 89:23 153:3

weekly 103:19,21
    104:1,22

**Confidential**

**Grae vs. Corrections**
Eleanor Innes - 30(b)(6)
**Corporation of America, et al.**

**weight** 142:17,23 143:2,14 150:21

**weightings** 143:3

**weights** 150:22

**went** 14:7 112:21 164:20

**weren't** 22:10

**Whitworth** 8:21 9:24 132:4,8,10 133:22 134:22 135:5 140:13 141:24 142:10 144:1 147:11 149:22 150:4 153:8 157:4 159:19 160:8 161:15 165:23 166:2,9,19,24 168:10 169:15 170:19 171:1,14,21 172:8

**William** 79:8,12 80:11

**Willow** 9:4

**witness** 9:3,6,8 16:22 20:17 23:13 29:11, 19,20,24 30:3,5,9, 12,20 32:9,17,20 33:7 34:4,23 35:6 39:22 40:16 45:19, 21 48:4 50:12 53:2 57:3,13 58:2,10,20 59:12 60:8,23 61:8, 16,24 62:14,22 65:1 66:20,24 67:21 68:8, 12,14 73:4,8,16 74:13,17 76:6,16 77:4,13,25 78:22 79:2 85:18 86:2,19 88:11,15,25 90:22 93:3 94:1 95:17 96:3,11,23 99:5,12 100:13 101:13 102:8,24 103:10 104:9,15 105:14,21 106:20,25 107:2 108:25 109:10

110:12 111:6,14 112:13,24 113:5,13, 22 114:20 115:2,12, 24 116:16,22 117:22 118:12,19,25 119:9, 19 120:7,19 121:11, 21 122:13,21 123:16 124:11 125:3,9,22 126:5,11,17 127:4 128:5 130:25 131:4, 7 134:20 135:3 140:10 141:18 142:5 143:24 147:10 149:18 153:7 157:2 159:16 160:6 166:17,23 168:6 169:14 170:15,25 171:11,19

**WL** 133:8 134:3

**Wood** 9:1 16:21 20:16 23:12 28:1,5 30:8 32:10 33:6,24 34:22 35:5 37:9,18, 25 39:21 43:1 45:18, 20 48:1 50:9 51:2,13 53:1 57:2,11,25 58:9,17 59:10 60:6, 20 61:4,14,23 62:12, 20 64:25 65:24 66:4, 8 67:16 68:5 69:24 73:15 76:4,15 77:3, 12,14 84:6,8 85:17 86:1,15 90:21 93:2, 25 95:16,24 96:10, 22 100:12 101:7,12 102:4,7,23 103:7 104:8 105:6,13,20 106:18 107:1 108:21 109:8,22 110:7 111:4,12 112:11,23 113:4,12,21 114:18 115:1,11,22 117:21 118:11,18,24 119:8, 18 120:6,17 121:10, 20 122:12,20 123:15

124:9,25 125:8,21 126:3,10,15,23 128:4,11,14 129:6 130:7,19 131:6 133:21 134:19 135:2 140:9 141:17 142:4 143:23 147:9 149:17 150:3 153:6 157:1 159:15 160:5 161:14 166:16,21 167:25 169:13 170:14,23 171:9,18 172:14,22

**word** 142:12

**words** 48:12 124:21 151:17

**work** 12:24 92:14 136:23

**Workers** 133:2,19,25

**workforce** 139:11

**working** 80:22,23 136:3

**works** 153:19

**worst** 122:22 123:3,8

**wouldn't** 32:25

**wrap** 127:18

**writing** 129:23

**written** 11:16,17 81:7

---

**Y**

**Yates** 119:2,22 120:19 121:5,16,17, 21 122:10,14 123:6, 24 124:1,7,15,23 127:16 131:15 165:4

**yeah** 34:10 165:16 172:23

**year** 36:6

**years** 24:16,22 56:22

**Yep** 15:17

**York** 8:12,13 9:11 10:10,14