# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

NIKKI BOLLINGER GRAE, Individually )
and on Behalf of All Others Similarly )
Situated, )
                          )
Plaintiff, )
                          )
v. )           **Case No. 3:16-cv-2267**
                          )           **Judge Aleta A. Trauger**
CORRECTIONS CORPORATION OF )
AMERICA, DAMON T. HININGER, )
DAVID M. GARFINKLE, TODD J. )
MULLENGER, and HARLEY G. LAPPIN, )
                          )
Defendants. )

## MEMORANDUM & ORDER

Amalgamated Bank, as Trustee for the LongView Collective Investment Fund ("Amalgamated"), has filed three motions asking the court to exclude testimony of potential expert or hybrid fact/expert witnesses for the defense: a Motion to Exclude Expert Testimony of Lucy P. Allen (Doc. No. 344); a Motion to Exclude Opinion Testimony of Defendants' Non-retained Experts William Dalius, Harley Lappin, Don Murray and Kim White (Doc. No. 351); and a Motion to Exclude Expert Testimony of Justin Marlowe (Doc. No. 357). The defendants (collectively, "CoreCivic") have filed two motions asking the court to exclude testimony of potential expert witnesses for the plaintiff: a Motion to Exclude Testimony of Donna Mellendick (Doc. No. 336); and a Motion to Exclude Testimony of Scott Dalrymple (Doc. No. 339). For the reasons set out herein, the motions regarding Marlowe and Mellendick will be granted in part and denied in part, and the other motions will be denied.

# I. BACKGROUND

The basic facts of this case have been set forth by the court several times in other parts of the record. In short, this is a securities fraud class action based on allegations that CoreCivic, a publicly traded company that owns and operates private prisons and other detention facilities, as well as various of its high-ranking executives, made false or misleading statements and omissions regarding facts material to CoreCivic's likelihood of continuing to do business with the federal Bureau of Prisons ("BOP"), leading to a significant loss in shareholder value when the BOP announced its decision to discontinue working with the company in a document known as the Yates Memorandum. The lead plaintiff, Amalgamated, also alleges that a similar loss occurred, on a much smaller scale, when, prior to the Yates Memorandum, the BOP declined to renew its contract with CoreCivic regarding CoreCivic's Cibola facility.

As one would expect, the effect (or lack of an effect) on CoreCivic's stock price of certain public statements and events is a central contested issue of the case. The basic realities of private prison operation and contracting are also at issue. The defendants and Amalgamated have respectively filed various motions to exclude potential expert witnesses who have been proffered by the opposing party or parties to address these issues. Eight potential witnesses have been challenged: Lucy Allen, William Dalius, Harley Lappin, Don Murray, Kim White, Justin Marlowe, Donna Mellendick, and Scott Dalrymple.

# II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of an expert witness' testimony at trial. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Under Rule 702,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

2

<ol type="a" start="1">
<li>(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;</li>
<li>(b)     the testimony is based on sufficient facts or data;</li>
<li>(c)     the testimony is the product of reliable principles and methods; and</li>
<li>(d)     the expert has reliably applied the principles and methods to the facts of the case.</li>
</ol>

"[T]he trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 453 (6th Cir. 2013) (quoting *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 533 (6th Cir.2010)). The court's task is to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

The district court acts as the "gatekeeper" on opinion evidence, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997), and must exercise its gatekeeping function "with heightened care." *U.S. v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (quotation omitted). However, the court will not exclude expert testimony "merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (citations omitted). Indeed, rejection of expert testimony is the exception rather than the rule—the gatekeeping function established by *Daubert* was never "intended to serve as a replacement for the adversary system." *See Rose v. Matrixx Initiatives, Inc.*, No. 07-2404-JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. 2009) (citing Fed. R. Evid. 702 advisory committee's note).

Rule 702 does not "require anything approaching absolute certainty." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) (citing *Daubert*, 509 U.S. at 590). Under *Daubert*, experts are "permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and

experience of the discipline." *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012) (quoting *Daubert*, 509 U.S. at 592) (internal quotation marks omitted). "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand, not that they know the answer to all the questions a case presents[.]" *Jahn v. Equine Servs. PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (emphasis and internal citation omitted). By the same token, "the 'knowledge' requirement of Rule 702 requires more than subjective belief or unsupported speculation." *Tamraz*, 620 F.3d at 670 (quoting *Daubert*, 509 U.S. at 590). Lastly, the "party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592 n.10).

