# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

NIKKI BOLLINGER GRAE, Individually )
and on Behalf of All Others Similarly )
Situated, )
  )
Plaintiff, )
  )
v. )      **Case No. 3:16-cv-2267**
  )      **Judge Aleta A. Trauger**
CORRECTIONS CORPORATION OF )
AMERICA, DAMON T. HININGER, )
DAVID M. GARFINKLE, TODD J. )
MULLENGER, and HARLEY G. LAPPIN, )
  )
Defendants. )

## MEMORANDUM

Amalgamated Bank, as Trustee for the LongView Collective Investment Fund ("Amalgamated"), has filed a Motion for Partial Summary Judgment (Doc. No. 347), to which CoreCivic, Inc., Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin[1] have filed a Response (Doc. No. 393), and Amalgamated has filed a Reply (Doc. No. 428). The defendants have filed a Motion for Summary Judgment (Doc. No. 352), to which Amalgamated has filed a Response (Doc. No. 396), and the defendants have filed a Reply (Doc. No. 418). The defendants also have filed a Request for Judicial Notice (Doc. No. 366), to which Amalgamated has filed a Response (Doc. No. 392). For the reasons set out herein, CoreCivic's request for judicial notice will be granted, and each motion for summary judgment will be granted in part and denied in part.

---

[1] The court will refer to CoreCivic, Inc. as "CoreCivic" when discussing the actions of the defendant business entity and will also use "CoreCivic," at times, to refer to the defendants collectively, when describing their litigation positions and actions. At some times relevant to this case, CoreCivic went by its old name, Corrections Corporation of America, or "CCA," and that name will appear in some quotations. For the purposes of this opinion, the names are interchangeable.

# I. BACKGROUND

CoreCivic is a private, publicly traded company that owns and operates prisons and other detention facilities, pursuant to contracts with the government agencies ultimately responsible for the incarcerated individuals' confinement and welfare. (Doc. No. 397 ¶¶ 1–2.) This class action securities fraud case involves the actions and statements of CoreCivic and its executives from a period of February 27, 2012 to August 17, 2016 ("Class Period"). To put it in a somewhat simplified manner, Amalgamated, as the lead plaintiff, alleges that the defendants made false or misleading statements or omissions about the quality and cost savings that CoreCivic provided to government clients, including the federal Bureau of Prisons ("BOP"). Amalgamated argues that those statements and omissions created a false picture of the health of CoreCivic's relationship with the BOP and the BOP's likelihood of continuing to do business with CoreCivic. These false or misleading statements and omissions, it is alleged, led to an overvaluation of CoreCivic's stock and, ultimately, losses on behalf of its investors when the BOP's parent agency, the U.S. Department of Justice ("DOJ"), announced that it would phase out its reliance on CoreCivic and other private prison operators, leading the value of the stock to decrease. Amalgamated also argues that a similar, smaller loss occurred when, shortly ahead of the comprehensive DOJ announcement, the BOP declined to renew a renewable contract at one CoreCivic facility, the Cibola County Correctional Center ("Cibola").

## A. CoreCivic's BOP Prisons

During the Class Period, CoreCivic, according to its own disclosures, operated between 64 and 85 facilities for governments at the local, state, and federal level.[2] (*Id.* ¶ 3.) In a 2016

---

[2] Amalgamated disputes the materiality of this fact and the admissibility of the underlying CoreCivic disclosures, but it has identified no factual dispute regarding the numbers themselves. (Doc. No. 397 ¶ 3.) Indeed, a considerable portion of Amalgamated's responses follow that pattern. For reasons that the court will explain later in this opinion, a bare objection that a cited document is inadmissible is not, in and of

2

financial disclosure, CoreCivic boasted of an over 93% "retention rate" under its government contracts—with that percentage defined to reflect how often a client would avail itself of a previously agreed-to contract extension option to continue working with CoreCivic in a particular facility (as opposed to defining "retention" to include, also, government decisions to enter into wholly new contracts after all option periods had expired). (*Id.* ¶ 5; Doc. No. 360-1 at 15.) The rates for preceding years were similarly high or higher, with the lowest being an 87.8% rate in 2013. (Doc. No. 397 ¶¶ 6–11.)

During the Class Period, CoreCivic had contracts with the BOP to operate five facilities: Cibola, Adams County Correctional Center ("Adams"), Eden Detention Center ("Eden"), McRae Correctional Facility ("McRae"), and the Northeast Ohio Correctional Center ("NEOCC") (*Id.* ¶ 15.) During the Class Period, CoreCivic's revenue from those facilities accounted for between 9% and 13.7% of its total revenue. (*Id.* ¶ 16.) Each of the facilities was considered "low security" and mostly housed inmates who were not U.S. citizens. (*Id.* ¶ 18.)

The contract for each facility included a Statement of Work that set forth the minimum contract performance requirements, in the form of 18 "Performance Objectives." (*Id.* ¶ 20.) At least four of the contracts included provisions allowing CoreCivic to receive "Award Fees" for meeting or exceeding performance benchmarks. The parties agree that, during the Class Period, CoreCivic received award fees 10 times, with the awards ranging from 8% of the maximum possible fee to 90% of the maximum possible fee. According to CoreCivic, those 10 Award Fees were out of a total 18 opportunities in which Award Fees could have been earned, although

itself, inherently sufficient to exclude a fact from consideration on a motion for summary judgment. Under this court's Local Rules, a party seeking to establish that a fact is disputed must support that assertion 'by specific citation to the record." L.R. 56.01(c)(3). Where either party has raised only an admissibility-based objection to the other party's asserted undisputed fact and has not cited a basis for disputing the content of the fact itself, the court will treat that response as conceding, for the purposes of summary judgment, that the substantive content of the fact is undisputed and that the court can consider the fact, unless the record suggests that it will not be possible to present the fact in admissible form at trial.

3

Amalgamated disputes that CoreCivic has established that it had only 18 Award Fee opportunities. It appears undisputed, though, that CoreCivic's rate of receiving at least some Award Fee was not *better* than 10 out of 18 and that, for many of those 10 Award Fees earned, CoreCivic earned less than half of what it could have earned under the relevant contract. (*Id.* ¶¶ 21–23.)

The contracts between the BOP and CoreCivic were typically for an initial four-year period, with three options for successive two-year extensions that BOP could exercise or decline. The following chart shows the course of those contracts during the Class Period:

| Facility | Contract Start | Extension 1 | Extension 2 | Extension 3 |
|---|---|---|---|---|
| **Adams** | 4/1/09 | 7/31/13 (exercised) | 7/17/15 (exercised) | N/A |
| **Cibola** | 1/12/10 | 10/1/14 (exercised) | 7/29/16 (DECLINED) | N/A |
| **Eden** | 1/17/07 | 4/26/11 (exercised) | 4/30/13 (exercised) | 5/1/15 (exercised) |
| **McRae** | 10/27/11 | 12/1/16 (exercised) | 11/26/18 (exercised) | N/A |
| **NEOCC** | 12/23/04 | 6/1/09 (exercised) | 5/31/11 (exercised) | 5/29/13 (exercised) |

(*Id.* ¶¶ 25–40.) As the chart reflects, the BOP chose not to renew its contract with CoreCivic regarding one facility, Cibola, during the period, but otherwise exercised its renewal options.

## B. Monitoring and Review of CoreCivic BOP Facilities

### 1. Self-monitoring

According to CoreCivic and its executives, the company performed regular internal audits of its facilities and tracked the facilities' performance. CoreCivic executive Michael Nalley, for example, testified that CoreCivic's "robust internal audit system" was "very comprehensive" and "very stringent." (Doc. No. 361-15 at 75.) Although CoreCivic points to

4

evidence confirming the existence of CoreCivic's internal review systems, Amalgamated disputes that the evidence establishes that such reviews were thorough or adequate. (Doc. No. 397 ¶¶ 42–44.) For example, Amalgamated points to an internal CoreCivic analysis that concluded that CoreCivic's Quality Assurance ("QA") process did not sufficiently overlap with the BOP's own evaluation metrics, particularly in the area of health services. (Doc. No. 400-8 at 6.)

### 2. Third-Party Accreditation

CoreCivic's BOP contracts required its facilities to receive accreditation from the American Correctional Association ("ACA"). (Doc. No. 397 ¶ 46.) According to a 2005 BOP document, "[t]he BOP uses ACA accreditation at its own prisons to establish a baseline of acceptable performance." (Doc. No. 398-5 at 5.) CoreCivic successfully maintained ACA accreditation at all of its BOP facilities during the Class Period, which, according to CoreCivic, reflects the facilities' passing ACA audits, although Amalgamated suggests that that terminology overstates the intensity of ACA review. (Doc. No. 397 ¶ 47.) Accreditation documentation provided in connection with this case confirms that the ACA review process included "an outside review by a team of experienced independent auditors" but also that the ACA relied, in part, on "the satisfactory completion of a rigorous self-evaluation." (Doc. No. 361-25 at 3.)

Amalgamated does not factually dispute that CoreCivic's facilities maintained accreditation or that their operations were, at least in some way, reviewed by the ACA in the process. Amalgamated disputes, however, that successfully maintaining ACA accreditation is a meaningful indicator that a facility was being operated adequately. (*See* Doc. No. 397 ¶ 45.) For example, Amalgamated points out that D. Scott Dodrill, a retired BOP official hired by CoreCivic as an expert in this case, admitted in his testimony that he was not aware of any

instance in which any for-profit BOP prison operator lost its ACA accreditation during the Class Period—which, Amalgamated suggests, is evidence that maintaining baseline accreditation was not a significant accomplishment. (Doc. No. 398-3 at 224.)

Another entity, the Joint Commission, accredits certain healthcare facilities. During the Class Period, CoreCivic's BOP facilities maintained Joint Commission accreditation for their healthcare operations.[3] (Doc. No. 397 ¶¶ 50–51; Doc. No. 367-11 at 187.) As with ACA accreditation, the parties disagree regarding their characterizations of the thoroughness of the Joint Commission's reviews for its accredited facilities. There is, on one hand, no evidence that would suggest that a facility that successfully maintained Joint Commission accreditation would categorically have been an adequately operated facility. On the other hand, the evidence does show that Joint Commission accreditation played a meaningful role in the ongoing regulation of healthcare facilities, and there is no evidence in the record that any CoreCivic BOP facilities ever lost or improperly operated without that accreditation. (Doc. No. 397 ¶¶ 50–51.)

3. BOP Monitoring

The BOP itself performed audits and monitoring of its CoreCivic-operated facilities through its Program Review Division. Such reviews were at least annual. (Doc. No. 397 ¶ 52.) The parties agree that, as part of the Program Review process, the BOP inspected the performance of CoreCivic facilities, tested the adequacy of their internal quality controls, and assessed risks related to contract performance. (*Id.* ¶ 53.) Program Reviews were performed pursuant to guidelines based on the Statement of Work, professional guidelines referenced by the

---

[3] The cited evidence is not entirely clear in confirming that, in fact, every CoreCivic BOP facility received Joint Commission Accreditation, and Amalgamated does not concede that that was the case. The evidence, however, fairly supports the inference that each facility was so accredited, and there is no evidence that any CoreCivic BOP facility lacked Joint Commission accreditation for a healthcare facility for which accreditation would have been appropriate.

6

Statement of Work, applicable BOP policies, and any other appropriate measures and sources referenced by or otherwise within the scope of the relevant contract. (*Id.* ¶ 54.)

Additionally, the BOP's "Contract Facility Monitoring ('CFM') Section . . . provides subject matter expertise in the form of routine monitoring of contract prisons." (*Id.* ¶ 55.) At the conclusion of each review of a contractor prison, the CFM Section would issue a CFM Report documenting its findings, if any. (*Id.* ¶ 56.) A CFM Report could include findings of deficiencies, repeat deficiencies, "repeat repeat deficiencies," "repeat repeat repeat deficiencies," and "repeat repeat repeat repeat deficiencies," as well as "significant findings." (*Id.* ¶ 57; Doc. No. 398-6 at 5.) A guidance document from the Department of Justice defined deficiencies as "[p]roblems or weaknesses noted by the reviewer which are in need of correction. In its broadest sense, a deficiency includes any condition needing improvement. A deficiency can include: noncompliance from policy/regulation; lack of adequate internal controls; poor or unprofessional practice; inefficient practice; ineffective results; poor quality, etc." (Doc. No. 361-32 at 33.) A "repeat deficiency" is defined as "[a] deficiency that was also listed as a deficiency during the last program review," reflecting "the failure of internal controls that were developed to correct a noted deficiency." (*Id.* at 36.) A "significant finding" is "[a] pattern of events or single event normally linked to a program review objective that indicates a deficiency in an organization or organizational element" and "is usually based on several related deficiencies." (*Id.* at 37.) By Amalgamated's count, CoreCivic, during the Class Period, received "338 Deficiencies, 44 Repeat Deficiencies, 6 repeat Repeat Deficiencies, 2 triple-Repeat Deficiencies, 1 quadruple-Repeat Deficiency and 3 significant findings." (Doc. No. 396 at 13.)

BOP policy also calls for all privately operated facilities under contract with the BOP to have two full-time employees from the BOP's Privatization Management Branch ("PMB")

overseeing the facility, although Amalgamated does not concede that this policy was always adhered to. (Doc. No. 397 ¶ 63.) PMB personnel were onsite at the facilities to which they were assigned. (*Id.* ¶ 64.) On-site BOP personnel have the power to issue Notices of Concern ("NOCs"), identifying instances of contract nonperformance that they have witnessed or identified. (*Id.* ¶ 66.) An NOC is, in the words of the DOJ Office of the Inspector General ("OIG"), "a memorandum the PMB staff submits to a contractor when the contractor is performing below a satisfactory level and the deficiency is more than minor or is a repetitive deviation from the contract requirements." (*Id.* ¶ 66; Doc. No. 361-28 at 9.) The parties agree that, during the Class Period, CoreCivic facilities received a number of NOCs. (Doc. No. 397 ¶ 67.)

BOP contractors were also evaluated pursuant to the BOP's Contractor Performance Assessment Reporting System ("CPARS"), which provided "tools to measure the quality and timely reporting of past performance information." Each CPARS report was known as a Contractor Performance Assessment Report, or "CPAR." (*Id.* ¶ 69; Doc. No. 361-37 at 2.) The Federal Acquisitions Regulation ("FAR")[4] refers to the CPARS as the "official source for past performance information," although Amalgamated suggests that that phrase, taken out of context, could inflate the system's importance, given that the parties agree that other sources existed that reflected contractor performance in the BOP-contractor relationship. (Doc. No. 397 ¶ 69.) Amalgamated also suggests that CPARs, compared to other sources, painted an overly favorable picture of the contractor under review, because the contractor had a greater opportunity to influence their content. (Doc. No. 396 at 21–22.) The FAR calls for contractor performance in

---

[4] "The Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies. The Federal Acquisition Regulations System consists of the Federal Acquisition Regulation (FAR), which is the primary document, and agency acquisition regulations that implement or supplement the FAR." 48 C.F.R. § 1.101.

particular areas to be assessed on a five-tier scale, receiving a rating of either Exceptional, Very Good, Satisfactory, Marginal, or Unsatisfactory. 48 C.F.R. § 42.1503, table 42-1.

## C. Performance of Individual Facilities

The documentation memorializing the BOP's dealings with CoreCivic facilities is substantial, and the court will not summarize every potentially relevant finding or event here. The court will, rather, highlight some key facts that are representative of the nature and trajectory of the BOP's relationship to CoreCivic with regard to each facility.[5]

### 1. Adams

During the Class Period, the BOP issued at least four CPARs for Adams.[6] (Doc. No. 397 ¶ 74.) A November 8, 2012, CPAR included ratings in five areas, three of which were rated "Satisfactory" and two of which were rated "Very Good." The more detailed narrative assessment noted a number of deficiencies—17 in total, most commonly in the area of health services—but stated that CoreCivic had performed "all vital functions" under the contract. The reviewer stated, under the "Recommendation" section, "Given what I know today about the Contractor's ability to execute what they promised in their proposal, I definitely would award to them today given that I had a choice." (Doc. No. 367-12 at 2–3.) The report added, however,

---

[5] The court notes that CoreCivic's history of NOCs, in particular, is discussed in greater detail in the court's Memorandum of December 18, 2017. (Doc. No. 76 at 3–13.) Although that Memorandum was drafted at the motion to dismiss stage and therefore was not based on an evidentiary record, CoreCivic has, at least generally speaking, not identified grounds for disputing the depiction of it as having frequently and repeatedly received NOCs at its facilities.

[6] The defendants assert that there were five CPARs for Adams, but Amalgamated concedes only four. Amalgamated also objects that the CPARs are inadmissible hearsay. The relevance of those reports, however, is not limited to the objective truth or falsity of their assessments, but rather extends to the impression they gave CoreCivic and its executives of the BOP's view of the company's performance. *See United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay.") (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009)). All other admissibility issues aside, therefore, the court may consider the CPARs at least insofar as they bear on the subjective understanding of CoreCivic personnel.

9

that, "[w]hile the Contractor has an extensive Quality Control audit tool, the tool was not effective in all areas . . . ." (*Id.* at 2.)

CPARs from 2013 through 2016 were similar, albeit with some variation, including better or worse individual ratings. For example, an August 2013 CPAR included two "Very Good" ratings, two "Satisfactory" ratings, and one "Unsatisfactory" rating, while noting "[s]everal deficient procedures or areas of non-conformance," including over 20 deficiencies, although the CPAR still provided a positive recommendation. (Doc. No. 367-21 at 2.) A CPAR from January 2015 had mostly "Satisfactory" ratings, with one "Very Good," but acknowledged a number of deficiencies, including 11 in the area of Health Services. (Doc. No. 367-22 at 3.) An October 2016 CPAR gave CoreCivic "Exceptional" and "Very Good" ratings for "Business Relations" and "Timeliness of Performance," respectively, but otherwise gave only "Satisfactory" ratings, including for "Quality." (Doc. No. 367-4 at 2.) The narrative assessment stated that "the contractor at the Adams County Correctional Center (ACCC), delivered a quality of service to the Bureau of Prisons (Bureau) that met the baseline contract requirements," and the reviewer's recommendation was once again positive. (*Id.* at 3, 7.) The picture painted by the Adams CPARs, overall, is that deficiencies, including recurring, unremedied deficiencies, were common, and ratings in areas were sometimes below "Satisfactory," but that the facility was nevertheless usually found to have provided the core services required in a broadly acceptable, though not exemplary, manner, causing the facility to receive positive recommendations. (*See* Doc. No. 397 ¶ 76.)

On May 20, 2012, there was a riot[7] at Adams. An account of the riot based on the information alleged in the pleadings can be found in the court's Memorandum of December 18,

---

[7] CoreCivic prefers the term "disturbance" to the term "riot" to describe this incident, but it does not dispute that the underlying events involved prisoners' congregating and using force against facility

2017. (Doc. No. 76 at 3–5.) The version of the riot described by the materials available at this stage is, at least in its general details, largely the same. In short, Adams personnel lost control of the facility population and, among other things, some facility staff were taken hostage and one staff member—that is, one of CoreCivic's own employees—was killed. (Doc. No. 397 ¶¶ 77–80.) A BOP on-site monitor was present for and witnessed the riot. (*Id.* ¶¶ 81–83.)

After the riot, the BOP drafted an After-Action Report. (*Id.* ¶ 84; Doc. No. 367-25.) The After-Action Report concluded that the riot could "be directly attributed to actions taken by the [Adams] administration leading up to the event." (Doc. No. 367-25.) The Review observed, in particular:

> [Adams] administration did not grasp the severity and degree of the Mexican national inmates' intent to orchestrate a meeting with approximately 1,700 Mexican national inmates and to escalate the situation to include violence toward staff if their demands were not met. Had the [Adams] administration understood the inmates' intentions, a preventative lock down could have been initiated. Systemic problems existed in the areas of communication, staffing deficiencies impacting performance, and deficits in intelligence systems. Specifically, the lack of Spanish-speaking staff, experienced staff, and experienced staff in the Intelligence Office . . . negatively affected the flow of communication and intelligence gathering.

(*Id.*)

The riot itself became public knowledge, although not all of the surrounding details were immediately known. CoreCivic mentioned the riot as an "inmate disturbance" in its Form 10-Q for the quarter that ended on June 30, 2012, and CoreCivic has identified instances in which commentators or analysts mentioned the underlying events in the context of discussing the potential effect, if any, on CoreCivic's value as a company, but CoreCivic has not identified any contemporaneous disclosures or analyses that acknowledged the substantive finding of

---

personnel. (Doc. No. 397 ¶¶ 77–80.) Based on the agreed-upon facts, the court is comfortable using the term "riot." The court notes, however, that the terminology used is ultimately of little, if any, importance relative to the details themselves.

culpability in the After-Action Report. (Doc. No. 397 ¶¶ 86–88.) CoreCivic also identifies a June 2016 article in *The Nation* magazine that discusses the events in some detail, including some aspects of the After-Action Report. (*Id.* ¶ 91; Doc. No. 340-18 at 5–17.)

### 2. NEOCC

During the Class Period, the BOP issued four CPARs for NEOCC. (Doc. No. 397 ¶ 97.) NEOCC's CPAR issued for the performance period of June 1, 2011, through May 31, 2012, recommended, "Given what I know today about the Contractor's ability to execute what they promised in their proposal, I probably would award to them today given that I had a choice." (*Id.* ¶ 98; Doc. No. 376-26 at 2.) Half of that CPAR's ratings were "Satisfactory," and the other half were "Very Good." (*Id.*) The CPAR did, however, note some deficiencies during the review period. (*Id.*) It also observed that "[t]he responsiveness at the institution level has not always been favorable." (*Id.*) NEOCC's other CPARs were broadly similar or better, including a number of "Very Good" ratings and laudatory statements in the narrative, although some deficiencies were still noted. (*See, e.g.*, Doc. No. 367-27 at 2; Doc. No. 367-28 at 2.)

The third and final option period under the NEOCC contract ended on May 31, 2015. (Doc. No. 397 ¶ 101.) The BOP had issued a Pre-Solicitation Notice on March 25, 2013, beginning the process of soliciting and reviewing new bids to perform future contract facility operations housing non-citizen BOP prisoners. (*Id.* ¶¶ 102–05.) CoreCivic submitted a bid for the contract to be fulfilled at NEOCC. (*Id.* ¶ 107.) The contract that CoreCivic sought for NEOCC was instead rewarded to The GEO Group, Inc. ("GEO"), despite GEO's bid having included a higher price than CoreCivic's. (*Id.* ¶ 109.) The BOP, in its internal Source Selection Decision document, stated that "GEO's strengths lead to a significantly better past performance rating (Very Good vs Poor) and technical rating (Very Good vs Acceptable) compared to CCA's

12

NEOCC proposal," resulting in the conclusion that GEO offered a greater value despite the higher price (Doc. No. 367-34 at 55.)

CoreCivic maintains that the Source Selection Decision document was not provided to CoreCivic, and, while Amalgamated argues that CoreCivic has not definitively established that the document was not shared, there is no cited evidence suggesting that CoreCivic did contemporaneously receive the full internal explanation. (Doc. No. 397 ¶ 112.) CoreCivic did, however, receive a notification of the BOP's decision that included the total estimated cost of the GEO bid and explained that CoreCivic was not found to offer the "best value to the Government." (*Id.* ¶ 110; Doc. No. 362-17 at 3–4.) Amalgamated has pointed to evidence from internal CoreCivic correspondence confirming that, regardless of whether the document itself was shared, CoreCivic was aware that it was passed over, despite its superior price. (Doc. No. 397 ¶ 112.)

### 3. Cibola

On January 9, 2015, Cibola received a Cure Notice from the BOP that listed seven items of non-conformance in health services and stated that, "unless the conditions are cured by April 21, 2015 the Government may terminate this contract." (*Id.* ¶ 116.) The Cure Notice stated that "Cibola County Correctional Center has numerous and repetitive items of critical nonconformance in the area of Health Services, specifically, Patient Care," including that "emergency medical care prior to an inmate's death was not provided by on-site medical staff as required by policy," because, among other things, "the only medical staff on duty left the scene during CPR and did not return." (*Id.*; Doc. No 362-23 at 7.) The Cure Notice warned that "[f]ailure to provide proper healthcare in accordance with the contract requirements can seriously jeopardize inmate, staff, and public health" and complained that some of the deficiencies that

13

formed the basis for the notice "have been noted deficient back to 2011" (Doc. No. 362-23 at 10.)

On April 20, 2015, CoreCivic sent a letter in response to the Cure Notice, in which it outlined a number of steps it claimed to be taking to address the issue of staffing for health services at Cibola, including the hiring of new personnel and the implementation of bonuses to improve retention. (Doc. No. 362-24 at 2–3.) On April 27, 2015, BOP Procurement Executive Matt Nace sent an email to Cibola's warden acknowledging "excellent progress" at the facility. (Doc. No. 362-37 at 2.) On or around May 18, 2015, the BOP sent CoreCivic notice that, in light of the facility's progress, the BOP was lifting its imminent threat of contract termination for Cibola. (Doc. No. 397 ¶ 123.) Internal correspondence among CoreCivic executives in 2016, however, showed that problems and inadequacies regarding health services at Cibola had continued, with executives voicing serious concerns and even outright pessimism regarding the success of the company's corrective efforts. (Doc. No. 398-19 at 1–3.) Some details of the Cure Notice were eventually revealed to the public in the aforementioned article in *The Nation*. (Doc. No. 397 ¶ 129.)

During the Class Period, the BOP issued five CPARs regarding Cibola. (*Id.* ¶ 124.) A CPAR from October 2012 included a mixture of "Satisfactory" and "Very Good" ratings and recommended, "Given what I know today about the Contractor's ability to execute what they promised in their Proposal. I definitely would award to them today given that I had a choice." (Doc. No. 367-38 at 2–4.) The CPAR credited Cibola with a "self-imposed high level of performance" but also acknowledged "some difficulty conforming with contract requirements for inmate health care," particularly with regard to adequate staffing. (*Id.* at 2.) Later, however, some CPARs were less positive. A CPAR covering periods of 2013 and 2014, for example, included

14

two "Marginal" ratings, although it did ultimately include a positive recommendation. (Doc. No. 367-40 at 3, 5.) A CPAR covering the next year continued to find "Quality" to be "Marginal," while still making a positive recommendation. (Doc. No. 367-41 at 2, 6.) The "Marginal" rating in the "Quality" metric continued for the next year as well. (Doc. No. 367-42 at 2.) The CPARs' narratives also reflected Cibola's history of deficiencies, including repeated deficiencies related to health services and staffing levels. (Doc. Nos. 367-38 to -42.)

In mid-2016, following several years of noted concerns, the BOP declined to exercise its renewal option under the Cibola contract, and the non-renewal was reported by news media in early August of that year. (Doc. No. 397 ¶ 130.) CoreCivic itself acknowledged the non-renewal no later than August 4, 2016, in its Form 10-Q for the second quarter of that year. (*Id.* ¶ 131.)

    4. Eden

During the Class Period, the BOP issued five CPARs regarding Eden. (*Id* ¶ 133.) A CPAR issued in July 2013 included four "Very Good" ratings and one "Satisfactory" rating. (Doc. No. 367-43 at 2.) It noted "some areas of non-conformance" but ultimately gave a positive recommendation. (*Id.*) The following year's CPAR was also laudatory, rating the facility's "Quality" as "Exceptional." (Doc. No. 367-44 at 2.) Ratings thereafter, however, declined. A September 2016 CPAR, covering portions of 2014 and 2015, rated both "Quality" and "Management" as "Marginal" and observed over 20 deficiencies. (Doc. No. 367-45 at 2.) The narrative assessment observed that "[t]he August 2014, CFM review resulted in a Significant Finding in the 'Administration and Patient Care' at the Eden Detention Center. . . . The CFM identified six repeat-deficiencies and five deficiencies—ultimately resulting in a Significant Finding warranting a follow-up CFM review in February 2015" (*Id.*) The CPAR also noted five NOCs during the assessment period, four of which were related to staffing levels (including one

15

based on staffing levels in health services). (*Id.* at 3.) The CPAR also noted that the BOP had deducted several hundreds of thousands of dollars from CoreCivic's invoices related to Eden for issues related to staffing. (*Id.* at 4.) In the following year, the "Marginal" ratings were upgraded to "Satisfactory," but the CPAR noted several additional instances of noncompliance, including those for which NOCs were issued. (Doc. No. 367-46 at 2–3.)

### 5. McRae

During the Class Period, the BOP issued five CPARs for McRae. (Doc. No. 397 ¶ 136.) A CPAR issued in December 2012 included one "Satisfactory" rating, two "Very Good" ratings, and one "Exceptional" rating. (Doc. No. 367-47 at 2.) The CPAR did, however, note two NOCs, nine deficiencies, and one repeat deficiency. (*Id.*) The reviewer recommended, "Given what I know today about the Contractor's ability to execute what they promised in their proposal. I definitely would award to them today given that I had a choice." (*Id.* at 3.) The McRae CPARs throughout the Class Period remained largely positive. Although the BOP noted some instances of nonconformance, including those for which NOCs were issued, the ratings and recommendations that the facility received continued to be supportive and laudatory. (Doc. Nos. 367-48 to -51; Doc. No. 397 ¶ 138.)

### D. The OIG Review of BOP Contractors

On August 11, 2016, the DOJ publicly released a report entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" ("OIG Review"). (Doc. No. 397 ¶ 139.) The authors of the OIG Review explained that the OIG "initiated this review to examine how the BOP monitors [private prison] facilities" as well as to "assess[] whether contractor performance meets certain inmate safety and security requirements and analyze[] how contract prisons and similar BOP institutions compare with regard to inmate safety and security data." (Doc. No. 149-

1 at *i*.) The Review, which included examination of CoreCivic facilities and data, found that, "in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." (*Id.*) The OIG Review noted that, in "recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer"—that death being the death of the officer killed at Adams. (*Id.* at 2.) The OIG Review observed that CoreCivic facilities experienced substantially higher rates, relative to BOP institutions, of a number of unwelcome occurrences, such as inmate fights, inmate-on-inmate assaults, and suicide attempts or self-mutilations. (*Id.* at 60–67.)

The Review did not recommend that the BOP stop using contract prisons. Rather, it offered four recommendations, all of which contemplated, or at least did not foreclose, continuing to work with private prison contractors. First, the Review recommended that the BOP

> 1. Convene a working group of BOP subject matter experts to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions in a number of key indicators, and identify appropriate action, if necessary.

(Doc. No. 149-1 at 45.) The remaining three recommendations were made for the purpose of "improv[ing] monitoring and oversight of BOP contract prisons":

> 2. Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.
>
> 3. Ensure that correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.
>
> 4. Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

(*Id.*)

Appendix 9 to the Review consisted of response letters from the contractors under review, including CoreCivic. CoreCivic suggested that the allegedly higher incidences of undesirable events at contract prisons could be attributed to the fact that contract prisons tend to house a demographically different population than BOP prisons. In particular, CoreCivic noted that its prisons housed a disproportionate number of foreign nationals, which, CoreCivic argued, posed unique security challenges. Ultimately, CoreCivic wrote:

> We share the interests of the OIG and the BOP in ensuring contract prisons are operated safely and securely and in compliance with contract requirements. We are also committed to working in partnership with the BOP to address any recommendations in furtherance of these goals. . . . We look forward to further discussions with the BOP regarding the data and recommendations in the report and collaboration on any policy or operational changes.

(*Id.* at 70.)

## E. The Yates Memo

On August 18, 2016, just a few days after the release of the OIG Review, Deputy Attorney General Sally Q. Yates issued a memorandum to the BOP entitled "Reducing our Use of Private Prisons" ("Yates Memorandum"). (Doc. No. 149-4.) The Yates Memorandum directed that, "as each [BOP private prison] contract reaches the end of its term, the Bureau should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population." (Doc. No. 149-4 at 3.) DAG Yates explained that, while "[p]rivate prisons served an important role during a difficult period, . . . time ha[d] shown that they compare poorly to our own [BOP] facilities." (*Id.* at 2.) Private facilities, Yates wrote, "simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and . . . they do not maintain the same level of safety and security." (*Id.*) Yates concluded that the BOP should "begin[] the process of reducing—and ultimately ending—our use of privately operated prisons." (*Id.* at 3.) The

Memorandum noted that , the BOP was "already taking steps in this direction," in that, "[t]hree week ago, the Bureau declined to renew a contract for approximately 1,200 beds"—a reference to Cibola. (*Id.*)

## F. CoreCivic's Stock Price

As a publicly traded company, CoreCivic's shares were available on the open market at a price reflecting the collective public valuation of the company among potential buyers and sellers. On August 4, 2016, the value of the stock fell by 6.2%. The parties sharply disagree regarding the cause or causes for the drop. CoreCivic maintains that the drop was solely caused by the status of negotiations with U.S. Immigrations and Customs Enforcement ("ICE"), another federal client not overseen by the DOJ. Amalgamated suggests that the drop in price was attributable, at least in part, to the non-renewal of the Cibola contract, which had been publicly acknowledged by CoreCivic on August 4, 2016, but which, CoreCivic argues, was mentioned in news coverage before that date. (Doc. No. 429 ¶¶ 79–80.) The parties agree that there was no statistically significant change in CoreCivic's share price in the two days immediately preceding August 4. (*Id.* ¶¶ 77–78.)

The parties agree that there was no statistically significant change in CoreCivic's stock price on August 11, 2016, the day of the release of the OIG Review. (*Id.* ¶ 81.) On August 18, 2016, however, in the immediate wake of the release of the Yates Memorandum, CoreCivic's stock price decreased by 35.5%. (*Id.* ¶ 81.) Because the Memorandum addressed private prison contractors generally, and not CoreCivic alone, CoreCivic was not the only entity affected. For example, GEO's stock price decreased by 39.6%.that day as well. (*Id.* ¶ 83.) CoreCivic's stock price ultimately rebounded following the 2016 presidential election and rose slightly further

when, in February 2017, the newly sworn Attorney General rescinded the Yates Memorandum. (Doc. No. 397 ¶¶ 143, 146–47.)

## G. Relevant CoreCivic Statements Throughout the Class Period

Amalgamated has identified a number of statements throughout the Class Period that, it argues, were false and/or misleading. Each statement was publicly made, often in the context of either a disclosure required by securities laws or in a public communication with investors. Accordingly, the specific content and timing of the statements are largely uncontested, although the parties' interpretation of that content often differs substantially.

Although any single statement has the capacity, on its own, to form the premise of a securities fraud claim, "[t]he key question . . . is 'whether defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Skechers USA, Inc. Secs. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (quoting *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). Amalgamated, in a Response to one of CoreCivic's Interrogatories, provided a comprehensive list of the statements on which it purports to base its claims, and Amalgamated cites that Response in its briefing as "the only valid compilation of the statements at issue." (*See* Doc. No. 265-15 at 7–38; Doc. No. 396 at 4 n.6.) CoreCivic has supplied an alternative list of what it believes, based on the operative complaint, to be the statements at issue, which it included as Appendix A to its Memorandum in support of its Motion for Summary Judgment. (Doc. No. 352-2.) Rather than going through the relevant statements one by one, the court will provide a few emblematic instances of statements that Amalgamated challenges as false or misleading regarding one or both of the two general issues at the heart of this case: quality and cost savings.[8]

---

[8] CoreCivic suggests, based on its citation to an unpublished Sixth Circuit case, that this court must go through a "statement-by-statement analysis" of each of the individual alleged misstatements. *Bondali v.*

For example, on March 30, 2016—relatively late in the Class Period—Hininger wrote, in a letter to shareholders, "Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners. By consistently doing so, we have experienced more than three decades of continued growth and contract retention rates in excess of 90 percent." (Doc. No. 423 ¶ 198.) He further emphasized:

> We take pride in our strong record of operational excellence that has earned CCA the confidence of our government partners. To maintain this confidence CCA is focused on our long-term performance. This requires we provide our facilities and staff with the necessary resources to operate the best corrections, detention and residential reentry facilities. It is only through our commitment to our long-term performance that CCA will drive future growth and increase shareholder value.

(*Id.*)

Similarly, at a June 2016 presentation, Hininger responded to a question about CoreCivic's viability in a potentially changing political environment as follows:

> One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements. But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well. We have operationally made sure that we are providing high quality and standard and consistent services to our partners and being very flexible and innovative in the solutions. And with that, we've had some nice growth in our business under those three respective Presidents. We had a lot of growth under Clinton, we had a lot of growth under

---

*YumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015). The proposition that that case set forth some absolute drafting rule for summary judgment opinions in securities fraud cases, however, is mistaken. The point that the Sixth Circuit made in *Bondali* was that the need to consider a body of statements together, in context, does not change the fact that, for liability to be found, at least some "particular statement" must either be "literally false" or "create[] a false impression." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)). This case involves dozens of statements, each of which says virtually—and in some cases, actually—one of the same few things. The court has discussed these statements in detail before and given numerous examples. Its discussion of the potential truth and falsity of those claims, as a legal matter, is the law of the case. Insofar as CoreCivic maintains that the court's analysis is nevertheless deficient unless it expressly acknowledges every statement, the court directly references and incorporates CoreCivic's Appendix A and Amalgamated's cited Interrogatory Response and notes that the specific examples in the body of this opinion are meant only to provide a representation of the general content and tenor of the statements at issue.

Bush, and we've had a lot of growth under President Obama. And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate . . . cost savings in our services, then I think we'll be just fine.

(Doc. No. 423 ¶ 201.)

Although Hininger's 2016 statements were especially in-depth, CoreCivic made other claims about the relationship between the quality of CoreCivic's services and its continued business from clients throughout (and before) the Class Period. For example, numerous reports that CoreCivic made to the SEC, beginning in November 2011, included the following statement:

> We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

(*Id.* ¶¶ 199–200.) Other examples include a November 2014 presentation in which CoreCivic boasted that "short- and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality" (*Id.* ¶ 206.)

The defendants point out that, during the Class Period, CoreCivic did publicly disclose some reasons for concern regarding the long-term sustainability of the BOP's reliance on private prisons. Specifically, CoreCivic acknowledged that the BOP's shift in favor of private facilities had been precipitated, at least in part, by significant overcrowding in BOP facilities. Starting in November 2015, CoreCivic's SEC filings began to disclose that changes in policy had begun to cause a decline in federal prison populations and that that trend could continue. At the same time, however, CoreCivic offered reasons why the decline in overcrowding might not negatively affect CoreCivic. (Doc. No. 397 ¶¶ 151–54.)

CoreCivic and executives also made a number of statements regarding supposed cost savings offered by relying on private prison contractors. For example, On October 2, 2013,

22

CoreCivic held a "2013 Analyst Day," in which CoreCivic executives made a presentation to investors and analysts. The presentation included a slide entitled "The Value CCA Provides to Government Partners and Taxpayers," claiming that a cited "Temple University Study" had "substantiated" what the slide referred to as "annual cost savings of 12% or more." (*Id.* ¶¶ 158–59.) The "study" described was a working paper that was funded in part by private prison operators, including CoreCivic. The fact that private prison contractors had funded the project was noted on the slide itself. (*Id.* ¶ 160; Doc. No. 363-31 at 15.) In other investor presentations and disclosures, defendants made similar claims about alleged cost savings from privatization and/or from contracting with CoreCivic, in particular, including claims citing to studies that CoreCivic had had a hand in funding. (Doc. No. 397 ¶¶ 167–76.)

CoreCivic also frequently compared supposed per diem costs between CoreCivic prisons and BOP-operated facilities. Amalgamated, however, raises a number of objections to those figures, suggesting that they did not present a fair picture of the actual relative costs of public and private prisons. For example, Amalgamated objects that CoreCivic's per diem figures for its own facilities

> did not include costs associated with the fact that taxpayers fund the privatization management branch, which oversees the contract; taxpayers fund the public sector employees who write the contract; taxpayers fund the BOP employees who manage the process of awarding a contract; taxpayers fund the public sector staff who monitor the contract while the prison is being operated; taxpayers fund the staff who write and update policies and procedures to cover the operations of for-profit prisons within the BOP's correctional system; taxpayers fund the senior management of the BOP who had responsibility with respect to BOP inmates who are in private prisons; and taxpayers fund the various other overhead costs associated with letting a contract, overseeing a contract and maintaining ultimate accountability for the inmates in private prisons such that an approach to cost comparison that does not allocate overhead costs to the private vendor would underestimate the true costs of contracting for the services.

(*Id.* ¶ 177.)

23

As Amalgamated points out, the supposed cost savings of private prisons are contested, and even the appropriate methodology for making such comparisons is uncertain. A 2007 report by the Government Accountability Office ("GAO") concluded that "[i]t is not currently feasible to conduct a methodologically sound cost comparison of BOP and private and low minimum security facilities because these facilities differ in several characteristics and BOP does not collect comparable data to determine the impact of these differences on cost." (Doc. No. 359-5 at 3.) CoreCivic's own expert on public budgeting, Professor Justin Marlowe, acknowledges these uncertainties, writing that "there is no one universally accepted methodology for comparing costs" and, "[a]s would be expected given the complexity in measuring and comparing costs between private and public correctional facilities, however, some divergent opinions exist." (Doc. No. 356-4 ¶¶ 21–22.)

Even when savings from privatization are concrete, moreover, they may be situational and may not reflect sustainable efficiency advantages. For example, if a government experiences a temporary excess in its prisoner population, it would, unsurprisingly, likely be less expensive to temporarily pay to house overflow in a private facility, if the only other alternative would be to construct an entirely new public facility. Those savings, though, would not necessarily suggest that prison privatization is a more cost-effective alternative generally. (*See* Doc. No. 397 ¶ 156.) It is, moreover, also possible for situational factors to render privatization particularly *expensive*, such as when the government must expend resources to address undesired and unforeseen situations associated with contractor underperformance. (*Id.*)

The OIG Review included an examination of the costs of contract prisons and BOP-operated prisons, and it concluded that "the average annual costs in the BOP institutions and the contract prisons per capita were $24,426 and $22,488, respectively." (Doc. No. 149-1 at 12.) The

24

Review, however, "caution[ed] against drawing the conclusion from that data . . . that contract prisons are necessarily lower cost than BOP institutions on an overall basis." (*Id.* at 11–12.) The OIG explained that it had been "unable to compare the overall costs of incarceration between BOP institutions and contract prisons in part because of the different nature of the inmate populations and programs offered in those facilities." (*Id.* at 11.)

## H. This Case

On August 23, 2016, Nikki Bollinger Grae filed a Class Action Complaint in this case. (Doc. No. 1.) Notice of the suit was published in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(A)(i), and Amalgamated filed a timely motion to be appointed lead plaintiff, see 15 U.S.C. §78u-4(a)(3)(B)(i). (Doc. No. 38.) Amalgamated claimed to have purchased or acquired almost 159,000 shares of CoreCivic stock and suffered over $1.2 million in losses as a result of the conduct covered by the suit. (Doc. No. 39 at 5.) The court granted Amalgamated's motion, appointing it the lead plaintiff for the case. (Doc. No. 52.)

On December 18, 2017, the court denied a Motion to Dismiss filed by the defendants. (Doc. Nos. 76–77.) In so doing, the court addressed a number of the core issues that continue to be central to this case, including, in particular, whether claims about the quality of CoreCivic's services could be actionable for fraud or whether they were, instead, merely non-actionable "puffery." The court concluded that Amalgamated's causes of action were, if supported by the facts, viable. (Doc. No. 76 at 28–30.)

On January 18, 2019, the court denied Amalgamated's Motion to Certify Class. (Doc. Nos. 143–44.) Amalgamated, however, filed a Motion to Reconsider, and, on March 26, 2019, the court granted that motion, based in significant part on arguments that Amalgamated had not

originally pursued but which the court deemed not to be waived. (Doc. Nos. 165–66.) In addressing the class certification issue, the court also addressed another key question in this case—whether claims for securities fraud could be premised on the theory that the defendants' false or misleading public statements artificially maintained the high value of CoreCivic stock, a "fraud-on-the-market" theory alleging "price maintenance," in the parlance of securities law. The court held that such a theory was an appropriate basis for liability under federal securities laws. (Doc. No. 165 at 25.) CoreCivic pursued an interlocutory appeal on that issue, which the Sixth Circuit denied, writing that its "case law supports the legal standard that the district court applied." (Doc. No. 13-1 at 2.)

CoreCivic now seeks summary judgment in its favor on all issues, and Amalgamated seeks partial summary judgment on one issue—reliance. (Doc. Nos. 347, 352.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party."

26

*Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

### A. Evidentiary Issues Related to Summary Judgment

#### 1. Judicial Notice

As a preliminary matter, CoreCivic asks the court to take judicial notice of "(1) publicly available Securities and Exchange Commission . . . disclosures; (2) publicly available articles, news releases, and reports; (3) publicly available government documents; and (4) evidence regarding CoreCivic's stock price," pursuant to Rule 201 of the Federal Rules of Evidence. (Doc. No. 366 at 1.) Rule 201 permits a court, either by motion of a party or on its own motion, to "judicially notice a fact that is not subject to reasonable dispute because it" either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Because Rule 201 is a creature of the Rules of Evidence, it permits a court to treat a fact as proven, for the purposes of trial, without the need for adhering to all of the ordinary requirements associated with the admission of evidence—such as laying foundation, performing authentication, or

27

swearing an appropriate witness. CoreCivic asks the court to use that mechanism to consider a number of publicly discoverable documents, such as its own corporate filings, as well as widely available news articles.

Because the court is currently considering only a motion for summary judgment, Rule 201 is not itself strictly necessary in order to bypass the formalities of admitting evidence. The fundamental basis of a Rule 56 motion is not evidence, but facts—specifically, facts, supported by citation to the record, that the court is permitted, by the Rules of Civil Procedure, to treat as undisputed, either because the parties actually agree on those facts or because the party challenging the facts has not disputed them sufficiently to persuade a reasonable fact finder. An asserted undisputed material fact needs only to be (1) supported by citation to the record, Fed. R. Civ. P. 56(c)(1), and (2) capable of being presented at trial in some admissible form, Fed. R. Civ. P. 56(c)(1). *See Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *Mount Vernon Fire Ins. Co. v. Liem Constr., Inc.*, No. 3:16-CV-00689, 2017 WL 1489082, at *3 (M.D. Tenn. April 26, 2017) (Crenshaw, J.); *Wilson v. Stein Mart, Inc.*, No. 3:15-CV-01271, 2016 WL 4680008, at *2 (M.D. Tenn. Sept. 7, 2016) (Nixon, S.J.); Jeffrey W. Stempel et al., 11–56 Moore's Federal Practice— Civil § 56.91 (2018); *see also Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. After a 2010 revision to Rule 56, materials cited to support or dispute a fact need only be capable of being presented in a form that would be admissible in evidence." (citations and internal quotation marks omitted)). At this stage, then, the determinative issue is not technically whether the requirements of Rule 201 have been satisfied, but whether the asserted facts can be presented in admissible form at trial.

28

Amalgamated has not identified any plausible reason why the facts cited would be incapable of being established with admissible evidence, if it came to that. That said, the court will note that most, if not all, of the cited materials will likely be appropriate for judicial notice at trial—not for the truth of the facts asserted therein, but for the basic fact that the documents exist and say what they say. *See Platt v. Bd. of Commissioners on Grievances & Discipline of Ohio Supreme Ct.*, 894 F.3d 235, 245 (6th Cir. 2018) (noting that court "may take notice of the documents and what they say, but it '[cannot] consider the statements contained in the document for the truth of the matter asserted'" (quoting *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014)). It is appropriate, for example, to take judicial notice of "the full text of the SEC filings, prospectus[es], [and] analysts' reports," but that does not mean that they constitute evidence that their contents were accurate. *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773–74 (M.D. Tenn. 2013) (Haynes, J.) (quoting *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001)). If CoreCivic or its attorneys had forged or altered any of these publicly discoverable documents, it would be easy for Amalgamated to find out (and to request extremely severe consequences against the culpable attorneys for doing so). The court, therefore, sees no obstacle to taking judicial notice of SEC disclosures or government documents. While historical stock prices technically fall outside those categories, the court similarly sees no obstacle to considering those historical prices, at least at this stage.

News reports present a somewhat more difficult case, but the Sixth Circuit has previously "take[n] judicial notice of the fact that . . . media articles . . . were published, without reaching any conclusions about their truth." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 662 n.10 (6th Cir. 2005). It may be that there are some obscure publications for which

29

such judicial notice of their content would be inappropriate. In this era, however, when significant news sources are widely archived and available through third-party databases, it would make little sense to require a party to hunt down witnesses to confirm, for example, that a news story was actually in a newspaper—at least, unless there is some reason to doubt that the article is real. None of the supposed facts reported in such a story, of course, can be treated as proven by that judicial notice. But noticing the article's existence is far less problematic. The court will, therefore, grant CoreCivic's motion, at least insofar as it is necessary to do so to consider the underlying facts in support of its motion for summary judgment.

### 2. Other Objections

The same principles resolve most of the other evidentiary objections that have been made (primarily by Amalgamated) regarding the admissibility of evidence relied upon in support or opposition to the pending motions. Amalgamated raised objections, most often on the basis of hearsay, with regard to a large number of CoreCivic's asserted undisputed facts, even ones that appear to be largely unobjectionable. Few, if any, of the objected-to facts are incapable of being produced in admissible form at trial. Moreover, many of the statements to which Amalgamated has objected were not offered for the truth of the matter asserted and, therefore, are not hearsay. *See Churn*, 800 F.3d at 776. This case is about an alleged fraud on the market, and, accordingly, it is largely about perceptions—both in how the market perceived CoreCivic and how the defendants themselves perceived reality when they made the statements at issue. For example, if statements by the BOP reasonably convinced a defendant that CoreCivic was doing an exemplary job, then that defendant might be found to lack the scienter necessary to commit fraud—even if the BOP personnel who made the statements had been confused or lying. What

matters is that the statements were made and heard, not necessarily that they were true. The statements, therefore, may be considered for a purpose other than the truth of the facts asserted.

Other of the parties' objections, particularly those involving expert testimony, were resolved in the court's Memorandum of March 17, 2021, declining to bar any of the parties' proposed experts but limiting the scope of two experts' testimony. (Doc. No. 439.) Accordingly, without prejudice to any objection at trial, the court overrules all objections made to facts cited in this opinion and/or relied upon by the court. The court strongly encourages the parties to work together, prior to trial, to agree to stipulations regarding all facts that are not actually subject to reasonable dispute.

## B. Elements of a Claim for Securities Fraud

"Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008)). "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (quoting *Frank*, 547 F.3d at 569). The defendants argue that the court should grant them summary judgment because (1) none of their statements was materially false or misleading; (2) they did not act with the requisite scienter; and (3) the relevant statements did not cause losses for Amalgamated or the other class members. Amalgamated, in turn, requests partial summary judgment with regard to one issue—reliance.

31

The first two of the issues that the defendants have identified are closely related. The defendants are alleged to have made false or misleading statements about the quality and savings that CoreCivic offered relative to the expectations of its government clients, including the BOP. Particularly regarding the issue of quality, the evidence that might show material falsity and the evidence that might show scienter significantly overlap, to the point where, at least in the context of this case, it is difficult to wholly separate the two questions. The court, accordingly, will first set out the governing standards for falsity, materiality, and scienter, which will then be applied to the classes of statements at issue in this case. The court will then turn, to the extent necessary, to the questions of loss causation and reliance.

### 1. Standard for Material Falsity

"Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." *Ashland,* 648 F.3d at 468 (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5" and Section 10(b). *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). However, where a defendant initially had no obligation to disclose facts on a particular subject, but he chooses voluntarily to address the subject in relation to a securities transaction, he "assume[s] a duty to speak fully and truthfully on th[e] subject[]." *Id.* (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)). The Sixth Circuit has stressed that a district court, in assessing the materiality of statements, should not "attribute to investors a child-like simplicity" or "an inability to grasp the probabilistic significance of [opinion statements]." *In re Omnicare*, 769 F.3d at 471–72.

A finding of fraud under Section 10(b) cannot be premised on a statement that is "too vague to qualify as material," such as a claim that is so "soft" that it "escapes 'objective verification.'" *Ashland,* 648 F.3d at 468 (quoting *In re Ford*, 381 F.3d at 570). According to that principle, a company's general boasts of quality are typically insufficient to establish liability under Section 10(b), because such statements usually "lack[] a standard against which a reasonable investor could expect them to be pegged." *Id.* at 671. For example, the Sixth Circuit found non-actionable the Ford Motor Company's statement that it "want[ed] to ensure that all [its] vehicles ha[d] world-class quality" and were "defect-free." *In re Ford Motor*, 381 F.3d at 571.

The Sixth Circuit, however, has also made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671–72 (6th Cir. 2005) (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."); *see also Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175–76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery"))). "[O]pinion or puffery . . . in particular contexts when it is both factual and material . . . may be actionable." *Id.* at 671–72 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)) (emphasis omitted).

33

"In the securities-fraud context, scienter includes [1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quoting *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008)). "Recklessness," in this context, "is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Frank*, 646 F.3d at 959 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). The Sixth Circuit has set forth a non-exhaustive list of nine factors relevant to determining scienter, although several of those factors are relevant only with regard to certain theories of liability:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552). In examining scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

Generally speaking, "fraudulent intent cannot be inferred merely from [an executive's] position[] . . . and alleged access to information." *PR Diamonds*, 364 F.3d at 688. That does not, however, mean that job titles or duties are irrelevant. While one cannot assume that an executive had knowledge of facts that did not "pertain[] to central, day-to-day operational matters," the

34

Sixth Circuit has acknowledged that "high-level executives *can* be presumed to be aware of matters central to their business's operation." *Id.* (citing *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-36 (S.D.N.Y. 2001)) (emphasis added). As with most factual issues, the rules of thumb set out in caselaw do not supersede a finder of fact's ability (and indeed duty) to consider the peculiarities of every unique case and to exercise common sense about the limited facts presented.

The unusually strong statutory pleading requirements for securities fraud cases under the PSLRA mean that Amalgamated's allegations of scienter were tested significantly more demandingly in connection with the defendants' Motion to Dismiss than is typically the case under the Federal Rules of Civil Procedure. "[T]he [PSLRA] imposes '[e]xacting . . . requirements for pleading scienter.'" *Ashland*, 648 F.3d at 469 (quoting *Frank*, 547 F.3d at 570). The plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Ashland*, 648 F.3d at 469 (quoting *Tellabs*, 551 U.S. at 314). The court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc.*, 551 U.S. at 326. Before the court can answer in the affirmative, it "must compare [the inference of scienter] with other competing possibilities, allowing the complaint to go forward 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Omnicare*, 769 F.3d at 473 (quoting *Tellabs, Inc.*, 551 U.S. at 324). The court considered Amalgamated's

allegations pursuant to this standard in its Memorandum of December 18, 2017 and concluded that the allegations supported a strong inference of scienter. (Doc. No. 76 at 37–42.)

## C. Statements Regarding Quality and Related Issues

Amalgamated argues that CoreCivic or its executives knowingly made materially false statements regarding the quality of CoreCivic's services, its internal quality controls, the BOP's assessment of CoreCivic's performance, CoreCivic's compliance with applicable standards, and the strength of CoreCivic's relationship with its government clients. As the defendants acknowledge, these issues were considered by the court, somewhat at length, in the context of the defendants' Motion to Dismiss. Amalgamated, in drafting its complaint, had already reviewed many of the sources that continue to provide the basis for their allegations, and the pleading standards of the PSLRA required the court to engage in an inquiry significantly closer to the summary judgment standard than is applied for an ordinary motion to dismiss, or even an ordinary motion to dismiss a claim of fraud subject to the more demanding standards of Rule 9(b) of the Federal Rules of Civil Procedure. It is unsurprising, then, that the parties' arguments on this issue are largely similar to those that were raised before. CoreCivic, however, argues that "at summary judgment, [Amalgamated] cannot ignore the context of [CoreCivic's] discrete performance issues." (Doc. No. 352-1 at 2.) CoreCivic argues that it has now had the opportunity to paint a fuller picture of its relationship with the BOP and of the prison contracting industry as a whole. In this context, CoreCivic argues, its history of, for example, numerous NOCs and frequent multiple-repeat deficiency findings is simply far too unremarkable to render the defendants' broad boasts about CoreCivic's performance to be false. Moreover, there is newly identified evidence, such as the BOP's history of giving positive recommendations regarding CoreCivic facilities in its CPARs, supporting an inference that CoreCivic's performance was not,

in fact, particularly deficient, or at least so deficient that it would render the defendants' statements false or misleading.

The facts and context that CoreCivic has identified may be persuasive to a jury on the issue of material falsity, but they are not sufficient to support a grant of summary judgment. Nothing about Amalgamated's theory of the case is contingent on showing that CoreCivic *never* received positive feedback from the BOP. Nor are Amalgamated's claims undermined by the fact that other prison contractors might have been in similar positions to CoreCivic. Certainly, if CoreCivic is found to have provided worse service than its private sector competitors, then that might support Amalgamated's claims. The underlying risks and expectations at issue in this case, however, involve CoreCivic's services relative to the prospect of the BOP's operating its own prisons. It does not negate the theory of fraud if CoreCivic was just one of multiple private prison contractors falling short of expectations. In any event, moreover, the evidence is far from settled that CoreCivic's services were, in fact, of comparable quality to that of its competitors. For example, the BOP's decision to select GEO over CoreCivic in its bid process, despite CoreCivic's superior price, suggests that CoreCivic did, in fact, raise particular quality concerns at the BOP.

Amalgamated has produced evidence that CoreCivic repeatedly—and indeed routinely— fell short of even minimum expectations at more than one of its BOP facilities. Although some of its failures were minor and technical and perhaps of the type that one might expect in any long-term government contracting relationship, numerous other failures were in areas where the stakes were the highest that the stakes can be—that is to say, life and death, as with the issue of health services. And the BOP informed CoreCivic, over and over again, that it had failed. CoreCivic argues that, even if it did sometimes fall short of BOP expectations, the BOP was only

37

one client, and its boasts were mostly about its client relationships and the quality of its services in clients' eyes generally. The BOP, however, was a single client that frequently accounted for more than 10% of CoreCivic's business. A reasonable juror could conclude that boasts about meeting client expectations that ignored a client on which the company depended that much were materially false or misleading.

CoreCivic brushes these facts aside by suggesting that "[s]ometimes bad things happen in prisons no matter whether the government, or a private company like CoreCivic, operates them." (Doc. No. 352-1 at 1.) That is undoubtedly so. But this case is not a referendum on how prisons should be run. At its heart, this is a case about a company and a client—specifically, a company with a business model that limited its potential client base and a large, important client whose exodus could be very damaging for the company. Although CoreCivic had many clients other than the BOP, the percentage of CoreCivic's business attributable to the BOP was considerable. CoreCivic, knowing that, received a continuous stream of serious, credible feedback, suggesting that the BOP was not satisfied with the quality of services it was receiving, at least much of the time. In addition to the steady stream of NOCs and deficiency findings, there were pivotal major events that themselves cast CoreCivic's performance on its BOP contracts into doubt—the Adams riot, the Cibola Cure Notice, the Cibola non-renewal, and the failure to obtain a new contract for NEOCC. In that context, a reasonable jury could conclude that statements assuaging investors that CoreCivic was meeting client expectations amounted to a materially false concealment of a serious risk.

Similarly, nothing that CoreCivic has identified is sufficient to establish that a reasonable juror would have no choice but to conclude that the defendants lacked knowledge of enough underlying facts to be aware of the alleged falsity of their statements. To the contrary, the

discovery performed by Amalgamated has, if anything, confirmed that CoreCivic and its executives were very cognizant of the health of the company's client relationships and of the fact that performance issues could imperil those relationships. The defendants, attempting to show that the BOP's actions were unforeseeable, point to testimony by individual defendants that they expected to continue to receive BOP business. The fact that the defendants even formed those expectations, though, is confirmation that they were monitoring the underlying facilities and relationships. CoreCivic's internal correspondence confirms this close level of monitoring and concern. (*See, e.g.*, Doc. No. 423 ¶ 257 (describing email correspondence about concerns regarding Eden).) Some correspondence, moreover, explicitly confirms concerns by CoreCivic executives that quality issues could imperil BOP contracts. (*Id.* ¶ 249 ("Between you and me, I don't like having the [Cibola] contract expiration in September 2016 with BOP populations system-wide declining so much. I don't want them with any more excuses to not renew the contract.").) Indeed, at least by the latter days of the Class Period, internal correspondence suggests that lobbyists working for, and communicating with, CoreCivic had deduced that there might, in fact, have been a major move by the BOP away from private contractors on the horizon.(*See* Doc. No. 401-6 at 4 (email stating that recent events "establish[ed] credibility to our concerns that BOP is moving forward with a larger plan to cancel all contract confinement beds").)

The ambiguities and complications that CoreCivic has identified may well be enough for a jury to ultimately conclude that the defendants' boasts during the Class Period were simply non-fraudulent spin, putting the most positive face on a reasonable interpretation of the underlying events. A jury could also be convinced that, even if some of the statements were, in hindsight, false or inadvertently misleading, there was enough uncertainty about the available

39

information, at the time, that one or even all of the defendants lacked the requisite mental state to be held liable for securities fraud. For example, there is evidence that, at the very least, the defendants did not have all of the potentially available information about the BOP's negative view of its services, such as the internal BOP documentation surrounding the decision not to award a new BOP contract to NEOCC. CoreCivic's burden, on this motion, however, is not to show that it could prevail, but that a verdict in its favor is the only outcome that a jury could reasonably reach. It has failed to do so on the issues of material falsity and scienter with regard to its statements about the quality of its services, the adequacy of its internal controls, its history of compliance with applicable standards, or its clients' estimation of its services. The court, therefore, will not grant summary judgment on that ground.

## D. Statements Regarding Cost Savings

The defendants argue, next, that, regardless of what the court has concluded regarding the defendants claims of quality, Amalgamated has failed to produce evidence from which a reasonable jury could conclude that the defendants knowingly or recklessly made materially false statements regarding the issue of cost savings, particularly the possibility that CoreCivic could provide cost savings relative to BOP-operated facilities. The court addressed the expert evidence that CoreCivic has provided about cost in its Memorandum of March 17, 2021, addressing the admissibility of particular expert testimony. (Doc. No. 439 at 12–15.) In short, CoreCivic does not purport to be able to establish, beyond dispute, that, all relevant costs considered, privatization of prisons, through CoreCivic or otherwise, necessarily saves money. How to make such cost comparisons is, CoreCivic concedes, a contested issue in academic and public policy literature. CoreCivic, however, has offered largely unrefuted testimony from a well-qualified

40

expert, Justin Marlowe, that establishes that there are at least some plausible grounds for making claims such as those made by the defendants regarding cost.

When it comes to cost savings, CoreCivic's argument that Amalgamated can establish, at most, non-actionable puffery is persuasive. Even if a jury concluded that CoreCivic did not, all things considered, actually offer its government clients savings relative to public facilities, there is simply not sufficient evidence from which the jury could conclude that the defendants, either knowingly or recklessly, departed from expected accounting practices in making their claims. Any reasonable investor would assume that CoreCivic and its executives likely painted the most favorable defensible picture of its cost advantages possible, and Amalgamated has been unable to identify evidence suggesting that they went further than that. The basic difficulties in drawing fiscal comparisons, moreover, were no secret, and a sophisticated market would know to take any claims by CoreCivic with that caveat in mind. The court, accordingly, will grant CoreCivic and the individual defendants summary judgment with regard to Amalgamated's claims based solely on representations regarding cost.

Indeed, Amalgamated's own briefing does not make a meaningful attempt to suggest that it has viable securities fraud claims based solely on CoreCivic's boasts of cost savings. Rather, Amalgamated argues instead that the issues of cost savings and quality are "intertwined" because the defendants' statements "interwove CCA's supposed high quality and great value." (Doc. No. 396 at 18.) That may be true, but it does not change the fact that CoreCivic is entitled to seek summary judgment regarding any theories of liability included in the operative complaint for which it has not yet received judgment or dismissal, and, as CoreCivic points out, the Amended Consolidated Complaint explicitly alleges that CoreCivic's boasts about costs were, in and of themselves, misleading. (*See, e.g.*, Doc. No. 57 ¶¶ 186–89.)

41

The only grounds that the plaintiffs continue to advance for finding that the defendants' cost claims were, in and of themselves, false or misleading are (1) that the defendants' statements did not inform investors "with the requisite intensity and credibility that there is no reliable means to evaluate the costs of comparable facilities run by the BOP and CCA" and (2) "that any apples-to-apples comparison of the BOP and CCA is impossible given the vast differences in the facilities, the varied security levels and the services offered." (Doc. No. 396 at 19.) The evidence, however, shows that there was a lively public debate regarding the supposed cost savings associated with privatization, and, because Amalgamated relies on a fraud-on-the-market theory, it must operate under the assumption that investors were aware of that uncertainty. Similarly, it was no secret that different prison types and populations posed different needs, making cost comparison difficult.

The court, accordingly, will grant the defendants' summary judgment with regard to any claims that it was false or misleading solely to suggest that CoreCivic offered cost savings to its government clients. The court stresses that its ruling is limited and should not be construed to suggest that every statement in which cost was mentioned is now thrown out of the case. Many of the statements that Amalgamated has identified refer to both cost savings and issues of quality, sometimes beside each other and sometimes combined into the hybrid issue of value. Any statement that contains claims about quality of services, explicitly or implicitly, may still be relevant to Amalgamated's claims discussed in the preceding section. Similarly, insofar as either party may still wish to address the issue of cost savings because it is relevant to the foreseeability of the discontinuation of the BOP's business, it may be appropriate, within limits, to do so. Nevertheless, the court will grant the defendants summary judgment with regard to the theory that any statements were false or misleading solely with regard to the issue of cost savings.

42

**E. Loss Causation and Reliance**

A Section 10(b) plaintiff must establish a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). The notion of causation in the securities fraud context, however, takes account of the fact that it is not usually the defendant's false statement or omission, in and of itself, that "cause[s] a security to drop in value, but rather, 'the underlying circumstance that [was] concealed or misstated'" *Id.* (quoting *Lentell*, 396 F.3d at 173). The determinative question, in this case, is therefore whether any risk wrongfully concealed by the defendants ultimately caused a harm to the value of CoreCivic's stock.

Closely related to the concept of loss causation is the issue of reliance. "Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 263 (2014). For example, in a conventional securities fraud case, an individual might show, via documentary or testimonial evidence, that he personally relied on a particular misrepresentation in making the decision to buy or sell at a specific price. *See Chelsea Assocs. v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975) ("In the usual fraud case or case brought for misrepresentation in violation of Rule 10b-5, proof of reliance upon the misstated or false fact is required.") (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2nd Cir. 1974), *cert. denied*, 421 U.S. 976 (1975)). Reliance and loss causation are conceptually distinct, but linked, concepts: one looks at the mindset and actions of the plaintiff, while the other looks at the ultimate economic consequences. When combined, reliance and loss describe the full chain of events underlying a securities fraud claim.

43

First, for example, a party buys (or sells or holds) a stock at a particular price, based on a representation regarding a particular subject matter—in other words, there is reliance. Then, some event related to that subject matter, which was concealed or misrepresented by the initial statement, causes the stock to lose value—that is to say, there is loss causation. But unless both elements exist—and, most importantly, both elements match each other in terms of their subject matter—there is no claim. Otherwise, there is only a statement relied upon by a party to no detriment—that is, reliance without loss—or a loss unrelated to a prior misrepresentation—that is, loss without reliance.

As the court has already held, Amalgamated is permitted to pursue a fraud-on-the-market theory of liability, based on the defendants' alleged price maintenance through their false or misleading statements. Fraud-on-the-market theories are based on the premise that "modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases." *Basic*, 485 U.S. at 243–44. As the Supreme Court has explained:

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Id.* at 244 (quoting *In re LTV Secs. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)). If, for example, an executive of a company makes a false statement affecting the market price of the company's stock, and a buyer purchases the stock at that market price, the buyer has, as a practical matter, relied on the executive's false statement in deciding what price to pay for his shares—even if the buyer was personally unaware of the statement. The "fraud-on-the-market" theory of reliance

acknowledges that a modern investor, acting on an open and efficient securities exchange, is relying on the market itself to be his eyes and ears with regard to publicly available information. *Id.*

The Supreme Court has held that, pursuant to the fraud-on-the-market theory, there is a rebuttable presumption of reliance with regard to material statements made about a company whose stock is traded on an "efficient market"—in other words, a market that, through plentiful and relatively unencumbered transaction opportunities, is able to assimilate all material public information into a share's price. *Id.* at 253; *see Halliburton II*, 573 U.S. at 270–72 (discussing efficiency of capital markets). That fraud-on-the-market presumption of reliance is sometimes referred to as the "*Basic* presumption," after *Basic Inc. v. Levinson*. *See In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("The *Basic* fraud-on-the-market presumption is based on the 'premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'") (quoting *Halliburton II*, 573 U.S. at 272)).

"[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277–78 (citing *Basic*, 485 U.S., at 248 n.27). Once a plaintiff makes an initial showing that it is entitled to the *Basic* presumption, however, "a defendant may rebut it with 'evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock.'" *BancorpSouth*, 2017 WL 4125647, at *1 (quoting *Halliburton II*, 573 U.S. at 279–80). The issue of whether a misstatement or correction actually affected a stock's price is referred to as "price

45

impact." *Id.* "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse," because the "fundamental premise" of the fraud-on-the-market theory—that the alleged fraud was reflected in the price of the security—has been refuted. *Id.* at 278 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 813 (2011)).

The question of price impact, however, is made somewhat more complicated in a price maintenance case, because the statements at issue are alleged only to have maintained, not immediately affected, the price of the underlying stock. *See Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 656–57 (S.D. Ohio 2017) ("[T]he price maintenance theory [is] the theory that a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price . . . ."). In a price maintenance case, price impact may be established, not via "evidence that a stock's price rose in a statistically significant manner after a misrepresentation," but with evidence that "it declined in a statistically significant manner after a corrective disclosure." *Id.* at 657. If the corrective disclosure clues the market in to the truth that the defendants had been falsely denying or concealing, and the value of the stock declines in response, it is evidence that the falsehood had, indeed, been improperly maintaining the higher price. *Id.* For example, if all the details about CoreCivic's past performance had suddenly been made public, and the price of the stock had immediately dropped, then that would be a classic example of price impact demonstrated by a corrective disclosure.

That, of course, is not what happened here; there was no sudden, comprehensive corrective disclosure, and the decline in the value of the stock was the result of an action taken by a third party, the DOJ. Caselaw recognizes, however, that the equivalent of a corrective disclosure—without any actual "disclosure" by the defendant itself—may come in the form of

46

the real-world realization of the risk that a company's executives concealed or denied. An event may "reveal some [previously]-undisclosed fact with regard to the specific misrepresentations alleged." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40–41 (2d Cir. 2009)). For example, in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, the plaintiff alleged that the defendant had concealed the extent of its risk of foreseeable losses in the event of a substantial downturn in the housing market, particularly as related to subprime mortgages. 830 F.3d at 381–82. When those risks materialized (and the public became aware of the company's losses), the stock price fell—even though there had not yet been a corrective disclosure by the company admitting to its false statements. *Id.* at 388. The district court dismissed the plaintiff's securities fraud claim on the ground that, because there was no "corrective revelation," the plaintiff could not establish loss causation with regard to the allegedly concealed risk. *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV160, 2014 WL 5516374, at *10 (N.D. Ohio Oct. 31, 2014). The Sixth Circuit reversed, concluding that a plaintiff can rely on materialization of risk in the same manner as it would have relied on a corrective disclosure. *Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 385.

As the court has mentioned, all of these core legal issues have already been addressed in this litigation, and the court has held that Amalgamated's general theories of loss causation and reliance are sound. The only issues remaining under the present motions, therefore, are whether (1) CoreCivic has shown, based on undisputed facts, that no reasonable finder of fact could conclude that Amalgamated established loss causation and (2) whether Amalgamated has shown, based on undisputed facts, that it is entitled to partial summary judgment on the issue of reliance.

CoreCivic argues that Amalgamated cannot establish a causal link related to the Yates Memorandum, because Amalgamated cannot establish that CoreCivic's history of quality issues was actually a precipitating factor in the DOJ's decision. But the evidence of both parties, including CoreCivic's own statements throughout the class period, confirms that providing quality services was a core part of maintaining the BOP's business. That is particularly true, given that the evidence shows that the BOP was beginning to move toward the end of a period of overcrowding that had arguably necessitated some reliance on private contractors. It is simple common sense that, as the DOJ's need for stopgap extra capacity waned, the quality of CoreCivic's services would become more important for retaining business. Although the gold standard of evidence for the DOJ's reasoning might be testimony from the decisionmakers themselves, the evidence that Amalgamated has provided is sufficient to support the inference that CoreCivic's quality issues played a role in the DOJ's decision—just as the DOJ itself said that they did. That is sufficient to establish the causal link under a fraud-on-the-market price maintenance theory and, therefore, defeat CoreCivic's motion for summary judgment on that basis.

The defendants respond that, at various points throughout the Class Period, information came out regarding CoreCivic facilities, such as through news coverage, that cast a negative light on the quality of CoreCivic's services, and the market value of the company did not, at the time, go down. The defendants argue that this evidence shows that the market was aware of CoreCivic's quality issues and that investors did not consider those issues to reflect a risk of a total loss of the BOP's business. Accordingly, CoreCivic argues, the Yates Memorandum was not the materialization of any concealed risk. As with other of CoreCivic's arguments, this might be persuasive to a jury, but it is not sufficient to remove the issue from reasonable dispute. The

48

evidence shows that the public was aware of some of CoreCivic's quality issues. There is no evidence, however, that the bits and pieces of information available to the public painted the whole picture. The risk at issue in this case, moreover, is not merely from the quality level of CoreCivic's services, but specifically from the BOP's *concerns* about those services. The fact that investors knew that there had been arguable shortcomings at CoreCivic facilities does not negate the wealth of publicly unavailable information about the BOP's detailed history of complaints and deficiency findings.

CoreCivic argues next that Amalgamated cannot establish that the defendants' alleged misrepresentations caused a portion of the decline in price following the Cibola non-renewal. As CoreCivic points out, there were allegedly some local media reports of the Cibola non-renewal a few days before CoreCivic's own prominent disclosure of what had happened, but a decline in price accompanied only CoreCivic's statements, not the first public news. The fact that there was not an immediate decline in the stock's value, CoreCivic argues, is inconsistent with a reliance on the efficient capital markets hypothesis, a necessary precondition for a fraud-on-the-market claim.

But there is nothing inconsistent about embracing the concept of efficient capital markets generally and acknowledging that, in practice, some "public" disclosures may be so low-profile that there will be some slight delay before the information disclosed is reflected in the market. *See Halliburton II*, 573 U.S. at 272 (observing that a presumption of capital efficiency does not require one "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price" (quoting *Basic*, 485 U.S. at 249 n.28 (1988))). CoreCivic seems to take the position that a party (and the court) must choose between either rejecting the idea of efficient capital markets outright or ascribing to the markets a nearly

49

mystical ability to immediately assimilate even the most obscurely reported information. Taken to its most absurd natural conclusion, CoreCivic's version of efficient capital markets would suggest that a stock price should instantly reflect any relevant fact disclosed, regardless of how obscure and out-of-the-way the forum, as long as the disclosure was technically public. The fact that that information reported only locally might take a small amount of time to be reflected in a price is not inconsistent with relying on the efficient capital markets hypothesis in a more general manner.

The scope of Amalgamated's request for partial summary judgment is relatively narrow. It asks the court to grant it partial summary judgment on the issue of reliance, because it is pursuing a fraud-on-the-market theory that obviates the need to establish the plaintiff's subjective personal reliance on an individual level. As CoreCivic points out, and as Amalgamated concedes, one of the requirements for actually establishing that the *Basic* presumption applies—materiality—is still fiercely contested. See *Halliburton II*, 573 U.S. at 277–78 ("[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." (citing *Basic*, 485 U.S., at 248 n.27)). The lack of materiality, alone, is sufficient to deny Amalgamated summary judgment outright on the issue of reliance. As Amalgamated points out, however, the issue of materiality would be sent to the jury regardless of the particular test for applying the *Basic* presumption, because materiality is an element of any claim for securities fraud, regardless of whether it is a fraud-on-the-market case. Amalgamated is, moreover, correct that the remaining requirements for triggering the presumption are not reasonably contested. CoreCivic has not produced evidence sufficient to

50

doubt that the market for CoreCivic stock was at least fundamentally efficient, albeit with occasional delays and failures to acknowledge information promptly that the market for any stock might experience. It is undisputed that trades by Amalgamated in CoreCivic's stock were made during the Class Period and that the relevant statements were also made during that period and were public. Amalgamated, therefore, is entitled to partial summary judgment on the fact that it can establish that it is entitled to the *Basic* presumption with regard to any statements that it shows to be material.

CoreCivic argues, however, that the *Basic* presumption is rebuttable, and contested issues of fact remain regarding whether CoreCivic can rebut it. Specifically, CoreCivic argues that it can rebut the *Basic* presumption both (1) collectively for the entire class by showing, through expert testimony, that there was no actual impact on the price of CoreCivic's stock by the challenged statements and (2) individually, with regard to Amalgamated itself, by establishing that Amalgamated was individually indifferent to the truth about CoreCivic's operations when it bought and sold CoreCivic stock. *See Halliburton II*, 573 U.S. at 294 (stating that *Basic* presumption is rebuttable).

With regard to the first of these arguments, CoreCivic is correct. CoreCivic has identified sufficient contested evidence regarding the price impact of the defendants' statements that it should be entitled to attempt to persuade a jury that it can rebut the *Basic* presumption. "[A] defendant may rebut [the presumption] with 'evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock.'" *BancorpSouth*, 2017 WL 4125647, at *1 (quoting *Halliburton II*, 573 U.S. at 279–80). As CoreCivic points out, it has advanced and provided evidentiary support for colorable arguments regarding the lack of price impact of the statements and/or revelation of the truth at issue in this case. Amalgamated

51

responds that the court concluded, at the class certification stage, that CoreCivic had failed to rebut the *Basic* presumption with regard to price impact. (Doc. No. 165 at 35.) True as that may be, the court's ruling on a Rule 23 motion is not sufficient to take an issue away from the jury unless the court's factual determination was the only result that one could reasonably reach. The court did not suggest, at the time, that that was the case, and it is not the case now. Although the court was unpersuaded based on the material available then, CoreCivic has presented price impact evidence from which a jury could conclude that the presumption was rebutted. The court, accordingly, will not grant partial summary judgment in that regard.

CoreCivic's argument regarding Amalgamated itself, however, is less persuasive. CoreCivic argues that Amalgamated would have purchased and sold CoreCivic's stock regardless of what had been disclosed, because Amalgamated made its investment decisions through outside advisors who used quantitative methods to make purchase and sale decisions. Amalgamated is not required, however, to show that it never would have purchased CoreCivic's stock at all in order for a fraud-on-the-market theory of reliance to be viable. As the court has explained, fraud on the market, in a case such as this, is about *price*, not whether some transaction would have occurred at all. The very point of a fraud-on-the-market theory is that fraudulent statements can, by setting the price, taint transactions regardless of the subjective experience of any individual actor. In any event, Amalgamated's briefing makes clear that it is only seeking summary judgment on the issue of "class-wide reliance." (Doc. No. 348 at 7.) The issue of Amalgamated's separate, individualized reliance is not before the court.

The court, accordingly, will grant Amalgamated partial summary judgment, only to the extent that the court rules that the class is entitled to a rebuttable presumption of reliance with regard to any public statements during the Class Period for which Amalgamated is able to

establish materiality. That ruling, however, will be without prejudice to any rebuttal of the presumption by CoreCivic through evidence of a lack of price impact.

## II. CONCLUSION

For the foregoing reasons, CoreCivic's Request for Judicial Notice (Doc. No. 366) will be granted, Amalgamated's Motion for Partial Summary Judgment (Doc. No. 347) will be granted in part and denied in part, and CoreCivic's Motion for Summary Judgment (Doc. No. 352) will be granted in part and denied in part. Amalgamated will be granted partial summary judgment with regard to the fact that it is entitled to a rebuttable presumption of reliance with regard to any public statements by the defendants for which it can establish materiality. CoreCivic will be granted summary judgment with regard to all claims based solely on defendants' assertions about CoreCivic's supposed cost advantages.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge