UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and
on Behalf of All Others Similarly Situated,

                                    Plaintiff,

        vs.

CORRECTIONS CORPORATION OF
AMERICA, et al.,

                                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:16-cv-02267

Honorable Aleta A. Trauger

JOINT FILING RE: MASTER LIST OF
MISLEADING STATEMENTS

Pursuant to the Court's March 23, 2021 Order (ECF No. 449), the parties have met and

conferred in an effort to reach agreement on a master list of misleading statements for trial, but

were unable to reach agreement as to every statement.  The parties, therefore, set forth their

respective positions below.

I.      **Plaintiff's Position[1]**:

        The gravamen of the Class claims is Defendants' scheme to defraud CCA investors, which

Defendants implemented through various methods and means, including, but not limited to, public

statements that concealed material information necessary to make Defendants' statements not

misleading.  Defendants voluntarily chose to speak about the purported quality of CCA's prison

services, purported compliance with federal standards and contractual obligations, and purported

ability to retain and grow its Federal Bureau of Prisons ("BOP") business.  *See* ECF No. 76 at 14,

17-18, 25.  Defendants thus assumed a duty to speak fully and truthfully about these subjects (ECF

No. 143 at 20), which they violated with a series of misleading half-truths and omissions.  Plaintiff

_____

[1]     "Plaintiff" is Lead Plaintiff and Class Representative Amalgamated Bank, as Trustee for the
LongView Collective Investment Fund.  "Defendants" are Corrections Corporation of America
("CCA"), Damon T. Hininger, David M. Garfinkle, Todd Mullenger and Harley G. Lappin.
Following the filing of this action, Defendants rebranded CCA and now refer to it as CoreCivic.

- 1 -

respectfully submits that the jury should consider the following Misleading Statements in their entirety for important context, including the level of detail that Defendants provided to investors while simultaneously withholding negative information.

| No. | MISLEADING STATEMENT |
|---|---|
| 1 | CCA Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on February 27, 2012 |
| 2 | CCA Statement in March 5, 2012 *Lewiston Morning Tribune* Article |
| 3 | CCA Form 10-Q filed with SEC on May 7, 2012 |
| 4 | CCA Form 10-Q filed with SEC on August 9, 2012 |
| 5 | CCA Form 10-Q filed with SEC on November 8, 2012 |
| 6 | CCA Form 10-K filed with SEC on February 27, 2013 |
| 7 | CCA Form 10-Q filed with SEC on May 9, 2013 |
| 8 | CCA Form 10-Q filed with SEC on August 8, 2013 |
| 9 | CCA 2013 Analyst Day Presentation on October 2, 2013 |
| 10 | CCA Form 10-Q filed with SEC on November 7, 2013 |
| 11 | CCA Form 10-K filed with SEC on February 27, 2014 |
| 12 | CCA Form 10-Q filed with SEC on May 8, 2014 |
| 13 | CCA Form 10-Q filed with SEC on August 7, 2014 |
| 14 | CCA Form 10-Q filed with SEC on November 5, 2014 |
| 15 | CCA 3Q14 Investor Presentation on November 7, 2014 |
| 16 | CCA Press Release, dated December 29, 2014 |
| 17 | CCA 4Q14 Earnings Call on February 11, 2015 |
| 18 | CCA 4Q14 Investor Presentation on February 24, 2015 |
| 19 | CCA Form 10-K filed with SEC on February 25, 2015 |
| 20 | CCA Form 10-Q filed with SEC on May 7, 2015 |
| 21 | CCA 1Q15 Investor Presentation on May 19, 2015 |

| No. | MISLEADING STATEMENT |
|-----|----------------------|
| 22 | CCA Form 10-Q filed with SEC on August 6, 2015 |
| 23 | CCA 2Q15 Investor Presentation on August 21, 2015 |
| 24 | CCA Form 10-Q filed with SEC on November 5, 2015 |
| 25 | CCA 3Q15 Investor Presentation on November 12, 2015 |
| 26 | CCA 4Q15 Investor Presentation on February 24, 2016 |
| 27 | CCA Form 10-K filed with SEC on February 25, 2016 |
| 28 | Defendant Damon Hininger March 30, 2016 Annual Letter to CCA Shareholders |
| 29 | CCA Form 10-Q filed with SEC on May 5, 2016 |
| 30 | CCA 1Q16 Earnings Call on May 5, 2016 |
| 31 | CCA 1Q16 Investor Presentation on May 17, 2016 |
| 32 | REITWeek: NAREIT's Investor Forum Presentation on June 8, 2016 |
| 33 | CCA Press Release, dated August 3, 2016 |
| 34 | CCA 2Q16 Earnings Call on August 4, 2016 |
| 35 | CCA Form 10-Q filed with SEC on August 4, 2016 |

As indicated above, because this case concerns misleading half-truths and material omissions, Plaintiff respectfully submits that the Class claims cannot be reduced to fragments of statements. For example, each of Defendants' Class-Period Annual Reports on Form 10-K includes a lengthy "Risk Factors" section that exceeds ten pages, which thus appear on their face to be comprehensive statements of risks, while concealing information about risks that had materialized concerning the quality of CCA's prison services, purported compliance with federal standards and contractual obligations, and ability to retain and grow its BOP business. Nevertheless, Plaintiff provides below a sample of Contextual Sub-Statements from each of the Misleading Statements.

During the parties' meet and confer efforts, Defendants indicated that they objected to certain of these Contextual Sub-Statements, asserting that some: (i) were "[n]ot pled"; or (ii) were dismissed by the Court at summary judgment. Neither contention is credible; they conflict with settled law, this Court's Orders, the undisputed record and even Defendants' own arguments throughout the course of this litigation and as recently as *yesterday*.

## A. Defendants Have Long Had Notice of Plaintiff's Claims

As set forth in the chart below, each of the Contextual Sub-Statements, or statements substantially identical thereto, were either pled in the operative complaint (ECF No. 57) ("Complaint"), identified in response to CCA's interrogatories, or both. Defendants, therefore, cannot credibly contend to be surprised or to have lacked notice that such sub-statements were encompassed within Plaintiff's claims.

Moreover, because each Contextual Sub-Statement falls squarely within the fraudulent scheme and misleading course of conduct that has always been central to Plaintiff's claims, and that Defendants never sought to dismiss or even address at summary judgment, there is no basis to suggest that any of the Contextual Sub-Statements cannot form a part of Plaintiff's claims at trial.

## B. None of the Alleged Misrepresentations and Omissions Falls Outside the Alleged Scheme

Four years ago, Plaintiff expressly pled a Rule 10b-5 (17 C.F.R. §240.10b-5) scheme liability violation in the Complaint. *See, e.g*., ¶3[2] ("defendants engaged in a scheme to defraud *and* made numerous materially false and misleading statements and omissions"); ¶31 ("Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of CCA stock."); ¶¶196, 200 (also referencing Defendants'

---

[2] All "¶_" citations herein are to the Complaint.

"scheme"); ¶213 (Count I – Defendants violated Rule 10(b)(5)(a) when they "employed devices, schemes and artifices to defraud").

While the Complaint listed a number of public statements in furtherance of the scheme, it also describes other conduct that a jury could reasonably find advanced Defendants' scheme to artificially inflate and maintain CCA's stock price, including: (i) hiring former BOP employees such as Lappin to buy their influence; (ii) "trying to direct public policy in [CCA's] favor through lobbying and campaign contributions"; (iii) falsely denying that CCA had "broken its pledge to run jails better, and cheaper, than government"; (iv) engaging in strategic cost cutting to boost reported profits, "to the detriment of providing services that were not only promised but also essential"; (v) failing to cure systemic deficiencies in staffing and health services; and (vi) participating in investor presentations, controlling CCA spokespeople, and being able to control the information disseminated by CCA. *See* ¶¶4-10, 25, 45-46, 53, 57, 61-66, 70-75, 88-95, 155, 201; *see, e.g.*, *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *2 (M.D. Tenn. Mar. 31, 2011) (scheme to defraud where defendants ran the "business in a manner which operated as a fraud or deceit upon investors" by, among other things, inadequately staffing facilities); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193-94 (D. Or. 2015) (citing cases where conduct such as approving articles, designing biased clinical trials, taking steps to mislead buyers, and touting company developments were sufficient for scheme liability). Defendants also know, as discovery has shown, that they routinely attempted to discredit any negative information regarding CCA's services – acts that were plainly in furtherance of their scheme. *See, e.g.*, ECF No. 121 at 18 n.29 (Defendants tried to discredit *The Nation* article); *id.* at 19 (Defendants tried to discredit the OIG Review).

Defendants did not move to dismiss Plaintiff's scheme claims (ECF No. 61 at 13-14),[3] nor did the Court dismiss such claims in ruling on Defendants' motion to dismiss, holding instead that:

> "So long as a [plaintiff] pleads sufficient detail – in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud – to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 444-45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

ECF No. 76 at 23 (alterations in original).

Since the Court's denial of the motion to dismiss, the United States Supreme Court has confirmed the viability of Securities Exchange Act of 1934 scheme liability, even for schemes that also encompass false statements: "Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b-5(a) and (c) . . . ." *Lorenzo v. S.E.C.*, _ U.S. _, 139 S. Ct. 1094, 1104 (2019); *see also Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 2021 U.S. Dist. LEXIS 9392, at *10 (S.D. Tex. Jan. 19, 2021) (following *Lorenzo*); *S.E.C. v. Kameli*, 2020 U.S. Dist. LEXIS 87691, at *40 (N.D. Ill. May 19, 2020) (following *Lorenzo*).

Here, each Contextual Sub-Statement falls squarely within the scheme pled in the Complaint. Indeed, as the Court previously held:

> Although CoreCivic's allegedly false statements are numerous, they are offered by Amalgamated in service of a single, central theory of liability: that CoreCivic and its executives falsely touted its services as offering cost savings to governments while delivering an acceptable level of quality – defined, in some instances, in relation to compliance with particular standards – such that CoreCivic

---

[3]   Defendants also decided not to move for summary judgment on Plaintiff's scheme claims.

4845-2281-6740.v1

was an attractive option for continued and future government contracts. The reality, Amalgamated alleges, is that CoreCivic did not offer significant savings and frequently delivered substandard services, which had caused its relationship with at least one major client, the BOP, to fray considerably over the years leading up to the publication of the OIG Review and Yates Memorandum.

ECF No. 76 at 25-26; *see also* ECF No. 447 at 20 n.8 ("for liability to be found, at least some 'particular statement' must either be 'literally false' or 'create[] a false impression.' *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)) (alteration in original). This case involves dozens of statements, each of which says virtually – and in some cases, actually – one of the same few things. Because there is no basis to suggest that any of the Contextual Sub-Statements fall outside the "single, central theory of liability" alleged in the Complaint or upheld at summary judgment, Defendants cannot credibly claim that any of the statements are outside the scope of the Complaint (let alone Plaintiff's interrogatory responses) or that they did not have adequate notice.

Nor is there any basis to exclude the Misleading Statement documents in which such Contextual Sub-Statements appear. By its very terms, Rule 10b-5(b) liability for "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading" greatly depends on context. 17 C.F.R. §240.10b-5(b); *see* ECF No. 76 at 28, 30, 35. As such, the omission of information as significant as CCA's systemic deficiencies enabling the unprecedented riot and murder at Adams (*see* ECF No. 401-24 at 57:10-80:9, 82:1-100:17; ECF No. 400-12 at 45:2-57:3, 156:12-162:18, 168:8-179:17, 211:2-22) or the unprecedented loss of CAR XV despite being the lowest bidder due to health services deficiencies at other facilities (*see* ECF No. 401-24 at 238:13-241:10; ECF No. 400-12 at 109:15-19, 182:15-183:16, 214:19-233:12) are far more misleading in the full context of seemingly exhaustive Forms 10-K comprising scores of pages and including many pages of seemingly remote risks. Moreover, the very nature of the omitted information means Defendants could have

- 7 -

disclosed it anywhere within the same document. This is why Plaintiff has identified the documents as the entire Misleading Statement, while also identifying specific Contextual Sub-Statements within each Misleading Statement as examples of half-truths that Defendants employed to mislead investors during the Class Period.

### C. Nothing in the PSLRA or Elsewhere Required Plaintiff to Amend the Complaint

Any contention that a statement or omission cannot form the basis for liability unless it is pled in the complaint is specious. It is entirely inconsistent with Defendants' previous assertions to this Court regarding the need for Plaintiff to supplement its interrogatory responses, where Defendants told the Court that "[t]he purpose of interrogatories . . . is to 'learn the details of the claims of the opposing party or parties' and 'narrow[] and sharpen[] the issues.'"[4] ECF No. 251 at 13 (some alterations in original). Plainly, if only a statement alleged in the Complaint could be actionable, there would be no need for interrogatories identifying the statements at issue in the first place, let alone the supplementation upon which Defendants insisted. Indeed, Defendants' sudden insistence that every statement be alleged in the Complaint cannot be squared even with their communications to Plaintiff as of *just yesterday*, where counsel for Defendants stated (wrongly) that certain of the enumerated statements "have never before been identified as part of Plaintiff's claims in pleadings (*or written discovery*)."

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires nothing more. To the extent it requires every statement to be set forth with particularity, the pretrial order the Court enters will contain a list of the statements at issue and "'is deemed to amend any previous pleadings which did not include that claim.'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457,

---

[4] Here, and throughout, internal citations are omitted and emphasis is supplied, unless noted.

474 (2007) (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)); ECF No. 446 at 2 ("the parties shall file a joint proposed Pretrial Order which shall contain . . . a recitation that the pleadings are amended to conform to the Pretrial Order and that the Pretrial Order supplants the pleadings"); *Howard v. Kerr Glass Mfg. Co.*, 699 F.2d 330, 333 (6th Cir. 1983) ("Issues presented at a pre-trial conference, incorporated in a pre-trial order supercede the pleadings in the case."); *Friedman & Friedman Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 498 (8th Cir. 2010) ("[A]n issue identified in the pretrial order is properly within the scope of the trial even though it was not included in the original pleadings."). Defendants have not, and cannot, cite to a single case suggesting Plaintiff's position is incompatible with any of the PSLRA's requirements.

### D. The Summary Judgment Order Did Not Dismiss Hybrid Misstatements Regarding Cost and Quality

Finally, the Court did not dismiss any hybrid statements about both cost and quality. To the contrary, in granting summary judgment on "claims based *solely* on defendants' assertions about CoreCivic's supposed cost advantages" (ECF No. 447 at 53), the Court "stresse[d] that its ruling is limited and should *not* be construed to suggest that every statement in which cost was mentioned is now thrown out of the case." *Id.* at 42. As the Court observed, many of Defendants' misleading statements "refer to both cost savings and issues of quality, sometimes beside each other and sometimes combined into the hybrid issue of value." *Id.* Thus, Defendants' "statement[s] that contains claims about quality of services, explicitly or implicitly, may still be relevant." *Id.* Here, each Contextual Sub-Statement to which Defendants object as purportedly dismissed contains *explicit* claims about quality of services. *See id.* As such, these Contextual Sub-Statements are properly included as examples of Defendants' Misleading Statements for trial.

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | **February 27, 2012 Form 10-K ("2011 Annual Report")** | | |

- 9 -

| No. | | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|---|
| 1 | 1(a) | Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. 2011 Annual Report at 17. | | |
| | 1(b) | We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system. 2011 Annual Report at 41. | | |
| | 1(c) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2011 Annual Report at 49. | | |
| | 1(d) | We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. . . . Our facilities not only operate under these established standards, but they are consistently challenged by management to exceed them. This challenge is presented, in large part, through our extensive and comprehensive Quality Assurance Program. 2011 Annual Report at 6-7. | | |
| | 1(e) | *Failure to comply with unique and increased governmental regulation could result in material penalties or non-renewal or termination of our contracts to manage correctional and detention facilities.* The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are | Not pled.[5] | Plaintiff pled CCA's 2011 Annual Report was misleading (ECF No. 57, ¶¶119-135) and identified this sub-statement in |

---

[5]  Defendants do not contest contextual sub-statements for which no objection is noted herein.

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | unique to government contractors and the combination of regulations we face is unique. Facility management contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. New federal regulations also require federal government contractors like us to self-report evidence of certain forms of misconduct. We may not always successfully comply with these regulations, and failure to comply can result in material penalties, including financial penalties, non-renewal or termination of facility management contracts, and suspension or debarment from contracting with certain government entities. 2011 Annual Report at 26-27. | | Plaintiff's Objections and Responses to Defendant CoreCivic, Inc.'s Second Set of Interrogatories to Plaintiff dated 5/1/20, ECF No. 399-14 ("Rog. Resp.") at 12-13. |
| 1(f) | In addition, the services we provide are labor-intensive. When we are awarded a facility management contract or open a new facility, we must hire operating management, correctional officers, and other personnel. The success of our business requires that we attract, develop, and retain these personnel. Our inability to hire sufficient qualified personnel on a timely basis or the loss of significant numbers of personnel at existing facilities could adversely affect our business and operations. Under many of our management contracts, we are subject to financial penalties for insufficient staffing. 2011 Annual Report at 29. | Not pled. | Plaintiff pled CCA's 2011 Annual Report was misleading (ECF No. 57, ¶¶119-135) and identified this sub-statement in Rog. Resp. at 13. |
| 1(g) | The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many governmental and regulatory authorities. Some of the regulations are unique to the corrections industry. Facility management contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to | Not pled. | Plaintiff pled CCA's 2011 Annual Report was misleading (ECF No. 57, ¶¶119-135) and identified this sub-statement in Rog. Resp. at 23. |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | subcontract with businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Failure to comply with these regulations can result in material penalties or non-renewal or termination of facility management contracts. 2011 Annual Report at 20-21. | | |
| 1(h) | **ITEM 1A. RISK FACTORS** As the owner and operator of correctional and detention facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations. 2011 Annual Report at 23. | Not pled. | Plaintiff pled CCA's 2011 Annual Report was misleading (ECF No. 57, ¶¶119-135) and identified a substantially identical sub-statement in Rog. Resp. at 111. |
| 1(i) | *Government agencies may investigate and audit our contracts and, if any improprieties are found, we may be required to refund revenues we have received, to forego anticipated revenues, and we may be subject to penalties and sanctions, including prohibitions on our bidding in response to RFPs.* Certain of the governmental agencies with which we contract have the authority to audit and investigate our contracts with them. As part of that process, government agencies may review our performance of the contract, our pricing practices, our cost structure and our compliance with applicable laws, regulations and standards. For contracts that actually or effectively provide for certain reimbursement of expenses, if an agency determines that we have improperly allocated costs to a specific contract, we may not be reimbursed for those costs, and we could be required to refund the amount of any such costs that have been reimbursed. If a government audit asserts improper or illegal activities by us, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeitures of profits, suspension of payments, fines and suspension or disqualification from doing business with certain government entities. Any adverse determination could adversely | Not pled. | Plaintiff pled CCA's 2011 Annual Report was misleading (ECF No. 57, ¶¶119-135) and identified a substantially identical sub-statement in Rog. Resp. at 41-42. |

- 12 -

| No. | | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|---|
| | | impact our ability to bid in response to RFPs in one or more jurisdictions. 2011 Annual Report at 27-28. | | |
| | 1(j) | Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report. 2011 Annual Report, Exs. 31.1, 31.2. | | |
| 2 | | **CCA Statement in March 5, 2012 *Lewiston Morning Tribune* Article** | | |
| | 2(a) | Steve Owen, the ***spokesman*** for Correctional Corporation of America, says the company is highly motivated to comply with its contracts, meet its own standards of excellence and always "do better than the competition." "As a business, we are able to provide taxpayers an essential government service at equally high standards of quality and efficiency," Owen said in an email to the AP. "Competitive private-sector entities are motivated to move swiftly, evaluate and refine success each day, and maintain the highest operating standards at least cost." | | |
| 3 | | **May 7, 2012 Form 10-Q ("1Q12 Quarterly Report")** | | |
| | 3(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 1Q12 Quarterly Report at 29. | | |
| | 3(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 1Q12 Quarterly Report, Exs. 31.1, 31.2. | | |
| 4 | | **August 9, 2012 Form 10-Q ("2Q12 Quarterly Report")** | | |
| | 4(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2Q12 Quarterly Report at 31. | | |
| | 4(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not | | |

- 13 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | misleading with respect to the period covered by this report. 2Q12 Quarterly Report, Exs. 31.1, 31.2. | | |
| 5 | **November 8, 2012 Form 10-Q ("3Q12 Quarterly Report")** | | |
| | 5(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 3Q12 Quarterly Report at 32. | | |
| | 5(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 3Q12 Quarterly Report, Exs. 31.1, 31.2. | | |
| 6 | **February 27, 2013 Form 10-K ("2012 Annual Report")** | | |
| | 6(a) | Our primary business strategy is to provide prison bed capacity, quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. 2012 Annual Report at 19. | | |
| | 6(b) | We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system. 2012 Annual Report at 52. | | |
| | 6(c) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2012 Annual Report at 61. | | |
| | 6(d) | Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional | | |

- 14 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | procedures, and company-wide policies and procedures that may exceed these guidelines. Our facilities not only operate under these established standards, but they are consistently challenged by management to exceed them. This challenge is presented, in large part, through our extensive and comprehensive Quality Assurance Program. 2012 Annual Report at 8. | | |
| 6(e) | The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many governmental and regulatory authorities. Some of the regulations are unique to the corrections industry. Facility management contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Failure to comply with these regulations can result in material penalties or non-renewal or termination of facility management contracts. 2012 Annual Report at 23. | Not pled. | Plaintiff pled CCA's 2012 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 136) and identified this sub-statement in Rog. Resp. at 23. |
| 6(f) | Failure to comply with unique and increased governmental regulation could result in material penalties or non-renewal or termination of our contracts to provide or manage correctional and detention facilities. The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are unique to government contractors and the combination of regulations we face is unique. Facility contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental | Not pled. | Plaintiff pled CCA's 2012 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 136) and identified an identical sub-statement in Rog. Resp. at 40. |

| No. | | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|---|
| | | agencies with which we have contracts. 2012 Annual Report at 29. | | |
| | 6(g) | In addition, the services we provide are labor-intensive. When we are awarded a facility management contract or open a new facility, we must hire operating management, correctional officers, and other personnel. The success of our business requires that we attract, develop, and retain these personnel. Our inability to hire sufficient qualified personnel on a timely basis or the loss of significant numbers of personnel at existing facilities could adversely affect our business and operations. Under many of our contracts, we are subject to financial penalties for insufficient staffing. 2012 Annual Report at 32. | Not pled. | Plaintiff pled CCA's 2012 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 136) and identified this sub-statement in Rog. Resp. at 24. |
| | 6(h) | **ITEM 1A. RISK FACTORS.** As the owner and operator of correctional and detention facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness as well as our qualification as a REIT for federal income tax purposes effective for our taxable year beginning January 1, 2013. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations. 2012 Annual Report at 26. | Not pled. | Plaintiff pled CCA's 2012 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 136) and identified an identical sub-statement in Rog. Resp. at 111. |
| | 6(i) | Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report. 2012 Annual Report, Exs. 31.1, 31.2. | | |
| 7 | | **May 9, 2013 Form 10-Q ("1Q13 Quarterly Report")** | | |
| | 7(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 1Q13 Quarterly Report at 35. | | |

- 16 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | 7(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 1Q13 Quarterly Report, Exs. 31.1, 31.2. | | |
| 8 | **August 8, 2013 Form 10-Q ("2Q12 Quarterly Report")** | | | |
| | 8(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2Q12 Quarterly Report at 40. | | |
| | 8(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 2Q12 Quarterly Report, Exs. 31.1, 31.2. | | |
| 9 | **October 2, 2013 Analyst Day Presentation ("2013 Analyst Day")** | | | |
| | 9(a) | Quality, in the form of Operational Excellence, is a core value and essential guiding principle for CCA. 2013 Analyst Day at 44. | | |
| 10 | **November 7, 2013 Form 10-Q ("3Q13 Quarterly Report")** | | | |
| | 10(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 3Q13 Quarterly Report at 42. | | |
| | 10(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 3Q13 Quarterly Report, Exs. 31.1, 31.2. | | |
| 11 | **February 27, 2014 Form 10-K ("2013 Annual Report")** | | | |
| | 11(a) | Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. 2013 Annual Report at 18. | | |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| 11(b) | We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system. 2013 Annual Report at 15. | | |
| 11(c) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2013 Annual Report at 61. | | |
| 11(d) | Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. 2013 Annual Report at 7. | | |
| 11(e) | *Failure to comply with unique and increased governmental regulation could result in material penalties or non-renewal or termination of our contracts to provide or manage correctional and detention facilities.* The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are unique to government contractors and the combination of regulations we face is unique and complex. Facility contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small | Not pled. | Plaintiff pled CCA's 2013 Annual Report was misleading (ECF No. 57, ¶¶130, 133, 137(a)) and identified a substantially identical sub-statement in Rog. Resp. at 40. |

- 18 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Federal regulations also require federal government contractors like us to self-report evidence of certain forms of misconduct. We may not always successfully comply with these regulations and contract requirements, and failure to comply can result in material penalties, including financial penalties, non-renewal or termination of facility contracts, and suspension or debarment from contracting with certain government entities. 2013 Annual Report at 30. | | |
| 11(f) | *Government agencies may investigate and audit our contracts and, if any improprieties are found, we may be required to refund revenues we have received, to forego anticipated revenues, and we may be subject to penalties and sanctions, including prohibitions on our bidding in response to RFPs.* Certain of the governmental agencies with which we contract have the authority to audit and investigate our contracts with them. As part of that process, government agencies may review our performance of the contract, our pricing practices, our cost structure and our compliance with applicable performance requirements, laws, regulations and standards. The regulatory and contractual environment in which we operate is complex and many aspects of our operations remain subject to manual processes and oversight that make compliance monitoring difficult and resource intensive. For contracts that actually or effectively provide for certain reimbursement of expenses, if an agency determines that we have improperly allocated costs to a specific contract, we may not be reimbursed for those costs, and we could be required to refund the amount of any such costs that have been reimbursed. If a government audit asserts improper or illegal activities by us, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeitures of profits, suspension of payments, fines and suspension or disqualification from doing business with certain government entities. In February 2014, we reached an agreement to pay $1.0 million in compensation to the state of Idaho regarding contractual disputes related to staffing at the Idaho Correctional Center stemming in part from an audit by the Idaho Department of Corrections. In addition to the potential civil and criminal penalties and administrative sanctions noted above, any adverse determination with respect to contractual or regulatory violations could negatively impact our ability to bid | Not pled. | Plaintiff pled CCA's 2013 Annual Report was misleading (ECF No. 57, ¶¶130, 133, 137(a)) and identified this sub-statement in Rog. Resp. at 41-42. |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | in response to RFPs in one or more jurisdictions. 2013 Annual Report at 31. | | |
| 11(g) | In addition, the services we provide are labor-intensive. When we are awarded a facility management contract or open a new facility, we must hire operating management, correctional officers, and other personnel. The success of our business requires that we attract, develop, and retain these personnel. Our inability to hire sufficient qualified personnel on a timely basis or the loss of significant numbers of personnel at existing facilities could adversely affect our business and operations. Under many of our contracts, we are subject to financial penalties for insufficient staffing. 2013 Annual Report at 33. | Not pled. | Plaintiff pled CCA's 2013 Annual Report was misleading (ECF No. 57, ¶¶130, 133, 137(a)) and identified this sub-statement in Rog. Resp. at 42. |
| 11(h) | The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many governmental and regulatory authorities. Some of the regulations are unique to the corrections industry. Facility management contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Failure to comply with these regulations and contract requirements can result in material penalties or non-renewal or termination of facility management contracts. 2013 Annual Report at 23. | Not pled. | Plaintiff pled CCA's 2013 Annual Report was misleading (ECF No. 57, ¶¶130, 133, 137(a)) and identified a substantially identical sub-statement in Rog. Resp. at 40-41. |
| 11(i) | **ITEM 1A. RISK FACTORS.**<br>As the owner and operator of correctional and detention facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness as well as our qualification as a REIT for federal income tax purposes effective for our taxable year beginning January 1, 2013. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and | Not pled. | Plaintiff pled CCA's 2013 Annual Report was misleading (ECF No. 57, ¶¶130, 133, 137(a)) and identified an identical sub-statement in Rog. Resp. at 111. |

- 20 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations. 2013 Annual Report at 26. | | |
| 11(j) | Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report. 2013 Annual Report, Exs. 31.1, 31.2. | | |
| 12 | **May 8, 2014 Form 10-Q ("1Q14 Quarterly Report")** | | |
| 12(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 1Q14 Quarterly Report at 35. | | |
| 12(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 1Q14 Quarterly Report, Exs. 31.1, 31.2. | | |
| 13 | **August 7, 2014 Form 10-Q ("2Q14 Quarterly Report")** | | |
| 13(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2Q14 Quarterly Report at 40. | | |
| 13(b) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 2Q14 Quarterly Report, Exs. 31.1, 31.2. | | |
| 14 | **November 5, 2014 Form 10-Q ("3Q14 Quarterly Report")** | | |
| 14(a) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 3Q14 Quarterly Report at 40. | | |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | 14(b) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 3Q14 Quarterly Report, Exs. 31.1, 31.2. | | |
| 15 | **November 7, 2014 3Q14 Investor Presentation ("3Q14 Investor Presentation")** | | |
| | 15(a) [S]hort- and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality. 3Q14 Investor Presentation at 10. | | |
| | 15(b) •Safety & Security is our **First** priority<br>•[CCA] Perform[s] quality services for our government partners and the offenders entrusted in our care<br>3Q14 Investor Presentation at 36. | | |
| 16 | **December 29, 2014 Press Release ("December 2014 Press Release")** | | |
| | 16(a) **Federal Bureau of Prisons Elects Not to Renew Contract at the Northeast Ohio Correctional Center** NASHVILLE, TN – (Marketwired) – 12/29/14 – *CCA* (NYSE: CXW) (the "Company" or "Corrections Corporation of America") announced today that the Federal Bureau of Prisons ("BOP") elected not to renew its contract at CCA's owned and operated 2,016-bed Northeast Ohio Correctional Center. During the nine months ended September 30, 2014, the facility generated approximately $30 million in revenue from the BOP. At this time, the BOP has not determined when it will begin transferring inmates out of the facility, but the current contract expires on May 31, 2015. CCA expects to continue to provide safe, secure housing and services for the U.S. Marshals Service ("USMS") at the Northeast Ohio Correctional Center following the transfer of the BOP population, while it markets the facility to provide solutions for other customers. CCA currently houses approximately 1,400 inmates from the BOP and approximately 580 detainees from the USMS at the Northeast Ohio facility. December 2014 Press Release at 1. | Not pled. | Plaintiff identified a substantially identical sub-statement in Rog. Resp. at 71.<br><br>The loss of the Northeast Ohio Correctional Ctr. ("NEOCC") is a central part of the case. *See, e.g.*, ECF No. 447 at 3; ECF No. 396 at 1, 9-11.<br><br>This statement was made in furtherance of the scheme. |
| 17 | **February 12, 2015 4Q14 Earnings Call ("4Q14 Earnings Call")** | | |
| | 17(a) Now before providing an update on our facilities under development and our federal, state and local partnerships, I would like to take a few moments to discuss recent news regarding our contract with the Federal Bureau of Prisons at our Northeast Ohio Correctional Center. | Not pled. | Plaintiff identified a substantially identical sub-statement in Rog. Resp. at 71. |

- 22 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | At the end of the fourth quarter, we received the disappointing news that we were unsuccessful in our rebid for the contract with the BOP at our Northeast Ohio Correctional Center, commonly referred to as CAR 15 RFP. The bidding process was highly competitive, and we believe we submitted a compelling proposal. Unfortunately, the BOP chose to move in a different direction, so our current contract is scheduled to expire effective June 1, 2015. Dave will provide additional details of the forecasted impact on our financial results, which is fully reflected in our 2015 guidance we provided in yesterday's earnings announcement. Within hours of receiving notice of this unsuccessful contract rebid, we mobilized our team to actively market the facility to other government partners and assessed our long-term plans for the facility. Our exceptional team of CCA employees at the Northeast Ohio Correctional Center have had a tremendous operating track record over the 10-year term of the existing contract with the Bureau. Therefore, we know this facility will be very attractive to potential partners who have capacity needs and we'll be aggressively marketing these available beds to them. 4Q14 Earnings Call at 3. | | The loss of NEOCC is a central part of the case. *See, e.g.*, ECF No. 447 at 3; ECF No. 396 at 1, 9-11.<br><br>Further, this statement was made in furtherance of the scheme. |
| 18 | **February 24, 2015 4Q14 Investor Presentation ("4Q14 Investor Presentation")** | | |
| | 18(a) | Short-term and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality. 4Q14 Investor Presentation at 10. | | |
| | 18(b) | •Safety & Security is our **First** priority<br>•[CCA] Perform[s] quality services for our government partners and the offenders entrusted in our care<br>4Q14 Investor Presentation at 36. | | |
| 19 | **February 25, 2015 Form 10-K ("2014 Annual Report")** | | |
| | 19(a) | Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. 2014 Annual Report at 18. | | |
| | 19(b) | We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their offenders introduces competition to their prison system, resulting in | | |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | improvements to the quality and cost of corrections services throughout their correctional system. 2014 Annual Report at 49. | | |
| 19(c) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2014 Annual Report at 27, 59. | | |
| 19(d) | Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. 2014 Annual Report at 7. | | |
| 19(e) | The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many governmental and regulatory authorities. Some of the regulations are unique to the corrections industry. Facility management contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Failure to comply with these regulations and contract requirements can result in material penalties or non-renewal or termination of facility management contracts. 2014 Annual Report at 22. | Not pled. | Plaintiff pled CCA's 2014 Annual Report was misleading (ECF No. 57, ¶¶127, 137(b)) and identified this sub-statement in Rog. Resp. at 70. |
| 19(f) | In addition, the services we provide are labor-intensive. When we are awarded a facility management contract or open a new facility, we must hire operating management, correctional officers, and other personnel. The success of our business requires that we attract, develop, and retain these personnel. Our inability to hire sufficient qualified personnel on a timely basis | Not pled. | Plaintiff pled CCA's 2014 Annual Report was misleading (ECF No. 57, ¶¶127, 137(b)) |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | or the loss of significant numbers of personnel at existing facilities could adversely affect our business and operations. Under many of our contracts, we are subject to financial penalties for insufficient staffing. 2014 Annual Report at 31. | | and identified this sub-statement in Rog. Resp. at 70-71. |
| 19(g) | During December 2014, the BOP announced that it elected not to renew its contract with us at our owned and operated 2,016-bed Northeast Ohio Correctional Center. The current contract with the BOP at this facility is scheduled to expire on May 31, 2015. 2014 Annual Report at 27, 58. | Not pled. | Plaintiff pled CCA's 2014 Annual Report was misleading (ECF No. 57, ¶¶127, 137(b)) and identified this sub-statement in Rog. Resp. at 71. |
| 19(h) | **ITEM 1A. RISK FACTORS.** As the owner and operator of correctional and detention facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness as well as our qualification as a REIT for federal income tax purposes effective for our taxable years beginning January 1, 2013. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations. 2014 Annual Report at 25. | Not pled. | Plaintiff pled CCA's 2014 Annual Report was misleading (ECF No. 57, ¶¶127, 137(b)) and identified an identical sub-statement in Rog. Resp. at 111. |
| 19(i) | *Failure to comply with facility contracts or with unique and increased governmental regulation could result in material penalties or non-renewal or termination of noncompliant contracts or our other contracts to provide or manage correctional and detention facilities.* The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are unique to government contractors, and the combination of regulations we face is unique and complex. | Not pled. | Plaintiff pled CCA's 2014 Annual Report was misleading (ECF No. 57, ¶¶127, 137(b)) and identified an identical sub-statement in Rog. Resp. at 70. |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | Facility contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Federal regulations also require federal government contractors like us to self-report evidence of certain forms of misconduct. We may not always successfully comply with these regulations and contract requirements, and failure to comply can result in material penalties, including financial penalties, non-renewal or termination of noncompliant contracts or our other facility contracts, and suspension or debarment from contracting with certain government entities. 2014 Annual Report at 29. | | |
| 19(j) | *Government agencies may investigate and audit our contracts and, if any improprieties are found, we may be required to cure those improprieties, refund revenues we have received, to forego anticipated revenues, and we may be subject to penalties and sanctions, including prohibitions on our bidding in response to RFPs.* Certain of the governmental agencies with which we contract have the authority to audit and investigate our contracts with them. As part of that process, government agencies may review our performance of the contract, our pricing practices, our cost structure and our compliance with applicable performance requirements, laws, regulations and standards. The regulatory and contractual environment in which we operate is complex and many aspects of our operations remain subject to manual processes and oversight that make compliance monitoring difficult and resource intensive. A governmental agency review could result in a request to cure a performance or compliance issue, and if we are unable to do so, the failure could lead to termination of the contract in question or other contracts that we have with that governmental agency. Similarly, for contracts that actually or effectively provide for certain reimbursement of expenses, if an agency determines that we have improperly allocated costs to a specific contract, we may not be reimbursed for those costs, and we could be required to refund the amount of any such costs that have been reimbursed. If a government | Not pled. | Plaintiff pled CCA's 2014 Annual Report was misleading (ECF No. 57, ¶¶127, 137(b)) and identified a substantially identical sub-statement in Rog. Resp. at 41-42. |

- 26 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | audit asserts improper or illegal activities by us, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeitures of profits, suspension of payments, fines and suspension or disqualification from doing business with certain government entities. In February 2014, we reached an agreement to pay $1.0 million in compensation to the state of Idaho regarding contractual disputes related to staffing at the Idaho Correctional Center stemming in part from an audit by the Idaho Department of Corrections. In addition to the potential civil and criminal penalties and administrative sanctions noted above, any adverse determination with respect to contractual or regulatory violations could negatively impact our ability to bid in response to RFPs in one or more jurisdictions. 2014 Annual Report at 30. | | |
| 19(k) | Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report. 2014 Annual Report, Exs. 31.1, 31.2. | | |
| 20 | **May 7, 2015 Form 10-Q ("1Q15 Quarterly Report")** | | |
| 20(a) | During December 2014, the BOP announced that it elected not to renew its contract with us at our owned and operated 2,016-bed Northeast Ohio Correctional Center. The current contract with the BOP at this facility is scheduled to expire on May 31, 2015. 1Q15 Quarterly Report at 34. | Not pled. | Plaintiff pled CCA's 1Q15 Quarterly Report was misleading (ECF No. 57, ¶¶130, 133) and identified an identical sub-statement in Rog. Resp. at 71. |
| 20(b) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 1Q15 Quarterly Report at 34. | | |
| 20(c) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 1Q15 Quarterly Report, Exs. 31.1, 31.2. | | |
| | **May 19, 2015 1Q15 Investor Presentation ("1Q15 Investor Presentation")** | | |

- 27 -

| No. | | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|---|
| 21 | 21(a) | Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality. 1Q15 Investor Presentation at 10. | Dismissed by Court at summary judgment. | The Court declined to dismiss statements that "refer to both cost savings and issues of quality." ECF No. 447 at 42. |
| | 21(b) | •Safety & Security is our **First** priority<br>•[CCA] Perform[s] quality services for our government partners and the offenders entrusted in our care<br>1Q15 Investor Presentation at 33. | | |
| 22 | **August 6, 2015 Form 10-Q ("2Q15 Quarterly Report")** | | | |
| | 22(a) | During December 2014, the BOP announced that it elected not to renew its contract with us at our owned and operated 2,016-bed Northeast Ohio Correctional Center with a net carrying value of $32.2 million as of June 30, 2015. The contract with the BOP at this facility expired on May 31, 2015. 2Q15 Quarterly Report at 38. | Not pled. | Plaintiff pled CCA's 2Q15 Quarterly Report was misleading (ECF No. 57, ¶¶130, 133) and identified a substantially identical sub-statement in Rog. Resp. at 71. |
| | 22(b) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2Q15 Quarterly Report at 39. | | |
| | 22(c) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 2Q15 Quarterly Report, Exs. 31.1, 31.2. | | |
| 23 | **August 21, 2015 2Q15 Investor Presentation ("2Q15 Investor Presentation")** | | | |
| | 23(a) | Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality. 2Q15 Investor Presentation at 10. | | |
| | 23(b) | •Safety & Security is our **First** priority<br>•[CCA] Perform[s] quality services for our government partners and the offenders entrusted in our care | | |

- 28 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | 2Q15 Investor Presentation at 31. | | |
| 24 | **November 5, 2015 Form 10-Q ("3Q15 Quarterly Report")** | | |
| | 24(a) | During December 2014, the BOP announced that it elected not to renew its contract with us at our owned and operated 2,016-bed Northeast Ohio Correctional Center with a net carrying value of $32.1 million as of September 30, 2015. The contract with the BOP at this facility expired on May 31, 2015. Facility net operating income decreased by $5.1 million from the third quarter of 2014 to the third quarter of 2015 and decreased by $6.0 million from the first nine months of 2014 to the same period in 2015 as a result of this reduction in inmate population. 3Q15 Quarterly Report at 41. | Not pled. | Plaintiff pled CCA's 3Q15 Quarterly Report was misleading (ECF No. 57, ¶¶130, 133, 139) and identified a substantially identical sub-statement in Rog. Resp. at 71. |
| | 24(b) | Based on information available at this filing, notwithstanding the contracts at facilities described above, we believe we will renew all other material contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 3Q15 Quarterly Report at 41-42. | | |
| | 24(c) | Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system are expected to decline further in the fourth quarter of 2015, and potentially future quarters, primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses. 3Q15 Quarterly Report at 38. | | |
| | 24(d) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 3Q15 Quarterly Report, Exs. 31.1, 31.2. | | |
| 25 | **November 12, 2015 3Q15 Investor Presentation ("3Q15 Investor Presentation")** | | |
| | 25(a) | Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality. 3Q15 Investor Presentation at 11. | | |
| | 25(b) | •Safety & Security is our **First** priority | | |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | •[CCA] Perform[s] quality services for our government partners and the offenders entrusted in our care<br>3Q15 Investor Presentation at 32. | | |
| 26 | **February 24, 2016 4Q15 Investor Presentation ("4Q15 Investor Presentation")** | | |
| | 26(a) | Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality. 4Q15 Investor Presentation at 11. | | |
| | 26(b) | •Safety & Security is our **First** priority<br>•[CCA] Perform[s] quality services for our government partners and the offenders entrusted in our care<br>4Q15 Investor Presentation at 33. | | |
| 27 | **February 25, 2016 Form 10-K ("2015 Annual Report")** | | |
| | 27(a) | Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. 2015 Annual Report at 21. | | |
| | 27(b) | We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their offenders introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system. 2015 Annual Report at 54. | | |
| | 27(c) | During December 2014, the BOP announced that it elected not to renew its contract with us at our owned and operated 2,016-bed Northeast Ohio Correctional Center with a net carrying value of $31.8 million as of December 31, 2015. The contract with the BOP at this facility expired on May 31, 2015. Facility net operating income decreased by $11.8 million from the year ended December 31, 2014 to the year ended December 31, 2015 as a result of this reduction in inmate population. 2015 Annual Report at 64. | Not pled. | Plaintiff pled CCA's 2015 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 127, 130) and identified a substantially identical sub-statement in Rog. Resp. at 71. |
| | 27(d) | Based on information available at this filing, notwithstanding the contracts at facilities described above, we believe we will renew all other material contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of | | |

- 30 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|-----|--------------------------|----------------------|----------------------|
| | available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2015 Annual Report at 64. | | |
| 27(e) | Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. 2015 Annual Report at 7. | | |
| 27(f) | Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses. Further, the public sector BOP correctional system remains overcrowded at approximately 119.5% at December 31, 2015. Nonetheless, increases in capacity within the federal system could result in a decline in BOP populations within our facilities, and could negatively impact the future demand for prison capacity. 2015 Annual Report at 53. | | |
| 27(g) | *Failure to comply with facility contracts or with unique and increased governmental regulation could result in material penalties or non-renewal or termination of noncompliant contracts or our other contracts to provide or manage correctional and detention facilities.* The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are unique to government contractors, and the combination of regulations we face is unique and complex. Facility contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also | Not pled. | Plaintiff pled CCA's 2015 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 127, 130, 133) and identified a substantially similar sub-statement in Rog. Resp. at 12-13, 110. |

- 31 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Federal regulations also require federal government contractors like us to self-report evidence of certain forms of misconduct. We may not always successfully comply with these regulations and contract requirements, and failure to comply can result in material penalties, including financial penalties, non-renewal or termination of non-compliant contracts or our other facility contracts, and suspension or debarment from contracting with certain government entities. 2015 Annual Report at 32. | | |
| 27(h) | In addition, the services we provide are labor-intensive. When we are awarded a facility management contract or open a new facility, we must hire operating management, correctional officers, and other personnel. The success of our business requires that we attract, develop, and retain these personnel. Our inability to hire sufficient qualified personnel on a timely basis or the loss of significant numbers of personnel at existing facilities could adversely affect our business and operations. Under many of our contracts, we are subject to financial penalties for insufficient staffing. 2015 Annual Report at 35. | Not pled. | Plaintiff pled CCA's 2015 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 127, 130, 133) and identified this sub-statement in Rog. Resp. at 110-11. |
| 27(i) | **ITEM 1A. RISK FACTORS.** As the owner and operator of correctional and detention facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness as well as our qualification as a REIT for federal income tax purposes effective for our taxable years beginning January 1, 2013. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations. 2015 Annual Report at 27-28. | Not pled. | Plaintiff pled CCA's 2015 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 127, 130, 133) and identified this sub-statement in Rog. Resp. at 110-11. |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | 27(j) *Government agencies may investigate and audit our contracts and, if any improprieties are found, we may be required to cure those improprieties, refund revenues we have received, to forego anticipated revenues, and we may be subject to penalties and sanctions, including prohibitions on our bidding in response to RFPs.* Certain of the governmental agencies with which we contract have the authority to audit and investigate our contracts with them. As part of that process, government agencies may review our performance of the contract, our pricing practices, our cost structure and our compliance with applicable performance requirements, laws, regulations and standards. The regulatory and contractual environment in which we operate is complex and many aspects of our operations remain subject to manual processes and oversight that make compliance monitoring difficult and resource intensive. A governmental agency review could result in a request to cure a performance or compliance issue, and if we are unable to do so, the failure could lead to termination of the contract in question or other contracts that we have with that governmental agency. Similarly, for contracts that actually or effectively provide for certain reimbursement of expenses, if an agency determines that we have improperly allocated costs to a specific contract, we may not be reimbursed for those costs, and we could be required to refund the amount of any such costs that have been reimbursed. If a government audit asserts improper or illegal activities by us, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeitures of profits, suspension of payments, fines and suspension or disqualification from doing business with certain government entities. In addition to the potential civil and criminal penalties and administrative sanctions, any adverse determination with respect to contractual or regulatory violations could negatively impact our ability to bid in response to RFPs in one or more jurisdictions. 2015 Annual Report at 34. | Not pled. | Plaintiff pled CCA's 2015 Annual Report was misleading (ECF No. 57, ¶¶122 & n.12, 124, 127, 130, 133) and identified a substantially identical sub-statement in Rog. Resp. at 41-42. |
| | 27(k) Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report. 2015 Annual Report, Exs. 31.1, 31.2. | | |
| 28 | **March 30, 2016 Defendant Hininger Annual Letter to Shareholders ("2015 Annual Letter")** | | |
| | 28(a) Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners. By consistently doing so, we have experienced more than three | | |

- 33 -

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | decades of continued growth and contract retention rates in excess of 90 percent. 2015 Annual Letter at 10. | | |
| 28(b) | We take pride in our strong record of operational excellence that has earned CCA the confidence of our government partners. To maintain this confidence CCA is focused on our long-term performance. This requires we provide our facilities and staff with the necessary resources to operate the best corrections, detention and residential reentry facilities. It is only through our commitment to our long-term performance that CCA will drive future growth and increase shareholder value. 2015 Annual Letter at 10. | | |
| 28(c) | CCA's value proposition to our government partners continues to make us the premier provider in the industry and an ideal solution for correctional systems seeking new or replacement facilities. 2015 Annual Letter at 16. | | |
| 29 | **May 5, 2016 Form 10-Q ("1Q16 Quarterly Report")** | | |
| 29(a) | Based on information available at this filing, notwithstanding the contracts at facilities described above, we believe we will renew all other material contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 1Q16 Quarterly Report at 37. | | |
| 29(b) | During December 2014, the BOP announced that it elected not to renew its contract with us at our owned and operated 2,016-bed Northeast Ohio Correctional Center with a net carrying value of $31.6 million as of March 31, 2016. The contract with the BOP at this facility expired on May 31, 2015. Facility net operating income decreased by $5.5 million from the three months ended March 31, 2015 to the three months ended March 31, 2016 as a result of this reduction in inmate population. 1Q16 Quarterly Report at 41. | Not pled. | Plaintiff pled CCA's 1Q16 Quarterly Report was misleading (ECF No. 57, ¶¶130, 133, 140) and identified a substantially identical sub-statement in Rog. Resp. at 71. |
| 29(c) | Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses. Further, the public sector BOP correctional system remains | | |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | overcrowded at approximately 118.4% at March 31, 2016. Nonetheless, increases in capacity within the federal system could result in a decline in BOP populations within our facilities, and could negatively impact the future demand for prison capacity. 1Q16 Quarterly Report at 34. | | |
| 29(d) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 1Q16 Quarterly Report, Exs. 31.1, 31.2. | | |
| 30 | **May 5, 2016 1Q16 Earnings Call ("1Q16 Earnings Call Tr.")** | | |
| 30(a) | [Analyst:] as we start rolling a bit more into the election season. Any thoughts about – or any concerns about what we may start hearing in terms of changes to the industry? Notwithstanding the fact that I think that you guys make a pretty compelling case for why the industry should continue to be there. We know that Hillary has comments maybe to the contrary. And I guess, more importantly, any thoughts of what you guys may do to proactively try and counteract some of the rhetoric that comes out of Washington? [Hininger:] We have had tremendous success at the state and federal level with either at state-level governor's being a democrat or being a republican, or a president being a democrat or republican. We've been able to have really good operations, perform very, very well, and provide great value to our partners regardless of who's in the White House or who's in the Governor's residence in a respective state. And that's our focus, just to make sure that we continue to do a great job every day, have high quality operations, and then provide great value back to the taxpayers of that respective jurisdiction. 1Q16 Earnings Call Tr. at 12-13. | | |
| 31 | **May 17, 2016  1Q16 Investor Presentation ("1Q16 Investor Presentation")** | | |
| 31(a) | Short- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality. 1Q16 Investor Presentation at 12. | Dismissed by Court at Summary Judgment | The Court declined to dismiss statements that "refer to both cost savings and issues of quality." ECF No. 447 at 42. |
| 31(b) | •Safety & Security is our **First** priority | | |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|-----|--------------------------|----------------------|----------------------|
| | •[CCA] Perform[s] quality services for our government partners and the offenders entrusted in our care<br>1Q16 Investor Presentation at 34. | | |
| 32 | **June 8, 2016 REITWeek: NAREIT's Investor Forum Presentation ("NAREIT Investor Presentation Tr.")** | | |
| | 32(a) | [Hininger:] One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements. But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well. We have operationally made sure that we are providing high quality and standard and consistent services to our partners and being very flexible and innovative in the solutions. And with that, we've had some nice growth in our business under those three respective Presidents. We had a lot of growth under Clinton, we had a lot of growth under Bush, and we've had a lot of growth under President Obama. And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings both on capital voids, but also cost savings in our services, then I think we'll be just fine. NAREIT Investor Presentation Tr. at 6. | | |
| 33 | **August 3, 2016 Press Release ("August 2016 Press Release")** | | |
| | 33(a) | ***BOP Elects Not to Renew Contract at Cibola County Corrections Center***. On July 29, 2016, the BOP elected not to renew its contract at CCA's owned and operated 1,129-bed Cibola County Corrections Center located in New Mexico. The contract was scheduled to expire on September 30, 2016. At this time the BOP has not determined when it will begin transferring inmates out of the facility, but CCA intends to idle the facility upon the completion of transferring out BOP offenders. CCA has begun to actively market the facility to provide correctional or detention solutions for other customers. Our updated guidance, summarized below, includes the negative impact of $0.01 per diluted share for 2016 assuming an expiration of the contract on September 30, 2016. August 2016 Press Release at 1. | Not pled. | Loss of Cibola has always been a central part of this case. *See, e.g.*, ECF No. 57, ¶¶70-73, 75; ECF No. 76 at 9-11, 30; ECF No. 447 at 3-4, 13-15, 38. Further, this statement was in furtherance of the scheme. |
| 34 | **August 4, 2016 2Q16 Earnings Call ("2Q16 Earnings Call Tr.")** | | |
| | 34(a) | [Hininger:] Last week, we received word from the BOP that they intend not to renew our contract at the 1,129-bed Cibola County | Not pled. | Loss of Cibola has always been |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | Correctional Center, which is set to expire on September 30 of 2016. Of course, we are disappointed with the Bureau's decision not to renew, but the federal inmate populations have declined by nearly 25,000 in the last three years, resulting in reduced overcrowding in BOP operated facilities. Today, the BOP is operating at approximately 117% of their rate of capacity, down from a roughly 140% three years ago. We are committed to work with the BOP through the transition at Cibola and continue to operate three additional correctional facilities on behalf of the BOP. Following the transfer of populations, we will idle this facility. We are actively marketing the facility and believe there are multiple potential partners that could utilize the facility to address needs within their correctional systems. 2Q16 Earnings Call Tr. at 4-5. | | a central part of this case. *See, e.g.*, ECF No. 57, ¶¶70-73, 75; ECF No. 76 at 9-11, 30; ECF No. 447 at 3-4, 13-15, 38. Further, this statement was in furtherance of the scheme. |
| 35 | **August 4, 2016 Form 10-Q ("2Q16 Quarterly Report")** | | |
| 35(a) | On July 29, 2016, the BOP elected not to renew its contract at our owned and managed 1,129-bed Cibola County Corrections Center located in New Mexico. The contract was scheduled to expire on September 30, 2016. At this time the BOP has not determined when it will begin transferring inmates out of the facility, but we intend to idle the facility upon the completion of transferring out BOP offenders. We have begun to actively market the facility to provide correctional or detention solutions for other customers. During the three and six months ended June 30, 2016, we recognized $0.9 million and $2.3 million, respectively, in facility net operating income associated with the facility. 2Q16 Quarterly Report at 43. | Not pled. | Plaintiff pled CCA's 2Q16 Quarterly Report was misleading (ECF No. 57, ¶¶130, 133, 140). Loss of Cibola has always been a central part of this case. *See, e.g.*, ECF No. 57, ¶¶70-73, 75; ECF No. 76 at 9-11, 30; ECF No. 447 at 3-4, 13-15, 38. Further, this statement was in furtherance of the scheme. |
| 35(b) | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations. 2Q16 Quarterly Report at 44. | | |
| 35(c) | Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive | | |

| No. | CONTEXTUAL SUB-STATEMENT | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| | application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses. Further, the public sector BOP correctional system remains overcrowded at approximately 117.2% at June 30, 2016. Nonetheless, increases in capacity within the federal system could result in a decline in BOP populations within our facilities, and could negatively impact the future demand for prison capacity. 2Q16 Quarterly Report at 40. | | |
| 35(d) | During December 2014, the BOP announced that it elected not to renew its contract with us at our owned and operated 2,016-bed Northeast Ohio Correctional Center with a net carrying value of $31.6 million as of June 30, 2016. The contract with the BOP at this facility expired on May 31, 2015. Facility net operating income decreased by $3.8 million and $9.3 million, respectively, from the three and six months ended June 30, 2015 to the comparable periods in 2016 as a result of this reduction in inmate population. 2Q16 Quarterly Report at 48. | Not pled. | Plaintiff pled CCA's 2Q16 Quarterly Report was misleading (ECF No. 57, ¶¶130, 133, 140) and identified a substantially identical sub-statement in Rog. Resp. at 71. |
| 35(e) | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. 2Q16 Quarterly Report, Exs. 31.1, 31.2. | | |

## II. Defendants' Position:

Plaintiff's proposed Master List of predicate statements fails to comply with the Court's order (ECF No. 449) and, in effect, seeks to make a last minute and impermissible change in its theory of the case, all contrary to the pleadings, the Court's Opinions and Orders, and years of discovery in the case. As such, Plaintiff's proposed list is fundamentally flawed and is of no assistance to the Court or Defendants in finalizing the case for trial.

After five years of litigation predicated on a specific theory of liability (namely, that Defendants made false or misleading statements and omissions about the nature of CoreCivic's

- 38 -

business), Plaintiff now seeks to switch its theory of liability in order to avoid having to prove the elements of the claims it pled, and in order to introduce entirely new, unpled statements at trial. The Court ordered the parties to work together to clarify what individual statements remained to be tried, given its grant of summary judgment to Defendants on statements pertaining solely to cost savings. Yet, Plaintiff's Proposed Master List attempts to label entire documents (including SEC filings hundreds of pages long) as "misleading," and introduce dozens of new "sub-contextual" statements. Plaintiff's attempt to change the nature of this case through a routine exercise on the eve of trial is not only contrary to the law and this Court's Orders, it is highly prejudicial to Defendants and it decimates the rights afforded to Defendants by the Private Securities Litigation Reform Act ("PSLRA"), the federal securities laws and the Federal Rules of Civil Procedure.

The "gravamen" of this case has never been, as Plaintiff suggested on a meet and confer last night for the first time, Defendants' "scheme to defraud" CCA investors. Throughout this litigation, indeed at every turn, the Court has recognized this is an affirmative misstatement case under Rule 10b-5(b).[6] While Plaintiff's operative Complaint contained boilerplate paragraphs referencing "scheme liability" (ECF No. 57, ¶¶ 31, 213), *it did not allege any deceptive act distinct*

---

[6] ECF No. 76 at 24-25 (Order Denying Motion to Dismiss) (outlining actionable misstatements and elements of claim under Rule 10b-5(b)); ECF No. 143 at 21-23(Order Denying Class Certification) ("This case, as pled and as it has been construed by the court and the parties prior to this juncture, is primarily about the false impression that CoreCivic, through its affirmative statements, gave to shareholders and potential shareholders about the quality and value of its services relative to BOP expectations."); ECF No. 165 at 1 (Order Granting Motion for Reconsideration of Class Certification) (recognizing Plaintiff's securities fraud claim was based on "making allegedly false and/or misleading public statements about the quality of CoreCivic's services and its history of performance relative to the expectations of its government clients, including the Federal Bureau of Prisons"); ECF No. 447 (Order Granting In Part And Denying In Part Motions for Summary Judgment) ("Amalgamated, as the lead plaintiff, alleges that the defendants made false or misleading statements or omissions about the quality and cost savings that CoreCivic provided to government clients, including the federal Bureau of Prisons"); *see also id.* (granting summary judgment as to a particular class of statements).

- 39 -

4845-2281-6740.v1

Case 3:16-cv-02267   Document 454   Filed 04/06/21   Page 39 of 52 PageID #: 24624

*from the alleged misstatements*, as is required to proceed on a "scheme liability" theory, and the Court did not even address that theory when denying Defendants' Motion to Dismiss.[7] There is not a shred of evidence of a "scheme to defraud" separate from the allegedly false and misleading statements that survived summary judgment and are ready for trial. Even if so-called "scheme liability" were a viable theory of liability (as set forth below, it is not), it would be fundamentally unfair and unduly prejudicial to Defendants to permit Plaintiff to proceed on an entirely new theory at this late stage of the case. *See, e.g., Coan v. Dunne*, 2019 WL 1976146, at *1 (D. Conn. May 3, 2019) ("Courts routinely bar parties from raising new claims on the eve of trial[.]").

The Court and the parties have spent years litigating and taking discovery on the misstatements (as summarized in Appendix A to Defendants' Motion for Summary Judgment (ECF No. 352-2) and theory of liability that Plaintiff actually pled. Experts have issued opinions that addressed the impact of those alleged misstatements on the price of CCA's stock. Defendants then moved for summary judgment on all of the challenged statements that Plaintiff pled in the operative complaint, and the Court granted Defendants summary judgment on a subset of those statements. Consistent with that decision, the Court ordered the parties to "make all reasonable efforts to agree to a Master List of predicate statements on which the plaintiff class will seek to base its claims at trial." ECF No. 449. The Court gave the following guidance:

> It is not required that each individual statement consist only of a single sentence. However, each statement ***shall be defined sufficiently concisely for it to be considered as a single statement***, rather than a compilation of statements. The decision to separate individual statements from each other for the purposes of the

---

[7] Defendants responded to Plaintiff's arguments regarding their boilerplate allegations of "scheme liability" under Rule 10b-5(a) or (c) in their Reply in support of their Motion to Dismiss, arguing that Plaintiff's theory could not survive because Plaintiff had not pled an inherently deceptive act that is distinct from an alleged misstatement. ECF No. 73 (Reply in Support of Motion to Dismiss) at 12 n.7. The Court did not address this issue, or make any reference to Plaintiff's scheme liability claim in its Order Denying Defendants' Motion To Dismiss. *See* ECF No. 76.

- 40 -

Master List will be without prejudice to the jury's consideration of each statement in context, including in the context of the other statements at issue.

*Id.* (emphasis added).

Plaintiff's Proposed Master List does not comply with the letter or spirit of this Order. Defendants specifically object to Plaintiff's Proposed Master List on the following grounds:

***Objections to Entire Documents as "Misleading Statements"***

Consistent with the Court's guidance, Defendants do not object to the jury having access to the full document (SEC filings, earnings call transcripts, and press releases listed above) to consider each remaining challenged statement in context. But, there is no legal or factual basis to label entire documents—some of which are hundreds of pages long—as "Misleading Statements," as Plaintiff seeks to do. The PSLRA requires Plaintiff to identify, with particularity, "each statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiff did not plead (and could not have pled) that these entire documents were false or misleading; and the Court clearly contemplated that the Master List would consist of "single statements" and not "a compilation of statements." ECF No. 449. Thus, Defendants object to any description of entire documents as "Misleading Statements," in particular in the presence of the jury. Further, some of the documents Plaintiff now seeks to include on the Master List were not identified in Plaintiff's operative Complaint as containing allegedly false statements. These include the December 2014 Press Release, 4Q14 Earnings Call Transcript, an August 2016 Press Release, and 2Q16 Earnings Call Transcript. Defendants object to any predicate statement belatedly identified by Plaintiff in any of those documents.

During the parties' meet and confer to discuss this Master List submission last night, Plaintiff suggested that the jury must consider documents as Misleading Statements "in their

entirety" because it was pursuing a theory of "scheme liability" under Rule 10b-5(a).[8]  In doing so, Plaintiff suggested that it would not need to prove at trial that any individual statement was false or misleading at the time that it was made.  Plaintiff did not identify any basis for scheme liability beyond the alleged false statements, even when pressed by Defense counsel.  As set forth above, the only "method and means" of this supposed scheme to defraud that Plaintiff has identified is "public statements that concealed material information necessary to make their statements not misleading."  Plaintiff cannot get around the demanding and undisputed burden of proof imposed by the PSLRA and Rule 10b-5(b) by pretending its hornbook misstatement claim is actually some sort of amorphous scheme liability claim under Rule 10b-5(a).

It is well established that "omissions and misrepresentations alone cannot form the basis of a fraudulent scheme.  Instead, Plaintiff must 'sufficiently allege[] a scheme to defraud separate and apart from [Defendants'] alleged misrepresentations.'"  *Gordon v. Royal Palm Real Est. Inv. Fund I, LLP*, 2020 WL 2836312, at *4–5 (E.D. Mich. May 31, 2020) (citing several cases); *see also S.E.C. v. Rio Tinto PLC*, 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021) ("in order to allege scheme liability under subsections (a) and (c) or Rule 10b–5, the SEC must allege 'the performance of an inherently deceptive act that is distinct from an alleged misstatement.'"); *In Re TEVA Sec. Litig.*, 2021 WL 1197805, at *2-3, 5–6 (D. Conn. Mar. 30, 2021) ("[w]here the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the plaintiff's attempt to bypass the elements necessary to impose misstatement liability under subsection (b) by labeling the alleged misconduct a scheme rather than a

---

[8] Rule 10b-5(b), upon which this case has proceeded since inception, provides liability if a person "make[s] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  In contrast, Rule 10b-5(a) provides liability for "employ[ing] any device, scheme, or artifice to defraud."  *Id.*

misstatement"); *S.E.C. v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011) ("[s]cheme liability . . . hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement"); *S.E.C. v. Geswein*, 2011 WL 4541308, at *16–18 (N.D. Ohio Aug. 2, 2011) ("The alleged deceptive scheme or course of conduct must go beyond misrepresentations under Rule 10b-5(b). The conduct must take the form of actions that were independently deceptive or fraudulent, such as sham or inherently deceptive transactions.") (citations omitted), *report and recommendation adopted in relevant part*, 2011 WL 4565861 (N.D. Ohio Sept. 29, 2011).

The Supreme Court recently addressed the issue of scheme liability in *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1099 (2019). There, the Supreme Court held that, even though a defendant did not "make" the underlying statement as required by Rule 10b-5(b), he could nevertheless be held liable through a private suit brought under subsections (a) and (c) of Rule 10b-5 because he disseminated the language with the intent to defraud. *Id.* at 1105. Here, in contrast, Plaintiff alleges that *Defendants made the alleged misstatements* (and signed SOX certifications). And again, Plaintiff has identified no additional acts that would somehow transform this misstatement claim into a claim for scheme liability. The exception in *Lorenzo* therefore does not apply. *Cf. Rio Tinto PLC*, 2021 WL 818745, at *2–3 ("The Court disagrees with the SEC's contention that *Lorenzo* holds that misstatements can form the basis for liability under Rule 10b-5(a) and (c) . . . . *Lorenzo* holds that those 'who disseminate false or misleading statements to potential investors with the intent to defraud' can be liable under these provisions, not that misstatements alone are sufficient to trigger scheme liability."). Endorsing Plaintiff's theory that making allegedly false statements is sufficient for scheme liability "would serve to erase the distinction between primary liability, which may be punished through private suits under 10b-5, and secondary liability, which may not." *Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, 2020 WL 611506, at

\*7–8 (S.D.N.Y. Feb. 7, 2020). Simply put, it cannot be the case that Plaintiff now, on the eve of trial, can proceed with a "scheme liability" claim under Rule 10b-5(a) based solely on affirmative misstatements, in order to avoid proving the elements of a claim under Rule 10b-5(b). Because Plaintiff's attempt to proceed with "scheme liability" fundamentally changes almost every aspect of the trial, Defendants would welcome the opportunity to address this issue further in supplemental briefing.

Plaintiff also suggested, in the alternative, that the inclusion of entire statements as "Misleading Statements" was permissible because it claims that Defendants' statements were misleading by omission. That too is contrary to this Court's previous holdings and established law. This Court previously rejected Plaintiff's attempt to frame their claims as pure "omission" claims, finding "the core of Amalgamated's allegations is, fundamentally, what CoreCivic said, not what it failed to say." ECF No. 143 at 20-22.[9] Even if Plaintiff's theory is (as articulated by Plaintiff) that Defendants "assumed a duty to speak fully and truthfully" and "violated" this duty with "misleading half-truths and omission," Plaintiff must still prove that particular statements were "half-truths" or rendered misleading by the alleged omission of particular facts. As this Court has recognized, Defendants have no general duty to disclose facts; rather, a duty to disclose arises only once Defendants have chosen to speak on a particular subject. *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)

---

[9] (Citing *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001); *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 682 (S.D. Tex. 2006); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at \*5 (S.D.N.Y. Aug. 1, 2006); *Siemer v. Assocs. First Capital Corp.*, 2001 WL 35948712, at \*22 (D. Ariz. Mar. 30, 2001); *Kotlisky v. Omaha Investments, Inc.*, 1992 WL 237360, at \*4 (N.D. Ill. Sept. 17, 1992)).

- 44 -

(requiring identification of particular statement rendered misleading by omission and explaining omitted facts must "conflict with what a reasonable investor would take from" that statement); *Bondali v. Yum! Brands, Inc.*, 620 F. App'x. 483, 491-92 (6th Cir. 2015) (requiring a "statement-by-statement" analysis). Plaintiff was required to identify all particular statements it claimed were false or misleading in its Complaint, and the list of predicate challenged statements should be limited to those statements.

### Objections to Specific "Contextual Sub-Statements"

Even if the Court construes Plaintiff's enumerated "contextual sub-statements," as the individual statements that remain to be tried in this case (and Defendants respectfully submit this is the only practical and fair way to proceed), Defendants object to certain of the statements included on Plaintiff's list that were not pled in Plaintiff's operative Complaint (and some of these statements were not even identified later in written discovery).[10] Plaintiff's attempt to change or expand the scope of this litigation on the eve of trial is not only contrary to the Court's order, but improper, highly prejudicial and would constitute reversible error. These include statements numbered 1(f), 1(g), 1 (h), 1(i), 6(e), 6(f), 6(g), 6(h), 11(e), 11(f), 11(g), 11(h), 11(i), 19(e), 19(f), 19(g), 19(h), 19(i), 20(a), 22(a), 24(a), 24(b), 27(c), 27(d), 27(g), 27(h), 27(i), 28(a), 28(b), 29(b), 33(a), 33(a), 35(a), 35(d), and 35(e). Even more problematic, Plaintiff's list purports to be only a "sample" of contextual sub-statements, which fails entirely to provide Defendants adequate notice of, or the ability to object to, additional statements Plaintiff may yet claim are false at trial. The very point of the Court's Order was to agree upon a specific list of predicate statements for trial.

---

[10] To be clear, Defendants do not believe statement numbers were referenced in written discovery: 1(g), 1(h), 6(f), 6(h), 11(h) 16(a), 11)h), 11(i), 16(a), 17(a), 19(h), 19(i), 19(j), 20(a), 22(a), 24(a), 27(c), 27(j), 29(b), 33(a), 34(a), 35(a), 35(d),

Plaintiff boldly argued that it is not prejudicial to add statements at this late stage (and on the parties' meet and confer last night, counsel for Plaintiff repeatedly ignored Defense counsel's explanation of prejudice). That is wrong. Defendants are entitled under the PSLRA to the identification of the particular statements that Plaintiff claims are false and misleading. 15 U.S.C. §78u-4(b)(1). If Plaintiff had identified these statements in its Complaint, as required, Defendants could have moved to dismiss them at the pleading stage or moved for summary judgment on those statements. Defendants also could have developed evidence during discovery to present to a jury demonstrating the truth of these myriad statements that were never before deemed to be in controversy. The fact that certain of these unpled statements were included in Plaintiff's discovery responses served at the close of discovery is not sufficient to provide Defendants with adequate notice of Plaintiff's claims. That is not the law; nor is it the manner in which this case should proceed. If Plaintiff had sought to challenge these statements, it was required to seek leave to amend its pleading to do so, show good cause for doing so, and have the Court make a determination as to the prejudice for doing so. Seeking to challenge *new* statements in response to a Court's Order dismissing *pled* statements is procedurally improper to say the least.

### Objections To Altering The Nature And Timing Of This Trial

Separate and apart from the fact that Plaintiff's attempted last minute switch in theories and statements to be tried is contrary to law, it also fundamentally alters the case to be tried. The Court has reserved two weeks for the upcoming trial, which was based on the nature of the case before the Court. Permitting this case to proceed based on Plaintiff's proposed predicate statements or new "scheme liability" theory would dramatically alter the length of the trial. While Plaintiff claims that it can present its case-in-chief in four days, Defendants respectfully submit that there is no way to adjudicate whether these entire SEC filings, earnings call transcripts, or

- 46 -

press releases—or even the contextual sub-statements spanning nearly 24 pages of single-spaced text—are false or misleading during the two weeks allotted for trial. Indeed, the new case Plaintiff wants to try could not possibly be tried in less than a month, separate and apart from the weeks of deliberations that it would take the jury to wade through a 24-pages on the verdict form reflecting Plaintiff's newly minted list of statements purportedly at issue.

DATED: April 6, 2021
ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
WILLOW E. RADCLIFFE
KENNETH J. BLACK
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN (*Admitted Pro Hac Vice*)
NATALIE F. LAKOSIL
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
nlakosil@rgrdlaw.com

Lead Counsel for Plaintiff

- 47 -

BARRETT JOHNSTON MARTIN
    & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

DATED: April 6, 2021                    RILEY WARNOCK & JACOBSON, PLC
                                        STEVEN A. RILEY, #6258
                                        MILTON S. McGEE, III, #024150


                                        s/ Milton S. McGee, III
                                        MILTON S. McGEE, III

1906 West End Avenue
Nashville, TN 37203
Telephone: 615/320-3700
615/320-3737 (fax)
sriley@rwjplc.com
tmcgee@rwjplc.com

LATHAM & WATKINS LLP
DAVID J. SCHINDLER (admitted *pro hac vice*)
BRIAN T. GLENNON (admitted *pro hac vice*)
MERYN C.N. GRANT (admitted *pro hac vice*)
355 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213/485-1234
213/891-8763 (fax)
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

LATHAM & WATKINS LLP
MORGAN E. WHITWORTH (admitted *pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415/391-0600
415/395-8095 (fax)
morgan.whitworth@lw.com

- 48 -

LATHAM & WATKINS LLP
SARAH A. TOMKOWIAK (admitted *pro hac vice*)
555 11th Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: 202/637-2335
415/637-2201 (fax)
sarah.tomkowiak@lw.com

Attorneys for Defendants Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger and Harley G. Lappin

- 49 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 6, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth J. Black**
  kennyb@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **Meryn C.N. Grant**
  Meryn.Grant@lw.com

- **Dennis J. Herman**
  dherman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Rachel L. Jensen**
  rachelj@rgrdlaw.com,e_file_sd@rgrdlaw.com,rachelj@ecf.courtdrive.com

- **Natalie F. Lakosil**
  nlakosil@rgrdlaw.com,nlakosil@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,adonovan@barrettjohnston.com,eseaborn@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Faraz Mohammadi**
  faraz.mohammadi@lw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,WillowR@ecf.courtdrive.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian Schall**
  brian@goldberglawpc.com

- **David J. Schindler**
  david.schindler@lw.com

- **Sarah A. Tomkowiak**
  sarah.tomkowiak@lw.com

- **Morgan E. Whitworth**
  morgan.whitworth@lw.com,morgan-whitworth-8044@ecf.pacerpro.com

- **Mark H. Wildasin**
  mark.wildasin@usdoj.gov,liz.lopes@usdoj.gov,melissa.russell@usdoj.gov,dkGeorge@bop.gov,othomas@bop.gov,CaseView.ECF@usdoj.gov,regina.taylor2@usdoj.go

- **Christopher M. Wood**
  cwood@rgrdlaw.com,willowr@rgrdlaw.com,CWood@ecf.courtdrive.com,morgank@ecf.courtdrive.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,MKuwashima

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)