UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, et al.,<br><br>     Defendants. | Civil Action No. 3:16-cv-02267<br><br>Honorable Aleta A. Trauger<br><br>DECLARATION OF CHRISTOPHER M. WOOD IN SUPPORT OF: (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARD TO PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4) |

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT ........................1

II. FACTUAL BACKGROUND OF LITIGATION ................................................10

III. PROCEDURAL HISTORY ........................................................................13

    A. Plaintiff Is Appointed Lead Plaintiff and Defeats Defendants' Motion to Dismiss ........................................................................14

    B. Defendants' Answer to the Complaint ................................................15

    C. Plaintiff Obtains Class Certification ................................................15

    D. Fact Discovery ........................................................................18

        1. Requests for Documents ................................................18

            a. Document Requests Directed at Defendants................................18

            b. Document Requests and Related Discovery Directed at Plaintiff ................................................19

        2. Interrogatories and Requests for Admission................................20

            a. Requests Directed at Defendants ................................20

        3. Discovery Disputes with Defendants................................21

            a. Disputes over Scope of Document Production ................................21

            b. Disputes over Improper Claims of Privilege ................................24

            c. Disputes over Documents Produced in Discovery................................27

            d. Disputes over Plaintiff's Interrogatories Served on Defendants ................................28

        4. Discovery from Third Parties................................29

            a. The BOP and Corrections' Auditors................................29

            b. Auditor Ernst & Young................................29

            c. Analysts................................29

            d. Lobbyists and Public Relations Consultants................................30

            e. CCA Retained Professors................................30

            f. Competitors................................30

g. Correct Care Solutions ................................................31

5. Fact Depositions.............................................................31

E. Plaintiff Largely Prevails on Summary Judgment ................................32

F. Investigators, Experts and Consultants Assisting the Litigation .........................33

1. Factual Investigators .......................................................34

2. Consultants......................................................................34

3. Class Certification Expert ................................................34

4. Economic and Damages Expert ......................................35

5. Industry Expert................................................................35

6. Trial Expert Discovery....................................................36

a. Discovery Propounded on Plaintiff's Experts................................36

b. Discovery Propounded on Defendants' Experts...........................37

7. Trial Expert Depositions .................................................37

8. *Daubert* Motions in Preparation for Trial ...................................38

G. Extensive Trial Preparation.......................................................39

IV. STRENGTHS AND WEAKNESSES OF CASE ..............................................41

V. NATURE AND ADEQUACY OF SETTLEMENT ................................................42

A. History of Settlement Negotiations.........................................................42

B. The Settlement Is in the Best Interests of the Class and Warrants Approval ........44

VI. PLAN OF ALLOCATION ..................................................................45

VII. CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE................................................46

A. The Requested Fee Is Reasonable....................................................47

B. The Requested Fee Is Supported by Plaintiff ...................................47

C. The Requested Fee Is Supported by the Effort Expended and Results Achieved ....................................................48

D.      The Risk of Contingent Class Action Litigation Supports the Requested
        Fee Award....................................................................................................48

VIII.   CONCLUSION....................................................................................................50

I, CHRISTOPHER M. WOOD, declare as follows:

1.      I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Class Counsel"), Court-appointed Class Counsel for Lead Plaintiff and Class Representative Amalgamated Bank, as Trustee for the LongView Collective Investment Fund ("Plaintiff") in this action.  I was actively involved in the prosecution of this action (hereinafter, the "Litigation"), am familiar with its proceedings and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Litigation.[1]

2.      I submit this Declaration in support of Plaintiff's application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Stipulation for a cash settlement of $56 million on behalf of the Class; (b) the proposed Plan of Allocation of settlement proceeds; and (c) the application for attorneys' fees and expenses.

3.      The Class, previously certified by the Court in its order granting Plaintiff's motion for reconsideration, is defined as:

> All persons who purchased or otherwise acquired Corrections Corporation of America, Inc. ("CCA") [now "CoreCivic"] securities between February 27, 2012 and August 17, 2016, inclusive, and who were damaged thereby.  Excluded from the Class are: (a) CCA/CoreCivic, its parents, subsidiaries and any other entity owned or controlled by CCA/CoreCivic; (b) Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin; (c) all other executive officers and directors of CCA/CoreCivic or any of its parents, subsidiaries or other entities owned or controlled by CCA/CoreCivic; (d) all immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and steprelations of similar degree; and (e) all predecessors and successors in interest or assigns of any of the foregoing.

## I.      SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT

4.      This action was brought against Corrections Corporation of America, Inc. ("CCA" or the "Company," now doing business as CoreCivic, Inc.), Damon T. Hininger, David M. Garfinkle,

---

[1]    Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Stipulation of Settlement, dated and filed on June 24, 2021 (ECF No. 463) (the "Stipulation").

Todd J. Mullenger and Harley G. Lappin ("Lappin") (collectively, "Defendants") on behalf of the Class, for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) by the U.S. Securities and Exchange Commission ("SEC"). This case was vigorously litigated until the proposed settlement agreement was reached on April 16, 2021 – less than a month before trial was set to commence.

5.     The settlement was not achieved until Plaintiff, *inter alia*: (a) successfully opposed Defendants' motion to dismiss the Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint"), filed on March 13, 2017 (ECF No. 57); (b) obtained class certification over Defendants' strenuous objections; (c) completed years of fact discovery, including reviewing and analyzing more than 3.7 million pages of documentary evidence produced by CCA and more than 20 third parties and taking numerous fact depositions; (d) filed more than a half-dozen discovery motions, including motions related to Defendants' interrogatory responses and claims of privilege; (e) retained experts in the fields of the performance of private prison operators and economics to prepare opening and supplemental reports; (f) completed expert discovery, including taking eight depositions of Defendants' designated trial experts and defending Plaintiff's two trial experts; (g) prepared and filed *Daubert* motions to exclude Defendants' expert witnesses and opposed Defendants' motions to exclude Plaintiff's experts; (h) successfully moved for partial summary judgment; (i) successfully opposed Defendants' motion for summary judgment; (j) prepared the case for trial, including drafting motions *in limine*, jury instructions and other pretrial materials, exchanging trial exhibits and deposition designations with Defendants, negotiating evidentiary objections and mobilizing a trial team of attorneys and staff, who were prepared to convene in Nashville for final trial preparation; (k) engaged in settlement negotiations with nationally

recognized mediators; and (l) assessed the risks of prevailing on Plaintiff's claims at trial and the Class' ability to collect on any judgment awarded.

6.      Plaintiff alleged, among other things, that Defendants participated in a fraudulent scheme by deceiving investors about the quality and cost savings of CCA's correctional services and CCA's client relationships and ability to win contract renewals from government customers or partners.[2]  Based on the evidence obtained in discovery, Plaintiff intended to prove at trial that Defendants perpetrated this fraud by:

- Concealing the existence or extent of ongoing security, staffing, healthcare and other problems at CCA's BOP facilities, such as by falsifying staffing logs, and misrepresenting the Company's operational and compliance record;

- Concealing the existence or extent of BOP and other government client dissatisfaction with CCA's poor operational performance;

- Strategically cutting costs, including through understaffing and poor hiring standards that resulted in the deterioration of CCA's performance and, in some instances, the death of inmates and a correctional officer;

- Hiring BOP officials, lobbying the government and leveraging politicians to exert pressure on CCA's government clients to win and retain business;

- Denying and falsely discrediting negative information publicized by government and media audits, reviews and investigations; and

- Concealing the inducements provided or offered to government clients to win or retain business despite poor operational performance.

7.      Plaintiff contends these actions caused CCA's publicly traded securities to trade at inflated prices, thereby causing economic harm to Class Members when the risks and conditions concealed by Defendants' misrepresentations and omissions, or the economic consequences thereof, materialized.  Plaintiff alleged that Defendants concealed material risks to the Company's business, which were revealed through public disclosures on August 4, 2016 with CCA's announcement that

---

[2]     CCA operated prisons on behalf of a number of government clients, including, at the start of the Class Period, five correctional facilities on behalf of one important government client, the United States Bureau of Prisons ("BOP").

- 3 -

the BOP contract for its Cibola County Correctional Center ("Cibola") would not be renewed, and on August 18, 2016, with the memorandum released by Deputy Attorney General Sally Yates, titled "Reducing our Use of Private Prisons" ("Yates Memo").

8. The settlement of this Litigation was negotiated with the assistance and oversight of the Honorable Layn R. Phillips (Ret.) and Gregory P. Lindstrom of Phillips ADR, respected mediators with substantial experience in mediating claims arising under the federal securities laws. The parties participated in in-person mediation sessions on February 28, 2019 and May 31, 2019. In advance of these mediations, Plaintiff and Defendants prepared comprehensive mediation submissions, supported by evidentiary materials, and vigorously advanced and thereafter defended their positions at the mediation. The parties did not reach a settlement during these sessions; however, the mediators were kept apprised of developments in the case and facilitated further negotiations between the parties during the approximately two years leading up to the settlement. After careful and detailed consideration of the parties' positions, Judge Phillips and Mr. Lindstrom made a mediators' proposal to both sides proposing a settlement based upon a cash payment of $56 million. Both sides accepted the mediator's proposal, and the material terms of the settlement were agreed to shortly thereafter.

9. The proposed settlement is the result of hard-fought and contentious litigation pursued by zealous advocates on both sides and takes into consideration the significant risks specific to the case. It was negotiated by experienced counsel for Plaintiff and Defendants with a solid understanding of both the strengths and weaknesses of their respective positions.

10. Class Counsel and Plaintiff believe this settlement represents an excellent result for the Class. Based upon the evidence obtained in discovery, as well as the investigation, research, analysis, motion practice and trial preparation conducted, Plaintiff believed its case had significant

- 4 -

merit but also recognized there were significant risks at trial and in recovering any judgment, which had to be carefully evaluated in determining what course (*i.e.*, whether to settle and on what terms or whether to continue to litigate through trial and an inevitable appellate process) was in the best interest of the Class. As set forth in further detail below, the specific circumstances involved here presented many risks and uncertainties in Plaintiff's ability to prevail if the case proceeded to trial and to collect on any judgment awarded. Even if Plaintiff were to win at trial, the risk of a years-long appeals process, during which time the Class would be denied any recovery, also had to be taken into account in evaluating the proposed settlement.

11. Plaintiff's perseverance through more than four years of litigation resulted in the discovery of substantial evidence in support of the alleged claims. Class Counsel believed discovery had revealed evidence sufficient to sustain a jury verdict in Plaintiff's favor, including evidence that: (i) CCA's staffing, intelligence gathering, healthcare and security deficiencies were pervasive; (ii) CCA incurred unprecedented numbers of recurring deficiencies – largely in Health Services – causing the deaths of inmates; (iii) during the Class Period, CCA could not win a competitively bid BOP contract, even when it offered its services at a lower price than the competition; (iv) CCA deliberately downplayed public criticism of its services while emphasizing the quality of its services; and (v) CCA's relationship with the BOP had deteriorated to the point that CCA was unlikely to win any competitively bid contracts in the future.

12. Despite the strength of the evidence developed in discovery, there were substantial risks to Plaintiff's ability to obtain, protect and ultimately recover on a favorable judgment at trial. Defendants vigorously contested liability and planned to marshal evidence at trial that they hoped would convince the jury that: (i) their statements were accurate to the best of their knowledge; (ii) the risks to CCA's business had all been disclosed or were unknown to Defendants at the time

their statements were made or, to the extent that Defendants did fail to disclose a material risk, that the risk had never in fact materialized; and (iii) Class Members' losses were the result of a political shift rather than the materialization of the risks arising from the poor quality of CCA's services. At the time the agreement to settle was reached, there was substantial uncertainty over the outcome of many of these issues as well as additional risks as a result of Defendants' imminent motions seeking to exclude evidence necessary to prove Plaintiff's claims.

13. In addition, there were significant risks regarding the extent of recoverable damages in the event Plaintiff prevailed on some, but not all, of its alleged claims. If, for example, the jury credited Plaintiff's allegations that Defendants misleadingly concealed CCA's deteriorating relationship with the BOP but found that Defendants generally told the truth about the quality of CCA's services (or vice versa), that could have reduced the amount of damages recoverable by the Class. Damages could also have been reduced if the jury found the fraud did not commence until some point after the start of the Class Period such that fewer shares were purchased at inflated prices or the amount of inflation in the shares was less than Plaintiff's experts estimated. This could have occurred, for example, if the jury found Defendants misled investors about the deteriorating relationship with the BOP but not until December 2014, when CCA lost its BOP contract for the Northeast Ohio facility but did not disclose the reasons for that loss.

14. Damages were also subject to reduction if the jury determined the stock price declines did not result from the materialization of the risks Defendants allegedly concealed. For example, defense experts were expected to testify that stock drops on which Plaintiff's damage claims were premised were based on information that had previously been disclosed, or were the result of a political shift, rather than a materialization of a concealed risk. Defendants were expected to assert that the August 4, 2016 stock price drop accompanying the announcement of the loss of the BOP

contract for Cibola resulted from unrelated issues at another, non-BOP facility (*i.e.*, the South Texas Family Residential Center facility) and that the market already knew of the loss of the Cibola contract prior to the stock drop. Defendants were also expected to argue that the stock drop at the end of the Class Period, accompanying the release of the Yates Memo, resulted from a sudden political shift and its anticipated effect on the private prison business as a whole and not from the revelation that the poor quality of CCA's services had and would cost CCA business with its government clients. While Plaintiff believed it had substantial responses to each of these arguments, were the jury to credit any or all of them, the damages recoverable at trial could have been significantly reduced or eliminated altogether.

15.     Plaintiff also anticipated a battle of the experts on these disputed issues at trial. Each side had retained experts who were expected to offer opposing testimony about: (i) the quality of CCA's corrections services; (ii) CCA's relationship with the BOP and the likelihood of retaining or winning new business from the BOP; and (iii) loss causation and damages. Even having retained experienced experts, there could be no guarantee that Plaintiff would prevail on the issues of their testimony as Defendants hired experts to counter Plaintiff's experts' theories. Indeed, the trial of this case could hinge on the testimony of experts, which presents a substantial risk of a party prevailing not on the merits but because of the jury's impression of one party's expert or experts.

16.     There was also significant risk of delay in providing Class Members with compensation for the harm caused by Defendants' fraud. Post-trial proceedings, including proceedings attendant to the determination of damages, threatened to delay the Class' recovery on any favorable judgment obtained at trial. In addition, Defendants were certain to appeal any verdict achieved in Plaintiff's favor. The appeals process could span years, during which time the Class

would receive no recovery. Any appeal would also create the risk of reversal, in which case the Class would receive nothing after having prevailed on the claims at trial.

17.     Even if Plaintiff were awarded damages at trial, there was also a real risk in this action regarding recovery. Not only had CCA not won a competitively bid BOP contract in years, President Biden issued an executive order on January 26, 2021, indicating the intent to phase out the federal government's reliance on private prison operators. In March 2021, Moody's downgraded CCA's corporate family rating, senior unsecured debt rating, and senior secured credit facility rating to Ba2 from Ba1, and revised its outlook to "negative." In April 2021, CCA announced an offering of new senior notes paying 8.25% interest, a significant increase from the 5% and 4.625% senior notes they replaced, reflecting the Company's increasing credit risk. As a result, Plaintiff was faced with the real risk that should it be awarded the damages it sought, CCA would not have the resources to fund the judgment and might seek the protection of the bankruptcy courts to avoid paying any judgment.

18.     All of these factors, together with the other factors discussed herein, were considered by Plaintiff and Class Counsel in concluding that the mediators' proposal to settle the Litigation for $56 million provided fair, reasonable and adequate consideration in light of the risks and uncertainties of trial. In reaching the determination to settle, Plaintiff and its counsel have weighed the documentary evidence, deposition testimony, expert reports and legal authority that weigh in favor of and against their claims. On balance, considering all the circumstances and risks both sides faced at and after trial, in addition to Plaintiff's ability to collect on a final judgment and the mediators' recommendation, Plaintiff concluded that settlement on the agreed terms provided fair, reasonable and adequate consideration for the claims alleged and was in the best interest of the Class.

19.     The settlement confers a substantial benefit on the Class and eliminates the significant risks inherent at trial and in post-trial proceedings and appeals, the outcome of which was far from certain.  It is respectfully submitted that the settlement should be approved as fair, reasonable and adequate; that Plaintiff's Counsel should be awarded attorneys' fees of one-third of the Settlement Fund and their expenses of $1,949,862.24; that the Plan of Allocation should be approved; and that Plaintiff should be awarded $17,525 for its time and expenses in representing the Class.

20.     Class Counsel has, as described below, vigorously prosecuted this action on a wholly contingent basis for more than four years and advanced or incurred significant litigation expenses, up to and including reserving non-refundable living accommodations in Nashville in the weeks before trial was set to begin.  Class Counsel has long borne the risk of an unfavorable result.  They have not received any compensation for their substantial efforts, nor have they been paid for their expenses.

21.     The fee application for one-third of the Settlement Fund is fair both to the Class and Class Counsel, is supported by Plaintiff and warrants this Court's approval.  This fee request is within the range of fees frequently awarded in these types of actions and is justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation and the nature and extent of legal services performed.

22.     Plaintiff's Counsel should also be awarded their expenses in the aggregate of $1,949,862.24, all of which were reasonably and necessarily incurred in prosecuting the Litigation. This amount includes the fees and expenses for: (a) investigators, consultants and experts whose services Class Counsel required in the successful prosecution, analysis and resolution of this case; (b) stenographic and videographer services for depositions; (c) travel and lodging for Class Counsel to attend Court hearings, mediations and to conduct discovery; (d) factual and legal research, as well as photocopying, imaging and printing thousands of pages of documents; (e) litigation database costs

- 9 -

for serving, cataloging and facilitating the review and analysis of more than 3.7 million pages of documents; (f) legal research; (g) court and witness fees; and (h) mediation fees.

23.     As described in detail below, these expenses were reasonably and necessarily incurred to plead Plaintiff's claims with particularity, certify the Class, complete discovery, respond to summary judgment and other pretrial motions, prepare this case for trial and obtain a settlement on the terms proposed.

## II.     FACTUAL BACKGROUND OF LITIGATION

24.     The following is a summary of the nature of the Class' claims, the principal events that occurred during the course of this Litigation and the legal services provided by Class Counsel.[3]

25.     This securities fraud class action was brought on behalf of a Class of investors who purchased or otherwise acquired the securities of CCA between February 27, 2012 and August 17, 2016, inclusive, against CCA and certain of its officers and directors.  ¶1.

26.     CCA, based in Nashville, Tennessee, was founded in 1983.  ¶21.  CCA began operating as a real estate investment trust for federal income tax purposes effective January 1, 2013. ¶33.  As of December 31, 2016, CCA purported to be the nation's largest owner of privatized correctional and detention facilities and one of the largest prison operators in the United States.  *Id.* CCA's services included housing low-security inmates – in particular, criminal non-U.S. citizens – on behalf of government clients.  *See* ¶¶34, 43, 68, 87.  Each year between 2010 and 2015, CCA derived more than 40% of its revenue from government clients, including 12%-15% from the BOP. ¶34.

---

[3]     The information in this section is based on the allegations in the Complaint, the evidence produced in discovery and other sources of information believed to be accurate.  However, the undersigned counsel does not have personal knowledge of the conduct of CCA's business other than what it has reviewed in the course of discovery.  References to "¶__" are to the Complaint, filed with the Court on March 13, 2017 (ECF No. 57), unless otherwise indicated.

27. Plaintiff alleged that, to convince investors of the success and sustainability of its privatized or for-profit prison business model, Defendants touted CCA's purportedly better services at a lower cost than government-run facilities and, as a result, claimed CCA was well positioned to continue to maintain a high rate of renewal of its government contracts and to win expanded future business. ¶¶35-36.

28. The Complaint also alleged that CCA concealed from investors, the BOP and others: (i) inadequate staffing that led to serious safety and security concerns for both inmates and staff; (ii) poor health services that repeatedly contributed to the deaths of inmates even though the BOP had previously warned CCA of similar issues; and (iii) numerous other systemic failures to comply with contractual requirements. *E.g.*, ¶¶37-114. Further, the Complaint alleged that any cost savings were only due to CCA's short staffing and failure to provide basic services in violation of its contractual obligations. *E.g.*, ¶189. The Complaint also alleged that the understaffing and other failures put CCA's inmates at risk of harm and gave rise to significant risks that remained concealed from investors. *E.g.*, ¶¶37-114.

29. The Class Period begins on February 27, 2012, when CCA filed with the SEC its 2011 annual report on Form 10-K for the fiscal year ended December 31, 2011. The annual report made a number of false representations about the high quality and competitive cost of CCA's correctional services, as well as CCA's ability to retain and expand business with government clients.

30. The Complaint alleged that just three months later, on May 20, 2012, a riot broke out at CCA's Adams County Correctional Center ("Adams") in Mississippi. The riot lasted more than 12 hours and resulted in the murder of a corrections officer, significant injuries to other staff and to inmates, hostages being taken and property destruction encompassing the majority of the facility and

totaling more than $1 million in damage. The BOP "directly attributed" the tragic results of the riot "to actions taken by the [Adams] administration leading up to the event." CCA publicly disclosed only that a "disturbance" had occurred at Adams while concealing CCA's systemic performance failures, which caused the disaster and permanently damaged its relationship with the BOP.

31. In 2014, CCA submitted a bid for a renewal of a BOP contract for its Northeast Ohio prison. The BOP told CCA it had not won the bid, despite having offered the lowest price, and thus had lost the contract. The BOP cited CCA's poor past performance at other facilities as a reason for the decision not to contract with CCA.

32. While Defendants were concealing from investors why they lost the Northeast Ohio contract to their chief rival, other bad news from the BOP poured in. CCA received a number of Notices of Concern ("NOC"), deficiencies, contract deductions and negative audit and other findings detailing CCA's performance failures throughout the Class Period. In contrast to what Defendants knew internally, Defendants continued to tout the Company as one that would retain and expand business because of CCA's high quality services that it provided at a lower cost.

33. Then, in early 2015, unbeknownst to investors, the BOP informed CCA that it would be receiving two even more significant negative reports regarding CCA's services. The first, a "Significant Finding" in patient care at Adams, was the result of a BOP finding that CCA's poor delivery of health care had caused or contributed to five inmate deaths. The second, a "Cure Notice" at Cibola, threatened to terminate that contract if CCA did not immediately remediate the deficient health services at that facility.

34. On August 3, 2016, CCA was forced to disclose that the BOP had notified CCA it would not renew the Cibola contract. Following the announcement of the loss of the Cibola

contract, CCA's closing share price dropped from $31.03 on August 3, 2016 to $29.11 on August 4, 2016.

36. Then, on August 18, 2016, the Yates Memo was issued, which stated that private prisons compare poorly to BOP prisons and directed the BOP to reduce its own contracts with private prison operators, citing the non-renewal of one contract (which the market understood to be the Cibola contract) as one action already taken consistent with that directive. Following this news, CCA's share price declined from $27.22 to close at $17.57 on August 18, 2016, a decline of $9.65 (35.5%).

## III. PROCEDURAL HISTORY

36. The litigation of this case was highly contentious, involving significant disputes at all phases of the case. Defendants mounted vigorous challenges at the pleading, class certification and summary judgment phases of this case, and the parties had numerous disputes over the scope and adequacy of discovery. Due to the extent of the disputes and communications, thousands of hours of attorney and staff time were required to obtain and review the documents responsive to discovery requests and compel sufficient responses to other discovery requests.

37. As described below, extensive briefing was required to sustain and maintain the claims asserted in this action through all phases of the Litigation, including at pleading, class certification and summary judgment. Voluminous communications were exchanged with defense counsel regarding scores of disputes that arose during the pendency of this case, including numerous disputes over discovery, expert testimony and the presentation of evidence at trial. Extensive meet and confers were held to ensure Defendants located and produced documents responsive to Plaintiff's discovery requests and to address delays by Defendants in doing so, as well as their overbroad claims of privilege and other asserted protections from discovery. Discovery was complicated by the geographic scope of CCA's operations and the time period of the alleged fraud,

- 13 -

as well as CCA's loss of contracts with the BOP, which resulted in CCA's failure to preserve certain evidence, and required Plaintiff to seek backup materials from the BOP. Even when documents were produced, Defendants' production was at times incomplete; repeated follow-up communications were necessary to get Defendants to plug the holes in their production.

38. These efforts, described in more detail below, contributed to the thousands of hours of attorney and staff time that were needed to complete discovery and prepare this case for trial and to develop Plaintiff's claims in the manner that led the meditators to propose, and the parties to agree, to the settlement that is now before the Court for approval.

A. **Plaintiff Is Appointed Lead Plaintiff and Defeats Defendants' Motion to Dismiss**

39. On August 23, 2016, Nikki Bollinger Grae initiated this action by filing a complaint against CCA in this District. On January 10, 2017, this Court appointed Plaintiff as Lead Plaintiff and approved its selection of Robbins Geller as Lead Counsel. ECF No. 52.

40. Based on an extensive analysis of the Company's SEC filings and public statements, media articles, government reports regarding the Company obtained through a U.S. Freedom of Information Act ("FOIA") request, as well as interviews of former employees conducted by investigators retained by Class Counsel, on March 13, 2017, Plaintiff filed its Complaint, alleging claims arising under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). ECF No. 57. All discovery in the matter was stayed pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

41. On May 12, 2017, Defendants moved to dismiss the Complaint on numerous grounds, including that the alleged false statements were immaterial puffery and that Plaintiff had failed to plead fraud with particularity or allege facts supporting a strong inference that the alleged false

- 14 -

statements were made with scienter. ECF Nos. 60-61. Plaintiff filed its opposition on June 26, 2017, arguing Defendants had not contested allegations that they operated a scheme and course of conduct that misled investors and had made actionably false or misleading statements and omissions. ECF No. 67. Relying on BOP and other reports that contradicted Defendants' statements and on the evidence developed through a pre-Complaint investigation, Plaintiff argued Defendants were engaged in a fraudulent scheme to mislead investors concerning the quality, cost and compliance of CCA's services, as well as their ability to retain and win business on those bases. On July 26, 2017, Defendants filed a reply in support of their motion to dismiss. ECF No. 73.

42. On December 18, 2017, the Court issued a Memorandum Opinion and Order denying Defendants' motion to dismiss the Complaint in its entirety, holding Plaintiff had alleged sufficient specific facts that collectively stated actionable claims under §§10(b) and 20(a). ECF Nos. 76-77.

### B. Defendants' Answer to the Complaint

43. On February 2, 2018, Defendants filed an answer to the Complaint, in which they denied all of Plaintiff's substantive allegations and asserted 15 separate affirmative defenses. ECF No. 81.

### C. Plaintiff Obtains Class Certification

44. On June 1, 2018, Plaintiff moved to certify this action as a class action, appoint Plaintiff as Class Representative and appoint Robbins Geller as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure. ECF Nos. 91-92. Class Counsel retained the services of Crowninshield Financial Research, Inc. and its founder, Steven P. Feinstein, Ph.D., CFA, to provide economic analysis in support of this motion, to opine as an expert on market efficiency and to explain that there was a methodology to calculate damages. *See* §III.F.3, *infra*. Defendants opposed Plaintiff's motion for class certification, asserting that Plaintiff was not typical and that reliance

could not be demonstrated on a class-wide basis because the truth had already been disclosed to the market. ECF No. 98.

45. At the same time, Plaintiff served its Second Set of Requests for Production to Defendant CCA. These detailed discovery requests sought information related to market efficiency, which was contested by Defendants. The discovery sought to establish as undisputed certain facts relating to CCA's stock price, analyst coverage, market makers and the other factors used by courts to assess the efficiency of the market. *See Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). Defendants served their responses and objections to the requests for admission and interrogatories on July 2, 2018.

46. On January 18, 2019, the Court denied Plaintiff's motion for class certification, finding Defendants had demonstrated an absence of price impact sufficient to rebut the presumption of reliance. ECF No. 143.

47. On February 4, 2019, Plaintiff filed in the Sixth Circuit Court of Appeals a Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) with respect to the Court's denial of class certification, reasoning that a report issued by the U.S. Department of Justice's Office of the Inspector General (the "OIG Report") had already revealed the true facts concerning CCA before the Yates Memo was issued and CCA's stock price dropped accordingly. *In re: Amalgamated Bank*, No. 19-502, ECF No. 1 (6th Cir. Feb. 4, 2019).

48. In addition, on February 1, 2019, Plaintiff moved for reconsideration of the Court's order denying class certification. ECF Nos. 147-150. In support, Plaintiff submitted evidence developed in discovery demonstrating that CCA had downplayed any issues with the quality of its services and the real risks facing the Company, including internal communications among CCA executives reflecting far more extensive deficiencies and concerns than had been revealed in the OIG

- 16 -

Report.  As a result, Plaintiff asserted that Defendants could not demonstrate a lack of price impact, and a class-wide presumption of reliance was appropriate.  On February 15, 2019, Defendants opposed the motion for reconsideration, including by arguing that evidence internal to CCA could not be evidence of price impact.  ECF No. 160.  On February 22, 2019, Plaintiff filed a reply.  ECF Nos. 161-164.

49.     On March 26, 2019, the Court issued a memorandum opinion and order granting Plaintiff's motion for reconsideration, certifying the Class, appointing Plaintiff as Class Representative, and appointing Robbins Geller as Class Counsel.  ECF No. 165.  In particular, the Court credited Plaintiff's argument that internal evidence obtained from CCA helped demonstrate price impact and thus that reliance could be proved on a class-wide basis.  On March 28, 2019, Plaintiff filed a motion to voluntarily withdraw the appeal of the Court's order denying class certification, which the Sixth Circuit granted the next day.  ECF No. 167; *see also In re: Amalgamated Bank*, No. 19-502, ECF Nos. 21-22 (6th Cir. March 28-29, 2019).

50.     On April 9, 2019, Defendants petitioned to appeal the Court's class certification order to the Sixth Circuit Court of Appeals pursuant to Rule 23(f) of the Federal Rules of Civil Procedure.  The case was docketed in that court as *In re CoreCivic, Inc., et al.*, No. 19-0504.  Following the filing of Plaintiff's opposition brief on April 19, 2019, the Sixth Circuit denied the petition on August 23, 2019.  *See* ECF No. 174.

51.     The Class Certification Order directed Plaintiff to provide the best notice practicable to Class Members.  As a result, Plaintiff retained the experienced firm of Gilardi & Co. LLC ("Gilardi") as the notice administrator and worked with it to prepare and mail the Notice of Pendency to potential Class Members.  Plaintiff filed its Motion to Approve the Form and Manner of Class Notice and Notice Plan on October 29, 2020.  ECF No. 329.  The Court approved the form of

notice on October 30, 2020. ECF No. 330. The Notice of Pendency was provided in accordance with this Court's Order.

### D. Fact Discovery

52.      Plaintiff undertook fact discovery for over two years – from February 2018 until November 2020 – obtaining and analyzing more than 2.2 million pages of documents from Defendants and about 1.5 million additional pages from third parties. Class Counsel deposed dozens of fact witnesses in places such as Tennessee, Texas and Florida, as well as remotely, during the course of discovery. Class Counsel also obtained interrogatory responses and admissions from Defendants to narrow the issues at trial. Below is summary of the discovery conducted by Plaintiff as well as the discovery propounded by Defendants and responded to by Plaintiff.

#### 1. Requests for Documents

##### a. Document Requests Directed at Defendants

53.      On January 30, 2018, Plaintiff served its First Request for Production of Documents to Defendants containing 14 requests regarding all aspects of its claims. Defendants served their responses to Plaintiff's first set of requests on March 1, 2018, objecting to the requests as irrelevant and overbroad and agreeing to produce documents pursuant to some requests while only agreeing to "meet and confer with Plaintiff's counsel in a good faith attempt to narrow this Request to a mutually agreeable scope" for a number of others.

54.      On June 1, 2018, Plaintiff served its Second Request for Production of Documents to Defendants containing 35 requests regarding all aspects of its claims. Defendants served their responses to Plaintiff's second set of requests on July 2, 2018, objecting in whole to some requests and in part to others.

55.      On May 7, 2020, Plaintiff served its Third Request for Production of Documents to Defendants containing two requests regarding CCA's loss of BOP contracts. Defendants served

their responses to Plaintiff's third set of requests on June 8, 2020, objecting, *inter alia*, that they had already produced all responsive information to the requests.

56.     On May 15, 2020, Plaintiff served its Fourth Request for Production of Documents to Defendants containing four requests regarding the misrepresentations at issue in this action. Defendants served their responses to Plaintiff's fourth set of requests on June 15, 2020, objecting in whole on grounds of relevance, overbreadth and burden.

57.     Ultimately, after months of negotiations to obtain documents responsive to their discovery requests, Defendants produced almost 35 volumes of electronic documents, totaling over 2.2 million pages.  Plaintiff expended significant time reviewing, organizing and analyzing the documents produced in preparation for depositions, expert reports, summary judgment and trial.

### b.     Document Requests and Related Discovery Directed at Plaintiff

58.     On April 19, 2018, Defendants served their own, largely class certification-directed, discovery requests.  Defendants' requests included both document requests and interrogatories and sought not only information relevant to class certification and representation, such as Plaintiff's trades in CCA stock, but also information going to Plaintiff's investigation of the Complaint, such as the identity of any former CCA employees whom Class Counsel had contacted in investigating the allegations or preparing the Complaint.  On May 21, 2018, Plaintiff served its responses and objections to both sets of discovery.

59.     On June 18, 2018, Defendants served a Notice of Fed. R. Civ. P. 30(b)(6) Deposition of Plaintiff regarding topics including Plaintiff's investments, the information upon which it relied in making its purchasing and selling decisions, communications with Defendants, its decision to serve as Lead Plaintiff, its discovery responses and its other litigation history.  After time preparing for the deposition, including meetings with Class Counsel, on July 10, 2018, Plaintiff's Senior Vice

- 19 -

President and Director of Equities Eleanor Innes testified as the Rule 30(b)(6) representative for Plaintiff.

60. Plaintiff also produced certain trading records, brokerage statements, monthly and annual account statements related to its investment in CCA securities, as well as relevant investment management agreements and statements of financial condition, among other responsive documents, on May 12, 2018.

61. Plaintiff objected to discovery into Plaintiff's investigation of the alleged misconduct; and on July 11, 2018, Defendants filed a Motion to Compel Disclosure of Identity of Plaintiff's Confidential Witness, contending disclosure of a confidential witness was necessary to contest the accuracy of any allegations made in reliance on the former CCA employee. ECF Nos. 96-97. On July 18, 2018, Plaintiff opposed the motion on the grounds that discovery into such collateral matters was irrelevant, wasteful and intrusive of work product protections. ECF No. 103. On July 31, 2018, the Court denied Defendants' motion on those grounds. ECF No. 108.

## 2. Interrogatories and Requests for Admission

62. Class Counsel expended significant effort to evaluate the bases, if any, for Defendants' allegedly false and misleading statements and the bases for Defendants' defenses, as well as to create complete sets of CCA reports and other documents directly relevant to the parties' claims and defenses.

### a. Requests Directed at Defendants

63. On March 17, 2020, Plaintiff served its First Set of Interrogatories to All Defendants, including 18 interrogatories seeking, for example, Defendants' basis (if any) for the allegedly false and misleading statements and the reasons for the loss of Defendants' contracts with the BOP. On May 1, 2020, Defendants provided objections and responses. On May 15, 2020, Plaintiff served its Second Set of Interrogatories to All Defendants, including eight further interrogatories seeking

evidence (if any) for certain of Defendants' defenses (such as that the Yates Memo represented a political shift) and the identity of certain reports and adverse BOP reviews of CCA's performance. On June 24, 2020, Defendants provided objections and responses. Plaintiff ultimately secured responses to each of the interrogatories, though not before Court intervention was required.

64. In addition, on May 13, 2020, Plaintiff served 113 requests for admission on Defendants.

### 3. Discovery Disputes with Defendants

#### a. Disputes over Scope of Document Production

65. Beginning in February and March 2018, counsel for both parties engaged in meet and confers to negotiate numerous issues concerning Defendants' anticipated document production, which were memorialized in voluminous letters documenting the parties' positions and outstanding issues. The issues in dispute included, *inter alia*, the relevance of the documents sought to Plaintiff's allegations (addressed on a request-by-request basis); Defendants' obligations to search for and locate relevant documents as opposed to just applying search terms; the relevant time period of responsive documents for each request; the titles, job duties and identities of relevant custodians; and the burden of production. Initially, Defendants took the position that they could satisfy their discovery obligations without directly responding to Plaintiff's requests and by producing documents on a few narrow topics they had unilaterally deemed were the only ones relevant to the litigation. Plaintiff rejected this position.

66. On a request-by-request basis, Plaintiff contended that Defendants' refusal to produce – or efforts to limit the scope of production – were unsupportable. These negotiations were lengthy and hard fought, and Plaintiff refused to concede on Defendants' unfounded attempts to limit their discovery obligations or narrow the scope of the case. Plaintiff also spent considerable time identifying Defendants' failure to search for or produce complete sets of internal and BOP periodic

- 21 -

reports and then spent time addressing Defendants' refusal to produce a complete set of these reports on the ground that they would be found attached to e-mails. Plaintiff spent additional time addressing Defendants' attempts to limit production to the 2012-2016 time period (essentially the Class Period) for all requests, even though certain issues – including the loss of BOP contracts – required documents from a longer period. As a result of these ongoing negotiations and Plaintiff's ongoing efforts to identify gaps in Defendants' productions, Defendants made more than 30 productions between March 2018 and November 2020, including producing discrete sets of internal or BOP reports that Plaintiff had identified as missing.

67.     The parties also had significant disputes over the production of electronic evidence. Plaintiff identified 89 potential custodians whose electronic files should be collected and searched, whereas Defendants initially sought to produce documents from only 22 custodians. The parties eventually agreed on a set of custodians to be included in Defendants' production. Nevertheless, disputes over Defendants' electronic evidence preservation and production efforts continued from March 2018 through the end of discovery as numerous issues arose over the completeness of Defendants' document preservation and collection and the comprehensiveness of their search.

68.     Plaintiff repeatedly demanded that Defendants set forth exactly which electronic systems were used to record information during the Class Period (for example, those systems used to track BOP reviews of CCA facilities) and the state of preservation for these systems. To determine the universe of available and potentially destroyed documents, Plaintiff demanded information regarding which custodians had their e-mail preserved, as well as the comprehensiveness of the preservation and when it occurred, which was critical to assessing the completeness of Defendants' productions. As revealed during the deposition of a corporate representative (William DuBray on December 12, 2018), only 11 custodians received litigation holds at the time the action was filed in

2016, but "800 or so individuals" received litigation holds two years later in 2018. The parties also discussed search terms to capture relevant documents and negotiated which terms would be applied to which custodians and for what time period, as well as how variants of search terms would be used and how Defendants proposed to ensure the completeness of their production. The time and effort needed to obtain this information, which were at times compounded by Defendants' inability to provide it, significantly increased the time and expense of discovery in this case.

69. Plaintiff was also diligent in assessing the quality of Defendants' productions, as numerous productions were made with metadata and other errors. In particular, in September 2018, Defendants produced over 100,000 documents with incorrect "family" metadata (*i.e.*, showing the relationship between parent e-mails and attachments), which required Defendants to provide "overlay" reproductions with the proper metadata, which they attempted unsuccessfully on multiple occasions in October and early November 2018 before successfully correcting these errors by the end of November 2018. The time and effort needed to obtain these technical corrections, which were at times compounded by Defendants' inability or refusal to provide it, significantly increased the time and expense of discovery in this case.

70. In addition to disputes over which systems and custodians would be searched, the restoration of backup tapes from Defendants' Eden facility was a contested issue between the parties as Defendants argued that evidence was not lost because Plaintiff could obtain from the BOP e-mails and other materials that Defendants had not maintained. Ultimately, despite CCA's failure to maintain the Eden backup tapes, Plaintiff was successful in obtaining from the BOP restored backup tapes.

71. Due to the extent and complexity of the discovery disputes, as well as Defendants' request for an indefinite extension to complete fact discovery (ECF No. 88), as well as their

accompanying refusal to produce a privilege log until after the deadline for substantial completion of discovery, Defendants did not make a substantial production until July 31, 2018, and only substantially completed their production on December 8, 2018, nearly a year after Plaintiff served its first discovery request.

### b. Disputes over Improper Claims of Privilege

72.    Prior to the discovery stay ordered in 2019, Defendants produced a number of privilege and redaction logs.  Plaintiff challenged these logs as inadequate and insufficient to support a claim of privilege.  In January 2020, after the stay imposed by the Court was lifted, Defendants added some 15,000 documents to their redaction log, as well as hundreds of additional documents to their privilege log.  Plaintiff continued to explain to Defendants the inadequacies in their privilege log, and Defendants refused to revise or otherwise cure the deficiencies.  As a result, on February 27, 2020, Plaintiff filed a Motion to Compel Improperly Withheld Documents.  ECF Nos. 193-196.

73.    The Court referred the motion to Magistrate Judge Frensley.  ECF No. 197. Defendants opposed the motion on March 12, 2020, arguing, *inter alia*, that the federal rules permit them to assert, and justify assertions of, privilege categorically and that dozens or more internal employees and external lobbyists and others served as "agents" of CCA's counsel such that their documents and communications were all protected by the privilege.  ECF Nos. 201-204.  Plaintiff responded on March 19, 2020.  ECF No. 206.  On April 30, 2020, Magistrate Judge Frensley found Defendants' privilege descriptions to be "cursory and categorical," but largely denied Plaintiff's motion for relief.  ECF No. 211.

74.    On May 15, 2020, Plaintiff moved this Court to review Magistrate Judge Frensley's April 30, 2020 Order.  ECF Nos. 213-214.  On May 29, 2020, Defendants opposed Plaintiff's motion.  ECF No. 217.

75. On June 5, 2020, the Court granted Plaintiff's Motion to Compel in part and ordered Defendants to:

1. Furnish Amalgamated and the court with a privilege log consisting of entries for all withheld documents for which Amalgamated has, in prior logs, identified Natasha Metcalf as the only relevant counsel or legal staff, including a field with the heading "Counsel Creating Privilege" and identifying by name the attorney(s) relevant to each assertion of privilege;

2. File an affidavit or declaration explaining Metcalf's role at CoreCivic, particularly as it is relevant to the defendants' assertions of privilege; and

3. Furnish to the court, for *in camera* review, all documents covered by the Metcalf privilege log.

ECF Nos. 221-222.

76. Defendants did not comply with the third element of the Court's order – to furnish hundreds of documents for *in camera* inspection – and instead, on June 19, 2020, produced them to Plaintiff. As a result, on June 23, 2020, Plaintiff filed a Response to Defendants' Notice of Filing, explaining that Defendants had produced to Plaintiff the documents the Court had ordered Defendants to submit for *in camera* review. ECF Nos. 226-229. Plaintiff further explained that Defendants' noncompliance with the Court's Order, and review of the documents produced, confirmed that the documents were not privileged and could not withstand scrutiny if submitted to the Court. *See* ECF Nos. 224-225. Defendants filed a response on June 29, 2020. ECF No. 233.

77. On July 1, 2020, in response to these submissions, in a telephonic hearing held the same day, the Court ordered appointment of a special master to review Defendants' privilege assertions. ECF No. 236. After negotiations, the parties selected the Honorable Faith S. Hochberg (Ret.) to serve as special master, which the Court approved. ECF Nos. 242-243, 246.

78. On August 14, 2020, the Court issued an Order Regarding Further Special Master Review, which ordered the Special Master to also review certain additional documents. ECF No. 275. The Court's order also allowed the Special Master to request from Defendants "family"

documents for e-mails or attachments for which privilege could not be determined based on Defendants' privilege log or the face of the submitted documents themselves (an option the Special Master exercised). *Id.*

79.     On September 18, 2020, Special Master Hochberg completed, and Plaintiff filed, the Report & Recommendation by the Special Master: Attorney-Client Privilege Review. ECF No. 305. The Report & Recommendation found that certain documents presented to her for review were improperly withheld by Defendants.

80.     The Court thereafter ordered and held on September 28, 2020, a telephonic hearing concerning the Special Master's report. ECF Nos. 307-308. The Court allowed Plaintiff to file a motion for sanctions, and the parties were advised that: "[t]he court will be ruling on the issues of the Special Master's fees in its ruling on this motion." ECF No. 308.

81.     On October 6, 2020, Plaintiff filed a Motion for Discovery Sanctions. ECF No. 314. On October 16, 2020, Defendants opposed the motion. ECF No. 322. On October 19, 2020, Plaintiff filed a reply brief in support of its motion. ECF No. 324. On December 18, 2020, the Court denied the Motion and ordered the parties to split the Special Master's fees. ECF No. 381.

82.     Another dispute arose between the parties concerning Defendants' intent to rely on advice of counsel as a defense. As a result, on August 10, 2020, Plaintiff filed a Motion to Preclude Defendants from Relying on the Advice of Counsel Defense. ECF Nos. 265-266. Defendants opposed the motion on August 24, 2020. ECF No. 289. On August 31, 2020, Plaintiff filed a reply brief in support of its motion. ECF No. 300.

83.     On February 4, 2021, the Court granted in part and denied in part Plaintiff's motion to preclude Defendants from relying on the advice of counsel defense. ECF No. 405. The Order included the majority of relief Plaintiff's motion had requested, including an order that "the

defendants are precluded from asserting any affirmative defense that they relied on the advice of counsel," as well as orders narrowing what evidence Defendants might present. *Id.* at 12-13. The Order also required the parties to "make all reasonable efforts to reach an agreed stipulation consistent with this Memorandum" (*id.*), which Plaintiff attempted over the next two months in anticipation of trial.

### c.  Disputes over Documents Produced in Discovery

84.    In addition to the issues related to where and how Defendants were searching for responsive documents, numerous other matters arose that required follow-up, including the format of production, errors in the files of particular productions, failure to specify the source of documents, improperly produced native files, inconsistent confidentiality markings and inconsistent claims of privilege.

85.    The massive size of the production in this case required expending significant time and expense on document hosting, storage, review and analysis.  Class Counsel utilized industry-leading Relativity software, which permitted a reviewer to search, sort, categorize, tag, prioritize, highlight and annotate documents in preparation for depositions, summary judgment, expert reports and trial.  Attorneys and support staff spent thousands of hours working in Relativity to compile and review sets of documents and to locate the evidence needed to certify the class, support expert testimony, respond to Defendants' summary judgment motion, depose witnesses and prepare the case for trial.  Attorneys and staff used search terms, date filters and custodian fields to review documents related to key issues in the case.  While these efforts substantially reduced the time needed to review Defendants' production, the size, complexity and incompleteness of the production nevertheless required significant effort to complete review and prepare the case for trial.  For example, Defendants did not produce all instances of Notices of Concern they received from the BOP; Plaintiff was forced to obtain missing Notices of Concern from the BOP to collect a full set.

Further, Notices of Concern often used inconsistent naming and numbering conventions or were mislabeled. Such issues significantly increased Plaintiff's difficulty in locating and collecting complete sets of relevant documents and reports.

### d. Disputes over Plaintiff's Interrogatories Served on Defendants

86. Defendants' interrogatory responses were insufficient, including because not all Defendants verified the responses and because the responses identified evidence by category, for example, rather than with specific evidence. Consequently, on July 27, 2020, Plaintiff filed a Motion to Compel Defendants to Further Respond to Interrogatories. ECF No. 254. Following a discovery conference, the Court granted permission for Plaintiff to withdraw the motion in order to refile it to include additional discovery disputes. ECF No. 260.

87. On August 14, 2020, Plaintiff filed a Motion to Compel Further Interrogatory Responses and for Discovery Sanctions. ECF No. 277. Also on August 14, 2020, Defendant Garfinkle provided his signed verification for Supplemental Responses to Plaintiff's First Set and Second Set of Interrogatories. On August 21, 2020, Defendants opposed the motion. ECF No. 285. On August 28, 2020, Plaintiff filed its reply. ECF No. 299. On November 2, 2020, the Court granted in part the motion, requiring Defendants to supplement their interrogatory responses (while declining to order discovery sanctions). ECF No. 331. On November 13 and 16, 2020, Defendants provided Supplemental Responses to Plaintiff's First Set of Interrogatories. On April 9, 2021, Defendants provided their Second Supplemental Responses to Plaintiff's Second Set of Interrogatories.

### 4. Discovery from Third Parties

88. Substantial efforts were undertaken by Class Counsel to obtain relevant evidence from third parties, including those described below. A brief description of the key subpoenas issued and documents sought is set forth below.

### a. The BOP and Corrections' Auditors

89. In support of Plaintiff's allegations, Plaintiff sought documents from government agencies and non-government auditors of CCA-operated prisons. Plaintiff sought documents via requests under FOIA and also subpoenas served on the BOP, as well as the U.S. Department of Justice's Office of the Inspector General and Office of Information Policy. Plaintiff also sought documents through the issuance of subpoenas to the American Correctional Association, the Joint Commission and the National Commission on Correctional Health Care, accrediting organizations that audited aspects of CCA's prisons.

### b. Auditor Ernst & Young

90. Plaintiff sought documents from the Company's outside auditor, Ernst & Young ("E&Y"), regarding E&Y's audit results, work papers, communications and other documents related to the professional services it provided to CCA from 2012 to 2016. E&Y resisted production and insisted Defendants be allowed to review E&Y's documents for privilege, delaying production. Plaintiff was ultimately successful in obtaining more than 1,700 pages of documents from E&Y.

### c. Analysts

91. Plaintiff subpoenaed documents from several firms, including Avondale Partners, TheStreet, SunTrust and Wells Fargo, that employed analysts to cover CCA during the Class Period. The subpoenas sought, *inter alia*, documents related to securities reports issued covering CCA, all notes, research and communications upon which the analysts relied upon in issuing these reports, communications with CCA employees and e-mail related to CCA. Plaintiff received nearly 160,000

- 29 -

documents from the analysts as a result of counsel's discovery efforts. Many of these documents were relevant to market efficiency, loss causation and damages.

### d. Lobbyists and Public Relations Consultants

92. Plaintiff subpoenaed documents from CCA's key lobbyists and public relations, investor relations and media consultants, including Akin Gump, Hobart Hallaway Quayle Ventures, Mair Strategies LLC and Hillenby, as well as Cornerstone Government Affair Group and Signal Group Consulting. Plaintiff subpoenaed these entities requesting, *inter alia*, communications and agreements between CCA and these entities, as well as drafts of the public statements Defendants made to investors. Plaintiff engaged in protracted negotiations with many of these entities because they improperly claimed that lobbying and media relations activities were covered by the attorney-client privilege.

### e. CCA Retained Professors

93. Plaintiff subpoenaed documents from two professors associated with Temple University, Simon Hakim and Erwin Blackstone, whom CCA paid as influencers, including retaining them to publish a purportedly independent working paper and subsequent study as well as related articles touting the cost savings of using private prisons. Plaintiff subpoenaed communications and agreements between CCA and these professors, as well as documents related to their studies.

### f. Competitors

94. Plaintiff subpoenaed documents from CCA's two main competitors, GEO Group and Management Training Corporation ("MTC"). In light of Defendants' argument that CCA lost business from its government clients as a result of a political shift that affected the entire industry and not due to CCA's poor performance, the subpoenas sought, *inter alia*, documents related to

CCA's competitors' competition with CCA for contracts, joint efforts to downplay or discredit negative reporting about the industry and the competitors' view of and response to the Yates Memo.

### g. Correct Care Solutions

95. The Complaint alleged CCA's provision of health care at Cibola was so poor that the BOP issued CCA a cure notice. Because CCA was unable to fix the problems it had caused, it hired a third party, Correct Care Solutions ("CCS"), to provide health care at the prison. This, too, failed, and CCA lost its contract with the BOP for Cibola – a fact CCA indicated it would try to blame on CCS at trial. Plaintiff's subpoena to CCS sought documents related to the provision of health care services at Cibola.

### 5. Fact Depositions

96. During the course of fact discovery, Plaintiff took the following fact depositions:

| Deponent | Position | Date | Location |
|---|---|---|---|
| Ashley Daugherty | Senior Director Ethics and Compliance | 12/07/2018 | Fort Walton Beach, FL |
| William DuBray (as 30(b)(6) witness) | Managing Director Enterprise Technology | 12/12/2018 | Nashville, TN |
| Patrick Swindle (as 30(b)(6) witness) | EVP and Chief Corrections Officer | 01/09/2019 | Nashville, TN |
| Michael Nalley | VP Correctional Programs | 01/15/2019 | Nashville, TN |
| Keith Hall | Managing Director | 10/24/2019 | Dallas, TX |
| Tameka Corlew Smith | Senior Director Ethics and Compliance | 10/29/2019 | Nashville, TN |
| Bart VerHulst | VP Federal Partnership Relations | 11/05/2019 | Nashville, TN |
| Kim White | EVP Human Resources | 11/15/2019 | Nashville, TN |
| John Baxter | VP Health Services | 12/19/2019 | Nashville, TN |
| Natasha Metcalf | VP Partnerships Development | 12/19/2019 | Nashville, TN |
| Tony Grande | EVP Chief Development Officer | 01/15/2020 | Nashville, TN |
| Cameron Hopewell | Managing Director, Investor Relations | 01/17/2020 | Nashville, TN |
| Emilee Beach | Quality Assurance Manager, Adams County Correctional Center | 02/11/2020 | Nashville, TN |
| Patrick Swindle | SVP Operations | 02/21/2020 | Nashville, TN |
| William Dalius | VP Facility Operations | 02/26/2020 | Nashville, TN |
| Damon T. Hininger | CEO | 03/03/2020 | Nashville, TN |

| Deponent | Position | Date | Location |
|----------|----------|------|----------|
| Jeb Beasley | Managing Director, Federal and Local Partnerships | 03/10/2020 | Nashville, TN |
| Todd Mullenger | CFO | 03/13/2020 | Nashville, TN |
| Douglas Martz | BOP, Chief of Privatized Corrections Contracting | 07/20/2020 | Videoconference |
| Paul Kelly | BOP, Senior Security Institution Manager, Adams County Correctional Center | 07/21/2020 | Videoconference |
| Robert Bland | BOP, Chief of Privatization | 07/23/2020 | Videoconference |
| Harley G. Lappin | Chief Corrections Officer | 07/28/2020 | Videoconference |
| John D. Ferguson | Director | 07/29/2020 | Videoconference |
| Damon T. Hininger | CEO | 07/30/2020 | Videoconference |
| David M. Garfinkle | CFO | 07/31/2020 | Videoconference |
| Thurgood Marshall, Jr. | Director | 11/12/2020 | Videoconference |

The percipient witness depositions included CCA-related individuals as well as BOP employees. Class Counsel spent numerous hours preparing questions and identifying and analyzing documents to use in their examinations.

### E.    Plaintiff Largely Prevails on Summary Judgment

97.    On November 20, 2020, Plaintiff filed a motion for partial summary judgment on the issue of reliance. ECF Nos. 347-348. The same day, Defendants filed a motion for summary judgment seeking judgment on all claims on the grounds that the alleged false statements were not false or made with scienter and that investors' losses were caused by a "political shift." ECF No. 352.

98.    In addition to the time preparing for Plaintiff's affirmative motion for summary judgment, substantial time and expense was required to respond to Defendants' motion for summary judgment, including time spent analyzing Defendants' brief and evidence, locating and explaining the contradictory documentary evidence and deposition testimony and developing the legal support necessary to demonstrate to the Court that material issues of fact existed with respect to each issue raised by Defendants.

- 32 -

99.     On January 22, 2021, Plaintiff filed its opposition brief opposing Defendants' summary judgment motion submitting along with the opposition brief 107 exhibits evidencing triable issues for a jury.  ECF No. 396.  Plaintiff also submitted a 136-page, 268-paragraph, point-by-point response to Defendants' Statement of Material Facts that required substantial time to prepare and necessitated the review of a considerable amount of evidence.  ECF Nos. 397-401.  Plaintiff provided detailed arguments accompanied by extensive factual and legal support demonstrating, *inter alia*, that: (i) CCA's past performance reflected systemic evidence of poor quality services, particularly in the areas of health services and staffing; and (ii) the BOP warned CCA that the poor quality of services and performance had and was jeopardizing its ability to win and retain BOP contracts.  On February 19, 2021, Plaintiff filed a reply in support of its motion for partial summary judgment.  ECF Nos. 428-429.  The same day, Defendants filed their reply brief in support of summary judgment which Plaintiff reviewed and analyzed.  ECF No. 418.

100.     On March 23, 2021, this Court ruled on the cross-motions for summary judgment. ECF No. 447.  The Court granted in part and denied in part both Plaintiff's and Defendants' motions for summary judgment.  *Id*.  The Court granted Plaintiff's motion subject only to the qualification that Plaintiff would still need to prove materiality at trial and that the ruling would be without prejudice to Defendants having an opportunity to rebut the presumption of reliance through evidence of a lack of price impact.  The Court substantially denied Defendants' motion for summary judgment.

### F.     Investigators, Experts and Consultants Assisting the Litigation

101.     Class Counsel used the services of investigators, expert witnesses and other consultants to assist Plaintiff in the prosecution of the Litigation.  Factual investigators helped Class Counsel draft the Complaint by understanding the manner in which CCA operated its business and the information available to Company insiders and confirm information obtained from other sources.

In addition, the work performed by experts and consultants provided valuable insight to Plaintiff and Class Counsel in the discovery phase as well as preparing their case for trial and in evaluating the mediators' proposal and other prospects for settlement during the course of the Litigation.

### 1. Factual Investigators

102. Prior to the filing of the Complaint (while discovery was stayed pursuant to the PSLRA), Plaintiff retained the services of an independent private investigator, L.R. Hodges & Associates, Ltd. ("LRH&A"), to identify, locate and contact former CCA employees or those with knowledge of CCA's operations to ascertain information relating to the claims alleged in this lawsuit. LRH&A was able to conduct detailed interviews with certain witnesses about issues relevant to the Litigation. The information obtained from these interviews assisted Plaintiff in satisfying the pleading standards of the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g.*, ¶¶10, 32.

### 2. Consultants

103. Plaintiff retained the consulting services of a confidential expert consultant to provide non-testifying expertise. This expert has a Ph.D. in economics and a J.D. He/she is a university professor and has authored several publications regarding private prisons. This expert provided analysis regarding the support for cost comparisons made by CCA and analysis of the expert reports of D. Scott Dodrill and Justin Marlowe.

### 3. Class Certification Expert

104. Plaintiff retained the services of the economic consulting firm Crowninshield and its founder, Dr. Steven P. Feinstein, concerning market efficiency and damages in connection with Plaintiff's claims under the Exchange Act. Dr. Feinstein provided expert testimony regarding market efficiency, as well as the ability to calculate damages in this action on a class-wide basis, and also analyzed the expert testimony of Defendants' economic expert Lucy Allen in connection with

- 34 -

Plaintiff's motion for class certification. Additionally, Dr. Feinstein performed preliminary damages analysis in connection with settlement negotiations.

### 4. Economic and Damages Expert

105. For trial, Plaintiff retained W. Scott Dalrymple, CFA, as an expert in the field of damages and loss causation. Mr. Dalrymple's August 7, 2020 expert report set forth his expert opinions regarding loss causation, market efficiency and the calculation of damages on a per-share basis. He performed an event study in which he analyzed publicly available media and analyst reports concerning CCA on every day of the Class Period and determined whether this information was material to the market while accounting for market and industry factors that may otherwise impact the stock price. Mr. Dalrymple also determined the portion of the price reaction on these dates that could be attributed to the revelation of allegedly previously concealed information about CCA. Following receipt of the report from Defendants' loss causation and damages expert, he issued a rebuttal report on September 18, 2020, in which he expanded on his findings and provided a detailed factual rebuttal of the analysis contained in the defense expert's report. Mr. Dalrymple spent significant time preparing to give testimony in this matter, including in advance of his deposition on October 22, 2020.

106. Following acceptance of the mediators' proposal, Mr. Dalrymple also assisted in the preparation of the Plan of Allocation of the net settlement proceeds. *Infra* §VI.

### 5. Industry Expert

107. Plaintiff retained the expert services of the consulting firm of D1 Corrections Consulting, LLC and its founder, Donna Mellendick, in connection with preparing the case for trial. Ms. Mellendick has over 30 years' experience in prison administration, including experience as an administrator for the Privatization Management Branch of the BOP, where she oversaw more than 50 staff members responsible for the management and oversight of the BOP's contracted large

- 35 -

correctional facilities. D1 Corrections Consulting and Ms. Mellendick provided vital expert analysis and testimony regarding, *inter alia*, the quality of CCA's performance of its contracts with the BOP and the impact of CCA's past performance on the likelihood that CCA would win any competitively bid BOP contract in connection with summary judgment and in preparation for trial.

108.     Ms. Mellendick's opening report, dated August 7, 2020, set forth her opinions on the quality and cost of CCA's BOP prisons, the status of CCA's business relationship with the BOP and CCA's likelihood of retaining or winning new business from the BOP. Ms. Mellendick analyzed every Contract Facility Monitoring audit report, Notice of Concern, Deduction, Cure Notice, Oversight Facility Summary Report, Contractor Self-Assessment Report, Award Fee Determination and Contractor Performance Assessment Reporting System report, along with numerous other documents, for all five of CCA's BOP prisons over a period covering 2011-2017, inclusive (and in some cases beyond that time period). Based on her review of these materials, Ms. Mellendick opined that by April 2013, CCA's past performance had reached a point where CCA was unlikely to win any competitively bid BOP contract. Ms. Mellendick spent significant time preparing to give testimony in this matter, including in advance of her deposition on October 27, 2020.

### 6.     Trial Expert Discovery

#### a.     Discovery Propounded on Plaintiff's Experts

109.     On October 16, 2020, Defendants served six broad document requests seeking all of the documents reviewed by Mr. Dalrymple and Ms. Mellendick, as well as their notes and work files. On October 19-20, 2020, Plaintiff produced more than 500,000 pages in response to Defendants' requests. Class Counsel and staff expended significant time working with the experts and their staffs to define and locate the universe of documents sought by the requests, to review all of these documents for attorney-client privilege and attorney work product and to prepare and format responsive, non-privileged documents for production.

### b. Discovery Propounded on Defendants' Experts

110. On August 7, 2020, Defendants identified their experts and served the expert reports of: (i) Lucy P. Allen ("Allen") as an expert on damages and loss causation; (ii) D. Scott Dodrill ("Dodrill") as an expert on the quality of corrections services; and (iii) Justin Marlowe, Ph.D., CGFM, as an expert on the costs and relative cost effectiveness of prisons. In addition, Defendants identified four percipient experts (without reports): defendant Lappin, William Dalius ("Dalius"), Donald Murray ("Murray") and Kim White ("White").

111. On October 8, 2020, Plaintiff served requests for production of documents on Defendants' experts, in conjunction with deposition notices to the same experts, seeking, *inter alia*, documents upon which the experts relied in forming their opinions, reports and testimony from other actions, documents related to compensation and hours worked and other requests targeting specific opinions and their supporting evidence. Ultimately, Defendants identified, via correspondence during October 2018, already-produced documents in response to these requests.

### 7. Trial Expert Depositions

112. Class Counsel expended substantial time preparing for and taking depositions of Defendants' seven designated trial experts and preparing to defend the depositions of Plaintiff's two trial experts. Extensive review of documents and information produced in discovery, analysis of the parties' respective positions on issues that were the subject of expert testimony and the expert reports and/or subject matters designated were required in connection with these depositions. Including Plaintiff's experts, Mr. Dalrymple (October 22, 2020) and Ms. Mellendick (October 27, 2020), nine expert depositions occurred (remotely, due to the COVID-19 pandemic) in a single month on a compressed time schedule, as follows[4]:

---

[4]    Class Counsel also deposed Ms. Allen on October 10, 2018, in connection with class certification.

| Defendants' Expert | Date of Deposition |
|---|---|
| Lucy Allen | 10/14/2020 |
| D. Scott Dodrill | 10/15/2020 |
| Justin Marlowe | 10/16/2020 |
| Donald Murray | 10/23/2020 |
| William Dalius | 10/28/2020 |
| Harley Lappin | 10/29/2020 |
| Kim White | 10/30/2020 |

113. In addition, Plaintiff's experts spent time reviewing materials and preparing for the depositions of Plaintiff's experts, Mr. Dalrymple on October 22, 2020 and Ms. Mellendick on October 27, 2020.

### 8. *Daubert* Motions in Preparation for Trial

114. On November 20, 2020, Plaintiff filed three *Daubert* motions to exclude or limit the testimony of the majority of Defendants' experts – Allen, Marlowe, Lappin, Dalius, Murray and White. ECF Nos. 344-345, 351, 354, 357-358. The same day, Defendants moved to exclude the opinions of Plaintiff's experts, Mr. Dalrymple and Ms. Mellendick. ECF Nos. 336, 339. These motions raised significant issues on both sides regarding core issues in the case, including the reliability of methodologies for and evidence supporting claims of CCA's subpar services, deteriorating relationship with the BOP and inability to retain or win new business from the BOP, the existence of loss causation and the amount of damages incurred by Class Members.

115. Plaintiff's motion to exclude the opinion of Allen, Defendants' economic and damages' expert, was based on arguments that she analyzed only an inapplicable theory of loss causation (*i.e.*, not the materialization of risk theory advanced by Plaintiff), invaded the province of the jury and relied on a skewed selection of analyst reports that could not provide a basis for a valid opinion. ECF No. 345.

116. Plaintiff's motion to exclude the opinion of Marlowe, Defendants' cost-comparison expert, was based on arguments that he was not qualified by training or expertise to opine on the cost

- 38 -

of private or CCA prisons relative to public or competitor prisons, failed to employ a reliable methodology, relied on Defendants' own statements and cherry-picked support that has been discredited. ECF No. 358.

117.   Plaintiff's motion to exclude Dalius, Lappin, Murray and White from testifying as experts included argument that Defendants filed no expert reports for these witnesses, they were not qualified to provide expert testimony, they had no reliable methodology or data and their testimony was cumulative and duplicative of other experts. ECF No. 354.

118.   On January 22, 2021, Class Counsel prepared and filed Plaintiff's opposition briefs to the motions to exclude their designated trial experts, providing detailed explanations of their methodologies and the factual and legal support for the opinions of Mr. Dalrymple and Ms. Mellendick. ECF Nos. 386, 388. On February 19, 2021, Plaintiff filed reply briefs in support of each of its motions to exclude Defendants' experts. ECF Nos. 425-426, 431.

119.   On March 17, 2021, the Court ruled on the cross-motions to exclude experts. ECF No. 439. The Court granted in part and denied in part the motion regarding Marlowe related to cost comparisons, specifically ruling Marlowe would not be allowed to testify regarding whether Defendants' characterizations were reasonable or, in context, misleading. The Court also granted in part and denied in part the motion regarding Ms. Mellendick related to feasibility of cost comparisons, holding that Ms. Mellendick would not be permitted to testify on the issues of whether cost comparison was possible or whether cost comparison statements were false or misleading. The Court denied the other *Daubert* motions while warning that the testimony of the non-retained experts would be monitored and confined to appropriate subjects of testimony at trial. *Id.*

G.    **Extensive Trial Preparation**

120.   Trial was scheduled for May 10, 2021. ECF Nos. 446, 451.

- 39 -

121.    In April 2021, Class Counsel secured additional office space in Nashville, Tennessee to accommodate the trial team in advance of the May 10, 2021 trial.  Class Counsel also arranged for housing for its litigation team in Nashville for the preparation and duration of the trial.  At the time the agreement in principle to settle this action was reached, many members of Class Counsel's trial team, though not yet relocated, had made preparations and were ready to move to Nashville for trial.

122.    Given the volume of documents that had been produced in discovery, the preparation of exhibit lists was a complicated and time-consuming task.  In all, Class Counsel identified and reviewed thousands of potential exhibits and eventually designated only 1,109 trial exhibits.  Class Counsel also reviewed and narrowed thousands of potential documents before identifying what Plaintiff's expert(s) intended to use as support for demonstrative exhibits pursuant to Rule 1006 of the Federal Rules of Evidence at trial.  In turn, Class Counsel reviewed and analyzed 295 trial exhibits designated by Defendants, including the basis of potential objections to Defendants' trial exhibits.  Class Counsel also prepared deposition designations from videotaped depositions to be presented at trial as a result of many witnesses not being within the subpoena power of this Court for trial.  The deposition designations and cross-designations remained open issues impacting trial.

123.    Plaintiff also prepared motions *in limine*, including to preclude evidence related to aggregate damages suffered by the Class, Class Members' trading records or other investments, "good acts" of Defendants, CCA's residential re-reentry services and facilities, BOP non-prison contracts not produced in discovery and concerning certain trial procedures.  Plaintiff met and conferred with Defendants about these motions, and about the motions in *limine* Defendants were preparing to file, which would have sought to exclude evidence that was important to Plaintiff's case.

- 40 -

124. Substantial efforts were also expended prior to trial regarding trial procedures, jury instructions, trial protocol, evidentiary disputes (including objections to exhibit lists and deposition designations) and administrative matters necessary to the trial of the case. Substantial work was also required with respect to the presentation of expert testimony and demonstratives.

## IV. STRENGTHS AND WEAKNESSES OF CASE

125. At the time of the settlement, Class Counsel and Plaintiff had a thorough understanding of the issues and risks present in this case. While there was substantial evidence to support a jury verdict in favor of the Class, there were considerable risks and uncertainties if the case had proceeded to trial and judgment. Plaintiff, in consultation with Class Counsel, carefully considered these risks throughout the Litigation and in deciding to settle this matter.

126. At the time the settlement was reached, numerous issues critical to Plaintiff's ability to obtain a verdict in the Class' favor at trial and recover any judgment remained outstanding, including motions that would determine the extent of the evidence that could be presented at trial, the issues upon which liability could be premised and the bases for Defendants' assertion of affirmative defenses.

127. As described in ¶¶10-17 above, the most significant risks to recovery for the Class include: (i) a risk that Defendants would be found not to have materially misled investors or engaged in a fraudulent scheme; (ii) the risks inherent in establishing Defendants' scienter, including the risks to proving that Defendants were reckless or had actual knowledge as to the poor quality of CCA services or its ability to retain or win new business from CCA's government clients; (iii) the risk that damages would not be awarded or would be limited based on Defendants' arguments that other causes resulted in the decline of CCA's stock prices or that the market was aware of CCA's poor quality services such that any stock price declines were unrelated to the concealed matters Plaintiff

alleges; (iv) the risk that important factual evidence would be limited or excluded; and (v) the risk that the Class would not be able to recover any damages awarded.

128.    In summary, while Plaintiff had developed strong documentary and testimonial evidence supported by expert opinion, it faced both factual and legal challenges in presenting this matter to a jury and potentially on appeal.  These risks were carefully considered by Class Counsel and Plaintiff before the mediators' proposal was accepted.

## V.    NATURE AND ADEQUACY OF SETTLEMENT

129.    The proposed settlement was the result of arm's-length negotiations between zealous advocates on both sides and could not have been reached without the substantial participation and assistance of strong mediators with extensive experience in negotiating the resolution of actions of this type.  In the estimation of Class Counsel, the compromise embodied in the stipulation with Defendants represents a successful resolution of a complex and risky class action.  We believe our reputation as attorneys who will zealously prosecute a meritorious case through the trial and appellate levels, as well as our aggressive litigation of this case, put us in a strong position in settlement negotiations with Defendants.

### A.    History of Settlement Negotiations

130.    The parties engaged in extensive settlement negotiations, including those set forth below.

131.    Settlement discussions occurred throughout the pendency of the Litigation, including at two formal mediations with Mr. Lindstrom that occurred in February and May 2019.  The parties also had numerous less-formal settlement communications, including communications between counsel (both in person and by phone and e-mail), as well as communications with and through the mediators.  The settlement discussions were led by Darren J. Robbins and the undersigned counsel, both of whom have considerable experience in litigating and resolving complex class actions.  All

members of Plaintiff's trial team, including other Robbins Geller attorneys and in-house and outside experts in damages, participated in or were consulted about settlement discussions, bringing substantial additional experience and insight to understanding the risks of litigation and the adequacy of proposals to resolve the case. The lead negotiators on the defense side had similar substantial experience in complex litigation and included attorneys from Latham & Watkins LLP and Steven A. Riley of Riley Warnock & Jacobson, PLC.

132.    The parties remained far apart in their respective assessments of the strengths and weaknesses of the case during these negotiations, and no settlement was reached. Nevertheless, the formal mediations and follow-up discussions laid the groundwork for the continuing discussions with the mediators that occurred as this case neared trial, and that ultimately resulted in the mediators' proposal to resolve the Litigation on the terms proposed. In particular, through the parties' settlement communications, as well as during the prosecution and defense of this case, each party obtained a solid understanding of its opponent's case and, as a result, gained a better appreciation of the strengths and weaknesses of its own case.

133.    Prior to the initial mediation with Mr. Lindstrom, the parties exchanged detailed mediation statements, explaining their positions to the mediators and each other. Thereafter, and in advance of the second formal mediation, the parties regularly updated Mr. Lindstom and Judge Phillips on the progress of the case, including by advising them of significant developments during discovery or as the result of motion practice. As summary judgment was briefed, expert discovery took place and *Daubert* motions were filed, the frequency of communications with the mediators and each other increased. The information learned and exchanged during these communications was significant in obtaining and evaluating the mediators' proposal to settle the case.

134.     In April 2021, following extensive discussions with both sides, Mr. Lindstrom and Judge Phillips issued a "mediators' proposal" to settle the case for a cash payment of $56 million in exchange for a mutual release of claims and other terms.  A mediators' proposal is an amount between the two parties' respective positions that the mediators view as a fair and reasonable settlement amount.  Both parties accepted the proposal on April 15, 2021.

135.     The Court was immediately notified of the proposed settlement, whereupon it struck the trial date and docketed a notation of the agreement.  ECF No. 457.  The parties then drafted, finalized and signed the formal settlement agreement detailing the terms of the proposed settlement, which was submitted to the Court with the Motion for Preliminary Approval, filed on June 24, 2021.  ECF No. 461.

**B.     The Settlement Is in the Best Interests of the Class and Warrants Approval**

136.     On June 29, 2021, the Court granted preliminary approval of the settlement, as well as of the form and manner of notice of the settlement to the Class.  ECF No. 464.  Plaintiff believes it could have prevailed on the merits of the case but acknowledges that there was a very real risk, as discussed in detail above, that the Class would not prevail at trial.  Had Plaintiff's case successfully reached trial, the Class faced the risk that a jury would find Defendants' statements inactionable or would not be convinced that Defendants engaged in a scheme to defraud or acted with the requisite scienter.  There were also the risks that the jury would reduce the damages awarded or Plaintiff would not be able to recover any judgment.  Furthermore, even if Plaintiff prevailed at trial and Defendants had the resources to fund a judgment, any recovery would be delayed by post-trial proceedings and appeals.

137.     Having considered the foregoing, and evaluating Defendants' likely defenses at trial, it is my informed judgment, based upon the litigation of this action to date and the extensive

experience of Class Counsel in litigating shareholder class actions, that the proposed settlement of this matter before the Court, upon a payment of $56 million in exchange for a mutual release of all claims and on the other terms set forth in the Stipulation, provides fair, reasonable and adequate consideration and is in the best interest of the Class.

## VI.    PLAN OF ALLOCATION[5]

138.    The proposed Plan of Allocation was created by Class Counsel with the assistance of Mr. Dalrymple based on his event study and analysis of the movement of CCA's securities during the Class Period.  The Plan of Allocation is intended to fairly apportion the net proceeds of the settlement based on the portion of the decline attributable to the alleged fraud as of the date of a Class Member's purchases or acquisitions and sales of CCA securities.

139.    The Plan of Allocation determines the amount of fraud-caused inflation in CCA's common stock as of the date of each of the alleged misrepresentations and corrective events Class Counsel determined had sufficient evidentiary support to present at trial: (i) the August 4, 2016 announcement of the loss of the contract for Cibola; and (ii) the August 18, 2016 release of the Yates Memo.

140.    The amount of inflation in CCA's stock at the time of each of these events was determined based on an event analysis examining CCA's stock price reactions corresponding to the corrective disclosures, adjusting for the impact of factors other than the revelation of allegedly concealed risks.

141.    Using the determinations of the amount of inflation in CCA's stock price at different points in the Class Period, the Plan of Allocation apportions damages to Class Members based on the

---

[5]    The summary of the Plan of Allocation provided herein is intended only to explain the basis on which the plan was developed in order to assist the Court in evaluating the fairness, reasonableness and adequacy of the proposed settlement.  Nothing set forth herein is intended to, or does, modify or affect the interpretation of the Plan of Allocation, which is set forth in full in the Notice sent to Class Members and will be applied by the Claims Administrator according to its express terms.

difference between the amount of inflation on the date they purchased or acquired their securities and on the date they sold them, or as of November 15, 2016 (the expiration of the 90-day "lookback period"), if the shares were retained as of that date. To be eligible for a recovery, the shares must have been purchased or acquired prior to, and sold after, at least one of the corrective disclosures. The Plan of Allocation also provides a recovery for purchasers of call options and sellers of put options who owned their options on the dates of the actionable fraudulent or corrective events based on the losses they incurred in their transactions. Class Members who realized a gain in their overall transactions in CCA securities during the Class Period will not be entitled to recovery.

142.    Based on Class Counsel's experience in this and other securities actions and their understanding of the factual circumstances giving rise to this action and the risks at trial, including the risks to both liability and damages, Class Counsel believes the Plan of Allocation set forth in the Notice provides a fair, reasonable and adequate method of compensating Class Members for the economic harm they suffered as a result of the fraud alleged in the Litigation.

## VII.    CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

143.    The successful prosecution of this action required Class Counsel and its staff to perform over 23,000 hours of work and incur more than $1,900,000 in expenses, as detailed in the accompanying declaration in support of the application for an award of fees and expenses. Based on the extensive efforts on behalf of the Class, as described above, Class Counsel is applying for compensation from the Settlement Fund on a percentage basis and has requested a fee in the amount of one-third of the Settlement Fund.

144.    The percentage method is the appropriate method of fee recovery because, *inter alia*, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. As set forth in

the accompanying memorandum in support of Class Counsel's application for an award of attorneys' fees and expenses ("Fee Memorandum"), courts throughout the Sixth Circuit have applied the percentage-of-recovery method in awarding fees. The percentage sought is merited in this case in light of the effort required and the results obtained.

### A. The Requested Fee Is Reasonable

145. In light of the nature and extent of the Litigation, the diligent prosecution of the action, the complexity of the factual and legal issues presented and the other factors described above, and as stated in the accompanying Fee Memorandum, Class Counsel believes the requested fee of one-third of the Settlement Fund is fair and reasonable.

146. A one-third fee award is consistent with percentages awarded by courts in this District and is justified by the specific facts and circumstances in this case and the substantial risks Plaintiff had to overcome at the pleadings, class certification, discovery and summary judgment phases of the Litigation, and to prepare to overcome at trial, as set forth herein.

### B. The Requested Fee Is Supported by Plaintiff

147. Plaintiff actively monitored the Litigation and consulted with Class Counsel during the course of settlement negotiations. Plaintiff spent considerable time and effort fulfilling its duties and responsibilities in this case, including reviewing briefs, answering discovery requests, producing documents, sitting for deposition, preparing a declaration in support of class certification and consulting with Class Counsel concerning the merits of the Litigation. As a result, Plaintiff developed an understanding of the strengths and weaknesses of this case, the risks to continued litigation and the nature and extent of Class Counsel's efforts on behalf of the Class.

148. As reflected in the accompanying Declaration of Amalgamated Bank Executive Vice President and General Counsel Deborah Silodor, Plaintiff believes the requested fee is fair and reasonable in light of the result achieved and supports award of Class Counsel's requested fee.

- 47 -

**C.** **The Requested Fee Is Supported by the Effort Expended and Results Achieved**

149.    As set forth herein, the $56 million cash settlement was achieved as a result of extensive and creative prosecutorial and investigative efforts, contentious and complicated motion practice, years of hard-fought discovery, analysis of voluminous evidence and, ultimately, preparation up to the eve of trial, as detailed herein.

150.    As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.  Plaintiff's success was by no means assured.  Defendants disputed whether the alleged false statements were even actionable, disputed that investors were misled and sought to attribute any harm suffered to non-fraud factors.  Were this settlement not achieved, and even if Plaintiff prevailed at trial, Plaintiff and the Class faced years of costly and risky appellate litigation against Defendants with ultimate success far from certain.  It is also possible that a jury could have found no liability or no damages.  Plaintiff faced the further risk that it would be unable to collect on a sizable judgment against Defendants.

151.    As a result of this settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.  These risk factors also support Class Counsel's request for one-third of the Settlement Fund.

**D.** **The Risk of Contingent Class Action Litigation Supports the Requested Fee Award**

152.    As set forth in the accompanying Fee Memorandum, a determination of a fair fee should include consideration of the contingent nature of the fee, the financial burden carried by Class Counsel and the difficulties that were overcome in obtaining the settlement.

153.    This action was prosecuted by Class Counsel on an "at-risk" contingent fee basis. Class Counsel fully assumed the risk of an unsuccessful result.  Class Counsel has received no

- 48 -

compensation for its services during the course of this Litigation and has incurred very significant expenses in litigating for the benefit of the Class. Any fees or expenses awarded to Class Counsel have always been at risk and are completely contingent on the result achieved. Because the fee to be awarded in this matter is entirely contingent, the only certainties from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort.

154. Class Counsel's efforts were performed on a wholly contingent basis despite significant risk and in the face of determined opposition. Under these circumstances, Class Counsel is justly entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained. Under all the circumstances present here, a one-third fee plus expenses is fair and reasonable.

155. There are numerous cases, including many handled by my firm, where class counsel in contingent fee cases such as this, after expenditure of thousands of hours of time and incurring significant out-of-pocket costs, have received no compensation whatsoever. The losses suffered by class counsel in other actions where insubstantial settlement offers were rejected, and where class counsel ultimately receives little or no fee, should not be ignored. Class Counsel know from personal experience that, despite the most vigorous and competent of efforts, attorneys' success in contingent litigation is never assured.

156. Lawsuits such as this are expensive to litigate. Those unfamiliar with the efforts required to litigate class actions often focus on the aggregate fees awarded but ignore the fact that those fees fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal and state authorities, are used to fund the expenses of other contingent cases prosecuted by Class Counsel and help pay the monthly salaries of the firms' attorneys and staff.

- 49 -

## VIII. CONCLUSION

157. For all of the foregoing reasons, Class Counsel respectfully requests the Court to approve the settlement and Plan of Allocation of settlement proceeds, approve the fee and expense application and award Class Counsel one-third of the Settlement Fund plus $1,949,862.24 in expenses, as well as the interest earned on both amounts at the same rate and for the same period as that earned on the Settlement Fund until paid, and approve the award of $17,525 to Plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 24th day of September, 2021, at Nashville, Tennessee.

*s/Christopher M. Wood*
CHRISTOPHER M. WOOD

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on September 24, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
  & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth J. Black**
  kennyb@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **Meryn C.N. Grant**
  Meryn.Grant@lw.com

- **Dennis J. Herman**
  dherman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Rachel L. Jensen**
  rachelj@rgrdlaw.com,e_file_sd@rgrdlaw.com,rachelj@ecf.courtdrive.com

- **Natalie F. Lakosil**
  nlakosil@rgrdlaw.com,nlakosil@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com,clyons@ecf.courtdrive.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,ealexander@barrettjohnston.com,adonovan@barrettjohnston.com,eseaborn@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Faraz Mohammadi**
  faraz.mohammadi@lw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,WillowR@ecf.courtdrive.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian Schall**
  brian@schallfirm.com

- **David J. Schindler**
  david.schindler@lw.com

- **Ellen Gusikoff Stewart**
  elleng@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sarah A. Tomkowiak**
  sarah.tomkowiak@lw.com

- **Morgan E. Whitworth**
  morgan.whitworth@lw.com,morgan-whitworth-8044@ecf.pacerpro.com

- **Mark H. Wildasin**
  mark.wildasin@usdoj.gov,liz.lopes@usdoj.gov,melissa.russell@usdoj.gov,dkGeorge@bop.gov,othomas@bop.gov,CaseView.ECF@usdoj.gov,regina.taylor2@usdoj.go

- **Christopher M. Wood**
  cwood@rgrdlaw.com,agonzales@rgrdlaw.coom,willowr@rgrdlaw.com,agonzales@ecf.courtdrive.com,CWood@ecf.courtdrive.com,morgank@ecf.courtdrive.com,smc

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)