

## PERFORMANCE AUDIT REPORT

# Department of Correction
*January 2020*

**Justin P. Wilson**
*Comptroller of the Treasury*





## DIVISION OF STATE AUDIT

# DEBORAH V. LOVELESS, CPA, CGFM, CGMA
## Director

*State Agency Audits*
**KANDI B. THOMAS, CPA, CGFM, CFE, CGMA**
Assistant Director

**JENNIFER WHITSEL, CPA, CFE, CGMA**
**DENA W. WINNINGHAM, CGFM**
Audit Managers

**Melissa Boaz, CPA, CGFM, CFE, CGMA**
**Jaclyn Clute**
**Vincent Finamore, CFE**
In-Charge Auditors

**Mason Ball, CPA, CFE, CGFM**
**Chris Colvard**
**Michael Deloach, CPA, CGFM**
**Fonda Douglas**
**Heather Murray**
**De'Aundrea Pointer**
**Valeria Stadelman**
**Chas Taplin, CPA, CFE**
**Sarah Vandergriff**
**Jackson Wickham**
**David Wright, CFE**
Staff Auditors

**Amy Brack**
Editor

**Amanda Adams**
Assistant Editor

*Information Systems*
**DANIEL V. WILLIS, CPA, CISA, CGFM**
Assistant Director

**BRENT L. RUMBLEY, CPA, CISA, CFE**
Information Systems Audit Manager

**James Falbe, CISA**
**Sam Osborn, CISA**
In-Charge Auditors

**Andrew Bullard, CISA**
**Daniel Elkins**
**Malik M. Moughrabi**
**Timothy F. Powers II**
Staff Auditors

---

**Comptroller of the Treasury, Division of State Audit**
Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243
(615) 401-7897

**Reports are available at**
comptroller.tn.gov/office-functions/state-audit.html

**Mission Statement**
The mission of the Comptroller's Office is
to make government work better.

**Comptroller Website**
comptroller.tn.gov



January 6, 2020

The Honorable Randy McNally
  Speaker of the Senate
The Honorable Cameron Sexton
  Speaker of the House of Representatives
The Honorable Kerry Roberts, Chair
  Senate Committee on Government Operations
The Honorable Martin Daniel, Chair
  House Committee on Government Operations
        and
Members of the General Assembly
State Capitol
Nashville, TN 37243
        and
The Honorable Tony Parker, Commissioner
Department of Correction
320 Sixth Avenue North
Nashville, Tennessee, 37243

Ladies and Gentlemen:

We have conducted a performance audit of selected programs and activities of the Department of Correction for the period October 1, 2017, through July 31, 2019. This audit was conducted pursuant to the requirements of the Tennessee Governmental Entity Review Law, Section 4-29-111, *Tennessee Code Annotated.*

Our audit disclosed certain findings, which are detailed in the Audit Conclusions section of this report. Management of the department has responded to the audit findings; we have included the responses following each finding. We will follow up the audit to examine the application of the procedures instituted because of the audit findings.

This report is intended to aid the Joint Government Operations Committee in its review to determine whether the department should be continued, restructured, or terminated.

Sincerely,

*Deborah V. Loveless*

Deborah V. Loveless, CPA, Director
Division of State Audit

DVL/jw/dw
19/032



Division of State Audit

# Department of Correction
Performance Audit
January 2020

*Our mission is to make government work better.*

## AUDIT HIGHLIGHTS

### The Department of Correction's Mission
*To operate safe and secure prisons and provide effective community supervision in order to enhance public safety.*

We have audited the Department of Correction for the period October 1, 2017, through July 31, 2019. Our audit scope included a review of internal controls and compliance with laws, regulations, policies, procedures, and provisions of contracts. We conducted site visits at the following correctional facilities:

**Scheduled Termination Date:**

June 30, 2020

### CoreCivic Facilities

Hardeman County Correctional Facility
Trousdale Turner Correctional Center
Whiteville Correctional Facility

### State Facilities

Northeast Correctional Complex
Northwest Correctional Complex
Turney Center Industrial Complex

We divided our report into 11 sections:

- department leadership oversight;
- department's annual inspections of correctional facilities;
- public reporting of inmate deaths and other serious incidents;
- inmate sexual abuse and sexual harassment investigations;
- inmate medical and mental health services;
- correctional staffing and department turnover;
- inmate services and support;
- department's community supervision responsibilities;
- COMET implementation;
- public records management; and

- recidivism rates for the department's educational and vocational programs.

We present a total of 18 findings, 13 observations, and 3 matters for legislative consideration. Our key conclusions below refer to each audit area and its overarching conclusions. The beginning of each section of the report lists the respective findings, observations, and other conclusions.

## KEY CONCLUSIONS

### Department Leadership Oversight

**The Department of Correction's leadership failed to provide adequate oversight activities of department and correctional facilities management in several areas relating to inmates, correctional staff, and the community, thereby affecting the department's ability to meet its mission "to operate safe and secure prisons and provide effective community supervision in order to enhance public safety."**

As a result of our review of the department, we have determined that various areas of the department's operations would benefit from increased oversight and the implementation of adequate internal controls. In order to ensure compliance with laws, regulations, and policies; provide safe and secure facilities; and reduce the risk to public safety, department management should develop a plan to improve areas throughout the organization, including

- ➤ quality reporting of information;
- ➤ correctional facilities staffing;
- ➤ inmate services, including medical and mental health services;
- ➤ parole and probation monitoring; and
- ➤ contracted services and other procurements.

Department management has a duty to provide a safe environment for staff at its facilities and inmates in its custody. Department management must also report complete and accurate information to decision makers. Department management must meet the medical and mental healthcare needs of individuals in custody and ensure that individuals on parole and probation are sufficiently monitored. Finally, management should provide sufficient oversight over contracted services and other procurements, ensuring that department staff comply with state laws and regulations and that vendors meet the department's expectations. See **Finding 1** on page 11.

### Department's Annual Inspections of Correctional Facilities

**Although the results of annual inspections provide management a basis to evaluate state and CoreCivic facility performance and to establish a basis to reward CoreCivic facilities, the department's overall annual compliance percentage scores do not provide a clear measure of correctional facility performance.**

Based on our review, we found that the Compliance Division's calculation of compliance percentages emphasizes the number of compliant items instead of the severity of critical findings. These scores do not differentiate between "critical" or "other" findings and do not stress mission-critical areas that may directly impact the safety and security of inmates, staff, and the general public. Management uses these scores to monitor performance at all correctional facilities and to reward CoreCivic's performance (although only at the Hardeman County facility currently). The Department of Correction's management has also used the overall scores to discuss facility inspection results during legislative hearings. See **Finding 2** on page 24.

## Public Reporting of Inmate Deaths and Other Serious Incidents

**Management did not ensure that state and CoreCivic facilities staff collected and reported complete, accurate, and valid information; as a result, their ability to provide reliable data is problematic.**
Because state leadership and the public use the information provided by the Department of Correction to draw conclusions about how correctional facilities are operating, it is vital that management ensures that data on incidents, including deaths and other serious incidents, is valid and reliable.

Based on our review, management did not implement or enforce established internal controls to ensure state and CoreCivic correctional facilities staff collected and accurately reported incident information for

- inmate deaths (see **Finding 4** on page 43);

- inmate assaults, inmate violence, and correction officers' use of force (see **Finding 5** on page 46);

- inmate accidents and injuries (see **Finding 6** on page 50); and

- facility lockdowns (see **Observation 1** on page 54).

Because of these internal control deficiencies, management's ability to provide accurate and complete information to key decision makers is problematic, impacting both management's oversight of facility operations and its ability to provide a safe and secure correctional environment (see **Finding 3** on page 40 and **Finding 8** on page 57).

## Inmate Sexual Abuse and Sexual Harassment Investigations

**Department of Correction management has not ensured that state and CoreCivic correctional facility staff followed policies and procedures for investigating sexual abuse and harassment allegations and documented their results.**
The failure to properly investigate and respond to allegations of sexual abuse and harassment can directly impact the safety and security of both inmates and staff at correctional facilities. During our review of investigations of sexual abuse and harassment occurring at correctional institutions, we identified the following deficiencies:

- at one state-managed facility, investigators misclassified investigative results as unfounded rather than unsubstantiated; in these cases, the investigators did not find sufficient evidence to substantiate the allegations; and

- at state- and CoreCivic-managed facilities, investigators did not record allegations timely, limiting department management's ability to effectively track and monitor the status of investigations.

Without accurate, complete, and timely investigation records, management cannot ensure that facility management, investigators, and staff take swift action to investigate and respond to allegations of sexual abuse and harassment. See **Finding 9** on page 82.

<div style="background-color:maroon; color:white; text-align:center;">**Inmate Medical and Mental Health Services**</div>

**Because of issues at both state and CoreCivic facilities involving medical and mental health documentation; medical records and medication transfer; and medicine dispensing, Department of Correction management did not fully demonstrate that inmates received sufficient medical and mental health services when needed.**
Pursuant to Section 41-1-408, *Tennessee Code Annotated*, the department has a responsibility to provide medical and mental health services to inmates under its custody. Based on our review of inmates' medical and mental health files, staff at the department and CoreCivic facilities did not maintain all required documentation, which prevents management from ensuring whether inmates received appropriate care (see **Finding 12** on page 100). Additionally, state correctional facilities staff did not ensure that inmate records and medications traveled with transferred inmates (see **Observation 5** on page 108). Based on our audit procedures, we also identified deficiencies with medicine distribution practices at CoreCivic facilities, placing both inmates and medical staff at risk (see **Observation 4** on page 103, **Observation 5** on page 108, and **Finding 13** on page 106).

**Department of Correction management did not provide adequate oversight over medical and mental health contractors to ensure the contractors met required staffing levels, and management did not follow statewide procurement policies governing contract terms and amendments, increasing the risk that contractors may not be held accountable for performance that may adversely impact medical and mental health services for the inmate population.**
The department's medical and mental health contractors, Centurion of Tennessee, LLC and Corizon Health, have been unable to consistently meet contractually required medical and mental health staffing levels, increasing the risk that inmates will not receive needed services (see **Finding 11** on page 98). Even though Centurion and Corizon have contract performance deficiencies, department management has established a value-added credit system (outside the scope of the contracts) in which the contractors are allowed to self-report areas and/or efforts that they believe deserve recognition. According to the department's Chief Financial Officer, the Chief Medical Officer reviews the contractor's reported information and may approve credits, which the contractor can use to offset any department-assessed liquidated damages. In the current system, contractors can fail to meet current contract requirements; receive credits for self-reported areas of good performance or efforts (including areas not currently required in the state's contract); and then use, or "net," the earned credits against assessed damages. Furthermore, we could not determine whether the contractors actually corrected the contract performance deficiencies, nor

did department management collect the majority of liquidated damages assessed.  (See **Finding 10** on page 96.)

<div align="center">**Correctional Staffing and Department Turnover**</div>

**Management must continue efforts to ensure adequate staffing at state and CoreCivic correctional facilities in order to provide safe and secure facilities for inmates and staff.**
Sufficient staffing of correctional officer positions is vital to achieving the mission of the Department of Correction; however, both state- and CoreCivic-managed facilities have experienced significant difficulties in hiring and retaining a sufficient number of correctional officers.  Due to minimal staffing levels at both state and CoreCivic entities, management has increased overtime and temporarily closed noncritical posts to cover critical posts and duties.  At the facilities we visited, we found that, on average, they operated with fewer than the approved number of correctional officers while noncritical posts, such as transportation and recreation, were consistently under-staffed or closed.  Low staffing levels coupled with frequent overtime impacts management's ability to provide safe and secure facilities, especially in emergencies.  See **Observation 6** on page 130 and **Observation 7** on page 133.

**The department should continue its efforts to remedy the deficiencies on CoreCivic's staffing reports as noted in the prior audit.**
Despite management's stated corrective action after the November 2017 performance audit and efforts to accurately track staffing positions on a monthly basis, CoreCivic facilities' monthly staffing reports contained the same errors noted in the prior audit, so department management cannot effectively track whether CoreCivic is meeting its contractually required staffing levels.  See **Finding 14** on page 135.

<div align="center">**Inmate Services and Support**</div>

**Management did not ensure that state and CoreCivic facilities performed mandatory procedures designed to protect and serve inmates.**
Staff at both the state-run and CoreCivic facilities did not conduct screenings to determine if inmates posed a risk of being a sexual abuser or victim within the policy-required timeframes (see **Finding 15** on page 160).  Furthermore, Trousdale Turner Correctional Center did not conduct the minimally required number of random inmate drug screenings, while Whiteville Correctional Facility, Turney Center Industrial Complex, and Northwest Correctional Complex did not consistently and accurately record the results of these screenings.  Without consistent application and documentation of these drug screenings, management cannot reasonably ensure facilities have taken sufficient measures to control drug use and its detrimental effects on facilities' safety and security (see **Observation 10** on page 167).

**Management did not ensure inmates are aware of, and have access to, information and services the Department of Correction provides.**
In compliance with law and policy, state and CoreCivic facilities are required to provide access to various programs and services for inmates.  As dictated by department policy, facilities must provide inmates with an orientation program within three days of their arrival; these orientation programs provide information on rules of conduct; disciplinary procedures; reporting grievances

and allegations of sexual abuse or assault; access to medical and mental health services; clothing; and family visitation. Management did not ensure facilities performed inmate orientations within the three-day timeframe that policy requires (see **Finding 16** on page 163). As a result of our review, we also determined that

- two state-managed facilities impeded inmates' access to forms and healthcare instructions (see **Observation 8** on page 165); and
- state and CoreCivic correctional staff did not properly maintain class and job documentation, such as an inmate's documented understanding of job duties and pay rates (see **Observation 9** on page 166).

## Department's Community Supervision Responsibilities

**Although we saw improvement, the Department of Correction has still not ensured the adequate monitoring of individuals placed on parole or probation.**

Offenders placed on parole or probation have been found guilty of crimes, and probation and parole officers are charged with ensuring that offenders comply with the conditions of their release in order to keep the community safe. The department's Community Supervision unit is responsible for monitoring approximately 40,000[1] individuals placed on parole or probation statewide. As noted in the previous three audits,[2] supervisors and management have not fulfilled their oversight responsibilities of the state's probation and parole officers and have not ensured these officers fulfilled their monitoring responsibilities (see **Finding 17** on page 179 and **Observation 11** on page 182). Additionally, as a result of our review, we determined that probation and parole officers and state and local law enforcement agencies do not have a single comprehensive resource to look up arrests made throughout the state, which would constitute parole or probation violations. As detailed in the **Matter for Legislative Consideration** on page 175, such a system would help officers determine if an offender had any recent arrests or open arrest warrants.

## COMET Implementation

**After signing a $15.3 million contract, spending 3 years on development, and facing unforeseen obstacles, the department's vendor has been unable to implement the new COMET system, and as of September 2019, there is no official "go-live" date.**

The department currently uses the Tennessee Offender Management Information System (TOMIS) as its primary offender management system. This system is outdated, costly to maintain, and requires significant manual processes and outside applications to sufficiently compile and track inmate data. The department's new offender management system, Correctional Offender Management Electronic Tracking (COMET), should streamline department operations, but its implementation is 18 months behind schedule with no official start date as of September 2019 (see **Observation 12** on page 188). We provide further information on management's production and distribution of quality information in our **Public Reporting of Inmate Deaths and Other Serious Incidents** section.

---

[1] We calculated a six-month average using monthly department supervisory reports we reviewed during the audit.
[2] We reported this finding in the 2012 performance audit of the Board of Probation and Parole. In 2012, the Department of Correction became responsible for community supervision; we followed up on this finding in the department's 2014 performance audit follow-up and in its 2017 performance audit.

**Department of Correction management did not ensure that both department and CoreCivic staff complied with public records regulations, resulting in lost records as well as potential evidence.**

Public records provide evidence of government operations and hold government officials accountable for their actions. For the department and its CoreCivic contractor, such records are also vital to review the effective operation of correctional facilities and community oversight and may even serve as potential evidence in investigations. Based on our review, we determined the following:

- At four of six correctional facilities, state and CoreCivic management did not properly retain, maintain, and destroy public records.

- At three of six correctional facilities, state and CoreCivic staff disposed of large volumes of files without submitting the state-required certificates of destruction.

- One state correctional facility did not maintain security footage for the department-established minimum of 90 days, sometimes overwriting footage within 2 weeks of recording.

For more information, see **Finding 18** on page 195. Additionally, staff at one state facility did not follow the department's procedure for restoring public records after a minor flood destroyed some Fire and Safety records in spring 2019 (see **Observation 13** on page 198).

**The Department of Correction has not reported recidivism rates for inmates who participated in educational and vocational programs, as required by statute, but has provided other information to the General Assembly.**

Section 41-21-238 et seq., *Tennessee Code Annotated,* requires the Commissioner of Education, with the assistance of the Commissioner of Correction, the Board of Regents,[3] and the University of Tennessee System, to develop a plan to increase educational and vocational opportunities for inmates. The Commissioner of Correction is required to monitor and document the plan's effectiveness, which includes calculating recidivism rates of inmate participants in these programs. Although the department routinely presents other measures of educational and vocational programs' success to the General Assembly, the department does not currently report program-specific recidivism rates. We have included a **Matter for Legislative Consideration** on page 203 concerning the requirement to report these recidivism rates.

---

[3] The General Assembly may also wish to amend Section 41-21-238 et seq., to include the six locally governed institutions, which are no longer part of the Tennessee Board of Regents.

# TABLE OF CONTENTS

Page

**INTRODUCTION** 1
Audit Authority 1
Background 1

**AUDIT SCOPE** 8

**PRIOR AUDIT FINDINGS** 9
Report of Actions Taken on Prior Audit Findings 9
Repeated Audit Findings 9

**AUDIT CONCLUSIONS**

**Department Leadership Oversight** 11

Finding 1 – The department's leadership failed to provide adequate oversight activities of department and correctional facilities management in several areas relating to inmates, correctional staff, and the community, thereby affecting the department's ability to meet its mission 11

**Department's Annual Inspections of Correctional Facilities** 21

Finding 2 – The department's overall annual compliance percentage scores do not provide a clear measure of correctional facility performance 24

**Appendix A: Department's Annual Inspections of Correctional Facilities**

Appendix A-1 – Methodologies to Achieve Objective 29

**Public Reporting of Inmate Deaths and Other Serious Incidents** 31

Finding 3 – The department's ability to provide accurate and complete information relating to deaths and other serious incidents is problematic 40

Finding 4 – The department did not accurately record inmates' causes of death in the Tennessee Offender Management Information System, which impacted the accuracy of the death information in the Statistical Abstract 43

Finding 5 – Department management did not ensure state and CoreCivic facility staff followed incident reporting policies, entered incident information accurately into TOMIS, and maintained supporting documentation for incidents as required 46

Finding 6 — The department did not ensure that state and CoreCivic correctional facility and health services staff entered all serious accidents, injuries, and illnesses in TOMIS in accordance with department policy    50

Observation 1 — Department policy does not formally define partial or total institutional lockdowns; therefore, correctional facility staff may not report them consistently in TOMIS    54

Finding 7 — The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions did not implement effective internal controls in two areas, increasing the risk of errors or data loss    56

Observation 2 — The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions did not provide adequate internal controls in two areas; however, the areas noted do not pose a critical risk to the state    56

Finding 8 — The department published inaccurate and incomplete inmate incident data in its fiscal year 2018 Statistical Abstract    57

**Appendix B: Public Reporting of Inmate Deaths and Other Serious Incidents**

Appendix B-1 — Department Policies Governing Serious Incidents, Accidents, Injuries, and Deaths    60

Appendix B-2 — Summary of Class A Incidents (Those Involving Serious Risk to the Facility or Community) Reported by Location    62

Appendix B-3 — Summary of Class B Incidents (Those Involving Possible Risk to the Facility or Community) Reported by Location    63

Appendix B-4 — Summary of Class C Incidents (Those Involving No Risk to the Facility or the Community) Reported by Location    64

Appendix B-5 — TDOC Incident Summary by Incident Type and Prison for Fiscal Year 2018    65

Appendix B-6 — Detail of Testwork Related to Inmate Deaths    68

Appendix B-7 — Summary of Incident-Related Issues Found During Correctional Facility Site Visits    68

Appendix B-8 — The Assistant Commissioner of Prisons' Expectations for Incident Reporting Related to Accidents, Injuries, and Illnesses    72

Page

Appendix B-9 – Total Number of Reported Lockdowns by Correctional Facility ........................ 73

Appendix B-10 – Methodologies to Achieve Objectives ........................ 74

**Inmate Sexual Abuse and Sexual Harassment Investigations** ........................ 77

Finding 9 – Management did not ensure that state and CoreCivic correctional facilities staff followed policies and procedures for investigating sexual abuse and sexual harassment allegations and documented their results ........................ 82

**Appendix C: Inmate Sexual Abuse and Sexual Harassment Investigations**

Appendix C-1 – Additional PREA Allegation and Investigation Information ........................ 86

Appendix C-2 – Methodologies to Achieve Objective ........................ 86

**Inmate Medical and Mental Health Services** ........................ 89

Finding 10 – Department management disregarded controls over statewide procurement and established its own informal procurement and payment system without proper review and approval by oversight authorities ........................ 96

Finding 11 – Centurion and Corizon did not meet contractual medical and mental health staffing levels ........................ 98

Finding 12 – CoreCivic and state-managed correctional facilities did not ensure that staff placed the required medical and mental health documents in the inmate files or completed the required documents in accordance with department policy ........................ 100

Observation 3 – Staff at Northeast Correctional Complex left a box containing confidential employee and inmate health information in an open area, increasing the risk of unauthorized access to confidential information ........................ 102

Observation 4 – We identified concerns with medication administration practices at two CoreCivic facilities during our site visits ........................ 103

Finding 13 – CoreCivic did not have an adequate procedure in place to quickly access inmate medication administration records during an outage of its new electronic medication administration system ........................ 106

# TABLE OF CONTENTS (Continued)

Page

Observation 5  &ndash;  Management should evaluate the department's process of transporting inmates' medical files and medications when inmates are transferred between correctional facilities to determine the risks to inmates when medical files and medications do not arrive at the right destination    108

## Appendix D: Inmate Medical and Mental Health Services

Appendix D-1  &ndash;  Department's Assessed Liquidated Damages and Offsetting Value-Added Credits for Centurion and Corizon    109

Appendix D-2  &ndash;  Analysis of Monthly Clinical Staffing Reports for Centurion and Corizon by State-Managed Correctional Facility    113

Appendix D-3  &ndash;  Analysis of Monthly Clinical Staffing Reports for CoreCivic-Managed Correctional Facilities    116

Appendix D-4  &ndash;  Detailed List of Errors Found in Inmate Medical File Review by Correctional Facility    118

Appendix D-5  &ndash;  Methodologies to Achieve Objectives    120

## Correctional Staffing and Department Turnover    123

Matter for Legislative Consideration − Department of Correction Retirees    123

Observation 6  &ndash;  Both CoreCivic and state-run facilities are operating with minimal staff, resulting in increased staff overtime and/or the temporary closure of noncritical posts    130

Observation 7  &ndash;  Despite ongoing challenges, the department is working to develop tangible strategies to retain correctional officers at its facilities    133

Finding 14  &ndash;  As noted in the prior audit, CoreCivic staffing reports still contain numerous errors    135

## Appendix E: Correctional Staffing and Department Turnover

Appendix E-1  &ndash;  Fiscal Year 2020 Budgeted Positions by Correctional Facility Location    139

Appendix E-2  &ndash;  Correctional Officer Separations by Type    140

Appendix E-3  &ndash;  CoreCivic Turnover    141

Appendix E-4  &ndash;  CoreCivic Contract Requirements    143

Appendix E-5  &ndash;  Deficiencies Noted Related to CoreCivic Monthly Staffing Reports    144

Appendix E-6  &ndash;  CoreCivic Staffing – Liquidated Damages Assessments    146

## TABLE OF CONTENTS (Continued)

Page

Appendix E-7  –  Methodologies to Achieve Objectives                                                    147

**Inmate Services and Support**                                                                        149

Finding 15        –  State and CoreCivic correctional facility personnel did not
consistently administer required inmate screenings that are
used to prevent sexual abuse in correctional facilities                                                 160

Finding 16        –  State and CoreCivic facility personnel did not perform
inmate orientation within three days of arrival at the facility
or did not consistently maintain a signed Orientation
Acknowledgement Form in the inmate institutional file                                                   163

Observation 8     –  Northwest Correctional Complex and Turney Center
Industrial Complex impeded inmates' access to information
relating to healthcare, including access to grievance and sick
call forms                                                                                             165

Observation 9     –  State and CoreCivic correctional staff did not properly
maintain class and job documentation in accordance with
department policy                                                                                      166

Observation 10   –  Trousdale Turner Correctional Center did not conduct the
minimally required random drug screenings of the inmate
population, and Whiteville Correctional Facility, Turney
Center Industrial Complex, and Northwest Correctional
Complex did not consistently and accurately record
screening results in TOMIS                                                                             167

**Appendix F: Inmate Services and Support**                                                            

Appendix F-1    –  Methodologies to Achieve Objectives                                                  169

**Department's Community Supervision Responsibilities**                                                 175

Matter for Legislative Consideration – Single Comprehensive Resource for
Offender Arrests                                                                                        175

Finding 17        –  Community supervision supervisors, District Directors, and
Correctional Administrators did not always review case
records as required by department policy to ensure probation
and parole officers performed their required duties                                                    179

Observation 11 – Although department management has worked since 2014 to ensure probation and parole officers performed their required duties, probation and parole officers did not meet supervision requirements for offender case plan reviews — 182

**Appendix G: Department's Community Supervision Responsibilities**

Appendix G-1 – Methodologies to Achieve Objectives — 184

**COMET Implementation** — 187

Observation 12 – After signing a $15,347,200 contract, spending three years on development, and facing unforeseen obstacles, the department's vendor has been unable to implement the new COMET system, and of September 2019, there is no official "go-live" date — 188

**Appendix H: COMET Implementation**

Appendix H-1 – TOMIS Mainframe and Processing Costs for Fiscal Years 2018 and 2019 — 191

Appendix H-2 – Methodologies to Achieve Objectives — 192

**Public Records Management** — 193

Finding 18 – Department management did not ensure its staff and CoreCivic complied with the state's public records statute and records management standards — 195

Observation 13 – Staff at the Turney Center Industrial Complex did not follow the department's procedure for restoring public records after a minor flood destroyed some Fire and Safety records in spring 2019 — 198

**Appendix I: Public Records Management**

Appendix I-1 – Methodologies to Achieve Objectives — 201

**Recidivism Rates for the Department's Educational and Vocational Program** — 203

Matter for Legislative Consideration – Recidivism Rates for the Department's Education and Vocational Programs — 203

**Appendix J: Recidivism Rates for the Department's Educational and Vocational Programs**

Appendix J-1 – Methodologies to Achieve Objective — 205

**APPENDICES** — 206

Appendix K-1 – Edison Business Units — 206

## TABLE OF CONTENTS (Continued)

| | | Page |
|---|---|---|
| Appendix K-2 | – Expenditure and Revenue Information by Fiscal Year | 207 |
| Appendix K-3 | – State's Recidivism Rates | 209 |
| Appendix K-4 | – Title VI Information | 210 |

## AUDIT AUTHORITY

This performance audit of the Department of Correction was conducted pursuant to the Tennessee Governmental Entity Review Law, Title 4, Chapter 29, *Tennessee Code Annotated.* Under Section 4-29-241, the department is scheduled to terminate June 30, 2020. The Comptroller of the Treasury is authorized under Section 4-29-111 to conduct a limited program review audit of the agency and to report to the Joint Government Operations Committee of the General Assembly. This audit is intended to aid the committee in determining whether the department should be continued, restructured, or terminated.

## BACKGROUND

The Department of Correction was established in 1923 under Section 4-3-601, *Tennessee Code Annotated,* to operate the state's correctional system. As such, the department's mission is to "operate safe and secure prisons and provide effective community supervision in order to enhance public safety."



The department ensures housing for 21,669 inmates[4] at 14 correctional facilities (see **Table 1**). The state owns and operates 10 facilities that house approximately 14,000 inmates, while CoreCivic, the state's private prison contractor, operates 4 facilities and provides housing for the remaining 7,700 inmates. See **Exhibit 1** on page 3 for a map with the list and locations of the state's and CoreCivic's correctional facilities.

All CoreCivic facilities and 7 of the state facilities provide housing exclusively to male inmates; the Tennessee Prison for Women and the Women's Therapeutic Residential Center (located at the West Tennessee State Penitentiary site) exclusively house female inmates; and the Bledsoe County Correctional Complex houses both male and female inmates.

A map of the state's correctional facilities is on page 3.

The department's Community Supervision unit supervises approximately 77,000 offenders on probation, on parole, or in a community correction program. **Table 1** illustrates the population of inmates and offenders under the department's jurisdiction as of August 2019.

---

[4] In this report, we will use the term "inmates" to describe individuals housed in a correctional facility; the term "offenders" will refer to individuals who are in the department's custody but reside in the community.

**Table 1**
**Number of Inmates/Offenders Under Department of Correction Oversight**
**as of August 2019**

| Type of Oversight | Number of Inmates/Offenders |
|---|---|
| Felons Incarcerated in Correctional Facilities | 21,669 |
| Probation and Community Corrections[5] | 66,589 |
| Parole | 10,621 |
| **Total Population** | **98,879** |

Source: Department of Correction's Tennessee Felon Population Update, August 2019.

---

[5] For sentenced offenders, Community Corrections programs allow nonviolent felony offenders to participate in community-based alternatives to incarceration. The department contracts with local governments and private agencies to develop services and resources to reduce the chances that the offender will continue criminal behavior.

**Exhibit 1**
**Department of Correction**
**Map of State Correctional Facilities**



**State-Run Facilities**

| Correctional Facility Name | Shortened Facility Name | Correctional Facility Name | Shortened Facility Name |
|---|---|---|---|
| Bledsoe County Correctional Complex | Bledsoe County | Northwest Correctional Complex | Northwest |
| Lois M. DeBerry Special Needs Facility | Lois M. DeBerry | Riverbend Maximum Security Institution | Riverbend |
| Mark Luttrell Transition Center | Mark Luttrell | Tennessee Prison for Women | Prison for Women |
| Morgan County Correctional Complex | Morgan County | Turney Center Industrial Complex | Turney Center |
| Northeast Correctional Complex | Northeast | West Tennessee State Penitentiary | West Tennessee State |

**CoreCivic Facilities**

| Correctional Facility Name | Shortened Facility Name | Correctional Facility Name | Shortened Facility Name |
|---|---|---|---|
| Hardeman County Correctional Facility | Hardeman | Trousdale Turner Correctional Center | Trousdale Turner |
| South Central Correctional Facility | South Central | Whiteville Correctional Facility | Whiteville |

3

The Department of Correction is organized into nine offices, whose division heads report directly to the Commissioner.

The <u>Chief of Staff</u> is responsible for carrying out the Commissioner's strategic vision for the department. He represents the Commissioner on various committees and acts as a liaison with other state departments.

The department's organizational chart is on page 7.

The <u>Office of Administration and General Counsel</u> oversees

- legal services,
- human resources,
- offender administration, and
- policy development.

This office also oversees the department's information systems through its partnership with the Department of Finance and Administration's Strategic Technology Solutions.

<u>Operational Support</u> is responsible for overall support to facilities, community supervision offices, and the central office. This responsibility includes facilities planning and construction; facilities management and maintenance; mission support; and staff development and training. Under the leadership of the Assistant Commissioner, the Tennessee Correction Academy provides pre-service, in-service, and specialized training schools to department staff.

The <u>Office of the Chief Financial Officer (CFO)</u> manages and oversees the department's annual budget and helps department management with budget management, cost benefit analysis, forecasting needs, and securing new funding to support the department's short- and long-term goals. In addition, the CFO is responsible for the department's accounting, procurement, contract administration, payments to local jails to offset costs relating to state inmate housing and care, and food services.

The <u>Office of the Assistant Commissioner of Prisons</u> oversees the operations of the correctional facilities. The Assistant Commissioner is responsible for

- the Local Jails Resources Office,
- statewide correctional facility transportation,
- inmate classification, and
- inmate disciplinary issues and grievances.

Reporting directly to the Assistant Commissioner of Prisons are four Correctional Administrators, who oversee the day-to-day operations of facilities within their respective regions and supervise the facility wardens and four contract monitors at the CoreCivic facilities.

The <u>Community Supervision unit</u> oversees approximately 77,000 offenders within the felony probation and parole operations and community corrections programming. The Assistant Commissioner is responsible for providing an accountability and support structure to help offenders achieve success in the community.

The <u>Office of Rehabilitative Services</u> is a team of professional educators, licensed medical and behavioral health care providers, and administrators who enhance public safety by providing essential, evidence-based services that prepare justice-involved individuals to lead healthy, independent, and successful lives.

The <u>Chief Interdiction Officer</u> is responsible for identifying, intercepting, restricting, and prosecuting people, including department staff, who provide contraband to the department's correctional facilities.

The department's <u>Executive Operations</u> include the following groups:



- The *Office of Investigations and Compliance* is the department's investigative arm. It investigates a wide range of matters that affect inmate safety, such as homicides.
- The *Compliance Section* is responsible for performing internal fiscal audits; annual inspections of correctional facilities and probation and parole districts;[6] program and fiscal reviews; and contract monitoring.
- The *Decision Support: Research and Planning Division* is responsible for the department's reporting functions, including preparing the department's Annual Report, Statistical Abstract, and all other publicly reported data.

Executive Operations also houses the Communications and Public Relations office; the Legislative Liaison; and Customer-Focused Government.

## Other Background Information

<u>American Correctional Association Accreditation</u>

The American Correctional Association (ACA) is a national professional organization and accrediting body for the correctional industry. The ACA sets the standards and practices for

---

[6] The department has 13 districts that serve probation and parole offenders statewide.

correctional facilities to "ensure staff and inmate safety and security, enhance staff morale, improve records maintenance and data management capabilities; assist in protecting the agency against litigation; and improve the function of the facility or agency at all levels." ACA's roles include developing and monitoring ACA standards and developing an accreditation process. As of August 14, 2019, all 14 of the department's state-run and CoreCivic correctional facilities are ACA-accredited.

State's Recidivism Rates

The department uses the federal Bureau of Justice's definition of recidivism, which is defined as counting the criminal acts that result in an individual's rearrest, reconviction, or return to a correctional facility[7] with or without a new sentence for a period of three years. The department's Decision Support: Research and Planning Division calculates annual recidivism rates for inmates housed in Tennessee correctional facilities and jails and posts the rates to openmaps.tn.gov.[8] In May 2018, the department published the 2017 recidivism rates for inmates who were released from custody in 2014. See **Appendix K-3** on page 209 for the most recent recidivism data on OpenMaps.

*Recidivism Calculation Formula*

To calculate recidivism rates, the department extracts from its Tennessee Offender Management Information System (TOMIS) data that shows all inmates released from custody in a given year. The extract also lists

> RECIDIVISM RATE =
>
> INMATES WHO RETURN TO PRISON OR JAIL WITHIN THREE YEARS
> ———————————————————————
> INMATES RELEASED IN A GIVEN BASE YEAR

- which of these inmates returned to custody for reasons such as violating probation or parole conditions or committing new charges with or without a new sentence; and

- whether the inmates returned to custody within one, two, or three years of their release date.

Because the county's courts and jails might not enter inmate-related information timely, the department requests that Strategic Technology Solutions (STS)[9] run new data extracts every quarter to capture any new information. Based on the data, the Research and Planning Division calculates the recidivism rate by applying the rate formula.

Revenues and Expenditures

For information relating to the department's financial information for fiscal years 2018 through 2019, see **Appendix K-2** on page 207.

---

[7] Rearrests, even if charges are dropped, can be included in recidivism rates.
[8] Created under former Governor Bill Haslam's administration, OpenMaps is a web portal that contains interactive data visualizations that showcase key, in-demand metrics from all corners of Tennessee state government.
[9] The Department of Correction has a partnership agreement with STS to provide information technology support and project management services to the department.

**Department of Correction**
Organizational Chart
February 2019



Source: Department of Correction management.

Case 3:15-cv-02093   Document 141-1   Filed 02/01/23   Page 24 of 234 PageID #: 25601

## AUDIT SCOPE

We have audited the Department of Correction for the period October 1, 2017, through July 31, 2019. Our audit scope included a review of internal controls and compliance with laws, regulations, policies, procedures, and provisions of contracts. We conducted site visits at the following correctional facilities:

### CoreCivic Facilities

Hardeman County Correctional Facility
Trousdale Turner Correctional Center
Whiteville Correctional Facility

### State Facilities

Northeast Correctional Complex
Northwest Correctional Complex
Turney Center Industrial Complex

We examined the following areas during the site visits or at the department level:

- department leadership oversight;
- department's annual inspections of correctional facilities;
- public reporting of inmate deaths and other serious incidents;
- inmate sexual abuse and sexual harassment investigations;
- inmate medical and mental health services;
- correctional staffing and department turnover;
- inmate services and support;
- department's community supervision responsibilities;
- COMET implementation;
- public records management; and
- recidivism rates for the department's educational and vocational programs.

Department management is responsible for establishing and maintaining effective internal control and for complying with applicable laws, regulations, policies, procedures, and provisions of contracts and grant agreements.

For our sample design, we used nonstatistical audit sampling, which was the most appropriate and cost-effective method for concluding on our audit objectives. Based on our professional judgment, review of authoritative sampling guidance, and careful consideration of underlying statistical concepts, we believe that nonstatistical sampling provides sufficient appropriate audit evidence to support the conclusions in our report. Although our sample results provide reasonable bases for drawing conclusions, the errors identified in these samples cannot be used to make statistically valid projections to the original populations. We present more detailed information about our methodologies in the individual sections of this report.

Case 3:15-cv-02093   Document 181-5   Filed 02/10/23   Page 25 of 234 PageID #: 25602

We conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## PRIOR AUDIT FINDINGS

### REPORT OF ACTIONS TAKEN ON PRIOR AUDIT FINDINGS

Section 8-4-109(c), *Tennessee Code Annotated,* requires that each state department, agency, or institution report to the Comptroller of the Treasury the action taken to implement the recommendations in the prior audit report. The prior performance audit report was dated November 2017 and contained five findings. The department filed its report with the Comptroller of the Treasury on June 28, 2018. We conducted a follow-up of the prior audit findings as part of the current audit.

### REPEATED AUDIT FINDINGS

The prior audit report contained findings stating that

- two CoreCivic-managed correctional facilities operated with fewer than approved correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and left critical posts unstaffed;

- CoreCivic staffing reports at Trousdale Turner Correctional Center and Hardeman County Correctional Facility contained numerous errors;

- Trousdale Turner Correctional Center management's noncompliance with contractual requirements and department policies relating to inmate services challenged the department's ability to effectively monitor the correctional facility;

- probation and parole officers did not always meet supervision requirements; and

- probation and parole supervisors did not always meet oversight requirements.

The current audit disclosed the following results of our follow-up work.

*Repeated as a Partial Finding*

- CoreCivic staffing reports still contain numerous errors.

*Repeated Condition in a New Finding*

- Although the department implemented tools to improve probation and parole supervisors' performance, the supervisors were still not consistently performing all their required duties; we also found that the department did not track whether District Directors and Correctional Administrators performed their required quarterly case file reviews.

*Repeated as Observations*

- Although department management took steps to address staffing matters at CoreCivic- and state-managed correctional facilities, all of Tennessee's facilities are operating with minimal staff.

- Although CoreCivic corrected the issues involving inmates' access to grievance forms and access to healthcare information at Trousdale Turner Correctional Center, we found these issues at state-managed facilities.

- Although department management initiated corrective action to address the problems with probation and parole officers' supervision of offenders, the parole officers did not meet supervision requirements in one area.

# AUDIT CONCLUSIONS

# DEPARTMENT LEADERSHIP OVERSIGHT

## CHAPTER CONCLUSION

**Finding 1 – The department's leadership failed to provide adequate oversight activities of department and correctional facilities management in several areas relating to inmates, correctional staff, and the community, thereby affecting the department's ability to meet its mission (page 11)**

# DEPARTMENT LEADERSHIP OVERSIGHT

Background

     In order to meet its mission "to operate safe and secure prisons and provide effective community supervision in order to enhance public safety," the Department of Correction is responsible for approximately 98,000 individuals who are either incarcerated in state correctional facilities or under a type of community supervision. For the department's incarcerated population, the department is required to ensure that it provides each inmate under its care safe and secure accommodations and services, such as medical and mental health care, education, and job training, so that the inmates become successful within the correctional environment and in the community upon release.

## Audit Results

**Audit Objective:** Did department leadership provide oversight and establish and implement controls to ensure the central office and the correctional facilities achieved the department's mission through effective and efficient operations and compliance with federal and state law and department policies and procedures?

**Conclusion:** We found that department leadership did not enforce established controls or did not implement controls to ensure the department and correctional facilities operated effectively and efficiently and complied with laws and department policies and procedures. See **Finding 1**.

**Finding 1 – The department's leadership failed to provide adequate oversight activities of department and correctional facilities management in several areas relating to inmates, correctional staff, and the community, thereby affecting the department's ability to meet its mission**

     As a result of our review, we determined that the Department of Correction's leadership failed to provide adequate oversight by establishing, implementing, enforcing key controls governing the department's and the correctional facilities processes. Providing clear oversight and enforcing or establishing needed controls is not only one of management's primary responsibility, but it is key to successfully fulfilling the department's mission to operate and maintain safe and secure prisons; provide effective community supervision; and adequately track and report facility performance and inmate statistics. We identified the following areas of concern.

Department's Annual Inspections of Correctional Facilities

     The department performs annual inspections of its correctional facilities to assess the facilities' operations and compliance with American Correctional Association prison operation standards, department policies and procedures, and contractual agreements. The department's calculation of a facility's inspection compliance score does not place more weight on critical inspection findings over other findings. Without a more transparent process and without a

weighted score methodology, state decision makers cannot effectively assess the severity of issues at a given facility based solely on the compliance score. For more information, see **Finding 2**.

<u>Public Reporting of Inmate Deaths and Other Serious Incidents</u>

During our work related to the department's reporting of inmate deaths and serious incidents (including accidents, injuries, and lockdowns) that occurred in the state's correctional facilities during our audit period, we found multiple instances where correctional staff did not enter death and incident data in the Tennessee Offender Management Information System (TOMIS), the department's official record, as required by department policy. The department uses this data to report important inmate-related safety statistics to the members of the General Assembly, inmates' families, and the community. The deficiencies we noted, beginning with **Finding 3**, question the accuracy and completeness of the department's publicly reported information.

<u>Inmate Sexual Abuse and Sexual Harassment Investigations</u>

According to the department's policy relating to sexual abuse and sexual harassment, the department is to provide a "safe, humane, and appropriately secure environment, free from threat of sexual abuse and sexual harassment for all inmates." Although department management has provided inmates with ways to report allegations of sexual abuse and sexual harassment, it is imperative that correctional investigators in charge of investigating these serious allegations follow department policy relating to logging and documenting the investigative process, as well as properly concluding on the investigation based on the evidence collected. We present additional details in **Finding 9**.

<u>Inmates' Medical and Mental Health Services</u>

Pursuant to Section 41-1-408, *Tennessee Code Annotated*, the department is to provide medical and mental health services to inmates under its care, and it does so by contracting with Centurion of Tennessee, LLC for primary medical services and with Corizon Health for mental health services. For these two contractors, management implemented an informal "value-added credit system" outside the scope of the current vendor contracts; the department gives credits to the vendors for different circumstances and allows the vendors to use the credits to offset assessed liquidated damages resulting from noncompliance with contract requirements. See **Finding 10** and **Finding 11** for more information.

<u>Correctional Staffing and Department Turnover</u>

While CoreCivic and state correctional facilities ensured that staff covered critical posts, both the CoreCivic and state facilities are experiencing difficulties with hiring a sufficient number of correctional officers. In response to the staff shortage, the CoreCivic and state facilities have temporarily closed noncritical posts and required officers to work significant overtime to ensure staff covered critical posts, which places both staff and inmates at risk due to officer fatigue. Overall, we found that all correctional facilities were operating with minimal staff. For more information, see **Observations 6 and 7**.

Furthermore, despite management's stated corrective action in the November 2017 performance audit report, we still found that CoreCivic facilities' monthly staffing reports contained the same errors noted in the prior audit, which means that department management still cannot effectively track whether CoreCivic is meeting its required staffing levels. The details are in **Finding 14**.

<u>Inmate Services and Support</u>

While the department has a policy in place to perform random monthly inmate drug screenings at all correctional facilities, staff at four correctional facilities either did not enter inmate drug screening results in TOMIS or entered inaccurate results; did not perform the minimally required number of drug screens each month; or, for those inmates who tested positive for alcohol and drugs, the facility staff did not hold the inmates' disciplinary hearings timely. For more information, see **Observation 10**.

<u>Department's Community Supervision Responsibilities</u>

The Community Supervision unit ensures that parole and probation officers monitor both types of offenders to ensure that the offenders comply with the conditions of their release so that the public is protected. Parole and probation officers use TOMIS to document monitoring efforts to ensure compliance with supervision requirements. The officers' supervisors are also responsible for ensuring that the officers have appropriately monitored the offenders in compliance with policy. The department's probation and parole supervisors continue to have issues relating to their oversight responsibilities. See **Finding 17** for additional details.

<u>COMET[10] Implementation</u>

The department currently uses a 25-year-old system as its official record of all matters concerning inmates and offenders in its care. Although the department signed a contract with Abilis Solutions, Inc. in February 2016 to develop a new offender management system called COMET, the project is approximately 18 months behind schedule. The department estimates that COMET may go live by December 2020. Additional information can be found in **Observation 13**.

<u>U.S. Government Accountability Office (GAO)</u>

GAO's *Standards for Internal Control in the Federal Government* (Green Book) sets internal control standards for federal entities and serves as best practices for nonfederal entities. The Green Book assigns governing bodies responsibilities for an organization's control environment, including making strategic decisions. In Principle 12, "Implement Control Activities," the Green Book states that "Management should implement internal control through policies." Per paragraphs 12.02 and 12.03,

---

[10] COMET stands for Correctional Offender Management Electronic Tracking.

Case 3:15-cv-02293 Document 141-5 Filed 02/10/23 Page 32 of 234 PageID #: 25609

- Management documents in policies the internal control responsibilities of the organization.
- Management documents in policies for each unit its responsibility for an operational process's objectives and related risks, and control activity design, implementation, and operating effectiveness. Each unit, with guidance from management, determines the policies necessary to operate the process based on the objectives and related risks for the operational process. Each unit also documents policies in the appropriate level of detail to allow management to effectively monitor the control activity.

Furthermore, per paragraph 12.05,

> Management periodically reviews policies, procedures, and related control activities for continued relevance and effectiveness in achieving the entity's objectives or addressing related risks. If there is a significant change in an entity's process, management reviews this process in a timely manner after the change to determine that the control activities are designed and implemented appropriately. Changes may occur in personnel, operational processes, or information technology.

Finally, as presented in Principle 16 of the Green Book, "Perform Monitoring Activities," to ensure that internal controls are properly designed and operating effectively, "Management should establish and operate monitoring activities to monitor the internal control system and evaluate the results."

<u>Management's Annual Risk Assessment Process</u>

> Pursuant to Section 9-18-102, *Tennessee Code Annotated*,

> (a) Each agency of state government and institution of higher education along with each county, municipal, and metropolitan government shall establish and maintain internal controls, which shall provide reasonable assurance that:

>> (1) Obligations and costs are in compliance with applicable law;

>> (2) Funds, property, and other assets are safeguarded against waste, loss, unauthorized use, or misappropriation; and

>> (3) Revenues and expenditures are properly recorded and accounted for to permit the preparation of accurate and reliable financial and statistical reports and to maintain accountability over the assets.

> (b) To document compliance with the requirements set forth in subsection (a), each agency of state government and institution of higher education shall annually perform a management assessment of risk. The internal controls discussed in subsection (a) should be incorporated into this assessment. The objectives of the annual risk assessment are to provide reasonable assurance of the following:

>> (1) Accountability for meeting program objectives;

(2) Promoting operational efficiency and effectiveness;

(3) Improving reliability of financial statements;

(4) Strengthening compliance with laws, regulations, rules, and contracts and grant agreements; and

(5) Reducing the risk of financial or other asset losses due to fraud, waste and abuse.

<u>Effect of Lack of Oversight</u>

The department's leadership must provide strong oversight to guide department and correctional facility management in the administration of their duties and responsibilities. Without such oversight, the leadership may not promptly identify issues and address key concerns and cannot effectively manage the strategic direction of the department.

## **Recommendation**

The Commissioner and top management should perform critical oversight responsibilities to ensure that all levels of department and correctional staff perform their responsibilities in accordance with federal and state law and department policies and procedures, and within a control environment as outlined by the Green Book. This may include revising current policies; training and re-training staff on the department's policies; and performing additional monitoring to ensure staff are following laws and policies.

Top management should also assess all risks in the department's documented risk assessment, including the risks noted in this report. In addition, top management should adequately document and approve the risk assessment and the mitigating controls. They should implement effective controls to ensure compliance with policies, procedures, and other instructions; assign employees to be responsible for ongoing monitoring of the risks and any mitigating controls; and take action if deficiencies occur.

## **Management's Comment**

Concur in part.

The Tennessee Department of Correction (TDOC) has demonstrated an unwavering commitment to continual improvements in the process of administering prisons and supervising offenders in the community.

Well established and highly developed internal controls, policies, and processes are in place to protect the public and ensure the safe operations of prisons and the delivery of effective community supervision in Tennessee.

TDOC has a long history of emphasizing internal controls, and they are integrated into our operational processes on a daily basis as evidenced by their inclusion in *every* policy written and *every* process implemented.

TDOC is a nationally recognized correctional industry leader having been accredited for more than thirty years. The agency voluntarily operates under the American Correctional Association (ACA), a private, non-profit accrediting body for the corrections industry that was founded in 1870 and has a significant place in the history of prison reform in the United States.

TDOC was the first state system to receive the prestigious ACA Golden Eagle Award, which represents the highest commitment to excellence in correctional operations and dedication to enhancing public safety and the well-being of incarcerated individuals. The award is based upon achieving accreditation in every area of operation. Currently every facility, all of community supervision, the Tennessee Training Academy, and central office headquarters have all achieved and maintained ACA accreditation.

In addition to ACA accreditation, TDOC maintains Prison Rape Elimination Act (PREA) certification at all of our facilities. Each facility is reviewed and evaluated by an independent Department of Justice (DOJ) Certified PREA Auditor. The DOJ on-site audits occur at each facility and include review of operations, conducting interviews with staff and inmates, observing practices, examining policies, and evaluating compliance documentation to determine if the facility should be issued PREA certification.

As a result of the Department of Justice certified PREA auditing process, TDOC has been recognized by ACA as one of only six state correctional systems that have earned the Lucy Webb Hayes Award which signifies that TDOC has achieved both department-wide ACA accreditation and DOJ PREA certification.

While our policies, practices, and processes have been rigorously evaluated by an outside independent correctional accrediting organization and found to meet or exceed all nationally recognized standards of practice, it is nonetheless important to give thoughtful consideration and provide swift action in the areas identified by the Comptroller's Office performance report.

The Comptroller's Office auditors have provided, and we acknowledge, that opportunities exist to improve and further enhance performance in ways that are in keeping with the United States Government Accountability Office's Green Book published in 2016.

Historically, correctional administration is by its very nature *compliance to expectation* business. As such, TDOC already has an established control environment as defined by the five principals in the Green Book.



TDOC holds ethics as the critical foundation to correctional pursuits and demonstrates its commitment to ethics through our Honor the Oath Program. The Oath requires all employees to adhere to a code of conduct that includes following policies and exhibiting due diligence in the performance of duties or face disciplinary processes as well as prosecution should the infraction rise to that level.

Under the guidance of the Commissioner and executive leadership, oversight of internal controls is assigned to the Compliance Division. The Compliance Division is comprised primarily of individuals with more than ten years of service to the State of Tennessee, and each represent a significant depth of knowledge regarding our processes to include Community Supervision, Community Corrections, Fiscal, and PREA and Institutional Compliance.

The Compliance Division is tasked with a variety of functions that contribute to the internal controls of the department to include conducting annual inspections of all of our facilities, correctional academy, and community supervision. During these annual inspections, a thorough review of all facility and district operations is conducted in accordance with the hierarchical organized structure of responsibility and associated policies.

Internal audits of all of TDOC operations are also conducted annually to include all ten TDOC facilities, the Tennessee Correctional Academy, and the central office. This includes reviewing employment hiring, training, and retention. These annual inspections are heavily relied upon because they are a good report card in determining the current status of internal controls throughout the department.

The Contract Monitoring Division oversees the internal controls for the privately managed facilities with an on-site monitor at each facility. Additional oversight is provided quarterly in the contract areas of food service, health services, and behavioral health services by subject matter

Case 3:15-cv-02073   Document 481-5   Filed 02/10/23   Page 36 of 234   PageID #: 25613

experts employed by TDOC's central office. Also, fiscal and program reviews are conducted of all Community Corrections contracts.

All compliance findings require a Plan of Corrective Action (POCA) from the area or division where the compliance issue was found. Follow-up reviews are conducted to determine the effectiveness of the POCA. All results are reported to Executive Staff through written reports as well as a presentation either during an executive briefing or during the Annual Commissioner's Tour.

Accountability for findings is primarily administered by facility or divisional staff where the noncompliance occurred, but the Commissioner and Executive Staff are engaged in the process. Although TDOC currently operates in a control environment as defined by the Green Book, there are four additional components of internal controls.



In order to accomplish the component of risk assessment, a comprehensive risk assessment is conducted annually of our operations in accordance with the Financial Integrity Act (T.C.A. 9-18-102). In 2018 TDOC's Enterprise Risk Management (ERM) process identified 248 departmental risks in 31 different service areas. The departmental process takes approximately five months to complete and requires all managers to evaluate their area of responsibility to determine areas of risk.



Each Warden, District Director, and Divisional Lead is tasked with reviewing their area to determine risks as well as a control to minimize each risk. The identification of 248 risks in 2018 required 248 controls to be implemented or maintained. Once identified, each division submits their assessment to the Executive Leadership to include Deputy and Assistant Commissioners for review.

A comprehensive submission is made by each division to the Director of Compliance and included in the report that details the risk and control implemented to include the potential impact as well as the likelihood of occurrence. The Compliance Division evaluates and compiles the submission for the Commissioner to review and approve.

Once approved, the required forms are submitted to F&A [the Department of Finance and Administration] and the Comptroller by December 31 of each year. The ERM process ensures that the department has accountability for meeting objectives; promotes operational efficiency and effectiveness; improves the reliability of financial statements; strengthens compliance with laws regulations, rules, contracts and grant agreements; as well as reduces the risk of financial or other asset loss due to fraud, waste and abuse.

The process helps to guide internal control activities in the department and helps to focus internal audit and compliance activities. Control activities are built into policies and procedures and evaluated for effectiveness at least annually. Evaluation of progress towards achievement of objectives is a continuous process and multiple layers exist in the review of information.

Information is communicated as accurately and as clearly as possible to internal and external stakeholders. When compliance issues are noted by the internal control process, monitoring of the deficiency is established, plans are made for how the issue will be resolved, and a subsequent evaluation of the effectiveness of the corrective action is performed. All deficiencies noted, including those identified in this report, are monitored by TDOC to ensure resolution.

In summary, TDOC has an extensive internal control process in place that includes the essential components identified by the United States Government Accountability Office's Green

Case 3:16-cv-02267  Document 141-5  Filed 02/01/23  Page 38 of 234 PageID #: 25615

Book. Nonetheless formal leadership training for TDOC management in Green Book implementation will be provided.

Going forward TDOC is committed to further strengthening existing internal controls and oversight processes by taking the decisive step of hiring a senior executive official who will be responsible for inspecting conformance to standards and contract administration and will report directly to the Commissioner.

# Department's Annual Inspections of Correctional Facilities

## Chapter Conclusion

**Finding 2 – The department's overall annual compliance percentage scores do not provide a clear measure of correctional facility performance (page 24)**

## DEPARTMENT'S ANNUAL INSPECTIONS OF CORRECTIONAL FACILITIES

General Background

The American Correctional Association (ACA) publishes correctional operational standards designed to enhance correctional practices for the benefit of inmates, staff, administrators, and the public. The ACA serves as the primary accrediting association for correctional facilities in Tennessee and the nation. ACA requires accredited facilities to be inspected every three years by the ACA and to perform annual departmental self-reviews. This requirement includes both state-run and CoreCivic facilities in Tennessee. Teams of experienced Department of Correction employees, including central office employees and correctional facilities subject matter experts, evaluate compliance levels at each facility.[11] The department refers to these self-reviews of compliance as annual inspections.

Inspection Tools



The department's Compliance Division develops the annual inspection tools, which incorporate ACA's operational standards, department policies and procedures, and contractual agreements. The Compliance Division ensures that the inspection tool includes, but is not limited to, compliance categories for security; safety and physical plant; facility administration; inmate education and jobs; medical and behavioral health; and food services. The annual inspection tools identify each compliance item subject to inspection and classify each compliance item as either "critical" or "other." Management updates the inspection tools annually.

The department has a separate inspection tool designed specifically for inspections at the CoreCivic-managed facilities. This inspection tool is tailored to the language in each facility's contract. According to department management, they developed a different tool for CoreCivic inspections to avoid duplicating work that the department's CoreCivic contract monitors perform monthly.[12]

During the annual inspections, the department's team of inspectors use observations, discussions, and sampling to evaluate the appearance, physical condition, and overall operation of each correctional facility to determine whether the facility has achieved compliance with each of the compliance items evaluated. According to department policy, the inspectors determine that an inspection item on the inspection tool is compliant if the facility met the requirement at least 95% of the time during the inspection period.

Upon completing the inspection, inspectors finalize the report, which includes information on a facility's totals for compliance and noncompliance. The department classifies findings as either "critical" or "other" in its annual inspection reports. The department defines a critical inspection finding as

---

[11] According to the department, CoreCivic personnel do occasionally participate as inspectors of department-managed facilities, but only under the supervision of department personnel, and they do not serve as subject matter experts.
[12] Contract monitors are department employees who are assigned to monitor contract compliance at the CoreCivic-managed facilities monthly.

> *mission critical to the safety and security of the operational unit, general public, and inmates/offenders.*

Examples of critical findings that the department identified during the fiscal year 2019 annual inspection cycle include, but are not limited to, the following:

- security staff did not follow tier management[13] protocols, which are designed to help staff supervise inmates or perform or document counts of inmates, in accordance with policy;
- staff did not properly inventory keys, tools, equipment, kitchen utensils, or sharp medical instruments;
- facility management did not ensure security gates, sprinkler systems, heating and cooling systems, and plumbing systems operated properly; and
- correctional staff did not perform mental health monitoring checks timely.

Examples of other findings that the department identified during the fiscal year 2019 annual inspection cycle include, but are not limited to, the following:

- staff did not check and record dishwasher temperatures;
- kitchen and laundry water heaters leaked;
- showers were not in good and clean operating order; and
- staff did not properly document medication administration records, filed items in the wrong sections of inmate medical files, and did not sign laboratory reports.

Upon receiving inspection findings, correctional facility administrators must develop corrective action plans for all areas of noncompliance; critical findings require expedited corrective action plans.[14] Inspectors also perform a follow-up review for all critical inspection findings within 30 days of the annual inspection to determine if critical findings were resolved. The inspectors also perform follow-up inspections 90 days after the initial inspection to determine whether correctional facility administrators effectively implemented corrective actions for all other findings; however, the inspectors do not score the follow-up inspections.

Management internally circulate the results of the facilities' annual inspection reports, which includes the inspector's calculation of the facility's overall compliance percentage score. According to management, the department also provides the results to legislators upon request. Based on our review of past legislative hearings, we found that department leadership quotes overall compliance percentages during legislative hearings as indicators of correctional facility

---

[13] Tier management is a supervision method that allows one half—or tier—of a medium or higher custody level group of inmates out of their cells into the pod or unit for leisure activities.

[14] Department Policy 103.07, "Annual Inspection and Compliance Reviews for Facilities," requires the facilities to develop corrective actions plans for critical inspection findings within seven working days and to document the plan on the Critical Response Form.

performance.  In September 2019, the department executed a new contract for the operation of the Hardeman County Correctional Facility, which included language describing that the facility's overall compliance scores were a key performance indicator to measure safety and security of the correctional facility.  The contract further provides that if the facility scores 98% or above, the department will apply a credit of $113,481.77 toward any outstanding liquidated damages.  In other words, the correctional facility has an incentive to achieve a high overall compliance score to gain monetary credit to apply against any future liquidated damages assessed for noncompliance or unmet performance measures.

For the following fiscal years, the inspectors used the applicable tool and reviewed a total number of compliance items during the annual inspections:

- fiscal year 2017 – 645 items reviewed for both department and CoreCivic facilities;
- fiscal year 2018 – 685[15] items reviewed for department facilities and 578 for CoreCivic facilities; and
- fiscal year 2019 – 695[16] items reviewed for department facilities and 595 for CoreCivic facilities.

<u>Inspection Scoring</u>

To determine the overall compliance percentage, the department uses the following formula:

$$\frac{Compliant\ Items}{Compliant\ Items + Noncompliant\ Items} = Overall\ Compliance\ Percentage$$

For example, inspectors reviewed **596** items at Northwest Correctional Complex in 2019 and found that the facility was compliant on **557** items and noncompliant on **39**.  The inspector calculated the overall compliance score based on the above formula: **557** divided by **596** results in an overall score of **93.46%**.  In the example, this calculated score alone does not reflect that of the **39** areas of noncompliance, **11** of the **39** noncompliant items were classified as critical findings.  **Figure 1** summarizes the annual inspection results and details of the critical inspection findings for fiscal year 2019 at Northwest Correctional Complex.

**Figure 1**
**Example of Northwest Inspection Results From 2019 Compliance Review[17]**

| Critical | Finding | Total Findings | Overall Compliance Percentage |
|---|---|---|---|
| 11 | 28 | 39 | 93.46% |

---

[15] For fiscal year 2018, the department reviewed 613 items at Mark Luttrell Transition Center.
[16] For fiscal year 2019, the department reviewed 680 items at Mark Luttrell Transition Center.
[17] We obtained this exhibit from Northwest's 2019 Compliance Review.  The "critical" column represents critical findings; the "finding" column represents other findings.

**Audit Objective:**  Do the department's annual inspections provide clear and useful results (overall compliance percentage scores) for decision makers and management?

**Conclusion:**  Based on our observation and review of the department's annual inspection process and inspection results, the department's inspections did identify noncompliance that required correctional facilities to submit corrective action plans and take action to resolve noncompliance; however, we found that the department's calculation of an overall compliance score is potentially misleading.  Specifically, we found that the methodology to calculate the score does not consider the severity of the noncompliance by differentiating between critical findings of noncompliance and other findings.  See **Finding 2**.

**Finding 2 – The department's overall annual compliance percentage scores do not provide a clear measure of correctional facility performance**

To achieve our objective, we observed the annual inspections performed at Whiteville Correctional Facility (Whiteville) and Northwest Correctional Complex (Northwest) to obtain an understanding of the inspection process, and we examined the Department of Correction's inspection tools.  We also reviewed the department's annual inspection reports for all correctional facilities (state-run and CoreCivic-managed) from fiscal years 2017, 2018, and 2019, and analyzed the scoring process.

> See the full methodology in Appendix A-1 on page 29.

Based on our observations of the annual inspection process at Whiteville and Northwest and on our review of the department's annual inspection policies, inspection tools, and inspection reports, we found that the Compliance Division's calculation of compliance percentages emphasizes the number of compliant items instead of the severity of critical findings.  A compliance score in the 90s could be construed as an indicator of high performance, when in reality, the facility may have multiple findings that are mission critical to the safety and security of the operational unit, general public, and inmates.  **Table 2** shows the overall compliance percentages for each correctional facility for fiscal years 2017, 2018, and 2019.

**Table 2**
**Overall Compliance Percentages by State and CoreCivic Facility**
**Fiscal Years 2017 Through 2019**

| Correctional Facility | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|
| Bledsoe County Correctional Complex | 99.70% | 99.69% | 99.08% |
| Lois M. DeBerry Special Needs Facility | 97.51% | 95.10% | 94.09% |
| Mark Luttrell Transition Center | N/A* | 96.20% | 97.99% |
| Morgan County Correctional Complex | 99.40% | 98.48% | 99.53% |
| Northeast Correctional Complex | 99.50% | 99.60% | 99.32% |
| Northwest Correctional Complex | 97.80% | 95.98% | 93.46% |
| Riverbend Maximum Security Institution | 99.50% | 97.12% | 97.76% |

| Correctional Facility | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|
| Tennessee Prison for Women | 95.00% | 95.20% | 96.50% |
| Turney Center Industrial Complex | 96.00% | 98.70% | 95.95% |
| West Tennessee State Penitentiary | 97.20% | 98.08% | 96.57% |
| Hardeman County Correctional Facility† | 97.50% | 95.07% | 98.06% |
| South Central Correctional Facility† | 97.00% | 95.40% | 92.10% |
| Trousdale Turner Correctional Center† | 85.00% | 96.90% | 94.96% |
| Whiteville Correctional Facility† | 95.80% | 94.57% | 94.28% |

*Mark Luttrell Transition Center was not inspected in fiscal year 2017 because the facility had just opened.
†Operated by CoreCivic.
Source: Auditors compiled this table from the department's annual inspection reports.

      **Table 3** shows the actual number of findings by type for fiscal years 2017, 2018, and 2019; **Table 4** shows the number of findings by type and the compliance scores for all state and CoreCivic facilities for fiscal year 2019.

**Table 3**
**Inspection Findings by Type and by Facility**
**Fiscal Years 2017 Through 2019**

| Correctional Facility | FY 2017 | | FY 2018 | | FY 2019 | |
|---|---|---|---|---|---|---|
| | Critical Findings | Other Findings | Critical Findings | Other Findings | Critical Findings | Other Findings |
| Bledsoe County | 0 | 2 | 0 | 2 | 1 | 5 |
| Lois M. DeBerry | 4 | 12 | 6 | 24 | 10 | 24 |
| Mark Luttrell | N/A* | N/A* | 6 | 14 | 2 | 9 |
| Morgan County | 0 | 3 | 1 | 8 | 1 | 2 |
| Northeast | 0 | 3 | 0 | 3 | 4 | 0 |
| Northwest | 0 | 14 | 5 | 20 | 11 | 28 |
| Riverbend | 0 | 4 | 3 | 14 | 6 | 8 |
| Prison for Women | 2 | 23 | 5 | 24 | 5 | 17 |
| Turney Center | 0 | 10 | 4 | 4 | 10 | 14 |
| West Tennessee State | 0 | 15 | 1 | 12 | 4 | 18 |
| Hardeman County† | 0 | 15 | 7 | 15 | 3 | 7 |
| South Central† | 0 | 20 | 2 | 23 | 15 | 28 |
| Trousdale Turner† | 4 | 62 | 1 | 14 | 7 | 19 |
| Whiteville† | 0 | 21 | 9 | 17 | 7 | 22 |

*Mark Luttrell Transition Center was not inspected in fiscal year 2017 because it had just opened.
†Operated by CoreCivic.
Source: Auditors compiled this table from the department's annual inspection reports.

**Table 4**
**Fiscal Year 2019 Inspection Results – Findings and Scores Combined**
**State and CoreCivic Facilities**

| Correctional Facility | Total Findings | Other Findings | Critical Findings | Overall Score |
|---|---|---|---|---|
| **State Facilities** | | | | |
| Morgan County | **3** | 2 | **1** | 99.53% |
| Northeast | **4** | 0 | **4** | 99.32% |
| Bledsoe County | **6** | 5 | **1** | 99.08% |
| Mark Luttrell | **11** | 9 | **2** | 97.99% |
| Riverbend | **14** | 8 | **6** | 97.76% |
| West Tennessee State | **22** | 18 | **4** | 96.57% |
| Prison for Women | **22** | 17 | **5** | 96.50% |
| Turney Center | **24** | 14 | **10** | 95.95% |
| Lois M. DeBerry | **34** | 24 | **10** | 94.09% |
| Northwest | **39** | 28 | **11** | 93.46% |
| **CoreCivic** | | | | |
| Hardeman | **10** | 7 | **3** | 98.06% |
| Trousdale Turner | **26** | 19 | **7** | 94.96% |
| Whiteville | **29** | 22 | **7** | 94.28% |
| South Central | **43** | 28 | **15** | 92.10% |

The U.S. Government Accountability Office's *Standards for Internal Control in the Federal Government* (Green Book) sets internal control standards for federal entities and serves as best practices for nonfederal entities. The Green Book assigns governing bodies responsibilities for an organization's control environment, including making strategic decisions. In Principle 13, "Use Quality Information," the Green Book states that "Management should use quality information to achieve the entity's objectives." Per Paragraph 13.05,

> Management processes the obtained data into quality information that supports the internal control system. This involves processing data into information and then evaluating the processed information so that it is quality information. Quality information meets the identified information requirements when relevant data from reliable sources are used. Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. Management considers these characteristics as well as the information processing objectives in evaluating processed information and makes revisions when necessary so that the information is quality information.

In Principle 15, "Communicate Externally," the Green Book states that "Management should externally communicate the necessary quality information to achieve the entity's objectives." Per Paragraph 15.03,

Management communicates quality information externally through reporting lines so that external parties can help the entity achieve its objectives and address related risks. Management includes in these communications information relating to the entity's events and activities that impact the internal control system.

Based on our review of legislative hearings and discussions with management and inspection staff, we found that department leadership quotes overall compliance scores when testifying about correctional facilities' performance before key officials. We found, however, that the department's methodology to calculate the overall compliance score

- does not adequately capture the severity of noncompliance ("critical" versus "other" findings); and
- is skewed given the high number of items evaluated and deemed compliant, which is far greater than the number of critical items reviewed.

The department's new contract with CoreCivic for the Hardeman County Correctional Facility includes a performance measure tied to the facility's annual inspection score that allows CoreCivic to earn a value-added credit. Therefore, it is important that the department's calculation of the overall compliance percentages properly and clearly reflects the findings that are mission critical to the safety and security of the operational unit, general public, and inmates, thereby providing the public with an accurate picture of a correctional facility's performance.

## Recommendation

The Commissioner should create a weighted scoring methodology for annual inspection findings that emphasizes critical findings over other findings. Alternatively, the Commissioner could drop the overall compliance percentages and focus on evaluating and reporting the nature of the findings, with an appropriate focus on critical findings that require immediate action.

## Management's Comment

Concur.

The agency's extensive annual inspection process currently utilizes 27 inspection instruments to review 713 items. The 713 items contain a total of 196 items that are labeled critical for TDOC institutions. There are 637 items for CoreCivic institutions with 144 items that are labeled critical.

TDOC welcomes recommendations for additional ways to improve our internal assessment and control process, and the two alternatives suggested by this audit have been considered: a weighted scoring system and a separate score system.

In constructing a weighted scoring system, the scoring should allow as much credit for those items found compliant as would be deducted for the same items found to be noncompliant. Also the value placed on critical items should be more than the value placed on noncritical items.

Using a five-point value for critical items and a one-point value for noncritical items is an example of a weighted scoring system that places more emphasis on critical than noncritical items.

Using this weighted scoring system, each TDOC facility has the opportunity to earn a maximum of 1,497 points (196 critical items x 5 + 517 noncritical items) and each CoreCivic facility has the opportunity to earn 1213 points (144 critical items x 5 + 493 noncritical items). Not all items apply to every institution, so the institution's possible points would be adjusted accordingly as this varies from institution to institution. Here are the scores applying this method for the current audit cycle.

| Facility[18] | Original Percentage | Weighted Percentage |
|---|---|---|
| **NECX** | 94.53% | 93.57% |
| **DNSF** | 93.72% | 94.93% |
| **WTSP/WTRC** | 93.25% | 94.98% |
| **TCIX** | 95.55% | 95.73% |
| **TTCC** | 86.00% | 87.28% |

Alternatively, the unweighted scores were calculated for each category, critical and noncritical item, and the results are shown below.

| Facility | Old Method Score | CRITICAL Finding Score | NONCRITICAL Finding Score |
|---|---|---|---|
| **NECX** | 94.53% | 92.70% | 95.21% |
| **DSNF** | 93.57% | 96.13% | 92.56% |
| **WTSP/WTRC** | 93.25% | 96.59% | 92.02% |
| **TCIX** | 95.55% | 95.90% | 95.43% |
| **TTCC** | 86.00% | 88.70% | 85.21% |

While only modest differences exist between the old method of scoring and either of the recommended scoring systems, both recommended scoring systems will be used going forward to ensure the highest degree of specificity and clarity in reporting critical and noncritical item scores.

---

[18] The facility abbreviations stand for
- NECX – Northeast Correctional Complex;
- DSNF – Lois M. DeBerry Special Needs Facility;
- WTSP/WTRC – West Tennessee State Penitentiary/Women's Therapeutic Residential Center;
- TCIX – Turney Center Industrial Complex; and
- TTCC – Trousdale Turner Correctional Center.

# Appendix A
## Department's Annual Inspections of Correctional Facilities

### Appendix A-1
### Methodologies to Achieve Objective

To achieve our objective, we interviewed the department's Director of Compliance, reviewed the department's policy regarding annual inspections, and observed the annual inspections performed at Whiteville Correctional Facility and Northwest Correctional Complex to obtain an understanding of the inspection process. We obtained and reviewed the department's inspection tools, we reviewed the American Correctional Association (ACA) standards, and we interviewed an ACA accreditation specialist to determine the ACA's expectations relating to the inspection process. We also reviewed the department's annual inspection reports from fiscal years 2017, 2018, and 2019 and analyzed the scoring process.

# PUBLIC REPORTING OF INMATE DEATHS AND OTHER SERIOUS INCIDENTS

## CHAPTER CONCLUSIONS

**Finding 3 – The department's ability to provide accurate and complete information relating to deaths and other serious incidents is problematic (page 40)**

**Finding 4 – The department did not accurately record inmates' causes of death in the Tennessee Offender Management Information System, which impacted the accuracy of the death information in the Statistical Abstract (page 43)**

**Finding 5 – Department management did not ensure state and CoreCivic facility staff followed incident reporting policies, entered incident information accurately into TOMIS, and maintained supporting documentation for incidents as required (page 46)**

**Finding 6 – The department did not ensure that state and CoreCivic correctional facility and health services staff entered all serious accidents, injuries, and illnesses in TOMIS in accordance with department policy (page 50)**

Observation 1 – Department policy does not formally define partial or total institutional lockdowns; therefore, correctional facility staff may not report them consistently in TOMIS (page 54)

**Finding 7 – The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions did not implement effective internal controls in two areas, increasing the risk of errors or data loss (page 56)**

Observation 2 – The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions did not provide adequate internal controls in two areas; however, the areas noted do not pose a critical risk to the state (page 56)

**Finding 8 – The department published inaccurate and incomplete inmate incident data in its fiscal year 2018 Statistical Abstract (page 57)**

## PUBLIC REPORTING OF INMATE DEATHS AND OTHER SERIOUS INCIDENTS

General Background



The Department of Correction uses the Tennessee Offender Management Information System (TOMIS) to track information on all aspects of an inmate's incarceration from initial intake through release. One important function of TOMIS is to track significant events, or incidents, that occur within correctional facilities and concern the safety and security of the facility, community, staff, and inmates. The department requires security staff at correctional facilities to enter all incidents into TOMIS and to perform two levels of review to ensure accuracy:

- first by the shift captain, and

- second by the warden or his/her designee.

If either party identifies any reporting errors, the warden/designee must put in a request to the department's central office information systems support group to modify or delete the incident.

Department management uses TOMIS to collect incident information to identify safety and security concerns at correctional facilities, evaluate current practices, identify needs for future training, and develop corrective action plans. Each October, the department's Decision Support: Research and Planning Division publishes a Statistical Abstract, which includes a summary of incidents correctional facility staff have entered into TOMIS during the previous fiscal year. The department also reports certain types of incidents, like inmate deaths, to the federal government annually. Because the public and key government decision makers use this information to draw conclusions about how correctional facilities are operating, it is vital that management ensure the incident data in the abstract is valid and reliable. We focused our audit work on the internal controls over data collection and reporting of serious incidents, including inmate deaths; accidents and injuries; and facility lockdowns.

General Incident Classification and Reporting

Pursuant to the department's Policy 103.02, "Incident Reporting," correctional incidents are significant events that occur within correctional facilities and are defined within one of three classes: A, B, or C. Types of incidents include, but are not limited to,

- inmates in possession of weapons;

- inmate assaults on staff or other inmates;

- correctional officers' use of force to restrain inmates, such as pepper spray, handcuffs and leg irons, medical restraints (arm and leg restraints to protect from self-harm), deadly weapons, and bean bag rounds;[19]

- deaths;

- discovery of contraband;

- injuries;

- lockdowns; and

- inmate defiance.

*Department Policies Governing Incidents*

When incidents occur in a correctional facility, correctional staff at both state and CoreCivic facilities are required to follow several department policies, including reporting to the department's Central Communication Center (CCC), which is a unit within the department's central office that is responsible for receiving and disseminating critical incident information. In addition, correctional staff may have to initiate disciplinary action against the inmate(s)

> **Types of Incident Classifications**
>
> - **Class A** incidents involve life-threatening matters and breaches of security that are likely to cause serious operational problems, imminent threat to the control and order of the correctional facility, and/or risk to the community. Examples include escapes and attempted escapes, deaths, assaults, hostage situations, total institutional lockdowns, rapes, certain uses of force, and various weapons.
>
> - **Class B** incidents are less serious incidents involving injuries to staff and/or inmates that cause the disruption of the normal facility operation or that pose a possible risk to the health or general safety of the general public. Examples include bomb threats, drug confiscation, illnesses, partial institutional lockdowns, natural disasters, tobacco possession, and cell phone possession.
>
> - **Class C** incidents are the least serious; they pose no threat to the local community or to the facility's safe and secure operation. Examples include defiance, positive drug screens, fighting, possession of intoxicants such as alcohol, sexual harassment and misconduct, and abuse of telephone privileges.
>
> Source: Tennessee Department of Correction Policy 103.02.

involved and may have to use force in response to certain events. See **Appendix B-1** on page 60 for a list of the department's policies governing serious incidents.

CoreCivic facilities follow the department's policies, but CoreCivic staff also use two additional forms, the 5-1a Incident Report and the 5-1c Incident Statement, to record first-hand accounts of incidents and to summarize all events surrounding an incident. CoreCivic staff may also record first-hand accounts of incidents using departmental forms, such as the witness statements found in the Use of Force packets and the disciplinary forms that record disciplinary actions taken against an inmate as the result of an incident.

The department does not consider CoreCivic's 5-1a and 5-1c forms part of its official record. Staff at the state facilities do not use a standard form to record initial incidents, so the first-

---

[19] Bean bag rounds are small fabric pillows filled with lead that an officer fires from a shotgun to briefly immobilize an inmate without causing long-term injury.

hand accounts of incidents consist of documents from the Use of Force packets if the incident involved a use of force.

<u>Inmate Death, Accident, and Injury Reporting by Facility Health Services Staff</u>

Because accidents, injuries, illnesses, and deaths occur in correctional facilities, the department has established policies and procedures that instruct correctional facility health services staff on the process to provide and document immediate medical attention given to inmates, employees, and visitors who sustain injuries or suffer medical emergencies at the facilities, as well as procedures to follow when a death occurs at a correctional facility.

The department enacted Policy 113.53, "Accident/Injury Reporting," to establish accident and injury reporting procedures and to facilitate the monitoring of accidents and injuries for quality improvement and risk management purposes.

This policy defines two kinds of injuries:

- **injuries of greater degree or severity** – a wound or other damage to the body that requires intervention beyond first aid (such as a deep laceration, fracture, or concussion), especially if the inmate or staff must be taken to an off-site health services provider; and

- **minor self-limiting injuries** – a wound or other damage to the body that will heal on its own or can be treated with first aid (such as a bruise, abrasion, bump, or laceration that does not require stitches).

Both departmental and CoreCivic health services staff are required to document all injuries with a greater degree of severity, occupational injuries, injuries associated with institutional violence, and deaths that occur within the facilities on a paper Accident/Incident/Traumatic Injury Report and then key the information into the department's offender management system, Tennessee Offender Management Information System (TOMIS), under the Accidents screen.[20] Staff document minor self-limiting injuries on progress notes[21] in the inmates medical file; these are not required to be documented in TOMIS.

The Accident/Incident/Traumatic Injury Reports allow facility health services staff to document important information, such as

> ➤ the location, date, and time of the accident, injury, or death;

> ➤ the type of injury or incident (work-related, sports, violence, use of force, or other);

> ➤ the weapon, property, equipment, or machinery involved;

> ➤ patient and witness statements of the event;

---

[20] TOMIS has multiple screens where users can input data. The screens that deal with health data, like the Accidents screen, are used by health services staff only.
[21] Health services staff use progress notes to document their interactions with inmates, observations of medical conditions, and treatment provided. These forms go in the inmate's health file and are not in TOMIS.

> the patient assessment and plan of treatment (also called SOAP)[22] and/or the referral to an outside hospital;

> the date and time of treatment; and

> whether the inmate died.

In most cases, if health services staff make an entry in TOMIS on the Accidents screen for a serious injury, inmate hospitalization, work-related injury, injury associated with violence, or death, the facility's security staff should enter a corresponding entry on a separate TOMIS Incidents screen. The Accidents screen contains the medical assessments of the injury or a description of the circumstances of death, and the Incidents screen contains the narrative of the incident (such as an assault, fight, pending investigation, work-related injury, inmate hospitalization, or manner of death) that corresponds to the injury and lists the parties involved.

While the department includes the information for **injuries of greater degree or severity** in its annual Statistical Abstract, management extracts this information from the TOMIS Incidents screen, which correctional officers enter data for, rather than from the Accidents screens used by facility health services staff.

*Additional Procedures for Inmate Deaths*

In addition to the **injuries of greater degree or severity** reporting requirements (for both facility health services and security staff), in the event of an inmate's death, the correctional facility security staff enter the death as an incident in TOMIS and select a cause of death based on the death incident type. Furthermore, correctional facility health services and department central office staff are required to follow additional policies involving inmate deaths. See **Appendix B-1** on page 60 for detailed descriptions of each policy.

TOMIS Inmate Death Incident Type

- Accident
- Execution - electric chair
- Execution - lethal injection
- Homicide
- Natural
- Suicide

Source: Tennessee Department of Correction Policy 103.02.

The facility health administrator places the Accident/Incident/Traumatic Injury Report (if applicable), the Problem Oriented Progress Report,[23] the Mortality and Morbidity Summary Report, and the original inmate death certificate in the inmate's health record. For documented Accident/Incident/Traumatic Injury Reports, health services staff also record the inmate's death on the TOMIS Accidents screen to document the inmate's death. The health services staff should

---

[22] SOAP is an acronym medical staff use to document a patient's medical assessments, and, according to department policy, this assessment is confidential. SOAP stands for
- Subjective – patient-reported complaints, history, and symptoms;
- Objective – exam and diagnostic tests;
- Assessment – diagnostic impression, rule-outs; and
- Plan – treatment plan, interventions, and follow-up.

[23] Problem Oriented Progress Reports are documents that medical personnel use to track an inmate's medical condition. They are a record of medical problems.

enter information contained in the Accident/Incident/Traumatic Injury Report that documents how the inmate was found; the treatment provided by the facility medical staff; and whether the inmate was transported to a local emergency room, hospital, or county medical examiner or coroner. The death certificate documents the medical examiner's official cause of death.

The department's Mortality and Morbidity Review Committee reviews all data related to an inmate's death and illness for quality assurance purposes. The committee also identifies risk factors related to inmate morbidity and mortality and recommends and implements strategies to reduce risk factors, such as disease management, and improve the health of the inmate. The committee members include the department's Chief Medical Director, the department's Associate Medical Director, Centurion and Corizon's[24] Chief Medical Officer/Medical Directors, and the facility's health services administrators. The Death in Custody Coordinator reports inmate death statistics to the U.S. Department of Justice's Bureau of Justice Statistics for publication.

The department's Chief Medical Officer stated that department policy requires designated health services staff at facilities (both CoreCivic and state-managed) to enter death information into the Online Sentinel Event Log (OSEL)[25] within six hours of the medical event. This web-based log is separate from TOMIS because it contains confidential health information.

When security staff enter inmate death information into TOMIS, the system limits the available death incident codes. Staff can only enter an inmate's death as Natural, Accident, Suicide, or Homicide (excluding the codes for an execution).[26] Because security staff must report incidents into TOMIS within eight hours of the event, staff initially enter the cause and time of death based on their initial observation. When the Death in Custody Coordinator sends the inmate's certified death certificate to the correctional facility, she sends it to health services staff for filing in the inmate's medical record. The department's Chief Medical Officer stated that if the official cause of death is different than what the security staff originally entered in TOMIS, the security staff should update the entry in TOMIS. In order for security staff to update the entry, health services staff have to communicate the inmate's official cause of death to security staff because only the facility's security staff can update the inmate's cause of death on the TOMIS Incidents screen.

For inmate deaths from October 1, 2017, to May 30, 2019, security staff at the correctional facilities classified 150 of the 171 total death incidents (88%) as Natural in TOMIS based on the results of the initial observation when the death was discovered. See **Table 5**.

---

[24] Centurion and Corizon are the department's medical and mental health vendors. CoreCivic provides its own medical and mental health care.

[25] According to the department's Policy 111.54, the department uses OSEL to report clinical decisions requiring mediation from the central office or significant events that impact daily operations of health and behavioral health care services within the facility. These entries would include things like medical emergencies; serious illnesses and injuries; infirmary and hospital admissions; suicide attempts; deaths; and missing medical records.

[26] The warden (or his/her designee) at the Riverbend Maximum Security Institution enters execution information into the TOMIS Incidents screen.

**Table 5**
**Classification of Inmate Deaths in the TOMIS Incidents Screen**
**October 1, 2017, Through May 30, 2019**

| Classification of Inmate Death | Number of Deaths | Percentage |
|---|---|---|
| Natural Death | 150 | 88% |
| Homicide | 4 | 2% |
| Accident | 1 | 1% |
| Suicide | 12 | 7% |
| Execution – Lethal Injection | 2 | 1% |
| Execution – Electric Chair | 2 | 1% |
| **Total Inmate Deaths** | **171** | **100%** |

Source: TOMIS.

Lockdown Incident Reporting

According to the Merriam-Webster dictionary, the word lockdown describes a situation where people are temporarily prevented from entering or leaving an area or building (such as a school) during a threat of danger. In a correctional setting, the term lockdown refers to the confinement of inmates to their cells for a temporary period for security purposes. Department staff described lockdowns as an appropriate security measure correctional officers use to control the movements of inmates in response to a variety of situations, such as a major fight or infection control.

The department's Policy 103.02, "Incident Reporting," outlines these procedures and identifies two types of lockdowns that must be reported in TOMIS and to the CCC:

- a partial institutional lockdown, and

- a total institutional lockdown.

The department also publicly reports the number of partial and total lockdowns annually within the incident summary table in its Statistical Abstract.

Facility Incident Reviews and TOMIS Modifications

At the facility level, the responding correctional officer completes a draft incident report when the incident occurs, and the shift commander subsequently reviews the report before staff enter the incident into TOMIS. Once entered into TOMIS, the warden/superintendent reviews each incident in TOMIS for clarity and accuracy to ensure the information reflects the actual events reported on the incident report.

According to the department's Policy 103.02 and 502.01, when a correctional facility has to change or delete an incident already entered into TOMIS, the warden/superintendent/designee will submit an Incident/Disciplinary Modification or Deletion Request form to the Assistant Commissioner of Prisons or the Deputy Commissioner of Operations. When the facility emails

the change request to the central office, the department's Prison Operations Team reviews the request for propriety and changes the incident in TOMIS as requested.

According to department management, central office staff do not perform any TOMIS reviews of recorded incidents, beyond the reviews conducted at the facility level, to check for accuracy, consistency, and compliance.

<u>Department's Annual Report and Statistical Abstract</u>

Each October, as required by Section 4-4-114, *Tennessee Code Annotated*, the department publishes an Annual Report that describes the department's organization and budget; outlines major initiatives and achievements; and provides basic demographics of incarcerated and supervised offenders. The department's Decision Support: Research and Planning Division (Research and Planning) also publishes a companion report, called the Statistical Abstract, which provides a deep dive into the various statistics that the department tracks. The most recent abstract available during our audit period was for fiscal year 2018; it is organized into the following categories:

- **Department Statistics –** budget, personnel, vacancy, and turnover;

- **Prison Statistics –** inmate population capacity at each facility, felon characteristics, local jail population, admissions and releases, sentence length and time served, and prison incidents;

- **Community Supervision Statistics –** population characteristics, admissions and releases, and supervision standards; and

- **Offender Accountability, Programs and Services –** community service, jobs, rehabilitative services, educational programs, drug screens, inmate health services, and behavioral health services.

Research and Planning obtains most of the information reported in the abstract from TOMIS. Strategic Technology Solutions is responsible for extracting information from TOMIS, like correctional facilities' incident data, by automatically generating and sending a Monthly Comprehensive Incident Summary report to Research and Planning and key department management personnel, who use this information to monitor the type and frequency of incidents in the correctional facilities. Research and Planning then compiles all these monthly incident reports for a given fiscal year into one table for inclusion in the annual Statistical Abstract. We examined the correctional facilities' reporting of incidents, including inmate deaths, and how the department reports incident data in the annual Statistical Abstract.

**Appendix B-5** on page 65 shows the prison incident summary table included in the department's fiscal year 2018 Statistical Abstract. The table summarizes incident data entered into TOMIS by facility operations personnel on felony arrests (of staff, inmates, and visitors); arson; assaults; deaths; disturbances; drugs; escapes; fires; injuries; illnesses; rapes; strikes; uses of force; weapons; lockdowns; and other miscellaneous incidents.

1. **Audit Objective:** Did department management establish internal control processes to ensure the department's critical information and incident data is reliable and that management and staff met reporting requirements?

   **Conclusion:** Based on our work related to inmate deaths; other serious incidents, including accidents and injuries; and lockdowns, we found that, although the department has policies governing data and reporting in TOMIS, the department and correctional facility management did not ensure staff followed all data entry policies and did not adequately review incident data to ensure the accuracy and completeness of the data.

   As a result, department management cannot rely on TOMIS, the official system of record, to capture, track, and provide data to report critical department and correctional facility statistics for internal and external users. See **Finding 3**.

2. **Audit Objective**: Did staff update the causes of inmate deaths in TOMIS once they learned the official cause of death based on the inmates' certified death certificates?

   **Conclusion**: We found that, after reviewing death certificates relating to 38 inmate deaths, the department did not accurately classify 8 inmate deaths (21%) in TOMIS, which resulted in inaccurate reporting of death information. See **Finding 4**.

3. **Audit Objective**: Did deceased inmates' paper health files contain the required documentation to support and document their deaths?

   **Conclusion**: Based on our review of paper inmate health files relating to 38 inmate deaths, we found at least 14 inmate health files (37%) did not contain all required documents, such as Accident/Incident/Traumatic Injury Reports, Problem Oriented Progress Reports, Morbidity and Mortality Summaries, and certified death certificates. See **Finding 4**.

4. **Audit Objective:** Did the correctional facilities staff appropriately document and enter Class A (the most serious) incidents into TOMIS?

   **Conclusion:** Based on our audit testwork, state and CoreCivic correctional facilities staff did not appropriately maintain original documentation of Class A incidents, nor did they consistently enter the incidents into TOMIS. See **Finding 5.**

5. **Audit Objective:** Did department management and staff ensure that, when required by departmental policy, health services staff entered required accidents, illnesses, and traumatic injuries on the Accidents screen and that security staff entered the precipitating incident on the Incidents screen in TOMIS?

**Conclusion:** Based on our review of serious accident/injury reporting practices, we found that at two CoreCivic facilities (Whiteville Correctional Facility and Trousdale Turner Correctional Center), the health services staff had not entered any serious accidents or injuries on the Accidents screen in TOMIS during our audit period. We found the lack of reporting questionable given the nature of the correctional environment.

We also found that state health services staff had not always entered serious injuries and illnesses into TOMIS in accordance with department policy at Hardeman County Correctional Facility, Northeast Correctional Complex, Northwest Correctional Complex, and Turney Center Industrial Complex.

We also compared the entries health services staff made on the Accidents screen to entries security staff made on the Incidents screen for the same event and found instances where security staff at both state and CoreCivic facilities failed to make the appropriate entry on the Incidents screen. This data is important because management uses the entries from the Incidents screen for security purposes and as the basis for publicly reporting the incident data in the department's annual Statistical Abstract. Management did not ensure that both health services and correctional staff entered accurate and complete information. See **Finding 6.**

**6. Audit Objective:** Did correctional staff consistently report partial and total lockdowns in TOMIS in accordance with department policy?

**Conclusion:** Based on our audit work, although department policy identifies the types of lockdowns, we found that management has not defined partial lockdowns in the department policy, resulting in inconsistent lockdown reporting by correctional staff. See **Observation 1.**

**7. Audit Objective:** Did the department and Strategic Technology Solutions (STS) follow state information systems security policies regarding information systems controls?

**Conclusion:** We determined that the department and STS did not provide adequate internal controls in two specific areas. See **Finding 7**. In addition, we found minor issues in two areas. See **Observation 2**.

**8. Audit Objective:** Did the department's Statistical Abstract provide accurate information regarding correctional facility incidents to the public and members of the General Assembly?

**Conclusion:** Based on our review of incident data that the department included in its fiscal year 2018 Statistical Abstract, we found that department management did not ensure the incident information reported to the public was accurate and transparent. See **Finding 8.**

39

**Finding 3 – The department's ability to provide accurate and complete information relating to deaths and other serious incidents is problematic**

Based on our audit work related to deaths and other serious incidents, we found that Department of Correction and correctional facility management did not always ensure staff followed all policies related to entering and reviewing incident information in the Tennessee Offender Management Information System (TOMIS), the department's official system of record. We noted several instances where information related to incidents was incorrect, incomplete, or not entered at all. As a result, information reported to the public, including families of inmates and decision makers, may be incorrect. In addition, department management needs accurate information on incidents to assess the safety and security conditions for staff and inmates.

Inmate Deaths

For eight inmate deaths that were classified as natural deaths in TOMIS, we found that five inmates actually died due to drug overdoses, two due to homicides, and one due to suicide. We also found that inmate health files did not contain all required department documentation that describe the events involving the death, including certified death certificates. See **Finding 4**.

Serious Incidents

We found that correctional facility staff did not appropriately maintain original documentation of Class A incidents, which are the most serious type of incidents that occur in correctional facilities, nor did they consistently enter the incidents into TOMIS in accordance with policy. See **Finding 5.**

Accident and Injury Reporting

Based on our review of serious accident/injury reporting practices, we found that at two CoreCivic facilities (Whiteville Correctional Facility and Trousdale Turner Correctional Center), the health services staff had not entered any serious accidents or injuries on the Accidents screen in TOMIS during our audit period—approximately one and a half years. Given the nature of the correctional environment and when compared to other correctional facilities, it is unlikely that a facility would have no serious incidents to report.

We found that health services staff had not entered serious injuries and illnesses into TOMIS in accordance with department policy at Hardeman County Correctional Facility, Northeast Correctional Complex, Northwest Correctional Complex, and Turney Center Industrial Complex.

We also found instances at both state and CoreCivic facilities where correctional staff did not make the appropriate accident/injury entries on the TOMIS Incidents screen. Department management extracts information correctional facility staff enter on the Incidents screen in TOMIS as the basis for the statistics and information in the department's annual Statistical Abstract. See **Finding 6.**

<u>Lockdown Reporting</u>

Although department policy identifies the types of lockdowns, we found that management has not defined partial lockdowns in its department policy, resulting in inconsistent reporting of this security measure by correctional staff in the department's Statistical Abstract. See **Observation 1.**

<u>Statistical Abstract</u>

The department uses information from TOMIS as the basis for its annual Statistical Abstract, which is available to the public on the department's website. The Statistical Abstract contains information on incidents such as assaults, injuries, rapes, lockdowns, and deaths, all of which comes from data the correctional staff entered into TOMIS. We also found that the department

- included inactive incident codes that showed zero incidents occurring in its abstract for fiscal years 2017 and 2018;
- did not report the incident summary table by facility in fiscal year 2017, making comparisons between facilities impossible; and
- did not include a label in the incident summary tables to explain that the tables excluded some correctional facility incidents.

These deficiencies impact management's ability to adequately track and report critical information and incident data used to assess conditions in its correctional facilities. See **Finding 8.**

<u>Information Systems</u>

We determined that the department and Strategic Technology Solutions did not provide adequate internal controls in two specific areas. See **Finding 7**. In addition, we found minor issues in two areas. See **Observation 2**.

<u>Overall Effect and Criteria</u>

The department relies on the information entered into TOMIS to provide a snapshot of how its correctional facilities are operating. If that information is not entered correctly, department management cannot rely on TOMIS to report critical department and correctional facility statistics to internal and external users.

The U.S. Government Accountability Office's *Standards for Internal Control in the Federal Government* (Green Book) provides internal control standards for federal entities and serves as best practices for state and other nonfederal entities. In Principle 13, "Use Quality Information," the Green Book dictates that management of an entity "should use quality information to achieve that entity's objectives." According to the Green Book, to obtain and use

quality information, management must identify information requirements, obtain relevant data from reliable sources, and then process data into quality information.

Management first identifies the necessary information requirements for achieving objectives and addressing risks while also considering "the expectations of both internal and external users." Management then "evaluates both internal and external sources of data for reliability," assessing whether the sources "provide data that are reasonably free from error and bias and faithfully represent what they purport to represent." Paragraph 13.05 of the Green Book adds

> Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. Management considers these characteristics as well as the information processing objectives in evaluating processed information and makes revisions when necessary so that the information is quality information. Management uses the quality information to make informed decisions and evaluate the entity's performance in achieving key objectives and addressing risks.

## Recommendation

Department management should ensure that staff receive proper training on entering information into TOMIS and should stress the importance that the public and decision makers place on the data that comes from TOMIS. Management should also review its policies to ensure they align with current practices.

## Management's Comment

Concur in part.

All deaths in custody have been reported in accordance with statutory requirements.

It is true that some associated documents for a few of the deaths were received at a later time and had not yet been entered into TOMIS when the audit was performed.

Nonetheless, department management stands by the process of properly reporting and documenting the deaths in custody but remains committed to finding opportunities, such as the adoption of an electronic medical records system, to further improve the process.

As it relates to serious incidents, department management notes that the vast majority of incidents in the testwork were correctly entered and that the audit expectation for maintaining documentation, in the form of incident drafts, is not required by policy. However, we will implement policy changes to ensure the most accurate and transparent process is in place.

**Finding 4 – The department did not accurately record inmates' causes of death in the Tennessee Offender Management Information System, which impacted the accuracy of the death information in the Statistical Abstract**

We obtained a list of 171 inmate deaths from October 1, 2017, through May 30, 2019, to determine the accuracy of inmate deaths recorded in the Tennessee Offender Management Information System (TOMIS). We compared this list to narrative information health services staff entered in the Online Sentinel Event Log (OSEL) to identify any natural deaths that could be misclassified. As a result of this comparison, we identified 38 inmate deaths with questionable causes and compared the causes of deaths in TOMIS to the inmates' certified death certificates.

> See the full methodology in Appendix B-10 on page 74.

<u>Conflicts Between Cause of Death in TOMIS and the Death Certificate</u>

Based on our testwork, we determined that the Department of Correction did not update TOMIS with the official cause of death for 8 of the 38 inmates tested (21%) who died in custody. See **Table 6.**

**Table 6**
**Results of Testwork – Inmate Cause of Death Comparison**

| Inmate Location | Information by Source and Listed Cause of Death | | |
|---|---|---|---|
| | TOMIS Incidents Screen | TOMIS Dead Offender Screen[27] | Department of Health's Issued Death Certificate |
| Northwest | Natural | Natural | Accident | *Overdose of fentanyl and synthetic opioid* |
| Northwest | Natural | Natural | Accident | *Overdose of fentanyl and methamphetamine* |
| Lois M. DeBerry | Natural | Natural | Accident | *Complications from falling off top bunkbed* |
| Turney Center | Natural | Drug Related | Accident | *Overdose of fentanyl and methamphetamine* |
| Turney Center | Natural | Natural | Accident | *Fentanyl overdose* |
| Morgan County | Natural | Natural | (Issued)[28] | |
| Riverbend | Natural | Suicide | Suicide | *Bled out after reopening previously self-inflicted wound* |
| Lois M. DeBerry | Natural | Natural | Homicide | *Complications from serious assault* |

---

[27] The Dead Offender screen is an administrative screen in TOMIS where correctional officers log the date, location, and type of death to remove inmates from the population count of the correctional facility.

[28] Although the department did not update this inmate's cause of death in TOMIS, we cannot disclose the cause because the department is currently investigating the circumstances surrounding this inmate's death.

The Chief Medical Officer stated that although the TOMIS Incidents screen records events that occur at the facility to ensure the facility's safety and security, the Incidents screen is not intended to capture/record the official cause of death for an inmate who dies in custody. While we understood the Chief Medical Officer's point, we found that the department's Research and Planning Division uses the TOMIS Incidents screen data to report inmate deaths by cause in the department's Statistical Abstract. The department's Death in Custody Coordinator ultimately receives the inmate death certificates and is better suited to provide accurate statistics related to inmates' causes of death.

To determine whether the department accurately reported inmate deaths to the U.S. Department of Justice's Bureau of Justice Statistics, we also compared the 38 inmate deaths we tested to the Bureau of Justice Statistics' reports and found that the Death in Custody Coordinator accurately reported the cause of death for these 38 inmates to the bureau.[29] We also found that the federal report contained more useful and accurate inmate death information than the department's required annual Statistical Abstract.

According to discussion with the Death in Custody Coordinator, we learned that she relies on various sources of information, including the official death certificate,[30] rather than death information in TOMIS for federal reporting purposes.

<u>Missing Inmate Health File Documents</u>

Based on our testwork, we also determined that the department did not maintain the required supporting documentation relating to inmate deaths in the inmates' paper health files. Specifically, we found that 14 of 38 deceased inmate health files (37%) did not contain the documents listed in **Appendix B-1** on page 60 as required by department policy. According to the Chief Medical Officer, the facility health administrator is responsible for placing the documents in the inmates' health files.

Additionally, according to department policy, staff should maintain an inmate's death certificate in the inmate's health file. From our initial file review, we found that management had not ensured that staff placed 21 of 38 (55%) death certificates in the health files. When we brought the missing documents to management's attention and asked them to follow up on the missing death certificates, the Death in Custody Coordinator provided the 21 death certificates.[31] Given our testwork results, management lacked an adequate control process to ensure inmates' health records had all the required documentation. See **Table 7** for the list of documents missing from the initial file review that the department subsequently provided. See **Appendix B-6** on page 68 for testwork details.

---

[29] The Death in Custody Coordinator enters the information into the Bureau of Justice Statistics' online database after she receives the official inmate death certificate indicating the cause of death.

[30] Other sources include inmate death information provided by the Central Communication Center notifications, information entered in OSEL, death notices from the Lois M. DeBerry Special Needs Facility (which provides various medical and mental health services to inmates with complex medical issues), death notices from the Assistant Commissioner for Prisons, and death notices from Victim Services Coordinators.

[31] For these 21 death certificates, the inmates passed away between November 8, 2017, and May 12, 2019.

**Table 7**
**Results of Testwork – Missing Documentation From Deceased Inmates Health File Review**

| Required Death-Related Documentation | # of Files Missing From Initial File Review | # of Files Provided After Follow-up Request | # of Total Missing Documents* |
|---|---|---|---|
| Accident/Incident/Traumatic Injury Reports | 12 | 2 | 10 |
| Problem Oriented Progress Reports | 4 | 4 | - |
| Mortality and Morbidity Summaries | 23 | 9 | 14 |
| Death Certificates | 21 | 21 | - |

*We have reported for each missing document type even though the error may represent the same inmate file that required multiple documents given the nature of the incident.

To determine whether management maintained accurate death information in TOMIS, we also performed testwork to review both TOMIS Accidents and Incidents screens. Based on our testwork, we found that the health services staff also did not enter 15 of 38 inmate deaths (39%) on the TOMIS Accidents screen as required by Policy 113.53, "Accident/Injury Reporting." Based on discussions with the Chief Medical Officer, he could not explain why the death certificates were not in the inmate health records when management provided us the files or why health services staff did not enter the death information in the TOMIS Accidents screen. We also found that correctional staff did not update the TOMIS Incidents screens for 8 of 38 inmate deaths (21%) once the official death certificates became available.

The department prepares the Statistical Abstract based on the TOMIS Incidents screen. Therefore, it is imperative that management ensure that correctional staff timely and accurately update TOMIS for the inmate's official cause of death when the death certificate becomes available (since the cause of death is not known when staff must initially report the incident into TOMIS).

**Recommendation**

The Commissioner should immediately review the department's death reporting procedures to ensure all inmate deaths are fully and accurately documented in all sources. In addition, the Commissioner should work to improve death reporting communication among relevant parties, including health services and correctional facility staff, to ensure the department reports accurate death statistics.

Given the current efforts for COMET (the new offender management system) implementation, the Commissioner should ensure COMET is designed to provide staff with the appropriate codes to use when classifying inmate deaths for initial death reporting while awaiting final certified death certificates. The department should consider adding a pending death incident status to force facility staff to update the official cause of death once it is received.

**Management's Comment**

Concur.

As noted by the auditors, this Department's Death in Custody Report, required by the U.S. Department of Justice, is 100% accurate.

As a result of information provided during this audit and our own continuous review, department management is creating procedures to ensure all inmate deaths are fully and accurately documented in all sources.

We are implementing a Pending Death Investigation code in TOMIS for staff to select until the official death certificate is received. Once received, the official manner of death will be updated in our offender management system. Likewise, additional cause of death information will be placed in a narrative screen associated with the death incident. This will allow the department to maintain the manner of death and cause of death on the same narrative screen. (A matter for clarification, TOMIS incident reporting related to deaths in custody identifies the manner of death not the cause of death as also mentioned in this audit.)

We are also examining current policy requirements concerning inmate and health records associated with those inmates who die in custody. Previously, these files were maintained at each facility. We are examining the feasibility of creating a centralized records storage repository for all inmate files that are considered "Death in Custody." This will allow a copy of the death certificate to be sent to a central location for inclusion in the inmate health record. At the same time the copy of the death certificate is sent for inclusion in the health record, a copy will be forwarded to Operations to be used to update the TOMIS incident. The department will update policy to reflect newly established/revised procedures.

## Finding 5 – Department management did not ensure state and CoreCivic facility staff followed incident reporting policies, entered incident information accurately into TOMIS, and maintained supporting documentation for incidents as required

From a total population of 2,271 serious (Class A) incidents recorded in the Tennessee Offender Management Information System (TOMIS) from October 1, 2017, through May 30, 2019, at the 6 facilities we visited, we tested a total random sample of 156 serious incidents to determine whether correctional staff entered the incidents into TOMIS in accordance with Department of Correction policy.

> For the full methodology, including the breakdown of the population and sample sizes for each correctional facility we visited, see Appendix B-10 on page 74.

Based on our review, we found that staff at the correctional facilities did not enter incidents into TOMIS as required by department policy. In addition, we found that the department did not maintain the original documentation to support incident entries into TOMIS. By policy, CoreCivic is required to use department-approved forms and record complete incident information into TOMIS; however, CoreCivic correctional staff did not always do so. We performed testwork during site visits at six correctional facilities (three state-managed and three CoreCivic-operated facilities), where we found numerous instances of noncompliance, including the following:

- correctional staff involved in use of force incidents did not always submit the required documents to the warden in accordance with policy;

- wardens did not submit required documents pertaining to assaults on facility staff to the Assistant Commissioner of Prisons and the Director of the Office of Investigations and Compliance in accordance with policy;

- correctional staff did not ensure that supporting documentation (such as 5-1a and 5-1c forms and witness statements) for incidents matched the incident information entered into TOMIS;

- the department does not require correctional facility staff to preserve supporting documentation of incident information (such as draft incident reports) entered into TOMIS—in some cases, even though management did not require facilities to keep the draft incident reports, management did provide these reports to us for our review if they still had them;

- correctional staff did not enter all required information related to incidents into TOMIS;

- correctional staff could not locate supporting documentation that we requested for our audit;

- correctional staff did not hold disciplinary hearings within the required timeframe;

- correctional staff did not use the incident report form or used the form incorrectly, while staff at other facilities were not aware that the form existed; and

- correctional staff did not always report incidents to the Central Communication Center within the required timeframe.

See **Chart 1** for a summary of our testwork results. The details of noncompliance for incident reporting is located on **Appendix B-7** on page 68.

**Chart 1**
**Number of Errors by Type of Noncompliance and by Correctional Facility**
**For the Period October 1, 2017, to April 12, 2019**



Source: Summary of audit testwork results.

Case 3:16-cv-02267 Document 141-1 Filed 02/01/22 Page 68 of 234 PageID #: 25645

We noted that the majority of incidents in our testwork were the result of homemade weapons. According to department staff, due to the high number of homemade weapons they find, it is not always feasible to report the incident to the Central Communication Center within 30 minutes as required by policy.

Based on discussions with department staff, they believe correctional facility staff were not adequately trained to enter incidents into TOMIS. In addition, they stated that some department policies related to incidents may require updates to better reflect actual practice.

Correctional facility staff use TOMIS, the department's system of record, to collect and report incident-related information to management, state decision makers, and the public. Management uses TOMIS to maintain records of incidents to support any disciplinary action against inmates. Failure to accurately and consistently include incident information in TOMIS as required by policy can result in underreporting information to the public, management, and other stakeholders. In addition, without transparent and accurate reporting, management increases the risk that correctional staff may not have taken appropriate actions to respond to incidents, including proper disciplinary action. Furthermore, by not maintaining original documentation to support the entries in TOMIS, the department has no means of determining whether staff accurately described the events and individuals involved.

## Recommendation

Department management should ensure that correctional facility staff are properly trained and understand the importance of following all policies and procedures for completing department-required incident forms, preserving original incident documentation, and accurately entering incidents in TOMIS. If management determines the current policy does not reflect actual practice, management should review department policies and consider appropriate changes.

## Management's Comment

Concur.

Department management agrees that TOMIS incident entries could be improved.

Several factors have contributed to the shortcomings outlined in the finding. Staffing, training, and TOMIS access, to name a few, have an integral role in the timely, complete, and accurate entry of incidents, as well as fulfilling requirements related to supporting documentation.

The agency has been vigorously recruiting and working to retain our valuable workforce. We experience multiple benefits from maintaining institutional knowledge in our workforce, not only by having staff who are capable of producing relevant and accurate work products, but also by passing on that knowledge.

Similarly, effective training and delivery is paramount in ensuring our staff has the requisite ability to properly perform in the area of incident entry, thereby reducing the need to delete or modify erroneous incident entries.

Case 3:23-cv-00993 Document 41-1 Filed 02/12/24 Page 69 of 234 PageID #: 25646

Lastly, appropriate access is vital in protecting the integrity of incident entries in TOMIS. By limiting access to properly trained personnel, we can reduce errors and greatly increase the accuracy and completeness of the incident information.

Although there currently is no policy requirement to maintain a copy of "draft" incident information, we will implement policy changes to ensure the most accurate and transparent process is in place. The modifications made will be based on best practices and accepted industry standards. Reviews will also be made of the incident and timeline requirements for reporting to the Central Communication Center. It is important for incident information to be delivered to the appropriate leadership in a timely and accurate manner. It is also recognized that rushing the process could result in the delivery of incomplete or inaccurate information.

## Finding 6 – The department did not ensure that state and CoreCivic correctional facility and health services staff entered all serious accidents, injuries, and illnesses in TOMIS in accordance with department policy

For the full methodology, including the breakdown of the population and sample sizes for each correctional facility we visited, see Appendix B-10 on page 74.

From a total population of 1,514 accident/injury entries that health services staff entered into the TOMIS Accidents screen from October 1, 2017, through April 12, 2019, we examined a total nonstatistical, random sample of 100 entries at 4[32] of the 6 facilities we visited and compared the information in TOMIS to the original documentation to determine if the TOMIS entries complied with Department of Correction policy.

No Accident/Incident/Traumatic Injury Entries at Trousdale Turner and Whiteville

From our review of accidents, illnesses, and traumatic injuries in TOMIS, we found that health services staff at two CoreCivic facilities, Whiteville Correctional Facility and Trousdale Turner Correctional Center, did not enter any serious accidents, injuries, or illnesses in the TOMIS Accidents screen for the period October 1, 2017, to April 12, 2019. As a result, we were unable to perform our testwork to meet our audit objectives at these facilities.



Because we believed that, given the correctional environment, both facilities would have experienced qualifying accidents, illnesses, and traumatic injuries, we discussed this issue with the health services staff at Trousdale Turner and Whiteville. We found that health services staff completed the paper Accident/Incident/Traumatic Injury Reports but did not key the reports into TOMIS as required

---

[32] The four facilities are Hardeman County Correctional Facility, Northeast Correctional Complex, Northwest Correctional Complex, and Turney Center Industrial Complex.

by policy. Management and staff at both facilities stated they were unaware of the requirement to enter accidents, illnesses, and traumatic injuries into TOMIS. According to the Assistant Wardens of Treatment at both facilities, key health services positions experienced turnover and new staff were not properly trained in departmental policy or TOMIS reporting. We also informed department management of our concerns, and the department promptly provided training to Trousdale and Whiteville's health services staff and told us that they would work backwards to enter the Accident/Incident/Traumatic Injury Reports completed from October 1, 2017, to April 12, 2019, into TOMIS.

Testwork Results From Four Correctional Facilities

For facilities we could test, we randomly selected a nonstatistical sample of 25 accidents or injuries from each facility based on a list of all serious accidents, illnesses, and injuries entered in TOMIS under the Accidents screen from October 1, 2017, to April 12, 2019. Our sample included accidents, illnesses, and traumatic injuries from Hardeman County Correctional Facility, a CoreCivic facility, and three state-managed facilities (Northeast Correctional Complex, Northwest Correctional Complex, and Turney Center Industrial Complex) to meet our audit objective of determining whether health services staff properly entered accidents, illnesses, and traumatic injuries into TOMIS in accordance with departmental policies.

*Confidential Health Information Entered on the Accidents Screen*

The department's policy on accident/injury reporting requires that "Health Services staff shall ensure that entries onto TOMIS [Accidents screen] do not contain confidential health information (e.g., SOAP documentation,[33] vital signs, diseases, illnesses, or health intervention)." Based on our testwork at Hardeman, Northeast, Northwest, and Turney Center, we found that health services staff at all four facilities entered confidential health information in TOMIS. According to department management, they believe this noncompliance is the result of lost institutional knowledge resulting from turnover and from a lack of training. See **Table 8** for a summary of our results.

**Table 8**
**Results of Testwork – TOMIS Entries Contained Inappropriate Confidential Health Information From October 1, 2017, to April 12, 2019**

| Correctional Facility | Number of Errors/Total Sample = (Error Percentage) |
|---|---|
| Northeast Correctional Complex | 16/25 (64%) |
| Northwest Correctional Complex | 19/25 (76%) |
| Turney Center Industrial Complex | 16/25 (64%) |
| Hardeman County Correctional Complex* | 22/25 (88%) |

*Operated by CoreCivic.

---

[33] See footnote 23 on page 34.

Case 3:16-cv-02267 Document 141-5 Filed 02/12/21 Page 71 of 234 PageID #: 25648

*Other Data Entry Errors*

During our review, we also found that health services staff made data entry errors at two correctional facilities (see **Table 9**). These entry errors included the following:

- the date, time, or location of the accident or injury listed on the Accident/Incident/Traumatic Injury Report did not match the information entered in TOMIS;

- health services staff made duplicate entries for the same event; and/or

- the Accidents screen entry was blank, meaning staff created an entry but failed to enter the details of the injury.

Department management stated these mistakes were due to human data entry errors.

**Table 9**
**Data Entry Errors**
**October 1, 2017, to April 12, 2019**

| Correctional Facility | Number of Errors/Total Sample = Error Percentage |
|---|---|
| Northeast Correctional Complex | 7/25 (28%) |
| Hardeman County Correctional Facility* | 17/25 (68%) |

*Operated by CoreCivic.

Additionally, based on our request for data, we found that health services staff at Turney Center could not locate three of the original Accident/Incident/Traumatic Injury Reports in the inmates' medical files. The facility was able to produce duplicates of two forms but could not locate the originals or any duplicate of one form. According to the department's Policy 113.53, "Accident/Injury Reporting," staff are required to place original forms in the inmates' medical files.

<u>Results of Other Audit Work</u>

During our primary testwork to determine whether health services staff entered accidents, illnesses, and traumatic injuries into the TOMIS Accidents screen, we also noticed that not all accidents or injuries involving inmates had a corresponding incident entry on the TOMIS Incidents screen. We found that facility health services staff may not have entered minor bumps, scrapes, bruises, or handcuff checks[34] into the Accidents screen because the injuries did not rise to the level of an injury of greater degree of severity. In other situations, facility security staff did not enter incidents on the Incidents screen when they should have. See **Table 10** for instances where facility security staff did not enter required incidents in TOMIS.

---

[34] When an inmate is placed in handcuffs for an extended period of time in response to an incident, medical staff routinely check to make sure the cuffs are not so tight that they are cutting off circulation. We found that health services staff at Northwest use the Accident/Incident/Traumatic Injury Report form and Accidents screen to document such cuff checks even though they are not required to do so by policy.

## Table 10
## Types of Accidents, Illnesses, and Injuries Entries With No Corresponding Incident Entry in TOMIS

| Incident Type | Northeast | Northwest | Turney Center | Hardeman* | Total |
|---|---|---|---|---|---|
| Use of Force (Chemical, Physical, or Security Restraints) | 1 | 0 | 0 | 1 | **2** |
| Assault and/or Fight† | 2 | 4 | 0 | 1 | **7** |
| Serious Hospitalization | 2 | 2 | 2 | 0 | **6** |
| Accidental Injury/Illness | 4 | 2 | 2 | 0 | **8** |
| Work-related Injury | 4 | 0 | 4 | 3 | **11** |
| Self-inflicted Injury | 0 | 1 | 0 | 0 | **1** |
| **Total** | **13** | **9** | **8** | **5** | **35** |

*Operated by CoreCivic.

†For these items, there was not an incident for an assault/fight or a pending investigation entry for instances where it was unclear whether an assault/fight occurred.

Reporting Expectations Not Communicated or Not Followed

We asked the department's Assistant Commissioner of Prisons to discuss his incident reporting expectations related to accidents, injuries, and illnesses, which we exhibit in **Appendix B-8** on page 72. Based on our discussion, the correctional facilities are not meeting the Assistant Commissioner's expectations for reporting workplace injuries, serious hospitalizations, self-inflicted injuries, and pending investigations when institutional violence may have been involved. Additionally, management at the correctional facility level agreed that there were some isolated use of force incidents that, although they should have been, were not reported.

When security staff do not enter all required incidents related to accidents, illness, and traumatic injuries into TOMIS in accordance with policy, it lessens the department's ability to use the information to identify safety and security concerns at correctional facilities. Additionally, if the facilities are underreporting incidents, it could undermine the accuracy and usefulness of incident data provided to the public and members of the General Assembly.

**Recommendation**

The department should ensure that health services staff and security staff at correctional facilities are adequately trained on accident, injury, and incident reporting policies and that staff consistently and accurately enter such information into TOMIS so that the department can make informed decisions for corrective action and quality improvement of the state's correctional system.

**Management's Comment**

Concur.

The Accident Injury Reports were completed. However, not all of these reports were entered into TOMIS.

In order to protect the integrity of the information entered into TOMIS, limited staff access is granted to staff in key positions at CoreCivic facilities. A further review of the number of staff granted access will be conducted to determine if sufficient staff has access and if additional access should be granted to reduce delays in entering this information. If it is determined that more access is needed, training will be conducted with the staff to detail the steps to be completed to ensure correct and timely entry of information.

We acknowledge there were also issues at the state-run facilities. That being noted, we are reinforcing a top-down approach to training and accountability for TOMIS incident entries. New employees in the basic correctional officer training program, the basic probation and parole training program, and the basic correctional professional training program are required to complete a week-long course on the intricacies of TOMIS. Additional training is provided, as needed.

The department is also working to include TOMIS refresher courses in its in-service training to be delivered either electronically through the Learning Management System (LMS) or through delivery at regional sites by institutional and community supervision instructors. This training will allow the department opportunities to strengthen the completeness, accuracy, and accountability that is not only required by policy but expected by our stakeholders.

A final contributing factor for the absence of the noted TOMIS entries for the Accident Injury Report is the lack of an established protocol between the medical staff and operational staff who both play critical roles in this process. A procedure will be formalized to outline the responsibilities associated with each entity in the process and to ensure that collaborative enforcement of accountability for TOMIS entries exists.

**Observation 1** – Department policy does not formally define partial or total institutional lockdowns; therefore, correctional facility staff may not report them consistently in TOMIS

<u>Lockdowns Defined</u>

According to correctional security staff, in the correctional environment, the term lockdown is often used to describe when officers lock inmates in their cells to restrict inmate movement in response to an incident, such as a fight or a severe weather threat, or when security staff must perform a search for contraband. Officers lock inmates inside their cells to achieve routine tasks, such as during inmate count times[35] or at night, but they do not consider these actions lockdowns. According to correctional facility security staff, the staff formally log lockdowns that involve multiple inmates or multiple buildings on the

> According to correctional security staff, only lockdowns that involve multiple inmates and/or multiple buildings on the prison compound are reported as an incident in TOMIS.

---

[35] The department's Policy 506.11 requires correctional officers to physically count the number of present inmates multiple times a day. Inmates must be locked in their cells in order to maintain an accurate count.

facility compound into the Tennessee Offender Management Information System (TOMIS) and report these lockdowns to the Department of Correction's Central Communication Center. In TOMIS, lockdowns are classified into two categories:



- partial institutional lockdown, or
- total institutional lockdown.

From October 1, 2017, through April 12, 2019, the correctional facilities reported 78 combined total and partial lockdowns. See **Appendix B-9** on page 73 for the total number of reported lockdowns during this period at each correctional facility. Because the department's policy regarding incident reporting does not distinguish between partial and total institutional lockdowns, we asked the security staff at the 6 correctional facilities we visited how they defined and reported lockdowns in TOMIS. Each facility consistently defined "total institutional lockdown" as all inmates on the compound locked in their cells for an extended period in response to a security threat, such as an inmate escape, riot, gang activity, severe weather, institution-wide search, or any other major incident. However, each facility defined partial institutional lockdowns differently. See **Table 11** for a summary of responses.

**Table 11**
**Security Staff Responses on Reporting Partial Lockdowns**

| Correctional Facility | Partial Lockdowns Defined by Correctional Security Staff |
|---|---|
| Hardeman County Correctional Facility* | At least one entire housing pod.[36] |
| Northeast Correctional Complex | At least one entire housing unit. |
| Northwest Correctional Complex | Two or more housing units. |
| Trousdale Turner Correctional Center* | It depends on the lockdown's length of time and the scope of the situation. |
| Turney Center Industrial Complex | One but up to three housing units. |
| Whiteville Correctional Facility* | At least one entire housing unit. |

*Operated by CoreCivic.

Given the inconsistencies for defining partial lockdowns, correctional facility staff have not reported partial lockdowns the same, which impacts management's ability to adequately monitor the use of or the number of lockdown incidents reported in TOMIS to ensure the partial lockdown meets the intended purpose of restricting the inmates' movement. Without consistent partial lockdown expectations, management cannot ensure lockdown procedures are not abused.

Overall, the department should consider revising its policies to clearly define the types of scenarios that merit the use of a partial institutional lockdown so that reporting is more consistent, and the public understands what it means.

---

[36] In a correctional setting, a housing pod can be described as one wing in a larger housing building or unit.

**Finding 7 – The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions did not implement effective internal controls in two areas, increasing the risk of errors or data loss**

The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions (STS) did not effectively design and monitor internal controls in two areas. For these areas, we found internal control deficiencies related to one of the Department of Correction's systems where both the department and STS did not adhere to state policies.

Ineffective implementation and operation of internal controls increases the likelihood of errors, data loss, and unauthorized access to department information. Pursuant to Standard 7.39 of the U.S. Government Accountability Office's *Government Auditing Standards*, we omitted details from this finding because they are confidential under the provisions of Section 10-7-504(i), *Tennessee Code Annotated*. We provided the department and STS management with detailed information regarding the specific conditions we identified, as well as the related criteria, causes, and our specific recommendations for improvement.

**Recommendation**

The department and STS should coordinate to ensure that these control deficiencies are corrected by the prompt development, implementation, and monitoring of effective internal controls.

**Management's Comment – Department of Correction**

Concur.

We will work with STS to implement improved internal controls.

**Management's Comment – Department of Finance and Administration's Strategic Technology Solutions**

We concur. STS will coordinate with TDOC [the Department of Correction] to ensure the identified weaknesses are promptly remediated with effective internal controls.

**Observation 2** – The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions did not provide adequate internal controls in two areas; however, the areas noted do not pose a critical risk to the state

The Department of Correction and the Department of Finance and Administration's Strategic Technology Solutions (STS) did not design and monitor effective internal controls in two areas. For these areas, we found internal control deficiencies where both parties did not adhere to state policies and industry best practices. The risk associated with these conditions was reduced because both the department and STS implemented effective mitigating controls.

Pursuant to Standard 7.39 of the U.S. Government Accountability Office's *Government Auditing Standards*, we omitted details from this observation because they are confidential under the provisions of Section 10-7-504(i), *Tennessee Code Annotated*.

---

### Finding 8 – The department published inaccurate and incomplete inmate incident data in its fiscal year 2018 Statistical Abstract

As a result of our testwork on deaths, serious incidents, and lockdowns, we interviewed Department of Correction management and reviewed the fiscal year 2018 Statistical Abstract to determine how the department compiles Tennessee Offender Management Information System (TOMIS) data for deaths, serious incidents, and lockdowns for the Statistical Abstract.

> See the full methodology in Appendix B-10 on page 74.

Incident Summary Tables in the Statistical Abstract Is Inaccurate or Incomplete

In its Statistical Abstract each year, the department publishes a table called "TDOC Incident Summary by Incident Type and Facility" that shows how many of a given incident occurred at each correctional facility (both CoreCivic and state-managed) during the prior fiscal year. This table includes the type of incident (death, drugs, escape, injury, etc.); the incident code (a three-letter abbreviation); a brief description of the incident; and the total number of incidents by facility. See the fiscal year 2018 incident summary table in **Appendix B-5** on page 65.



In its fiscal year 2018 Statistical Abstract, the department included 10 inactive incident types in the incident summary tables. If a reader examined the inactive incident types on the Statistical Abstract, they would see zero incidents reported at each correctonal facility; however, the reader may interpret the zeros to mean zero occurrences rather than no recording of information. See **Appendix B-5** on page 65 for the 10 inactive incident types (highlighted in yellow) on the Statistical Abstract.

In addition, readers do not know that the department does not report all incident types on the Statistical Abstract. The department's Policy 103.02, "Incident Reporting," defines 166 incident types that facilities operations staff are required to routinely enter into TOMIS. The department, however, only reports 104 of them on the Statistical Abstract. Nonreported incident types include the following:

- ➢ Misdemeanor Arrest of Staff,
- ➢ Violation of State Law,
- ➢ Possession/Use/Introduction/Sale of Tobacco Products by an Employee,
- ➢ Solicitation of Staff,
- ➢ Weapon Discharge – Non-training,
- ➢ Defiance,
- ➢ Positive Drug Screen,
- ➢ Refused Drug Screen,
- ➢ Failure to Report as Scheduled,
- ➢ Offender Injury Accident,
- ➢ Possession/Selling/Use of Intoxicants,
- ➢ Instituitonal Shakedowns,
- ➢ Out of Place,
- ➢ Refused Cell Assignment,
- ➢ Sexual Harassment,
- ➢ Tampering With a Security Device or Equipment, and
- ➢ Use of Force – Security Restraints.

Furthermore, department management informed us that correctional facility operations personnel use the Rape incident category only when a rape allegation is substantiated by DNA testing and has been referred for outside prosecution. The department does not disclose this fact in the report.

Based on our review of past legislative hearings, we found that members of the General Assembly use the information in the Statistical Abstract to draw conclusions about prison operations and conditions. As a result, it is important that the department be transparent about information included in the tables.

During our audit, the department experienced turnover at the Director and Assistant Director level within the Decision Support: Research and Planning Division. The new Director stated that the turnover contributed to some of the issues. The Director also explained that Strategic Technology Solutions (STS) did not adequately communicate to the Research and Planning Division when incident categories were deactivated so that the division could exclude them from the abstract. The Director agreed that the incident summary table could be better labeled to clarify that it only includes certain, not all, correctional facility incidents.

In the *Standards for Internal Control in the Federal Government* (Green Book), Principle 13, "Use Quality Information," stresses the importance of producing and using quality information. According to paragraphs 13.02 and 13.03,

13.02    Management designs a process that uses the entity's objectives and related risks to identify the information requirements needed to achieve the objectives and address the risks. Information requirements consider the expectations of both internal and external users. Management defines the identified information requirements at the relevant level and requisite specificity for appropriate personnel.

13.03    Management identifies information requirements in an iterative and ongoing process that occurs throughout an effective internal control system. As change in the entity and its objectives and risks occurs, management changes information requirements as needed to meet these modified objectives and address these modified risks.

In Principle 15, "Communicate Externally," the Green Book dictates that "Management should externally communicate the necessary quality information to achieve the entity's objectives." Paragraph 15.03 of the Green Book adds the following:

Management communicates quality information externally through reporting lines so that external parties can help the entity achieve its objectives and related risks. Management includes in these communications information relating to the entity's events and activities that impact the internal control system.

Department management stated that correctional facility staff responsible for reporting incidents were not appropriately trained. If staff do not report incidents consistently, it could undermine the accuracy of incident data provided to the General Assembly and members of the public in the department's annual Statistical Abstract.

**Recommendation**

Department management should ensure that staff follow policy regarding incident reporting to ensure that the information entered into TOMIS is complete and accurate. Management of the department's Decision Support: Research and Planning Division should ensure that all data from TOMIS that is included in the Statistical Abstract is accurate, up-to-date, and adequately labeled so that readers, including members of the General Assembly, can understand the reported information and make appropriate decisions.

**Management's Comment**

Concur.

Department management understands the importance of accurate data entry and subsequent statistical distribution. Incident data entered into TOMIS is used by both internal and external stakeholders. As noted in comments related to other findings, we are engaged in a review of current policies and processes, associated with TOMIS incident entry, designed to ensure that we provide complete and accurate information to all interested parties.

# Appendix B
## Public Reporting of Inmate Deaths and Other Serious Incidents

### Appendix B-1
### Department Policies Governing Serious Incidents, Accidents, Injuries, and Deaths

<u>Serious Incidents</u>

- Policy 103.02, "Incident Reporting," states that, at the time an incident occurs, the reporting staff member shall complete a draft incident report, which shall be reviewed for accuracy, modified if necessary, approved by the shift commander or appropriate department head, and then entered into TOMIS. The policy also requires the use of an incident report form for incidents involving serious injury or death of an inmate. The policy further requires the following for both CoreCivic and state-managed facilities:

  o all incidents resulting in death are to be reported to the Office of Investigations and Compliance Director immediately;

  o a Staff Assault Incident Review should occur within 24 hours with a completed written report within 72 hours of incidents involving assaults on staff;

  o approved incident reports should be entered into TOMIS within 8 hours of the incident's occurrence/discovery and should contain the date and time of the incident; the location of the incident; the correct name and TOMIS ID number of each offender involved; the correct name and rank, if applicable, of each staff member involved; the correct name and affiliation of other persons involved; and the list of all disciplinary infractions to be issued in connection with the incident;

  o incident reports involving the death, serious injury, or escape of an inmate are to include the inmate's name and any aliases; TOMIS ID; date of birth; race; date of admission to the department; county where convicted; offenses; sentence; release eligibility date and safety valve;[37] custody level; National Crime Information Center (NCIC) number;[38] and any other pertinent information excluding confidential medical or mental health information; and

  o incident reports concerning discovery of a weapon are to include specific information as to materials used to manufacture homemade weapons, where each weapon was found, and the circumstances of the discovery.

- Policy 103.15, "Central Communication Center," states that the correctional facility's shift commander or designee must report by telephone certain incidents, including Class A and Class B incidents, to the Central Communication Center within 30 minutes.

---

[37] The safety valve is the earliest possible release date for an inmate if there is an executive order regarding prison overcrowding. Not all inmates qualify for safety valve release, including those convicted of violent offenses.

[38] The NCIC is a national crime database maintained by the Federal Bureau of Investigation. All inmates are assigned an NCIC number.

- Policy 502.01, "Uniform Disciplinary Procedures," states that no inmate charged with a disciplinary offense should be required to wait more than seven calendar days for his or her disciplinary hearing, unless the hearing is continued.

- Policy 506.08, "The Use of Force," states that any use of force incident involving hard empty hand control[39] and above shall be reported to the department's Office of Investigations and Compliance within 24 hours of the incident, and the Use of Force report must be submitted to the warden within 8 hours or by the end of the shift. When a use of force event occurs, correctional staff must complete various required documents including witness statements, the supervisor's review report and checklist, and any other supplemental reports to document the event. Management refers to these documents collectively as the Use of Force packet.

## Inmate Deaths

Policy 113.05, "Deaths and Autopsies," indicates the following:

- The health care provider who performed the initial physical assessment of the deceased inmate at the facility completes the Accident/Incident/Traumatic Injury Report[40] and documents the physical observation and assessment of the deceased on the Problem Oriented Progress Report.

- The department's Death in Custody Coordinator (the coordinator) obtains a certified copy of the death certificate from the Department of Health's Office of Vital Records[41] and forwards the original document to the facility where the inmate was housed.

- No later than seven days after an inmate's death, the correctional facility's health administrator completes the Health Services Mortality and Morbidity Summary. The facility's medical director and the health services administrator sign the summary and place it in the inmate's health record.

- Upon notification of a death in custody, the coordinator notifies the department's Chief Medical Officer and other physician reviewers[42] as designated. The attending physician at the facility that housed the inmate presents the death in custody case at the next scheduled Mortality and Morbidity Review Committee meeting.

---

[39] Policy 506.08, "The Use of Force," describes hard empty hand control as a manual control technique characterized by the use of an empty hand with such force that there is a potential for causing injuries, such as scratches; bruises; soft tissue injury; or, to a greater extent, bone fractures. This would include the arm bar, wrist lock, joint manipulation, strike, and pressure point pain compliance techniques.

[40] According to the department's Chief Medical Officer, if the inmate died at a hospital, health services staff are not required to complete the Accident/Incident/Traumatic Injury Report.

[41] The Death in Custody Coordinator works at the department's central office and maintains a list of inmates who died in custody. The coordinator submits the list to the Department of Health on Fridays. Once the coordinator receives the death certificates from the Department of Health, she updates the list. It may take several weeks or months for the Department of Health to issue death certificates.

[42] According to the Chief Medical Officer, the physician reviewers are physicians who participate in the discussion of inmate deaths by asking and answering pertinent questions surrounding an inmate's death. The discussion includes clinical factors that may have contributed to the inmate's death.

**Appendix B-2**
**Summary of Class A Incidents (Those Involving Serious Risk to the Facility or Community) Reported by Location**
**October 1, 2017, Through April 12, 2019**



Source: Tennessee Offender Management Information System.

**Appendix B-3**
**Summary of Class B Incidents (Those Involving Possible Risk to the Facility or Community) Reported by Location**
**October 1, 2017, Through April 12, 2019**



Source: Tennessee Offender Management Information System.

## Appendix B-4
## Summary of Class C Incidents (Those Involving No Risk to the Facility or the Community) Reported by Location
## October 1, 2017, Through April 12, 2019

Source: Tennessee Offender Management Information System.

Case 3:16-cv-02267 Document 141-5 Filed 02/10/22 Page 84 of 234 PageID #: 25661

**Appendix B-5**
**TDOC Incident Summary by Incident Type and Prison for Fiscal Year 2018***
**Pulled from the TDOC Statistical Abstract**

### TDOC Incident Summary by Incident Type and Prison: FY 2018

| Inc Type | Incident Description | BCCX Bledsoe County Correctional Complex | HCCF Hardeman County Correctional Facility | MCCX Morgan County Correctional Complex | MLTC Mark Luttrell Transition Center | NECX Northeast Correctional Complex | NWCX Northwest Correctional Complex | RMSI Riverbend Maximum Security Institution | SCCF South Central Correctional Facility | SPND DeBerry Special Needs Facility | TCIX Turney Center Industrial Complex | TPFW TN Prison for Women | TTCC Trousdale Turner Correctional Center | WCFA Whiteville Correctional Facility | WTSP West TN State Penitentiary | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Average Population** | **2,370** | **1,968** | **2,111** | **243** | **1,732** | **2,288** | **779** | **1,626** | **748** | **1,572** | **733** | **2,476** | **1,499** | **1,800** | **21,945** |
| Arrest | AFO  FELONY-OFN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Arrest | AFS  FELONY-STAFF | 2 | 2 | 5 | 1 | 2 | 1 | 0 | 6 | 0 | 3 | 0 | 1 | 7 | 1 | **31** |
| Arrest | AFV  FELONY-VISITOR | 19 | 2 | 16 | 0 | 6 | 1 | 0 | 2 | 0 | 10 | 1 | 1 | 2 | 6 | **66** |
| Arson | ARI  SER-INJ-PROP DMG>$500-OPER DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Arson | ARD  INJURY-PROP DMG >$500-OPR DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Arson | ARP  PROP DMG >$500 OPER DISRUP | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 3 | 0 | 0 | 0 | 1 | 0 | **7** |
| Assault | AOO  OFN-WITHOUT WEAPON | 44 | 24 | 8 | 0 | 16 | 33 | 6 | 33 | 12 | 13 | 7 | 46 | 27 | 16 | **285** |
| Assault | AOW  OFN-WEAPON | 5 | 19 | 7 | 0 | 22 | 15 | 7 | 28 | 5 | 6 | 6 | 21 | 5 | 4 | **150** |
| Assault | ASO  STAFF-WITHOUT WEAPON | 9 | 18 | 18 | 1 | 10 | 26 | 9 | 69 | 13 | 9 | 4 | 34 | 28 | 20 | **268** |
| Assault | ASW  STAFF-WEAPON | 26 | 15 | 9 | 0 | 1 | 9 | 12 | 41 | 19 | 4 | 2 | 39 | 10 | 12 | **199** |
| Assault | AVO  VISITOR/GUEST-WITHOUT WEAPON | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **2** |
| Assault | AVW  VISITOR/GUEST - WEAPON | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DEA  OFN-NATURAL | 4 | 3 | 5 | 0 | 7 | 7 | 3 | 1 | 61 | 0 | 4 | 3 | 4 | 0 | **102** |
| Death | DEC  DEATH-OFN-EXEC-ELEC CHR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DEH  OFN-HOMICIDE | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | **3** |
| Death | DEI  OFN-EXEC-LETH INJ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DES  OFN-SUICIDE | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 2 | **12** |
| Death | DOA  OFN-ACCIDENT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** |
| Death | DEG  STAFF-HOMICIDE (ON DUTY) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DEF  STAFF-SUICIDE (ON DUTY) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DSA  STAFF-ACCIDENT (ON DUTY) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DET  STAFF (ON DUTY)-NATURAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DEV  VISITOR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DVH  VISITOR-HOMICIDE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DVS  VISITOR-SUICIDE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DVA  VISITOR-ACCIDENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Death | DVN  VISITOR-NATURAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Disturbance | DIL  TEMP. CONTROL LOSS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Disturbance | DIR  THREAT CONTROL LOSS | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | **3** |
| Disturbance | DIS  MINOR | 0 | 4 | 4 | 0 | 4 | 3 | 4 | 1 | 0 | 1 | 3 | 0 | 1 | 3 | **28** |
| Drugs | DFI  INSIDE SECURE PERIMETER-NO POSS | 0 | 29 | 7 | 0 | 7 | 7 | 3 | 4 | 0 | 0 | 0 | 0 | 2 | 0 | **59** |
| Drugs | DFO  OUTSIDE SECURE PERIMETER | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | **5** |
| Drugs | DRK  CONFIS-SIGNIF AMT-STAFF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Drugs | DRL  CONFIS-SIGNIF AMT-VISITOR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Drugs | DRN  CONFISCATION-STAFF | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** |
| Drugs | DRO  CONFISCATION-VISITOR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | **1** |
| Drugs | DRP  PARAPHERNALIA | 49 | 18 | 43 | 0 | 35 | 66 | 25 | 15 | 6 | 45 | 2 | 63 | 6 | 14 | **387** |
| Drugs | DRS  POSSESSION / SELLING / USE | 131 | 120 | 160 | 0 | 99 | 189 | 65 | 61 | 22 | 103 | 34 | 184 | 61 | 88 | **1,317** |
| Drugs | IOP  INTOXICANTS FOUND ON PROPERTY | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | **3** |
| Equip Prob | EPA  MAJOR DISRUPTION | 1 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **5** |

*Please note that incidents reported may include more than one participant while other incidents are by definition about a single participant (ex: death or suicide).*
*Source: This report summarizes data entered by Facility Operations' personnel in accordance with TDOC policy 103.02.*

*Highlighted codes are inactive codes in TOMIS.

## TDOC Incident Summary by Incident Type and Prison: FY 2018 (cont.)

| | | | BCCX | HCCF | MCCX | MLTC | NECX | NWCX | RMSI | SCCF | SPND | TCIX | TPFW | TTCC | WCFA | WTSP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Bledsoe County Correctional Complex | Hardeman County Correctional Facility | Morgan County Correctional Complex | Mark Luttrell Transition Center | Northeast Correctional Complex | Northwest Correctional Complex | Riverbend Maximum Security Institution | South Central Correctional Facility | DeBerry Special Needs Facility | Turney Center Industrial Complex | TN Prison for Women | Trousdale Turner Correctional Center | Whiteville Correctional Facility | West TN State Penitentiary | |
| | | **Average Population** | 2,370 | 1,968 | 2,111 | 243 | 1,732 | 2,288 | 779 | 1,626 | 748 | 1,572 | 733 | 2,476 | 1,499 | 1,800 | **21,945** |
| Escape | ACA | ABSCOND CUSTODY-ATTEMPT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Escape | ACM | ABSCOND CUSTODY-MIN SECURITY | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | **2** |
| Escape | ESA | SECURE SUPERVISION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Escape | ESB | MIN SECURITY-VIOLENCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Escape | ESC | MIN SECURITY UNIT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** |
| Escape | ESF | ATT. SECURE SUPV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Escape | ESH | ATT.MIN SECURITY-VIOLENCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Escape | ESI | ATT. MIN SECURITY | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Escape | ESR | RETURN FROM ESCAPE PRIOR TO TOMIS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Fire | FII | SER-INJ-PROP DMG>$500-OPR DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Fire | FIP | INJ-PROP DMG>$500-OPR DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Fire | FIS | PROP DMG>$500-OPER DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Injury | IHA | ACCIDENT-OFN-SERIOUS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Injury | IHC | ACCIDENT-OFN WRK RELATED | 1 | 0 | 31 | 6 | 0 | 0 | 5 | 1 | 1 | 27 | 1 | 0 | 0 | 1 | **74** |
| Injury | IHB | ACCIDENT-OFN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Injury | IJA | ACCIDENT-STAFF-SERIOUS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Injury | IJB | ACCIDENT-STAFF | 36 | 0 | 49 | 8 | 19 | 5 | 16 | 13 | 6 | 10 | 6 | 0 | 16 | 3 | **187** |
| Injury | ILA | ACCIDENT-VISITOR-SERIOUS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Injury | ILB | ACCIDENT-VISITOR | 4 | 0 | 1 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | **13** |
| Injury | INB | SELF INFLICTED-SERIOUS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Injury | INC | SELF INFLICTED | 37 | 9 | 3 | 0 | 0 | 11 | 12 | 13 | 58 | 5 | 11 | 12 | 9 | 26 | **206** |
| Illness | IOT | OFN-SERIOUS-HOSP | 17 | 4 | 98 | 4 | 0 | 28 | 9 | 2 | 0 | 6 | 23 | 58 | 36 | 40 | **325** |
| Illness | ISH | STAFF-SERIOUS-HOSP(ON DUTY) | 10 | 0 | 15 | 2 | 3 | 3 | 2 | 2 | 1 | 2 | 1 | 0 | 4 | 7 | **52** |
| Illness | IVS | VISITOR-SERIOUS-HOSP | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** |
| Illness | IVM | VISITOR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other | CIP | CELL INSIDE PERIMETER-NO POSS | 2 | 1 | 25 | 0 | 13 | 14 | 9 | 2 | 0 | 1 | 0 | 1 | 2 | 1 | **71** |
| Other | BTH | BOMB THREAT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other | CON | CONTRABAND | 163 | 188 | 115 | 1 | 80 | 207 | 113 | 154 | 47 | 160 | 79 | 129 | 143 | 78 | **1,657** |
| Other | PCT | POSS/USE CELLULAR TEL. | 19 | 36 | 292 | 6 | 225 | 394 | 84 | 102 | 11 | 87 | 6 | 148 | 57 | 50 | **1,517** |
| Other | PTO | POSS/USE TOBACCO PROD. | 50 | 25 | 88 | 0 | 46 | 120 | 77 | 15 | 37 | 65 | 44 | 55 | 12 | 44 | **678** |
| Other | PDA | PROP DMG>$500 | 9 | 0 | 6 | 3 | 1 | 16 | 9 | 0 | 6 | 1 | 9 | 0 | 0 | 5 | **65** |
| Other | SXM | SEXUAL MISCONDUCT | 43 | 7 | 95 | 0 | 132 | 140 | 107 | 153 | 29 | 48 | 20 | 254 | 23 | 259 | **1,310** |
| Other | RAP | RAPE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other | RIO | RIOT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other | SBT | SABOTAGE - OPR DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other | HOS | HOSTAGE SITUATION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other | EHT | EPIDEMIC PUBLIC HEALTH THREAT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other | PGA | PART IN STG ACTIVITY | 41 | 39 | 27 | 0 | 21 | 17 | 3 | 62 | 2 | 21 | 0 | 23 | 23 | 8 | **287** |
| Other | PGM | POSSESS STG MATERIAL | 130 | 12 | 50 | 0 | 2 | 54 | 13 | 18 | 3 | 32 | 2 | 13 | 22 | 5 | **356** |
| Other | ILP | INST LOCKDOWN-PARTIAL | 0 | 2 | 0 | 0 | 0 | 2 | 3 | 7 | 0 | 0 | 0 | 2 | 2 | 0 | **18** |
| Other | ILT | INST LOCKDOWN-TOTAL | 0 | 1 | 0 | 0 | 0 | 1 | 2 | 5 | 1 | 0 | 0 | 4 | 7 | 0 | **21** |
| Strike | SKI | INMATE-OPER.DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Strike | SKS | STAFF-OPER DISRUP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Suicide | SUA | ATT-SERIOUS INJURY | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Suicide | SUC | ATTEMPT | 12 | 1 | 1 | 0 | 3 | 1 | 1 | 2 | 2 | 1 | 2 | 2 | 1 | 6 | **35** |

*Please note that incidents reported may include more than one participant while other incidents are by definition about a single participant (ex: death or suicide).*
*Source: This report summarizes data entered by Facility Operations' personnel in accordance with TDOC policy 103.02.*

*Highlighted codes are inactive in TOMIS.

Case 3:16-cv-02267 Document 141-1 Filed 02/01/22 Page 86 of 234 PageID #: 25663

## TDOC Incident Summary by Incident Type and Prison: FY 2018 (cont.)

| | | BCCX | HCCF | MCCX | MLTC | NECX | NWCX | RMSI | SCCF | SPND | TCIX | TPFW | TTCC | WCFA | WTSP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Bledsoe County Correctional Complex | Hardeman County Correctional Facility | Morgan County Correctional Complex | Mark Luttrell Transition Center | Northeast Correctional Complex | Northwest Correctional Complex | Riverbend Maximum Security Institution | South Central Correctional Facility | DeBerry Special Needs Facility | Turney Center Industrial Complex | TN Prison for Women | Trousdale Turner Correctional Center | Whiteville Correctional Facility | West TN State Penitentiary | |
| | Average Population | 2,370 | 1,968 | 2,111 | 243 | 1,732 | 2,288 | 779 | 1,626 | 748 | 1,572 | 733 | 2,476 | 1,499 | 1,800 | 21,945 |
| Use of Force | UFC  CHEMICAL AGENTS | 3 | 76 | 7 | 0 | 13 | 3 | 12 | 79 | 9 | 2 | 0 | 95 | 95 | 7 | 401 |
| Use of Force | UFD  DEADLY WEAPON | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use of Force | UFE  ELEC RESTRAINTS | 5 | 0 | 9 | 0 | 6 | 15 | 3 | 0 | 2 | 3 | 2 | 0 | 0 | 7 | 52 |
| Use of Force | UFL  LESS THAN LETHAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use of Force | UFM  MEDICAL | 6 | 0 | 6 | 0 | 5 | 5 | 7 | 0 | 138 | 0 | 2 | 1 | 0 | 0 | 170 |
| Use of Force | UFP  PHYSICAL | 13 | 26 | 31 | 0 | 9 | 11 | 25 | 48 | 20 | 23 | 9 | 75 | 27 | 22 | 339 |
| Weapon | WAB  AMMUNITION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weapon | WAM  AMMUNITION-SIGNIF AMT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weapon | WCF  COMMERCIAL FIREARM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weapon | WCK  COMMERCIAL KNIFE | 1 | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 1 | 11 |
| Weapon | WEB  EXPLOSIVE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weapon | WEX  EXPLOSIVE-SIGNIF AMT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weapon | WHF  NON COMMERCIAL FIREARM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weapon | WHK  NON COMMERCIAL KNIFE | 5 | 131 | 76 | 0 | 173 | 426 | 37 | 240 | 2 | 96 | 0 | 328 | 139 | 68 | 1,721 |
| Weapon | WOT  OTHER | 11 | 1 | 16 | 0 | 4 | 6 | 4 | 1 | 1 | 5 | 1 | 16 | 0 | 3 | 69 |
| Weapon | WPC  CLUB | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 4 |
| Weapon | WRM  RAW MATERIALS | 15 | 1 | 21 | 0 | 21 | 45 | 6 | 0 | 0 | 13 | 0 | 15 | 2 | 8 | 147 |
| Weapon | WTA  CLASS A TOOL | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 4 |
| Weapon | WTB  CLASS B TOOL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | **Summary** | | | | | | | | | | | | | | | |
| | | BCCX | HCCF | MCCX | MLTC | NECX | NWCX | RMSI | SCCF | SPND | TCIX | TPFW | TTCC | WCFA | WTSP | Total |
| | TOTAL | 925 | 825 | 1,348 | 33 | 990 | 1,887 | 703 | 1,184 | 519 | 805 | 289 | 1,626 | 777 | 819 | 12,730 |
| | Rate per 100 - Total | 39.0 | 41.9 | 63.8 | 13.6 | 57.2 | 82.5 | 90.3 | 72.8 | 69.4 | 51.2 | 39.4 | 65.7 | 51.8 | 45.5 | 58.0 |

*Please note that incidents reported may include more than one participant while other incidents are by definition about a single participant (ex: death or suicide).*
*Incident rates (per 100 inmates) are calculated on the basis of the average inmate population by facility and system wide.*
*Source: This report summarizes data entered by Facility Operations' personnel in accordance with TDOC policy 103.02.*

Source:  Department of Correction website.

## Appendix B-6
### Detail of Testwork Related to Inmate Deaths

Our initial testwork relating to deceased inmates' health records revealed the following overlapping missing documents. Of the 38 files we reviewed,

- 12 files (32%) did not have the Accident/Incident/Traumatic Injury Report;

- 4 files (11%) did not have the Problem Oriented Progress Report;

- 23 files (61%) did not have the Mortality and Morbidity Summary; and

- 21 files (55%) did not have the inmate's certified death certificate.

The Chief Medical Officer provided the following missing documents after we requested them:

- 2 Accident/Incident/Traumatic Injury Reports;

- 3 Problem Oriented Progress Reports (1 inmate died at a hospital instead of at the facility, so staff did not need to complete the report);

- 9 Mortality and Morbidity Summaries and 14 Death Summaries, which the Lois M. DeBerry Special Needs Facility substituted for the required Mortality and Morbidity Summary;[43] and

- 21 missing inmate death certificates.

## Appendix B-7
### Summary of Incident-Related Issues Found During Correctional Facility Site Visits

At Whiteville Correctional Facility, we found the following:

- For 6 of 27 items (22%), the facility staff did not enter the incident into TOMIS within 8 hours of occurrence or discovery.

- For 18 of 27 items (67%), the body of the draft incident report did not match the information in TOMIS. Because CoreCivic managed this facility, CoreCivic staff provided us with their CoreCivic 5-1a and 5-1c forms and a few disciplinary forms that they found in a box, which we were able to compare to TOMIS.

- For 26 of 27 items (96%), facility staff did not report the incident to the department's Central Communication Center (CCC) within 30 minutes of occurrence or discovery.

---

[43] The Lois M. DeBerry Special Needs Facility did not record information on 14 of the Mortality and Morbidity Summary forms. The Chief Medical Officer allowed the facility to prepare a Death Summary in lieu of the Mortality and Morbidity Summary because it provided more detail than the Mortality and Morbidity Summary. Although the intent was to be more thorough, the facility did not address the completion of the Mortality and Morbidity Summaries as listed in policy.

- For 7 of 27 items (26%), facility staff did not hold a disciplinary hearing within 7 calendar days of the incident.

- For 5 of 27 items (19%), staff did not submit a Use of Force report to the warden within 8 hours or by the end of the shift.

- For 9 of 27 items (33%), staff did not enter all required incident inmate information in TOMIS; specifically, they did not include descriptions of homemade weapons.

At Trousdale Turner Correctional Center, we found the following:

- For 3 of 25 items (12%), facility staff did not enter the incident information into TOMIS within 8 hours of occurrence or discovery.

- For 7 of 25 items (28%), the body of the draft incident report did not match the information staff entered into TOMIS. Because Trousdale is a CoreCivic facility, we compared the CoreCivic 5-1a and 5-1c forms to TOMIS.

- For 24 of 25 items (96%), staff did not report the incident to the CCC within 30 minutes of occurrence or discovery.

- For 4 of 25 items (16%), staff did not hold a disciplinary hearing within 7 calendar days of the incident.

- For 2 of 25 items (8%), staff could not locate the Staff Assault Incident Review Report.

- For 7 of 25 items (28%), staff did not submit a Use of Force report to the warden within 8 hours or by the end of shift.

- For 9 of 25 items (36%), staff did not enter all required information related to the incident into TOMIS; specifically, staff did not include lists of disciplinary infractions, names of all persons involved, and descriptions of homemade weapons.

At Hardeman County Correctional Facility, we found the following:

- For 5 of 25 items (20%), facility staff did not enter the incident into TOMIS within 8 hours of occurrence or discovery.

- For 12 of 25 items (48%), the body of the draft incident report did not match the information entered into TOMIS. Because CoreCivic manages this facility, we compared CoreCivic 5-1a and 5-1c forms to TOMIS.

- For 24 of 25 items (96%), staff did not report the incident to the CCC within 30 minutes of occurrence or discovery.

- For 3 of 25 items (12%), staff did not hold a disciplinary hearing within 7 calendar days of the incident.

- For 3 of 25 items (12%), staff did not submit a Use of Force report to the warden within 8 hours or by the end of shift.

- For 16 of 25 items (64%), staff did not enter all required information related to the incident into TOMIS; specifically, staff did not include

    o lists of disciplinary infractions,

    o the location of the incident,

    o the time of the incident,

    o the names of all persons involved, and

    o descriptions of homemade weapons.

At Northwest Correctional Complex, we found the following:

- For 2 of 26 items (8%), facility staff did not enter the incident into TOMIS within 8 hours of occurrence or discovery.

- For 26 of 26 items (100%), because staff could not provide draft incident reports, we could not compare them to the information in TOMIS.

- For 26 of 26 items (100%), staff did not report the incident to the CCC within 30 minutes of occurrence or discovery.

- For 7 of 26 items (27%), staff did not hold a disciplinary hearing within 7 calendar days of the incident.

- For 1 of 26 items (4%), staff did not complete a Staff Assault Incident Review Report within 72 hours.

- For 15 of 26 items (58%), staff did not enter all required information related to the incident into TOMIS; specifically, staff did not include

    o lists of disciplinary infractions,

    o the location of the incident,

    o the time of the incident,

    o charges filed,

    o inmate TOMIS IDs,

    o the names of all persons involved, and

    o descriptions of homemade weapons.

At Turney Center Industrial Complex, we found the following:

- For 6 of 28 items (21%), staff did not enter the incident into TOMIS within 8 hours of occurrence or discovery.

- For 25 of 28 items (89%), because staff could not provide draft incident reports, we could not compare them to the information in TOMIS. For 3 incidents, we compared documentation from Use of Force packets to the TOMIS entries because the Use of Force packets contained first-hand accounts of the incidents.

- For 28 of 28 items (100%), staff did not report the incident to the CCC within 30 minutes of its occurrence or discovery.

- For 6 of 28 items (21%), staff did not hold a disciplinary hearing within 7 calendar days of the incident.

- For 3 of 28 items (11%), staff did not submit a Use of Force report to the warden within 8 hours or by the end of the shift.

- For 17 of 28 items (61%), staff did not enter all required information into TOMIS; specifically, staff did not include the location of the incident, the names of all persons involved, and descriptions of homemade weapons.

At Northeast Correctional Complex, we found the following:

- For 7 of 25 items (28%), staff did not enter the incident into TOMIS within 8 hours of occurrence or discovery.

- For 24 of 25 items (96%), the body of the draft incident report either did not match what was entered into TOMIS or staff could not provide a draft incident report for comparison to TOMIS. For 3 incidents, we compared documentation from Use of Force packets to TOMIS entries because the Use of Force packets contain first-hand accounts of the incidents.

- For 24 of 25 items (96%), staff did not report the incident to the CCC within 30 minutes of its occurrence or discovery.

- For 7 of 25 items (28%), staff did not hold a disciplinary hearing within 7 calendar days of the incident.

- For 21 of 25 items (84%), staff did not enter all required information into TOMIS; specifically, staff did not include the location of the incident, the names of all persons involved, and descriptions of homemade weapons.

- Staff at Northeast's Carter County annex facility used incident report forms to record all initial incidents.

**Appendix B-8**
**The Assistant Commissioner of Prisons' Expectations for Incident Reporting Related to Accidents, Injuries, and Illnesses**

- Code 4 Medical Emergencies[44]– "The reporting protocol would be dictated by the severity of the injury or the seriousness of the illness. If the event rises to the requirements outlined in [Policy] 103.02, 'Incident Reporting,' then the requirements of that policy would be followed."

- Inmate Transports to Outside Hospitals for Injury/Illness – "An inmate could be transported to a hospital for an illness that is not life-threatening, yet the required care may be beyond the abilities of the infirmary. A TOMIS entry would be required."

- Work-Related Injuries – "Offender work-related injuries that have been verified by the work supervisor should be entered on the incident screen, per Policy 103.02. The accident, incident, and traumatic injury form should also be completed."

- Accidents With Injuries (Minor to Serious) – "Once security is notified of an inmate injury, no matter the level of severity, an incident would be entered into TOMIS under the appropriate incident code."

- Inmate Injuries Consistent With an Altercation (Minor to Serious) – "The initial entry, prior to completed investigation, could be pending investigation. Depending on the outcome of the investigation, the final entry could be one of the following: 1) assault on offender with weapon or without, 2) fighting, 3) injury accident offender, or 4) injury self-inflicted."

---

[44] This a radio code that correctional staff use when an inmate, staff member, or visitor is experiencing a medical emergency, such as serious chest pains, loss of blood, or other condition that would require health services staff to respond immediately to their location.

Case 3:15-cv-02673 Document 141-5 Filed 02/02/23 Page 92 of 234 PageID #: 25669

**Appendix B-9**
**Total Number of Reported Lockdowns by Correctional Facility**
**October 1, 2017, Through April 12, 2019**

*CoreCivic-managed correctional facilities.
Source: Tennessee Offender Management Information System.

Case 3:16-cv-02267 Document 441-5 Filed 02/11/22 Page 93 of 234 PageID #: 25670

## Appendix B-10
## Methodologies to Achieve Objectives

### Death Reviews and Reporting

To achieve our objectives, we reviewed Department of Correction policies and interviewed the department's Chief Medical Officer and Death in Custody Coordinator to gain an understanding of the process that correctional facility and department staff follow to record an inmate's cause of death in TOMIS and to document the circumstances surrounding the death in the inmate's health record.

To determine the accuracy of inmate deaths recorded in TOMIS, we obtained a list of 171 inmate deaths recorded by facility security staff from October 1, 2017, through May 30, 2019, and compared it to narrative information that health services staff entered in the Online Sentinel Event Log to identify any natural deaths that could be misclassified.

As a result of this comparison, we identified 38 inmate deaths with questionable causes and compared the causes of deaths in TOMIS to the inmates' certified death certificates.

To determine whether the inmate's health record contained the proper documentation relating to the death and subsequent reporting of the death, we reviewed the inmate's health records and searched for documentation required in departmental Policy 113.05, "Deaths and Autopsies."

### Other Incident Reporting

To achieve our objective, we interviewed staff at

- Whiteville Correctional Facility (operated by CoreCivic),
- Trousdale Turner Correctional Center (operated by CoreCivic),
- Hardeman County Correctional Facility (operated by CoreCivic),
- Northwest Correctional Complex,
- Turney Center Industrial Complex,
- Northeast Correctional Complex,
- the department's central office, and
- the Tennessee Correction Academy

to gain an understanding of the process to enter incidents into TOMIS and the type of supporting documentation that facility staff maintain. We reviewed department policies related to entering incidents and pulled a nonstatistical, random sample of Class A incidents at each of the six prisons we visited (see **Table 12**) and performed testwork to determine whether staff entered the incidents into TOMIS according to policy. We searched for original documentation to support the incident entries related to incidents involving staff assault, use of force, and disciplinary hearings. We also

determined if facility staff reported incidents to the Central Communication Center within the required timeframe.

**Table 12**
**Population and Sample Sizes for Incident Testwork**

| Correctional Facility | Population Size | Sample Size Tested |
|---|---|---|
| Trousdale Turner Correctional Center | 642 | 25 |
| Hardeman County Correctional Facility | 351 | 25 |
| Whiteville Correctional Facility | 693 | 27 |
| Northwest Correctional Complex | 96 | 26 |
| Turney Center Industrial Complex | 180 | 28 |
| Northeast Correctional Complex | 309 | 25 |
| **Total** | **2,271** | **156** |

Source: Compiled from auditor testwork.

### Accident and Injury Reporting

To achieve our objective, we tested a random sample of 25 accident/injury entries made in the Accidents screen at the following correctional facilities and populations:

**Table 13**
**Accident/Injury Testwork Population Sizes**

| Correctional Facility | Population Size |
|---|---|
| Hardeman County Correctional Facility | 564 |
| Northeast Correctional Complex | 566 |
| Northwest Correctional Complex | 85 |
| Turney Center Industrial Complex | 299 |
| **Total** | **1,514** |

When we attempted to pull a sample of accidents and injuries at Whiteville Correctional Facility and Trousdale Turner Correctional Center, we found that health services staff did not make any entries in the TOMIS Accidents screen during our audit period, so we were unable to perform the same testwork at those facilities.

We also compared the entries that health services staff made in the Accidents screen to the entries that security staff made in the Incidents screen to see if health services staff reported any accidents or injuries that security staff did not.

### Lockdown Reporting

To achieve our objective, we interviewed security staff at

- Hardeman County Correctional Facility (operated by CoreCivic),

- Trousdale Turner Correctional Center (operated by CoreCivic),

- Whiteville Correctional Facility (operated by CoreCivic),

- Northeast Correctional Complex,

- Northwest Correctional Complex, and

- Turney Center Industrial Complex

to gain an understanding of each prison's definition and reporting of lockdowns. We reviewed department policies for any references to lockdowns. From TOMIS, we extracted and examined a list of 74 reported lockdowns at all prisons for the period October 1, 2017, to April 12, 2019. We also reviewed the Central Communication Center's spreadsheet for any references to lockdowns.

## Statistical Abstract

To achieve our objectives, we interviewed the Director and the Assistant Director of the Decision Support: Research and Planning Division; reviewed the department's Annual Reports and Statistical Abstracts from fiscal years 2016, 2017, and 2018; and obtained a list of current and retired incident codes to gain an understanding of how the division compiles the statistics in the reports. We also conducted testwork related to reporting incidents including deaths, accidents and injuries, and lockdowns at three CoreCivic and three state correctional facilities to identify issues with how correctional staff enter incident data into TOMIS.

# Inmate Sexual Abuse and Sexual Harassment Investigations

## Chapter Conclusion

**Finding 9 – Management did not ensure that state and CoreCivic correctional facilities staff followed policies and procedures for investigating sexual abuse and sexual harassment allegations and documented their results (page 82)**

## INMATE SEXUAL ABUSE AND SEXUAL HARASSMENT INVESTIGATIONS

<u>General Background</u>

Congress enacted the Prison Rape Elimination Act of 2003 (PREA) to address the problem of sexual abuse of people in U.S. correctional agencies. It applies to all public and private correctional facilities that house adult or juvenile inmates, as well as community-based agencies. It also mandates certain standards concerning detection and prevention of prison rape. The Tennessee Department of Correction is required to follow federal PREA standards, issued by the U.S. Department of Justice.



PREA seeks to eliminate sexual assaults and other sexual misconduct in correctional facilities across the country. The Act sets nationwide standards for how correctional facilities and jails should

- identify potential victims and aggressors of sexual abuse and harassment;
- limit cross-gender viewing and searches (male officers do not view female inmates in bathrooms or shower areas or conduct body searches, and vice versa);
- conduct PREA-related training and education for staff; and
- receive, respond to, and investigate allegations of sexual abuse and harassment.

The law also requires audits of all correctional facilities at least once every three years by a U.S. Department of Justice-certified PREA auditor.

Federal law describes two categories for classifying PREA allegations:

- sexual harassment, and
- sexual abuse.

PREA defines sexual harassment as

repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another; and repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

The definition for sexual abuse, however, is broad and includes nonconsensual sexual contact between inmates and consensual or nonconsensual sexual contact between inmates and staff. In the context of this law, rape is considered a form of sexual abuse. According to the department's Policy 502.06, "PREA Implementation, Education, and Compliance," the

department has a zero-tolerance policy regarding sexual acts between staff and inmates as well as between inmates, regardless of whether the act is consensual.

<u>Screenings for Risk of Inmate Abuse or Victimization</u>

The department's Policy 502.06.01, "Prison Rape Elimination Act (PREA) Screening, Classification, and Monitoring," states that the department is to provide a "safe, humane, and appropriately secure environment, free from threat of sexual abuse and sexual harassment for all inmates."

To help meet these standards, the department requires that every inmate receive a PREA screening upon entering the state's correctional system. By asking a series of confidential questions, the screening application helps correctional staff identify whether an inmate is at risk of being either sexually abusive or sexually victimized. See page 153 for more information relating to the department's PREA screening process.

<u>PREA Allegation Reporting</u>

Department policy categorizes PREA allegations as

➢ inmate-on-inmate sexual abuse,

➢ inmate-on-inmate sexual harassment,

➢ staff-on-inmate sexual abuse, and

➢ staff-on-inmate sexual harassment.

Federal PREA law requires the department to provide multiple ways for inmates and staff to privately report PREA allegations. The department's Policy 502.06.2, "Prison Rape Elimination Act (PREA) Allegations, Investigations, and Sexual Abuse Response Teams (SART)," makes the following reporting methods available:

• an internal correctional facility hotline;

• an external advocacy groups hotline;

• a PREA tip line;

• reporting directly to staff either verbally or in writing; and

• any other written communication.

The department created a web-based application called the PREA Allegation System (PAS) in which the correctional facility investigators and/or the facility PREA coordinator log allegations. According to department policy, these staff must log an allegation into PAS within 24 hours of receiving the allegation in order to initiate and track a prompt response to the allegation. Once the allegation is logged, department management can monitor and track the investigation's progress, as well as report on the investigation's findings. PAS assigns each PREA

Case 3:15-cv-00967 Document 141-5 Filed 02/02/23 Page 99 of 234 PageID #: 25676

allegation a unique allegation identification number to allow department management to more easily search and track allegations. Staff log

- the date of the alleged incident;
- the date the allegation was reported;
- the type of allegation;
- the alleged aggressor and victim;
- a description of the allegation;
- a description of the actions taken to investigate the allegation; and
- the results of the investigation.

Since staff use PAS as the primary PREA tracking system, they do not enter PREA allegation information into the Tennessee Offender Management Information System (TOMIS) unless and until the investigators substantiate the sexual assault, based on DNA tests, and send the case to a third-party litigator. The department uses the PAS data to prepare its annual PREA report. See **Appendix C-1** on page 86 for the number of PREA allegations that each correctional facility logged in PAS by type from October 1, 2017, to June 30, 2019.

The data entered into TOMIS, however, does not include the investigation's confidential details. We were told that staff enter the substantiated PREA cases into TOMIS as a means to report them in the department's Statistical Abstract.

PREA Investigations

According to the department's Policy 502.06.2, "PREA Allegations, Investigations and Sexual Abuse Response Teams," management must investigate every allegation of sexual abuse and harassment timely, efficiently, and confidentially in accordance with federal standards. When first responding staff receive an allegation, they should

- instruct inmates to not take any actions that could destroy physical evidence, such as washing hands, showering, brushing teeth, changing clothes, or going to the restroom;
- separate the alleged victim and abuser;
- preserve and protect the alleged crime scene until steps can be taken to collect any evidence;
- notify the Sexual Abuse Response Team;[45] and
- conduct the investigation.

---

[45] The Sexual Abuse Response Team is a coordinated response team of medical and mental health practitioners, facility investigators, and facility security leadership. The department's Office of Investigations and Compliance personnel are not part of this team.

Each correctional facility has an institutional investigator who investigates PREA allegations and reports investigation results. At the conclusion of the investigation, the investigator classifies the allegation as either substantiated, unfounded, or unsubstantiated.

Sexual Abuse Response Team Responsibilities

Each correctional facility is required to have a Sexual Abuse Response Team in place to coordinate the correctional facility's response to allegations. The team ensures that alleged victims of sexual abuse receive immediate medical and mental health attention. The time between when an alleged incident occurs and when it is reported is important because it can impact the amount of physical and DNA evidence collected. The department's Office of Investigations and Compliance personnel, located in field offices throughout the state, collect the physical evidence at the scene if physical evidence is present.

> **PREA Standards**
>
> **Substantiated** – Based on the evidence, the alleged event occurred.
>
> **Unfounded** – Based on the evidence, the alleged event did not occur.
>
> **Unsubstantiated** – Based on the evidence, the investigator could not determine whether or not the alleged event occurred.

If a sexual abuse allegation is reported within 72 hours, the critical time period in order to collect evidence, as required by Policy 502.06.2, then the security shift supervisor who is notified of the allegation is required to initiate a Sexual Abuse Incident Check Sheet. The check sheet provides correctional facility personnel with a list of required notifications they must make, as well as tasks the first responders, medical and mental health personnel, and other Sexual Abuse Response Team members must perform. Management and staff use the check sheet to document the date and time that staff perform each required task. The check sheet is not required after 72 hours of the incident because evidence collection is not viable after this point; however, the allegation must still be reported and investigated.

At the conclusion of every substantiated or unsubstantiated sexual abuse allegation, the facility is required to conduct and document an incident review within approximately 30 days of the investigation's conclusion. Unfounded allegations do not require such a review. The Sexual Abuse Incident Review allows facility personnel to

- consider whether the allegation should lead to a change in policy to prevent the incident from occurring again or to provide better response to a similar event;

- consider if the incident was motivated by race, sexual orientation, gender identity, gang affiliation, or other motivating factors;

- examine the alleged location to determine if any physical barriers could have enabled abuse;

- assess the adequacy of the staffing levels in the area; and

- consider whether to deploy or change monitoring technology.

Case 3:16-cv-02267 Document 481-5 Filed 02/10/22 Page 101 of 234 PageID #: 25678

The Sexual Abuse Response Team is responsible for ensuring that, upon the completion of the investigation, the required documentation is given to the institutional investigator for inclusion in the investigation file. See **Table 14** for a list of the investigation findings by allegation type for all correctional facilities from October 1, 2017, to June 30, 2019.

**Table 14**
**PREA Investigation Findings by Allegation Type**
**October 1, 2017, to June 30, 2019**

| Allegation Finding | Inmate-on-Inmate Sexual Abuse | Inmate-on-Inmate Sexual Harassment | Staff-on-Inmate Sexual Abuse | Staff-on-Inmate Sexual Harassment | Total |
|---|---|---|---|---|---|
| Substantiated | 8 | 12 | 32 | 6 | **58** |
| Unsubstantiated | 104 | 60 | 30 | 49 | **243** |
| Unfounded | 64 | 52 | 76 | 117 | **309** |
| Investigation Ongoing[46] | 20 | 4 | 3 | 3 | **30** |
| **Total** | **196** | **128** | **141** | **175** | **640**[47] |

Source: The Department of Correction's PREA Allegation System.

For additional information on the department's PREA policies, action plan, response to allegations, and investigation information, visit the department's website (https://www.tn.gov/correction/sp/prison-rape-elimination-act.html), which also includes a link to the department's PREA Annual Report.

## Audit Results

**Audit Objective:** Did the department and CoreCivic investigate and document PREA allegations in accordance with department policy and national PREA standards?

**Conclusion:** Based on our audit work, we found that both department and CoreCivic correctional facilities staff did not log PREA allegations timely, and staff at two state facilities, Turney Center Industrial Complex and Northeast Correctional Complex, did not maintain proper investigation documentation. See **Finding 9.**

---

[46] The "Investigation Ongoing" category represents any allegation that did not have a final finding listed with the allegation at the time of our review.
[47] This number does not include two allegations in the table in **Appendix C-1** on page 86 where no type or finding was entered into PAS.

**Finding 9 – Management did not ensure that state and CoreCivic correctional facilities staff followed policies and procedures for investigating sexual abuse and sexual harassment allegations and documented their results**

To determine if the Department of Correction and CoreCivic complied with department policy and federal PREA standards for the period of October 1, 2017, to April 11, 2019,

- we obtained a total population of 108 PREA allegations at Hardeman County Correctional Facility, Whiteville Correctional Facility, Northwest Correctional Complex, and Northeast Correctional Complex; and

- we selected a nonstatistical, random sample of 50 allegations from a population of 117 PREA allegations at Trousdale Turner Correctional Center and Turney Center Industrial Complex.

For the full methodology, including the breakdown of the population and sample sizes for each correctional facility we visited, see Appendix C-2 on page 86.

We also reviewed documentation in the department's PREA Allegation System (PAS) and the investigative files.

Allegations Not Entered Into PAS Timely

Based on our testwork, we found that staff at each correctional facility did not enter PREA allegations into PAS within 24 hours of receipt, as required by the department's Policy 502.06.2, "PREA Allegations, Investigations and Sexual Abuse Response Teams." According to department management, correctional facility staff logged these PREA allegations into PAS when the investigations were completed, rather than within 24 hours of receiving the allegation as required. See **Table 15** for a summary of our testwork results.

**Table 15**
**Results of Testwork – Allegations Not Entered Timely**

| Correctional Facility | Number of Items Tested | Number of Errors and Error Percentage of Allegations Logged After 24 Hours | Average Number of Days Late |
|---|---|---|---|
| Northeast | 22 | 13 (59%) | 15 |
| Northwest | 21 | 12 (57%) | 5 |
| Turney Center | 25 | 15 (60%) | 5 |
| Trousdale Turner* | 25 | 18 (72%) | 10 |
| Hardeman* | 27 | 6 (22%) | 3 |
| Whiteville* | 38 | 34 (89%) | 10 |

*Operated by CoreCivic.

*Additional Concerns Identified at South Central Correctional Facility*

While examining statistics relating to the number of substantiated, unsubstantiated, and unfounded allegations, we noticed that South Central Correctional Facility staff had not entered any investigation results into PAS from April 17, 2019, to August 6, 2019, the date we pulled the statistics. Furthermore, using the facility's internal PREA allegation tracking spreadsheet, we found that staff did not enter four sexual abuse and one sexual harassment allegations made between June 18, 2019, and July 22, 2019.

According to the department's Director of Contract Monitoring, South Central's assistant warden, who was responsible for PREA reporting, transferred to the Hardeman County Correctional Facility in April 2019 but continued to serve as the interim assistant warden at South Central until the position was filled at the end of June. Additionally, South Central hired a new institutional investigator at the beginning of June 2019. According to the warden, the PREA information was not entered into PAS because no one at South Central had access to PAS during that time period.

Investigative Documentation Incomplete or Misclassified

During our testwork, we identified issues with investigative documentation at two state facilities, Northeast Correctional Complex and Turney Center Industrial Complex.

*Northeast's PREA Reviews and Investigation Check Sheets*

At the Northeast Correctional Complex, we found the following:

- For 7 of 22 PREA allegations tested (32%), staff did not complete a Sexual Abuse Incident Check Sheet to document any abuse allegations that were reported within 72 hours after the alleged incident occurred.

- For 2 of 22 PREA allegations tested (9%), staff determined that the allegations were either unsubstantiated or substantiated but lacked a completed Sexual Abuse Incident Review.[48]

The department's Policy 502.06.2 states that

If the alleged sexual abuse occurred within a 72-hour time period of reporting, the security shift supervisor who is notified of the allegation shall initiate the Sexual Abuse Incident Check Sheet . . .

The facility shall conduct a Sexual Abuse Incident Review Report, at the conclusion of every sexual abuse investigation, including investigations in which the allegation has not been substantiated, unless the allegation has been determined to be unfounded.

---

[48] A Sexual Abuse Incident Review is not required if staff determine that the allegations of sexual abuse or harassment were unfounded.

Staff are required to use the Sexual Abuse Incident Check Sheets to document when they take the required steps to respond to an allegation. In addition, by preparing the Sexual Abuse Incident Review Report, management documents its evaluation of the events to help consider whether it should implement processes to prevent similar sexual abuse or harassment incidences from happening in the future. Based on our discussions with department management, the department had identified concerns with the completeness of the case files at Northeast and has appointed a new institutional investigator to conduct future investigations.

*Turney Center's Investigation Results Misclassified*

Based on our testwork at the Turney Center Industrial Complex, for 8 of 25 PREA allegations tested (32%), we found that the investigator did not include sufficient documentation in the investigation case files to support staff's final findings. Specifically, the institutional investigator marked the allegations as unfounded; however, we found that staff's descriptions of the event used a variation of the phrase "due to the lack of evidence," which suggested that staff should have classified the allegation as unsubstantiated rather than unfounded.

According to Title 28, *Code of Federal Regulations,* Part 115, Section 5,

*Unfounded allegation* means an allegation that was investigated and determined not to have occurred.

*Unsubstantiated allegation* means an allegation was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.

For three of the eight allegations,[49] correctional facility staff apparently improperly concluded the allegations were unfounded and, based on that conclusion, did not require staff to complete the Sexual Abuse Incident Review.

After we discussed the misclassifications with department management, they determined that four of the eight allegations should have been classified as unsubstantiated rather than unfounded. Management stated that the remaining four allegations were correctly classified as unfounded, but correctional facility staff should have entered greater detail in the investigative report to justify the findings.

<u>Overall Effect</u>

If correctional facility staff do not log the PREA allegations into PAS timely (within 24 hours of receiving the allegation), department management cannot effectively track and monitor the status of investigations to ensure staff are following required policy when investigating and documenting serious allegations of sexual abuse and harassment. When correctional facility staff do not complete the check sheets or incident reviews when required, the department cannot ensure

---

[49] For four of the allegations misclassified as unfounded, correctional facility staff conducted the Sexual Abuse Incident Review even though it was not required. One other allegation involved sexual harassment, which did not require a review.

that facility staff took proper actions, including notifying facility management and medical and mental health personnel to collect physical evidence if physical evidence is present.

Management's incident review process allows department and facility management to evaluate the events to determine if they need to make any changes to prevent an alleged incident of sexual abuse from occurring again. Because many inmates do not report abuse out of fear of retaliation or shame, or because they do not believe that complaints of sexual abuse will result in any changes, the department's incident reporting may not capture the complete picture of inmate sexual abuse. If correctional facility staff do not properly understand how to classify allegation investigation results, there is an increased risk that management and staff will not properly review or even report critical sexual abuse and harassment allegations.

## **Recommendation**

To ensure that PREA investigations are properly performed in accordance with departmental policies and federal standards, management should educate the correctional facility investigators and other facility personnel who are involved with PREA allegation investigations on the requirements of the investigations. The department should also monitor the information in PAS to ensure that correctional facilities are accurately and timely entering the required information.

## **Management's Comment**

Concur.

Department management understands the importance of accurate data entry and subsequent statistical distribution. Incident data entered into TOMIS is used by both internal and external stakeholders. As noted in comments related to other findings, we are engaged in a review of current policies and processes, associated with TOMIS incident entry, designed to ensure that we provide complete and accurate information to all interested parties.

# Appendix C
## Inmate Sexual Abuse and Sexual Harassment Investigations

### Appendix C-1
#### Additional PREA Allegation and Investigation Information

#### Table 16
#### PREA Allegations by Correctional Facility and Type
#### October 1, 2017, to June 30, 2019

| Facility | Inmate-on-Inmate | | Staff-on-Inmate | | Other | Total |
|---|---|---|---|---|---|---|
| | Sexual Abuse | Sexual Harassment | Sexual Abuse | Sexual Harassment | No Type Entered | |
| Bledsoe County Correctional Complex | 17 | 26 | 16 | 32 | 1 | 92 |
| Hardeman County Correctional Facility* | 17 | 3 | 9 | 4 | 0 | 33 |
| Morgan County Correctional Complex | 9 | 22 | 17 | 19 | 0 | 67 |
| Mark Luttrell Transition Center | 0 | 0 | 0 | 1 | 0 | 1 |
| Northeast Correctional Complex | 6 | 3 | 8 | 8 | 0 | 25 |
| Northwest Correctional Complex | 19 | 4 | 1 | 2 | 0 | 26 |
| Riverbend Maximum Security Institution | 1 | 6 | 20 | 15 | 0 | 42 |
| South Central Correctional Facility* | 35 | 5 | 13 | 3 | 0 | 56 |
| Lois M. DeBerry Special Needs Facility | 1 | 15 | 7 | 14 | 0 | 37 |
| Turney Center Industrial Complex | 10 | 15 | 16 | 28 | 0 | 69 |
| Tennessee Prison for Women | 3 | 1 | 10 | 9 | 0 | 23 |
| Trousdale Turner Correctional Center* | 50 | 11 | 5 | 4 | 1 | 71 |
| Whiteville Correctional Facility* | 17 | 10 | 7 | 12 | 0 | 46 |
| West Tennessee State Penitentiary | 11 | 7 | 12 | 24 | 0 | 54 |
| **Total** | **196** | **128** | **141** | **175** | **2** | **642** |

*Operated by CoreCivic.
Source: The Department of Correction's PREA Allegation System.

### Appendix C-2
#### Methodologies to Achieve Objective

To meet our objective, we obtained the Department of Correction's and CoreCivic's policies related to Prison Rape Elimination Act (PREA) matters, including screenings,[50] investigations, education, and monitoring. We discussed the investigative process with department personnel. To determine if the department and CoreCivic complied with department policy and federal PREA standards, we obtained a list of the PREA allegations for the following correctional facilities for the period of October 1, 2017, to April 11, 2019, and tested either the population or a nonstatistical, random sample of allegations and reviewed the documentation in the department's PREA Allegation System (PAS) and the investigative files.

---

[50] See page 153 for information about PREA screenings.

Case 3:16-cv-02693 Document 141-5 Filed 02/10/22 Page 107 of 234 PageID #: 25684

**Table 17**
**PREA Allegation Population and Sample by Correctional Facility**

| Correctional Facility | Population | Sample Tested* |
|---|---|---|
| Hardeman County Correctional Facility† | 27 | – |
| Whiteville Correctional Facility† | 38 | – |
| Trousdale Turner Correctional Center† | 61 | 25 |
| Northwest Correctional Complex | 21 | – |
| Turney Center Industrial Complex | 56 | 25 |
| Northeast Correctional Complex | 22 | – |

*If blank, the entire population was tested.
†CoreCivic-managed correctional facility.

# INMATE MEDICAL AND MENTAL HEALTH SERVICES

## CHAPTER CONCLUSIONS

**Finding 10 – Department management disregarded controls over statewide procurement and established its own informal procurement and payment system without proper review and approval by oversight authorities (page 96)**

**Finding 11 – Centurion and Corizon did not meet contractual medical and mental health staffing levels (page 98)**

**Finding 12 – CoreCivic and state managed correctional facilities did not ensure that staff placed the required medical and mental health documents in the inmate files or completed the required documents in accordance with department policy (page 100)**

Observation 3 – Staff at Northeast Correctional Complex left a box containing confidential employee and inmate health information in an open area, increasing the risk of unauthorized access to confidential information (page 102)

Observation 4 – We identified concerns with medication administration practices at two CoreCivic facilities during our site visits (page 103)

**Finding 13 – CoreCivic did not have an adequate procedure in place to quickly access inmate medication administration records during an outage of its new electronic medication administration system (page 106)**

Observation 5 – Management should evaluate the department's process of transporting inmates' medical files and medications when inmates are transferred between correctional facilities to determine the risks to inmates when medical files and medications do not arrive at the right destination (page 108)

## INMATE MEDICAL AND MENTAL HEALTH SERVICES

<u>General Background</u>

The Department of Correction is responsible for providing medical, mental health, dental, and vision services to inmates incarcerated in the state's correctional facilities. To provide these services, the department contracts with the following vendors to provide services at state-run correctional facilities:



- Centurion of Tennessee, LLC., for primary medical services, and

- Corizon Health for mental health services.

The department also contracts with Clinical Solutions to operate the central pharmacy, which is located at the Lois M. DeBerry Special Needs Facility and fills prescriptions for the state facilities.

CoreCivic is responsible for providing medical and mental health services to inmates housed at its four correctional facilities. CoreCivic also contracts with Clinical Solutions to fill prescriptions at its facilities.

<u>Access to Medical Services</u>

Both state and CoreCivic correctional facilities have established hours each day for medical staff to evaluate and treat inmates for non-emergency health issues. In addition, the department requires state and CoreCivic each facilities to provide nursing coverage, as well as an on-call physician 24 hours per day, 7 days per week. Centurion is also required to contract with specialty care providers to ensure that inmates have access to specialized services when needed. Corizon is responsible for providing access to mental health practitioners 24 hours per day, 7 days per week.

<u>Staffing Levels</u>

Centurion and Corizon's contracts include a staffing pattern that describes the medical and mental health staffing levels required at the department's facilities. The medical and mental health staffing levels are subject to change when the department identifies changes in needs for clinical staffing at its facilities. Each month, the vendors submit a clinical staff vacancy report to the department, which denotes each vacant position for each facility the vendor operates for the department. The reports list the dates that the positions became vacant, which the department uses to determine when to assess liquidated damages. The department requires Centurion to fill clinical vacancies within 14 days of the position's vacancy, and non-clinical positions must be filled within 30 days. The department requires Corizon to fill all vacant positions within 31 days. According to CoreCivic's contracts, it has 45 days to fill all vacant medical and mental health positions. See page 127 for information related to CoreCivic's 45-day requirement, which applies to both correctional and medical/mental health staff.

When the Centurion and Corizon do not meet staffing requirements, the department is authorized to assess liquidated damages. Under Centurion's contract, the department can assess liquidated damages of $200 per day after 14 days per clinical vacancy, while the department is

authorized to assess damages of $250 per day after 31 days per Corizon's vacancies.  We discuss the department's assessment of liquidated damages against Centurion and Corizon later in this chapter.

<u>Medical and Mental Health Files</u>

Department policies require clinical personnel at all correctional facilities to document the medical and mental health care of inmates.  The correctional facilities must maintain complete and current files on each inmate, and all documents placed within the health record must be in chronological order in the appropriate section of the file.  The following documents are critical for providing and continuing care for the inmates:

- a health classification summary,

- a report of physical examination,

- a health history,

- a health questionnaire,

- a Health Services Major Medical Conditions Problem List,

- a medication administration record,

- physician's orders,

- a mental health evaluation, and

- a drug screening form.

When inmates enter the department's custody, department personnel assess them based on their medical and mental health appraisals, physical examinations, and health histories.  The inmates are classified as Class A, B, or C inmates for medical purposes.  Class A inmates have no restrictions and need no accommodations.  Class B inmates have physical or mental conditions that might limit certain capabilities.  Class C inmates have serious physical or mental limitations.  Department personnel document their assessments on the health classification summary, report of physical examination, and health history.

In addition, when an inmate enters a correctional facility, the health services staff must complete the health questionnaire, which serves as a medical and mental health screening tool and allows staff to document that they instructed inmates about the process to receive medical and mental health care at the facility.

When an inmate's medical and mental health diagnoses require treatment, health services staff are required (by policy) to document this information on the Health Services Major Medical Conditions Problem List.

Health services staff use physician's orders to record treatment orders, and the orders provide the basis for the inmates' prescribed medications. Treatment orders outline the steps that staff must take to provide care to inmates with conditions serious enough to warrant care.

Health services staff complete mental health evaluations for inmates who

- require mental health intervention;

- have not received prior mental health treatment while in the department's custody; or

- discontinued mental health treatment and the mental health provider has no access to the most recent evaluation.

Also, when an inmate enters the department's custody, the inmate is required to undergo a drug screening upon entering the correctional facility. The intake facility staff document the initial drug screening on the Drug Screen Consent/Refusal form, which is then included in the inmate's medical file.

Prescribing and Filling Medications

 Mid-level providers[51] and physicians prescribe medications to inmates and document these prescriptions on their physician's orders. Department policy requires prescriptions listed on the physician's orders to include a diagnosis and stop date before the pharmacy contractor, Clinical Solutions, fills them, and the prescribing provider must document the prescribing diagnosis in the patient record. Health services staff order the prescribed medications through the electronic Center for Innovative Pharmacy Solutions System, and Clinical Solutions fills the orders.

Each month, medical staff transcribe the information from the physician's orders onto the medication administration record, a form used to document the administration of prescribed medications. By policy, this form must include the following information:

➢ inmate name and number and current month and year;

➢ date of order and start/stop date;

➢ name of drug, dose or strength, and dosage form;

➢ route of administration (oral, intravenous, or topical);

➢ time interval or frequency of administration;

➢ duration of order and/or automatic stop order;

➢ attending provider (physician, dentist, etc.); and

---

[51] Mid-level providers are clinical professionals with advanced practice training that legally authorizes them to treat inmates and prescribe medications under protocols developed by a supervising physician. Such providers include certified physician assistants; nurse practitioners; or clinical nurse specialists with a master's level of training and a certificate of fitness, or a doctorate.

> initials of the nurse who transcribed the order.

*Administering Medications*

Each correctional facility has its own procedures for administering medications to its inmates. Some facilities use a medication window that is open during designated times of the day when inmates can walk up to get their medications, while other facilities deliver medications to inmates within their housing units. For some medications, like controlled substances, the administering medical staff must crush and/or float the medicine in small cups of water to minimize the possibility of inmates saving the medication under their tongues for hoarding or selling. Health services staff provide other medications, like blood pressure pills, to inmates to keep in their possession for self-administration.

The medication administration record serves as the official record of when and how health services staff administered each medication to an inmate. Each time a nurse administers a medication, the nurse is required to initial the medication administration record next to each dose provided. It is essential that staff administer medications accurately (that is, the right inmate, drug, dose, time of administration, and route of administration) to meet inmates' medicinal needs.

*New Electronic Medication Administration Record*

Between January and April 2019, CoreCivic gradually rolled out its new electronic Medication Administration Record System, developed by Health Care Systems, at its four Tennessee correctional facilities: Hardeman County Correctional Facility, South Central Correctional Facility, Trousdale Turner Correctional Center, and Whiteville Correctional Facility. CoreCivic worked with Clinical Solutions to host the electronic system through a virtual desktop, with the software installed on each health services computer requiring access at the CoreCivic facilities. Since the system is only accessible through a virtual desktop, it requires internet connectivity. The system uses a scanner and barcoding system to keep track of medications administered. It also interfaces with the Center for Innovative Pharmacy Solutions system to streamline the ordering of medications.

Transfer of Inmate Medical Records

Inmates can be transferred between correctional facilities either permanently or temporarily for various reasons, such as medical treatment, court dates, programming needs, or security reasons. Due to the distance between some correctional facilities, other correctional facilities serve as transit facilities, which house inmates overnight while they are being transported to the receiving facility.

According to department policy, when inmates are temporarily or permanently transferred to a new correctional facility, the inmates' individual health files transfer with them. Health services staff must coordinate with correctional facility transportation staff to ensure that health services staff prepare and package the health records for transfer with the inmates. The sending facility's health services staff must complete the following steps each time inmates and their health records leave a correctional facility:

- maintain copies of the inmate's current medication administration record, a list of the inmate's current medical problems, the last treatment plan note, and the most recent 48 hours of Problem Oriented Progress Records;[52]

- complete a Transfer/Discharge Health Summary and place it in the inmate's health record; and

- complete the Health Records/Medication Movement Document to alert the transportation official of the inmate's special medical needs.



Health services staff package the health records and current medications in a manila envelope and tape a copy of the Health Records/Medication Movement Document to the outside of the package. Transportation staff who receive the records become responsible for ensuring the health files arrive at the final destination, and transportation and health services staff must sign the movement document to record the package's chain of custody.

Online Sentinel Event Log

The department uses a web tool called the Online Sentinel Event Log (OSEL) to report clinical decisions requiring mediation from the central office or significant events that impact daily operations of health and behavioral health care services within the facility. These OSEL entries include, but are not limited to, medical emergencies; serious illnesses and injuries; infirmary and hospital admissions; suicide attempts; deaths; and missing medical records.

If an inmate arrives at the receiving facility without his or her health records or medication, then policy requires the receiving facility's health services administrator to report the event in OSEL and immediately contact the sending facility to arrange for it to send the records as soon as possible.

Department's Quarterly Monitoring

The department's Office of Clinical Services performs quarterly monitoring at both the state and CoreCivic correctional facilities to determine whether the contractors are performing their duties in accordance with contract requirements and departmental policies. These quarterly reviews serve as the department's main tool to assess contractor compliance. The department uses the number of findings from the reviews to calculate and assess liquidated damages against the contractors. See **Table 18** for the quarterly contract monitoring compliance rates for the six facilities we visited. In addition, see **Table 19** and **Table 20** for the department's assessed and collected liquidated damages against Centurion and Corizon for areas of noncompliance during our audit period.

---

[52] Medical personnel use Problem Oriented Progress Records to track an inmate's medical conditions and problems.

**Table 18**
**Quarterly Contract Monitoring Compliance Rates by Correctional Facility**
**For Fiscal Year 2019**

| Correctional Facility | Compliance Percentage (Health Services) | Compliance Percentage (Mental Health) |
|---|---|---|
| Trousdale Turner | 18 of 29 (62%) | 54 of 58 (93%) |
| Whiteville | 18 of 26 (69%) | 46 of 57 (81%) |
| Hardeman | 23 of 27 (85%) | 34 of 39 (87%) |
| Northwest | 28 of 39 (72%) | 39 of 41 (95%) |
| Turney Center | 33 of 34 (97%) | 46 of 51 (90%) |
| Northeast | 44 of 48 (92%) | 37 of 39 (95%) |

Source: Auditors compiled results from the most recent quarterly monitoring reports obtained from the Department of Correction as of March 19, 2019.

**Table 19**
**Centurion Assessed and Actual Liquidated Damages Collected**
**October 1, 2017, to June 30, 2019**

| Calendar Year | Contractual Amounts Paid by Department | Assessed Liquidated Damages | Actual Liquidated Damages Collected |
|---|---|---|---|
| October to December 2017 | $ 21,068,010.18 | $        0 | $        0 |
| 2018 | $ 80,353,938.67 | $   598,600 | $92,020 |
| January to June 2019 | $ 48,988,549.63 | $   964,410 | $        0 |
| **Total** | **$150,410,498.48** | **$1,563,020** | **$92,020** |

Source: Data extracts from Edison, the state's accounting system, and liquidated damage assessment letters provided by the department.

**Table 20**
**Corizon Assessed and Actual Liquidated Damages Collected**
**October 1, 2017, to June 30, 2019**

| Calendar Year | Contractual Amounts Paid by Department | Assessed Liquidated Damages | Actual Liquidated Damages Collected |
|---|---|---|---|
| October to December 2017 | $ 3,527,064.57 | $        0 | $0 |
| 2018 | $15,262,242.68 | $377,750 | $0 |
| January to June 2019 | $10,314,455.01 | $236,750 | $0 |
| **Total** | **$29,103,762.26** | **$614,500** | **$0** |

Source: Data extracts from Edison, the state's accounting system, and liquidated damage assessment letters provided by the department.

<u>Facility Fire and Safety Duties</u>

Each correctional facility has a designated Fire and Safety Officer (FSO), who is responsible for compiling monthly statistics related to any accidents and injuries that occur within the facility. In order to create the monthly report, the correctional facility's medical staff provides Accident/Incident/Traumatic Injury Reports to the FSO.

The FSOs review the monthly statistics to identify any trends related to safety at the facility. For example, if multiple people fall and injure themselves in the same spot, the FSO would look for an underlying issue (such as a water leak or an uneven sidewalk) and repair it to prevent further injuries. Each FSO compiles the statistics in a spreadsheet and sends them to the department's Director of Safety Programs. The department's Safety Programs Office does not collect accident and injury statistics from any of the CoreCivic correctional facilities because CoreCivic has its own corporate procedure for tracking accidents and injuries.

## Audit Results

**1. Audit Objective:** Did the correctional facilities adequately staff medical and behavioral health personnel to provide care for the inmates?

   **Conclusion:** Centurion and Corizon did not meet the minimum medical and mental health staffing requirements, and the department did not adequately enforce contract requirements related to staffing medical and mental health positions. See **Finding 11**.

**2. Audit Objective:** Did Centurion and Corizon prepare and maintain critical medical and mental health documentation in accordance with department policy and contract requirements?

   **Conclusion:** Based on our testwork, we determined that Centurion and Corizon did not prepare and maintain important medical and mental health documentation in accordance with department policy and contract requirements. See **Finding 12**.

**3. Audit Objective:** Did the department assess liquidated damages for noncompliance and collect those damages from Centurion and Corizon for identified areas of contract noncompliance?

   **Conclusion:** We found that the department assesses liquidated damages for identified areas of contract noncompliance; however, the department does not collect the majority of assessed monetary damages due to a value-added credit system that offsets most of the damages. See **Finding 10.**

**4. Audit Objective:** Did the correctional facilities administer inmate medications in accordance with department policy?

   **Conclusion:** Based on our observations of nurses administering medications at multiple correctional facilities, we identified concerns regarding the administration of medication and recording the delivery of medications to inmates at two CoreCivic facilities. See **Observation 4**.

**5. Audit Objective:** Is CoreCivic's new electronic medication administration record system operating effectively?

| Conclusion: | Based on our observations, CoreCivic did not have a backup plan in place in the event its health services staff could not access the system when its facilities lost internet connectivity. See **Finding 13.** We also found that CoreCivic staff often experienced login problems and connectivity issues. See **Observation 4**. |

**6. Audit Objective:** Did the inmates experience delays in medical care when transferring from one correctional facility to another?

| Conclusion: | Although we were unable to determine if inmates experienced breaks in medical care, the department should evaluate the inmate transfer process to ensure inmate medical files are also properly transferred. See **Observation 5**. |

**7. Audit Objective:** Did the department take proper measures to ensure that Fire and Safety Officers secured documents containing confidential health information at the correctional facilities?

| Conclusion: | During a walkthrough of the warehouse facility at the Northeast Correctional Complex, we found that the Fire and Safety Officer did not properly secure boxes containing Accident/Incident/Traumatic Injury Reports, which contain confidential health information related to serious injuries and illnesses. See **Observation 3**. |

### Finding 10 – Department management disregarded controls over statewide procurement and established its own informal procurement and payment system without proper review and approval by oversight authorities

Although the Department of Correction management had formal contracts in place for two medical service vendors, management failed to follow the state's established contract amendment process when it decided to informally modify the contract terms involving vendor liquidated damages. Specifically, management designed and implemented a "value-added credit system" to issue credits to a vendor for performance outside the scope of its formal contract with the department. Under the modified arrangement, when the department issues credits to the vendor, the vendor is allowed to use the credits to reduce any assessed or future liquidated damages resulting from the vendor's noncompliance with contract requirements.

We found that both medical services vendors, Centurion and Corizon, benefited from the department's value-added credit system. Although the credit system was not authorized through proper contract amendments, the department issued each vendor credits to offset liquidated damages. The department had assessed both vendors a combined total of approximately **$2.1 million** for contract noncompliance issues; however, by negating the damage assessments through the value-added credit system, the department **only collected damages of $92,020 from Centurion** and **$0 from Corizon** during our audit period.

Value-Added Credits and Assessed Liquidated Damages

We obtained the department's list of the vendors' self-reported efforts for which the Chief Medical Officer issued credits (see **Appendix D-1** on page 109). Based on our review of the list, we found instances where the department issued credits for areas not included in the contract; it appears the department also issued credits for existing contract requirements. Given the conditions noted in **Finding 11** related to vendor nonperformance, we question management's decision to implement the informal value-added credit system.

We sought additional clarity from staff within the state's Central Procurement Office (CPO) on both of these contracts and the related liquidated damages clause. According to CPO, Centurion's contract, which was executed in 2013 and again in 2018, has more permissive language in regard to assessing liquidated damages, allowing more flexibility for negotiations of liquidated damages. Corizon's contract, however, which was executed in 2016, is absolute and requires the vendor to pay damages through invoice adjustments. Despite the contract language differences regarding liquidated damages, CPO agreed that neither contract allows for the value-added credit system.

Management's Rationale for the Credit System

According to the department's Chief Financial Officer (CFO), the contracts between Centurion and Corizon both state that the department "may assess" liquidated damages, which he stated means *it is at the department's discretion whether to collect any damages*. Additionally, the CFO explained that sometimes the department will pursue a contract amendment, but sometimes the amendment process takes too long.

Criteria and Impact of Improper Contracts Terms and Condition

By creating new terms and conditions outside the normal contract process, management has subjected the state to the risk of financial repercussions from potential litigation, including risks associated with vendor solicitation and contract negotiations. In addition, management's modification to the liquidated damages process was not formally reviewed or approved by the state's contract oversight authorities, the Central Procurement Office, the Office of the Comptroller of the Treasury, and the Fiscal Review Committee, all of whom protect the state's interests.

According to the *Comprehensive Rules and Regulations of the Central Procurement Office*, Section 0690-03-01-.17(h), "Entire Agreement, Amendments, Modifications, Renewals or Extensions,"

All contracts subject to these Rules shall contain a provision that provides that the contract reflects the entire agreement of the parties and that there are no other prior or contemporaneous agreements that modify, supplement or contradict any of the express terms of the contract. All contracts shall further provide that any amendments, modifications, renewals or extensions to the contract shall be in writing and signed by all parties who signed the Base Contract.

**Recommendation**

Chief executives of each state entity should take direct responsibility for issuing, monitoring, and managing their entity's respective vendor contracts; however, they cannot operate outside the contracts' authority.

Department management should review every contract currently in place and evaluate whether management is allowing vendors to perform services outside the scope of the contract. If so, management should amend the contract immediately to include those services in the contract.

**Management's Comment**

Concur.

Department management interpreted language in the contract to be discretionary with regard to the implemented remedies that were done in the best interest of the department and the state.

Department management agrees that based upon the auditors' findings and interpretation of the contract, we will review all contracts currently in place and going forward amend contracts to include services if they are being performed out of scope.

<span style="color:darkred">**Finding 11 – Centurion and Corizon did not meet contractual medical and mental health staffing levels**</span>

To determine if Centurion and Corizon complied with contractual staffing levels, we selected a nonstatistical, random sample of five months within the audit period at the three state-managed correctional facilities we visited.

> See the full methodology in Appendix D-5 on page 120.

Based on our analysis of the five monthly clinical staffing reports that we obtained and reviewed for Northwest Correctional Complex, Turney Center Industrial Complex, and Northeast Correctional Complex, we determined that Centurion and Corizon did not meet the medical and mental health staffing requirements outlined in their respective contracts. Specifically, Centurion and Corizon did not always fill vacancies within the required timeframe.[53] (See **Tables 20-25** in **Appendix D-2** on page 113.) The vendors' staff at the facilities are working a considerable number of overtime hours to cover for these vacant positions. See **Table 21** for an example of total overtime hours for the five months selected at the three correctional facilities.

---

[53] The department assessed Centurion and Corizon liquidated damages for contract noncompliance; however, the department allowed for an informal value-added credit system, which offset the liquidated damages assessments. See **Finding 10** for details.

**Table 21**
**Number of Overtime Hours Per Facility[54] Per Month[55]**

| Facility | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
|---|---|---|---|---|---|
| Northeast | 177.37 | 106.58 | 164.87 | 196.75 | 196.00 |
| Turney Center | 214.27 | 320.25 | 365.50 | 492.25 | 366.50 |
| Northwest | 594.75 | 481.65 | 642.00 | 895.00 | 625.75 |

Source: Monthly medical timesheet documentation for Northeast Correctional Complex, Turney Center Industrial Complex, and Northwest Correctional Complex obtained from the Department of Correction.

According to the contract, Centurion is "responsible for adequate staffing at each State facility." Corizon's contract states that it will also "provide adequate and qualified staff to fulfill its obligations." Even though Centurion's contract provides for 14 days to fill clinical vacancies, we found that the department allows Centurion 30 days due to the difficulties in advertising the vacancies, holding interviews, and completing the hiring process; however, this allowance is not listed as a provision of the contract. Corizon's contract states that all vacancies should be filled within 31 days, its normal contract requirement. For our analysis of clinical staffing reports, see **Appendix D-2** on page 113.

According to management, the contractors experienced challenges in hiring staff, particularly behavioral health staff, because professionals have to move to rural areas where the facilities are located. Management stated that this is a nationwide clinical problem and is not limited to the correctional field.

We could not determine if inmates suffered from lack of care, but potential risks exist if facilities do not have adequate medical and mental health staff. Inmates could remain untreated or could be treated by overworked, overly tired personnel who have to work long hours due to vacancies.

## Recommendation

The department should work with Centurion and Corizon to develop and enhance recruiting of medical and mental health professionals to staff these positions at the correctional facilities.

## Management's Comment

Concur.

Staff shortages exist; however, there was no determination that inmate care suffered as a result. The "positions" that were vacant did not go unfilled. For the most part, shifts were covered and the services were provided. In any cases where the shifts were not covered, liquidated damages were calculated.

---

[54] Based on the total number of overtime hours reported in Centurion's timesheet documentation.
[55] Months referenced in the table are the months listed in the respective correctional facility's table in **Appendix D-2** on page 113. For example, at Northeast, we analyzed staffing for the months of March, April, July, November, and December 2018.

Case 3:16-cv-02267   Document 141-5   Filed 02/12/28   Page 120 of 234 PageID #: 25697

Also, many of the things mentioned in the recommendation are things the agency already does. Standing meetings where staffing is discussed are held regularly and frequently, at least four times per month with our vendor partners. We meet with Centurion, on a bi-weekly basis (twice per month) and CoreCivic and Corizon on a monthly basis (once per month).

The focus of these meetings is committed to staffing, specifically to identify strategies to review, augment and improve staffing and personnel resources. Staffing resources, techniques and strategies are discussed and developed.

At each of these meetings we review vacancies and collaborate with the vendor to develop innovative strategies to enhance recruitment and retention and other techniques to attract the best and the brightest medical providers are developed and discussed.

It is important to recognize that the staffing challenges we encounter are not solely a contractual compliance challenge or a correctional health care problem. Hiring sufficient staff, both medical and security, to work in a correctional setting is in fact a statewide as well as a national challenge.

According to the Tennessee Board of Nursing Statistics, RNs not practicing in the target counties range from 3 to 7%, likewise the percent of LPNs not practicing ranges from 3 to 7%. "A 2019 report released by Nursing Solutions, Inc. estimated the shortage of registered nurses will reach 1.13 million by 2024. The U.S. Health Resources and Service Administration projected Tennessee will only be able to meet half of the demand for registered nurses by next year."

The department will continue to work with Centurion and Corizon to develop and enhance recruiting of medical and mental health professionals to staff positions at the correctional facilities.

### Finding 12 – CoreCivic and state-managed correctional facilities did not ensure that staff placed the required medical and mental health documents in the inmate files or completed the required documents in accordance with department policy

To determine if the inmates' medical files have the required medical and mental health documentation as required by policy, we tested a nonstatistical, random sample of 294 inmates from a total population of 726 inmates who were likely to have documented medical and mental health conditions at the six correctional facilities we visited from April 2019 through June 2019.

> For the full methodology, including the breakdown of the population and sample sizes for each correctional facility we visited, see Appendix D-5 on page 120.

Based on our review of the sample of inmate medical files, we found instances where health services staff did not file medical and mental health documentation as required or did not complete the documentation in accordance with Department of Correction policy. We performed testwork during site visits at six correctional facilities (three state-managed and three CoreCivic-operated), and we found numerous instances of noncompliance. Specifically, we noted the following:

- medical staff did not always include key information on the medical administration records;

- medical staff did not always include initial drug screenings in the medical files;

- we could not locate physical and mental health exams in all medical files we reviewed;

- we could not locate mental health evaluations for all inmates with documented mental health conditions in our sample;

- medical staff did not always include physician's orders in patient files;

- we could not locate mental health treatment plans for all inmates with documented mental health conditions in our sample; and

- we could not locate health classification summaries in all medical files we reviewed.

See **Chart 22** for a summary of our testwork results. The detail of noncompliance for incident reporting is located on **Appendix D-4** on page 118.

**Chart 22**
**Number of Errors by Noncompliance Type and Correctional Facility**

| | Correctional Facilities | | | | | |
|---|---|---|---|---|---|---|
| | Whiteville | Trousdale Turner | Hardeman | Northwest | Turney Center | Northeast |
| Missing Key Information in Medical Administration Records | 13 | 13 | 17 | 19 | 14 | 6 |
| Missing Initial Drug Screenings | 21 | 1 | 9 | 14 | 21 | 10 |
| Missing Physical and Mental Health Exams | 3 | - | 6 | - | - | - |
| Missing Mental Health Evaluations | 7 | - | 4 | 2 | - | 2 |
| Missing Physician's Orders for Medications | - | - | 3 | - | - | - |
| Missing Mental Health Treatment Plans | - | - | 3 | - | - | - |
| Missing Health Classification Forms | - | - | - | - | 2 | - |

Source: Auditor testwork results.

According to management, the missing or incomplete medical information is likely a result of human error and staff not following departmental policies related to documentation of medical and mental health assessments and treatment plans. We could not determine if patients did not receive care; however, not ensuring that health services staff properly document inmate medical and mental health assessments and treatment plans, including prescriptions, increases the risk that inmates

- will not receive the appropriate medical and mental healthcare treatment or services;

- will not receive appropriate prescriptions to achieve the desired therapeutic effect; and

- could potentially hurt themselves, other inmates, and staff if ailments are left untreated.

## **Recommendation**

Department management should immediately review its training of all staff responsible for medical administration and its monitoring of vendors who provide medical and mental health services at its facilities to ensure that the medication administration records contain documentation required by the department. Furthermore, the department should review all inmate medical files to ensure they are accurate and complete.

Given the issues identified, the department should evaluate its risk assessment and include additional controls or process changes to reduce the likelihood of accidental medical injuries to inmates under its care.

## **Management's Comment**

Concur.

The Department has an old and cumbersome paper health records system. So it is true that required medical and mental health documents were not always in the inmate files or that staff had not always completed the required documents in accordance with department policy. Therefore, it is a top priority for our agency to transition from paper to electronic medical records to keep pace with healthcare industry standards.

Department management will also review its training of all staff responsible for medical administration and its monitoring of vendors who provide medical and mental health services at its facilities to ensure that the medication administration records contain documentation required by the department.

**Observation 3** – Staff at Northeast Correctional Complex left a box containing confidential employee and inmate health information in an open area, increasing the risk of unauthorized access to confidential information

While performing a walkthrough of Northeast Correctional Complex's warehouse on June 11, 2019, we observed a large box of paperwork in an open area. While looking through the boxes, we found various facility-related documentation, including Accident/Incident/Traumatic Injury Reports, which contain protected health information, for both inmates and employees from October 2017 through December 2018. Furthermore, we observed two correctional officers in and around the warehouse area who could have accessed the files. According to the prison's Fire and Safety Officer, she placed the boxes in the warehouse from approximately December 2018 to June 11, 2019, to make more storage space in her office. She intended to send the boxes to the records

section of the warehouse but had not at this point. After we brought the issue to her attention, she moved the boxes to her office and secured them behind a locked door.

The department's Policy 113-52, "Release of Protected Health Information," states that the protected health information of any inmate is confidential and should only be used, shared, or disclosed in accordance with policy. It also states that

> any employee who possesses confidential information in his/her office shall lock office doors and/or filing cabinets that contain protected health information. No information of this nature shall be stored in general view in any location within the facility. An employee shall report any suspected tampering of files to his/her immediate supervisor.

By not properly securing confidential documents, management increases its risk that confidential health information and sensitive incident-related details could be seen by staff or inmates. The Accident/Incident/Traumatic Injury Reports contain incident witness statements, increasing the risk of inmate retaliation if inmates see these reports. Furthermore, because some documents contained health information, there is an increased risk of potential violations of the federal Health Insurance Portability and Accountability Act.[56]

Department of Correction and correctional facility management should ensure that all sensitive records are properly secured to prevent unauthorized access by facility staff or inmates.

---

**Observation 4** – We identified concerns with medication administration practices at two CoreCivic facilities during our site visits

The Department of Correction's Policy 113.71, "Administration/Distribution of Medication," requires the following procedures when distributing medications to promote the safe management of pharmaceuticals consistent with legal and professional standards of care:

- The medication administration record is to be used as a permanent record of medication administered/distributed to an inmate. Upon administration or distribution of a prescribed medication, all pertinent information shall be recorded on the medication administration record.

- Nursing personnel shall verify that they have the right inmate, drug, dose, time of administration, and route of administration before administering/distributing a medication.

- Certain medications, like those ordered to treat mental health disorders, require direct observation therapy, which means face-to-face observation and monitoring by a qualified health professional of an inmate taking their medications.

---

[56] The federal Health Insurance Portability and Accountability Act requires health care providers and health care insurers to maintain the privacy and security of individually identifiable health information.

- All psychotropic drugs, controlled medications, [tuberculosis] prophylaxis/treatment medication, and drugs requiring parenteral administration are to be administered only on a dose by dose basis crushed, and under water, unless directed otherwise by the provider.

- If a medication is not administered, the nurse shall enter the appropriate code in accordance with the legend indicated on the approved medication administration record(s).

The department's policy does not explicitly outline physical safety requirements regarding medication administration; however, according to Paragraph 10.03 of the *U.S. Government Accountability Office's Standards on Internal Controls*, which serves as best practice for states,

> Management designs appropriate types of control activities for the entity's internal control system. Control activities help management fulfill responsibilities and address identified risk responses in the internal control system.

The same section also lists physical control over vulnerable assets as a common control activity category, suggesting that "Management establishes physical control to secure and safeguard vulnerable assets."

During our visits to correctional facilities, we observed nurses administering medications at Hardeman County Correctional Facility, Trousdale Turner Correctional Center, Northeast Correctional Complex, Northwest Correctional Complex, and Turney Center Industrial Complex. Based on our observations, we identified the following medication administration concerns at two of the CoreCivic facilities.

*Hardeman*

- Nurses were repeatedly and unexpectedly logged out of the new electronic medication administration records system (eMARs) and/or experienced login difficulties, which could impact the nurses' ability to record information regarding medication distribution or administration.

- The electronic medication administration records, which nurses use to administer medication, did not always print correctly for the nurses; reports had intermittent blanks rather than the department-defined codes showing that the inmate took or did not take the medication; reports were missing KOP[57] information; reports were missing medication start and stop dates; and reports printed with undefined codes.

- Although department policy requires "face-to-face observation and monitoring by a qualified health professional of an inmate taking their medication," we observed nurses relying on correctional officers to ensure inmates swallowed their medications before leaving the clinic rather than the nurses ensuring inmates swallowed their pills.

---

[57] KOP stands for keep on person, which is medication that inmates are allowed to keep in their cells rather than having to obtain it from the nurse each day.

- Nurses apparently double-scanned some medications into eMARs in an attempt to get caught up with scanning medications that had been administered earlier in the day. Facility staff told us that the nurses were delayed in entering medication data due to a system outage earlier in the day and had to perform duplicate scans when the system was available. While we could not determine if this resulted in inmates not receiving medications, management must ensure that it implements proper controls to reduce the risk of inmates not receiving medications or receiving duplicate doses due to system outages.

*Trousdale Turner*

- Nurses informed us that they had difficulties logging into eMARs and often lost connectivity to the system, which could result in medication distribution/administration information going unrecorded.

- The medication administration reports did not print correctly; reports had intermittent blanks rather than the department-defined codes showing that the inmate took or did not take the medication; reports were missing medication start and stop dates; and reports printed with undefined codes.

- One nurse told us that she was administering psychotropic medications and/or controlled substances, but we did not observe her crush or float any of the medications as required by policy.

- We observed three inmates walk away with their medications without waiting for a nurse to watch them swallow even though policy requires "face-to-face observation and monitoring by a qualified health professional of an inmate taking their medication."

- As nurses were administering medications to a pod, several inmates entered the common area of the unit and were allowed to stand very close to the medication cart behind the nurses as they administered medications, posing a potential risk to the security and safety of nursing staff and medications. While department policy does not explicitly outline physical safety requirements for staff who administer medications, management has a responsibility to establish physical controls to secure and safeguard vulnerable assets, including both the medical staff and the medications.

CoreCivic's Regional Health Services Director indicated that nurses experienced login and intermittent connectivity issues with the new eMARs system because only 25 users across all 4 CoreCivic-managed facilities could log in to the virtual desktop concurrently. If nurses did not log out when not actively using the system, nurses attempting to access eMARs might not be able to log in to the system. Additionally, the department's Associate Director of Medical Services indicated that poor internet speeds could also cause some of the system connectivity issues. The department's Chief Medical Officer stated that because eMARs is so new, CoreCivic is working through the bugs, but it intends to perfect the system at the CoreCivic facilities and eventually transition to using it at the department-managed facilities.

The department's Chief Medical Officer indicated that some of the problems could be due to turnover and lack of refresher training. The effects of poor physical controls surrounding the administration of medications are wide-ranging and include increased risks of

- physical harm to nurses, officers, and inmates;
- inmates stealing pills;
- inmates not taking critical medications; and
- inmates trading or selling pills.

The Chief Medical Officer should ensure that health services staff distribute medication to inmates in accordance with department policy and medical industry standards to ensure that inmates receive their medications in a safe, controlled environment. The department should continually provide training to health services staff at the correctional facilities to ensure that knowledge is not lost when there are periods of high turnover.

### **Finding 13 – CoreCivic did not have an adequate procedure in place to quickly access inmate medication administration records during an unexpected outage of its new electronic medication administration system**

During our visit to Hardeman County Correctional Facility on May 14, 2019, the facility experienced a localized internet outage that affected the ability of staff at both Hardeman County and Whiteville health services to log in to the electronic medication administration records system (eMARs) to obtain records. The outage lasted from approximately 7:00 a.m. to 1:00 p.m.; as a result, staff could not quickly identify inmates who needed morning medications. To obtain the medication records during the outage, CoreCivic's Regional Health Services Director emailed the records from a remote site to the Department of Correction's onsite contract monitor, who used his personal cellular Wi-Fi device to access email and print the records.

Based on our real-time observations during the internet outage and review of the instructions provided by the Regional Health Services Director, we found that CoreCivic had a procedure in place for a nurse at each facility to save a nightly backup of inmates' medication administration records onto one designated desktop so the facility would be able to access and print the files in the event staff could not access eMARs. This procedure, however, did not take into consideration that new users who had never logged in to the desktop would not be able to log into it. Only three users had the ability to log into the desktop to retrieve the backup, and none of those individuals were onsite the day of the outage.

According to Critical Element CP-2, "Take Steps to Prevent and Minimize Potential Damage and Interruption," of the U.S. Government Accountability Office's *Federal Information System Control Audit Manual* (FISCAM),[58]

---

[58] FISCAM provides a methodology for performing information system control audits in accordance with generally accepted government auditing standards.

File backup procedures should be designed so that a recent copy is always available. . . . Staff should be trained in and aware of their responsibilities in preventing, mitigating, and responding to emergency situations.

Additionally, FISCAM Critical Element CP-3, "Develop and Document a Comprehensive Contingency Plan," states,

A contingency plan or suite of related plans should be developed for restoring critical applications; this includes arrangements for alternative processing facilities in case the usual facilities are significantly damaged or cannot be accessed. Agency/entity-level policies and procedures define the contingency planning process and documentation requirements. Furthermore, an entity wide plan should identify critical systems, applications, and any subordinate or related plans. It is important that these plans be clearly documented, communicated to affected staff, and updated to reflect current operations. . . . In addition, the plan should address entity systems maintained by a contractor or other entity (e.g., through service level agreements).

CoreCivic's Regional Health Services Director stated that eMARs is brand new, and CoreCivic had not anticipated all the scenarios that could go wrong during an internet outage. Not having an adequate plan in place to retrieve inmate medication administration records during a system outage increases the risk that inmates may not receive their prescribed medications. During our audit fieldwork, the department's Director of Contract Monitoring for CoreCivic facilities provided us documentation that showed CoreCivic created a new, formal disaster recovery plan for eMARs on July 1, 2019.

### Recommendation

In the event of an internet outage, natural disaster, or other event that may prevent users from accessing electronic copies of inmates' medication administration records, the department should be able to ensure that the right inmate gets the right medication at the right time. The department should ensure that CoreCivic facilities follow and test their new disaster recovery process for saving and retrieving emergency medication administration records.

### Management's Comment

Concur.

Department agrees with the audit recommendation and is requiring a revision to the individual CoreCivic Institution's Emergency Operations Plan, Policy #506.20, Section VI.(D)(4), "Emergency Medical Services Plan," to include the new disaster recovery process for saving and retrieving EMR records that contain site specific information. This plan will be tested in accordance with policy #506.20 and be added to contract monitoring and exam instruments to ensure the framework of the procedure is in place to respond in the event of an emergency internet outage.

**Observation 5** – Management should evaluate the department's process of transporting inmates' medical files and medications when inmates are transferred between correctional facilities to determine the risks to inmates when medical files and medications do not arrive at the right destination

While performing testwork at Northwest Correctional Complex during the week of May 20, 2019, health services staff could not find an inmate's medical file that we requested for our testwork. We found that the file was missing from April 14, 2019, until May 23, 2019. According to the facility's Health Services Administrator, this inmate had a chronic health condition and had to be admitted to Nashville General Hospital. As a standard procedure, when inmates are admitted into Nashville area hospitals, the facility's health services staff temporarily transfer the inmates' medical files to the Lois M. DeBerry Special Needs Facility. In this instance, due to a miscommunication, when the hospital discharged the inmate, staff at Lois M. DeBerry did not transfer the inmate's file back to Northwest.

To determine whether correctional facilities experienced delays in receiving inmate medications or medical files, we reviewed all of the entries in the Online Sentinel Event Log (OSEL) from October 1, 2017, to June 30, 2019. We identified approximately 800 instances where facility health services staff made an entry in OSEL when inmates arrived at a receiving institution without all of their medications; medical paperwork (such as medication administration records); and/or medical files. We found, however, that the information in OSEL is limited because health services staff do not always enter the name of the sending facility or update the entry when they actually receive inmates' medical information. Furthermore, we observed that correctional facilities' health services staff took alternative steps, such as creating temporary medical files and contacting the central pharmacy or the prior facility's staff, to obtain the necessary information in order to serve the inmates.

Although we were unable to determine if inmates experienced a break in medical care due to the lack of medical files, management should evaluate the entire process, identify risks to inmates, and develop controls to mitigate those risks.

# Appendix D
## Inmate Medical and Mental Health Services

### Appendix D-1
### Department's Assessed Liquidated Damages and Offsetting Value-Added Credits for Centurion and Corizon

### Excerpts From Department-Provided Exhibit of Centurion's Liquidated Damages Applied to Value-Added Services
### (Unaudited)

Value Added Services –Centurion

| | | |
|---|---|---|
| 1. TPFW restructuring of staffing – comprehensive evaluation of staffing patterns based on significant increases in diagnostic intakes (avg. 5-10 per week to 50-75 per week) and establishment of a new intake housing unit requiring in-unit health services delivery TPFW required additional staffing resources. Staffed the unit above contract matrix more than one year. Also two CNTs for ADL care. | 2.0 FTEs LPN Intake<br>2.0 CNTs Infirmary care<br>2.8 FTES LPN Housing unit (represents 7 day/week;2 shifts per day)<br><br>Implemented in Fall 2016 | $121,002<br>$76,760<br>$169,403<br>ST:$367,166<br><br>Estimated additional cost $225,000 |
| 2. TPFW Support during restructure - staff were secured from other sites and required bonus pay in addition to housing to support the mission during the review and restructuring phase to ensure care delivery | | $592,166 |
| 3. DSNF – added .5 MD FTE to meet newly identified patient care needs for extended hours to evaluate hospital returns and transfers from other facilities on afternoon chain | Implemented in Fall 2016 | $114,978 |
| 4. PTRAX secured and enhanced scheduling system for on-site patient scheduling; eliminating paper 'appointment book' system previously utilized. System auto generates inmate passes to match TDOC controlled movement passes and Master call out. Off-site scheduling component added to track specialist care. Infirmary bed management added. | | $220,075 |

| | | |
|---|---|---|
| 7. Envolve/Nurtur – Centene implemented in the correctional setting a telephonic health coaching program comparable to those used with community patients. Initial patient population consisted of diabetics but patients with CAD (cardiac) have been added. Patients receive monitored calls from a health coach specializing in a specific area of need such as diet or exercise. Review of patient lab results indicates an average decrease in HgAlc of 2 points for diabetic patients. | Implemented 2014 | $146,305 |
| 8. RubiconMD – remote consultation of specialist by provider. Indirect telehealth visit reduces need to send patient off-site or allows for specific, directed care | | $30,000 |
| 9. No Rate Increase received 9/1/17 – See email sent October 3rd, 2019 for explanation | | $850,000 |
| Total | | $2,043,524 |

**Excerpt From Department-Provided Exhibit of Corizon's Liquidated Damages Applied to Value-Added Services (Unaudited)**

| ITEM | Decription of SERVICE | Hours | Cost | Expenses | Total |
|---|---|---|---|---|---|
| **TN BHS Out of Scope items** | | | | | |
| Specialized treatment treatment groups as part of the development of the new curriculum for the sex offender program. Each individual that was enrolled in the SOTP program was reviewed for selection into the new programming. The treatment team is made up of a psychologist, specialized therapist, and LCSW. All individual were deemed appropriate for continuing in the SOTP. Treatment Team groups within the Sex Offender Program | Additional treatment teams were administered with the Sex Offender Program to assist in the transition of individuals from the program to the living outside the incarcerated environment and transitioning to housing placement if required. | 31 | $45.00 | $0.00 | $1,395.00 |
| in response to the Public Safety Act of 2016, TDOC enhanced the Sex Offender Treatment Program to ensure program was evidenced based. In addition, the program was enhanced to include curriculum considered best practice for treating sex offenders. Modification of Sex Offender Program Reg. Dir | TDOC requested the SOTP be reviewed and revised to reflect the most updated treatment for sex offenders in a correctional setting. The program selected was the Jill Stinson Model. The regional manager was responsible for researching and implementing the new programming. The regional manager trained the facilitators in the model and designed the program. | 200 | $85.00 | $0.00 | $17,000.00 |
| A recreational therapist was assigned an addtionnal duty of providing recreational activities to the operational staff. This was to support the staff working extended shifts and boarding between shifts. Recreation Therapist services to non-MH Health Program | DeBerry Special Needs Facility requested that the vendor have the recreational therapists provide various activities for the staff working double shifts. The staff was required to board between shifts and the activities provided stress relief to the taxed staff. This is essential given the time the Correctional Officers were spending on the job/overtime and to assist in maintaining grounded mental health. | 500 | $45.00 | $0.00 | $22,500.00 |

| | | | | | |
|---|---|---|---|---|---|
| A comprehensive, integrated, systematic and multi-tactic crisis intervention approach to manage critical stress after traumatic events for all employees, under the umbrella of the Tennessee Public Safety Network (TPSN), a non profit agency providing critical incident stress debriefings statewide. CISM Training | TDOC requested to have the vendor provide staff to participate in the CISM training and be part of the CISM. Trainings are conducted annually and a refresher class is offered annually to have individuals trained for Critical Incidents. A licensed mental health provider is required to be part of the formal debriefings. Corizon sends five to six individuals to be part of the team and trainings. This paramount as staff is exposed to truamatic events and can develop trauma like symptoms. This can render staff ill or ineffective if they are not supported appropriately. The team was deployed for the murder of Debra Johnson and subsequent escape of the assailant which occurred during the audit and delayed some of our responses to you, the multiple executions at RMSI over the last 2 years, and for any event that may negatively impact our staff. | 320 | $75.00 | $2,000.00 | $26,000.00 |
| A comprehensive, integrated, systematic and multi-tactic crisis intervention approach to manage critical stress after traumatic events for all employees, under the umbrella of the Tennessee Public Safety Network (TPSN), a non profit agency providing critical incident stress debriefings statewide. CISM TrainingCISM (Cummings) | TDOC requested to send a psychologist to Sumner County to help those Probation officers who were involved with Mr. Cummings. Mr. Cummings was arrested in a high profile mass murder event in which he was the alleged suspect in eight murders. | 60 | $75.00 | $100.00 | $4,600.00 |
| TDOC has estblished and opened two of three housing untis for for veterans to be housed together. The inmates will receive programming and specialized case management. The program began in spring 2019. Housing Training (Vet and Recovery) | TDOC requested the vendor to provide training to the staff that will be involved in the veteran's program. The training was conducted by a LADAC and covered areas of substance abuse with the veteran population. The programs are at BCCX and TCIX. A program will be developed at NWCX. | 120 | $65.00 | $500.00 | $8,300.00 |
| Total | | | | | $820,605.00 |

# Appendix D-2
## Analysis of Monthly Clinical Staffing Reports for Centurion and Corizon
## By State-Managed Correctional Facility

**Tables 23, 24**, and **25** provide an overview of the facility vacancies under the Centurion contract.

### Table 23
### Northeast Correctional Complex Vacancies (Centurion)[59]

|  | March 2018 | April 2018 | July 2018 | November 2018 | December 2018 |
|---|---|---|---|---|---|
| Contract FTE[60] | 51.20 | 51.20 | 51.20 | 51.20 | 51.20 |
| FTE Filled | 50.20 | 50.20 | 51.20 | 49.20 | 47.20 |
| FTE Vacancies | 1.00 | 1.00 | 0.00 | 2.00 | 4.00 |
| % of FTE Positions Filled | 98.0% | 98.0% | 100.0% | 96.1% | 92.2% |
| % of FTE Positions Vacant | 2.0% | 2.0% | 0.0% | 3.9% | 7.8% |
| Missed Hours per Week Due to Vacancies | 40 | 40 | 0 | 80 | 160 |
| # of Inmates[61] | 1,755 | 1,785 | 1,750 | 1,692 | 1,693 |
| # of Licensed Practical Nurses (LPNs) | 21.60 | 21.60 | 21.60 | 21.60 | 21.60 |
| # of Registered Nurses (RNs) | 11.60 | 11.60 | 12.60 | 11.60 | 10.60 |
| Inmates per LPN | 81.25 | 82.64 | 81.02 | 78.33 | 78.38 |
| Inmates per RN | 151.29 | 153.88 | 138.89 | 145.86 | 159.72 |

Source: Monthly medical timesheet documentation and staffing matrices for Northeast Correctional Complex obtained from the Department of Correction.

### Table 24
### Turney Center Industrial Complex Vacancies[62] (Centurion)

|  | October 2017 | February 2018 | June 2018 | July 2018 | August 2018 |
|---|---|---|---|---|---|
| Contract FTE | 46.40 | 46.40 | 46.40 | 47.80 | 47.80 |
| FTE Filled | 44.40 | 44.40 | 43.40 | 43.40 | 46.00 |
| FTE Vacancies | 2.00 | 2.00 | 3.00 | 4.40 | 1.80 |
| % of FTE Positions Filled | 95.7% | 95.7% | 93.5% | 90.8% | 96.2% |
| % of FTE Positions Vacant | 4.3% | 4.3% | 6.5% | 9.2% | 3.8% |
| Missed Hours per Week Due to Vacancies | 80 | 80 | 120 | 176 | 72 |
| # of Inmates | 1,625 | 1,546 | 1,606 | 1,604 | 1,604 |
| # of LPNs | 16.80 | 16.80 | 15.80 | 15.80 | 17.40 |

---

[59] Includes the main site in Johnson County and the annex in Carter County.
[60] FTE stands for full-time equivalent. It equals a unit that indicates the employed person's workload. An FTE of 1.0 is equal to one full-time employee, while an FTE of 0.5 equals half the workload of a full-time employee.
[61] Based on the number of inmates listed at the facility for the month in the department's Bed Space Report.
[62] Includes the main site in Hickman County and the annex in Wayne County.

|  | October 2017 | February 2018 | June 2018 | July 2018 | August 2018 |
|---|---|---|---|---|---|
| # of RNs | 9.40 | 10.40 | 10.40 | 10.40 | 10.40 |
| Inmates per LPN | 96.73 | 92.02 | 101.65 | 101.52 | 92.18 |
| Inmates per RN | 172.87 | 148.65 | 154.42 | 154.23 | 154.23 |

Source: Monthly medical timesheet documentation and staffing matrices for Turney Center Industrial Complex obtained from the Department of Correction.

**Table 25**
**Northwest Correctional Complex Vacancies (Centurion)**

|  | January 2018 | May 2018 | July 2018 | September 2018 | January 2019 |
|---|---|---|---|---|---|
| Contract FTE | 62.70 | 62.70 | 68.00 | 68.00 | 68.00 |
| FTE Filled | 53.30 | 56.50 | 61.50 | 63.30 | 60.10 |
| FTE Vacancies | 9.40 | 6.20 | 6.50 | 4.70 | 7.90 |
| % of FTE Positions Filled | 85.0% | 90.1% | 90.4% | 93.1% | 88.4% |
| % of FTE Positions Vacant | 15.0% | 9.9% | 9.6% | 6.9% | 11.6% |
| Missed Hours per Week Due to Vacancies | 376 | 248 | 260 | 188 | 316 |
| # of Inmates | 2,319 | 2,354 | 2,342 | 2,362 | 2,008 |
| # of LPNs | 21.20 | 21.20 | 24.00 | 25.40 | 25.00 |
| # of RNs | 9.4 | 12.6 | 12.8 | 14.60 | 10.8 |
| Inmates per LPN | 109.39 | 111.04 | 97.58 | 92.99 | 80.32 |
| Inmates per RN | 246.70 | 186.83 | 182.97 | 161.78 | 185.93 |

Source: Monthly medical timesheet documentation and staffing matrices for Northwest Correctional Complex obtained from the Department of Correction.

**Tables 26, 27**, and **28** provide an overview of the hours missed each month for behavioral health employees under Corizon's responsibility. It is important to note that although Corizon provides the service, it uses a number of state-employed clinical staff who have continued to work at the state-run facilities. In the event the state employees end state service, Corizon will assume the responsibility to fill the vacancy as stated in the contract.

**Table 26**
**Northeast Correctional Complex Analysis (Corizon)[63]**

|  | March 2018 | April 2018 | July 2018 | November 2018 | December 2018 |
|---|---|---|---|---|---|
| Required Hours | 2,279.20 | 2,175.60 | 2,279.20 | 2,103.20 | 2,175.60 |
| Worked Hours | 1,772.00 | 1,560.75 | 1,957.75 | 1,672.25 | 1,750.75 |
| Missed Hours | 507.20 | 614.85 | 321.45 | 430.95 | 424.85 |
| Missed 8-hour Days | 63.40 | 76.86 | 40.18 | 53.87 | 53.11 |
| Percentage of Hours Worked | 78% | 72% | 86% | 80% | 80% |
| Percentage of Hours Missed | 22% | 28% | 14% | 20% | 20% |

---

[63]Includes the main site in Johnson County and the annex in Carter County.

| | March 2018 | April 2018 | July 2018 | November 2018 | December 2018 |
|---|---|---|---|---|---|
| Positions Required | 16 | 16 | 16 | 15 | 15 |
| Positions Filled | 16 | 14 | 15 | 13 | 14 |
| Positions Vacant | 0 | 2 | 1 | 2 | 1 |

Source: Monthly behavioral health timesheet documentation and staffing matrices for Northeast Correctional Complex obtained from the Department of Correction.

**Table 27**
**Turney Center Industrial Complex Analysis (Corizon)[64]**

| | October 2017 | February 2018 | June 2018 | July 2018 | August 2018 |
|---|---|---|---|---|---|
| Required Hours | 2,235.20 | 2,032.00 | 2,301.60 | 2,235.20 | 2,520.80 |
| Worked Hours | 1,894.75 | 1,522.50 | 2,089.00 | 2,058.25 | 2,202.50 |
| Missed Hours | 340.45 | 509.50 | 212.60 | 176.95 | 318.30 |
| Missed 8-hour Days | 42.56 | 63.69 | 26.58 | 22.12 | 39.79 |
| Percentage of Hours Worked | 85% | 75% | 91% | 92% | 87% |
| Percentage of Hours Missed | 15% | 25% | 9% | 8% | 13% |
| Positions Required | 16 | 15 | 16 | 15 | 15 |
| Positions Filled | 15 | 14 | 16 | 15 | 15 |
| Positions Vacant | 1 | 1 | 0 | 0 | 0 |

Source: Monthly behavioral health timesheet documentation and staffing matrices for Turney Center Industrial Complex obtained from the Department of Correction.

**Table 28**
**Northwest Correctional Complex Analysis (Corizon)**

| | January 2018 | May 2018 | July 2018 | September 2018 | January 2019 |
|---|---|---|---|---|---|
| Required Hours | 3,256.80 | 3,256.80 | 2,763.20 | 2,672.00 | 2,888.80 |
| Worked Hours | 2,639.48 | 2,549.25 | 2,374.50 | 2,328.00 | 2,458.00 |
| Missed Hours | 617.32 | 707.55 | 388.70 | 344.00 | 430.80 |
| Missed 8-hour Days | 77.17 | 88.44 | 48.59 | 43.00 | 53.85 |
| Percentage of Hours Worked | 81% | 78% | 86% | 87% | 85% |
| Percentage of Hours Missed | 19% | 22% | 14% | 13% | 15% |
| Positions Required | 21 | 19 | 20 | 21 | 20 |
| Positions Filled | 21 | 19 | 19 | 20 | 19 |
| Positions Vacant | 0 | 0 | 1 | 1 | 1 |

Source: Monthly behavioral health timesheet documentation and staffing matrices for Northwest Correctional Complex obtained from the Department of Correction.

---

[64]Includes the main site in Hickman County and the annex in Wayne County.

# Appendix D-3
## Analysis of Monthly Clinical Staffing Reports for CoreCivic-Managed Correctional Facilities

### Table 29
### Whiteville Correctional Facility Vacancies (CoreCivic)

|  | November 2017 | March 2018 | August 2018 | September 2018 | December 2018 |
|---|---|---|---|---|---|
| Contract FTE | 25.85 | 25.85 | 26.05 | 28.25 | 25.50 |
| FTE Filled | 16.05 | 17.05 | 24.25 | 27.25 | 25.50 |
| FTE Vacancies | 9.80 | 8.80 | 1.80 | 1.00 | 0.00 |
| % of FTE Positions Filled | 62.1% | 66.0% | 93.1% | 96.5% | 100.0% |
| % of FTE Positions Vacant | 37.9% | 34.0% | 6.9% | 3.5% | 0.0% |
| Missed Hours per Week Due to Vacancies | 392 | 352 | 72 | 40 | 0 |
| # of Inmates | 1,499 | 1,510 | 1,527 | 1,518 | 1,501 |
| # of LPNs | 4 | 9 | 10 | 10 | 9 |
| # of RNs | 2 | 6 | 5 | 7 | 6 |
| Inmates per LPN | 374.75 | 167.78 | 152.70 | 151.80 | 166.78 |
| Inmates per RN | 749.50 | 251.67 | 305.40 | 216.86 | 250.17 |

Source: Monthly medical and behavioral health staffing documentation for Whiteville Correctional Facility obtained from the Department of Correction.

### Table 30
### Hardeman County Correctional Facility Vacancies (CoreCivic)

|  | September 2018 | October 2018 | November 2018 | March 2019 | April 2019 |
|---|---|---|---|---|---|
| Contract FTE | 37.05 | 37.05 | 36.05 | 31.15 | 31.05 |
| FTE Filled | 35.15 | 36.05 | 36.15 | 36.15 | 36.15 |
| FTE Vacancies | 1.90 | 1.00 | -0.10 | -5.00 | -5.10 |
| % of FTE Positions Filled | 94.9% | 97.3% | 100.3% | 116.1% | 116.4% |
| % of FTE Positions Vacant | 5.1% | 2.7% | -0.3% | -16.1% | -16.4% |
| Missed hours per Week Due to Vacancies | 76 | 40 | -4 | -200 | -204 |
| # of Inmates | 1,998 | 1,983 | 1,989 | 1,977 | 1,976 |
| # of LPN | 13 | 13 | 13 | 13 | 13 |
| # of RN | 8 | 9 | 9 | 9 | 9 |
| Inmates per LPN | 153.69 | 152.54 | 153.00 | 152.08 | 152.00 |
| Inmates per RN | 249.75 | 220.33 | 221.00 | 219.67 | 219.56 |

Source: Monthly medical and behavioral health staffing documentation for Hardeman County Correctional Facility obtained from the Department of Correction.

Case 3:16-cv-02267   Document 481-5   Filed 02/10/22   Page 137 of 234 PageID #: 25714

**Table 31**
**Trousdale Turner Correctional Center Vacancies (CoreCivic)**

|  | June 2018 | July 2018 | August 2018 | November 2018 | December 2018 |
|---|---|---|---|---|---|
| Contract FTE | 45.91 | 45.91 | 49.93 | 51.83 | 51.83 |
| FTE Filled | 45.63 | 45.63 | 52.88 | 49.28 | 51.28 |
| FTE Contract Vacancies | 0.28 | 0.28 | -2.95 | 2.55 | 0.55 |
| % of FTE Contract Positions Filled | 99.4% | 99.4% | 105.9% | 95.1% | 98.9% |
| % of FTE Positions Vacant | 0.6% | 0.6% | -5.9% | 4.9% | 1.1% |
| Missed Hours per Week Due to Vacancies | 11.2 | 11.2 | -118 | 102 | 22 |
| # of Inmates | 2,552 | 2,549 | 2,549 | 2,507 | 2,523 |
| # of LPNs | 15 | 15 | 20 | 16 | 19 |
| # of RNs | 10.28 | 10.28 | 11.28 | 11.28 | 10.28 |
| Inmates per LPN | 170.13 | 169.93 | 127.45 | 156.69 | 132.79 |
| Inmates per RN | 248.25 | 247.96 | 225.98 | 222.25 | 245.43 |

Source: Monthly medical and behavioral health staffing documentation for Trousdale Turner Correctional Center obtained from the Department of Correction.

**Appendix D-4**
**Detailed List of Errors Found in Inmate Medical File Review by Correctional Facility**

At Whiteville Correctional Facility,

- in 13 of 16 medical files we reviewed (81%), medication administration records did not contain key required information about the inmates' prescribed medication, including start dates, order dates, number of KOP pills given,[65] and department-approved codes;

- for 3 of 60 medical files tested (5%), staff did not provide inmates instruction on how to receive medical care and staff did not document the physical and mental health exam for the inmates' duration of their time served; and

- for 7 of 60 medical files tested (12%), staff did not document that they performed a mental health evaluation for inmates with known mental health conditions.

At Trousdale Turner Correctional Center,

- we determined that for all 13 medical files tested (100%), health services staff did not include key information about inmates' medication on the medication administration record, including the start and stop date, dosage, order date, number of KOP pills given, name of the prescribing doctor, and discontinue date.

At Hardeman County Correctional Facility,

- for 17 of 18 medical files tested (94%), staff did not include key information about inmates' medication on the medication administration records, including the dosage information, number of KOP pills given, order date, and start date;

- for 6 of 60 medical files tested (10%), staff did not instruct inmates on how to receive medical care and did not document that they performed the inmates' physical and mental health exams for the duration of their time served;

- for 3 of 60 medical files tested (5%), we could not find a physician's order to corroborate prescriptions listed on the medication administration records;

- for 4 of 60 medical files tested (7%), we could not find a mental health evaluation for inmates with documented mental health conditions; and

- for 3 of 60 medical files tested (5%), we could not find a mental health treatment plan for inmates with documented mental health conditions.

At Northwest Correctional Complex,

- for 19 of 25 medical files tested (76%), health services staff did not include key information about inmates' medication on the medication administration records,

---

[65] KOP stands for keep on person, which is medication that inmates are allowed to keep in their cells rather than having to obtain it from the nurse each day.

including the dosage information, start date, number of KOP pills given, order date, correct number of pills, and frequency of administration;

- for 2 of 60 medical files tested (3%), staff did not document in the files that they performed a mental health evaluation for inmates with known mental health conditions; and

- for 1 of 60 medical files tested (2%), we could not locate the mental health treatment plan for an inmate with a documented mental health condition.

At Turney Center Industrial Complex,

- for 14 of 27 medical files tested (52%), health services staff did not include key information about inmates' medication on the medication administration records, including the start and stop date, number of KOP pills given, and prescriptions that were listed on a physician's order;

- for 2 of 27 medical files tested (7%), we could not locate the inmate's health history;

- for 1 of 27 medical files tested (4%), we could not locate a physical examination for the inmate; and

- for 1 of 27 medical files tested (4%), staff did not instruct the inmate on how to receive medical care and staff did not document that they performed the inmate's physical and mental health exam for the duration of the inmate's time served.

At Northeast Correctional Complex,

- for 6 of 25 medical files tested (24%), health services staff did not complete key information about inmates' medication on the medication administration records, including the start and stop date, dosage information, and prescriptions that were listed on a physician's order; and

- for 2 of 60 medical files tested (3%), we could not locate a mental health evaluation for inmates with known mental health conditions.

Additionally, at each facility tested, we identified several instances where health services staff did not place the inmate's initial drug screening in the inmate's medical file.

**Appendix D-5**
**Methodologies to Achieve Objectives**

To meet our objectives, we obtained and reviewed the department's contracts with Centurion and Corizon to ascertain their contractual obligations for staffing and filling vacancies and providing medical and mental health services. We reviewed applicable department policies related to maintaining and organizing health records, specifically

- physician's orders;

- medical and mental health screenings;

- medication administration records;

- mental health evaluations and treatment plans;

- initial inmate drug screenings; and

- health classifications.

We obtained the department's last four clinical quarterly monitoring reports for the correctional facilities listed in **Table 32** to determine the areas the department identified as the main issues in the audit. To determine the facilities' compliance with department policy and contractual requirements and to determine a level of assurance on the quality of care that the inmates are receiving in Tennessee's correctional facilities, we obtained reports generated from the Tennessee Offender Management Information System. We specifically targeted inmates who were listed as Class B or "limited duty"[66] who were likely to have documented medical or mental health conditions. Using these reports as our populations, we tested a nonstatistical, random sample of inmates at the six correctional facilities during our site visits. We then obtained the inmates' medical files (including old volumes) to identify if the facility staff were following department policies and contract requirements by maintaining the required documentation in the files.

**Table 32**
**Medical and Mental Health Testwork Sampling Plan**

| Correctional Facility | Population Size | Sample Size |
|---|---|---|
| Whiteville Correctional Facility* | 76 | 60 |
| Trousdale Turner Correctional Center* | 203 | 25 |
| Hardeman County Correctional Facility* | 189 | 60 |
| Northwest Correctional Complex | 138 | 60 |
| Turney Center Industrial Complex | 29 | 29 |
| Northeast Correctional Complex | 91 | 60 |

*CoreCivic-managed facilities.

To determine Centurion's and Corizon's compliance with staffing requirements, we obtained their contract staffing requirements. During our site visits, we selected a nonstatistical,

---

[66] Class B or "limited duty" indicates inmates with physical or mental conditions that place certain restrictions on their capabilities.

random sample of five months within the audit period. We obtained and analyzed the staffing reports and timesheet documentation for each month sampled to determine

- the number of staff vacancies for each month;
- whether Centurion and Corizon adequately staffed the required positions; and
- whether the department assessed liquidated damages where appropriate.

We interviewed health services staff at Whiteville Correctional Facility, Hardeman County Correctional Facility, Trousdale Turner Correctional Center, Northwest Correctional Complex, Turney Center Industrial Complex, and Northeast Correctional Complex and spoke with the department's Director of Clinical Quality Assurance and the Chief Medical Officer to determine the general procedures for inmate health care, as well as the process for moving inmates and their medical files and medications between facilities. We also reviewed entries made in the department's Online Sentinel Event Log that involved missing medical records or medications to determine whether inmates who were transferred arrived at other facilities with their medical records and medications.

We visited three state correctional facilities (Northeast, Northwest, and Turney Center) and three CoreCivic-managed facilities (Hardeman County, Trousdale Turner, and Whiteville) and observed each facility's medication administration process and spoke with various nurses and health administrators. We also met with CoreCivic's Regional Health Services Director to discuss the eMARs system.

To determine the amount of medical and mental health liquidated damages the department assessed and collected, we interviewed the department's Chief Financial Officer and the Chief Medical Officer to gain an understanding of the process the department uses to identify areas of contract noncompliance, assess liquidated damages, and collect damages. We also reviewed

- assessment letters issued to Centurion and Corizon;
- payments made to Centurion and Corizon; and
- invoices where liquidated damages had been deducted from October 1, 2017, to July 31, 2019.

# CORRECTIONAL STAFFING AND DEPARTMENT TURNOVER

## CHAPTER CONCLUSIONS

**Matter for Legislative Consideration – Department of Correction Retirees (page 123)**

Observation 6 – Both CoreCivic and state-run facilities are operating with minimal staff, resulting in increased staff overtime and/or the temporary closure of noncritical posts (page 130)

Observation 7 – Despite ongoing challenges, the department is working to develop tangible strategies to retain correctional officers at its facilities (page 133)

**Finding 14 – As noted in the prior audit, CoreCivic staffing reports still contain numerous errors (page 135)**

## CORRECTIONAL STAFFING AND DEPARTMENT TURNOVER

## MATTER FOR LEGISLATIVE CONSIDERATION – DEPARTMENT OF CORRECTION RETIREES

A provision of state law may warrant further study.  Section 41-24-112(c), *Tennessee Code Annotated,* the Private Prison Contracting Act of 1986, states, "In no event will a department employee be allowed to retire and receive benefits while continuing employment with a facility contractor."  This law raises the question about whether a department retiree receiving state retirement benefits can accept a position with any CoreCivic-managed correctional facility.[67]

Based on our discussion with management, the department does not have any procedures to ensure that department retirees collecting state retirement benefits do not accept positions with CoreCivic.  Furthermore, based on discussion with department management, we found that the department believes that the Private Prison Contracting Act only applies to the South Central facility because the state contracts directly with CoreCivic for this one facility; the department believes the act does not apply to the other three CoreCivic facilities because the state contracts directly with the local government that then subcontracts with CoreCivic.

According to department management and the Comptroller of the Treasury legal staff, based on the statute as currently written, we are uncertain if department employees can retire and accept positions with CoreCivic-managed state facilities or other CoreCivic-managed institutions.

<u>Correctional Facility Staffing Levels</u>

State contracts with both CoreCivic (South Central Correctional Facility) and local governments (which subcontract with CoreCivic for facility management of Trousdale Turner Correctional Center, Whiteville Correctional Facility, and Hardeman County Correctional Facility) require each facility to submit to the state an operations plan that addresses how each facility will meet contract requirements, including but not limited to the following:

> Critical posts must be staffed regardless of the correctional facility's circumstances; failing to do so jeopardizes the safety and security of inmates, staff, and the community.

- *Contract staffing patterns* – the staffing patterns list the designated posts and the number of officers CoreCivic will use per shift per post.  The Department of Correction approves CoreCivic's proposed staffing pattern.[68]

- *Staffing rosters (i.e., daily shift rosters)* – daily personnel assignments are authorized

---

[67]We compared a department retirement list and CoreCivic rosters to a list of department retirees receiving retirement benefits for the audit period.  We noted one individual who worked for the Trousdale Turner Correctional Center and received State of Tennessee retirement benefits between October and November 2018.  We also noted one individual who is receiving retirement benefits while working for a CoreCivic-run detention center, Silverdale, in East Tennessee.

[68] To manage each facility, CoreCivic also uses "operational" staffing patterns, which list the designated posts and number of officers per shift approved by the department and also list additional posts and staff per shift that are not contracted positions and are not necessarily on the daily shift rosters.

for each shift. The rosters show the active officer posts, the officers scheduled per post, and the officers' attendance.

- o *Critical posts* – facility management decides whether posts are critical and lists them in bold on the staffing rosters. According to the department's Policy 506.22, critical posts must be staffed regardless of institutional circumstances because leaving the posts unstaffed would jeopardize the security or safety of the facility, staff, inmates, or community.

- o *Noncritical posts* – facility management decides which posts can be left unstaffed without jeopardizing security and lists them on the staffing rosters. According to the department's Policy 506.22, management may leave noncritical posts unstaffed in lieu of authorizing overtime.

The operations plans establish the policies and procedures the facilities are required to follow in all areas covered by the contract. The department's Policy 506.22 states that the "plan shall not be altered, amended, modified, revised or supplemented without the prior written approval by the State." For each CoreCivic-operated facility, the warden must obtain prior approval from the department's Assistant Commissioner of Prisons for each contract budget staffing pattern and the corresponding daily staffing rosters.

The CoreCivic facilities have an operational budget that includes the positions required by the contract, as well as other supplemental positions that exceed the contract requirement for number of staff.

The department requires its own facilities to follow the same standards as CoreCivic and to obtain approval from the Assistant Commissioner of Prisons prior to making any changes to the daily staffing rosters. Noncritical posts can be closed to move correctional officers to critical posts without prior approval when staff call in or do not show up for work. Like CoreCivic facilities, state facilities must send copies of the daily staffing rosters for each shift to the department's Assistant Commissioner of Prisons for review. The department initiated this process in response to the November 2017 performance audit.

Results of Prior Audit

In the department's November 2017 performance audit, we reported that shortages in correctional officer staffing may have prevented the Trousdale Turner and Whiteville facilities from meeting staffing obligations and may have limited their ability to effectively manage the inmate populations assigned to them. Both facilities operated with fewer than the approved minimum number of correctional officer staff and did not follow staffing pattern guidelines. Trousdale Turner did not have all staffing rosters and left critical posts unstaffed on several days.

In response to the prior audit, the department submitted its corrective action plan to the Comptroller's Office in 2018. The department's plan included efforts to add two contract monitors to perform on-site monitoring at each of the CoreCivic-operated facilities to ensure CoreCivic complies with the state and local government contracts. We observed the monitors and their process for writing Noncompliance Reports (NCRs) to note any CoreCivic facility noncompliance identified during the monitoring reviews. The department uses the NCRs to assess liquidated

damages against CoreCivic for identified noncompliance.

*Current Audit*

During the current audit, we performed site visits at the Trousdale Turner and Whiteville facilities to determine if department and CoreCivic management corrected the issues noted during the prior audit. We also extended our work to another CoreCivic-operated facility, Hardeman County, as well as the state-operated facilities: Turney Center, Northwest, and Northeast.

Department Staffing Statistics and Turnover

The department has 6,440 approved full-time positions according to the state's fiscal year 2020 budget; as of July 22, 2019, 5,450 positions were filled. As shown in **Chart 2**, the majority of the department's workforce—4,724 positions, or 73%—is located at the facilities. For a breakdown of fiscal year 2020 positions at each state-managed correctional facility, see **Appendix E-1** on page 139.

**Chart 2**
**Department of Correction**
**Fiscal Year 2020 Budgeted Positions by Business Unit**



Source: Tennessee State Budget, Fiscal Year 2019–2020.

Department Separation Statistics

We analyzed the department's separation data for fiscal years 2018 and 2019 (through December 31, 2018); see **Table 33**. Management of the facilities monitors turnover on a monthly

Case 3:16-cv-02267 Document 481-5 Filed 02/10/22 Page 146 of 234 PageID #: 25723

and fiscal-year basis.  In addition, the department participates in the Tennessee Department of Human Resources' exit survey program and receives feedback from exit surveys to enhance the department's retention efforts.

**Table 33**
**Department of Correction Turnover Rates**
**Fiscal Years 2018 to 2019 (Through December 31, 2018)**

| Fiscal Year | Separations | Average Employees per Year | Turnover Rate |
|---|---|---|---|
| 2018 | 1,676 | 6,601.0 | 25.4% |
| 2019 | 861 | 6,611.5 | 13.0% |

Source: Edison, the state's enterprise management system.

Based on our analysis of department turnover, **Table 34** shows the top 10 positions with the highest turnover for fiscal years 2018 through 2019 (through December 31, 2018).

**Table 34**
**Top 10 Positions with Turnover**
**Fiscal Years 2018 to 2019 (Through December 31, 2018)**

| Positions |
|---|
| Correctional Officer |
| Probation/Parole Officer |
| Correctional Corporal |
| Correctional Counselor |
| Correctional Sergeant |
| Correctional Clerical Officer |
| Probation/Parole Manager |
| Secretary |
| Registered Nurse |
| Correctional Teacher |

Source: Edison, the state's enterprise management system.

Our review showed that approximately 70% of the separations during this period were entry-level security staff, known as correctional officers, who primarily resigned from or abandoned their positions (see **Appendix E-2** on page 140 for more details).  According to management, most correctional officers leave after one year of service; from years two to five, the turnover rate decreases.  In April 2018, the Commissioner created the Retention Task Force to develop strategies to retain correctional officers.  For more information about the task force's strategies, see **Observation 7** on page 133.

> For the CoreCivic facilities' turnover statistics, see Appendix E-3 on page 141.

CoreCivic Staffing Oversight

CoreCivic is a private prison contractor that operates 4 of the state's 14 correctional facilities for the Tennessee Department of Correction.  The four private prisons are

- Hardeman County Correctional Facility,
- South Central Correctional Facility,
- Trousdale Turner Correctional Center, and
- Whiteville Correctional Facility.

As a contractor, the department requires CoreCivic to submit staffing reports to the department's contract monitors at the facilities each month; the staffing reports must include

- names of the new hires and terminations,
- the position numbers associated with positions,
- reasons for terminations, and
- all vacant positions within their staffing patterns and the number of days each position has been vacant.

The correctional facilities use monthly staffing memos to report information on new hires, terminations, and staffing vacancies to the department. The information reported within each memo should accurately reflect the staffing activities within the CoreCivic facilities to ensure compliance with the terms set in each contract. The monthly staffing memos also allow the department to determine the security needs for the CoreCivic facilities.

*CoreCivic Contract Requirements*

For staffing and vacancies, we summarized CoreCivic's contractual responsibilities in **Appendix E-4** on page 143. With the exception of Hardeman County, CoreCivic must fill vacancies within 45 days and provide the department with reports showing new hires, terminations, and position vacancies with the number of days vacant.

*Department Oversight and Liquidated Damages*

The positions reported within the monthly staffing reports could contain all positions within each job class of contract-approved positions. Some examples of job classes include

- correctional officers,
- academic/vocational instructors,
- administrative clerks,
- licensed practical nurses, and
- registered nurses.

Each contract, excluding Hardeman County's contract, also requires CoreCivic to fill all vacant staffing positions within 45 days if the position is an approved contracted position. Because the CoreCivic facilities hire more staff than their approved staffing pattern to cover for the

continuous turnover they experience, CoreCivic is not required to report or track extra positions with the other contracted positions.[69]  See the **Staffing Levels** section beginning on page 123 for more information on approved and operational staffing patterns.

The contract monitors for the department

- review the monthly staffing reports for accuracy,
- use the reports to ensure compliance with the contract staffing requirements, and
- issue any notices of noncompliance for contract violations.

As a result of their review of the compliance instruments,[70] department policies, and contract provisions, the contract monitors issue notices of noncompliance to the facility.  Department management meets monthly to discuss the areas of noncompliance noted and the seriousness of the deficiency and to calculate liquidated damages.

The department has the discretion to alter the damage amounts it assesses for noncompliance.  According to the department's General Counsel, if the damages are not proportionate to the costs CoreCivic incurred, such as salaries, benefits, and overtime, the department cannot enforce the damages pursuant to case law.  For instance, for areas of noncompliance such as staffing vacancies and critical posts, the department considers the percentage of time a post was vacant and the amount of overtime CoreCivic paid to keep the critical posts staffed as a way to offset the amount of liquidated damages owed for that period.  Furthermore, when the department issues a damages assessment letter, CoreCivic can appeal the assessment within 30 days of receiving the letter.

<u>Results of Prior Audit</u>

In the department's November 2017 performance audit, we found that Trousdale Turner's and Hardeman County's staffing reports contained numerous errors, rendering the reported staffing information unreliable.  We noted the following issues in the staffing reports:

- missing position numbers for vacancies;
- vacancies carried over to subsequent months without adding the additional number of vacant days;
- positions left vacant for more than 30 days that were not listed on previous month's report;
- different job titles with the same position number;

---

[69] CoreCivic is required to meet specific staffing patterns, which list the designated posts and number of correctional officers per shift; the department approves the staffing patterns.  CoreCivic may hire additional staff beyond the approved staffing pattern to manage each facility.

[70] Compliance instruments are the standards set for CoreCivic operations that contract monitors review to ensure compliance.  The instruments are generated from a mixture of American Correctional Association (ACA) accreditation standards, departmental policies, and contract provisions.

Case 3:16-cv-02267   Document 481-5   Filed 02/12/21   Page 149 of 234 PageID #: 25726

- hires and terminations that did not reconcile to the number of vacancies; and

- reports that did not contain the number of filled positions, the inmate population, and the officer-to-inmate ratio.

In response to this finding, department management stated that it instructed Trousdale Turner to include position numbers as recommended in the audit report as the best mechanism for reporting vacancies.

<u>Current Audit Work</u>

To follow up on the prior finding, to verify that CoreCivic included contractually required reporting requirements and to verify the overall accuracy of the staffing reports, we reviewed staffing reports at four CoreCivic facilities for the period October 2018 through January 2019.

<div align="center"><b><span style="color:darkred">Audit Results</span></b></div>

---

1. **Audit Objective:** Did department management correct the prior audit finding by ensuring that CoreCivic staffed critical posts?

   **Conclusion:** Based on our review, we found that the department added monitors at each CoreCivic facility and CoreCivic had improved its critical post staffing.

2. **Audit Objective:** Did department management ensure that all state facility posts were staffed appropriately?

   **Conclusion:** Based on our review, department management did not ensure that wardens at both the state and CoreCivic facilities staffed all approved posts. See **Table 36**.

   While both the state and CoreCivic facilities covered critical posts, both still were unable to hire a sufficient number of correctional officers. As a result, facilities have temporarily closed noncritical posts and required staff to work overtime to cover critical posts. See **<span style="color:darkred">Observation 6</span>**.

3. **Audit Objective:** Did department management make any changes in the way posts are designated as critical or noncritical?

   **Conclusion:** Based on our review, department management made reasonable changes in the way posts are designated as critical or noncritical.

4. **Audit Objective:** Are there any notable differences in staffing patterns between CoreCivic and state-run facilities?

   **Conclusion:** Based on our review, staffing patterns at CoreCivic facilities and state-run facilities are very similar in regard to the number of correctional officers for each post. One difference we found was that the CoreCivic facilities have

supplemental security staff positions on their operational staffing pattern. This means they have staff in excess of the contract requirement for staffing. Overall, we found that facilities were operating with minimal staff given the facilities' needs. We also noted a difference between how the state and CoreCivic facilities complete the daily staff rosters. State facilities do not include the time staff arrive at each post, whereas CoreCivic's facilities do. We believe documenting staff arrival times provides management with better data for monitoring the sufficiency of staffing.

5.  **Audit Objective:** Did the department experience any turnover that affected the department's ability to meet its mission?

    **Conclusion:** Although the department is relying on overtime to maintain correctional facility staff levels (see **Observation 6** on page 130), management is working to improve its efforts to recruit and retain correctional officers to alleviate the overtime burden on current correctional staff, thereby allowing the department to continue to meet its mission. See **Observation 7.**

6.  **Audit Objective:** Did the department correct the prior audit finding by ensuring that CoreCivic's monthly staffing reports accurately reflected correctional officer vacancies and turnover rates?

    **Conclusion:** Despite the department's corrective action and its efforts to accurately track staffing positions month-to-month, we once again found errors in CoreCivic facilities' monthly staffing reports. See **Finding 14**.

7.  **Audit Objective:** Did department management appropriately assess and collect liquidated damages due to CoreCivic's failure to staff vacancies at its correctional facilities?

    **Conclusion:** Based on our audit work, management appropriately assessed and collected liquidated damages against CoreCivic for staffing vacancies at its facilities. See **Appendix E-6** on page 146 for assessment amounts per correctional facility.

**<u>Observation 6</u>** – <u>Both CoreCivic and state-run facilities are operating with minimal staff, resulting in increased staff overtime and/or the temporary closure of noncritical posts</u>

While department management took steps to address the staffing of critical posts at both state and CoreCivic facilities, the department and CoreCivic have had to increase overtime for correctional officers and/or temporarily close noncritical posts, such as recreational posts, which may negatively impact inmate behaviors. These measures are at best temporary, and without a long-term solution to hire and retain officers, the department and CoreCivic increasingly risk losing existing staff whose long hours have affected their physical and emotional health. See **Table 35**.

**Table 35**
**Inmate and Correctional Officer Staffing Data**

| Facility | Inmate Population (as of June 30, 2018) | Ratio of Correctional Officer Series[71] to Inmates | Average Number of Monthly Overtime Hours[72] | Average Monthly Overtime Costs[73] |
|---|---|---|---|---|
| State Facilities | | | | |
| Northwest | 2,363 | 1:10 | 10,073 | $205,049 |
| Northeast | 1,795 | 1:06 | 11,495 | $240,508 |
| Turney Center | 1,606 | 1:08 | 8,737 | $173,478 |
| CoreCivic Facilities | | | | |
| Trousdale Turner | 2,552 | 1:14 | 15,771 | $282,676 |
| Hardeman | 1,991 | 1:09 | 10,344 | $147,326 |
| Whiteville | 1,519 | 1:09 | 8,986 | $130,229 |

Source: TDOC Budget and Fiscal Office; CoreCivic, Human Resources Director.

At the facilities we visited, we found that, on average, the facilities operated with fewer than the approved number of correctional officers (see **Table 36**). In most cases, recreation and transportation posts were consistently under-staffed or closed. These positions are designated as noncritical; however, if these noncritical positions are not properly staffed, the facilities may not be able to provide inmates with programming and services like recreation time or transportation to and from medical appointments, which may negatively impact inmate behaviors. See **Table 36** for a summary of approved correctional officer posts for each shift and the average number of filled posts we observed as filled.

---

[71] "Correctional Officer Series" includes correctional officers and senior correctional officers only.
[72] Average monthly overtime hours were calculated for the months of October 2018 through January 2019.
[73] Average monthly overtime costs were calculated for the months of October 2018 through January 2019.

Case 3:16-cv-02267   Document 181-5   Filed 12/01/22   Page 152 of 234 PageID #: 25729

**Table 36**
**Summary of Correctional Officer Posts on Approved Daily Rosters**
**October 2018 to January 2019**

| Facilities | Average Approved Correctional Officer Posts[74] | | Average Filled Correctional Officer Posts[75] | | Average Number of Correctional Officer Posts Unfilled (per Shift) | | Average Number of Correctional Officer Posts Unfilled |
|---|---|---|---|---|---|---|---|
| | 1st Shift | 2nd Shift | 1st Shift | 2nd Shift | 1st Shift | 2nd Shift | Average Total |
| State Facilities | | | | | | | |
| Northwest (Site 1) | 98 | 45 | 60 | 34 | 38 | 11 | 49 |
| Northwest (Site 2) | 29 | 29 | 19 | 19 | 10 | 10 | 20 |
| Northeast | 115 | 47 | 86 | 39 | 29 | 8 | 37 |
| Turney Center | 99 | 27 | 67 | 24 | 32 | 3 | 35 |
| CoreCivic Facilities | | | | | | | |
| Trousdale Turner | 51 | 36 | 42 | 32 | 9 | 4 | 13 |
| Hardeman | 77 | 51 | 77 | 44 | 0 | 7 | 7 |
| Whiteville | 60 | 40 | 42 | 32 | 18 | 8 | 26 |

Source: TDOC and CoreCivic facility daily shift rosters and logbooks.

<u>Realities of Correctional Facility Staffing</u>

Wardens must deal with emergencies during daily facility operations. Inmate altercations between staff or other inmates, medical issues with inmates, and discovery of contraband may require the warden to close critical posts for short periods to move correctional officers from one area to another. But we found that the department allows management to make emergency staffing changes differently at state versus CoreCivic facilities. For example, all facilities may restrict inmate movement (generally known as a "lockdown") in a specific area so that officers can help transport inmates to a hospital. This restriction can result in closing critical posts for a short time. However, the department automatically penalizes CoreCivic when it does not maintain critical posts during a lockdown but does not penalize state facilities for the same deficiency. In effect, the department has not afforded CoreCivic the same flexibility when responding to emergencies.

In certain non-emergency circumstances, both state and CoreCivic facilities commonly move security staff from noncritical posts to help cover critical posts. Some facilities use supervisory and/or supplemental staff to cover noncritical posts as an extension of their daily duties. For example, a facility may use unit management staff to escort and monitor their unit's inmates during recreation periods. In this situation, the recreation post shown on the roster is designated closed, but the service is still provided, and the post is temporarily covered by unit supervisory staff.

---

[74] First and second shifts are 12 hours long. Each facility also has an eight-hour day shift that we included in the first-shift figures.
[75] Our observations are based on a review of correctional officers on the approved staffing rosters and the posts designated on the rosters. If a post is not reflected on the approved roster or if the roster does not reflect the filling of that post, we are not able to account for it.

<u>Responsibilities of Correctional Officers</u>

Given that correctional officers experience higher stress levels due to the potential for daily violence and confrontations with inmates, the department and CoreCivic must strive for increased pay and benefits for staff filling this position. Correctional officers are required to maintain order and provide for the safety, security, care, and direct supervision of inmates during all phases of activity in a facility. To fulfill these job duties, correctional officers need to be able to think on their feet in order to determine the best way to approach and solve problems in their units, including using interpersonal, critical-thinking, and negotiation skills to defuse issues between inmates. Officers also need to be intuitive and able to interpret behavioral patterns to anticipate likely problems before they escalate.

As of July 1, 2019, the department's starting pay for correctional officers was approximately $32,500 annually; the correctional officers receive a 5% increase after completing one year of service. With the new starting salary, the state implemented an across-the-board 7% increase to existing employees to align their salaries with the new starting salaries. For more information about the department's efforts to retain correctional officers, see **Observation 7**.

<u>The Negative Effect of Overtime on Both Officers and Inmates</u>

Regularly requiring staff to work overtime can lead to lower morale, compromised critical thinking skills, and increased staff turnover, which put staff, inmates, and the community at risk. Without sufficient staff to cover posts so that facilities can provide inmates with recreation time and/or transportation to medical services, inmates may experience low morale, heightened frustration, and denial of medical treatment, which may lead to increased behavioral issues and unmet medical needs.

---

**Observation 7** – Despite ongoing challenges, the department is working to develop tangible strategies to retain correctional officers at its facilities

According to the department's human resources (HR) management, the HR team spends a significant amount of funds and effort toward recruiting and retaining correctional officers. **Table 37** shows the number of separations and turnover rates at each facility for fiscal years 2018 and 2019 (through December 31, 2018).

**Table 37**
**Turnover Rates by Correctional Facility Location**
**Fiscal Years 2018 and 2019 (Through December 31, 2018)**

| Facility Location | Fiscal Year 2018 | | First 6 Months of Fiscal Year 2019 | |
|---|---|---|---|---|
| | Separations | Turnover Rate | Separations | Turnover Rate |
| Bledsoe County | 216 | 30.2% | 104 | 14.5% |
| Lois M. DeBerry | 156 | 30.7% | 61 | 12.0% |
| Mark Luttrell | 42 | 26.3% | 27 | 16.9% |
| Morgan County | 233 | 33.9% | 120 | 17.4% |
| Northeast | 105 | 21.3% | 61 | 12.4% |

Case 3:16-cv-02267 Document 181-5 Filed 12/01/22 Page 154 of 234 PageID #: 25731

| Facility Location | Fiscal Year 2018 | | First 6 Months of Fiscal Year 2019 | |
|---|---|---|---|---|
| | Separations | Turnover Rate | Separations | Turnover Rate |
| Northwest | 207 | 32.2% | 75 | 11.7% |
| Riverbend | 122 | 35.1% | 74 | 21.3% |
| Prison for Women | 0 | 0.0% | 59 | 24.3% |
| Turney Center | 125 | 28.7% | 60 | 13.8% |
| West Tennessee State | 117 | 17.5% | 78 | 11.7% |

Source:  Edison.

<u>Recruiting</u>

According to HR management, recruiting efforts take place near the facilities.  The department draws candidates from the correctional facility's home county as well as neighboring counties.  To be considered, a candidate must have a high school diploma.  HR management also stated that it takes a certain type of person to handle the work of a correctional officer.  To expand their reach, management recruits at the following locations and uses the following methods:

- Fort Campbell, Kentucky;

- Tennessee Department of Labor and Workforce Development career centers;

- colleges and universities;

- career fairs (offsite or at the facilities);

- churches;

- county fairs and barbeque festivals;

- high schools;

- radio;

- the department's website and social media accounts;

- billboards; and

- placing flyers on vehicles in parking lots.



Source: Department of Correction Twitter feed.  Posted July 11, 2019.

HR management stated that economic development can negatively impact the department's ability to successfully recruit.  If businesses move into an area and can match the department's starting salary for correctional officers, candidates may choose to accept a position at a company that offers a better work environment.  Management

also stated that the department has a difficult time recruiting in Davidson County, primarily due to pay and the county's current construction boom. Furthermore, compared to the state's current starting salary of $32,500, Davidson County government offers a higher salary—$37,177.61 per year—to correctional trainees, with an increase to $40,542.65 after completing eight weeks of training.

Staff Retention

The department's HR management uses employee exit surveys to enhance staff retention efforts, especially for correctional officers. Through the Commissioner's Retention Task Force, the department developed the following strategies to retain correctional officers:

- The correctional officer starting salary increased to $32,500,[76] effective July 1, 2019. After one year, the correctional officer is given an additional 5% salary increase. According to HR management, this starting salary increase moved Tennessee from the bottom to nearly the top of correctional officer pay among Tennessee's contiguous states.

- Existing employees received a 7% across-the-board pay increase to bring their salaries in line with the new starting salaries.

- As of July 15, 2019, the department is working with the Tennessee Department of Human Resources to develop staff supervisor training and on-the-job training for new correctional officers.

Management should continue its efforts to recruit, hire, and retain correctional officers. As part of its retention efforts, the department should work with current correctional officers to determine if the newly implemented strategies are working and make adjustments or implement additional strategies as needed to maintain facility safety and to meet its mission.

---

## <span style="color:darkred">**Finding 14 – As noted in the prior audit, CoreCivic staffing reports still contain numerous errors**</span>

We reviewed each CoreCivic facility's monthly staffing report for the period October 2018 through January 2019, including Hardeman County Correctional Facility, Trousdale Turner Correctional Center, South Central Correctional Facility, and Whiteville Correctional Facility.

See the full methodology in Appendix E-7 on page 147.

The prior audit identified multiple inconsistencies with CoreCivic staffing reports. As part of its corrective action, the department redesigned the monthly staffing reports that CoreCivic submits to contract monitors for review that addressed some of these issues by adding position numbers and hire/termination dates. Although we recognize that CoreCivic management improved the monthly staffing reports since the prior audit, we still found errors on the staffing

---

[76] According to salary.com, as of July 30, 2019, the average correctional officer annual salary in the United States was $44,872, with wages ranging from $39,950 to $49,799.

reports even though correctional facility contract members review them weekly. Based on our review during the current audit, we found that the reports

- showed positions on the monthly staffing memos that did not reconcile to the monthly staffing reports;

- had duplicate entries for vacant positions;

- listed positions with the same position numbers (each position should have a unique position number); and

- did not always have hiring dates associated with the filled positions.

Furthermore, we reviewed the staffing reports and noted numerous positions that were vacant for over 45 days, which directly correlate to the correctional officer staffing and overtime issues:

- Whiteville – 75 vacant positions;

- South Central – 67 vacant positions; and

- Trousdale Turner – 83 vacant positions.

For Hardeman, the department provided us with two sets of monthly staffing memos and vacancy reports for November and December 2018 that contained discrepancies in the staffing information reported for those months. Due to the discrepancies between the two reports, we could not conclude on relevant staffing information for those two months, including whether positions were vacant for over 45 days (although, according to its contract, Hardeman is not required to fill vacancies within 45 days). As a result, although CoreCivic reported 95 vacant positions that exceeded 45 days from October 2018 through January 2019, we could only review vacancies for the months of October 2018 and January 2019, which showed 91 vacant positions that exceeded 45 days.

We found one instance with Whiteville where the department did not assess damages for a vacant position that was over the 45-day fill requirement. We summarize our review of monthly staffing reports for each facility in **Chart 3.**[77]

---

[77] We generated the error totals based on the number of errors we noted within each CoreCivic facility monthly staffing report.

**Chart 3**
**Summary of Staffing Report Errors by Facility**



Source: Results of audit testwork.

Case 3:16-cv-02267   Document 141-5   Filed 02/10/22   Page 158 of 234 PageID #: 25735

See **Appendix E-5** on page 144 for a list of specific deficiencies relating to our review of the monthly staffing reports.

Based on our discussions with CoreCivic management, their facility human resources staff cannot easily copy and paste or move the staffing information into the forms the department requires them to use. Staff must manually enter the information each month, which could lead to errors when reporting newly hired or vacant positions.

Inaccurately reporting and/or omitting staffing and vacancy information on the monthly staffing reports increases the risk that the department may not be able to track CoreCivic's vacant correctional officer positions to meet the security needs of its correctional facilities, thereby preventing the department from properly overseeing CoreCivic's contract requirements.

## Recommendation

The Department of Correction should ensure that CoreCivic's monthly vacancy and staffing data for all CoreCivic correctional facilities are complete and accurate, as required by the facility's contract. If the reports are not accurate, the department should issue CoreCivic a report of noncompliance until CoreCivic resolves the errors and should assess the appropriate amount of liquidated damages.

## Management's Comment

Concur.

The Department continues to pursue more suitable report structures that the contractors will provide to improve month to month vacancy and staffing data reporting and monitoring processes.

The Department of Correction has issued noncompliance reports for inaccurate monthly staffing reports to contractors of Hardeman Correctional Facility (HCCF), Trousdale Turner Correctional Center (TTCC) and Whiteville Correctional Facility (WCFA). South Central Correctional Facility (SCCF) has been issued noncompliance reports for vacancies over 45 days. Contractors for all four of the facilities have been assessed liquidated damages.

## Appendix E
## Correctional Staffing and Department Turnover

**Appendix E-1**
**Department of Correction**
**Fiscal Year 2020 Budgeted Positions by Correctional Facility Location**

| Correctional Facility Location | Number of Positions |
|---|---|
| Bledsoe County Correctional Complex | 691 |
| Lois M. DeBerry Special Needs Facility | 497 |
| Mark Luttrell Transition Center | 157 |
| Morgan County Correctional Complex | 658 |
| Northeast Correctional Complex | 474 |
| Northwest Correctional Complex | 615 |
| Riverbend Maximum Security Institution | 335 |
| Tennessee Prison for Women | 231 |
| Turney Center Industrial Complex | 414 |
| West Tennessee State Penitentiary | 652 |
| **Total** | **4,724** |

Source: The Budget document, Fiscal Year 2019–2020.

**Appendix E-2**
**Department of Correction**
**Correctional Officer Separations by Type**



Source: Edison, the state's enterprise management system.

## Appendix E-3
## CoreCivic Turnover

We also analyzed CoreCivic's separation data for fiscal years 2018 and 2019 (through December 31, 2018); see **Table 38**. Similar to the state, CoreCivic experienced high turnover in correctional staff; however, CoreCivic's turnover at the facility level is significantly higher than the state-managed facilities. At CoreCivic, most of the separated employees abandoned their jobs, were terminated, or resigned. See **Table 39** for a full list of separation reasons during this period.

**Table 38**
**CoreCivic Turnover Rates**
**Fiscal Year 2018 and 2019 (Through December 31, 2018)**

| Facility Location | 2018 | | 2019 | |
|---|---|---|---|---|
| | Separations | Turnover Rate | Separations | Turnover Rate |
| Hardeman County Correctional Facility | 207 | 53% | 92 | 25% |
| South Central Correctional Facility | 289 | 95% | 151 | 47% |
| Trousdale Turner Correctional Center | 241 | 78% | 125 | 25% |
| Whiteville Correctional Facility | 233 | 76% | 83 | 26% |

Source: CoreCivic management.

**Table 39**
**CoreCivic Reasons for Separation**
**Fiscal Year 2018 and 2019 (Through December 31, 2018)**

| Separation Reasons | Number of Separations |
|---|---|
| Job Abandonment - No Rehire | 330 |
| Terminated for Cause - No Rehire | 241 |
| Resigned - Other | 189 |
| Resigned - No Rehire | 146 |
| Personal Reasons | 103 |
| Other Employment | 100 |
| Failed to Give Notice | 49 |
| Failed to Give Notice - No Rehire | 48 |
| Resigned Under Investigation - No Rehire | 36 |
| Resigned - No Reason Given | 26 |
| Failed to Return From Leave | 21 |
| Retirement | 20 |
| Policy/Contraband | 17 |
| Job Dissatisfaction | 14 |
| Policy/Procedure Violation | 14 |
| To Attend School | 10 |
| Relocation | 10 |
| Dissatisfied With Pay | 8 |
| Death | 7 |
| Leave - Max Leave Expired | 7 |
| Unsatisfactory Performance | 6 |
| Failed Background Screening | 6 |
| Leave - Military (After 30 Days) | 3 |
| Layoff/Facility Closure | 3 |
| Terminated - Prison Rape Elimination Act Violation - No Rehire | 2 |
| Resigned During Prison Rape Elimination Act Investigation - No Rehire | 2 |
| Failed Background Screening - No Rehire | 1 |
| Unsatisfactory Performance - No Rehire | 1 |
| Falsification of Records | 1 |
| **Grand Total** | **1,421** |

Source: CoreCivic Management.

**Appendix E-4**
**CoreCivic Contract Requirements**

**Table 40**
**Staffing and Vacancy Due Dates for Each Correctional Facility**

| Correctional Facility | Contract Requirements | | |
|---|---|---|---|
| | Vacancy Fills | Monthly Staffing Assignments | Position Information |
| Hardeman | No contract requirement | 15th of every month | 5th & 15th of every month |
| South Central | 45 days | 5th of every month | 5th of every month |
| Trousdale Turner | 45 days | 15th of every month | 15th of every month |
| Whiteville | 45 days | By the 15th of prior month | 15th of every month |

Source: Respective CoreCivic contracts.

**Table 41**
**CoreCivic's Contractually Required Position Information**

| Correctional Facility | Reporting Requirements |
|---|---|
| Hardeman | Report the previous month's <br> • compliance with the staffing pattern, <br> • security post assignments, and <br> • monthly post assignments. |
| Trousdale Turner and South Central | Report the previous month's <br> • names of employees hired, including positions; <br> • number of employees voluntarily or involuntarily terminated, with the reason and position; and <br> • number of positions vacant and number of days. |
| Whiteville | Report the previous month's <br> • names of employees hired, including positions; and <br> • number of employees voluntarily or involuntarily terminated, with the reason and position. |

Source: Respective CoreCivic contracts.

143

**Appendix E-5**
**Deficiencies Noted Related to CoreCivic Monthly Staffing Reports**

Whiteville Correctional Facility

- Although CoreCivic reports both new hires and terminations monthly, we could not reconcile 19 positions reported on the monthly staffing memo over a 4-month period to positions on the monthly staffing report that tracks the days vacant for each position.

- On the monthly staffing memos, staff did not list hire dates associated with the 22 positions that were filled.

South Central Correctional Facility

- Although CoreCivic reports both new hires and terminations within a reporting period, we could not reconcile eight positions reported on the monthly staffing memos to the monthly staffing report that tracks the days vacant for each position.

- During the month of November 2018, the total reported vacancies did not match the number of employees reported on the monthly staffing memo.

- One new-hire position on the monthly staffing report did not list the termination date or days vacant count associated with the position.

Trousdale Turner Correctional Center

- Although CoreCivic reports both new hires and terminations within a reporting period, we could not reconcile 30 positions reported on the monthly staffing memos to the monthly staffing report that tracks the days vacant for each position.

- In October 2018 and January 2019, CoreCivic reported a total number of employees that did not match the number of employees reported on the monthly staffing memo.

- For two new-hire positions on the monthly staffing memos, staff did not list position numbers associated with the positions being filled.

- During January's reporting period, CoreCivic reported four duplicate entries for the same positions becoming vacant.

Hardeman County Correctional Facility

- Although CoreCivic reports both new hires and terminations within a reporting period, we could not reconcile 15 positions reported on the monthly staffing memo to the monthly staffing report that tracks the days vacant for each position.

- On the monthly staffing memos, staff did not list positions numbers associated with the 131 new-hire and terminated positions.

- In November and December 2018, CoreCivic reported a total number of employees that did not match the number of employees reported on the monthly staffing memo.

- We found one instance where two different positions shared the same position number in the same reporting period.

**Appendix E-6**
**CoreCivic Staffing**
**Liquidated Damages Assessments**

| Whiteville Correctional Facility | | | | | |
|---|---|---|---|---|---|
| | **Oct. 2018** | **Nov. 2018** | **Dec. 2018** | **Jan. 2019** | **Total** |
| Original Assessment | $160,893.60 | $150,616.80 | $190,566.60 | $191,572.40 | $693,649.40 |
| Adjusted Assessment | $44,169.67 | $26,190.55 | $91,916.44 | $97,059.63 | $259,336.29 |
| Difference | $116,723.93 | $124,426.25 | $98,650.16 | $94,512.77 | $434,313.11 |
| % of Original Assessment* | 27% | 17% | 48% | 51% | 37% |

| Trousdale Turner Correctional Center | | | | | |
|---|---|---|---|---|---|
| | **Oct. 2018** | **Nov. 2018** | **Dec. 2018** | **Jan. 2019** | **Total** |
| Original Assessment | $166,450.64 | $104,220.64 | $54,716.80 | $120,751.50 | $446,139.58 |
| Adjusted Assessment | - | - | - | - | - |
| Difference | $166,450.64 | $104,220.64 | $54,716.80 | $120,751.50 | $446,139.58 |
| % of Original Assessment* | 100% | 100% | 100% | 100% | 100% |

| South Central Correctional Facility | | | | | |
|---|---|---|---|---|---|
| | **Oct. 2018** | **Nov. 2018** | **Dec. 2018** | **Jan. 2019** | **Total** |
| Original Assessment | $25,655.32 | $27,727.24 | $61,902.28 | $77,316.20 | $192,601.04 |
| Adjusted Assessment | - | - | - | - | - |
| Difference | $25,655.32 | $27,727.24 | $61,902.28 | $77,316.20 | $192,601.04 |
| % of Original Assessment* | 100% | 100% | 100% | 100% | 100% |

* "% of Original Assessment" is the percentage of the adjusted assessment against the initial assessed liquidated damage total.
Source: Noncompliance Reports and the legal Adjusted Assessment Letters issued to the CoreCivic facilities by the Department of Correction.

**Appendix E-7**
**Methodologies to Achieve Objectives**

For this audit, we analyzed correctional officer staffing for three state-operated facilities:

- Northeast Correctional Complex,

- Northwest Correctional Complex, and

- Turney Center Industrial Complex,

and three CoreCivic-managed facilities:

- Hardeman County Correctional Facility,

- Trousdale Turner Correctional Center, and

- Whiteville Correctional Facility.

To achieve our objectives, we gained an understanding of the staffing-level requirements; reviewed applicable policies and state and federal guidance; interviewed applicable personnel and management; and performed walkthroughs of the facilities. To determine if each facility warden properly staffed posts as required by the approved staffing pattern, we tested a random, nonstatistical sample of 240 daily staffing rosters, 40 rosters at each of the six facilities visited from October 2018 to January 2019. We randomly selected five days from each month and tested the daily rosters for both day and night shifts. To determine whether the wardens made any changes in the way posts are designated, we reviewed the request for post changes and the daily rosters that department management approved for the period October 2017 through May 2019. We also analyzed the staffing patterns between CoreCivic and state-run facilities to determine if there were any noticeable differences in the number of required staff.

We reviewed the department's turnover rates to gain an understanding of turnover trends. We compared the department's turnover rates to national rates obtained from the U.S. Department of Labor's Bureau of Labor Statistics. We analyzed turnover rates at the department level, as well at each facility location to examine trends by location. We interviewed department human resources staff to gain an understanding of their process to monitor turnover and to determine its impact on the department's mission.

To meet the objectives and gain an understanding of CoreCivic's efforts to correct the prior audit finding relating to correctional officer vacancies and turnover rate, we interviewed the Director of Contract Monitoring and the Correctional Administrator responsible for the CoreCivic facilities. We also obtained the contract monitors' training plan and department policies, as well as the April 2018 monthly staffing report for each CoreCivic facility.

For testwork, we examined each CoreCivic facility's monthly staffing report for the period October 2018 through January 2019, including Hardeman County Correctional Facility, Trousdale Turner Correctional Center, South Central Correctional Facility, and Whiteville Correctional Facility, to determine if CoreCivic's reports accurately reflected correctional officer vacancies and

turnover rates.  We compared the staffing reports to each other for reporting consistency, to the monthly staffing memos, and to the operating contract requirements.

To determine if the department accurately assessed liquidated damages against CoreCivic for failing to fill vacancies within 45 days, we obtained the noncompliance reports for each facility (except Hardeman County) associated with the sample of monthly staffing reports we tested, as well as the original and revised liquidated damages assessments (if CoreCivic appealed the assessment).[78]  We also reviewed CoreCivic invoices in Edison to determine if the department recouped the assessments.

---

[78] According to the contract with Hardeman County, this facility is not contractually required to fill vacancies within 45 days.

# INMATE SERVICES AND SUPPORT

## CHAPTER CONCLUSIONS

**Finding 15 – State and CoreCivic correctional facility personnel did not consistently administer required inmate screenings that are used to prevent sexual abuse in correctional facilities (page 160)**

**Finding 16 – State and CoreCivic facility personnel did not perform inmate orientation within three days of arrival at the facility or did not consistently maintain a signed Orientation Acknowledgement Form in the inmate institutional file (page 163)**

Observation 8 – Northwest Correctional Complex and Turney Center Industrial Complex impeded inmates' access to information relating to healthcare, including access to grievance and sick call forms (page 165)

Observation 9 – State and CoreCivic correctional staff did not properly maintain class and job documentation in accordance with department policy (page 166)

Observation 10 – Trousdale Turner Correctional Center did not conduct the minimally required random drug screenings of the inmate population, and Whiteville Correctional Facility, Turney Center Industrial Complex, and Northwest Correctional Complex did not consistently and accurately record screening results in TOMIS (page 167)

# INMATE SERVICES AND SUPPORT

## Inmate Admission and Intake Process

Per the department's policies and its *Classification User's Guide,* TDOC accepts all inmates into physical custody at one of two classification diagnostic centers: the Bledsoe County Correctional Complex or the Tennessee Prison for Women. These centers also function as correctional facilities with their own assigned inmate populations.

> The department uses several processes, such as inmate assessments, inmate classification, Risk Needs Assessments, sexual abuse risk screenings, and random drug screenings, to ensure inmates are placed in a correctional setting and are provided with the appropriate services that allow the inmates to become successful within the correctional environment and upon release.

Both centers receive and process inmates sent from the state's 95 counties. These inmates may be first-time convicted felons, former felons returning to TDOC on a new conviction, parole violators, or probation or community correction violators. The counties are responsible for transporting these inmates to the diagnostic centers.[79]

Upon the inmate's arrival at a diagnostic center, diagnostic center personnel review the inmate's paperwork for authorization of the inmate's confinement. This authorization may be either a copy of the judgment order, a copy of the parole violation warrant and/or revocation, or a probation revocation order. If a county jail originally housed the inmate, jail personnel will also provide the state's diagnostic personnel with an Inmate Admissions Assessment form. Once diagnostic personnel confirm the authorizing paperwork, the inmate proceeds to intake.

Every inmate must pass through the department's intake process, called an initial diagnostic or initial classification, at one of the two diagnostic centers. TDOC policies require diagnostic personnel to complete this intake process within 14 business days of the inmate's arrival. Classification begins with inmate orientation, continues with several inmate examinations and assessments, provides for establishing inmate files to memorialize the examinations and assessments (including the inmate's understanding), and concludes with the inmate's first incarceration classification hearing. A panel appointed by the warden of the diagnostic center determines which TDOC facility will house the inmate.[80]

---

[79] The only exceptions to this are TDOC backup inmates, inmates returning from a court appearance or medical facility, or escapees. Backup inmates are TDOC sentenced felons who serve their sentences at local jails under a contractual agreement between the county and TDOC, a practice that partially relieves overcrowding at TDOC facilities. Inmates returning to TDOC from a court-ordered appearance or medical facility return to their assigned facilities. Tennessee law enforcement agencies transport escapees to the nearest TDOC facility, pending further transfer to the institution where the escape occurred. Female escapees must go to the Tennessee Prison for Women.

[80] The panel consists of the Associate Warden of Treatment as chairperson (the Chief Correctional Counselor serves as the alternate chairperson when the Associate Warden is unavailable), a ranking correctional officer to represent the security team, a correctional counselor to represent the treatment team, a clinical services professional, and the institutional inmate job coordinator if needed. Per TDOC policy, the Contract Monitor of Operations serves as the alternate chairperson at private facilities.

The following activities do not need to occur in a certain order, so long as diagnostic personnel perform them before the classification hearing:

- **Orientation** – TDOC policies mandate that each inmate must undergo a thorough orientation program within three days of arrival at any TDOC facility. This is to ensure the inmate learns the rules and procedures of that facility, what sanctions exist for unsatisfactory behavior, and what programs are available that can provide new job, educational, and behavior skills.

- **Testing** – The inmate receives medical and dental examinations, a drug screening, an educational assessment, and a mental health appraisal. The inmate must also receive a Prison Rape Elimination Act (PREA) screening within 72 hours of arrival and a Risk Needs Assessment to help management devise a program for the inmate.

- **Initial Custody Assessment** – Diagnostic personnel complete this at initial intake to determine whether an inmate should live alone in a cell or with other inmates, and whether to hold the inmate in maximum, close, medium, or minimum custody. This assessment considers such factors as the inmate's history of violence, severity of the current offense, and prior convictions or disciplinary hearings.

- **Programs and Placement** – Diagnostic personnel use the classification process to create appropriate facility placement and program recommendations for the panel to consider based on inmate information gathered during the initial diagnostic. These recommendations help determine what jobs and classes provided by TDOC might be best for the inmate.

These initial classification efforts give diagnostic personnel the tools to build a comprehensive account of each inmate that will best inform the panel's choice of facility for that inmate. Personnel gather all possible information about the inmate for review and consideration in case any material is missing or incomplete in one source.

<u>Inmate Admissions Assessment Forms (Inmate Intake)</u>

The Tennessee Department of Correction's Division of Prisons *Classification User's Guide* requires diagnostic personnel to use the Inmate Admissions Assessment form to help the panel determine whether to house an inmate in a single cell or with another inmate.[81] The form has two parts, A and B. County jail personnel must complete part A of this form before the inmate transfers to TDOC custody, to provide the diagnostic receiving facility with information regarding an inmate's circumstances and behavior while at the jail. This is the only form carrying information about the inmate that originates with jail personnel.

Part A of the Inmate Admissions Assessment has 11 questions for jail personnel to answer:

- how long the jail housed the inmate;

---

[81] Other documentation considered for this question includes the National Crime Information Center (NCIC) report, classification scale, pre-sentence investigation, and the inmate's file from any previous TDOC incarceration, sexual behavior, or victims of sexual assault (all are described later in this chapter).

- whether the inmate was the victim or perpetrator of violence or rape while in the jail;

- whether the jail housed the inmate in a single or double cell;

- if there were other inmates with whom this inmate was incompatible;

- if the inmate tried to escape while at the jail;

- if jail personnel suspected the inmate of trafficking drugs while in jail;

- if the inmate was violent while in the jail;

- if the inmate has known medical or mental health problems;

- whether the inmate smokes;

- if jail personnel suspect the inmate is a gang member;

- and whether jail personnel think this inmate should be in a double cell.

The warden's designee at the diagnostic receiving facility completes part B of the form and signs it to indicate that facility personnel received and reviewed the information and determined the inmate's cell arrangement (single or double). This form serves as critical documentation of the inmate's behaviors or tendencies while housed in a local jail prior to entering TDOC custody and the facility's basis for housing decisions. Finally, facility staff file the form in the inmate's institutional file as part of the inmate's institutional record.

The inmate's institutional file follows the inmate throughout his or her time served in TDOC facilities and is not considered complete without a full record of the inmate's conduct while incarcerated, including time spent in jail.

<u>Inmate Classification Process</u>

*General Background*

TDOC Policy 401.08, "Classification Hearing Process," and the Division of Prisons *Classification User's Guide* define classification as an ongoing inmate evaluation process that considers the behavior, circumstances, and needs of individual inmates as they progress through the justice system. In other words, the department's goal is to place an inmate in the best possible environment where he or she will cope best with the reality of incarceration. The two diagnostic centers, Bledsoe and Tennessee Prison for Women, are responsible for the inmate classification process.

*Classification and Reclassification Process*

The diagnostic center's warden must establish a classification panel that is responsible for reviewing an inmate's circumstances to determine the best environment during the incarceration period.

Each classification panel consists of a chairperson, a ranking correctional officer, a correctional counselor, a clinical services professional,[82] and an institutional inmate job coordinator[83] (if needed), who are responsible for making recommendations concerning inmate custody levels[84] as well as the facility location and programs[85] to which the inmate is assigned. The panel makes these recommendations by majority decision during a hearing with the inmate.

Before making their decision, the panel considers several factors during the inmate's initial classification review, including



- inmate criminal history;

- court recommendations;

- disciplinary records;

- staff observations of the inmate; and

- jail assessments.

Each classification review culminates in a hearing with the inmate and the panel. The facility must notify the inmate in writing at least 48 hours before the date of the scheduled hearing; however, the inmate can waive his or her right to notification. The hearing must occur within 14 business days of the inmate's admission into the state correctional system.

Annual reclassification hearings allow for regular custody assessment of inmates to ensure they receive the proper facility restrictions, programs, services, and resources paired to their circumstances. The classification panel will reassess the inmates at each annual hearing and make recommendations for custody level changes, programs, and facility assignments as it sees fit. The counselor or case manager that prepares the reclassification should record the conclusions of the panel and any significant remarks in the Tennessee Offender Management Information System (TOMIS), along with the date of the hearing.

The panel documents its classification and reclassification decisions with the Offender Classification Summary, which captures the hearing information, panel participation, and inmate awareness. This summary document also serves as a record of the panel's comments, justification of its recommendations, and final approval as evidenced by the panel member's signatures. The inmate must also sign the Summary to document his or her presence at the hearing. If the inmate refuses to sign the Summary, a member of the panel notes the inmate's refusal on the Summary. An inmate's refusal to sign does not invalidate the hearing or the panel's recommendations.

---

[82] A member of the medical team that provides physical and behavioral health services at the facility.

[83] Institutional staff person responsible for assigning inmates to programs, maintaining job registers and descriptions, and coordinating sentence credit policy requirements, among other duties.

[84] Custody level refers to the level of inmate supervision necessary for the protection of inmates, staff, and the community. Levels range from least restrictive (minimal trustee) to most restrictive (maximum).

[85] The term "program" describes a range of vocational and academic opportunities the department makes available to inmates based upon an assessment of their needs. Depending on their classification, inmates may have access to an array of programs, including farm and livestock operations; various industries; institutional and community service work assignments; and mental health, treatment, and social services.

The presence of this signed and completed form in the inmate's institutional file confirms the inmate was present at the hearing, given the opportunity to participate, and made aware of the panel's final decision. While the panel's classification decision is recorded in TOMIS, the actual Summary document is the department's official record of the inmate's participation in the process.

Risk Needs Assessments (RNAs)

TDOC Policy 513.09, "Risk Needs Assessments (RNA) for Institutions and Transition Centers," defines an RNA tool as an assessment instrument completed by an RNA-certified user[86] who uses face-to-face "motivational interaction and interview techniques" to collect useful information about an inmate to identify the inmate's characteristics, traits, problems, or issues that may increase the risks that the inmate will commit another crime. Using this tool, correctional personnel design the inmate's case management plan to reduce those risks.

RNA-certified users at the department's intake facilities[87] must give every inmate an assessment as part of the initial classification process. Users at all facilities perform reassessments of inmates every 12 months.

RNA-certified users administer the inmate's assessment by using the Static Risk Offender Needs Guide – Revised (STRONG-R) as an assessment tool. Specifically, certified users, trained by software provider Vant4ge, use the STRONG-R to assess inmate needs and predict recidivism based on inmate responses and criminal history. Users complete, save, and print the STRONG-R results using the software application, Vant4gePoint. The inmate signs the printed report, known as an RNA Needs report, and facility staff file it in the inmate's institutional file.

The certified user notes the inmate's signature in TOMIS. If the inmate refuses to sign, a facility staff member will sign and date the RNA Needs report to acknowledge the inmate's refusal to sign, and facility staff will enter the notation in TOMIS. The certified user also marks the proposed STRONG-R assessment in Vant4agePoint as unable to complete. According to facility staff, however, inmates still receive programming if they refuse to sign and date the RNA Needs report.

A signature on the RNA Needs report from either the inmate or the certified user confirms the inmate was present for the assessment and given the opportunity to participate and is the supporting evidence for the accompanying entries in TOMIS and for programming placement. Should Vant4gePoint be unavailable for any reason in the future, a physical copy of the inmate's most recent assessment may be retrieved from the inmate's institutional file.

PREA Screenings

Congress enacted the Prison Rape Elimination Act of 2003 (PREA) to address the problem of sexual abuse of persons in U.S. correctional agencies. It applies to all public and private correctional facilities that house adult or juvenile inmates as well as community-based agencies.

---

[86] A certified user is an individual who has successfully completed a user certification course for the STRONG-R, facilitated by a trainer certified by Vant4ge.
[87] The department's intake facilities are Bledsoe County Correctional Complex and the Tennessee Prison for Women.

Case 3:16-cv-02267   Document 141-5   Filed 02/01/22   Page 175 of 234 PageID #: 25752

It mandates certain standards concerning detection and prevention of prison rape. The Tennessee Department of Correction must follow federal PREA standards issued by the United States Department of Justice.

TDOC Policy 502.06.01, "Prison Rape Elimination Act (PREA) Screening, Classification, and Monitoring," states that the department is to provide a "safe, humane, and appropriately secure environment, free from threat of sexual abuse and sexual harassment for all inmates."

To help meet these standards, the department requires that every inmate receive a PREA screening upon entry into the state's correctional system. Classification teams and health services staff at each correctional facility perform the PREA screenings using the department's PREA Screening application. Through a series of questions, the screening application helps staff identify whether an inmate is either at risk of being sexually abusive or sexually victimized. Pursuant to federal PREA standards, these questions are confidential. Using the screening results, staff make informed decisions concerning inmate housing, cell assignments, work, education, and other program assignments. The goal of the screening is to separate those inmates with a high risk of committing sexual abuse from potential victims.

Staff administer these screenings when an inmate first enters department custody at an intake correctional facility (or diagnostic center) and again when the inmate arrives at the assigned correctional facility.

Once the inmate arrives at the assigned facility, a PREA screening must take place within 72 hours. Facility staff screen the inmate again within 30 days to consider any additional circumstances or information that may have come to light since the inmate first arrived.

See additional results of PREA testwork in the Sexual Abuse and Sexual Harassment section of this report.

Orientation Process at Assigned Correctional Facility

TDOC Policy 404.05, "Orientation Unit," mandates that every inmate must participate in a cognitive orientation program within three calendar days of arrival at a correctional facility. A cognitive orientation program is an informational program designed to familiarize an inmate with the rules of the institution, such as expectations, procedures, and levels of disciplinary action. The Division of Prisons *Classification User's Guide* defines orientation as the basis for making inmates aware of available programs that can provide new job, educational, and behavior skills. Facility staff also use the orientation to observe inmate behavior and identify any special problems. Information provided to the inmate at orientation includes a copy of the institutional or department inmate handbook, Prison Rape Elimination Act (PREA) awareness literature, a description of programs and services available at the prison, an explanation of the TDOC disciplinary and security threat group (STG) procedures, and a brief explanation of the major aspects of a felony sentence.

Correctional facility staff use the Orientation Acknowledgement Form to document the completion of the inmate's orientation. It is the responsibility of the designated orientation unit

staff at the prison to perform the orientation within the three-day limit and to record the orientation in TOMIS.  The Orientation Acknowledgement Form includes signatures of the inmate, the inmate representative if present, the Correctional Counselor, the Classification Coordinator, the Health Services Designee, and the Associate Warden of Treatment or Chief Counselor.  Once completed, the orientation unit staff will place the form in the inmate institutional file as proof the inmate acknowledged receipt of orientation materials.

<u>Access to Grievance Forms and Required Informational Postings at the Assigned Correctional Facility</u>

According to Tennessee Department of Correction Policy 501.01, "Inmate Grievance Procedures,"

inmates can file grievances, or written complaints, concerning

- the substance or application of a written or unwritten department policy or practice;
- any single behavior or action toward an inmate by staff or other inmates; or
- any condition or incident within the department or correctional facility that personally affects the inmate.

The policy also states,

Access to the grievance procedure: Inmate Grievance, and locked grievance depositories,[88] shall be made available for use by all inmates.  Inmates shall have unimpeded access to these grievance forms.  For general population inmates, the grievance forms shall be openly available for pickup without the need for a request to staff. 

The inmates are also permitted to inquire about and request healthcare services, including scheduled and unscheduled sick call.[89]  According to Policy 113.30, "Access to Health Care," "Written instructions explaining access to health care services shall be posted in all living areas and shall be in terms that can be understood by all inmates."

The correctional facilities must also post the Prison Rape Elimination Act (PREA) hotline numbers in the inmate common areas (i.e., living areas where inmates socialize, play games, make calls, etc.) so that inmates may report allegations of sexual abuse and harassment to the department; inmates also receive this information in an inmate handbook when they arrive at the facility, as required by department Policy 502.06.3, "Medical, Mental Health, Victim Advocacy and Community Support Services for PREA Victims."

---

[88] A grievance depository is a locked box where inmates can insert their grievance forms.
[89] A sick call is an organized method by which inmates are evaluated and treated for non-emergency health care requests by qualified health care professionals.

Case 3:16-cv-02267   Document 481-5   Filed 02/12/28   Page 177 of 234 PageID #: 25754

*Results of Prior Audit Regarding Grievance Forms*

During the November 2017 performance audit, we found that Trousdale Turner Correctional Center management did not provide grievance forms in one housing pod[90] and sick call request forms in two pods. Inmates had to request these forms from the correctional officer on duty. We also found that the officer in one of those units did not have sick call forms for approximately four hours. In addition, only one pod out of four we visited had posted instructions for obtaining medical care.

Management concurred with the finding and stated that the facility contract monitor noted multiple deficiencies, leading the department to increase the number of audits conducted at Trousdale.

**Current Audit Follow-up**

We returned to Trousdale and extended our work at the following CoreCivic and state-managed correctional facilities:

- Hardeman County Correctional Facility (CoreCivic-managed);
- Whiteville Correctional Facility (CoreCivic-managed);
- Northwest Correctional Complex;
- Turney Center Industrial Complex; and
- Northeast Correctional Complex.

<u>Inmate Classes and Jobs Documentation</u>

*Classes and Jobs*

The Tennessee Department of Correction provides inmates with opportunities to complete their education while they are incarcerated. The educational system is fully accredited by the Tennessee Department of Education to ensure the highest level of education for incarcerated individuals. A variety of academic and career technical programs, such as Adult Basic Education (high school equivalency), Career Management Success, and Career and Technical Education allow inmates to obtain an education and learn a skill that will translate to employment upon their reentry into society.

The correctional facilities have licensed instructors and a principal on staff who work with the inmates to provide educational services. Inmates are also paid by the hour to attend these classes. Attendance records act as the primary source of information to document inmates' class attendance hours as well as the inmates' wages for attending class. Department Policy 117.01 requires facility management to "maintain accurate educational records. . . ."



The department also provides inmates the opportunity to have jobs while incarcerated. Correctional facilities offer a number of different types of jobs, depending on the inmate's skill level, work history, disciplinary history, and other factors, such as medical qualifications or job availability. For example, Turney Center Industrial Complex and Hardeman County Correctional Facility provide well-behaved inmates the opportunity to work in the Retrieving Independence Program, where the inmates work with and train puppies to become specially trained service dogs. For each inmate with a job, the department maintains a job file that contains all of the

---

[90] A pod is a smaller area within a housing unit where inmates with similar custody levels and programming needs live.

Case 3:16-cv-02267   Document 181-1   Filed 02/12/21   Page 178 of 234 PageID #: 25755

documentation for the inmate's work history while incarcerated. The file includes job register requests, job interview documents, job recommendations, job acknowledgment forms, and other job-related items, such as medical documentation to qualify or disqualify the inmate for a job. Department Policy 505.07 requires inmates to sign job acknowledgment forms to show that they understand the requirements and duties of each job, to whom they report, the amount of money the inmate will earn for the job, and where to report to work. The correctional facility's job coordinator is responsible for placing the required forms in inmate job files.

*Results of the Prior Audit Regarding Inmate Classes and Jobs Documentation*

In the department's November 2017 performance audit report, we reported that CoreCivic did not properly document attendance for inmates housed and assigned to classes or jobs at Trousdale Turner Correctional Center, a CoreCivic-managed facility. We also found that when CoreCivic facility staff were able to provide the inmate attendance records, facility staff had inaccurately recorded inmates' attendance.

Management concurred with the finding and stated that the facility contract monitor noted multiple deficiencies at this facility, leading the department to increase the number of audits conducted at Trousdale.

> **Current Audit Follow-up**
>
> We returned to Trousdale Turner and extended our work at the following CoreCivic and state-managed correctional facilities:
>
> - Hardeman County Correctional Facility (CoreCivic-managed);
> - Whiteville Correctional Facility (CoreCivic-managed);
> - Northwest Correctional Complex;
> - Turney Center Industrial Complex; and
> - Northeast Correctional Complex.

Random Drug Screenings

To combat inmate alcohol and drug use, the Tennessee Department of Correction and CoreCivic conduct random drug screenings each month. The department's central office selects a monthly random sample of inmates from each correctional facility and sends to the facilities a listing that includes the names of approximately 5% of the facility's population. According to department Policy 506.21, "Inmate Drug Testing," "At a minimum, each correctional facility shall test 2.5 percent of the institution's in-house population each month."

The facility's drug screening coordinator then determines when during the month the facility will perform the drug screen of the selected inmates. If an inmate's specimen tests positive for alcohol and drugs, the drug testing coordinator must send positive field screenings to a third-party lab for analysis to confirm the test results and identify the types of drugs in the specimen.

If an inmate tests positive for drugs or alcohol or refuses a random drug screening, the inmate faces potential disciplinary action, such as fines, loss of privileges, and mandatory drug testing. In fact, the facility drug screening coordinator enters an incident in the Tennessee Offender Management Information System (TOMIS), to initiate the process of disciplinary action including actions taken. According to department Policy 502.01, "Uniform Disciplinary Procedures," the department has seven calendar days to hold a disciplinary hearing.

1. **Audit Objective:** Did the department ensure that correctional facility staff completed the required Inmate Admissions Assessment form?

   **Conclusion:** Based on audit work performed, we found that facility staff completed the Inmate Admissions Assessment forms.

2. **Audit Objective:** Did the department ensure inmates received a classification hearing as required by department policy?

   **Conclusion:** Based on testwork performed, we found that inmates received a classification hearing as required by department policy.

3. **Audit Objective:** Did the department ensure inmates received written notice of their classification hearing at least 48 hours in advance?

   **Conclusion:** Based on testwork performed, we found in either the inmate institutional files or in TOMIS, the department provided inmates with 48-hour notice of the upcoming hearing.

4. **Audit Objective:** Did the department ensure Offender Classification Summaries were present in inmate institutional files?

   **Conclusion:** We found at the Trousdale Turner facility that the Chief Counselor kept six Offender Classification Summaries on a shelf in her office rather than in the inmate's institutional files as required by policy.

5. **Audit Objective:** Did the department ensure Risk Needs Assessments were filed in inmate institutional files?

   **Conclusion:** Based on our review, correctional facility staff placed the Risk Needs Assessments in the inmate institutional files.

6. **Audit Objective:** Did the department consistently screen inmates for histories of aggressive sexual behavior or sexual abuse/victimization within 72 hours and again within 30 days of arrival to their assigned correctional facility?

   **Conclusion:** Based on testwork performed, we found that several inmates at both state and CoreCivic facilities did not receive a PREA screening within the 72-hour and/or 30-day deadlines set by policy. See **Finding 15.**

7. **Audit Objective:** Did the department ensure inmates received orientation within three days of their arrival at a correctional facility, and that staff signed and completed orientation forms and filed the forms in the inmate institutional files?

**Conclusion:** From our review of inmate institutional files at the four facilities (state and CoreCivic), we found inmates who did not receive orientation within the required three-day limit, and whose signed orientation forms were not on file. See **Finding 16.**

**8. Audit Objective:** Did CoreCivic's management correct the prior audit finding by providing inmates with unimpeded access to grievance and sick call forms, information relating to medical care access in living areas, and access to PREA hotline numbers at its correctional facilities?

**Conclusion:** Based on our walkthroughs of the housing pods at Trousdale Turner Correctional Center, Whiteville Correctional Facility, and Hardeman County Correctional Facility, CoreCivic management corrected the prior audit finding by providing inmates with unimpeded access to grievance and sick call forms.

**9. Audit Objective:** Did department management provide inmates at its state-run correctional facilities with unimpeded access to grievance and sick call forms, information relating to medical care access in living areas, and access to PREA hotline numbers?

**Conclusion:** Based on our observations of the housing pods at the state correctional facilities, we noted a few instances where inmates did not have unimpeded access to grievance forms and information relating to access healthcare. See **Observation 8**. We did observe that the facilities posted PREA hotline information in the inmates' living areas.

**10. Audit Objective:** Did correctional facilities maintain the required documentation for inmates attending classes and assigned to jobs to support the inmates' pay and job responsibilities?

**Conclusion:** Based on our testwork, we found that state and CoreCivic facilities did not maintain adequate inmate class attendance records to support inmate pay for attending classes or maintain inmate job documentation in accordance with department policy. See **Observation 9**.

**11. Audit Objective:** Did the correctional facilities perform the required random drug screenings and enter the results into TOMIS as required by policy?

**Conclusion:** Based on our review, we found that facilities did not comply with the department's policy regarding required random drug screenings and did not enter the results into TOMIS as required. See **Observation 10**.

## Finding 15 – State and CoreCivic correctional facility personnel did not consistently administer required inmate screenings that are used to prevent sexual abuse in correctional facilities

Based on testwork performed to determine if correctional facility staff screened inmates upon arrival for sexual abuse risks in accordance with the Prison Rape Elimination Act (PREA) standards, we found that staff at 5 facilities did not complete most initial PREA screenings upon arrival, and staff at all 6 facilities did not complete some 30-day screenings after arrival, as required by department policy.  See **Table 42** for results.

**Table 42**
**Prison Rape Elimination Act Standards' Required Screening Not Performed**

| Correctional Facility | Inmate Sample Size | 72-Hour Screenings | | 30-Day Screenings | |
|---|---|---|---|---|---|
| | | Not Performed Timely | Not Performed At All | Not Performed Timely | Not Performed At All |
| Northeast | 60 | 16 | 1 | 9 | – |
| Northwest | 25 | 11 | – | 13 | 3 |
| Turney Center | 25 | 3 | – | 9 | 8 |
| Hardeman* | 60 | 3 | – | 5 | 5 |
| Whiteville* | 60 | 2 | – | | 1 |
| Trousdale Turner* | 60 | No Issues | | 4 | 2 |

Source: Inmates' institutional files.
*CoreCivic-managed facilities.

According to Department Policy 502.06.1, "Prison Rape Elimination Act (PREA) Screening, Classification, and Monitoring,"

- All inmates shall be screened, using the PREA Screening Application, upon arrival at a facility for their risk of being sexually abused by other inmates or sexually abusive toward other inmates. This screening shall ordinarily take place within 72 hours of arrival at the facility.

- Within 30 days of the inmate's arrival at a facility, staff will again screen, using the PREA Screening Application, the inmate for risk of victimization or abusiveness to include any additional relevant information received by the facility since the intake screening.

In our discussion with department management, they stated that they did not dispute the fact that the facilities either did not complete the screenings or completed them late; they believe the issues likely occurred due to staffing shortages or simple human error. Furthermore, management stated that sometimes inmates may be unavailable for the screening due to a court hearing, medical reasons, or a transfer.

The Department of Justice's May 2019 PREA Audit Report on the Northwest facility found similar problems. The report stated that "the initial PREA risk screening was conducted past 72 hours, past 30 days and/or not at all."[91] When the department does not conduct timely and accurate risk screenings, the risk of inmates being abused or abusing others increases.

**Recommendation**

Management should ensure that all relevant correctional staff tasked with performing PREA screenings perform the screenings within the required timeframes. Management should implement effective controls to ensure compliance with applicable requirements, assign employees to be responsible and accountable for ongoing monitoring of risks and any mitigating controls, and act if deficiencies occur.

**Management's Comment**

Concur.

PREA compliance is a priority for our Department.

PREA screenings are an important tool to ensure sexual safety at all of our facilities. All offenders are screened as part of the diagnostic process and any risks for sexual victimization are identified and documented as well as any proclivities to act as a sexual aggressor.

In a recent DOJ audit of our diagnostic facility, Bledsoe County Correctional Complex, the DOJ auditor noted that TDOC not only met the standard for initial screenings, but exceeded the

---

[91] The Department of Justice PREA audits issued from October 2017 through July 2019 on the Turney Center and Northeast facilities found no problems with screenings.

standard because they were conducted immediately upon arrival rather than waiting the allowable 72 hours. The results of these screenings are documented and available for approved users in the Tennessee Offender Management Information System (TOMIS) thereby allowing us to communicate the results statewide.

Prior to housing assignment at any facility, the results of prior screenings are reviewed. In addition to the initial diagnostic screening, an offender should be screened within 72 hours of arrival to each facility in our system and also subsequently screened within 30 days. As the issues with timeliness of screenings were discovered internally, they were corrected prior to the audit. Of the 290 initial screenings reviewed during the audit, 36 were noted to be deficient. Of the 36 noted to be deficient, 35 of them were completed prior to the audit review. Of the 290 thirty-day reviews evaluated during the audit, 59 were noted to be deficient. Of the 59 noted to be deficient, 40 of them had been completed prior to the audit review.

Although the internal process did resolve 93% of the errors, the issues with timeliness of PREA screenings have already been addressed at the facilities noted with a comprehensive agency approach being developed and implemented.

### Finding 16 – State and CoreCivic facility personnel did not perform inmate orientation within three days of arrival at the facility or did not consistently maintain a signed Orientation Acknowledgement Form in the inmate institutional file

Department Policy 404.05 states that inmates must receive orientation within three calendar days of arrival, and that the Orientation Acknowledgement Form is the document of record for the completed orientation; the form serves as the department's record that the correctional facility informed the inmate about the rules of the facility in order to assist the inmate with integration into the new environment. Policy 512.01, "Maintenance and Safeguarding of Inmate Institutional Records," states that the correctional staff should file the completed form in the inmate's institutional file. To determine if correctional staff at the 6 facilities we visited obtained Orientation Acknowledgement Forms, we selected a total nonstatistical random sample of 250 inmate files from a total population of 5,232 files.

> For the full methodology, including the breakdown of the population and sample sizes by correctional facility we visited, see Appendix F-1 on page 169.

Based on testwork performed during our facility visits, we tested a sample of inmates assigned to the four correctional facilities on and after October 1, 2017. We found that the facilities either did not conduct orientation for their assigned inmates in a timely manner or did not obtain Orientation Acknowledgement Forms as documentation that inmates received orientation.

**Table 43**
**Results of Testwork – Late Orientations and**
**Missing Orientation Acknowledgement Forms**

| Correctional Facility | Inmate Sample Size | Number of Orientations Performed Past the 3-Day Limit | Number of Missing Orientation Forms |
|---|---|---|---|
| Northeast | 60 | 8 | 28 |
| Northwest | 24 | 11 | 8 |
| Turney Center | 60 | 1 | 8 |
| Whiteville* | 60 | 2 | 2 |

Source: Inmate institutional files.
*CoreCivic-managed facility.

Whiteville and Turney Center personnel could not explain why they conducted orientation late or account for the missing forms. At Northwest, the Director of Compliance explained that, during a U.S. Department of Justice PREA audit in December 2018 and May 2019, the federal auditor requested a random sample of inmate Orientation Acknowledgement Forms as part of the facility's PREA audit. In both audits, Northwest's personnel could not provide the auditor with the Orientation Acknowledgement Forms. As a result of this audit, Northwest personnel were retrained on the orientation process. As part of the follow-up corrective action plan for the May 2019 audit, all inmates received orientation again. Northwest personnel did not have these new orientation forms in the files.

According to Northeast personnel, they documented orientation in TOMIS. We found, however, that the TOMIS contact notes stated "to complete the orientation process/paperwork with the Sgt [Sergeant]" and did not indicate that personnel provided orientation within the required three days. Additionally, Northeast personnel could not find the Orientation Acknowledgement Forms for some inmates and could not explain why they conducted the orientations late.

Orientation is designed to make inmates aware of institutional and department policies they are expected to adhere to during their stay. It also provides inmates entering the system with information including, but not limited to, clothing issuance, family visitation and telephone privileges, inmate funds, disciplinary procedures, and access to health and mental health care. Completed and signed Orientation Acknowledgement Forms confirm that offenders received orientation upon arrival at a facility and the information they need to successfully integrate into the correctional environment. Signed, completed forms are proof the inmate acknowledged receipt of orientation materials.

## Recommendation

Management should ensure that all correctional staff are conducting inmate orientations and completing and filing the appropriate forms as required by policy and should provide additional training to ensure correctional facilities comply with department policy.

**Management's Comment**

 Concur.

 Orientation of inmates is an important step to ensure an individual's successful integration into the period of confinement.

 Although inmate orientation could be delayed by a number of factors, the process itself is expected to progress within the allotted timeframe.

 We further acknowledge that proper documentation is necessary to create the historical record relevant to an inmate's arrival processing at the receiving facility.

 The facility internal review process will be utilized to reinforce this policy requirement by conducting training and enforcing accountability.

**Observation 8** – Northwest Correctional Complex and Turney Center Industrial Complex impeded inmates' access to information relating to healthcare, including access to grievance and sick call forms

 Based on our observations while touring five housing pods at the correctional facilities we visited, we found that CoreCivic had corrected the issues involving access to grievance and sick call forms and had posted written instructions for inmates to access medical care in inmate living spaces; however, we found that two state-managed facilities—Northwest Correctional Complex and Turney Center Industrial Complex—had actually impeded the inmates' access to forms and healthcare instructions. Specifically, we found the following:

- At Northwest Correctional Complex, in 3 of the 5 pods we visited (60%), facility management placed the grievance and sick call forms in the cages used by the correctional officers. Inmates had to ask a correctional officer for the forms.

- In one of the 10 pods at Turney Center (10%), we found that inmates did not have ready access to grievance forms. Additionally, in one pod, facility management did not post the required information regarding inmates' access to medical care.

 According to department staff, correctional officers and housing supervisors[92] did not promptly replace grievance and sick call forms as needed and did not replace the posted instructions to access medical care that had been removed. We discussed with department staff the location of grievance and sick call forms locked in cages, and staff stated they placed the forms in the cages because the inmates used the forms to draw on or for illicit drug activity or had merely ripped the forms up. While we understand the challenges facilities' staff face in providing full access to these forms, without access to grievance and sick call forms, inmates cannot file a complaint or obtain medical care without assistance from facility staff, which may potentially

---

[92] Housing supervisors are correctional officers who supervise the regular correctional officers and inmates in the housing units and pods.

delay an inmate's grievance resolution or ability to receive medical care promptly. Additionally, without access to the posted information concerning how to obtain medical care, inmates may not fully understand how to obtain the medical care they need.

We recommend management and staff continue to find ways to make the required forms and information readily available to the inmates.

---

**Observation 9** – State and CoreCivic correctional staff did not properly maintain class and job documentation in accordance with department policy

Classes

To determine if correctional staff maintained the required documentation for inmates attending classes, we tested a sample of inmates at six correctional facilities and examined attendance records for 13 randomly selected days for the period, as described in **Appendix F-1** on page 169. Because class instructors did not complete attendance sheets or maintain other clear documentation to support inmate class attendance, we found that staff at each facility could not fully support class attendance for the inmates we tested. We also determined that department management did not ensure that all attendance entries in TOMIS agreed with the correctional facility's attendance records that were provided. Our testwork results are shown in **Table 44**.

**Table 44**
**Results of Testwork – Inmates with Class Attendance Record Issues**

| Facility | Attendance Records Not Complete or Clear | Attendance Records Do Not Agree with TOMIS | Attendance Records Not Maintained |
|---|---|---|---|
| Northeast* | 11 of 60 (18%) | 2 of 60 (3%) | 9 of 25 (36%) |
| Northwest | 6 of 25 (24%) | 7 of 25 (28%) | 9 of 25 (36%) |
| Turney Center | 6 of 25 (24%) | 12 of 25 (48%) | 9 of 25 (36%) |
| Whiteville† | 1 of 60 (2%) | 8 of 60 (13%) | No Issues |
| Trousdale Turner† | 1 of 60 (2%) | 4 of 60 (7%) | No Issues |

*Due to numerous issues found in the initial sample of 25, we expanded the sample for some testwork to 60.
†CoreCivic-managed facilities.
Source: Department of Correction class attendance records.

According to department management, the issues noted related to oversight and human error. In the instances where instructors at Northeast and Turney Center did not complete attendance records, the inmates in question were in special housing units and were not required to attend class to complete class-related work. The class instructors gave the inmates homework for class credit. However, we could not verify the inmates actually completed the homework or the instructors maintained documentation for inmates they saw on those days. When department and CoreCivic management do not ensure that staff maintain accurate attendance records, the risk increases for improper payments to inmates for attending classes.

We found that for five of the six correctional facilities visited, the department and CoreCivic did not have the required documentation, such as the inmates' signed job acknowledgment forms. See **Table 45**. Agreements for job positions and inmate-acknowledged responsibilities provide the department and CoreCivic with transparency and documentation to prevent possible disputes regarding job responsibilities and inmate pay.

**Table 45**
**Results of Testwork - Job Acknowledgment Forms**

| Facility | No Inmate Acknowledgement Form |
|---|---|
| Northeast | 15 of 25 (60%) |
| Northwest | 16 of 60 (27%) |
| Turney Center | 18 of 60 (30%) |
| Hardeman* | 8 of 25 (32%) |
| Trousdale Turner* | 8 of 60 (13%) |

Source: Department of Correction inmate job files.
* CoreCivic-managed facilities.

According to the department, the job acknowledgment forms were likely with the inmates' job supervisors, instead of in the inmates' job files. However, we requested the forms multiple times, and facility staff could not locate them while we were on site.

These job acknowledgement forms are important because they document that the inmate understands the duties of his or her job, the pay rates for the job, and who the job supervisor is. The management and staff of the department and CoreCivic should ensure the job coordinators are aware of the requirement for the job agreements to be signed by the inmates and the need for the signed agreement to be maintained in the job files. The department should continue to work with educators at the facilities to ensure they follow departmental policies for attendance recordkeeping and entry into TOMIS.

**Observation 10** – Trousdale Turner Correctional Center did not conduct the minimally required random drug screenings of the inmate population, and Whiteville Correctional Facility, Turney Center Industrial Complex, and Northwest Correctional Complex did not consistently and accurately record screening results in TOMIS

Based on our testwork at the six correctional facilities, we found that four facilities did not conduct the required random drug screenings each month and did not enter the results in TOMIS. Specifically, we found the following:

- The facility personnel at Whiteville Correctional Facility did not record the inmates' random drug screen results in TOMIS for 3 of 60 inmate drug screens we reviewed (5%). Although the staff should have recorded the results in TOMIS, we found that, because the results of all three drug screens were negative, facility personnel did not

need to pursue disciplinary action for these inmates. According to department management, this issue was due to an oversight; staff should have entered the information into TOMIS as negative drug screens.

- Based on our interview with the drug testing coordinator at Trousdale Turner Correctional Center, the coordinator informed us that he did not test the minimally required 2.5% of the inmate population for either March or April 2019. According to the drug testing coordinator, when he was given the responsibility for conducting the drug screenings in March 2019, he received on-the-job training from the former drug testing coordinator. He went on to state that he did not have access to TOMIS at that time and had to attend a critical incident response team class.

- We found that the Turney Center Industrial Complex drug testing coordinator did not enter 3 of 60 screenings (5%) in TOMIS accurately for drug screens conducted in February and March 2019. Specifically, the coordinator did not enter one test result and incorrectly entered information on the remaining two drug screenings. For the two incorrectly entered tests, the inmates refused to take the drug screen, but the coordinator entered in TOMIS that the test results were "Negative"; according to the drug screening coordinator, he mistakenly clicked on the wrong TOMIS prompt. For the drug screen that the coordinator did not enter, the sample tested positive for alcohol and drugs; however, the coordinator stated he missed entering the information.

- Based on discussion with the drug screening coordinator and the disciplinary board sergeant and our review of drug screening documentation, we found that facility personnel at Northwest Correctional Complex were approximately three months behind on holding disciplinary hearings for inmates with positive drug screens and those inmates who refused to take the drug screens. Northwest's Disciplinary Board Sergeant stated that the relevant policy, TDOC Policies 502.01 and 502.02, states that disciplinary hearings should be performed in a reasonable time.

> "No inmate charged with a disciplinary offense should be required to wait more than seven days for his/her disciplinary hearing to be held."
>
> Source: TDOC Policy 502.01.

By not performing the minimum number of monthly random drug screenings, facility management faces an increased risk that inmate alcohol or drug use could go undetected, creating an environment for increased violent behavior. The department and CoreCivic management should continue to educate and work with the facilities' drug testing coordinators to ensure the facilities meet the 2.5% random drug testing requirement and that staff enter the drug screening results completely and accurately into TOMIS. By doing so, the department and CoreCivic can better track the number of positive drug results occurring at each facility, allowing them to address facilities with the greatest risk of alcohol and drug abuse. The department and CoreCivic can also offer inmate referrals to the facilities' substance abuse treatment programs, if the facilities conduct the appropriate screenings and accurately enter the results in TOMIS.

# Appendix F
# Inmate Services and Support

### Appendix F-1
### Methodologies to Achieve Objectives

To achieve our objectives, we selected a nonstatistical random sample of inmates at the following correctional facilities to determine if they completed the Inmate Admissions Assessment forms.

| Correctional Facility | Inmate Population | Inmate Sample Size |
|---|---|---|
| Northeast | 168 | 58 |
| Northwest | 476 | 24 |
| Turney Center | 246 | 58 |
| Hardeman* | 332 | 25 |
| Whiteville* | 1,496 | 25 |
| Trousdale Turner* | 2,514 | 25 |
| **Total** | **5,232** | **215** |

\* CoreCivic-managed facilities.
Source: Department of Correction inmate rosters pulled from INFOPAC reports generated on June 6, 2019 (Northeast), May 15, 2019 (Northwest), May 30, 2019 (Turney Center), May 9, 2019 (Hardeman), April 11, 2019 (Whiteville), and May 2, 2019 (Trousdale Turner).

We reviewed files for inmates assigned to each facility on or after October 1, 2017, which is the beginning of the audit period. We inspected the files to determine if correctional facility personnel consistently checked the Inmate Admissions Assessment form for completeness and filed it as required by policy.

We selected nonstatistical random samples of inmate files assigned the following correctional facilities on or after October 1, 2017, to determine if the inmates received written notice at least 48 hours in advance of any classification panel hearing or if the inmates waived this notice instead.

| Correctional Facility | Inmate File Population Size | Inmate File Sample Size for Late Classification Hearings | Inmate File Sample Size for Missing 48-Hour Notifications and Waivers | Inmate File Sample Size for Missing Classification Summaries |
|---|---|---|---|---|
| Northeast | 168 | 24 | 25 | 58 |
| Northwest | 476 | 23 | 59 | 24 |
| Turney Center | 246 | 23 | 58 | 24 |
| Hardeman* | 332 | 25 | 25 | 25 |
| Whiteville* | 1,496 | 60 | 60 | 60 |
| Trousdale Turner* | 2,514 | 60 | 25 | 60 |
| **Total** | **5,232** | **215** | **252** | **216** |

*CoreCivic-managed facilities.
Source: Department of Correction inmate rosters pulled from INFOPAC reports generated on June 6, 2019 (Northeast), May 15, 2019 (Northwest), May 30, 2019 (Turney Center), May 9, 2019 (Hardeman), April 11, 2019 (Whiteville), and May 2, 2019 (Trousdale Turner).

In addition, we tested inmate files to determine if the inmates received a classification hearing within 14 days of their arrival for processing at the Bledsoe County Correctional Complex and whether the files contained signed Offender Classification Summaries. We then compared the files to corresponding dates, entries, and contact notes in TOMIS.

We selected a nonstatistical random sample of inmate files assigned to the following correctional facilities on or after October 1, 2017, and we inspected these files to determine if the they contained a signed Risk Needs Assessment report.

| Correctional Facility | Inmate File Population Size | Inmate File Sample Size |
|---|---|---|
| Northeast | 168 | 58 |
| Northwest | 476 | 24 |
| Turney Center | 246 | 24 |
| Hardeman* | 332 | 25 |
| Whiteville* | 1,496 | 25 |
| Trousdale Turner* | 2,514 | 60 |
| **Total** | **5,232** | **216** |

*CoreCivic-managed facilities.
Source: Department of Correction inmate rosters pulled from INFOPAC reports generated on June 6, 2019 (Northeast), May 15, 2019 (Northwest), May 30, 2019 (Turney Center), May 9, 2019 (Hardeman), April 11, 2019 (Whiteville), and May 2, 2019 (Trousdale Turner).

We compared the files to corresponding dates, entries, and contact notes in TOMIS.

From the following populations, we selected a nonstatistical random sample of inmates assigned to the following correctional facilities on or after October 1, 2017, to determine if the inmates received the appropriate Prison Rape Elimination Act screenings upon arrival at the facility.

| Correctional Facility | Inmate Population Size | Inmate Sample Size |
|---|---|---|
| Northeast | 168 | 60 |
| Northwest | 476 | 25 |
| Turney Center | 246 | 25 |
| Hardeman* | 332 | 60 |
| Whiteville* | 1,496 | 60 |
| Trousdale Turner* | 2,514 | 60 |
| **Total** | **5,232** | **290** |

*CoreCivic-managed facilities.
Source: Department of Correction inmate rosters pulled from INFOPAC reports generated on June 6,
2019 (Northeast), May 15, 2019 (Northwest), May 30, 2019 (Turney), May 9, 2019 (Hardeman), April
11, 2019 (Whiteville), and May 2, 2019 (Trousdale).

We examined dates listed in TOMIS to determine whether facility staff screened the
inmates for a history of aggressive sexual behavior or sexual abuse and victimization within 72
hours after their arrival at the facilities and rescreened inmates within 30 days.

We selected a nonstatistical random sample of inmate files assigned to the following
correctional facilities on or after October 1, 2017, to determine if each inmate had a completed and
signed Orientation Acknowledgement Form in the inmate's institutional file.

| Correctional Facility | Inmate File Population Size | Inmate File Sample Size |
|---|---|---|
| Northeast | 168 | 58 |
| Northwest | 476 | 24 |
| Turney Center | 246 | 58 |
| Hardeman* | 332 | 25 |
| Whiteville* | 1,496 | 60 |
| Trousdale Turner* | 2,514 | 25 |
| **Total** | **5,232** | **250** |

*CoreCivic-managed facilities.
Source: Department of Correction inmate rosters pulled from INFOPAC reports generated on June 6, 2019
(Northeast), May 15, 2019 (Northwest), May 30, 2019 (Turney Center), May 9, 2019 (Hardeman), April
11, 2019 (Whiteville), and May 2, 2019 (Trousdale Turner).

We compared the files to corresponding dates, entries, and contact notes in TOMIS.

We obtained and reviewed department policies related to grievances and access to
healthcare at all six correctional facilities:

- Northeast Correctional Complex (state-managed);

- Northwest Correctional Complex (state-managed);

- Turney Center Industrial Complex (state-managed);

- Hardeman County Correctional Facility (CoreCivic-managed);

- Whiteville Correctional Facility (CoreCivic-managed); and

- Trousdale Turner Correctional Center (CoreCivic-managed).

During each visit we performed walkthrough procedures in five housing pods at each facility, expanding to five additional pods at Turney Center due to issues we found, to determine if department and CoreCivic management provided inmates with unimpeded access to grievance forms and posted instructions for inmates to access medical care and the Prison Rape Elimination Act (PREA) hotline numbers in the pods' living areas.

We reviewed departmental policy related to inmate classes and jobs. We obtained INFOPAC reports from TOMIS related to inmate pay and attendance for different pay periods. At each facility we visited, we selected the following nonstatistical random samples of inmates from the following populations. To test inmate class requirements, we haphazardly selected 13 days for each inmate.

| Correctional Facility | Period | Population Size | Maximum Sample Size Tested |
|---|---|---|---|
| **Northeast Correctional Complex** | April 26-May 25, 2019 | 1,245 inmates assigned to jobs and 262 inmates assigned to classes | 25 inmates assigned to jobs and 60 inmates assigned to classes |
| **Northwest Correctional Complex** | March 26-April 25, 2019 | 1,733 inmates assigned to jobs and 671 inmates assigned to classes | 60 inmates assigned to jobs and 25 inmates assigned to classes |
| **Turney Center Industrial Complex** | March 26-April 25, 2019 | 1,770 inmates assigned to jobs and 160 inmates assigned to classes | 60 inmates assigned to jobs and 25 inmates assigned to classes |
| **Hardeman County Correctional Facility\*** | March 26-April 25, 2019 | 1,600 inmates assigned to jobs and 464 inmates assigned to classes | 25 inmates assigned to jobs and 60 inmates assigned to classes |
| **Whiteville Correctional Facility\*** | February 26-March 25, 2019 | 1,119 inmates assigned to jobs and 319 inmates assigned to classes | 25 inmates assigned to jobs and 60 inmates assigned to classes |
| **Trousdale Turner Correctional Center\*** | March 26-April 25, 2019 | 1,745 inmates assigned to jobs and 364 inmates assigned to classes | 60 inmates assigned to jobs and 60 inmates assigned to classes |
| | **Total** | **9,212 inmates assigned to jobs and 2,240 inmates assigned to classes** | **255 inmates assigned to jobs and 290 inmates assigned to classes** |

\*CoreCivic-managed facilities.
Source: Offender Pay Attendance reports generated from INFOPAC for the periods listed above.

Case 3:16-cv-02267 Document 481-1 Filed 02/10/22 Page 194 of 234 PageID #: 25771

For the inmates sampled, we obtained educational attendance records for each class to determine which inmates attended. We haphazardly sampled 13 days from the pay period[93] prior to our facility visit to determine if the inmates' attendance records agreed to the inmates' pay. We obtained the job files for each inmate sampled to determine if the job files contained the required acknowledgment forms signed by the inmates.

We obtained and reviewed the department's policy for required random drug testing. We conducted site visits and performed testwork at the six correctional facilities we visited.

We obtained the department's monthly drug screening listing from each facility's drug testing coordinator for approximately one to two months prior to the date of the site visit. Using the listings, we selected the following nonstatistical random sample from each facility to determine if the facility performed drug screenings on 2.5% of inmates each month. We also determined if the facility entered the drug screening results in TOMIS; for any positive screenings, we determined if the facility initiated disciplinary action, as required by department policy.

| Correctional Facility | Site Visit Date | Sample Size Tested |
|---|---|---|
| Northeast | June 10-14, 2019 | 25 |
| Northwest | May 20-24, 2019 | 25 |
| Turney Center | June 3-7, 2019 | 60 |
| Hardeman* | May 13-17, 2019 | 60 |
| Whiteville* | May 15, 2019 | 60 |
| Trousdale Turner* | May 6-9, 2019 | 25 |
| **Total** | | **255** |

* CoreCivic-managed facilities.
Source: Samples pulled from population of random drug screenings obtained from each facility's Drug Screening Coordinator for the month(s) prior to visits to correctional facilities.

---

[93] The pay period is the month for which the inmate is paid for working a job or attending a class. The pay periods start on the 26th of one month and end on the 25th of the succeeding month.

# Department's Community Supervision Responsibilities

## Chapter Conclusions

**Matter for Legislative Consideration – Single Comprehensive Resource for Offender Arrests (page 175)**

**Finding 17 – Community supervision supervisors, District Directors, and Correctional Administrators did not always review case records as required by department policy to ensure probation and parole officers performed their required duties (page 179)**

Observation 11 – Although department management has worked since 2014 to ensure probation and parole officers performed their required duties, probation and parole officers did not meet supervision requirements for offender case plan reviews (page 182)

# DEPARTMENT'S COMMUNITY SUPERVISION RESPONSIBILITIES

## MATTER FOR LEGISLATIVE CONSIDERATION – SINGLE COMPREHENSIVE RESOURCE FOR OFFENDER ARRESTS

The Department of Correction and state and local law enforcement agencies could benefit from a single comprehensive resource for looking up offender arrests across the state to more easily monitor offenders' compliance with supervision requirements.   Section 40-28-605, *Tennessee Code Annotated*, requires that probation and parole officers "supervise, investigate and check on the conduct, behavior and progress of parolees and persons placed on probation."  As noted in **Observation 11**, officers are required to determine on a monthly basis whether offenders have new arrests or outstanding warrants; however, to fulfill this requirement, officers must search and ultimately rely on multiple federal, state, local, and third-party sources to determine whether the department's offenders have new arrests or outstanding warrants.  These sources include searching paper arrest logs of local jurisdictions, news sources, the victim notification service,[94] arrest compilation websites (such as Arrests.gov), the federal National Crime Information Center (NCIC), and third-party free cell phone applications (such as Vinelink or Mobile Patrol).  Based on our discussions with department management, the state does not have a centralized (state, local, and federal) electronic database for arrests or warrants.

State law enforcement and department probation and parole officers could benefit from a statewide electronic database for the centralization of arrests, warrants, and other similar actions.  A single comprehensive resource would allow law enforcement and probation and parole officers to quickly determine if an individual has been arrested recently anywhere in the state, or if there is any open warrant out for their arrest.

Offender Supervision Process

Probation and parole officers are responsible for supervising parolees and individuals on probation on active supervision status[95] on a monthly basis to ensure they meet the conditions of their parole or sentence.   Specifically, the officers are required to perform the following 11 supervisory requirements:

- perform arrest checks;

- request offender drug screens;

- perform employment verification;

- hold face-to-face meetings with offenders;

---

[94] Tennessee's Victim Notification Service is maintained by the Department of Correction and is used to keep registered victims, survivors, families, and other interested parties informed of an offender's status, movements, parole hearing dates, release status, and other information.

[95] The department may also place offenders on administrative offender status who live out of state, have outstanding warrants or are in custody, or have absconded supervision.  Of the supervisory requirements, officers are only required to perform arrest checks on administrative status offenders.

- collect monthly probation and parole fees for supervision, diversion, and Criminal Injuries Compensation funds, as well as incidental fees from activities like DNA collection, GPS monitoring, and drug testing;

- perform home visits;

- create or review the offender's case plan, which details risks, needs, and areas of concern, and provides the offender with suggested methods to better their situation and comply with supervision requirements;

- conduct searches of a higher-risk offender's home;

- perform procedures to determine an offender's needs and any significant risks the offender poses that need to be taken into account to properly supervise and reform the offender;

- perform checks to ensure sex offenders are attending required sex offender treatment therapy; and

- perform checks to determine if the offender is complying with any special conditions set by the judge as a condition of their probation or parole.

The offender's supervision level[96] determines the specific supervisory requirements an officer must perform and their required frequency. For example, officers are required to conduct a face-to-face meeting with minimum-security offenders every six months, with medium-security offenders every three months, and maximum- and enhanced-security offenders every month.

Standards Due Report

A staff person from the Department of Finance and Administration's Strategic Technology Solutions group generates the data needed for the Standards Due Report for use by the Department of Correction. The Department of Correction's administrative staff then use this data to create a tool that contains information on all offenders on probation and parole. Department management distributes the tool twice a week to each probation and parole officer to facilitate their monitoring of offenders. Officers use this tool to complete their supervisory requirements each month, as it highlights each requirement that is due during the current month and any requirements that are overdue, so that officers can prioritize those items to ensure that they are completed.

During the period October 1, 2018, through March 4, 2019, the reports contained data on an average of 40,432[97] offenders. This data includes the assigned probation and parole officer and the due dates for each of the 11 supervisory requirements for all offenders.

---

[96] The most common supervision levels are Intake, Minimum, Medium, Maximum, and Enhanced. Additionally, there are four levels of supervision for sex offenders. These are Transitional, Intermediate, Secondary, and Primary.
[97] We calculated a six-month average using monthly department supervisory reports we reviewed during the audit.

Department policy describes community supervision supervisors and managers' review requirements to ensure probation and parole officers continually monitor their assigned offenders and update the offender case records.

| Offender Case Record Life Cycle | Review Requirements |
|---|---|
| Initial Case Record Review | Once the offender enters community supervision, supervisors and/or managers review all initial case records within 60 days of the offender's community supervision start date.  This includes reviewing the case file and TOMIS. |
| Monthly Case Record Review | District supervisors inspect a minimum of 3% of their case files and TOMIS records. |
| Closing Case Record Review | Supervisors perform a final review of the offender's case file when the court or Board of Parole issued an order of restitution[98] prior to the offender's release from community supervision. |
| Quarterly Case Record Reviews | Community Supervision District Directors review 10% of their district's required 3% monthly case record reviews.  Correctional Administrators review 10% of the District Directors' quarterly case record reviews per their assigned regions. |

Source:  Department of Correction Policy 706.02, "*Supervisory Review of Caseloads.*"

To facilitate the monitoring of probation and parole officers' work, the department provides a Supervisor Annual Case Record Review report four times a month to probation and parole supervisors, District Directors, and Correctional Administrators.  In the first report, the department randomly selects a sample of offender case records representing 3% of the total active parole and probation offender population as of the beginning of that month.  Supervisors must complete their case record reviews listed on the Supervisory Case Record Review report and enter their comments in TOMIS before the end of the month.

By the end of each quarter, District Directors must review 10% of the Supervisory Case Record Review reports run for that quarter and specifically review the supervisors' or managers' work.  Correctional Administrators must audit 10% of the District Directors' reviews by the end of that same quarter.

Results of Prior Audits

In the 2012 Performance Audit of the Board of Probation and Parole (TDOC took over all board functions after this audit), we found that probation and parole officers were not completing

---

[98] Identified victims, whether individuals or businesses, may be entitled to an order of restitution for certain losses suffered because of the commission of an offense, or losses the offender agrees to repay as part of a plea agreement. The sentencing judge determines the parameters and issues the order of restitution.

Case 3:16-cv-02107   Document 148-1   Filed 02/10/22   Page 199 of 234 PageID #: 25776

all supervision requirements. Management concurred and indicated that the department would ensure that probation and parole officers follow offender supervision guidelines and enter all information appropriately in TOMIS, largely through additional training and equipment upgrades to increase efficiency. We also found that probation and parole officer supervisors did not review approximately half of the cases in our sample. Management concurred and indicated it would use all available tools to ensure the completion of supervisory reviews, and that supervisors discuss the results with officers as policy requires.

In the 2014 Performance Audit of the Department of Correction, we found that while there was improvement in supervision rates since 2012, probation and parole officers were still not completing all supervision requirements. Management concurred and restated its commitment to improving officer performance, citing increased training and improvement of standards, adding a requirement for probation and parole managers to report monthly to their District Directors, and requiring manager and District Director signatures on case file review audit forms. We also found that the department had not used all available tools to ensure the completion of supervisory reviews and did not ensure supervisors discussed reviews with officers as required. Management concurred only in part, stating that they believed their performance to be an improvement over the previous audit. However, they stated they would initiate a policy to clarify review requirements and timeliness. Following the audit fieldwork, management developed additional monitoring methods at the district level to monitor supervisors.

In the department's 2017 performance audit, we reported repeated conditions that probation and parole officers did not always meet offender supervision requirements and supervisors did not always meet oversight requirements. Management concurred with our findings and stated that to improve the monitoring capabilities of officers, they would add by 2018 a compliance rating scale to each standard in the Standards Due Report. This would be the basis of an automatically calculated compliance score for each offender every time the report generated, allowing officers, managers, and other supervisors the ability to quickly review an offender's status. Management also stated that the Standards Due Report allows managers to view their officers' caseloads at a glance, so that they can help the officers manage their work and time. They stated that the Report also allows District Directors to quickly determine their district's compliance level. They were working to implement a Case Management Review process to facilitate improvements in the ability to meet supervisor oversight requirements. Management updated the Standards Due Report to include functionality that alerted probation and parole officers when a supervisory requirement was almost due or was overdue for each offender. This change allowed the department to correct this finding for all supervisory requirements other than reviewing and creating offender case plans.

<p align="center">**Audit Results**</p>

1. **Audit Objective:** In response to the prior audit finding, did management ensure that community supervision supervisors and managers meet the requirements for offender case record reviews to ensure the probation and parole officers performed their required duties?

**Conclusion:** Based on our testwork, we found that the department's community supervision supervisors did not always perform their required duties for initial and monthly reviews. Furthermore, we noted that the District Directors and Correctional Administrators did not complete their required number of quarterly case reviews. See **Finding 17**.

2. **Audit Objective:** In response to the prior audit finding, did management ensure that probation and parole officers met all offender supervision standards?

   **Conclusion:** Based on our testwork, although the probation and parole officers used the updated Standards Due Report tool to better perform their duties in a timely manner, we found that the officers did not always complete offender case plan reviews when required. See **Observation 11**.

3. **Audit Objective:** Do probation and parole officers have a single comprehensive resource for looking up arrests in Tennessee to make their monthly arrests checks?

   **Conclusion** Based on our discussions with agency management during our review of offender supervision, officers do not have a reliable source of arrest information statewide. See **Matter for Legislative Consideration**.

## Finding 17 – Community supervision supervisors, District Directors, and Correctional Administrators did not always review case records as required by department policy to ensure probation and parole officers performed their required duties

To determine whether probation and parole supervisors and high-level management met supervisory review responsibilities, we obtained and analyzed 18 monthly Supervisor Annual Case Record Review reports.

> For the full methodology, see Appendix G-1 on page 184.

These reports, in total, included 18,130 offenders who were active from October 1, 2017, through March 31, 2019. In addition, we attempted to obtain documentation relating to District Director and Correctional Administrator reviews.

Department Policy 706.02, "Supervisory Review of Caseloads," requires supervisors to ensure parole and probation officers are properly monitoring offenders by

- reviewing all offender case records after completion of the intake process but within 60 days of the offender supervision start date,

- entering a summary of the review into TOMIS as a contact note with a comment outlining the completeness of the offender case record and TOMIS record, and

- reviewing a minimum of 3% of their staff's offender case records each month using the Monthly Case Record Review.

The policy also requires the District Directors to compile three months of supervisory reviews and inspect 10% of those reviews, including the case records they refer to for deficiencies; and requires Correctional Administrators to review 10% of the District Director's quarterly case records to identify any deficiencies in the reviews.

Initial Case Record Reviews – Repeated Condition

The initial case record review is the first review of an offender case file and TOMIS record performed by a supervisor, meant to ensure that officers completed the intake process for every offender beginning probation or parole. During our testwork, we found that supervisors did not perform initial reviews for 5 of 60 probation and parole offender case records (8%) within the required 60-day period, and 1 of the 60 case records (2%) did not receive the initial review. Additionally, supervisors must enter specific contact notes in TOMIS upon completion of the initial review. For 14 of 60 initial reviews (23%), we determined in our testwork that the supervisor opened the TOMIS record but did not document the review in the contact notes as required.

According to the department, the Community Supervision unit is short staffed, causing supervisors with large workloads to fall behind in their reviews. Department management also stated that the policy which sets the deadline for the initial review may be confusing to some supervisors.

District Director and Correctional Administrator Quarterly Reviews – New Condition

Based on our review, we determined that the department did not track whether District Directors and Correctional Administrators performed the required 10% of supervisor reviews every quarter. According to the Director of Compliance, by the time of our audit, management had not implemented "a formal tracking mechanism to memorialize and preserve a record of the reviews completed by District Directors and Correctional Administrators." The Director of Compliance and Acting Assistant Commissioner both stated that if the outgoing Assistant Commissioner of Community Supervision who exited during our audit period had a process for tracking District Director and Correctional Administrator reviews, she did not share it with them.

After the completion of our field work and discussion of these findings with department management, the Director of Compliance and Acting Assistant Commissioner created adjustments to department Policy 706.02, stating that the adjustments would be in force no later than November 1, 2019.

The newly adjusted policy now requires that District Directors and Correctional Administrators perform their respective 10% reviews once a month instead of once a quarter. The new policy also establishes a contact code in TOMIS specifically for Correctional Administrator reviews to differentiate them from other supervisor reviews. Finally, the policy clearly defines the period of initial case record review for probation and parole supervisors, requiring them to perform an initial review within 60 days after the initial intake and orientation interview performed by a probation and parole officer.

The Director of Compliance and the Acting Assistant Commissioner also provided evidence to indicate they will receive monthly updates on the numbers of reviews performed by the District Directors and Correctional Administrators. In addition, they provided evidence of new spreadsheets built for internal use that would provide the Acting Assistant Commissioner with a weekly breakdown of both performed and unperformed reviews for a three-month period, as well as the number of reviews of violent and sex offenders performed by region. They stated that the data for these numbers will come from TOMIS.

Overall Effect

When community supervision supervisors and managers do not perform required reviews completely and timely, the department cannot ensure offenders are meeting community supervision requirements and are increasing the risk that offenders will go unmonitored and that the community's safety will be put at risk.

**Recommendation**

Management should provide appropriate training to community supervision supervisors and managers regarding department policies and procedures. Furthermore, the department should implement appropriate procedures that ensure District Directors and Correctional Administrators are meeting policy requirements for case record reviews.

**Management's Comment**

Concur in part.

While there is always room for improvement, it is important to recognize that the Community Supervision division completion of both Initial and Annual Supervisory Case File Reviews has consistently met the required 95% or above compliance standard required by the department's internal audit process.

The Department acknowledges that at the manager level some files were not reviewed within the expected time frame; however all reviews were conducted. Focused training on documentation requirements will continue to be delivered to ensure more comprehensive comments are entered by supervisors during the case file review process. To more specifically target the training, we have developed a report to identify insufficient documentation in ZZZI and ZZZA contact notes.

Also, while review of supervision practices by the Correctional Administrators and District Directors takes place through the use of the Standards Due Report practices, not all case file reviews by the District Directors and Correctional Administrators were appropriately documented. The department has since developed and implemented specific procedures for verification of case file reviews completed by District Directors and Correctional Administrators.

The procedure was reviewed and noted as adequate by the Comptroller's auditors prior to the close of the audit. It includes a two-pronged tracking mechanism that provides regular updates

of case file reviews completed throughout the month and an end-of-the-month report-out to ensure the reviews are completed by District Directors and Correctional Administrators in accordance with policy.

The procedure demonstrated with the auditors was implemented in August 2019 and currently reflects all required completed case file reviews by District Directors and Correctional Administrators.

Additionally, Policy 706.02, "Supervisory Review of Caseloads," has been modified to clarify ambiguity in policy language relative to the specific timeframe in which supervisors should complete initial case file reviews.

Also, the formula for the Standards Due Report has been modified to reflect this policy change. And finally, the Initial Casefile Review Checklist has been modified to further clarify items related to the Case Management Plan, Employment Verification, and other Intake standards of supervision requirements.

Training regarding these modifications has been provided to supervisors.

**Observation 11** – Although department management has worked since 2014 to ensure probation and parole officers performed their required duties, probation and parole officers did not meet supervision requirements for offender case plan reviews

We analyzed six monthly Standards Due Reports for the period October 1, 2018, through March 4, 2019, to determine whether probation and parole officers met the 11 key supervisory requirements, and we selected the first report created for each month of the test period. Based on this analysis, we identified 2 of 11 supervisory requirements (18%)—Employment Checks and Offender Case Plan Reviews—that were consistently overdue. We selected a random sample of 25 overdue items for employment checks and 25 overdue items for offender case plan reviews. We reviewed the officers' TOMIS case activity and notes[99] to determine if these overdue items were due to an officer failing to perform supervisory requirements.

We found that, for 7 of 25 offender case plan reviews (28%), officers did not document in TOMIS case activity and notes to indicate that they completed these reviews timely. To perform offender case plan reviews, the officer meets face-to-face with offenders to discuss their risks and needs, progress or deficits, and any special conditions, and other areas of concern. The officer then creates or modifies the offender's case plan,[100] using contact notes that describe the recommendations that the officer believes will help the offender meet the terms of probation or parole.

---

[99] Case activity includes all information in TOMIS related to the offender's community supervision case. This includes all contact notes, supervision level, and location. See the methodology in **Appendix G-1** on page 184 for more information.

[100] In the offender's case plan, the officer can recommend classes or meetings with case workers or other specialists.

Department Policy 704.01, "Standards of Offender Supervision," requires officers to create offender case plan reviews for offenders. Policy 704.01 also requires the officer to document within TOMIS all contact and activity that the officer schedules and completes with the offender, including when the officer attempted to contact or complete activities with the offender but was unable to do so. Additionally, Policies 706.01, "Offender Case Record Management," and 706.03, "Offender Contact Notes," require officers to record in TOMIS any offender case activity. If officers do not adequately and timely supervise offenders, the risk increases that an offender will violate the terms of probation or parole.

For employment verification, based on our review of the contact notes, we noted that the offenders

- failed to contact the officer,

- did not always provide the required proof, and

- failed to show for scheduled visits.

As a result of the offenders' actions, the officers could not complete their review as required.

Management should ensure that probation and parole officers conduct all required offender monitoring activities on time and ensure that those activities are documented in accordance with department policy.

# Appendix G
## Department's Community Supervision Responsibilities

### Appendix G-1
### Methodologies to Achieve Objectives

To meet our objective, we interviewed the Former Assistant Commissioner of Community Supervision, Acting Assistant Commissioner of Community Supervision, Director of Classification, Director of Community Housing Supervision, Director of Community Supervision Policy, a Data Analyst in Community Supervision, a Business Intelligence specialist with Finance and Administration, a District Director, and the Senior Management Consultant to obtain an understanding of the Community Supervision unit and the procedures management implemented to address the prior audit findings. We also reviewed all relevant laws and department policies and procedures. To determine if probation and parole officers met all offender supervision requirements, we obtained and analyzed[101] six Standards Due Reports from October 1, 2018, through March 4, 2019, then

- traced key pieces of offender data from these reports to TOMIS to determine if the reports are accurately obtaining data from the TOMIS database;

- used the original TOMIS data used to create the Standards Due Reports to re-perform calculations of the total amount of supervisory requirements overdue relative to each offender and compared them to the department's calculations;

- compared the number and percentage of overdue requirements from the March 4, 2019, Standards Due Report to the overdue amounts from both the October 1, 2018, Standards Due Report and the prior testwork results from the 2017 performance audit to determine if overall improvement has been made;

- created a trend analysis to determine if the percentage of overdue requirements have improved or worsened over time; and

- performed additional sample testwork (see below) to determine if officers were performing their supervisory requirements or if other factors prevented the officers from completing their duties.

This testwork consisted of selecting a nonstatistical random sample of 25 overdue items for both employment checks (from a population of 2,432 overdue checks) and offender case plan reviews (from a population of 2,278 overdue reviews) and reviewing the TOMIS case notes for the offender to determine if these overdue items were due to an officer failing to perform supervisory requirements.

---

[101] This analysis consisted of two steps. First, we used the raw TOMIS data used to create the Standards Due Reports to build our own report, then reconciled the two reports for all 11 supervisory requirements. We compared the number of offenders each requirement applied to with the number of overdue procedures for that requirement. These procedures were performed for each of the six months in the above testwork period and then reviewed to determine if lateness progressed over the same period.

To determine if an overdue item was caused by the officer failing to perform the supervisory requirements, we reviewed the following information within TOMIS for six months prior to and after the requirement's due date:

- all contact notes for the offender;

- the offender's supervision level; and

- the offender's location.

We noted that officers often created contact notes that described the completion of a supervisory requirement but did not include all contact codes for the requirements described within that note. The Standards Due Report determines if a requirement is late by detecting if an officer entered this code. If the officer described how they performed the supervisory requirement in any note, we did not consider it an error. Additionally, the officer could note that they could not contact the offender; that the offender did not attend a scheduled meeting, was sick, or was in court; or other similar reasons why the requirement could not be completed.

We reviewed the offender's supervision level and location to determine if the offender needed to have the tested supervisory requirements performed. For example, if the offender's previous supervision level was "In Custody," "Warrant," "Residential Treatment Placement," or other similar supervision level, then the officer would not need to perform the supervision requirements. Also, an offender's supervision level may change from "In Custody, etc." to a standard level, such as minimum or medium security. In this case, the Standards Due Report would only see that a supervisory requirement was not previously performed and would flag it as late, not taking into consideration an offender's previous non-active status.

To determine whether probation and parole supervisors, managers, District Directors, and Correctional Administrators were meeting all standards required by policy, we obtained and analyzed 18 monthly Supervisor Annual Case Record Review reports. These 18 reports together totaled 18,130 offenders who were active during the period October 1, 2017, to March 31, 2019. We used this population to

- test a 12-month period for duplicate TOMIS IDs (out of 12,357 TOMIS IDs) in these reports, to ensure the algorithm that creates the report was properly omitting duplicate IDs;

- test two random, nonstatistical samples of offenders listed in the supervisor case record review reports: one sample of 60 (out of 8,422 offender records in TOMIS) for adherence to proper intake review procedures, and one sample of 60 (out of 7,561 offender records) for adherence to proper closing review procedures; and

- test a third random, nonstatistical sample of 60 offenders listed in the supervisor case record review reports (out of 5,111 offender records) to determine whether supervisors followed proper procedures during monthly reviews.

We also tested whether District Directors and Correctional Administrators were reviewing their required number of offender case files and supervisor reviews. To do so, we obtained and

reviewed a list of all probation and parole managers, District Directors, and Correctional Administrators active within our audit period, inspected review forms completed by Directors and Administrators, and analyzed a department spreadsheet that summarized the count of Director and Administrator review forms by probation and parole district. Our conclusions were based on interviews and correspondence with department management; a list of all probation and parole managers, District Directors, and Correctional Administrators active within our audit period; review forms completed by Directors and Administrators that the department provided; and inspection of a department spreadsheet that summarized the count of those forms by probation and parole district.

# COMET Implementation

### Chapter Conclusion

Observation 12 – After signing a $15,347,200 contract, spending three years on development, and facing unforeseen obstacles, the department's vendor has been unable to implement the new COMET system, and as of September 2019, there is no official "go-live" date (page 188)

# COMET IMPLEMENTATION

<u>General Background Information</u>

The Tennessee Department of Correction relies on information systems to support its critical business functions, including managing its inmate/offender population statewide. The department contracts with the Department of Finance and Administration's Strategic Technology Solutions Division (STS) for the department's technology needs, including systems development, operations, and maintenance.

Under a Federal Court Consent Decree in February 1990 (related to the *Grubbs vs. Bradley* lawsuit**)**, the Tennessee Department of Correction hired Andersen Consulting to design, install, and implement the Tennessee Offender Management Information System (TOMIS). Completed in June 1992, TOMIS managed the entire correctional process from sentencing through incarceration to release. TOMIS has served the department well for over 25 years, but in today's technological climate, the state's ability to support the system is diminishing.

<u>TOMIS Replacement Efforts</u>

To address the aging mainframe system, in fiscal year 2013 the department began looking for a replacement to TOMIS. The department contracted with the Department of Finance and Administration's Business Solutions Delivery (BSD)[102] group, which is part of Strategic Technology Solutions, to manage the project and to work with the Department of General Services' Central Procurement Office (CPO) so that the state could find a new IT vendor. Based on their efforts, the state awarded a contract to Abilis Solutions Inc.

Abilis offered a commercial off-the-shelf product that met 80% of the department's needs, but Abilis would have had to customize the remaining 20% to meet the department's needs. According to research gathered during the request for information and request for proposal phase of the project, the approximate time frame for most vendors to implement a new system was three years. However, according to the BSD Domain Director, the department's former Commissioner insisted on rolling out COMET within the first two years of the contract and transitioning to Abilis's hosting of the system for years three through five.

The department's contract with Abilis for the development of the new offender management system, which the department named COMET, began on February 5, 2016, with a termination date of February 4, 2021, and a maximum liability amount of $15,374,200. Under the contract, Abilis is set to receive a firm fixed-payment amount of $11,709,904, meaning that the department will only pay Abilis up to this amount regardless of any cost overruns the vendor incurs to complete the project. The remaining contract budget availability of $3.6 million was set aside to cover STS's costs to pay salaries of contractors and employees who work on the COMET project as well as costs of servers and software development. Based on expenditure data extracted from Edison, the department has paid Abilis approximately $9 million since project initiation.

---

[102]Business Solutions Delivery consists of five domain groups assigned to departments: Health and Social Services; Law/Safety/Corrections; Resources and Regulations; General Government; and Business and Community Development.

In an effort to meet the former Commissioner's implementation deadlines, the contract originally identified January 26, 2018,[103] as the target completion date for COMET to go live. The vendor, however, fell behind schedule, requiring the department and STS to set a late-2020 tentative go-live date. In addition to COMET's implementation delay, the department is continuing to pay approximately $368,804 per month to keep TOMIS operational.

<div align="center">

**Audit Results**

</div>

**Audit Objective:** What is the current status of the department's $15.3 million contract with Abilis Solutions to develop COMET, the department's new offender management system?

**Conclusion:** Due to unanticipated obstacles**,** the COMET project is over 18 months behind schedule. STS and the department have yet to re-baseline the project schedule and select an official new go-live date. See **Observation 12.**

**Observation 12** – After signing a $15,347,200 contract, spending three years on development, and facing unforeseen obstacles, the department's vendor has been unable to implement the new COMET system, and as of September 2019, there is no official "go-live" date

The department has paid approximately $9 million to Abilis, COMET's contractor, and COMET's implementation is over 18 months behind schedule. When we spoke with COMET project managers, they indicated that COMET may not be implemented until December 2020. However, the project schedule has not been re-baselined to include an official go-live date as of September 2019.

TDOC, Business Solutions Delivery, and Strategic Technology Solutions Identified COMET Challenges

- **Public Safety Act of 2016**[104] – The passage of the Public Safety Act of 2016 (PSA) (Sections 40-28-301 through 306, *Tennessee Code Annotated*) required significant modifications to both TOMIS and COMET. As a result, department and STS subject matter experts shifted from the COMET implementation project to TOMIS system changes to comply with the new statute. Staff devoted an estimated nine months to one year implementing the required changes in TOMIS and departmental policies and procedures in order to comply with the PSA.

    Furthermore, because the department signed the contract with Abilis prior to the PSA's passage, staff responsible for changing TOMIS were also required to make system

---

[103] This was the deadline to comply with the former Commissioner's two-year completion period.
[104] The Public Safety Act of 2016 aims to reduce crime and address the growing prison and jail population by focusing on key areas driving Tennessee's violent crime rate. To accomplish this, the initiative has four main components: addressing domestic violence, implementing smart changes in sentencing, using a single validated risk and needs assessment across the criminal justice community, and instituting swift, certain, and proportionate sanctions for offenders on community supervision if no new crime has been committed.

changes in COMET to comply with the law. Department management explained that the passage of the PSA ultimately "changed the goal line" for the COMET project.

- **Two-Year Timeline Unrealistic Due to PSA** – The BSD Domain Director indicated that the department's former Commissioner required all parties to complete the project within two years. Based on the STS project team's initial research and proposals received, however, the evidence indicated that the vendor needed three years to complete the project. The department's original expectation, though, was hampered by the passage of the Public Safety Act.

- **Commercial Off-the-Shelf Product Challenges** – When Abilis bid on the project, its proposal stated that it could provide a system that was 80% off-the-shelf and 20% customized to meet the department's needs. The BSD COMET project managers indicated that COMET is approximately 50% customized, rather than the originally anticipated 20%, because of changes needed due to implementation of the Public Safety Act. Department management stated that they did not originally pursue a custom-built system because of the high cost.

- **Saving the Most Challenging Modules for Last** – The department and BSD COMET project team both indicated that Abilis chose to save development of the two most challenging modules—sentencing and warrants and supervision—until the end of the project. When Abilis designed the offender management system for Virginia, the system required very little customization. Tennessee's business rules for both sentencing and warrants and supervision, however, are very complex. TDOC and STS both believe that Abilis underestimated the level of difficulty and time required to account for all the business rules for these modules.

- **Abilis Project Management Turnover** – In his opinion, the BSD COMET project manager indicated that Abilis experienced project management turnover, resulting in an unstable project knowledge basis. He added that Abilis constantly brought in new project managers, who had to be educated to understand the department's business requirements for COMET. The project director position with Abilis has been vacant for over a year.

- **Multiple Parties Involved in Project** – The department developed a new validated risk and needs assessment tool called Strong-R[105] through Vant4ge[106] as a result of the PSA. Vant4ge's vendor had to work with the department, STS, and Abilis to update the Strong-R application to interface with COMET, requiring all parties to be on the same page. Based on our review of Abilis' COMET Weekly Status Reports from March through July 2019, all parties are coordinating efforts to identify issues and work on solutions.

---

[105] Strong R is a program designed to match offenders to programs that are most likely to prevent re-offending.

[106] Vant4ge (Vant4gePoint) is a software application the department uses to perform inmate Risk Needs Assessments to determine if the inmate is at risk of committing another crime. For more information about the Risk Needs Assessment, see the description on page 153.

Remaining Work to Be Completed on COMET

- **Outstanding Change Requests** – As of August 31, 2019, there were eight outstanding change requests (CRs). The department submits change requests to modify COMET's development. For one outstanding CR relating to community supervision, Abilis misunderstood the difference between probation and parole. The department and Abilis are continuing to discuss acceptable changes to COMET.

- **Data Migration** – The BSD COMET project managers estimated that as of August 2019, data migration from TOMIS to COMET was 80% complete.

- **User Acceptance Testing** – The department has been conducting some testing as of August 2019, but some modules require TDOC subject matter experts to test for functionality. In some areas, tests cannot be done until data migration (moving data from TOMIS to COMET) is complete.

- **End User Training** – The last piece that must be completed before COMET can go live is end-user training. The department plans on utilizing a train-the-trainer model where the department and STS train superusers, and they in-turn train the employees who will use the system daily. The department indicated that it will not conduct training until the change requests, data migration, and functionality testing are completed to reduce the possibility of retraining if COMET changes.

Due to the challenges relating to COMET implementation, the department must continue using TOMIS. The department paid, on average, $367,104.94 per month in fiscal years 2018 and 2019 to STS to maintain TOMIS and will continue to do so until COMET is implemented. See **Appendix H-1** on page 191 for costs related to TOMIS. Additionally, the department placed a moratorium on making any changes to TOMIS that are not mission critical until COMET goes live. This creates a challenge if the department must make necessary changes, such as updating incident codes, to maintain data integrity. Ultimately though, department management indicated that it is not rushing the project because it is focused on "getting COMET right."

Case 3:16-cv-02267 Document 181-1 Filed 12/01/22 Page 213 of 234 PageID #: 25790

# Appendix H
## COMET Implementation

### Appendix H-1
### TOMIS Mainframe and Processing Costs for Fiscal Years 2018 and 2019

| FY 2018 TOMIS Mainframe and CPU[107] Costs | | | |
|---|---|---|---|
| Month | Mainframe | CPUs | Total |
| Jul-17[108] | | | $ 0 |
| Aug-17 | $ 242,141.40 | $ 2,292.37 | $ 244,433.77 |
| Sep-17 | $ 201,847.98 | $ 1,932.07 | $ 203,780.05 |
| Oct-17 | $ 205,158.30 | $ 1,939.50 | $ 207,097.80 |
| Nov-17 | $ 247,579.75 | $ 2,190.24 | $ 249,769.99 |
| Dec-17 | $ 190,043.24 | $ 1,743.06 | $ 191,786.30 |
| Jan-18 | $ 193,671.86 | $ 1,683.19 | $ 195,355.05 |
| Feb-18 | $ 639,165.93 | $ 1,817.14 | $ 640,983.07 |
| Mar-18 | $ 692,922.34 | $ 2,385.27 | $ 695,307.61 |
| Apr-18 | $ 623,135.09 | $ 1,938.86 | $ 625,073.95 |
| May-18 | $ 631,536.82 | $ 2,317.85 | $ 633,854.67 |
| Jun-18 | $ 597,216.27 | $ 1,986.55 | $ 599,202.82 |
| **FY 18 Monthly Average** | **$ 405,856.27** | **$ 2,020.55** | **$ 407,876.83** |
| **Total FY 18** | **$4,464,418.98** | **$22,226.10** | **$4,486,645.08** |

Source: STS Billing Data for Fiscal Year 2018.

| FY 2019 TOMIS Mainframe and CPU Costs | | | |
|---|---|---|---|
| Month | Mainframe | CPUs | Total |
| Jul-18 | $ 290,117.38 | $ 3,494.03 | $ 293,611.41 |
| Aug-18 | $ 375,816.60 | $ 4,614.36 | $ 380,430.96 |
| Sep-18 | $ 295,137.23 | $ 3,589.61 | $ 298,726.84 |
| Oct-18 | $ 294,068.91 | $ 3,631.11 | $ 297,700.02 |
| Nov-18 | $ 368,963.11 | $ 4,333.18 | $ 373,296.29 |
| Dec-18 | $ 346,601.56 | $ 4,427.47 | $ 351,029.03 |
| Jan-19 | $ 371,884.53 | $ 4,560.48 | $ 376,445.01 |
| Feb-19 | $ 310,630.35 | $ 3,838.69 | $ 314,469.04 |
| Mar-19 | $ 310,645.50 | $ 3,984.54 | $ 314,630.04 |
| Ap-19 | $ 301,103.43 | $ 3,774.45 | $ 304,877.88 |
| May-19 | $ 333,773.70 | $ 3,955.40 | $ 337,729.10 |
| June-19 | $ 309,243.11 | $ 4,579.79 | $ 313,822.90 |

[107] CPU costs are STS's costs to process and make copies of TOMIS data.
[108] STS designated July 2017 a "billing holiday." STS did not charge its contracted departments for mainframe services for this month.

| FY 2019 TOMIS Mainframe and CPU Costs | | | |
|---|---|---|---|
| Month | Mainframe | CPUs | Total |
| FY 19 Monthly Average | $ 325,657.95 | $ 4,065.26 | $ 329,723.21 |
| Total FY 19 | $3,907,895.41 | $48,783.11 | $3,956,678.52 |

Source:  STS Billing Data for Fiscal Year 2019.

**Appendix H-2**
**Methodologies to Achieve Objectives**

      To determine the department's and vendor's status to implement COMET, we interviewed the Business Solutions Delivery COMET project managers, TDOC senior management, and staff of Abilis Solutions Inc.  We also interviewed state Department of Correctio staff in Maine and Virginia to determine their experiences working with Abilis to implement their department's new offender management system.  We requested and reviewed monthly COMET progress reports, STS billing data (for the cost of TOMIS upkeep), as well as COMET project expenditures.

# PUBLIC RECORDS MANAGEMENT

## CHAPTER CONCLUSIONS

**Finding 18 – Department management did not ensure its staff and CoreCivic complied with the state's public records statute and records management standards (page 195)**

Observation 13 – Staff at the Turney Center Industrial Complex did not follow the department's procedure for restoring public records after a minor flood destroyed some Fire and Safety records in spring 2019 (page 198)

# PUBLIC RECORDS MANAGEMENT

## General Background

The Public Records Commission is required by Section 10-7-302, *Tennessee Code Annotated*, to determine and order the proper disposition of the state's public records and direct the Tennessee Department of State's Records Management Division to initiate any action necessary to establish the regulation of record holding and management in any state agency. Section 10-7-301(6), *Tennessee Code Annotated*, defines public records as

> all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency.

According to Section 10-7-509, *Tennessee Code Annotated*, "the disposition of all state records shall occur only through the process of an approved records disposition authorization." Based on our review, Department of Correction policy for maintaining footage was in conflict with the department's approved records disposition authorizations.

Public officials are legally responsible for creating and maintaining records that document government business transactions. These records provide evidence of government operations and accountability to citizens. Public officials must maintain records according to established records disposition authorizations (RDAs). According to Section 10-7-509, *Tennessee Code Annotated*,

> The disposition of all state records shall occur only through the process of an approved records disposition authorization. Records authorized for destruction shall be disposed of according to the records disposition authorization and shall not be given to any unauthorized person, transferred to another agency, political subdivision, or private or semiprivate institution.

RDAs describe the public record, retention period, and destruction method for each record type under an agency's authority. Agencies must submit a certificate of destruction to the Records Management Division after properly disposing of any public records according to their approved RDAs.

In March 2013, the Records Management Division developed an online application to catalog and maintain RDAs, and the Public Records Commission asked all state agencies to amend or retire their existing RDAs and create new ones for public records still in use. As of March 2012, the Department of Correction had 53 active RDAs. The department has updated, retired, or combined all but one of these RDAs and has created five new RDAs.

## Department's Records Management Process

The Department of Correction is unique among state agencies because it operates a central office in Nashville, the Cook Chill Records Warehouse; 14 correctional facilities; and probation

and parole offices. Each of these facilities is responsible for many different types of public records that must be maintained, and each facility must have staff who are properly trained in record retention requirements. Each correctional facility has its own records storage facility or warehouse, as well as its own facility Records Officers and property officers charged with storing, maintaining, and destroying public records created by or transferred to that facility. The department has an agency Records Officer and a central office records management group. Each facility's records management staff takes direction from and submits certificates of records destruction for approval to the department's Records Officer.

Additionally, four of the state's correctional facilities are privately operated by CoreCivic and may have their own records instead of state-created records; however, they must follow applicable state RDAs. According to the department's Records Officer, the department sends each CoreCivic facility updated RDA lists, records management instructions, and other information annually.

The Records Management Division conducted a public records assessment at the department's records warehouse and the central office, as well as the Morgan County Correctional Complex, Tennessee Prison for Women, Turney Center Industrial Complex, and Riverbend Maximum Security Institution.[109] The purpose of the assessment was to

- measure the department's records management process;
- identify the RDAs used and determine if new ones were needed; and
- assess the volume of records for each RDA.

The division issued the assessments on November 21, 2017; December 11, 2017; June 1, 2018; June 28, 2018; July 27, 2018; and August 3, 2018. The division noted 36 recommendations.

<u>Public Records Recovery Process</u>

In September 2018, the department established a procedure for what to do if an original record gets damaged or destroyed. These instructions are in the department's *Records Management Disaster Reference Manual*, which, according to the Records Officer, is distributed to facility record staff during annual training and annual inspections by Records Division staff. In the event of water damage, the manual states that staff should move paper records to a secure area, arrange them individually, and frequently turn them over to increase exposure to the air. It also states not to re-box records until they are completely dry. If there is an outbreak of mold, staff should quarantine and dry the records in a location that vents to the outside. Once the records are dried, then the mold can be removed. According to the department's Records Officer, staff at the facility should perform a preliminary assessment of the damage and report it to the director within 24 hours. A central office records management team would then be dispatched to assist with cleanup and resolution.

---

[109] The Records Management Division performed six separate records assessments: the department's central office on November 17, 2017; the Morgan County Correctional Complex on December 1, 2017; the Turney Center Industrial Complex on June 1, 2018; the Cook Chill Records Warehouse on June 21, 2018; the Riverbend Maximum Security Institution on July 23, 2018; and the Tennessee Prison for Women on July 27, 2018.

1. **Audit Objective:** Did department management ensure that the department's RDAs as of March 2013 had been revised or retired?

   **Conclusion:** Management ensured that all but one of the department's existing RDAs were revised or retired. The department's Records Officer is currently working with the Records Management Division to update the remaining RDA.

2. **Audit Objective:** Did department management implement the recommendations from the Records Management Division's assessments?

   **Conclusion:** Based on our review, the department's Records Officer completed corrective action on 17 of 36 recommendations (47%), partial corrective action on 4 recommendations (11%), and no corrective action on 15 recommendations (42%) as of August 2019. The Records Officer stated that all corrective action should be complete by November 30, 2019.

3. **Audit Objective:** Did department management ensure that the correctional facilities were following records management requirements?

   **Conclusion:** Based on our testwork, department management did not ensure that the correctional facilities were following records management requirements. See **Finding 18**.

4. **Audit Objective:** Did staff follow the department's public records recovery procedures after a flood event that damaged records?

   **Conclusion:** Staff did not follow the department's public records recovery process after a minor flood event at the Turney Center Industrial Complex. As a result, paper files were no longer readable and had mold damage. See **Observation 13.**

## Finding 18 –Department management did not ensure its staff and CoreCivic complied with the state's public records statute and records management standards

The Department of Correction has a basic responsibility to protect the state's public records and to follow state statute and guidance provided by the Department of State's Records Management Division. Additionally, the Department of Correction should ensure that CoreCivic follows the same requirements.

The department did not have written policies and procedures governing how facility staff and CoreCivic manage public records. Based on our site visit reviews, we found that for four of six correctional facilities, department and CoreCivic management did not ensure that the

department's public records were properly retained, maintained, and destroyed. Specifically, we noted the following issues during our visits to the correctional facilities:

- **Outdated RDAs**: Facilities did not have up-to-date copies of records disposition authorizations (RDAs) on file because management did not ensure that appropriate staff at each facility had the current list.

- **Destroying Records Without Approved Certificates of Destruction:** Facilities destroyed public records throughout the year without creating certificates of destruction or notifying the department's Records Officer.

- **Insufficient Record Inventories:** Facilities did not keep detailed inventories of the type, volume, location, or date of destruction of records that were to be destroyed.

**Table 46** summarizes the issues we found at four of the six facilities. We did not note any issues pertaining to the retention of records at either the Trousdale Turner Correctional Center or the Turney Center Industrial Complex.

**Table 46**
**Results of Public Records Review**

| Issue | Correctional Facility* | | | |
|---|---|---|---|---|
| | **Hardeman** | **Whiteville** | **Northeast** | **Northwest** |
| **Outdated RDAs** | X | X | X | X |
| **Destroying records without approved certificates of destruction** | X | X | | X |
| **Insufficient record inventories** | X | X | | X |

*The Hardeman and Whiteville correctional facilities are operated by CoreCivic, while Northeast and Northwest are operated by the Department of Correction.

During our review, we learned that facility staff destroyed large volumes of files they considered old enough and did not prepare the required certificates of destruction. Because of the lack of insufficient record inventories, we were unable to determine if staff maintained the destroyed records in accordance with state statute. Given the problems we identified during our fieldwork, we also reviewed the department's 2018 annual risk assessment and found that management did not identify any risks related to the state's public records.

Noncompliance With Video Recordings

Based on our observation at the Northwest Correctional Complex, department management did not ensure security camera footage was retained for the required three months in accordance with RDA 34, "Recordings From Law Enforcement Electronic Devices – Incident Not Identified," which states that all camera footage must be kept for a minimum of 90 days whether or not an incident was captured. However, according to the facility's warden, the security camera system sometimes overwrote the footage after two weeks of recording. Furthermore, we noted that the department's Policy 506.29 states that facilities only need to keep recorded data that may have recorded an incident for 30 days, which conflicts with the statewide RDA. When required

recordings are not available, including footage that may record an incident that is not immediately apparent, valuable evidence is lost.

Based on our discussions with management, the records management issues were caused by a lack of staff training, ineffective communication, or no internal controls to ensure that staff followed records management policies and procedures. Most facility Records Officers or property officers charged with storing and destroying records did not maintain up-to-date copies of RDAs and did not know how to obtain up-to-date RDAs. Additionally, one key member of the records staff did not know the department's central Records Officer or how to contact her to obtain updated information and did not know to submit certificates of destruction for her review. Additionally, we found that staff at one CoreCivic correctional facility did not know to follow state RDA requirements and stated that they only needed to follow their internal policies concerning the retention and destruction of public records.

Overall Effect

Public records ensure a state agency's official business is fair and transparent. Without retaining records in accordance with established RDAs, there is an increased risk that the department cannot effectively conduct its operations and assure the public, legislators, and other stakeholders about management decisions. Not ensuring that the department's public records are properly created, maintained, or retained through RDAs could lead staff to prematurely destroy records and to keep out-of-date or nonessential records. Additionally, without an effective records management system, if records are misplaced, damaged, or not retained, staff may need to spend time locating, restoring, or recreating these records, if possible.

**Recommendation**

The Commissioner should ensure that all of the department's public records are covered by an RDA and that staff prepare and submit certificates of destruction as required. The Commissioner should ensure that written policies and procedures are prepared and disseminated so the department meets all state records retention requirements. The Records Officer should work with the Records Management Division to resolve the conflict between Statewide RDA 34 and department policy.

The Records Officer should ensure that appropriate management and staff of all correctional facilities, whether managed privately or by the state, are properly trained and understand the process required for properly destroying records. The Records Officer should also ensure all facilities have up-to-date RDAs on file. Department management should create policies and procedures manuals for the CoreCivic-managed correctional facilities to ensure that they understand which records management requirements apply to them and how best to comply with state policies and requirements. The Commissioner should ensure management assesses all significant risks, including the risks noted in this finding, in the department's annual risk assessment.

**Management's Comment**

Concur.

The Department recognizes the serious nature of record keeping responsibilities and is taking swift action to meet RDA and training expectations.

As to the retention of video from security cameras, most of the Department's fixed security cameras are analog and the analog recorders do not have the capacity to retain three months of video and cannot be upgraded.

Replacement of those cameras/recorders will take some time and funding, but will be studied. In the budget submitted to the governor, there is a capital project for upgrading security electronics for 1 million dollars. If approved, approximately $600,000 of those funds would be utilized this next year to purchase digital encoders for the analog cameras and larger digital records which would provide the required 90 days of storage for all cameras in the prisons.

After purchasing the equipment, approximately 6 months would be required to upgrade the equipment by ITS staff.

In the meantime, the Department will consult with the Records Management Division concerning the feasibility of an RDA specifically for the Department's security video that is within current capacity.

**Observation 13** – Staff at the Turney Center Industrial Complex did not follow the department's procedure for restoring public records after a minor flood destroyed some Fire and Safety records in spring 2019

During our visit to the Turney Center Industrial Complex in June 2019, we learned that a minor flood in March 2019 had damaged some records in the Fire and Safety Officer's office. Fire and Safety Officers are responsible for ensuring the safety of buildings, equipment, and hazardous chemicals. Their primary responsibilities include routine inspections of fire alarms, smoke detectors, sprinkler systems, fire extinguishers, and emergency breathing apparatuses. They also conduct inventories of hazardous materials, inspect the facilities for any safety concerns, and compile statistics on employee and offender injuries that occur within the facilities.

We accompanied Turney Center Industrial Complex's Fire and Safety Officer to a storage room at the water treatment plan, where the officer had moved the damaged records after the flood. We observed three boxes full of originals and copies of Fire and Safety records. Copies included meeting minutes from monthly Fire and Safety meetings; Accident/Incident/Traumatic Injury Reports; and maintenance work orders. The following items were original records that were in conditions ranging from wrinkled to covered in mold:

- Hazardous Material Inventory Sheets;
- Weekly Fire/Safety Inspection Checklists;

- Hazardous Materials Bin Cards; and
- Self-Contained Breathing Apparatus (SCBA) and Emergency Escape Breathing Apparatus (EEBA) Inspection and Data Sheets.

The records in the boxes included documentation from 2014, 2015, and 2017.

Department of Correction staff must follow three records disposition authorizations (RDAs) in regard to the records mentioned above:

- **RDA 2275, "Tennessee Occupational Safety & Health Association Inspection Reports":** This RDA includes, but is not limited to, copies of inspection reports completed by the Department of Labor and Workforce Development to monitor safety at all Department of Correction buildings and institutions. These records are required to be maintained for five years before they can be destroyed.

- **RDA 2392, "Work Place Chemicals and Hazardous Materials Records":** This RDA includes, but is not limited to, all required documents pertaining to hazardous chemicals and materials used or stored in the workplace. This includes workplace chemicals, hazardous material bin cards, hazardous material inventory, and material safety data sheets. These records are required to be maintained for 30 years after the hazardous materials or chemicals are no longer used or stored onsite.

- **RDA 11085, "Department of Correction Administrative Records":** This RDA includes, but is not limited to, records pertaining to administrative functions. This includes facility maintenance records and fire, safety, and sanitation inspection reports. These records are to be maintained for five years before they can be destroyed. These items were previously listed under retired RDA 1773, which is still referenced at the bottom of some of the related forms.

The department's *Records Management Disaster Reference Manual* outlines the procedures for recovering and protecting records that cannot be reproduced. This process requires that wet records be moved to a secure location, arranged individually, and turned over frequently to increase exposure to the air. The process also requires staff to notify facility management and the department's Records Officer; however, the manual does not state how soon the Records Officer should be notified.

The department's Director of Compliance informed us that due to lack of training, the Fire and Safety Officer was unaware of the official process to prevent the records from further destruction.[110] He did not place the records out individually to dry or notify anyone that the records were damaged. The director stated that management at the Turney Center Industrial Complex should have been notified immediately so that the recovery process could be initiated.

Failure to ensure that records are restored after a natural disaster could lead to costly restoration services or the permanent loss of critical institutional documentation. The department should ensure that all facility operations staff, not just records personnel, are informed and follow

---

[110] The Fire and Safety Officer, hired in January 2017, no longer works for the department.

the department's records management disaster recovery process. The department should include specific language in its *Records Management Disaster Reference Manual* that facility operations personnel should immediately contact the department's Records Officer to obtain assistance after a disaster.

200

# Appendix I
## Public Records Management

### Appendix I-1
### Methodologies to Achieve Objectives

To gain an understanding of the records management process, we interviewed the department's Records Officer and facility staff and management, and we reviewed the Secretary of State's *Records Management Best Practices and Procedures*, *Tennessee Code Annotated,* the *Rules of Public Records Commission,* and internal policies and procedures. We reviewed the department's RDAs and statewide RDAs to ensure compliance with statewide records management procedures and requirements. We reviewed the Secretary of State's records management assessments of the department and performed procedures to determine if the department adequately responded to these assessments. To determine if the department properly assessed risks related to records management, we reviewed the department's risk assessment included in its 2018 Financial Integrity Report. We visited six correctional facilities to determine their records management procedures, appropriateness of storage facilities, and knowledge of staff and management.

To determine whether staff followed recovery procedures after the minor flood event, we interviewed the Fire and Safety Officer at the Turney Center Industrial Complex and spoke with the department's Director of Compliance. We also viewed the damaged records and documented the various types of records that were destroyed.

# Recidivism Rates for the Department's Educational and Vocational Programs

## Chapter Conclusion

**Matter for Legislative Consideration – Recidivism Rates for the Department's Education and Vocational Programs (page 203)**

# RECIDIVISM RATES FOR THE DEPARTMENT'S EDUCATIONAL AND VOCATIONAL PROGRAMS

<u>Background</u>

As described under State's Recidivism Rates on page 6 of this report, the department defines recidivism in Tennessee as the percentage of felony inmates who are reincarcerated within three years of their release. See page 6 for more information about the department's calculation of recidivism rates. The department publishes recidivism rates for felons annually on OpenMaps.tn.gov; however, it does not publish recidivism rates for inmates who participated in specific educational or vocational programs as required by Section 41-21-238 et seq., *Tennessee Code Annotated,* which requires the Department of Correction, in conjunction with the Department of Education, the University of Tennessee, and the Tennessee Board of Regents, to develop a plan to increase the education and vocational opportunities available to inmates in the custody of the Department of Correction.

This statute further specifies that the results of the monitoring of the plan should be reported annually to the state and local government committee of the senate, the state government committee of the house of representatives, the education committee of the senate, and the education administration and planning committee of the house of representatives.

According to the department's Legislative Liaison, the department used to present recidivism rates for educational and vocational programs to the Corrections Oversight Committee; however, that committee dissolved in 2010.

<div align="center">

**Audit Results**

</div>

**Audit Objective:** Did the department report to the appropriate legislative committees the recidivism rates for inmates who participated in educational and/or vocational programs?

**Conclusion:** Based on inquiries with management, the department has not reported recidivism rates for educational and vocational programs since 2011 because the Select Oversight Committee on Corrections was dissolved in 2011. The department believes there are other important education-related statistics like program participation rates, graduation rates, and completed certifications that are better measures of the success of educational and vocational programs than recidivism rates. As such, the General Assembly may wish to consider amending state statute to reflect current measures. See the **Matter for Legislative Consideration**.

# MATTER FOR LEGISLATIVE CONSIDERATION – RECIDIVISM RATES FOR THE DEPARTMENT'S EDUCATION AND VOCATIONAL PROGRAMS

As previously noted, the passage of Section 41-21-238 et seq., *Tennessee Code Annotated*, in 1994 required the Commissioner of Education, with the assistance of the Commissioner of

Correction, the Board of Regents,[111] and the University of Tennessee system, to develop a plan to increase the educational and vocational opportunities available to inmates in the department's custody. This statute requires the Department of Correction to monitor and document the effectiveness of this plan; part of the documentation includes calculating the recidivism rate of inmates who participate in the plan. The department is required to submit the results of the monitoring of the plan to select legislative committees annually.

During our audit, the department's management indicated that they routinely present educational and vocational program information to the General Assembly; however, they do not include recidivism rates of inmates in educational and vocational programs because the department believes there are other measures like participation and completion rates that are better indicators of success. According to management, the plan referenced in this statute is outdated given the shift in educational focus over the last 25 years. As a result, the General Assembly may wish to consider amending the statute to reflect the department's current approach towards educational and vocational programming.

---

[111] The General Assembly may also wish to amend Section 41-21-238 et seq., to include the six locally governed institutions, which are no longer part of the Tennessee Board of Regents.

# Appendix J
## Recidivism Rates for Educational and Vocational Programs

### Appendix J-1
### Methodologies to Achieve Objective

To achieve our objective, we interviewed the Commissioner, Assistant Commissioner of Rehabilitative Services, Director and Assistant Director of the department's Decision Support: Research and Planning Division, and the department's Legislative Liaison to gain an understanding of the department's responsibility to report to the appropriate legislative committees recidivism rates for inmates who participate in educational and vocational programs. We obtained recidivism rate calculations made by the department's Research and Planning Division to determine whether the department calculates recidivism rates for inmates who participated in specific educational or vocational programs and reviewed recorded legislative hearings to determine if the department presented such recidivism rates.

# APPENDICES

### Appendix K-1
### Edison Business Units

| | |
|---|---|
| 329.00 | Correction |
| 329.01 | Administration |
| 329.04 | State Prosecutions |
| 329.06 | Correction Academy |
| 329.13 | Tennessee Prison for Women |
| 329.14 | Turney Center Industrial Complex |
| 329.16 | Mark Luttrell Transition Center |
| 329.17 | Charles B. Bass Correctional Complex |
| 329.18 | Bledsoe County Correctional Complex |
| 329.21 | Hardeman County Incarceration Agreement |
| 329.22 | Hardeman County Incarceration Agreement - Whiteville |
| 329.23 | Trousdale Incarceration Agreement |
| 329.28 | Correction Release Centers |
| 329.32 | Major Maintenance |
| 329.41 | West Tennessee State Penitentiary |
| 329.41 | Northeast Correctional Complex |
| 329.42 | Riverbend Maximum Security Institution |
| 329.43 | Northeast Correctional Complex |
| 329.44 | South Central Correctional Facility |
| 329.45 | Northwest Correctional Facility |
| 329.46 | Lois M. DeBerry Special Needs Facility |
| 329.47 | Morgan County Correctional Complex |
| 329.48 | Office of Investigations and Compliance |
| 329.50 | Sex Offender Treatment Program |
| 329.51 | Probation and Parole Field Supervision |
| 329.52 | Community Corrections |
| 329.99 | Sentencing Act of 1985 |

# Appendix K-2
## Department of Correction
## Expenditure and Revenue Information by Fiscal Year
## <span style="color:red">UNAUDITED INFORMATION</span>

| Description | Fiscal Year 2018 | Fiscal Year 2019† |
|---|---|---|
| Regular Salaries | $ 215,331,413.84 | $ 210,729,428.28 |
| Longevity | 6,363,521.70 | 7,720,056.94 |
| Overtime | 22,213,556.89 | 27,221,724.24 |
| Benefits | 110,935,363.11 | 105,067,632.30 |
| **Subtotal Personnel** | $ 354,843,855.54 | $ 350,738,841.76 |
| | | |
| Travel | $ 2,685,730.08 | $ 3,010,491.69 |
| Printing and Duplicating | 70,656.03 | 78,510.91 |
| Utilities and Fuel | 19,479,155.12 | 18,947,119.62 |
| Communications | 799,624.00 | 755,890.52 |
| Maintenance, Repairs, and Service | 7,373,433.28 | 7,561,963.10 |
| Professional Services Third Party | 177,096,916.67 | 176,213,534.53 |
| Supplies and Materials | 50,237,860.22 | 44,985,247.37 |
| Rentals and Insurance | 1,772,360.46 | 2,002,696.24 |
| Motor Vehicle Operations | 558,645.77 | 578,467.70 |
| Awards and Indemnities | 4,978,227.65 | 5,496,853.80 |
| Grants and Subsidies | 284,980,270.00 | 257,524,501.29 |
| Unclassified | 3,600.00 | 27,570.15 |
| Stores for Resale/Reissue/Mfg. | 10,050,181.82 | 9,522,275.60 |
| Equipment | 926,147.75 | 844,116.15 |
| Land | 0.00 | 0.00 |
| Buildings | 32,032.00 | 14,877.00 |
| Discounts Lost | 0.00 | 0.00 |
| Highway Construction | 0.00 | 0.00 |
| Training | 374,021.43 | 333,918.64 |
| Data Processing | 5,815,937.61 | 4,496,498.19 |
| Professional Services State Agencies | 51,969,511.94 | 47,396,374.04 |
| Retirement of Debt | 0.00 | 0.00 |
| Interest on Debt | 0.00 | 0.00 |
| Trustee Fees | 0.00 | 0.00 |
| Depreciation | 0.00 | 0.00 |
| Loss on Disposal of Equipment | 0.00 | 0.00 |
| Reallocations Plant Work Order | 0.00 | 0.00 |
| **Subtotal Operations** | $ 619,204,311.83 | $ 579,790,906.54 |
| **Total Expenditures** | $ 974,048,167.37 | $ 930,529,748.30 |

† - This information runs through June 20, 2019.

Source: Edison.

Case 3:16-cv-02267 Document 341-5 Filed 02/12/21 Page 231 of 234 PageID #: 25808

| Description | Fiscal Year | |
|---|---|---|
| | 2018 | 2019† |
| Reserve - Unencumbered Bal | $ 13,781,501.39 | $ 3,847,297.64 |
| Reserve - Capital Outlay | 1,309,502.75 | 0.00 |
| Reserves | 4,322,342.71 | 2,601,874.30 |
| State Appropriations | 977,254,100.00 | 996,651,619.28 |
| **Total Appropriation** | $ 996,667,446.85 | $ 1,003,100,791.22 |
| Federal Revenue | $ 324,795.74 | $ 583,608.60 |
| Federal Capital Grants | 0.00 | 0.00 |
| Refund Prior Year Federal Expense | 0.00 | 0.00 |
| **Total Federal** | $ 324,795.74 | $ 583,608.60 |
| Counties | $ - | $ - |
| Refund of Prior Year Local Expense | 0.00 | 0.00 |
| Cities | 0.00 | 0.00 |
| Non-Governmental | 0.00 | 30,505.31 |
| Other State | 0.00 | 0.00 |
| Current Services | 14,404,266.25 | 14,850,100.19 |
| Interest Income | 613.90 | 971.75 |
| Inter-Departmental | 1,886,689.71 | 2,692,633.28 |
| Interdepartmental - CU | 2,087.59 | 1,256.12 |
| Current Services - Licenses | 0.00 | 0.00 |
| Current Services - Fines | 0.00 | 0.00 |
| **Subtotal Other Revenue** | $ 16,293,657.45 | $ 17,575,466.65 |
| **Total Funding** | $ 1,013,285,900.04 | $ 1,021,259,866.47 |
| | | |
| † - This information runs through June 20, 2019. | | |

Source: Edison.

**Appendix K-3**
**State's Recidivism Rates**
**Calendar Years 2011 to 2017**



Source: OpenMaps.TN.Gov.

**Appendix K-4**
**Title VI Information**

Pursuant to state statute, the Tennessee Human Rights Commission is responsible for verifying that state governmental entities receiving federal financial assistance comply with the requirements of Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, and national origin in federally funded programs and activities. The commission serves as the central coordinating agency for executive-branch departments and agencies and provides technical assistance, consultation, and resources to encourage and assist departments and agencies with compliance.

By October 1 of each year, state departments and agencies receiving federal funds must submit Title VI implementation plans to the commission describing how they will meet Title VI requirements. The commission staff perform reviews of all implementation plans each year to ensure the plans include limited English proficiency (LEP) policies and procedures, data collection procedures, subrecipient monitoring, and whether departments provide sufficient Title VI training to staff. The commission staff also perform detailed on-site compliance reviews of a select number of state agencies each year to ensure that agencies are following the implementation plans.

The commission issues the report *Tennessee Title VI Compliance Program* (available on its website: https://www.tn.gov/humanrights.html), which covers the status of Title VI compliance for the State of Tennessee. The report describes the implementation plan review process, the results of compliance reviews completed, and details of federal dollars received by state agencies, Title VI complaints received, and Title VI implementation plan submission dates.

According to the commission's fiscal year 2017-2018 report (the most recent report available as of July 2019), the Department of Correction's Title VI implementation plan was submitted on time. In addition, the commission's implementation plan review of the Department of Correction's 2017-18 Title VI implementation plan resulted in no findings. See the charts for a breakdown of the department's employee gender and ethnicity as of July 19, 2019.

| Employees by Gender | |
|---|---|
| Gender | Number of Employees |
| Male | 3,077 |
| Female | 2,522 |

| Employees by Ethnicity | |
|---|---|
| Gender | Number of Employees |
| White | 3,965 |
| Black or African American | 1,455 |
| Hispanic or Latino | 77 |
| Asian | 20 |
| American Indian or Alaska Native | 19 |
| Other | 38 |
| Two or More Ethnicities | 15 |
| Native Hawaiian or Other Pacific Islander | 1 |
| Unknown | 9 |