

# STATE OF TENNESSEE
## COMPTROLLER OF THE TREASURY

# DEPARTMENT OF CORRECTION

**Performance Audit Report**

**November 2017**

**Justin P. Wilson, Comptroller**



**Division of State Audit**
**Sunset Performance Section**

**DEBORAH V. LOVELESS, CPA, CGFM, CGMA**
Director

**JOSEPH SCHUSSLER, CPA, CGFM**
Assistant Director

**DENA W. WINNINGHAM, CGFM**
Audit Manager

**Vincent Finamore, CFE**
**David Wright, CFE**
In-Charge Auditors

**Fonda Douglas**
**Greg Spradley**
**Jafar Ware**
Staff Auditors

**Amy Brack**
Editor

**Amanda Adams**
Assistant Editor

---

**Comptroller of the Treasury, Division of State Audit**
Suite 1500, James K. Polk State Office Building
505 Deaderick St.
Nashville, TN 37243-1402
(615) 401-7897

**Reports are available at**
www.comptroller.tn.gov/sa/AuditReportCategories.asp

**Mission Statement**
The mission of the Comptroller's Office is
to make government work better.

**Comptroller Website**
www.comptroller.tn.gov



**STATE OF TENNESSEE**
**C O M P T R O L L E R   O F   T H E   T R E A S U R Y**
**DEPARTMENT OF AUDIT**
**DIVISION OF STATE AUDIT**
SUITE 1500, JAMES K. POLK STATE OFFICE BUILDING
505 DEADERICK STREET
NASHVILLE, TENNESSEE  37243-1402

PHONE (615) 401-7897
FAX (615) 532-2765

November 3, 2017

The Honorable Randy McNally
 Speaker of the Senate
The Honorable Beth Harwell
 Speaker of the House of Representatives
The Honorable Mike Bell, Chair
 Senate Committee on Government Operations
The Honorable Jeremy Faison, Chair
 House Committee on Government Operations
       and
Members of the General Assembly
State Capitol
Nashville, Tennessee 37243
       and
The Honorable Tony Parker, Commissioner
Tennessee Department of Correction
320 Sixth Avenue North
Nashville, Tennessee 37243-0465

Ladies and Gentlemen:

Transmitted herewith is the sunset performance audit of the Department of Correction. This audit was conducted pursuant to the requirements of the Tennessee Governmental Entity Review Law, Section 4-29-111, *Tennessee Code Annotated*.

This report is intended to aid the Joint Government Operations Committee in its review to determine whether the department should be continued, restructured, or terminated.

Sincerely,

*Deborah V. Loveless*

Deborah V. Loveless, CPA
Director

17275

Performance Audit
**Department of Correction**
November 2017
_____

## FINDINGS

**Trousdale Turner Correctional Center and Whiteville Correctional Facility, managed by Core Civic, operated with fewer than approved correctional officer staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and one left critical posts unstaffed**
Shortages in correctional officer staff may have prevented two Core Civic facilities (Trousdale Turner Correctional Center and Whiteville Correctional Facility) from meeting staffing obligations and may have limited their ability to effectively manage the inmate populations assigned to them. Correctional officer staffing was often less than operationally planned, and Trousdale Turner had unstaffed critical posts on several days. Both facilities had rosters that did not match state-approved staffing patterns, and both facilities were consistently short-staffed (page 7).

**Core Civic staffing reports for two facilities (Trousdale Turner Correctional Center and Hardeman County Correctional Center) contained numerous errors, so information about hires, terminations, and vacancies may not be reliable**
Our review of staffing reports revealed inconsistencies regarding hires, terminations, and vacancies for two of the four Core Civic facilities. We found the following reporting issues for Trousdale Turner Correctional Center and Hardeman County Correctional Center: missing position numbers for vacancies; vacancies carrying over to subsequent months without additional vacant days; vacancies listed with more than 30 days not listed for the previous month; different job titles with the same position number; the number of hires and terminations not reconciling to the number of vacancies; and reports missing the number of filled positions, inmate population, and officer-to-inmate ratio (page 15).

**Trousdale Turner Correctional Center management's continued noncompliance with contract requirements and department policies challenges the department's ability to effectively monitor the private prison**
After nearly two years in operation, Trousdale Turner Correctional Center still did not comply with some of the Department of Correction's policies and contract requirements. While the department's contract monitoring efforts regularly report the facility's shortcomings, cuts in monitoring staff may have reduced the department's ability to effectively monitor key contract

requirements. This lack of effective monitoring has resulted in situations that may undermine the department's ability to achieve its stated mission and could result in harm to inmates (page 22).

**Probation and parole officers did not always meet supervision requirements**
As noted in the 2012 and 2014 performance audits, probation and parole officers did not always meet supervision standards. We determined that the department has not fully corrected probation and parole issues identified in the previous two performance audits and must continue to improve its monitoring capabilities (page 26).

**Probation and parole supervisors did not always meet oversight requirements**
As noted in the 2012 and 2014 performance audits, supervisors did not always meet the requirements for reviewing the work of probation officers. We found that 2 of the 5 case files had been reviewed by a supervisor within 60 days, while 2 did not contain the required initial case file review code indicating the date when the file had been reviewed, and 1 was not performed within the required time frame (page 28).

## OBSERVATION

The audit also discusses the following issue: the department should annually publish the correctional officer turnover rate and clearly identify which classifications are included in its annually published correctional officer series turnover rate (page 18).

# Performance Audit
# Department of Correction

---

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **INTRODUCTION** | 1 |
| Purpose and Authority for the Audit | 1 |
| Organization and Statutory Responsibilities | 1 |
| **AUDIT SCOPE** | 6 |
| **OBJECTIVES, METHODOLOGIES, AND CONCLUSIONS** | 6 |
| **Staffing Levels—Private Prison Review** | 6 |

Finding 1 − Trousdale Turner Correctional Center and Whiteville Correctional Facility, managed by Core Civic, operated with fewer than approved correctional officer staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and one left critical posts unstaffed ... 7

Finding 2 − Core Civic staffing reports for two facilities (Trousdale Turner Correctional Center and Hardeman County Correctional Center) contained numerous errors, so information about hires, terminations, and vacancies may not be reliable ... 15

**Staffing—State Facilities** ... 18

Observation 1 − The department should annually publish the correctional officer turnover rate and clearly identify which classifications are included in its annually published correctional officer series turnover rate ... 18

**Private Prison Monitoring** ... 21

Finding 3 − Trousdale Turner Correctional Center management's continued noncompliance with contract requirements and department policies challenges the department's ability to effectively monitor the private prison ... 22

**Community Supervision Division** ... 25

Finding 4 − Probation and parole officers did not always meet supervision requirements ... 26

Finding 5 − Probation and parole supervisors did not always meet oversight requirements ... 28

# Performance Audit
# Department of Correction

---

## INTRODUCTION

---

### PURPOSE AND AUTHORITY FOR THE AUDIT

This performance audit of the Department of Correction was conducted pursuant to the Tennessee Governmental Entity Review Law, Title 4, Chapter 29, *Tennessee Code Annotated*. Under Section 4-29-239(a)(13), the department is scheduled to terminate June 30, 2018. The Comptroller of the Treasury is authorized under Section 4-29-111 to conduct a limited program review audit of the department and to report to the Joint Government Operations Committee of the General Assembly. This audit is intended to aid the committee in determining whether the Department of Correction should be continued, restructured, or terminated.

### ORGANIZATION AND STATUTORY RESPONSIBILITIES

The Department of Correction was established in 1923 under Title 4, Chapter 3, Part 6, *Tennessee Code Annotated*, to operate the correctional system for the State of Tennessee (Section 41-1-102). The department's mission is to operate safe and secure prisons and provide effective community supervision in order to enhance public safety. In July 2012, duties including probation and parole supervision and community correction grant program functions were transferred to the department from the Board of Parole.

The department houses nearly 21,000 inmates at 10 adult prisons; contracts with a private prison management company for the operation of one prison; and contracts with several counties for the operation of three other private correctional facilities that are owned and operated by private contractor Core Civic (formerly known as Corrections Corporation of America). All facilities housing Department of Correction prisoners are located on the map on page 5. The Tennessee Prison for Women and the Women's Therapeutic Residential Center (located at the West Tennessee State Penitentiary site) exclusively house female offenders, and the Bledsoe County Correctional Complex houses both male and female offenders. The other 11 facilities house only male offenders. The department's Community Supervision unit supervises nearly 78,000 offenders on probation, on parole, or in a community correction program. Table 1 illustrates the offender population under the department's jurisdiction as of July 2017.

Case 3:23-cv-00009 Document 48-5 Filed 02/16/22 Page 7 of 35 PageID #: 5818

**Table 1**
**Number of Offenders Under Department of Correction Oversight**
**July 2017**

| Type of Oversight | Number of Offenders |
| --- | --- |
| Incarcerated Felons | 30,185 |
| Probation and Community Corrections | 66,148 |
| Parole | 11,553 |
| **Total Population** | 107,886 |

Source: Tennessee Felon Population Update, July 2017.

The department employs more than 6,500 staff members at the correctional facilities, at administrative offices in Nashville, and at Community Supervision offices throughout the state. The department trains staff members and criminal justice professionals from other government agencies at the Tennessee Correction Academy in Tullahoma.

The department's Commissioner is supported by a Deputy Commissioner/Chief of Staff, who also oversees Title VI and Grant Management; a Deputy Commissioner Administration/General Counsel; four Assistant Commissioners (Operational Support, Prisons, Community Supervision, and Rehabilitative Services); and the Chief Financial Officer. Executive Operations, also under the Commissioner's purview, includes the Office of Investigations and Compliance; Legal Services; Communications; Decision Support; Research and Planning; and the department's Legislative Liaison. The department recently added a Chief Interdiction Officer who answers directly to the Commissioner and focuses on combatting the introduction of prohibited items (drugs, cell phones, etc.) into correctional facilities. Various divisions operate under each Deputy and Assistant Commissioner, as follows:

Deputy Commissioner of Administration/General Counsel

Staff Attorneys; the Policy Development Manager; Human Resources; Offender Administration (including Offender Sentence Management and Offender Records Management); and Talent Management operate under the supervision of the Deputy Commissioner of Administration/General Counsel.

Assistant Commissioner of Operational Support

Support divisions under this Deputy Commissioner include Facilities Planning and Construction; Facilities Management and Maintenance; Mission Support; and Statewide Training, which oversees the Tennessee Correction Academy.

Assistant Commissioner of Prisons

Under the Assistant Commissioner of Prisons, the correctional administrators in the East, Middle, and West regions oversee the operation of all state-owned and operated correctional facilities, while one correctional administrator for Core Civic facilities oversees contract monitors

at the four Core Civic facilities housing prisoners.  The Assistant Commissioner of Prisons also oversees the Local Jails Resource Office, Transportation, Classification, and Inmate Grievances.

Assistant Commissioner of Community Supervision

The Assistant Commissioner of Community Supervision supervises three Field Services Administrators, who in turn oversee correctional administrators in charge of probation, parole, and specialized caseload operations in the East, Middle, and West regions of the state.  This unit also oversees the department's Community Correction Programs and the Criminal Conviction Records unit.

Assistant Commissioner of Rehabilitative Services

This Assistant Commissioner oversees Offender Development and Rehabilitation; Quality Assurance; Clinical/Behavioral Services; Women's Programs/Services; and four Day Reporting Centers.

Chief Financial Officer

Accounting and Payroll; Budget Services; Procurement; Local Jail Payments/State Prosecutions Accountant; Contract Administration; and Fleet Management operate under the Chief Financial Officer.

The department's organizational chart is presented on the next page.

TENNESSEE DEPARTMENT OF CORRECTION
ORGANIZATIONAL CHART
'SEPTEMBER 20, 2017



# Tennessee Department of Correction
## Facility Locations



Tennessee Prison for Women
Riverbend Maximum Security Institution
Lois M. DeBerry Special Needs Facility
Nashville

West Tennessee
State Penitentiary
Henning

Northwest Correctional Complex
Tiptonville

Women's
Therapeutic
Residential
Center at West
Tennessee
Penitentiary

Trousdale Turner
Correctional Center
Hartsville

Morgan County
Correctional Complex
Wartburg

Northeast Correctional Complex Annex
Roan Mountain
Northeast Correctional Complex Main
Mountain City

Bledsoe County
Correctional Complex
Pikeville

Mark H. Luttrell
Correctional Center
Memphis

Hardeman County
Correctional Facility

Whiteville
Correctional Facility

Whiteville

South Central
Correctional Facility

Turney Center
Industrial Complex

Annex

Clifton

Turney Center Industrial
Complex Main
Only

Tennessee Correction Academy
Tullahoma

Source: Information provided by the Department of Correction.

We audited the Department of Correction's activities for the period July 1, 2014, through August 31, 2017. Our audit scope included a review of internal controls and compliance with laws, regulations, and provisions of contracts or grant agreements that are significant within the context of the audit objectives. Management of the department is responsible for establishing and maintaining effective internal controls and for complying with applicable laws, regulations, and provisions of contracts and grant agreements.

For our sample design, we used nonstatistical audit sampling, which was the most appropriate and cost-effective method for concluding on our audit objectives. Based on our professional judgment, review of authoritative sampling guidance, and careful consideration of underlying statistical concepts, we believe that nonstatistical sampling provides sufficient, appropriate audit evidence to support the conclusions in our report. Although our sample results provide reasonable bases for drawing conclusions, the errors identified in these samples cannot be used to make statistically valid projections. We present more detailed information about our methodologies in the individual report sections.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## OBJECTIVES, METHODOLOGIES, AND CONCLUSIONS

### STAFFING LEVELS—PRIVATE PRISON REVIEW

Background Information

Core Civic (formerly Corrections Corporation of America) is a private prison contractor based in Tennessee and operates four prisons in the state (Hardeman County Correctional Center, South Central Correctional Center, Trousdale Turner Correctional Center, and Whiteville Correctional Facility). South Central is owned by the state and is operated under direct contract with the state; the other three are subcontracted through the counties in which they are located. Trousdale Turner began accepting state prisoners on January 4, 2016, with an assigned capacity of 2,512 inmates; as of July 5, 2017, it housed 2,483 inmates, which is 99% of capacity. Whiteville began accepting state prisoners in 2002, with an assigned capacity of 1,505 inmates; as of July 5, 2017, it housed 1,497 inmates, which is 99% of capacity.

<u>Objective and Methodology for Staffing Review (Finding 1)</u>

The contracts for the Trousdale Turner, Whiteville, and Hardeman County facilities require each facility to submit an operations plan, subject to the state's approval, that addresses all areas of the contract, including but not limited to the following:

- *Staffing patterns* list the designated posts and the number of officers the contractor will use per shift per post. The department approves the contractor's proposed staffing pattern.
- *Staffing rosters* are daily shift logs that show the active officer posts, the officers scheduled per post, and the officer attendance.
- *Critical posts* are shown in bold on the staffing rosters and are based on what facility management determines to be critical to its operations. According to the department's Policy 506.22, critical posts must be staffed regardless of institutional circumstances; if the posts were left unstaffed, it would jeopardize the security or safety of the facility, staff, offenders, or community.

These operations plans establish the policies and procedures the facilities are required to follow in all areas covered by the contract. The terms also state that the "plan shall not be altered, amended, modified, revised or supplemented without the prior written approval by the State."

We analyzed correctional officer staffing by comparing a sample of daily facility staffing rosters to the currently approved staffing patterns.

We randomly selected 3 days per month over the 9-month period between October 2016 and June 2017, for a total of 27 days. We selected a separate sample of days for each facility and asked facility staff for copies of the completed daily staffing rosters for the selected days. We also reviewed the department's contract monitoring reports and monitoring tools related to the evaluation of staffing patterns and rosters for both the Trousdale Turner and Whiteville facilities.

**Finding**

**1. Trousdale Turner Correctional Center and Whiteville Correctional Facility, managed by Core Civic, operated with fewer than approved correctional officer staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and one left critical posts unstaffed**

Shortages in correctional officer staff may have prevented two Core Civic facilities (Trousdale Turner Correctional Center and Whiteville Correctional Facility) from meeting staffing obligations and may have limited their ability to effectively manage the inmate populations assigned to them. Correctional officer staffing was often less than operationally planned, and Trousdale Turner had unstaffed critical posts on several days. Both facilities had rosters that did not match state-approved staffing patterns, and both facilities were consistently short-staffed.

Case 3:23-cv-00009 Document 48-5 Filed 02/18/22 Page 13 of 35 PageID #: 725824

The number of staffing rosters we expected to receive varied for the facilities, depending on the number of shifts per day during the time under review.  For Trousdale Turner, we expected a total of 72 signed rosters and for Whiteville, a total of 54 signed rosters.  We received only 51% of the requested signed rosters from Trousdale Turner, but we received 100% from Whiteville (see Table 2).

**Table 2**
**Daily Shift Rosters Requested From Core Civic Facilities**
**October 2016 – June 2017**

| Facility | Number of Rosters Expected | Percentage Received |
|---|---|---|
| Trousdale Turner | 72* | 51% |
| Whiteville | 54** | 100% |

**Shift Rosters Not Received**

*We received blank rosters from Trousdale Turner for each shift in both October and November 2016.*

\* Between October 2016 and March 2017, Trousdale Turner operated on three 8-hour shifts, so we expected to receive 54 staffing rosters ([3 rosters per day x 3 sampled days per month] x 6 months).  Between April and June, the facility operated two 12-hour shifts per day.  For this period, we expected to receive 18 staffing rosters ([2 rosters per day x 3 sampled days per month] x 3 months).  In total, we expected 72 (54 + 18) staffing rosters.
\*\* Whiteville operated with two 12-hour shifts during the entire sampled period, so we expected to receive 54 staffing rosters ([2 shifts per month x 3 sampled days per month] x 9 months).

From the rosters, we judgmentally chose to review 16 officer posts for Trousdale Turner and 17 posts for Whiteville.  The selected posts consisted of housing units; segregation; recreation; transportation; central control; perimeter; medical; and utility, search, and escort.  The majority of the posts were designated as critical on the rosters.

Trousdale Turner Correctional Center Review

Trousdale Turner operated with less than the number of security staff listed on the approved staffing pattern.  Our analysis revealed instances of officers working consecutive shifts (16 hours in a row); critical and non-critical posts closed because officers were moved to cover other posts; and posts designated as closed on the roster with no staff assigned when the staffing pattern indicated the posts should be staffed.  On April 1, 2017, Trousdale Turner management implemented a new staffing pattern that changed the number of critical posts and the number of shifts for security staff; however, the department did not approve the new plan until June 2017.  The new staffing pattern changed certain security and unit management posts from three 8-hour shifts to two 12-hour shifts and reduced the total number of correctional officer staff needed to cover operations.  See Table 3.

**Table 3**
**Trousdale Turner Correctional Center's Staffing Patterns**

| Date of Staffing Pattern | Required Officers | Officer-to-Inmate Ratio |
|---|---|---|
| October 2016 to March 2017 | 196 | 1:13 |
| April 1, 2017, and onward | 183 | 1:14 |

Source: TTCC TDOC approved staffing patterns provided by TDOC.

Between the months of December 2016 and March 2017, some correctional officers worked extended hours because of staffing shortages, which may have motivated the staffing pattern change. The rosters show that on one day in March, 11 officers worked 16-hour shifts to cover posts.

A sample of 3 different days in 3 months revealed 44 critical posts unstaffed. We might have identified more unstaffed posts, but our review was limited by the blank staffing rosters. We received only 10 of the 18 rosters we expected between April and June 2017 ([2 rosters per day x 3 sampled days] x 3 months). See Table 4.

**Table 4**
**Trousdale Turner Correctional Center's Critical Posts Unstaffed**
**Three Selected Days in Each Month**
**April – June 2017**

| Month | Sampled Days | | | Total |
|---|---|---|---|---|
| | Day 1 | Day 2 | Day 3 | |
| April | Blank Rosters | 7 | 11 | 18 |
| May | 12 | Blank Rosters | 6 | 18 |
| June | Blank Rosters | Blank Rosters | 8 | 8 |
| | | | Review Period Total | 44 |

Source: Daily rosters provided by Trousdale Turner Correctional Center.

**Critical Posts Unstaffed**

*Although there were 8 blank rosters (2 shifts per day x 4 days), we still identified 44 unstaffed critical posts.*

<u>Whiteville Correctional Facility Review</u>

Whiteville operated with fewer staff than allowed by the approved staffing pattern. According to our analysis of 17 correctional officer positions, the staffing pattern's combined shift total need for the positions reviewed was 79 officers. We observed, on average, a shift total of 57 officers, a difference of 21 officers. Most critical posts were staffed on the sampled days, but 1 critical post (the front gate) was often unstaffed for approximately 6 hours out of the 12-hour second shift.

<u>Recreation and Transportation Posts</u>

In some cases, staffing rosters for both facilities had fewer posts than the approved staffing patterns required. Recreation and transportation posts were consistently under-staffed, under-posted, and closed. These positions are designated as non-critical; however, if these positions are

not properly manned, the facilities may not be able to properly provide offenders with programming and services like yard time or transportation to and from medical appointments.

The Trousdale Turner staffing pattern requires 5 recreation posts to be manned for 8 hours during the 1st and 2nd shifts, 5 days a week. The Whiteville staffing pattern requires 5 recreation posts to be manned for 12 hours during the 1st shift, 7 days a week. For the sampled days in April through June 2017, Trousdale Turner's rosters only list 3 posts and the Whiteville rosters only list 4 posts, instead of 5 as in the staffing pattern. Neither facility's roster showed that the posts were manned to the level the staffing patterns require. (See Tables 5 and 6.)

**Table 5**
**Trousdale Turner Correctional Center – Recreation Posts Filled (April – June 2017)**
Note: 1st Shift | 2nd Shift
Staffing Pattern = 5 | 5, 5 Days per Week

| Month | Posts per Shift | Sample Day | | | |
|---|---|---|---|---|---|
| **Staffing Pattern** | **5 \| 5** | **Day 1** | **Day 2** | **Day 3** | **Total** |
| April Rosters | 3 \| 3 | - \| -* | - \| -* | 0 \| 0 | 0 |
| May Rosters | 3 \| 3 | 0 \| 0 | Blank Roster | 0 \| 0 | 0 |
| June Rosters | 3 \| 3 | Blank Roster | - \| -* | 1 \| 1 | 2 |
| | | | | Period Total | 2 |

* Weekend.
**Summary:** Trousdale Turner lists only 3 of the 5 required posts on the daily rosters. In our sample, 34 out 36 roster posts were unfilled. The staffing pattern recommends 60 posts.

**Table 6**
**Whiteville Correctional Facility – Recreational Posts Filled (April – June 2017)**
Note: 1st Shift | 2nd Shift
Staffing Pattern = 5 | 0, 7 Days per Week

| Month | Posts per Shift | Sample Day | | | |
|---|---|---|---|---|---|
| **Staffing Pattern** | **5 \| 0** | **Day 1** | **Day 2** | **Day 3** | **Total** |
| April Rosters | 4 \| 0 | 1 \| 0 | 3 \| 0 | 4 \| 0 | 8 |
| May Rosters | 4 \| 0 | 1 \| 0 | 2 \| 0 | 0 \| 0 | 3 |
| June Rosters | 4 \| 0 | 1 \| 0 | 0 \| 0 | 2 \| 0 | 3 |
| | | | | Period Total | 14 |

**Summary:** Whiteville lists only 4 of 5 required posts on the daily rosters. In our sample, 22 out of 36 roster posts were unfilled. The staffing pattern recommends 45 posts.

Table 7
**Trousdale Turner Correctional Center – Transportation Posts Filled (April – June 2017)**
Note: 1st Shift | 2nd Shift
Staffing Pattern = 3 | 1, 5 Days per Week

| Month | Posts per Shift | Sample Day | | | |
|---|---|---|---|---|---|
| **Staffing Pattern** | **3 | 1** | **Day 1** | **Day 2** | **Day 3** | **Total** |
| April Rosters | 4 | 0 | - | -* | - | -* | 4 | 0 | 4 |
| May Rosters | 4 | 0 | 4 | 0 | Blank Roster | 1 | 0 | 5 |
| June Rosters | 4 | 0 | Blank Roster | - | -* | 1** | 0 | 1 |
| | | | | **Period Total** | 10 |

*Weekend.
**Posts without staff assigned 3 of the 4.
**Summary**: Trousdale Turner lists 4 posts on 1st shift and 0 on 2nd shift. Rosters show 1st-shift posts are 8 hours, from 7:00 a.m. to 3:00 p.m. In our sample, 10 out of 24 posts were unfilled. The staffing pattern recommends 24 posts; however, 6 of these are to be on 2nd shift.

Whiteville did not have designated transportation posts on its roster. The staffing pattern provides that there should be 2 posts on the 1st shift for 8 hours, 5 days a week.

<u>Department of Correction Monitoring</u>

We reviewed Whiteville's April, May, and June monitoring reports; its March, May, and June noncompliance summaries; and its April and August noncompliance reports. For Trousdale Turner, we reviewed its June noncompliance report, as well as its April and June monitoring report. In these reports, the department did not cite unstaffed posts or staffing pattern inconsistencies for these two prisons for the reviewed period. The department's annual inspections for Whiteville and Trousdale Turner did not address these areas either. The staffing reports we reviewed indicated compliance with staffing rosters and staffing levels. We found, however, that the rosters did not match the approved staffing patterns, and both facilities were experiencing problems filling posts consistently.

The contract monitor for Trousdale Turner did include unstaffed critical posts in the most recent noncompliance report dated August 11, 2017, we feel in part due to the observations we shared. As a result of the noncompliance report, Trousdale Turner created a plan of action to address these issues.

We visited both Trousdale Turner and Whiteville facilities and spoke with the wardens and other facility staff, as well as the contract monitors. Historically, staffing has been a concern for correctional facilities statewide. According to Trousdale Turner management, they continue to recruit new officers and have increased correctional officer salaries (see Table 8). The newly appointed warden (as of July 1, 2017) informed us that they conduct pre-service training for new recruits every two weeks.

| 2015 | 6/12/2016 | 12/11/2016 | 6/25/2017 |
|---|---|---|---|
| $11.75 | $13.75 | $15.75 | $16.50 |

Source: The Human Resources Director at the Trousdale Turner
Correctional Center.

The facilities have changed their training programs by emphasizing more on-the-job training within the facilities, including exposing new recruits to inmates earlier in the curriculum. Whiteville management mentioned that providing exposure upfront helps new officers to more quickly determine if the job will be a fit for them or not. Whiteville has also increased salaries for its officers, as shown in Table 9.

**Table 9**
**Whiteville Correctional Facility**
**Correctional Officer Salary**

| 2015 | 6/12/2016 | 12/11/2016 | 6/25/2017 |
|---|---|---|---|
| $11.75 | $11.75 | $12.50 | $13.25 |

Source: The Human Resources Manager at the Whiteville Correctional Facility.

Whiteville management mentioned during our visit that the overall nature of inmates and the characteristics of newly hired correctional officers create new challenges for recruiting and keeping correctional officers. The younger inmates are more disrespectful and less cooperative. Young correctional officers no longer view the position as a career, but rather as a temporary paycheck on the path to a different job, or perhaps to earn money while in school. Management stated that younger officers take less pride in the job, but, more importantly, they lack the required human interaction skills to properly interact with the inmates.

Facilities that fail to maintain consistent staffing levels of correctional officers can be limited in their ability to provide staff and inmates with a safe environment and to meet inmate needs like recreation and transportation. A March 2017 article, "Impacts of Understaffing," published by the American Correctional Officer Intelligence Network, states, "Staffing is arguably the most crucial element to safety inside our prisons" and "the total interaction between staff and inmates is what determines the level of safety within the

> **"Staffing is arguably the most crucial element to safety inside our prisons"** and **"the total interaction between staff and inmates is what determines the level of safety within the facility."**
>
> —American Correctional Officer Intelligence Network, "Impacts of Understaffing"

facility." Staffing rosters and staffing patterns are strong indicators of operational performance, and they should be analyzed routinely. Not following approved staffing patterns can undermine

the department's ability to provide a safe prison environment and to reduce recidivism. It can also lead to increased violence, escapes, forced overtime, staff sick leave, staff turnover, and cases of post-traumatic stress disorder.

## Recommendation

To ensure critical posts are staffed, the department's contract monitors should identify unstaffed critical posts, write noncompliance reports documenting these contract violations, document when staffing levels are below the approved staffing requirements, and document the actions Core Civic management takes to address staff shortages. The contract monitors also should ensure that department management approve any staffing change before it is implemented. Core Civic should ensure that facilities are operating with enough staff to provide necessary services and should complete staffing reports for all shifts.

## Management's Comment

We concur in part with the finding. The Department of Correction has issued multiple noncompliance reports to Core Civic for understaffing at both Trousdale Turner Correctional Center (TTCC) and Whiteville Correctional Facility (WCFA). Both facilities have submitted corrective action plans and have been proactive with regard to recruitment and retention, as illustrated by significantly increasing staff pay. For instance, TTCC has increased their officer pay by more than $4.00 per hour and is also providing an additional $1.00 to $2.00 per hour for any correctional staff with previous years of correctional experience. Immediate signing bonuses and relocation bonuses are also being offered by Core Civic as a means of resolving staff vacancies.

We do not concur in part with the finding. The Department of Correction works daily with Core Civic to support consistent staffing patterns and gives thoughtful consideration to any proposed staffing changes. As a point of clarification, approved staffing patterns list how many people are required to be working at the facility based on their inmate population. However, this is not the amount of people required to be at the facility on a shift by shift basis. Various shifts across a twenty-four hour period are characterized by staff being distributed differentially based upon the movement (or lack of movement) associated with inmate activities. For instance, the pattern of staff placement overnight is not identical to staff placement during the daytime. Similarly, most facilities remove the front gate officer after traffic stops in the area. And finally, some posts by function are only necessary when offenders are present, such as a utility/yard officer position that is required if inmates are on the yard, but these officers are frequently redirected to other functions when inmates are no longer present in that area.

Objective and Methodology for Staffing Reports (Finding 2)

We obtained staffing reports from each of the four Core Civic facilities for January through June 2017 to determine if staffing information (new hires, terminations, and vacancies) was accurately communicated. Contract terms require the state to develop reporting requirements for staff turnover and vacancies and that each month each contracted facility submit a report to the contract monitor. The report must include names and position numbers for employees hired, the name of each employee terminated including the reason for termination, and any vacant positions on the staffing pattern including the number of days vacant. Department contract monitors located on-site at each contracted facility use these reports to monitor staffing and identify contract violations, such as when a position is vacant for more than 45 days.

Contract monitors provided the audit team staffing reports that are in the form of a memo, except for the Whiteville Correctional Facility, which provided a Staffing Legend spreadsheet. The memos are divided into three sections:

1. Total Number of Employees Hired for Reporting Period,

2. Total Number of Employees Terminated for Reporting Period, and

3. Vacant Positions in Staffing Pattern.

In each section of the memo, the number of items in the list should equal the total number at the top of the list.



**CCA.**
America's Leader in Partnership Corrections

**MEMORANDUM**

TO: TDOC Contract Monitor Brun

FROM: Warden Blair Leibach

DATE: 05/10/2017

RE: Monthly Staffing for Trousdale Turner Correctional Center

Reporting Period April 2017

1. Total Number of Employees Hired for Reporting Period: 32

| | New Employee Name | Position |
|---|---|---|
| 1 | | Correctional Officer |
| 2 | | Correctional Officer |
| 3 | | Correctional Officer |
| 4 | | Correctional Officer |
| 5 | | Correctional Officer |
| 6 | | Correctional Officer |
| 7 | | Correctional Officer |
| 8 | | Correctional Officer |

2. Total Number of Employees Terminated for Reporting Period: 23

| | Terminated Employee Name | Position | Reason for Termination |
|---|---|---|---|
| 1 | | CORRECTIONAL OFFICER | Job Abandonment-No Rehire |
| 2 | | CORRECTIONAL OFFICER | Job Abandonment - No Rehire |
| 3 | | CORRECTIONAL OFFICER | Job Abandonment - No Rehire |
| 4 | | CORRECTIONAL OFFICER | Job Abandonment - No Rehire |
| 5 | | ACADEMIC INSTRUCTOR | Job Abandonment - No Rehire |

3. Vacant Positions in Staffing Pattern:

| | Position Title | Position Number | Days Vacant |
|---|---|---|---|
| 1 | Sr. Correctional Officer | 9 positions | 18 days |
| 2 | Warehouse/Commissary Worker | 4717156 | 15 |
| 3 | Vocational Instructor - Carpentry | 4714385 | 182 |
| 4 | Vocational Instructor - Plumbing | 4714326 | 182 |
| 5 | Vocational Instructor - Computers | 4714351 | 57 |
| 6 | Vocational Instructor - CMS | 4714254 | 39 |
| 7 | Academic Instructor | 4714094 | 69 |
| 8 | Academic Instructor | 4714131 | 52 |

For section 1, Employees Hired, the employee name and position title are provided; for section 2, Employees Terminated, the employee name, position title, and reason for termination are provided; for section 3, Vacant Positions, the position title, position number, and number of days vacant are provided. The Staffing Legend provided by Whiteville is a spreadsheet which lists each position in the facility and provides detailed information concerning position numbers, employee names, hiring dates, termination dates, and vacancy designations.

**2.    Core Civic staffing reports for two facilities (Trousdale Turner Correctional Center and Hardeman County Correctional Center) contained numerous errors, so information about hires, terminations, and vacancies may not be reliable**

Our review of staffing reports revealed inconsistencies regarding hires, terminations, and vacancies for two of the four Core Civic facilities. We found the following reporting issues for Turner Trousdale Correctional Center and Hardeman County Correctional Center:

- missing position numbers for vacancies;

- vacancies carrying over to subsequent months without additional vacant days;

- vacancies listed with more than 30 days not listed for the previous month;

- different job titles with the same position number;

- the number of hires and terminations not reconciling to the number of vacancies; and

- reports missing the number of filled positions, inmate population, and officer-to-inmate ratio.

We elaborate on two of the more significant problems below.

<u>Not Providing Position Numbers</u>

In the April, May, and June 2017 staffing reports, staff at Trousdale Turner listed "Correctional Officer, 64 Positions" and "Senior Correctional Officer, 9 positions" as vacancies (see Exhibit 1). Without position numbers for each unique position, the contract monitor has a limited ability to track positions over time and the report does not meet contract requirements. We also observed that reports we reviewed did not include position numbers with the lists of hires and terminations, but did include this information for vacancies. This means monitors could not easily compare lists and locate discrepancies.

**Exhibit 1**
**Vacant Positions in Staffing Pattern for Trousdale Turner Correctional Center**

### 3. Vacant Positions in Staffing Pattern:

| | Position Title | Position Number | Days Vacant |
|---|---|---|---|
| 1 | Sr. Correctional Officer | 9 positions | 18 days |
| 2 | Warehouse/Commissary Worker | 4717156 | 15 |
| 3 | Vocational Instructor - Carpentry | 4714385 | 182 |
| 4 | Vocational Instructor - Plumbing | 4714326 | 182 |
| 5 | Vocational Instructor - Computers | 4714351 | 57 |
| 6 | Vocational Instructor - CMS | 4714254 | 39 |
| 7 | Academic Instructor | 4714094 | 69 |
| 8 | Academic Instructor | 4714131 | 52 |
| 9 | Academic Instructor | 4714289 | 37 |
| 10 | Administrative Clerk | 4714668 | 77 |
| 11 | Administrative Clerk | 4714625 | 3 |
| 12 | Administrative Clerk | 4714561 | 55 |
| 13 | Maintenance Worker | 4714924 | 68 |
| 14 | Correctional Officer | 64 positions | 30 |

Carrying Over Recurring Vacancies Without Adding Additional Vacant Days

We found that the department did not cite at least two 45-day violations at Trousdale Turner because of not verifying the staffing report information. The contract monitor issued a noncompliance report for March 2017 that cited Trousdale Turner for having 2 positions vacant for more than 45 days. These positions both showed 152 days vacant. We identified 3 additional positions that could have also needed citing (at least 2 should have been cited). Trousdale Turner reported 2 of these positions in the March 2017 staffing report as 24 and 29 days vacant, with another reported as 41 days vacant. However, these same positions were listed in the January and February reports as 24 and 29 days vacant, and the third as 8 days vacant. Because the positions had carried over 2 months without additional vacant days added (31 days between the January and February report + 25 days between the February and March report), they appeared on the March report as under the 45-day threshold (see Exhibit 2). Positions 4714351 and 4714131 should have been cited in February with 60 days and 55 days vacant; and in March, with 85 days and 80 days vacant. Because 4714094 is listed in March as having 41 days, it was likely filled during the month, which is why 41 days vacant is listed. Without positions numbers in the Hires section of the report, it is difficult to confirm.

**Exhibit 2**
**Trousdale Turner Correctional Center's Staffing Reports**
**January Through March 2017**

**January 2017 Staffing Report**

| | Position Title | Position Number | Days Vacant |
|---|---|---|---|
| 3 | Vocational Instructor - Carpentry | 4714385 | 152 |
| 4 | Vocational Instructor - Plumbing | 4714326 | 152 |
| 5 | Vocational Instructor - Computers | 4714351 | 29 |
| 7 | Academic Instructor | 4714094 | 8 |
| 8 | Academic Instructor | 4714131 | 24 |

**February 2017 Staffing Report**

| | Position Title | Position Number | Days Vacant |
|---|---|---|---|
| 3 | Vocational Instructor - Carpentry | 4714385 | 152 |
| 4 | Vocational Instructor - Plumbing | 4714326 | 152 |
| 5 | Vocational Instructor - Computers | 4714351 | 29 |
| 7 | Academic Instructor | 4714094 | 8 |
| 8 | Academic Instructor | 4714131 | 24 |

**March 2017 Staffing Report**

| | Position Title | Position Number | Days Vacant |
|---|---|---|---|
| 3 | Vocational Instructor - Carpentry | 4714385 | 152 |
| 4 | Vocational Instructor - Plumbing | 4714326 | 152 |
| 5 | Vocational Instructor - Computers | 4714351 | 29 |
| 7 | Academic Instructor | 4714094 | 41 |
| 8 | Academic Instructor | 4714131 | 24 |

## Recommendation

The department's monitoring staff should ensure that the information they receive from Core Civic is complete and accurate, and they should verify information, including vacancies and the length of time positions are vacant. If the reports are not accurate, monitors should cite this in noncompliance reports until the issues are corrected. Additionally, the department may wish to require the number of filled positions and inmate population to be included in each report, so it can better determine the officer-to-inmate ratio, staff turnover rates, and vacancy rates.

## Management's Comment

We concur with the finding. Trousdale Turner Correctional Center (TTCC) has been instructed to use the format identified by the Comptroller's Office audit staff as the best mechanism for reporting vacancies. Using the suggested format will improve the accuracy of information being provided to the monitor and more readily reveal any noncompliance.

**Observation**

1.    **The department should annually publish the correctional officer turnover rate and clearly identify which classifications are included in its annually published correctional officer series turnover rate**

Department of Correction management acknowledges that the turnover rate for correctional officers is high in state-operated correctional facilities. The department operates 10 correctional facilities, and the average correctional officer salary was $28,389.61 between fiscal years 2014 and 2017 (see Chart 1).



Source: State of Tennessee's employment management system, EDISON. We obtained Correctional Officer employee data for each fiscal year and averaged the salaries.

Department Correctional Officer Turnover Rate

As the department does not annually publish the correctional officer turnover rate, when we asked them to provide the rates, the department's human resources management said it would take some time to calculate the turnover rate to provide to us. Furthermore, the department's human resources management was unable to provide us with a standardized method for calculating the correctional officer turnover rate. The turnover rate for correctional officers eventually provided to us is higher than the turnover rate the department published in its annual statistical abstract reports for fiscal years 2013 through 2016.

We calculated correctional officer turnover rates, because this is an entry-level position whose adequate staffing is critical to the security of correctional facilities. We calculated officer rates for fiscal years 2014, 2015, 2016, and 2017. Our calculated correctional officer turnover rate and the department's human resources management-provided turnover rate are similar. Chart 2 illustrates that both of the calculated turnover rates for correctional officers (only) are higher than

Case 3:23-cv-01260 Document 48-5 Filed 02/11/22 Page 24 of 35 PageID #: 835

the correctional officer series turnover rates published in the department's statistical abstract reports. This shows the mitigating effects of including supervisory and managerial classifications in the calculation of turnover, instead of reporting the officer rate independently.



**Chart 2**
**Turnover Rates**
**FY2014 - 2017**

- Reported by department in Statistical Abstracts (Correctional Officer Series)
- Calculated by Comptroller's Office (Correctional Officer)
- Provided by department during the audit (Correctional Officer)

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Reported by department | 30% | 40% | 36% | |
| Calculated by Comptroller's Office | 37% | 56% | 50% | 48% |
| Provided by department | 37% | 62% | 48% | 45% |

Not publishing the correctional officer turnover rate may provide stakeholders with incomplete data. We recommend that the department publish the correctional officer turnover rate in its statistical abstracts in addition to the series rate. The department should also clearly communicate which positions are included in the series rate it publishes and the rationale for providing a combined series rate.

Staffing Concerns

The percentage of correctional officer separations in the first three years of employment has increased to 93% from an average 86% for the prior three fiscal years. On average, the bulk of these separations are a combination of job abandonments and resignations (63%), which is 3 times higher than the next category (dismissals or qualifications not met). See Charts 3 and 4.

Case 3:22-cv-00009 Document 48-5 Filed 02/18/22 Page 25 of 35 PageID #: 5836





To better prepare new correctional officers for the position, the department has recently modified its training to include two weeks of on-site training at state-operated correctional facilities.

Overtime Policy

In 2014, the department adopted a 28-day period for staff scheduling, citing advantages such as improved departmental communication and flexibility in scheduling. However, (1) the length of time between working and being paid for overtime, and (2) not accruing overtime pay (time and a half) until after working 171.1 hours in those 28 days may be factors in the increase in turnover between 2014 and 2015. The American Correctional Association recommended, in its October 2015 report, that the department change the work period from 28 days to 14 days. In 2017, the department moved to implement the 14-day work period.

According to the department, for the 14-day period to be successful, correctional officers will be required to work 12-hour shifts, which will reportedly allow for complete shift coverage in the state-operated facilities. In addition, the 12-hour shift, the department says, will allow correctional officers to be off every 4th day. However, according to facility staffing, some correctional officers may still be required to work a schedule outside of the 12-hour shift, 14-day work period schedule, but this is a facility choice.

Under the 14-day period, the department pays correctional officers premium overtime pay after 80 hours worked within the 14 days. The department cites advantages for correctional officers such as a reduced amount of time between working and being paid for overtime; not being required to work more than three days in a row; and getting a three-day weekend every other week, via a rotating schedule.

The department will pilot the new scheduling system beginning in September 2017 at Bledsoe County Correctional Complex, Turney Center Industrial Complex, and West Tennessee

State Penitentiary, and in late November or early December 2017 at the other seven state-operated correctional facilities. Once the new system is fully implemented at all state-operated correctional facilities, the department will be the only state agency utilizing the 12-hour shift, 14-day work period scheduling system.

## PRIVATE PRISON MONITORING

Objective and Methodology

Our objective was to evaluate the Department of Correction's monitoring of the state's private prisons. To accomplish that, we conducted inspections and file reviews at two Core Civic facilities housing Tennessee inmates. We identified several of the department's operational policies, and facility standards, and contract requirements and tested each facility's compliance with these and with records management. Our work at each facility included observing, reviewing paper files, and checking records in the Tennessee Offender Management Information System (TOMIS). For the file reviews and record checks, we generated a random sample of inmates from each of the facilities' roster reports and reviewed information for those selected. For Trousdale Turner Correctional Center, we randomly selected 248 inmates from a roster of 2,483. Once on-site, we determined that after a review of 93 inmate files and 87 medical files, we had a sufficient understanding of the identified problems and would not benefit from further review. Based on our experience at Trousdale Turner, we randomly selected 50 inmates from 1,497 at the Whiteville Correctional Facility. We reviewed all 50 inmate and medical files. Our sampling methodology is nonstatistical; therefore, our conclusions are not statistically generalizable to the entire population. We decided that 50 files from Whiteville would be sufficient to identify if the same types of issues found at Trousdale Turner were also occurring at Whiteville.

We reviewed compliance with facility standards, including unimpeded inmate access to sick call and grievance forms; instructions for obtaining health care posted in housing units; grievance procedures accessible in the facility's library; locked depositories for collection of grievance forms; sign-in sheets to record attendance at classes or jobs within the facility; and secure storage of incident reports and video recordings that are clearly labeled to match written reports.

We also examined a sample of inmate files and medical files for items required by departmental policy, including documentation of inmate health screenings upon arrival at each facility and inmate-signed facility orientation forms, which communicate instructions for obtaining medical care. We also reviewed charge sheets, which inmates are required to sign when disciplined, or their refusal to sign must be noted.

Finally, we checked TOMIS records for documentation of inmate activities, analyzing whether disciplinary investigations had been completed within seven days of the incident; whether appropriate fines were assessed against inmates guilty of disciplinary infractions; whether documentation of disciplinary reports was signed by both the inmate (or their refusal noted) and the reporting staff member; and whether inmate grievances were documented and resolved within appropriate time periods. Our work resulted in the following finding.

**Finding**

**3.** **Trousdale Turner Correctional Center management's continued noncompliance with contract requirements and department policies challenges the department's ability to effectively monitor the private prison**

After nearly two years in operation, Trousdale Turner Correctional Center still did not comply with some of the Department of Correction's policies, facility standards, and contract requirements. While the department's contract monitoring efforts regularly report the facility's shortcomings, cuts in monitoring staff may have reduced the department's ability to effectively monitor key contract requirements. This lack of effective monitoring has resulted in situations that may undermine the department's ability to achieve its stated mission, and could result in harm to inmates.

Our facility visits and file reviews (see the above Objectives and Methodology section for sampling information) revealed multiple instances of noncompliance at Trousdale Turner. One issue, unimpeded access to sick call and grievance forms, appeared to be an issue at both Trousdale Turner and Whiteville. Issues of noncompliance identified during our tour at Trousdale included the following:

- One housing pod did not have grievance forms in the unit, and two pods did not have sick call request forms. Inmates were required to request these forms from the correctional officer on duty. The officer in one of those units reported being out of sick call forms for approximately four hours and waiting for copies. Access to grievance forms, according to the department's Policy 501.01, is required to be "unimpeded." Access to health care is governed by the department's policies and terms of the contract.

- Only one pod out of four had instructions for obtaining medical care posted in the pod. Facility management reported that inmates often tore down items posted in pods or tore off small pieces to write notes, eventually destroying the posted item. Facility managers reported that they were planning to install closed-circuit television screens high on the walls of the pods, with rotating screens displaying information inmates need to know.

Impeded access to sick call forms may reduce inmates' ability to receive timely medical examinations and treatment. Impeded access to grievance forms may reduce inmates' willingness to file grievances against the same staff members they have to ask to provide them with grievance forms.

We did not find issues with locked depositories at housing units, available grievance handbooks, appropriate sign-in sheets at inmate job locations, classrooms with assigned inmate signatures, proper segregation unit records, and properly stored incident report records and videos.

Departmental policies also require certain paperwork to be included in inmate files or inmate medical files. Inmates must sign a form indicating they received facility orientation and instructions for obtaining medical care. Below are the results of our file reviews for Trousdale Turner:

- Of 87 medical files, 11 (13%) did not include documentation of a health screening conducted upon arrival at the facility.

- Of 93 inmate files, 27 (29%) did not include documentation that inmates had been instructed on how to obtain medical care.

We also checked the sampled files for appropriate notations in TOMIS regarding grievances, fines assessed to inmates found guilty of disciplinary infractions, and attendance at assigned jobs or classes. Results of our review at Trousdale Turner include the following:

- Of 29 inmates with grievances noted in TOMIS, 1 (3%) had a grievance that was not logged in TOMIS.

- Of 80 inmates assigned to either a job or class, 20 (25%) had no attendance recorded. Of those 20, 18 were assigned to classes, not jobs.

- Of 80 inmates assigned to either a job or class, 16 (20%) had inaccurate information recorded. Inaccuracies included long periods of time where no attendance was recorded; instances of an inmate assigned to one job or class, but attendance recorded for something different; or an inmate assigned to a class, but attendance at a job recorded. Supervisors of facility school staff are responsible for entering inmate attendance. The department monitor noted problems with verifications of class attendance in the March 2017 internal compliance audit.

These issues at Trousdale Turner could have been caused by relatively new staff members and a lack of experience and training on TOMIS data entry, or by the inmates not attending assigned classes. Notably, from the sampled files at Trousdale Turner, we found no instances of fines not assessed for inmates found guilty of disciplinary infractions.

<u>Reduction in Department Monitoring Staff</u>

We found that the department reduced its monitoring staff and increased the responsibilities of contract monitors at private prisons. Contract provisions include both a contract monitor and a liaison from the department located on-site, with their salaries reimbursed by the private contractor. In July 2015, as a part of the state's Voluntary Buyout Program (VBP), the department eliminated the liaison positions at all private facilities, leaving one contract monitor at each facility to do both jobs. The department also created a single correctional administrator position to oversee monitoring and to provide a layer of administrative oversight for the four private facilities. According to TDOC's justification for this restructuring, this additional layer of administrative oversight would both increase accountability and ensure consistency in operational policies and procedures. However, the liaison's duties were to be absorbed by the contract monitors, adding such additional duties as attending disciplinary and grievance hearings, approving inmate segregation, and being available 24/7 to receive incident reports from the prisons. Contract monitors' original task was to ensure facilities complied with policies, contract provisions, and the Commissioner's directives in all areas of facility operation. Under the structure in place after the VBP, contract monitors are not only responsible for the liaison duties described above, but also for completing each of the monitoring instruments below on a quarterly basis:

23

| Commissary | Counts |
| Disciplinary Procedures | Drug Testing |
| Facility and Property | Grievances |
| Inmate Jobs | Personal Property |
| Policies and Procedures | Records and Reports |
| Safety | Searches |
| Security Equipment | Special Management Inmates |
| Staffing (monthly) | Use of Force |

Having only one individual responsible for both monitoring and (former) liaison duties at Trousdale Turner may have contributed to that facility's continued noncompliance. Other possible significant factors are the following:

- Trousdale Turner is a relatively new facility.

- Instability in leadership could be a factor—during our review, the facility was on its third warden in two years.

- A mix of inmates transferred from other prisons into Trousdale Turner, a newly established correctional setting and population. For example, wardens at other facilities asked to transfer inmates to Trousdale Turner might move those with disciplinary issues, inmate compatibility issues, or security threat group (gang) affiliation.

- Compared to Whiteville, which we found to be largely in compliance with policies and contract provisions, Trousdale Turner is significantly larger, housing 2,483 inmates compared to 1,497 at Whiteville at the time we visited. A larger facility, with nearly 1,000 more inmates, would likely also have more disciplinary problems, grievances, incidents, and staffing challenges. When we visited Trousdale Turner, the department was in the process of transferring approximately 40 inmates per day in and out of the facility to reduce the percentage of confirmed gang-affiliated inmates at the facility.

- A larger facility adds to the responsibilities of the single on-site contract monitor, likely reducing the overall effectiveness of monitoring to enforce compliance.

The conditions identified in this finding could undermine the department's ability to prepare offenders for successful reentry into society. Not enforcing class attendance; inaccurate recordkeeping; limited access to grievance, medical, and sick call forms; and unperformed health screenings may prevent the facility from meeting the department's goal of providing a successful correction system.

## Recommendation

The department should address any monitoring deficiency resulting from its decision to eliminate the department liaison position from private prison contract monitoring staff. The department and Core Civic should ensure that staff properly record class attendance and job assignments in TOMIS and should ensure inmates attend their assignments. The department and Core Civic should provide inmates with unimpeded access to grievance and sick call forms. The

department should enforce compliance with policies, standards, directives, and contract terms, and should consider imposing civil monetary penalties allowed in the contract.

## Management's Comment

We concur with the finding. Aptly noted by the Comptroller's Office auditors, Trousdale Turner Correctional Center (TTCC) is a relatively new facility that has been operating for less than two years. As such, considerable oversight has been required at the Correctional Administrator level. Many noncompliance issues have been documented on the contract monitoring reports, annual audits, and quarterly medical and mental health audits.

At the direction of the Correctional Administrator, the facility Contract Monitor has submitted 36 noncompliance reports in the last 18 months that relate to nearly every area of the facility. This past March, the annual audit contained 66 deficiencies and resulted in the decision to double the number of audits being conducted at TTCC to ensure continuous forward progress in meeting compliance expectations. The department has also submitted a breach of contract requesting liquidated damages due to continued noncompliance on a critical operational issue.

## COMMUNITY SUPERVISION DIVISION

The Community Supervision Division monitors offenders placed on either parole or probation. Offenders on parole have been incarcerated and released to the community. Offenders on probation have been found guilty of a crime but have not been imprisoned. Parole and probation officers monitor offenders to ensure compliance with supervision requirements specified by the offender's assigned supervision level.

The 2012 performance audit and the 2014 follow-up audit identified two findings, one regarding offender supervision by parole and probation officers, and the other pertaining to supervisory review. To determine whether the department resolved the two findings, we tested a sample of 60 probation and parole offenders from the 70,438 offenders the department is responsible for monitoring. The sample consisted of

- 12 offenders (6 on parole and 6 on probation) who were assigned to Interactive Offender Tracking for noncompliance with the conditions of their supervision;
- 12 offenders (6 on parole and 6 on probation) who were placed on Global Positioning System (GPS) monitoring due to a sex offense conviction or having attributes of a violent nature; and
- 36 regular offenders (18 on parole, and 18 on probation).

We reviewed both TOMIS records and paper files over a six-month period, November 2016 to April 2017, to assess the department's compliance. We used this sample for both Findings 4 and 5.

**4.     Probation and parole officers did not always meet supervision requirements**

As noted in the 2012 and 2014 performance audits, probation and parole officers did not always meet supervision standards.   We noted the following problems during our current review:

- 3 of 48 required arrest checks (6%) were not performed and 1 (2%) was not performed within the required time frame;

- 1 of 48 required drug tests (2%) was not performed within the required time frame;

- 1 of 12 Vermont Assessment of Sex Offender Risk checks (8%) was not performed within the required time frame;

- 3 of 48 offenders tested (6%) did not have matching addresses in TOMIS and the paper file;

- 1 of 12 offenders (8%) was missing sex offender treatment monitoring checks;

- 4 of 48 offenders (8%) were missing required face-to-face checks; and

- 7 of 48 special condition monitoring checks (15%) were not conducted in the required time frame.

We determined that the department has not fully corrected probation and parole issues identified in the previous two performance audits and must continue to improve its monitoring capabilities.


**Recommendation**

We recommend that the department ensures probation and parole officers conduct all required monitoring activities and enter all information into TOMIS.


**Management's Comment**

We concur with the finding.  The Department of Correction has significantly changed how offenders are being managed in the community since assuming responsibility for them in 2012. The goals for the transfer of community supervision included the creation of a seamless supervision model that would foster consistency in how offenders were being managed, focus on increased accountability for offenders, provide cohesive, assessment driven prevention and intervention strategies, and streamline services that would enhance public safety.

To date, the agency has

- Updated the Probation Parole Standards of Supervision to better align with best practices;
- Established felony offender individualized case management plans;
- Implemented a validated risk /needs assessment that is utilized throughout the criminal justice community;
- Effectively enacted a swift, certain and proportionate system of graduated sanctions to hold offenders on community supervision accountable;
- Successfully leveraged partnerships that support enforcement both within and outside the agency;
- Invested heavily in staffing, training, and equipping Probation/Parole Officers to improve felon risk management in the community;
- Expanded transitional programming and treatment availability across the state;
- Focused on workforce development and employable skills training through the opening of the Mark Luttrell Transition Center in Shelby County;
- Partnered with the Department of Safety and Homeland Security to issue drivers licenses to offenders preparing for release to the community; and
- Achieved ACA accreditation of the Community Supervision division.

These accomplishments have resulted in a more robust system of accountability in both how offenders are being supervised in the community and the overall level of offender compliance with conditions of supervision. Given these improvements, it is safe to say that, despite the occasional human error, the day-to-day supervision of more than 78,000 offenders is better managed now than at any previous time.

As it relates to the specific audit finding, the department continues to seek improvements in the monitoring capabilities of parole and probation officers tasked with ensuring that offenders in the community are meeting supervision requirements. One example of enhancing officer monitoring capabilities involves recent changes to the *Standards Due Report* that have been made since the audit follow-up period concluded. The report is a weekly summary of supervision standard compliance requirements and the frequency of the requirement for each offender under parole or probation supervision. Using the new *Standards Due Report* has enhanced the ability of our community supervision officers and managers to monitor the timeliness of completion of compliance standards, such as arrest checks, drug screens, and special conditions checks, throughout the month (rather than at the end of the month).

To further strengthen offender monitoring, by 2018 a compliance rating scale will be assigned to each standard in the *Standard Due Report*. The result will be a compliance score automatically calculated for each offender every time the report is generated. This modification will allow officers, managers and other members of leadership to quickly review the compliance requirements and status for each offender under supervision in the community.

## Finding

**5.     Probation and parole supervisors did not always meet oversight requirements**

As noted in the 2012 and 2014 performance audits, supervisors did not meet the requirements for reviewing the work of probation officers.

According to the department's Policy 706.02, "Supervisory Review of Caseloads,"

- supervisors shall review all offender case records within 60 days of the offender's supervision start date, and

- closing case records reviews shall occur no later than 90 days prior to the offender's projected expiration date.

To determine if supervisors reviewed the files within the required time frames, we tested 60 probation and parole files. Within the sample of 60 case files, we identified 5 files initiated after November 1, 2016, thus requiring review by the officer's supervisor within 60 days. We found that 2 of the 5 case files had been reviewed by a supervisor within 60 days, while 2 did not contain the required initial case file review code indicating the date when the file had been reviewed, and 1 was not performed within the required time frame.

Closing Reviews

Supervisors are required to review case files no later than 90 days prior to an offender's projected expiration date. Within the same sample of 60 offender files reviewed, we identified 47 cases closed or projected to close after November 1, 2016. Of these cases, 37 had expiration dates beyond the time frame where we could assess compliance with six of these cases having lifetime supervision because they were sex offenders. Of the remaining case files, 3 did not have a closure review, 4 cases with closure reviews were conducted after the expiration date, and 3 complied with the criteria.

Annual Reviews

To determine if case files were annually reviewed as required, we tested a sample of 10 active case files out of the 961 cases TOMIS selected for supervisory review in April 2017. We found that 6 of the 10 sampled files had an initial case review code, indicating that they had been reviewed in April as required. Three of the 10 case files had not been reviewed. The 10th file had a supervisor closing code for the month reviewed.

We determined that the department has not fully corrected the issues and must continue to improve its supervisory review of parole and probation officers.

## Recommendation

The department should ensure probation and parole officers and supervisors complete case file reviews as required.

## Management's Comment

We concur with the finding. The department is currently implementing a Case Management Review (CMR) process to facilitate improvements in probation and parole managers' ability to meet oversight requirements. The goal is to support effective and efficient use of time and assets to ensure the completion of mandatory case records reviews while maintaining a robust role in supervising probation and parole officers. An integral part of the CMR process is the *Standards Due Report* discussed in Management's Comment for Finding 4.

Access to the weekly *Standards Due Report* is now providing managers with information that allows them to quickly assess the status and compliance for each officer's caseload and promptly work with officers to appropriately schedule and manage their outstanding requirements for the month. In addition, the district directors can easily discern their district's compliance at any given time during the month and follow up as appropriate with managers.

Quicker assessments of caseload status and the ability to streamline the management of outstanding caseload requirements increase the time available to perform the mandatory case records reviews. However, even a successful time saving process isn't a sufficient substitute for much needed staff increases. Consider this example. Caseload sizes are high (frequently more than 100 offenders) and managers supervising 8 or more officers may have review responsibilities for almost 1,000 offenders. The 3% casefile review protocol means that a manager is expected to complete about 360 case records reviews per year while actively managing their parole and probation officers. This is in addition to the required initial case records reviews and all closing case records reviews.