# After-Action Report

### Disturbance
### Adams County Correctional Center
### Natchez, Mississippi
### May 20 – May 21, 2012



SUBMITTED BY:

_____/s/_____           ___July 27, 2012___
**Frank Strada, Warden**       **Date Submitted**
**MDC Brooklyn**
**Reviewer-In-Charge**

SENSITIVE BUT UNCLASSIFIED

Case 3:16-cv-02267    Document 493-1    Filed 04/02/22    Page 1 of 27 PageID #: 36109

US13250

# TABLE OF CONTENTS

I.      INTRODUCTION/EXECUTIVE SUMMARY ...............1

II.     CHRONOLOGY OF EVENTS .........................4

III.    ANALYSIS OF EVENTS ...........................9

IV.     OTHER FACTORS ...............................13

V.      CONCLUSIONS .................................17

VI.     RECOMMENDATIONS .............................18

VII.    COST/IMPACT STATEMENT .......................20

VIII.   ATTACHMENTS INDEX ...........................22

SENSITIVE BUT UNCLASSIFIED

—i—

US13257

## I. INTRODUCTION/EXECUTIVE SUMMARY

The Federal Bureau of Prisons (BOP) contracts with Corrections Corporation of America (CCA) to manage and operate the Adams County Correctional Center (ACC) in Natchez, Mississippi. ACC is a low security facility for the incarceration of approximately 2,567 male inmates serving federal terms of imprisonment. All federal inmates placed in ACC are criminal aliens, and only BOP inmates are incarcerated at the facility.

On Sunday, May 20, 2012, at approximately 1:00 p.m. (CST), inmates at ACC began grouping on multiple recreation yards. At approximately 1:40 p.m., inmates initiated a disturbance that fully involved the ACC facility and its inmates. The disturbance lasted until May 21, 2012, and resulted in some significant staff and inmate injuries, to include a staff homicide, hostages, and property destruction encompassing the majority of ACC. There were no inmate escapes.

On May 25, 2012, Blake R. Davis, Assistant Director of the BOP's Correctional Programs Division (CPD), appointed an After-Action Review Team which visited the facility June 12-14, 2012. The team was assembled to identify the causal factors leading up to the incident and any issues or concerns impacting current and future BOP contracts to house federal inmates. The team included:

- Frank Strada, Warden, Federal Correctional Complex (Low), Allenwood, Pennsylvania; Reviewer-in-Charge;

- Rodney W. Chandler, Senior Deputy Regional Director, South Central Regional Office (SCRO);

- Frank Lara, Correctional Services Administrator, Correctional Services Branch, Correctional Programs Division (CPD), Central Office (CO);

- Mike Breckon, Chief, Office of Emergency Preparedness (OEP), CPD, (CO);

- Douglas Martz, Chief, Privatized Corrections Contracting, Admin Division, (CO);

- Celia Santana, Assistant Administrator, Privatization Management Branch, CPD, (CO);

**SENSITIVE BUT UNCLASSIFIED**

Page **1** of **23**

The Investigative Fund

US13259

-   Richard Hansford, Assistant General Counsel, Office of General Counsel (OGC), CO;

-   Ben Valle, Captain, FCC Oakdale, South Central Region;

-   Mark Gaytan, Intelligence Analyst, Privatization Management Branch, CPD;

-   Ernesto Gonzalez, Intelligence Officer, Sacramento Intelligence Unit (SIU);

The review team reviewed documents provided by CCA pertaining to the disturbance, including staff and inmate statements. Further, the review team conducted interviews with select staff and reviewed contract documents. (b)(7)(E)

(b)(7)(E)

The team found inconsistencies between the CCA provided written timeline and the video timeline. The team attempted to reconcile the two for an accurate timeline.

In light of the contractual relationship between the BOP and CCA, the review team defined its scope to address the following areas of review:

<u>Causation Factors</u>: Identify and describe the chronology of events, the factors that caused the disturbance at ACC.

<u>Prior Contract Management</u>: Review and analyze the BOP's contract oversight and monitoring functions at ACC prior to the disturbance to determine whether appropriate monitoring and accountability for discrepancies occurred;

<u>Prior Utilization of External Resources</u>: Review and analyze whether BOP resources outside of contract oversight and monitoring functions were utilized, or could have assisted, in avoiding this disturbance (e.g., training, intelligence sharing, resources);

<u>Future Contract Management Improvements</u>: Analyze and determine what future improvements can be made in the areas of contract management, oversight, and monitoring (e.g., staffing, policy,

**SENSITIVE BUT UNCLASSIFIED**

Page **2** of 23

on-site responsibilities) that could assist the BOP in future
management of contract facilities;

<u>Future Contract and Statement of Work Provisions</u>: Analyze and
determine what improvements can be made to the contract and
statement of work documents to assist the BOP in future
management of contract facilities.  Areas of focus include
provisions for obtaining emergency assistance, performance award
consequences, and corrective action measures for discrepancies;

<u>Analysis and Critique of Disturbance Response</u>: Analyze and
critique the actions of CCA, the BOP, and outside Law Enforcement
Agencies in response to the disturbance for the purpose of future
emergency preparedness, negotiation, and inmate management,
including post-disturbance management of the inmate population.

<u>Legal Issues</u>: Analyze legal authority in a contract corrections
setting during an emergency situation where federal inmates are
being housed.  This will assist in the development of protocols
and future improvements in the BOP's responsiveness to crisis
situations.



## II. CHRONOLOGY OF EVENTS

**March – May, 2012**

For several months prior to the disturbance, elements within the Mexican national population had been meeting openly. During these meetings an agenda was submitted to remove individual Mexican state representatives and select new representation. Inmate (b)(7)(E) was the alleged architect behind this realignment. He arrived at ACC March 30, 2012. Within weeks, Inmate (b)(7)(E) had removed the former senior representative (b)(7)(E) and assumed a leadership role with Mexican national inmates.

**May 19, 2012**

The Mexican national inmates met openly by state groups on the facility's multiple recreation yards. This was not an unusual occurrence at this particular facility; however, it was abnormal in the fact most group meetings were conducted on Sunday rather than Saturday. Preliminary information revealed the Mexican national population would select new leadership. According to the ACC incident overview, it was agreed the now unified Mexican national population would conduct a meeting, as a group under one banner on the East main recreation yard the following day. The purpose of the meeting was to elect new representatives, develop a list of demands, and present those demands to the facility administration. Should the administration refuse the list of demands, a protest in force was planned.

On the night of May 19, ACC's administration received information (b)(7)(E) that the Mexican national inmates planned to conduct large group meetings the following day.

**May 20, 2012**

As standard practice, prior to opening the East main recreation yard, an area search was conducted (b)(7)(E) (b)(7)(E) The discovery of this contraband resulted in the closing of the East main recreation yard for the remainder of the day. Upon learning of the recreation yard closure, the Mexican national inmate population assumed the former representatives had alerted the administration of their planned meeting. The inmates quickly reformulated their plan to include removal of the former representatives from the yard. During the morning activities, the warden, who was the

SENSITIVE BUT UNCLASSIFIED

US13261

administrative duty officer, was actively communicating with the inmates in an attempt to gauge the mood of the inmate population.

At approximately 11:00 a.m., inmate Salazar and several other inmate representatives approached the warden. The warden informed inmate (b)(7)(E) that the administration was aware of the planned Mexican national group meeting and a group meeting of that nature and size (approximately 1,700) would not be allowed.

Inmate (b)(7)(E) stated the meeting was required as he had relinquished his position as the Mexican national representative, and there were other internal unresolved issues within the group. The Warden consulted with the shift captain (equivalent to a BOP operations lieutenant) who informed him the only abnormal occurrence was that the noon meal was lightly attended.

Following the meeting with inmate (b)(7)(E) the warden summoned the SIS lieutenant, chief of security (equivalent to a BOP captain), the acting investigator (equivalent to a BOP SIA), the security threat group (STG) officer (equivalent to a BOP SIS Technician), and the special operations response team (SORT) lieutenant to report to the institution.

At approximately 12:00 p.m., inmates were observed grouping on the various recreation yards. In addition, approximately twenty inmates escorted an inmate to the special housing unit, informing staff he could not stay on the yard. The After-Action Team can only conclude the inmates began to execute their plan to remove all former representatives off of the yard.

At approximately 1:00 p.m., large inmate groupings were observed on multiple recreation yards. The administration perceived these groupings to be the result of the administration's denial of the larger group meeting the inmates planned for later that day.

At approximately 1:33 p.m., the institution called for (b)(7)(E)
(b)(7)(E)

At approximately 1:40 p.m., large groups of inmates were observed running toward the west end of the facility. (b)(7)(E)
(b)(7)(E)



(b)(7)(E)

Case 3:16-cv-02267     Document 493-1     Filed 04/02/22     Page 8 of 27 PageID #: 23316

US43263



At approximately, 4:56 p.m., the staff members injured on the roof of H-J building were extracted. At 5:12 p.m., one staff member was transported via air-evacuation to a local hospital. The staff member was pronounced dead at the local hospital at 6:08 p.m. The other staff member was transported via ambulance.

At approximately 5:00 p.m., one injured staff hostage and one injured inmate were extracted through (b)(7)(E) and at 5:19 p.m., the staff member was transported by EMS to a local hospital for treatment. At approximately 5:37 p.m., the inmate was transported to a local hospital. Shortly thereafter, the other staff member who had been assaulted on the rooftop of E-Unit was extracted and did not require outside medical treatment.

**SENSITIVE BUT UNCLASSIFIED**



At approximately 8:37 p.m., the compound was secured and all staff hostages were accounted for. Approximately 300 inmates remained on the E-Unit recreation yard under the control of the tactical teams.

At 10:40 p.m., BOP SORT from FCC Pollock arrived and reported to the staging area.

**May 21, 2012**

At approximately 12:05 a.m., two additional inmates were discovered with injuries and were escorted to R&D. One was transported to a local hospital for treatment via air evacuation, and the other inmate was transported via ambulance.

At approximately 2:42 a.m., all remaining inmate participants had been searched, removed from the compound, and escorted back to their housing assignments.

At approximately 3:00 a.m., BOP SORT from FCC Beaumont arrived and reported to the staging area.

SENSITIVE BUT UNCLASSIFIED

US13265

At approximately 4:42 a.m., count was cleared with all inmates accounted for. The Incident Management Team transitioned from active engagement to institution lock-down operations.

## III. ANALYSIS OF EVENTS

The After-Action Review Team identified and analyzed the following contributing factors:

### A. Pre-Disturbance Decisions

While the inmates made multiple demands, the focal point of the disturbance was based upon an internal power struggle among the approximate 1,700 Mexican national inmates incarcerated at ACC. There were several staff decisions and actions occurring shortly before the disturbance, and shortly after it began, which may have been contributing factors.

- On March 30, 2012, inmate (b)(7)(E) (b)(7)(E) arrived at ACC. He was sentenced for Possession with Intent to Distribute Cocaine with a projected release date of June 8, 2014. Inmate (b)(7)(E) is a Mexican national inmate from the Mexican state of Chihuahua.

- According to ACC's Incident Overview, within weeks of his arrival, inmate Arredondo allegedly manipulated the Mexican national inmate population to gain control and influence. Additionally, he was allegedly able to convince the Mexican national population that the current Mexican national leaders were cooperating with the administration;

- On May 19, 2012, the administration learned approximately 1,700 Mexican national inmates planned to conduct a group meeting the morning of May 20, 2012;

- On the morning of May 20, 2012, staff conducting a routine area search of the East main recreation yard discovered hard contraband in the form of (b)(7)(E) resulting in the closure of the East main recreation yard;

- On May 20, 2012, the warden spoke with inmate (b)(7)(E) whom ACC documented as the Mexican national leader. During the discussion the warden conveyed to inmate (b)(7)(E) the Mexican national population would not be allowed to conduct a group meeting of that magnitude;

**SENSITIVE BUT UNCLASSIFIED**

Page **9** of **23**

–  On May 20, 2012, following the discussion with inmate
   (b)(7)(E)      the warden recalled the chief of security, SIS
   staff and the SORT commander;

–  On May 20, 2012, at approximately 2:00 p.m., the warden and
   chief of security authorized staff with (b)(7)(E)
   (b)(7)(E)

   **B.  Intelligence:** A review of the intelligence operations at
   ACC prior to November 2011, revealed (b)(7)(E)
   (b)(7)(E)

**SENSITIVE BUT UNCLASSIFIED**

US13267
Case 3:16-cv-02267    Document 493-1    Filed 04/02/22    Page 12 of 27 PageID #: 26120

(b)(7)(E)



**SENSITIVE BUT UNCLASSIFIED**

Case 3:16-cv-02267   Document 493-1   Filed 04/02/22   Page 13 of 27 PageID #: 26121

US13268



(b)(7)(E)

**SENSITIVE BUT UNCLASSIFIED**

Page **12** of **23**

US13269

Case 3:16-cv-02267    Document 493-1    Filed 04/02/22    Page 14 of 27 PageID #: 26122



**IV. OTHER FACTORS** - The After-Action Review Team identified the following additional areas as relevant, although not directly related to causing the disturbance.

    **A. Prior Contract Management** - The After-Action Review Team reviewed all available oversight and monitoring documentation. Documentation reviewed revealed, since contract award, the available oversight and monitoring tools have been well utilized to document ACC operations under the contract. The After-Action Review Team reviewed the following materials:

- Pre-Notice to Proceed Inspection Report and contractor's response;

- All four BOP PRD Contract Facility Monitoring (CFM) Reports and the contractor's responses;

- Six BOP Six Month Oversight Summary Reports;

- 14 BOP Notices of Concern and the contractor's responses;

- Three CCA Quarterly Quality Control Program Audits;

- The ACA Accreditation Audit Report;

- The JCAHO Accreditation Quality Report;

**SENSITIVE BUT UNCLASSIFIED**

- The CCA-FSC Annual Operational Audit;

- ACC Monthly Staffing Level Reports for 14 months;

- Deductions since contract award; and

- The two most recent Annual Partnering Workshop Reports.



**SENSITIVE BUT UNCLASSIFIED**

Case 3:16-cv-02267    Document 493-1    Filed 04/02/22    Page 16 of 27 PageID #: 26124

US13271

Based on the review of contract oversight and monitoring documents, the team determined appropriate monitoring and accountability of contract deficiencies has occurred.

**B. Legal Issues – The** BOP's contract with CCA contains provisions requiring the contractor to maintain procedures for responding to institution emergencies. The contract and statement of work between the BOP and CCA define the term "emergency" in a manner that clearly contemplates the type of disturbance experienced at ACC. Specifically, the contract defines "emergency" as "any significant disruption of normal institution procedure, policy or activity caused by inmate disturbances, work or food strikes, food borne illness, escapes, fires, natural disasters, employee strikes or work stoppages, or other serious incidents." (See attachments 01-Contract Documents and CCA & BOP Contract #DJB1PC010, part 1, Page 15.) The CCA technical proposal references the contractor's plans for using:

- Special Operations and Response Team (SORT);
- Intervention Equipment (i.e., weapons, munitions, chemical agents, etc.);
- Use of Force; and
- Written agreements with the appropriate state and local authorities for assistance.

CCA's technical proposal specifically states, "The facility shall have written agreements with the appropriate state and local authorities that allow the facility to make requests for assistance in the event any emergency incident would adversely affect the community." CCA had entered into an Inter-Local Cooperation Agreement with the Adams County Sheriff's Department in compliance with their technical proposal. (See attachment Inter-Local Cooperation Agreement by and between Adams County Sheriff's Department and CCA, dated June 16, 2011.) The agreement required ACC to immediately notify the Adams County Sheriff's Department in the event of an escape or a disturbance at ACC that staff could not contain; (b)(7)(E)
(b)(7)(E)
(b)(7)(E) Further, the agreement stated that during the course of any cooperative effort between ACC and the Adams County Sheriff's Department, personnel of each organization would recognize the knowledge, jurisdiction, and procedures of each other within their own respective areas of responsibility.

(b)(7)(E)

**SENSITIVE BUT UNCLASSIFIED**

US13272

(b)(7)(E)
(b)(7)(E)
The After-Action Review Team requested a copy of any written agreements between CCA and the State of Mississippi that would address any state response to an institution emergency. ACC indicated that no written agreements with the MSHP or the State of Mississippi to provide procedures for the use of state resources in response to an emergency situation were in place. The role of the MSHP inside the institution, to include appropriate use of less than lethal force and lethal force, was not clearly defined.

ACC had deployed less than lethal force and were prepared to use lethal force if needed. ACC was authorized by the contract to utilize use of force that was "consistent with all applicable Federal and state laws and BOP Use of Force Standards." (See Attachments 01-Contract Documents and CCA Technical Proposal to BOP Solicitation, pages 21.) Further, the State of Mississippi had authorized CCA staff to use "non-deadly force" as reasonably necessary "to prevent or quell a riot." (See attachment-Committee Substitute for Senate Bill No. 3175", effective April 21, 2008.- The State of Mississippi also authorized CCA staff to "use firearms or other deadly force except as a last resort when reasonably necessary to prevent the commission of a violent felony, to prevent the escape of a convicted felon from custody, or to defend the officer or any other person from imminent danger of death or serious bodily injury." (See attachment Mississippi Senate Bill 3175.)

(b)(7)(E)

**SENSITIVE BUT UNCLASSIFIED**

US13273
Case 3:16-cv-02267    Document 493-1    Filed 04/02/22    Page 18 of 27 PageID #: 26126

## V. CONCLUSIONS

For the purpose of this review, the Conclusion Section is divided into two parts.  The first part provides concluding comments regarding the disturbance's causation and contractor's immediate response.  The second section provides concluding comments regarding the BOP's contractual responsibilities.

### A. Disturbance

After a review of all documentation pertaining to this incident, interviews with select staff, and a review of applicable policies and procedures, the After-Action Review Team concluded the specific disturbance can be directly attributed to actions taken by the administration leading up to the event.

ACC administration did not grasp the severity and degree of the Mexican national inmates' intent to orchestrate a meeting with approximately 1,700 Mexican national inmates and to escalate the situation to include violence toward staff if their demands were not met.  Had the ACC administration understood the inmates' intentions, a preventative lock down could have been initiated.

(b)(7)(E)



**SENSITIVE BUT UNCLASSIFIED**

(b)(7)(E)

### B. Contract Monitoring

After a thorough review of all documentation pertaining to oversight and contractual responsibility, interviews with staff, and a review of applicable policies and procedures, the After-Action Review Team concluded that oversight staff used tools available to monitor contractor performance and initiate appropriate adverse actions as needed. However, follow-up to ensure the establishment of agreements between the contractor and all outside agencies identified in the contractor's Technical Proposal did not occur.

The After-Action Review Team believes possible changes should be explored to expand oversight/monitoring techniques and implementation of enhanced consequences when unacceptable performance areas are identified and persist. Additionally, further clarification of the state and local law enforcement's ability to legally assist during these types of events and establishment of response protocols will greatly assist the agency in future similar situations. The specific ideas are outlined in the recommendation section of the report.

## VI. RECOMMENDATIONS

Through the course of the review, several areas of concern were identified requiring immediate attention. Additionally, many of the following recommendations may involve revising existing and future contracts.

A. Consider increasing oversight monitoring requirements/check lists/QAP (BOP Quality Assurance Plan) to include monitoring of contractor's emergency preparedness procedures.

B. Update the BOP's emergency plans to include identifying the closest Bureau resources to respond to private facilities during an emergency situation.

C. Consider implementing stronger staffing and training requirements for the intelligence office in existing and future contracts. Consider enhancing intelligence function requirements to ensure intelligence operations at private

**SENSITIVE BUT UNCLASSIFIED**

Page **18** of **23**

facilities adequately compliment the BOP's intelligence initiatives.

D.  Consider strengthening contract language in the area of emergency preparedness to include Incident Command System, tactical plans, (b)(7)(E)

(b)(7)(E)

E.

F.  Recommend ACC staff use their Shift Activity Report for staff to document and report signs of discord or their observations among the inmate population to the SIS.

G.  Recommend ACC foster team building, for example, the SIS can prepare training lesson plans to educate staff on the proper procedures for recognizing and reporting suspicious inmate behavior, (b)(7)(E)
(b)(7)(E)

H.  Recommend the contractor strengthen staff and inmate communication.  The contractor reported the inmates stated they only wanted to talk with the administration.

I.  Recommend the contractor use the Automated Inmate Management System (AIMS) as prescribed by the contract.

J.  (b)(7)(E)

K.  Consider adding minimum contract requirements for (b)(7)(E)
(b)(7)(E)

L.

M.  Consider reviewing state and local law enforcement's legal authority to enter a private facility when responding to significant institution events.  Specifically, review the

**SENSITIVE BUT UNCLASSIFIED**

Case 3:16-cv-02267    Document 493-1    Filed 04/02/22    Page 21 of 27 PageID #: 26129

US13276

The Investigative Fund

state and local law enforcement's legal ability to enter a
private facility in order to prevent serious injury or loss
of life of federal inmates and contractors.

N. The contractor should consider strengthening inmate
accountability procedures by (b)(7)(E)

(b)(7)(E)

O.

## VII. COST/IMPACT STATEMENT

**Instructions:** The following impact statement is to be completed
as a required element of all After-Action Reports regarding major
incidents occurring at institutions. All amounts must be clearly
labeled as estimates or actual final figures. When major portions
of the impact statement are based on estimates, an amended impact
statement must be filed once more accurate cost/impact information
is available. Prepare separate forms for each institution or
regional office impacted (i.e., multiple institutions sending SORT
teams).

Reporting Institution: ACC (CCA Business Manager)

Incident Site: ACC

Incident: Disturbance/Staff Homicide

Incident Dates: Sunday, May 20, 2012 through
Monday, May 21, 2012

**Overtime:**

Cost Center            Hrs   Cost

**Contractor Costs for May:**
TDY Staff Services   - $18,577.24

**SENSITIVE BUT UNCLASSIFIED**

Page **20** of **23**

**BOP Costs to Date:**
　　　　SORT/DCT　- $3,775.24
　　　　After Action Team　- $10,080.83
　　　　Transportation Out　- $852.12
　　　　Total　　　$14,708.19

**Facilities Damage/Cost Impact:** $500,000

Facilities damage/cost impact should list specific buildings, areas, and repair costs for each.  Temporary emergency security features should also be accounted for (temporary fences, towers, etc.).

Physical plant, Food, Equipment/Supplies, and Inventory

**Estimated Cost to Adams County**　　　Total:　$518,959.26

**Medical Treatment Cost Statement:**

| Cost Center | Staff Injuries | Inmate Injuries |
|---|---|---|
| BOP | None | Three (3) |
| Non-BOP | Pending | |
| Totals | $ Pending | |

**Comments (number of staff/inmates hospitalized, etc.):**

- At the submission of this report CCA currently has 33 staff members on OWCP.  A cost assessment for staff injuries could not be correctly calculated at this time.

- There was one staff fatality.

**Transfers Cost Statement:**

Number of inmates transferred (attach bus manifests):
- At the submission of this report a total seventy three (73) inmates have been temporarily placed in Bureau facilities.  A total of three (3) inmates have been permanently transferred to Bureau of prisons facilities.

**Total Cost ACC Disturbance/Staff Homicide** $ 518,959.26

SENSITIVE BUT UNCLASSIFIED

US13278



**BOP Costs to Date:**
         SORT/DCT  - $3,775.24
         After Action Team  - $10,080.83
         Transportation Out  - $852.12
         Total     $14,708.19

**Facilities Damage/Cost Impact:** $500,000

Facilities damage/cost impact should list specific buildings, areas, and repair costs for each.  Temporary emergency security features should also be accounted for (temporary fences, towers, etc.).

<u>Physical plant, Food, Equipment/Supplies, and Inventory</u>

**Estimated Cost to Adams County**     Total: $518,959.26

**Medical Treatment Cost Statement:**

| Cost Center | Staff Injuries | Inmate Injuries |
|---|---|---|
| BOP | None | Three (3) |
| Non-BOP | Pending | |
| Totals | $ Pending | |

**Comments (number of staff/inmates hospitalized, etc.):**

- At the submission of this report CCA currently has 33 staff members on OWCP. A cost assessment for staff injuries could not be correctly calculated at this time.

- There was one staff fatality.

**Transfers Cost Statement:**

Number of inmates transferred (attach bus manifests):
- At the submission of this report a total seventy three (73) inmates have been temporarily placed in Bureau facilities.  A total of three (3) inmates have been permanently transferred to Bureau of prisons facilities.

**Total Cost ACC Disturbance/Staff Homicide** $ 518,959.26

**SENSITIVE BUT UNCLASSIFIED**

Page **21** of 23

US13278

VIII. ATTACHMENTS INDEX

01 - Contract Documents

A - CCA & BOP Contract #DJB1PC007

02 - Contract Monitoring Documents

A - Pre-Notice to Proceed Inspection Report and contractor's response

B - BOP-PRD Six-Month Contract Facility Monitoring (CFM) Reports

C - BOP Six-Month Oversight Summary Reports

D - BOP Notices of Concerns (NOC)

E - CCA Quarterly Quality Control Program Audits

F - ACA Accreditation Report

G - JCAHO Accreditation Quality Report

H - CCA-FSC Annual Operational Audit

I - ACC Monthly Staffing Level Chart

J - Deduction List Summary 2009-08 thru 2012-05

K - Annual Partnering Workshop Reports

03 - Operating Policies and Procedures

A - ACC Policy and Procedures Manual, Emergency Plans

04 - Mutual Aid Agreements:

A - Inter-local Cooperation Agreement between Adams County Sheriff's Department and CCA

05 - Incident Response Documents

SENSITIVE BUT UNCLASSIFIED

A -   Incident Overview ACC 2012-05-20

B -   CCA Report of Incident (583) 2012-05-23

C -   ACC Staff Memorandums

D -   ACC Command Center Chronology

E -   CCA Command Center Chronology

F -   BOP-CPD Incident Command Post Chronology

G -   SCR Incident Command Post Chronology

06 - Incident Report Documents

A -   Mississippi Senate Bill 3175.

**SENSITIVE BUT UNCLASSIFIED**