## IV. ANALYSIS

### A. Witnesses Proffered by the Defendants

**1. Lucy P. Allen.** Allen is a well-credentialed economist who has been hired by the defendants to testify regarding a number of issues related to the case, most centrally the issue of what events or statements affected the value of CoreCivic's stock. Amalgamated argues that the court should bar Allen's testimony because the opinion that she intends to offer is not relevant or reliable. Specifically, Amalgamated argues that Allen has, in effect, devoted her testimony to debunking a theory of loss causation on which Amalgamated does not intend to rely.

Allen concludes that the price effect of the Yates Memorandum was due to the Memorandum's signaling of a political shift away from privatization, not due to the Memorandum's revealing that contractors' services had been unsatisfactory. Accordingly, then,

4

Allen suggests, even if the defendants did, for example, misrepresent the quality of CoreCivic's services, that misrepresentation had no relevant price effect, because the harm to CoreCivic's price was solely due to the unrelated change in policy. Amalgamated argues that this misunderstands the significance of the Yates Memorandum in their theory of the case. The Yates Memorandum, Amalgamated argues, was not important merely because it, in some sense, revealed the low quality of CoreCivic's services, but rather because it was the materialization of a concealed risk, and, if the risk had not been concealed, that risk would have been reflected in the (lower) price of CoreCivic's stock prior to the Yates Memorandum's release. *See Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 388 (6th Cir. 2016) (discussing "materialization of risk" theory of liability for securities fraud).

The parties' disagreement regarding Allen arises, in large part, from an issue that the court has previously addressed in this case—the relationship between, on one hand, the *general* question of the "quality" of CoreCivic's services and, on the other hand, the more specific issue of whether CoreCivic was meeting the *BOP's* expectations in a way that was likely to prevent actions like those directed by the Yates Memorandum. As the court wrote in its opinion of December 18, 2017,

> A company's general boasts of quality are typically insufficient to establish liability under Section 10(b), because such statements usually "lack[] a standard against which a reasonable investor could expect them to be pegged." [*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005).] CoreCivic, however, did peg its claims to something concrete: its relationships with specific, identifiable government clients, who themselves had express, documented expectations that they communicated to CoreCivic in their contracts, Notices of Concern, and other review findings. . . . As CoreCivic acknowledged in at least one annual report, CoreCivic "derives, and expects to continue to derive, a significant portion of [its] revenues from a limited number of governmental agencies." (Docket No. 61 at 16.) . . . . Those identifiable clients' expectations, moreover, were not ineffable or purely subjective, but rather tied to specific existing contracts and quality review practices.

(Doc. No. 76 at 28–29.) The concept of "quality" at issue in this case, therefore, is not generic, but, rather, based on the "concrete, explicit expectations" of the relevant client—the BOP. (*Id.* at 29.)

In this light, the court cannot conclude that Allen's testimony is irrelevant to Amalgamated's theory of causation. Everyone involved in this case agrees that the Yates Memorandum hurt the value of CoreCivic's stock. It may be that, as Amalgamated suggests, the Yates Memorandum was the realization of the risks attendant to a history of poor performance that was mostly concealed from the public. It may also, however, be the case that the Yates Memorandum was simply the manifestation of a change in general philosophy at the Department of Justice, unrelated to specific issues of underperformance. Regardless of the terminology that Allen has used, her testimony is relevant to that core question. The court therefore will not bar her testimony, and Amalgamated can rely on cross examination to highlight any shortcomings or misunderstandings in her analysis. Similarly, Amalgamated's arguments that Allen's testimony is unreliable because she ignored important facts is an appropriate source for cross examination, not a basis for exclusion.

Amalgamated argues next that the court should exclude the aspects of Allen's testimony based on the contemporaneous statements of market analysts, which she cites as part of the discussion of the market's assessment of CoreCivic stock. There is little doubt that the analysts' statements are hearsay and could not be offered for their truth—that is, as, effectively, ready-made expert testimony that was not made in court and that is not subject to cross examination. Allen, however, does not intend to offer the analyst statements in that way. Rather, she mentions them as part of her analysis, as an economist, of the contemporaneous sense of the market. Under Rule 703 of the Federal Rules of Evidence,

6

> [i]f experts in the particular field would reasonably rely on [the relevant] kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. Amalgamated has not provided any evidence that would refute the premise that analyst reports are a commonly relied-upon tool for an analysis such as Allen's. The importance of analyst reports in a securities fraud case, moreover, is not based on the reliability of the reports themselves, but rather on the fact that the analysts are influences and barometers of the market. Even if an analyst's view of a company is entirely mistaken, if that analyst's views are taken seriously by investors, the analysis may be reflected in the stock price. Allen, therefore, can include discussion of the analysts' statements as part of explaining her own views. Insofar as any analyst reports are presented in such a way that the jury may be confused about their purpose, the issue can be addressed with a curative instruction. The court will not limit Allen's testimony in that regard.

**2. William Dalius, Harley Lappin, Don Murray, and Kim White.** These four proposed witnesses are former employees of the BOP who later became (and, in some cases, continue to be) CoreCivic employees. CoreCivic has indicated that, insofar as it is necessary,[1] CoreCivic intends to call them as "hybrid" witnesses—that is, witnesses who will "testify as a fact witness and also provide expert testimony." Fed. R. Civ. P. 26(a)(2)(C) advisory committee's note to 2010 amendment. Amalgamated argues that these four witnesses are unqualified, that their

---

[1] CoreCivic disclosed each witness as a potential hybrid expert only "[t]o the extent that the [c]ourt deems any portion of [the witness's] testimony to be expert opinion testimony under the Federal Rules of Evidence." (E.g., Doc. No. 356-2 at 4.) As is often the case with witnesses who possess some specialized expertise, the line between expert and non-expert testimony may not always be clear with regard to these individuals. CoreCivic states, in its briefing, that "the Hybrid Witness Disclosure was made out of an abundance of caution and to fully apprise Plaintiff of all evidence that may constitute a mixture of 'fact' and 'expert' testimony at trial." (Doc. No. 384 at 5.)

7

testimony is cumulative and unreliable, and that, at least in some instances, the testimony is not based on sufficient facts or data. Amalgamated notes, in particular, that one witness, Harley Lappin, is a defendant in this case, and, if he is permitted to provide expert testimony, he will, in essence, simply be vouching for his own behavior, based on his work as a BOP official before becoming a CoreCivic executive.

CoreCivic has not disclosed expert reports prepared by these witnesses. However, as CoreCivic correctly points out, "[h]ybrid witnesses are governed by Rule 26(a)(2)(C) and are not required to provide a written report for those opinions within the scope of their personal involvement in the matter." *Reliable Transp. Specialists, Inc. v. Wausau Underwriters Ins. Co*., No. 15-12954, 2019 WL 1559462, at *3 (E.D. Mich. Apr. 10, 2019); *see also Call v. City of Riverside*, No. 3:13-CV-133, 2014 WL 2048194, at *5 (S.D. Ohio May 19, 2014) (observing that the current version of Rule 26(a)(2)(C) recognizes "the unique role that an expert who is actually involved in the events giving rise to the litigation plays in the development of the factual underpinnings of a case" (quoting *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 7 (1st Cir. 2011)). Instead, consistently with the rules, CoreCivic provided only summaries of these witnesses' expected expert testimony. (Doc. No. 356-2.) The lack of reports, therefore, does not inherently prevent CoreCivic from relying on these witnesses' expertise. It does, however, impose a strict limitation on how that expertise can be used. The hybrid witnesses can only testify within the scope of their personal involvement in this matter and cannot opine broadly in the manner of an ordinary expert. Moreover, although the procedures regarding these witnesses and the scope of their testimony are different from the procedures associated with pure experts, their testimony remains "subject to *Daubert*," insofar as it is presented as expert opinion. *In re*

*Aredia & Zometa Prod. Liab. Litig.*, 483 F. App'x 182, 187 (6th Cir. 2012) (citing *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009)).

The summaries of the witnesses' expected testimony are largely similar and explain that the witnesses will testify that CoreCivic's "operational performance was similar to and compared favorably with the BOP's operational performance in the areas of correctional facility management, oversight, staffing, security, and related policies and procedures." (*E.g.,* Doc. No. 356-2 at 6.) Amalgamated does not dispute that each of the witnesses accumulated significant internal BOP experience in their careers prior to coming to CoreCivic. The court, therefore, sees no reason to doubt that these witnesses would be capable of testifying based on their extensive experience with federal prison standards and performance in a case that *did not* involve CoreCivic. The core issues with regard to this motion, therefore, are (1) whether the witnesses' relationships with CoreCivic render them so unreliable as to preclude admission of their testimony; (2) whether the subject matter of their testimony is of the type appropriate for expert testimony; (3) whether, as the plaintiffs suggest, these witnesses are tainted because they have seen communications that were withheld as privileged, and (4) whether any individual witness's testimony should be excluded for any other witness-specific reason.

The court will not exclude the witnesses based on their potential bias, which can be fairly assessed by a jury. "Determining the credibility of a witness, which includes '[a]ssessing the potential bias of the expert witness,' is ultimately an issue for the jury." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, No. 2:18-CV-01509, 2020 WL 7767625, at *11 (S.D. Ohio Dec. 30, 2020) (quoting *Cruz-Vazquez v. Mennonite General Hosp.*, Inc., 613 F.3d 54, 59 (1st Cir. 2010)). An ordinary juror is perfectly capable of drawing whatever inference he or she wishes to draw regarding the fact that a witness receives or received a

9

paycheck from CoreCivic. The court sees no reason to prejudge that issue by excluding the evidence.

The court also does not find that the underlying issue—quality expectations of federal prisons—is inappropriate for expert testimony or that the testimony, as previewed by CoreCivic's summaries, would necessarily stray beyond the boundaries of that acceptable expert opinion. Amalgamated objects that the witnesses' opinions would not be grounded in a particular widely-accepted methodology, as, for example, a scientific expert's would. Each witness, however, will testify based on the simplest form of expertise that there is: years of experience in a specialized field about which the public has limited knowledge. *See Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 980 (6th Cir. 2004) ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of *experience*." (quoting Fed. R. Evid. 702 advisory committee's note (2000 Amendments) (emphasis added)). As CoreCivic points out, a holding that these witnesses lack corrections expertise would border on concluding that *no* witness could have such expertise. Lappin, for example, not only worked for the BOP for over a quarter-century but was, in fact, the BOP Director. Dalius was the BOP's Chief Financial Officer. Murray and White each boasts over two decades of experience at the BOP, including operational experience relevant to issues raised in this case, such as staffing and facility audits. If any particular testimony strays too far from what can be justified based on any specific witness's knowledge and experience, Amalgamated can object at the time. The court, however, will not bar the witnesses from testifying as hybrid witnesses outright.

Similarly unavailing is the argument that the witnesses have reviewed communications that were withheld as privileged. The court has dealt extensively with the issue of privilege in this case and has provided guidance for counsel regarding how to navigate the issue at trial. (*See*

10

Doc. No. 405 at 9–13.) Amalgamated has not identified any basis for concluding that these witnesses' testimony would be irredeemably tainted by their exposure to any particular privileged information.

The court is also unpersuaded by any witness-specific argument that Amalgamated has raised. Some witnesses' expertise may be deeper, more relevant, or more up-to-date than others'. The court cannot conclude at this stage, however, that any witness will exceed the boundaries of what he or she could fairly address, particularly given that, consistently with the Rules, all the court has reviewed so far are brief summaries of the testimony. Moreover, while CoreCivic's relatively generic summaries of its hybrid witnesses' respective testimonies, taken in isolation, might give the impression that it expects all of the hybrid witnesses to testify broadly on the general issue of facility quality, CoreCivic has, in its briefing, assured the court that each witness will testify only to the areas in which he or she has meaningful knowledge or expertise. (*See* Doc. No. 384 at 4–5.) If any witness ventures beyond those boundaries at trial, Amalgamated can object.

Finally, Amalgamated argues that, even if the court permits, for example, one of these witnesses to testify as a hybrid expert, the court should not permit all of them to do so because their testimony will be duplicative and redundant. Amalgamated's objection may prove to be well-founded. It is difficult, however, to determine whether the testimony will truly be cumulative at this stage. A witness that appears superficially redundant to another may ultimately turn out to be necessary, particularly if, for example, the first witness's credibility is sufficiently tarnished at trial.

The court, moreover, may make such decisions at trial in a more focused manner than simply by excluding witnesses altogether. Indeed, the hybrid nature of these witnesses makes the

11

prospect of prematurely excluding their testimony as cumulative particularly unnecessary. As CoreCivic points out, each of these witnesses is being proffered as both a fact witness and an expert. Merely excluding them as experts would not exclude them as fact witnesses, meaning that even a ruling in Amalgamated's favor at this juncture would likely necessitate more focused objections and rulings at trial. The court will deny this motion without prejudice to renewal of any objection that either a witness or a portion of a witness's testimony is cumulative or outside the scope of his or her individual expertise.

**3. Justin Marlowe.** Justin Marlowe is "a Research Professor at the Harris School of Public Policy, and the Associate Director of the Center for Municipal Finance at the University of Chicago. From 2014 to 2020, [he] was the Endowed Professor of Public Finance and Civic Engagement at the Daniel J. Evans School of Public Policy & Governance at the University of Washington." (Doc. No. 359-1 at 1.) He has been retained "to evaluate statements CoreCivic made [during the Class Period] regarding cost savings CoreCivic provided to the BOP and, relatedly, statements comparing CoreCivic's cost of services to the BOP's cost of services." (*Id.* at 2.) He concluded that "[t]he statements CoreCivic made during the Class Period regarding cost savings relative to its government partners were supported by internal CoreCivic documents and publicly available information." (*Id.*) Amalgamated argues that Marlowe is not qualified to offer such an opinion, that his testimony is speculative and irrelevant, and that he would improperly testify to legal conclusions.

Amalgamated's arguments that Marlowe is unqualified and that his testimony would be irrelevant are unpersuasive. Marlowe is a well-credentialed and recognized expert in the field of public budgeting. His direct experience is not all-encompassing, but no expert's is. Marlowe has substantial expertise in the fields of public finance and governmental cost accounting, about

which he is being offered to testify. Moreover, contrary to Amalgamated's arguments, the fact that his testimony would focus solely on cost savings, rather than quality, does not render the testimony irrelevant. It is true that, as this case has progressed, Amalgamated's focus on CoreCivic's claims of cost savings has waned, with quality taking an increasingly central role in the litigation. Allegations that the defendants misrepresented CoreCivic's cost savings, however, did appear in the operative complaint, and any claims based on those statements remain pending. Moreover, this case, as the court has explained, is not fundamentally about quality in some abstract sense but about the likelihood of CoreCivic's retaining BOP business. Cost savings, by all accounts, were pertinent to retaining the BOP as a client, albeit not solely determinative. Expert testimony regarding savings, therefore, is relevant to the jury's evaluation of the defendants' alleged concealment of the risk that the BOP's business would be discontinued.

Similarly unavailing is the argument that Marlowe's testimony is not founded in a well-accepted methodology. Marlowe bases his testimony on his review of academic literature regarding cost accounting and his own experience in the field, which, together, form a well-accepted basis for providing expert testimony. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4043943, at *3 (N.D. Ohio Aug. 26, 2019) ("Courts have admitted expert testimony as reliable where experts extrapolate their opinions from their knowledge and experience combined with a review of the relevant scientific literature." (quoting *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 738 (N.D. Ohio 2011))). As Amalgamated points out, cost accounting is a complex field, and various competing methodologies exist for measuring the savings, or lack thereof, of privatization projects. The contested and complex nature of the field, however, is all the more reason why an academic expert such as Marlowe is appropriate. Indeed,

Marlowe himself addresses these issues in his testimony. (*See* Doc. No. 359-1 at 10 ("First, there is no one universally accepted methodology for comparing costs.").)

Amalgamated's objections regarding the arguably legal nature of some of Marlowe's conclusions, however, are well-founded, particularly in the few instances in which Marlowe appears to have offered his full blessing to the reasonableness or propriety of certain statements, rather than merely discussing whether they are supported by an acceptable accounting methodology. "[O]nly the [c]ourt may determine the applicable law in [a] case," and, if it is a jury case, "the [c]ourt alone instructs the jury as to that law." *Heil Co. v. Evanston Ins. Co.*, No. 1:08-CV-244, 2013 WL 11322818, at *1 (E.D. Tenn. Feb. 15, 2013). Accordingly, "a witness may not testify to a legal conclusion," *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)), and "[e]xpert testimony on the law is excluded because the trial judge does not need the judgment of witnesses" on questions of law. *United States v. Gordon*, 493 F. App'x 617, 626–27 (6th Cir. 2012) (quoting *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984)). Moreover, while the question of what is "reasonable" is typically an issue of fact, not law, courts have held, at least in some settings, that "[t]elling jurors defendants acted 'reasonably' is . . . inadmissible expert testimony," because it invades on the legal question of what the reasonableness standard entails. *United States v. Arrow-Med Ambulance, Inc.*, No. 17-CR-73-JMH, 2018 WL 1902682, at *4 (E.D. Ky. Apr. 20, 2018) (citing *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997); *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC.*, No. 5:11-CV-374-DCR, 2014 WL 1664263, at *5 (E.D. Ky. Apr. 25, 2014)); *see also Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (stating than an expert witness cannot provide "testimony that does little more than tell the jury what result to reach").

The danger of allowing an expert to dictate what is reasonable may be particularly acute in the securities fraud context, when the "reasonableness" of any particular utterance may be inextricably bound up with the question of whether the statement would be legally permissible, in light of, among other things, other statements and publicly available information.[2] *See In re Skechers USA, Inc. Secs. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) ("The key question . . . is 'whether defendants' representations, taken together and in context, would have misled a reasonable investor.'" (*quoting McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). Similarly, it is outside Marlowe's expertise whether a lay investor would find any particular statement, in context, to be misleading. The jurors, as ordinary English speakers themselves, will need no help in that regard.

Although CoreCivic is correct that "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), an opinion does become objectionable when it leaves the area of the witness's factual expertise and crosses into either the judge's exclusive authority to explain the applicable legal standard or trespasses on the jury's power to apply a factual standard that is not based on any aspect of the witness's expertise. Marlowe, therefore, can explain the facts underlying particular statements by the defendants, but he will not be allowed to testify regarding whether the defendants' characterizations were reasonable or, in context, misleading.

---

[2] Indeed, even CoreCivic appears to recognize the dangers associated with the use of the term "reasonable," going out of its way to assure the court that Marlowe does not intend to use it as a legal term. (Doc. No. 382 at 24.) If that is the case, then Marlowe should have little difficulty in providing his opinions while eschewing the word altogether.

15

**B. Witnesses Proffered by Amalgamated**

**1. Donna Mellendick.** Donna Mellendick worked at the BOP for more than 30 years, ultimately retiring as the Administrator for the Privatization Management Branch in August 2015. Amalgamated asked Mellendick to provide her opinion on the following:

> (1) the quality of CCA's[3] performance of its contracts with the BOP; (2) whether (and if so when) its past performance ever reached a point as to render CCA unlikely to win any competitively bid BOP contract (and therefore unlikely to receive any additional BOP business beyond the option years of existing contracts); and (3) whether the services CCA provided to the BOP were sufficiently comparable to the services BOP provided at its own facilities as to be able to make an apples-to-apples cost comparison such that anyone could have accurately claimed that contracting with CCA did and/or would save the BOP money.

(Doc. No. 338 at 3.) Mellendick's core qualifications are similar to those of CoreCivic's hybrid witnesses, and CoreCivic does not dispute that, like those witnesses, Mellendick is qualified to speak from her extensive experience in the field of federal corrections. Rather, the defendants argue that Mellendick's testimony is unreliable and irrelevant.

First, CoreCivic argues that Mellendick's opinion is irrelevant and not founded on an appropriate methodology because she relies on "a performance standard she invented that is inconsistent with the quality standards used in her field, including by the BOP." (Doc. No. 336-1 at 3.) CoreCivic appears to be basing that characterization, in large part, on the fact that Mellendick used an ordinary English phrase, "largely deficient," that is not an accepted term of art in the field (*See id.* at 9.) Any divergence between Mellendick's standards and those applied, in practice, by the BOP, however, is an appropriate subject for cross-examination, not a reason for exclusion. The difficulty of assessing the quality of prison services has been an issue throughout this case. The court, in its rulings in this opinion, has afforded the defendants latitude

---

[3] "CCA" is an acronym of CoreCivic's old name. As has been the case throughout this litigation, the names will be used interchangeably.

in their desire to rely on experienced individuals to characterize the issue as those witnesses understand it. Amalgamated will receive the same latitude, and any flaws in that can be highlighted by the opposing party on cross examination. Mellendick's use of a simple phrase such as "largely deficient" does not change that analysis.

The defendants argue next that Amalgamated intends to use Mellendick as a "mere mouthpiece" to provide evidence that is, in large part, "nothing more than a chronological summarization of documents." (Doc. No. 336-1 at 13.) The defendants' argument, however, is belied by their own objection that Mellendick has "invented" a standard for evaluating CoreCivic's performance. CoreCivic cannot, at the same time, plausibly fault Mellendick for opining too freely and not opining enough. Just as CoreCivic's experts will be permitted to testify regarding the materials on which they reasonably relied, so may Mellendick.

Next, the defendants argue that, if Mellendick is permitted to testify, she should nevertheless be barred from offering any opinion regarding CoreCivic's likelihood of renewing contracts, because she did not, herself, make contracting decisions at the BOP, but rather merely oversaw the contracted-for facilities. This is yet another issue related to credibility that can be highlighted on cross-examination. Mellendick was exposed to the BOP's expectations of contract prisons during her career, and she is permitted to offer an opinion in that regard.

Finally, CoreCivic objects that Mellendick should not be permitted to testify on the issue of cost comparison. Although the actual opinion that Mellendick has offered in this regard is quite limited, CoreCivic's objection is persuasive. In her report, Mellendick states that, "[g]iven the vast differences among the services CCA offered the BOP and the services the BOP provides in its own institutions, it is my opinion it is impossible to make an apples-to-apples comparison." (Doc. No. 338 at 8.) Mellendick is certainly qualified to compare the differences between

17

different corrections services at different facilities. Mellendick, however, does not have professional expertise in cost comparison such that she could opine about what is "impossible" in the field. Moreover, Mellendick's Report makes clear that the purpose of her conclusion, in this regard, is to suggest that, because one cannot make a cost comparison between CoreCivic facilities and BOP facilities, any claim of cost savings was false. (*Id.*) Such testimony, however, would improperly invade on the province of the jury for much the same reasons that the court discussed previously regarding Marlowe's testimony about the reasonableness of particular statements. The jury does not need expert guidance in making its ultimate determinations of truth or falsity. The court, accordingly, will grant CoreCivic's motion in the limited regard that Mellendick will not be permitted to testify on the issues of whether cost comparison was possible or whether cost comparison statements were false or misleading.

**2. Scott Dalrymple.** Scott Dalrymple is an economist who was retained by Amalgamated to "analyze and quantify the effect of plaintiff's allegations that the Defendants engaged in a scheme to defraud investors and made materially false and misleading statements and omissions regarding CCA's business and operations that led to artificially inflated share prices between February 27, 2012 and August 17, 2016." (Doc. No. 401-31 (Report) at 1.) The defendants argue that Scott Dalrymple's testimony is unreliable and irrelevant. The defendants identify a number of alleged deficiencies and limitations of Dalrymple's opinion, most of which, in isolation, are plainly better suited to cross examination. CoreCivic's chief and most serious objection, however, is that Dalrymple's analysis simply does not address any of the contested issues in the case; rather, the defendants argue, Dalrymple has merely assumed that the plaintiffs' theory of the case is true and made calculations accordingly. (*See* Doc. No. 342 at 4.)

18

There is, however, nothing wrong with Dalrymple's limiting his analysis to some, but not other, of the aspects of Amalgamated's case. Dalrymple has been clear that his calculations apply "[t]o the extent the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud." (Doc. No. 401-31 (Report) at 28.) Dalrymple's qualification of his conclusion in this regard is, if anything, welcome. Evidence is relevant as long as it has sufficient bearing on a "fact . . . of consequence in determining the action." Fed. R. Evid. 401. There is no reasonable dispute that damages are an issue of consequence in this litigation. The fact that Dalrymple's analysis assumes certain other contested facts does not undermine the relevance it does have. Moreover, insofar as the failure of the Dalrymple testimony to establish certain elements of Amalgamated's fraud claims translates to a failure, by Amalgamated, to establish those elements *at all*, it is an issue for summary judgment or trial—not a question of admissibility.

Aside from that central objection, CoreCivic has raised some alleged flaws or inconsistencies in Dalrymple's methodology, but none is sufficient to warrant exclusion. The calculation of damages in a case based on the realization of a concealed risk is an inherently difficult task, because one must separate the damages caused by the concealed risk from the loss of value that would have accompanied the relevant adverse event, even if the pre-event risk had not been concealed. Dalrymple, however, acknowledges and addresses this challenge, reaching what he characterizes as a "conservative" estimate of the loss attributable to fraud. (*See* Doc. No. 401-31 (Report) at 26.) Although CoreCivic finds fault with aspects of that analysis, none of those objections is sufficient to render Dalrymple's methodology so unreliable as to be inadmissible. Similarly, CoreCivic's argument that Dalrymple's analysis is undermined by inconsistencies between his methodology regarding the Yates Memorandum and his

19

methodology regarding the Cibola renewal does not actually establish that either analysis is inadmissible. Amalgamated does not concede that there is any conflict between the two methods, but, even if they do differ, there is no evidence that only one possible approach to loss estimation is permissible or that different approaches cannot consistently be applied to different events in the same case.

The court is also unpersuaded by the argument that Dalrymple's analysis regarding the Cibola non-renewal is inconsistent with the plaintiff's reliance on the efficient capital market hypothesis. The court has addressed the efficient capital market hypothesis before in this case and will not belabor it at length here. Generally speaking, the hypothesis suggests that prices of publicly traded stocks reflect all publicly available information and that, therefore, a buyer or seller can be harmed by dissemination of false information, without his knowledge of that information, because he traded at an inflated or deflated price reflecting the false information. (*See* Doc. No. 143 at 7–8.) As CoreCivic points out, there were allegedly some local media reports of the Cibola non-renewal a few days before CoreCivic's own prominent disclosure of what had happened, but a decline in price accompanied only CoreCivic's statements, not the first public news. The fact that there was not an immediate decline in the stock's value, CoreCivic argues, is inconsistent with a reliance on the efficient capital markets hypothesis.

But there is nothing inconsistent about embracing the concept of efficient capital markets generally and acknowledging that, in practice, some "public" disclosures may be so low-profile that there will be some slight delay before the information disclosed is reflected in the market. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) (observing that a presumption of capital efficiency does not require one "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market

price" (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 249 n.28 (1988))). CoreCivic seems to take the position that a party (and the court) must choose between either rejecting the idea of efficient capital markets outright or ascribing to the markets an outright mystical ability to immediately assimilate even the most obscurely reported information. Taken to its most absurd natural conclusion, CoreCivic's version of efficient capital markets would suggest that a stock price should instantly reflect any relevant fact disclosed, even if the fact was disclosed, for example, at the bottom of the tenth page of a small state's fifth-largest newspaper. The fact that that information reported only locally might take a small amount of time to be reflected in a price is not inconsistent with relying on the efficient capital markets hypothesis in a more general manner. The court, therefore, will not exclude Dalrymple's testimony.

## V. CONCLUSION

For the foregoing reasons, Amalgamated's Motion to Exclude Expert Testimony of Justin Marlowe (Doc. No. 357) and the defendants' Motion to Exclude Testimony of Donna Mellendick (Doc. No. 336) are hereby **GRANTED** in part and **DENIED** in part. It is hereby **ORDERED** that (1) Marlowe shall refrain from testifying that any statement by any defendant was reasonable, appropriate, non-misleading, or otherwise in compliance with any legal standard and (2) Mellendick shall refrain from testifying regarding the feasibility of performing cost comparisons between different facilities or methods of administering facilities or whether any defendant's statement about cost comparison was false or misleading. Amalgamated's Motion to Exclude Expert Testimony of Lucy P. Allen (Doc. No. 344) and Motion to Exclude Opinion Testimony of Defendants' Non-retained Experts William Dalius, Harley Lappin, Don Murray and Kim White (Doc. No. 351), as well as the defendants' Motion to Exclude Testimony of Scott Dalrymple (Doc. No. 339), are hereby **DENIED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge